UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

CENTRAL DIVISION

| | | |
|---|---|---|
| In re UNITI GROUP INC. SECURITIES LITIGATION | ) ) ) | Master File No. 4:19-cv-00756-BSM |
| | | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) ) | <u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u> |
| ALL ACTIONS. | ) ) ) | <u>DEMAND FOR JURY TRIAL</u> |

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND SUMMARY OF THE FRAUD ..................................... 2

II.  JURISDICTION AND VENUE .......................................................... 12

III.  PARTIES ...................................................................................... 12

IV.  ADDITIONAL PARTICIPANTS ........................................................ 15

V.  BACKGROUND TO THE SPIN-OFF AND DEFENDANTS'
     KNOWLEDGE IT VIOLATED WINDSTREAM'S DEBT COVENANTS ........ 18

    A.  Company Background ...................................................... 18

    B.  The Decision to Spin-Off Uniti and Execute a Sale-Leaseback
        Transaction ..................................................................... 19

    C.  Windstream Services' Indenture Prohibits Sale-Leaseback
        Transactions .................................................................... 23

    D.  Windstream, with Defendants' Help, Gains Regulatory
        Approval of the Spin-Off and Conceals that the Spin-Off
        Violated the Indenture's Prohibition on Sale-Leaseback
        Transactions .................................................................... 30

    E.  Windstream, with Defendants' Help Finalizes the Structure of
        the Spin-Off Including the Terms of the Master Lease ................... 38

    F.  Defendants Finalize the Spin-Off ...................................... 41

    G.  Defendants Also Conceal that the Master Lease Was Not a
        True Lease, but a Financing in Disguise ........................... 44

VI.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING
     STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ............... 50

    A.  Uniti Begins Operations Following the Spin-Off and
        Defendants Conceal That the Master Lease Violated the
        Terms of the Indenture ..................................................... 51

        1.  March 26, 2015 – Filing of the Form 8-K and
            Information Statement ........................................... 51

        2.  April 24, 2015 Completion of Spin-Off ................... 56

**Page**

3.       June 10, 2015 – REITWeek 2015 .......................................... 56

4.       July 2, 2015 – Registration of 8.25% Notes ........................ 57

5.       August 13, 2015 – 2Q15 Results .......................................... 57

6.       November 14, 2016 – 3Q16 Results ..................................... 59

B.    Materialization of the Risk and Defendants' Continued
      Materially False and Misleading Statements and Omissions........... 62

1.       August 3, 2017 – 2Q17 Results and Windstream's
         Announcement of Elimination of Dividend......................... 62

2.       August and September 2017 – Hedge Fund Increases
         Position in Uniti Notes ...................................................... 63

3.       September 25, 2017 – Noteholder Aurelius Challenges
         the Spin-Off as a Violation of the Indenture....................... 65

4.       October 4, 2017 – Deutsche Bank Leveraged Finance
         Conference ......................................................................... 66

5.       October 2017 –Aurelius Initiates Litigation Against
         Windstream and Windstream Responds with
         Counterclaims ................................................................... 69

6.       November 2017 – 3Q17 Results and Uniti's Response
         to Windstream Notice of Default ......................................... 69

7.       December 4, 2017 – UBS Global Media and
         Communications Conference................................................. 74

8.       March 1, 2018 – 4Q17 and Full Year 2017 Results ............. 74

9.       Spring 2018 ...................................................................... 75

10.      September 6, 2018 – Bank of America Merrill Lynch
         2018 Media, Communications & Entertainment
         Conference ......................................................................... 75

11.      October 3, 2018 – Deutsche Bank Leveraged Finance
         Conference ......................................................................... 76

**Page**

12.   November 1, 2018 – 3Q18 Results ........................................ 76

13.   February 15, 2019 –Judge Rules in Favor of Aurelius, Finding that the Spin-Off and the Master Lease Transaction Breached the Indenture; Uniti Stock Tumbles in Response ............................................................. 79

14.   March 4, 2019 – Notification of Late Filing ........................ 81

15.   March 2019 – Full Year 2018 Results; Defendants Continue to Conceal that the Master Lease was a Financing ............................................................................... 82

16.   May 9, 2019 – 1Q19 Results ................................................ 86

17.   May 14, 2019 – JPMorgan Global Technology, Media and Communications Conference ......................................... 87

18.   May 29, 2019 – Cowen Technology, Media & Telecom Conference ............................................................. 88

19.   June 5, 2019 – REITWeek 2019 .......................................... 88

20.   June 20, 2019 – Wells Fargo Securities 2019 5G Forum .................................................................................... 90

21.   June 24, 2019 – Defendants Announce $300 Million Note Offering, Admitting that External Capital was Necessary for Uniti to Navigate Windstream's Bankruptcy ........................................................................... 92

VII.   POST-CLASS PERIOD REVELATIONS ............................................... 92

VIII.   ADDITIONAL EVIDENCE OF SCIENTER ........................................... 94

IX.   LOSS CAUSATION ...................................................................... 99

A.   Partial Disclosure – August 2017 ................................................ 101

B.   Partial Disclosure – September 25, 2017: Aurelius Notice of Default ........................................................................................... 102

4848-2207-4295.v23

**Page**

C.      Partial Disclosure – February 15, 2019: Judge Furman's Findings of Fact............................................................. 104

D.      Partial Disclosure – June 24, 2019: $300 Million Note Offering ......................................................................... 105

X.      APPLICABILITY OF THE PRESUMPTION OF RELIANCE: *AFFILIATED UTE* AND FRAUD ON THE MARKET PRESUMPTION......... 108

XI.     INAPPLICABILITY OF STATUTORY SAFE HARBOR............................... 110

XII.    CLASS ACTION ALLEGATIONS.................................................... 111

XIII.   CLAIMS FOR RELIEF.................................................................... 113

XIV.    PRAYER FOR RELIEF .................................................................. 118

XV.     JURY DEMAND............................................................................ 119

Lead Plaintiffs Zhengxu He, Trustee for the He & Fang 2005 Revocable Living Trust ("He"), Steamfitters Local 449 Pension Plan ("Local 449"), Wayne County Employees' Retirement System ("Wayne County ERS"), and David McMurray, on behalf of himself and as sole beneficiary of the David McMurray R/O IRA ("McMurray," together, "Lead Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned counsel, hereby bring this Consolidated Amended Class Action Complaint (the "Complaint") against Uniti Group Inc. f/k/a Communications Sales & Leasing, Inc. ("Uniti," "CS&L" or the "Company"), Chief Executive Officer ("CEO") Kenneth A. Gunderman ("Kenny Gunderman"), and Chief Financial Officer ("CFO") Mark A. Wallace ("Wallace" collectively, "Defendants").[1]  The allegations herein are based on Lead Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Co-Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Uniti and Windstream Holdings, Inc. ("Windstream Holdings," as further defined herein); securities analysts' reports and advisories about the Company and Windstream Holdings; press releases and other public statements issued by the Company and Windstream Holdings; media reports about the Company; trial exhibits and testimony in relevant litigation; and consultation with an expert in the areas of loss causation and damages.  Co-Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants.  Lead Plaintiffs believe that substantial

---

[1]    Kenny Gunderman and Wallace are collectively referred to as the "Individual Defendants."

4848-2207-4295.v23

additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Lead Plaintiffs allege as follows:

## I.      INTRODUCTION AND SUMMARY OF THE FRAUD

1.     This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of Uniti during the period from April 24, 2015 to June 24, 2019, inclusive (the "Class Period"), and were damaged thereby. The action is brought against Uniti and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.     Defendant Uniti was formed on April 24, 2015, following the spin-off from its then-parent company Windstream Holdings (the "Spin-Off"). The origins of the Spin-Off date back to at least 2013, when Windstream Services, LLC – a then-publicly traded subsidiary of Windstream Holdings – found itself in a financial predicament.

3.     Windstream is a telecommunications provider that owns and operates wireless telecommunications networks, but, by 2013, its wireless networks desperately needed substantial investment to remain competitive. Windstream, however, lacked the cash needed to make this investment itself, in part, because Windstream's investors were reliant upon, and expected, a steady dividend stream.

4.     To assess its options and find a solution to the problem, Windstream turned to its financial advisors at Stephens, Inc. ("Stephens") – and specifically to a banker at Stephens named Kenny Gunderman.

5.     Defendant Kenny Gunderman proposed a novel way to solve Windstream's problems: create and spin-off a Real Estate Investment Trust ("REIT") owning Windstream's assets.  Although telecommunications network assets are not traditional REIT-like assets, the Internal Revenue Service ("IRS") had recently issued a ruling that was interpreted as opening the door for REIT status to be applied to such non-traditional assets.

6.     The transaction Defendant Kenny Gunderman and Windstream's advisors came up with contemplated that Windstream Holdings would create a REIT (*i.e.*, Uniti), sell its aging telecommunications assets to it, and then lease them back – which would allow Windstream (through its operating subsidiaries) to use and operate those assets as before. The difference was that by selling the assets to Uniti, Windstream would receive in return significant cash and debt relief through the sale of those assets.   And even better, Windstream had complete control over the transaction and could structure the transaction, and set the terms, that Windstream alone deemed suitable.

7.     Structuring the transaction was complex, however, because Defendants had to overcome a number of complicated legal and regulatory hurdles.

8.     First, the indenture governing certain unsecured notes (the "Notes," as further defined herein) that Windstream had previously issued (the "Indenture") contained restrictive covenants that specifically prohibited Windstream Services, or its operating subsidiaries, from selling any of Windstream's network assets to an entity and then leasing them back.  If such covenants were breached, noteholders representing 25 percent or more of the aggregate principal amount of the Notes could seek to accelerate payments on the Notes, a figure in the hundreds of millions of dollars that could potentially, trigger a Windstream bankruptcy.

- 3 -

9.      Second, in addition to obtaining the necessary regulatory approvals from various state agencies and the IRS, Windstream had to be sure that the lease it ultimately would enter into with Uniti (the "Master Lease") appeared to be a "true lease" and not a financing.  If the "Lease" entered into was really a financing in disguise, Windstream risked violating covenants in its Indenture.  And if Windstream filed for bankruptcy and attempted to recharacterize the lease as a financing, Uniti's "rent" payments from Windstream could cease, spelling financial ruin for Uniti.

10.     Internal emails reveal that Windstream and its executives were mindful of these restrictions in the Indenture at the time they contemplated the Spin-Off – which is why they settled on a structure for the transaction *that appeared* to comply with the restrictive covenants in the Indenture.

11.     Specifically, as laid out in an April 2013 email, discussed in greater detail herein, Windstream's executives decided to create a holding company – *i.e.*, Windstream Holdings which would be the entity that would technically "lease" the spun-off telecommunications assets from Uniti).   Since Windstream Services and its operating subsidiaries – not the newly created holding company – were the only Windstream entities prohibited from engaging in sale-leaseback transactions using this "Holdco" structure could allow Windstream and its operating subsidiaries to "lease" the assets without actually signing the Master Lease.

12.     In the months that followed, Windstream and its advisors – including the Defendants – worked to execute the transaction. Internal documents and Board meeting minutes reveal that John P. Fletcher ("Fletcher") (who at the time served as General Counsel

for **both** Windstream and Uniti) and Defendant Kenny Gunderman were actively involved in structuring the transaction.

13.     Indeed, the Master Lease was specifically structured with the restrictions of the Indenture in mind – and there is no dispute that the Master Lease was not negotiated at arms' length, as Fletcher has since admitted.  Defendant Kenny Gunderman and Fletcher were on both sides of the Master Lease negotiation, and other relevant parties were seriously conflicted at the time of the transaction, including Uniti's then-CEO Anthony Thomas ("Tony Thomas" or "Thomas") (who would later become Windstream's CEO) and Windstream's then-SVP Robert "Bob" Gunderman (who is Kenny Gunderman's brother, and would later become Windstream's CFO).  These conflicts allowed Windstream to settle on terms in the Master Lease that would benefit it.

14.     By March 2015, Windstream and Defendants finalized the Spin-Off and, on April 24, 2015, the Spin-Off was completed and the Master Lease signed.  As a result of this transaction, Windstream became Uniti's largest customer, accounting for at least two-thirds of Uniti's annual revenues every year since the Spin-Off.  To put it plainly, Uniti was financially dependent on Windstream for the majority of its revenue.

15.     At the time of the Spin-Off and in the months that followed, Windstream's and Uniti's management, including Defendants Kenny Gunderman and Wallace, settled on a public relations strategy aimed at concealing the known risk that the Spin-Off violated the Indenture.  Internal documents from August 2014 and April 2015 reveal that Fletcher and Defendants Kenny Gunderman and Wallace were advised to hide the truth if ever asked why Windstream Holdings – rather than Windstream Services – signed the Master Lease.  The

- 5 -

goal, of course, was to conceal that the Spin-Off was an attempt to conceal a prohibited transaction – and the Master Lease was specifically designed to aid that deception.

16.    And deflect they did. Indeed, throughout the Class Period, Defendants repeatedly concealed that the Spin-Off violated the Indenture by hiding from the market and investors: (i) the material risk that the Spin-Off was a prohibited sale-leaseback transaction that violated the Indenture, and (ii) the true extent of the risk that the Master Lease was not a true lease, but rather a carefully disguised financing arrangement that: (a) violated various provisions of the Indenture (including debt and asset sale restrictions); (b) jeopardized Uniti's existence as a REIT; and (c) put Uniti and its investors at materially greater financial risk in the event Windstream filed for bankruptcy.

17.    These risks were well known to Defendants, but never disclosed by them to the market. Defendants' failure to disclose the true nature of the Master Lease and Spin-Off concealed risks related to the Master Lease, and Uniti's main source of revenue, depriving investors of the ability to properly analyze the Company's current state of affairs and prospects, and rendering Defendants' Class Period statements false and misleading.  It was foreseeable that the value of Uniti's securities would be adversely affected when the truth about the propriety of the Spin-Off and Master Lease was revealed, and the concealed risks materialized.

18.    The truth and concealed risks materialized through a series of disclosures beginning in August 2017 when Windstream eliminated its dividend and rumors began swirling that the Spin-Off violated Windstream's Indenture.  On September 25, 2017, after the close of the market, Windstream filed a Report on Form 8-K disclosing that, on

September 22, 2017, it had received a "purported notice of default" from a noteholder that claimed to hold greater than 25% in aggregate principal amount of Windstream's 6 3/8% Senior Notes due 2023 (later disclosed as Aurelius Capital Master, Ltd. ("Aurelius")) alleging that the transfer of certain assets and the subsequent lease of those assets in connection with the Spin-Off constituted a sale and leaseback transaction which did not comply with the sale and leaseback covenant under the Indenture.

19.    Windstream's dividend elimination, the rumors the Spin-Off violated the Indenture, and the resulting Notice of Default from Aurelius, clobbered the price of Uniti's securities.  Uniti's stock price declined 40% between August 3, 2017 and September 27, 2019 as a result of this information.

20.    Over the next few months, litigation followed (*U.S. Bank N.A. v. Windstream Servs., LLC*, No. 17-cv-07857-JMF (S.D.N.Y.) (the "Aurelius Litigation")) – and all the while Defendants continued to conceal that the Master Lease violated Windstream's Indenture as well as the extent of the effects of the concealed risk that the Spin-Off was a breach of the Indenture, which would immediately accelerate payment on the Notes, requiring Windstream to pay hundreds of millions of dollars.

21.    Uniti failed to address the disclosure of the receipt, by its largest customer Windstream, of a notice of default for nearly six weeks.  But when Uniti finally spoke, rather than disclosing the truth, Defendants Kenny Gunderman and Wallace continued to perpetuate the fraud by denying the Master Lease violated the Indenture and downplaying the magnitude of the risk of Windstream defaulting on the Master Lease.  At a November 7, 2017 investor conference, Gunderman assured the market that the risk of a Windstream

- 7 -

default would never materialize: "***We've looked very, very closely at the legal claim, and we're very confident that the legal arguments are on Windstream's side. So [we] think that that's going to resolve itself*** . . . ."  At a November 29, 2017 presentation, Wallace emphasized that Uniti had reviewed the lease and concluded that Windstream would receive a favorable outcome in the Aurelius Litigation:

> So we have a ***very high degree of confidence*** that Windstream is going to prevail in the litigation. We have a ***very high degree of confidence*** that they're going to have [a] favorable outcome to this. And in many case, I would say that we think that there's a ***good likelihood*** that it might be resolved in a relatively short period of time ***favorably*** for Windstream. . . . We've gone back and ***done a deep dive*** into it. We have every confidence in the strength of our lease agreement that we have been articulating from the very first days that we were spun off. So we have ***tremendous confidence*** in the lease. We have confidence in the lease protections, ***the way the lease was structured*** as a master lease. And so I think to your point, even in a downside scenario, no matter how low the probability, I think it is low, I think that we are – I think we're as protected as any landlord can be. And so I think the Windstream lease[] was ***well-crafted***, and we have [a] very high degree of confidence that Windstream will continue to make payments and will continue to receive an uninterrupted lease stream.

22.    On December 4, 2017, Defendant Wallace again stressed that Uniti was "***highly confident*** that Windstream [would] have a favorable outcome in all the litigation."

23.    Buoyed by Defendants' positive statements and omissions concerning the Aurelius Litigation, Uniti's stock price reversed its decline. From November 7, 2017 through February 15, 2019, Uniti's stock price increased by more than 14%, from $16.53 to $19.98.

24.    But the truth about the Master Lease and the concealed risk it violated the Indenture further materialized on February 15, 2019, when, following a multi-day bench trial and the submission of substantial evidence, Judge Jesse Furman of the Southern District of New York ruled that the Spin-Off and signing of the Master Lease breached the Indenture.

- 8 -

The court concluded that "[Windstream's] financial maneuvers – and many of its arguments [in the Court proceeding] – are too cute by half." The court ruled, among other things, that the fact that the Windstream operating subsidiaries used and paid for all their former assets "walks like a lease and talks like a lease . . . because it is a lease." The court also held that Windstream was "judicially estopped from denying that the [Windstream Operating Subsidiaries] 'lease' the [assets transferred to Uniti]." With this strong rebuke, the court declared over $300 million of Windstream 6 3/8% notes due and payable.

25.     This news, which disclosed the true nature of the Master Lease and also was, in part, a materialization of the risk concealed by Defendants' material misrepresentations and omissions alleged herein, *caused Uniti's stock price to plummet more than 37%, from $19.98 per share on February 15, 2019 to $12.51 per share on February 19, 2019*. The entirety of the decline can be attributed to the ruling in the Aurelius Litigation, as there was no other material, Company-specific news disclosed to the market that day. Over the next three days, Uniti's stock price declined even further, to a closing value of $9.23 on February 22, 2019.

26.     Judge Furman's decision – and the $300 million judgment – had a significant negative impact on Windstream's ability to operate as a going concern. On February 25, 2019, Windstream Holdings (and all its subsidiaries) filed for Chapter 11 bankruptcy protection. As a result of Windstream's bankruptcy, Uniti's stock price declined more than 9% over the three trading days following its filing.

27.     The Aurelius Litigation pushed Windstream into bankruptcy by revealing the true nature of the Spin-Off and Master Lease as a prohibited sale-leaseback transaction.

- 9 -

Additionally, the bankruptcy placed a spotlight on the fraud related to the economic viability of the assets originally transferred from Windstream to Uniti, revealing that the Master Lease was actually a prohibited financing and not a "true lease."  Defendants knew, or recklessly disregarded, that the Master Lease was a prohibited financing.  The risk that Windstream would seek to recharacterize the Master Lease in bankruptcy was apparent from the beginning to Defendants, but they failed to disclose the known risk was disclosed to investors such as Lead Plaintiffs and the Class Members.

28.     While Windstream has continued to make rent payments under the Master Lease since its bankruptcy filing, it has attempted to recharacterize the Master Lease as a financing in an Adversary Proceeding (as defined below) against Uniti in the Bankruptcy Court.  Windstream's filings in that Adversary Proceeding bring to light even more egregious behavior by both Windstream and Uniti, and their key executives (including the Defendants), during the lead-up to the Spin-Off.  Windstream's filings demonstrate that Windstream, Uniti and their key executives, knew the entire transaction was predicated upon false information – grossly inflated projections of the useful life of the copper wire assets that formed almost 80% of the assets transferred in the Spin-Off.

29.     Between February 19 and June 20, 2019, Defendants continued to disseminate materially false and misleading statements and omissions to the market, including but not limited to statements that Uniti would be able "to navigate the Windstream bankruptcy proceedings without having to raise external capital," that the Master Lease was designed to withstand a bankruptcy filing by Windstream, and that Uniti was seeing no impact to its

business due to Windstream's bankruptcy. These misstatements and omissions artificially inflated and/or artificially maintained the price of Uniti's securities.

30.    On June 24, 2019, after the close of the market, Uniti announced a $300 million notes offering that included an option to purchase an additional $45 million of notes, thus implicitly acknowledging, contrary to statements made by Defendants Uniti, Kenny Gunderman and Wallace earlier in the year, that Windstream's bankruptcy was negatively impacting Uniti and that it could not maintain its business operations without accessing the capital markets. This news, which disclosed the true about the state of Uniti's business, was also a materialization of the risk concealed by these material misrepresentations and omissions alleged herein, *caused Uniti's stock price to decline more than 10%, closing at $9.38 per share on June 25, 2019 on heavy trading volume*.

31.    Defendants had a motive to hide the true nature of the Master Lease and the risks associated with the Spin-Off and the Master Lease from Uniti investors. Uniti's financial viability – as well as the employment and lucrative compensation packages of Defendant Kenny Gunderman at Uniti and Robert ("Bob") Gunderman, his brother, at Windstream – in turn, depended on Windstream's continued success. If it were publicly disclosed that Windstream violated – or had engaged in a transaction that risked violating – the Indenture, and risked causing a default, the value of Uniti securities would crater (as it did when the truth was finally revealed).

32.    As a result of Defendants' materially false and misleading statements and omissions, the precipitous decline in the price of Uniti's securities – and Lead Plaintiffs' and other Class members' significant losses – were foreseeable to Defendants.

## II.    JURISDICTION AND VENUE

33.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

34.    This Court has jurisdiction over this action pursuant to §27 of the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §1331.

35.    Venue is properly laid in this District pursuant to §27 of the Exchange Act, and 28 U.S.C. §1391(b).  The Company is headquartered in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

36.    In connection with the acts and conduct alleged in this Complaint, Defendants directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the national securities markets.

