# Exhibit C

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): March 26, 2015**

# Communications Sales & Leasing, Inc.
**(Exact name of registrant as specified in its charter)**

| **Maryland** | **001-36708** | **46-5230630** |
|---|---|---|
| **(State or other jurisdiction** | **(Commission** | **(IRS Employer** |
| **of incorporation)** | **File Number)** | **Identification No.)** |

**10802 Executive Center Drive**
**Benton Building Suite 300**
**Little Rock, AR**
**(Address of principal executive offices)**

**72211**
**(Zip Code)**

**Registrant's telephone number, including area code: (501) 748-4491**

**Not Applicable**
**(Former name or former address, if changed since last report.)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

¨    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

¨    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

¨    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

¨    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01.  Entry into a Material Definitive Agreement**

On March 26, 2015, Communications Sales & Leasing, Inc. ("CS&L") entered into a Separation and Distribution Agreement (the "Separation Agreement") with Windstream Holdings, Inc. and its subsidiary Windstream Services, LLC (collectively, "Windstream"). The Separation Agreement was entered into in connection with Windstream's previously announced spin-off of CS&L, which is more fully described in the information statement, dated March 26, 2015, filed as Exhibit 99.1 to this Current Report on Form 8-K (the "Information Statement"). The Separation Agreement contains the key provisions relating to the separation of CS&L's business from Windstream. It also contains other agreements that govern certain aspects of CS&L's relationship with Windstream that will continue after the spin-off. A summary of the material terms of the Separation Agreement is set forth in the Information Statement under "Our Relationship with Windstream Following the Spin-Off – Separation and Distribution Agreement," and is incorporated by reference herein. The description is qualified in its entirety by the agreement filed with this Current Report on Form 8-K as Exhibit 2.1, which is incorporated by reference herein.

**Item 7.01   Regulation FD Disclosure**

On March 26, 2015, Windstream issued a press release relating to the separation of CS&L's business from Windstream. A copy of the press release is attached hereto as Exhibit 99.2. The information contained in this Item 7.01 to this Current Report on Form 8-K, including Exhibit 99.2, shall not be deemed "filed" with the Securities and Exchange Commission (the "Commission") nor incorporated by reference into any registration statement filed by CS&L under the Securities Act of 1933, as amended.

**Item 8.01   Other Events**

CS&L previously filed with the Commission a registration statement on Form 10, initially filed on October 24, 2014 (as amended, the "Registration Statement"), relating to the distribution by Windstream of at least 80.1% of the outstanding shares of common stock of CS&L to the stockholders of Windstream Holdings, Inc. On March 26, 2015, the Registration Statement was declared effective by the Commission. The Registration Statement includes a preliminary information statement that describes the distribution and provides important information regarding CS&L's business and management.

The final Information Statement is attached hereto as Exhibit 99.1. Windstream has made the Information Statement publicly available and intends to begin mailing it to stockholders on or about March 31, 2015.

**Cautionary Statement Regarding Forward Looking Statements**

CS&L claims the protection of the safe-harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. Forward-looking statements are subject to uncertainties that could cause actual future events and results to differ materially from those expressed in the forward-looking statements. Forward-looking statements include, but are not limited to, statements regarding the completion of the transaction, the effective date of the distribution and other transaction dates, the expected benefits of the transaction, and the pro forma dividend for each company. Such statements are based on estimates, projections, beliefs, and assumptions that CS&L believes are reasonable but are not guarantees of future events and results. Actual future events and results of CS&L may differ materially from those expressed in these forward-looking statements as a result of a number of important factors.

Factors that could cause actual results to differ materially from those contemplated in CS&L's forward-looking statements include, among others: (i) risks related to the anticipated timing of the proposed separation, the expected tax treatment of the proposed transaction, the ability of each of Windstream (post-spin) and CS&L to conduct and expand their respective businesses following the proposed spinoff, the ability of Windstream to reduce its debt by the currently-anticipated amounts, and the diversion of management's attention from regular business concerns; (ii) the risk that the conditions to the spin-off, including financing of the transaction, are not satisfied; and (iii) those additional factors set forth under "Risk Factors" in the Information Statement.

