# Exhibit F

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

## CURRENT REPORT

**PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934**

**Date of Report (Date of earliest event reported): January 23, 2013
(January 22, 2013)**

---

# WINDSTREAM CORPORATION

**(Exact Name of registrant as specified in its charter)**

---

| **Delaware** | **001-32422** | **20-0792300** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| **4001 Rodney Parham Road, Little Rock, Arkansas** | **72212** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

**(501) 748-7000**
**Registrant's telephone number, including area code**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01.    Entry into a Material Definitive Agreement.**

On January 23, 2013 (the "Closing Date"), Windstream Corporation (the "Company") announced that it had completed its previously announced private offering of its 6.375% Senior Notes due 2023 (the "Notes"). In connection with the issuance of the Notes, the Company entered into an Indenture, dated as of the Closing Date (the "Indenture"), among the Company, certain subsidiaries of the Company named therein, as guarantors thereto (the "Guarantors"), and U.S. Bank National Association, as trustee (the "Trustee"), and a Registration Rights Agreement, dated as of the Closing Date (the "Registration Rights Agreement"), among the Company, the Guarantors, and Wells Fargo Securities, LLC, as representative of the several initial purchasers of the Notes (the "Initial Purchasers"). The Notes were offered only to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended (the "Securities Act"), and outside the United States to non-U.S. persons pursuant to Regulation S under the Securities Act. A copy of the press release announcing the completion of the offering of the Notes is attached hereto as Exhibit 99.1 and is incorporated herein by reference.

*Indenture*

Pursuant to the Indenture, the Company issued and sold to the Initial Purchasers $700 million aggregate principal amount of the Notes. The terms of the Indenture provide that, among other things, the Notes are senior unsecured obligations of the Company and will rank equally with the Company's unsecured unsubordinated debt, senior to any of the Company's subordinated debt, and will effectively be subordinated to the Company's secured debt, including indebtedness under the Company's Fourth Amended and Restated Credit Agreement, to the extent of the assets securing such debt. The Company's obligations under the Notes are jointly and severally guaranteed by all of the Company's domestic subsidiaries that guarantee the borrowings under the Company's Fourth Amended and Restated Credit Agreement.

Interest on the Notes accrues at a rate of 6.375% per annum. Interest on the Notes is payable semiannually in arrears on February 1 and August 1 of each year, commencing on August 1, 2013. The Company will make each interest payment to the holders of record of the Notes on the immediately preceding January 15 and July 15.

*Optional Redemption*. At any time prior to February 1, 2018, the Company may redeem all or part of the Notes upon not less than 30 nor more than 60 days' prior notice at a redemption price equal to the sum of (i) 100% of the principal amount thereof, plus (ii) a make-whole premium as of the date of redemption, plus (iii) accrued and unpaid interest and additional interest, if any, thereon, to the date of redemption. In addition, the Company may redeem some or all of the Notes on or after February 1, 2018, at redemption prices set forth in the Indenture, together with accrued and unpaid interest. At any time prior to February 1, 2016, the Company may use the proceeds of certain equity offerings to redeem up to 35% of the aggregate principal amount of the Notes, including any permitted additional Notes, at a redemption price equal to 106.375% of the principal amount.

*Repurchase upon Change of Control*. Upon the occurrence of a change in control triggering event (as defined in the Indenture), each holder of the Notes may require the Company to repurchase all or a portion of the Notes in cash at a price equal to 101% of the aggregate principal amount of the Notes to be repurchased, plus accrued and unpaid interest, if any, thereon to the date of repurchase.

*Other Covenants*. The Indenture contains covenants that limit, among other things, the Company's and certain of its subsidiaries' ability to (1) incur additional debt and issue preferred stock, (2) make certain restricted payments, (3) consummate specified asset sales, (4) enter into transactions with affiliates, (5) create liens, (6) declare or pay any dividend or make any other distributions, (7) make certain investments and (8) merge or consolidate with another person.

*Events of Default*. The Indenture provides for customary events of default (subject in certain cases to customary grace and cure periods), which include non-payment, breach of covenants in the Indenture, payment defaults or acceleration of other indebtedness, a failure to pay certain judgments and certain events of bankruptcy and insolvency. Generally, if an event of default occurs, the Trustee or holders of at least 25% in principal amount of the then-outstanding Notes may declare the principal of and accrued but unpaid interest, including additional interest, on all the Notes to be due and payable.

*Use of Proceeds*. The Company used the net proceeds of this offering to pay the consideration in connection with the Tender Offer and Consent Solicitation (as defined below under Item 8.01), including any accrued and unpaid interest, on the PAETEC 8.875% Notes (as defined below under Item 8.01) tendered pursuant to the Tender Offer and Consent Solicitation together with related fees and expenses. The Company intends to use the remaining net proceeds of the offering, together with available cash, to redeem all of the PAETEC 8.875% Notes that remain outstanding following consummation of the Tender Offer and Consent Solicitation.

The foregoing description of the Indenture and the Notes is qualified in its entirety by reference to the full text of the Indenture, a copy of which is attached hereto as Exhibit 4.1, and the Notes, the forms of which are attached hereto as Exhibit 4.2, all of which are incorporated herein by reference.

### *Registration Rights Agreement*

In connection with the issuance of the Notes, the Company has agreed, pursuant to the Registration Rights Agreement, to file a registration statement (the "Exchange Offer Registration Statement") with the United States Securities and Exchange Commission (the "SEC") with respect to a registered offer (the "Registered Exchange Offer") to exchange the Notes for new notes of the Company (the "Exchange Notes") having terms substantially identical in all material respects to the Notes within 180 days of the Closing Date, and to use its commercially reasonable efforts to cause the Exchange Offer Registration Statement to be declared effective under the Securities Act by the SEC within 210 days of the Closing Date, and to use its commercially reasonable efforts to cause the Registered Exchange Offer to be consummated not later than 240 days following the Closing Date. The Exchange Notes will generally be freely transferable under the Securities Act.

In addition, the Company has agreed under certain circumstances to file one or more shelf registration statements to cover resales of the Notes. In the event that (i) applicable interpretations of the staff of the SEC do not permit the Company to effect a Registered Exchange Offer, (ii) for any other reason the Registered Exchange Offer is not consummated within 240 days of the Closing Date, (iii) an Initial Purchaser notifies the Company following consummation of the Registered Exchange Offer that Notes held by such Initial Purchaser are not eligible to be exchanged for the Exchange Notes in the Registered Exchange Offer, or (iv) certain holders of the Notes are not permitted to participate in the Registered Exchange Offer or do not receive fully tradable Exchange Notes pursuant to the Registered Exchange Offer, the Company will, at its cost, (a) promptly file and use its commercially reasonable efforts to cause to become effective no later than 240 days after the Closing Date a shelf registration statement with the SEC covering resales of the Notes and (b) use its commercially reasonable efforts to keep the shelf registration statement continuously effective for a period of one year after its effective date (subject to certain exceptions).

