# Exhibit J

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| WINDSTREAM HOLDINGS, INC., *et al.*,[1] | ) ) ) | Case No. 19-22312 (RDD) |
| Debtors. | ) ) | (Jointly Administered) |
|  | ) | |
| WINDSTREAM HOLDINGS, INC. and WINDSTREAM SERVICES, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | Adversary Proceeding |
| v. | ) ) | Case No. 19-08279 (RDD) |
| UNITI GROUP, INC., CSL NATIONAL, LP, CSL ALABAMA SYSTEM LLC, CSL ARKANSAS SYSTEM, LLC, CSL FLORIDA SYSTEM, LLC, CSL GEORGIA SYSTEM, LLC, CSL IOWA SYSTEM, LLC, CSL KENTUCKY SYSTEM, LLC, CSL MISSISSIPPI SYSTEM, LLC, CSL MISSOURI SYSTEM, LLC, CSL NEW MEXICO SYSTEM, LLC, CSL OHIO SYSTEM, LLC, CSL OKLAHOMA SYSTEM, LLC, CSL TEXAS SYSTEM, LLC, CSL REALTY, LLC, CSL GEORGIA REALTY, LLC, CSL NORTH CAROLINA SYSTEM, LP, CSL NORTH CAROLINA REALTY, LP, CSL TENNESSEE REALTY, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

---

[1]  The last four digits of Debtor Windstream Holdings, Inc.'s tax identification number are 7717. Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/windstream. The location of the Debtors' service address for purposes of these chapter 11 cases is: 4001 North Rodney Parham Road, Little Rock, Arkansas 72212.

## AMENDED COMPLAINT

Plaintiffs Windstream Holdings, Inc. ("Holdings") and Windstream Services, LLC ("Services," and together with Holdings, "Windstream" or the "Company"), by and through its undersigned counsel, for its Complaint against defendants Uniti Group, Inc. ("Uniti Group"), CSL National, LP ("CSL National"), as well as CSL Alabama System, LLC, CSL Arkansas System, LLC, CSL Florida System, LLC, CSL Georgia System, LLC, CSL Iowa System, LLC, CSL Kentucky System, LLC, CSL Mississippi System, LLC, CSL Missouri System, LLC, CSL New Mexico System, LLC, CSL Ohio System, LLC, CSL Oklahoma System, LLC, CSL Texas System, LLC, CSL Realty, LLC, CSL Georgia Realty, LLC, CSL North Carolina System, LP, CSL North Carolina Realty, LP, CSL Tennessee Realty, LLC (collectively, the "Landlord Entities," and together with Uniti Group and CSL National, "Uniti" or the "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1. Though denominated as a lease, the "Uniti Arrangement"—the contractual arrangement between Windstream and Uniti—turns out to be no such thing. Calling this arrangement a lease rather than what it actually is, a financing, in and beyond the multiparty context of chapter 11 gives license to a long-term transfer of billions of dollars of value away from the Debtors to the everlasting and irreparable detriment of their creditors.

2. The "Master Lease" is not a true lease. Among other deficiencies, the principal "leased" assets as of closing in April 2015 were depreciating at such a precipitous clip that almost all—if not all—of their remaining useful life was going to be consumed during the initial 15-year lease term, leaving insufficient residual interest to support a true lease finding.

3. Moreover, the initial 15-year lease term is itself inaccurate. Because the transferred network assets composed a large portion of Windstream's operations, Windstream expected to renew some (or all) of those leased assets for multiple renewal terms. Indeed, in the months

2

leading up to the Uniti Arrangement, Windstream's statements to regulators (focused on continuity of service in their states) made clear that Windstream was going to extend the Master Lease beyond 15 years so long as the leased assets retained meaningful economic value. Windstream never intended to leave a material reversionary interest for Uniti at the end of the "lease," revealing the arrangement for what it is: a disguised financing.

4. Even Windstream's Tenant Capital Improvements ("TCIs")—which are forfeited to Uniti under the Uniti Arrangement—have not been enough to leave any material remaining economic life in the "leased" networks. Windstream plowing hundreds of millions of dollars in the networks has not kept pace with the speed at which the leased networks have been leaking value, and this highly unusual shifting of burdens from "landlord" to "tenant" is among the most powerful indicia of Windstream's continued ownership of the networks. In other words, Windstream's forced investments for Uniti's benefit chains Windstream to the Master Lease, making a failure to renew at the end of the term economically irrational.

5. Uniti understood this view and shared it with concerned current and prospective investors. Talking points from April 2015, and public statements in the years since, admit an expectation that Windstream would renew the Master Lease. Uniti's public statements, including from an investor call just two months ago, on May 29th, also admit an expectation that Windstream would maintain rental streams in renewal periods near current levels due to Windstream's transfer of hundreds of millions of dollars in Tenant Capital Improvements during the initial term. Uniti had to make these admissions to convince capital markets that it had a future beyond 2030. For Uniti too, the structure of the lease term and renewal periods was intended to permit a true lease finding and allow Uniti to obtain REIT status. It was always a fig leaf meant to obscure the reality of a longer lease term.

3

6.    Moreover, it is not just the absence of material residual value and the Tenant Capital Improvements that reveal Windstream as the true owner of the networks:

- The Master Lease is at the extreme end of triple net leases. It is more akin to a bondable lease—a variant of a triple net lease where the tenant carries every imaginable risk related to the real estate. Here, Windstream's obligation to pay full "rent" continues unabated even if the leased networks are destroyed, leaving Windstream unable to generate revenue from the networks to fund their rent. Likewise, short of complete condemnation of the networks, Windstream must continue to pay rent in full even when the continuity and synergy across its 36 networks has been eviscerated. This most radical form of triple net lease is conclusive of a financing transaction. Even acts of God—most decidedly the landlord's burden under a true lease—are not Uniti's problem in this arrangement.

- The $650 million annual rent was predetermined to provide a sufficient yield to attract equity investors and, based on Uniti's projected capital needs, to service its debt. Upon ordaining the "rent," bundling the assets to support that number was reverse engineered. Had the Master Lease been a true lease, rent should have reflected network depreciation. But instead, a rent escalator was included to shoehorn the Master Lease into the framework of traditional real estate leases with traditional REITs. Thus, the escalating "rental rate," which grows from $650 million to $690 million while the networks lose the vast majority of their value, resembles a financing rate rather than the fair market value of depreciating assets.

- Windstream entered into 11 "Indefeasible Right of Use Agreements" ("IRUs") in which it granted rights to third parties to use the leased property for longer than the initial term of the Master Lease.

- The Master Lease was accounted for as a financing with the "rent" split into principal and interest, and the transferred assets remaining on Windstream's books. A true lease does not require such an exercise. But GAAP maps onto economic substance and saw the Uniti Arrangement for what it was: a financing arrangement, not a true lease.

7.    To be clear, recharacterization has no moral component, and there is no assertion that Windstream's and Uniti's goals were improper. The private, bilateral arrangement that the Master Lease was a true lease benefited both Windstream and Uniti, enabling the use of a tax advantaged REIT structure and, in the short run, ameliorating some of Windstream's growing economic challenges. But that polite, good faith arrangement turns malignant in chapter 11 when differences between lease and loan treatment can have a devastating impact on third parties.

4

8. Bankruptcy law supporting recharacterization thus adapts as lessors (and lessees) devise new arrangements in an effort to protect their economic interests at the expense of other stakeholders in a chapter 11 reorganization. The last successful recharacterization becomes the roadmap for structuring the next "lease." Here, despite creativity and good intentions, the Master Lease was an exercise in jamming a square peg into a round hole. It was a complex—and ultimately unsuccessful—effort to call a financing arrangement a lease.

9. If recharacterized as what it is—a financing—Uniti's resulting claim would be almost entirely unsecured and structurally subordinated. As a result of recharacterization, the excessive rent payments would cease, and Windstream could invest in its networks to expand and improve its service offerings to the benefit of its customers and, indirectly, its stakeholders.

10. This Complaint also addresses the constructive fraudulent transfers under the Master Lease. Many of the Tenant Capital Improvements represent clear constructive fraudulent transfers. Windstream's solvency expert has determined that Windstream, under applicable law, became insolvent, inadequately capitalized, and/or unable to pay its debts as they came due at a point no later than the end of Q3 2017, in part as a result of claims of default under an indenture by Aurelius Capital Master, Ltd. ("Aurelius") (which was ultimately upheld in federal court in February 2019). Windstream received no consideration for the Tenant Capital Improvements after this date—and they were worth hundreds of millions of dollars. Given that Windstream received no consideration in return for these transfers, let alone reasonably equivalent value, these transfers were constructively fraudulent. Additionally, Windstream's "rent" payments have been, and remain, above market, and these overpayments are additional constructive fraudulent transfers.

11. Finally, this Complaint addresses Uniti's repeated breaches of the Master Lease. Despite Uniti having received a bargain at Windstream's expense, Uniti repeatedly breached the

5

Master Lease's non-competition clauses by causing subsidiaries to acquire certain of Windstream's competitors. Uniti cannot dominate and control subsidiaries to circumvent contractual protections. Windstream did not create Uniti to compete with it and further erode the value of the leased telecommunications networks. Uniti's conduct, at bottom, violates the Master Lease and runs counter to public statements to regulators and investors alike.

## JURISDICTION AND VENUE

12.     On February 25, 2019 (the "Petition Date"), Holdings and its affiliated debtors and debtors in possession (collectively the "Debtors") filed voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").

13.     This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1334. This Adversary Proceeding is a core proceeding under 28 U.S.C. § 157.

14.     This Court has personal jurisdiction over each of the Defendants under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7004(f).

15.     This Court also has personal jurisdiction over each of the Defendants because, among other reasons, each of Windstream's claims arise out of conduct that has a substantial relationship to the State of New York. Section 41.5 of the Master Lease (attached as **Exhibit A**) memorializes that the "Master Lease was negotiated in the State of New York, which State the Parties agrees has a substantial relationship to the Parties and to the underlying transaction embodied hereby" (internal capitalization omitted).

16.     In the alternative, this Court has non-core concurrent jurisdiction over this proceeding under 18 U.S.C. § 1334(b). Holdings' and Services' claims are directly related to their bankruptcy cases and will have significant impact on the Debtors' estates.

17.     Pursuant to Bankruptcy Rule 7008(a), Holdings and Services consent to the entry of final orders or judgment by this Court.

6

18. Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

19. This adversary proceeding is initiated under Bankruptcy Rule 7001(1) and (9), and 28 U.S.C. § 2201.

## THE PARTIES

20. Holdings is a corporation organized under the laws of the State of Delaware with its headquarters in the State of Arkansas.

21. Services is a limited liability company organized under the laws of the State of Delaware with its headquarters in the State of Arkansas.

22. Upon information and belief, Uniti Group (f/k/a Communications Sales & Leasing, Inc.) is a corporation organized under the laws of the State of Maryland with its headquarters in the State of Arkansas. Uniti was formed on September 4, 2014 as a wholly owned subsidiary of Services.

23. Upon information and belief, CSL National is a limited partnership organized under the laws of the State of Delaware.

24. Upon information and belief, CSL Alabama System, LLC is a limited liability company organized under the laws of the State of Delaware.

25. Upon information and belief, CSL Arkansas System, LLC is a limited liability company organized under the laws of the State of Delaware.

26. Upon information and belief, CSL Florida System, LLC is a limited liability company organized under the laws of the State of Delaware.

27. Upon information and belief, CSL Georgia System, LLC is a limited liability company organized under the laws of the State of Delaware.

28. Upon information and belief, CSL Iowa System, LLC is a limited liability company organized under the laws of the State of Delaware.

7

29. Upon information and belief, CSL Kentucky System, LLC is a limited liability company organized under the laws of the State of Delaware.

30. Upon information and belief, CSL Mississippi System, LLC is a limited liability company organized under the laws of the State of Delaware.

31. Upon information and belief, CSL Missouri System, LLC is a limited liability company organized under the laws of the State of Delaware.

32. Upon information and belief, CSL New Mexico System, LLC is a limited liability company organized under the laws of the State of Delaware.

33. Upon information and belief, CSL Ohio System, LLC is a limited liability company organized under the laws of the State of Delaware.

34. Upon information and belief, CSL Oklahoma System, LLC is a limited liability company organized under the laws of the State of Delaware.

35. Upon information and belief, CSL Texas System, LLC is a limited liability company organized under the laws of the State of Delaware.

36. Upon information and belief, CSL Realty, LLC is a limited liability company organized under the laws of the State of Delaware.

37. Upon information and belief, CSL Georgia Realty, LLC is a limited liability company organized under the laws of the State of Delaware.

38. Upon information and belief, CSL North Carolina System, LP is a limited partnership organized under the laws of the State of Delaware.

39. Upon information and belief, CSL North Carolina Realty, LP is a limited partnership organized under the laws of the State of Delaware.

40.     Upon information and belief, CSL Tennessee Realty, LLC is a limited liability company organized under the laws of the State of Delaware.

## FACTUAL BACKGROUND

41.     Windstream is a publicly traded Fortune 500 company and a leading provider of advanced network communications and technology solutions for consumers, businesses, enterprise organizations, and wholesale customers across the United States.  Headquartered in Little Rock, Arkansas, Windstream provides these solutions across a range of services including cloud computing, integrated voice and data services, internet security services, and consumer video services.

42.     Broadband telecommunications is a challenging market, and, to remain competitive, Windstream must keep pace with technological innovation and consumer demand for ever faster network speeds.  But much of the network transferred by Windstream to Uniti comprises copper wire cables, which are incapable of transmitting data at competitive speeds.

