**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

| | |
|---|---|
| IN RE UNITI GROUP INC. SECURITIES LITIGATION | No. 4:19-cv-00756-BSM |

**OPENING BRIEF IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ........................................................................................................................ 4

      A.    Uniti's Spinoff from Windstream and Master Lease ............................................. 4

      B.    Uniti's Public Disclosures.................................................................................... 7

      C.    The Aurelius Litigation Against Windstream......................................................... 9

      D.    Windstream's Bankruptcy Proceedings............................................................... 10

      E.    Plaintiffs' Lawsuit............................................................................................. 12

LEGAL STANDARDS ............................................................................................................ 12

ARGUMENT ........................................................................................................................... 13

I.      PLAINTIFFS HAVE FAILED TO STATE A SECTION 10(b) CLAIM UNDER
RULE 10b-5(b) (COUNT I) .......................................................................................... 13

      A.    Plaintiffs Fail to Plead Any Actionable Omission or Misstatement ..................... 14

            1.    No Actionable Omission.......................................................................... 15

            2.    No Actionable Misstatement.................................................................... 22

      B.    Plaintiffs Fail to Plead a Strong Inference of Scienter........................................ 25

            1.    Plaintiffs' Scienter Allegations Are Implausible .................................... 25

            2.    Plaintiffs Have Failed to Plead Motive..................................................... 26

            3.    The Complaint's Own Allegations Affirmatively Refute Any
Claim of Fraudulent Intent or Recklessness ............................................ 28

      C.    Plaintiffs Have Failed to Plead Loss Causation.................................................... 34

      D.    Plaintiffs' Claims Concerning the Sale-Leaseback Covenant Are Untimely ....... 38

II.      PLAINTIFFS HAVE FAILED TO STATE A SECTION 10(b) CLAIM UNDER
RULE 10b-5(a) OR (c) (COUNT II) ............................................................................ 39

III.      PLAINTIFFS HAVE FAILED TO STATE A CONTROL PERSON CLAIM
UNDER § 20(a) (COUNT III).................................................................................... 41

CONCLUSION........................................................................................................................ 41

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*In re 2007 Novastar Fin. Sec. Litig*,
  579 F.3d 878 (8th Cir. 2009) ....................................................................... 13, 14

*Abbott Labs. v. Adelphia Supply USA*,
  2017 WL 6014322 (E.D.N.Y. Aug. 14, 2017) ..................................................... 17

*In re AMDOCS Ltd. Sec. Litig.*,
  390 F.3d 542 (8th Cir. 2004) ............................................................................. 23

*In re Apogee Enters., Inc. Sec. Litig.*,
  2020 WL 1445856 (D. Minn. Mar. 25, 2020) ....................................................... 28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................... 12, 25

*Barnes v. Oldner*,
  259 F. Supp. 3d 926 (E.D. Ark. 2017) ........................................................... 40, 41

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ........................................................................................ 15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................ 12

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
  506 F. App'x 32 (2d Cir. 2012) ......................................................................... 15

*In re Cerner Corp. Sec. Litig.*,
  425 F.3d 1079 (8th Cir. 2005) ...................................................................... 13, 27

*In re Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004) ................................................................ 16

*Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*,
  519 F.3d 778 (8th Cir. 2008) ........................................................................ 25, 28

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
  934 F. Supp. 2d 1219 (C.D. Cal. 2013) ............................................................... 33

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ........................................................................... 24

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)) ....................................................................................... 34

ii

*Elam v. Neidorff*,
544 F.3d 921 (8th Cir. 2008) ............................................................................... 29

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
68 F. Supp. 3d 530 (S.D.N.Y. 2014) ................................................................... 39

*Graham v. Catamaran Health Sols. LLC*,
940 F.3d 401 (8th Cir. 2017) ............................................................................ 5, 24

*Hood v. United States*,
152 F.2d 431 (8th Cir. 1946) ................................................................................. 5

*Horizon Asset Mgmt. v. H & R Block, Inc.*,
580 F.3d 755 (8th Cir. 2009) ............................................................................... 14

*In re Hutchinson Tech., Inc., Secs. Litig.*,
536 F.3d 952 (8th Cir. 2008) ............................................................................. 3, 41

*In re IBM Corp. Sec. Litig.*,
163 F.3d 102 (2d Cir. 1998) ................................................................................ 14

*Julianello v. K-V Pharm. Co.*,
791 F.3d 915 (8th Cir. 2015) ..................................................................... 23, 24, 25

*In re K-tel Int'l, Inc. Sec. Litig.*,
300 F.3d 881 (8th Cir. 2002) ..................................................................... 15, 27, 28

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) ................................................................................ 26

*Kowal v. MCI Commc'ns Corp.*,
16 F.3d 1271 (D.C. Cir. 1994) ............................................................................. 22

*Kushner v. Beverly Enters., Inc.*,
317 F.3d 820 (8th Cir. 2003) ......................................................................... *passim*

*Lucke v. Wells Fargo Bank, N.A.*,
2014 WL 12601035 (D. Minn. Apr. 2, 2014) ...................................................... 33

*McAdams v. McCord*,
584 F.3d 1111 (8th Cir. 2009) ......................................................................... 34, 35

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
2011 WL 4389689 (C.D. Cal. May 5, 2011) ....................................................... 33

*In re Medtronic Inc., Sec. Litig.*,
618 F. Supp. 2d 1016 (D. Minn. 2009) ............................................................ 29, 31

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010) ............................................................................................ 38

iii

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ................................................................. 36 , 37

*Miller v. Redwood Toxicology Lab., Inc.*,
688 F.3d 928 (8th Cir. 2012) ............................................................................ 5

*In re NAHC, Inc. Sec. Litig*,
306 F.3d 1314 (3d Cir. 2002) ......................................................................... 20

*In re Navarre Corp. Sec. Litig.*,
299 F.3d 735 (8th Cir. 2002) ..................................................................... 1, 13

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ......................................................................... 26

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ...................................................................................... 22

*In re Omnicom Grp., Inc. Sec. Litig.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008) ........................................................... 36

*In re OSG Sec. Litig.*,
2015 WL 3466094 (S.D.N.Y. May 29, 2015) ................................................ 35

*Parnes v. Gateway 2000*,
122 F.3d 539 (8th Cir. 1997) ......................................................................... 23

*Patel v. Parnes*,
253 F.R.D. 531 (C.D. Cal. 2008) ................................................................... 15

*Pet Quarters, Inc. v. Badian*,
2006 WL 827331 (E.D. Ark. Mar. 29, 2006) ................................................. 27

*Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*,
545 F. Supp. 2d 845 (E.D. Ark. 2008) ............................................................ 5

*Podraza v. Whiting*,
790 F.3d 828 (8th Cir. 2015) ..................................................................... 5, 28

*Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) .......................................................................... 16

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
679 F.3d 972 (8th Cir. 2012) ..................................................... 3, 13, 39, 40, 41

*Rand-Heart of N.Y., Inc. v. Dolan*,
812 F.3d 1172 (8th Cir. 2016) .......................................................... 34, 35, 36, 37

*RSM Prod. Corp. v. Fridman*,
643 F. Supp. 2d 382 (S.D.N.Y. 2009) ............................................................ 33

*Rubke v. Capitol Bancorp, Ltd.*,
  551 F.3d 1156 (9th Cir. 2009) ........................................................................ 19

*Schaaf v. Residential Funding Corp.*,
  517 F.3d 544 (8th Cir. 2008) .......................................................................... 34

*Scott v. Pub. Sch. Ret. Sys. of Mo.*,
  764 F. Supp. 2d 1151 (W.D. Mo. 2011) ......................................................... 12

*SEC v. Quan*,
  2013 WL 5566252 (D. Minn. Oct. 8, 2013) .............................................. 40, 41

*Seibert v. Sperry Rand Corp.*,
  586 F.2d 949 (2d Cir. 1978) ........................................................................... 19

*In re Sofamor Danek Grp., Inc.*,
  123 F.3d 394 (6th Cir. 1997) .......................................................................... 16

*St. Croix Waterway Ass'n v. Meyer*,
  178 F.3d 515 (8th Cir. 1999) .......................................................................... 12

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
  552 U.S. 148 (2008) ......................................................................................... 1

*In re Stratasys Ltd. S'holder Sec. Litig.*,
  864 F.3d 879 (8th Cir. 2017) .......................................................................... 18

*Swaffar v. Catholic Health Initiatives, Inc.*,
  2005 WL 8164785 (E.D. Ark. Dec. 12, 2005) ............................................... 12

*In re Target Corp. Sec. Litig.*,
  955 F.3d 738 (8th Cir. 2020) .................................................................. *passim*

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ........................................................................... 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................... 1, 3, 25

*U.S. Bank Nat'l Ass'n v. Windstream Servs., LLC*,
  2019 WL 948120 (S.D.N.Y. Feb. 15, 2019) .................................................... 9

*Zaluski v. United Am. Healthcare Corp.*,
  527 F.3d 564 (6th Cir. 2008) .......................................................................... 17

*Zarecor v. Morgan Keegan & Co.*,
  801 F.3d 882 (8th Cir. 2015) .......................................................................... 39

## STATUTES & RULES

11 U.S.C. § 365 ................................................................................................................ 21

15 U.S.C. § 78u-4 ....................................................................................................... *passim*

15 U.S.C. § 78u-5 ............................................................................................................ 23

## OTHER AUTHORITIES

5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357
(3d ed. 2004) ..................................................................................................................... 5

Defendants Uniti Group Inc. ("Uniti"), Kenneth A. Gunderman, and Mark A. Wallace (collectively, "Defendants") respectfully submit this brief in support of their motion to dismiss the Consolidated Amended Complaint (ECF No. 62) (the "Complaint" or "CAC") pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## <u>PRELIMINARY STATEMENT</u>

This is a federal securities case brought against a company for failing to predict the future. Plaintiffs filed this putative class action lawsuit against Uniti and two of its officers when Uniti's stock price dropped in 2019 after two different and unexpected litigation events. The first was a court ruling in a case against Uniti's largest customer (and former corporate parent), which led to that customer's bankruptcy; Uniti was not even a party to that case. The second occurred after the same customer later opportunistically tried to sue Uniti in its bankruptcy proceedings. As so often happens when a company's stock price drops, securities litigation followed: Plaintiffs worked backwards from these two litigation events to bring this case, alleging in hindsight that Uniti's public statements between 2015 and 2017 were somehow misleading because Uniti did not predict these later litigation events.

Plaintiffs' allegations fail to state a claim under the heightened pleading standards of the PSLRA, which Congress enacted to prevent exactly this type of "fraud by hindsight" claim. *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 742 (8th Cir. 2002). Before the PSLRA's enactment, plaintiffs often employed securities fraud actions "abusively to impose substantial costs on companies . . . whose conduct conform[ed] to the law." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). To address these abuses, the PSLRA imposes a "heightened pleading" requirement. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 165 (2008). Among other things, the PSLRA requires that plaintiffs asserting a securities fraud claim

1

plead with particularity each statement alleged to be misleading and the reasons why the statements are misleading, 15 U.S.C. § 78u-4(b)(1), as well as "facts giving rise to a *strong inference* that the defendant acted with" scienter, i.e., an intent to deceive. *Id.* § 78u-4(b)(2)(A) (emphasis added).

The Complaint does not meet either of these standards. It should be dismissed for several independent reasons.

