UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

CENTRAL DIVISION

| | |
|---|---|
| In re UNITI GROUP INC. SECURITIES LITIGATION | )<br>)<br>)  Master File No. 4:19-cv-00756-BSM<br>) |
| This Document Relates To:<br><br>    ALL ACTIONS. | )<br>)<br>)<br>)<br>) |

**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................................ iii

I. INTRODUCTION ................................................................................................................1

II. RELEVANT FACTS............................................................................................................4

    A. Windstream Executives and Defendant Gunderman Devise the Spin-Off................................................................................................................................4

    B. The Formation of Uniti Would Solve Windstream's Capital Needs, but Windstream's Indenture Prohibited Sale-Leaseback Transactions and Restricted the Amount of Debt Windstream Could Carry on Its Books.......................5

    C. To Ensure That Windstream Received the Necessary Regulatory Approvals, Windstream and Defendants Misrepresented and Omitted Material Information Concerning the Spin-Off and the Master Lease ..........................9

    D. To Keep Up the Charade During the Class Period, Defendants Continued to Misrepresent and Omit Material Information Concerning the Spin-Off and Master Lease ..................................................................................11

    E. By August 2017, Information About The Propriety of The Spin-Off Began to Reach The Market and, In Response, Defendants Doubled-Down On Their Misrepresentations and Omissions Concerning the Spin-Off and Master Lease ....................................................................................................12

    F. In Response to Judge Furman's Ruling and Windstream's Bankruptcy Filing, Defendants Shift Their Message and Misrepresent Uniti's Ability to Withstand Windstream's Bankruptcy.............................................................15

    G. Post-Class Period Adversarial Action Between Windstream and Uniti Confirms That Windstream And Defendants Knew All Along That The Master Lease Was A Disguised Financing Arrangement.....................................17

III. PLAINTIFFS HAVE ADEQUATELY STATED A §10(b) CLAIM ................................17

    A. Plaintiffs Have Adequately Pled Materially False and Misleading Statements and Omissions ...............................................................................................18

        1. The Complaint Clearly Alleges Materially False and Misleading Statements and Omissions, And The Reasons Those Statements And Omissions Were False and Misleading at the Time.....................................18

- i -

2.    By Choosing to Speak About the Propriety Of The Spin-Off And Master Lease, Defendants Were Obligated To Speak The Full Truth.................................................................................................21

3.    The Complaint Does Not Plead Non-Actionable "Soft" Statements .................................................................................................24

4.    Defendants Cannot Avail Themselves of the Truth-On-The-Market Defense .................................................................................30

5.    The Complaint Does Not Plead Non-Actionable "Statements Of Opinion"...............................................................................................32

6.    The PSLRA's Safe Harbor Does Not Immunize Defendants' False and Misleading Statements................................................................34

7.    The Alleged False and Misleading Statements Made Before the Start of the Class Period Are Actionable ...........................................37

B.    Plaintiffs Plead Facts Giving Rise to a Strong Inference of Scienter .........................38

1.    The Balance Of Competing Inferences Supports A Strong Inference of Scienter ...................................................................................39

2.    Defendants Knew and Had Access To Information Indicating That Their Public Statements Were Materially Misleading................................41

(a)    Sale-Leaseback Violation.............................................................41

(b)    True Lease Determination ............................................................47

3.    Defendants Had Motive and Opportunity to Commit Fraud ...............................49

C.    Plaintiffs Have Adequately Pled Loss Causation .........................................................51

D.    Defendants' Contention that Plaintiffs' Claims Are Time-Barred is Premature, And Incorrect.............................................................................................56

IV.    PLAINTIFFS HAVE ADEQUATELY STATED A §10(b) CLAIM UNDER RULE 10b-5(a) AND (c) ..............................................................................................59

V.    PLAINTIFFS HAVE ADEQUATELY STATED A §20(a) CLAIM ...............................62

VI.    CONCLUSION...................................................................................................................62

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Adelphia Supply USA*,
  No. 15-CV-05826, 2017 WL 6014322 (E.D.N.Y. Aug. 14, 2017) .........................................26

*In re Able Labs. Sec. Litig.*,
  No. 05-CV-02681-JAG, 2008 WL 1967509 (D.N.J. Mar. 24, 2008)....................................62

*In re Am. Italian Pasta Co. Sec. Litig.*,
  No. 05-CV-00725, 2006 WL 1715168 (W.D. Mo. June 19, 2006).........................................48

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012).................................................................................................39

*In re Avon Sec. Litig.*,
  No. 19-CV-01420, 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)....................................33, 34

*Barnes v. Oldner*,
  259 F. Supp. 3d 926 (E.D. Ark. 2017).....................................................................................61

*Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
  94 F. Supp. 3d 1035, 1044-45 (D. Minn. 2015)................................................................ *passim*

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................................3

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
  506 F. App'x 32 (2d Cir. 2012) .............................................................................................21

*Campbell v. Transgenomic, Inc.*,
  916 F.3d 1121 (8th Cir. 2019) ...............................................................................................62

*Carvelli v. Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019) .............................................................................................32

*In re CenturyLink Sales Practices & Sec. Litig.*,
  403 F. Supp. 3d 712 (D. Minn. 2019)................................................................................35, 51

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
  No. 17-CV-1580-LGS, 2018 WL 2382600 (S.D.N.Y. May 24, 2018) .................................57

*In re Chronimed Inc. Sec. Litig.*,
  No. Civ. 01-1092-DWF-AJB, 2002 WL 1016824 (D. Minn. May 16, 2002) ....................3, 47

*In re Citigroup, Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Trust, Inc.*
   *v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006)................................................26

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)........................................................................................26

*In re Credit Suisse-AOL Sec. Litig.*,
   465 F. Supp. 2d 34 (D. Mass. 2006) ..............................................................29, 32, 36

*Cummings v. Paramount Partners, LP*,
   715 F. Supp. 2d 880 (D. Minn. 2010).........................................................................46

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) .....................................................................................37

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
   323 F. Supp. 3d 393 (S.D.N.Y. 2018)..........................................................................57

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005).............................................................................17, 51, 54, 55

*Dutton v. D&K Healthcare Res.*,
   No. 4:04-CV-147-SNL, 2006 WL 1778884 (E.D. Mo. June 23, 2006) .....................3

*Elam v. Neidorff*,
   544 F.3d 921 (8th Cir. 2008) .................................................................................48, 49

*In re Eletrobras Sec. Litig.*,
   245 F. Supp. 3d 450 (S.D.N.Y. 2017)..........................................................................29

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011)......................................................................................................54

*FHFA v. Nomura Holding Am., Inc.*,
   104 F. Supp. 3d 441 (S.D.N.Y. 2015), *aff'd*, 873 F.3d 85 (2d Cir. 2017) ........... 32-33

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
   270 F.3d 645 (8th Cir. 2001) .................................................................20, 39, 40, 47

*Freedman v. St. Jude Med., Inc.*,
   4 F. Supp. 3d 1101 (D. Minn. 2014).............................................................18, 23, 42

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018)..........................................................................34

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000).........................................................................................30

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
68 F. Supp. 3d 530 (S.D.N.Y. 2014), *aff'd*, 639 F. App'x 664 (2d Cir. 2016)........................58

*Gebhardt v. ConAgra Foods, Inc.*,
335 F.3d 824 (8th Cir. 2003) ........................................................................24, 39, 55

*In re Hi-Crush Partners L.P. Sec. Litig.*,
No. 12-CV-8557, 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ..............................................23

*Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*,
580 F.3d 755 (8th Cir. 2009) ..............................................................................17

*Hutchins v. NBTY, Inc.*,
No. 10-CV-2159, 2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012)............................................23

*In re Initial Pub. Offering Sec. Litig.*,
399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005), *aff'd sub nom. Tenney v. Credit
Suisse First Boston Corp.*, No. 05-3430, 2006 WL 1423785 (2d Cir. May 19,
2006) ....................................................................................................52

*Institutional Inv'rs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)..............................................................................45

*JAC Holding Enters., Inc. v. Atrium Capital Partners, LLC*,
997 F. Supp. 2d 710 (E.D. Mich. 2014)....................................................................60

*Julianello v. K-V Pharm. Co.*,
791 F.3d 915 (8th Cir. 2015) ............................................................................35

*In re K-Tel Int'l Inc. Sec. Litig.*,
300 F.3d 881 ............................................................................................21

*Kushner v. Beverly Enterprises, Inc.*,
317 F.3d 820 (8th Cir. 2003) ............................................................................27

*Lapin v. Goldman Sachs Grp., Inc.*,
506 F. Supp. 2d 221 (S.D.N.Y. 2006)......................................................................29

*Lentell v. Merrill Lynch & Co., Inc.*,
396 F.3d 161 (2d Cir. 2005)..............................................................................52

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
No. 09-CV-00799, 2011 WL 2444675 (D. Del. June 14, 2011)..............................................50

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ............................................................................26

*Lustgraaf v. Behrens*,
   619 F.3d 867 (8th Cir. 2010) ...............................................................................18, 21

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) .......................................................................................50

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)......................................................................................................24

*McAdams v. McCord*,
   584 F.3d 1111 (8th Cir. 2009) ....................................................................................51

*In re Medtronic, Inc. Sec. Litig.*,
   618 F. Supp. 2d 1016 (D. Minn. 2009), *aff'd sub nom. Detroit Gen. Ret. Sys.
   v. Medtronic, Inc.*, 621 F.3d 800 (8th Cir. 2010)........................................................39

*Merck & Co., Inc. v. Reynolds*,
   559 U.S. 633 (2010).............................................................................................56, 58

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ..................................................................................52

*Minneapolis Firefighters' Relief Assn v. Medtronic, Inc.*,
   No. 08-CV-06324-PAM-AJB, 2010 WL 11469576 (D. Minn. Feb. 3, 2010)................... 46-47

*In re MoneyGram Int'l, Inc. Sec. Litig.*,
   626 F. Supp. 2d 947 (D. Minn. 2009)....................................................................22, 49

*In re NAHC, Inc. Sec. Litig.*,
   306 F.3d 1314 (3d Cir. 2002).......................................................................................26

*In re Nash Finch Co. Sec. Litig.*,
   502 F. Supp. 2d 861 (D. Minn. 2007)......................................................................... 3, 38-39

*In re Navarre Corp. Sec. Litig.*,
   299 F.3d 735 (8th Cir. 20002) ............................................................................. *passim*

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*,
   840 F. Supp. 243 (S.D.N.Y. 1993) ..............................................................................58

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019)............................................................................40

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)..........................................................................................32, 33, 34

*In re Omnicom Grp., Inc. Sec. Litig.*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008)..........................................................................52

*Patel v. Parnes*,
  253 F.R.D. 531 (C.D. Cal. 2008) ..................................................................................21

*Pet Quarters, Inc. v. Badian*,
  No. 4:04-CV-697-RSW, 2006 WL 8445030 (E.D. Ark. Apr. 28, 2006)................................58

*PR Diamonds, Inc. v. Chandler*,
  364 F.3d 671 (6th Cir. 2004) ........................................................................................50

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
  679 F.3d 972 (8th Cir. 2012) ...................................................................................... *passim*

*Rand-Heart of N.Y., Inc. v. Dolan*,
  812 F.3d 1172 (8th Cir. 2016) .......................................................................... 18, 36-37, 52

*Ret. Fund v. Tile Shop Holdings, Inc.*,
  94 F. Supp. 3d 1035 (D. Minn. 2015)............................................................................. *passim*

*Ret. Sys. v. Wal-Mart Stores, Inc.*,
  No. 12-CV-05162, 2014 WL 4823876 (W.D. Ark. Sept. 26, 2014)........................................41

*In re Retek Inc. Sec. Litig.*,
  621 F. Supp. 2d 690 (D. Minn. 2009)..............................................................................51

*Ritchey v. Horner*,
  244 F.3d 635 (8th Cir. 2001) .......................................................................................58

*Rubke v. Capital Bancorp Ltd.*,
  551 F.3d 1156 (9th Cir. 2009) .....................................................................................32

*S.E.C. v. Langford*,
  No. 8:12-CV-344, 2013 WL 1943484 (D. Neb. May 9, 2013) ........................................60, 62

*S.E.C. v. Quan*,
  No. 11-CV-723, 2013 WL 5566252 (D. Minn. Oct. 8, 2013), *aff'd,* 870 F.3d
  754 (8th Cir. 2017)..............................................................................................61, 62

*Sagez v. Glob. Agric. Invs., LLC*,
  No. 11-CV-03059-DEO, 2014 WL 3779072 (N.D. Iowa July 31, 2014)................................57

*Sanchez v. Centene Corp.*,
  407 F. Supp. 3d 831 (E.D. Mo. 2019)...............................................................................49

*Schaaf v. Residential Funding Corp.*,
  517 F.3d 544 (8th Cir. 2008) .....................................................................................52, 53

*Schoenfeld v. U.S. Resort Mgmt., Inc.*,
  No. 05-CV-04368-CVC-NKL, 2007 WL 2363500 (W.D. Mo. Aug. 16, 2007) ....................57

*St. Croix Waterway Ass'n v. Meyer*,
  178 F.3d 515 (8th Cir. 1999) ........................................................................55

*In re St. Jude Med., Inc. Sec. Litig.*,
  836 F. Supp. 2d 878 (D. Minn. 2011) ................................................... *passim*

*St. Paul Travelers Sec. Litig.
  II*, No. 04-CV-04697, 2006 WL 2735221 (D. Minn. Sept. 25, 2006) ...............30, 39

*In re Stellent, Inc. Sec. Litig.*,
  326 F. Supp. 2d 970 (D. Minn. 2004)..................................................... *passim*

*In re Synovis Life Techs., Inc. Sec. Litig.*,
  No. 04-CV-3008-ADM-AJB, 2005 WL 2063870 (D. Minn. Aug. 25, 2005)...................44, 45

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)......................................................................... *passim*

*Tracy v. Telemetrix, Inc.*,
  No. 8:12-CV-359, 2016 WL 3383229 (D. Neb. May 3, 2016) . Case....................57

*In re Tyson Foods, Inc. Sec. Litig.*,
  275 F. Supp. 3d 970 (W.D. Ark. 2017)..................................................23

*United States v. Xiong*,
  914 F.3d 1154 (8th Cir. 2019) .........................................................59

*In re UnitedHealth Grp. PSLRA Litig.*,
  No. 06-CV-1691, 2007 WL 1621456 (D. Minn. June 4, 2007)..............................18

*Va. Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991).....................................................................32

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005)...................................................23

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
  845 F.3d 384 (8th Cir. 2016) .........................................................59

*Witcher v. TeamCare*,
  No. 2:18-cv-00022-KGB, 2018 WL 10160961 (E.D. Ark. Sept. 4, 2018)..............57

*In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*,
  286 F. Supp. 2d 1047 (D. Minn. 2003)...............................................22, 24, 62

*Zaluski v. United Am. Healthcare Corp.*,
  527 F.3d 564 (6th Cir. 2008) .........................................................27

*Zarecor v. Morgan Keegan & Co., Inc.*,
 801 F.3d 882 (8th Cir. 2015) ..................................................................................56, 58

*Zelman v. JDS Uniphase Corp.*,
 376 F. Supp. 2d 956 (N.D. Cal. 2005) .....................................................................37, 38

**Statutes**

15 U.S.C. § 78u-5(c)(1) ...........................................................................................................34

28 U.S.C. §1658(b) .................................................................................................................56

17 C.F.R. § 240.10b-5.................................................................................................18, 21, 62

17 C.F.R. § 240.10b-5(a), (c)..........................................................................................59, 62

17 C.F.R. § 240.10b-5(b) ........................................................................................................59

**Other Authorities**

Fed. R. Civ. P. Rule 8 .............................................................................................................51

Fed. R. Civ. P. Rule 12(b)(6) ...............................................................................................3, 39

Lead Plaintiffs Zhengxu He, Trustee for the He & Fang 2005 Revocable Living Trust, Steamfitters Local 449 Pension Plan, Wayne County Employees' Retirement System, and David McMurray, on behalf of himself and as sole beneficiary of the David McMurray R/O IRA ("Plaintiffs") hereby submit this opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint. ECF No. 63 ("Mot." or the "Motion").[1]

## I.    INTRODUCTION

The detailed allegations of the Complaint far exceed the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which was enacted to deter frivolous litigation, not meritorious lawsuits like this one. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007).