## III.    PARTIES

37.    Lead Plaintiff He is an individual who resides in Reno, Nevada and purchased Uniti common stock during the Class Period as set forth in the Certification previously filed (ECF No. 34-2) and incorporated herein, and was damaged thereby.

38.    Lead Plaintiff Local 449 is a union pension fund that is based in Pittsburgh, Pennsylvania.  It represents approximately 29,700 union-trained steamfitters and their beneficiaries and is a sophisticated institutional investor that had $558 million in total pension assets under management as of March 2020.  Local 449 purchased Uniti common

stock during the Class Period as set forth in the Certification previously filed (ECF No. 30-1) and incorporated herein, and was damaged thereby.

39.     Lead Plaintiff Wayne County ERS is a pension fund that is based in Wayne County, Michigan which provides retirement services for active, deferred, and retired Wayne County employees, Wayne County Airport Authority employees and Wayne County 3rd Circuit Court employees.  Wayne County ERS represents approximately 8,300 participants (including 5,000 retirees and 3,300 active employees) and is a sophisticated institutional investor that had $1.6 billion in total pension assets under management as of March 2020. Wayne County ERS purchased Uniti common stock during the Class Period as set forth in the Certification previously filed (ECF No. 30-1) and incorporated herein, and was damaged thereby.

40.     Lead Plaintiff McMurray purchased Uniti common stock during the Class Period as set forth in the Certification previously filed (ECF No. 30-1) and incorporated herein, and was damaged thereby.

41.     Defendant Uniti (formerly known as CS&L) at all relevant times was a REIT engaged in the acquisition and construction of communications infrastructure, and is a provider of wireless infrastructure solutions for the communications industry.  Uniti is a Maryland corporation with its principal executive offices located at 10802 Executive Center Drive, Benton Building Suite 300, Little Rock, Arkansas 72211.  At the time it went public, CS&L's common stock traded under the ticker "CSAL" on the NASDAQ, an efficient market.[2]  On February 27, 2017, CS&L changed its name to Uniti and began trading its

---

[2]     The terms "Uniti" and "CS&L" are used interchangeably herein.

common stock under the ticker "UNIT" on the NASDAQ, an efficient market.  From the date of its incorporation in February 2014[3] until after the Spin-Off, Uniti management was dominated by Windstream executives and former Windstream advisors.

42.     Defendant Kenny Gunderman has been the Company's CEO and President since March 2, 2015, and a member of Uniti's Board of Directors.  Kenny Gunderman is a Certified Public Accountant and experienced investment banker advising clients on real estate matters.  In fact, Kenny Gunderman was lead adviser/relationship person at Stephens, a privately held investment banking and financial services firm located in Little Rock, Arkansas, and advised Windstream on the Spin-Off transaction.  Kenny Gunderman left Stephens right before the Spin-Off was completed to become Uniti's first post-Spin-Off President and CEO.  He still serves in both positions today, and he is well compensated for his work. According to Uniti's annual proxy filings, Kenny Gunderman has received over $5 million in compensation every year since the Spin-Off.

43.     Defendant Wallace has served as the Company's CFO, Treasurer, and Executive Vice President since April 1, 2015.  Wallace is a Certified Public Accountant licensed in Texas.

44.     The Individual Defendants and the Company are collectively referred to herein as "Defendants."  The Individual Defendants made, or caused to be made, materially false and misleading statements or omissions that caused the price of Uniti securities to be artificially inflated or artificially maintained during the Class Period.

---

[3]   Uniti was initially incorporated in the state of Delaware but reorganized in the state of Maryland in September 2014.

45.     The Individual Defendants, because of their positions, possessed the power and authority to control the contents of the Company's quarterly reports, shareholder letters, press releases, securities offering materials and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of and/or contributed to the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions, and their access to material non-public information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations and omissions being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements and material omissions pleaded herein.

## IV.   ADDITIONAL PARTICIPANTS

46.     Windstream Holdings, Inc. ("Windstream Holdings") is a publicly traded holding company incorporated in the state of Delaware and the parent of Windstream Services, LLC ("Windstream Services," together with Windstream Holdings, "Windstream").  Following its delisting on March 6, 2019, Windstream Holdings' common stock no longer trades on the NASDAQ, but still trades on the Over-the-Counter ("OTC") Pink Sheets market under the ticker symbol "WINMQ."  Prior to the Spin-Off, Windstream Holdings was the parent of Uniti with 100% control and ownership.  Windstream Holdings is not named as a defendant herein because on February 25, 2019, it filed for bankruptcy

protection pursuant to Chapter 11 of the U.S. Bankruptcy Code, which triggered an automatic stay preventing lawsuits against it.

47.    Windstream Services is a Delaware limited liability company with its principal place of business in Little Rock, Arkansas.  Windstream Services is a wholly owned subsidiary of Windstream Holdings.  Windstream Services is itself a holding company, and its subsidiaries include the operating entities of Windstream (the "Windstream Operating Subsidiaries").  Through its Windstream Operating Subsidiaries – which hold the required authorization and licensure from the Federal Communications Commission ("FCC") and state regulators – Windstream Services provides telephone exchange services and other telecommunications services in localities throughout the United States.  Prior to February 28, 2015, Windstream Services was organized as a Delaware corporation named Windstream Corporation.  Effective February 28, 2015, the company converted into a Delaware limited liability company with the name Windstream Services, LLC.[4]  Windstream Services is not named as a defendant herein because on February 25, 2019, it filed for bankruptcy protection pursuant to Chapter 11 of the U.S. Bankruptcy Code, which triggered an automatic stay preventing lawsuits against it.

48.    Tony Thomas was Windstream's CFO from August 2009 until September 2014.  As alleged herein, Thomas was intimately involved in all parts of planning, preparation, and implementation of the Spin-Off.  In addition to being Windstream's CFO, he also served as Head of REIT Operations at Windstream from September 2014 to

---

[4]    Both Windstream Services LLC and Windstream Corporation are defined herein as "Windstream Services."

December 2014, and during this time, was also Uniti's President and CEO. Although he was a long-time Windstream executive, he led the "Uniti Group" that negotiated against Fletcher's "Windstream Group" over the terms of the Spin-Off, including much of the Master Lease. In December 2014, and prior to the Master Lease becoming effective in April 2015, Thomas was hired as Windstream's CEO, and has served in the role since.

49.     Robert Gunderman has been Windstream's CFO since December 2014. Before that, Robert Gunderman served as Windstream's Senior Vice President, Financial Planning and Treasurer from May 2012 to December 2014, while also serving as Windstream's interim CFO from October 2014 to December 2014. As alleged herein, Robert Gunderman also was intimately involved in all parts of planning, preparation, and implementation of the 2015 Uniti Spin-Off. Robert Gunderman is the brother of Defendant Kenny Gunderman.

50.     John Fletcher was General Counsel to both Windstream Services and Windstream Holdings, until departing in March 2018. Windstream tapped Fletcher to direct and implement Windstream's legal and regulatory strategy for the proposed REIT (Uniti) and Fletcher served as Uniti's Executive Vice President, Secretary, and General Counsel until at least February 10, 2015.[5] At all relevant times leading up to the Spin-Off, which eventually resulted in Uniti holding assets formerly owned by Windstream, Fletcher served as General Counsel of Windstream.

51.     Together with Defendants, Windstream, Thomas, Fletcher and Robert Gunderman engaged in a scheme to defraud Lead Plaintiffs and the class through the

---

[5]   Fletcher signed SEC filings on behalf of CS&L until February 10, 2015 as the Company's Executive Vice President, Secretary and General Counsel.

creation and structuring of the Uniti Spin-Off from Windstream, which they knew, or recklessly disregarded, at the time of the transaction to be in violation of Windstream's Indenture.

## V.   BACKGROUND TO THE SPIN-OFF AND DEFENDANTS' KNOWLEDGE IT VIOLATED WINDSTREAM'S DEBT COVENANTS

### A.   Company Background

52.   Based in Little Rock, Arkansas, Uniti operates as a REIT that owns and leases the use of its wireless networks to telecommunications companies.  Uniti principally focuses on acquiring and constructing fiber optic broadband networks, wireless communication towers, copper and coaxial broadband networks, and data centers.  Operations are managed in four separate lines of business: Uniti Fiber, Uniti Towers, Uniti Leasing, and Talk America.

53.   Uniti was formed on April 24, 2015, following the separation and completion of its Spin-Off from its then-parent company Windstream Holdings, a publicly traded company that provides (through its subsidiary, Windstream Services) advanced network communications, including cloud computing and managed services, to residential and business customers throughout the United States.

54.   As detailed more thoroughly below, in connection with the Spin-Off transaction, Windstream sold certain of its telecommunications network to Uniti, and Uniti then leased those assets back to Windstream Holdings via a long-term lease agreement (*i.e.*, the Master Lease).

55.    Windstream is Uniti's largest customer by far. Indeed, a substantial portion of Uniti's revenues are derived from the Master Lease with Windstream Holdings – specifically accounting for 87.9%, 74.8%, and 68.2% of Uniti's annual revenue in 2016, 2017, and 2018, respectively.   Uniti's financial success is therefore highly dependent on Windstream's viability.

## B.    The Decision to Spin-Off Uniti and Execute a Sale-Leaseback Transaction

56.    The origins of the Spin-Off date back to at least 2013.   At the time, Windstream's aging telecommunications network needed substantial investment to remain competitive and as a yield stock, Windstream's investors expected consistent dividend payments.   As a result, Windstream's cash position and its options to finance the critical upgrade to its telecommunications network, were limited.

57.    In or around 2013, Windstream searched for a way to both maintain its dividend and make much-needed investments to its telecommunications network.[6]   It was critical that Windstream upgrade its broadband network to remain competitive in its industry where its peers were able to offer faster network speeds as a result of investments they made in new technologies.   But the failure to pay a dividend would cripple Windstream's ability to attract investment and raise capital.[7]   Simply put, Windstream did not have the cash to both pay its dividend and upgrade its network infrastructure.

---

[6]    Complaint, *Windstream Holdings, Inc., et al. v. Uniti Grp., Inc., et al.*, No. 19-08279 (Bankr. S.D.N.Y. Jan. 22, 2020), ECF No. 71 ("Adversary Proceeding Complaint"), ¶43.

[7]    *Id.*

- 19 -

58.     Windstream, including Bob Gunderman, assessed its options with its financial advisors at Stephens – the lead adviser at Stephens being Bob's own brother Defendant Kenny Gunderman.   After considering a wide range of solutions, Windstream and its advisors finally settled on a novel way to solve the company's challenges: structuring a REIT based on telecommunications networks.[8]   The idea, which was, in part, the brainchild of Kenny Gunderman, was to create and spin-off a REIT that owned Windstream's primary assets – copper wire and fiber optic cable networks.[9]   Although telecommunications network assets were not traditional REIT-like assets, the IRS had recently issued a ruling that was interpreted as opening the door for REIT status to be applied to such non-traditional assets.[10]

59.     The structure of the transaction contemplated that: (1) Windstream Services would create Windstream Holdings (a holding company that would be created specifically for purposes of the transaction); (2) Windstream Services would then direct the Windstream Operating Subsidiaries to execute an intra-company transfer of certain critical assets, including 300,000 miles of copper wires and fiber optic cables, as well as related real estate, to a newly formed REIT (*i.e.*, Uniti) that would be a wholly owned subsidiary of Windstream Holdings; (3) the REIT would then lease those assets back to Windstream Holdings; and (4) the REIT would then be spun off as an independent public company.

60.     Importantly, the Windstream Operating Subsidiaries, which owned and operated the applicable Windstream network assets, would continue to use and occupy the

---

[8]    *Id.*, ¶44.

[9]    *Id.*

[10]    *Id.*

4848-2207-4295.v23

assets as before and fulfill all obligations toward the assets, including maintenance, tax payments and capital improvements.  The Windstream Operating Subsidiaries would also fund the rent owed on the Master Lease by making dividend payments to Windstream Holdings.  Windstream Holdings would then use those dividend payments to pay the rent owed to Uniti.

61.     The sale and leaseback of its network assets would offer Windstream greater financial flexibility, including the ability to make critical investments to its broadband network to help it meet increasing demand for high-speed internet and remain competitive in the industry.  It also would create two viable companies designed to appeal to different investors – the REIT (*i.e.*, Uniti) more attractive to value investors wanting a steady dividend and the new Windstream (*i.e.*, Windstream Holdings) more attractive to growth investors.

62.     In addition, the Spin-Off provided Windstream with significant cash and debt relief through the sale of assets (which were overvalued because the Master Lease contained inflated information about the useful life of copper wire (*see* §V.G) at a time when the Company was heavily indebted (*i.e.*, Indenture) (*see* §§V.B-C).  While an accelerated payment of the Notes was sufficient to drive Windstream into bankruptcy, the Spin-Off offered Windstream an avenue to try to put its assets out of reach from creditors while still retaining effective control over them by using and profiting from the assets, and benefiting from the conflicted relationships between Windstream and Uniti.  *See* §§V.D-E.

63.     Before the Spin-Off could be executed and Windstream could reap the above-mentioned benefits, however, a number of structural issues had to be addressed, and Windstream's General Counsel – Fletcher – worked with Windstream's advisors, including

- 21 -

Defendant Kenny Gunderman (then still at Stephens) – to address the legal and regulatory hurdles.

64.     First, Windstream and Defendants Uniti and Kenny Gunderman would need to obtain required regulatory approvals, including from the IRS, which needed to approve REIT treatment for Uniti.  The transaction also had to be reviewed by various state regulatory authorities, which regulate telecommunications companies like Windstream, and had to sign off on the transfer of assets, to ensure it would not interfere with citizens' access to critical telecommunications services.

65.     Second, it was crucial that Windstream and Defendants Uniti and Kenny Gunderman obtain opinions that the Master Lease was a "true lease."  If the Master Lease did not meet the legal standards of a true lease, the transaction could be recharacterized as a financing putting Windstream in violation of the Indenture.  Also, should the Master Lease not meet the legal standards of a "true lease," it would put Uniti and its shareholders at greater risk should Windstream file bankruptcy.  Uniti's claim to rent from Windstream under the terms of the Master Lease would be unsecured, and structurally subordinated, to other creditors' claims if the Master Lease were recharacterized as a financing.

66.     Third, and most importantly, Windstream and Defendants Uniti and Kenny Gunderman had to ensure that it appeared that the structure of the transaction did not breach the terms (including the restrictive covenants) of the agreements governing Windstream's long-term debt. If any such covenants were breached, Noteholders representing 25% or more of the aggregate principal amount of the notes could seek to accelerate payments on the

Notes, potentially triggering a Windstream bankruptcy that would spell financial disaster for Uniti.

67.     Addressing these issues, and others, was critical to Windstream and Defendants Uniti and Kenny Gunderman's ability to execute the Spin-Off.

### C.     Windstream Services' Indenture Prohibits Sale-Leaseback Transactions

68.     Windstream and Defendants Uniti and Kenny Gunderman understood that it was critical to structure the Spin-Off transaction in a way that would make it appear as though the terms of the Indenture that governed certain unsecured Notes that Windstream Services issued on January 23, 2013 were not breached.[11]

69.     The Indenture contains a number of typical restrictive covenants.  One such restrictive covenant prohibits Windstream Services and certain of its subsidiaries – including the Windstream Operating Subsidiaries – from entering into sale-leaseback transactions, absent certain conditions (none of which are applicable here).

70.     Specifically, §4.19 of the Indenture states as follows:

Sale and Leaseback Transactions.

[Windstream Services] shall not, and shall not permit any of its Restricted Subsidiaries[12] to, enter into any Sale and Leaseback Transaction . . . .

71.     The Indenture defines "Sale and Leaseback Transaction" as:

---

[11]   The Notes are guaranteed by certain of Windstream Services' subsidiaries in an aggregate principal amount of $700 million and are due in 2023, bearing interest at an annual rate of 6 3/8%.

[12]   "Restricted Subsidiar[ies]" is defined in the Indenture to include the Windstream Operating Subsidiaries.

4848-2207-4295.v23

> [W]ith respect to any Person,[13] any transaction involving any of the assets or properties of such Person whether now owned or hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred.

72.     Thus, the Indenture specifically prohibits the Windstream Operating Subsidiaries – *i.e.*, the Windstream Services subsidiaries that owned (at the time of the Indenture) and operated a substantial portion of Windstream's telecommunications network – from selling any of Windstream's network assets to an entity and then leasing them back.

73.     In addition, the Indenture prohibits Windstream Services and the Windstream Operating Subsidiaries from incurring any additional debt unless, after giving effect to the additional debt, Windstream kept its "Consolidated Leverage Ratio" below a certain ratio. Section 4.09 of the Indenture states:

> The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness; provided, however, that the Company or any of its Restricted Subsidiaries that are Guarantors may Incur Indebtedness, if the Company's Consolidated Leverage Ratio at the time of the Incurrence of such additional Indebtedness, and after giving effect thereto, is less than 4.50 to 1.

74.     Thus, the Indenture prohibits certain financing transactions in which the network assets could be used to support additional loans to Windstream.

75.     Windstream and its executives were mindful of the Indenture's restrictions early on, while they were still contemplating the structure of the Spin-Off. In an April 15,

---

[13]   "Person" was defined broadly to include "any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity."

- 24 -

2013 email to Robert Gunderman (Windstream's then-Treasurer and Defendant Kenny Gunderman's brother), Windstream's then-CFO, Tony Thomas wrote:

> Here are some questions I have related to the Captive.
>
> **We need a capital structure that works with the Indenture**; we may be able to use the HoldCo strategy here. Create HoldCo and put Windstream Financial underneath HoldCo. . . .  Remember, **the sales – leaseback provision in the Indenture can be a limiting factor here**.

76.     The "HoldCo strategy" was precisely what Windstream and Defendants Uniti and Kenny Gunderman employed to evade the restrictive covenants in the Indenture: Windstream would: (1) form Windstream Holding (*i.e.*, "HoldCo"), which would own Windstream Services and its subsidiaries (*i.e.*, the Windstream Operating Subsidiaries); (2) cause the Windstream Operating Subsidiaries to sell certain network assets to an internally-controlled REIT entity (*i.e.*, Uniti – "the Captive"); and (3) have Windstream Holdings, which is not a party to the Indenture, lease the assets back from Uniti at the time the REIT was spun off as an independent public company.  This meant, in effect, that the Windstream Operating Subsidiaries would not sign the Master Lease with Uniti (which would clearly violate the terms of the Indenture), but would retain use of the assets as before and continue providing telecommunications services to Windstream's customers.

77.     On August 30, 2013, Windstream Services' Board approved the formation of Windstream Holdings.   Windstream Holdings was formed, not to provide telecommunications services in its own right, but to serve merely as a holding company for its indirect subsidiaries, including the Windstream Operating Subsidiaries, which are the entities licensed and approved by the applicable federal or state regulators to provide telecommunications services.

- 25 -

78.     Uniti was incorporated as a wholly-owned subsidiary of Windstream Holdings in the state of Delaware in February 2014 and reorganized in the state of Maryland in September 2014.   From the date of its incorporation until after the Spin-Off, Uniti management was dominated by Windstream executives and former Windstream advisors.

79.     On February 12, 2014, around the time Uniti was incorporated, Windstream's Board of Directors held a meeting at the Dallas Fort Worth Grand Hyatt in the Europe Conference Room.  The meeting began at 7:45 a.m. and adjourned at 10:30 a.m.  In addition to Windstream's Board members, Tony Thomas, Fletcher and Defendant Kenny Gunderman were also in attendance.  One of the topics of discussion at this meeting was the potential Spin-Off of the newly formed Uniti.  According to the minutes from the meeting, prepared by Fletcher as Corporate Secretary, the group discussed in detail many aspects of the Spin-Off transaction, including "key financial attributes" of the Spin-Off and "significant execution risks" to proceeding with the Spin-Off.

80.     In conjunction with the February 12, 2014 Board meeting, a detailed and extensive power-point was provided to the attendees for the "Strategic Planning Session." This 75-page power-point was prepared, in part, by Defendant Kenny Gunderman and his team at Stephens.   Included in the power-point was a description of the history of Windstream's consideration of forming a REIT subsidiary and the steps that had been taken, and the timing of those steps, for obtaining the required IRS approval.  "Key Considerations" for the transaction were also outlined, including that it would be "difficult to pursue M&A aggressively" and that Windstream had "no clear path to deleverage meaningfully" should it decide not to proceed with the Spin-Off.  Also included in this power point was a detailed

graphic showing the corporate structure of Windstream and Uniti as a result of the Spin-Off. Several valuation scenarios for Windstream and Uniti were also highlighted.

81. On May 6-7, 2014, Windstream's Board met again to discuss "Project RITE," *i.e.*, the Spin-Off.  The meeting was held in the Quapaw Parlor at the Capital Hotel in Little Rock, Arkansas.  Windstream's Board was present for the meeting, as well as Tony Thomas, Fletcher and Defendant Kenny Gunderman, among others.  According to the minutes of this meeting, again prepared by Fletcher as Corporate Secretary, the attendees, including specifically Fletcher and Defendant Kenny Gunderman, discussed in great detail the "steps required to effect the transaction," "the structure of the lease between the resulting companies," the Spin-Off's impact on Windstream's "plans to retire and replace copper plant," and the underlying valuations scenarios.  The minutes also indicate that Thomas presented to the group an overview of "the methodology utilized by Ernst & Young to prepare a preliminary estimate of ranges for the fair market value of assets to be transferred to [Uniti] and the initial lease rate under the Master Lease."

82. The attendees of the May 6-7, 2014 Board meeting were provided with a 300-page packet of information about the Spin-Off, including specific outlines of various valuation scenarios as well as potential financial and economic impacts to Windstream and Uniti as a result of the transaction.  These materials also provided a schematic of the "[s]tructure & [r]elationship between [Windstream] & [Uniti]," and a detailed "[o]verview of [the] Master Lease," including a discussion of the parties to the Master Lease, the term, the rent to be paid, and the assets to be transferred to Uniti.

4848-2207-4295.v23

83.    The May 6-7, 2014 Board meeting materials also provided specific breakdowns of the financial benefits the Spin-Off would have for Windstream, including eliminating the "limit[ations]" to Windstream's ability to "invest for growth, pursue strategic acquisitions and/or delever."  Indeed, the materials outlined in detail how completing the Spin-Off would permit Windstream to make essential and critical upgrades to its networks and systems that would not have been made absent the Spin-Off, specifically its ability to replace its aging "copper DSLAMs to fiber-fed in competitive areas and create entire fiber-fed communities."  The meeting attendees were also provided a detailed overview of Ernst & Young's ("E&Y") valuation analysis for the network assets to be transferred to Uniti, the estimation for the fair value of the rent to be assessed, and the residual life of the transferred assets at the end of the lease term.