**Item 9.01   Financial Statements and Exhibits.**

(d)   Exhibits.

| Exhibit No. | Exhibit |
| --- | --- |
| 2.1 | Separation and Distribution Agreement, dated as of March 26, 2015, by and among Windstream Holdings, Inc., Windstream Services, LLC and Communications Sales & Leasing, Inc. |
| 99.1 | Information Statement of Communications Sales & Leasing, Inc., dated March 26, 2015 |

Case 4:19-cv-00756-BSM     Document 63-3     Filed 07/10/20     Page 4 of 13

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: March 26, 2015                                           COMMUNICATIONS SALES & LEASING, INC.

                                                                By:      /s/ Kenneth Gunderman
                                                                         _____
                                                                         Name:      Kenneth Gunderman
                                                                         Title:     President & Chief Executive Officer

## EXHIBIT INDEX

| Exhibit No. | Exhibit |
|---|---|
| 2.1 | Separation and Distribution Agreement, dated as of March 26, 2015, by and among Windstream Holdings, Inc., Windstream Services, LLC and Communications Sales & Leasing, Inc. |
| 99.1 | Information Statement of Communications Sales & Leasing, Inc., dated March 26, 2015 |
| 99.2 | Press Release, dated March 26, 2015 |

**Exhibit 99.1**



March 26, 2015

Dear Shareholder of Windstream Holdings, Inc.:

We are pleased to inform you that the board of directors of Windstream Holdings, Inc. ("Windstream Holdings" and, together with its consolidated subsidiaries, "Windstream") has approved a plan to spin off certain telecommunications network assets, including its fiber and copper networks and other real estate, into Communications Sales & Leasing, Inc. ("CS&L"), which will become, upon its election, an independent, publicly traded real estate investment trust. Windstream will retain a passive ownership interest in up to 19.9 percent of the common stock of CS&L at the time of the spinoff. Windstream intends to use all of its shares of CS&L common stock opportunistically during a twelve month period following the spinoff, subject to market conditions, to retire debt.

Certain subsidiaries of CS&L will lease the assets to Windstream Holdings through an exclusive long-term triple-net lease. Windstream will continue to operate and maintain the assets in order to deliver advanced communications and technology services to consumers and businesses. We believe that CS&L will be positioned to provide an attractive dividend to shareholders and grow through acquisitions, capital investments and rent escalation.

The transaction will be completed by way of a *pro rata* distribution of no less than 80.1 percent of the outstanding shares of CS&L common stock to Windstream Holdings shareholders of record as of the close of business on April 10, 2015, the record date for the spinoff. After giving effect to the interest in CS&L retained by Windstream, each Windstream Holdings shareholder will receive one share of CS&L common stock for every five shares of Windstream Holdings common stock held on the record date. The number of Windstream Holdings shares you own will not change as a result of the spinoff. CS&L intends to list its common stock on the NASDAQ Global Select Market under the symbol "CSAL." Windstream Holdings common stock will continue to be listed and traded on the NASDAQ Global Select Market under the symbol "WIN."

If the distribution date is not on the record date of Windstream's normal quarterly dividend, we intend to pay a *pro rata* dividend to our shareholders based on the number of days elapsed in the quarter. Following the close of the transaction, Windstream initially expects to pay an annual dividend of $.10 per share and CS&L initially expects to pay an annual dividend of $2.40 per share (which would be equivalent to a $.60 per share Windstream dividend per annum). After giving effect to the interest in CS&L retained by Windstream, each shareholder at the time of the spinoff will receive the equivalent of a $.48 per share Windstream dividend per annum.

No vote of Windstream Holdings' shareholders is required in connection with the spinoff. You do not need to make any payment, surrender or exchange your shares of Windstream Holdings common stock or take any other action to receive your shares of CS&L common stock.

The enclosed information statement, which is being made available to all Windstream Holdings shareholders, describes the spinoff in detail and contains important information about CS&L and its business. We urge you to read the information statement carefully and in its entirety.

We want to thank you for your continued support of Windstream, and we look forward to your support of CS&L in the future.