If the Company fails to satisfy these obligations and its other obligations as set forth in the Registration Rights Agreement, the Company will be required to pay additional interest to the holders of the Notes. The Company agrees that if: (i) it does not file an Exchange Offer Registration Statement with respect to the Notes with the SEC on or prior to the 180th day following the Closing Date, (ii) the Exchange Offer Registration Statement is not declared effective on or prior to the 210th calendar day following the Closing Date, or (iii) the Registered Exchange Offer is not consummated or a shelf registration statement is not declared effective, in each case on or prior to the 240th day following the Closing Date, (any event described in (i) through (iii) being referred to individually as a "Registration Default"), then the Company will pay additional cash interest on the Notes. The rate of the additional interest will be 0.25% per annum for the first 90-day period immediately following the occurrence of a Registration Default, and such rate will increase by an additional 0.25% per annum with respect to each subsequent 90-day period until all Registration Defaults have been cured, up to a maximum additional interest rate of 1.0% per annum. The Company will pay such additional interest on regular interest payment dates. Such additional interest will be in addition to any other interest payable from time to time with respect to the Notes and the Exchange Notes.

The foregoing description of the Registration Rights Agreement is qualified in its entirety by reference to the full text of the Registration Rights Agreement, a copy of which is attached hereto as Exhibit 4.3 and incorporated herein by reference.

Each of the initial purchasers or an affiliate thereof acts as a lender under the Company's credit facilities. In addition, affiliates of each of Wells Fargo Securities, LLC, Barclays Capital Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Goldman, Sachs & Co., Mitsubishi UFJ Securities (USA), Inc., Morgan Stanley & Co. LLC, and SunTrust Robinson Humphrey, Inc. act as co-documentation agents under the Company's senior secured credit facilities. Affiliates of certain initial purchasers also act as bookrunners and arrangers under the Company's senior secured credit facilities. Furthermore, the Company used the net proceeds of this offering to, among other things, repurchase outstanding PAETEC 8.875% Notes by way of the Tender Offer and Consent Solicitation. The Company engaged Wells Fargo Securities, LLC to act as the sole dealer manager and solicitation agent for the Tender Offer and Consent Solicitation, for which roles Wells Fargo Securities, LLC have received and will receive customary fees. Certain of the initial purchasers may hold PAETEC 8.875% Notes and, if such PAETEC 8.875% Notes have been or will be tendered and accepted in the Tender Offer and Consent Solicitation, have received or will receive a portion of the proceeds of the offering of the Notes.

### *Refinancing Amendment*

On January 23, 2013, the Company announced that it had amended its existing senior secured credit facilities (the "Refinancing Amendment"). The Refinancing Amendment provides for the incurrence of $1,345.0 million of additional term loans, the proceeds of which were used to repay the credit facility tranche A-2 and tranche B-1 term loans due in July 2013 and the credit facility tranche B-2 term loans due in December 2015.

The foregoing description of the Refinancing Amendment is qualified in its entirety by reference to the full text of the Refinancing Amendment and the form of the Fifth Amended and Restated Credit Agreement, which are attached hereto as Exhibits 10.1 and 10.2, respectively, and which are incorporated herein by reference.

JPMorgan Chase Bank, N.A., which is the administrative agent and collateral agent under the Company's senior secured credit facilities, Bank of America, N.A., which served as lead arranger and bookrunner on the Refinancing Amendment, certain of the other lenders under the Company's senior secured credit facilities, and certain of their respective affiliates have performed or may in the future perform various commercial banking, lending, investment banking, financial advisory, trustee, hedging or other services for the Company and its subsidiaries and affiliates, for which they have received or will receive fees and reimbursement of expenses.

A copy of the press release announcing the Refinancing Amendment is attached hereto as Exhibit 99.2 and is incorporated herein by reference.

### Item 2.03.  Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.

The information in Item 1.01 of this Form 8-K is hereby incorporated by reference into this Item 2.03.

### Item 8.01.      Other Events.

### *Tender Offer and Consent Solicitation*

On January 22, 2013, the Company announced the the pricing of its tender offer and solicitation of consents (the "Tender Offer and Consent Solicitation") for any and all of the outstanding $650.0 million aggregate principal amount of 8.875% Senior Secured Notes due 2017 (the "PAETEC 8.875% Notes") issued by PAETEC Holding Corp. ("PAETEC"), a wholly-owned subsidiary of the Company. A copy of the press release announcing the pricing of the Tender Offer and Consent Solicitation is attached hereto as Exhibit 99.3 and is incorporated herein by reference.

On January 23, 2013, the Company also announced the results of the early settlement of the Tender Offer and Consent Solicitation and receipt of the requisite consents to enter into the Eleventh Supplemental Indenture, dated as of January 23, 2013 (the "Eleventh Supplemental Indenture"), among PAETEC, certain subsidiaries of PAETEC and the Company, as guarantors thereto, and The Bank of New York Mellon, as trustee, to the indenture governing the PAETEC 8.875% Notes (as previously amended and supplemented, the "PAETEC Indenture"). As of 5:00 p.m., New York City time, on January 22, 2013 (the "Early Tender Deadline"), approximately $583.3 million aggregate principal amount of the PAETEC 8.875% Notes were tendered (representing approximately 89.7% of the outstanding PAETEC 8.875% Notes). The Company exercised its option to accept for payment and settle the Tender Offer and Consent Solicitation with respect to all PAETEC 8.875% Notes that were validly tendered at or prior to the Early Tender Deadline (the "Early Settlement"). Such Early Settlement occurred on January 23, 2013, concurrently with the closing of the offering of the Notes, and the Eleventh Supplemental Indenture became effective at that time. The Tender Offer and Consent Solicitation will expire at midnight, New York City time, on February 5, 2013, unless extended or earlier terminated by the Company.

The Eleventh Supplemental Indenture eliminates or modifies certain restrictive covenants and other provisions contained in the PAETEC Indenture and releases all of the collateral securing obligations under the PAETEC 8.875% Notes. A copy of the Eleventh Supplemental Indenture is attached hereto as Exhibit 4.4 and is incorporated herein by reference. A copy of the press release announcing the early results of the Tender Offer and Consent Solicitation is attached hereto as Exhibit 99.4 and is incorporated herein by reference.

**Item 9.01. Financial Statements and Exhibits**

(d) Exhibits

| Exhibit Number | Description |
|---|---|
| 4.1 | Indenture, dated as of January 23, 2013, among Windstream Corporation, certain subsidiaries of Windstream Corporation, as guarantors thereto, and U.S. Bank National Association, as trustee. |
| 4.2 | Form of 6.375% Senior Note due 2023 (included in Exhibit 4.1). |
| 4.3 | Registration Rights Agreement, dated as of January 23, 2013, among Windstream Corporation, certain Subsidiaries of Windstream Corporation, and Wells Fargo Securities, LLC, as representative of the several initial purchases of the 6.375% Senior Notes due 2023 of Windstream Corporation. |
| 4.4 | Eleventh Supplemental Indenture, dated as of January 23, 2013, among PAETEC Holding Corp., certain subsidiaries of PAETEC Holding Corp. and Windstream Corporation, as guarantors thereto, and The Bank of New York Mellon, as trustee. |
| 10.1 | Refinancing Amendment. |
| 10.2 | Form of Fifth Amended and Restated Credit Agreement (included in Exhibit 10.1). |
| 99.1 | Press Release, dated January 23, 2013, announcing the completion of the offering of 6.375% Senior Notes due 2023. |
| 99.2 | Press Release, dated January 23, 2013, with respect to Refinancing Amendment. |
| 99.3 | Press Release, dated January 22, 2013, announcing the pricing of the Tender Offer and Consent Solicitation. |
| 99.4 | Press Release, dated January 23, 2013, announcing the results of the early settlement of the Tender Offer and Consent Solicitation. |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this Current Report on Form 8-K to be signed on its behalf by the undersigned hereunto duly authorized.