43.     In 2013, Windstream confronted a growing dilemma.  Windstream required significant reinvestment in its infrastructure but had little cash to spare as the Company tried to both reinvest in its network and maintain strong dividends to investors.  Maintaining the historical dividend was a natural and necessary strategic goal for Windstream as, like other utility companies, it was largely yield rather than growth oriented.  The dividend was critically important to the Company's continued ability to raise capital.  Thus, failure to upgrade its broadband network risked Windstream falling behind its competition, but failure to maintain dividends at robust historical levels risked losing the Company's investors' trust and market perception.  To upgrade these networks, Windstream needed to make substantial capital investments and improvements.  But Windstream's EBITDA was declining, and credit markets were less willing to lend after

9

reevaluating their view of telecommunication companies and reducing the number of EBITDA multiples that they were willing to loan against.

44. Windstream vetted multiple potential solutions to solve these challenges—from a sale to a traditional financing—before its banker presented a unique solution. At a February 1, 2013 meeting, Windstream's banker proposed to Windstream a first-of-its-kind transaction in the telecommunications space: structuring a REIT based on telecommunications networks. The proposal called for Services to create and spin-off a REIT owning its primary assets: copper wire and fiber optic cable networks. This solution would have been unthinkable only a few years earlier as these assets had not traditionally been thought of as "REIT-able." But the IRS had issued a ruling that was seen as opening the door for REIT status to be applied to non-traditional assets.

45. The spin-off proposal carried a host of benefits, among them: (a) in what Windstream referred to as "multiple arbitrage," the same assets in a REIT could procure a larger multiple when raising debt than if those assets remained in a traditional telecommunications company; (b) the Uniti Arrangement could allow Windstream to deleverage, enabling Windstream to pursue new strategic and operational opportunities and providing cushion under debt covenants; (c) the Uniti Arrangement could create two viable companies that appealed to different investor groups—the REIT more attractive to value investors wanting a steady dividend and the new Windstream more attractive to growth investors; (d) Windstream could reinvest in its broadband network to match increasing demand for high-speed internet across much of its network; and (e) the generation of tax benefits.

46. With the prospects for a sale or refinancing dimming, Windstream turned to a REIT solution. Windstream worked with advisors to structure this complicated transaction, where Windstream still needed access to the transferred network post-spin, into the REIT requirements

10

that would provide the aforementioned benefits to Windstream, Uniti and their stakeholders. Thus was born the "Uniti Arrangement," in which Uniti would acquire assets from certain Windstream subsidiaries and then lease the transferred networks to Holdings (with Services as an express beneficiary) for an initial lease term of, ostensibly, 15 years.

## I. THE UNITI ARRANGEMENT

47. From February 2013 to April 2015, Windstream vetted, structured, and implemented the Uniti Arrangement, which is laid out in the timeline and the subsections below:



### A. Origins of the Uniti Arrangement.

48. As noted above, Windstream's banker explained that the IRS in recent years had approved non-traditional REITs, that such expansion could cover telecommunications assets, and that the REIT structure could generate significant tax savings for Windstream.

49. For the Uniti Arrangement to work, Uniti had to be a REIT. Indeed, Uniti recognized in a recent filing with this Court that a "critical component of the transaction" was Uniti Group's taxation as a REIT.[2]

---

2  On July 19, 2019, CSL National and the Landlord Entities filed their *Objection of Uniti to Motion of UMB Bank, National Association and U.S. Bank National Association* [Bankruptcy Docket No. 824].

50.     This critical concept drove most of the decisions around the Uniti Arrangement, including the creation of the Master Lease.  There was no room for error.  First, the IRS could reject REIT treatment of non-traditional "real estate" assets—a determination that teetered in and out of doubt while Windstream vetted the Uniti Arrangement.  Second, even upon obtaining IRS approval, Windstream faced multiple hurdles to fit the new company (Uniti) into the rigorous tax constraints for REITs, including the requirement that the Master Lease be treated as a true lease.  Heightening the challenge, copper wire and fiber optic cables are depreciating assets (whether due to physical decline or economical obsolescence) unlike traditional real estate.

51.     The envisioned REIT structure had three general steps:

- First, Services would direct its subsidiaries to transfer telecommunications operating assets, such as copper wires and fiber optic cables, into new sister subsidiaries (such assets never resided at Holdings).  Uniti Group (one of those subsidiaries) was structured as a REIT for tax purposes.

- Second, Holdings (after receiving a distribution from Services) would distribute the majority of the equity in the new parent company of these new sister subsidiaries to its existing shareholders.

- Third, Holdings would enter into a "lease" with certain of the new subsidiaries and would continue operating the transferred assets via the transferring subsidiaries.

52.     Windstream had enthusiasm for the concept but acknowledged there were challenges to its success.  For example, and as discussed in Subsection E below, state regulators might not approve the novel transaction.  Windstream was an established public utility.  Uniti was not, and, given REIT requirements that prohibit the entity from actively operating REIT assets, Uniti could not operate the network assets and maintain its REIT status, even if it wanted to.

**B.    Windstream sets the Master Lease rent.**

53.    Just a month into evaluating the Uniti Arrangement, and in the first presentation to the Windstream board about it, Windstream determined the ideal rent: $650 million per year.  As recorded in Windstream's March 29, 2013 board presentation:

**Board of Directors Meeting - Project RITE Presentation**

## FINANCIAL SUMMARY – PROPCO
*(Dollars in Millions, Except Per Share)*

| | For the Projected Fiscal Year Ending 12/31, | | | | | CAGRs |
| | 2013 | 2014 | 2015 | 2016 | 2017 | PF FY13E - FY17E |
|---|---|---|---|---|---|---|
| Lease Revenue | $ 650 | $ 650 | $ 650 | $ 650 | $ 650 | 0.0% |
| Pole Attachment Revenue | 8 | 8 | 8 | 8 | 8 | 0.0% |
| TRS Revenue (Consumer CLEC) | 34 | 24 | 16 | 12 | 8 | (30.0%) |
| **Total Revenue** | $ 692 | $ 682 | $ 675 | $ 670 | $ 666 | (0.9%) |

54.    Windstream's desire to continue issuing dividends to investors drove the sizing of the rent.  Windstream wanted the Uniti Arrangement to provide for continuation of Windstream's historical dividends to shareholders via distributions from Uniti and Windstream.  While different ranges were discussed over time, there was never significant deviation from the $650 million annual rent.

55.    The amount of rent also was determined based on the amount of financing Windstream wanted Uniti to obtain and, in turn, the ultimate consideration Windstream would receive from Uniti.  More rent meant more potential financing.  More Uniti financing allowed for a larger payment to Windstream and greater ability for Windstream to deleverage.  As Windstream memorialized in one presentation, $650 million as the rent would provide "significant deleveraging to OpCo [Services]" in the near-term while allowing "PropCo [Uniti] to pay substantial dividend post transaction" over the long-run.

56.    Thus, the rent amount was determined first, and then the networks were selected to include in the Uniti Arrangement as a good faith effort to support that rent amount (additionally, some networks were excluded based on regulatory prohibitions).

**C.**     **Windstream seeks and obtains IRS approval for the Uniti Arrangement while simultaneously addressing economic challenges to the business.**

57.     In May 2013, Windstream requested a Private Letter Ruling from the IRS that, among other things, the assets Windstream intended to transfer to Uniti constituted qualifying "real estate" assets and that various tax-free spin-off requirements were satisfied.

58.     Two weeks later, however, the IRS unexpectedly suspended issuing Private Letter Rulings for non-traditional REITs, such as Windstream's. Without assurances of if or when the IRS would issue a PLR, Windstream ceased most work related to the Uniti Arrangement.

59.     In August 2013, Services (then known as Windstream Corporation) formed Holdings in order to create a holding company organization structure. Despite the IRS suspension, Windstream determined that a holding company corporate structure had benefits beyond just the REIT, including providing flexibility and optionality with respect to raising capital. Holdings' sole asset was its equity in Services.

60.     Also during the IRS suspension (and continuing through February 2014), Windstream evaluated alternatives to the Uniti Arrangement, including a potential sale of the Company and other financing paths. Windstream identified prospective buyers and engaged in diligence, but no sale materialized. Further, Windstream, consistent with its appetite for acquisitions, explored strategic acquisitions during this timeframe.

61.     In November 2013, the IRS lifted the non-traditional PLR suspension, thus making the Uniti Arrangement a viable option again.

62.     Once discussions of a potential sale ended in February 2014, the Uniti Arrangement became Windstream's best strategic option.

63.     On July 17, 2014, the IRS issued its Private Letter Ruling and approved Windstream's telecommunications assets to be used to structure a REIT.

14

64.     Thirteen days later, on July 29th, Windstream announced the Uniti Arrangement

publicly:



**windstream.**
*smart solutions. personalized service.*
July 29, 2014

**Windstream to Spin Off Assets Into Publicly Traded REIT**

*Transaction accelerates company's transformation by enabling greater network investments that will enhance service to customers while providing the REIT with opportunities to grow and diversify*

*Aligns strategic objectives and creates new opportunities for both companies to increase shareholder value*

**D.     Windstream continues to structure and vet the Uniti Arrangement, including the Master Lease's terms.**

65.     While Windstream was waiting on approval from the IRS, two groups worked to

negotiate the terms of the Uniti Arrangement, including the Master Lease:

| **Windstream Group** | **Uniti Group** |
|---|---|
| John Fletcher (lead) | Tony Thomas (lead) |
| Dan King | Jeff Small |
| Willis Kemp | Bryan Cave (outside counsel) |
| Skadden (outside counsel) | |

66.     Mr. Thomas had been appointed as Head of REIT Operations in October 2014, and

Mr. Small (a Windstream employee) had been designated to join Mr. Thomas at the newly-formed

REIT company after the spin-off was complete.

67.     The negotiations were interdependent to maximize the tax and other benefits of the

entire Uniti Arrangement.  The ultimate Master Lease included terms included for REIT tax

purposes, including those relating to the ownership of the TCIs, as opposed to any business

purpose.

15

68.     Windstream also engaged an investment banker, Stephens, Inc. ("Stephens") to advise regarding the Uniti Arrangement.  Uniti's current CEO Kenneth Gunderman was on the Stephens team advising Windstream.

69.     In connection with over 100 diligence questions about the Uniti Arrangement, in June 2014, Windstream recorded its expectation that it (referred to as "OpCo" in the document) would renew.  As excerpted below, Windstream stated that "it would not be expected that OpCo could or would not renew all of the lease POD's at one time"—or stated straight: Windstream expected to renew *all* of the leased properties.

| Question | Response |
|---|---|
| Can PropCo refinance, or issue equity, in the future if OpCo does not renew the initial lease? | There will be strong incentives on both sides for stability in the rental payment streams. During the term, PropCo will also spend significant efforts to diversify its portfolio and it would not be expected that OpCo could or would not renew all of the lease POD's at one time. Finally, PropCo does have certain end of lease protections to ensure that a tenant will be available and it will need to ensure those are enforced. |

70.     In September 2014, Windstream formed Uniti.

71.     The bulk of the documentation for the Master Lease was completed by fall 2014.

72.     In December 2014, the then-current CEO of Windstream left the Company and Tony Thomas was appointed by the Windstream board as CEO of Windstream.  At that point, Mr. Thomas was tasked with closing the Uniti Arrangement on behalf of Windstream.

73.     In early 2015, management positions were filled for Uniti (including the hiring of Kenneth Gunderman as Uniti's CEO), but the bulk of the negotiations regarding the Master Lease had concluded months earlier, as previously noted.  Windstream had moved to the execution phase of the Uniti Arrangement.

74.     While structuring the Master Lease, Windstream continued its internal corporate restructuring to facilitate the Uniti Arrangement from a tax perspective, including continuation of

16

converting subsidiaries into limited liability companies (for example, Windstream Corporation was converted into Windstream Services, LLC in March 2015).

**E.      Windstream seeks approval of the Uniti Arrangement from state regulators.**

75.      Though the IRS had issued the PLR, Windstream also needed approvals (or a decision that no approval was required) from state public utility commissions and began making those requests in the second half of 2014.

76.      Windstream, as a telecommunications provider, is governed by state regulations that, for example, require state approval (or a declaration that no such approval is required) for certain types of asset transfers.  In some states, the applicable regulations are heightened because Windstream is the "carrier of last resort," meaning Windstream must provide certain services to customers in particular regions at prevailing rates, lest those customers be left with no services at all.

77.      Obtaining approval from state regulators was essential to the Uniti Arrangement's success, and there was a chance regulators may refuse to approve asset transfers to Uniti—an unknown, non-operating REIT.  Therefore, in conjunction with its legal advisors, Windstream worked to confirm with regulators that the Uniti Arrangement, as structured, would not leave their citizens without a provider of critical services.  Should Windstream exit, it would, of course, be challenging for Uniti to find a replacement tenant for networks tailor-made for Windstream.

78.      To address regulators' concerns, Windstream and Uniti emphasized that the Master Lease had renewal terms allowing Windstream to extend the Master Lease for a total of 35 years.

79.      In one exchange, Windstream's then-interim CFO and Treasurer (and now current CFO) Bob Gunderman testified under oath in response to questions from the Kentucky Public Service Commission that Windstream's Master Lease "should remain in effect for a minimum of 35 years."

17

**Q. ON PAGE 11 OF HIS DIRECT TESTIMONY, MR. BARBER STATES THAT THE APPLICATION DOES NOT DISCUSS WHAT HAPPENS AT THE CONCLUSION OF THE LEASE. PLEASE ADDRESS THIS ISSUE.**

A. I would first like to emphasize that the Lease has an initial term of 15 years, and up to four (4) renewal terms of five (5) years each, at Windstream's sole option (provided there is no event of default), so that the Lease should remain in effect for a minimum of 35 years. At that point, Windstream and CSL could negotiate an extension or a replacement for the Lease, or they could allow it to expire. Of course it is impossible to predict what technological and economic changes may have occurred by that time; it is at least theoretically possible that, by 2050, the Subject Assets could be considered obsolete and have little practical value. It is much more likely, however, that there will continue to be demand for some kind of telecommunications capabilities delivered to homes and businesses over fixed transmission facilities, as there has been since telephone technology was developed in the late 19th century, even though the nature of the facilities and the services they enable will probably continue to change.