*First*, Plaintiffs have failed to identify any actionable misstatement or omission or to plead with particularity the reasons why any of Defendants' public statements were misleading. 15 U.S.C. § 78u-4(b)(1). Plaintiffs' central premise is that Uniti did not sufficiently disclose two future legal risks: (1) that a court might someday reach the legal conclusion that Uniti's spinoff from and publicly-disclosed lease with its former parent and largest customer—non-party Windstream Holdings, Inc.—violated a publicly-disclosed covenant in the bonds of a Windstream subsidiary, leading to Windstream's bankruptcy; and (2) that Windstream's bankruptcy estate might choose to bring an opportunistic litigation against Uniti, claiming—in contrast to Windstream's express representations in the parties' lease—that the lease was somehow not a "true lease." It is well established, however, that defendants have no duty to disclose these kinds of speculative litigation risks—classic "soft information" that is not actionable unless it is "virtually . . . certain" to occur. *Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820, 831 (8th Cir. 2003). And in any event, Plaintiffs cannot identify anything that was actually misleading about any of Defendants' statements, especially since all of the underlying relevant documents were publicly disclosed.

*Second*, Plaintiffs fail to meet their burden under the PSLRA to plead facts that give rise to a "strong inference" that Defendants acted with scienter in allegedly failing to disclose such risks. As the Supreme Court has instructed, a "strong" inference must be "cogent and at least as

2

compelling as any opposing inference one could draw from the facts alleged" after "consider[ing] plausible, nonculpable explanations for the defendant's conduct." *Tellabs*, 551 U.S. at 324. Here, Plaintiffs' entire theory is implausible, as it depends on the assumption that Windstream and Uniti intentionally exposed themselves to the risk of bankruptcy and potential "financial ruin" (CAC ¶ 9) for no apparent reason. In fact, the very documents and testimony on which Plaintiffs rely to support their scienter allegations affirmatively *refute* any inference of scienter. Far from supporting such an inference, these materials make clear that those involved in structuring the lease were not seeking to mislead, but instead were properly focused on working closely with experienced legal and accounting advisors to ensure that the transactions did not violate Windstream's bonds and that the lease was a "true lease." Plaintiffs have pled no facts that would support the slightest inference, much less the requisite strong inference, that any defendant intended to mislead anyone about anything.

*Third,* Plaintiffs have not adequately pleaded "loss causation"—i.e., that Defendants' alleged misrepresentations caused their losses. And, *finally*, certain of Plaintiffs' allegations are time-barred because they were brought more than two years after a reasonably diligent investor would have discovered them.

Plaintiffs' remaining claims for scheme liability and control person liability should also be dismissed. The scheme liability claim fails because it is duplicative of Plaintiffs' primary fraud claim and Plaintiffs' therefore have not identified any conduct "beyond" Defendants' alleged misrepresentations and omissions that could support a scheme liability claim. *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 980 (8th Cir. 2012). And the control person liability claim fails because Plaintiffs have not pleaded a primary violation of the securities laws. *See In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 961 (8th Cir. 2008)

Accordingly, the Complaint should be dismissed in its entirety, with prejudice.

3

## BACKGROUND

### A.      Uniti's Spinoff from Windstream and Master Lease

Uniti was created in April 2015 when it was spun off as an independent company from its former corporate parent, Windstream Holdings, Inc. ("Windstream Holdings").  CAC ¶¶ 52-53. Windstream Holdings is a publicly traded company that operates telecommunications networks. *Id.* ¶ 3.  Following the spinoff, Uniti (originally known as Communications Sales & Leasing, Inc.)[1] became an independent, publicly traded telecommunications company (organized as a publicly traded real estate investment trust ("REIT")) that owns telecommunications networks, which it then leases to companies like Windstream.  *Id.* ¶ 52.

As part of the spinoff, Windstream Services, LLC ("Windstream Services" and, together with Windstream Holdings, "Windstream"), a subsidiary of Windstream Holdings, caused its operating subsidiaries to convey fiber and copper fiber network assets to Uniti.  *Id*. ¶¶ 53-54, 59. At the same time, a Uniti affiliate entered into a master lease with Windstream Holdings (the "Master Lease"), pursuant to which Windstream Holdings leased those assets from Uniti.  *Id.* ¶¶ 54, 59.

Before the spinoff, Windstream Services had issued debt securities (i.e., bonds) to investors.  The bond indentures (i.e., the agreements governing the terms of the debt securities) included a provision prohibiting Windstream Services or its operating subsidiaries from entering into a so-called "Sale and Leaseback Transaction," which was defined specifically as a "transaction involving any of the assets or properties of *such Person . . .* , whereby *such Person* sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties" to be used for the same purpose as the assets or properties that were sold.  *Id.* ¶¶ 69-

---

[1] For ease of reference, Defendants refer to Communications Sales & Leasing, Inc. as Uniti throughout this brief.

72 (emphasis added).  In other words, the covenant precluded a transaction in which Windstream Services or any of its operating subsidiaries sold or transferred assets and then the *same entity* leased the assets back.

The Complaint itself concedes that Windstream worked with its outside advisors to ensure that the spinoff and Master Lease would not violate the sale-leaseback provision.  *Id.* ¶¶ 11, 75, 86, 103.  In particular, Windstream sought to avoid that restriction by making Windstream *Holdings* the counterparty to the lease, since that entity (unlike Windstream Services and its operating subsidiaries) was not a party to the relevant indentures or restricted by their covenants, and was also not the entity that sold or transferred the assets to Uniti (a requirement to meet the definition of "Sale and Leaseback Transaction" under Windstream's debt covenants).  *Id.* ¶¶ 11, 75-76, 86.

Internal Windstream documents—all of which are cited in the Complaint and therefore can be considered in their entirety on this motion[2]—confirm that neither Windstream nor Defendants believed that the spinoff or Master Lease violated the indentures.  For example, an April 2013 internal email between two Windstream executives recognized that Windstream "need[ed] a capital structure that *works* with the Indenture," and suggested that the spinoff be structured accordingly.  *Id.* ¶¶ 11, 75 (emphasis added).  Consistent with that objective, materials prepared for a Windstream board meeting in early May 2014, at which Defendant Gunderman

---

[2] In ruling on a Rule 12(b)(6) motion to dismiss, courts may consider the contents of documents that are cited in the complaint.  *See Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) ("While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider 'matters incorporated by reference or integral to the claim . . .' without converting the motion into one for summary judgment." (quoting 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004)).  The Court also "may take judicial notice of filings of public record," including SEC filings, *Graham v. Catamaran Health Sols. LLC*, 940 F.3d 401, 405 n.1 (8th Cir. 2017) (citing *Podraza v. Whiting*, 790 F.3d 828, 833 (8th Cir. 2015)), and court filings, *Hood v. United States*, 152 F.2d 431, 435 (8th Cir. 1946) (federal district court may take judicial notice of proceedings from another federal district court); *see also Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 545 F. Supp. 2d 845, 847 (E.D. Ark. 2008) (holding that SEC releases, briefs and opinions of other jurisdictions, and public disclosures filed with the SEC "are the types of matters that are not subject to dispute and must be judicially noticed"), *aff'd*, 559 F.3d 772 (8th Cir. 2009).

5

was present as a financial advisor to Windstream (*id.* ¶¶ 81-82), explained in connection with the proposed spinoff that the "lease obligation will be at OpCo/HoldCo, [the] sale-leaseback covenant [is] not implicated at Windstream" and therefore "the contemplated transaction can likely be done without consents/waiver under the indentures" (Ex. A at 50).[3] An August 2014 email between Windstream executives echoed that conclusion, explaining that Windstream did "not believe that the Windstream indentures require any consents or waivers to effect the transaction" and that because "the lease is being implemented at Windstream Holdings, it does not impact any covenants in the Windstream indentures, including the sale-leaseback provisions." CAC ¶¶ 92-93. And in November 2014, Windstream's then-Treasurer told Kentucky regulators that Windstream "had no concerns with any covenants within its indentures." *Id.* ¶ 99. The Complaint does not allege any basis to conclude that anyone at Uniti ever had a different view.

In addition to structuring the Master Lease to avoid violating Windstream's "Sale and Leaseback" covenant, Windstream and Uniti also sought to ensure that the Master Lease would meet the requirements of a "true lease" so that Uniti would qualify as a REIT, an essential objective of the spinoff. CAC ¶ 65. Among other things, Windstream engaged the well-known law firm Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to provide a legal opinion to Uniti that the Master Lease constituted a "true lease." *Id.* ¶¶ 128-29, 135. Windstream also engaged the "Big Four" accounting firm Ernst & Young, LLP ("E&Y") to provide it with, among other things, an independent appraisal of the useful life of the leased assets—a relevant factor in determining whether the Master Lease could be considered a "true lease." *Id.* ¶¶ 83, 85, 128. E&Y concluded, among other things, that the leased copper assets (constituting 80% of the

---

[3] "Ex. __" refers to the Exhibits attached to Defendants' Motion to Dismiss the Consolidated Amended Complaint, filed herewith.

network assets transferred to Uniti) had a total useful life of over 40 years, greater than the Master Lease's initial term, which factored into Skadden's "true lease" opinion. *Id.* ¶¶ 129-30. Consistent with the conclusion of its expert legal and accounting advisors, Windstream itself expressly represented in the Master Lease that the lease "is a 'true lease,' [and] is not a financing lease . . . or other financing or trust arrangement." Ex. B, Ex. 10.1 § 6.1(a). Windstream also expressly agreed to "waive[] any claim or defense based upon the characterization of this Master Lease as anything other than a true lease and . . . not to challenge the validity, enforceability or characterization of the lease of the Leased Property as a true lease." *Id.* § 6.1(e).

### B.    Uniti's Public Disclosures

Before and after the April 2015 spinoff, Uniti made robust public disclosures regarding the Master Lease, the spinoff, and Uniti's business. For example, Uniti filed an initial information statement (the "Information Statement") with the Securities and Exchange Commission ("SEC") on March 26, 2015, describing the terms of the spinoff and Master Lease. *See* CAC ¶¶ 142-43; Ex. C, Ex. 99.1. Uniti also disclosed the Master Lease itself in full. *See* Ex. B, Ex. 10.1. Consistent with the terms of the Master Lease, the Information Statement disclosed that "[t]he subsidiaries of Windstream Holdings will have the right to use, occupy and operate the Distribution Systems and discharge any of Windstream Holdings' obligations under the Master Lease." Ex. C, Ex. 99.1 at 104. It further disclosed that "[a]ll of [Windstream Holdings'] operations are conducted by its wholly owned subsidiary," Windstream Services, and by Windstream Services' "direct and indirect wholly owned subsidiaries." *Id.* at 1.

These disclosures were consistent with public representations that Plaintiffs allege that Windstream made in connection with obtaining regulatory approval for the spinoff. In particular, the Complaint alleges that Windstream represented to regulators that, "although Uniti would actually own the network assets after the Spin-Off, there would be no functional change to

7

the status quo, because those assets would continue to be operated by the Windstream Operating Subsidiaries," for their "exclusive use and benefit."  CAC ¶¶ 91, 95-96.[4]

Uniti also disclosed that there were risks attendant to the spinoff.  For example, Uniti disclosed that "[d]isputes with third parties could also arise out of" the spinoff, and that it "could experience unfavorable reactions to the Spin-Off from" various constituencies, including "lenders" and "interested parties."  *Id.* ¶ 146 (quoting Information Statement).  Uniti further disclosed that, following the spinoff, "Windstream will be our only tenant" and that, as a result, Uniti would "be dependent on Windstream Holdings to make payments to [Uniti] under the Master Lease, and an event that materially and adversely affects Windstream's business, financial position or results of operations could materially and adversely affect [Uniti's] business, financial position or results of operation."  *Id.* ¶¶ 147-48.