With exacting particularity, the Complaint outlines a longstanding fraudulent scheme and course of conduct designed to mislead the public, various state regulators, and investors about the propriety of Uniti's very existence – the validity of the spin-off transaction that resulted in Uniti becoming a public-company and the lease entered into as a result of the spin-off transaction, and the true risk facing the Company should the spin-off transaction be declared invalid. The Complaint alleges that before and during the Class Period, April 24, 2015 through June 25, 2019, Defendants misrepresented and concealed that, from its inception, the spin-off transaction was explicitly structured to evade the restrictions in an Indenture governing certain unsecured notes issued by Uniti's parent company Windstream strictly prohibiting (1) sale-

---

[1] References to "Mot." and "Motion" also refer to the brief submitted in support thereof. ECF No. 64. Defendants are Uniti Group Inc. ("Uniti" or the "Company"), Kenneth A. Gunderman, and Mark A. Wallace. Gunderman and Wallace are referred to collectively as the "Individual Defendants." The Consolidated Amended Class Action Complaint is referred to herein as the "Complaint," (cited as "¶__"). ECF No. 62. All capitalized terms shall be ascribed the same meaning as in the Complaint. Unless otherwise noted, all internal citations have been omitted and emphasis added.

leaseback transactions like the spin-off transaction; and (2) financing arrangements like the resulting lease. As a result, Defendants misrepresented and concealed the true risk facing the Company should the spin-off transaction be challenged as invalid – i.e., that Uniti's largest (and at one point *only* customer) would be responsible for the immediate payment of hundreds of millions of Notes, meaning bankruptcy for Windstream and, likely, Uniti.  ¶¶55, 68-78, 90-91, 95-99, 109-110, 139-228.

The Complaint details internal documents, including emails and Board meeting materials, received by Defendants that reveal the efforts taken to structure the transaction to work around the prohibitions in Windstream's Indenture. ¶¶56-58, 79-86. For example, the Complaint quotes from an internal public relations strategy provided to Defendants that instructed them to conceal that the transaction violated the Indenture, including talking points describing how Defendants should publicly discuss the details of the transaction. The talking points advised Defendants to, among other things, deflect if ever asked about the structure of the transaction, and instead offer vague responses to such questions. ¶¶92-94, 118-121. Additionally, the Complaint recounts valuation analyses Defendants had in their possession that showed that the useful life of the main asset being sold to Uniti, and leased-back to Windstream, did not exceed the term of the lease to be executed as part of the spin-off transaction, and as a result, the lease was really a financing arrangement prohibited by the Indenture. ¶¶125-138.

The Complaint also describes the rewards heaped on Defendants as a result of successfully completing the transaction, which delivered $1.035 billion in cash, and $672 million in debt relief to Windstream who desperately needed the infusion of capital to stay competitive, and who had no other options to raise this necessary capital. ¶¶113, 238(f). For instance, Defendant Kenny Gunderman – someone without any experience as an executive of a publicly

2

traded company – was named Uniti's post-spin-off President and CEO, which came with a $5 million annual salary. ¶42.

Defendants' Motion ignores these allegations and the limits of a motion to dismiss, and instead urges the Court to accept their version of the facts, and resolve factual questions in their favor. But, under Rule 12(b)(6), a complaint's allegations must be accepted as true, considered in their entirety and "construed in the light most favorable to the nonmoving party." *Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1044-45 (D. Minn. 2015) ("Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party."); *Tellabs*, 551 U.S. at 310, 322. Viewed through the appropriate lens, there is no question that the Complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

At bottom, Defendants' Motion is a myriad of proclaimed possibilities of what might have been in the minds of Defendants, and an all-but-direct plea to the Court to absolve them of liability before any discovery is taken. But, on a motion to dismiss, "the question is not whether Plaintiff can be successful on its securities fraud claims, but rather, whether Plaintiff has pled its allegations and supporting facts with particularity such that the Complaint should remain for discovery." *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 877 (D. Minn. 2007).[2] The Complaint sets forth detailed allegations of Defendants' fraud, and the organized efforts they

---

[2] *See also Dutton v. D&K Healthcare Res.*, No. 4:04-CV-147-SNL, 2006 WL 1778884, at *2 (E.D. Mo. June 23, 2006) (holding that the court should not dismiss a complaint "merely because the court doubts that the plaintiff will be able to prove all of the necessary allegations"); *In re Chronimed Inc. Sec. Litig.*, No. Civ. 01-1092-DWF-AJB, 2002 WL 1016824, at *6 (D. Minn. May 16, 2002) (holding that to dismiss plaintiff's claims "based on an undeveloped record and the mere possibility of an alternative explanation" to the alleged fraud "would be premature" at the motion to dismiss stage of the litigation).

undertook to conceal it from investors. Nothing more is, or can be, required of Plaintiffs. Defendants' Motion should be denied.

## II.    RELEVANT FACTS

Uniti operates as a REIT that owns and leases the use of its wireless networks to telecommunications companies. ¶5. As described below, Uniti was formed when its parent company, Windstream Holdings, a publicly traded holding company, spun Uniti off as an independent, public company after having sold certain of Windstream Holdings' telecommunications assets to Uniti, which, in turn, leased those assets back to Windstream Holdings via a long-term lease agreement (the "Spin-Off"). ¶¶53-54, 59. Windstream Holdings and Windstream Operating Subsidiaries (together, "Windstream") are Uniti's largest customer, accounting for 87.9%, 74.8%, and 68.2% of Uniti's annual revenues in 2016, 2017, and 2018, respectively. ¶55. Thus, during (and even after) the Class Period, Uniti's financial success was highly dependent on Windstream's financial viability. *Id.*

### A.    Windstream Executives and Defendant Gunderman Devise the Spin-Off

By 2013, Windstream was in desperate need of capital. ¶56. Specifically, Windstream needed an infusion of capital to make critical upgrades to its aging telecommunications networks to keep up with its peers that were offering faster network speeds as a result of investments those companies had made in new technologies. ¶57. But Windstream's ability to fund these necessary investments were hamstrung by two circumstances: (1) its investors' expectation of consistent dividend payments, and (2) limited options to obtain financing for these crucial upgrades. Windstream simply did not have the cash to make its dividend payments and upgrade its network infrastructure, and needed outside financing. *Id.*

Enter Defendant Kenny Gunderman. Defendant Gunderman, was, at the time, Windstream's lead adviser at investment banking firm Stephens, Inc., and also the brother of

Windstream's Senior Vice President, Financial Planning and Treasurer Robert Gunderman. ¶¶49, 58. Taking advantage of a recent IRS ruling expanding the types of assets that could be classified as a REIT, Defendant Gunderman proposed that Windstream create and spin-off a REIT owning Windstream's copper wire and fiber optic cable networks.  ¶58.

The structure of the Spin-Off contemplated several steps: (1) Windstream Services – Windstream's predecessor holding company – would create a new holding company specifically for purposes of the Spin-Off, i.e., Windstream Holdings, under which Windstream Services and the Windstream Operating Subsidiaries would be wholly-owned subsidiaries; (2) Windstream Services would direct the Windstream Operating Subsidiaries – which actually owned and operated the telecommunication networks – to execute an intra-company transfer of certain critical assets, including 300,000 miles of copper wires and fiber optic cables, as well as related real estate, to Uniti, a newly formed REIT, also a wholly-owned subsidiary of Windstream Holdings; (3) Uniti would then lease those assets back to Windstream Holdings via a "Master Lease"; and (4) Windstream Holdings would spin-off Uniti as an independent public company. ¶¶47, 59.

> **B.** **The Formation of Uniti Would Solve Windstream's Capital Needs, but Windstream's Indenture Prohibited Sale-Leaseback Transactions and Restricted the Amount of Debt Windstream Could Carry on Its Books**

On January 23, 2013, Windstream issued $700 million of unsecured notes, due in 2023, (the "Notes"), that were subject to an Indenture that contained several restrictive covenants. ¶¶68-69. Two of these restrictive covenants were particularly relevant to the Spin-Off executed by Windstream and Defendants.

First, the Indenture specifically provided that "[Windstream Services] shall not, and shall not permit any of its Restricted Subsidiaries [defined to include the Windstream Operating Subsidiaries] to, enter into any Sale and Leaseback Transaction." ¶¶69-71. At the time of the

Indenture, the Windstream Operating Subsidiaries owned and operated the telecommunication networks that were ultimately sold to Uniti. ¶60. Accordingly, the Spin-Off contemplated that, post Spin-Off, the Windstream Operating Subsidiaries would continue to use and occupy the telecommunication networks as before and fulfill all obligations toward the assets, including maintenance, tax payments, and capital improvements. ¶60. However, the Indenture specifically prohibited the sale and leaseback of these assets. ¶¶69-72.

Second, the Indenture prohibited Windstream Services and the Windstream Operating Subsidiaries from "directly or indirectly" incurring any additional debt, unless after considering the additional debt, Windstream kept its "Consolidated Leverage Ratio" below a certain threshold. ¶73. This covenant prohibited certain financing transactions in which the network assets could be used to support additional loans to Windstream. ¶74.

Windstream and its executives and advisors working on the Spin-Off transaction were well aware of the Indenture's restrictions. In fact, in April 2013, Windstream's then-CFO Tony Thomas (who is currently Windstream's CEO) emailed Robert Gunderman (Windstream's then-Treasurer and Defendant Gunderman's brother) specifically flagging the restrictive covenants in the Indenture as a potential problem for executing the Spin-Off:

> We need a capital structure that works with the Indenture; we may be able to use the HoldCo strategy here. Create HoldCo and put Windstream Financial underneath HoldCo…***Remember, the sales – leaseback provision in the Indenture can be a limiting factor here***.

¶75. Despite the Indenture's restrictions, Windstream's Board ultimately approved the use of this "HoldCo" strategy, which resulted in the formation of Windstream Holdings on August 30, 2013, and incorporation of Uniti, as a wholly-owned subsidiary of Windstream Holdings, in February 2014. ¶¶77-78.

Over the course of several meetings in the first half of 2014, Windstream's Board of Directors, Windstream and Uniti executives, including Thomas (Windstream's CFO and Uniti's CEO), John Fletcher (Windstream and Uniti's General Counsel), and Defendant Gunderman, discussed, analyzed, and finalized the structure of the Spin-Off and the Master Lease.  ¶¶79-85. Defendant Gunderman, in particular, provided information during at least one "Strategic Planning Session" in February 2014 by preparing a 75-page power-point presentation that was included with the materials distributed for that meeting. ¶80. In this power-point, Defendant Gunderman described the history of Windstream's consideration of forming a REIT subsidiary and the steps that had been taken to do so. *Id.* Defendant Gunderman's power-point also acknowledged that without proceeding with the Spin-Off, Windstream had "no clear path to deleverage meaningfully" and that it also would be "difficult to pursue M&A aggressively." *Id.* Defendant Gunderman's power-point also included several valuation scenarios for Windstream and Uniti.  *Id.*

During several meetings in May 2014, attended by Defendant Gunderman, Windstream and Uniti executives Thomas and Fletcher, and Windstream's Board of Directors, specific details concerning the Spin-Off and Master Lease were discussed. ¶¶81-85. The attendees explicitly considered the "steps required to effect the transaction" and the "structure of the lease between the resulting companies." ¶81. In materials provided for the meetings, attendees were given a detailed "[o]verview of [the] Master Lease," including the economics of the transaction and a discussion of the parties to the Master Lease, the term, the rent to be paid and the assets to be transferred to Uniti. ¶¶82, 85. The attendees also discussed and were provided a written "communications strategy" to be employed with "regulators," "stakeholders," and "investors,"

7

which included "a 2-3 day IR roadshow to visit top shareholders" and "attending" two "investor conferences" in May 2014.  ¶84.

Attendees at these meetings also discussed in detail the Spin-Off's benefits to Windstream, notably how the Spin-Off would eliminate the "limit[ations]" on Windstream's ability to "invest for growth, pursue strategic acquisitions and/or delever." ¶¶83, 85. In particular, the meeting materials outlined how the Spin-Off would permit Windstream to make the essential network upgrades and realize its plan to replace its aging "copper DSLAMS to fiber-fed in competitive areas and create entire fiber-fed communities." ¶¶81, 83, 85. This discussion also included a detailed overview of the valuation analysis performed by accounting firm Ernst & Young, LLP that estimated the fair value of rent to be assessed in the Master Lease, and the residual life of the transferred assets at the end of the lease term.  ¶¶81, 83, 85.

Through these meetings, Windstream and Defendants Uniti and Gunderman, determined that Windstream Holdings would be the only Windstream entity to sign the Master Lease, to avoid, as Fletcher and Robert Gunderman have since admitted under oath, "a clear violation" of the Indenture (¶86), considering that the Indenture prohibited Windstream Services and the Windstream Operating Subsidiaries from signing the lease.  ¶¶69-71.

Once these decisions were finalized, Windstream and Uniti worked to obtain regulatory approval of the Spin-Off. While those regulatory approval efforts were underway, a cobble of Windstream executives, who were also *simultaneously* Uniti executives, worked to finalize the terms of the Master Lease. ¶¶102-108. Indeed, the two negotiating groups – the "Windstream Group" and the "Uniti Group" – were headed by Fletcher and Thomas, respectively, both Windstream and Uniti executives at the time. ¶¶104-105. Even more telling, Fletcher has admitted under oath that the "negotiations" of the Master Lease were not at arms-length. ¶103.

**C.    To Ensure That Windstream Received the Necessary Regulatory Approvals, Windstream and Defendants Misrepresented and Omitted Material Information Concerning the Spin-Off and the Master Lease**

In order for the Spin-Off to proceed, Windstream and Uniti's representatives and executives – including Fletcher, Robert Gunderman, and his brother Defendant Gunderman – needed to obtain approval of the transaction from numerous state regulatory bodies. ¶89. As Fletcher has confirmed under oath, the "regulators were focused on whether the transferor subsidiaries would be able to continue to operate and discharge their regulatory requirements." ¶90. At the same time, however, Windstream and Defendants needed to conceal from the market the true nature of the transaction and the extent of the risk that the Spin-Off violated the terms of the Indenture, as the transaction was vital to Windstream's ability to upgrade its aging network – something essential for its ability to stay competitive.  ¶87.

Windstream, Uniti, and their executives walked this tightrope by following a carefully crafted messaging strategy aimed at avoiding discussing the details of the Indenture's restrictions prohibiting the Spin-Off and Master Lease. ¶92. Indeed, this messaging strategy encouraged vague and non-responsive answers to questions concerning the impact of the restrictive covenants in the Indenture on the Spin-Off and Master Lease, specifically instructing to "***not go into detail*** . . . unless specifically asked" about each different type of covenant or restriction, and to provide additional information "ONLY IF PRESSED."  ¶¶93-94.

To that end, Windstream's advisors, with the knowledge, support, and approval of Windstream and Uniti's executives (including Fletcher, General Counsel for ***both*** companies), drafted, reviewed, and signed various applications, affidavits, and other documents submitted to regulatory bodies as part of the approval processes in several states. ¶¶91, 96-97. In these filings, Windstream and Uniti assured state regulators that: (1) in connection with the Master Lease, the Windstream Operating Subsidiaries would have "exclusive" and "long-term" "usage rights" and

9

"control" over the transferred assets, and would have the same obligations with respect to the assets that they had always had; and (2) the Master Lease was being executed by Windstream Holdings "for the benefit of the [Windstream Operating Subsidiaries]." ¶95.

Fletcher and Robert Gunderman also provided testimony under oath to the Kentucky Public Service Commission concerning the Spin-Off and Master Lease as part of obtaining regulatory approval in that state, *acknowledging that they were "speaking for both companies," i.e., Windstream and Uniti*. ¶99. Additionally, during this testimony, Robert Gunderman, in the presence of Fletcher, affirmatively represented to regulators that the Spin-Off and Master Lease *would not* violate Windstream's Indenture, stating that "[a]s part of this transaction, [Windstream] ha[d] no concerns with any covenants within [its] indentures or [its] existing credit agreement." *Id.*

Ultimately, Windstream and Uniti were successful in obtaining the regulatory approvals. In March 2015, Fletcher and Defendant Gunderman (by then Uniti's President and CEO) participated in Windstream Board of Director meetings "to provide the Board with a status update on the proposed REIT transaction." ¶109. At a March 25, 2015 Board meeting attended by both Fletcher and Defendant Gunderman, Windstream's Board approved the Spin-Off. ¶110.

For his efforts in bringing the Spin-Off and Master Lease to fruition, Defendant Gunderman was rewarded by being named Uniti's post-Spin-Off President and CEO, a role he continues to hold today and which comes with a $5 million annual paycheck. ¶¶42, 106, 238(d). Similarly, his brother Robert was promoted and named Windstream's CFO and Thomas ascended to become Windstream's CEO. ¶¶48-49.