84.    The May 6-7, 2014 Board meeting materials also outlined the "communications strategy" to be employed with "regulators," "stakeholder[s]," and "investors."  This strategy included "a 2-3 day IR roadshow to visit top shareholders" as well as "attending 2 previously scheduled investor conferences in May."  A draft of the investor presentation entitled "WIN to Pursue Separation of its Real-Estate Assets/From its Operating Assets" dated May 19, 2014 was provided in the May 6-7, 2014 Board meeting materials.

85.    A few weeks later, on May 22, 2014, the Board convened a meeting via teleconference to discuss the Spin-Off.  In particular, the meeting was meant to answer questions that the Windstream Board had following the May 6-7, 2014 meeting.  The attendees of this meeting included the Windstream Board members, in addition to Tony Thomas, Fletcher and Defendant Kenny Gunderman.  As with the other Board meetings

- 28 -

concerning the Spin-Off, extensive and detailed information was gathered and provided to the meeting attendees. According to the meeting minutes and the 52-page packet of materials provided to the attendees, the meeting participants discussed in detail the economics of the Spin-Off, the benefits the transaction would provide to Windstream's ability to make capital improvements, as well as follow-up discussions concerning the valuation analysis being performed by E&Y.

86.     As a result of these meetings, Windstream and Defendants Uniti and Kenny Gunderman determined that Windstream Holdings would be the only Windstream entity to sign the Master Lease. Fletcher has since admitted that one reason that Windstream Holdings was the only Windstream entity to sign the Master Lease was to avoid "a clear violation" of the Indenture.[14]  Robert Gunderman has testified similarly.[15]

87.     Although the structure of the transaction was settled, in order for the Spin-Off to proceed, Windstream and Uniti's representatives and executives – including Fletcher and Defendant Kenny Gunderman – needed to convince state regulators (for the reasons detailed below) that the Windstream Operating Subsidiaries would continue using and operating Windstream's assets as they always had. On the other hand, Defendants simultaneously needed to conceal from the market the true nature of the transaction and extent of the risk that the Spin-Off violated the terms of the Indenture, as the transaction was critical to Windstream's ability to upgrade its aging telecommunications network – something Windstream could not do without successfully executing the Spin-Off.

---

[14]   Aurelius Litigation, ECF No. 230 ("Aurelius Litigation Trial Transcript") at 123, 131-132, 269.

[15]   Aurelius Litigation Trial Transcript at 269:2-9.

4848-2207-4295.v23

**D.  Windstream, with Defendants' Help, Gains Regulatory Approval of the Spin-Off and Conceals that the Spin-Off Violated the Indenture's Prohibition on Sale-Leaseback Transactions**

88.  On July 29, 2014, Windstream publicly announced that it would spin-off its network assets into a publicly traded REIT (*i.e.*, Uniti).[16]

89.  Around this same time, Windstream and Defendants Uniti and Kenny Gunderman worked to obtain the necessary approvals for the transaction from state regulators.  Because Windstream is a telecommunications provider, it is governed by state regulations that require approval for certain types of asset transfers.  Regulators needed to ensure that any such transactions did not interfere with citizens' access to critical telecommunication services.

90.  It was imperative to the regulatory approval of the Spin-Off that Windstream and Uniti assure regulators that, despite the structure of the Spin-Off, the Windstream Operating Subsidiaries would still continue to operate the assets and discharge their regulatory requirements.  Indeed, in connection with the Aurelius Litigation, Fletcher testified that:

> Q. Would you agree that, in general, the regulators were focused on whether the transferor subsidiaries would be able to continue to operate and discharge their regulatory requirements?
>
> A. Yes.[17]

---

[16]  Less than two weeks earlier, on July 17, 2014, the IRS approved Windstream's telecommunications assets to be used to structure a REIT.

[17]  Aurelius Litigation Trial Transcript, 29:20-24.

91.     To convince state regulators that the Spin-Off would not disrupt access to its network, Windstream's advisors – including Fletcher, who, at the time, served as General Counsel for *both* Windstream and Uniti – with the knowledge, support, and approval of Windstream's officers and directors – drafted, reviewed, and signed various applications, affidavits, and other regulatory documents designed to convince state utility regulatory bodies that they should approve Windstream's sale of the assets to Uniti.  These regulatory filings represented that although Uniti would actually own the network assets after the Spin-Off, there would be no functional change to the status quo, because those assets would continue to be operated by the Windstream Operating Subsidiaries.

92.     On August 6, 2014, in the midst of the effort to obtain regulatory approvals which began in July 2014, Mary Michaels, Windstream's Vice President of Capital Markets and Investor Relations, sent an email to Thomas, Robert Gunderman, Fletcher and Windstream's Board of Directors.  This email summarized the market's reaction to the announced Spin-Off.  It also revealed Windstream's messaging strategy aimed at avoiding discussing the details surrounding the structure's impact on the Notes, and that the Master Lease was specifically drafted with the Indenture's restrictions in mind.  Ms. Michaels's email also attached a 26-page document entitled "Project RITE: Master Question & Answer Document."  That document catalogued potential questions and responses on a wide variety of topics including, "[r]ationale for transaction," "[a]lternative strategies considered," and "[v]aluation of REIT."

93.     If asked whether the transaction complied with Windstream's credit and debt agreements, the talking points encouraged a vague and non-responsive answer and instructed

to "not go into detail . . . unless specifically asked" about each different type of covenant or

restriction, but to respond as follows, "([if] pressed)":

- We do not believe that the Windstream indentures require any consents or waivers to effect the transaction (***do not go into detail . . . unless specifically asked on each point***).

*     *     *

- ***If pressed on sale/leaseback provision: Given that the lease is being implemented at Windstream Holdings, it does not impact any covenants in the Windstream indentures, including the sale-leaseback provisions***.

94.     The "Master Question & Answer Document" also guided vague and

unresponsive answers to questions about the reason for forming Windstream Holdings in the

first place:

Was Windstream Holding Company created for the purposes of this transaction?

- No, it's a best practice corporate structure.

ONLY IF PRESSED: What are the benefits of the HoldCo structure?

- We believe that having a multi-layer holding company structure creates more options to allow us to improve our cost of capital and access the capital markets over time

*     *     *

Could you have done this transaction without the HoldCo structure?

- This transaction is an example of how the Holdco structure afforded Windstream the flexibility to pursue a value creating transaction benefitting all of our stakeholders

95.     Windstream and Defendant Uniti assured State regulators, that, among other

things: (a) in connection with the Master Lease, the Windstream Operating Subsidiaries

would have "exclusive" and "long-term" "usage rights" and "control" over the transferred

- 32 -

assets, and would have the same obligations with respect to the assets that they had always had; (b) the Windstream Operating Subsidiaries would have no obligations to pay rent under the Master Lease; and (c) the Master Lease was being executed by Windstream "for the benefit of the [Windstream Operating Subsidiaries]."

96.     In fact, Fletcher has since admitted that regulators were "'repeatedly assured'" that the Windstream Operating Subsidiaries "would have long-term exclusive control of the property they had transferred."[18]  For example:

(a)     In support of the application submitted to the Alabama Public Service Commission ("Alabama PSC"), which was filed in Montgomery, Alabama on July 31, 2014, Fletcher (who signed the application) requested authorization to transfer certain assets of the "WIN Companies" (companies that made up the Windstream Operating Subsidiaries) to Uniti, who would then lease them back to Windstream Holdings on a long-term basis, for the exclusive use and benefit of the WIN Companies.  Fletcher assured the Alabama PSC that the "WIN Companies can continue to operate their telecommunications business as they do currently."  Fletcher also stated that the transaction would be "virtually invisible to the WIN Companies' customers" but was being done simply to, among other things, "enable the WIN Companies to improve their financial condition."[19]

(b)     In support of the application submitted to the Kentucky Public Service Commission ("Kentucky PSC"), Robert Gunderman – during a November 13, 2014 hearing – testified that the Windstream Operating Subsidiaries had no obligation to pay rent under the Master Lease.[20]  Robert Gunderman also repeatedly represented that the Master Lease was being entered into by Windstream Holdings for the exclusive use of the Windstream Operation Subsidiaries.[21]  In support of the Kentucky application, Fletcher also testified that "the [Windstream Operating

---

[18]   Aurelius Litigation Trial Transcript at 46:19-47:3.

[19]   Application of Windstream Subsidiaries for Approval, *In the Matter of Windstream Alabama LLC, et al.*, Alabama Public Service Commission (July 31, 2014), ¶¶1-2, 26.

[20]   Transcript, *In re Application of Windstream Kentucky East, LLC and Windstream Kentucky West, LLC*, No. 2014-00283 (Nov. 13, 2014) ("KY Transcript") at 34:7-35:25.

[21]   KY Transcript at 109:20-110:8.

4848-2207-4295.v23

Subsidiaries] will have an exclusive . . . right to use and occupy all the assets that are within their system today."

(c)     Regulators in North Carolina were told:

> Under the transaction proposed, certain fixed assets of the [Windstream Operating Subsidiaries], including copper, fiber, real estate and other network assets will be transferred to [Uniti] and [Uniti] will lease those assets back to Windstream [Holdings] on a long-term basis for the exclusive use and benefit of the [Windstream Operating Subsidiaries]. The [Windstream Operating Subsidiaries] will be responsible for the operation and maintenance of the assets and will continue to have responsibility for quality of service standards and fulfillment of all regulatory obligations. [22]

The North Carolina regulators were also assured that Windstream Operating Subsidiaries would continue to provide services to its North Carolina customers even though the lease agreement was between Uniti and Windstream Holdings:

> According to the Applicants, as the transaction is now structured, [Uniti]'s exclusive customer is Windstream [Holdings] and not the public writ large; the [Windstream Operating Subsidiaries] and not [Uniti] will provide service to the [Windstream Operating Subsidiaries]' customers using equipment which the [Windstream Operating Subsidiaries] previously owned; and the equipment and facilities previously owned by the [Windstream Operating Subsidiaries] are now owned by [Uniti] and leased by [Uniti] to Windstream [Holdings] for the benefit of the [Windstream Operating Subsidiaries]. [23]

(d)     Georgia regulators were given the same description of the Spin-Off:

> Under the Transaction, certain fixed assets of the [Windstream Operating Subsidiaries], including copper, fiber, real estate and other distribution related assets, as

---

[22]   Declaratory Ruling, *In the Matter of Windstream North Carolina, LLC, et al.*, North Carolina Utilities Commission (Oct. 13, 2014) at 3.

[23]   *Id*. at 8-9.

- 34 -

> more fully described in this Application (the "Subject
> Assets") will be transferred to [Uniti], a newly
> established corporation, and [Uniti] will lease them back
> to Windstream [Holdings] on a long term basis for the
> exclusive use and benefit of the [Windstream Operating
> Subsidiaries,]

and that "[t]he long-term lease arrangement will allow the [Windstream Operating Companies] to continue to operate their telecommunications businesses as they do now.[24]

(e)    In the Application for Approval of the Spin-Off, signed by Fletcher, Ohio Regulators were, likewise, given the same description of the Spin-Off:

> Under the Transaction, certain fixed assets of the
> [Windstream Operating Subsidiaries], including copper,
> fiber, real estate and other network assets, as more fully
> described in this Application (the "Subject Assets"), will
> be transferred to [Uniti], a newly established corporation,
> and [Uniti] will lease them back to Windstream
> [Holdings] on a long-term basis for the exclusive use and
> benefit of the [Windstream Operating Subsidiaries].
> [Uniti] will elect to operate as a Real Estate Investment
> Trust ("REIT"), and both [Uniti] and Windstream
> [Holdings] will thereafter be independent publicly traded
> companies. Under the terms of the exclusive lease from
> [Uniti], the [Windstream Operating Subsidiaries] will be
> responsible for the operation and maintenance of the
> Subject Assets and will continue to have responsibility
> for service quality standards and fulfillment of all
> regulatory obligations.[25]

(f)    The Pennsylvania Application, which included a verified statement from Robert Gunderman, likewise described the Spin-Off transaction as providing:

> [C]ertain fixed assets of the [Windstream Operating
> Subsidiaries], including copper, fiber, real estate and
> other network assets ("Subject Assets"), will be

---

[24]  Application for Declaratory Ruling, *In re Georgia Windstream, LLC, et al.*, Georgia Public Service Commission at 4-5, 8.

[25]  Telecommunications Filing Form, *In the Matter of the Application of Windstream Holdings, Inc., et al. to Transfer*, Public Utilities Commission of Ohio (Aug. 19, 2014) at 13.

transferred to [Uniti], a newly established corporation. [Uniti] will lease the transferred assets back to [Windstream] Holdings for the exclusive use and benefit of the [Windstream Operating Subsidiaries] under a long-term master lease that, at [Windstream] Holdings option, will be in effect for thirty-five years.[26]

(g)   In their application to the West Virginia Public Service Commission, Windstream represented that "Windstream [Holdings] is proposing *an intra-corporate transaction* (the 'Transaction') in which its business will be divided into two independent units: an operating unit that will continue to provide telecommunications and related services, and a real estate investment trust unit that will hold title to certain distribution plant assets (the 'Subject Assets')" and "[t]he Subject Assets of the [Windstream Operating Subsidiaries, including copper, fiber, real estate and other network assets, will be transferred to [Uniti], a newly established corporation, and [Uniti] will lease them back to Winstream [Holdings] on a long term basis for the exclusive use and benefit of the [Windstream Operating Subsidiaries]."[27]

97.     These representations, and others, were designed to convince regulators that the "intra-corporate transaction" would be "virtually invisible" and "seamless" to customers, and on this basis, regulators granted approval of the asset transfer.

98.     While Fletcher told state regulators that the Windstream Operating Subsidiaries would retain an exclusive right to use and access the transferred assets, he knew at the same time that the Master Lease structure violated the terms of the Indenture.  Fletcher has since testified as follows during the Aurelius Litigation:

Q. The question is, at the time that this transaction was being planned, you were aware that if the transferor subsidiaries [*i.e.*, Windstream Operating Subsidiaries] signed the master lease, that would have been a clear violation of the indenture at issue in this case.

---

[26]   Joint General Rule Application, *In re Cavalier Telephone Mid-Atlantic, LLC, et al.*, Pennsylvania Public Utility Commission (Aug. 26, 2014) at 5.

[27]   Petition for Approval of Transfer, *In the Matter of Talk America Services, LLC, et al.*, Public Service Commission of West Virginia (Aug. 29, 2014) at 2-3.

A. Yes.[28]

99.    Yet, despite that Windstream and Defendant Uniti knew this fact, Robert Gunderman affirmatively represented to regulators, during the November 2014 hearing before the Kentucky PSC, that the contemplated Spin-Off and lease transaction ***would not violate*** any of Windstream's debt agreements or restrictive covenants, stating that "[a]s part of this transaction, [Windstream] ha[d] no concerns with any covenants within [its] indentures or [its] existing credit agreement."[29]   Fletcher was present during this testimony.[30] And Robert Gunderman affirmed that he and Fletcher were "speaking for both companies," *i.e.*, Windstream and Defendant Uniti.[31]

100.    Thus, Windstream, Defendant Uniti and their advisors, including Fletcher, represented to state regulators that the Windstream Operating Subsidiaries would retain exclusive access and control of the assets owned by Uniti and that the Master Lease did not violate any of Windstream's debt covenants (which was necessary in order to obtain regulatory approval) despite knowledge that such an arrangement violated the terms of the Indenture – a fact that was concealed from the market.

101.    Defendants' deception worked.  On August 13, 2014, Covenant Review issued a report titled "Windstream: How Would the Bond Covenants be Implicated by the Proposed REIT Spin-Off."  Covenant Review, whose tag line on the top of their reports reads "The

---

[28]    Aurelius Litigation Trial Transcript at 123:2-6.

[29]    KY Transcript at 116:11-117:9.

[30]    *Id*. at 150:14-17.

[31]    *Id*. at 71:2.

Authority on Bond and Loan Covenants," tracked the covenants disclosed by Uniti and analyzed the likelihood that the Spin-Off would result in a violation of the restrictive covenants found in §4.07 (Restricted Payments), §4.14 (Change of Control), and §5.01 (Merger) of the Indenture. But, because it was not disclosed, the analyst was unaware of the possibility that §4.19's prohibition on sale-leaseback transactions could be violated by the Spin-Off. The analyst was also unaware of the true risk that the terms of, and assumptions underlying, the Master Lease, particularly the inflated projections of the useful life of copper wire, rendered it not a "true lease," but a financing arrangement which violated §4.09's leverage ratio covenant.

### E.   Windstream, with Defendants' Help Finalizes the Structure of the Spin-Off Including the Terms of the Master Lease

102.   While the regulatory approval process was underway, Windstream, Defendant Uniti, Thomas, Robert Gunderman, Fletcher and Defendant Kenny Gunderman worked simultaneously on finalizing the Master Lease.[32]

103.   As described in ¶¶56-87, the Master Lease was structured as a workaround to the Indenture's prohibitions on sale-leaseback transactions. Indeed, Windstream had total control over structuring the transaction and drafting the Master Lease. At all relevant times during the "negotiation" of the Master Lease, the officers of Windstream Holdings were also officers of Uniti. Fletcher has openly admitted that the Master Lease was not negotiated at arm's-length.[33]

---

[32]   Amended Complaint, *SLF Holdings, LLC v. Uniti Fiber Holdings, Inc., et al.*, No. 1:19-cv-01813-LPS (D. Del. Nov. 18, 2019) ECF No. 71 ("SLF Complaint"), ¶97.

[33]   Aurelius Litigation Trial Transcript at 92:18-93:4.

104.    Fletcher in particular, as leader of the "Windstream Group" during these "negotiations," was simultaneously General Counsel of *both* Windstream and Uniti.  He therefore had a client on both sides of the transaction while formally negotiating on behalf of the "Windstream Group."  The Windstream Group also included Dan King and Willis Kemp, with representation from Skadden Arps Slate Meagher & Flom ("Skadden").

105.    The "Uniti Group" was led by Windstream's former CFO, its then Head of REIT Operations and future CEO, Thomas.  Thomas's involvement in the Spin-Off is clear – during 2014 Thomas first served as Windstream's CFO, then Head of REIT Operations *at the same time he was* Uniti's President and CEO, before being appointed CEO of Windstream in December 2014.  Although he was a long-time senior executive of Windstream, Thomas led the "Uniti Group" that negotiated against Fletcher's "Windstream Group" over the structure and terms of the Spin-Off, including the terms of the Master Lease. Jeff Small and the law firm Bryan Cave LLP also served on the Uniti Group.[34]

106.    In early 2015, management and Board positions were filled for Uniti, including the hiring of Defendant Kenny Gunderman as Uniti's CEO and President on March 2, 2015. Immediately prior to his joining Uniti, Kenny Gunderman was employed at Stephens advising Windstream on the Spin-Off, and attending Windstream Board meetings where the Spin-Off strategy and transaction was being discussed in detail.

---

[34]    Jeff Small (a Windstream employee) had been designated to join Thomas at the newly-formed REIT company after the Spin-Off was complete.

4848-2207-4295.v23

107.    Francis X. Frantz ("Frantz"), a director on Windstream's Board, and its former Chairman of the Board, was named the Chairman of Uniti's Board of Directors.  Frantz also attended the Windstream Board meetings described in ¶¶79-85, 109-110.

108.    As demonstrated below, the relevant parties were conflicted parties to the Spin-Off, and as a result, the transaction was not created at "arm's length," but rather was the opposite – an "arm-in-arm" transaction.



109.    On March 17, 2015, Fletcher and Defendant Kenny Gunderman participated in a Windstream Board of Director teleconference.  According to the minutes of the meeting, the purpose of the teleconference was "to provide the Board a status update on the proposed REIT transaction."  The attendees discussed the timeline for closing the Spin-Off and the status of the financing activities necessary to close the transaction, among other topics.

- 40 -

Kenny Gunderman, then CEO of Uniti, gave a presentation concerning Uniti's "operational readiness" at the meeting.

110. On March 25, 2015, the Windstream Services Board approved the Spin-Off transaction.[35]  Fletcher and Defendant Kenny Gunderman participated in the Board teleconference where the Spin-Off was approved.

### F.    Defendants Finalize the Spin-Off

111. On March 26, 2015, Uniti, Windstream Holdings and Windstream Services entered into a Separation and Distribution Agreement.  This agreement provided that on April 24, 2015, Windstream Services would cause the Windstream Operating Subsidiaries to transfer to Uniti various telecommunications assets, including fiber optic and copper cable lines, office land and buildings, rights to certain permits, agreements, and easements, and a local exchange carrier business.  These assets were valued at $7.45 billion.

112. The assets to be transferred included substantial and critical parts of Windstream's network in thirty-seven states and the District of Columbia.  In an April 12, 2015 email received by Defendants Kenny Gunderman and Wallace, talking points attached acknowledged that the transferred assets were "essential and the only means for [Windstream] to serve clients," and to which continued access was essential for Windstream "to have a business and continue to generate cash flows."

113. In return for these assets, Windstream Services received all of Uniti's common stock, $1.035 billion in cash, and $2.5 billion in debt comprised of term loans and unsecured notes.  On April 24, 2015, Windstream Services transferred 80.4% of Uniti's common stock

---

[35]   Current Report on SEC Form 8-K (Mar. 26, 2015) (the "March 26, 2015 Form 8-K").

4848-2207-4295.v23

to its parent company, Windstream Holdings, and Windstream Holdings distributed those shares to Windstream Holdings' stockholders, at which time Uniti's stock became a separate publicly traded stock listed on the NASDAQ.

114.   On April 24, 2015, pursuant to the Separation and Distribution Agreement, Windstream Holdings and a number of Uniti subsidiaries signed the Master Lease.  The Master Lease gave Windstream Holdings the exclusive right to use the assets transferred to Uniti for fifteen years, with options to extend the term up to a total of thirty-five years.

115.   Rent was set at $650 million per year (and increased to $653.5 million during the first year of the lease), payable in monthly installments, with annual increases of 0.5% per year beginning with the fourth year of the term.

116.   In addition to the fixed rent, the Master Lease was a "'triple-net' lease," requiring the tenant to maintain, repair and pay for taxes, utilities, and insurance on the transferred assets.  The Master Lease provided that all capital improvements paid for by the tenant to maintain, repair, overbuild, upgrade, or replace the leased property "shall automatically become a part of the Leased Property" – that is, property of Uniti, the owner of the assets.