Sincerely,

Anthony W. Thomas
President and Chief Executive Officer

Table of Contents



March 26, 2015

Dear Future Shareholder of Communications Sales & Leasing, Inc.:

It is our pleasure to welcome you as a shareholder of our company, Communications Sales & Leasing, Inc. ("CS&L"). Following the distribution of no less than 80.1 percent of the outstanding shares of CS&L common stock by Windstream Holdings, Inc. to its shareholders, CS&L will be an independent, publicly traded real estate investment trust that will own, acquire and lease distribution systems serving the communications infrastructure industry and potentially other industries. We will strive to be a significant provider of capital and financing to the communication industry.

Our initial properties will include, among other things, an extensive communications distribution system, comprised of approximately 66,000 route miles of fiber optic cable lines, 235,000 route miles of copper cable lines, and central office land and buildings across 37 states that are currently owned by Windstream. This distribution system will be leased to Windstream Holdings on a long-term, triple-net basis. We expect to diversify our tenant base in the future by acquiring additional properties and leasing them to other local, regional and national telecommunications providers. We also expect to grow and diversify our portfolio through the acquisition of properties in different geographic markets, and in different asset classes.

Our goal at CS&L is to create value for our shareholders and we plan to accomplish this by growing our dividend distributions over time. CS&L initially expects to pay an annual dividend of $2.40 per share.

We invite you to learn more about CS&L and its business by reviewing the enclosed information statement. We urge you to read the information statement carefully and in its entirety. We are excited by our future prospects, and look forward to your support as a holder of our common stock.

Sincerely,

Kenneth Gunderman
President and Chief Executive Officer

**Table of Contents**

**INFORMATION STATEMENT**

# COMMUNICATIONS SALES & LEASING, INC.

## Common Stock
**(Par Value $0.0001 Per Share)**

This information statement is being furnished in connection with the *pro rata* distribution by Windstream Holdings, Inc. ("Windstream Holdings" and, together with its consolidated subsidiaries, "Windstream") to its shareholders of no less than 80.1 percent of the outstanding shares of common stock of Communications Sales & Leasing, Inc. ("CS&L"). At the time of the distribution, certain of CS&L's subsidiaries will own approximately 66,000 route miles of fiber optic cable lines, 235,000 route miles of copper cable lines, central office land and buildings across 37 states and beneficial rights to permits, pole agreements and easements that are currently owned by Windstream (collectively, together with certain other rights, title and interests, the "Distribution Systems").

Prior to the *pro rata* distribution by Windstream Holdings to its shareholders of no less than 80.1 percent of the outstanding shares of CS&L common stock, Windstream will effect a series of restructuring transactions, culminating with a distribution of no less than 80.1 percent of the outstanding shares of CS&L common stock to Windstream Holdings by its wholly owned subsidiary (together with the *pro rata* distribution by Windstream Holdings to its shareholders of no less than 80.1 percent of the outstanding shares of CS&L common stock, the "Spin-Off"). Windstream will retain a passive ownership interest in up to 19.9 percent of the common stock of CS&L at the time of the Spin-Off. Windstream intends to use all of its shares of CS&L common stock opportunistically during a twelve month period following the Spin-Off, subject to market conditions, to retire debt.

After the Spin-Off, certain of CS&L's subsidiaries will lease the Distribution Systems to Windstream Holdings on a long-term triple-net basis. The Spin-Off is intended to be tax-free to Windstream Holdings shareholders for U.S. federal income tax purposes, except for cash paid in lieu of fractional shares.

After giving effect to the interest retained in CS&L by Windstream, you will receive one share of CS&L common stock for every five shares of Windstream Holdings common stock held of record by you as of the close of business on April 10, 2015 (the "record date"). You will receive cash in lieu of any fractional shares of CS&L common stock which you would have otherwise received. The date on which the shares of CS&L common stock will be distributed to you (the "distribution date") is expected to be April 24, 2015. After the Spin-Off is completed, CS&L will be an independent, publicly traded real estate investment trust.

**No vote of Windstream Holdings' shareholders is required in connection with the Spin-Off.** Therefore, you are not being asked for a proxy, and you are requested not to send us a proxy. You will not be required to make any payment, surrender or exchange your shares of Windstream Holdings common stock or take any other action to receive your shares of CS&L common stock.