WINDSTREAM CORPORATION

| | | |
|---|---|---|
| By: | | /s/ John P. Fletcher |
| Name: | | John P. Fletcher |
| Title: | | Executive Vice President and General Counsel |

Date: January 23, 2013

**EXHIBIT INDEX**

**Exhibit**                                              **Description**

| Exhibit Number | Description |
|---|---|
| 4.1 | Indenture, dated as of January 23, 2013, among Windstream Corporation, certain subsidiaries of Windstream Corporation as guarantors thereto, and U.S. Bank National Association, as trustee. |
| 4.2 | Form of 6.375% Senior Note due 2023 (included in Exhibit 4.1). |
| 4.3 | Registration Rights Agreement, dated as of January 23, 2013, among Windstream Corporation, certain Subsidiaries of Windstream Corporation, and Wells Fargo Securities, LLC, as representative of the several initial purchases of the 6.375% Senior Notes due 2023 of Windstream Corporation. |
| 4.4 | Eleventh Supplemental Indenture, dated as of January 23, 2013, among PAETEC Holding Corp., certain subsidiaries of PAETEC Holding Corp. and Windstream Corporation as guarantors thereto, and The Bank of New York Mellon, as trustee. |
| 10.1 | Refinancing Amendment. |
| 10.2 | Form of Fifth Amended and Restated Credit Agreement (included in Exhibit 10.1). |
| 99.1 | Press Release, dated January 23, 2013, announcing the completion of the offering of 6.375% Senior Notes due 2023. |
| 99.2 | Press Release, dated January 23, 2013, with respect to Refinancing Amendment. |
| 99.3 | Press Release, dated January 22, 2013, announcing the pricing of the Tender Offer and Consent Solicitation. |
| 99.4 | Press Release, dated January 23, 2013, announcing the results of the early settlement of the Tender Offer and Consent Solicitation. |

Exhibit 4.1

EXECUTION VERSION

**Windstream Corporation**

**6 ³/₈% SENIOR NOTES DUE 2023**

———————————————

**Indenture**

**Dated as of January 23, 2013**

———————————————

**U.S. Bank National Association**

**Trustee**

———————————————

**TABLE OF CONTENTS**

Page

ARTICLE ONE
DEFINITIONS AND INCORPORATION
BY REFERENCE

| | |
|---|---|
| Section 1.01. Definitions | 1 |
| Section 1.02. Other Definitions | 26 |
| Section 1.03. Incorporation by Reference of Trust Indenture Act | 27 |
| Section 1.04. Rules of Construction | 27 |

ARTICLE TWO
THE NOTES

| | |
|---|---|
| Section 2.01. Form and Dating | 28 |
| Section 2.02. Execution and Authentication | 29 |
| Section 2.03. Methods of Receiving Payments on the Notes | 30 |
| Section 2.04. Registrar and Paying Agent | 30 |
| Section 2.05. Paying Agent to Hold Money in Trust | 31 |
| Section 2.06. Holder Lists | 31 |
| Section 2.07. Transfer and Exchange | 31 |
| Section 2.08. Replacement Notes | 44 |
| Section 2.09. Outstanding Notes | 44 |
| Section 2.10. Treasury Notes | 45 |
| Section 2.11. Temporary Notes | 45 |
| Section 2.12. Cancellation | 45 |
| Section 2.13. Defaulted Interest | 46 |
| Section 2.14. CUSIP Numbers | 46 |

ARTICLE THREE
REDEMPTION AND OFFERS TO
PURCHASE

| | |
|---|---|
| Section 3.01. Notices to Trustee | 46 |
| Section 3.02. Selection of Notes to Be Redeemed | 46 |
| Section 3.03. Notice of Redemption | 47 |
| Section 3.04. Effect of Notice of Redemption | 48 |
| Section 3.05. Deposit of Redemption Price | 48 |
| Section 3.06. Notes Redeemed in Part | 49 |
| Section 3.07. Optional Redemption | 49 |
| Section 3.08. Repurchase Offers | 50 |
| Section 3.09. No Sinking Fund | 52 |

ARTICLE FOUR
COVENANTS

Section 4.01. Payment of Notes                                                                      52
Section 4.02. Maintenance of Office or Agency                                                       52
Section 4.03. Reports                                                                               53
Section 4.04. Compliance Certificate                                                                54
Section 4.05. Taxes                                                                                 55
Section 4.06. Stay, Extension and Usury Laws                                                        55
Section 4.07. Restricted Payments                                                                   55
Section 4.08. Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries             59
Section 4.09. Incurrence of Indebtedness                                                            61
Section 4.10. Asset Sales                                                                           64
Section 4.11. Transactions with Affiliates                                                          65
Section 4.12. Liens                                                                                 67
Section 4.13. Business Activities                                                                   67
Section 4.14. Offer to Repurchase upon a Change of Control                                          68
Section 4.15. [INTENTIONALLY LEFT BLANK]                                                            69
Section 4.16. Designation of Restricted and Unrestricted Subsidiaries                              69
Section 4.17. Payments for Consent                                                                  70
Section 4.18. Guarantees                                                                            71
Section 4.19. Sale and Leaseback Transactions                                                       71
Section 4.20. [INTENTIONALLY LEFT BLANK]                                                            72
Section 4.21. Termination of Applicability of Certain Covenants if Notes Rated Investment Grade     72

ARTICLE FIVE
SUCCESSORS

Section 5.01. Merger, Consolidation or Sale of Assets                                               72
Section 5.02. Successor Corporation Substituted                                                     73

ARTICLE SIX
DEFAULTS AND REMEDIES

Section 6.01. Events of Default                                                                     73
Section 6.02. Acceleration                                                                          75
Section 6.03. Other Remedies                                                                        76
Section 6.04. Waiver of Past Defaults                                                               76
Section 6.05. Control by Majority                                                                   76
Section 6.06. Limitation on Suits                                                                   77
Section 6.07. Rights of Holders of Notes to Receive Payment                                         77
Section 6.08. Collection Suit by Trustee                                                            78
Section 6.09. Trustee May File Proofs of Claim                                                      78
Section 6.10. Priorities                                                                            78
Section 6.11. Undertaking for Costs                                                                 79