80. Likewise, Windstream told the Alabama Public Services Commission that the Master Lease would run on a "long term basis":

> The Subject Assets will be transferred to [Uniti], which will lease the use of the Subject Assets back to Windstream for the benefit of the WIN Companies on an exclusive, long term basis so that the WIN Companies can continue to operate their telecommunications business as they do currently. [Uniti] will not provide any transportation or public utility services to any customer in Alabama, nor will [Uniti] operate any of the Subject Assets or any transmission or switching facilities. Rather, [Uniti] will simply own the Subject Assets and lease them exclusively for the WIN Companies.

81. Similar statements meant to reassure were provided informally to various regulatory staff, emphasizing Windstream's ability to renew and maintain the assets for up to 35 years.

82. Ultimately, Windstream obtained the requisite approvals from state regulators.

**F. Windstream and Uniti finalize and execute the Uniti Arrangement.**

83. In March and April 2015, Windstream and Uniti finalized and executed the Uniti Arrangement.

84.     In March 2015, Windstream and Uniti executed a Separation and Distribution Agreement (attached as **Exhibit B**).  Services (including certain of its subsidiaries) transferred the following assets to Uniti, among others (the "Transferred Assets"):

- 64,223 route miles of fiber cables;

- 234,838 route miles of copper cables;

- central office land and buildings;

- beneficial rights to permits, pole agreements, and easements; and

- one of Services' CLEC businesses.

85.     Windstream did not transfer title to various easements, permits, and pole attachment agreements to which copper and fiber cables were affixed.  Indeed, over 90% of the route miles of copper wire and fiber optic cable were located in real estate not owned by Windstream and not deeded to Uniti.

86.     Windstream and Uniti agreed to a valuation of the Transferred Assets at $7.450 billion.  According to Ernst & Young LLP ("Ernst & Young"), almost all of that value ($6.990 billion or almost 94%) came from the copper wire and fiber optic cables as well as other outside plant equipment.  Land, buildings, and easements were valued at just $460 million, or about 6% of the total value of the Transferred Assets.

87.     In exchange, and as shown in the below graph, Services received from Uniti: approximately (a) $1.035 billion in cash, and (b) $2.450 billion in face value of Uniti debt securities.  Services later used a portion of these proceeds to redeem outstanding debt.



88.     Services then distributed approximately 80.4% of the equity in Uniti to its parent Holdings.  Services retained the remaining approximately 19.6% equity in Uniti to sell at a later time.

89.     Holdings, in turn, distributed the approximately 80.4% equity in Uniti to its shareholders on a pro rata basis.  Upon the completion of this distribution, Uniti operated as an independent, publicly-traded company that elected to be treated as a REIT for tax purposes.

90.     Along with the spin off, on April 24, 2015, Holdings executed the Master Lease with CSL National and certain Uniti subsidiaries, so that Windstream could continue operating the transferred assets as it had before the Uniti Arrangement.  The final structure looks like:



## II.     EFFORTS TO EVALUATE AND ADDRESS RECHARACTERIZATION

91.     While structuring the Uniti Arrangement, Windstream knew of the recharacterization risk.

92.     To address the recharacterization risk, Windstream (a) engaged an advisor, Ernst & Young, to opine on the remaining economic life of the telecommunications networks, and (b) structured the Master Lease renewal terms to avoid creating an "economic compulsion" to renew.[3]  However, no amount of legal structuring could deny the true financing nature of the arrangement.

---

[3]     An economic compulsion to renew occurs when renewal is reasonably assured because there is either a bargain renewal option or the purported tenant would suffer economic penalties from not renewing. In the event of economic compulsion, the true lease term is deemed to include the renewal period or periods that are economically compelled.  Contracting parties in this way cannot avoid recharacterization through initial lease terms that do not capture the true anticipated length of the "lease."

**A.**     <u>Economic Life</u>: **Due to the economic obsolescence of copper wire and fiber optic cables, the remaining economic life was overstated.**

93.     Remaining useful life is a critical component for any recharacterization analysis. Courts routinely look at whether there is a meaningful reversionary interest to the lessor at the end of a purported lease and, where such interest does not exist, have found transactions to be disguised financings.

94.     Windstream understood in structuring the Master Lease that the leased networks must have a useful life well-beyond the initial lease term.  It was not enough for such remaining useful life to be nominal.  There had to be at least 20% to 25% of residual value at the end of the Master Lease. *See, e.g.*, ASC 840 (finding that a capital lease for accounting purposes when "[t]he lease term is equal to 75% or more of the estimate economic life of the leased property"); IRS Revenue Procedure 2001-28 § 4.01(3) (an instructive IRS guidepost that requires for a true lease "a remaining useful life of the longer of one year or 20% of the originally estimated useful life of the property [existed] … at the end of the lease term").  Thus, Windstream and Uniti needed a remaining useful life no less than 20 years based on a 15-year initial term—and probably much longer.  Otherwise there is no material residual value, and no "true lease."

95.     On April 16, 2015, Ernst & Young completed its final valuation report as of December 31, 2014.  Ernst & Young recognized that the residual value of the "leased" assets could "not [be] less than 20%."  And it concluded that the transferred assets had a "weighted average remaining useful life" of 28 years.  That conclusion assumed that the telecommunications networks—of which copper wire cables were a significant portion of the networks by value and almost 80% of the cables by route miles—had a total economic life between 40 to 50 years.

96.     Ernst & Young reported in the below table the weighted average remaining useful life by each one of the 36 facilities that comprised the Master Lease.  No property has a remaining

22

useful life of less than 25 years, and 34 out of 36 (94.4%) had a remaining economic life of less than the total Master Lease term—35 years. The total weighted average remaining economic life across all of the networks was 28 years.

| | | | Attachment E Fair Market Value by POD / Facility | | | | |
| | | | FMV (USD) | RUL | Residual Value @ 15 yrs | | |
| Number | POD | POD Description | Millions | Years | USD (M) | Uninflated | Inflated |
|---|---|---|---|---|---|---|---|
| 1 | AL-CLEC | Alabama CLEC | 18 | 29.26 | 5 | 28.8% | 44.8% |
| 2 | AL-ILEC | Alabama ILEC | 80 | 26.44 | 26 | 32.1% | 50.0% |
| 3 | AR-CLEC | Arkansas CLEC | 187 | 30.63 | 54 | 29.0% | 45.2% |
| 4 | AR-ILEC | Arkansas ILEC | 250 | 28.31 | 78 | 31.4% | 48.9% |
| 5 | CENTRAL-CLEC | Central US CLEC (1) | 5 | 26.16 | 2 | 45.5% | 70.9% |
| 6 | EAST-CLEC | Eastern US CLEC (2) | 10 | 25.75 | 3 | 32.1% | 50.0% |
| 7 | FL-CLEC | Florida CLEC | 62 | 26.48 | 22 | 36.0% | 56.0% |
| 8 | FL-ILEC | Florida ILEC | 125 | 28.88 | 41 | 32.6% | 50.8% |
| 9 | GA-CLEC | Georgia CLEC | 42 | 26.48 | 13 | 31.1% | 48.4% |
| 10 | GA-ILEC | Georgia ILEC | 1,050 | 27.37 | 340 | 32.4% | 50.4% |
| 11 | IA-CLEC | Iowa CLEC | 119 | 27.78 | 36 | 30.0% | 46.7% |
| 12 | IA-ILEC | Iowa ILEC | 550 | 29.92 | 183 | 33.2% | 51.7% |
| 13 | IL-CLEC | Illinois CLEC | 196 | 28.67 | 58 | 29.7% | 46.3% |
| 14 | IN-CLEC | Indiana CLEC | 145 | 29.43 | 43 | 29.9% | 46.6% |
| 15 | KY-CLEC | Kentucky CLEC | 117 | 31.09 | 34 | 29.1% | 45.3% |
| 16 | KY-ILEC | Kentucky ILEC | 790 | 29.69 | 294 | 37.3% | 58.0% |
| 17 | MI-CLEC | Michigan CLEC | 30 | 27.27 | 10 | 32.1% | 50.0% |
| 18 | MO-CLEC | Missouri CLEC | 27 | 30.41 | 8 | 30.7% | 47.8% |
| 19 | MO-ILEC | Missouri ILEC | 177 | 28.40 | 57 | 32.1% | 50.1% |
| 20 | MS-CLEC | Mississippi CLEC | 24 | 30.33 | 7 | 29.2% | 45.4% |
| 21 | MS-ILEC | Mississippi ILEC | 22 | 28.58 | 7 | 30.9% | 48.1% |
| 22 | NC-CLEC | North Carolina CLEC | 107 | 25.41 | 33 | 30.7% | 47.8% |
| 23 | NC-ILEC | North Carolina ILEC | 614 | 26.83 | 196 | 31.9% | 49.7% |
| 24 | NM-Combined | New Mexico ILEC & CLEC | 161 | 26.85 | 55 | 34.2% | 53.3% |
| 25 | OH-CLEC | Ohio CLEC | 137 | 45.25 | 47 | 34.6% | 53.9% |
| 26 | OH-ILEC | Ohio ILEC | 472 | 25.42 | 179 | 37.8% | 58.9% |
| 27 | OK-CLEC | Oklahoma CLEC | 49 | 31.40 | 15 | 31.3% | 48.8% |
| 28 | OK-ILEC | Oklahoma ILEC | 301 | 26.69 | 102 | 34.0% | 53.0% |
| 29 | PA-CLEC | Pennsylvania CLEC | 78 | 26.56 | 27 | 34.7% | 54.1% |
| 30 | TN-CLEC | Tennessee CLEC | 111 | 28.81 | 33 | 29.4% | 45.9% |
| 31 | TX-CLEC | Texas CLEC | 138 | 27.93 | 42 | 30.8% | 48.0% |
| 32 | TX-ILEC | Texas ILEC | 793 | 27.14 | 270 | 34.0% | 53.0% |
| 33 | VA-CLEC | Virginia CLEC | 234 | 26.24 | 71 | 30.4% | 47.3% |
| 34 | WEST-CLEC | Western US CLEC (3) | 21 | 25.73 | 6 | 30.4% | 47.4% |
| 35 | WI-CLEC | Wisconsin CLEC | 88 | 28.80 | 26 | 29.6% | 46.1% |
| 36 | WV-CLEC | West Virginia CLEC | 120 | 40.60 | 34 | 28.6% | 44.5% |
| | | | 7,450 | | 2,460 | | |

23

97.      But these assumptions and conclusions failed to adequately account for the impending economic obsolescence of the assets (particularly of the copper wire cables composing a significant portion of the value of the transferred networks).  Ernst & Young found no "material forms of economic obsolescence that would warrant an adjustment":

> Economic obsolescence
> Economic obsolescence is the loss in value caused by adverse conditions external to the assets, such as poor market demand for the product or service, industrial reorientation, unavailability of transportation, and governmental regulation. In order to determine if there was economic obsolescence, we looked at information provided by Windstream regarding the Transaction and the results of our market metrics analysis. Based on our review of this information, we did not find material forms of economic obsolescence that would warrant an adjustment.
>
> Page 20
>
>  EY

98.      This finding does not hold up.  By 2015 it was already clear that copper wire cables could not keep up with market demand for faster internet speeds by 2030 (let alone by 2050).  Speeds were simply too slow given technological developments.  It might be true that the copper wire cables were not physically obsolete as they would likely still work, but such cables were economically obsolete as nobody would pay for it (just as a buggy whip still physically works today, but has become obsolete with the advent of automobiles).

99.      Thus, in 2015, copper cables were nearing the end of their economic life.  With competitors providing increasing speeds through fiber optic cables or other technologies such as wireless technologies, and with 1 GB speeds on the horizon, copper was becoming obsolete except in the least competitive markets.  For many locations, Windstream's copper will be uncompetitive on or around 2025.

100.    Windstream engaged consultants to opine on depreciation, and thus the economic

obsolescence of copper cables, for years.  Windstream also observed other metrics of economic

life in the telecommunications sector.  Even manufacturers and the FCC had weighed in.  All of

these sources showed a far shorter economic life than Ernst & Young.

101.    First, in 2011 and 2012, Duff & Phelps prepared depreciation reports of

Windstream's ILEC assets.  Duff & Phelps, based on market analysis from Technology Futures,

Inc., concluded that copper wire cables had a remaining economic life of 3.9 to 7.7 years:

**Table 2**
**TFI Recommendations on Depreciation Lives for Windstream**

**TFI Recommended Depreciation Lives for Windstream**
**Average Remaining Life as of January 1, 2012**

| | Technology Substitution Only | | | After Access Line Losses | | |
|---|---|---|---|---|---|---|
| Competition Level: | High | Medium | Low | High | Medium | Low |
| Tech Scenario: | Early | Middle | Late | Early | Middle | Late |
| Digital Switching | 4.8 | 5.6 | 6.4 | 4.3 | 4.9 | 5.5 |
| Circuit Equipment - Average | 4.1 | 4.6 | 5.0 | 3.8 | 4.2 | 4.6 |
| Circuit Equipment - DSL | 3.4 | 3.7 | 4.0 | 3.4 | 3.7 | 4.0 |
| Circuit Equipment - Narrowband | 4.7 | 5.5 | 6.3 | 4.2 | 4.8 | 5.3 |
| Metallic Cable - Underground | 4.7 | 5.5 | 6.3 | 3.9 | 4.4 | 4.9 |
| Metallic Cable - Buried & Arial | 5.9 | 6.8 | 7.7 | 5.5 | 6.2 | 6.8 |
| Fiber Cable** | 6.8 | 7.8 | 8.8 | 6.8 | 7.6 | 8.4 |

* Applies to non-VHS broadband equipment only. For VHS broadband equipment, TFI
recommends an ARL based on a 4-10 year P-Life, depending on the equipment type.
** Applies to standard single mode fiber only. For full spectrum fiber, TFI
recommends an ARL based on a 20-25 year P-Life.

*Source:* Technology Futures, Inc.