Finally, Uniti specifically disclosed the risk that the Master Lease might "not [be] respected as a true lease for U.S. federal income tax purposes" and could be "instead treated as a service contract, joint venture or some other type of arrangement," in which case, as Uniti warned, it "may fail to qualify as a REIT."  Ex. C, Ex. 99.1 at 23.

---

[4] The statements made by Windstream to regulators that are cited in the Complaint (CAC ¶ 96) were all publicly available. *See, e.g.*, Alabama Application for Approval, Ala. Pub. Serv. Comm'n (Jul. 31, 2014), https://www.pscpublicaccess.alabama.gov/pscpublicaccess/PSC/ PSCDocumentDetailsPage.aspx?DocumentId=30e28213-bc65-4dbc-8751-7ab4d21903bb&Class=Filing; Georgia Application for Declaratory Ruling, Ga. Pub. Serv. Comm'n (Aug. 12, 2014), https://psc.ga.gov/search/facts-document/?documentId=154714; Kentucky Application, Ky. Pub. Serv. Comm'n (Aug. 7, 2014), https://psc.ky.gov/PSCSCF/2014%20cases/2014-00283/20140807_Windstream%20Kentucky%20East%20and% 20Windstream%20Kentucky%20West_Application.pdf;  Kentucky Application Hearing Transcript, Ky. Pub. Serv. Comm'n (Nov. 13, 2014), https://psc.ky.gov/PSCSCF/2014%20cases/2014-00283/20141126_Windstream%20Kentucky%20Hearing%20Transcript.pdf; North Carolina Request for Declaratory Ruling, N.C. Util. Comm'n (Aug. 4, 2014), https://starw1.ncuc.net/NCUC/ViewFile.aspx?Id=5f92c2c3-da47-463c-b15f-9852db2a6418; Ohio Application to Transfer Assets, Ohio Pub. Util. Comm'n (Aug. 19, 2014), https://dis.puc.state.oh.us/TiffToPDf/A1001001A14H19B45338A50782.pdf; West Virginia Petition for Approval, W. Va. Pub. Serv. Comm'n (Aug. 29, 2014), http://www.psc.state.wv.us/scripts/WebDocket/ViewDocument.cfm? CaseActivityID=406218&NotType=%27WebDocket%27.

### C.    The Aurelius Litigation Against Windstream

In August 2017, more than two years after Uniti's spinoff, rumors surfaced that the hedge fund Aurelius Capital Master, Ltd. ("Aurelius") was acquiring Windstream debt in order to pursue claims that the spinoff and Master Lease violated the Sale and Leaseback covenant in Windstream's indentures. CAC ¶ 172. Plaintiffs do not allege that, prior to these reports in August 2017, Defendants—or anyone else—believed that such a lawsuit was likely, much less that it would succeed.

On October 12, 2017, the indenture trustee filed suit against Windstream, at Aurelius' direction, claiming, based entirely on public information, that the spinoff and Master Lease breached the "Sale and Leaseback" covenant in Windstream's debt indentures. *Id.* ¶ 181. None of the Defendants in this action were named as defendants in or were otherwise parties to that lawsuit. Windstream vigorously disputed Aurelius' claims, arguing, among other things, that the covenant prohibiting "Sale and Leaseback Transactions" did not apply by its plain terms because Windstream Holdings (the lessee under the Master Lease) was not a party to the indentures and was a different "Person" than the operating subsidiaries that sold the assets to Uniti. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Windstream Servs., LLC*, 2019 WL 948120, at *16 (S.D.N.Y. Feb. 15, 2019). Windstream Services also counterclaimed, seeking a declaration that the spinoff did not breach the indenture's restrictive covenants. CAC ¶ 182. Consistent with Windstream's position at all times (including in statements it had made at the time of the spinoff), Defendants Gunderman and Wallace stated that they believed there was a "good likelihood" that Windstream would prevail in the litigation and that the legal arguments were on Windstream's side. *Id.* ¶¶ 21-22, 184-89, 194-98. Uniti acknowledged, however, the possibility that Aurelius could prevail, even if Uniti believed the probability of such an outcome was "low," and explained that even in such a "downside scenario," Uniti believed it would be "as protected as any landlord can

9

be." *Id.* ¶ 21; *see also id.* ¶ 195 (explaining that "there's always some risk").

On February 15, 2019, the court ruled against Windstream, finding, among other things, that the spinoff and Master Lease breached Windstream Services' debt indenture; the court also declared over $300 million of its notes immediately due and payable. *Id.* ¶¶ 201-04. Plaintiffs concede that the ruling came as "shocking news" (*id.* ¶ 206), with one independent analyst at Morgan Stanley describing it as a "surprise court defeat" for Windstream (*id.* ¶ 260).

### D.     Windstream's Bankruptcy Proceedings

On February 25, 2019, ten days after the court's ruling in favor of Aurelius, Windstream Holdings filed for bankruptcy. *Id.* ¶ 208. On February 27, 2019, Uniti issued a press release commenting on the bankruptcy. *Id.* ¶ 209. Mr. Gunderman stated in the press release that Uniti continued to "closely monitor Windstream's situation," "believe[d] [Windstream] will successfully navigate through the reorganization process," and was "pleased to see Windstream state its intent to continue operations in the ordinary course and pay in full its service providers" (e.g., the ongoing rent payments owed to Uniti). *Id.* A few weeks later, during a conference call with analysts and investors to discuss Uniti's 2018 financial results, Mr. Gunderman stated that "we believe we now have the ability to navigate the Windstream bankruptcy proceedings without having to raise external capital and still be able to invest uninterrupted in our premier fiber, tower and leasing businesses." Ex. D at 10 (cited at CAC ¶ 214).

On July 25, 2019, in connection with its ongoing bankruptcy proceedings, Windstream's bankruptcy estate filed an adversary proceeding against Uniti. CAC ¶ 231. Windstream's complaint in the adversary proceeding alleged, among other things, that the Master Lease was not a "true lease"—notwithstanding Windstream's express contractual representations and the legal opinion of its outside counsel at the time of the spinoff (*see supra* at 6-7)—and sought to "recharacterize" the Master Lease as a disguised financing arrangement. CAC ¶ 231.

10

Windstream's recharacterization claim was based on several factors (*id.* ¶¶ 125-29), including that the "true" useful life of the leased copper wire assets (which made up a substantial portion of the assets leased to Windstream under the Master Lease) was purportedly less than or equal to the term of the Master Lease (*id.* ¶ 127).  As noted above, among the factors relevant to whether a lease is a "true lease," the useful life of the leased assets must be longer than the term of the Master Lease.  Accordingly, the expectation that the remaining useful life of the leased assets would exceed the initial term of the Master Lease, as E&Y opined at the time of the spinoff, was one factor that Skadden considered in opining that the Master Lease was a "true lease."  *See supra* at 6-7; *see also* CAC ¶ 128.  Based solely on allegations in Windstream's complaint in the adversary proceeding, however, Plaintiffs allege that the projections of the remaining useful life of the leased copper wire assets on which Skadden relied were supposedly "inflated" and therefore that the Master Lease was not a "true lease."  *See, e.g.*, CAC ¶¶ 129, 167(f), 232, 239.

Plaintiffs further allege that, if Windstream were to succeed in establishing that the Master Lease was not a "true lease," Uniti's entitlement to rent under the Master Lease could be put at risk.  *Id.* ¶¶ 9, 65, 123, 167(g).  As the Complaint shows, Uniti vigorously disputed Windstream's claims and made clear that it believed the Master Lease was in fact a "true lease," as the parties intended it to be.  *See, e.g.*, *id.* ¶ 230.  Moreover, despite the purported risks of recharacterization, Windstream has continued to pay all of the rent owed under the Master Lease throughout the course of its bankruptcy.  *Id.* ¶ 28.

On March 2, 2020, Windstream and Uniti reached a settlement of Windstream's claims. *Id.* ¶ 234; Ex. E.  No court has ever accepted or endorsed Windstream's allegations—which are the sole source of Plaintiffs' own allegations regarding the allegedly undisclosed risk of recharacterization.

11

### E.   Plaintiffs' Lawsuit

On October 25, 2019, a putative securities class action complaint was filed in this Court, which, along with similar shareholder actions, were consolidated into the present action.  ECF Nos. 44, 60.  On May 11, 2020, Plaintiffs filed the operative Complaint.  The Complaint alleges that Defendants made false and misleading statements regarding the spinoff and Master Lease and asserts claims for securities fraud under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, and control person liability under § 20(a) of the Exchange Act.  CAC ¶¶ 280-303.  Much of the Complaint is copied nearly verbatim from a lawsuit filed by SLF Holdings, LLC against Uniti, Gunderman, and certain other defendants in the United States District Court for the District of Delaware.  *SLF Holdings, LLC v. Uniti Fiber Holdings Inc., et al.*, No. 19-01813-LPS (D. Del.).  Defendants in that case moved to dismiss the complaint, and that motion is currently pending.

**LEGAL STANDARDS**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court must "take the well-pleaded allegations in the complaint as true and view the complaint, and all reasonable inferences arising therefrom, in the light most favorable to the plaintiff."  *St. Croix Waterway Ass'n v. Meyer*, 178 F.3d 515, 519 (8th Cir. 1999).  But the Court need not accept, and indeed, "must 'reject conclusory allegations of law and unwarranted inferences.'"  *Swaffar v. Catholic Health Initiatives*, 2005 WL 8164785, at *2 (E.D. Ark. Dec. 12, 2005) (citation omitted).

Because Plaintiffs assert fraud claims under the Exchange Act, they must satisfy an even higher pleading standard under the PSLRA.  *Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820,

12

826 (8th Cir. 2003). "The PSLRA goes beyond the ordinary pleading requirements described in Rules 8(a)(2) and 9(b) of the Federal Rules of Civil Procedure." *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 882 (8th Cir. 2009). Its "pleading standards are unique to securities and were adopted in an attempt to curb abuses of securities fraud litigation." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 741 (8th Cir. 2002).

To survive a motion to dismiss under the PSLRA, "a securities plaintiff must satisfy two heightened pleading standards." *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1083 (8th Cir. 2005). *First*, the PSLRA "requires a plaintiff to 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]'" *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 980 (8th Cir. 2012) (quoting 15 U.S.C. § 78u–4(b)(1)). "If falsity is alleged based upon information and belief, the complaint must state with particularity all facts on which the belief is formed." *Cerner*, 425 F.3d at 1083 (citing 15 U.S.C. § 78u–4(b)(1)). *Second*, the plaintiff must plead scienter—i.e., the intent to deceive—by "stat[ing] with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind." *Id.* If either of these requirements is not met, the PSLRA "requires the court to dismiss the complaint." *Kushner*, 317 F.3d at 826; *see, e.g., In re Target Corp. Sec. Litig.*, 955 F.3d 738, 742 (8th Cir. 2020) (affirming dismissal of securities fraud claim for failure to plead scienter); *Novastar*, 579 F.3d at 883-84 (affirming dismissal of securities fraud claim for failure to plead falsity).