**D.    To Keep Up the Charade During the Class Period, Defendants Continued to Misrepresent and Omit Material Information Concerning the Spin-Off and Master Lease**

On March 26, 2015, Uniti announced the completion of the Spin-Off, stating that it would be finalized on April 24, 2015. ¶140. That same day, Uniti, Windstream Holdings and Windstream Services entered into a Separation and Distribution Agreement that governed the execution of the transfer of assets to Uniti as part of the Spin-Off transaction. ¶111.

On April 12, 2015, Defendants participated in a "messaging call" with members of Windstream's management, including Robert Gunderman, and investment bankers from JPMorgan and Bank of America. ¶118. Prior to the "messaging call," the participants were again provided with a set of talking points to use in addressing how the Master Lease and the Windstream relationship should be discussed publicly. *Id.* Consistent with the messaging strategy used during the regulatory approval process (*see supra* at 9), among other things, the talking points provided to Defendants encouraged vague and indirect responses to questions concerning the choice of parties to the Master Lease and other topics concerning the Spin-Off structure. ¶120. Indeed, the talking points counseled to "*always lead with*" that "WIN is a very reliable tenant," and to stress that the "[Master] Lease Structure [was] Well Designed and Ironclad" and that "WIN and [Uniti's] collective intent in negotiating the lease was for it to be impossible to reject it in a bankruptcy." ¶119. Defendants faithfully stuck to this messaging strategy during the Class Period.

Prior to the finalization of the Spin-Off and execution of the Master Lease, Defendants stuck to these talking points and made several filings with the SEC that contained material misstatements and omissions concerning both transactions, including that the Spin-Off did not violate *any* agreement, document, or instrument to which Windstream, or its assets, were bound, i.e., the Indenture. ¶¶141-150. Defendants continued this misinformation campaign during the

11

Class Period, which begins on April 24, 2015, assuring investors over the next two years that the Company had put forth "extraordinary efforts over the last several months to launch [Uniti]," putting it on a "solid foundation for success." ¶163. Defendants also touted their "Deep Familiarity with Sale Leaseback Transactions," which they claimed was one way they would structure future growth transactions for Uniti (¶156), and told investors that the Company was "always look[ing] at potential sale-leaseback options," including "*additional sale-leaseback options with Windstream*." ¶165.

> E. **By August 2017, Information About The Propriety of The Spin-Off Began to Reach The Market and, In Response, Defendants Doubled-Down On Their Misrepresentations and Omissions Concerning the Spin-Off and Master Lease**

On August 3, 2017, Windstream announced it was eliminating its dividend payment, which triggered an immediate drop of Uniti's stock price. ¶¶168, 247-248.  Later that same day, on a conference call following Uniti's announcement of its second quarter 2017 financial results, Defendant Gunderman pulled out the April 2015 talking points playbook and represented that the lease payment from Windstream was "very, very safe and a very high-priority payment from their perspective," and that Defendants "remain[ed] highly confident" in receiving it. ¶169. A few days later, Defendant Gunderman used his appearance at an investor conference to repeat similar assurances. ¶171. As if reading straight from the talking points, Defendant Gunderman told the market:

> And so we've obviously done an exhaustive amount of work on the protections associated with that lease payment in any sort of scenario, whether it's steady-state, distressed, bankruptcy, any scenario you want to work through, and feel confident that *we're protected in all cases*.

*Id.*

But things quickly got worse for Uniti. In August 2017, rumors began to circulate that New York-based hedge fund Aurelius was buying Windstream's Notes in an effort to gain a 25%

position, fueling speculation that Aurelius believed the Spin-Off violated the Indenture. ¶172. These rumors also caused Uniti's stock price to fall. ¶¶172, 249. In response, Defendants once again leaned on the April 2015 talking points, assuring investors that the Master Lease was "fair," that Defendants had "a lot of confidence" in Windstream's executives and that the Master Lease "[was] designed to be well structured for distressed situations." ¶¶173-175.

Then, on September 25, 2017, Windstream filed a Form 8-K announcing that it had received a "purported notice of default" from Aurelius (the "Notice of Default"), contending that the Spin-Off transaction violated the Indenture's prohibition against sale-leaseback transactions. ¶177. Uniti's stock price plummeted on this news. ¶¶178, 254. Within a few weeks, Aurelius instructed the trustee of the Notes, U.S. Bank National Association, to file suit in the U.S. District Court for the Southern District of New York, alleging that the Spin-Off violated Windstream's Indenture (the "Aurelius Litigation"). ¶181. A ruling in Aurelius' favor would trigger an acceleration provision in the Indenture that would make the entire aggregate amount of the Notes, and any unpaid interest, due immediately – a figure in the hundreds of millions of dollars, which would likely bankrupt Windstream and have dire consequences for Uniti. *Id.*

Over the next 15 months, as the Aurelius Litigation progressed, Defendants went on the defensive, repeating the April 2015 talking points, assuring the market that the Master Lease was "well-structured," "well-crafted," and that Defendants had "tremendous confidence in the lease" and "the way" it was "structured." ¶¶179, 188. Defendants also repeatedly assured investors that they had "done a deep dive" into the Master Lease, that they had "always felt good about the protections in the master lease," that after doing a "deeper dive on [the] lease . . . than [they had] ever ha[d] before" they "continue[d] to be highly confident in the leased, lease payment, the protections that [they] ha[d] in all scenarios," and that the rent payment was "a priority payment

from [their] standpoint and from Windstream's standpoint as well." ¶¶179, 186, 188, 196. Finally, Defendants took every opportunity to expressly disclaim the possibility of a ruling in favor of Aurelius and insisted that because Windstream "had very competent counsel and advisors (Defendant Gunderman being one of them) involved in the initial spin-off," "Windstream [would] ultimately have a favorable outcome," that Aurelius' claims were "manufactured," that Defendants had a "high degree of confidence" and were "highly confident" that Windstream would prevail, and that the "risk" was "small" for an "unfavorable outcome" in the Aurelius Litigation. ¶¶184, 187-189, 194-195, 197-198.

Defendants' execution of the April 2015 "messaging call" talking points was a success. Following the negative reaction to the initial news of a potential default of the Indenture by Windstream, Uniti's stock price reversed its decline, increasing 22% between October 4, 2017 and February 15, 2019. ¶¶200, 254.

But, on February 15, 2019, after the market closed, Judge Jesse Furman, who presided over the Aurelius Litigation bench trial in July 2018, entered his Findings of Fact and Conclusions of Law, holding that the Spin-Off and execution of the Master Lease violated the Indenture. ¶¶201-204. Specifically, Judge Furman found that, given the realities of the structure of the Spin-Off and Master Lease, the Windstream Operating Subsidiaries "leased" the assets transferred to Uniti in violation of the terms of the Indenture, notwithstanding that Windstream Holdings was the Master Lease signatory. ¶202. Because of these findings, Judge Furman declared more than $300 million of the Notes immediately due and payable. ¶204.

This was a major blow to Windstream – Uniti's largest customer. And, as a result, on February 19, 2019 (the first trading day after Judge Furman's findings were released), Uniti's stock price cratered, dropping *an astounding 37%, on a trading volume of 49 million shares –*

14

*25 times the average daily trading volume* for Uniti's stock. ¶¶206, 255-256. A few days later, on February 21, 2019, Uniti's credit ratings were downgraded as a result of the market discovering the truth – that the sale leaseback transaction violated the Indenture, which caused Uniti's stock price to continue its free fall, losing another 18% in a single day, on 24 million shares trading. ¶¶207, 259. Then, on February 25, 2019, Windstream filed for Chapter 11 bankruptcy protection, again sending Uniti's stock price into decline – dropping another 9% in value to close at $9.64 per share on February 28, 2019. ¶¶208-09. In contrast, on February 15, 2019, prior to Judge Furman's ruling being disseminated, Uniti's stock closed at $19.98 per share. All told, in a 14-day period, this information caused a loss of a staggering $10.34 per share, or nearly 52% in the value of Uniti common stock. ¶200.

> **F.      In Response to Judge Furman's Ruling and Windstream's Bankruptcy Filing, Defendants Shift Their Message and Misrepresent Uniti's Ability to Withstand Windstream's Bankruptcy**

Immediately following Windstream's bankruptcy filing on February 25, 2019, Defendants took to the airwaves to proclaim that Windstream would "successfully navigate through the reorganization process," and to assure Uniti investors that Windstream's business was continuing to operate in the "ordinary course" and that it was "pay[ing] in full its service providers," i.e., Uniti. ¶209.

Despite Defendants' unabated assurances, Windstream's bankruptcy filing triggered concerns that Windstream would seek to recharacterize the Master Lease with Uniti as a financing. ¶211. Windstream's bankruptcy "and its potential uncertain effects on the Master Lease" also caused Uniti's auditors, PricewaterhouseCoopers LLP, to state in Uniti's 2018 Form 10-K filed on March 18, 2019, that the auditors had "substantial doubt as to whether [Uniti] could continue as a going concern within one year after the date the financial statements are issued." ¶212. In contrast, in the same SEC filing Defendants assured Uniti investors that while

Windstream had the option to "assume or reject the Master Lease" in bankruptcy, the probability of Windstream rejecting the lease in bankruptcy was "*remote*." ¶213.

Between March and June 2019, Defendants broke out the tried and true April 2015 talking points and repeatedly assured the market that there was *no real risk that Windstream would default on its obligations under the Master Lease*, going so far as to call speculation of a default on the Master Lease "*remote*" and "*irrational*," and that Windstream's bankruptcy was actually a positive event for Uniti. ¶¶216, 218-220, 222-223. Defendants also repeated their talking points that the Master Lease was a "true lease" and that it was "specifically designed for a bankruptcy scenario to protect [Uniti]." ¶¶216, 224.

But Defendants also shifted their message to Uniti investors, telling the market that Uniti had the "ability to navigate the Windstream bankruptcy proceedings without having to raise external capital" and that it would continue "to invest uninterrupted" in its business platforms. ¶¶214, 217. Defendants also repeatedly represented that Uniti "really [had not] seen an impact to [its] business and [it] continue[d] to operate as usual," that there had been "no hiccups," and that the Company had "adequate liquidity" that would "[b]uild [t]hroughout 2019." ¶¶218, 221-222, 225.

Then, just a month after proclaiming that Uniti would ride out Windstream's bankruptcy without having to raise external capital, Defendants announced that Uniti had done just that: on June 24, 2019, the Company announced that it was issuing $300 million in exchangeable senior notes due 2024, with an option to issue an additional $45 million within the first two weeks the exchangeable notes were issued. ¶227. On this news, Uniti's stock price fell 10% in one day, on a trading volume five times higher than Uniti's average daily trading volume during the Class Period. ¶¶228, 262-263.

### G. Post-Class Period Adversarial Action Between Windstream and Uniti Confirms That Windstream And Defendants Knew All Along That The Master Lease Was A Disguised Financing Arrangement

Within days of Uniti's announcement of the issuance of up to $345 million in exchangeable notes, on June 28, 2019, the trustee of Windstream's Notes (who had just prevailed in the Aurelius Litigation) asked the bankruptcy court to order Windstream to cease its payments to Uniti under the Master Lease, asserting that the Master Lease was actually a disguised financing and that the rental payments could therefore not continue during the bankruptcy. ¶229. Then, on July 25, 2019, Windstream initiated an adversarial proceeding in connection with its bankruptcy action against Uniti, similarly arguing that the Master Lease was not a true lease at all, but was instead a disguised financing (the "Adversary Proceeding"). ¶¶124, 231. The allegations in the Adversary Proceeding laid bare the fact that Defendants knew the Master Lease was a financing all along and could be recharacterized as such in the event of a Windstream bankruptcy. ¶¶125-138.

## III. PLAINTIFFS HAVE ADEQUATELY STATED A §10(b) CLAIM

To state a securities fraud claim under §10(b), a plaintiff must allege: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (internal citations and quotations omitted); *Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 760 (8th Cir. 2009). Defendants here contest only three elements of Plaintiffs' §10(b) claim: material misrepresentation, scienter, and loss causation, and their arguments on each fail.

17

A.   **Plaintiffs Have Adequately Pled Materially False and Misleading Statements and Omissions**

Section 10(b) and Rule 10b-5 make it "unlawful to, among other things, make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Rand-Heart of N.Y., Inc. v. Dolan*, 812 F.3d 1172, 1176 (8th Cir. 2016) (internal quotations and citation omitted). A statement is misleading if it "creates an impression of a state of affairs" that "materially differ[s] from the one that actually exist[s]." *Freedman v. St. Jude Med., Inc.*, 4 F. Supp. 3d 1101, 1114 (D. Minn. 2014). A complaint need not "prove" falsity; instead it need only *allege* facts "sufficient to support an inference" that statements were false or misleading when made. *Lustgraaf v. Behrens*, 619 F.3d 867, 874 (8th Cir. 2010) (reversing dismissal). "In essence, the plaintiff must specify each allegedly false statement – i.e., state the date, location, and maker of the statement – and why the statement was false." *In re Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 980 (D. Minn. 2004) (internal quotations omitted); *see also In re UnitedHealth Grp. PSLRA Litig.*, No. 06-CV-1691, 2007 WL 1621456, at *1 (D. Minn. June 4, 2007) (a complaint "should not be dismissed . . . where there is a reasonably founded hope that the [discovery] process will reveal relevant evidence to support plaintiffs' claims.") (alteration in original). Plaintiffs' allegations meet these requirements.

1.   **The Complaint Clearly Alleges Materially False and Misleading Statements and Omissions, And The Reasons Those Statements And Omissions Were False and Misleading at the Time**

Defendants do not seriously contest, because they cannot, that the Complaint identifies the alleged false and misleading statements, or material omissions, and alleges in detail why they were false or misleading, easily satisfying the requirement to allege the "who, what, when,

18

where, and how" to adequately plead falsity. *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 980 (8th Cir. 2012).

Plaintiffs allege that Defendants made materially false and misleading statements and omissions (¶¶141-50, 157-59, 163, 165, 169, 171, 173-75, 179-80, 183-89, 194-98) concealing that the Spin-Off transaction that they had conceived constituted a sale-leaseback transaction between Uniti and the Windstream Operating Subsidiaries in direct violation of the Indenture, reflecting an inherent flaw in Uniti's business model and concealing the extent of the risk that Windstream could be driven into bankruptcy, sending Uniti into financial ruin. Plaintiffs also allege that Defendants made materially false and misleading statements and omissions (¶¶141-50, 159, 163, 169, 171, 173-75, 179-80, 183, 185-86, 188, 190-91, 196, 205, 209, 212-225) regarding the risk that the Master Lease could be successfully recharacterized as a financing arrangement that also violated the Indenture, jeopardizing Uniti's main source of revenue, again sending Uniti into financial collapse.

Plaintiffs fortify and confirm the false and misleading nature of Defendants' statements and omissions by quoting internal documents drafted by and received by Defendants, minutes from meetings Defendants attended and participated in, and testimony given under oath. ¶¶75, 79-86.[3] For instance, Plaintiffs cite to a lengthy presentation authored by Defendant Gunderman that discussed the history of the decision to proceed with the Spin-Off, detailed valuations analyses concerning the assets to be transferred to Uniti, and provided a comprehensive "[o]verview of the Master Lease," which included Windstream's precarious financial position and desperate need to complete the Spin-Off to access the capital necessary to upgrade its networks and remain competitive in the industry. ¶¶78, 82-83, 85. Plaintiffs also cite to meeting

_____

[3] While formal discovery is stayed in this case pursuant to the PSLRA, Plaintiffs have obtained certain publicly available documents concerning the Spin-Off from the Aurelius Litigation.

minutes outlining that Defendants discussed the specific structure of the Spin-Off, including which parties would be signatories to the Master Lease, the economics of the Spin-Off and Master Lease, and "significant execution risks" to proceeding with the Spin-Off. ¶¶79, 81, 85. As a result of these meetings and materials, Plaintiffs allege that Windstream and Defendants Uniti and Kenny Gunderman determined that Windstream Holdings could be the only Windstream entity to sign the Master Lease in order to avoid "a clear violation" of the Indenture. ¶86.