117.   Because Uniti and Windstream shared officers at the time the Spin-Off was conceived and completed, and because Uniti's new CEO, Defendant Kenny Gunderman, had been Windstream's financial advisor during this transaction, Defendants Uniti and Kenny Gunderman knew, or recklessly disregarded the fact that the Master Lease violated the terms of the Indenture, and that Windstream (and, as a result, Uniti) faced significant risk if a Noteholder challenged the transaction on that basis.

118.   On April 12, 2015, a "messaging call" was held with members of Windstream's management, Uniti's management, and investment bankers from JPMorgan and Bank of America.  Defendants Kenny Gunderman and Wallace participated on the call, along with Robert Gunderman and other members of Windstream's management.  Prior to the call, the participants received an email attaching a "Consolidated Q&A list for discussions with lender" – a set of talking points to use in addressing how the Master Lease and the Windstream relationship should be publicly discussed.

119.   The April 12, 2015 talking points advised that if asked if "WIN in Distressed Situation/What happens in WIN Bankruptcy?" to "***always lead with***" that "WIN is a very reliable tenant."   Additionally, the talking points also counseled Defendants Kenny Gunderman and Wallace to stress that the "Lease Structure [was] Well Designed and Iron-Clad" and that "WIN and CS&L's collective intent in negotiating the lease was for it to be impossible to reject it in a bankruptcy."  Defendants stuck with this message throughout the Class Period.

120.   If asked "[w]hy is the lease with WIN Holdings VS WIN Services?," the April 12, 2015 talking points directed Defendants Kenny Gunderman and Wallace and Windstream's executives to conceal the truth by offering the following responses: "[t]his is a complex transaction and after considering many factors we concluded that having the lease at WIN Holdings was the best structure."  And "[i]f [p]ressed," they were not to provide a direct response but should only point out the "[f]actors evaluated," including "corporate structure, tax, accounting, [and] debt."  This messaging is consistent with Windstream's earlier strategy, reflected in Mary Michaels's August 6, 2014 email, described in ¶¶92-94,

that management avoid getting into details surrounding how the structure of the Master Lease impacts Windstream's Indenture.

121.    Robert Gunderman forwarded the April 12, 2015 email to Thomas and updated him on the discussions had on the messaging call.  Robert Gunderman explained to Thomas that during the messaging call it was decided that Defendant Kenny Gunderman and his team would "reinforce their message" about the Spin-Off to "holdout []" accounts using the attached talking points.

### G.    Defendants Also Conceal that the Master Lease Was Not a True Lease, but a Financing in Disguise

122.    In addition to the concealed risk that Noteholders could successfully challenge the Spin-Off as a violation of the Indenture, Defendants knew, or recklessly disregarded, that the Master Lease was a financing in which Windstream really owned the network assets and Uniti simply provided financing to Windstream, ostensibly secured by those assets. Defendants were aware of the risk that the Master Lease could be "recharacterized" as a financing arrangement and that such arrangement also violated the Indenture.

123.    The magnitude of this risk was significant.   Defendants knew that if Windstream filed for bankruptcy protection and was able to successfully recharacterize the Master Lease as a financing (rather than a "true lease"), then Uniti's claim in a Windstream bankruptcy to "rent" payments would be almost entirely unsecured and structurally subordinated to other creditors' claims.  Thus, by concealing the true nature of the risk that the Master Lease could be recharacterized as a financing, Defendants failed to disclose to investors that Uniti's most significant driver of revenue – *i.e.*, rent from Windstream

pursuant to the Master Lease – would effectively disappear in the event of a Windstream bankruptcy, devastating Uniti's ability to continue as a going concern.

124.    This is precisely what happened.  In connection with Windstream's bankruptcy filing (as discussed more thoroughly below), Windstream has taken the position in an adversary proceeding (the "Adversary Proceeding") against Uniti that "[t]he 'Master Lease' is not a true lease," but is actually a financing.  *See* Adversary Proceeding Complaint, ¶2.

125.    Indeed, in the Adversary Proceeding, Windstream argues that it, not Uniti, is the true owner of the network assets and has sought to recharacterize the Master Lease as a financing transaction.  According to Windstream, the Master Lease is actually a financing because:

(a)    Windstream, the ostensible tenant under the Master Lease, actually bears all the risk related to the real estate.  "The Master Lease is at the extreme end of triple net leases, and "is more akin to a bondable lease – a variant of a triple net lease where the tenant carries every imaginable risk related to the real estate."  Indeed, Windstream must pay "'full rent'" even if the leased networks become compromised, deteriorate physically, age to obsolescence, or are otherwise impaired such that they cannot generate revenue to fund the rent.[36]

(b)    The $650 million in "rent" that Windstream owed annually to Uniti "was predetermined to provide a sufficient yield to attract equity investors" to Uniti and was "based on Uniti's projected capital needs to service its debt."  Unlike a normal "rent" that should decline as the networks Windstream was renting depreciated, the Master Lease includes a rent escalator.  This was done in an attempt to shoehorn the Master Lease into the framework of traditional real estate leases with traditional REITs – considering that, unlike copper wire and fiber optic cables, real estate is not a rapidly deteriorating asset. In other words, the rent is not tied to the fair market value of the assets.[37]

(c)    Windstream bears the burden under the Master Lease of making improvements to the networks, thereby paying to improve an asset it is purportedly leasing, an

---

[36]    Adversary Proceeding Complaint, ¶6.

[37]    *Id.*

arrangement Windstream likens to a lessee paying to replace the engine in a leased vehicle.[38]

(d)     Windstream accounted for the transaction on its books as a "failed sale-leaseback transaction," with the "rent" split into principal and interest and the transferred assets remaining on Windstream's books.[39]

126.    Of particular note is Windstream's claim in bankruptcy that the Master Lease's rent was chosen specifically to shoehorn the Master Lease into the framework of traditional real estate leases with traditional REITs – which required glossing over the fact that the assets here (*i.e.*, copper wire and fiber optic cables), unlike real estate assets, are depreciating assets.

127.    In fact, Defendants were aware that defining the Master Lease as a "true lease" depended on false and inflated information about the useful life of copper wire – *i.e.*, the leased asset.  In order for the Master Lease to be deemed a "true lease," Windstream and Uniti needed to assume that the useful life of these assets was more than double their true useful life, or the assets being leased would be depreciated to zero during the term of the Master Lease.

128.    In connection with seeking approval for Uniti REIT-treatment, Windstream and its advisors, including Fletcher and Defendant Kenny Gunderman (who championed the idea of forming the Uniti REIT), told the IRS that the estimated useful life of copper wire in the to-be-spun-off networks was 30 to 40 years.  Windstream, Fletcher and Defendant Kenny Gunderman knew this estimate was at odds with valuations of those assets that it possessed at that time, and with what it now claims in bankruptcy to be its own accounting treatment

---

[38]   *Id.*, ¶215.

[39]   *Id.*

for copper wire at the time – which is depreciated over 20 years, a treatment that it recognizes is "on the longer side of actual expectation."[40]  Further, this inflated information about the useful life of these assets also formed the basis of an analysis by Windstream's advisor E&Y, and a "true lease" opinion delivered by Skadden to Uniti's management. Indeed, Windstream now represents in its bankruptcy that "[f]or many locations, Windstream's copper will be uncompetitive on or around 2025,"[41] *i.e.*, five years ***before*** the initial term of the Master Lease expires.

129.   Likewise, based upon the allegations in Windstream's complaint in the Adversary Proceeding and the Skadden "true lease" opinion, Uniti also provided inflated projections of the leased networks' remaining useful life and economic value, and then represented and warranted to its own outside advisors that these projections were reasonable. These inflated projections that the assets would have a useful life beyond the initial term of the Master Lease, and the first renewal term, provided one of the bases on which Skadden concluded that the Master Lease would be treated for tax purposes as a "true lease."  Fletcher knew that the useful life projections provided to E&Y and Skadden were inflated, considering that he served as leader of the "Windstream Group" during the Master Lease negotiations, which was represented by Skadden during those negotiations.  Indeed, E&Y's valuation analysis was discussed in detail at several Board meetings attended by Fletcher and Defendant Kenny Gunderman.  ¶¶81-85.

---

[40]   Adversary Proceeding Complaint, ¶105.

[41]   Adversary Proceeding Complaint, ¶99.

130.    The inflated projections of remaining useful life and economic value were also the basis for an opinion by E&Y that the copper network (which constituted 80% of the network assets transferred to Uniti) had a total useful life in excess of 40 years.  Defendant Uniti either provided the projections that E&Y relied upon, or, alternatively, knew or recklessly disregarded that the projections were inaccurate and unsupportable.

131.    Further, Windstream also alleges in bankruptcy that it had other analysts examine the remaining economic life of copper cables, and those analysts had reached conclusions markedly different than E&Y's.  Duff & Phelps, for example, prepared depreciation reports of Windstream's copper wire networks and concluded as early as 2011 and 2012 that the remaining economic life of those copper wire cables was between 3.9 and 7.7 years.[42]  Another analyst, CostQuest Associates, concluded in 2016 that the average remaining life for metallic cables was between 1.3 and 7.5 years, depending on the type of cable.[43]  BCRI Valuation Services, in a 2015 Depreciation & Cost Manual, assigned a 4 to 7 year useful life for metallic cables.[44]

132.    Despite its own accounting policy, when Windstream requested a private letter ruling from the IRS in 2013 regarding the REIT spinoff, Windstream and its advisors, including Fletcher and Defendant Kenny Gunderman, represented to the IRS that the copper wiring to be distributed to Uniti had a useful life of approximately 30 to 40 years.

---

[42]    Adversary Proceeding Complaint, ¶101.

[43]    Adversary Proceeding Complaint, ¶103.

[44]    Adversary Proceeding Complaint, ¶104.

133.    Uniti made similar statements, representing in its Information Statement to shareholders in connection with the Spin-Off that its copper wiring had a useful life of 7 to 40 years.  But Defendants knew this was false and that the actual useful life was much shorter than the upper end of the range that it disclosed in the Information Statement.

134.    As alleged in ¶¶81-85, Fletcher and Defendant Kenny Gunderman, knew or recklessly disregarded, based on information and discussion at various Windstream Board meetings, that Windstream's representations to the IRS and Uniti's representations in its Information Statement in connection with the Spin-Off about the copper wire cables could not be squared with the initial term of the Master Lease and the follow-on five-year renewal terms.

135.    What's more, although Skadden determined that the Master Lease was a "true lease" (an opinion that expressly relied on E&Y's useful life projections that Fletcher and Defendants Uniti and Kenny Gunderman knew to be inflated and unreasonable), the opinion also confirmed for Uniti's executives, including Defendant Kenny Gunderman, the significant risks associated with the Spin-Off transaction – risks Defendants concealed from investors.

136.    Skadden's opinion warned that the IRS "'may argue that the proposed lease is merely a financing arrangement and that the purported lessor [Uniti] is, in substance, a secured creditor but holds no equity interest in the property.'"[45]  Windstream is making this very argument in the Adversary Proceeding.

---

[45]    SLF Complaint, ¶85.

4848-2207-4295.v23

137.    Skadden's analysis also anticipated the exact argument that Aurelius would later advance in declaring an event of default on the Notes: that the economic substance of the Spin-Off was analogous to a sale-leaseback transaction.  In fact, Skadden concluded: "'the Spin-Off and Master Lease involve a contribution of property to [Uniti] by Windstream and a leaseback of those properties from [Uniti] to Windstream.  Thus, there is a transfer of legal ownership of the Distribution Systems followed by a leaseback of that property that could be viewed as similar to a sale-leaseback arrangement.'"[46]

138.    Skadden's "true lease" opinion therefore identified for Uniti management both the very risk that ultimately brought Windstream to bankruptcy, and the argument Windstream ultimately advanced in connection with its bankruptcy to recharacterize the Master Lease as a financing – both of which Defendants concealed from the market.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

139.    Lead Plaintiffs allege that the statements highlighted in bold and italics within this section were materially false and misleading because, among other reasons, the statements omitted material information of which Defendants were aware, or recklessly disregarded.  As alleged herein, such statements artificially inflated, or artificially maintained, the price of Uniti's publicly traded securities and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired those securities during the Class Period.  Because Defendants chose to speak on the issues described below, they were obligated to not mislead investors or withhold material information.  As described below,

---

[46]    *Id.*, ¶86.

Defendants created an impression of a state of affairs at Uniti that differed in a material way from the one that actually existed.

### A. Uniti Begins Operations Following the Spin-Off and Defendants Conceal That the Master Lease Violated the Terms of the Indenture

#### 1. March 26, 2015 – Filing of the Form 8-K and Information Statement

140.    On March 26, 2015, Uniti announced the completion of the Spin-Off stating that it would be finalized on April 24, 2015.  Defendants also represented to investors that upon the completion of the Spin-Off and signing of the Master Lease on April 24, 2015, Windstream Holdings would be the lessee of Uniti's network assets, failing to disclose to the Company's investors that the Master Lease was actually a prohibited sale-leaseback between Uniti and the Windstream Operating Subsidiaries, in violation of the Windstream Indenture's restrictive covenants, and that the Master Lease was not a lease at all, but instead a financing arrangement.

141.    On March 26, 2015, Defendant Kenny Gunderman – Uniti's President and CEO – wrote a letter to "Future Shareholder of Communications Sales & Leasing, Inc.," (*i.e.*, Uniti), which was filed in connection with the March 26, 2015 Form 8-K.  In the letter, Gunderman described the sale and leaseback arrangement – stating in part that Uniti was leasing its network assets to Windstream Holdings:

> Our initial properties will include, among other things, an extensive communications distribution system, comprised of approximately 66,000 route miles of fiber optic cable lines, 235,000 route miles of copper cable lines, and central office land and buildings across 37 states that are ***currently owned by Windstream. This distribution system will be leased to Windstream Holdings on a long-term, triple-net basis***.  We expect to diversify our tenant base in the future by acquiring additional properties and leasing them to other local,

- 51 -

regional and national telecommunications providers.  We also expect to grow and diversify our portfolio through the acquisition of properties in different geographic markets, and in different asset classes.

142.    On March 26, 2015, Amendment No. 4 of the Registration Statement on Form 10 (the "Information Statement") – related to the Spin-Off filed by Uniti on March 25, 2015 and signed by Defendant Kenny Gunderman – was declared effective.

143.    Uniti's March 26, 2015 Information Statement echoed Defendant Kenny Gunderman's assertion in his letter to "Future Shareholders" discussed at ¶141, that "the Distribution Systems" – *i.e.*, the copper and fiber network assets Uniti acquired from the Windstream Operating Subsidiaries – "will be *leased to Windstream Holdings*" pursuant to the Master Lease.

144.    Uniti's March 26, 2015 Information Statement also omitted material information.  Though Defendants communicated to investors that certain restrictive covenants in Windstream's debt agreements had affected the structure of the Spin-off, they failed to mention the Indenture's clear prohibition on sale-leaseback transactions. Specifically, Defendants disclosed to investors that "[i]n order to comply with restrictions under Windstream's debt agreements . . . Windstream [would] retain ownership of certain distribution systems in select states."

145.    Indeed, Defendants disclosed the "Restricted Payment" covenant under §4.07, the Mergers covenant under §5.01, and the Change of Control covenant under §4.14. Defendants therefore disclosed certain restrictions in Windstream's Indenture while choosing to conceal that the Master Lease violated the Indenture's restriction on sale-leaseback transactions under §4.19.  Similarly, Defendants made no mention of §4.09's leverage ratio

covenant, which concealed that the Master Lease was not in fact a "true lease," but was a financing arrangement. *See* ¶¶122-138.

146. Uniti's March 26, 2015 Information Statement also included materially false and misleading statements with respect to Uniti's risk disclosures. One such risk disclosure concerned the impact to the Company's business from the reaction of third parties to the Spin-Off:

> The Spin-Off may lead to increased operating and other expenses, of both a nonrecurring and a recurring nature, and to changes to certain operations, which expenses or changes could arise pursuant to arrangements made between Windstream and us or could trigger contractual rights of, and obligations to, third parties. ***Disputes with third parties could also arise out of these transactions, and we could experience unfavorable reactions to the Spin-Off from employees, lenders, ratings agencies, regulators or other interested parties***. These increased expenses, changes to operations, disputes with third parties*, or other effects could materially and adversely affect our business, financial position or results of operations.

147. Another risk disclosure in Uniti's March 26, 2015 Information Statement attempted to warn of events that could affect its payments under the Master Lease: "***We will be dependent on Windstream Holdings to make payments to us under the Master Lease, and an event that materially and adversely affects Windstream's business, financial position or results of operations could materially and adversely affect our business, financial position or results of operation***."

148. Further, the March 26, 2015 Information Statement included materially false and misleading statements regarding its relationship with Windstream and Windstream's ability to pay its rent pursuant to the Master Lease:

> Immediately following the Spin-Off, Windstream will be our only tenant. Windstream is a leading provider of advanced network communications, including cloud computing and managed services, to

- 53 -

businesses nationwide. Windstream also offers broadband, phone and digital TV services to consumers primarily in rural areas. ***Following the Spin-Off, Windstream will continue to operate the leased communications facilities, hold the associated regulatory licenses and own and operate other assets, including distribution systems in select states not included in the Spin-Off. Windstream will retain ownership of distribution systems in select states in order to achieve a transaction size that in its determination is optimal in terms of assets transferred, debt extinguishment and fair market rental. For the year ended December 31, 2014, Windstream generated annual revenue of approximately $5.8 billion and net cash from operations of $1.5 billion. Windstream's liquidity position, modest leverage and ability to generate significant free cash flow should provide it with the ability to pay the annual lease obligations to CS&L for the foreseeable future***.

149.    The materially false or misleading statements and omissions alleged in ¶¶143-148 from Uniti's March 26, 2015 Information Statement were also incorporated into other Information Statements filed with the SEC as attachments to: (1) a Form 10 filed by Uniti on October 24, 2014, and signed by Thomas as CEO of Uniti; (2) Amendment No. 1 to the Form 10 filed on December 22, 2014, and signed by Fletcher as General Counsel of Uniti; and (3) Amendment No. 2 to the Form 10 filed on February 10, 2015, and also signed by Fletcher.

150.    The March 26, 2015 Form 8-K also included, as an exhibit, the March 26, 2015 Separation and Distribution Agreement signed by Defendant Kenny Gunderman, which stated:

> ***None of the execution, delivery or performance of this Agreement, or the consummation of the Transactions does or will, with or without the giving of notice, lapse of time, or both, violate, conflict with, result in a material breach of, or constitute a material default under or give to others any right of termination, acceleration, cancelation or other right under (a) the organizational documents of WHI or Windstream, (b) any material agreement, document or instrument to which WHI or Windstream is a party or by which WHI or Windstream (or their assets or properties) are bound or (c) any term or provision of any judgment, order, writ, injunction or decree binding on WHI or Windstream (or their assets or properties)***.

- 54 -

151.    Despite Defendants' statements made in connection with the completion of the Spin-Off in the March 26, 2015 Form 8-K and Information Statement, the true reason that Windstream Holdings signed the Master Lease (rather than Windstream Services or Windstream Operating Subsidiaries) was to make it appear that the Master Lease did not violate the restrictions in the Indenture prohibiting sale-leaseback transactions as Fletcher has admitted. *See* ¶¶56-58. However, guided by talking points described in ¶¶92-94, 118-121, Defendants continued, throughout the Class Period, to conceal that the Master Lease and the Spin-Off violated the Indenture, and the true nature and extent of the risk to Uniti's investors should the truth about the Spin-Off structure become known which would spell financial disaster for Uniti.

152.    Based on Defendants' representations, investors and analysts understood that Windstream Holdings would be the lessee of the network assets upon the signing of the Master Lease on April 24, 2015 (but not that the Spin-Off violated the Indenture). Defendants' statements in the Information Statement and March 26, 2015 Form 8-K misleadingly characterized Windstream Holdings as the lessee of Uniti's newly acquired network assets under the terms of the Master Lease, without disclosing that, in reality, the Windstream Operating Subsidiaries were the *de facto* lessees.

153.    Defendants' deception worked. In a report announcing the initiation of coverage of Uniti on June 22, 2015, analysts at JPMorgan stated as follows: "The primary source of revenue for [Uniti] is the 15-year, triple-net, exclusive Master Lease agreement with Windstream Holdings whereby Windstream pays [Uniti] $650 million a year for the

exclusive rights to use the wireline assets located in 36 markets across 29 states Windstream sold to [Uniti] as part of the spin-off and sale-leaseback transaction."

### 2.    April 24, 2015 Completion of Spin-Off

154.    The Class Period begins on April 24, 2015, the day that Windstream completed the Spin-Off of Uniti.  On that day, Windstream distributed over 120 million shares of Uniti shares to Windstream stockholders on a pro rata basis as described in the March 26, 2015 Information Statement.  The Company's stock began trading on the NASDAQ on April 27, 2015 with the false and misleading statements, and material omissions, outlined in ¶¶141-150, informing investors about Uniti and its relationship with Windstream.

155.    In addition to issuing Uniti common stock as part of the Spin-Off, the Company also "completed private offerings by certain selling security holders of $400 million aggregate principal amount of the Issuers' 6.00% Senior Secured Notes due 2023" and "$1.11 billion aggregate principal amount of the Issuers' 8.25% Senior Notes due 2023." Copies of the Indentures which described the terms and conditions of the Company's issuance of these notes were attached to the Form 8-K filed by the Company on April 27, 2015.

### 3.    June 10, 2015 – REITWeek 2015

156.    On June 10, 2015, before the market opened, Defendants Kenny Gunderman and Wallace gave a presentation during REITWeek 2015, the National Association of Real Estate Investment Trust ("NAREIT")'s Investor Forum, held at the New York Hilton Midtown in New York City on June 9-11, 2015.  In a presentation for analysts and investors, Gunderman and Wallace discussed the Company's strategy to grow its business portfolio and

dilute its dependence on the revenues from the Master Lease with Windstream.   In discussing the "Universe of Potential Partners" in the "Fragmented Telecom Industry" (including potential business partners in the Fiber/Competitive, ILEC/RLEC, Cable, and other data center segments) available to the Company, Gunderman and Wallace touted their "Deep Familiarity with Sale Leaseback Transactions," which was, according to them, one of the ways the Company could structure future growth transactions.