There is no current trading market for CS&L common stock. We anticipate that a limited market, commonly known as a "when-distributed" trading market, will develop at some point following the record date, and that "regular-way" trading in shares of CS&L common stock will begin on the first trading day following the distribution date. If trading begins on a "when-distributed" basis, you may purchase or sell CS&L common stock up to and including the distribution date, but your transaction will not settle until after the distribution date. CS&L's common stock has been approved for listing on the NASDAQ Global Select Market ("NASDAQ") under the symbol "CSAL" subject to official notice of issuance. As discussed under the caption "The Spin-Off—Listing and Trading of Our Shares," if you sell your Windstream Holdings common stock in the "due-bills" market after the record date and before the distribution date, you also will be selling your right to receive shares of CS&L common stock in connection with the Spin-Off. However, if you sell your Windstream Holdings common stock in the "ex-distribution" market before the distribution date, you will still receive shares of CS&L common stock in the Spin-Off.

CS&L intends to elect to be taxed as a real estate investment trust ("REIT") for U.S. federal income tax purposes commencing with its taxable year ending December 31, 2015. To assist CS&L in qualifying as a REIT, among other purposes, CS&L's charter will contain certain restrictions relating to the ownership and transfer of its stock, including a provision generally restricting shareholders from owning more than 9.8% in value or in number, whichever is more restrictive, of the outstanding shares of CS&L's common stock or more than 9.8% in value of the aggregate of the outstanding shares of all classes and series of CS&L stock, without the prior consent of CS&L's board of directors. See "Description of Our Capital Stock—Restrictions on Transfer and Ownership of CS&L Stock."

CS&L is an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"), and, as such, is allowed to provide in this information statement more limited disclosures than an issuer that would not so qualify. In addition, for so long as we remain an emerging growth company, we may also take advantage of certain limited exceptions from investor protection laws such as Sarbanes-Oxley Act of 2002, as amended (the "Sarbanes-Oxley Act"), and the Investor Protection and Securities Reform Act of 2010 for limited periods. However, we expect that we will cease to be an emerging growth company upon the issuance of debt prior to the consummation of the Spin-Off. See "Summary—Emerging Growth Company Status" and "Description of Financing and Material Indebtedness".

**In reviewing this information statement, you should carefully consider the matters described under the caption "Risk Factors" beginning on page 18.**

Neither the Securities and Exchange Commission (the "SEC") nor any state securities commission has approved or disapproved these securities or determined if this information statement is truthful or complete. Any representation to the contrary is a criminal offense.

This information statement does not constitute an offer to sell or the solicitation of an offer to buy any securities.

Windstream Holdings first mailed this information statement to its shareholders on or about March 31, 2015.

**The date of this information statement is March 26, 2015.**

Table of Contents

## SUMMARY

*The following is a summary of material information included in this information statement. This summary may not contain all of the details concerning the Spin-Off or other information that may be important to you. To better understand the Spin-Off and CS&L's business, you should carefully review this entire information statement.*

*Unless the context otherwise requires, any references in this information statement to "we," "our," "us" and the "Company" refer to CS&L and/or its consolidated subsidiaries. References in this information statement to "Windstream" generally refer to Windstream Holdings, Inc. and its consolidated subsidiaries (other than CS&L and its consolidated subsidiaries after the Spin-Off), unless the context requires otherwise. Windstream Holdings, Inc. is a holding company with no direct operating assets, employees or revenues. All of its operations are conducted by its wholly owned subsidiary Windstream Services, LLC ("Windstream Subsidiary"), which has its own management, employees and assets, and by Windstream Subsidiary's direct and indirect wholly owned subsidiaries.*

*This information statement has been prepared on a prospective basis on the assumption that, among other things, the Spin-Off and the related transactions contemplated to occur prior to or contemporaneously with the Spin-Off will be consummated as contemplated by this information statement. There can be no assurance, however, that any or all of such transactions will occur or will occur as so contemplated.*

*You should not assume that the information contained in this information statement is accurate as of any date other than the date set forth on the cover. Changes to the information contained in this information statement may occur after that date, and we undertake no obligation to update the information, except in the normal course of our public disclosure obligations. In particular, a number of matters contained in this information statement relate to agreements or arrangements that have not yet been finalized and expectations of what may occur. Prior to the Spin-Off, it is possible that these agreements, arrangements and expectations may change.*