ARTICLE SEVEN
TRUSTEE

Section 7.01. Duties of Trustee                                                                79
Section 7.02. Certain Rights of Trustee                                                        80
Section 7.03. Individual Rights of Trustee                                                     82
Section 7.04. Trustee's Disclaimer                                                             82
Section 7.05. Notice of Defaults                                                               82
Section 7.06. Reports by Trustee to Holders of the Notes                                       83
Section 7.07. Compensation and Indemnity                                                       83
Section 7.08. Replacement of Trustee                                                           84
Section 7.09. Successor Trustee by Merger, Etc.                                                85
Section 7.10. Eligibility; Disqualification                                                    85
Section 7.11. Preferential Collection of Claims Against Company                                86

ARTICLE EIGHT
DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01. Option to Effect Legal Defeasance or Covenant Defeasance                         86
Section 8.02. Legal Defeasance and Discharge                                                   86
Section 8.03. Covenant Defeasance                                                              87
Section 8.04. Conditions to Legal or Covenant Defeasance                                       87
Section 8.05. Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous Provisions   89
Section 8.06. Repayment to the Company                                                         89
Section 8.07. Reinstatement                                                                    90

ARTICLE NINE
AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01. Without Consent of Holders of Notes                                              90
Section 9.02. With Consent of Holders of Notes                                                 91
Section 9.03. Compliance with Trust Indenture Act                                              93
Section 9.04. Revocation and Effect of Consents                                                93
Section 9.05. Notation on or Exchange of Notes                                                 93
Section 9.06. Trustee to Sign Amendments, Etc.                                                 94

ARTICLE TEN
NOTE GUARANTEES

Section 10.01. Guarantee                                                                       94
Section 10.02. Limitation on Guarantor Liability                                               95
Section 10.03. Execution and Delivery of Note Guarantee                                        96
Section 10.04. Guarantors May Consolidate, Etc., on Certain Terms                              96
Section 10.05. Release of Guarantor                                                            97

ARTICLE ELEVEN
SATISFACTION AND DISCHARGE

Section 11.01. Satisfaction and Discharge                                                                      97
Section 11.02. Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous Provisions    98
Section 11.03. Repayment to the Company                                                                        99

ARTICLE TWELVE
MISCELLANEOUS

Section 12.01. Trust Indenture Act Controls                                                                    99
Section 12.02. Notices                                                                                         100
Section 12.03. Communication by Holders of Notes with Other Holders of Notes                                   101
Section 12.04. Certificate and Opinion as to Conditions Precedent                                              101
Section 12.05. Statements Required in Certificate or Opinion                                                   101
Section 12.06. Rules by Trustee and Agents                                                                     102
Section 12.07. No Personal Liability of Directors, Officers, Employees and Stockholders                        102
Section 12.08. Governing Law                                                                                   102
Section 12.09. Consent to Jurisdiction                                                                         102
Section 12.10. No Adverse Interpretation of Other Agreements                                                   103
Section 12.11. Successors                                                                                      103
Section 12.12. Severability                                                                                    103
Section 12.13. Counterpart Originals                                                                           103
Section 12.14. Acts of Holders                                                                                 103
Section 12.15. Benefit of Indenture                                                                            105
Section 12.16. Table of Contents, Headings, Etc.                                                               105

**EXHIBITS**

Exhibit A     FORM OF 2023 NOTE

Exhibit B     FORM OF CERTIFICATE OF TRANSFER

Exhibit C     FORM OF CERTIFICATE OF EXCHANGE

Exhibit D     FORM OF CERTIFICATE FROM ACQUIRING INSTITUTIONAL ACCREDITED INVESTOR

Exhibit E     FORM OF SUPPLEMENTAL INDENTURE TO BE DELIVERED BY SUBSEQUENT GUARANTORS

**INDENTURE** dated as of January 23, 2013 among Windstream Corporation, a Delaware corporation, the Guarantors (as defined below) listed on the signature pages hereto and U.S. Bank National Association, a national banking association organized under the laws of the United States, as Trustee.

The Company has duly authorized the execution and delivery of this Indenture to provide for the issuance from time to time of its 6 3/8% Senior Notes due 2023 as provided in this Indenture. The Guarantors have duly authorized the execution and delivery of this Indenture to provide for a guarantee of the Notes and of certain of the Company's obligations hereunder. All things necessary to make this Indenture a valid agreement of the Company and the Guarantors, in accordance with its terms, have been done.

The Company (as defined below), the Guarantors and the Trustee (as defined below) agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders (as defined below) of the Company's 6 3/8% Senior Notes due 2023:

**ARTICLE ONE**
**DEFINITIONS AND INCORPORATION**
**BY REFERENCE**

Section 1.01. Definitions

"**144A Global Note**" means a global note substantially in the form of Exhibit A bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee, that shall be issued in a denomination equal to the outstanding principal amount at maturity of the Notes sold in reliance on Rule 144A.

"**Acquired Debt**" means Indebtedness of a Person existing at the time such Person merges with or into or becomes a Restricted Subsidiary and not Incurred in connection with, or in contemplation of, such Person merging with or into or becoming a Restricted Subsidiary.

"**Additional Interest**" means all additional interest owing on the Notes pursuant to the Registration Rights Agreement.

"**Additional Notes**" means an unlimited maximum aggregate principal amount of Notes (other than the Notes issued on the date hereof) issued under this Indenture in accordance with Sections 2.02 and 4.09 and having the same terms in all respects as the Notes, or similar in all respects to the Notes, except that interest will accrue on the Additional Notes from their date of issuance.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" shall have correlative meanings.

1

"**Permitted Refinancing Indebtedness**" means any Indebtedness of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund other Indebtedness of the Company or any of its Restricted Subsidiaries (other than intercompany Indebtedness); *provided* that:

(1)     the amount of such Permitted Refinancing Indebtedness does not exceed the amount of the Indebtedness so extended, refinanced, renewed, replaced, defeased or refunded (plus all accrued and unpaid interest thereon and the amount of any reasonably determined premium necessary to accomplish such refinancing and such reasonable expenses incurred in connection therewith);

(2)     such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded;

(3)     if the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded is subordinated in right of payment to the Notes or the Note Guarantees, such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of the Notes and is subordinated in right of payment to the Notes or the Note Guarantees, as applicable, on terms at least as favorable, taken as a whole, to the Holders of Notes as those contained in the documentation governing the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded;

(4)     if the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded is *pari passu* in right of payment with the Notes or any Note Guarantees, such Permitted Refinancing Indebtedness is *pari passu* with, or subordinated in right of payment to, the Notes or such Note Guarantees;

(5)     and such Indebtedness is Incurred either (a) by the Company or any Guarantor or (b) by the Restricted Subsidiary that is the obligor on the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"**Preferred Stock**" means, with respect to any Person, any Capital Stock of such Person that has preferential rights to any other Capital Stock of such Person with respect to dividends or redemptions upon liquidation.

"**Private Placement Legend**" means the legend set forth in Section 2.07(g)(i) to be placed on all Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

"**Purchase Agreement**" means the Purchase Agreement dated January 8, 2013, among the Company, the Guarantors and Wells Fargo Securities, LLC, as representative of the several Initial Purchasers.