102.    Thus, several years *before* the Uniti Arrangement, Duff & Phelps observed that

"[t]he substitution of fiber for metallic feeder cable will accelerate markedly from the historic

trend," and that competition will "significantly reduc[e] the economic life and value of the

equipment."

25

103.    A subsequent depreciation report from CostQuest Associates in 2016 corroborated Duff & Phelps' analysis.  The report showed an average remaining life ("ARL") of between 1.3 and 7.5 years for metallic cable (depending on type).

**Table 1.3**
TFI Recommendations ARLs for Windstream, as of 1/1/2016

*Reflecting technology substitution and access line losses, but not physical mortality.*

| | Low | Medium | High |
|---|---|---|---|
| Competition Level: | | | |
| Tech Scenario: | Late | Middle | Early |
| **Metallic Cable** | | | |
| Feeder | 1.9 | 1.5 | 1.3 |
| Distribution | 7.5 | 4.9 | 3.7 |
| Underground | 1.9 | 1.5 | 1.3 |
| Buried & Aerial | 6.4 | 4.2 | 3.2 |
| Digital Switching | 4.0 | 3.2 | 2.8 |
| **Legacy Circuit Equipment** | | | |
| Narrowband (DLC) | 1.9 | 1.6 | 1.4 |
| Standard Broadband (ADSL) | 1.5 | 1.4 | 1.2 |
| Non-Premium Broadband (ASDL2+) | 1.6 | 1.4 | 1.2 |
| Other Legacy (ATM, SONET, T1) | 4.0 | 3.5 | 3.0 |
| Composite | 2.3 | 2.0 | 1.7 |

For fiber cable: Age-dependent, Iowa R3-25
For Modern Circuit and Switching: Age dependent, Iowa L2-9

*Source: Technology Futures, Inc.*

104. Other depreciation studies in the market in 2015 likewise were assigning short lives to metallic cables. BCRI Valuation Services' 2015 Depreciation & Cost Manual, for example, assigned a 4 to 7 year life for metallic cables.

Table 5 – BCRI's 2015 Communications Tables

| Rate Category Name | RCatID | TblID | Life | Curve | Residual |
|---|---|---|---|---|---|
| **Communications Plant Accounts** | | | | | |
| Broadcasting: All Broadcasting Plant & Equipment | 5472 | 1052 | 8.7 | Compound | 5.0% |
| Broadcasting: Electronic Broadcasting Eq. | 5468 | 1021 | 10.1 | L0\10 | 5.0% |
| Cable - Fiber Cable | 420 | 788 | 20.0 | GM\20 | 5.0% |
| Cable - Metallic Cable | 419 | 1140 | 5.3 | Compound | 5.0% |
| Cable - Metallic Distribution Cable | 428 | 1138 | 6.2 | Compound | 5.0% |
| Cable - Metallic Distribution Cable (Excluding Drops) | 5466 | 1139 | 5.8 | Compound | 5.0% |
| Cable - Metallic Feeder Cable | 426 | 1137 | 4.2 | Compound | 5.0% |
| Cable - Telecom Metallic Drops | 5443 | 1141 | 7.1 | Compound | 5.0% |
| CATV Cable - Coax Trunking Cable | 5441 | 1129 | 4.2 | Compound | 5.0% |
| CATV Cable - Coaxial Cable | 5446 | 1131 | 7.3 | Compound | 5.0% |
| CATV Cable - Coaxial Cable (Excluding Drops) | 5469 | 1133 | 7.4 | Compound | 5.0% |
| CATV Cable - Coaxial Distribution | 5474 | 1130 | 8.7 | Compound | 5.0% |
| CATV Cable - Coaxial Distribution (excl. Drops) | 5475 | 1134 | 8.5 | Compound | 5.0% |
| CATV Cable - Coaxial Drops | 5444 | 1132 | 9.5 | Compound | 5.0% |
| CATV Converters, set-top boxes, etc | 269 | 1135 | 3.9 | Compound | 5.0% |
| CATV Equipment | 6624 | 1136 | 7.4 | O2\7.16 | 5.0% |
| CATV Head-End Video Equipment | 5436 | 1011 | 8.1 | L0\8 | 5.0% |
| Circuit - Analog | 364 | 1145 | 4.6 | Compound | 5.0% |
| Circuit - Digital | 365 | 1146 | 5.8 | Compound | 5.0% |
| Circuit - High-Speed Internet Access Equipment | 5433 | 1142 | 5.1 | Compound | 5.0% |
| Circuit - Microwave Electronics | 5435 | 1010 | 8.1 | L0\8 | 5.0% |
| Circuit - Optical | 366 | 1147 | 9.8 | Compound | 5.0% |
| Circuit - PCS Antenna Systems | 541 | 1153 | 5.7 | Compound | 5.0% |
| Circuit - PCS Base Station Equipment (All Generations) | 5458 | 1152 | 4.1 | Compound | 5.0% |
| Circuit - PCS Base Station Equipment G2.0 | 5450 | 1065 | 1.1 | Compound | 5.0% |
| Circuit - PCS Base Station Equipment G2.5 | 547 | 1149 | 1.5 | Compound | 5.0% |
| Circuit - PCS Base Station Equipment G3.0 | 592 | 1150 | 1.5 | Compound | 5.0% |
| Circuit - PCS Base Station Equipment G4.0 | 5476 | 1151 | 5.6 | Compound | 5.0% |
| Circuit - PCS: Nextel-iDEN Cell Site Equipment | 6652 | 1102 | 1.1 | Compound | 5.0% |
| Circuit - Radio | 5482 | 1010 | 8.1 | L0\8 | 5.0% |
| Circuit Equipment | 418 | 1148 | 5.8 | Compound | 5.0% |
| Fiber Cable & Conduit | 431 | 984 | 32.5 | GM\20 | 5.0% |
| Structures - Communication Antennas | 4405 | 1038 | 10.0 | L1\10 | 5.0% |
| Structures - Communication Towers | 540 | 474 | 50.0 | R5\50 | 5.0% |
| Structures - Conduit Systems | 392 | 473 | 40.0 | R4\40 | 5.0% |
| Structures - Microwave Dishes | 5447 | 471 | 15.0 | R3\15 | 5.0% |
| Structures - Microwave Dishes & Electronics | 5448 | 1027 | 11.2 | Compound | 5.0% |
| Structures - Poles | 373 | 469 | 35.1 | R1.5\35 | 5.0% |

©Copyright 2015 BCRI Inc. All Rights Reserved Page 19 of 106

105. Second, in Competitive Local Exchange Carrier, or "CLEC," territories in 2015, Windstream's accounting department depreciated copper wire cables over 20 years—less than half

27

of Ernst & Young's assumption for the total economic life of copper. Even then, Windstream accountants will testify that 20 years was, if anything, on the longer side of actual expectation.

106. Third, in April 2015, other telecommunications companies likewise depreciated copper wire cables over a total economic life of 20 to 25 years.

107. Fourth, manufacturer recommendations for copper wire cables are 25 years.

108. Last, on June 28, 1994 (at a time when copper wire cables were still viable for the foreseeable future), the FCC issued a Second Report and Order prescribing a projection life for metallic cables, such as copper, of 25 to 30 years:

| 9 FCC Rcd No. 14 | **Federal Communications Commission Record** | | | FCC 94-174 |

**APPENDIX B**

ACCOUNTS AND RANGES FOR PHASE ONE IMPLEMENTATION

| ACCOUNT NUMBER | ACCOUNT NAME | DEPRECIATION RATE CATEGORY | PROJECTION LIFE RANGE (YEARS) | | FUTURE NET SALVAGE RANGE (PERCENT) | |
|---|---|---|---|---|---|---|
| | | | LOW | HIGH | LOW | HIGH |
| 2112 | Motor Vehicles | Motor Vehicles | 7.5 | 9.5 | 10 | 20 |
| 2113 | Aircraft | Aircraft | 7 | 10 | 30 | 60 |
| 2114 | Special Purpose Vehicles | Special Purpose Vehicles | 12 | 18 | 0 | 10 |
| 2115 | Garage Work Equipment | Garage Work Equipment | 12 | 18 | 0 | 10 |
| 2116 | Other Work Equipment | Other Work Equipment | 12 | 18 | 0 | 10 |
| 2122 | Furniture | Furniture | 15 | 20 | 0 | 10 |
| 2123.1 | Office Support Equip | Office Support Equip | 10 | 15 | 0 | 10 |
| 2123.2 | Co. Communications Equip | Co. Communications Equip | 7 | 10 | -5 | 10 |
| 2124 | Gen. Purpose Computers | Gen. Purpose Computers | 6 | 8 | 0 | 5 |
| 2231 | Radio Systems | Radio Systems | 9 | 15 | -5 | 5 |
| 2232 | Circuit Equipment | Digital Data Service | 7 | 11 | -5 | 10 |
| 2232 | Circuit Equipment | Analog | 8 | 11 | -5 | 0 |
| 2311 | Station Apparatus | Station Apparatus | 5 | 8 | -5 | 5 |
| 2341 | Large PBX | Large PBX | 5 | 8 | -5 | 5 |
| 2351 | Public Telephone | Public Telephone | 7 | 10 | 0 | 10 |
| 2362 | Other Terminal Equipment | Other Terminal Equipment | 5 | 8 | -5 | 5 |
| 2421 | Aerial Cable | Non-Metallic | 25 | 30 | -25 | -10 |
| 2422 | Underground Cable | Non-Metallic | 25 | 30 | -20 | -5 |
| 2422 | Underground Cable | Metallic | 25 | 30 | -30 | -5 |
| 2423 | Buried Cable | Non-Metallic | 25 | 30 | -10 | 0 |
| 2424 | Submarine Cable | Submarine Cable | 25 | 30 | -5 | 0 |
| 2441 | Conduit Systems | Conduit Systems | 50 | 60 | -10 | 0 |

109.     In other words, Ernst & Young's useful life figure was an outlier.  The below graph compares Ernst & Young's useful life calculation against other indicia of useful life for copper wires.  The market spoke with one voice: a 20 to 25 year total economic life (not *remaining* economic life, but *total* economic life).  Ernst & Young was far above that, applying a 40 to 50 year total economic life for the telecommunications networks.

**Total Economic Life of Copper Wire**



110. Further, the aforementioned contemporaneous studies, commissioned by Windstream for 2011, 2012, and 2016—which were done well before this litigation to satisfy regulatory requirements in Incumbent Local Exchange Carrier, or "ILEC," markets—set the *remaining* economic life of the transferred copper wire as well as certain fiber optic cable at under 10 years for depreciation purposes. These depreciation rates were largely age independent. Market speeds were causing copper's obsolescence however old the copper wire cables were. The end was expected to come well before the initial Master Lease term would conclude in 2030.

**Total Remaining Economic Life of Copper Wire as of 2015**



111. These graphs reflected the reality at the time of the Uniti Arrangement: it was clear in April 2015 that, even though copper wire cables (just as the buggy whip) could still physically work for some time into the future, such cables were becoming economically obsolete. Market demand for ever increasing internet speed was well known as were the limitations of copper in providing that speed. Wall Street Journal headlines in November 2012, for example, included "AT&T Move Signals End of the Copper-Wire Era." And the Associated Press in July 2013 was running the story: "Big Disconnect: Telcos Abandon Copper Phone Lines."

112. Because customers continue to demand increases in speed that copper wire cables cannot support, time has proven the (non-Ernst & Young) remaining economic life estimates

correct. Windstream's copper wire cables will already be obsolete in many of its markets on or around 2025—a mere decade after the Master Lease was executed.

113. Also problematic was the economic life of fiber optic cables. Windstream's internal accountants recognize that their depreciation of fiber for 20 years was too short to account for the Master Lease as an operating lease. Again, Windstream relied on Ernst & Young's outlier remaining economic life calculations.

**B.**     <u>Lease Term</u>**: Windstream's and Uniti's paper efforts to avoid an economic compulsion to renew cannot deny their true economic intentions.**

114. Windstream faced two competing goals in structuring the Master Lease term. On the one hand, the term could not be too long. If too long or if Windstream were likely to renew (or economically compelled to renew) following the initial term, there would be no material residual value. The law then recognizes such "leases" for what they are—financings. On the other hand, as discussed above, it was critical to regulators that the actual lease term, however divided between initial and renewal periods, be as long as possible.

115. To balance those concerns (discussed further in Section IV below), Windstream, on paper, created a 15-year term with four 5-year renewal periods. Master Lease §§ 1.3–1.4. The Master Lease purported to be indivisible across the 36 markets (called "properties" or "PODs") for the initial term. *Id.* § 1.2. But Windstream could choose which ones to renew in each renewal term, and renewal rent was determined by an appraiser if Windstream and Uniti could not reach agreement. *Id.* § 1.4.

116. This odd construction, in which an "indivisible" lease suddenly becomes entirely divisible, was done in part to try to avoid an economic compulsion argument. It was unsuccessful. Each of the PODs either will have insufficient remaining economic life to reach the end of the

initial lease term (and thus no residual value) or else have their value increased by the TCIs, leading Windstream to renew the Master Lease.

117. Despite this structuring on paper, Windstream's evidence at trial will show that it was extremely likely to exercise one or more renewal terms, each for five years, as it had no plans for a complete overhaul or construction of a new network. And senior Windstream management from both ends of the deal deemed it unthinkable that Windstream would not renew.

118. In fact, Windstream's internal board presentations from May 2014 suggested that renewal was expected and termination was "[l]ikely [a] small portion of overall Master Lease":



* * * * *

119.     Recharacterization addresses the question of whether the "lessor" is acting as the owner of the property.  Courts will recharacterize leases as financing arrangements when there is non-material residual value at the end of the lease term.  Owners purchase an economic interest in property and bear the risk of fluctuations in value; lenders rely on a borrower's creditworthiness to make a return and may require collateral to secure their loan.