## ARGUMENT

I. **PLAINTIFFS HAVE FAILED TO STATE A SECTION 10(b) CLAIM UNDER RULE 10b-5(b) (COUNT I)**

To state a claim under Section 10(b) and Rule 10b-5(b) promulgated thereunder, Plaintiffs must allege: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance,

13

often referred to in cases involving public securities markets (fraud-on-the-market cases) as transaction causation; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." *Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 760 (8th Cir. 2009) (internal quotation marks omitted).

As set forth below, the Court should dismiss Count I for multiple, independent reasons. First, the Complaint fails to allege any actionable misstatement or omission by Defendants. Second, Plaintiffs fail to allege a plausible, much less strong, inference of scienter. Third, Plaintiffs fail to allege loss causation. And finally, Plaintiffs' claims concerning the alleged non-disclosure of the risk that the spinoff and Master Lease violated Windstream's debt covenants are time barred.

### A.      Plaintiffs Fail to Plead Any Actionable Omission or Misstatement

Plaintiffs fail to identify any actionable misleading statement or omission by any of the Defendants or to plead with particularity the reason or reasons why any such statement is purportedly misleading, as required under the PSLRA.

As a threshold matter, several of the allegedly false or misleading statements identified by Plaintiffs, including all the statements in Uniti's March 2015 Information Statement regarding the spinoff and Master lease, pre-date the class period (CAC ¶¶ 140-152) and, thus, cannot give rise to liability under Rule 10b-5. *See, e.g.*, *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("A defendant . . . is liable only for those statements made during the class period."). Even putting aside this threshold issue, however, the Complaint fails to overcome the fact that the allegedly undisclosed legal risks at issue constitute "soft" information and affirmative statements of opinion that are simply inactionable as a matter of law. And even if otherwise actionable, Plaintiffs fail to explain with particularity, as required by the PSLRA, how or why

14

any alleged statement by Defendants was false or rendered misleading by the alleged omissions.[5]

### 1.      *No Actionable Omission*

Plaintiffs' principal theory is that Defendants omitted to disclose two legal risks related to the spinoff of Uniti from Windstream and the Master Lease between the two companies—specifically, "(i) the material risk that the Spin-Off was a prohibited sale-leaseback transaction that violated the Indenture, and (ii) the true extent of the risk that the Master Lease was not a true lease, but rather a carefully disguised financing arrangement." CAC ¶ 16. But "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). A duty to disclose arises only where a regulation, statute or rule requires disclosure, or "if there have been inaccurate, incomplete or misleading disclosures." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897–98 (8th Cir. 2002) (company must "provide complete and non-misleading information with respect to the subjects on which [it] undertakes to speak"). Plaintiffs do not claim that there was any rule or regulation that required disclosure here. Rather, they contend that the alleged omissions rendered certain affirmative statements by Defendants misleading. Yet Plaintiffs plead no basis to support such a conclusion, particularly given that

---

[5] Indeed, it is often difficult to tell exactly what Plaintiffs claim is even misleading about the relevant disclosures. The Complaint contains *ninety* paragraphs purporting to identify allegedly false and misleading statements, many of which consist of long, undifferentiated block quotes from Uniti's SEC filings, press releases and earnings calls. CAC ¶¶ 139-228. Rather than allege, with specificity, why each statement is false or misleading, the Complaint cross-references large sets of paragraphs and alleges that the statements therein "were each false and misleading when made in that each omitted and/or misrepresented material facts" based on numerous unspecified "true facts"—often spanning multiple pages—that were allegedly "known or recklessly disregarded by Defendants." *See id.* ¶¶ 167, 176, 199, 226. This leaves both Defendants and the Court with the unenviable task of trying to make sense of this hopelessly tangled pleading to decipher what Plaintiffs claim is actually misleading and why. A number of courts have dismissed similarly pled securities claims for this reason alone. *See, e.g.*, *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37-38 (2d Cir. 2012) (affirming dismissal of complaint that "consist[ed] in large part of large block quotations with italicized text, followed by a passage that reads 'the statements referenced in the preceding paragraphs were each materially false and misleading when made for the reasons set forth in ¶ 256'" and then "provide[d] a bullet-point list (running over a page) of 'true facts, which were then known to or recklessly disregarded by each of the Defendants'" (alterations omitted)); *Patel v. Parnes*, 253 F.R.D. 531, 551-52 (C.D. Cal. 2008) (complaint failed to plead with particularity where the "allegations regarding falsity do not tie these reasons to particular statements" and "instead, the reasons appear to apply generally to the statements quoted in the preceding paragraphs").

15

there is no duty, as a matter of law, to disclose the kind of soft information at issue here.

(a)      *Risk of Sale-Leaseback Covenant Violation*

Plaintiffs' argument that Defendants failed to disclose the risk that the spinoff violated the sale-leaseback covenant fails because, as the Eighth Circuit has held, "there is no duty to disclose 'soft information,' such as a matter of opinion, predictions, or a belief as to the legality of the company's own actions." *Kushner*, 317 F.3d at 831.  Instead, "[s]oft information must be disclosed only if *virtually as certain* as hard facts."  *Id.* (emphasis added).  Thus, a company is "not required to publicly opine about the legality of" an issue where "no regulatory action [had been] initiated."  *Id.* (quoting *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 402 (6th Cir. 1997)).  Likewise, a company owes no duty to "disclose uncharged, unadjudicated wrongdoing," *Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014), or specific "litigation risks" that are not "substantially certain to occur," *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006).

Here, the "risk" that was allegedly concealed—that the spinoff violated the sale-leaseback provision of Windstream's indentures—is a classic example of this type of "soft" information:  It is, at bottom, a legal opinion as to the merits of an argument that would not be asserted, much less adjudicated, until years after most of the alleged statements by Defendants were made.  *See Kushner*, 317 F.3d at 831 ("[S]oft information" includes "a belief as to the legality of the company's own actions.").  Nor are there any allegations suggesting that such a risk was "virtually . . . certain" to occur at the time of the alleged omissions.  *Id.*  To the contrary, there is no allegation that, prior to August 2017, any Windstream bondholder (or anyone else) had raised any hint that the spinoff and Master Lease constituted a violation of Windstream's debt indentures.  And even after the indenture trustee filed suit, at Aurelius' instruction,

16

Windstream itself fought the claims and neutral market observers expected that Windstream would prevail in the dispute.  *See, e.g.*, CAC ¶ 260 (industry analyst described the court's ruling against Windstream as a "surprise"); *see also id.* ¶ 206 ("shocking news").  Defendants had no obligation during the pendency of the lawsuit, prior to the adjudication of Aurelius' claims, to offer a legal opinion as to *Windstream's* indenture—particularly when, as the Complaint makes clear, Defendants (like Windstream itself) did not believe that any violation had taken place.  *See, e.g.*, *id.* ¶¶ 186-89, 194-95, 197-98.

In short, such a legal risk does not come close to the type of "hard fact" that Defendants had a duty to disclose.  *See, e.g.*, *Kushner*, 317 F.3d at 828 ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonabl[y] available to them." (internal quotation marks omitted)); *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 575-76 (6th Cir. 2008) (company had no duty to disclose risk that it may have breached a customer contract, because the risk constituted "soft information" and there were no allegations that defendants believed they had breached the contract or anticipated that the contract was in danger); *Abbott Labs. v. Adelphia Supply USA*, 2017 WL 6014322, at *9-10 (E.D.N.Y. Aug. 14, 2017) (company had no duty to disclose opinion about potential illegality of certain transactions because that opinion was uncertain during the relevant timeframe).

In any event, Plaintiffs identify no statement by Uniti even suggesting, much less offering assurance that Windstream—an independent, publicly traded company—was in compliance or would continue to be in compliance with all of its debt covenants.  The statements that Plaintiffs do identify are in no way inconsistent with the possible risk that Windstream might later be deemed to have violated the Sale-Leaseback covenant (or other covenants) in its debt indentures. For example, the fact that, during an investor conference, Defendants Gunderman and Wallace touted their "[f]amiliarity with Sale Leaseback Transactions" generally and noted that such

transactions could provide the means for future growth and reduced reliance on Windstream for revenue (CAC ¶ 156) said nothing about Windstream's compliance with its debt covenants. Likewise, Uniti's general risk disclosure that "disputes with third parties" arising out of the spinoff "could arise" in the future was not rendered false or misleading by the alleged undisclosed risk of a covenant breach by Windstream. *Id.* ¶ 162. Contrary to Plaintiffs' assertion that such a risk had "already materialized" (*id.* ¶ 167(c)), the Complaint does not allege that any third party had raised any dispute at the time of the statement, or at any time until August 2017, when rumors first arose that Aurelius intended to assert a claim (*supra* at 9).[6]

Plaintiffs also baselessly assert that, even after Aurelius brought suit, Defendants misleadingly expressed confidence in Windstream's legal position (*see, e.g.*, CAC ¶¶ 186-89, 194-95, 197-98) by not offering a legal opinion that the spinoff and Master Lease violated Windstream's debt covenants. Defendants' opinion that Windstream was likely to prevail in the litigation is not inconsistent with the possibility that Windstream might lose. Indeed, Defendants expressly acknowledged the risk that Windstream might lose the litigation, even if they believed that such an outcome was unlikely. *See supra* at 9-10 (citing CAC ¶¶ 21, 195).

Finally, to the extent that Plaintiffs suggest that Defendants failed to disclose any underlying facts relevant to whether there was a risk that Windstream violated its debt covenants,

---

[6] For the same reasons, Defendants' alleged statements that Uniti was "well positioned to create substantial shareholder value" (CAC ¶ 159), that Uniti had a "solid foundation for success" (*id.* ¶ 163) and that Windstream's liquidity position and ability to generate significant free cash flow "should provide it with the ability to pay the annual lease obligations to [Uniti] for the foreseeable future (*id.* ¶ 148) were likewise not misleading. In any event, such statements are classic examples of non-actionable puffery. *See, e.g.*, *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) (explaining that "[n]o reasonable investor would rely on 'soft, puffing statements'—which encompass 'optimistic rhetoric' and 'promotional phrase[s] used to champion the company but [] devoid of any substantive information'" and holding that such statements are non-actionable as a matter of law (alteration in original; citation omitted)). Plaintiffs also contend that Uniti's press release touting its "successful launch . . . as an independent publicly traded REIT" (CAC ¶ 159) was misleading on account of the fact that Windstream executives stood on both sides of the transaction during the negotiation of the spinoff and Master Lease (*id.* ¶ 167(d)). That is baseless. No reasonable investor would have interpreted such a statement as signifying that the spinoff and Master Lease were negotiated on an arm's length basis. Rather, the statement merely indicated that, *following the spinoff*, Uniti was an independent, publicly traded company—a fact that is indisputably true.

that fails because such information was public.  Plaintiffs allege that Uniti "misleadingly characterized Windstream Holdings as the lessee of Uniti's newly acquired network assets under the terms of the Master Lease, without disclosing that, in reality, the Windstream Operating Subsidiaries were the *de facto* lessees."  CAC ¶ 152.  That is wrong.  In fact, the Master Lease was publicly disclosed in its entirety (Ex. B, Ex. 10.1), as were Windstream Services' debt indentures (*see, e.g.*, Ex. F, Ex. 4.1).  The Master Lease itself made clear, as further described in Uniti's March 2015 Information Statement, that "[t]he subsidiaries of Windstream Holdings will have the right to use, occupy and operate the Distribution Systems and discharge any of Windstream Holdings' obligations under the Master Lease."  Ex. C, Ex. 99.1 at 104.  Moreover, the Information Statement disclosed that "[a]ll of [Windstream Holdings'] operations are conducted by its wholly owned subsidiary," Windstream Services, and by Windstream Services' own "direct and indirect wholly owned subsidiaries."  *Id.* at 1.  Thus, it was public knowledge that Windstream's operating subsidiaries would use the leased assets under the Master Lease and were the *de facto* lessees—precisely the information that was allegedly concealed.[7]  That is fatal to Plaintiffs' claims.  *See, e.g.*, *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162-63 (9th Cir. 2009) ("[I]t is pointless and costly to compel firms to reprint information already in the public domain." (internal quotation marks omitted)); *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) ("[W]here information is equally available to both parties, a defendant should not be held liable to the plaintiff under the securities laws for failure to disclose.").