Plaintiffs also allege that Defendants were equipped with a "communication strategy" and talking points to govern communications concerning the Spin-Off and Master Lease with regulators and the market. ¶¶84, 92-94, 118-121. The "communication strategy" and talking points encouraged vague and non-responsive answers to questions concerning whether the Spin-Off and Master Lease complied with Windstream's Indenture, specifically instructing to "not go into detail . . . unless specifically asked" about each type of covenant or restriction. ¶¶93, 120. The talking points also instructed Defendants, if asked if "WIN in Distressed Situation/What happens in WIN Bankruptcy?" to "always lead with" that "WIN is a very reliable tenant," that the "Lease Structure [was] Well Designed and Iron-Clad" and that "WIN and [Uniti's] intent in negotiating the lease was for it to be impossible to reject it in a bankruptcy." ¶119. Defendants stuck to these talking points throughout the Class Period in their efforts to conceal from the market the true extent of the inherent problems with the structure of the Spin-Off and Master Lease, and the risk that exposure of these flaws could send both Windstream and Uniti into bankruptcy.

Defendants largely ignore these allegations, which doom their Motion, as the publication of statements despite access to contradictory facts is one of the "classic fact patterns" of securities fraud. *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir.

20

2001). In sum, the Complaint more than satisfies the requirement to allege facts "sufficient to support an inference" that statements were false or misleading when made. *Lustgraaf*, 619 F.3d at 874.[4]

### 2.    By Choosing to Speak About the Propriety Of The Spin-Off And Master Lease, Defendants Were Obligated To Speak The Full Truth

Because Defendants cannot make a colorable argument that Plaintiffs' allegations lack the required specificity, they instead resort to arguing that they had "no duty" to disclose the information Plaintiffs allege was concealed. Mot. at 15-22. Defendants premise their argument on the notion that "silence, absent a duty to disclose, is not misleading under Rule 10b-5." Mot. at 15. But this is a fallacy – Defendants were ***not silent***.

It is well-settled in the Eighth Circuit that, "even absent a duty to speak, a party who discloses material facts in connection with securities transactions assume[s] a duty to speak fully and truthfully on those subjects." *In re K-Tel Int'l Inc. Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002; *KV Pharm.*, 679 F.3d at 983 n.8 ("Having chosen to represent it was in material compliance with FDA regulations and cGMP, KV was obligated to make a full disclosure of any

---

[4] Defendants, relying on inapposite authority, argue that the Complaint's structure and use of "block quotations" is improper. Mot. at 15 n.5. Defendants are wrong. Here, unlike in the cases Defendants cite, the Complaint includes a structure that clearly sets forth the alleged false and misleading statements and omissions, and the undisclosed information Defendants possessed, by providing informational headings that describe the time frame and subject matter of the allegations. Accordingly, Defendants' reliance on *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37–38 (2d Cir. 2012), is groundless. Likewise, *Patel v. Parnes*, 253 F.R.D. 531 (C.D. Cal. 2008) is factually inapposite, as nearly all the paragraphs in the complaint were under the heading "Defendants' Class Period Misrepresentations." *Id.* at 551. Defendants' argument is further undercut by their Motion, in which they appear to have had no trouble understanding the Complaint and crafting arguments that Plaintiffs' allegations are deficient.

material facts.").[5] While Defendants acknowledge this duty (Mot. at 15), they failed, spectacularly, to meet it.

Plaintiffs allege that Defendants misleadingly assured investors that Uniti was "well positioned to create substantial shareholder value," (¶159) and had a "solid foundation for success" (¶163), without also disclosing that the Spin-Off violated the Indenture and Windstream, Uniti's largest customer and the source of nearly 70% of its annual revenue, could be forced into bankruptcy because of this structure. Defendants also made affirmative misstatements about the Spin-Off transaction and the related Master Lease, telling the market, repeatedly, that there was no "problem" with the Master Lease as it was "well structured" (¶¶ 173, 175), and asserting that it offered "protect[ions]" to Uniti should Windstream fall into bankruptcy. ¶171. Defendants also insisted that the lease payment from Windstream was "very, very safe and a very high priority payment." ¶169. Defendants doubled-down on their assurances after the Aurelius Litigation commenced, falsely assuring Uniti investors that the Spin-Off was properly structured and that the Aurelius Litigation would not be successful (¶¶183-89, 194-98), without disclosing that, from the time the Spin-Off was conceived and completed, Defendants were aware that the Master Lease violated the terms of the Indenture. ¶¶68-86, 92-94. Indeed, Defendants *actively* avoided discussing those issues with investors by sticking to talking points directing Defendants to give only vague and incomplete responses to questions concerning the

---

[5] *See also In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 979 (D. Minn. 2009) ("By expressly commenting on the strategic review and the Portfolio's valuation, [defendant] had a duty to disclose all related material information."); *Stellent*, 326 F. Supp. 2d at 985 ("If one speaks, he must speak the whole truth."); *Beaver Cty.*, 94 F. Supp. 3d at 1050-51 (obligation to "speak fully and truthfully," and statements that are "literally true" can still be misleading if "the literal truth fails to appraise reasonable investors of the full story"); *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 286 F. Supp. 2d 1047, 1058 (D. Minn. 2003) (stock issuers must "give complete information on a subject once [it is] raised").

structure of the Spin-Off and Master Lease, and the safety of the lease payment from Windstream. ¶¶118-121; *see also* §§ II.D-E, III.A.1.[6]

Additionally, because Defendants touted the structure, safety, and offered-protections of its relationship with Windstream – the source of the majority of Uniti's annual revenue and, thus, vital to Uniti's financial success – Defendants were "obligated to disclose information concerning the source of [this] success, since reasonable investors would find that such information would significantly alter the mix of available information." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005); *In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 986 (W.D. Ark. 2017) ("Several courts have found explanations for financial success to be materially false or misleading when an undisclosed wrongdoing contributed to the success.").[7]

Thus, by choosing to speak on these issues, Defendants were required to speak the full truth – i.e., that the Spin-Off ran afoul of the Indenture and was specifically designed to appear as though it complied with it, and that the Master Lease was not a "true lease," but a disguised

---

[6] Further, Defendants' "risk disclosures" regarding disputes with third parties (¶¶146-47, 160-62, 166) and risks associated with Windstream's dispute with Aurelius (¶¶190-92) were also materially misleading because they failed to provide the full picture about the "risks" discussed. Although Uniti warned, for example, that "[d]isputes with third parties could arise" out of the Spin-Off transaction (¶162), **Defendants did not disclose the actual risk**: that because the Spin-Off violated the Indenture, if challenged, Uniti's largest customer could file for bankruptcy, jeopardizing the majority of Uniti's annual revenue, potentially sending Uniti into bankruptcy too. And even if these "risk disclosures" contained information that was "true," Defendants were still obligated to speak fully on the subjects. *Beaver Cty.*, 94 F. Supp. 3d at 1050-51 (statements that are "literally true" can still be misleading if "the literal truth fails to appraise reasonable investors of the full story"); *Freedman*, 4 F. Supp. 3d at 1121 ("'half-truths' – [or] literally true statements that create a materially misleading impression – will support claims for securities fraud") (citing *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011)).

[7] *See also In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-CV-8557, 2013 WL 6233561, at *13 (S.D.N.Y. Dec. 2, 2013) ("A corporation has a duty to disclose a major dispute or uncertainty that exists in an important business relationship where the company publicly touts that specific relationship and the uncertainty may significantly affect the corporation's financial success."); *Hutchins v. NBTY, Inc.*, No. 10-CV-2159, 2012 WL 1078823, at *5–6 (E.D.N.Y. Mar. 30, 2012) (defendant had a duty to disclose the risk of losing its largest customer after announcing positive financial results).

financing arrangement that also violated the Indenture and provided no protection to Uniti's "lease" payment should Windstream file for bankruptcy, as Defendants knew and understood, *see infra* at §§ III.B, during the Class Period. *KV Pharm.*, 679 F.3d at 983 n.8 (defendants obligated to make a "full disclosure of any material facts" supporting assurance that the company was in compliance with FDA requirements); *Xcel Energy*, 286 F. Supp. 2d at 1058 (stock issuers must "give complete information on a subject once [it is] raised").

### 3.      The Complaint Does Not Plead Non-Actionable "Soft" Statements

In furtherance of their "no duty to disclose" arguments, Defendants contend that they were under no duty to disclose that the Spin-Off and Master Lease violated the Indenture as there is no duty to disclose "soft information" and that the omitted information reflected a mere legal risk. Mot. at 16-21. In doing so, Defendants really argue that the concealed information was not material. Materiality, however, is a jury question that "requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts" and is "rarely" decided at the pleading stage. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36 (2011) (internal quotations omitted); *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829 (8th Cir. 2003) (materiality is normally a "question of fact for the jury"). Defendants' arguments, which mischaracterize Plaintiffs' allegations, and invite the Court to improperly resolve factual issues, should be rejected.

Most critically, Plaintiffs do not allege that Defendants failed to predict (and disclose) that Aurelius would successfully challenge the Spin-Off as a violation of the Indenture (or that a judge would rule in a prospective bondholder's favor at some later date), as Defendants contend. Mot. at 17. Instead, ***Plaintiffs allege that Defendants failed to disclose hard facts***: that the ***structure*** of the transaction – i.e., the Spin-Off of the assets to Uniti and execution of the Master Lease with Windstream – violated Windstream's Indenture from ***inception***. In fact, Plaintiffs

24

allege that Defendants ascribed significant importance to making it appear to the market that the Spin-Off and Master Lease did not violate Windstream's Indenture – going so far as to affirmatively represent to regulators and in SEC filings that the Spin-Off and Master Lease *did not violate* the Indenture. ¶¶99, 150. Defendants also faithfully followed talking points encouraging them to provide vague and incomplete information on these topics, but only if "pressed," and at every chance *downplayed that there was any risk whatsoever* that the Spin-Off could be successfully challenged. *See* §§ II.D-E, III.A.1, III.B.

The same is true of Plaintiffs' allegations concerning the viability of the Master Lease, and the risk it would be rejected by Windstream in bankruptcy. Plaintiffs do not allege that Defendants needed to anticipate (and disclose) that Windstream *might* wind up in bankruptcy and, if so, *could* seek to recharacterize the Master Lease as a financing. Mot. at 20. Instead, Plaintiffs allege that Defendants failed to disclose *facts* – specifically that in order to obtain the determination that the Master Lease was a "true lease" at the time of the Spin-Off (and not a financing prohibited by the Indenture), Defendants provided economically unsupportable assumptions about the useful life of copper wire – i.e., the leased asset – to make it appear that the assets would outlive the terms of the Master Lease, a condition necessary to a "true lease" determination. ¶¶127-134. Indeed, Plaintiffs allege that Defendants were in possession of valuation analyses showing that the useful life of the copper wire was far shorter than the term of the Master Lease, meaning that if Windstream did challenge the "true lease" determination in bankruptcy and it was determined to be a financing, Uniti's lease payment would not be protected as a "secured" claim, but would become structurally subordinated to other creditors' claims.  ¶¶79-86, 127-134. Accordingly, the true extent of the risk of recharacterization, which

was not disclosed to investors, was much graver than Defendants portrayed. *See* §§ II.F, II.G, III.B.

"The omission of a known risk, its probability of materialization, and its anticipated magnitude" – which is precisely what Plaintiffs allege Defendants failed to disclose here – "are usually material to any disclosure discussing the prospective result from a future course of action." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009). Defendants' argument – and the cases they cite – endorse the proposition that a defendant-company is not required to "disclose uncharged, unadjudicated wrongdoing," *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014), and involve situations in which a plaintiff alleges that a company should have predicted potential legal consequences of certain actions and disclosed those potential outcomes. Mot. at 16.[8] But, as discussed in detail above, Plaintiffs allege that Defendants failed to disclose *facts* – that Uniti's very raison d'être was fundamentally flawed, because it was dependent on a transaction that violated the Indenture and could trigger a Windstream bankruptcy if ever exposed (as it ultimately was), risking the vast majority of the Company's annual revenue, and Uniti's very viability.[9]

---

[8] Defendants' citation to *In re NAHC, Inc. Securities Litigation*, 306 F.3d 1314, 1330 (3d Cir. 2002) and *In re Citigroup, Inc. Securities Litigation*, 330 F. Supp. 2d 367, 377-78 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Trust, Inc. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006), are misguided, as Plaintiffs here do not allege that Defendants failed to "predict future events" and disclose that they engaged in conduct that *could* result in litigation or regulatory action in the future. Mot. at 16, 20. Defendants' citation to *Abbott Laboratories v. Adelphia Supply USA*, No. 15-CV-05826, 2017 WL 6014322, at *9-10 (E.D.N.Y. Aug. 14, 2017) is similarly misplaced. Mot. at 17. *Abbott* is not a securities class action, and did not resolve what constitutes a "duty to disclose" in the context of a Section 10(b) claim, but instead addressed whether there is an obligation to disclose "*legal consequences*," in the context of a state law intentional misrepresentation claim, *id.* at *9, an issue irrelevant here.

[9] For this same reason, the Court should disregard Defendants' argument that "[t]he mere fact that Windstream *attempted* to recharacterize the Master Lease, does not mean that it was not in fact a 'true lease.'" Mot. at 20-21. This is a red herring. Plaintiffs allege that Defendants failed to disclose that the determination that the Master Lease was a "true lease" depended on false and inflated information about the useful life of the primary leased asset. This *fact* was never

*(continued … )*

26

Defendants' heavy reliance on *Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820, 831 (8th Cir. 2003), and its holding that there is no duty to disclose "'soft information,' such as a matter of opinion, predictions, or a belief as to the legality of the company's own actions," is thus misplaced. And even if Defendants are correct that the allegedly concealed information was "soft," *Kushner*'s holding that "[s]oft information must be disclosed only if virtually as certain as hard facts," actually supports Plaintiffs' arguments. 317 F.3d at 831. As explained above, Plaintiffs allege that Defendants failed to disclose "***hard facts***" about the nature of the Spin-Off and Master Lease: (1) that the transaction that brought Uniti into existence violated the Indenture; (2) the Master Lease also violated the Indenture and offered no protection to Uniti should its legitimacy as a "true lease" be challenged; and (3) Defendants drafted and received internal documents, and attended meetings, revealing their awareness of the issues Plaintiffs allege were not disclosed. *See* §§ II.B, III.A.1.[10] Plaintiffs do not allege that Defendants failed to disclose their "predictions" or "beliefs as to the legality" of their own actions. In that same vein, Defendants' reliance on *Zaluski v. United American Healthcare Corp.*, 527 F.3d 564, 575-76 (6th Cir. 2008), in which the court found that defendants were not obligated to disclose that certain payments the defendant-company made to a third party "could" cause the company's counterparty to terminate the applicable contract, is thus similarly irrelevant.

---

( *… continued*)

disclosed and would be actionable regardless of whether Windstream ever attempted to recharacterize the Master Lease as a financing. And Defendants' reliance on the Bankruptcy Code to argue that Windstream did not actually "reject" the lease, *id.* at 21 n.8, is irrelevant to Defendants' failure to disclose material information necessary to render their Class Period statements not misleading.

[10] *Kushner* is also distinguishable because there, the conduct plaintiffs allege should have been disclosed was illegal conduct perpetrated by ***lower-level*** employees, 317 F.3d at 829-30, and there were ***no allegations that the high-level-executive defendants had any knowledge of such conduct***. *Id.* at 829. Here, however, the Individual Defendants were intimately involved in the Spin-Off transaction and negotiation of the Master Lease, and possessed information that was omitted and conflicted with their affirmative statements. *See* §§ II.B-C, III.B.

Finally, Defendants' argument that the Complaint is deficient because there are no allegations that the risk that a challenge to the Spin-Off's structure was certain, and that "neutral" market observers were surprised by the Aurelius Litigation, misses the mark. Mot. at 16-17. What is actually relevant is that Defendants understood from Uniti's inception, but failed to disclose, that the Spin-Off and Master Lease violated the Indenture. *See* §§ II.D, II.E, III.A.1. That market observers did not have access to and appreciate this information says nothing about whether Defendants themselves understood the inherent flaws in the Spin-Off and Master Lease.