### 4.    July 2, 2015 – Registration of 8.25% Notes

157.   On July 2, 2015, Defendants caused Uniti to file a Form S-4 with the SEC offering to register under the Securities Act of 1933 the $1.1 billion of 8.25% Senior Notes due in 2023 that were previously issued in the Spin-Off (discussed above in ¶155) via an Exchange Offer.  The Form S-4 was declared effective by the SEC on July 31, 2015.

158.   The Exchange Offer was conducted pursuant to the July 2, 2015 Form S-4, a Prospectus dated August 5, 2015 and a Prospectus Supplement dated August 13, 2015 (the "Senior Notes Registration Statement").  The Senior Notes Registration Statement indicated that the deadline to submit the originally issued Senior Notes was September 2, 2015.  The Senior Notes Registration Statement repeated the statements alleged in ¶¶141-150, 160-162.

### 5.    August 13, 2015 – 2Q15 Results

159.   On August 13, 2015, before the market opened, Defendants issued a press release announcing Uniti's financial results for 2Q15.  The press release stated:

> "We are extremely pleased with the successful launch of [Uniti] as an independent publicly traded REIT," commented Kenny Gunderman, President and Chief Executive Officer.  "We have developed a strong pipeline of acquisition and capital funding opportunities, and believe we are well positioned to create substantial shareholder value as we grow and diversify our portfolio."

- 57 -

160.   The press release also outlined "[f]actors which could have a material adverse effect on our operations and future prospects or which could cause actual results to differ materially from our expectations" including "***the ability and willingness of Windstream Holdings and any other customers to meet and/or perform their obligations under any contractual agreements that are entered into with us, including master lease arrangements***."

161.   On August 13, 2015, Defendants also filed with the SEC the Company's 2Q15 Form 10-Q, signed by Defendant Wallace.   The 2Q15 Form 10-Q repeated the "factors which could have a material adverse impact" on the Company's operations contained in the August 13, 2015 press release alleged in ¶160.

162.   The 2Q15 Form 10-Q also updated Defendants' statements concerning the impact to the Company's business as a result of disputes with third parties to the Spin-Off:

> The Spin-Off may lead to increased operating and other expenses, of both a nonrecurring and a recurring nature, and to changes to certain operations, which expenses or changes could arise pursuant to arrangements made between Windstream and us or could trigger contractual rights of, and obligations to, third parties*. **Disputes with third parties could also arise out of these transactions.  These increased expenses, changes to operations, disputes with third parties, or other effects could materially and adversely affect our business, financial position or results of operations*** . . . .

163.   On August 13, 2015, at 11:00 a.m. Eastern Time, Defendants held a conference call with analysts and investors to discuss the Company's 2Q15 financial results and the state of its business.   The conference call was also webcast live on the Company's website. Defendants Kenny Gunderman and Wallace, and Rob Clancy, then Uniti's Vice President of Investor Relations, participated in the call.   Gunderman ended the conference call by

- 58 -

assuring investors that the Company had put forth "extraordinary efforts over the last several months to launch [Uniti]," which put it on a "*solid foundation* for success."

164.    Defendants' statements drove the price of Uniti's stock up nearly 5% to close at $22.21 per share on August 13, 2015.

### 6.    November 14, 2016 – 3Q16 Results

165.    Doubling down on their representation that the Master Lease arrangement with Windstream was appropriate, during a November 14, 2016 conference call with analysts and investors to discuss Uniti's 3Q16 financial results and the state of its business held before the market opened, Defendant Kenny Gunderman emphasized that the Company was "always look[ing] at potential sale-leaseback options [and] *additional sale-leaseback options with Windstream*."

166.    Defendants repeated the statements alleged in ¶¶160-162 in the press releases issued by the Company and the Forms 10-K and 10-Q, signed by Defendants Kenny Gunderman and Wallace, and filed with the SEC, relating to Uniti's 3Q15-3Q17 financial reports.

167.    The statements referenced above in ¶¶157-163, 165-166 were each false and misleading when made in that each omitted and/or misrepresented material facts.  The true facts, which were then known to or recklessly disregarded by Defendants were:

(a)     The Spin-Off constituted a sale-leaseback transaction between Uniti and the Windstream Operating Subsidiaries in direct violation of Windstream's Indenture's restrictive covenants.  ¶¶56-86.  Indeed, Fletcher admitted that he knew at the time that "if the transferor . . . signed the master lease, that would have been a clear violation of the

- 59 -

indenture at issue in this case." ¶86. Furthermore, throughout the Class Period, internal documents demonstrate that Defendants were aware of and concerned about the appearance that the Master Lease violated the terms of the Indenture. ¶¶68-86. Specifically, prior to the Spin-Off, Windstream and Uniti executives, including each of the Individual Defendants, were told to not go into detail unless "pressed" about the structure of the Master Lease and to give general canned responses. ¶¶92-94, 118-121.

(b) Windstream Holdings was the only Windstream entity to sign the Master Lease so that Defendants could evade the restrictions in the Windstream Operating Subsidiaries' Indenture prohibiting sale-leaseback transactions, and make it appear publicly that the Master Lease did not violate the Indenture. ¶¶68-86.

(c) Despite warning that "[d]isputes with third parties could also arise out of [the] transactions" and that the Company "could experience unfavorable reactions to the Spin-Off," this risk had already materialized as the Spin-Off violated Windstream's covenant restricting the sale and leaseback of Windstream's assets, and the violation of the Indenture increased the risk that Noteholders representing 25% or more of the aggregate principal amount on the Notes would seek to accelerate payments on the Notes, potentially triggering a Windstream bankruptcy. ¶¶56-86.

(d) Uniti was not launched as an "independent publicly traded REIT," as the Spin-Off was tailor-made with Windstream executives on both sides of the deal. ¶¶102-110. Indeed, at all relevant times during the "negotiation" of the Master Lease, the officers of Windstream Holdings were also officers of Uniti. ¶108. For example, Fletcher was the

General Counsel for both Windstream and Uniti, and Tony Thomas was both the CFO and Head of REIT Operations for Windstream and Uniti's President and CEO.  ¶¶104-105.

(e)    Defendants knew the Master Lease was a financing arrangement, in which Windstream owned the network assets and Uniti simply provided financing to Windstream.  This was a breach of §4.09 of the Indenture, and also carried with it the significant risk that if Windstream filed for bankruptcy protection and was able to successfully recharacterize the Master Lease, Uniti's claim in a Windstream bankruptcy to rent payments would be almost entirely unsecured and structurally subordinated to other creditors' claims.  ¶¶122-138.

(f)    Uniti's determination that the Master Lease was a "true lease" depended on false and inflated information about the useful life of the primary leased asset – copper wire.  ¶¶122-138.  In truth, the transferred assets did not have a useful life beyond the initial term of the Master Lease and the first renewal.  *Id.*  As detailed by Duff & Phelps's depreciation reports, as early as 2011 and 2012, the remaining economic life of Windstream's copper wire networks was between 3.9 and 7.7 years, not the 7 to 40 years Defendants represented to investors.  *Id.*

(g)    Uniti was not "well positioned to create substantial shareholder value," did not have a "solid foundation for success," and "Windstream's liquidity positions" could not "generate significant free cash flow [to] provide it with the ability to pay the annual lease obligations to [Uniti] for the foreseeable future" as Defendants concealed that: (i) the Spin-Off was a prohibited sale-leaseback transaction and could be successfully challenged by a Noteholder owning 25% or more of Windstream's debt; and (ii) the Master Lease was

- 61 -

actually a financing, which in the event of a Windstream bankruptcy, Uniti's most significant driver of revenue – rent from Windstream pursuant to the Master Lease – could effectively disappear, or be materially reduced.  ¶¶56-86, 122-138.

(h)     Uniti could not engage in "additional sale-leaseback options with Windstream" as Defendants were aware that the Master Lease transaction was a sale-leaseback in clear violation of the Indenture, eliminating the possibility of additional sale-leaseback transactions with Windstream.  ¶¶56-86.

## B.     Materialization of the Risk and Defendants' Continued Materially False and Misleading Statements and Omissions

### 1.     August 3, 2017 – 2Q17 Results and Windstream's Announcement of Elimination of Dividend

168.    On the morning of August 3, 2017, Windstream announced that it was eliminating its dividend.  In response to this information, Uniti's stock price immediately began to fall.

169.    Later that day, after the market closed, Defendants held a conference call with analysts and investors to discuss Uniti's 2Q17 financial results and the state of its business, which were also released on August 3, 2017.  In an effort to stop Uniti's stock price from falling further, during the conference call, when questioned about the sustainability of Windstream given its announced dividend elimination, Defendant Kenny Gunderman insisted that the lease payment from Windstream was "***very, very safe and a very high-priority payment from their perspective***" and that Defendants "***remain highly confident in that lease payment***."

170.   Despite Defendant Kenny Gunderman's assurances, Uniti's stock price fell nearly 12% on August 3 and August 4, 2017, on trading volumes exceeding 7 million shares – more than three times the average daily trading volume during the Class Period – as the market absorbed this information.

171.   A few days later, on August 8, 2017, Defendant Kenny Gunderman gave a presentation to investors, analysts, and market participants at the Cowen Communications Infrastructure Summit on behalf of Uniti.  When questioned about ongoing concerns with Windstream and its decision to eliminate its dividend, Gunderman acknowledged Windstream's direct effect on Uniti's stock price, but again repeated his assurance that the lease payment from Windstream was safe, and that Defendants had built into the Master Lease protections that safe-guard the Company "**in all cases**":

> Yes.  So yes, our stock showed weakness on Thursday and Friday, which is at a time when we had a really strong quarter where we met or beat expectations and raised our guidance for the year, and we showed weakness, and which is frustrating in and of itself, but we understand the importance of Windstream to our story. . . .  And ultimately, when you put it all together, and I said it last week and I will say it again, we feel very, very confident in the lease payment coming from Windstream, not only because of the credit-enhancing actions that they've taken, but because of the nature of the payment itself.  It is – we own 80% of Windstream's network, and that is the very definition of a mission-critical payment.  ***And so we've obviously done an exhaustive amount of work on the protections associated with that lease payment in any sort of scenario, whether it's steady-state, distressed, bankruptcy, any scenario you want to work through, and feel confident that we're protected in all cases***.

### 2.   August and September 2017 – Hedge Fund Increases Position in Uniti Notes

172.   Additionally, during August 2017, rumors began to circulate that New York-based hedge fund Aurelius was buying Notes to obtain a 25% position of the aggregate

principal amount, fueling speculation that Aurelius believed the Spin-Off violated the Indenture.  This speculation caused Uniti's stock price to slide. On July 31, 2017, for instance, Uniti's stock price reached $26.31, but, as these rumors circulated in August 2017, Uniti's stock price fell precipitously, closing at $19.26 on August 31, 2017.  A September 5, 2017 report issued by Covenant Review detailed these rumors as "recent market speculation that the separation of the Uniti business from Windstream's remaining businesses may have violated the Asset Sales covenant of the various Windstream bonds."

173.  On September 8, 2017, Jim Volk, then Uniti's Vice President, Finance and Investor Relations and Defendant Wallace gave a presentation to investors, analysts, and market participants at the Bank of America Merrill Lynch Media, Communications & Entertainment Conference on behalf of Uniti.  In response to analyst concerns regarding Aurelius's recent acquisition of Windstream Notes, again Wallace insisted that the Master Lease was properly structured:

> So ever since we were spun off from Windstream 2 years ago, we've always – we were spun out as a single [tenant] REIT, which is not ideal, which has been part of the reason we've been very focused on first flying away from Windstream. . . .  I think on the lease itself, ***I don't really view the lease itself as, to your point, as the problem***. I think the lease, when it was structured – keep in mind it was structured by Windstream. We were spun off from Windstream. It was designed and it was priced to be a fair market value lease. . . . So I think the lease is fair.

174.  On September 13, 2017, Defendant Wallace gave a presentation to investors, analysts, and market participants at the Goldman Sachs Communacopia Conference.  In discussing Uniti's relationship with Windstream, Wallace repeatedly expressed "confidence" in Windstream and Windstream's management.  Specifically, Wallace emphasized that he had "***gotten to know . . . Tony and Bob and a lot of other people at Windstream since [he***

***had] been associated with Uniti Group.  Kenny has known them for a long period of time.***

***And we have a lot of confidence in them.  I think they're very – I think Tony is a very good***

***operator***."

175.    At that same Goldman Sachs conference, when questioned about the structure

of the Master Lease, Defendant Wallace again repeatedly claimed that the Master Lease was

"well structured":

> Yes.   So I think that Windstream – our lease agreement with
> Windstream is very ***well structured***.  And just – if you remember, from the
> spinout 2 years ago, it's actually structured by Windstream.  So I think it's a
> ***well-structured*** – it is structured as a master lease agreement.  Like most
> master lease agreement[s], ***it is designed to be well structured for distressed***
> ***situations***, meaning master lease is designed to be accepted, if you go into a
> bankruptcy proceeding or reorganization, it's designed to be accepted or
> rejected in a whole. . . .  So I think for all those reasons, we continue to think
> that our lease is ***well structured***, and – [for] all those reasons and others, we
> think our lease is ***well structured***.

176.    The statements referenced above in ¶¶169, 171-175 were each false and

misleading when made in that each omitted and/or misrepresented material facts.  The true

facts, which were then known to or recklessly disregarded by Defendants are outlined in

¶167.

### 3.    September 25, 2017 – Noteholder Aurelius Challenges the Spin-Off as a Violation of the Indenture

177.    On September 25, 2017, after the market closed, Windstream filed a Form 8-K

with the SEC disclosing that it had received a "purported notice of default" from Aurelius

(the "Notice of Default"):

> On September 22, 2017, Windstream Services, LLC (the "Company")
> received a purported notice of default dated September 21, 2017 (the
> "Notice") from a noteholder that claims to hold greater than 25% in aggregate
> principal amount of the Company's 6 3/8% Senior Notes due 2023 (the

"Notes") issued under the indenture dated January 23, 2013 (as amended and supplemented, the "Indenture"), between the Company (as successor to Windstream Corporation), as issuer, Windstream Finance Corp., as co-issuer, the guarantors party thereto and U.S. Bank National Association, as trustee (the "Trustee").

The Notice alleges that the transfer of certain assets and the subsequent lease of those assets in connection with the spinoff of Communications Sales & Leasing, Inc. (now known as Uniti Group, Inc.) in April 2015 constituted a Sale and Leaseback Transaction (as defined in the Indenture) which did not comply with the Sale and Leaseback covenant under the Indenture. The transactions did not constitute a Sale and Leaseback Transaction, and the Company asserts no default occurred, and that no default is continuing, under the Sale and Leaseback covenant under the Indenture.

178. This news, which was at least in part a materialization of the risk concealed by Defendants' material misrepresentations and omissions alleged herein, caused Uniti's stock price to plummet, closing at $15.66 per share on September 26, 2017, a decline of nearly 10% from the prior day's closing price, with over 11 million shares traded, more than five times the average daily trading volume during the Class Period. The price of Uniti's stock continued to decline on September 27, 2017, closing at $14.73 per share as the market absorbed the import of the September 25, 2017 information, a loss of another 5% on an over 11 million share trading volume.

### 4. October 4, 2017 – Deutsche Bank Leveraged Finance Conference

179. Defendants used a series of appearances at conferences sponsored by Wall Street investment banks, and Uniti's 3Q17 earnings announcement, to stem the bleeding in Uniti's securities prices. The first conference occurred on October 4, 2017, nine days after the announcement of Aurelius's Notice of Default. Volk and Defendant Wallace gave a presentation to investors, analysts, and market participants at the Deutsche Bank Leveraged

Finance Conference on behalf of Uniti.  In an effort to convince the market that the claims in Aurelius's Notice of Default were meritless, Defendant Wallace, in his prepared remarks stated:

> ***We do think the Windstream lease in and of itself is well-structured***.  It is structured, as I mentioned, to be as a master lease.  It is important to Windstream from an operations standpoint in terms of the scale and the number of customers that they serve by having access to the lease.  It is a master leases [sic].  As we've said before, they are designed to be in the – as a single lease, they're designed to be indivisible.  It is a single rent payment, so it's not – it's designed so that it can't be subdivided or cherry picked.  It is – in any sort of a distress situation, it is required to be either accepted or rejected in full.  And acceptance would require that the lease be – that the tenant be in compliance.  Windstream is the carrier last resort, so it's important for Windstream to continue to have access to the lease network to serve the customers and to fulfill the regular required obligations as well.  ***So we think the master lease is well-crafted and we think it's a priority payment from our standpoint and from Windstream's standpoint as well***.

180.    During the same conference, Defendant Wallace had the following exchange with an analyst:

> **[Analyst:]**
>
> Okay.  All right. So getting to some Q&A.  Towards the end of the presentation, we talked about Uniti Leasing.  And I just want to get [to] the elephant in the room with Windstream.  So Windstream is a financial situation.  It's been a key focus for investors, especially considering 70% of your revenue still comes from them.  Especially true, I think, following a weaker second quarter where Windstream eliminated its dividend.  So maybe to start, can you talk about Windstream's decision to cut its dividend?  And more importantly, I guess, what that implies for your rental revenues coming from them?
>
> **[Defendant Wallace:]**
>
> Sure.  ***So I think Windstream, on their decision to eliminate the dividend, I think from our standpoint, from a landlord standpoint, we find it to be credit-enhancing. So obviously, with that decision, they'll be retaining more cash flows in their business***.  So we think it's credit-enhancing from that standpoint.  Now obviously, I would say that I think the market had a negative reaction to it based on the pressure that resulted on their securities

from that.  And I think, as far as I can tell, I think that's a result of, I think, people viewed the dividend elimination as being a harbinger of – or a foreshadowing that there's – that Windstream's future results would not be what the market was expecting those to be, and that, that was – that would be the reason for them to eliminate the dividend.  I don't think that's what they intended at all. I think they intended it to be just a capital finance position. They felt like they weren't getting credit for the dividend.  ***But – so we were certainly surprised by the reaction to it***.  I think they were as well. I do think that to the extent that there was – that I'm correct about what I believe, people took it to mean from a perception standpoint.  I think Windstream has been at conferences.  They hosted a separate conference with investors, and they tried to make sure that – correct any misperceptions in the marketplace.  So as I've kind of heard them articulate their strategy, they're focused on, and certainly, you should pay attention to what Windstream says about its own operations, so they should be the primary spokesman, not me.  But as I understand it, I think they have a lot of initiatives going on right now that I fully expect them to be successful at executing on, whether it be the synergy realization from Earthlink and Broadview, whether it be the reduction of interconnection costs. I think they've spoken about CapEx and working capital being improved in the second half of the year versus first half of the year.  They've also talked recently about asset sales and looking at monetizing some of their unutilized fiber.  So I think all those things were good.  I think they've got a lot of things they're focused on right now.  And as I said earlier, I think I'll expect them to be successful to execute.

*     *     *

**[Analyst:]**

How about when we think about leverage for the business, can you talk about your preferred target leverage range for the company?  And whether you would consider potentially taking that lower given some of the concern around Windstream's financial situation?

**[Defendant Wallace:]**

So our – what we've said is that we've been on a net leverage basis at about 5.7 to 5.8x.  We've been in that – have said for a while, that's our target range and ***there's no change in that target range***.  The actual kind of month-to-month leverage will change as we draw down on the revolver for acquisitions and then term out and replace that with permanent capital.  But the target range is still about the same as it has been.

5.     **October 2017 –Aurelius Initiates Litigation Against Windstream and Windstream Responds with Counterclaims**

181.    Meanwhile, Aurelius pushed forward with litigation against Windstream.  On October 12, 2017, Aurelius, exercising authority by virtue of its controlling position in the Notes, caused the trustee of the Notes – U.S. Bank National Association ("U.S. Bank" or "Trustee") – to file suit in the U.S. District Court for the Southern District of New York, alleging that Windstream Services had breached a covenant in the Indenture restricting sale-leaseback transactions, in a litigation captioned *U.S. Bank N.A. v. Windstream Servs., LLC*, No. 17-cv-07857-JMF (S.D.N.Y. Oct. 12, 2017).[47]  The alleged default, if uncured, would trigger an acceleration provision in the Indenture that would make the Notes' entire aggregate principal amount, plus any unpaid interest, due immediately – a figure in the hundreds of millions of dollars.

182.    On October 13, 2017, in the Aurelius Litigation, Windstream Services brought counterclaims against the Trustee and Aurelius, seeking (among other things) a judicial declaration that the Spin-Off did not breach the Indenture's restrictive covenants.[48]

6.     **November 2017 – 3Q17 Results and Uniti's Response to Windstream Notice of Default**

183.    On November 2, 2017, as part of Uniti's announcement of its 3Q17 financial results, Defendants filed with the SEC Uniti's 3Q17 Form 10-Q, signed by Defendant

---

[47]    Aurelius Litigation, ECF No. 1.

[48]    Aurelius Litigation, ECF No. 10.  In response, on November 21, 2017, Aurelius brought counterclaims of its own, seeking both a declaration that Windstream Services was in default (despite Windstream Services' efforts to secure a waiver through issuance of the New Notes) and a money judgment for the aggregate principal amount of its Notes plus interest.  Aurelius Litigation, ECF No. 64.

Wallace. The 3Q17 Form 10-Q acknowledged that Windstream received a Notice of Default, but Defendants did not disclose that they had been aware of the risk that a Noteholder could challenge the Spin-Off as a violation of Windstream's debt covenants and that, all along, they knew that the risk of a notice of default on this basis was more than theoretical:

> On September 22, 2017, Windstream Services, LLC ("Windstream Services"), Windstream's primary operating subsidiary, received a purported notice of default dated September 21, 2017 from a large purported holder of Windstream Services' 6 3/8% Senior Notes due 2023 (the "Windstream Notes"). ***The notice alleged, among other things, that Windstream Services violated certain restrictive covenants of the indenture governing the Windstream Notes in connection with Windstream's Spin-Off of Uniti Group. Windstream is challenging the alleged default in federal court and recently launched an exchange offer and consent solicitation to obtain a waiver of the alleged default from holders representing a majority of the aggregate principal amount of the Windstream Notes. If the alleged defaults claimed by the noteholder are not waived, the noteholder or the Windstream Notes' trustee may allege that an "event of default" has occurred under the Windstream Notes' indenture. An actual "event of default" would permit the Windstream Notes' trustee or holders of at least 25% in aggregate principal amount of outstanding of the Windstream Notes to declare the principal amount of all outstanding Windstream Notes to be immediately due and payable***. Such an outcome would trigger cross-default provisions in Windstream's other debt instruments, including Windstream Services existing credit facility, which, in turn, would trigger a default under the Master Lease. In addition, Windstream Services' ability to pay dividends to Windstream Holdings under the terms of its indentures is subject to certain conditions, including the absence of a default or event of default, and any actual default or event of default could prevent Windstream Services from providing sufficient funding to Windstream Holdings to make payments on the Master Lease. Accordingly, we monitor the credit quality of Windstream through numerous methods, including by (i) reviewing the credit ratings of Windstream by nationally recognized credit rating agencies, (ii) reviewing the financial statements of Windstream that are publicly available and that are required to be delivered to us pursuant to the Master Lease, (iii) monitoring news reports regarding Windstream and its businesses, (iv) conducting research to ascertain industry trends potentially affecting Windstream, and (v) monitoring the timeliness of its lease payments.