## Our Company

Following the Spin-Off, CS&L will become, upon its election, a publicly traded, self-administered real estate investment trust ("REIT") primarily engaged in the ownership, acquisition and leasing of communication distribution systems. CS&L expects to generate revenues primarily by leasing communications distribution systems to telecommunications operators in triple-net lease arrangements, under which the tenant is primarily responsible for costs relating to the distribution systems (including property taxes, insurance, and maintenance and repair costs). To our knowledge, CS&L will be the first REIT focused on acquiring and building communication distribution systems, and expects to grow its portfolio by aggressively pursuing opportunities to acquire additional communications distribution systems to lease to communication service providers on a triple-net basis. CS&L also anticipates diversifying its portfolio over time, including potentially acquiring other real property assets within or outside of the communications infrastructure industry to lease to third parties.

At the time of the Spin-Off, certain of CS&L's subsidiaries will own, among other things, the Distribution Systems. After the Spin-Off, the Distribution Systems will be leased to Windstream Holdings on a triple-net basis pursuant to a long-term exclusive lease agreement (the "Master Lease") and CS&L's primary source of revenue will be rent payable under the Master Lease. See "Our Relationship with Windstream Following the Spin-Off—Master Lease." Additionally, CS&L will operate a small consumer competitive local exchange carrier ("CLEC") business (the "Consumer CLEC Business").

Table of Contents

*We could fail to qualify as a REIT if income we receive from Windstream is not treated as qualifying income.*

Under applicable provisions of the Code, we will not be treated as a REIT unless we satisfy various requirements, including requirements relating to the sources of our gross income. See "U.S. Federal Income Tax Considerations—Taxation of REITs in General—Income Tests." Rents received or accrued by us from Windstream will not be treated as qualifying rent for purposes of these requirements if the Master Lease is not respected as a true lease for U.S. federal income tax purposes and is instead treated as a service contract, joint venture or some other type of arrangement. If the Master Lease is not respected as a true lease for U.S. federal income tax purposes, we may fail to qualify as a REIT.

In addition, subject to certain exceptions, rents received or accrued by us from Windstream will not be treated as qualifying rent for purposes of the REIT gross income requirements if we or a beneficial or constructive owner of 10% or more of our stock beneficially or constructively owns 10% or more of the total combined voting power of all classes of Windstream Holdings stock entitled to vote or 10% or more of the total value of all classes of Windstream Holdings stock. Our charter will provide for restrictions on ownership and transfer of our shares of stock, including restrictions on such ownership or transfer that would cause the rents received or accrued by us from Windstream to be treated as non-qualifying rent for purposes of the REIT gross income requirements. The provisions of our charter that will restrict the ownership and transfer of our stock are described in "Description of Our Capital Stock—Restrictions on Transfer and Ownership of CS&L Stock." Nevertheless, there can be no assurance that such restrictions will be effective in ensuring that rents received or accrued by us from Windstream will not be treated as qualifying rent for purposes of REIT qualification requirements.

*Dividends payable by REITs do not qualify for the reduced tax rates available for some dividends.*

The maximum U.S. federal income tax rate applicable to income from "qualified dividends" payable by U.S. corporations to U.S. shareholders that are individuals, trusts and estates is currently 20%. Dividends payable by REITs, however, generally are not eligible for the reduced rates. Although these rules do not adversely affect the taxation of REITs, the more favorable rates applicable to regular corporate qualified dividends could cause investors who are individuals, trusts and estates to perceive investments in REITs to be relatively less attractive than investments in the stocks of non-REIT corporations that pay dividends, which could adversely affect the value of the stock of REITs, including our stock.