22

"**Restricted Subsidiary**" of a Person means any Subsidiary of such Person that is not an Unrestricted Subsidiary.

"**Rule 144**" means Rule 144 promulgated under the Securities Act.

"**Rule 144A**" means Rule 144A promulgated under the Securities Act.

"**Rule 903**" means Rule 903 promulgated under the Securities Act.

"**Rule 904**" means Rule 904 promulgated under the Securities Act.

"**S&P**" means Standard & Poor's Ratings Services and its successors.

"**Sale and Leaseback Transaction**" means, with respect to any Person, any transaction involving any of the assets or properties of such Person whether now owned or hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Shelf Registration Statement**" means the Shelf Registration Statement as defined in the Registration Rights Agreement.

"**Significant Subsidiary**" means any Restricted Subsidiary that would constitute a "significant subsidiary" within the meaning of Article 1 of Regulation S-X of the Securities Act.

"**Stated Maturity**" means, with respect to any installment of interest or principal on any series of Indebtedness, the date on which such payment of interest or principal was scheduled to be paid in the original documentation governing such Indebtedness, and shall not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"**Subordinated Debt**" means any Indebtedness of the Company or any Guarantor which is subordinated in right of payment to the Notes or the related Note Guarantees, as applicable, pursuant to a written agreement to that effect.

"**Subsidiary**" means, with respect to any specified Person:

(1)    any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(2)    any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (b) the only general partners of which are such Person or one or more Subsidiaries of such Person (or any combination thereof).

24

"**Unrestricted Subsidiary**" means any Subsidiary of the Company that is designated by the Board of Directors of the Company as an Unrestricted Subsidiary pursuant to a Board Resolution in compliance with Section 4.16 and any Subsidiary of such Subsidiary.

"**U.S. Person**" means a U.S. person as defined in Rule 902(k) under the Securities Act.

"**Valor**" means Valor Communications Group, Inc., a Delaware corporation.

"**Voting Stock**" of any Person as of any date means the Capital Stock of such Person that is ordinarily entitled to vote in the election of the Board of Directors of such Person.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(1)    the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that shall elapse between such date and the making of such payment; by

(2)    the then outstanding principal amount of such Indebtedness.

Section 1.02. <u>Other Definitions</u>.

| Term | Defined in Section |
|---|---|
| "**Act**" | 12.14 |
| "**Affiliate Transaction**" | 4.11 |
| "**Asset Sale Offer**" | 4.10 |
| "**Authentication Order**" | 2.02 |
| "**Basket Period**" | 4.07 |
| "**Change of Control Offer**" | 4.14 |
| "**Change of Control Payment**" | 4.14 |
| "**Change of Control Payment Date**" | 4.14 |
| "**Covenant Defeasance**" | 8.03 |
| "**Credit Facility Refinancing**" | 4.09 |
| "**DTC**" | 2.01 |
| "**Event of Default**" | 6.01 |
| "**Excess Proceeds**" | 4.10 |
| "**Excess Proceeds Trigger Date**" | 4.10 |
| "**Legal Defeasance**" | 8.02 |
| "**Offer Amount**" | 3.08 |

26

Section 4.05. Taxes.

The Company shall pay, and shall cause each of its Subsidiaries to pay, prior to delinquency, any taxes, assessments, and governmental levies except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment is not adverse in any material respect to the Holders of the Notes.

Section 4.06. Stay, Extension and Usury Laws.

Each of the Company and Guarantors covenant (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and each of the Company and Guarantors (to the extent that it may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.07. Restricted Payments.

(a) The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

(i) declare or pay (without duplication) any dividend or make any other payment or distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests (including, without limitation, any payment in connection with any merger or consolidation involving the Company or any of its Restricted Subsidiaries) or to the direct or indirect holders of the Company's or any of its Restricted Subsidiaries' Equity Interests in their capacity as such (other than dividends, payments or distributions (x) payable in Equity Interests (other than Disqualified Stock) of the Company or (y) to the Company or a Restricted Subsidiary of the Company);

(ii) purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger or consolidation involving the Company or any of its Restricted Subsidiaries) any Equity Interests of the Company or any Restricted Subsidiary thereof held by Persons other than the Company or any of its Restricted Subsidiaries;

(iii) make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value Subordinated Debt, except (a) a payment of interest or principal at the Stated Maturity thereof or (b) the purchase, repurchase or other

55

acquisition of any such Indebtedness in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such purchase, repurchase or other acquisition; or

(iv) make any Restricted Investment

(all such payments and other actions set forth in Section 4.07(a)(i) through (iv) above being collectively referred to as "**Restricted Payments**"),

unless, at the time of and after giving effect to such Restricted Payment:

(A) no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof;

(B) the Company would, after giving pro forma effect to such Restricted Payment as if such Restricted Payment had been made at the beginning of the applicable four-quarter period, have been permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Consolidated Leverage Ratio test set forth in Section 4.09(a); and

(C) such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Company and its Restricted Subsidiaries on or after July 17, 2006 (excluding Restricted Payments permitted by clauses (2), (3), (4), (5), (6), (8), (9) (only in connection with any calculation made for purposes of making a Restricted Payment on or prior to July 17, 2007; any payments made under such clause (9), even prior to such date, will be included as Restricted Payments for purposes of making any calculation after such date), (10) and (11) of Section 4.07(b)), is less than the sum, without duplication, of:

(1) an amount equal to the Company's Consolidated Cash Flow for the period (taken as one accounting period) from October 1, 2006 to the end of the Company's most recently ended fiscal quarter for which internal financial statements are available (the "**Basket Period**") less 1.4 times the Company's Fixed Charges for the Basket Period, *plus*

(2) 100% of the aggregate net cash proceeds received by the Company after July 17, 2006 as a contribution to its common equity capital or from the issue or sale of Equity Interests (other than Disqualified Stock) of the Company or from the Incurrence of Indebtedness (including the issuance of Disqualified Stock) of the Company or any of its Restricted Subsidiaries that has been converted into or exchanged for such Equity Interests (other than Equity Interests sold to, or Indebtedness held by, a Subsidiary of the Company and except to the extent converted into or exchanged for Disqualified Stock), *plus*

(3) with respect to Restricted Investments made by the Company and its Restricted Subsidiaries after July 17, 2006 pursuant to this Section 4.07(a), (i) the aggregate amount of cash equal to the return

56

from such Restricted Investments in any Person resulting from repayments of loans or advances, or other transfers of assets, in each case to the Company or any Restricted Subsidiary or from the net proceeds received in cash from the sale of any such Restricted Investment (except, in each case, to the extent any such payment or proceeds are included in the calculation of Consolidated Net Income) or (ii) in the case of redesignations of Unrestricted Subsidiaries as Restricted Subsidiaries, the Fair Market Value of the Restricted Investments therein at the time of such redesignation.