120.     Here, this "lease" is a disguised financing.  As shown in the below scenarios, either: (a) Windstream was going to renew the Master Lease beyond the point in time when the "leased" networks had material residual value, (b) the material residual value of these networks was shorter than even the initial Master Lease term, or (c) a combination of both.  For each of these reasons, the Master Lease entered the "red zone," where no material residual value remains.

**Paths to Recharacterization**



### III. SETTING THE MASTER LEASE RENT

121. After determining that the Master Lease rent should be $650 million annually and then bundling networks to transfer to Uniti, Windstream engaged Ernst & Young to value the transferred networks.

122. As part of its final report, Ernst & Young concluded that "[t]he Lease Rent … reasonably reflects the fair market rental value of the Assets for the Lease Term."

123. But there were at least four issues rendering rent too high from the outset.

124. First, the valuation, which was based on the cost method (replacement cost minus depreciation and obsolescence), was too high. Ernst & Young applied no penalty for economic obsolescence and only a 10% penalty for functional obsolescence (and, further, despite viewing the Distribution Systems as an integrated system, applied the cost method rather than the income method in making its fair market value determination). Yet, copper wire technology was becoming obsolete and, as a result, depreciating in value. In fact, Ernst & Young acknowledged that, during the course of the Master Lease, "over 95% of the [copper] feeder cable" and "approximately 50% of the [copper] distribution cable" would have to be replaced with fiber. This replacement had to occur because of copper's accelerating obsolescence and should have significantly reduced the valuation and, consequently, the rent.

125. Second, from that valuation, Ernst & Young applied too high of a lease rate. It used a market lease rate of between 9% and 11%. But questions within Windstream were being raised in 2014 that a "9%-11% range seems high," and that a lower market lease rate resulting in lower rent ("7%-9% seems more realistic") should be used.

126. Third, Windstream received no reduction in rent when it agreed during negotiations that all TCI Replacements would belong to Uniti. Thus, Ernst & Young's fair market rent

34

conclusion did not account for this significant non-cash consideration that Windstream would be providing to Uniti. Further, upon renewal, Uniti could charge Windstream for the value of the TCI Replacements remaining at the end of the prior Master Lease term.

127. Fourth, Ernst & Young only valued the economic value of the network to Uniti while it was being leased to Windstream, and, as a result, did not reliably or accurately determine the value of the network.

## IV.   THE MASTER LEASE

128. Relevant to Windstream's causes of action, the Master Lease contains the following provisions structuring the Windstream and Uniti arrangement:

129. **Use of the telecommunications network:** Holdings' subsidiaries have the right to "use, occupy and operate" the Leased Assets and discharge Holdings' obligations under the Master Lease. Master Lease § 7.2.

130. **Initial term and rent:** Windstream structured a 15-year term with four, 5-year renewal periods. Master Lease §§ 1.3–1.4. The Master Lease also enabled Windstream and Uniti to extend the initial term to 20 years with three, 5-year renewal options. *Id.* § 1.3. For the extension to be effective, Windstream had to elect to renew within the first five years. *Id.* Windstream could condition the extension on Uniti agreeing to make up to $50 million in funding commitments each year for up to five years (not to exceed the seventh anniversary of the commencement of the Master Lease). *Id.* §§ 1.3, 2.1, "Full Funding Commitment," 10.2(b).

131. During the initial term, annual rent began at $650 million and grows at 0.5% per year beginning in year four (May 2018). Master Lease §§ 2.1, "Rent" ("commencing with the fourth (4th) Lease Year and continuing each Lease Year thereafter during the Initial Term, the

Rent shall increase to an annual amount equal to the Escalated Rents") and "Escalated Rent" ("an amount equal to 100.5% of the Rent as of the end of the immediately preceding Lease Year").

132. Under the Master Lease, Holdings pays the rent. Holdings' rent payments are funded from distributions made by Services to Holdings.

133. **Tenant Capital Improvements:** Tenant Capital Improvements includes "maintenance, repair, overbuild, upgrade, or replacement of the Leased Property, including, without limitation, the replacement of copper distribution systems with fiber distribution systems." Master Lease § 10.2(c). Certain Tenant Capital Improvements are required. *Id.* § 9.1(a) (requiring that Windstream "shall maintain" at "its expense" the Leased Property).

134. The value of many Tenant Capital Improvements is not credited to Windstream. Instead, these Tenant Capital Improvements are conveyed to Uniti for no consideration. Master Lease § 10.2(c) ("If Tenant constructs a Capital Improvement that is not funded by Landlord (each a 'Tenant Capital Improvement') and the Capital Improvement constitutes maintenance, repair, overbuild, upgrade or replacement of the Leased Property, including, without limitation, the replacement of copper distribution systems with fiber distribution systems (each a 'TCI Replacement'), then such TCI Replacement shall automatically become a part of the Leased Property.").

135. **Renewal terms and rent:** Following the 15-year initial term, Windstream has the option to renew the Master Lease for one or more of the 36 facilities, also called "PODs." Master Lease §§ 1.2, 1.4, Ex. A.

136. Renewal rent is determined by a two-step process. Uniti first makes a proposal to Windstream for the renewal rent amount. Master Lease § 1.4(b). If no negotiated agreement is reached, two appraisal firms will determine the renewal rent, which must be equal to the fair market

rental value "for each Facility based on an approach consistent with Exhibit E." *Id.* §§ 2.1, 41.14, Ex. E. The appraisal process values for each of the facilities being renewed apart from the others, and includes in its basis the value added from the Tenant Capital Improvements that became a part of the Leased Property. *Id.* § 41.14, Ex. E.

137. Neither side during negotiations wanted Tenant Capital Improvements to be included in the basis for renewal rent. Windstream risked paying twice for the same Tenant Capital Improvements—first in financing the Improvement and then again, as shown above, once the TCIs are valued as part of the bundle of assets being priced for renewal. This extreme "double-pay" misaligned incentives. Windstream did not want to pay twice, and Uniti recognized that requiring Windstream to pay twice could reduce Windstream's investments in the Master Lease networks.

138. **Destruction or condemnation:** The Master Lease includes a "hell or high water" clause, and Windstream's rent obligations are not excused if the telecommunications assets are destroyed or condemned. Master Lease §§ 5.1, 15.1(b).

139. **Triple net lease:** Windstream is responsible for (a) all taxes, permit or license fees, and other governmental charges, (b) all insurance premiums, (c) all utilities, (d) all fees related to easements, licenses or other rights that benefit the telecommunications networks, and (v) all maintenance and repair costs. Master Lease §§ 3.4, 4.1, 8.2, 9.1–9.2.

140. **Non-compete covenants:** The Master Lease contains restrictive covenants barring the Landlord Entities from competing with Windstream. Section 18.2, for example, bars the Landlord Entities from merging or consolidating with Windstream's "Competitors" without express written approval.

141. "Competitor," in turn, means: "any Person engaged in any business activity then actively being conducted by Tenant or its subsidiaries or any business that Tenant or any of its

37

Subsidiaries has engaged in during the preceding one-year period within any state in which Tenant or any of its Subsidiaries is licensed as an incumbent local exchange carrier or competitive local exchange carrier." Master Lease § 2.1, "Competitor."

142.    The Landlord Entities also cannot install or construct telecommunications systems in territories where Windstream is operating. Master Lease § 7.3(b); Amendment to Master Lease (attached as **Exhibit C**) § 7.2(g).

143.    Windstream may seek a rent abatement if misconduct or gross negligence causes interference with Windstream's use of the leased assets. Master Lease § 5.1.

## V.    WINDSTREAM'S INVESTMENT IN TENANT CAPITAL IMPROVEMENTS

144.    When it entered into the Master Lease, Windstream had to continue investing in and upgrading the "leased" networks to remain competitive and avoid those networks becoming obsolete.

145.    In particular, Windstream knew (as was discussed in Section II.A) that copper wire cables, which were almost 80% of the leased cables by route miles, had to either be upgraded or replaced with fiber optic cables to meet market demand for faster speeds.

146.    As a result, since April 2015, Windstream has invested more than $830 million in Tenant Capital Improvements. Windstream provides Uniti monthly reports showing the amount it spends on Tenant Capital Improvements. Some of the amounts, such as capital overbuilds, are at Windstream's discretion under Section 10.2 of the Master Lease; others, such as certain maintenance and repair, are required under the Master Lease. Of Windstream's total Tenant Capital Improvements (whether required or discretionary), Windstream has spent more than $330 million (about 40%) upgrading copper and another $430 million (about 50%) investing in fiber.

**Tenant Capital Improvements**

| Category | 2015 (from April) | 2016 | 2017 | 2018 | 2019 (through June) |
|---|---|---|---|---|---|
| Cables: Copper | $36,288,543.93 | $70,736,596.92 | $123,969,030.67 | $68,901,385.92 | $38,163,166.55 |
| Cables: Fiber | $100,819,578.44 | $88,979,887.44 | $101,441,657.44 | $97,940,030.46 | $42,471,299.48 |
| Other TCIs | $11,129,181.02 | $14,476,933.21 | $21,089,570.07 | $10,423,031.01 | $11,345,143.75 |
| Total | $148,237,303.39 | $174,193,417.57 | $246,500,258.18 | $177,264,447.39 | $91,979,609.78 |

$838,175,036.31

147. Many of these Tenant Capital Improvements, however, will not belong to Windstream but instead have been automatically conveyed to Uniti under the Master Lease. Under Section 10.2(c) of the Master Lease, Tenant Capital Improvements that constitute "maintenance, repair, overbuild, upgrade or replacement of the Leased Property … shall automatically become a part of the Leased Property." These discretionary Tenant Capital Improvements belong to Uniti without Windstream receiving any consideration in exchange. To capture the full benefits of these TCIs, therefore, Windstream had to renew the Master Lease; otherwise, the investment would be forfeited with value remaining. Windstream's current estimate is that Services and its subsidiaries have made approximately $366 million in such discretionary TCI Replacements from Q4 2017 through November 2019.

## VI.   WINDSTREAM'S SUBSEQUENT TREATMENT OF THE MASTER LEASE

148. Since the Uniti Arrangement was executed, Windstream and Uniti, at significant times, have treated the Master Lease for what it is: a financing arrangement.

### A.   Windstream accounted for the Master Lease as a financing.

149. Until recent tweaks in GAAP, from 2015 to 2018, Windstream accounted for the Master Lease as a financing.[4] As a result, the transferred assets continue to be recorded as assets

---

[4]   In 2019, Windstream updated its accounting treatment of the Master Lease based on new accounting rules.

39

on Windstream's financial statements. Windstream also recorded its purported rent payments under the Master Lease as principal and interest.

150. In evaluating the accounting treatment of the Master Lease, Windstream determined that the Master Lease was a "failed spin-leaseback." Because GAAP did not recognize that accounting treatment, Windstream analogized to the accounting treatment for sale-leaseback agreements. Under the accounting rules for sale-leaseback agreements, however, Windstream determined that its continuing involvement with the transferred networks precluded true lease accounting. That is, the applicable true lease accounting rules for sale-leaseback agreements required that there be an actual sale. Windstream, however, had retained the title in the various easements, permits, and pole attachment agreements to which copper wire and fiber optic cables were affixed.

**B.      Windstream's Indefeasible Right of Use Agreements show it acting as the owner of the transferred assets.**

151. Since the Uniti Arrangement, Windstream has entered into Indefeasible Right of Use Agreements that lease unused fiber cables. These Agreements grant exclusive, irrevocable use of fiber cables to third parties for a set period of time, cannot be terminated, and in general are paid in advance.

152. In 2017 and 2018, Windstream entered into 11 Indefeasible Right of Use Agreements leasing over 2,000 miles of fiber optic cables to third parties for a term beyond the initial Master Lease term. That is, Windstream committed to third parties that it would exercise its renewal options. At least one IRU terminates in 2039—almost a decade after the initial lease term ends.

153. Uniti agreed to the first eight of these IRUs before objecting to the last three.

40

**C.** **Windstream and Uniti told investors that Windstream intended to renew the Master Lease.**

154.    Windstream and Uniti have understood that Windstream had no choice but to renew the Master Lease, ultimately leaving the transferred assets with no material residual value.

155.    For example, internal talking points to investors in the weeks preceding the execution of the Uniti Arrangement emphasized that the Master Lease is a long-term lease allowing Windstream to meet regulatory obligations over "35 plus years":

> **2. Master Lease / Relationship with WIN**
>    a.  How did you derive lease terms?
>       •  Lease framework was carefully designed to benefit/protect both WIN and CS&L
>       •  Longer-term lease provides more certainty needed for the REIT business while also allowing WIN to operate the network and meet its regulatory obligations over a long- period of time (35 plus years)

156.    Likewise, in repeated presentations since the Uniti Arrangement (which continue to be posted on Uniti's homepage), Uniti has told its lenders it was confident that "Windstream is substantially dependent on network leased from Uniti for its business operations."  Uniti recognized that Windstream's "replacement cost to overbuild" the network would "exceed several billion dollars" and "would [take] several years."  Indeed, Uniti noted that the Master Lease is "Critical for Windstream to Continue as a Going Concern."

> ▪  **Windstream is Substantially Dependent on Network Leased from Uniti for its Business Operations**
>    •  WIN is Dependent on Lease and Access to Uniti's Network to Serve Vast Majority of Customers
>    •  WIN Replacement Cost to Overbuild the Uniti Leased Network would Exceed Several Billion Dollars
>    •  Time to Replicate, if Possible, Would be Several Years
>    •  No other Vendor Could Lease the Identical Network to WIN to Replace Uniti

> **Master Lease is Critical for Windstream to Continue as a Going Concern**

157.    Moreover, just two months ago, in a May 29, 2019 investor conference call, Uniti's CFO Mark Wallace opined that, "any depreciation of the copper assets that may happen over the

next 10 years, it'd be more than offset, both by appreciation in the fiber assets as well as the [tenant] capital improvement that Windstream continues to make in our network."  Mr. Wallace then gave his "bottom line": "the Windstream network is mission-critical to Windstream."