---

[7] Contrary to Plaintiffs' suggestion (*see, e.g.*, CAC ¶ 87), such information was not in any way inconsistent with Windstream's statements to regulators that (a) "the Windstream Operating Subsidiaries would have 'exclusive' and 'long-term' 'usage rights' and 'control' over the transferred assets, and would have the same obligations with respect to the assets that they had always had; (b) the Windstream Operating Subsidiaries would have no obligations to pay rent under the Master Lease; and (c) the Master Lease was being executed by Windstream 'for the benefit of the [Windstream Operating Subsidiaries]'" (*id.* ¶ 95).  In any event, Windstream's statements to regulators were likewise public.  *See supra* at 7-8 & n.4.

19

(b)   *Risk that Master Lease Was Not a "True Lease"*

Plaintiffs' claim that Defendants failed to disclose the risk that the Master Lease was not a "true lease" (*see, e.g.*, CAC ¶ 122) also fails.

*First*, the allegedly undisclosed legal risk that Windstream may someday bring a recharacterization lawsuit is also just the kind of "soft" information that there is no duty to disclose. *See supra* at 16-17. At the time of most of the alleged statements, Uniti had no reason to believe that Windstream would seek to recharacterize the Master Lease, particularly when, as noted, Windstream had expressly represented that the Master Lease was a "true lease" and not a disguised financing or any other type of arrangement, and further expressly agreed "not to challenge the validity, enforceability or characterization of the lease of the Leased Property as a true lease." *See supra* at 6. That alone is fatal to the claim. *See Kushner*, 317 F.3d at 831 (no duty to disclose soft information unless it is "virtually as certain as hard facts"); *see also In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ("[Defendants] are not obligated to predict future events unless there is reason to believe that they will occur."). Once Windstream filed its claims, shareholders were free to review Windstream's legal filings and draw their own conclusions about the merits of its claims. Uniti had no obligation to concede at that point— contrary to its legal positions and prior to any adjudication—that Windstream's claims were meritorious. To hold otherwise would transform every disputed legal issue involving a public company into securities fraud. That is not the law.

*Second*, Plaintiffs fail to identify any affirmative statement by Defendants that was rendered misleading on account of the alleged omission. For example, Plaintiffs allege that Defendants made various statements expressing confidence that Windstream would not reject the Master Lease and/or would continue to make lease payments (*see, e.g.*, *id.* ¶¶ 169, 171, 173, 175, 179, 186, 188, 196), even after Windstream asserted its claims for recharacterization (*see, e.g.*,

20

*id.* ¶ 230). But Plaintiffs fail to show that such statements were in any way rendered misleading by the fact that Windstream could (or ultimately did) seek to recharacterize the Master Lease as a financing. The mere fact that Windstream *attempted* to recharacterize the Master Lease, does not mean that it was not in fact a "true lease"—as Windstream covenanted in the lease itself. *See supra* at 7. And no court has ever accepted or endorsed Windstream's opportunistic allegations seeking to recharacterize the Master Lease as a disguised financing, rather than a "true lease." *See supra* at 11. Plaintiffs' assertion that the Master Lease was not a "true lease" rests on nothing more than Windstream's baseless and unadjudicated allegations.

In any event, Uniti clearly and expressly disclosed the legal risk to shareholders that the Master Lease might "not [be] respected as a true lease for U.S. federal income tax purposes" and could be "instead treated as a service contract, joint venture or some other type of arrangement." Ex. C, Ex. 99.1 at 23. Moreover, Plaintiffs do not (and cannot) dispute that, notwithstanding Windstream's self-serving claims, Windstream in fact *never* rejected the Master Lease in bankruptcy and has continued to pay every dollar of rent due, to this day (*see* CAC ¶ 28)—which is entirely consistent with Defendants' alleged affirmative statements.[8]

*Finally*, to the extent Plaintiffs allege that Defendants failed to disclose the "true risk" that the Master Lease could be recharacterized by omitting that the useful life assumptions underlying Skadden's "true lease" opinion were purportedly inflated (*see, e.g.*, CAC ¶¶ 127-29), that too is unavailing. Uniti expressly did disclose that the useful life of the leased copper assets could be as little as seven years (CAC ¶ 133)—again, precisely the information that was

---

[8] Windstream's unadjudicated claim that the Master Lease should be recharacterized is not the same as rejection. Under the Bankruptcy Code, a debtor's rejection of a lease "constitutes a breach of such . . . lease," 11 U.S.C. § 365(g), and requires court approval, *id.* § 365(a). Here, there is no question that Windstream did not "reject" the Master Lease. In fact, the parties specifically stipulated that Windstream would not be required to assume or reject the Master Lease until after its recharacterization litigation against Uniti was resolved, and that Windstream would also continue to pay rent to Uniti as it became due. *See* Second Stipulation and Agreed Order, *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. Nov. 27, 2019), ECF No. 1265 at 3.

21

allegedly concealed.  Nothing more was required.  *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) (securities laws do not call for "pejorative characterizations of disclosed factual matters").

### 2.    *No Actionable Misstatement*

In addition to their baseless omissions theories, Plaintiffs also allege that Defendants made certain affirmatively false statements.  In particular, Plaintiffs take issue with Defendants' disclosure during March 20, 2019 and May 9, 2019 investor calls, that Uniti "believe[d] [it had] the ability to navigate the Windstream bankruptcy proceedings without having to raise external capital."  CAC ¶¶ 214, 217.  Plaintiffs claim that such statements were somehow rendered false because there was a risk that Windstream would "challenge the validity of the Master Lease in bankruptcy, putting two-thirds of Uniti's revenue in jeopardy."  *Id.* ¶ 226(c).  This claim fails.

*First*, the relevant statements—each of which was prefaced by "we believe"—are statements of opinion rather than statements of objective fact.  Accordingly, they are actionable only if (1) "the speaker did not hold the belief she professed," (2) "the supporting fact[s] [the speaker] supplied were untrue," or (3) "the speaker omits information whose omission makes the statement misleading to a reasonable investor."  *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86, 195 (2015)).  A statement of opinion is not misleading merely because the speaker "'knows, but fails to disclose, some fact cutting the other way.'"  *Id.* (quoting *Omnicare*, 575 U.S. at 189).  Instead, the "core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'"  *Id.*

Plaintiffs do not come close to meeting that standard here.  The Complaint does not contain any allegations suggesting that, at the time of the statements at issue, Uniti did not honestly believe that it could "navigate" the Windstream bankruptcy without raising external

22

capital. Nor does the Complaint identify any omitted fact that would "conflict with what a reasonable investor would take from the statement itself."[9] The mere fact that Uniti later announced a $300 million notes offering (CAC ¶ 262) does not demonstrate that Defendants' statements of belief were not earnestly held at the time they were made. To hold otherwise would amount to impermissible "fraud by hindsight." *Target*, 955 F.3d at 743 (citation omitted); *see Kushner*, 317 F.3d at 831 ("The fact that a defendant's belief or opinion later prove[s] to be wrong in hindsight does not render the statements untrue when made." (citation omitted)).

*Second*, the statements are nonactionable for the independent reason that they fall under the PSLRA's safe-harbor for forward-looking statements, which protects against liability for any forward-looking statement that is "(1) . . . accompanied by meaningful cautionary language, (2) . . . immaterial, *or* (3) . . . made without actual knowledge that it was false or misleading." *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 920–21 (8th Cir. 2015) (citing 15 U.S.C. § 78u–5(c)(1)). There is no question that these statements are protected under this standard.[10]

The statements are clearly forward-looking: Whether Uniti would be able to "navigate" the Windstream bankruptcy proceedings without having to raise external capital necessarily could not be assessed when the statements were made. *See id.* at 921 ("In determining whether a statement is truly forward-looking, the determinative factor is not the tense of the statement;

---

[9] Although Plaintiffs allege that there was a risk that Windstream would "challenge the validity of the Master Lease in bankruptcy, putting two-thirds of Uniti's revenue in jeopardy" (CAC ¶ 226(c)), Plaintiffs do not allege that any such revenue was ever actually in jeopardy during the pendency of the bankruptcy case. To the contrary, as noted above, the Complaint concedes that, despite its recharacterization claims, Windstream has continued to pay all of the rent that it has owed (*id.* ¶ 28).

[10] These statements are also protected under the analogous "bespeaks caution" doctrine, which provides that when a defendant's "forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information the document provided investors." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 548 (8th Cir. 1997) (internal citations omitted); *see also In re AMDOCS Ltd. Sec. Litig.*, 390 F.3d 542, 548 (8th Cir. 2004) ("Cautionary language which relates directly to that which the Plaintiffs claim to have been misled, if sufficient, renders the alleged misrepresentation or omissions immaterial as a matter of law."). As detailed below, Defendants' statements were accompanied by sufficient cautionary language and were therefore non-material under the bespeaks caution doctrine.

23

instead, the key is whether its truth or falsity is discernible only after it is made." (internal quotation marks omitted)).

The statements also fall under at least two different provisions of the safe-harbor. To begin, there are no factual allegations whatsoever that the statements were made with "actual knowledge" that they were false. *Id.* That alone requires dismissal. Moreover, the statements were also accompanied by meaningful cautionary language. For example, Uniti's presentation accompanying its March 20, 2019 investor call cautioned that "[c]ertain statements in this presentation may constitute forward-looking statements within the meaning of the [PSLRA]," including "all statements that are not historical statements of fact," statements of "our business strategies . . . operating and financial performance, . . . and our 2019 financial outlook," and statements prefaced by words such as "believe." Ex. G at 2.[11] The deck further explained that such "statements are based on management's current expectations and beliefs and are subject to a number of risks and uncertainties that could lead to actual results differing materially from those projected, forecasted or expected." *Id.* Uniti also disclosed numerous specific risks that could "materially alter [its] expectations," including risks related to Windstream. *Id.* A presentation issued in connection with the May 9, 2019 investor call included similar cautionary language. *See* Ex. H at 2. Such language is more than adequate to render the challenged statements nonactionable. *See, e.g.*, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (statements on investor call were accompanied by meaningfully cautionary language where call began with a notice that "these prepared remarks contain forward-looking statements concerning future financial performance and guidance" and cautioned about various factors that could affect

---

[11] *See Graham*, 940 F.3d at 405 n.1 (court "may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents" (internal quotation marks and citation omitted)).

the company's future performance).[12]

### B.      Plaintiffs Fail to Plead a Strong Inference of Scienter

Plaintiffs also fail to plead a strong inference of scienter—"i.e., the defendant's intention 'to deceive, manipulate or defraud'"—under the unusually heightened pleading standards of the PSLRA.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (citation omitted).  In the Eighth Circuit, "[s]cienter can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity."  *Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008).  Under any of these options, in order to satisfy the PSLRA's heightened pleading requirement, the Complaint must "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A) (emphasis added); *see Target*, 955 F.3d at 742.  A "strong" inference must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged" after "consider[ing] plausible, nonculpable explanations for the defendant's conduct."  *Tellabs*, 551 U.S. at 324; *see also Target*, 955 F.3d at 742.  As set forth below, Plaintiffs have not even plead a *plausible* inference of scienter, much less a "strong" one, as required under the PSLRA.