Moreover, both before and throughout the Class Period, ***Defendants actively worked to undercut the market's appreciation of the risks associated with the Spin-Off and Master Lease***. During the regulatory process, and in its first SEC filings, Defendants told investors that the Spin-Off and Master Lease ***did not violate Windstream's Indenture***. ¶¶99, 150. Within days of Windstream's announcement of the elimination of its dividend, Defendants told the market that they had "obviously done an extensive amount of work on the protections associated with that lease payment in any sort of scenario, whether it's steady state, distressed, bankruptcy, any scenario you want to work through, and feel confident we're protected in all cases." ¶171. Once Aurelius challenged the Spin-Off, Defendants told the market they had "done a deeper dive on our lease and our different scenarios than we have ever done before," and that the protections in place would safe-guard Uniti. ¶¶186, 188. And even after Judge Furman ruled that the Spin-Off violated the Indenture, and after Windstream filed for bankruptcy, Defendants told the market that it was "irrational" to "speculat[e]" that the Master Lease would be rejected, and that "we just don't see a risk of rejection of the lease." ¶¶216, 223.

Defendants argue that these statements were not materially misleading because there is no obligation to provide a "legal opinion" and that their assurance that Windstream was likely to

28

prevail was not inconsistent with the possibility that Windstream might lose. Mot. at 18, 20. But, again, these arguments intentionally mischaracterize the Complaint's allegations: Plaintiffs do not allege that Defendants failed to accurately predict how Judge Furman would rule in the Aurelius Litigation or what Windstream would do in bankruptcy, but that it was misleading for Defendants to characterize Aurelius' claims as "manufactured" and assure investors that they were "highly confident" that the Master Lease was properly structured and offered "protections" to Uniti "in all cases" without disclosing that the Spin-Off was explicitly designed to evade the restrictions in the Indenture, and that the Master Lease was really a financing prohibited by the Indenture. §§ II.D, II.E, II.F, III.A.1. And because Defendants' statements conflicted with the "warnings" in any "risk disclosure" they may have provided to the market concerning the Spin-Off and Master Lease's propriety, those "warnings" were neutralized. *See Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) ("[E]ven if the [multiple disclosures] raised some concern in the market about [the company's] alleged conflicts, such information was counteracted by contemporaneous statements by [the company]."); *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 50 n.17 (D. Mass. 2006) (finding the defendants' decision to publish optimistic assessments of the company's financial position was "akin to a statement that the reader need not worry much about the generic risk disclosures that appeared from time to time.").[11]

---

[11] Defendants also challenge certain statements as non-actionable puffery, Mot. at 18 n.6 (citing ¶¶159, 163). But these statements have to be considered in their totality. *See In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 888 (D. Minn. 2011). Affirmative statements such as Uniti had a "solid foundation for success" (¶163) are actionable because they speak to facts important to the Company's very existence – i.e., that the Spin-Off that created Uniti and resulted in the Master Lease did not violate the Indenture as Defendants had told regulators and their investors from Uniti's inception. ¶¶99, 150; *see also* §§ II.C-E. This was not meaningless fluff to investors, and is actionable. *See In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 n.6 (S.D.N.Y. 2017) (statements in code of conduct actionable because they "purported to reflect the [c]ompany's current state of affairs" that rules "are observed"); *Lapin*, 506 F. Supp. 2d at 239-40

*(continued … )*

### 4. Defendants Cannot Avail Themselves of the Truth-On-The-Market Defense

Defendants also try and mount a "truth-on-the-market" defense, arguing that (1) because the Indenture and Master Lease were public documents, investors were aware of precisely how the transaction was structured (Mot. at 18-19); and (2) because they disclosed that the Master Lease might "not [be] respected as a true lease for U.S. federal income tax purposes," and "instead [could be] treated as a service contract, joint venture or some other type of arrangement," the market was fully informed of the information Plaintiffs allege was concealed. Mot. at 21-22. To establish a truth-on-the-market defense, Defendants must show that information Plaintiffs claim was concealed was "*transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression*," a "*notoriously difficult burden to carry short of trial*." *Stellent*, 326 F. Supp. 2d at 985-86. Defendants' arguments are not nearly enough to establish, as a matter of law, that the market knew the truth about the Spin-Off's structure or the Master Lease's status as a "true lease," and the associated risks to Uniti.[12]

While it might be true that the Master Lease and the Indenture documents were publicly available, those documents omitted that the Spin-Off was specifically structured to try to evade the restrictions in the Indenture – a fact Defendants do not contest is true. Indeed, regulators were

---

( *… continued*)

(statement about "dedication to complying with the letter and spirit of the laws" actionable where company's "success depended on such adherence"). Moreover, Defendants' statements about the propriety of the Master Lease were "not an expression of corporate optimism . . . but rather [] factual statement[s] directly attributing [Uniti's] financial success to the strength of its [] relationships." *Beaver Cty.*, 94 F. Supp. 3d at 1049; *St. Paul Travelers Sec. Litig. II*, No. 04-CV-04697, 2006 WL 2735221, at *3 (D. Minn. Sept. 25, 2006) ("Investors need the complete picture to ensure that optimistic statements about a company's financial condition do not mislead investors.").

[12] Courts in other jurisdictions have similarly held that the truth-on-the-market defense is "intensely fact specific and is rarely an appropriate basis for dismissing" a complaint at the pleading stage. *See, e.g.*, *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).

explicitly told that the Spin-Off *did not* violate the Indenture – a representation Defendants repeated in SEC filings as the Spin-Off was being finalized, and Defendants *actively avoided* discussing or providing detailed information about the structure of the Spin-Off to investors in keeping with talking points provided to them just prior to the Spin-Off's consummation. *See* §§ II.C-E, III.A.1-3, III.B. Further, Plaintiffs allege that analysts at "Covenant Review," whose tag line is "The Authority on Bond and Loan Covenants," were also fooled by Defendants' omissions and misstatements. ¶101. In an August 2014 report, the analyst tracked the covenants disclosed by Uniti (which excluded the covenants restricting sale-leaseback transactions and additional financing) and analyzed the likelihood that the Spin-Off would result in a violation of the Indenture, concluding that it did not. *Id.*

Additionally, just because Defendants disclosed that the Master Lease might not be viewed as a "true lease" for tax purposes and instead "treated as a service contract," does not transmit to the market information with a "*degree of intensity and credibility sufficient to effectively counter-balance any misleading impression*." *Stellent*, 326 F. Supp. 2d at 985-86. These disclosures did not inform investors that defining the Master Lease as a "true lease" in the first place depended on inflated projections of the useful life of the copper wire assets being leased to Windstream, and that the leased assets did not have a useful life beyond the initial term of the Master Lease and the first renewal – a fact upon which a "true lease" determination rests. ¶¶127-134.[13] The allegedly concealed information was therefore *not* public at all.[14]

---

[13] Neither did Defendants' "disclosure" "that the useful life of the leased copper assets could be as little as seven years," (Mot. at 21), inform investors about the true range of the life of this asset, and that its real useful life would not last the term of the Master Lease. As an initial matter, Defendants' "disclosure" indicated that the useful life could range from *7 to 40 years* (¶133), far in excess of valuations of the life of this asset that Plaintiffs allege Defendants possessed, but concealed from investors. ¶¶127-134. It is axiomatic that the securities laws require a Company to make truthful and accurate statements, and a reasonable investor is not required to engage in
*(continued … )*

31

And, finally, as discussed above (§ III.A.3), Defendants downplayed at every opportunity that there was *any* risk that the Spin-Off and Master Lease were subject to any serious challenge, essentially telling investors they "need not worry much about the generic risk disclosures that appeared from time to time." *Credit Suisse-AOL*, 465 F. Supp. 2d at 50 n.17.

The factual questions Defendants ask the Court to consider cannot be resolved as a matter of law, and as a result, Defendants' truth-on-the-market defense fails. *Stellent*, 326 F. Supp. 2d at 985-86.

### 5.    The Complaint Does Not Plead Non-Actionable "Statements Of Opinion"

Curiously, Defendants challenge certain alleged misstatements as non-actionable opinion statements without specifying which statements they contend are objectionable on this basis – though it appears this argument applies to only those statements prefaced with the words "we believe." Mot. at 22-23 (citing ¶¶214, 217).

As an initial matter, that Defendants used the words "we believe" before making affirmative statements does not automatically render them not actionable: "*But those magic words ['we believe' or 'we think'] can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors*." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 193 (2015); *see also Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1322 (11th Cir. 2019) ("Of course, simply because

---

*( … continued)*

extensive analysis to discover that a statement is fraudulent. *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow.").

[14] For this reason, Defendants' citation to *Rubke v. Capital Bancorp Ltd.*, 551 F.3d 1156, 1162-63 (9th Cir. 2009) is unhelpful because there, the allegedly concealed information was actually in the public domain.

a statement is couched as opinion – 'I believe,' 'I think,' or even 'In my opinion' – doesn't foreclose a finding that it constitutes an express or implied misrepresentation of fact."); *FHFA v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 565 (S.D.N.Y. 2015) ("[T]he use of the word 'believed' does not transform defendants' representation . . . into a statement of opinion"), *aff'd*, 873 F.3d 85 (2d Cir. 2017).

What is instead relevant is whether Defendants either: (i) did not genuinely hold the expressed opinions, or (ii) omitted material facts about the basis for the opinion, which rendered the statements misleading in context. *Omnicare*, 575 U.S. at 192-93, 195. In fact, "[t]hat [Defendants] may have believed [their statements] to be accurate is irrelevant, even when read as an opinion statement. ***The core inquiry when determining whether an omission renders an opinion misleading is whether the omitted facts 'conflict with what a reasonable investor would take from the statement itself.'***" *In re Avon Sec. Litig.*, No. 19-CV-01420, 2019 WL 6115349, at *17 (S.D.N.Y. Nov. 18, 2019) (citing *Omnicare*, 575. U.S. at 188-90).

While Defendants assured investors (following the judgment in the Aurelius Litigation) that they "believed" Uniti would be able "to navigate the Windstream bankruptcy proceedings without having to raise external capital" (¶¶214, 217),[15] Defendants failed to disclose the true extent of the risk that the Master Lease could be recharacterized as a financing arrangement, jeopardizing the majority of Uniti's revenues, and rendering it necessary for Uniti to seek external capital to remain afloat. The Complaint sets forth in great detail the information that Defendants had concerning the useful life of the copper wire assets being "leased," and the necessity to a "true lease" determination that the useful life exceed the Master Lease's initial

---

[15] Other similar statements Defendants made that were prefaced with the words "we believe" (¶216) are similarly misleading, notwithstanding that Defendants do not mention them in their Motion and therefore have not challenged them.

lease term. ¶¶127-134. Indeed, Plaintiffs allege that Defendants knew that the assumptions provided to accountants and lawyers evaluating the Master Lease to render an opinion on it were grossly inflated and in conflict with useful life estimates in Defendants' possession. ¶¶79-86, 127-134. Had accurate information on the copper wire assets been provided, a "true lease" opinion would not have been received, and because of the debt level restrictions in the Indenture, the Spin-Off could not have been consummated. ¶¶122-123, 127-130. Defendants' omission of this material information renders their statements misleading, and actionable, because the omitted information "conflict[s] with what a reasonable investor would take from the statement itself." *Omnicare*, 575. U.S. at 188-90; *Avon*, 2019 WL 6115349, at *17 (same); *see also Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 303 (S.D.N.Y. 2018) (finding opinion statements actionable where defendants omitted information which made the statement misleading).[16]

### 6. The PSLRA's Safe Harbor Does Not Immunize Defendants' False and Misleading Statements

The PSLRA contains a safe harbor provision that protects a defendant from liability ***only if***: (1) the defendant made forward-looking statements accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the statement is made without actual knowledge that it was false or misleading. 15 U.S.C. § 78u-5(c)(1). Defendants contend their "opinion" statements in ¶¶214, 217 are also protected forward-looking statements that were

---

[16] Plaintiffs' allegations are not, as Defendants' claim, Mot. at 23, impermissible allegations of "fraud by hindsight," which occur when a plaintiff challenges statements that were not false or misleading when made and instead only become false or misleading upon the materialization of some future event. Here, Defendants' statements did not "become" false or misleading because Windstream later sought to recharacterize the Master Lease as a financing. Defendants' statements were ***always*** misleading because they failed to disclose that defining the Master Lease as a "true lease" depended on information about the useful life of the copper wire assets being leased that Defendants knew, prior to the completion of the Spin-Off, was false and inflated in order to obtain a "true lease" opinion in the first instance. ¶¶79-85, 127-134; *see also* § III.B.

accompanied by "meaningful cautionary language," and that Plaintiffs have failed to plead their actual knowledge of its falsity, affording them protection under the PSLRA's safe harbor. Mot. at 23-25.[17] Defendants are again wrong.

"The critical inquiry in determining whether a statement is forward-looking is whether its veracity can be determined at the time the statement is made" or if that determination "is tied to a future event." *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 920-21 (8th Cir. 2015). On March 20, 2019, during a conference call with analysts and investors, Defendant Gunderman gave prepared remarks and told the market that as a result of Windstream's bankruptcy "we've been contingency planning with our board and advisers," and:

> *As a result and as a result of several other steps we're taking, we believe we now have the ability to navigate the Windstream bankruptcy proceedings without having to raise external capital and still be able to invest uninterrupted in our premier fiber, tower and leasing businesses, including potentially pursuing smaller M&A transactions.*

¶214. There is nothing forward-looking, or predictive, about Defendants' plain language. Defendants told Uniti investors that because of planning it had undertaken, Uniti "*now*" had the ability to navigate Windstream's bankruptcy without raising external capital – the "veracity" of which could be determined when the statement was made, and was not dependent on some future event coming to pass. *Julianello*, 791 F.3d at 921. The safe harbor simply does not apply. *In re CenturyLink Sales Practices & Sec. Litig.*, 403 F. Supp. 3d 712, 729 (D. Minn. 2019) (holding that the PSLRA safe harbor did not protect statements about current and past facts). And even assuming, arguendo, that Defendants' statement was forward-looking (which it is not), the safe

---

[17] Defendants do not specify which statements they claim are forward-looking statements that are protected by the safe harbor (although Defendants' argument appears to be focused on just the alleged statements at ¶¶214, 217). It is worth noting that nearly all of the alleged misstatements are **not forward-looking**. *See* ¶¶141-45, 148-50, 157-59, 163, 165, 169, 171, 173-75, 179-80, 183-89, 194-98, 209, 212-225.

harbor also does not apply because Plaintiffs have alleged that Defendants made the challenged statement with actual knowledge that it was false and misleading. *See infra* at § III.B.

Furthermore, Defendants' boilerplate cautionary language was not sufficiently meaningful to trigger the safe harbor's protection. Defendants highlight generic cautionary language that every company includes with their public disclosures, such as boilerplate preliminary statements included in investor presentations and quarterly and annual SEC filings, offering hollow words that "various factors" could impact Uniti's projected financial results. Mot. at 24-25. But the statement Defendants contend is protected by the PSLRA's safe harbor does not involve any prediction about Uniti's financial results, but instead concerns the Company's ability to navigate Windstream's bankruptcy without raising outside capital. Moreover, the "cautionary" language Defendants cite imparts no specific information whatsoever about the risks associated with executing on the "planning" Defendants claimed to have undertaken with its "board and advisors" that would permit Uniti to "navigate" Windstream's bankruptcy without raising external capital. *Id.*[18] The Eighth Circuit has rejected as sufficiently "meaningful" boilerplate "cautionary" statements, like those Defendants cite and rely on here, that fail to include "***company-specific warnings based on a realistic description of the risks applicable to the particular circumstances***." *Rand-Heart*, 812 F.3d at 1179; *St. Jude*, 836 F. Supp. 2d at 893 ("[B]ecause this generic, 'boiler-plate' statement lacks any specificity as

---

[18] In a footnote, Defendants point to a purported "risk disclosure" that generically warns that Uniti may have to access external capital to generate funds to fund its business operations. Mot. at 25 n. 12. This does not save Defendants' arguments. As discussed, Defendants' statement to the contrary in the face of the bankruptcy of their largest customer renders any "warning" that could be attributed to that "disclosure" meaningless. *See supra* at 29 (citing *Lapin*, 506 F. Supp. 2d at 238; *Credit Suisse-AOL*, 465 F. Supp. 2d at 50 n.17).

to particular risks or uncertainties, it may not serve as a 'meaningful cautionary statement.'").[19]

The PSLRA safe harbor is unavailable to Defendants.

### 7. The Alleged False and Misleading Statements Made Before the Start of the Class Period Are Actionable

Defendants argue that the alleged false and misleading statements that pre-date the Class Period are not actionable. Mot. at 14. But that general rule is not always applicable, such as where, as here, Uniti's stock did not trade before the start of the Class Period. *See Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 966 (N.D. Cal. 2005) ("Defendants . . . err in generalizing the principle that "[i]n a securities class action lawsuit, liability cannot attach to statements made either before or after the class period.").