184.    On November 2, 2017, after the markets closed, Defendants held a conference call with analysts and investors to discuss Uniti's 3Q17 financial results and the state of its business.  The conference call was also webcast live on the Company's website.  Defendants Kenny Gunderman and Wallace spoke on the call.  In his prepared remarks, Gunderman ***expressly disclaimed the possibility of a ruling in favor of Aurelius in the pending litigation*** – insisting that Windstream "had very competent counsel and advisers involved in the initial spin-off and additional well-respected law firms" and as a result "Windstream [would] ultimately have a ***favorable outcome***."

185.    On that same conference call, when questioned about the history and context of the Master Lease with Windstream, Defendant Kenny Gunderman responded:

> I think what I would say – rather than getting into a lot of detail there, what I would say is ***advisers were hired at the time to establish a fair market value for the spin-off business and then to also establish a fair market value lease payment associated with those assets.  And there was a fairly exhaustive analysis behind that, and actually, 2 different advisers, 1 of the big 4 accounting firms, sort of led that analysis, and then there was another adviser to supplement that***.  So that was the process leading up to the spinoff.

186.    A few days later, on November 7, 2017, Defendants Kenny Gunderman and Wallace gave a presentation to investors, analysts, and market participants at the Wells Fargo Media & Telecom Conference on behalf of Uniti.  Immediately, analysts questioned Uniti about the Notice of Default sent by Aurelius to Windstream.  In response, Gunderman again emphasized that Uniti had meticulously reviewed the lease and insisted that Aurelius's claims were "manufactured":

> [Jennifer Fritzsche – Wells Fargo Analyst:] So I'm just going to start with a "let's get it out of the way" question . . . .  With over 80% of your revenue coming from Windstream, the inevitable question we're getting is, talk about that leased revenue.  Is there talks [sic] about renegotiating?  Is

there any – that is the key question right now.  And then we'll get to the fundamentals.

. . . [Defendant Kenny Gunderman:] But – so we realize the Windstream question is a big question.  There's a lot of fear and confusion out there right now driving our securities, largely attributable to the – kind of the alleged default notice.  *We find it extremely frustrating, especially on behalf of our shareholders that there's so much turmoil going on, and especially when we think the claim itself is just manufactured.  We've been following it very, very closely. . . .  We've done a deeper dive on our lease and our different scenarios than we ever have before and continue to be highly confident in the leased, lease payment, the protections that we have in all scenarios. So none of that has changed. . . .  And we do think that the trends and the tide are moving in Windstream's favor in terms of the things that they're dealing with*. . . .

[Jennifer Fritzsche – Wells Fargo Analyst:] And 2 just housekeeping items, I want to confirm that way back when, when we – it seems like years can turn into decades the last few months, but that Windstream was the one who agreed to – I mean, they actually approached you with the lease terms, correct?  And then the auditors have looked at it every which way.

[Defendant Kenny Gunderman:] Yes, that's right.  I mean, we were a spinout from Windstream.  So essentially, we didn't exist until the lease had already been fully negotiated and we were spun out.  So essentially, Windstream and their attorneys and advisers, including law firms and accounting firms, devised the lease.  And it was blessed by very reputable law firms and at least one, maybe 2 of the big 4 accounting firms.

[Jennifer Fritzsche - Wells Fargo Analyst:] Got it. And on the bondholder situation with them, you feel comfortable that they are headed in the right . . .

[Defendant Kenny Gunderman:] Highly confident. We've looked very, very closely at the legal claim, and we're *very confident that the legal arguments are on Windstream's side*.  So [I] think that that's going to resolve itself, if it ever gets to that point.  And in the exchange and consent process that's ongoing, we think that's going to end very favorably as well.

187.    At that same conference when he was later questioned about Uniti's ability to

diversify, Defendant Kenny Gunderman again insisted that Aurelius's claims against

Windstream were "*manufactured*," stating: "[W]e need to continue to demonstrate our

ability to grow with our organic businesses, and we also need to work through these current issues with Windstream and this threat, ***which we think is manufactured***, in order to get back to our real growth strategy, and we expect that to happen."

188.   On November 29, 2017, Defendant Wallace gave a presentation to investors, analysts, and market participants at the Bank of America Merrill Lynch Leveraged Finance Conference on behalf of Uniti.  When questioned about ongoing concerns that Windstream might end up in a default scenario, Wallace again emphasized that Uniti had reviewed the Master Lease and concluded that Windstream would receive a favorable outcome in the Aurelius Litigation:

> Yes, so let me start with Windstream.  So we have a ***very high degree of confidence*** that Windstream is going to prevail in the litigation.  We have a ***very high degree of confidence*** that they're going to have favorable outcome to this.  And in many [sic] case, I would say that we think that there's a ***good likelihood*** that it might be resolved in a relatively short period of time ***favorably*** for Windstream.  So with that respect, I would say that we would echo a similar degree of confidence that Windstream has stated as well.  Look, I think that we have – the situation, since the volatility some of the claims have been made, we've gone back and looked at our lease agreement.  We've consulted our counsel about the lease agreement.  We've gone back and ***done a deep dive*** into it.  We have every confidence in the strength of our lease agreement that we have been articulating from the very first days that we were spun off.  So we have ***tremendous confidence*** in the lease.  We have confidence in the lease protections, ***the way the lease was structured*** as a master lease.  And so I think to your point, even in a downside scenario, no matter how low the probability, I think it is low, I think that we are – I think we're as protected as any landlord can be.  And so I think the Windstream lease was ***well-crafted***, and we have [a] ***very high degree of confidence*** that Windstream will continue to make payments and will continue to receive an uninterrupted lease stream.

### 7.     December 4, 2017 – UBS Global Media and Communications Conference

189.   The following week, on December 4, 2017, in a presentation to investors, analysts, and market participants at the UBS Global Media and Communications Conference on behalf of Uniti, Defendant Wallace again stressed that Uniti was "***highly confident*** that Windstream [would] have a favorable outcome in the litigation."

### 8.     March 1, 2018 – 4Q17 and Full Year 2017 Results

190.   On March 1, 2018, Defendants issued a press release announcing Uniti's financial results for 4Q and fiscal year 2017.  As in each of its previous press releases, the press release contained a list of "factors which could materially alter our expectations" including "the ability and willingness of our customers to meet and/or perform their obligations under any contractual arrangements entered into with us."

191.   On March 1, 2018, Defendants filed with the SEC Uniti's 2017 Form 10-K, signed by Defendants Kenny Gunderman and Wallace.  The 2017 Form 10-K contained the following "risk factor" related to the Company's relationship with Windstream:

> In recent years, Windstream has experienced annual declines in its total revenue and sales. ***Most recently, Windstream has endured a challenge from an entity who acquired certain Windstream debt securities for the purpose of seeking an "event of default" under such securities relating to the Spin-Off.  An actual "event of default" would permit the trustee or holders of at least 25% in aggregate principal amount of outstanding of such Windstream debt securities to declare the principal amount of all outstanding Windstream debt to be immediately due and payable***.  Such an outcome would trigger cross-default provisions in Windstream's other debt instruments, including Windstream's existing credit facility, which, in turn, would trigger a default under the Master Lease.  ***A default by Windstream under the Master Lease could materially adversely affect our business, assets, financial position, and results of operations, including our ability to pay dividends to our stockholders as required to maintain our status as a REIT***.

192.    Defendants repeated the statements alleged in ¶¶190-191 in the press releases issued by the Company and the Forms 10-Q filed with the SEC, and signed by Defendant Wallace, relating to Uniti's 1Q18-3Q18 earnings announcements.

### 9.    Spring 2018

193.    Then, beginning in the Spring of 2018, Defendants again appeared at a series of investor conferences.  Defendants used their appearances at these conferences, and the Company's 3Q18 earnings announcement, to continue to reinforce their message, and the market's perception, that the Master Lease was not in jeopardy, and that the claims of default by Aurelius were meritless.

194.    During a conference call held on May 16, 2018, Lawrence Gleason, President of Uniti Towers and Defendant Wallace gave a presentation to investors, analysts, and market participants at the JPMorgan Global Technology, Media and Communications Conference, where Wallace again assured investors that Uniti "***expect[ed] Windstream to have a favorable outcome***" in the Aurelius Litigation.

### 10.    September 6, 2018 – Bank of America Merrill Lynch 2018 Media, Communications & Entertainment Conference

195.    Defendants next appeared at the Bank of America Merrill Lynch 2018 Media, Communications & Entertainment Conference, on September 6, 2018.  Defendant Wallace and Gleason, gave a presentation to investors, analysts, and market participants on behalf of Uniti.  When questioned about the Aurelius Litigation, Wallace acknowledged the impact of the litigation on Uniti, but again insisted that Windstream would receive a favorable ruling:

> But I think it also – it is also the lawsuit relative to us. And because it would be – with the litigation overhang there and then ***there's always some risk, I'll admit, small, as to what the impact of an unfavorable position could be***.

- 75 -

Now that said, we *fully expect* – I believe Windstream fully expects as well, but I think they're speaking at the conference and I think they'll affirm it. *We fully expect to have a favorable decision*. And sooner is better from that standpoint, and I think they fully expect to have a favorable outcome on the court ruling as well.

196.    Later when questioned again about the effect of the Aurelius Litigation on the Company, Defendant Wallace stated: "[O]ur story has been pretty consistent. *We've always felt good about the master lease. We've always felt good about the protections in the master lease. We always thought it was a priority payment for Windstream*."

### 11.    October 3, 2018 – Deutsche Bank Leveraged Finance Conference

197.    On October 3, 2018, Defendant Wallace gave a presentation to investors, analysts, and market participants at the Deutsche Bank Leveraged Finance Conference where Wallace stated: "I expect that the litigation will be *favorably* settled here for Windstream, and we'll get a ruling from the judge pretty soon."

### 12.    November 1, 2018 – 3Q18 Results

198.    Defendants repeated these assurances during the Company's November 1, 2018 conference call with analysts and investors to discuss Uniti's 3Q18 financial results. The conference call, which was held after the market closed, was webcast live on the Company's website. Defendants Kenny Gunderman and Wallace spoke on the call. In his opening remarks, Gunderman again acknowledged the "overhang from the Windstream litigation," but reiterated "that Windstream [would] receive a *favorable* ruling." Later, when again questioned by analysts about any future Windstream ruling, Gunderman reassured analysts that Uniti "*anticipate[d] a favorable ruling*" and that he was "*very confident* in that and believe[d] it[] [was] coming."

- 76 -

199.    The statements referenced above in ¶¶179-180, 183-192, 194-198 were each false and misleading when made in that each omitted and/or misrepresented material facts. The true facts, which were then known to or recklessly disregarded by Defendants were:

(a)    Defendants' claim that they had done a "[f]airly exhaustive analysis of" the Master Lease failed to disclose that the Spin-Off constituted a sale-leaseback transaction between Uniti and the Windstream Operating Subsidiaries in direct violation of Windstream's Indenture's restrictive covenants. ¶¶56-86.  Indeed, Fletcher admitted that he knew at the time that "if the transferor . . . signed the master lease, that would have been a clear violation of the indenture at issue in this case." ¶86.

(b)    Contrary to Defendants' representations, Uniti's lease payment from Windstream was not "very, very, safe" nor did the Master Lease have protections that safe-guarded the Company "in all cases."  Instead, Defendants were aware that the Master Lease was a financing arrangement.  This not only resulted in a breach of §4.09 of the Indenture, but it also carried with it the significant risk that if Windstream filed for bankruptcy protection, and was able to successfully recharacterize the Master Lease as a financing, Uniti's claim in a Windstream bankruptcy to rent payments would be almost entirely unsecured and structurally subordinated to other creditors' claims.  ¶¶122-138.

(c)    Defendants were not in fact "confiden[t]" in Windstream's management because they knew that Windstream executives, who were on both sides of the Spin-Off deal, structured the Master Lease as a workaround to the Indenture's prohibition of sale-leaseback transactions, and knew that the Spin-Off was in violation of that covenant. ¶¶56-86, 102-110.  Indeed, as early as 2013, while still contemplating the structure of the Spin-Off,

Windstream's then CFO Tony Thomas wrote an email to Robert Gunderman highlighting their knowledge of the Indenture's restrictions on sale-leaseback transactions.  ¶75.

(d)    The Master Lease was, in fact, far from "well-structured" or "well-crafted" as Defendants concealed that: (i) the Spin-Off was a prohibited sale-leaseback transaction and could be successfully challenged by a Noteholder, such as Aurelius; and (ii) the Master Lease was a financing, which in the event of a Windstream bankruptcy, Uniti's most significant driver of revenue – rent from Windstream pursuant to the Master Lease – would effectively disappear or be materially reduced.  ¶¶56-86, 122-138.

(e)    Despite Defendants' repeated assurances that Aurelius's claim against Windstream was "manufactured,"  and that it was "highly confident" that Windstream would receive a "favorable ruling" or "favorable outcome" from the court, Defendants knew all along that the Spin-Off constituted a sale-leaseback transaction between Uniti and the Windstream Operating Subsidiaries in direct violation of Windstream's Indenture's restrictive covenants and that a risk of Aurelius succeeding in its notice of default was more than theoretical.  ¶¶56-86.   Indeed, throughout the Class Period, internal documents demonstrate that Defendants were aware of and concerned about the appearance that the Master Lease violated the terms of the Indenture.  Specifically, prior to the Spin-Off, Windstream and Uniti executives, including Individual Defendants, were told to not go into detail unless "pressed" about the structure of the Spin-Off and to give general canned responses.  ¶¶92-94, 118-121.

200.    Defendants' false and misleading statements assuring the market that the Spin-Off did not violate Windstream's debt covenants and downplaying the risk of a Windstream

default to the Master Lease if in fact it was determined that the Spin-Off did violate the debt covenants, had their intended effect: Following the negative reaction to the initial news of a potential default by Windstream of its debt covenants, Uniti's stock price reversed its decline over the following 15 months.  From October 4, 2017 through February 15, 2019, Uniti's stock price increased by over 22%, from $15.56 to $19.98 per share.

### 13. February 15, 2019 –Judge Rules in Favor of Aurelius, Finding that the Spin-Off and the Master Lease Transaction Breached the Indenture; Uniti Stock Tumbles in Response

201.    On February 15, 2019, U.S. District Court Judge Jesse M. Furman – the judge presiding over the Aurelius Litigation – entered his Findings of Fact and Conclusions of Law (which followed a bench trial held in July 2018), finding that the Spin-Off and execution of the Master Lease violated the Indenture.

202.    Specifically, Judge Furman found that, given the realities of the structure of the transaction and Master Lease, the Windstream Operating Subsidiaries "leased" the Transferred Assets in violation of the terms of the Indenture, notwithstanding that Windstream Holdings was the Master Lease signatory: "In short, the [Operating] Subsidiaries hold the Transferred Assets – that is, they have the right to use and occupy the property – for a fixed term in exchange for consideration.  Thus, the labels used by the parties to the [Spin-Off] aside, the [Operating] Subsidiaries 'lease[d]' the Transferred Assets within the ordinary meaning of the term 'lease.'"[49]

---

[49]    Aurelius Litigation, ECF No. 245 ("Aurelius Litigation Order") at 33.

203.    In addition, the court found that Windstream's efforts to issue New Notes to create a majority to outvote Aurelius and waive the default was improper and violated the Indenture. Judge Furman stated: "[T]he Court holds that some or all of the New Notes issued in connection with the 2017 Transaction – enough, in any event, to deprive the consenting Noteholders of a majority – did not qualify as 'Additional Notes' under the Indenture and, thus, the 2017 Transaction [*i.e.*, the Notes exchange] did not succeed in waiving or 'curing' the default caused by the [Spin-Off]."[50]

204.    As a result of these findings, the Court declared over $300 million of Aurelius Notes due and payable.[51]

205.    On February 19, 2019, the first trading day after Judge Furman's ruling, Uniti issued a statement about it and the impact the ruling had on the Company's business and the Master Lease.    In that statement, Defendant Kenny Gunderman stated: "'It is our understanding that Windstream intends to take action and pursue all available options.  The validity of our master lease agreement with Windstream was not impacted by the ruling, and access to our network remains critical to Windstream's operations and its ability to serve its customers.'"  Gunderman also assured Uniti's investors that: "'We are focused on working through the challenges related to the court ruling and continue to be committed to serving the interest of our stockholders, our customers, and our other partners.'"

206.    This shocking news, which was at least in part a materialization of the risk concealed by Defendants' material misrepresentations and omissions alleged herein, caused

---

[50]    *Id*. at 51.

[51]    *Id*.

4848-2207-4295.v23

Uniti's stock price to drop on February 19, 2019, *an astounding 37%, on a trading volume of nearly 49 million shares, nearly 25 times Uniti's average daily trading volume during the Class Period*.

207.   On February 21, 2019, Fitch Ratings ("Fitch") and Standard & Poor's Global Ratings ("S&P") both downgraded Uniti's credit ratings, and revised their outlooks to "Negative" citing Judge Furman's February 15, 2019 ruling as the catalyst for the changes. On this news, Uniti's stock price continued its free fall, with over 24 million shares trading, closing at $9.99, a loss of another 18%.

208.   Judge Furman's decision – and the $300 million judgment – also had a significant negative impact on Windstream's ability to operate as a going concern.  On February 25, 2019, Windstream Holdings (and all its subsidiaries) filed for Chapter 11 bankruptcy protection.  As a result of Windstream's bankruptcy, Uniti's stock price declined more than 9% from a close of $10.60 on February 25, 2019 to a close of $9.64 on February 28, 2019.

209.   On February 27, 2019, the Company issued a statement commenting on Windstream's bankruptcy filing.  Defendant Kenny Gunderman told investors: "'We continue to closely monitor Windstream's situation, and *believe it will successfully navigate through the reorganization process*.  We were pleased to see Windstream state its intent to continue operations in the ordinary course and pay in full its service providers.'"

### 14.   March 4, 2019 – Notification of Late Filing

210.   Then, on March 4, 2019, the Company filed a "Notification of Late Filing" on Form 12b-25 with respect to Uniti's Annual Report on Form 10-K for the fiscal year ending

December 31, 2018 ("2018 Form 10-K").  In it, the Company informed the SEC that it was

unable to timely file its 2018 Form 10-K because:

> Certain subsidiaries of the Company are the landlords under a long-term exclusive triple-net lease (the "Master Lease"), pursuant to which these subsidiaries lease telecommunications network assets, including fiber and copper networks and other real estate (the "Distribution Systems") to Windstream Holdings, Inc. ("Windstream Holdings" and, together with its subsidiaries, "Windstream").  For the year ended December 31, 2018, 68.2% of the Company's revenues were derived from leasing the Distribution Systems to Windstream Holdings pursuant to the Master Lease.  On February 25, 2019, Windstream filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.  As of the prescribed time for filing the Annual Report, the Company and its auditors, PricewaterhouseCoopers LLP ("PwC"), are continuing to assess the impact of Windstream's bankruptcy petition on the Company's financial statements.  Based on currently available information as of the date of this Form 12b-25, PwC expects its audit opinion for fiscal year ended December 31, 2018 will include an explanatory paragraph indicating there is substantial doubt as to the Company's ability to continue as a going concern.  If the Company receives a going concern opinion, it would constitute an event of default under the Company's credit agreement, and the Company is seeking a waiver from its lenders.  The Company has taken, and intends to continue to take, actions to ensure that it can continue to operate as a going concern as a result of Windstream's bankruptcy petition.  The Company believes that on or before the fifteenth calendar day following the prescribed due date of the Annual Report it will be able to finalize its financial statements reflecting the impact of Windstream's bankruptcy petition.

### 15. March 2019 – Full Year 2018 Results; Defendants Continue to Conceal that the Master Lease was a Financing

211.   The filing of Windstream's bankruptcy on February 25, 2019 triggered

concerns that Windstream would seek to recharacterize the Master Lease as a financing – a

risk that Defendants knew of throughout the Class Period, but failed to disclose the true

extent of to investors.   Defendants continued to conceal that the Master Lease was a

financing and downplay the extent of the risk posed by recharacterization even after Windstream's bankruptcy filing.

212.    On March 18, 2019, Defendants filed with the SEC Uniti's 2018 Form 10-K, signed by Defendants Kenny Gunderman and Wallace.  The 2018 Form 10-K, disclosed that Uniti's auditors, PricewaterhouseCoopers LLP, have "substantial doubt as to whether [Uniti] could continue as a going concern within one year after the date the financial statements are issued as a result of Windstream's bankruptcy petition and its potential uncertain effects on the Master Lease."  The 2018 Form 10-K, however, provided financial statements that did not include any adjustment that might be necessary if the Company was unable to continue as a going concern, underscoring Defendants' message, and the market's expectation, that Windstream's bankruptcy was not adversely impacting Uniti.

213.    The 2018 Form 10-K also stated:

> In bankruptcy, Windstream has the option to assume or reject the Master Lease.  Because the Master Lease is a single indivisible Master Lease with a single rent payment, the lease must be assumed or rejected in whole and cannot be sub-divided by facility or market.  ***A significant amount of Windstream's revenue is generated from the use of our network included in the Master Lease, and we believe that the Master Lease is essential to Windstream's operations***.  Furthermore, Windstream is designated as a "carrier of last resort" in certain markets where it utilizes the Master Lease to provide service to its customers, and Windstream would require approval from the Public Utility Commissions and the Federal Communications Commission to cease providing service in those markets. ***As a result, we believe the probability of Windstream rejecting the lease in bankruptcy to be remote***.