*REIT distribution requirements could adversely affect our ability to execute our business plan.*

We generally must distribute annually at least 90% of our REIT taxable income, determined without regard to the dividends paid deduction and excluding any net capital gains, in order for us to qualify as a REIT (assuming that certain other requirements are also satisfied) so that U.S. federal corporate income tax does not apply to earnings that we distribute. To the extent that we satisfy this distribution requirement and qualify for taxation as a REIT but distribute less than 100% of our REIT taxable income, determined without regard to the dividends paid deduction and excluding any net capital gains, we will be subject to U.S. federal corporate income tax on our undistributed net taxable income. In addition, we will be subject to a 4% nondeductible excise tax if the actual amount that we distribute to our shareholders in a calendar year is less than a minimum amount specified under U.S. federal income tax laws. We intend to make distributions to our shareholders to comply with the REIT requirements of the Code.

Initially our funds from operations will be generated primarily by rents paid under the Master Lease. From time to time, we may generate taxable income greater than our cash flow as a result of differences in timing between the recognition of taxable income and the actual receipt of cash or the effect of nondeductible capital expenditures, the creation of reserves or required debt or amortization payments. If we do not have other funds available in these situations, we could be required to borrow funds on unfavorable terms, sell assets at disadvantageous prices or distribute amounts that would otherwise be invested in future acquisitions in order to make distributions sufficient to enable us to pay out enough of our taxable income to satisfy the REIT distribution requirement and to avoid corporate income tax, including the 4% excise tax in a particular year. These alternatives could increase our costs or reduce our equity. Thus, compliance with the REIT requirements may hinder our ability to grow, which could adversely affect the value of our common stock.

Table of Contents

*Expenses*

The Separation and Distribution Agreement provides that all costs and expenses incurred and directly related to the Spin-Off will be paid by Windstream to the extent incurred and payable on or prior to the distribution date, and will be paid by the party incurring the cost or expense to the extent arising and payable following the distribution date.

*Net Working Capital Adjustment*

The Separation and Distribution Agreement provides a mechanism for the parties to agree, after closing of the Spin-Off, upon the net working capital of the Distribution Systems and Consumer CLEC Business as of the distribution date. If such amount is less than $0, CS&L will pay such amount to Windstream. If such amount is greater than $0, Windstream will pay such amount to CS&L.

**Master Lease**

We will enter into the Master Lease with Windstream Holdings, pursuant to which Windstream Holdings will lease the Distribution Systems. Under the Master Lease, the Operating Partnership and our individual subsidiaries that own the properties subject to the Master Lease will be the landlord, and Windstream Holdings will be the tenant. A default by Windstream Holdings with regard to any property will cause a default with regard to the entire portfolio, The subsidiaries of Windstream Holdings will have the right to use, occupy and operate the Distribution Systems and discharge any of Windstream Holdings' obligations under the Master Lease.

The following description of the Master Lease does not purport to be complete, but contains a summary of certain material provisions of the Master Lease.

*Term and Renewals*

The Master Lease will provide for the lease of land, buildings, structures and other improvements on the land and appurtenances to the land and improvements (including the Company's rights under any permits, easements and pole agreements) relating to the operation of the Distribution Systems.

The Master Lease will provide for an initial term of 15 years, with no purchase options. At the option of Windstream Holdings, the Master Lease may be extended for up to four renewal terms of five years each, and Windstream Holdings can elect which Distribution Systems then subject to the Master Lease to renew. In addition, Windstream Holdings has the right to extend the initial term of the Master Lease from 15 years to 20 years for all of the Distribution Systems and, if exercised, the number of renewal terms will be reduced to three so that the maximum term (taking into account all renewals) is 35 years and we will have certain capital funding obligations under the Master Lease as summarized below.

Windstream Holdings will not have the ability to terminate its obligations under the Master Lease prior to its expiration without our consent other than in limited circumstances (i.e., condemnation). If the Master Lease is terminated prior to its expiration other than with our consent, Windstream Holdings may be liable for damages and incur charges such as continued payment of rent through the end of the lease term and maintenance and repair costs for the Distribution Systems. See "Risk Factors—Risks Related to Our Business."

*Rental Amounts and Escalators*

The Master Lease is a triple-net lease. Accordingly, in addition to rent, Windstream Holdings will be required to pay, among other things, the following items subject to limited carveouts set forth in the Master Lease:

- all impositions and taxes levied on or with respect to the Distribution Systems (other than taxes on our income, gross receipts and capital stock and our franchise taxes);

104