(b) Section 4.07(a) shall not prohibit, so long as, in the case of Section 4.07(b)(5), (7) and (8), no Default has occurred and is continuing or would be caused thereby:

(1) the payment of any dividend within 60 days after the date of declaration thereof, if at said date of declaration such payment would have complied with the provisions of this Indenture;

(2) the payment of any dividend or other distribution by a Restricted Subsidiary of the Company to the holders of its Equity Interests on a pro rata basis;

(3) the making of any Restricted Payment in exchange for, or out of the net cash proceeds of a contribution to the common equity of the Company or a substantially concurrent sale (other than to a Subsidiary of the Company) of, Equity Interests (other than Disqualified Stock) of the Company; *provided* that the amount of any such net cash proceeds that are utilized for any such Restricted Payment shall be excluded from Section 4.07(a)(C)(2);

(4) the defeasance, redemption, repurchase or other acquisition of Indebtedness subordinated to the Notes or the Note Guarantees with the net cash proceeds from an Incurrence of Permitted Refinancing Indebtedness;

(5) the declaration and payment of dividends or distributions to holders of any class or series of Disqualified Stock of the Company or any Preferred Stock of its Restricted Subsidiaries issued or incurred in accordance with Section 4.09;

(6) the repurchase of Equity Interests deemed to occur upon the exercise of options or warrants to the extent that such Equity Interests represent all or a portion of the exercise price thereof;

(7) the repurchase of Equity Interests of the Company constituting fractional shares in an aggregate amount since July 17, 2006 not to exceed $300,000;

(8) the repurchase, redemption or other acquisition or retirement for value of any Equity Interests of the Company or any of its Restricted Subsidiaries held by any current or former employee, consultant or director of the Company or any of its Restricted Subsidiaries pursuant to the terms of any employee equity subscription agreement, stock option agreement or similar agreement; *provided* that the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests in any fiscal year shall not

57

exceed the sum of: (i) $20.0 million, with unused amounts pursuant to this subclause (i) being carried over to succeeding fiscal years; *plus* (ii) the aggregate net cash proceeds received by the Company since July 17, 2006 as a contribution to its common equity capital or from the issue or sale of Equity Interests (other than Disqualified Stock) of the Company to any current or former employee, consultant or director of the Company or any of its Restricted Subsidiaries; *provided* that the amount of any such net cash proceeds that are used to permit a repurchase, redemption or other acquisition under this subclause (ii) shall be excluded from Section 4.07(a)(C)(2);

(9) dividends paid by the Company on its Common Stock in an amount not to exceed $237.5 million in the aggregate for the first two quarterly dividend payments immediately following July 17, 2006 and any dividend declared by Valor, prior to July 17, 2006 and paid thereafter;

(10) the repurchase of any Subordinated Debt at a purchase price not greater than 101% of the principal amount thereof in the event of (x) a change of control pursuant to a provision no more favorable to the holders thereof than Section 4.14 hereof or (y) an Asset Sale pursuant to a provision no more favorable to the holders thereof than Section 4.10 hereof, provided that, in each case, prior to the repurchase, the Company has made a Change of Control Offer or Asset Sale Offer, as the case may be, and repurchased all Notes issued under this Indenture that were validly tendered for payment in connection therewith;

(11) Restricted Payments made on July 17, 2006 as part of the Transactions as described in the offering memorandum dated June 28, 2006; and

(12) other Restricted Payments in an aggregate amount not to exceed $100.0 million.

(c) The amount of all Restricted Payments (other than cash) shall be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued to or by the Company or such Subsidiary, as the case may be, pursuant to the Restricted Payment. Not later than the date of making any Restricted Payment, the Company shall deliver to the Trustee an Officers' Certificate stating that such Restricted Payment is permitted and setting forth the basis upon which the calculations required by this Section 4.07 were computed, together with a copy of any opinion or appraisal required by this Indenture.

(d) For the purposes of this covenant, any payment made on or after July 17, 2006, but prior to the Issue Date shall be deemed to be a "Restricted Payment" to the extent that such payment would have been a Restricted Payment had the Indenture been in effect at the time of such payment (and, to the extent that such Restricted Payment would have been permitted by clauses (b)(1) through (b)(12) above, such Restricted Payment may be deemed by the Company to have been made pursuant to such clause).

58

Section 4.09. <u>Incurrence of Indebtedness</u>.

(a) The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness; *provided, however*, that the Company or any of its Restricted Subsidiaries that are Guarantors may Incur Indebtedness, if the Company's Consolidated Leverage Ratio at the time of the Incurrence of such additional Indebtedness, and after giving effect thereto, is less than 4.50 to 1.

(b) Section 4.09(a) shall not prohibit the Incurrence of any of the following items of Indebtedness (collectively, "**Permitted Debt**"):

(i) the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness under Credit Facilities in an aggregate principal amount at any one time outstanding pursuant to this clause (i) not to exceed $4.0 billion, less the aggregate amount of all Net Proceeds of Asset Sales applied by the Company or any Restricted Subsidiary thereof to permanently repay any such Indebtedness pursuant to Section 4.10;

(ii) the Incurrence of Existing Indebtedness;

(iii) the Incurrence by the Company of Indebtedness represented by the Notes to be issued on the Issue Date and the Guarantees of Notes (including Additional Notes) by the Guarantors;

(iv) the Incurrence by the Company or any Restricted Subsidiary thereof of Indebtedness represented by Capital Lease Obligations, mortgage financings or purchase money obligations, in each case, Incurred for the purpose of financing all or any part of the purchase price or cost of construction or improvement of property (real or personal), plant or equipment used in the business of the Company or such Restricted Subsidiary (whether through the direct acquisition of such assets or the acquisition of Equity Interests of any Person owning such assets), in an aggregate principal amount at any time outstanding, including all Permitted Refinancing Indebtedness Incurred to refund, refinance or replace any Indebtedness Incurred pursuant to this clause (iv), not to exceed the greater of (x) 3.0% of Total Assets and (y) $250.0 million;

(v) the Incurrence by the Company or any Restricted Subsidiary thereof of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to refund, refinance or replace Indebtedness (other than intercompany Indebtedness) that was permitted by this Indenture to be Incurred under Section 4.09(a) or clauses (ii), (iii), (iv), (v), (xiv) or (xv) of this Section 4.09(b);

(vi) the Incurrence by the Company or any of its Restricted Subsidiaries of intercompany Indebtedness owing to and held by the Company or any of its Restricted Subsidiaries; *provided, however,* that (A) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Company or a Restricted Subsidiary thereof and (B) any sale or other transfer of any such Indebtedness to a Person that is not either the Company or a Restricted Subsidiary thereof, shall be deemed, in each case, to constitute an Incurrence of such Indebtedness by the Company or such Restricted Subsidiary, as the case may be, that was not permitted by this Section 4.09(b)(vi);

61

(vii) the Guarantee by the Company or any of its Restricted Subsidiaries of Indebtedness of the Company or a Restricted Subsidiary thereof that was permitted to be Incurred by another provision of this Section 4.09;

(viii) the Incurrence by the Company or any of its Restricted Subsidiaries of Hedging Obligations that are Incurred for the purpose of fixing, hedging or swapping interest rate, commodity price or foreign currency exchange rate risk (or to reverse or amend any such agreements previously made for such purposes), and not for speculative purposes;