## VII.     WINDSTREAM'S INSOLVENCY

158.     Based on expert analysis performed following the Petition Date, Windstream was insolvent no later than the end of Q3 2017.

### A.     Growing competition and disruption in the telecommunications sector have challenged Windstream's business.

159.     Since before April 2015, significant shifts in customer preferences and competitive pricing in the telecommunications sector have been challenging Windstream's business.  Wired services providers, such as Windstream, have faced increased pressure as customers move away from voice services provided via copper-based landlines and move toward wireless voice and internet service offerings and high speed wired Internet services offerings allowing streaming and downloading of the ever-increasing amount of available digital content.

160.     Windstream recognized when structuring and entering into the Uniti Arrangement that it had to bolster its capital improvement spending to remain competitive against wireless competitors and cable competitors with high speed Internet services.  Windstream's existing copper-intensive network could not keep up with customer demand for faster Internet speeds absent significant investments in new technologies including fiber.

### B.     Windstream's financial performance declined.

161.     These business challenges resulted in Windstream's financial performance declining from 2013 to 2018, and Windstream's expert has determined that Windstream became

insolvent no later than the end of Q3 2017 based on the following financial metrics, among others.[5]

Those metrics reveal that Windstream was losing revenue and posting net losses year-over-year.

At the same time, Windstream's total debt and lease liabilities increased.

### 1.   Revenue and Income

162.    Windstream reported downward trends in revenue, operating income, and net income from 2013 to 2018—which Windstream's expert will opine are indicators of potential financial distress.  Windstream reported net losses since 2016, meaning that Windstream's total expenses were greater than total revenues.  The 2015 net income was primarily the result of a one-time $326 million gain on the sale of data centers that year.

| | Windstream Revenue, Operating Income, and Net Income ($ in millions) | | | | | |
|---|---|---|---|---|---|---|
| | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 |
| **Revenue** | $5,988.1 | $5,829.5 | $5,765.3 | $5,387.0 | $5,852.9 | $5,713.1 |
| **Operating Income** | $1,009.0 | $507.1 | $509.4 | $515.4 | ($1,593.5) | $296.6 |
| **Net income / (Loss)** | $241.0 | ($39.5) | $27.4 | ($383.5) | ($2,116.6) | ($723.0) |
| **% Change** | | | | | | |
| Revenue | | -2.65% | -1.10% | -6.56% | 8.65% | -2.39% |
| Revenue (excluding 2017 acquisitions) | | | | | -7.52% | |

163.    The revenue increase in 2017 was due to two acquisitions Windstream made that year.  Those acquisitions, however, did not result in total revenue growth in 2018.  As Moody's noted in March 2017, when it changed Windstream's ratings outlook from stable to negative, "Windstream may not be able to reverse its unfavorable operating trends."

164.    Further, in the run up to Q3 2017, Windstream reported net losses in each quarter from Q1 2016 to Q3 2017 (except for net income of $1.5 million for Q2 2016 primarily due to

---

[5]    All of the financial data reported in the Amended Complaint is based on the information reported in Windstream's public filings as of the date indicated.  These amounts do not reflect any restatements to the financial information that may have occurred after the initial public filing.  Windstream's expert has determined that any restatements occurring between 2013 and 2018 were either immaterial or as a result of changes in accounting pronouncements.

non-recurring gains). Windstream's operating income likewise declined across each quarter from Q1 2016 to Q3 2017 (except for Q2 2017, as a result of an acquisition completed by Windstream in Q1 2017).

### 2. OIBDA

165. Windstream uses OIBDA as the measure of its operating performance when presenting financial results to investors in SEC filings. OIBDA represents GAAP operating income, before goodwill impairment and depreciation and amortization. In supplemental schedules provided to its investors and contained on Windstream's website, Windstream also uses Adjusted OIBDAR, which further excludes certain items and Adjusted OIBDA, which adjusts for the Master Lease payments.

166. From 2013 to 2018, with the exception of the 2017 acquisitions, Windstream's Adjusted OIBDAR declined.

| | Windstream Operating Income to Adjusted OIBDA ($ in millions) | | | | | |
|---|---|---|---|---|---|---|
| | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 |
| Operating Income | $ 1,009.0 | $ 507.1 | $ 509.4 | $ 515.4 | $(1,593.5) | $ 296.6 |
| Depreciation and Amortization | 1,340.9 | 1,386.4 | 1,366.5 | 1,263.5 | 1,470.0 | 1,526.7 |
| Goodwill Impairment | - | - | - | - | 1,840.8 | - |
| **OIBDA** | **2,349.9** | **1,893.5** | **1,875.9** | **1,778.9** | **1,717.3** | **1,823.3** |
| Restructuring Charges | 9.6 | 35.9 | 20.7 | 20.3 | 43.0 | 45.0 |
| Adjustments per Investor Supplements | (41.4) | 210.5 | 151.5 | 114.5 | 249.3 | 106.6 |
| **Adjusted OIBDAR** | **2,318.1** | **2,139.9** | **2,048.1** | **1,913.7** | **2,009.6** | **1,974.9** |
| Master Lease Rent Payment | - | - | (446.0) | (653.6) | (653.5) | (655.7) |
| **Adjusted OIBDA** | **$ 2,318.1** | **$ 2,139.9** | **$ 1,602.1** | **$ 1,260.1** | **$ 1,356.1** | **$ 1,319.2** |

### 3. Balance Sheet

167. Windstream's balance sheet also declined. Windstream's liabilities began to exceed its assets in 2017, showing a decline in Windstream's equity.

| | Windstream Annual Balance Sheet ($ in million) | | | | | |
|---|---|---|---|---|---|---|
| | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 |
| **Assets** | $ 13,444.6 | $ 12,713.4 | $ 12,518.1 | $ 11,770.0 | $ 11,084.3 | $ 10,257.9 |
| Change, 2013-2018 | | | | | | (3,186.7) |
| | | | | | | -23.7% |
| **Liabilities** | $ 12,604.4 | $ 12,488.6 | $ 12,211.7 | $ 11,600.0 | $ 12,383.2 | $ 12,177.2 |
| Change, 2013-2018 | | | | | | (427.2) |
| | | | | | | -3.4% |
| **Equity / (Deficit)** | $ 840.2 | $ 224.8 | $ 306.4 | $ 170.0 | $ (1,298.9) | $ (1,919.3) |
| Change, 2013-2018 | | | | | | (2,759.5) |
| | | | | | | -328.4% |

### 4. Working Capital

168. As shown in the table below, Windstream's working capital was negative in each quarter from 2013 to 2018. In other words, Windstream's current liabilities exceeded its current assets. As a result, Windstream relied on availability under its revolver. Windstream's adverse court ruling and subsequent bankruptcy filing in February 2019 caused the acceleration of long-term debt.

| | Windstream Historical Working Capital ($ in millions) | | | |
|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 |
| **2013** | $ (990.3) | $ (218.6) | $ (351.1) | $ (260.8) |
| **2014** | (284.2) | (374.3) | (375.8) | (1,039.3) |
| **2015** | (290.4) | (102.9) | (174.7) | (391.8) |
| **2016** | (209.6) | (248.3) | (227.4) | (387.7) |
| **2017** | (337.9) | (300.9) | (302.5) | (610.9) |
| **2018** | (344.5) | (406.3) | (417.1) | (10,201.5) |

### 5. Revolver

169. Between 2013 and 2018, Windstream maintained a $1.25 billion revolver under its secured financing facility. Windstream's revolver availability declined from $1.1 billion at the end of the Q2 2016 to $129 million at Q3 2017. Windstream's expert will opine that the decline to $129 million at Q3 2017 is another indication of financial distress.

**6.** **Leverage**

170. The table below shows Windstream's total debt, including Master Lease obligations, from Q1 2013 to Q4 2018:

| | Windstream Total Debt and Lease Liabilities ($ in millions) | | | |
|---|---|---|---|---|
| | **Q1** | **Q2** | **Q3** | **Q4** |
| **2013** | $ 8,996.7 | $ 8,944.7 | $ 8,846.8 | $ 8,707.2 |
| **2014** | 8,706.3 | 8,685.6 | 8,661.1 | 8,651.7 |
| **2015** | 8,820.6 | 10,832.0 | 10,853.3 | 10,323.6 |
| **2016** | 10,561.4 | 9,822.3 | 9,906.3 | 9,864.2 |
| **2017** | 10,439.1 | 10,497.6 | 10,752.5 | 10,675.8 |
| **2018** | 10,734.3 | 10,626.4 | 10,431.7 | 10,371.2 |

171. Windstream's ratio of cash flows from operations as compared to its debt balance declined after the Uniti Arrangement. The following table shows the decline in cash flows from operations as compared with Windstream's debt balance.

| | Twelve Months Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **12/31/2013** | **12/31/2014** | **12/31/2015** | **12/31/2016** | **12/31/2017** | **12/31/2018** |
| **Net cash provided by operating activities** | **$1,519.4** | **$1,467.3** | **$1,026.6** | **$ 924.4** | **$ 950.7** | **$1,013.1** |
| Total debt | $8,707.2 | $8,651.7 | $5,170.5 | $4,863.6 | $5,843.9 | $5,728.1 |
| Master Lease obligation | - | - | 5,080.4 | 4,927.7 | 4,758.9 | 4,570.3 |
| Other lease obligations | - | - | 72.7 | 72.9 | 73.0 | 72.8 |
| **Total debt and lease obligations** | **$8,707.2** | **$8,651.7** | **$10,323.6** | **$9,864.2** | **$10,675.8** | **$10,371.2** |
| Net cash provided by operating activities *divided by* total debt and lease obligations | 17.4% | 17.0% | 9.9% | 9.4% | 8.9% | 9.8% |

172. As indicated in the following chart, the ratio of total debt, including the Master Lease obligation, to equity increased through 2016 as a result of increasing debt and decreasing equity balances. In 2017, as equity became negative, the ratio also became negative—which Windstream's expert will opine is an indication of financial distress.

46



**C.    Windstream's market capitalization and credit ratings declined.**

173.    As shown in the graph below, Holdings' stock price began falling in Q4 2016.  The below graph shows Holdings' stock price adjusted for Holdings' 1:5 reverse stock split in 2018 (*i.e.*, every five shares of old Holdings' stock became one share of new Holdings' stock).



174.    Further, Holdings' total market capitalization (*i.e.*, number of outstanding shares time prices) trended downwards, except for a temporary increase in 2017 when Windstream made

47

an acquisition. Even before the Aurelius allegations of default, Holdings' market capitalization was about one-third less than when Uniti was spun-off; and, following Aurelius' allegations, Holdings' market capitalization declined.



175. From 2013 to 2017, Windstream's credit ratings likewise fell. As of December 31, 2017, Moody's and S&P issued Windstream a corporate credit rating of B3 and B, respectively. As of December 31, 2018, Moody's and S&P issued Windstream a corporate credit rating of Caa1 and CCC+, respectively.

| | Moody's Credit Ratings | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 2/22/2019 |
| Senior secured credit rating | Ba2 | Ba2 | Ba3 | B1 | B2 | Caa1 | Caa3 |
| Senior unsecured credit rating | B1 | B1 | B2 | B2 | B3 | Caa2 | Ca |
| Corporate credit rating | Ba3 | Ba3 | B1 | B1 | B2 | Caa1 | Caa3 |
| Outlook | Stable | Stable | Stable | Stable | Negative | Negative | Negative |

| | S&P's Credit Ratings | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 2/22/2019 |
| Senior secured credit rating | BB+ | BB+ | BB | BB | BB- | B/CCC | CCC+ |
| Senior unsecured credit rating | B | B | B+ | B+ | B- | CCC- | C |
| Corporate credit rating | BB- | BB- | B+ | B+ | B | CCC+ | CCC- |
| Outlook | Stable | Stable | Stable | Stable | Negative | Developing | Negative |

48

**D.     Windstream became insolvent no later than the end of Q3 2017.**

176.    As a result of the decline in Windstream's financial performance as well as incorporating the market's reaction to Aurelius, Windstream's expert determined following the Petition Date that Windstream was insolvent no later than the end of Q3 2017 based on the three applicable legal tests: (a) the balance sheet test, which assesses Windstream's financial condition by comparing the sum of its debts to its property at a "fair valuation," (b) the ability to pay test, which assesses an entity's ability to pay its obligations as they become due in the ordinary course of operations, and (c) the unreasonably small capital test, which assesses an entity's ability to sustain its operations, service its debts, and meet other obligations over a reasonable period of time from the transfer date.

177.    Under the balance sheet test, Windstream's expert valued Windstream according to four separate methodologies at various times from 2015 to 2018 and then compared that valuation to the face value of Windstream's debt.  In particular, Windstream's expert reached the following opinions (which it continues to refine) with respect to Q3 2017 and onwards:

- Using a comparable companies method to determine a valuation multiple based on EBITDA, Windstream was insolvent since Q3 2017.

- Using Windstream's observable market value method to determine Windstream's capitalization, Windstream was insolvent since Q3 2017.

- Using the discounted cash flow ("DCF") method (*i.e.*, projecting future economic income and discounting to present), Windstream was insolvent on the December 31, 2017 testing date.

- Using the capitalized economic income ("CEI") method (*i.e.*, using contemporaneous economic income adjusted for nominal future growth and discounting to present), Windstream was insolvent in Q3 2017 and since Q1 2018.

178.    Also based on Windstream's declining financial performance, and the resulting impact on Windstream's working capital, revolver availability, debt levels, and leverage ratios among other factors, Windstream's expert will opine that Windstream was unable to pay its debts

as they became due and had unreasonably small capital no later than the end of Q3 2017. Facts and analysis supporting these findings include that (a) Windstream reported net losses in each quarter from the Q1 2016 through Q3 2017, except for 2Q16; (b) revolver availability declined from $1.1 billion at the end of the Q2 2016 to $129 million at Q3 2017; and (c) total equity declined from $1.1 billion on January 1, 2013 to a negative $1.9 billion by December 31, 2018.