### 1.      *Plaintiffs' Scienter Allegations Are Implausible*

As an initial matter, Plaintiffs cannot plead a strong inference of scienter because their

---

[12] Although the cautionary language in the investor presentation deck was more than sufficient, Uniti's March 18, 2019 Form 10-K, which was incorporated into the investor presentation deck by reference (Ex. G at 2), contained additional cautionary language regarding Uniti's ability to raise capital.  *See, e.g.*, Ex. I at 15 (disclosing that Uniti "may need to access the capital markets to generate additional funds in an amount sufficient to fund our business operations, announced investment activities, capital expenditures, debt service and distributions to our shareholders").  The Form 10-K also disclosed risks associated with Windstream's bankruptcy, including the risk that Windstream might reject or be unwilling to make payments under the Master Lease.  *Id.* at 13.  That language also suffices.  *Julianello*, 791 F.3d at 921 ("Cautionary statements disclosed in SEC filings may be incorporated by reference; they do not have to be in the same document as the forward-looking statements.").

entire theory of the case is implausible and therefore does not create the necessary "'compelling' case for fraud." *Target*, 955 F.3d at 743.  As the Ninth Circuit recently emphasized, "[a]llegations that are implausible do not create a strong inference of scienter." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 2020 WL 3069776, at \*1 (9th Cir. Jun. 10, 2020).  Put another way, "[w]here '[a] plaintiff's view of the facts defies economic reason, . . . [it] does not yield a reasonable inference of fraudulent intent.'"  *Kalnit v. Eichler*, 264 F.3d 131, 140-41 (2d Cir. 2001) (citation omitted).

Here, Plaintiffs ask the Court to conclude that (1) Windstream structured the spinoff and Master Lease in a manner that it knew violated, or likely violated, its debt indentures, leaving an eventual bankruptcy and likely "financial ruin" (CAC ¶ 9) all but inevitable; and (2) Uniti not only went along with the supposed charade but, moreover, knew that in any Windstream bankruptcy, Windstream could and would seek to re-characterize the Master Lease as a financing, depriving Uniti of its valuable assets and leaving it at the back of the line in Windstream's allegedly inevitable bankruptcy as an unsecured creditor.  The Court need not credit such facially implausible and economically irrational allegations.  *See Nguyen*, 2020 WL 3069776, at \*8; *Kalnit*, 264 F.3d at 140-41.  The "more compelling inference, which is fatal to [Plaintiffs]' case," *Target*, 955 F.3d at 743, is that Uniti simply failed to anticipate that a court would conclude that the spinoff violated Windstream's indenture or that Windstream would declare bankruptcy and contend—in direct contravention to all of its prior statements—that the Master Lease was not a true lease.

### 2.    *Plaintiffs Have Failed to Plead Motive*

In the face of this overwhelmingly plausible and innocent inference, Plaintiffs allege that Defendants acted with scienter because they had a "motive" and "economic incentives" "to hide the truth about the Spin-Off and the Master Lease from Uniti investors."  CAC ¶¶ 239-40.  In

particular, Plaintiffs allege that "[i]f it were publicly disclosed that Windstream violated—or had engaged in a transaction that risked violating—the Indenture, and causing a default, the value of Uniti securities would crater" and Defendants "would be inviting Windstream's noteholders to do exactly what Aurelius did—cause the Indenture Trustee to file a breach of contract action against Windstream." *Id.* ¶ 240. Plaintiffs also allege that disclosing that the leased assets had a "useful life of 20 years or less would not support the 'true lease' treatment of the Master Lease, which would in turn jeopardize the tax treatment of Uniti as a REIT." *Id.* ¶ 239.

But these sorts of generalized allegations of corporate profit motive are insufficient to plead scienter under the PSLRA. "The desire to make a company seem more profitable is a desire universally held among corporations and their executives." *Cerner*, 425 F.3d at 1085. The Eighth Circuit has thus recognized that these types of generalized allegations of motive are "insufficient as a matter of law." *K-tel Int'l*, 300 F.3d at 894 (internal quotation marks omitted); *see Pet Quarters, Inc. v. Badian*, 2006 WL 827331, at *4 (E.D. Ark. Mar. 29, 2006) ("The Eighth Circuit has consistently held that allegations with regard to motive generally possessed by all corporations, such as profitability, do not give rise to a strong inference of scienter.").

And beyond those generalized allegations, Plaintiffs fail to allege any particularized facts supporting the alleged motives, as required under the PSLRA. *See* 15 U.S.C. § 78u-4(b)(2). Plaintiffs' generic allegations about the compensation Defendants received for their work on the spinoff and as employees of Windstream and Uniti (*see, e.g.*, CAC ¶¶ 31, 238(d), (f)) are insufficient to meet Plaintiffs' burden. *See Cerner*, 425 F.3d at 1085 (allegations about defendants' "desire to increase their bonus and executive compensation packages . . . fail to raise the requisite strong inference of scienter"). Nor do Plaintiffs allege that any individual Defendant sought to profit on the alleged fraud by selling Uniti stock, a fact that undermines any inference of scienter. *See K-tel Int'l*, 300 F.3d at 894 ("[E]vidence that the individual defendants

27

abstained from trading may undercut allegations of motive.").[13]

### 3.    *The Complaint's Own Allegations Affirmatively Refute Any Claim of Fraudulent Intent or Recklessness*

Because Plaintiffs cannot plead that Defendants had a motive to commit fraud, they must allege facts giving rise to a strong inference that Defendants either had an intent to defraud Uniti's investors or were severely reckless.  *See Cornelia I. Crowell GST Tr.*, 519 F.3d at 782. Severe recklessness means "highly unreasonable omissions or misrepresentations that . . . present a danger of misleading buyers or sellers which is either known to the defendant, or is so obvious that the defendant must have been aware of it."  *Podraza v. Whiting*, 790 F.3d 828, 842 (8th Cir. 2015) (internal quotation marks and citation omitted); *see also In re Apogee Enterprises, Inc. Sec. Litig.*, 2020 WL 1445856, at *13 (D. Minn. Mar. 25, 2020) (no scienter where plaintiff failed to allege conduct "rising to the level of an extreme departure from the standards of ordinary care" (citation omitted)).  In the absence of adequate motive allegations, a plaintiff's other allegations of scienter must be "particularly strong in order to meet the [PSLRA] standard." *K-tel Int'l*, 300 F.3d at 894.

As explained below, the Complaint lacks even a single allegation supporting the conclusion that Defendants intended to commit fraud or acted with reckless disregard for the truth.  Indeed, not only do Plaintiffs' allegations not support a "strong inference" of scienter, they affirmatively refute any such inference.

(a)    *Alleged Omissions Relating to Sale-Leaseback Covenant*

With respect to the undisclosed risk that the spinoff and Master Lease violated Windstream's debt covenants, Plaintiffs' principal scienter argument is that Defendants were

---

[13] The fact that *Windstream* sold equity in Uniti shortly after the spinoff, which was necessary to effectuate the spinoff itself (*id.* ¶ 239(f)), does not support an inference of scienter by any of the *Defendants*.

familiar with the terms of the spinoff and Master Lease and therefore either *must* have known that the transactions violated the indentures or recklessly disregarded that fact. *See, e.g.*, CAC ¶ 45 ("Because of their positions, and their access to material non-public information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not be disclosed to and were being concealed from the public and that the positive representations and omissions being made were then materially false and misleading"); *id.* ¶ 238(a) (alleging that Defendant Gunderman was "a long-term advisor to Windstream on various transactions" and therefore "was in a prime position to understand the potential Indenture breach and the risk of default under the Master Lease").

But the Eighth Circuit has repeatedly held that "must have known" allegations cannot give rise to a strong inference of scienter. *See, e.g.*, *Target*, 955 F.3d at 743 ("We disregard 'blanket' or 'catch-all' assertions of scienter." (citation omitted)); *Elam v. Neidorff*, 544 F.3d 921, 929-30 (8th Cir. 2008) (rejecting allegations that defendants "must have known" of contrary information as failing to "give rise to an inference of scienter"); *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1033 (D. Minn. 2009) ("[P]leading of scienter may not rest on the inference that defendants must have been aware of [information] based on their positions within the company." (internal quotation marks and citation omitted)), *aff'd sub nom. Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800 (8th Cir. 2010). Here, Plaintiffs do not plead any particularized facts showing that any one at Windstream, much less at Uniti, believed that the Master Lease violated Windstream's indentures. *See Kushner*, 317 F.3d at 828-29 (rejecting "investors attempt to make out a strong inference of scienter based upon circumstantial evidence" absent "a showing that the defendants had knowledge of contradictory crucial information at the time that they made their statements").

Indeed, the internal documents that Plaintiffs cite, as well as their other allegations, show

29

just the opposite.  Plaintiffs cite to various Windstream board materials from 2014 in support of their scienter allegations.  CAC ¶¶ 79-86.  But those board materials make clear that Windstream's directors and the other participants at the meetings, including Defendant Gunderman, were expressly advised that the Master Lease and spinoff would *not* violate the indentures' sale-leaseback provision.  For example, a presentation that was given during the early May 2014 Windstream board meeting, which is cited in the Complaint (*id.* ¶ 82) included a slide addressing the implications of a potential spinoff on Windstream's bond indentures (Ex. A at 50).  Although the slide noted that "debt incurrence/sale-leaseback covenants" were among the "Key issues to consider," it concluded that "Given that lease obligation will be at OpCo/HoldCo, *sale-leaseback covenant not implicated at Windstream.*"  *Id.* (emphasis added).

Subsequent internal Windstream emails cited in the Complaint support the same conclusion.  For example, an August 6, 2014 email from a Windstream vice president to other Windstream executives stated that "Given that the lease is being implemented at Windstream Holdings, it does not impact any covenants in the Windstream indentures, *including the sale-leaseback provisions.*"  CAC ¶ 93 (emphasis added).  Similarly, an April 2013 internal Windstream email stated that Windstream "need[ed] a capital structure *that works with the [note] Indenture*" and that "the sales-leaseback provision in the Indenture *can be a limiting factor here.*"  *Id.* ¶ 75 (emphasis added).  In other words, as Plaintiffs concede, the spinoff and Master Lease were structured in a way "*to avoid* 'a clear violation' of the Indenture" (*id.* ¶ 86 (emphasis added))— not to violate it.  Consistent with that objective, during a November 2014 hearing with Kentucky regulators, a Windstream executive stated that "[a]s part of this transaction, [Windstream] ha[d] no concerns with any covenants within [its] indentures or [its] existing credit agreement."  *Id.* ¶ 99.