As the court explained in *Zelman*, "the purpose of defining a plaintiff class, through dates or otherwise, is to limit the class of plaintiffs to those ascertainable individuals who have standing to bring the action." *Id.* The court explained further that the "[d]efinition of the plaintiff class is not a device for limiting the universe of actionable conduct, even though, in the standard securities fraud action, the class period also happens to be the same as the period "during which defendants' fraud was allegedly alive in the market." *Id.* "This overlap occurs simply because it is only those plaintiffs who traded in the securities at issue while the fraud could have been affecting those securities' value who can possibly state a claim for damage resulting from the fraud." *Id.* (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 228 & n. 5 (1988)).

Based on the foregoing, the court in *Zelman* found that because the class at issue were purchasers of a debt security "linked" to the value of an underlying equity security, it only made

---

[19] This same analysis applies to Defendants' argument that their statements are protected "under the analogous 'bespeaks caution' doctrine." Mot. at 23 n.10. And Defendants' citation to *In re Cutera Securities Litigation*, 610 F.3d 1103, 1112 (9th Cir. 2010) is unhelpful because the statements there were revenue projections and therefore forward-looking statements as defined in the PSLRA, which is plainly not the case here.

sense to start the class period at the time the security existed and its price was impacted by the false statement. *Id.* at 966.  The court held:

> On its face, Plaintiff's proposed class definition serves the purposes it is supposed to serve: It defines a group of plaintiffs all of whom were injured in the same way, if any were. The fact that the proposed class period begins after the first of the alleged misstatements does not make those earlier statements irrelevant or not actionable.

*Id.* at 966-67.

The same analysis applies here. Uniti's stock could not trade at the time of the pre-Class Period statements as the Spin-Off had not yet been finalized. The pre-Class Period information, however, informed investors at the start of the Class Period when Uniti's stock first traded publicly and whose value could be impacted by Defendants' misstatements and omissions. Thus, as in *Zelman*, the proposed Class here "serves the purpose[] it is supposed to serve" by defining a group of individuals and entities, all of whom were injured in the same way.  376 F. Supp. 2d at 966.  Defendants' attempt to dismiss the March 26, 2015 statements is therefore groundless.

### B.     Plaintiffs Plead Facts Giving Rise to a Strong Inference of Scienter

The Complaint pleads a strong inference of scienter. The inference of scienter "need not be irrefutable" (i.e., of the "'smoking-gun' genre"), nor even the "most plausible of competing inferences." *Tellabs*, 551 U.S. at 310, 324. Rather, a complaint will survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 310. The inquiry is whether all allegations, "taken collectively" give rise to a strong inference, not "whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23.

A "strong inference" of scienter arises: "(1) from facts demonstrating a mental state embracing an intent to deceive, manipulate or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." *Nash Finch Co.*, 502

F. Supp. 2d at 881. Courts in this Circuit have recognized "badges of fraud" to assist in evaluating scienter allegations, including whether defendants: (1) "engaged in deliberately illegal behavior," (2) "knew facts or had access to information suggesting that their public statements were not accurate," or (3) "failed to check information they had a duty to monitor." *St. Paul*, 2006 WL 2735221, at *3.[20]

### 1.  The Balance Of Competing Inferences Supports A Strong Inference of Scienter

Defendants argue that Plaintiffs' scienter allegations are implausible. But, as is a theme in the Motion, this argument requires the Court to resolve factual issues in Defendants' favor, which is plainly not appropriate at this stage. *Green Tree*, 270 F.3d at 666 ("The strong-inference pleading standard does not license [courts] to resolve disputed facts at [the motion-to-dismiss] stage of the case."); *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion."). Instead, courts "must assume the truth of the allegations pleaded with particularity in the complaint," *Green Tree*, 270 F.3d at 666, and draw all reasonable inferences from the alleged facts in Plaintiffs' favor. *See Gebhardt*, 335 F.3d at 829 ("We will assume the facts pleaded are true and will construe those facts in the light most favorable to the plaintiffs."); *Stellent*, 326 F. Supp. 2d at 979 (courts must view "factual allegations in the light most favorable to the plaintiff" on a motion to dismiss).

As detailed below, the Complaint pleads a plausible and cogent inference of scienter. Indeed, internal documents demonstrate that Defendants ***knew*** the Spin-Off violated the sale-

---

[20] Courts in this Circuit have held that scienter of either a named individual or a non-defendant employee can be imputed to the corporate defendant. *See In re Medtronic, Inc. Sec. Litig.*, 618 F. Supp. 2d 1016, 1035 (D. Minn. 2009), *aff'd sub nom. Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800 (8th Cir. 2010); *St. Paul*, 2006 WL 2735221, at *4 n.3; *Beaver Cty.*, 94 F. Supp. 3d at 1054 ("[s]cienter of a corporate officer may be imputed to the corporation itself").

leaseback covenant in the Indenture. ¶¶93-94. Additionally, Defendants were advised to offer vague and non-responsive answers to questions concerning the impact of the Indenture's restrictive covenants on the Spin-Off and Master Lease. *Id.* These documents support an inference that the Spin-Off and Master Lease violated the restrictions in the Indenture, that Defendants knew this, and that they knowingly engaged in a messaging campaign aimed at concealing the truth.

Defendants suggest that the more plausible inference is non-fraudulent, because Plaintiffs' allegations are "economically irrational." Mot. at 25-26. But while not necessary to adequately infer scienter, the Complaint pleads facts demonstrating why Defendants also possessed a motive to commit fraud – namely that it would be economically *rational* to pursue the Spin-Off transaction notwithstanding the risk that it could be challenged, as Windstream desperately needed a strategy to generate cash. ¶¶56-67. That Defendants' scheme did not succeed does not mean the court should "infer innocence by hindsight," and further, whether Defendants' conduct is economically rational is a question of fact that cannot be decided on a motion to dismiss. *Green Tree*, 270 F.3d at 662, 666.

Defendants' contention that Plaintiffs' scienter allegations are implausible should therefore not be credited. And, at the very least, even if Defendants' contentions create a plausible competing inference (which they do not), a "tie . . . goes to the plaintiff." *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 39 (S.D.N.Y. 2019); *see also Tellabs*, 551 U.S. at 310 (complaint survives so long as the inference of scienter is "*at least as compelling* as any plausible opposing inference."). For these reasons and those detailed below, Plaintiffs have adequately pled a strong inference of scienter.

40

2.      **Defendants Knew and Had Access To Information Indicating That Their Public Statements Were Materially Misleading**

"[O]ne 'classic' fact pattern giving rise to a strong inference of scienter" is where "defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 746 (8th Cir. 20002) (citing *Green Tree*, 270 F. 3d at 665); *City of Pontiac Gen. Emps.' Ret. Sys. v. Wal-Mart Stores, Inc.*, No. 12-CV-05162, 2014 WL 4823876, at *4 (W.D. Ark. Sept. 26, 2014) (issue is whether defendants "knew certain facts or had access to information suggesting that [a] statement was not entirely accurate"). This is precisely the case here. As discussed herein, Defendants were intimately involved in conceiving and negotiating the Spin-Off and Master Lease – a transaction that was indisputably not an arms'-length transaction. ¶¶104-10.

(a)      **Sale-Leaseback Violation**

The Complaint alleges with great specificity that Defendants knew and/or had access to information demonstrating that their Class Period statements regarding the sale-leaseback covenant violation were materially false and misleading.

*First*, Defendants do not dispute that the Spin-Off transaction (and its unique "Hold-Co" structure) was designed specifically with the Indenture's sale-leaseback restrictions in mind. Windstream and Defendants specifically structured the transaction and the Master Lease to evade the restrictions of the Indenture – as an April 15, 2013 email reveals – by creating Windstream Holdings and having it (rather than the Windstream Operating Subsidiaries) sign the Master Lease. ¶¶75-76. Even at that point, Defendants were aware that the Indenture would be a "limiting factor" in executing the transaction. ¶75.

Defendants assert that this email actually indicates they believed the transaction ***complied*** with the Indenture. Mot. at 30. But Plaintiffs allege that this email demonstrates that Defendants

41

understood that the Indenture's sale-leaseback covenant prohibited the actual owner and operator of the assets from signing the lease – and that Defendants and Windstream designed the "Hold-Co" structure to get around this provision. ¶76. Fletcher, Uniti's General Counsel, has admitted that he knew at the time the transaction was being structured that "if the transferor . . . signed the master lease, that would have been a clear violation of the indenture at issue in this case." ¶86.[21]

Robert Gunderman has testified similarly. *Id.* It is reasonable to infer that the Individual Defendants also understood the limitations imposed by the Indenture, and on this Motion, Plaintiffs' inferences are credited, not Defendants'. *Tellabs*, 551 U.S. at 310. Plaintiffs allege Defendant Kenny Gunderman served initially as an outside advisor to Windstream who spearheaded the structure of the transaction, attended Windstream Board meetings where this issue was discussed, authored and received detailed documents outlining the obstacles to the completion of the Spin-Off, including who the appropriate parties could be given the Indenture's restrictions and was therefore in a prime position to understand the Indenture breach and the risk of default under the Master Lease. ¶¶56-86. Further, Plaintiffs allege that Defendant Wallace was a party to the pre-Spin-Off messaging call and understood the instructions were to not discuss details about the structure of the Spin-Off and Master Lease because they violated the Indenture. ¶¶ 118-120. *See also* §§ II.B-E, III.A.1. "[P]ossession of information that contradicted or undermined" Defendants' positive representations supports a strong inference of scienter. *Freedman*, 4 F. Supp. 3d at 1122-23. Indeed it is a "classic fact pattern giving rise to a strong inference of scienter." *Navarre*, 299 F.3d at 746 (internal quotation omitted).

---

[21] Defendants argue that Fletcher's admission does not support scienter, because he was not an executive of Uniti at the time of any misstatement. Mot. at 31. This is not true – he was Uniti's General Counsel upon Uniti's incorporation and throughout the regulatory approval process and finalization of the Spin-Off and Master Lease. ¶50.

*Second*, Plaintiffs allege that internal documents reflect Defendants' intentional efforts to conceal the truth. The April 2015 talking points sent to Windstream and Uniti executives, including the Individual Defendants, prepared responses to the question of, "[w]hy is the lease with WIN Holdings VS WIN Services?" ¶118-21. The talking points instructed Defendants to respond as follows: "this a complex transaction and after considering many factors we concluded that the lease at WIN Holdings was the best structure." ¶120. The talking points further instructed that "[i]f pressed," executives were *only* to identify "[f]actors evaluated," including "corporate structure, tax, accounting, [and] debt," *id.* – *a list that excludes mention of the sale-leaseback covenant*. *See* ¶¶92-94.

Defendants argue that these talking points do not support an inference of scienter because they "say[] nothing about the sale-leaseback covenant." Mot. at 31. But that is precisely the point. The talking points reflect Defendants' awareness that investors and others would want to understand why Windstream Services did not sign the Master Lease – and why Windstream Holdings was created to do so instead – and evidence Defendants' deliberate measures to avoid providing that information to investors by deflecting from the truth. It is precisely because the talking points say nothing about the Indenture – and instead advised participants to provide benign explanations, such as the complexity of the transaction, and (when "pressed") divert to discussing corporate structure and tax concerns – that these documents demonstrate Defendants' scienter. This inference must be drawn in Plaintiffs' favor, not Defendants', at this stage. *Tellabs*, 551 U.S. at 310.

*Third*, Plaintiffs allege other internal documents demonstrate that Defendants were aware that the Master Lease violated the terms of the Indenture. ¶¶68-86. For example, attendees at a May 6-7, 2014 Windstream Board meeting (including Defendant Kenny Gunderman (¶81)) were

provided with a 300-page packet of information about the Spin-Off, such as a schematic of the "[s]tructure & [r]elationship between [Windstream] & [Uniti]," and a detailed "[o]verview of [the] Master Lease," including a discussion of the parties to the Master Lease, the term, the rent to be paid, and the assets to be transferred to Uniti. ¶82. Defendants again repeat the claim that this document – and other Board materials detailed in the Complaint (¶¶79-86) – support an inference that Defendants believed the Spin-Off would not violate the Indenture. Mot. at 30. But Plaintiffs allege that these documents demonstrate that the Individual Defendants had a detailed understanding of the Spin-Off's structure, which must be viewed in conjunction with other documents demonstrating that the structure was used to evade the restrictions in the Indenture. *E.g.*, ¶76; *Tellabs*, 551 U.S. at 310, 322.  Defendants' detailed understanding of the transaction's structure supports an inference of their knowledge about why that structure was chosen, and that the Spin-Off violated the Indenture nonetheless.[22] Indeed, officers are deemed to know "facts reasonably available to them, particularly when the facts are critical to a business' core operation or an important transaction." *In re Synovis Life Techs., Inc. Sec. Litig.*, No. 04-CV-3008-ADM-AJB, 2005 WL 2063870, at *15 (D. Minn. Aug. 25, 2005).

*Fourth*, the "true lease" opinion prepared by the law firm Skadden Arps Slate Meagher & Flom ("Skadden") and delivered to Uniti management (¶128) expressly cautioned Defendants that, as structured, the Master Lease could be deemed a "sale-leaseback transaction." ¶137. Indeed, Skadden concluded: "the Spin-Off and Master Lease involve a contribution of property to [Uniti] by Windstream and a leaseback of those properties from [Uniti] to Windstream. Thus, there is a transfer of legal ownership of the Distribution Systems followed by a leaseback of that

---

[22] Defendants point to a series of other documents identified in the Complaint, which they claim also supports their chosen inference that Defendants thought the Spin-Off did not violate the Indenture. Mot. at 30. But, again, competing inferences must be drawn in Plaintiffs' favor at this stage. *Tellabs*, 551 U.S. at 310, 322.

property that could be viewed as similar to a sale-leaseback arrangement." *Id.* Plaintiffs allege that this confirms Defendants' knowledge that the Master Lease could be found to violate the Indenture. Defendants get cute with semantics and argue that "the fact that the spinoff and Master Lease were similar to a 'sale-leaseback arrangement' does not mean that they met the contractual definition of a 'Sale and Leaseback Transaction.'" Mot. at 31. But, again, the inference must be drawn in Plaintiffs' favor now, and the Complaint's allegations viewed in totality. *Tellabs*, 551 U.S. at 310, 322. Defendants' access to an opinion from a prominent law firm explaining that the structure of the transaction was the equivalent of a sale-leaseback arrangement supports an inference that they therefore knew the transaction could violate the Indenture's restrictions on such transactions.[23]

*Fifth*, Defendants' representations to investors after the Aurelius Litigation commenced that they looked "very, very closely" at the legal claim and did a "deep dive" on the Master Lease (¶¶186, 188), and as a result the Master Lease was "well structured" and "designed to be well structured for distressed situations" (¶175), contribute to a strong inference of scienter. Defendants essentially admit that they performed a detailed analysis of the Master Lease structure. Having done so, they either knew that the transaction was flawed from inception, or were severely reckless in not knowing it.[24] *See St. Jude*, 836 F. Supp. 2d at 903 (finding that

---

[23] Defendants argue that even if these documents all support an inference of scienter, they only reflect the state of mind of *Windstream* executives – not *Uniti* executives. Mot. at 31. This is nonsense. Defendant Gunderman received this information in documents and meetings; Fletcher, **Uniti's General Counsel**, did as well. ¶¶81, 85. A defendants' access to information suggesting their public statements are materially inaccurate supports an inference of scienter. *Navarre*, 299 F.3d at 746. Further, as detailed below, Uniti was at the time part of Windstream. *See infra* at 48.

[24] Further, many of Defendants' statements were in response to analysts' questions about this subject (*e.g.*, ¶¶171, 173, 175), and "the specificity and repetition of [] analysts' questions" support a strong inference that Defendants' misleading statements about the subject were at least reckless, if not made with actual knowledge. *Institutional Inv'rs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009).

45

plaintiffs' allegations of defendants' knowledge of "critical facts" about the company's "core business information could be imputed to the Individual Defendants").