214.    On March 20, 2019, at 4:15 p.m. Eastern Time, Defendants held a conference call with analysts and investors to discuss Uniti's 2018 financial results.  The conference call was also webcast live on the Company's website.  Defendants Kenny Gunderman and Wallace spoke on the call.  Gunderman, in his prepared remarks, addressed Windstream's

- 83 -

bankruptcy and its impact on Uniti's business and operations.  Gunderman told investors that

the Company had the "***ability to navigate the Windstream bankruptcy proceedings without***

***having to raise external capital***" and will continue "to invest uninterrupted" in its business

platforms:

> As most of you are aware, Windstream recently received an unfavorable court ruling related to its Aurelius lawsuit.  As a reminder, Uniti was not a party to this litigation and the validity of our master lease agreement was not challenged by the court's ruling.  Subsequently, on February 25, Windstream commenced voluntary restructuring proceedings under Chapter 11 of the U.S. Bankruptcy Code.  Obviously, we're disappointed by this outcome, but ***we've been contingency planning with our board and advisers for this possibility for some time . . . .***
>
> ***As a result and as a result of several other steps we're taking, we believe we now have the ability to navigate the Windstream bankruptcy proceedings without having to raise external capital and still be able to invest uninterrupted in our premier fiber, tower and leasing businesses, including potentially pursuing smaller M&A transactions***.  We feel confident that Windstream will successfully restructure its balance sheet and remain focused on operating its business in normal course in the meantime.  It is in all parties' interest to minimize disruption and service to customers, and we're pleased that Windstream has consented to remain current with all critical vendors, including Uniti.
>
> Our network leased to Windstream is vitally important to Windstream, and we fully expect our commercial relationship to remain in place during and after bankruptcy.  Also as Uniti and Windstream have been saying for almost 2 years now, we remain open to pursuing mutually beneficial transactions between the 2 companies that could be credit enhancing for Windstream and value accretive to Uniti.
>
> ***The volatility in our stock price since the court's ruling and subsequent bankruptcy filing are largely related to an impression that our relationship with Windstream will be impaired to the detriment of our stockholders.  We disagree with this impression***.  In fact, we believe that our relationship could be strengthened to both companies' benefit.  At the conclusion of the bankruptcy proceedings, we are optimistic that Windstream will not only be a stronger tenant, which will be beneficial to Uniti, but we believe our commercial relationship could be enhanced.

- 84 -

215.   During the March 20, 2019 conference call, Defendants addressed several

questions from analysts concerning Windstream's bankruptcy and its impact on Uniti's

status as a REIT:

> [Philip Cusick – JPMorgan:]   That sort of leads me to a different question. Is there a risk?  And what would the argument be at this point where Windstream bond holders are trying to come after you and collapse the whole structure?  How do you address that with potential partners as you talk to them and sort of maintain momentum through this process?
>
> . . . [Defendant Kenny Gunderman:]   But I would say is [sic] we find that extremely unlikely and what we have found so far in the process – the bankruptcy process, is basically what we would expect, which is that all parties, including Windstream from what we hear, from creditors, regulators is that there is a very strong focus on maintaining operations, no disruption of service, continue to provide service to customers and meet the regulatory obligations, which is a rational point of view.  That's what all parties should be focused on, and we think that's going to continue throughout the process. ***And so when we engage with our customers and our vendors and our potential M&A counterparties and we talk about the facts related to the bankruptcy and what's really going on, I think folks are reassured about the ultimate outcome.  It's less a question of uncertainty at that point and more just a question of timing***.

216.   Defendant Kenny Gunderman also emphasized during his discussions with

analysts on the March 20, 2019 conference call that Uniti's partnership with Windstream

would be stronger as a result of Windstream's bankruptcy and that there was ***no real risk***

***that Windstream would default on its obligations under the Master Lease***:

> [Philip Cusick – JPMorgan:] Okay.  And you seem really constructive on the potential outcome and the partnership with Windstream being strengthened on the other side of this, but do you anticipate some sort of recharacterization of the REIT, the lease and the payments being substantially different than they are today?  Or is your base case that we sort of go from the current payment structure and then maybe assets and payments change, but only on sort of differences in the asset mix?
>
> [Defendant Kenny Gunderman:]  Yes. . . .  So –  and I think in a nutshell, what I'd say, is our view hasn't changed from what it was before the

filing or before the Aurelius ruling a year ago or 2 years ago. And what I mean by that is, we've always said that our network that we're leasing to Windstream is mission critical. It's mission critical to their business and ***the lease arrangement between the 2 of us is a master lease and is structured explicitly to anticipate a bankruptcy as a downside scenario. And in that scenario, it has to be accepted or rejected in its entirety. We can't be forced to negotiate. And so we've always said that we believe a scenario of rejection of the lease is remote because of the significance of the network to their business***. We've also said that we would be open to – Uniti would be open to mutually-beneficial negotiations to enhance the lease to both of our benefit, consensual negotiations. So you take that as the backdrop, we still believe a lot of those things today. ***And when you consider the significance of the network to the operations of Windstream to the cash flow generation, capability to satisfy creditors to the regulatory obligations, we just don't see a risk of rejection of the lease***, and we do think that there are some opportunities to enhance it and those opportunities are similar to the ones we've talked about in the past. Nothing new there. ***Your point about some of the – what we would characterize as more frivolous claims of recharacterization or fraudulent conveyance and other things. We've heard of those types of claims over the past couple of years or so. And as you would expect, we are – we have a point of view on those and believe they are not grounded in strong basis. We believe, we have a strong defense against any of those and don't believe they're going to be – they would ever be successful***. And so ultimately, we believe that the lease will be accepted in its current form or accepted in some form that is changed to a mutually beneficial way for Uniti and for Windstream.

### 16.   May 9, 2019 – 1Q19 Results

217.   On May 9, 2019, Defendants issued a press release announcing Uniti's financial results for 1Q19. That same day, at 4:15 p.m. Eastern Time, Defendants held a conference call with analysts and investors to discuss Uniti's 1Q19 financial results and the state of its business. Defendant Kenny Gunderman repeated his statement that the Company did not need to raise external capital to "navigate the Windstream bankruptcy proceedings":

> Windstream continues to remain current on its monthly lease payments, which have been paid in full and on time through May. We continue to be open to pursuing mutually beneficial outcomes with Windstream that could potentially be credit-enhancing to Windstream and its stakeholders and value accretive to Uniti.

- 86 -

We still believe *we have the ability to navigate the Windstream bankruptcy proceedings without having to raise external capital and still be able to invest in all of our valuable business units, including potentially pursuing smaller M&A transactions*. We remain confident that Windstream will successfully emerge from the restructuring process and continue to remain focused on operating its business in normal course, resulting in a potentially stronger tenant and a commercial relationship that could be enhanced.

218.  On May 9, 2019, Uniti filed its 1Q19 Form 10-Q, signed by Defendant Wallace.  The 1Q19 Form 10-Q repeated Defendants' assertions that they believed "*the probability of Windstream rejecting the Master Lease in bankruptcy to be remote*," and "[b]ased on our analysis, including consideration of the timing of [Windstream's] requirements to make post-petition lease payments under U.S. bankruptcy law, *we believe that we have adequate liquidity to continue to fund our operations for twelve months after the issuance of the financial statements*."

### 17.    May 14, 2019 – JPMorgan Global Technology, Media and Communications Conference

219.  A few days later, on May 14, 2019, Bill DiTullio (then Uniti's Director of Finance and Investor Relations) and Defendant Wallace gave a presentation to investors, analysts, and market participants at the JPMorgan Global Technology, Media and Communications Conference on behalf of Uniti.  In discussing the Company's relationship with Windstream and the impact of Windstream's bankruptcy to Uniti, Wallace emphasized that there was *no real risk* of Windstream defaulting on the Master Lease:

The bankruptcy process so far has played out pretty much as we expected. . . . [T]here is a recognition that the Windstream network that we leased to them is mission-critical, so that's good to – that everybody has that understanding, which we've always have [sic] said that its mission-critical to their operations. And as I've – as we've talked to even investors and even this morning.  I think there's a recognition more and more that it's in everybody's interest to proceed through the bankruptcy process as quickly as possible.

4848-2207-4295.v23

220.    Defendant Wallace also told investors at the conference that Windstream's bankruptcy was actually a ***positive event*** for Uniti:

> I think once Windstream emerges in kind of the base cases, the lease either gets assumed as is or gets consensually renegotiated on good terms for both parties.  I think we're pretty optimistic again about how that plays out in terms of Uniti's long-term success here.  And by that, what I mean is that expecting Windstream to come – to emerge from bankruptcy lower leveraged and there – and also – and therefore, a better credit profile, I think that's going to enhance the cost of capital for Uniti Group significantly.

### 18.    May 29, 2019 – Cowen Technology, Media & Telecom Conference

221.    On May 29, 2019, Bill DiTullio and Defendant Wallace gave a presentation to investors, analysts, and market participants at the Cowen Technology, Media & Telecom Conference on behalf of Uniti.  In discussing the impact of Windstream's bankruptcy on Uniti, DiTullio, Uniti's Director of Finance, stated that "***we really haven't seen an impact to our business and we continue to operate the business as usual***."

### 19.    June 5, 2019 – REITWeek 2019

222.    Defendants again appeared at NAREIT's annual REITWeek, on June 5, 2019 on behalf of Uniti.  In response to a question from David Barden from Bank of America Merrill Lynch about how Windstream's bankruptcy was affecting the Company, Defendant Kenny Gunderman repeated the refrain that Uniti was operating without impact from Windstream's bankruptcy and again emphasized Windstream's bankruptcy was actually a *positive* thing for the Company:

> And so we're now a couple of months into the filing, and I would say that I'm very, very pleased with the preparation that we had done in advance and I'm [very] pleased with our execution on our plan since then.  And so as it relates to the 3 operating businesses that we have or the 3 businesses that we have, ***we've really had no disruption of service.  We've had no hiccups.  We've just***

*continued to move along, investing in our business uninterrupted at Uniti Fiber, Uniti Towers and Uniti Leasing*.  And so I'm very pleased with our progress there, both organic growth and even some inorganic growth.

*     *     *

So we've been pleased at the desire to move quickly. We've been pleased that the various constituents have universally recognized the mission-critical nature of the network that we provide to Windstream . . . .

*At some point, this process, the bankruptcy process is going to be behind us sometime in the next couple of quarters, several quarters.  And when that day comes, we're going to emerge as a stronger company and we're going to have a stronger, large tenant in Windstream, and so we're looking forward to that day*.

223.   Defendant Kenny Gunderman also told attendees at REITWeek that the

possibility of Windstream rejecting the Master Lease was "*irrational*":

[David Barden – Bank of America Merrill Lynch:]  But just to your point on the concept of lease rejection, Windstream has a legal and regulatory obligation as a carrier of last resort to provide services in the states in which it operates.  Is a rejection even a theoretical possibility?

[Defendant Kenny Gunderman:]  We don't think so. We've always said that, and back to your earlier comment, I think if you go back and listen to comments that Windstream made before the circumstances that they're in now, I think they would also say that.  *So I think talking about it is – you kind of get further and further out into the world of irrational by even speculating on it*.

. . . So again, all of that is what we would expect, and I think that's going to play out as we expected.

224.   Defendant Kenny Gunderman also repeated the statement that the "lease" with

Windstream was a "true master lease" and that it was "specifically designed for a bankruptcy

scenario to protect [Uniti]."

**20.    June 20, 2019 – Wells Fargo Securities 2019 5G Forum**

225.    On June 20, 2019, Defendants caused Uniti to file a Form 8-K with the SEC. The Form 8-K attached a copy of an investor presentation to be given at the Wells Fargo Securities 2019 5G Forum on June 20, 2019.  In that presentation, Defendants represented that the Company's "[l]iquidity [would] [b]uild [t]hroughout 2019".

226.    The statements referenced above in ¶¶212-225 were each false and misleading when made in that each omitted and/or misrepresented material facts.  The true facts, which were then known to or recklessly disregarded by Defendants were:

(a)    Despite Defendants' repeated assurances that the validity of Uniti's Master Lease agreement with Windstream was not impacted by Judge Furman's ruling in the Aurelius Litigation and that there was no "risk of rejection" of the Master Lease, Defendants knew that Windstream could successfully recharacterize the lease as a financing arrangement, which would result in a breach of §4.09 of the Indenture and cause Uniti's claim in bankruptcy to Windstream's rent payments to be entirely unsecured and structurally subordinated to other creditors' claims. ¶¶122-138.

(b)    The Master Lease was not "essential" or "critical" to Windstream's operations.  Instead, Windstream did not intend and, in fact, could not renew the Master Lease because the depreciating nature of the transferred assets caused Windstream's copper assets to be economically obsolete on or around 2025 –five years before expiration of the initial Master Lease term. ¶¶122-138.  As detailed by Duff & Phelps's depreciation reports, as early as 2011 and 2012, the remaining economic life of Windstream's copper wire

networks was between 3.9 and 7.7 years, not the 7 to 40 years as Defendants represented to investors.  ¶131.

(c)     The Company did not, in fact, have the "ability to navigate the Windstream bankruptcy proceedings without having to raise external capital" should Windstream challenge the validity of the Master Lease in bankruptcy, putting two-thirds of Uniti's revenue in jeopardy – a risk Defendants downplayed but knew to be more than a "remote" possibility that was "irrational."

(d)     As a result of the significant possibility that Windstream would seek to recharacterize the Master Lease as a financing arrangement, Uniti could not in fact "emerge as a stronger company" without any "hiccups" or "impact" to its business from Windstream's bankruptcy.  Instead, if Windstream successfully recharacterized the lease, Uniti's claims in a Windstream bankruptcy to rent payments would be inferior to other creditors' claims and as a result Uniti's most significant driver of revenue – rent from Windstream pursuant to the Lease – would effectively disappear or be materially reduced. ¶¶122-138.

(e)     The claims of recharacterization were not "frivolous" and the Master Lease with Windstream was not a "true master lease."  Instead, Defendants knew that Uniti's determination that the Master Lease as a "true lease" depended on false and grossly inflated information about the useful life of the primary leased asset – copper wire.  ¶¶81-85, 122-138.  In truth, the transferred assets did not have a useful life beyond the initial term of the Master Lease and the first renewal.  *Id.*  Indeed, Skadden recognized that the IRS could argue

that the proposed lease was merely a financing arrangement and that the purported lessor, Uniti, was, in substance, a secured creditor that held no equity interest in the property. ¶136.

### 21.   June 24, 2019 – Defendants Announce $300 Million Note Offering, Admitting that External Capital was Necessary for Uniti to Navigate Windstream's Bankruptcy

227.   Despite Defendants' repeated assertions that they did not have any liquidity concerns, and would not need to raise external capital to fund Uniti's operations, on June 24, 2019, after the close of the market, Defendants caused the Company to issue a press release announcing a $300 million aggregate principle amount of exchangeable senior notes due 2024, with an option to purchase an additional $45 million aggregate principle amount of exchangeable senior notes during a 13-day period beginning on, and including, the first day on which the exchangeable notes are issued.

228.   This news, which was a materialization of the risk that Windstream's bankruptcy was not impacting Uniti's business concealed by Defendants' misrepresentations and omissions alleged herein.  This information caused Uniti's stock price to fall more than 10% from the closing price on June 24, 2019, closing at $9.38 per share on June 25, 2019, with more than 10 million shares trading, five times the average daily trading volume during the Class Period.

## VII.   POST-CLASS PERIOD REVELATIONS

229.   On June 28, 2019, U.S. Bank and UMB Bank, trustees for $1.1 billion in Windstream bonds, asked the bankruptcy court to order that Windstream cease its monthly payment to Uniti under the Master Lease.  The Trustees asserted that the Master Lease was

really a disguised loan and that such payments could not continue during Windstream's bankruptcy.

230.   Defendant Kenny Gunderman responded to the Trustees' assertions on July 1, 2019 reiterating his confidence that the Master Lease was a "true lease," stating that Windstream "'must continue to pay rent in order to maintain access to the network – otherwise it will not be able to operate its business.'"  His statement continued: "'This latest effort by out-of-the-money junior creditors of Windstream to extract value from Uniti does nothing to change that essential fact . . . [W]e believe that the lease is a true lease and will be respected and enforced as such, and we will vigorously contest any argument to the contrary.'"[52]

231.   On July 25, 2019, Windstream initiated the Adversary Proceeding against Uniti in connection with its bankruptcy action. In the Adversary Proceeding, Windstream argued that the Master Lease was not a true lease at all – but was instead a disguised financing.

232.   The complaint Windstream filed in the Adversary Proceeding lays out the scheme that Windstream and Uniti participated in to effectuate the Spin-Off – including the back-filled financial terms of the Master Lease through the "negotiation" of above-market lease payments based on unsupportable and unreasonable projections of copper's useful life (and thus the value of all the assets transferred).

---

[52]   Andrew Scurria, *Windstream Creditors Want Uniti Rent Stopped*, The Wall Street Journal (July 1, 2019),  https://www.wsj.com/articles/windstream-creditors-want-uniti-rent-stopped-11561760927.

4848-2207-4295.v23

233.     The allegations in the Adversary Proceeding laid bare the fact that Defendants knew that the Master Lease was a financing and could be recharacterized as such in the event of Windstream bankruptcy.

234.     On March 2, 2020, on the eve of trial in the Adversary Proceeding, Windstream and Uniti announced that they had reached an agreement in principle to resolve the dispute.  Nevertheless, the damage inflicted on Uniti's investors by Defendants' false and misleading statements, and material omissions, was done.

## VIII.  ADDITIONAL EVIDENCE OF SCIENTER

235.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company, or in their own name, were materially false and misleading; Defendants knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants – by virtue of their receipt of, or access to, information reflecting the true facts regarding Windstream and Uniti, their control over, or receipt of, or modification of Uniti's materially misleading misstatements – were active participants in the fraudulent scheme alleged herein.

236.     Defendants knew, or recklessly disregarded, the false and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period

without the knowledge and complicity, or at least, the reckless disregard, of Uniti and Windstream personnel at the highest levels of those companies.

237.   The scienter of both Windstream's and Uniti's corporate officers, including Defendants Kenny Gunderman and Wallace can be attributed to Defendant Uniti.

238.   The following allegations additionally support a strong inference of scienter. At the time of the Spin-Off, Defendants knew that the Master Lease violated Windstream's Indenture.   Indeed, at a presentation during REITWeek 2015, for analysts and investors, Defendants Kenny Gunderman and Wallace touted their "Deep Familiarity with Sale Leaseback Transactions."   ¶156.   This violation of Windstream's Indenture put Windstream's future payments to Uniti, totaling nearly $10 billion over 15 years, under the Master Lease, at a heightened risk of default.[53]   The facts below support Defendants' knowledge, or reckless disregard, that the structure of the 2015 Uniti Spin-Off and Uniti's execution of the Master Lease with Windstream Holdings violated – or seriously risked violating – the restrictive covenants in the Indenture:[54]

(a)   Prior to joining Uniti as its CEO, while at Stephens, Defendant Kenny Gunderman, was a long-term advisor to Windstream on various transactions, including the

---

[53]   The Master Lease provides that Windstream would pay $650 million per year (and increased to $653.5 million during the first year of the lease), with annual increases of 0.5% per year beginning with the fourth year of the term, for a 15-year term.

[54]   Defendants, Windstream, and other relevant parties proceeded with the Spin-Off in light of the known risk that the Spin-Off was in violation of the Indenture because they were motivated by the numerous benefits it offered, including: (1) a new position for Defendant Kenny Gunderman as CEO of Uniti; (2) financial flexibility, asset protection, and significant capital for Windstream; and (3) the creation of two options for investment – the Uniti REIT, which was designed for a steady dividend, and the new Windstream (*i.e.*, Windstream Holdings), which was more attractive to growth investors. *See* §V.

4848-2207-4295.v23

structuring of the Spin-Off and the Master Lease.  Therefore, he was in a prime position to understand the potential Indenture breach and the risk of default under the Master Lease. ¶56-86;

      (b)     Prior to the Spin-Off, Windstream and Uniti executives, including each of the Individual Defendants, were coached to tell bondholders and credit agencies that there was no issue with a potential Indenture breach, to not to go into detail and that "if pressed" to give general canned responses.  ¶¶92-96, 118-121.   These facts suggest that prior to the Spin-Off, the Indenture breach was known within Windstream and Uniti and their advisor network, including Fletcher, Defendants Kenny Gunderman and Wallace;

      (c)     Defendants Kenny Gunderman and Wallace were copied on an email dated April 12, 2015 that coached Windstream and Uniti executives to tell investors the reason they structured the Master Lease with Windstream Holding as the lessee (instead of the Windstream Operating Subsidiaries that issued the Notes) was "complex" with "many factors." This email suggests that Windstream and Uniti executives deflect questions about the use of Windstream's holding company structure to avoid any discussion about the potential Indenture breach.  ¶¶118-121;

      (d)     Defendant Kenny Gunderman earned more than $5 million annually as CEO and President of Uniti following the Spin-Off.  Therefore, Gunderman was financially motivated to conceal the Windstream Indenture breach and any resulting risks to Uniti;

      (e)     Windstream Holdings was created at the time the sale-leaseback structure was being contemplated.  Windstream Holdings was a shell company that did not have employees or generate the revenue necessary to make lease payments to Uniti.

Moreover, accounting records of the Windstream Operating Subsidiaries and Windstream Holding indicate that the Windstream Operating Subsidiaries were the *de facto* lessee of the Master Lease.  The weight of this evidence supported the ruling by Judge Furman in the Aurelius Litigation, and strongly suggests that Defendants knew about Windstream's Indenture breach and its risk to Uniti at the time of the Spin-Off; and

(f)     Windstream completely divested its equity interest in Uniti stock shortly after the Spin-Off and prior to the revelation of the alleged fraud and profited handsomely – transferring the remaining 19.6% of Uniti's common stock to its secured bank creditors in exchange for the retirement of $672 million of aggregate borrowings outstanding under its revolver and to satisfy transaction-related expenses.  This fact suggests that Windstream and its advisors, including Fletcher and Defendant Kenny Gunderman, who were paid millions of dollars to consult on the Spin-Off and Master Lease, were financially motivated to conceal the Indenture breach and its risk to Uniti.