(ix) the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or Guarantees or letters of credit, surety bonds or performance bonds securing any obligations of the Company or any of its Restricted Subsidiaries pursuant to such agreements, in any case Incurred in connection with the disposition of any business, assets or Restricted Subsidiary (other than Guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or Restricted Subsidiary for the purpose of financing such acquisition), so long as the principal amount does not exceed the gross proceeds actually received by the Company or any Restricted Subsidiary thereof in connection with such disposition;

(x) the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, *provided, however,* that such Indebtedness is extinguished within five Business Days of its Incurrence;

(xi) the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness constituting reimbursement obligations with respect to letters of credit in respect of workers' compensation claims or self-insurance obligations or bid, performance, appeal or surety bonds (in each case other than for an obligation for borrowed money);

(xii) the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness constituting reimbursement obligations with respect to letters of credit issued in the ordinary course of business; *provided* that, upon the drawing of such letters of credit or the Incurrence of such Indebtedness, such obligations are reimbursed within 30 days following such drawing or Incurrence;

(xiii) the Incurrence by the Company or any Guarantor of Indebtedness to the extent that the net proceeds thereof are promptly deposited to defease or to satisfy and discharge the Notes;

(xiv) the Incurrence of Acquired Debt, *provided* that after giving effect to the Incurrence thereof, the Company could Incur at least $1.00 of Indebtedness under the Consolidated Leverage Ratio set forth in Section 4.09(a) hereof; and

(xv) the Incurrence by the Company or any of its Restricted Subsidiaries of additional Indebtedness in an aggregate principal amount at any time outstanding, including all Permitted Refinancing Indebtedness Incurred to refund, refinance or replace any Indebtedness Incurred pursuant to this Section 4.09(b)(xv), not to exceed $250.0 million.

62

For purposes of determining compliance with this Section 4.09, in the event that any proposed Indebtedness meets the criteria of more than one of the categories of Permitted Debt described in Section 4.09(b)(i) through (xv) above, or is entitled to be Incurred pursuant to Section 4.09(a), the Company shall be permitted to classify such item of Indebtedness at the time of its Incurrence in any manner that complies with this Section 4.09; *provided* that any refinancing (a "**Credit Facility Refinancing**") of amounts Incurred in reliance on the exception provided by Section 4.09(b)(i) shall be deemed to have been Incurred in reliance on such Section 4.09(b)(i). Indebtedness under the Credit Agreement outstanding on the Issue Date shall be deemed to have been Incurred on such date in reliance on the exception provided by Section 4.09(b)(i). Additionally, all or any portion of any item of Indebtedness (other than Indebtedness under the Credit Agreement Incurred on the Issue Date and Credit Facility Refinancings, which at all times shall be deemed to have been Incurred under Section 4.09(b)(i) above) may later be reclassified as having been Incurred pursuant to Section 4.09(a) or under any one of the categories of Permitted Debt described in Section 4.09(b)(i) through (xv) so long as such Indebtedness is permitted to be Incurred pursuant to such provision at the time of reclassification.

(c) Notwithstanding any other provision of Section 4.09, the maximum amount of Indebtedness that may be Incurred pursuant to Section 4.09 shall not be deemed to be exceeded with respect to any outstanding Indebtedness due solely to the result of fluctuations in the exchange rates of currencies.

(d) The Company shall not Incur any Indebtedness that is contractually subordinate in right of payment to any other Indebtedness of the Company unless it is contractually subordinate in right of payment to the Notes to the same extent. No Guarantor shall Incur any Indebtedness that is contractually subordinate in right of payment to any other Indebtedness of such Guarantor unless it is contractually subordinate in right of payment to such Guarantor's Note Guarantee to the same extent. For purposes of the foregoing, no Indebtedness shall be deemed to be contractually subordinated in right of payment to any other Indebtedness of the Company or any Guarantor, as applicable, solely by reason of any Liens or Guarantees arising or created in respect thereof or by virtue of the fact that the holders of any secured Indebtedness have entered into intercreditor agreements giving one or more of such holders priority over the other holders in the collateral held by them.

63

Section 4.14. <u>Offer to Repurchase upon a Change of Control</u>.

(a) If a Change of Control Triggering Event occurs, each Holder of Notes shall have the right to require the Company to repurchase all or any part (equal to $2,000 or an integral multiple of $1,000 in excess of $2,000) of that Holder's Notes pursuant to an offer by the Company (a "**Change of Control Offer**") at an offer price (a "**Change of Control Payment**") in cash equal to not less than 101% of the aggregate principal amount of the Notes repurchased plus accrued and unpaid interest and Additional Interest, if any, thereon, to the date of repurchase (the "**Change of Control Payment Date**"). No later than 30 days following any Change of Control Triggering Event (unless the Company has exercised its right to redeem the Notes pursuant to Section 3.07 hereof), the Company shall mail a notice to each Holder describing the transaction or transactions that constitute the Change of Control and offering to repurchase Notes on the Change of Control Payment Date specified in such notice, which date shall be no earlier than 30 days and no later than 60 days from the date such notice is mailed, pursuant to the procedures described in Section 3.08 (including the notice required thereby). The Company shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change of Control Triggering Event. To the extent that the provisions of any securities laws or regulations conflict with the Change of Control provisions of this Indenture, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached their obligations under the Change of Control provisions of this Indenture by virtue of such compliance.

(b) On the Change of Control Payment Date, the Company shall, to the extent lawful:

(i) accept for payment all Notes or portions thereof properly tendered pursuant to the Change of Control Offer;

(ii) deposit with the Paying Agent an amount equal to the Change of Control Payment in respect of all Notes or portions thereof so tendered; and

(iii) deliver or cause to be delivered to the Trustee the Notes so accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof being purchased by the Company.

(c) The Paying Agent shall promptly mail or wire transfer to each Holder of Notes so tendered the Change of Control Payment for such Notes, and the Trustee shall promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any; *provided* that each such new Note shall be in a principal amount of $2,000 or an integral multiple $1,000 in excess of $2,000.

(d) The Company shall publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

68

(e) Notwithstanding anything to the contrary in this Section 4.14, the Company shall not be required to make a Change of Control Offer upon a Change of Control Triggering Event if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 4.14 and all other provisions of this Indenture applicable to a Change of Control Offer made by the Company and purchases all Notes tendered and not withdrawn under such Change of Control Offer.

Section 4.15. [INTENTIONALLY LEFT BLANK].

Section 4.16. Designation of Restricted and Unrestricted Subsidiaries.