## VIII. UNITI BREACHES THE MASTER LEASE AGREEMENT

179. Despite receiving excess benefits under the Master Lease, Uniti has not honored its limited obligations to Windstream. It was not Windstream's intent when creating Uniti and structuring the Master Lease for Uniti to become another competitor of Windstream's. Section 18.2 of the Master Lease, therefore, bars Uniti from acquiring companies within the geographic areas in which Windstream operates when those companies are "actively engaged in any business activity then actively being conducted" by Windstream. Yet that has been what Uniti has done through creative corporate structuring in an effort to circumvent the Master Lease.

180. Windstream unsuccessfully attempted to resolve these breaches, including pursuant to Section 41.15 of the Master Lease, in multiple communications with Uniti, including letters dated August 22, September 6, September 11, October 8, and November 5, 2018.

### A. Uniti improperly acquired six "Competitors."

181. Since entering into the Master Lease, Uniti Group, through subsidiary companies, engaged in at least six mergers or acquisitions of "Competitors" in clear violation of Section 18.2 of the Master Lease. Uniti did not seek, and Windstream did not give, its consent to any of the impermissible transactions.

182. First, in May 2016, CSL Bandwidth Inc. acquired PEG Bandwidth through merger.

183. In the year prior to Uniti's acquisition, PEG Bandwidth engaged in business operations actively being conducted by Windstream and is a "Competitor" of Windstream's under

50

the Master Lease. PEG Bandwidth owned and operated numerous towers and over 14,000 route miles of fiber optic cables providing telecommunications services, including in states where Windstream or its subsidiaries are licensed to operate. Uniti described its acquisition of PEG Bandwidth as a "fiber company acquisition," and noted that PEG Bandwidth "was primarily serving the carriers with fiber-to-the-tower backhaul." At the time of the acquisition, Windstream likewise provided fiber-to-the-tower backhaul services for carriers owning or renting space on the towers.

184. Second, in June 2016, CSL Fiber Holdings LLC, acquired Tower Cloud through merger.

185. In the year prior to Uniti's acquisition, Tower Cloud engaged in business operations actively being conducted by Windstream and is a "Competitor" of Windstream's under the Master Lease. Tower Cloud owned and operated towers and fiber optic cables providing telecommunications services, including in states where Windstream or its subsidiaries are licensed to operate. According to Uniti, Tower Cloud was the "largest provider of fiber-to-the-tower in the southeast United States." At the time of the acquisition, Windstream likewise provided fiber-to-the-tower services in the same geographic areas.

186. Third, in February 2017, Uniti Holdings LP acquired Hunt Telecom through merger.

187. In the year prior to Uniti's acquisition, Hunt Telecom engaged in business operations actively being conducted by Windstream and is a "Competitor" of Windstream's under the Master Lease. According to Uniti, Hunt Telecom "is a provider of data transport to K-12 schools and government agencies with a dense fiber network in Louisiana." At the time of Uniti's

acquisition, Windstream likewise provided data transport services in Louisiana where Windstream is licensed to operate.

188. Fourth, in April 2017, Uniti Fiber Holdings Inc. acquired all of the membership interests of Southern Light pursuant to a Membership Interest Purchase Agreement.

189. In the year prior to Uniti's acquisition, Southern Light engaged in business operations actively being conducted by Windstream and is a "Competitor" of Windstream's under the Master Lease. Southern Light owned and operated fiber optic cables providing telecommunications services, including in states where Windstream or its subsidiaries are licensed to operate. Uniti has described Southern Light as a "metropolitan dark and lit fiber infrastructure provider operating a 6,000+ route mile fiber network in 12 tier 2 and 3 markets." Windstream likewise operates a fiber optic network, both dark and lit, to provide telecommunications services to customers.

190. Fifth, in October 2018, Uniti Fiber acquired Information Transport Solutions, Inc. for cash consideration.

191. In the year prior to Uniti's acquisition, Information Transport Solutions engaged in business operations actively being conducted by Windstream and is a "Competitor" of Windstream's under the Master Lease. Information Transport Solutions "is a full service provider of technology solutions" for schools, universities, and government agencies and provides those services through use of telecommunications networks, including in states where Windstream or its subsidiaries are licensed to operate. Windstream likewise utilizes copper and fiber optic network to provide technology solutions for consumers, businesses, enterprise organizations, and wholesale customers across the United States.

52

192.     Sixth, in March 2019, Southern Light, LLC acquired JKM Consulting, Inc. (also known as M2 Communications) for cash consideration.

193.     In the year prior to Uniti's acquisition, JKM Consulting engaged in business operations actively being conducted by Windstream and is a "Competitor" of Windstream's under the Master Lease.  Master Lease § 2.1.  JKM Consulting owned and operated fiber optic cables providing telecommunications services, and Uniti has described JKM Consulting as "a local fiber provider located in Eastern Alabama," where Windstream is licensed to operate.  Windstream likewise operates a network to provide telecommunications services in this state.

194.     Upon information and belief, for all six of Uniti's mergers or acquisitions, in the year prior, the acquired companies did not derive over 90% of revenue from data hosting and storage services, managed services solutions for data hosting, IT infrastructure, security, operating system and software application management, or rent.  Instead, the majority of their revenue came from the provision of telecommunications services using fiber networks.

**B.     Uniti cannot use non-Landlord subsidiaries to circumvent the Master Lease.**

195.     Windstream believes that Uniti structured each of these mergers or acquisitions to circumvent the Master Lease's restrictive covenants.  Upon information and belief, each of these acquiring subsidiaries participated in these transactions at the direction of Uniti Group (the ultimate parent company) and its senior management as part of Uniti Group's plan to consummate the challenged acquisitions through entities not party to the Master Lease and thus attempt to evade the Master Lease's contractual obligations.

196.     In particular, the Landlord entities under the Master Lease are wholly owned subsidiaries of Uniti Group.  All benefits that the Landlord obtains under the Master Lease inures to Unit Group's benefit.

197.   Moreover, Uniti Group chose not to use the Landlord entities to effectuate the six acquisitions, but instead chose newly-created or recently-acquired entities.  This choice defeated the Master Lease's restrictive covenants, and thus Uniti engaged in these six acquisitions in a method designed to avoid use of Landlord entities to acquire Competitors but continue to allow Uniti Group to receive all benefits.

198.   Under these circumstances, Uniti's use of creative corporate structuring to circumvent the Master Lease cannot be honored.

199.   **Common ownership.**  Uniti Group sits atop Uniti's corporate structure, and it owns the Landlord entities and the non-Landlord entities that made the six acquisitions.  Windstream also understands that Uniti does not maintain separate headquarters across its corporate entities.

200.   **Overlapping boards of directors.**  Uniti's CFO did not believe that any Uniti entity has a separate board of directors from any other Uniti entity.

201.   **Common corporate minutes.**  Uniti's CFO could not identify any Uniti separate corporate minutes.

202.   **Common books and records.**  The books and records of all Uniti corporate entities are maintained in one "integrated" system.

203.   **Same branding.**  All Uniti entities use common Uniti branding (at least after a short period of time).

204.   For these reasons, though the acquiring entities are not named parties to the Master Lease, corporate formalities cannot be honored to allow Uniti's circumvention of the Master Lease, especially when Windstream pays Uniti for use of network assets in the form of rent payments.  Had Uniti used Landlord entities to make the six acquisitions, there would be no dispute that Uniti had breached Section 18.2 of the Master Lease.  Uniti's creative corporate structuring should not

54

permit another result when Windstream has nonetheless been forced to compete with Uniti, depriving Windstream of an essential benefit it received in exchange for the substantial consideration provided.

## IX. THE AURELIUS LITIGATION

205. In November 2017, U.S. Bank National Association, as indenture trustee (the "Indenture Trustee") (and at the behest of Aurelius, sued Services in the United States District Court for the Southern District of New York (the "Southern District of New York"). The Indenture Trustee alleged a default under the indenture governing Windstream's 6 3/8% senior unsecured notes due 2023 (the "6 3/8% Notes"). The Indenture Trustee and Aurelius asserted—more than two years after the Uniti Arrangement was executed—that the Uniti Arrangement constituted a prohibited "Sale and Leaseback Transaction" under the 6 3/8% Notes Indenture.

206. On December 7, 2017, Aurelius issued a notice of acceleration related to the 6 3/8% Notes.

207. Despite overwhelming support among Windstream's noteholders for the Uniti Arrangement, on February 15, 2019, the Southern District of New York issued an opinion in favor of one noteholder—Aurelius. It determined that Services and certain of its subsidiaries were direct or indirect tenants under the Master Lease, and found in relevant part that the Uniti Arrangement was a prohibited Sale and Leaseback Transaction under the 6 3/8% Notes Indenture and that Aurelius' December 2017 notice of acceleration was valid.

## X. WINDSTREAM'S BANKRUPTCY

208. Following the issuance of the Southern District of New York's opinion, Windstream filed for chapter 11 on February 25, 2019.

209. On July 19, 2019, CSL National and the Landlord Entities filed their *Objection of Uniti to Motion of UMB Bank, National Association and U.S. Bank National Association*

55

[Bankruptcy Docket No. 824]. Among other things, CSL National and the Landlord Entities asserted that the Master Lease is a "true lease."

210. During the chapter 11 cases, Uniti further has asserted to the Debtors that the Master Lease is a lease of "real property" subject to 11 U.S.C. § 365.

## FIRST CAUSE OF ACTION
### (Recharacterization)
### (Holdings and Services against Uniti Group, CSL National, and the Landlord Entities)

211. Holdings and Services reincorporate and reallege each of the allegations in paragraphs 1 through 210 as if fully set forth herein.

212. An actual controversy has arisen and now exists between Windstream and Uniti as to whether the Uniti Arrangement, including the Master Lease, creates a "lease" under the Bankruptcy Code or instead should be recharacterized as a financing arrangement. *See* 28 U.S.C. § 2201.

213. In uncovering financing arrangements disguised as leases, courts in this Circuit conduct a contextual analysis that scrutinizes the economic realities of the transaction. Here, there are multiple metrics, not limited to the below, establishing that the Uniti Arrangement was a disguised financing arrangement. The Uniti Arrangement allowed Windstream to raise $3.45 billion in cash and debt securities through leveraging its telecommunications networks.

214. First, no material residual value will remain once Windstream exits the Master Lease. Windstream intended to harvest all material value under the Master Lease. The evidence at trial, as shown in the graph below, will establish that: (a) the true Master Lease term is 20 years, if not longer, while (b) the remaining economic life and residual value in the leased telecommunications networks was set to expire in far less than an average of 28 years. These reasons squeeze residual value from either side: length of the Master Lease and life of the leased

56

19-08257-scc Doc 19-cv-00756-BSM Filed 01/22/20 Document 68-10 Entered 01/22/20 12:13:01 Filed 07/22/20 Main Document Page 58 of 68

Pg 57 of 67

networks.  Windstream just needs to prevail on one to establish that there is none of the residual value (shown in green) required for true leases.  Uniti instead has entered the "red zone," where remaining value is immaterial (less than 25%).



215.    Second, Uniti is not acting as an owner with an economic interest in the telecommunications network and that bears the economic risk of fluctuations in value.  Nor is Windstream acting as a tenant with a time-boxed interest in the leased assets.

- Uniti does not maintain or develop the leased networks.  Instead, the Master Lease is an aggressive form of a triple net lease, which places the burden on Windstream to, at its own cost, insure, maintain—and upgrade (through the TCI provisions)—the leased networks.  Master Lease §§ 4.1, 8.2, 9.1, 10.2.  No one who leases a car replaces the engine for free, and then agrees to pay more to continue leasing the car.  Tenants just do not upgrade leased assets for no consideration, as here.

- Uniti shifted the financial risk of destruction to Windstream through the Master Lease's "hell or high water" and condemnation clauses.  Master Lease §§ 5.1, 15.1(b).  Windstream as the "lessee" must continue to pay rent even if the networks are destroyed or condemned, despite bearing the loss from destruction being a classic indicator of ownership.  In other words, Uniti gets paid, making a return, even if the networks are destroyed or condemned.

- Windstream continues to own title to the easements and other real property interests.  As a result, Windstream had to account for the Master Lease as a financing with "rent" payments divided into principal and interest.  GAAP and the principles behind it reflect the true economic substance of the Uniti Arrangement, and Windstream will show at trial that GAAP is instructive when interpreting and understanding the term "lease" under the Bankruptcy Code.

57

216. Third, the Master Lease was not priced at market to be a lease. It includes an escalator to annual rent. Yet the leased networks are declining in value—not appreciating. Over the course of the initial term, therefore, Windstream's rent will grow by over $40 million while the leased networks plummet in value. Rent was not structured to match the value of the leased network over time. Rent instead was structured to ensure an adequate rate of return for Uniti, to mimic traditional REIT leases with appreciating assets, and to ensure robust dividends to Windstream's and Uniti's common investors.

217. Fourth, the Uniti Arrangement was structured so that Holdings would be the one purporting to lease the telecommunications networks from Uniti. Windstream did not structure the Uniti Arrangement to allow Uniti to lease the networks to someone else.

218. Further, even short of an entire recharacterization, small adjustments to the lease term and/or Ernst & Young's remaining useful economic life (referred to as "RUL" in the table below) conclusions support a partial recharacterization of almost all of the 36 properties under the Master Lease. The below table tests whether there is material residual value for each of the 36 properties based on increases to the true lease term and/or decreases to Ernst & Young's remaining economic life conclusion. It also applies for illustrative purposes Ernst & Young's valuation of each of the 36 properties.

219. Under each of the three tested scenarios, more than 80% of the properties should be recharacterized. Uniti thus should not be allowed to avoid recharacterization through the bundling of separate assets that, standing alone, would be recharacterized.