Plaintiffs' remaining allegations do not support a contrary inference:

- Plaintiffs point to a set of internal Windstream talking points that address, among other things, the hypothetical question, "Why is the lease with WIN Holdings VS

30

WIN Services?" *Id.* ¶ 120.  In response, the talking points say "[t]his is a complex transaction and after considering many factors we concluded that having the lease at WIN Holdings was the best structure" and, "[i]f [p]ressed," the "[f]actors evaluated," including "corporate structure, tax, accounting, [and] debt." *Id.*  That statement, however, says nothing at all about the sale-leaseback covenant, much less supports an inference that Defendants believed the Master Lease violated the covenant.

- Plaintiffs cite testimony given by John Fletcher, during the Aurelius trial, that it would have been a "clear violation" of Windstream's debt indentures if Windstream Services, or its operating subsidiaries, signed the Master Lease, rather than Windstream Holdings.  *Id.* ¶¶ 98, 167(a), 199(a).  But such a counterfactual conclusion—which no one disputes—does not support an inference of scienter, because Windstream Holdings *was* the only entity that signed the Master Lease.  In any event, Mr. Fletcher, the former general counsel of Windstream who was also briefly an officer of Uniti prior to its spinoff, is not alleged to have been an officer of Uniti at the time of any of the allegedly false or misleading statements (*see id.* ¶ 50).  Accordingly, his knowledge and testimony is irrelevant to scienter.  *See Medtronic*, 618 F. Supp. 2d at 1035 (holding that to plead scienter against a corporate defendant, a plaintiff must "adequately allege the scienter of individual corporate officers").

- Skadden's April 2015 "true lease" opinion, which described the spinoff as involving "a transfer of legal ownership of the Distribution Systems followed by a leaseback of that property that could be viewed as similar to a sale-leaseback arrangement" (CAC ¶ 137 (internal quotation marks omitted)), likewise does not support an inference of scienter.  The fact that the spinoff and Master Lease were *similar* to a "sale-leaseback arrangement" does not mean that they met the contractual definition of a "Sale and Leaseback Transaction" in Windstream's indentures.  *See supra* at 8-9.  There is no allegation that Skadden even addressed that issue, much less reached such a conclusion in its opinion.

As these allegations show, there is no well-pled allegation that anyone at Windstream believed that there was a material risk that the spinoff and Master Lease violated the sale-leaseback provision—much less that would give rise to a strong inference that anyone intended to mislead investors.  And even if they somehow did, they would still be insufficient because, at most, they only reflect the state of mind of *Windstream* executives; accordingly, they cannot give rise to a strong inference that any *Uniti* executives—and therefore Uniti—acted with scienter at the time of any allegedly false or misleading statement.  *See Medtronic*, 618 F. Supp. 2d at 1035.

(b)    *Alleged Omissions Relating to Useful Life of Leased Assets and Status of Master Lease as "True Lease"*

Plaintiffs likewise fail to plead facts supporting a strong inference that Defendants acted with scienter in connection with any alleged omission relating to whether the Master Lease was a "true lease."  *See* CAC ¶¶ 122-38.

As an initial matter, Defendants had no reason to believe that Windstream itself would seek to re-characterize the Master Lease as something other than a "true lease."  Not only had Skadden (based in part on E&Y's independent valuation) provided a legal opinion that the lease was a "true lease" (CAC ¶ 128), but Windstream itself expressly agreed that the "*Master Lease is a 'true lease,'* is not a financing lease . . . or other financing or trust arrangement" (Ex. B., Ex. 10.1 § 6.1(a) (emphasis added)).  And Windstream further "waive[d] any claim or defense based upon the characterization of this Master Lease as anything other than a true lease" and agreed "not to challenge the validity, enforceability or characterization of the lease of the Leased Property as a true lease."  *Id.* § 6.1(e).  Plaintiffs do not allege that Windstream ever took a contrary position prior to filing its self-serving complaint in its bankruptcy over four years later.

Despite this, Plaintiffs allege that Defendants knew, at the time of the spinoff, that E&Y's independent analysis of the useful life of the leased assets, and its opinion that the leased copper assets had a useful life of over 40 years, were unreliable and that Skadden's "true lease" opinion, in turn, was based on "inflated" estimates of the useful remaining life of the copper wire assets.  CAC ¶¶ 128-29).  But the Complaint lacks any well-pled factual allegations to support Plaintiffs' theory.  Plaintiffs concede that their allegations about the useful life projections rest entirely on Windstream's allegations in its adversary proceeding.  *See, e.g.*, *id.* ¶¶ 124-25, 129, 239.

32

Moreover, Windstream's complaint does not even support Plaintiffs' allegations.[14]  For example, Plaintiffs allege that "Uniti also provided inflated projections of the leased networks' remaining useful life and economic value" to E&Y.  CAC ¶ 129.  But Windstream's complaint against Uniti does not allege that Uniti provided *any* information to E&Y, much less "inflated" projections.  Rather, Windstream's complaint makes clear that E&Y was retained to provide an *independent* estimate of the leased assets' useful life.  *See* Ex. J at ¶¶ 92, 95-96.  Accordingly, the Court need not accept as true Plaintiffs' allegations, which are directly contradicted by documents incorporated into the Complaint.  *See Lucke v. Wells Fargo Bank, N.A.*, 2014 WL 12601035, at *4 (D. Minn. Apr. 2, 2014) ("[I]f a document used for purposes of the motion to dismiss contradicts the complaint's allegations, the document controls and the court need not accept as true the inconsistent allegations in the complaint." (citation omitted)).

Lacking any well-pled allegation that Uniti in fact had or provided any "inflated" estimates of the useful remaining life of the leased copper wire assets to E&Y, Plaintiffs are left with Windstream's allegations that *Windstream* allegedly had access to information that contradicted E&Y's analysis.  CAC ¶ 131.  But the information that was allegedly available to Windstream is irrelevant to whether *Uniti* or the Individual Defendants had any basis to question E&Y's opinions.  The Complaint does not allege that the Individual Defendants or anyone else at Uniti was provided any of the contradictory information that Windstream allegedly possessed.  Such information, therefore, cannot support any inference, much less a strong inference, of

---

[14] Even if Plaintiffs' allegations were supported by Windstream's complaint, the allegations of which have never been accepted or endorsed by any court (*see supra* at 11), they should still be disregarded.  *See, e.g.*, *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1226 (C.D. Cal. 2013) ("As a general rule, 'paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)'" (quoting *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009)); *see also Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *20 (C.D. Cal. May 5, 2011) (striking paragraphs copied from other complaints when plaintiffs "have not reasonably investigated the allegations").

scienter.

    (c)    *Alleged Misstatements Regarding Windstream's Bankruptcy*

Finally, Plaintiffs fail to plead a strong inference of scienter with respect to their allegation that Defendants affirmatively misrepresented Uniti's "ability to navigate the Windstream bankruptcy proceedings without having to raise external capital." *See* CAC ¶¶ 214, 217 (internal quotation marks omitted). Indeed, Plaintiffs do not even attempt to "state with particularity," 15 U.S.C. § 78u-4(b)(2)(A), *any* facts that could rise to an inference that defendants acted with the requisite intent with regard to this statement. As explained above (*supra* at 22), Plaintiffs do not plead any facts to support an inference that Uniti did not honestly believe at the time of the statement that it could "navigate" the Windstream bankruptcy without raising external capital. And Plaintiffs' allegations regarding Uniti's $300 million notes offering are nothing more than improper allegations of fraud-by-hindsight. *See Target*, 955 F.3d at 743.

## C.    Plaintiffs Have Failed to Plead Loss Causation

Plaintiffs' Rule 10b-5(b) claim should also be dismissed because Plaintiffs have failed to adequately plead loss causation, which "corresponds to the common law's requirement of proximate causation." *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008). As the Supreme Court has explained, "[t]he securities statutes make fraud actions available 'not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations *actually cause*.'" *Rand-Heart of New York, Inc. v. Dolan*, 812 F.3d 1172, 1179 (8th Cir. 2016) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (emphasis added)). Thus, to state a claim under Rule 10b-5, a plaintiff must "state facts showing a causal connection between the defendant's misstatements and the plaintiff's losses." *McAdams v. McCord*, 584 F.3d 1111, 1114 (8th Cir. 2009). In securities cases like this one, plaintiffs seek to establish loss causation by asserting that a "corrective disclosure" of new

information—i.e., a disclosure that purportedly revealed information that plaintiffs claim had been misstated or improperly withheld—caused the defendant company's stock price to decline, thereby injuring investors who purchased before the corrective disclosure and continued to hold stock at that time. *See Rand-Heart*, 812 F.3d at 1179-80.

As an initial matter, Plaintiffs do not even attempt to plead loss causation with respect to their claim that Defendants failed to disclose the risk that the Master Lease was not a "true lease." *See* CAC ¶¶ 241-66. The Complaint does not contain a single allegation that Uniti's stock price dropped when the allegedly concealed information was revealed to the market or that Plaintiffs otherwise suffered any loss in connection with the omission. *See McAdams*, 584 F.3d at 1114 (dismissing claim where plaintiff failed to specify how the defendant's statements "proximately caused the investors' losses").

This is not a mere pleading failure. According to Plaintiffs, the supposedly "corrective" information was revealed to the market on July 25, 2019, when Windstream filed a complaint in an adversary proceeding against Uniti in connection with the Windstream bankruptcy. CAC ¶ 28. But the price of Uniti's stock barely moved that day and was unchanged the next. *See* Ex. K at 2 (July 24 closing price of $8.84; July 25 closing price of $8.60; July 26 closing price of $8.60). Moreover, corrective disclosures that occur after the class period, which ended here on June 24, 2019 (CAC ¶ 1), cannot establish loss causation. *See, e.g.*, *In re OSG Sec. Litig.*, 2015 WL 3466094, at *3 n.14 (S.D.N.Y. May 29, 2015) ("[D]isclosures made after the close of the class period cannot be 'corrective' for the purpose of establishing loss causation." (citation omitted)). For this reason, Plaintiffs have not pled, and cannot plead, loss causation with respect to the "true lease" allegations.

The "corrective disclosures" Plaintiffs identify relating to the Aurelius litigation (CAC ¶¶ 249, 251, 255) also fail to adequately plead loss causation. For a plaintiff to establish loss

35

causation through corrective disclosures, the plaintiff must demonstrate that the corrective disclosures "present facts to the market that are *new*, that is, *publicly revealed for the first time*." *Rand-Heart*, 812 F.3d at 1180 (emphasis added); *see, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551-52 (S.D.N.Y. 2008) ("[T]he disclosed fact must be new to the market.  A recharacterization of previously disclosed facts cannot qualify as a corrective disclosure." (citations omitted)), *aff'd*, 597 F.3d 501 (2d Cir. 2010).  "[I]f investors already know the truth, false statements won't affect the price."  *Rand-Heart*, 812 F.3d at 1180.

Plaintiffs' alleged "corrective disclosures" fail this test.  Plaintiffs allege that Uniti's stock price fell following disclosure of Aurelius' short position, Aurelius' notice of default, and the judicial decision in the Aurelius litigation.  CAC ¶¶ 249, 251, 255.  But those disclosures revealed no new facts that were concealed or obscured by Uniti or anyone else.  *See Rand-Heart*, 812 F.3d at 1180.  Rather, Aurelius' claimed default, the ensuing litigation, and the court's ruling were based entirely on the terms of the spinoff, the Master Lease, and Windstream's debt indentures, which were all publicly available in SEC filings for *years before* Aurelius first pursued its litigation.  *See supra* at 18-19.  Therefore, they could not have been "corrective" disclosures.