*Finally*, Defendants' access to information and understanding of the transaction's structure must be understood in context. There is no dispute that this was not an arms'-length negotiation. ¶103. In fact, Plaintiffs allege that, at all relevant times during the "negotiation" of the Master Lease, the officers of Windstream Holdings were also officers of Uniti, all of whom were deeply involved in determining the structure of the transaction. *Id.* There was also substantial overlap between Windstream and Uniti at various points during the execution of the Spin-Off. ¶¶78, 103-10. And Defendant Kenny Gunderman was involved in the transaction at every stage and then was appointed CEO of Uniti, ¶106. Defendant Gunderman's relationship with Windstream "permits an inference that [he] had access to [this] information that contradicted the statements [he was] making." *Cummings v. Paramount Partners, LP*, 715 F. Supp. 2d 880, 902 (D. Minn. 2010). Indeed, Plaintiffs do not merely allege that the Individual Defendants "must have known" of the alleged misconduct on the basis of their position in the company, as Defendants contend, Mot. at 28-29; rather, the Complaint alleges in painstaking detail that Defendants knew and had access to information about this highly conflicted transaction that would result in an agreement between Uniti and Windstream – *its only customer*. Defendants' access and receipt of information which conflicted with their public statements supports a strong inference of scienter. *Navarre*, 299 F.3d at 746; *see also Minneapolis Firefighters' Relief Assn v. Medtronic, Inc.*, No. 08-CV-06324-PAM-AJB, 2010 WL 11469576, at *7 (D. Minn. Feb. 3, 2010) (importance of product at issue to company's business, in conjunction with defendants' senior management positions, supported an inference of knowledge

46

of issues affecting that product); *St. Jude*, 836 F. Supp. 2d at 903 (finding inference of scienter where "core business information could be imputed to the [i]ndividual [d]efendants").

### (b)    True Lease Determination

Plaintiffs allege that Defendants knew the useful life of its copper wire was much shorter than the estimates on which the Skadden opinion and Ernst &Young's ("E&Y") analysis were based, and thus Defendants had knowledge that there was a major risk that the Master Lease could not be considered a "true lease." ¶¶122-38.[25] Defendants therefore cannot (as they attempt to do, Mot. at 32), rely on these opinions to now claim that they lacked knowledge. Likewise, Defendants cannot hide behind the assurances Windstream provided that the Master Lease was a true lease (Mot. at 32), because at the time of those assurances (and at the time the Spin-Off was structured and executed) Uniti was still part of Windstream.[26] Defendants' efforts to resolve these factual questions now cannot be countenanced, as the Complaint's allegations must be "construed in the light most favorable to the nonmoving party." *Beaver Cty.,* 94 F. Supp. 3d at 1044; *see also Green Tree*, 270 F.3d at 666 (the pleading requirements for scienter "do[] not license [courts] to resolve disputed facts at this stage of the case"); *In re Chronimed Inc. Sec. Litig.*, No. 01-CV-01092-DWF-AJB, 2002 WL 1016824, at *6 (D. Minn. May 16, 2002) (finding the plaintiff's scienter allegations sufficient and holding "to dismiss them based on an undeveloped record and the mere possibility of an alternative explanation would be premature.").

Defendants suggest that Plaintiffs plead no factual support for the allegation that Defendants knew that the Skadden opinion and E&Y's analysis were based on inflated projections. Mot. at 33. Not so. As an initial matter, Defendants' irrelevant assertion that

---

[25] These same facts support an inference that Defendants knew their statements regarding Windstream's bankruptcy were materially false and misleading. ¶¶ 214, 217.

[26] Indeed, Defendants do not dispute – as Judge Furman found – that the 2015 sale-leaseback between Uniti and Windstream was "not negotiated at arm's length." ¶103.

47

Plaintiffs' "true lease" allegations rest entirely on allegations pled in the Adversary Proceeding ring hollow when compared to the well-pled allegations in the Complaint.[27] These allegations include that: (i) Skadden represented the "Windstream Group" in its negotiation of the Master Lease, (ii) E&Y's valuation analysis was discussed in detail at Board Meetings attended by Fletcher and Defendant Kenny Gunderman, and (iii) the minutes for one such meeting, attended by Defendant Kenny Gunderman, indicate that the group discussed an overview of the "methodology utilized by Ernst & Young to prepare a preliminary estimate of ranges for the fair market value of assets to be transferred to [Uniti] and the initial lease rate under the Master Lease." ¶¶81-85, 103-05, 129.

Furthermore, as explained above, Defendants simply cannot distance themselves from *Windstream's* knowledge of the actual useful life of the copper wiring – and Windstream's access to information that contradicted E&Y's analysis, Mot. at 33 – because *Uniti was part of Windstream at the time the Spin-Off was conceived and executed*. Those entities were one and the same at the time the knowledge was obtained. And Defendant Gunderman was present at the meetings where these valuation analyses were discussed, and received documents in which they were described in detail. ¶¶79-85. Allegations that Defendants had documents and information that conflict with their public representations support a strong inference of scienter. *See Navarre*, 299 F.3d at 746.

Finally, this Circuit has recognized that the temporal proximity between alleged false and misleading statements and the revelation that those statements were false is relevant to the scienter analysis. *See Elam v. Neidorff*, 544 F.3d 921, 930 (8th Cir. 2008) ("[T]he close

---

[27] Plaintiffs need not present evidence at this stage of the case. Instead, Plaintiffs need only plead particular facts that, if true, would constitute illegal conduct, because the pleading stage is not "the time to put Plaintiffs to their proof." *In re Am. Italian Pasta Co. Sec. Litig.*, No. 05-CV-00725, 2006 WL 1715168, at *6 (W.D. Mo. June 19, 2006).

proximity between defendants' June statements and the mid-July announcement that resulted in the 35 percent decline in stock value is relevant to scienter."). Here, Defendants assured the market that Uniti would be able to navigate the Windstream bankruptcy without raising additional capital on May 29, June 5, and June 20, 2019 (¶¶221-25) and just weeks (and days later), on June 24, 2019, Uniti announced a $300 million notes offering in order to navigate the Windstream bankruptcy, which sent the Company's stock price crashing. ¶¶227-28. This temporal proximity, when viewed holistically with the other scienter allegations identified herein, supports a strong inference of scienter. *Elam*, 544 F.3d at 930.

### 3.       Defendants Had Motive and Opportunity to Commit Fraud

Allegations of motive and opportunity are not required to adequately allege a strong inference of scienter, *Sanchez v. Centene Corp.*, 407 F. Supp. 3d 831, 845, 847 (E.D. Mo. 2019) (motive allegations not necessary, nor must a complaint have the "hallmarks of a securities fraud case," such as insider trading), but such allegations can be used to support an inference of scienter. *St. Jude*, 836 F. Supp. 2d at 895 (citing *Navarre*, 299 F.3d at 745) ("With respect to 'motive and opportunity,' the Eighth Circuit has explained that this phrasing 'is a term of art, 'meaning something far narrower than what it appears to mean,' and is not per se required under the heightened PSLRA pleading requirements.'"); *MoneyGram*, 626 F. Supp. 2d at 981 ("Motive is shown through 'concrete and personal benefit to the individual defendants resulting from the fraud.'").

Nonetheless, Plaintiffs' allegations of motive further support a strong inference of scienter by alleging that Defendants had strong incentives to conceal that the Spin-Off and Master Lease violated the Indenture. Windstream was Uniti's largest customer by far – alone providing almost 70% of Uniti's annual revenue. ¶55. In order to protect that revenue stream – and Uniti's very existence – Defendants needed to conceal the violations of the Indenture to

avoid its largest customer defaulting on hundreds of millions of dollars in Notes. If there was a default, Windstream would have to pay the outstanding principle and interest, sending it into bankruptcy, which, in turn, threatened Uniti's ability to survive. ¶¶65-66. Only by concealing the true nature of these risks could Defendants hope to possibly avoid the collapse of this "house of cards." ¶240; *see also PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690-91 (6th Cir. 2004) (allegations that defendants had a motive to engage in fraud to preserve company's continued viability were suggestive of scienter); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (explaining that a reckless gamble – "concealing bad news in the hope that it will be overtaken by good news" – can show motive); *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, No. 09-CV-00799, 2011 WL 2444675, at *12 (D. Del. June 14, 2011) ("[A] motive of personal financial gain [can] bolster[] the inference of scienter.").

Defendants argue that these allegations are tantamount to "generalized allegations of corporate profit motive." Mot. at 27. But this is not the same as cases in which plaintiffs allege that defendants were motivated to see their company succeed – rather here, the motivation was to conceal that Uniti's entire structural legitimacy and financial viability was dependent on a knowingly questionable transaction that risked bankrupting the Company's most significant customer, and Uniti itself. This is not the sort of "motive generally possessed by all corporations," *id.* (citing *Pet Quarters, Inc. v. Badian*, 2006 WL 827331, at *4 (E.D. Ark. Mar. 29, 2006))—as Defendants argue.

Likewise, allegations that Defendants, including Defendant Kenny Gunderman, sought to personally gain from the fraud cannot be dismissed as a motive that all executives possess. Here, uniquely, Defendant Gunderman ***conceived of*** the Spin-Off transaction while at Stephens, Inc., (¶58) – and after it was executed, he became CEO of Uniti ***despite having no experience as an***

50

*executive of a public company* and was rewarded with a $5 million annual salary, (¶42) while his brother, Bob Gunderman, was promoted to CFO of Windstream. ¶49. Defendant Gunderman's motivation to conceal the flaws in the transaction are therefore not the same as typical executives' "desire to increase their bonus and executive compensation packages." Mot. at 27.

### C. Plaintiffs Have Adequately Pled Loss Causation

Plaintiffs' loss causation allegations are evaluated under Rule 8's notice pleading standard, *Dura*, 544 U.S. at 346; *CenturyLink*, 403 F. Supp. 3d at 735, which has been characterized as a "simple test" that "should not prove burdensome for a plaintiff who has suffered an economic loss." *St. Jude.*, 836 F. Supp. 2d at 908. "To adequately plead loss causation, the complaint must state facts showing a causal connection between the defendant's misstatements and the plaintiff's losses." *McAdams v. McCord*, 584 F.3d 1111, 1114 (8th Cir. 2009). However, loss causation "is not a probability requirement." *In re Retek Inc. Sec. Litig.*, 621 F. Supp. 2d 690, 701 (D. Minn. 2009). Instead, "[l]oss causation in a securities fraud case is analogous to the common law's requirement of proximate causation" – a plaintiff "must show that the loss was foreseeable and that the loss was caused by the materialization of the concealed risk." *McAdams*, 584 F.3d at 1114. The Complaint easily satisfies these standards.

Defendants do not deny that the Complaint alleges dramatic declines in Uniti's stock price during the Class Period. Nor do they identify any other information that purportedly caused the price declines alleged. Instead, Defendants attack the partial disclosures concerning the "claimed default, the ensuing litigation, and the court's ruling" by arguing that the disclosed facts did not provide "new" information to the market. Mot. at 35-36. But in doing so, Defendants misconstrue Plaintiffs' loss causation allegations, mistakenly suggesting that Plaintiffs rely only on a "corrective disclosure" theory of loss causation.

51

As alleged in the Complaint, Plaintiffs explicitly plead a ***materialization of the risk theory of loss causation***, ¶¶17, 18, 21, 24, 25, 30, 167, 178, 206, 228, 266, an approach specifically sanctioned in this Circuit. *See Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008). Under this approach, a plaintiff may plead that the "loss was foreseeable and caused by the materialization of the concealed risk." *Id.* at 552; *see also Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) (holding that a misrepresentation is "'the proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor."). Most notably, as explained by the court in *In re Initial Public Offering Securities Litigation*, the materialization of the risk theory of loss causation differs from the approach requiring a corrective disclosure:

> Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss. By contrast, where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed – i.e., a corrective disclosure.

399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005), *aff'd sub nom. Tenney v. Credit Suisse First Boston Corp.*, No. 05-3430, 2006 WL 1423785 (2d Cir. May 19, 2006). Defendants' distortion of the Complaint's clearly pled loss causation allegations is fatal to its there-were-no-"new"-facts-presented-to-the-market loss causation argument.[28]

And even if Defendants' interpretation of the Complaint were correct (and it is not), the Complaint alleges that after Windstream announced it was eliminating its dividend in August

---

[28] Defendants' cited cases are thus completely inapposite. *See Rand-Heart*, 812 F.3d at 1179 (analyzing allegations of loss causation under the "corrective disclosure" theory of loss causation); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551-52 (S.D.N.Y. 2008) (same); *Meyer v. Greene*, 710 F.3d 1189, 1202 (11th Cir. 2013) ("The Investors rest their showing of loss causation on three purported corrective disclosures[.]").

2017 and that it received the Notice of Default in September 2017, Defendants continued to perpetuate the fraud by actively concealing and denying that the Master Lease violated the Indenture and that the rent payments from Windstream were in jeopardy. ¶¶21, 22, 169, 179-198, 215-224. As discussed above, Defendants' repeated and continued misrepresentations and omissions of material facts begets any contention that the information was public and well-known. *See* § III.A.4. Here, the Complaint plainly alleges the material risks that Defendants concealed, that they were aware of those risks, and when those risks materialized, Plaintiffs suffered a loss. ¶¶241-266. Nothing more is required to plead loss causation under a materialization of the risk theory. *Schaaf*, 517 F.3d at 552 (noting that the materialization of the risk theory requires a plaintiff to plead that the "loss was foreseeable and caused by the materialization of the concealed risk").

Moreover, Defendants' argument that Windstream's August 2017 announcement is "irrelevant" here is meritless. Mot. at 37. The Complaint alleges that on August 3, 2017, Windstream announced that it was eliminating its dividend payment to its investors. ¶247. In response to the news, Uniti's stock price immediately and dramatically reacted. ¶¶247-249. Defendants' oblique claim that Windstream's announcement is "irrelevant" to the misstatements in this case is thus inconsistent with the reaction of Uniti's stock price to this information and is in conflict with the conclusion of numerous analysts following and reporting on Uniti. For example, a JPMorgan report recognized that Uniti shares fell 40% "since reporting in-line 2Q17 earnings on August 3rd, driven by fears surrounding the *stability of the Windstream business* and the viability of the WIN/UNIT spin structure." ¶252. Additionally, SunTrust Robinson Humphrey characterized Uniti's stock as "[u]nder pressure since WIN cut its dividend[.]" ¶253. It is unquestionable that as Uniti's largest customer, market participants viewed Windstream's

elimination of its dividend as new, material, and troubling information. ¶250. These facts, which must be taken as true at this stage of the proceedings, and construed in Plaintiffs' favor, are sufficient to allege loss causation.

The remainder of Defendants' arguments, which attack the allegations under a "corrective disclosure" theory of loss causation in isolation, are equally meritless. First, Defendants contend that Plaintiffs fail to allege loss causation because the "corrective disclosures" do not directly address or admit that the Master Lease was not a "true lease." Mot. at 35, 37. But "a securities fraud plaintiff is not necessarily precluded from establishing loss causation where a corrective disclosure does not, on its face, specifically identify or explicitly correct a previous representation[.]" *St. Jude*, 836 F. Supp. 2d at 910.

Further, the Supreme Court has never required a corrective disclosure to match or be a mirror image of their false statements. *See Dura*, 544 U.S. at 342, 346-47 (holding that a plaintiff need only "provide[] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation"); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812-13 (2011) (noting that all a plaintiff is required to show to adequately allege loss causation is that the "misrepresentation that affected the integrity of the market price also caused a subsequent economic loss"). Nevertheless, the Complaint identifies the materialization of the known risk that the Master Lease was a disguised financing in the June 24, 2019 partial disclosure, which placed a spotlight on the economic viability of the assets originally transferred from Windstream to Uniti in the Spin-Off. ¶¶27, 29, 30. Additionally, this partial disclosure was a materialization of the risk that the Company did not have the ability to navigate the Windstream bankruptcy "unscathed" and without having to

raise external capital – as Defendants had repeatedly claimed – putting two-thirds of Uniti's revenue in jeopardy. ¶¶226-228, 262-264.[29]

Finally, Defendants ask the Court to weigh their truth-on-the-market defense by deciding why Uniti's stock price fell. Mot. at 36-37. But, as discussed, *see supra* at § III.A.4, this is an "intensely fact-specific" defense that is "rarely an appropriate basis for [dismissal]" at the motion to dismiss stage. *Stellent*, 326 F. Supp. 2d at 985-86. Put simply, at the pleading stage, Defendants cannot prevail by asking the Court to determine substantive factual issues concerning what caused Uniti's stock price to fall as a matter of law. In rejecting these same tactics, the Eighth Circuit reversed the district court's dismissal of the plaintiff's loss causation allegations holding it "decline[d] to attach dispositive significance to the stock's price movements absent sufficient facts and expert testimony, which cannot be considered at this procedural juncture, to put this information in its proper context." *Gebhardt*, 335 F.3d at 831-32.