239.   Defendants had a motive to conceal that the Master Lease and Spin-Off violated Windstream's Indenture as well as the extent of the risks associated with the 2015 Uniti Spin-Off and the Master Lease from Uniti's investors.  The IRS private letter ruling that permitted Uniti to exist as a REIT in the first place was based in part on Windstream and Uniti's representation to the IRS that the useful life of the copper wires that made up approximately 80% of the assets to be spun off to Uniti was 30 to 40 years, in contravention of analyses that Windstream possessed at the time and, on information and belief based upon the allegations of Windstream's complaint in the Adversary Proceeding, in contravention of Windstream's own accounting policy of depreciating copper wire assets in its Competitive

Local Exchange Carrier networks over 20 years.  ¶¶122-138.  So too was the E&Y analysis of the useful life of the assets to be spun off to Uniti based on inflated and unsupportable projections provided by Uniti.  *Id*.  And Uniti knew that these projections were inflated and unrealistic: its own accounting for those assets carried them at a useful life of 7 to 40 years until 2017, when, without explanation, the accounting treatment in its financial statements changed to a useful life of 20 years.  A useful life of 20 years or less would not support the "true lease" treatment of the Master Lease, which would in turn jeopardize the tax treatment of Uniti as a REIT.

240.    Similarly, Defendants had immediate economic incentives to hide the truth about the Spin-Off and the Master Lease from Uniti investors.  Windstream's financial viability depended on not defaulting on its Notes.  And Uniti's financial viability – as well as the employment and lucrative compensation packages of Defendant Kenny Gunderman at Uniti and Robert Gunderman, his brother, at Windstream – in turn, depended on Windstream's continued success.  If it were publicly disclosed that Windstream violated – or had engaged in a transaction that risked violating – the Indenture, and causing a default, the value of Uniti securities would crater.  Moreover, Defendants knew, or recklessly disregarded, that if they publicly identified the true nature of the risk that Windstream was in violation of the Indenture, then they essentially would be inviting Windstream's noteholders to do exactly what Aurelius did – cause the Indenture Trustee to file a breach of contract action against Windstream.  Only by concealing the true nature of these risks could Uniti and Windstream, and the Individual Defendants, hope to possibly avoid the collapse of this "house of cards."

## IX.   LOSS CAUSATION

241.   During the Class Period, as detailed herein, Uniti and the Individual Defendants engaged in a course of conduct that artificially inflated, or artificially maintained, the price of Uniti's securities and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired Uniti's securities during the Class Period.

242.   The material misstatements and omissions regarding the Master Lease's violation of Windstream's Indenture concealed risks related to the true nature of Spin-Off as violative of Windstream's Indenture, and it was foreseeable that the value of Uniti's securities would be adversely affected when the market learned the truth and the concealed risks materialized.

243.   When the truth about the Spin-Off and the hidden risks materialized and became known to the market, the price of Uniti's securities declined precipitously as the prior artificial inflation was removed from the price of the stock.   As a result of their purchases and acquisitions of Uniti's securities at artificially inflated prices during the Class Period, Lead Plaintiffs and other members of the Class suffered a substantial economic loss (*i.e.*, damages under the federal securities laws).   The price decline in Uniti's securities was a foreseeable and direct result of the nature and extent of Defendants' materially false and misleading statements, and omissions.   Thus, the Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiffs and the Class.

244.   None of the partial disclosures were sufficient on their own to fully remove the inflation from Uniti's securities, because each only partially revealed the truth and risks

associated with the Spin-Off causing a default to Windstream's debt covenants, and the impact of Windstream's default on Uniti's business, that had been concealed from investors. As a result of these partial disclosures of the fraud, the price of Uniti's stock fell from $24.69 per share at the close of trading on August 2, 2017 (the day before the truth began to enter the market) to $9.38 per share at the close of trading on June 25, 2019 – a 62% decline. Additionally, as a result of these partial disclosures of the fraud, the price of Uniti's 8.25% bond fell from $103.84 per unit at the close of trading on August 2, 2017 (the day before the truth began to enter the market) to $93.39 per unit at the close of trading on June 25, 2019 – a 10.07% decline.

245.   Internal discussions at Uniti and Windstream confirm that this motive to attract investment – while hiding the true nature of the Spin-Off from potential investors – drove Defendants' false and misleading public disclosures.  Before the Spin-Off, Windstream's Vice President of Capital Markets and Investor Relations instructed executives that were intimately involved with the 2015 Uniti Spin-Off not to go into detail unless "[p]ressed" on why the Master Lease would be implemented with Windstream Holdings – according to an August 2014 email sent in the midst of seeking required regulatory approval of the transaction.  ¶¶92-94.  And at Uniti, Defendants Kenny Gunderman's and Wallace's role were to "reinforce the message" about the viability of the 2015 Uniti Spin-Off.  Even then, the "talking points" counseled to actively avoid any discussion of the existential risks to Windstream and Uniti that the Spin-Off and Master Lease posed, and that Defendants had concealed.  ¶¶118-121.

246. The truth and concealed risks materialized through a series of disclosures as detailed below. The following price declines in Uniti's securities are not necessarily comprehensive since fact and expert discovery are not complete. These price declines in Uniti's securities were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific non-fraud factors.

A. **Partial Disclosure – August 2017**

247. As detailed in ¶168, on August 3, 2017, Windstream announced that it was eliminating its dividend payment to its investors. This caused the price of Uniti's stock to immediately and dramatically decline. As a result of Windstream's disclosure, the price of Uniti's stock fell more than 8% on August 3, 2017 on a volume of more than 4 million shares to close at $22.57 per share, and another nearly 4% on August 4, 2017 to close at $21.84, with over 7 million shares trading that day.

248. On August 3, 2017, Defendants, in an attempt to reverse the decline in Uniti's stock, made false statements reassuring the market that despite Windstream's elimination of its dividend, its lease payments from Windstream were "very, very safe." ¶169. On August 8, 2017, Defendants again falsely reassured the market that the lease payment from Windstream was not in jeopardy and that the Master Lease had safeguards to protect the Company "in all cases." ¶171. Uniti's stock price, however, continued its collapse falling more than 12% between August 8 and August 11, 2017 as the market absorbed this information, closing on August 11, 2017 at $19.37 per share.

249. Additionally, partial disclosures relating to the default of Windstream's debt covenants caused by the Spin-Off began to enter the market during August 2017 when

rumors circulated that the Spin-Off violated Windstream's debt covenants. ¶172. This information also caused Uniti's stock price to fall during August 2017. In contrast to the decline in Uniti's stock, the MSCI US REIT Index, which includes Uniti, remained flat.

250.    Analysts tied the declines in Uniti's stock price to news about Windstream's business and rumors that the Spin-Off violated Windstream's debt covenants putting it in default of its Indenture. On September 19, 2017, Jennifer Fritzsche of Wells Fargo Securities issued a report noting:

> There are a couple short reports circling that question UNIT's original REITco spin. The questions center around part of the transfer of WIN's ownership in UNIT shares a few years back to a third-party entity. At the time, WIN used the proceeds of this sale to lower its borrowings under its outstanding revolver. This short report is arguing that WIN violated the debt agreement as deals such as this are supposed to be done with 75% cash or more. It is our understanding (although we have not seen all the reports) that the majority of the covenant review shops do not view this as a gray area of concern as these assets were done from an unrestricted subsidiary of WIN and were used to pay down debt (through the revolver).

**B.     Partial Disclosure – September 25, 2017: Aurelius Notice of Default**

251.    Then, Windstream filed a Form 8-K, after market close on September 25, 2017, disclosing that it had received a "purported notice of default" from Aurelius claiming that the Spin-Off violated Windstream's debt covenants. As alleged in ¶177, Windstream reassured its investors, as well as Uniti's investors, that no such default had occurred.

252.    Analysts tied the disclosure of an alleged default in Windstream's debt covenants caused by the Spin-Off to the decreased price of Uniti stock. JPMorgan analyst, Philip Cusick, noted that:

> Uniti shares have fallen 40% to $14.66 (vs SPX +2%) since reporting in-line 2Q17 earnings on August 3rd, driven by fears surrounding the stability

of the Windstream business and the viability of the WIN/UNIT spin structure. Windstream shares have fallen 52% in the same period. In the last two weeks news surrounding the S&P downgrade on September 19th and Windstream's dispute with creditors have boosted fears even more.  While we initially defended Uniti shares on the premise that the company's lease with Windstream should be advantaged in or out of bankruptcy, today we downgrade Uniti to a Neutral as the theme of Windstream's distress continues to increase in volume.  Although we expect UNIT to report in-line earnings on November 2, we believe the equity could weaken further before its relationship with WIN is confirmed.  Due to elevated risk and volatility associated with the companies we downgrade UNIT to Neutral and lower our price target to $16 from $27 based on a higher cost of capital (discount rate now 10% vs. 8% previously).

253.    SunTrust Robinson Humphrey's analyst, Greg P. Miller, also reported, "Under pressure since WIN cut its dividend, last week's disclosure that a 25% WIN noteholder issued the company a notice of default alleging breach of the Sale and Leaseback covenant two years ago from the spin-off that added to the UNIT sell-off."

254.    As a result of this partial disclosure, the price of Uniti's stock declined more than 10% on a trading volume of nearly 12 million shares to close at $15.66 per share on September 26, 2017, and another 5% on September 27, 2017 to close at $14.73 per share.  In contrast to the decline in Uniti stock, the MSCI US REIT Index *increased* by 0.13% on September 26, 2017 and decreased by .87% on September 27, 2017.  Defendants' continued false and misleading statements, and material omissions, that the Master Lease was "well-crafted" and the claims of default "manufactured," made in the following 15 months, however, maintained the artificial inflation in the price of Uniti's securities.  ¶¶179-180, 183-192, 194-198.

### C. Partial Disclosure – February 15, 2019: Judge Furman's Findings of Fact

255.    After the close of the market on February 15, 2019, another partial disclosure was made.  As described in ¶¶201-204, Judge Furman, who presided over the trial between Windstream and Aurelius concerning whether the Spin-Off violated Windstream's debt covenants, issued his ruling determining that the Spin-Off did violate Windstream's Indenture, and finding that a $300 million judgment should be entered against Windstream.

256.    As a result of this information, the price of Uniti stock declined more than 37% on a trading volume of almost 49 million shares to close at $12.51 per share on February 19, 2019, the first trading day after Judge Furman's decision was issued.  In contrast to the decline in the price of Uniti's stock, the MSCI US REIT Index *increased* by .13% that day.

257.    JPMorgan's analyst agreed that Uniti's stock suffered as a result of Windstream's legal issues:

> Although we believe Uniti will eventually be seen as an important infrastructure provider with uniquely structured partnerships, as long as the Windstream process is in question, UNIT shares are likely to trade poorly as Windstream's lease payment supplies the cash for Uniti's $2.40 ($422m) annual dividend.  We downgrade Uniti Group to Underweight from Neutral, and reduce our Dec-19 price target to $16 from $23.

258.    As analysts at RBC Capital Markets succinctly stated, "With Windstream planning to appeal the ruling, the continued uncertainty around the Uniti story is extended and legal headlines will likely be the primary driver of stock price movements."

259.    Credit rating agencies likewise reacted negatively.  As alleged in ¶207, on February 21, 2019, S&P and Fitch, respectively, downgraded the credit ratings of Uniti as the markets digested the revelations about the Spin-Off.  As a direct result, the price of

Uniti's stock fell further, over 18%, to close at $9.99 per share with over 24 million shares trading. Uniti's stock price continued to fall on February 22, 2019 as the market absorbed this news, losing another 8%, to close at $9.23 per share on heavy trading of nearly 20 million shares.

260.    Analysts once again tied the decrease in Uniti's stock price to news that the Spin-Off violated Windstream's debt covenants.  Morgan Stanley analyst, Simon Flannery, issued a report stating:

> What's next for Uniti?: Following the surprise court defeat for key tenant Windstream (~85% of EBITDA, 100%+ of cash flow) last Friday, Uniti's debt (Exhibit 1) and equity (Exhibit 2) securities have continued to be pressured as investors become increasingly concerned about the financial condition of Windstream.  Windstream's stock has fallen 75% ($37m market cap) since the ruling, while Uniti's stock is down 54% ($1.7b market cap). We expect the next few weeks (if not days) to be pivotal, as we await news on Windstream's next steps and Uniti's upcoming dividend decision.  We retain our Underweight rating on Uniti and continue to see risks despite the stock price decline.

261.    Between February 19 and June 20, 2019, Defendants continued to disseminate the false and misleading statements and material omissions alleged in ¶¶205, 212-225 that Uniti would be able "***to navigate the Windstream bankruptcy proceedings without having to raise external capital***," that the Master Lease was designed structurally to withstand a bankruptcy filing by Windstream, and that Uniti was seeing no impact to its business due to Windstream's bankruptcy.  Defendants' misstatements and omissions maintained the artificial inflation in the price of Uniti's securities.

### D.    Partial Disclosure – June 24, 2019: $300 Million Note Offering

262.    As detailed in ¶227, after the close of the market on June 24, 2019, Defendants announced a $300 million note offering that included an option to purchase an additional $45

million notes, thus implicitly acknowledging that Uniti's business was impacted by Windstream's bankruptcy and, as a result, Uniti could not maintain its business operations without accessing the capital markets, contrary to the Company's and Defendants Kenny Gunderman's and Wallace's repeated representations.  *See* ¶¶212-225.

263.   Uniti's stock price immediately declined closing at $9.38, an over 10% loss from the prior day's closing price, with over 10 million shares traded.  In contrast, the MSCI US REIT Index declined only 1.17% on June 25, 2019.

264.   The chart below shows Uniti's stock price reaction on the dates of partial disclosures and the clear divergence to its peer index:



- 106 -

265.    As depicted in the below chart, the price of Uniti's debt securities also declined as a result of the partial disclosures beginning on August 3, 2017, as news of the corrective disclosures penetrated the market.  The price of Uniti's debt securities diverged widely from the Bloomberg Barclays U.S. Corp. Index:



266.    The declines in the price of Uniti's securities pled herein were a direct result of the nature, extent, and impact of Defendants' prior material false and misleading statements and omissions, and the materialization of the risks they concealed, being revealed to investors and the market.  The timing and magnitude of the price declines of Uniti's securities negate any inference that the loss suffered by Lead Plaintiffs and other Class

members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

## X. APPLICABILITY OF THE PRESUMPTION OF RELIANCE: *AFFILIATED UTE* AND FRAUD ON THE MARKET PRESUMPTION

267.   Lead Plaintiffs allege that throughout the Class Period, Defendants omitted material information of which Defendants were aware or reckless in not knowing.  Such statements artificially inflated, or artificially maintained, the price of Uniti publicly traded securities and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired those securities during the Class Period.  Because Defendants chose to speak on the issues described in §VI, they were obligated to not mislead investors or withhold material information.  To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to the risks detailed herein, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

268.   Lead Plaintiffs are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory because, among other things:

(a)   Defendants made public representations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   The Company's securities traded in an efficient market;

- 108 -

(d)     The omissions and misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Lead Plaintiffs and other members of the Class purchased the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

269.    At all relevant times, the market for the Company's securities was efficient for the following reasons, among others:

(a)     The Company's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)     The Company regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(d)     According to the Company's 2019 Form 10-K, as of March 4, 2020, there were 193,263,981 shares of Uniti stock outstanding, demonstrating a very active and broad market for Uniti common stock;

(e)     Uniti was followed by several securities analysts employed by major brokerage firm(s) including Stephens, Wells Fargo Securities, Cowen & Co., RBC Capital

Markets, JPMorgan, Deutsche Bank and SunTrust Robinson Humphrey, which wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s), were publicly available, and entered the public marketplace; and

> (f)     Unexpected material news about Uniti was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

270.    As a result of the foregoing, the market for Uniti securities promptly digested current information regarding Uniti from publicly available sources and reflected such information in the price of Uniti securities. Under these circumstances, all persons and entities who purchased or otherwise acquired the publicly traded securities of Uniti during the Class Period suffered similar injury through their purchase of Uniti securities at artificially inflated and/or artificially maintained prices and the presumption of reliance applies.

## XI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

271.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

272.    To the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not identified as "forward-looking statements"

4848-2207-4295.v23

when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

273.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of the forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Uniti who knew that the statement was false or misleading when made.

## XII.   CLASS ACTION ALLEGATIONS

274.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of Uniti during the period from April 24, 2015 to June 24, 2019, inclusive, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Uniti during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Uniti's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person; (vii) Windstream; and (vii) any person who was an officer or director of Windstream during the Class Period.

275.    The members of the Class are so numerous that joinder of all members is impracticable.  The Company's stock is currently actively traded on the NASDAQ, and there were 193,263,981 shares of Uniti stock outstanding as of March 4, 2020.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Uniti or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

276.    Common questions of law and fact predominate and include: (i) whether Defendants violated the 1934 Act; (ii) whether Defendants omitted and/or misrepresented material facts; (iii) whether Defendants knew or recklessly disregarded that their statements were false and misleading; and (iv) whether Defendants' statements and/or omissions artificially inflated and/or artificially maintained  the price of Uniti's securities; and (v) the extent of damages sustained by Class members and the appropriate measure of damages.

277.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

278.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

4848-2207-4295.v23

279.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## XIII.  CLAIMS FOR RELIEF

### COUNT I
### For Violation of §10(b) of the 1934 Act and
### Rule 10b-5(b) Promulgated Thereunder Against All Defendants

280.    Lead Plaintiffs incorporate ¶¶1-279 by reference.

281.    This Count is asserted pursuant to §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, on behalf of Lead Plaintiffs, against Defendants Uniti, Kenny Gunderman, and Wallace.

282.    During the Class Period, Defendants carried out a plan that was intended to, and did: (a) deceive the investing public, including Lead Plaintiffs, and the Class; and (b) artificially manipulate the price of Uniti securities.

283.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 113 -

284. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Uniti securities during the Class Period.

285. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

286. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

287. Defendants' liability arises from the fact that they developed and engaged in a scheme to manipulate the price of Uniti's securities and were aware of the dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

288. Defendants had actual knowledge of the misrepresentations, omissions, and deceptive conduct alleged herein, or acted with reckless disregard for the truth. Defendants'

acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public, and to artificially manipulate the market price of Uniti's securities.

289.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Uniti's securities.  Lead Plaintiffs and the Class would not have purchased Uniti's securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

290.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Uniti securities during the Class Period.

## COUNT II
### For Violation of §10(b) of the Exchange Act
### and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants

291.    Lead Plaintiffs repeat, incorporate, and reallege every allegation set forth above as though fully set forth herein.

292.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c).  Accordingly, Lead Plaintiffs need not allege in this Count nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

293.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the Class; (ii) artificially inflate the market price of Uniti securities; and (iii) cause Lead Plaintiffs and other Class members to purchase Uniti

securities at artificially inflated prices.  In furtherance of this unlawful plan, scheme, and course of conduct, Defendants employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiffs and the Class in connection with their purchases of Uniti securities in violation of §10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

294.  Defendants' fraudulent devices, schemes, artifices, and deceptive acts, practices, and course of business included the creation of Uniti through structuring a Spin-Off from Windstream – which was known at the time of the transaction to be in violation of Windstream's Indenture – while simultaneously disseminating false and misleading information to the market regarding the "well-structured" nature of the Master Lease and repeated assurances that the Spin-Off would not violate Windstream's Indenture, which would put Uniti's business in serious jeopardy, as alleged herein.

295.  Lead Plaintiffs and the Class reasonably relied upon the integrity of the market in which Uniti's securities traded.

296.  During the Class Period, Lead Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct.  Had Lead Plaintiffs and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Uniti's securities, or if they had, would not have done so at the artificially inflated prices paid for such stock.

297.    As a direct and proximate result of Defendants' scheme to defraud and such

unlawful course of conduct, Lead Plaintiffs and the Class suffered damages in connection

with their purchases of Uniti securities during the Class Period.

298.    By reason of the foregoing, Defendants violated §10(b) of the Exchange Act

and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Lead Plaintiffs and the

Class for damages suffered in connection with their purchases of Uniti securities during the

Class Period.

## COUNT III
### For Violation of §20(a) of the 1934 Act
### Against Defendants Kenny Gunderman and Wallace

299.    Lead Plaintiffs incorporate ¶¶1-298 by reference.

300.    During the Class Period, Defendants Kenny Gunderman and Wallace acted as

controlling persons of Uniti within the meaning of §20(a) of the 1934 Act.  By virtue of their

positions and their power to control public statements about the Company, Defendants

Kenny Gunderman and Wallace had the power and ability to control the actions of the

Company and their employees.  Uniti controlled Defendants Kenny Gunderman and Wallace

and its other officers and employees.  By reason of such conduct, Defendants Kenny

Gunderman and Wallace are liable pursuant to §20(a) of the 1934 Act.

301.    Defendants Kenny Gunderman and Wallace were provided with or had

unlimited access to the Company's internal reports, press releases, public filings, and other

statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these

statements were issued, and had the ability to prevent the issuance of the statements or cause

them to be corrected.

4848-2207-4295.v23

302. In particular, Defendants Kenny Gunderman and Wallace had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Uniti, in turn, controlled Defendants Kenny Gunderman and Wallace and all of its employees.

303. By reason of such wrongful conduct, Defendants Kenny Gunderman and Wallace are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants Kenny Gunderman and Wallace's wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A. Determining that this action is a proper class action, certifying Lead Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure, and designating Lead Plaintiffs' counsel as Class Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

4848-2207-4295.v23

## XV.  JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED:  May 11, 2020

ROBBINS GELLER RUDMAN
  & DOWD LLP
DEBRA J. WYMAN
TING H. LIU


_____
s/ Debra J. Wyman
DEBRA J. WYMAN

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
debraw@rgrdlaw.com
tliu@rgrdlaw.com

LABATON SUCHAROW LLP
CAROL C. VILLEGAS
CHRISTINE M. FOX
ROSS KAMHI


_____
s/ Christine M. Fox
CHRISTINE M. FOX

140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)
cvillegas@labaton.com
cfox@labaton.com
rkamhi@labaton.com

Lead Counsel for Lead Plaintiffs

4848-2207-4295.v23

PATTON TIDWELL & CULBERTSON, LLP
GEOFFREY P. CULBERTSON
2800 Texas Blvd.
Texarkana, TX 75503
Telephone:  903/792-7080
903/792-8233 (fax)
gpc@texarkanalaw.com

Liaison Counsel for the Class

Brian Schall
THE SCHALL LAW FIRM
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Tel: (424) 303-1964
Email: brian@schallfirm.com

Guillaume Buell
THORNTON LAW FIRM LLP
1 Lincoln Street, 25th Floor
Boston, MA 02111
Tel: (617) 720-1333
Email: gbuell@tenlaw.com

Additional Plaintiffs' Counsel

4848-2207-4295.v23