(a) The Board of Directors of the Company may designate any Restricted Subsidiary of the Company to be an Unrestricted Subsidiary; *provided* that:

(i) any Guarantee by the Company or any Restricted Subsidiary thereof of any Indebtedness of the Subsidiary being so designated shall be deemed to be an Incurrence of Indebtedness by the Company or such Restricted Subsidiary (or both, if applicable) at the time of such designation, and such Incurrence of Indebtedness would be permitted under Section 4.09;

(ii) the aggregate Fair Market Value of all outstanding Investments owned by the Company and its Restricted Subsidiaries in the Subsidiary being so designated (including any Guarantee by the Company or any Restricted Subsidiary thereof of any Indebtedness of such Subsidiary) shall be deemed to be a Restricted Investment made as of the time of such designation and that such Investment would be permitted under Section 4.07;

(iii) the Subsidiary being so designated:

(1) is not party to any agreement, contract, arrangement or understanding with the Company or any Restricted Subsidiary thereof unless either (A) such agreement, contract, arrangement or understanding is with customers, clients, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Indenture, which are fair to the Company and its Restricted Subsidiaries in the determination of a majority of the disinterested members of the Board of Directors or the senior management of the Company, or (B) the terms of any such agreement, contract, arrangement or understanding are no less favorable to the Company or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Company;

(2) is a Person with respect to which neither the Company nor any of its Restricted Subsidiaries has any direct or indirect obligation (A) to subscribe for additional Equity Interests or (B) to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results; and

69

terms or provisions of this Indenture or the Notes unless such consideration is offered to be paid and is paid to all Holders of the Notes that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

Section 4.18. Guarantees.

The Company shall not permit any of its Restricted Subsidiaries (other than any Insignificant Subsidiary), directly or indirectly, to Guarantee or pledge any assets to secure the payment of any other Indebtedness of the Company or any Domestic Restricted Subsidiary unless such Restricted Subsidiary is a Guarantor or simultaneously delivers to the Trustee an Opinion of Counsel and executes a supplemental indenture, substantially in the form of Exhibit E-1 hereto, providing for the Guarantee of the payment of the Notes by such Restricted Subsidiary, which Guarantee shall be senior to or *pari passu* with such Subsidiary's Guarantee of such other Indebtedness.

Section 4.19. Sale and Leaseback Transactions.

The Company shall not, and shall not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction; *provided* that the Company or any Restricted Subsidiary thereof may enter into a Sale and Leaseback Transaction if:

(i) the Company or such Restricted Subsidiary, as applicable, could have (A) Incurred Indebtedness in an amount equal to the Attributable Debt relating to such Sale and Leaseback Transaction pursuant to Section 4.09 and (B) incurred a Lien to secure such Indebtedness pursuant to Section 4.12 in which case such Indebtedness and Lien shall be deemed to have been so Incurred;

(ii) the gross cash proceeds of that Sale and Leaseback Transaction are at least equal to the Fair Market Value of the property that is the subject of that Sale and Leaseback Transaction; and

(iii) the transfer of assets in that Sale and Leaseback Transaction is permitted by, and the Company applies the proceeds of such transaction in compliance with, Section 4.10.

71

Section 4.20. [INTENTIONALLY LEFT BLANK].

Section 4.21. Termination of Applicability of Certain Covenants if Notes Rated Investment Grade.

Notwithstanding the foregoing, the Company's and its Restricted Subsidiaries' obligations to comply with this Article Four (except for Sections 4.01, 4.02, 4.03, 4.04, 4.05, 4.06, 4.12, 4.14, 4.18 and 4.19) and Section 5.01(a)(iii) will terminate with respect to the Notes and cease to have any further effect from and after the first date when the Notes are rated Investment Grade.

**ARTICLE FIVE**
**SUCCESSORS**

Section 5.01. Merger, Consolidation or Sale of Assets.

(a) The Company shall not, directly or indirectly: (1) consolidate or merge with or into another Person (whether or not the Company is the surviving corporation) or (2) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties and assets of the Company and its Restricted Subsidiaries taken as a whole, in one or more related transactions, to another Person, unless:

(i) either: (1) the Company is the surviving corporation; or (2) the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, conveyance or other disposition shall have been made (A) is a corporation or limited liability company organized or existing under the laws of the United States, any state thereof or the District of Columbia (*provided* that, if the Person formed by or surviving such consolidation or merger, or the transferee of such properties or assets, is a limited liability company, then there shall be a Restricted Subsidiary of such Person which shall be a corporation organized in the jurisdictions permitted by this Section 5.01(a)(i) and a co-obligor of the Notes) and (B) assumes all the obligations of the Company under the Notes, this Indenture and the Registration Rights Agreement pursuant to agreements reasonably satisfactory to the Trustee;

(ii) immediately after giving effect to such transaction, no Default or Event of Default exists;

(iii) immediately after giving effect to such transaction on a pro forma basis, the Company or the Person formed by or surviving any such consolidation or merger (if other than the Company), or to which such sale, assignment, transfer, conveyance or other disposition shall have been made, shall either (x) be permitted to Incur at least \$1.00 of additional Indebtedness pursuant to the Consolidated Leverage Ratio test set forth in Section 4.09(a) or (y) have a Consolidated Leverage Ratio that is lower than the Consolidated Leverage Ratio of the Company immediately prior to such transaction; and

(iv) each Guarantor, unless such Guarantor is the Person with which the Company has entered into a transaction under this Section 5.01, shall have by amendment to its Note Guarantee confirmed that its Note Guarantee shall apply to the obligations of the Company or the surviving Person in accordance with the Notes and this Indenture.

72

(b) In addition, the Company and its Restricted Subsidiaries may not, directly or indirectly, lease all or substantially all of the properties or assets of the Company and its Restricted Subsidiaries considered as one enterprise, in one or more related transactions, to any other Person. Section 5.01(a)(ii) and (iii) shall not apply to (i) any merger, consolidation or sale, assignment, transfer, conveyance or other disposition of assets between or among the Company and any of its Restricted Subsidiaries or (ii) any transaction if, in the good faith determination of the Board of Directors of the Company, the sole purpose of the transaction is to reincorporate the Company in another state of the United States.

Section 5.02. Successor Corporation Substituted.

Upon any consolidation or merger, or any sale, assignment, transfer, conveyance or other disposition of all or substantially all of the assets of the Company in accordance with Section 5.01 hereof, the successor Person formed by such consolidation or into or with which the Company is merged or to which such sale, assignment, transfer, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, assignment, conveyance or other disposition, the provisions of this Indenture referring to the "Company" shall refer instead to the successor Person and not to the Company), and may exercise every right and power of, the Company under the Indenture with the same effect as if such successor Person had been named as the Company in this Indenture. In the event of any such transfer (other than any transfer by way of lease), the predecessor Company will be released and discharged from all liabilities and obligations in respect of the Notes and the Indenture and the predecessor Company may be dissolved, wound up or liquidated at any time thereafter.

## ARTICLE SIX
## DEFAULTS AND REMEDIES

Section 6.01. Events of Default.

(a) Each of the following is an "**Event of Default**" with respect to the Notes:

(i) default for 30 days in the payment when due of interest on, or Additional Interest with respect to, the Notes;

(ii) default in payment when due (whether at maturity, upon acceleration, redemption, required repurchase or otherwise) of the principal of, or premium, if any, on the Notes;

(iii) failure by the Company or any of its Restricted Subsidiaries to comply with Article Five;

(iv) failure by the Company or any of its Restricted Subsidiaries for 30 days after written notice by the Trustee or Holders representing 25% or more of the aggregate

73