**Partial Recharacterization**

| No. | POD | E&Y RUL | 20 Year Term 5 Year RUL Decrease | 15 Year Term 10 Year RUL Decrease | 15 Year Term 15 Year RUL Decrease |
|---|---|---|---|---|---|
| 1 | AL-CLEC | 29.26 | Recharacterized | Recharacterized | Recharacterized |
| 2 | AL-ILEC | 26.44 | Recharacterized | Recharacterized | Recharacterized |
| 3 | AR-CLEC | 30.63 | | | Recharacterized |
| 4 | AR-ILEC | 28.31 | Recharacterized | Recharacterized | Recharacterized |
| 5 | CENTRAL-CLEC | 26.16 | Recharacterized | Recharacterized | Recharacterized |
| 6 | EAST-CLEC | 25.75 | Recharacterized | Recharacterized | Recharacterized |
| 7 | FL-CLEC | 26.48 | Recharacterized | Recharacterized | Recharacterized |
| 8 | FL-ILEC | 28.88 | Recharacterized | Recharacterized | Recharacterized |
| 9 | GA-CLEC | 26.48 | Recharacterized | Recharacterized | Recharacterized |
| 10 | GA-ILEC | 27.37 | Recharacterized | Recharacterized | Recharacterized |
| 11 | IA-CLEC | 27.78 | Recharacterized | Recharacterized | Recharacterized |
| 12 | IA-ILEC | 29.92 | Recharacterized | Recharacterized | Recharacterized |
| 13 | IL-CLEC | 28.67 | Recharacterized | Recharacterized | Recharacterized |
| 14 | IN-CLEC | 29.43 | Recharacterized | Recharacterized | Recharacterized |
| 15 | KY-CLEC | 31.09 | | | Recharacterized |
| 16 | KY-ILEC | 29.69 | Recharacterized | Recharacterized | Recharacterized |
| 17 | MI-CLEC | 27.27 | Recharacterized | Recharacterized | Recharacterized |
| 18 | MO-CLEC | 30.41 | | | Recharacterized |
| 19 | MO-ILEC | 28.4 | Recharacterized | Recharacterized | Recharacterized |
| 20 | MS-CLEC | 30.33 | | | Recharacterized |
| 21 | MS-ILEC | 28.58 | Recharacterized | Recharacterized | Recharacterized |
| 22 | NC-CLEC | 25.41 | Recharacterized | Recharacterized | Recharacterized |
| 23 | NC-ILEC | 26.83 | Recharacterized | Recharacterized | Recharacterized |
| 24 | NM-COMBINED | 26.85 | Recharacterized | Recharacterized | Recharacterized |
| 25 | OH-CLEC | 45.25 | | | |
| 26 | OH-ILEC | 25.42 | Recharacterized | Recharacterized | Recharacterized |
| 27 | OK-CLEC | 31.4 | | | Recharacterized |
| 28 | OK-ILEC | 26.69 | Recharacterized | Recharacterized | Recharacterized |
| 29 | PA-CLEC | 26.56 | Recharacterized | Recharacterized | Recharacterized |
| 30 | TN-CLEC | 28.81 | Recharacterized | Recharacterized | Recharacterized |
| 31 | TX-CLEC | 27.93 | Recharacterized | Recharacterized | Recharacterized |
| 32 | TX-ILEC | 27.14 | Recharacterized | Recharacterized | Recharacterized |
| 33 | VA-CLEC | 26.24 | Recharacterized | Recharacterized | Recharacterized |
| 34 | WEST-CLEC | 25.73 | Recharacterized | Recharacterized | Recharacterized |
| 35 | WI-CLEC | 28.8 | Recharacterized | Recharacterized | Recharacterized |
| 36 | VW-CLEC | 40.6 | | | |
| **Number of PODs Recharacterized** | | | 29 | 29 | 34 |
| **Recharacterization Value** | | | $6.296B | $6.296B | $7.193B |

220.    Additionally, Windstream expects discovery of Uniti's internal documents will uncover further evidence.  Indeed, Uniti's investor presentations alone show that it too understood that Windstream was going to harvest all material value from the Master Lease.  Uniti told investors that "Windstream is substantially dependent on network leased from Uniti for its business operations," and Windstream had limited options to transition away.  Further, even in these chapter 11 cases, Uniti conceded: "Windstream cannot fulfill those critical obligations [*i.e.*, "carrier of last resort," among other obligations] without access to the Leased Property."

59

221. For these reasons, Holdings and Services request a declaration that the Uniti Arrangement, including the Master Lease, does not constitute a "lease" under the Bankruptcy Code but instead should be recharacterized as a financing arrangement.

## SECOND CAUSE OF ACTION
### (Personal Property)
### (Holdings and Services against CSL National and the Landlord Entities)

222. Holdings and Services reincorporate and reallege each of the allegations in paragraphs 1 through 210 as if fully set forth herein.

223. An actual controversy has arisen and now exists between Windstream and Uniti as to whether the Master Lease creates a lease of "real property" under the Bankruptcy Code. *See* 28 U.S.C. § 2201.

224. Almost all of the value of the Transferred Assets came from copper wire and fiber optic cables as well as other outside plant equipment. As courts recognize, cables and this other equipment are "personal property"—not "real property."

225. For these reasons, Holdings and Services request a declaration that the Master Lease is not a lease of "real property" under the Bankruptcy Code, including 11 U.S.C. § 365.

## THIRD CAUSE OF ACTION
### (Constructive Fraudulent Transfer)
### (Holdings and Services against Uniti Group, CSL National, and the Landlord Entities)

226. Holdings and Services reincorporate and reallege each of the allegations in paragraphs 1 through 210 as if fully set forth herein.

**A. Windstream was insolvent as of at least the end of Q3 2017.**

227. Based on Windstream's expert's ongoing analysis of its financial condition, Windstream, under applicable law, became insolvent, inadequately capitalized, and/or unable to pay its debts as they came due at a point no later than the end of Q3 2017, and remained so at all

60

times thereafter through the Petition Date. As shown in Section VII above, Windstream's solvency

expert reached this conclusion based on an analysis of, among other factors:

- Windstream's declining revenue and income, including the total net losses since 2016;

- Windstream's balance sheet, which showed liabilities exceeding assets by more than one billion dollars by the end of 2017 and almost two billion dollars by the end of 2018;

- Windstream's declining revolver availability, which fell from $1.1 billion at the end of Q2 2016 to $129 at Q3 2017; and

- Windstream's market capitalization, which was over one billion dollars around the time of the spin, fell to less than $800 million by mid-2017 and then to around $400 million when Aurelius' involvement became known to the market (and fell further over the course of 2018).

228. Windstream's solvency expert continues to evaluate whether Windstream was

insolvent during one or more periods of time before the end of Q3 2017.

**B.** **Holdings and Services did not receive reasonably equivalent value under the Master Lease.**

229. Further, the Master Lease, once executed, locked Holdings into hundreds of

millions in rent overpayments, which Services (through distributions to Holdings) has been paying

since April 2015.

230. $650 million in annual rent—which will grow to more than $690 million in 2030—

was not market, nor was it intended to be. The parties instead chose a non-negotiated base rent

with an escalator to appease shareholders no longer receiving a Windstream dividend and to mimic

traditional REIT structures involving traditional real estate.

231. Rent was not set at market, and Windstream's annual rent plus consideration in the

form of Tenant Capital Improvements exceeded the fair market rent value of the "leased" networks

for at least four reasons:

232. First, the assets Windstream chose to transfer to Uniti did not support $650 million

in annual rent even at the commencement of the Master Lease. The $7.45 billion valuation was

too high from the outset, and multiple metrics supported a lower valuation. Windstream's copper-intensive networks, in short, were not worth that much, but Ernst & Young failed to apply a higher functional penalty and any economic obsolescence penalty. Ernst & Young also did not account for the value of the significant consideration Windstream agreed to provide Uniti in the form of TCI Replacements, even though Ernst & Young recorded that over half of Windstream's copper network was being replaced by fiber. Further, a lower market lease rate should have been applied.

233. Second, Windstream's overpayments grow with each passing year. The networks depreciate while rent grows under the escalator. Over the course of the initial term, annual rent will grow by more than $40 million (about 6%) while Ernst & Young found that the uninflated value of the networks will fall by more than two-thirds.

234. Third, Windstream should recover for its discretionary Tenant Capital Improvements that are forfeited to Uniti. Since the end of Q3 2017 through November 2019, Windstream's current estimate is that Services and its subsidiaries have made approximately $366 million in discretionary TCI Replacements—in particular, overbuilds, upgrades, and replacements of the networks, such as replacing copper wire cables with fiber optic cables. Windstream, however, has had to forfeit ownership of these Tenant Capital Improvements under the Master Lease for no consideration.

235. Uniti has acknowledged that it is aware that these gratuitous transfers of the discretionary Tenant Capital Improvements confer an unearned benefit on it. For example, in January 2018, Uniti's CFO explained that, "one of the features of the Windstream lease is that if they overbuild copper with fiber, then the fiber assets become ours and that's a very attractive feature of the lease that we've - that's been a real benefit to us since we were spun off." Uniti's

CFO further stated in June 2017 that "[s]ince the spin-off, we have actually inherited about $250 million of assets from Windstream overbuilding our copper network."

236. Under Section 10.2(c) of the Master Lease, Tenant Capital Improvements that constitute "maintenance, repair, overbuild, upgrade or replacement of the Leased Property … shall automatically become a part of the Leased Property," and thus belong to Uniti.

237. Fourth, Services and its subsidiaries receive no benefits for the transfers that it makes to Uniti (through Holdings). Services makes distributions to Holdings exactly equal to the amount of Holdings' "rent," which Holdings then transfers to Uniti.

238. Services and its subsidiaries also fund the Tenant Capital Improvements that are then forfeited to Uniti. Uniti then leases these forfeited assets back to Holdings, in exchange for the rent payments under the Master Lease, and Services receives no direct consideration from Uniti or Holdings in exchange for these transfers.

### C. Windstream's damages are hundreds of millions of dollars.

239. In advance of Master Lease payments being due, Services distributes funds to Holdings (for no consideration) for the purpose of Holdings making the payments. Holdings uses these funds to make these payments to Uniti.

240. Windstream has not received equivalent value under the Master Lease, either for its rent payments or the Tenant Capital Improvements that were discretionary but forfeited. These constitute constructive fraudulent transfers under at least Sections 544, 548, and 550 of the Bankruptcy Code and applicable New York state law, including N.Y. DCL §§ 273–74. Uniti should be liable for these transfers as either an initial transferee under Section 550(a)(1) of the Bankruptcy Code, or an immediate transferee of the initial transferee under Section 550(a)(2) of the Bankruptcy Code.

241. In total, Windstream has suffered hundreds of millions of dollars in damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Breach of Contract)
### (Holdings against Uniti Group, CSL National, and the Landlord Entities)

242. Holdings incorporates and realleges each of the allegations in paragraphs 1 to 210 above as if set forth fully herein.

243. At all relevant times hereto, the Master Lease was a valid contract between Holdings and Uniti.

244. Holdings has performed all of its obligations under the Master Lease and remains willing and able to perform future obligations.

245. Uniti, however, has willfully breached the Master Lease. Uniti has, among other things, merged with or acquired "Competitors" without Holdings' consent.

246. These breaches violate Section 18.2 of the Master Lease.

247. In addition, contracting parties have a duty of good faith and fair dealing in their performance and enforcement of contracts. The implied covenant of good faith and fair dealing is implicated whenever a party to a contract acts in a way that deprives another party the material benefits of the contract without a contractual basis for doing so.

248. Uniti has violated the implied covenant of good faith and fair dealing by engaging in conduct that deprived Holdings of material benefits under the Master Lease.

249. Holdings has satisfied all conditions precedent to seeking relief under the Master Lease, including under Section 41.15 thereof.

250. Holdings has suffered and continues to suffer damages as a result of the willful breaches of contract.

251.    Holdings, therefore, is entitled to monetary damages and/or an abatement of rent in an amount to be proven at trial.

[*Rest of Page Intentionally Left Blank*]

## PRAYER FOR RELIEF

WHEREFORE, Holdings and Services request that this Court enter judgment and granting

the following relief:

a.    A declaration that the Uniti Arrangement, including the Master Lease, does not create a "lease" under the Bankruptcy Code, including 11 U.S.C. § 365, and instead should be recharacterized as a financing arrangement;

b.    A declaration that the Master Lease does not create a lease of "real property" under the Bankruptcy Code, including 11 U.S.C. § 365;

c.    Avoidance of the constructive fraudulent transfers;

d.    Recovery of the property fraudulently transferred, or damages in an amount to be determined at trial for the value thereof, from the direct and indirect transferees;

e.    A declaration that Uniti breached the Master Lease;

f.    An abatement of rent in an amount to be proven at trial under the Master Lease;

g.    Damages in an amount to be proven at trial against Uniti for its breaches of the Master Lease;

h.    Attorneys' fees, costs, and expenses incurred in this Adversary Proceeding, including pursuant to Section 37.1 of the Master Lease;

i.    Pre and post-judgment interest up to the statutory maximum; and

j.    Any other relief that this Court may deem just, proper, or equitable under the circumstances.

Dated: January 22, 2020          */s/ Stephen E. Hessler, P.C.*
New York, New York               Stephen E. Hessler, P.C.
                                 Marc Kieselstein, P.C.
                                 **KIRKLAND & ELLIS LLP**
                                 **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                 601 Lexington Avenue
                                 New York, New York 10022
                                 Telephone:    (212) 446-4800
                                 Facsimile:    (212) 446-4900

                                 - and -

                                 James H.M. Sprayregen, P.C.
                                 Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
                                 Brad Weiland (admitted *pro hac vice*)
                                 Richard U.S. Howell (admitted *pro hac vice*)
                                 Yates M. French (admitted *pro hac vice*)
                                 Ravi S. Shankar (admitted *pro hac vice*)
                                 **KIRKLAND & ELLIS LLP**
                                 **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                 300 North LaSalle Street
                                 Chicago, Illinois 60654
                                 Telephone:    (312) 862-2000
                                 Facsimile:    (312) 862-2200

                                 *Counsel to the Debtors and Debtors in Possession*