The Eleventh Circuit's opinion in *Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013), cited with approval by the Eighth Circuit in *Rand-Heart*, is instructive.  There, the court rejected the attempt to establish loss causation based on a stock price drop following disclosure of a short-seller's opinion.  The court reasoned that "[b]ecause a corrective disclosure obviously must disclose *new* information, the fact that the sources used in the [short-seller's presentation] were already public is fatal to the Investors' claim of loss causation." *Id.* at 1198 (citation omitted). The court further explained that "the mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure."  *Id.* at 1199. The same reasoning applies here.  The decline in Uniti's stock was not due to new facts

36

"revelatory of any fraud, but was instead due to 'changed investor expectations'" stemming from a claimed default and an adverse judicial decision reflecting the negative views of "an investor who wielded great clout in the industry." *Id.* at 1200. Therefore, as in *Meyer*, Plaintiffs have failed to plead loss causation based on the Aurelius-related corrective disclosures.

Plaintiffs' remaining purported corrective disclosures fare no better. Plaintiffs allege that Uniti's stock price fell after Windstream announced that it was cutting its dividend on August 3, 2017. CAC ¶ 247. But whether *Windstream* cut the dividend that it paid to *its* investors (not Uniti) is irrelevant to any of the alleged statements or omissions made by Defendants. Plaintiffs also allege that Uniti's stock price drop following Uniti's announcement on June 24, 2019, of a $300 million note offering. But Plaintiffs fail to allege that Uniti's alleged "fraud—and not other events—caused the price to fall" after this announcement. *Rand-Heart*, 812 F.3d at 1179 (internal quotation marks and citation omitted). Plaintiffs contend that the announcement revealed that "Uniti's business was impacted by Windstream's bankruptcy and, as a result, Uniti could not maintain its business operations without accessing the capital markets." CAC ¶ 262. But such an allegation fails to demonstrate loss causation because the alleged corrective disclosure, on its face, does not correspond to the reasons the original statement was allegedly false. *Rand-Heart*, 812 F.3d at 1180 (no loss causation where "[n]othing in the . . . press release correct[ed] previous misrepresentations"). According to Plaintiffs, the statement was false because there was a risk that Windstream would "challenge the validity of the Master Lease in bankruptcy, putting two-thirds of Uniti's revenue in jeopardy." CAC ¶ 226(c). But Windstream did not challenge the Master Lease until July 25, 2019 (*id.* ¶ 231), over one month later, and there are no allegations tying Uniti's $300 million note offering to an expectation that Windstream would sue Uniti or otherwise seek to challenge the lease. The mere fact that Uniti's stock price fell after it announced the note offering cannot establish loss causation. *Rand-Heart*,

37

812 F.3d at 1180 ("[N]ot every bit of bad news that has a negative effect on the price of a security necessarily has a *corrective* effect for purposes of loss causation.").

### D.      Plaintiffs' Claims Concerning the Sale-Leaseback Covenant Are Untimely

In addition to the shortcomings identified above, Plaintiffs' claim relating to the allegedly undisclosed risks concerning Windstream's sale-leaseback covenant (CAC ¶¶ 140-210) should be dismissed because it is untimely.  A Section 10(b) claim is untimely if not brought within two years of when a "reasonably diligent plaintiff would have discovered 'the facts constituting the violation' after an appropriate investigation." *Zarecor v. Morgan Keegan & Co.*, 801 F.3d 882, 887 (8th Cir. 2015) (quoting *Merck & Co. v. Reynolds,* 559 U.S. 633 (2010)).

Here, even assuming Defendants had any obligation to disclose the risk that the spinoff and Master Lease might have violated certain of Windstream's debt covenants—which, as explained above, they did not (*see supra* at 16-19)—Plaintiffs' own allegations show that investors were on notice of the risk well over two years before the initial complaint was filed in this action on October 25, 2019.  In particular, Plaintiffs allege that as early as August 2017, "rumors began to circulate that New York-based hedge fund Aurelius was buying Notes . . . , fueling speculation that Aurelius *believed the Spin-Off violated the Indenture*."  CAC ¶ 172 (emphasis added).  Similarly, on September 25, 2017, Plaintiffs allege that Windstream notified investors that it had received a notice of default from Aurelius claiming "that the transfer of certain assets and the subsequent lease of those assets in connection with the spinoff . . . *constituted a Sale and Leaseback Transaction . . . which did not comply with the Sale and Leaseback covenant under the Indenture*."  *Id.* ¶ 177 (emphasis added).  Finally, Plaintiffs allege that on October 12, 2017, Aurelius caused the Windstream trustee to sue Windstream, "*alleging that Windstream Services had breached a covenant in the Indenture restricting sale-leaseback transactions*."  *Id.* ¶ 181 (emphasis added).  Plaintiffs allege that investors were aware of these

38

disclosures because Uniti's stock price fell in response (*id.* ¶¶ 249-54), and that they were "a materialization of the risk concealed by Defendants' material misrepresentations and omissions alleged herein" (*id.* ¶¶ 25, 178, 206).

Moreover, Plaintiffs were also on notice of many of their allegations regarding scienter, including that Defendants allegedly *must* have known that the Master Lease violated Windstream's debt indentures given their positions at Windstream and their involvement in the spinoff, and that Defendants purportedly had a motive to commit fraud by virtue of their desire to maintain their lucrative positions. *See supra* at 26-29. Indeed, Defendants' roles in the spinoff, post-spinoff roles at Uniti and compensation were all public information.[15]

In light of these allegations, there can be no question that a reasonable investor was on notice of the possibility that Uniti had failed to disclose the risk that the Master Lease and spinoff violated the Sales-Leaseback provision of Windstream's debt indentures. *See, e.g.*, *Zarecor*, 801 F.3d at 887 (a reasonably diligent investor would be on notice of related lawsuit). Any claims based on those allegations are therefore time-barred.

## II.    PLAINTIFFS HAVE FAILED TO STATE A SECTION 10(b) CLAIM UNDER RULE 10b-5(a) OR (c) (COUNT II)

Plaintiffs' claim under Rules 10b-5(a) and (c) should be dismissed because it is duplicative of Plaintiffs' Rule 10b-5(b) claim. Claims under Rules 10b-5(a) and (c) are "generally referred to as 'scheme liability' claims." *KV Pharm.*, 679 F.3d at 986. To state such a claim, a plaintiff "must allege that the defendants engaged in deceptive conduct *separate from*

---

[15] To the extent Plaintiffs did not yet have access to internal Windstream emails and board materials by October 2017, as explained above, those materials affirmatively *undermine* any inference of scienter (*see supra* at 29-30) and therefore were not necessary for Plaintiffs to be on notice of their claims. In any event, a plaintiff need not be on notice of *all* of its allegations in order for the statute of limitations to run. *See, e.g.*, *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 68 F. Supp. 3d 530, 536 (S.D.N.Y. 2014) (statute of limitations began to run when "a substantial portion" of information on which scienter allegations were based "was either known or freely available to investors"), *aff'd*, 639 F. App'x 664 (2d Cir. 2016).

any alleged misstatements or omissions." *Barnes v. Oldner*, 259 F. Supp. 3d 926, 937 (E.D. Ark. 2017) (emphasis added) (citation omitted). In other words, "misrepresentation claims under Rule 10b-5(b) *cannot simply be recast as scheme liability claims* under Rules 10b-5(a) and (c)." *KV Pharm.*, 679 F.3d at 987 (emphasis added). In addition, "[l]egitimate business transactions that do not have a deceptive purpose or effect cannot form the basis of scheme liability." *SEC v. Quan*, 2013 WL 5566252, at \*14 (D. Minn. Oct. 8, 2013), *aff'd*, 870 F.3d 754 (8th Cir. 2017).

Here, the only "scheme" alleged in the Complaint consists of Defendants' "creation of Uniti through structuring a Spin-Off from Windstream . . . while simultaneously disseminating false and misleading information to the market regarding the 'well-structured' nature of the Master Lease and repeated assurances that the Spin-Off would not violate Windstream's Indenture." CAC ¶ 294. That is the *same* conduct underlying Plaintiffs' misrepresentation claim. *See supra* at 15-16. Plaintiffs have therefore not identified any conduct "beyond" Defendants' alleged misrepresentations and omissions that could plausibly support a scheme liability claim. *See KV Pharm.*, 679 F.3d at 987 (scheme liability "must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b)"). To the extent that Plaintiffs' scheme liability claim depends on the "creation of Uniti through structuring a Spin-Off from Windstream" (CAC ¶ 294), the claim fails because the Spin-Off was effectuated by *Windstream*, not Defendants (*see, e.g.*, *id.* ¶ 6) ("Windstream had complete control over the transaction and could structure the transaction, and set the terms, that Windstream alone deemed suitable."). In any event, Windstream's creation of Uniti is insufficient to state a scheme liability claim because there is no allegation in the complaint that it was not a "legitimate business transaction." *Quan*, 2013 WL 5566252, at \*44. [16]

---

[16] Even if the Court were to find that Plaintiffs' duplicative allegations were otherwise actionable under Rule 10b-5(a) or (c), Plaintiffs' claim would still fail for the same reasons as their Rule 10b-5(b) claim. To state a claim (….continued)

### III.   PLAINTIFFS HAVE FAILED TO STATE A CONTROL PERSON CLAIM UNDER § 20(a) (COUNT III)

To state a claim under Section 20(a), a plaintiff must allege an "underlying violation of the [Exchange Act]."  *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 961 (8th Cir. 2008). Thus, because Plaintiffs have failed to plead an underlying violation of the securities laws (*see supra* Sections I & II), their Section 20(a) claim fails.  *See id.*

### CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss the Complaint with prejudice.

Dated: July 10, 2020

OF COUNSEL:

Edmund Polubinski III *
Brian M. Burnovski *
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
edmund.polubinski@davispolk.com
brian.burnovski@davispolk.com

*/s/Jess Askew III*
Jess Askew III, Ark. Bar No. 86005
Andrew King, Ark. Bar No. 2007176
Frederick H. Davis, Ark. Bar No. 2012271
KUTAK ROCK LLP
124 West Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201-3706
(501) 975-3000 Telephone
jess.askew@kutakrock.com
andrew.king@kutakrock.com
frederick.davis@kutakrock.com

*Counsel for Defendants Uniti Group Inc. Kenneth A. Gunderman, and Mark A. Wallace*

* *admitted pro hac vice*

(continued….)

under Rule 10b-5(a) or (c), a plaintiff must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which require the plaintiff to "specify, with particularity, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue."  *Barnes v. Oldner*, 259 F. Supp. 3d 926, 937 (E.D. Ark. 2017) (quoting *KV Pharm.*, 679 F.3d at 986).  As with claims under Rule 10b-5(b), the plaintiff must also "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter.  15 U.S.C. § 78u-4(b)(2)(A); *see In re Enron Corp. Sec., Derivative & ERISA Litig.*, 2006 WL 6892915, at *3 (S.D. Tex. Dec. 4, 2006).  For the same reasons Plaintiffs fail to plead any false or misleading statement or a strong inference of scienter for their Rule 10b-5(b) claim (*see supra* Section I), they likewise fail to do so for their Rule 10b-5(a) and (c) claim.

41