Thus, because the Complaint ties the precipitous drop in Uniti stock to the materialization of the risks concealed by Defendants and revelation of the fraud through four partial disclosures, the Complaint easily satisfies *Dura*'s requirement to provide Defendants with some "indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347.

---

[29] Curiously, Defendants also attack the partial disclosures by asserting that the "corrective" information was actually revealed to the market on July 25, 2019, but caused no loss to Plaintiffs. Mot. at 35. This factual argument is not only premature, but is a red-herring. Plaintiffs' allegations, which must be taken as true and construed in the light most favorable to the plaintiff, *St. Croix Waterway Ass'n v. Meyer*, 178 F.3d 515, 519 (8th Cir. 1999), do not allege July 25, 2019 as a so-called "corrective" disclosure date. *See e.g.*, ¶¶246-266. Instead, the Complaint clearly identifies the risks Defendants concealed from investors and the market that ultimately materialized and that resulted in the negative price reaction in Uniti's stock and Plaintiffs' losses. *Dura* requires nothing more. 544 U.S. at 347.

### D.   Defendants' Contention that Plaintiffs' Claims Are Time-Barred is Premature, And Incorrect

Unsurprisingly, instead of squarely confronting the Complaint's well-pled allegations, Defendants again ask this Court to decide fact questions inappropriate for resolution at the pleading stage, this time contending that Plaintiffs' claims are time-barred. Mot. at 38-39. To be timely, a Section 10(b) "private right of action . . . may be brought not later than the earlier of . . . 2 years after the discovery of the facts constituting the violation" or "5 years after such violation." 28 U.S.C. §1658(b). The "limitations period in §1658(b)(1) begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'" after an appropriate investigation. *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010) (alteration in original); *Zarecor v. Morgan Keegan & Co., Inc.*, 801 F.3d 882, 887 (8th Cir. 2015). And as scienter is an "important and necessary element of a §10(b) 'violation,'" discovery will necessarily also include "scienter-related facts beyond the facts that show a statement (or omission) to be materially false or misleading." *Merck & Co.*, 559 U.S. at 648, 650. As discussed below, Plaintiffs' claims have been timely brought.

Defendants contend that Plaintiffs were on "notice" of the fraud as early as August 2017. Mot. at 38. Defendants are once again incorrect. Defendants' argument rests on an announcement by Windstream that it was eliminating its dividend and "rumors" in the market that Aurelius was buying the Notes fueling speculation that Aurelius believed that the Spin-Off violated Windstream's Indenture. *Id.*; ¶¶168, 172. However, critically important to the determination Defendants ask the Court to make on a naked record are allegations that Defendants **continued to make misrepresentations and omissions** to obviously stem the bleeding of Uniti's stock that resulted from Windstream's elimination of its dividend and the rumors about Aurelius – allegations Defendants ignore because they undermine their argument.

56

¶¶169, 179, 184, 186-188, 194, 196-198. Because Defendants "continued to mislead [Plaintiffs] regarding the alleged fraud . . . the date the Plaintiffs were put on notice about the fraud becomes an issue of fact that should not be decided at this preliminary stage of the case." *Sagez v. Glob. Agric. Invs., LLC*, No. 11-CV-03059-DEO, 2014 WL 3779072, at *17 (N.D. Iowa July 31, 2014).[30]

Thus, whether the information in August 2017 was sufficient to trigger a "discovery" of the claims Plaintiffs allege and put Plaintiffs on "notice" of the fraud as Defendants contend, is an intensely factual determination. *Tracy v. Telemetrix, Inc.*, No. 8:12-CV-359, 2016 WL 3383229, at *1 (D. Neb. May 3, 2016) ("Defendants' argument that Plaintiff[s'] claims are time-barred requires the court to make fact-dependent determinations as to when the injury occurred and when Plaintiff knew, or should have known, about the injury."). Case law leaves little doubt that these types of fact-intensive determinations are "better resolved on fully supported motions for summary judgment or as part of the nonjury trial of this matter." *Id.*; *see also Schoenfeld v. U.S. Resort Mgmt., Inc.*, No. 05-CV-04368-CVC-NKL, 2007 WL 2363500, at *2 (W.D. Mo. Aug. 16, 2007) ("factual disputes" regarding administrative exhaustion and statute of limitations "are not appropriately considered in a motion to dismiss"); *Witcher v. TeamCare*, No. 2:18-cv-00022-KGB, 2018 WL 10160961, at *2 (E.D. Ark. Sept. 4, 2018) (denying motion to dismiss based on statute of limitations as the court had to "make fact-dependent findings to determine th[e] [limitations] date").

---

[30] *See also DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 438 (S.D.N.Y. 2018) (declining to dismiss based on the statute of limitations as "express denials of the reported allegations could have allayed a reasonable investor's concerns"); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-CV-1580-LGS, 2018 WL 2382600, at *5 (S.D.N.Y. May 24, 2018) (declining to dismiss complaint on statute of limitations ground when the defendants "countered" statements in "many news reports of delays and accounting irregularities" with explicit denials of any wrongdoing).

Defendants' conclusory statute of limitations arguments also fall inordinately short of their burden to establish this affirmative defense. *Ritchey v. Horner*, 244 F.3d 635, 638-41 (8th Cir. 2001); *Pet Quarters, Inc. v. Badian*, No. 4:04-CV-697-RSW, 2006 WL 8445030, at *3 n.3 (E.D. Ark. Apr. 28, 2006) (holding that the defendants carried a "heavy burden" in "establishing that the plaintiff was on inquiry notice as a matter of law"). Indeed, ***"[i]nquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct.***" *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993).[31] Defendants provide *no such* evidence in support of their arguments. Defendants' inability to satisfy their "heavy burden" at this stage is also clear from their contention that the internal documents that supposedly placed Plaintiffs on notice of their scienter allegations are the same documents that "affirmatively undermine any inference of scienter." Mot. at 39. Defendants cannot have it both ways, while at the same time failing to point to any other scienter facts that could have triggered Plaintiffs' obligation to investigate whether they had been defrauded. *Merck & Co.*, 559 U.S. at 648, 650.[32]

---

[31] Defendants cherry-pick a statement from *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 68 F. Supp. 3d 530, 536 (S.D.N.Y. 2014), *aff'd*, 639 F. App'x 664 (2d Cir. 2016), to assert that a "plaintiff need not be on notice of *all* of its allegations in order for the statute of limitations to run." Mot. at 39. Defendants miss the mark. In *Gavin/Solmonese*, plaintiff alleged scienter "primarily based on statements" made by defendants in public SEC filings. 68 F. Supp. 3d at 536. These statements identified as "warning signs" took on "greater significance in the context of W2E's consistent defaults on its debentures." *Id.* These allegations are in direct contrast to the facts here, where Defendants repeatedly denied the fraud after the Notice of Default was issued and after Windstream announced the elimination of its dividend.

[32] Furthermore, Defendants' passing reference to *Zarecor* to support dismissal of the sale-leaseback claims suffers from a glaring oversight. Mot. at 39. In *Zarecor*, the court held that it did not need to "pinpoint exactly when a reasonably diligent plaintiff would have then discovered 'the facts constituting the violation' under the federal discovery rule." 801 F.3d at 887. Instead, the court concluded that the plaintiffs were on notice of the facts constituting the violation in 2009 because they had filed a "statement of claim in arbitration with the Financial Industry Regulatory Authority" alleging the same claims as their securities fraud case. *Id.* As the plaintiffs filed their federal suit in 2011, more than two years later, the court found the federal suit untimely. *Id.* The facts in *Zarecor* are distinguishable from the facts here.

**IV.    PLAINTIFFS HAVE ADEQUATELY STATED A §10(b) CLAIM UNDER RULE 10b-5(a) AND (c)**

Section 10(b) establishes two kinds of liability: "false statement liability (17 C.F.R. § 240.10b-5(b)) and scheme liability (17 C.F.R. § 240.10b-5(a), (c))." *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 389 (8th Cir. 2016). "Scheme liability concerns the use of any device, scheme, or artifice to defraud and any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." *Id.* (internal quotations omitted). Accordingly, "[a] defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rule 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions." *KV Pharm.*, 679 F.3d at 987.

Here, while the purported scheme certainly involves allegedly false and misleading statements, it critically also includes conduct beyond said statements.[33] As discussed in-depth *supra* § II, beginning in 2013, motivated by a desire to boost their personal profit, provide an injection of cash into a doomed telecommunications network, and manipulate the price of Uniti securities, Defendants concocted a plan to find a solution to Windstream's financial problems: having Windstream Holdings create a REIT (i.e., Uniti), sell its aging telecommunications assets to it, and then "lease" them back in what was a disguised financing transaction. ¶¶6, 56-59. In furtherance of the scheme, Windstream and Defendants Uniti and Kenny Gunderman worked to obtain the necessary approvals for the Spin-Off from state regulators, while concealing that the Spin-Off violated the Indenture's prohibition on sale-leaseback transactions. ¶88-90. This

---

[33] Here, Defendants only seek to dismiss Plaintiffs' scheme liability claim for failure to adequately plead a deceptive or manipulative act. Mot. at 39-40. Defendants are thus prohibited from challenging the other elements of scheme liability, including scienter, in their reply brief. *See United States v. Xiong*, 914 F.3d 1154, 1161-62 (8th Cir. 2019).

required Fletcher, General Counsel for Windstream *and* Uniti, who also spoke to regulators "for both companies" – to draft, review, and sign various applications, affidavits, and other regulatory documents designed to "convince state utility regulatory bodies that they should approve Windstream's sale of the assets to Uniti." ¶¶91, 99.

Further, while the regulatory approval process was underway, Defendants and Windstream – the officers of Windstream also being officers of Uniti at the time – negotiated and finalized the Master Lease. And, in an effort to effectuate the Spin-Off, Defendants also back-filled financial terms in the Master Lease by negotiating above-market lease payments based on unsupportable projections of the useful life of copper wire – which made up the majority of the assets to be sold to Uniti. ¶232. In fact, the Complaint alleges that despite valuations they had at the time, Defendants provided these inflated numbers to E&Y and the IRS, specifically to support an opinion that the Master Lease was a "true lease." ¶¶127-128.

Accordingly, because the Complaint explicitly pleads conduct beyond Defendants' alleged misrepresentations and omissions, Plaintiffs' scheme liability claim is sufficiently pled. *See, e.g*, *S.E.C. v. Langford*, No. 8:12-CV-344, 2013 WL 1943484, at *8 (D. Neb. May 9, 2013) (holding that the scheme did "not become deceptive only through misstatements in public filings," but included "actions designed to deceive the regulators, and to present a false picture of the Bank as a solvent entity."); *JAC Holding Enters., Inc. v. Atrium Capital Partners, LLC*, 997 F. Supp. 2d 710, 735 (E.D. Mich. 2014) (allowing a scheme liability claim where the alleged conduct was "not just specific false statements . . . but also the planning and carrying out of a comprehensive scheme, by specific steps, to mislead the buyers as to JAC's value . . . .").

Defendants' attempt to peg the Complaint's well-pled scheme liability claim with the allegations in *KV Pharm.* is groundless. Mot. at 40. Unlike the host of allegations detailing

specific deceptive conduct separate from the misstatements and omissions discussed above, the plaintiffs in *KV Pharm.* **included no such allegations** and instead only "generally alleged" that the defendants "carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did . . . deceive the investing public." 679 F.3d at 986. The plaintiffs then supported this "general allegation" by "incorporat[ing] their allegations regarding the false and misleading statements about KV's compliance with FDA regulations . . . ." *Id.* Here, Plaintiffs detail allegations of deceptive conduct, beyond the making of false statements, undoubtedly satisfying the standard outlined in *KV Pharm.* [34]

Next, Defendants argue, without support, that because "the Spin-Off was effectuated by Windstream" and "not Defendants," Plaintiffs' scheme liability claim fails. Mot. at 40. Defendants again flatly ignore Plaintiffs' actual allegations that at the time the Spin-Off was conceived, through the regulatory approval process, and during the "negotiations" of the terms of the Spin-Off and Master Lease, the involved Windstream executives were *simultaneously* Uniti executives – *something Defendants do not contest*. ¶¶103-08.

Finally, Defendants' assertion that there is "no allegation in the complaint that [the Spin-Off] was not a 'legitimate business transaction'" is nonsense. Mot. at 40. Here, Plaintiffs clearly allege that the Spin-Off and Master Lease were structured with the knowledge that the transactions violated the sale-leaseback provisions in the Indenture and that the Master Lease was a disguised financing. ¶¶5, 12-13, 58, 63-66, 75-76, 79-81, 85-91, 95-121.[35]

---

[34] Defendants' reliance on *Barnes v. Oldner*, 259 F. Supp. 3d 926 (E.D. Ark. 2017) is also misplaced. Mot. at 39, 40, 41. In *Barnes*, the court held that the plaintiff's scheme liability claim was insufficient because the plaintiff "failed to allege what effect the defendants' conduct in further of the scheme had on the securities at issue . . . ." *Id.* at 937. Here, Plaintiffs include such allegations and, indeed, Defendants do not contend otherwise. *See* Mot. at 39-40.

[35] Defendants' reliance on *S.E.C. v. Quan,* No. 11-CV-723, 2013 WL 5566252 (D. Minn. Oct. 8, 2013), *aff'd,* 870 F.3d 754 (8th Cir. 2017), is misguided. Mot. at 40. In *Quan*, the court **denied**
*(continued … )*

In sum, the "deceptive conduct alleged by the [Complaint] goes beyond misstatements or omissions" and "is inherently deceptive and distinct from the alleged misstatement." *Langford*, 2013 WL 1943484, at *8. Moreover, while "defendant[s'] improper actions may have resulted in misstatements as to [the Spin-Off and Master Lease] that were eventually reported to the public, [their] conduct with respect to [the Spin-Off and Master Lease] amounts to more than making a false statement." *Id*. Thus, the Complaint describes a classic scheme that is actionable under Rule 10b-5. *See In re Able Labs. Sec. Litig.*, No. 05-CV-02681-JAG, 2008 WL 1967509, at *20 (D.N.J. Mar. 24, 2008) (finding similar factual allegations sufficiently alleged a Rule 10b-5(a) and (c) claim).

## V.    PLAINTIFFS HAVE ADEQUATELY STATED A §20(a) CLAIM

Defendants seek dismissal of Plaintiffs' §20(a) claims solely on the purported failure to allege an underlying violation of the securities laws. Mot. at 41. As discussed above, however, because Plaintiffs have adequately alleged primary violations under §10(b), Plaintiffs' control person claims should be sustained. *See Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1128 (8th Cir. 2019); *Xcel Energy*, 286 F. Supp. 2d at 1060 (denying defendants' motion to dismiss the control person liability claim as the plaintiffs had met the pleading requirements for a §10(b) claim).

## VI.    CONCLUSION

For the reasons set forth herein, Defendants' Motion should be denied in its entirety.

---

*( … continued)*
***a motion for summary judgment*** holding that several fact issues existed to which reasonable minds could differ, including whether the renegotiation was a "legitimate business transaction and not inherently deceptive." *Id.* at *15. This analysis is completely irrelevant to the standard the Court must apply and the issues presented in Defendants' ***motion to dismiss***.

DATED:  September 8, 2020

*/s/ Christine M. Fox*

CHRISTINE M. FOX

LABATON SUCHAROW LLP
CAROL C. VILLEGAS
CHRISTINE M. FOX
ROSS M. KAMHI
140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)
cvillegas@labaton.com
cfox@labaton.com
rkamhi@labaton.com

*/s/ Debra J. Wyman*

DEBRA J. WYMAN

ROBBINS GELLER RUDMAN
  & DOWD LLP
DEBRA J. WYMAN
TING H. LIU
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
debraw@rgrdlaw.com
tliu@rgrdlaw.com

*Lead Counsel for Lead Plaintiffs*

Geoffrey P. Culbertson
PATTON TIDWELL & CULBERTSON, LLP
GEOFFREY P. CULBERTSON
2800 Texas Blvd.
Texarkana, TX 75503
Telephone:  903/792-7080
903/792-8233 (fax)
gpc@texarkanalaw.com

*Liaison Counsel for the Class*

63

Brian Schall
THE SCHALL LAW FIRM
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Tel: (424) 303-1964
Email: brian@schallfirm.com

Guillaume Buell
THORNTON LAW FIRM LLP
1 Lincoln Street, 25th Floor
Boston, MA 02111
Tel: (617) 720-1333
Email: gbuell@tenlaw.com

*Additional Plaintiffs' Counsel*

64