**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

| | |
|---|---|
| IN RE UNITI GROUP INC. SECURITIES LITIGATION | No. 4:19-cv-00756-BSM |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

1

**TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT .................................................................................................... 1

ARGUMENT................................................................................................................................. 3

I.      PLAINTIFFS HAVE FAILED TO STATE A SECTION 10(b) CLAIM UNDER
        RULE 10b-5(b) (COUNT I) .............................................................................................. 3

        A.      Plaintiffs Fail to Plead Any Actionable Omission or Misstatement ...................... 3

                1.      No Actionable Omission................................................................... 3

                2.      No Actionable Misstatement.................................................................... 12

                3.      Pre-Class-Period Representations Are Non-Actionable ........................... 15

        B.      Plaintiffs Fail to Plead a Strong Inference of Scienter.......................................... 15

                1.      Plaintiffs' Scienter Allegations Are Implausible ..................................... 15

                2.      Plaintiffs Have Failed to Plead Motive...................................................... 18

                3.      The Complaint's Own Allegations Affirmatively Refute Any
                        Claim of Fraudulent Intent or Recklessness ............................................ 21

        C.      Plaintiffs Have Failed to Plead Loss Causation.................................................... 28

        D.      Plaintiffs' Claims Concerning the Sale-Leaseback Covenant Are Untimely ....... 31

II.     PLAINTIFFS HAVE FAILED TO STATE A SECTION 10(b) CLAIM UNDER
        RULE 10b-5(a) OR (c) (COUNT II) ................................................................................ 33

III.    PLAINTIFFS HAVE FAILED TO STATE A CONTROL PERSON CLAIM
        UNDER § 20(a) (COUNT III)......................................................................................... 34

CONCLUSION............................................................................................................................. 34

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*Abbott Labs. v. Adelphia Supply USA*,
    2017 WL 6014322 (E.D.N.Y. Aug. 14, 2017) ..................................................... 5, 6

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) ................................................................................ 17

*Barnes v. Oldner*,
    259 F. Supp. 3d 926 (E.D. Ark. 2017) ............................................................ 33, 34

*In re Ceridian Corp. Sec. Litig.*,
    542 F.3d 240 (8th Cir. 2008) ............................................................................... 17

*In re Cerner Corp. Sec. Litig.*,
    425 F.3d 1079 (8th Cir. 2005) ............................................................................. 21

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014) .................................................................................. 5

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
    713 F. Supp. 2d 378 (D. Del. 2010) ................................................................ 15, 16

*Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*,
    519 F.3d 778 (8th Cir. 2008) ............................................................................... 21

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2010) ............................................................................... 19

*Davidoff v. Farina*,
    2005 WL 2030501 (S.D.N.Y. Aug. 19, 2005) ..................................................... 19

*Detroit Gen. Ret. Sys. v. Medtronic, Inc.*,
    621 F.3d 800 (8th Cir. 2010) ............................................................................... 28

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ....................................................................................... 30, 31

*Elam v. Neidorff*,
    544 F.3d 921 (8th Cir. 2008) ................................................................... 23, 25, 28

*In re Eletrobras Secs. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017) ................................................................... 8

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    2006 WL 6892915 (S.D. Tex. Dec. 4, 2006) ....................................................... 33

*Espinoza v. Whiting*,
   8 F. Supp. 3d 1142 (E.D. Mo. 2014),
   *aff'd sub nom. Podraza v. Whiting*, 790 F.3d 828 (8th Cir. 2015) ................................... 17, 23

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
   270 F.3d 645 (8th Cir. 2001) ....................................................................................... 21

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
   68 F. Supp. 3d 530 (S.D.N.Y. 2014), *aff'd*, 639 F. App'x 664 (2d Cir. 2016) ................ 32, 33

*Gebhardt v. ConAgra Foods, Inc.*,
   335 F.3d 824 (8th Cir. 2003) ....................................................................................... 31

*Gen. Elec. Co. v. Cathcart*,
   980 F.2d 927 (3d Cir. 1992) ........................................................................................... 5

*In re GeoPharma, Inc. Sec. Litig.*,
   411 F. Supp. 2d 434 (S.D.N.Y. 2006) ......................................................................... 24

*In re H & R Block Sec. Litig.*,
   527 F. Supp. 2d 922 (W.D. Mo. 2007) ...................................................................... 6, 24

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ................................................................. 9

*Horizon Asset Mgmt., Inc. v. H & R Block, Inc.*,
   580 F.3d 755 (8th Cir. 2009) ..................................................................................... 2, 17

*Hutchins v. NBTY, Inc.*,
   2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012) ............................................................... 9

*In re Hutchinson Tech., Inc., Sec. Litig.*,
   536 F.3d 952 (8th Cir. 2008) ....................................................................................... 34

*In re IBM Corp. Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998) ........................................................................................ 15

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) ........................................................................................ 20

*Jakobe v. Rawlings Sporting Goods Co.*,
   943 F. Supp. 1143 (E.D. Mo. 1996) ............................................................................ 15

*Janus Capital Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) ...................................................................................................... 7

*Julianello v. K-V Pharm. Co.*,
   791 F.3d 915 (8th Cir. 2015) .................................................................................. 14, 15

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ................................................................................... 16, 20

*Katyle v. Penn Nat'l Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011) ............................................................................... 30

*K-Tel Int'l Sec. Litig. v. K-Tel Int'l*,
    300 F.3d 881 (8th Cir. 2002) ....................................................... 7, 18, 19, 20, 22

*Kushner v. Beverly Enters., Inc.*,
    317 F.3d 820 (8th Cir. 2003) .......................................................... 4, 6, 20, 21, 25

*Lapin v. Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) .................................................................. 8

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007) ............................................................................... 15

*LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*,
    318 F.3d 148 (2d Cir. 2003) ............................................................................... 32

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) .............................................................................. 19

*Marcu v. Cheetah Mobile Inc.*,
    2020 WL 4016645 (S.D.N.Y. July 16, 2020) ..................................................... 10

*McAdams v. McCord*,
    584 F.3d 1111 (8th Cir. 2009) ...................................................................... 30, 31

*In re Medtronic Inc., Sec. Litig.*,
    618 F. Supp. 2d 1016 (D. Minn. 2009) .............................................................. 25

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) .......................................................................... 29

*Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*,
    641 F.3d 1023 (8th Cir. 2011) ............................................................................ 17

*In re Navarre Corp. Sec. Litig.*,
    299 F.3d 735 (8th Cir. 2002) ........................................................................ 19, 27

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) .................................................................. 16, 18, 21

*In re Northpoint Commc'ns Group, Inc. Sec. Litig*,
    184 F. Supp. 2d 991 (N.D. Cal. 2001) ............................................................... 23

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ............................................................................... 22

*In re NVE Corp. Secs. Litig.*,
    551 F. Supp. 2d 871 (D. Minn. 2007) ..................................................... 22, 27, 28

*Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*,
    873 F. Supp. 2d 1070 (D. Minn. 2012) ................................................. 17

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ........................................................... 30

*Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*,
    730 F.3d 263 (3d Cir. 2013) ........................................................... 31

*In re PetroChina Co. Ltd. Sec. Litig.*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015) ................................................. 25

*Podraza v. Whiting*,
    790 F.3d 828 (8th Cir. 2015) ...................................................... 17, 28

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ........................................................... 19

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
    679 F.3d 972 (8th Cir. 2012) ........................................................... 34

*Rand-Heart of N.Y., Inc. v. Dolan*,
    812 F.3d 1172 (8th Cir. 2016) .................................................... 29, 31

*Rubke v. Capitol Bancorp Ltd*,
    551 F.3d 1156 (9th Cir. 2009) ......................................................... 10

*Sagez v. Glob. Agric. Invs., LLC*,
    2014 WL 3779072 (N.D. Iowa July 31, 2014) ..................................... 32

*Schaaf v. Residential Funding Corp.*,
    517 F.3d 544 (8th Cir. 2008) ..................................................... 30, 31

*Seibert v. Sperry Rand Corp.*,
    586 F.2d 949 (2d Cir. 1978) ........................................................... 10

*In re St. Jude Med., Inc. Sec. Litig.*,
    836 F. Supp. 2d 878 (D. Minn. 2011) ............................................... 23

*In re Stratasys Ltd. S'holder Sec. Litig.*,
    864 F.3d 879 (8th Cir. 2017) ...........................................................8

*In re Synovis Life Techs., Inc. Sec. Litig.*,
    2005 WL 2063870 (D. Minn. Aug. 25, 2005) ..................................... 23

*In re Target Corp. Sec. Litig.*,
    955 F.3d 738 (8th Cir. 2020) ..................................................... 16, 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................... 16, 19

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*,
  475 F.3d 824 (7th Cir. 2007) .......................................................................... 30

*In re Tyson Foods, Inc. Secs. Litig.*,
  275 F. Supp. 3d 970 (W.D. Ark. 2017) ...................................................... 8, 10

*United States v. Bestfoods*,
  524 U.S. 51 (1998) ........................................................................................ 20

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005) ......................................................... 9, 10

*Youngers v. Virtus Inv. Partners Inc.*,
  2017 WL 5991800 (S.D.N.Y. Dec. 4, 2017) ................................................. 20

*Zarecor v. Morgan Keegan & Co.*,
  801 F.3d 882 (8th Cir. 2015) ........................................................................ 31

*Zelman v. JDS Uniphase Corp.*,
  376 F. Supp. 2d 956 (N.D. Cal. 2005) .......................................................... 15

OTHER AUTHORITIES

1 W. Fletcher, Cyclopedia of Law of Private Corporations § 33, at 568 (rev. ed. 1990) ............ 20

Defendants respectfully submit this reply brief in further support of their motion to dismiss the Complaint (the "Motion" or "Mot.").[1]

## PRELIMINARY STATEMENT

Plaintiffs' opposition ("Opp.") only confirms that this case is exactly the sort of "fraud by hindsight" stock-drop litigation that the PSLRA and its uniquely heightened pleading standards were designed to stop.

*First*, Plaintiffs concede that the PSLRA requires them to both identify each actionable misstatement or omission and to plead with particularity the reasons why they were purportedly misleading.  Plaintiffs, however, fail to do so under any of their theories.  As to their first theory—that Defendants allegedly failed to disclose the *legal risk* that Uniti's spinoff from Windstream and entry into a Master Lease violated the sale-leaseback provision in Windstream's debt indentures—Plaintiffs do not dispute that controlling Eighth Circuit case law makes clear that such legal risks are classic "soft information" for which there is no duty to disclose.  In their opposition, Plaintiffs try to avoid that case law by recharacterizing the omitted information as supposed "hard facts."  But the conclusion that there was a violation of the sale-leaseback covenant is not a "fact"; it is a legal opinion, which is likewise "soft" information that was not required to be disclosed.  That is particularly true when the alleged violation concerned the debt indentures of a separate, independent public company (Windstream); where Plaintiffs concede that the spinoff was specifically structured by Windstream and its sophisticated advisors to *avoid* a violation; and where there is no dispute that Defendants and Windstream publicly disclosed all of the relevant facts necessary for shareholders to draw their own conclusions in that regard.

Plaintiffs likewise cannot plead that Defendants were obligated to disclose the *legal risk* that Windstream might one day decide, in a potential future bankruptcy, to *allege* that the Master

---

[1] Capitalized terms not defined herein shall have the same meaning as in the Motion.

Lease was not a "true lease" and should instead be recharacterized as a long-term financing, especially when Windstream had expressly represented to Uniti for years that the Master Lease *was* a true lease. Here, too, any supposed "hard facts" were at most risks and legal opinions about the legal status of the Master Lease—none of which was required to be disclosed. In any event, Uniti *did* disclose the risk that the lease might not be respected as a true lease as well as other information that Plaintiffs now claim was concealed. Plaintiffs offer no credible response.

Plaintiffs' claim that Uniti somehow misrepresented that it had the ability to navigate Windstream's bankruptcy without raising external debt likewise fails. Plaintiffs argue that such statements were rendered misleading by Uniti's subsequent decision to conduct a debt offering. But Plaintiffs' opposition fails to show that the debt offering had anything to do with the bankruptcy. Nor, in any event, do Plaintiffs rebut the fact that such statements are nonactionable opinions and forward-looking statements protected under the PSLRA.

*Second*, Plaintiffs' claims also fail to satisfy the PSLRA's heightened standard for pleading scienter. Plaintiffs do not dispute that the PSLRA requires them to plead facts giving rise to a *strong* inference that Defendants acted with an intent to deceive. Nevertheless, Plaintiffs all but ignore the PSLRA's well-established requirement that the Court weigh plausible nonculpable explanations for the defendants' conduct against inferences favoring the allegation of scienter. Plaintiffs' repeated suggestion that the Court must blindly credit their inferences— and only their inferences—at this stage is incorrect. Instead, after properly *weighing* the inferences, as required, it is clear that Plaintiffs' theory of scienter is implausible on its face— refuted by the very documents they cite in the Complaint—and that the more compelling (and only reasonable) inference is that Defendants simply failed to anticipate that a court would conclude that the spinoff violated Windstream's indenture or that Windstream would declare bankruptcy and contend that the Master Lease was not a true lease. That is not fraud.

2

*Third*, Plaintiffs' Section 10(b) claims should be dismissed for the independent reasons that Plaintiffs have failed to plead loss causation and certain of their allegations are time-barred. On loss causation, Plaintiffs contend that they are relying on a "materialization of the risk theory" and, thus, purportedly do not need to show any stock drop tied to a corrective disclosure. But even under that theory, Plaintiffs must plausibly allege that the loss resulted from the materialization of a *concealed risk*, and here there were no concealed risks. On timeliness, Plaintiffs mischaracterize Defendants' arguments and ignore the fact that over two years before Plaintiffs filed suit, another investor filed an action alleging the *very same indenture violation* that Plaintiffs now claim was allegedly concealed. That is fatal to their claim.

*Finally*, Plaintiffs' remaining claims should also be dismissed. Plaintiffs fail to distinguish their primary fraud claim from their scheme liability claim, which fails not only for the same reasons but also because Plaintiffs fail to allege any deceptive conduct apart from any alleged misstatement or omission. And Plaintiffs' control person claim fails because they do not plead a primary violation of the securities laws.

## ARGUMENT

### I. PLAINTIFFS HAVE FAILED TO STATE A SECTION 10(b) CLAIM UNDER RULE 10b-5(b) (COUNT I)

#### A. Plaintiffs Fail to Plead Any Actionable Omission or Misstatement

##### 1. *No Actionable Omission*

###### (a) *Risk of Sale-Leaseback Covenant Violation*

Plaintiffs fail to allege that Defendants made any actionable omission regarding whether the spinoff and Master Lease violated, or risked violating, the sale-leaseback covenants in Windstream's debt indentures. Mot. 15-19. Plaintiffs' opposition does not show otherwise.[2]

---

[2] Indeed, the opposition only underscores that Plaintiffs have failed to identify the allegedly false or misleading statements with the particularity required under the PSLRA. *See* Mot. 14-15. (….continued)

3

*First*, the risk that the spinoff and Master Lease violated the indentures is classic "soft information"—i.e., "matter[s] of opinion, predictions, *or a belief as to the legality of the company's own action*"—for which there is no duty to disclose as a matter of law.  Mot. 16-17 (quoting *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (emphasis added)).[3] Plaintiffs respond that their claim is based on an alleged failure to disclose "hard facts"—not merely the risk that the spinoff and Master Lease *could* breach the indentures.  Opp. 24-27 & nn.8-9.  But that contention is belied by Plaintiffs' own assertions.  The Complaint is littered with allegations that Defendants failed to disclose the "*risk*" that the spinoff and Master Lease would be deemed to violate the indentures.  *See, e.g.*, CAC ¶¶ 16, 17-18, 20, 24 (emphasis added).  Likewise, elsewhere in their opposition, Plaintiffs repeatedly frame the issue as a failure to disclose the "*risk*" of a challenge to the transactions.  *See, e.g.*, Opp. 2 ("Defendants misrepresented and concealed the true *risk* facing the Company should the spin-off transaction be challenged as invalid" (emphasis added)); *id.* at 9 ("Defendants needed to conceal from the market the true nature of the transaction and the extent of the *risk* that the Spin-Off violated the terms of the Indenture" (emphasis added)); *id.* at 19, 28 (similar).  Indeed, in opposing Defendants' arguments regarding loss causation, Plaintiffs' argued that their entire case is premised on a "***materialization of the risk theory***."  *Id.* at 52.

In any event, Plaintiffs cannot transform the risk of unasserted, unadjudicated legal

(continued….)

Throughout (*e.g.*, Opp. 18-20), Plaintiffs generically point to dozens of paragraphs in the Complaint (mostly long, undifferentiated block quotes from Uniti's SEC filings, press releases, and earnings calls)—and repeatedly conflate their various claims—making it difficult to identify what exactly Plaintiffs allege to be misleading and why.  *See* Mot. 15 n.5.  The fact that Defendants have attempted, as best they can, to "argu[e] that Plaintiffs' allegations are deficient" (Opp. 21 n.4) does not negate this pleading failure, which alone provides grounds for dismissal.

[3] Plaintiffs' suggestion that the Court cannot decide at the pleading stage whether the alleged omission is soft information (*see* Opp. 24) is refuted by the Eighth Circuit's decision in *Kushner*, which affirmed a dismissal of a Section 10(b) claim on that basis.  *Kushner*, 317 F.3d at 831.

4

claims into *known* "hard facts" through their mere say-so.  They now assert, in hindsight, that the structure of the spinoff and Master Lease violated the sale-leaseback covenant in Windstream's debt indentures "from *inception*" (*id.* at 24), but they do not (and cannot) allege that anyone had claimed, much less proven, any such violation at the time of the alleged omissions.  Rather, as Plaintiffs concede, it was not until August 2017 that anyone first suggested there might be a violation, when rumors surfaced that Aurelius intended to claim a default.  *See* Opp. 12-13.  And it was not until February 2019 (after a full trial and over the strong opposition of Windstream itself) that a court made any such finding—in an opinion that Plaintiffs themselves concede was "shocking news" and that one independent analyst described as a "surprise court defeat" for Windstream.  *See* Mot. 9-10 (quoting CAC ¶¶ 206, 260).  Moreover, Plaintiffs further concede that the spinoff and Master Lease were expressly structured by Windstream and its advisors precisely to *avoid* a breach of Windstream's indentures.  *See, e.g.*, Opp. 8, 20.

Under these circumstances, there is no basis in law or logic to conclude that the legal *opinion* that the spinoff and Master Lease violated Windstream's debt indentures was a "hard fact" that Uniti was obligated to disclose.  That is particularly true when Windstream, the actual party to the indentures and an independent public entity, itself vigorously disputed that any such violation existed.  For that reason, Plaintiffs' attempt (Opp. 26 & n.8) to distinguish the well-settled rule that there is no duty "to disclose uncharged, unadjudicated wrongdoing," *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014), is unavailing.  *See* Mot. 16-17.  Nor do the securities laws require "speculative disclosure" based on "predict[ions] that certain claims might be asserted" or that liability might result.  *Gen. Elec. v. Cathcart*, 980 F.2d 927, 935 (3d Cir. 1992); *see also, e.g.*, *Abbott Labs. v. Adelphia Supply USA*, 2017 WL 6014322, at *9 (E.D.N.Y. Aug. 14, 2017) (no duty to disclose legal opinion that

5

product sale was illegal, which, even "if accurate, was not certain at the time of sale").[4]

The Court's decision in *In re H & R Block Sec. Litig.*, 527 F. Supp. 2d 922 (W.D. Mo. 2007), is instructive. There, the plaintiffs alleged that the defendants violated the securities laws by failing to disclose to investors that one its products was unlawful and that the revenue it was earning from the product was therefore unsustainable. *Id.* at 927-28. The court disagreed because "no court ha[d] found that the product [was] unlawful." *Id.* at 930. The plaintiffs were therefore "attempting to show the Company knew something that [was] still unknown" at the time. *Id.* Accordingly, the plaintiffs could not show that the company had "actual knowledge of wrongdoing.'" *Id.* at 928 (quoting *Kushner,* 317 F.3d at 831). The same is true here.[5]

Indeed, a contrary conclusion would turn every contract dispute involving a public company—or even a *potential* dispute—into a claim for securities fraud: Even if no breach had yet been (or might ever be) asserted, and even if the company believed that no breach had occurred, the company could be liable for failing to disclose the supposed "fact" that a "breach" had already occurred. In fact, Plaintiffs seek to go even one step further—trying to impose liability not against the actual party to the allegedly breached contract (here, Windstream) but to an independent public company (Uniti) that merely has a significant relationship with the allegedly breaching party. Under that theory, corporations would not only have to continually monitor for, and disclose, *unasserted potential* breaches of their own contracts, but also of their significant customers. That makes no sense and cannot be the law.

*Second*, the omissions are not actionable for the independent reason that they did not

---

[4] Plaintiffs argue that *Abbott* is inapposite because it did not address a Section 10(b) claim (Opp. 26), but they fail to identify any material difference between the duty to disclose under California law, as applied in that case, and federal disclosure law.

[5] Plaintiffs' repeated assertions that Defendants *knew*—with the certainty of "hard facts"— that there was a violation and purportedly tried to hide that fact (*see, e.g.*, Opp. 27) finds no support in any well-pled fact in the Complaint. *See infra* § I.B.

6

render any statement by Defendants misleading. Mot. 17-18. Plaintiffs argue that Defendants had a duty not to speak in "half truths" (*see* Opp. 21), but that duty requires only that an actor "provide complete and non-misleading information with respect to the subjects *on which he undertakes to speak*." *K-Tel Int'l Sec. Litig. v. K-Tel Int'l*, 300 F.3d 881, 898 (8th Cir. 2002) (internal quotation marks and citation omitted). Here, none of the affirmative statements that Plaintiffs identify were plausibly rendered misleading by the failure to disclose that the spinoff and Master Lease might (or, in hindsight, did) violate the indentures.

To begin, Plaintiffs have not, and cannot, identify any statement by Defendants assuring investors that Windstream was, in fact, in compliance with the sale-leaseback covenant in its debt indentures (or any other debt covenant). Plaintiffs' bald assertion that Defendants affirmatively represented in SEC filings that Windstream did not violate its debt indentures (*see* Opp. 25 (citing CAC ¶¶ 99, 150)), finds no support in the statements they cite.[6]

Nor do Plaintiffs plausibly allege how any other statement they identify was in any way misleading. Indeed, none of the statements they identify (*see* Opp. 22)—*e.g.*, that Uniti was "well positioned to create substantial shareholder value" (based on a "strong pipeline of acquisition and capital funding opportunities") and had a "solid foundation for success"; that the Master Lease offered "protection[ions]" to Uniti in the event of a Windstream bankruptcy; that Windstream's lease payments were "very, very safe and a very high priority payment"; that

---

[6] Paragraph 99 of the Complaint identifies a statement by Robert Gunderman, who is neither a Defendant in this action, nor alleged to have had any role at Uniti at the time of any alleged misstatement or omission. Paragraph 150 quotes from the separation and distribution agreement governing Uniti's spinoff, which was attached to a March 26, 2015 Form 8-K. But Plaintiffs misleadingly omit that the quoted language was a representation made *by Windstream* to Uniti. *See* Ex. M, Ex. 2.1, art. 5.4. It is fundamental that *Defendants* cannot be liable for a statement made by *Windstream*. *See, e.g.*, *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 148 (2011) (holding that only the "maker" of an allegedly misleading statement can be liable under Rule 10b-5). That Defendant Kenny Gunderman signed the agreement, on behalf of Uniti (Opp. 25), does not render him (or Uniti) the "maker" of Windstream's representations.

Defendants did not view "the lease itself . . . as the problem"; and that the lease was "well structured for distressed situations" (CAC ¶¶ 159, 163, 169, 171, 173, 175))—had anything to do with Windstream's bond indentures, much less constituted an explicit or implicit representation that Windstream was in compliance with its debt covenants. *See* Mot. 17-18. In any event, Defendants disclosed clearly that "***[d]isputes with third parties could . . . arise***" from the spinoff. CAC ¶ 162. Plaintiffs argue that this, too, was misleading because Defendants did not disclose the "actual" risk that Windstream could file for bankruptcy, potentially sending Uniti into bankruptcy as well. *Id.* But that ignores Plaintiffs' allegations conceding that such a risk was also disclosed. *See* CAC ¶ 147 (quoting disclosure that Uniti "***will be dependent on Windstream Holdings to make payments to us under the Master Lease, and an event that materially and adversely affects Windstream's business, financial position or results of operations could materially and adversely affect our business, financial position or results of operation***").[7]

Similarly, Plaintiffs fail to show that any of Defendants' statements after the Aurelius Litigation was filed were misleading. *See* Opp. 22 (citing CAC ¶¶ 183-89, 194-98. Defendants' opinions that Aurelius likely would not prevail in its claims were not inconsistent with the possibility that Windstream might lose the litigation. Mot. 18. To the contrary, Defendants expressly acknowledged as much (*see, e.g.*, CAC ¶ 21 (noting potential for "downside

---

[7] Plaintiffs also fail to rebut the fact that many of the statements on which they rely are nonactionable puffery. Mot. 18 n.6. They claim the statements "speak to facts important to the Company's very existence." Opp. 29 n.11. But "importance" is not the standard; the question is whether the statements are "so vague and such obvious hyperbole that no reasonable investor would rely upon them," *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) (citation omitted). That is the case here. The cases Plaintiffs cite are not to the contrary, as they address statements far different than those at issue here. *See, e.g.*, *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) (defendant "repeatedly emphasized and reasserted the strength of its internal controls and its commitment to transparency and ethical conduct . . . specifically in response to damaging media reports about bribery and bid-rigging"); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (defendant touted its "truly independent investment research" even when it knew about "pervasive conflicts" in its research department and "and the effect they had on its research reports").

scenario"); *id.* ¶ 195 ("***there's always some risk***"))—which Plaintiffs' opposition ignores.[8]

Plaintiffs also argue that, "because Defendants touted the structure, safety, and offered-protections of its relationship with Windstream – the source of the majority of Uniti's annual revenue and, thus, vital to Uniti's financial success – Defendants were 'obligated to disclose information concerning the source of [this] success.'"  Opp. 23 (quoting *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005)).  But there is no well-pled allegation that Defendants failed to accurately disclose the source of Uniti's revenue.  Nor do the cases Plaintiffs cite support that conclusion.  Indeed, the only such case involving, as here, an alleged contractual breach directly *undermines* Plaintiffs' position:  In *In re Hi-Crush Partners L.P. Securities Litigation*, (*see* Opp. 23 n.7), the court dismissed a Section 11 claim where a company failed to disclose an alleged breach of contract because there were no allegations that the defendant knew that the counterparty had asserted, or would assert, a breach claim until well after the alleged misrepresentations were made.  2013 WL 6233561, at *11-12 (S.D.N.Y. Dec. 2, 2013).  The same is true here; as noted above, there are no allegations that Aurelius or anyone else asserted a violation of the indentures until years after the spinoff.[9]

---

[8] Moreover, Uniti's SEC filings disclosed in detail the risk that Windstream might lose the Aurelius litigation; that such a loss would result in an actual "event of default" for Windstream under its indentures; and that an adverse outcome in the litigation could have a material adverse impact to Uniti.  *See, e.g.*, Exs. N at 11, O at 11.

[9] Although *Hi-Crush* allowed a Section 10(b) claim to proceed, the facts are distinguishable.  In connection with that claim, the plaintiffs challenged different statements by the defendant, in which it publicly touted its relationship with a key customer without disclosing that the customer had, by then, expressly repudiated the parties' agreement.  *Hi-Crush*, 2013 WL 6233561, at *13.  Nothing like that is alleged here.  Similarly, in *Hutchins v. NBTY, Inc.*, the defendant made misleading disclosures about its future business prospects, despite knowing that one of its biggest customers had decided to solicit competitive bids from other suppliers, which would materially impact the forecasted results.  2012 WL 1078823, at *5-6 (E.D.N.Y. Mar. 30, 2012).  Plaintiffs' reliance on *Van der Moolen*, and *In re Tyson Foods, Inc. Securities Litigation*, 275 F. Supp. 3d 970, 986 (W.D. Ark. 2017), is likewise unavailing:  Those cases involved the failure to disclose express past malfeasance (violations of NYSE rules and an antitrust conspiracy), not simply the possibility of a future claimed breach of contract.  Indeed, other courts have expressly criticized the holding in *Van* (….continued)

*Finally*, Plaintiffs fail to overcome that the underlying facts giving rise to the allegedly undisclosed risk of a violation of Windstream's sale-leaseback covenant were themselves disclosed. Mot. 18-19. Among other things, Defendants and Windstream disclosed the Master Lease and the indentures in their entirety, and made clear that Windstream's operating subsidiaries would be the entities using the leased assets—precisely the information that was allegedly concealed. *See id.* Plaintiffs do not dispute this, but instead mischaracterize it as a "truth-on-the-market" defense that cannot be resolved on a motion to dismiss. Opp. 30-32. That is not so. Where, as here, defendants disclosed the very information that was allegedly omitted, courts have not hesitated, even at the pleading stage, to dismiss plaintiffs' claims. *See* Mot. 19 (citing *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162-63 (9th Cir. 2009); *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978)); *see also Rochester Laborers Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835, 869 n.35 (E.D. Mo. 2012) ("Any claim based on a failure to disclose this information cannot survive because it is undisputed that [the defendant] did, in fact, disclose [that information]."). Indeed, it would be absurd to allow a securities claim to proceed past the pleading stage when, as here, the Complaint's own allegations or information incorporated by reference make clear that there was no omission.[10]

(b)    <u>*Risk that Master Lease Was Not a "True Lease"*</u>

For similar reasons, Plaintiffs also fail to allege the existence of any actionable omission with respect to whether the Master Lease was a "true lease." Mot. 20-22. Like the alleged

---

(continued….)

*der Moolen* (on which the court relied upon in *Tyson Foods*) as "inconsistent with the well-established proposition that there is no "general duty to disclose corporate mismanagement or uncharged" misconduct. *See Marcu v. Cheetah Mobile Inc.*, 2020 WL 4016645, at *4 n.1 (S.D.N.Y. July 16, 2020) (citing cases declining to follow *Van der Moolen*).

[10] Plaintiffs' assertion that Defendants failed to disclose that the spinoff was "structured to try to evade the restrictions in the Indenture" (Opp. 30-31) does not change that conclusion, as Plaintiffs fail to show how Windstream's (or Defendants') intent to comply with the provisions in the debt indentures rendered any affirmative statements by Defendants materially misleading.

10

omissions above, the legal risk that the Master Lease was not a "true lease," or that Windstream would eventually challenge that conclusion (despite its contractual promise not to do so), is exactly the type of "soft information" for which there is no duty to disclose. *Id.* at 20; *supra* at 4. In any event, Uniti *did* disclose that the Master Lease might not be respected as a "true lease" (Mot. 8, 21)—refuting any notion that the risk was not disclosed (even if it had to be).

Plaintiffs offer no meaningful response. Instead, they again attempt (inaccurately) to characterize the omission as one of "hard facts" rather than legal risks. Opp. 25 (citing CAC ¶¶ 127-135). They argue that Defendants failed to disclose estimates (in Windstream's possession) of the useful life of the copper wire assets leased to Windstream under the Master Lease. Opp. 25-26. And they contend that the undisclosed estimates were inconsistent with the independent useful life estimate prepared by E&Y (of the entire leased network, including both copper and fiber assets)—which was, in turn, an input into the legal opinion prepared by Skadden that the Master Lease was a "true lease." CAC ¶¶ 127-134.[11] But those allegedly undisclosed "facts" are relevant only insofar as they support Plaintiffs' theory that Defendants failed to disclose "the true extent of the risk of recharacterization" (Opp. 25)—a risk that, as noted above, *was* expressly disclosed. For that reason, they are a red herring. In any event, Uniti disclosed that information, too. Mot. 21-22. Plaintiffs argue that the disclosure was insufficient because it stated that the useful life could range from 7 to 40 years. Opp. 31 n.13. But Plaintiffs fail to explain how a reasonable investor could interpret such a disclosure, on its face, as anything other than a disclosure that the useful life *could be as low as seven years*. Contrary to

---

[11] As Plaintiffs explain, whether the useful life of the leased assets exceeds the term of the Master Lease—and, thus, whether there was any residual value in the assets at the end of the lease term—is a factor that makes it more likely that a lease is a "true lease." Opp. 25. But as discussed below in the context of scienter, Plaintiffs fail to allege any well-pled facts that support their contention that the information was in fact inconsistent with E&Y's independent useful life estimate or that *Defendants* (as opposed to unnamed individuals at Windstream) had access to such information or were aware of its purported implications. *See infra* at 25-28.

Plaintiffs' suggestion (*id.*), no "extensive analysis" was required to arrive at that conclusion, and thus, *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991), is inapposite.

Regardless, Plaintiffs fail to identify any affirmative statements by Defendants that were rendered misleading on account of the alleged omission of such facts, which is independently fatal to the claim. Mot. 20-21. Plaintiffs point to statements by Defendants expressing confidence that Windstream would not reject the Master Lease and/or would continue to make lease payments, but Plaintiffs fail to show that such statements were rendered misleading on account of the alleged failure to disclose the purported "true risk" of a recharacterization claim by Windstream. *Id.* Indeed, at no time during its bankruptcy did Windstream ever reject the Master Lease or fail to pay a single dollar of the rent that it owed. *Id.* at 21. That is entirely consistent with Defendants' disclosures that the lease was structured to be protective of Uniti in a distressed situation and refutes Plaintiffs' bald assertion that the Master Lease provided "no protection" to Uniti (Opp. 27). Windstream's unadjudicated, unproven allegations regarding recharacterization are not to the contrary and do not alter that conclusion.

### 2.   *No Actionable Misstatement*

Plaintiffs also allege that Defendants made certain affirmative misstatements following Windstream's announcement that it would be filing for bankruptcy—in particular statements made during March 20, 2019 and May 9, 2019 investor calls that Uniti "believe[d] [it had] the ability to navigate the Windstream bankruptcy proceedings without having to raise external capital." Mot. 22 (quoting CAC ¶¶ 214, 217). Plaintiffs allege these statements were false because Uniti later announced, on June 24, 2019, that it was issuing $300 million in exchangeable senior notes. *See* Opp. 16 (citing CAC ¶ 227). Plaintiffs allege no facts, however, from which to infer that the June 24 debt offering was undertaken because Uniti was no longer

12

able to "navigate" the bankruptcy without such funds [12]  To the contrary, Uniti had previously disclosed that it was "closely monitoring the equity and debt markets and will seek to access them promptly when we determine market conditions are appropriate."  Ex. I at 15.  Its debt offering was entirely consistent with that intention.

Moreover, such statements cannot give rise to a securities fraud claim for the additional reasons that they are nonactionable statements of opinion and/or forward-looking statements protected under the PSLRA's safe-harbor.  Mot. 22-25.  Plaintiffs fail to show otherwise.

*First*, statements that Uniti believed it would be able to "navigate" the Windstream bankruptcy without raising external capital are statements of opinion.  Mot. 22-23.  Plaintiffs do not dispute that Defendants honestly held those opinions at the time.  *See* Opp. 33.  Rather, they assert that Defendants omitted facts that conflict with what a reasonable investor would take from the statements.  *Id.*  But the only "facts" that Plaintiffs identify—the risk that the Master Lease could be recharacterized as a financing arrangement and the purportedly inflated life of the leased assets (Opp. 32-33)—do not *conflict* with anything implied by the statements.  Nothing in the statements remotely implies that Windstream would not seek to recharacterize the Master Lease.  Moreover, given that Windstream never actually rejected the Master Lease and continued to fully pay rent throughout the bankruptcy (Mot. 21), Plaintiffs fail to explain how the risk of recharacterization was even relevant to Uniti's decision to raise external capital.

*Second*, the statements about Uniti's ability to navigate the Windstream bankruptcy without raising external capital are also protected under the PSLRA's safe harbor for forward-looking statements.  Plaintiffs wrongly argue that the statements are not forward looking because

---

[12] The press release announcing the offering stated that the debt would be used to pay down existing debt and to help fund a pre-planned acquisition (Ex. L at 2)—not anything having to do with circumstances related to the bankruptcy.  All references to "Ex." are to the exhibits attached to Defendants' motion or otherwise attached hereto.

13

they use the word "now." Opp. 35. Not so. "[T]he determinative factor is not the tense of the statement; instead, the key is whether its 'truth or falsity is discernible only after it is made.'" *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 921 (8th Cir. 2015) (citation omitted). Whether Uniti *would be able* to survive the Windstream bankruptcy without raising external capital necessarily turns on future events and, therefore, the statements are clearly forward looking.

Equally unavailing is Plaintiffs' argument that Defendants fail to meet the statutory requirements for the safe harbor to apply—i.e., that the statements were made without "actual knowledge" they were false and were accompanied by meaningful cautionary language. Opp. 36-37. The only support for Plaintiffs' contention that the statements were made with "actual knowledge" of their falsity is a cross-reference to their scienter argument. *Id.* at 35-36. But the referenced section nowhere addresses Defendants' statements about navigating the bankruptcy, other than the legally incorrect assertion that scienter can be inferred solely from the temporal proximity of the statements to the later announcement of the note offering. *See infra* at 28.

Nor do Plaintiffs succeed in rebutting the fact that the statements were accompanied by meaningful cautionary language. Mot. 24. Plaintiffs argue that the cautionary language was insufficiently specific and mere "boilerplate." Opp. 36. But that contention is belied by the language itself, which included specific warnings that Uniti's 2019 financial outlook was "based on management's current expectations and beliefs" and "subject to a number of risks and uncertainties" that could "materially alter [Uniti's] expectations," including various specified risks relating directly to Windstream. Mot. 24 (quoting Ex. G at 2). Uniti also specifically cautioned, in SEC filings incorporated by reference into the investor presentation deck (which Plaintiffs do not dispute can be considered by the Court), that Uniti "may need to access the capital markets to generate additional funds." *Id.* at 25 n.12 (quoting Ex. I at 15).

14

### 3.    *Pre-Class-Period Representations Are Non-Actionable*

In addition to the issues identified above, several of the allegedly false or misleading statements—including those in Uniti's March 2015 Information Statement regarding the spinoff and Master lease—are inactionable for an independent reason:  They pre-date the class period (CAC ¶¶ 140-150).  *See In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998); Mot. 14. In response, Plaintiffs cite to a single district court case holding that defendants can be held liable for pre-class statements.  *See* Opp. 37-38 (citing *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956 (N.D. Cal. 2005)).  But that position has been rejected by the only Court of Appeals to have considered it, *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007), and by courts in this Circuit, *e.g.*, *Jakobe v. Rawlings Sporting Goods Co.*, 943 F. Supp. 1143, 1154 n.10 (E.D. Mo. 1996) ("[L]iability cannot attach to statements made either before or after the class period.").  In any event, *Zelman* is distinguishable.  Unlike the equity-linked debt securities at issue in that case, which were alleged to be linked to securities that were actively trading in the market at the time of the pre-class-period statements, *see Zelman*, 376 F. Supp. 2d at 966, Uniti's stock did not exist before the Class Period, nor is it alleged to be pegged to the value of Windstream's stock.  *See City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 393-94, 393 n.10 (D. Del. 2010) (distinguishing *Zelman* where alleged misstatements were made "at a time when there was no market for [the issuer's] stock").

### B.    Plaintiffs Fail to Plead a Strong Inference of Scienter

Plaintiffs' Section 10(b) claim must also be dismissed for the independent reason that Plaintiffs fail to plead a "strong inference" of scienter, as required by the PSLRA.  Mot. 25-34. Plaintiffs' opposition fails to overcome this fatal shortcoming.

### 1.    *Plaintiffs' Scienter Allegations Are Implausible*

As an initial matter, the Court should reject Plaintiffs' scienter allegations as implausible.

15

Mot. 25-26.  Plaintiffs' theory requires concluding that, along with Windstream, Defendants knowingly entered into inherently flawed transactions that would inevitably and unavoidably lead to Windstream's—and thus Uniti's—financial ruin.  As Defendants have explained (*id.* at 26), the Court need not credit such economically irrational allegations, especially where a much more compelling, non-fraudulent inference exists:  i.e., that Defendants failed to anticipate that a court would conclude that the spinoff violated Windstream's indenture or that Windstream would declare bankruptcy and contend—contrary to all of its prior statements—that the Master Lease was not a true lease.  *See In re Target Corp. Sec. Litig.*, 955 F.3d 738, 743 (8th Cir. 2020) (affirming dismissal where non-fraudulent inference was "more compelling"); *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 408 (9th Cir. 2020) ("Allegations that are implausible do not create a strong inference of scienter."); *Kalnit v. Eichler*, 264 F.3d 131, 140-41 (2d Cir. 2001) ("Where 'plaintiff's view of the facts defies economic reason, . . . [it] does not yield a reasonable inference of fraudulent intent.'" (citation omitted)).  For that reason alone, the Court should dismiss Plaintiffs' Rule 10b-5(b) claim.

In response, Plaintiffs argue that the Court cannot find that their scienter allegations are implausible at this stage because doing so would require the Court to resolve factual issues in Defendants' favor.  Opp. 39.  But that is not so.  Defendants are not asking the Court to resolve any factual issues in their favor.  Rather, Defendants are asking the Court to apply the well-established heightened standard that governs the pleading of scienter under the PSLRA.  Under that standard, which Plaintiffs all but ignore, a plaintiff must allege facts supporting a "strong inference" of fraud that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Target*, 955 F.3d at 742 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 324 (2007)).  As the Supreme Court has explained, "*[t]he inquiry is inherently comparative.*"  *Tellabs*, 551 U.S. at 323 (emphasis added); *see also Horizon Asset*

16

*Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 761 (8th Cir. 2009) (explaining that the court "*must* weigh 'plausible nonculpable explanations for the defendant's conduct' against inferences favoring the plaintiff's allegation of scienter" (emphasis added) (quoting *Tellabs*, 551 U.S. at 323-24)). Thus, any suggestion that the Court must blindly accept Plaintiffs' inferences without any regard to the strength of competing inferences (*see, e.g.*, Opp. 42-45) is wrong.[13]

Where, as here, plaintiffs' fraud allegations are not as "cogent and at least as compelling as any opposing inference of nonfraudulent intent," the complaint must be dismissed. In *Target*, for example, the Eighth Circuit affirmed the dismissal of claims alleging that Target fraudulently downplaying problems in launching stores in Canada, which led its Canadian subsidiary to go bankrupt. 955 F.3d at 740-41. Despite allegations that Target was well aware of the problems at the time of the allegedly misleading disclosures, the court held that "[n]othing in the complaint ma[de] a 'compelling' case for fraud, finding that the allegations amounted to at most "fraud by hindsight," which the PSLRA "does not allow." *Id.* at 743. The court therefore concluded that "the more compelling inference, which is fatal to the investors' case, is that Target executives did not understand the magnitude of the problems they faced" at the time. *Id.*[14]

---

[13] The cases Plaintiffs cite on the standards governing a motion to dismiss (Opp. 39) are not to the contrary. All but one predates the Supreme Court's decision in *Tellabs*, and as the Eighth Circuit has explained, *Tellabs* "added an additional hurdle for Eighth Circuit plaintiffs to overcome" as compared to the court's pre-*Tellabs* case law. *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 244 (8th Cir. 2008). The one case plaintiffs cite that post-dates *Tellabs* is inapposite because it did not involve a securities fraud claim governed by the PSLRA. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (addressing Sherman Act claim).

[14] *See also, e.g.*, *Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1030 (8th Cir. 2011) (court did "not believe the inference of scienter [was] as compelling as the more innocent, simpler inference that the defendants did not believe" their statements were false when made); *Ceridian*, 542 F.3d at 249 (the "more compelling" inference was that the defendants only "should have known" of the falsity of their statements because "[t]hat is a viable claim of negligence, but not of fraud"); *Espinoza v. Whiting*, 8 F. Supp. 3d 1142, 1156 (E.D. Mo. 2014) (plaintiffs could not "provide a cogent and compelling inference of scienter when compared to explanations provided by the defendants"), *aff'd sub nom. Podraza v. Whiting*, 790 F.3d 828 (8th Cir. 2015); *Okla. Firefighters Pension & Ret. Sys. v. Capella Educ.* (….continued)

17

The Ninth Circuit's decision in *Nguyen* is also instructive.  There, the plaintiffs' "core theory" of scienter was that the defendants made misleading statements about whether the FDA would likely approve a drug when they "knew" that the FDA would not do so.  *Nguyen*, 962 F.3d at 415.  The court rejected this theory, which "did not resonate in common experience."  *Id.*  As the court explained, the allegations "encounter[ed] an immediate first-level problem:  why would defendants promise the market that the FDA would approve [the drug] if defendants knew the FDA would eventually figure out that [the drug] could not be approved . . . ? The theory does not make a whole lot of sense."  *Id.*  Similar questions arise here:  Why would Defendants engage in the spinoff if they knew that it would inevitably result in the bankruptcy of Uniti's biggest customer?  And why would they knowingly enter into a Master Lease that they knew could be recharacterized in the event of a Windstream bankruptcy?  Plaintiffs lack any "cogent and compelling" answer to those questions, which requires dismissal of the Complaint.

## 2.     *Plaintiffs Have Failed to Plead Motive*

Plaintiffs' arguments regarding Defendants' purported motive to commit fraud fail to overcome the implausibility of their fraud theory.  According to Plaintiffs, "it would [have] be[en] economically ***rational*** to pursue the Spin-Off transaction notwithstanding the risk that it could be challenged, as Windstream desperately needed a strategy to generate cash."  Opp. 40 (citing CAC ¶¶ 56-67); *see also* Opp. 49-51.  But Plaintiffs offer no particularized support for that assertion. Under the PSLRA, "conclusory and speculative allegations are insufficient" to plead motive. *K-Tel Int'l*, 300 F.3d at 895.  Rather, allegations of motive must be "concrete and personal."  *Id.* at 894.  Plaintiffs argue that Defendants' "motivation was to conceal that Uniti's entire structural legitimacy and financial viability was dependent on a knowingly questionable transaction that

(continued….)

*Co.*, 873 F. Supp. 2d 1070, 1084 (D. Minn. 2012) (plaintiffs' theory of scienter was "difficult to believe" because it required the defendant to have engaged in "self-defeating" practices).

18

risked bankrupting the Company's most significant customer, and Uniti itself." Opp. 50. But that argument simply assumes the conclusion. Plaintiffs must offer particularized allegations as to *why* Defendants would choose to engage in such a knowingly ruinous transaction; their bare statement that Defendants had such a motive is insufficient. *See K-Tel Int'l*, 300 F.3d at 894-95; *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 743 (8th Cir. 2002) (failure to plead "'why' with particularity in this example is indicative of the failings of the investors' amended complaint").

Plaintiffs' bald assertion that Windstream was "desperate[] . . . to generate cash" (Opp. 40) is insufficient to meet Plaintiffs' burden. The Complaint alleges that Windstream needed to upgrade its infrastructure (CAC ¶ 57), and that it hoped that spinning off certain assets into a REIT "would offer Windstream greater financial flexibility" (*id.* ¶ 61). But such allegations do not support the inference that Windstream needed cash, much less that Windstream had such a "desperate" need that it would undertake an inevitably ruinous transaction in order to obtain it. *See, e.g.*, *Davidoff v. Farina*, 2005 WL 2030501, at *11 n.19 (S.D.N.Y. Aug. 22, 2005) (rejecting scienter allegations where "it would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail"). Indeed, the spinoff was not executed until *several years* after it was first conceived (*see* CAC ¶¶ 56, 111)—refuting any inference that that Windstream had a "desperate" need to undertake an inevitably ruinous transaction with an "inherent" flaw (Opp. 19). *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (courts are not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences").[15]

Even if Plaintiffs had adequately alleged that *Windstream* was "desperate" to engage in

---

[15] Such a scenario is far different than the cases cited by Plaintiffs (Opp. 50 (citing *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690-91 (6th Cir. 2004); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)), in which courts have inferred fraud based on actions taken to cover up temporary financial blips in the hope that the companies' financial prospects will improve in the future.

the spinoff (and they do not), that would be insufficient to plead scienter as to *Uniti*—a separate corporate entity.  *See Youngers v. Virtus Inv. Partners Inc.*, 2017 WL 5991800, at *5 (S.D.N.Y. Dec. 4, 2017) ("An attempt to extrapolate [one entity's] knowledge . . . to [other entities'] knowledge of the same would raise a bare inference of scienter leaving any complaint susceptible to summary dismissal.").  Plaintiffs repeatedly contend that Windstream's knowledge and intent can be imputed to Uniti because "Uniti was part of Windstream at the time the Spin-Off was conceived and executed" and "those entities were one and the same."  Opp. 48 (emphasis omitted).  But that is not so.  Uniti was a *subsidiary* of Windstream.  CAC ¶ 78.  And it is black-letter law that "a subsidiary is a distinct legal entity and is not liable for the actions of its parent or sister corporations simply by dint of the corporate relationship."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 341 n.44 (3d Cir. 2010); *accord United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("Neither does the mere fact that there exists a parent-subsidiary relationship between two corporations make the one liable for the torts of its affiliate." (quoting 1 W. Fletcher, Cyclopedia of Law of Private Corporations § 33, at 568 (rev. ed. 1990))).

In the alternative, Plaintiffs argue that they have pleaded motive because "Defendants" "sought to personally gain from the fraud."  Opp. 50.  Their only purported support for that contention, however, is that "Defendant Gunderman conceived of the Spin-Off transaction while at Stephens, Inc." and later "became CEO of Uniti despite having no experience as an executive of a public company and was rewarded with a $5 million annual salary, while his brother, Bob Gunderman, was promoted to CFO of Windstream."  *Id.* at 50-51 (emphasis omitted).  Such an allegation falls far short of pleading a strong inference of scienter, as the mere desire to maintain or increase executive compensation, which can be imputed to all corporate officers, is generally insufficient to plead motive.  *See, e.g.*, *Kushner*, 317 F.3d at 830; *Kalnit*, 264 F.3d at 140.

Although excessive compensation can sometimes support an inference of scienter,

20

Plaintiffs' allegations come nowhere close to the "*overwhelming* magnitude of the benefit and other suspicious circumstances" necessary to do so.  *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1085 (8th Cir. 2005) (emphasis added); *compare Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661 (8th Cir. 2001) (finding strong inference of scienter for executive where plaintiffs alleged that he earned $102 million in annual compensation under suspicious circumstances, making him the "highest paid business executive in the entire United States"), *with Kushner*, 317 F.3d at 830 (compensation of $1.7 million did "not demonstrate a heightened motive to commit fraud").  Here, Plaintiffs plead no facts concerning Defendant Gunderman's salary that could support an inference that he had a motive to commit fraud (*e.g.*, how much he was earning before the spinoff or whether $5 million was a material amount to him at the time).  *See K-Tel Int'l*, 300 F.3d at 894.  Nor do Plaintiffs explain *why* he would commit fraud, just to become the CEO of a company that was built on a purported "house of cards" that could collapse at any moment (CAC ¶ 240).  *See Nguyen*, 962 F.3d at 415 (rejecting allegation that "does not resonate in common experience"); *Capella Educ. Co.*, 873 F. Supp. 2d at 1084 (dismissing claim where the alleged scheme was "self-defeating"); Mot. 27-28.[16]

### 3.    *The Complaint's Own Allegations Affirmatively Refute Any Claim of Fraudulent Intent or Recklessness*

Without any allegations of motive, Plaintiffs must allege facts giving rise to a strong inference that Defendants either had an intent to defraud Uniti's investors or were severely reckless.  *See Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir.

---

[16] As for Mr. Wallace, Plaintiffs do not even attempt to claim that he had any motive to commit fraud.  Indeed, the opposition references him only once, arguing that his alleged attendance at a "messaging call" in August 2015 supported a finding of scienter with respect to the indenture violation claim.  *See* Opp. 42 (citing CAC ¶¶ 118-120).  But as explained below (*see infra* § I.B.3.(c)), such allegations do not give rise to a strong inference of scienter because the talking points discussed during that meeting do not even mention the indentures, let alone show that Mr. Wallace (or anyone else) believed that the spinoff violated them.

21

2008); *K-tel Int'l*, 300 F.3d at 894 (in the absence of adequate motive allegations, a plaintiff's other allegations of scienter must be "particularly strong in order to meet the [PSLRA] standard"). Plaintiffs do not even come close to doing so. Mot. 28-34.

(a)   *Alleged Omissions Relating to Sale-Leaseback Covenant*

Plaintiffs contend that "the Complaint alleges with great specificity that Defendants knew and/or had access to information demonstrating that their Class Period statements regarding the sale-leaseback covenant violation were materially false and misleading." Opp. 41. But far from pleading "with great specificity," Plaintiffs make only generalized and conclusory assertions of scienter and draw wholly unreasonable inferences from documents referenced in the Complaint.

As an initial matter, Plaintiffs fail to allege that any Defendant actually "knew" that the spinoff and Master Lease constituted a violation of Windstream's indentures, much less had any intent to deceive investors in that regard. Mot. 28-31. Indeed, Plaintiffs do not refer to or cite a *single* document where any individual expresses any belief that the spinoff structure violated the Indenture. *See In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 886 (D. Minn. 2007) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)), *aff'd*, 527 F.3d 749 (8th Cir. 2008)).[17] Instead, the only allegations in the Complaint that speak to anyone's state of mind regarding the indenture directly *refute* any such inference. For example, an August 2014 email between Windstream executives states that, "[g]iven that the lease is being implemented at Windstream Holdings, *it does not impact any covenants in the Windstream indentures, including the sale-leaseback provisions*." CAC ¶ 93. Likewise, a Windstream executive told regulators in 2014 that Windstream "ha[d] no concerns

---

[17] For example, Plaintiffs make much of a "300-page packet of information" provided to the Windstream board in May 2014 (Opp. 43-44), but do not dispute that *nothing* in the packet indicated that the spinoff violated the indenture or that any Defendant believed that it did.

with any covenants within [its] indentures or [its] existing credit agreement." *Id.* ¶ 99.  Plaintiffs largely ignore these facts.  They refer to an April 15, 2013 email between Windstream executives regarding the spinoff (Opp. 41-42 (citing CAC ¶¶ 75-76)), but that email likewise only *supports* the conclusion that the spinoff and Master Lease were structured to "evade" the restrictive covenant and "*avoid* 'a clear violation' of the Indenture" (CAC ¶¶ 76, 86 (emphasis added))— not to violate it.  Nothing in the email suggests that anyone involved in the transaction believed that it would result in a violation of the indenture.[18]

Unable to overcome such facts, Plaintiffs inexplicably argue that Defendants' intention to avoid a violation of the indenture somehow *supports* an inference of scienter.  Opp. 41; *see also, e.g.*, *id.* at 42 (contending that scienter can be inferred because Defendants designed the spinoff "to get around" the Indenture); *id.* at 44 (acknowledging that "the structure was used to evade the restrictions in the Indenture").  But that only proves the point:  Everyone involved in the transaction believed that the spinoff and Master Lease did *not* breach the covenant.  *See* CAC ¶ 103 ("As described in ¶¶56-87, the Master Lease *was structured as a workaround* to the Indenture's prohibitions on sale-leaseback transactions." (emphasis added)).  Plaintiffs cannot allege a strong inference that Defendants knew that the spinoff breached the indenture when they simultaneously acknowledge that the spinoff was structured specifically to *avoid* such a result.

---

[18] Plaintiffs also argue that Defendants are "deemed to know 'facts reasonably available to them, particularly when the facts are critical to a business' core operation or an important transaction."  Opp. 44 (quoting *In re Synovis Life Techs., Inc. Sec. Litig.*, 2005 WL 2063870, at *15 (D. Minn. Aug. 25, 2005)); *see also* Opp. 45-46 (citing *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 903 (D. Minn. 2011)).  But the Eighth Circuit has never expressly recognized the "core operations" theory of scienter.  *See Espinoza*, 8 F. Supp. 3d at 1152.  And even if it did, the theory "requires, at a minimum, a showing (with all requisite particularity) that the critical facts were actually known within the company."  *Elam*, 544 F.3d at 930 (quoting *In re Northpoint Commc'ns Grp., Inc. Sec. Litig.,* 184 F. Supp. 2d 991, 998 (N.D. Cal. 2001)).  Here, Plaintiffs do not plead any particularized facts showing that any Defendant "actually kn[ew]" that the spinoff violated the Indenture.  Instead, Plaintiffs "merely assert that this information must have existed and must have been known."  *Id.*

*See, e.g.*, *H & R Block Sec. Litig.*, 527 F. Supp. 2d at 922 (no scienter where emails failed to show that anyone at company believed product was unlawful); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 446 & n.83 (S.D.N.Y. 2006) (no scienter where plaintiffs' theory was "internally inconsistent").

Equally unavailing is Plaintiffs' reliance on April 2015 talking points to show that Defendants were supposedly hiding their knowledge of a violation. *See* Opp. 43 (citing CAC ¶¶ 118-21). The talking points do not even *mention* the sale-leaseback covenant at all, much less suggest any belief that the covenant would be violated by the spinoff. Mot. 30-31. Plaintiffs concede as much, but contend that the talking points support an inference of scienter "precisely *because* [they] say nothing about the Indenture," purportedly showing that Defendants were "deflecting from the truth." *Id.* 43 (emphasis added). That inference, like the others Plaintiffs attempt to draw, is simply implausible. *See* Mot. 30-31. Indeed, the talking points do not direct any person to avoid discussing the indenture or the sale-leaseback covenant (which, again, are never mentioned)—and the underlying agreements, including the indenture, the Master Lease and the terms of the spinoff, were all public in any event. *Id.* at 18-19.

Nor do Plaintiffs find support for their scienter allegations in Skadden's letter opinion that the Master Lease constituted a "true lease." *See id.* 44-45. The fact that Skadden's 80-page opinion included a single sentence noting that that the transactions "could be viewed as similar to a sale-leaseback arrangement" (Opp. 44-45 (citing CAC ¶ 137)) supplies no basis to infer that anyone involved in the transactions knew that they met the specific definition of a "Sale and Leaseback Transaction" in the indenture. Plaintiffs do not deny that Skadden's "true lease" opinion did not purport to address Windstream's debt indentures at all. Mot. 31. Nor do Plaintiffs plausibly explain why Skadden, which advised Windstream generally as to the structure of the spinoff (CAC ¶ 104) would have advised its client to knowingly undertake a

24

transaction that would breach its indentures.  Plaintiffs argue that Defendants "get cute with semantics."  Opp. 45.  But it is not "semantics."  The *contractual* definition of a "Sale and Leaseback Transaction" in the indenture did not prohibit *all* sale-leaseback transactions, but rather, only those in which the *same* "Person" both sold or transferred the relevant assets *and* leased them back.  Here, however, the assets were conveyed to Uniti by restricted subsidiaries of Windstream, but leased back by the parent holding company—i.e., a different "Person" which was not restricted under the terms of the indentures.  *See* Mot. 4-5.  Plaintiffs allege no facts to suggest that Defendants (or Skadden) did not genuinely believe that distinction was meaningful—and that, accordingly, there was no breach of the indenture.[19]

At bottom, Plaintiffs theory of scienter boils down to an argument that because Defendants were "deeply" familiar with both the mechanics of the spinoff and the limitations of the indenture, they *must have known* that the spinoff violated the indenture.  *See, e.g.*, Opp. 45.  But as the Eighth Circuit has explained, allegations that defendants "must have known" of contrary information fails to "give rise to a strong inference of scienter."  *Elam v. Neidorff*, 544 F.3d 921, 929 (8th Cir. 2008); *see also Kushner*, 317 F.3d at 828-29 (rejecting "attempt to make out a strong inference of scienter based upon circumstantial evidence").

    (b)    *Alleged Omissions Relating to Useful Life of Leased Assets and Status of Master Lease as "True Lease"*

Plaintiffs' "true lease" allegations (Opp. 47-49) also fail to support a strong inference of

___

[19] For these reasons, Plaintiffs' references to the knowledge of former Windstream General Counsel John Fletcher (who was also General Counsel of Uniti *prior to* the spinoff) (*see* Opp. 45 n.23) is beside the point.  In any event, Mr. Fletcher's knowledge is irrelevant, as he was not an officer of Uniti at the time of any alleged misstatement or omission.  *See In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1035 (D. Minn. 2009) ("a corporation should be 'deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter.'" (citation omitted)), *aff'd sub nom. Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800 (8th Cir. 2010); *see also In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 365 (S.D.N.Y. 2015) (plaintiff failed to allege scienter where individual was "no longer a[n] employee by the time the Company filed its 2012 annual report").

scienter.  *See* Mot. 32-34.  Plaintiffs argue that Defendants "knew the useful life of its copper wire was much shorter than the estimates on which the Skadden opinion and [E&Y] analysis were based, and thus Defendants had knowledge that there was a major risk that the Master Lease could not be considered a 'true lease.'"  Opp. 47 (quoting CAC ¶¶ 122-38).  But Plaintiffs fail to address the allegations that affirmatively undermine such knowledge:  Windstream itself assured Uniti that the Master Lease was a "true lease," a position it maintained until suddenly reversing course years later.  *See* Mot. 32.

Plaintiffs argue that Defendants "cannot hide behind" Windstream's assurances "because at the time of those assurances . . . Uniti was still part of Windstream."  Opp. 47.  But that is belied by the Complaint's own allegations.  Windstream made the assurances in the Master Lease itself (Ex. B., Ex. 10.1 § 6.1(a)), which was signed *after* the spinoff was executed (CAC ¶ 140).  At the time of the assurances, therefore Uniti was *not* still part of Windstream.  In any event, Plaintiffs' response is irrelevant.  Even if Uniti were part of Windstream at the time of the assurances (and it was not), that does not create an inference that Uniti—a separate corporate entity even when it was a subsidiary of Windstream (*see supra* at 19-20)—somehow knew that Windstream would go back on its contractual promise years later.

Nor do Plaintiffs allege any particularized facts that could support an inference that Defendants "knew the useful life of its copper wire was much shorter than the estimates on which the Skadden opinion and [E&Y] analysis were based."  Opp. 47.  Plaintiffs argue that *Windstream* had information that purportedly undermined E&Y's analysis, and that such knowledge can be imputed to Uniti.  *Id.* at 48.  This argument fails.

As an initial matter, Plaintiffs do not adequately allege that Windstream had information that undermined E&Y's analysis.  *See* Mot. 32-33.  Plaintiffs assert that "E&Y's valuation analysis was discussed in detail at [Windstream] Board Meetings."  Opp. 48.  But Plaintiffs do

26

not allege that anyone ever discussed that E&Y's useful life estimates were inaccurate. *See, e.g.*, *id.* (alleging merely that at one meeting "the group discussed an overview of the 'methodology utilized by E&Y to prepare a preliminary estimate of ranges'" (quoting CAC ¶ 81)).  Moreover, Plaintiffs do not dispute (and fail to mention in their opposition) that E&Y was retained to provide an *independent* estimate of the leased assets' useful life. *See* Ex. J at ¶¶ 92, 95-96. Although Plaintiffs allege that Windstream had access to reports that purportedly "reached conclusions markedly different than E&Y's" (CAC ¶ 131), these reports are not comparable: E&Y appraised the useful life of the *entire distribution network* being leased, including assets other than copper wires (*id.* ¶¶ 83, 130), whereas the other estimates cited by Plaintiffs addressed only the copper assets (*id.* ¶ 131).  Regardless, it does not follow that the other estimates cited by Plaintiffs (based on Windstream's unproven allegations) are correct, while E&Y's was inflated. That is especially true in the absence of any allegation that E&Y was not in fact independent or had reason to provide an inflated estimate.

Moreover, even if *Windstream* had information that undermined E&Y's analysis, there are no factual allegations from which to conclude that *Defendants* had such information.  Mot. 33-34.  Plaintiffs argue that Windstream's knowledge of the information can be imputed to Uniti simply because Uniti was part of Windstream prior to the spinoff.  Opp. 25.  But, as explained above (*see supra* at 19-20), that is not the law.  Plaintiffs also argue that "Defendant Gunderman was present at the meetings where [E&Y's] valuation analyses were discussed."  Opp. 48.  But the mere fact that he *attended* meetings does not show that he "had access to, or knowledge of, information contradicting" Uniti's public statements or undermining E&Y's analysis. *See Navarre Corp.*, 299 F.3d at 742; *NVE Corp.*, 551 F. Supp. 2d at 886.  Even if such information had been discussed, Plaintiffs do not allege any basis to conclude that Defendant Gunderman was personally aware of the implications thereof—i.e., that such information could support a

27

successful claim by Windstream for recharacterization. As the Eighth Circuit has explained, mere possession of data does not indicate that a defendant "was aware of the implications of that data." *Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800, 809 (8th Cir. 2010); *see also NVE Corp.*, 551 F. Supp. 2d at 887 (no scienter where there were "no specific allegations that particular . . . problems were conveyed to any of the Individual Defendants").

(c)     *Alleged Misstatements Regarding Windstream's Bankruptcy*

Plaintiffs also fail to plead a strong inference of scienter with respect to their allegation that Defendants misrepresented Uniti's ability to navigate the Windstream bankruptcy proceedings without having to raise external capital. Mot. 34. Plaintiffs contend that scienter can be inferred from the "temporal proximity" between Uniti's allegedly false statements and its later announcement of a $300 million note offering. Opp. 49. But as stated in the very case that Plaintiffs cite for that argument, "[w]ithout more, inferring scienter from [ ] temporal proximity . . . is nothing more than speculation." *Elam*, 544 F.3d at 930 (citation omitted); *see Podraza*, 790 F.3d at 841 (temporal proximity of one week did not "support a strong inference of scienter").

## C.     Plaintiffs Have Failed to Plead Loss Causation

Plaintiffs' Rule 10b-5(b) claim should also be dismissed because Plaintiffs have failed to adequately plead loss causation.

*First*, Plaintiffs cannot plead loss causation with respect to the their claim that Defendants failed to disclose the risk that Master Lease was not a "true lease" for a simple reason: the Complaint does not contain a single allegation that Uniti's stock price dropped when the allegedly concealed risk—the risk that the Master Lease was not a "true lease"—was allegedly revealed to the market. Plaintiffs do not dispute that when Windstream filed its adversary proceeding challenging the Master Lease (on July 25, 2019), Uniti's stock price barely moved. *See* Mot. 35. Instead, they argue that have somehow pleaded loss causation for this claim

28

through their allegation that Uniti announced a $300 million note offering on June 24, 2019. Opp. 54-55. But, as Defendants explained (Mot. 37), that allegation cannot show loss causation because "[n]othing in the . . . press release correct[ed] previous misrepresentations." *Rand-Heart of N.Y., Inc. v. Dolan*, 812 F.3d 1172, 1180 (8th Cir. 2016). The disclosure on June 24, 2019 said *nothing* about the Master Lease or even the Windstream bankruptcy, much less disclosed some risk that had not been disclosed. *See* Ex. L; *supra* at 13 n. 12. Plaintiffs' argument that the disclosure of the note offering on June 24, 2019 was a "materialization of the known risk that the Master Lease was a disguised financing" (Opp. 54) fares no better. To the contrary, that risk has never materialized: No court has ever held (or, because of the settlement of the claim, ever will hold) that the Master Lease was not a true lease. *See* Mot. 11.[20]

*Second*, Plaintiffs cannot plead loss causation with respect to the claim that Windstream failed to disclose that the spinoff violated the indenture. Plaintiffs do not (and cannot) allege that Uniti's stock dropped in connection with the disclosure of any *new* information about the indenture. *See* Mot. 35-38; *Rand-Heart*, 812 F.3d at 1179 ("[I]f investors already know the truth, false statements won't affect the price."). Indeed, all of the information at issue—Aurelius's claims of default, the ensuing litigation, and the court's decision—was based on the *publicly available* terms of the spinoff, Master Lease, and Windstream's debt indentures. Mot. 36. Plaintiffs cannot allege loss causation under such circumstances. *See id.*; *Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013) ("[T]he fact that the sources . . . were already public is fatal to

---

[20] Plaintiffs also argue that the disclosure "was a materialization of the risk that the Company did not have the ability to navigate the Windstream bankruptcy 'unscathed.'" Opp. 54. But that is not the allegedly undisclosed "risk" on which Plaintiffs seek to recover in the Complaint. Instead, they allege that Uniti failed to disclose the risk that it "did not, in fact, have the 'ability to navigate the Windstream bankruptcy proceedings without having to raise external capital' *should Windstream challenge the validity of the Master Lease in bankruptcy*." CAC ¶ 226(c) (emphasis added). As explained above, however,, the June 24, 2019 disclosure could not have been a "materialization" of that risk because it did not even mention the Master Lease or the bankruptcy; indeed, Windstream did not challenge the Master Lease until over a month later.

the Investors' claim of loss causation.").

Plaintiffs do not dispute that all of this information was publically available.  Instead, they argue that they are asserting a "materialization of the risk theory."  Opp. at 52 (citing *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008)).  But Plaintiffs concede that even under that theory, they must plausibly allege that the "loss was foreseeable and caused by the materialization of *the concealed risk*."  Opp. 52 (emphasis added) (quoting *Schaaf*, 517 F.3d at 550, 552).[21]  And, as explained above, there were no concealed risks; all of the information at issue was public.  Plaintiffs' reliance on a *Windstream* announcement in August 2017 that it was eliminating its dividend payment to its investors (*Id.* at 53 (citing CAC  ¶¶ 247-49)) is unavailing.  Plaintiffs cannot explain how an announcement about *Windstream's* dividend has any "causal connection" to *Uniti's* alleged misstatements and Plaintiffs' alleged losses.  *McAdams*, 584 F.3d at 1114 (emphasis added).  Nor do Plaintiffs even try to allege that the elimination of Windstream's dividend was the materialization of any "concealed risk."  *Schaaf*, 517 F.3d at 550.

*Finally*, Plaintiffs contend that Defendants' loss causation arguments essentially ask the Court "to weigh their truth-on-the-market defense by deciding why Uniti's stock price fell."  Opp. 55.  That is wrong.  Defendants do not ask the Court on this motion to consider extrinsic evidence to determine *why* Uniti's stock rose or fell at any point in time.  Rather, Defendants have identified a basic pleading failure, which is evident on the face of the Complaint:  Plaintiffs have failed to plead loss causation, and as a result, their claim must be dismissed.  *See, e.g.*,

---

[21] Citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), Plaintiffs assert that their "loss causation allegations are evaluated under Rule 8."  Opp. 51.  But *Dura* did not so hold.  Rather, it "assume[d]," without deciding, that Rule 8 applied.  *Dura*, 544 U.S. at 346. Since then, several Courts of Appeals have held that Rule 9(b), *not* Rule 8, governs allegations of loss causation.  *See, e.g.*, *Or. Pub. Emps.' Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) ("Rule 9(b) applies to all elements of a securities fraud action, including loss causation.");  *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011); *Tricont'l Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 844 (7th Cir. 2007).  In any event, whether under Rule 8 or Rule 9(b), Plaintiffs loss causations allegations fail.

*Rand-Heart*, 812 F.3d at 1180; *McAdams*, 584 F.3d at 1114; *Schaaf*, 517 F.3d at 550.[22]

> **D.        Plaintiffs' Claims Concerning the Sale-Leaseback Covenant Are Untimely**

As previously explained (Mot. 38-39), Plaintiffs' claim relating to the allegedly undisclosed risks concerning Windstream's sale-leaseback covenant should be dismissed as untimely.  According to Plaintiffs' own allegations, investors were on notice of the risk well over two years before the initial complaint was filed in this action on October 25, 2019.

In response, Plaintiffs repeatedly mischaracterize Defendants' arguments rather than actually address them.  First, Plaintiffs attack a straw man, falsely contending that Defendants' argument rests on Windstream's August 2017 announcement that it was cutting its dividend, and on "rumors" in the market, in late August 2017, that Aurelius was planning to call a default. Opp. 56.  But Plaintiffs ignore the key subsequent events, which are likewise outside the limitations period—in particular, that (1) in September 2017 Windstream notified investors that it had received a notice of default from Aurelius claiming that the spinoff violated the indentures' sale-leaseback provision and (2) in early October 2017, the indenture trustee filed suit alleging, in great specificity, Aurelius's theory regarding an alleged violation.  Mot. 38.  In other words, more than two years before Plaintiffs brought suit, another investor filed a lawsuit alleging the very same information that Plaintiffs now claim was allegedly concealed.  That alone demonstrates the untimeliness of Plaintiffs' sale-leaseback claims.  *See, e.g.*, *Zarecor v. Morgan Keegan & Co.*, 801 F.3d 882, 887 (8th Cir. 2015) (reasonably diligent investor would be on notice of related lawsuit); *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 278 (3d Cir. 2013) (reasonably diligent plaintiff

---

[22] Plaintiffs' reliance on *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824 (8th Cir. 2003), is misplaced.  *See* Opp. 55.  Not only does *Gebhardt* pre-date the Supreme Court's decision in *Dura*, but *Dura* rejects the holding of *Gebhardt*.  *Compare Gebhardt*, 335 F.3d at 831 ("Paying more for something than it is worth is damaging"), *with Dura*, 544 U.S. at 347 (holding that an "artificially inflated purchase price is not itself a relevant economic loss").

would have noticed a complaint containing allegations similar to plaintiff's).

Plaintiffs argue that, because Defendants "continued to make misrepresentations and omissions" regarding the alleged fraud, the Court may not decide the issue at the pleading stage. Opp. 56-57 (emphasis omitted). That is not so.  For purposes of deciding whether a securities claim is time barred, even on a motion to dismiss, "[r]eassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern." *LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 155 (2d Cir. 2003).  Here, the majority of the allegations that Plaintiffs cite are merely Defendants' opinions that Windstream would likely prevail in the litigation. *See, e.g.*, CAC ¶¶ 184, 186-88, 194, 197-98.  But no reasonable investor would simply have taken Uniti's (or Windstream's) word for that.  The remaining disclosures that Plaintiffs identify—that Uniti thought the lease was "well-structured" and provided Uniti protections for its lease payments (*id.* ¶¶ 179, 186, 196)—are neither false nor misleading, and have nothing to do with the alleged fraud.  For that reason, the one case cited by Plaintiffs in support of their argument, *Sagez v. Global Agricultural Investments, LLC*, 2014 WL 3779072 (N.D. Iowa July 31, 2014), is distinguishable:  In that case, subsequent factual statements by defendants expressly conflicted with the information that purportedly put the plaintiff on notice of its claim. *Id.* at *17-18.  Nothing of the sort is alleged here.

The fact that Plaintiffs may not have had access to certain internal Windstream or Uniti documents (*see* Opp. 58)—which, in any event, affirmatively undermine any inference of scienter (*see supra* § I.B.3)—does not excuse the untimeliness of Plaintiffs' sale-leaseback claim.  Mot. 39 n.15; *see Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 68 F. Supp. 3d 530, 536 (S.D.N.Y. 2014) (statute of limitations began to run when "a substantial portion" of information on which scienter allegations were based "was either known or freely available to investors"),

32

*aff'd*, 639 F. App'x 664 (2d Cir. 2016).  Plaintiffs' attempt to distinguish *Gavin/Solmonese* only underscores why Plaintiffs were on notice here.  In that case, the court in that case found that a company's public statements that formed the basis for plaintiff's scienter allegations took on even "greater significance in the context of [the company's] consistent defaults on its debentures."  68 F. Supp. 3d at 536.  Similarly, here, whatever publicly available statements that Plaintiffs purportedly relied on should have taken on even greater significance after Aurelius filed suit asserting the exact theory that Plaintiffs now allege.

## II.   PLAINTIFFS HAVE FAILED TO STATE A SECTION 10(b) CLAIM UNDER RULE 10b-5(a) OR (c) (COUNT II)

The Court should dismiss Plaintiffs' scheme liability claim under Rule 10b-5(a) and (c). Mot. 39-40.  As an initial matter, Plaintiffs' scheme liability claim is duplicative of their Rule 10b-5(b) claim and fails for the same reasons, including, among other things, Plaintiffs' failure to plead a strong inference of scienter, *see In re Enron Corp. Sec., Derivative & ERISA Litig.*, 2006 WL 6892915, at *3 n.8 (S.D. Tex. Dec. 4, 2006) (scheme liability claims are subject to the PSLRA's heightened pleading standards), or loss causation, *see Barnes v. Oldner*, 259 F. Supp. 3d 926, 937 (E.D. Ark. 2017) (plaintiff must allege the "effect the scheme had on the securities at issue" (citation omitted)).[23]

Plaintiffs' scheme liability claim also fails because Plaintiffs fail to allege that Defendants "engaged in deceptive conduct separate from any alleged misstatements or

---

[23] Plaintiffs' assertion that Defendants "only" sought to "dismiss Plaintiffs' scheme liability claim for failure to adequately plead a deceptive or manipulative act," and that Defendants are therefore "prohibited from challenging the other elements of scheme liability, including scienter, in their reply brief" (Opp. 59 n.33) ignores Defendants' argument that the scheme liability claim should be dismissed "for the same reasons as their Rule 10b-5(b) claim."  Mot. 40 n.16.  That includes the failure to plead a strong inference of scienter.

33

omissions." *Id.*[24] Plaintiffs argue that they have sufficiently pleaded "conduct beyond Defendants' alleged misrepresentations and omissions" with their allegations concerning the implementation of the spinoff and negotiation of the Master Lease. Opp. 60. But that is the *same* alleged conduct underlying Plaintiffs' claim under Rule 10b-5(b). *See* Mot. 40. Plaintiffs cannot state a scheme liability claim by "simply . . . recast[ing]" their misrepresentation claim in this way. *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012). And for the same reasons Plaintiffs' Rule 10b-5(b) claim fails—in particular, Plaintiffs' failure to plead either a misrepresentation or scienter—Plaintiffs cannot plead that this conduct was in any way "deceptive. *Barnes*, 259 F. Supp. 3d at 937. Plaintiffs' argument to the contrary is a rehash of their argument in support of scienter and fails for the same reasons.

## III.   PLAINTIFFS HAVE FAILED TO STATE A CONTROL PERSON CLAIM UNDER § 20(a) (COUNT III)

Plaintiffs do not dispute that their Section 20(a) claim is entirely derivative of their claims under Section 10(b). Because the underlying claims fail, the Section 20(a) claim must be dismissed. *See In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 961-62 (8th Cir. 2008).

### <u>CONCLUSION</u>

For the reasons set forth above, Defendants respectfully request that the Court dismiss the Complaint with prejudice.

---

[24] Plaintiffs contend that Defendants' reliance on *Barnes* is "misplaced" because the court there held that the plaintiff "failed to allege what effect the defendants' conduct in further of the scheme had on the securities at issue." Opp. 61 n.34 (quoting *Barnes*, 259 F. Supp. 3d at 937). But Plaintiffs do not dispute the principle for which Defendants cite *Barnes*, i.e., that Plaintiffs must plead "deceptive conduct separate from any alleged misstatements or omissions." *Barnes*, 259 F. Supp. 3d at 937. In any event, just as in *Barnes*, for the same reasons Plaintiffs have failed to plead loss causation here, they have also failed to plead "what effect Defendants' conduct had on the securities at issue." *Id.*; *see supra* § I.C.

Dated: October 23, 2020

OF COUNSEL:

Edmund Polubinski III *
Brian M. Burnovski *
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
edmund.polubinski@davispolk.com
brian.burnovski@davispolk.com

Jess Askew III, Ark. Bar No. 86005
Andrew King, Ark. Bar No. 2007176
Frederick H. Davis, Ark. Bar No. 2012271
KUTAK ROCK LLP
124 West Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201-3706
(501) 975-3000 Telephone
jess.askew@kutakrock.com
andrew.king@kutakrock.com
frederick.davis@kutakrock.com

*Counsel for Defendants Uniti Group Inc.,
Kenneth A. Gunderman, and Mark A. Wallace*

*\* admitted pro hac vice*

35

## ADDITIONAL EXHIBITS

- Ex. L, Uniti Group Inc. Press Release (June 24, 2019), referenced in ¶¶ 30, 227-228, and 262 of the Complaint.

- Ex. M, Excerpt of Communications Sales & Leasing, Inc. Form 8-K (Mar. 26, 2015), referenced in ¶¶ 110 n.35, 141, and 143-152 of the Complaint.

- Ex. N, Excerpt of Uniti Group Inc. Form 10-Q (May 3, 2018).

- Ex. O, Excerpt of Uniti Group Inc. Form 10-Q (August 3, 2018).

# Exhibit L

Exhibit 99.1



**Press Release**

Release date: June 24, 2019

---

# Uniti Group Inc. Announces Launch of Exchangeable Notes Offering and Extension of Revolving Credit Facility

---

LITTLE ROCK, Ark. – Uniti Group Inc. (the "Company", "Uniti", or "we") (Nasdaq: UNIT) today announced the planned offering by Uniti Fiber Holdings Inc. (the "Issuer"), a subsidiary of the Company, of $300 million aggregate principal amount of exchangeable senior notes due 2024 (the "Exchangeable Notes"). The offering of the Exchangeable Notes is subject to market and other conditions.

The Issuer also intends to grant to the initial purchasers of the Exchangeable Notes an option to purchase up to an additional $45 million aggregate principal amount of the Exchangeable Notes during a 13-day period beginning on, and including, the first day on which the Exchangeable Notes are issued.

The Exchangeable Notes will be general senior unsecured obligations of the Issuer, guaranteed by the Company and each of the Company's subsidiaries (other than the Issuer) that is an issuer, obligor or guarantor under its existing senior notes.

The Exchangeable Notes will mature on June 15, 2024, unless earlier repurchased, redeemed or exchanged. Prior to March 15, 2024, the Exchangeable Notes will be exchangeable only upon satisfaction of certain conditions and during certain periods, and thereafter, the Exchangeable Notes will be exchangeable at any time until the close of business on the second scheduled trading day immediately preceding the maturity date. The Exchangeable Notes will be exchangeable on the terms set forth in the indenture into cash, shares of common stock of the Company (the "Common Stock"), or a combination thereof, at the Issuer's election.

The Issuer may redeem all or a portion of the Exchangeable Notes, at any time, at a cash redemption price equal to 100% of the principal amount of the Exchangeable Notes to be redeemed, plus accrued and unpaid interest to, but not including, the redemption date, if the Company's board of directors determines such redemption is necessary to preserve the Company's status as a real estate investment trust for U.S. federal income tax purposes. The Issuer may not otherwise redeem the Exchangeable Notes prior to June 20, 2022. On or after June 20, 2022 and prior to the 42nd scheduled trading day immediately preceding the maturity date, if the last reported sale price per share of Common Stock has been at least 130% of the exchange price for the Exchangeable Notes for certain specified periods, the Issuer may redeem all or a portion of the Exchangeable Notes at a cash redemption price equal to 100% of the principal amount of the Exchangeable Notes to be redeemed plus accrued and unpaid interest to, but not including, the redemption date.

In addition, Uniti has entered into an amendment to its credit agreement to extend the maturity date of its revolving credit facility. Pursuant to the amendment, Uniti will extend the maturity date of $575.9 million of commitments under its revolving credit facility to April 24, 2022 and expects to pay down approximately $101.6 million of outstanding revolving loans and terminate the related commitments with a portion of the net proceeds of the offering of the Exchangeable Notes. The remaining commitments of approximately $72.4 million will

mature on April 25, 2020. The operative provisions of the amendment will become effective upon Uniti obtaining sufficient cash to fund the repayment on or prior to September 15, 2019. In addition, in the event that the commitments maturing on April 24, 2020 are not repaid in full or extended to April 24, 2022 on or before April 10, 2020, the maturity date of the revolving credit facility will spring to a maturity date of April 25, 2020.

The Issuer intends to use a portion of the net proceeds of the offering to repay the $101.6 million of outstanding borrowings under the revolving credit facility in connection with the amendment described above, pay the cost of the exchangeable note hedge transactions described below and for general corporate purposes, which may include funding acquisitions (including the previously announced acquisition of Bluebird Networks, LLC) and the repayment of additional borrowings under our revolving credit facility.

In connection with the pricing of the Exchangeable Notes, the Issuer intends to enter into privately negotiated exchangeable note hedge transactions with one or more of the initial purchasers and/or their respective affiliates (the "option counterparties"). The exchangeable note hedge transactions will cover, subject to customary anti-dilution adjustments substantially similar to those applicable to the Exchangeable Notes, the same number of shares of Common Stock that will initially underlie the Exchangeable Notes. The exchangeable note hedge transactions are expected generally to reduce potential dilution to the Common Stock and/or offset potential cash payments the Issuer is required to make in excess of the principal amount, in each case, upon any exchange of the Exchangeable Notes. Concurrently with the Issuer's entry into the exchangeable note hedge transactions, the Company intends to enter into warrant transactions with the option counterparties relating to the same number of shares of Common Stock, subject to customary anti-dilution adjustments. These warrant transactions could separately have a dilutive effect on the Common Stock to the extent that the market price per share exceeds the applicable strike price of the warrants on one or more of the applicable expiration dates unless, subject to the terms of the warrant transactions, the Company elects to cash settle the warrants. If the initial purchasers exercise their option to purchase additional Exchangeable Notes, we intend to repay additional outstanding debt under its revolving credit facility. In addition, the Issuer may enter into additional exchangeable note hedge transactions with the option counterparties and the Company may enter into additional warrant transactions with the option counterparties.

In connection with establishing their initial hedges of the exchangeable note hedge transactions and warrant transactions, the option counterparties and/or their respective affiliates have advised the Issuer and the Company that they expect to purchase Common Stock or securities of the Issuer in secondary market transactions and/or enter into various derivative transactions with respect to the Common Stock concurrently with or shortly after the pricing of the Exchangeable Notes, including with certain investors in the Exchangeable Notes. This activity could increase (or reduce the size of any decrease in) the market price of Common Stock or the Exchangeable Notes at that time. In addition, the option counterparties and/or their respective affiliates may modify their hedge positions by entering into or unwinding various derivatives with respect to the Common Stock and/or purchasing or selling shares of Common Stock or securities of the Issuer in secondary market transactions following the pricing of the Exchangeable Notes and prior to the maturity of the Exchangeable Notes (and are likely to do so following exchange of the Exchangeable Notes, during any observation period related to an exchange of the Exchangeable Notes or upon any repurchase of Exchangeable Notes by the Issuer (whether upon a fundamental change or otherwise)). The effect, if any, of these activities on the market price of the Common Stock or the Exchangeable Notes will depend in part on market conditions and cannot be ascertained at this time, but any of these activities could cause or prevent an increase or a decline in the market price of the Common Stock or the Exchangeable Notes, which could affect the ability of noteholders to exchange Exchangeable Notes and could also affect the amount of cash and/or the number and value of the shares of Common Stock noteholders receive upon exchange of the Exchangeable Notes.

The Exchangeable Notes will not be registered under the Securities Act of 1933, as amended (the "Securities

Act"), or any state securities laws, and may not be offered or sold in the United States absent registration or an applicable exemption from registration under the Securities Act or any applicable state securities laws. The Exchangeable Notes will be offered only to persons reasonably believed to be qualified institutional buyers under Rule 144A under the Securities Act. The Company has agreed to file registration statement covering resales of the shares of Common Stock issuable upon exchange of the Exchangeable Notes with the Securities and Exchange Commission (the "SEC").

This press release does not constitute an offer to sell, or a solicitation of an offer to buy, nor shall there be any sale of these securities in any state or jurisdiction in which such an offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state or jurisdiction.

**ABOUT UNITI**

Uniti, an internally managed real estate investment trust, is engaged in the acquisition and construction of mission critical communications infrastructure, and is a leading provider of wireless infrastructure solutions for the communications industry. As of March 31, 2019, Uniti owns 5.6 million fiber strand miles, approximately 500 wireless towers, and other communications real estate throughout the United States. Additional information about Uniti can be found on its website at www.uniti.com.

**FORWARD-LOOKING STATEMENTS**

Certain statements in this press release may constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, as amended from time to time. Those forward-looking statements include all statements that are not historical statements of fact including those regarding our proposed offering of the Exchangeable Notes.

Words such as "anticipate(s)," "expect(s)," "intend(s)," "estimate(s)," "foresee(s)," "plan(s)," "believe(s)," "may," "will," "would," "could," "should," "seek(s)" and similar expressions, or the negative of these terms, are intended to identify such forward-looking statements. These statements are based on management's current expectations and beliefs and are subject to a number of risks and uncertainties that could lead to actual results differing materially from those projected, forecasted or expected. Although we believe that the assumptions underlying the forward-looking statements are reasonable, we can give no assurance that our expectations will be attained. Factors which could materially alter our expectations include, but are not limited to, the future prospects of our largest customer, Windstream Holdings, which filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code; our ability to continue as a going concern if Windstream Holdings were to reject the master lease or be unable or unwilling to perform its obligations under the master lease; the ability and willingness of our customers to meet and/or perform their obligations under any contractual arrangements entered into with us, including master lease arrangements; the ability of our customers to comply with laws, rules and regulations in the operation of the assets we lease to them; the ability and willingness of our customers to renew their leases with us upon their expiration, and the ability to reposition our properties on the same or better terms in the event of nonrenewal or in the event we replace an existing tenant; the adverse impact of litigation affecting us or our customers; our ability to renew, extend or obtain contracts with significant customers (including customers of the businesses we acquire); the availability of and our ability to identify suitable acquisition opportunities and our ability to acquire and lease the respective properties on favorable terms; the risk that we fail to fully realize the potential benefits of acquisitions or have difficulty integrating acquired companies; our ability to generate sufficient cash flows to service our outstanding indebtedness; our ability to access debt and equity capital markets; the impact on our business or the business of our customers as a result of credit rating downgrades and fluctuating interest rates; our ability to retain our key management

3

personnel; our ability to qualify or maintain our status as a real estate investment trust ("REIT"); changes in the U.S. tax law and other state, federal or local laws, whether or not specific to REITs; covenants in our debt agreements that may limit our operational flexibility; other risks inherent in the communications industry and in the ownership of communications distribution systems, including potential liability relating to environmental matters and illiquidity of real estate investments; the risk that the agreements relating to our pending transactions may be modified or terminated prior to closing; the risks related to satisfying the conditions to our pending transactions; and additional factors described in our reports filed with the SEC.

Uniti expressly disclaims any obligation to release publicly any updates or revisions to any of the forward-looking statements set forth in this press release to reflect any change in its expectations or any change in events, conditions or circumstances on which any statement is based.

INVESTOR AND MEDIA CONTACTS:

Mark A. Wallace, 501-850-0866
Executive Vice President, Chief Financial Officer & Treasurer
  mark.wallace@uniti.com

Bill DiTullio, 501-850-0872
Director, Finance and Investor Relations
  bill.ditullio@uniti.com

4

# Exhibit M

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

### CURRENT REPORT
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): March 26, 2015**

# Communications Sales & Leasing, Inc.
**(Exact name of registrant as specified in its charter)**

| **Maryland** | **001-36708** | **46-5230630** |
|---|---|---|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

| **10802 Executive Center Drive Benton Building Suite 300 Little Rock, AR** | **72211** |
|---|---|
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (501) 748-4491**

**Not Applicable**
**(Former name or former address, if changed since last report.)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

¨   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

¨   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

¨   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

¨   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01.   Entry into a Material Definitive Agreement**

On March 26, 2015, Communications Sales & Leasing, Inc. ("CS&L") entered into a Separation and Distribution Agreement (the "Separation Agreement") with Windstream Holdings, Inc. and its subsidiary Windstream Services, LLC (collectively, "Windstream"). The Separation Agreement was entered into in connection with Windstream's previously announced spin-off of CS&L, which is more fully described in the information statement, dated March 26, 2015, filed as Exhibit 99.1 to this Current Report on Form 8-K (the "Information Statement"). The Separation Agreement contains the key provisions relating to the separation of CS&L's business from Windstream. It also contains other agreements that govern certain aspects of CS&L's relationship with Windstream that will continue after the spin-off. A summary of the material terms of the Separation Agreement is set forth in the Information Statement under "Our Relationship with Windstream Following the Spin-Off – Separation and Distribution Agreement," and is incorporated by reference herein. The description is qualified in its entirety by the agreement filed with this Current Report on Form 8-K as Exhibit 2.1, which is incorporated by reference herein.

**Item 7.01   Regulation FD Disclosure**

On March 26, 2015, Windstream issued a press release relating to the separation of CS&L's business from Windstream. A copy of the press release is attached hereto as Exhibit 99.2. The information contained in this Item 7.01 to this Current Report on Form 8-K, including Exhibit 99.2, shall not be deemed "filed" with the Securities and Exchange Commission (the "Commission") nor incorporated by reference into any registration statement filed by CS&L under the Securities Act of 1933, as amended.

**Item 8.01   Other Events**

CS&L previously filed with the Commission a registration statement on Form 10, initially filed on October 24, 2014 (as amended, the "Registration Statement"), relating to the distribution by Windstream of at least 80.1% of the outstanding shares of common stock of CS&L to the stockholders of Windstream Holdings, Inc. On March 26, 2015, the Registration Statement was declared effective by the Commission. The Registration Statement includes a preliminary information statement that describes the distribution and provides important information regarding CS&L's business and management.

The final Information Statement is attached hereto as Exhibit 99.1. Windstream has made the Information Statement publicly available and intends to begin mailing it to stockholders on or about March 31, 2015.

**Cautionary Statement Regarding Forward Looking Statements**

CS&L claims the protection of the safe-harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. Forward-looking statements are subject to uncertainties that could cause actual future events and results to differ materially from those expressed in the forward-looking statements. Forward-looking statements include, but are not limited to, statements regarding the completion of the transaction, the effective date of the distribution and other transaction dates, the expected benefits of the transaction, and the pro forma dividend for each company. Such statements are based on estimates, projections, beliefs, and assumptions that CS&L believes are reasonable but are not guarantees of future events and results. Actual future events and results of CS&L may differ materially from those expressed in these forward-looking statements as a result of a number of important factors.

Factors that could cause actual results to differ materially from those contemplated in CS&L's forward-looking statements include, among others: (i) risks related to the anticipated timing of the proposed separation, the expected tax treatment of the proposed transaction, the ability of each of Windstream (post-spin) and CS&L to conduct and expand their respective businesses following the proposed spinoff, the ability of Windstream to reduce its debt by the currently-anticipated amounts, and the diversion of management's attention from regular business concerns; (ii) the risk that the conditions to the spin-off, including financing of the transaction, are not satisfied; and (iii) those additional factors set forth under "Risk Factors" in the Information Statement.

**Item 9.01   Financial Statements and Exhibits.**

(d)   Exhibits.

| Exhibit No. | Exhibit |
|---|---|
| 2.1 | Separation and Distribution Agreement, dated as of March 26, 2015, by and among Windstream Holdings, Inc., Windstream Services, LLC and Communications Sales & Leasing, Inc. |
| 99.1 | Information Statement of Communications Sales & Leasing, Inc., dated March 26, 2015 |

99.2    Press Release, dated March 26, 2015

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: March 26, 2015                                      COMMUNICATIONS SALES & LEASING, INC.

By:      /s/ Kenneth Gunderman

         Name:      Kenneth Gunderman
         Title:      President & Chief Executive Officer

**EXHIBIT INDEX**

| Exhibit No. | Exhibit |
| --- | --- |
| 2.1 | Separation and Distribution Agreement, dated as of March 26, 2015, by and among Windstream Holdings, Inc., Windstream Services, LLC and Communications Sales & Leasing, Inc. |
| 99.1 | Information Statement of Communications Sales & Leasing, Inc., dated March 26, 2015 |
| 99.2 | Press Release, dated March 26, 2015 |

SEPARATION AND DISTRIBUTION AGREEMENT

BY AND AMONG

WINDSTREAM HOLDINGS, INC.,

WINDSTREAM SERVICES, LLC

AND

COMMUNICATIONS SALES & LEASING, INC.

Dated March 26, 2015

Group shall not be deemed to be a disabling conflict with respect to such representation. Each of the Parties hereby waives any conflict of interest resulting from the foregoing. The Parties further agree that, as to all communications, whether written or electronic, among Skadden and any member of the WHI Group, and all of their files, attorney notes, drafts or other documents, that relate in any way to the Transactions, that predate the Effective Time and that are protected by the attorney-client privilege, the expectation of client confidence or any other rights to any evidentiary privilege, such protections belong to the WHI Group and may be controlled by the directors and officers of WHI and shall not pass to or be claimed by the CS&L Group. The Parties agree to take, and to cause their respective affiliates to take, all steps necessary to implement the intent of this   Section 4.8 . The Parties further agree that Skadden and its partners and employees are third party beneficiaries of this   Section 4.8 .

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF WHI AND WINDSTREAM

Except as disclosed in any form, statement, document, schedule or report, together with any amendments thereto and exhibits or other information incorporated therein, filed with or furnished to the SEC by WHI or Windstream and publicly available on the EDGAR system prior to the date of this Agreement (excluding any disclosures set forth in any section thereof entitled "Risk Factors" or "Forward-Looking Statements" or any other disclosures included therein to the extent that they are predictive or forward-looking in nature), each of WHI and Windstream hereby represents and warrants to CS&L as follows:

5.1 Organization and Authority. WHI is a corporation and Windstream is a limited liability company, each duly organized, validly existing and in good standing under the Laws of the State of Delaware. Each of WHI and Windstream has all requisite power and authority to enter into this Agreement and to carry out the Transactions, and to own, lease or operate its property and to carry on its business as presently conducted and, to the extent required under applicable Law, is, in all material respects, qualified to do business and in good standing in each jurisdiction in which the nature of its business or the character of its property make such qualification necessary.

5.2 Due Authorization. The execution, delivery and performance of this Agreement by each of WHI and Windstream has been duly and validly authorized by all necessary action of WHI and Windstream, as applicable. This Agreement constitutes the legal, valid and binding obligation of each of WHI and Windstream, enforceable against each of WHI and Windstream in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium or other similar Law relating to creditors' rights and general principles of equity.

5.3 Consents and Approvals. Except for the Required Approvals:

(a) no material Approval or Notification is required to be obtained from or made to any Governmental Authority by WHI or Windstream in connection with the execution, delivery and performance of this Agreement or the consummation of the Transactions, and

(b) no Approval or Notification is required to be obtained from or made to any third Person (other than a Governmental Authority or under and applicable Law) by WHI or

24

Windstream in connection with the execution, delivery and performance of this Agreement or the consummation of the Transactions that, if not obtained, would reasonably be expected to result in a material adverse effect on the CS&L Business.

5.4 <u>No Violation</u>. None of the execution, delivery or performance of this Agreement, or the consummation of the Transactions does or will, with or without the giving of notice, lapse of time, or both, violate, conflict with, result in a material breach of, or constitute a material default under or give to others any right of termination, acceleration, cancelation or other right under (a) the organizational documents of WHI or Windstream, (b) any material agreement, document or instrument to which WHI or Windstream is a party or by which WHI or Windstream (or their assets or properties) are bound or (c) any term or provision of any judgment, order, writ, injunction or decree binding on WHI or Windstream (or their assets or properties).

5.5 <u>Litigation</u>. Except as may be listed in a letter, dated on or around the Distribution Date, delivered by WHI and WIN and acknowledged by CS&L, there is no material Action, litigation, claim or other proceeding, either judicial or administrative (including, without limitation, any governmental action or proceeding), pending or, to WHI's or Windstream's knowledge, threatened in the last twelve months, against WHI, Windstream or their Subsidiaries with respect to any Assigned Asset or the CS&L Business. WHI, Windstream and their Subsidiaries are not bound by any material outstanding order, writ, injunction or decree of any Governmental Authority against or affecting all or any portion of the Assigned Assets or the CS&L Business.

5.6 <u>Solvency</u>. WHI and Windstream have been and will be solvent at all times prior to and immediately after giving effect to the Internal Reorganization, the Reorganization and the Distribution.

5.7 <u>Ownership of Assigned Assets</u>.

(a) Windstream or its Subsidiaries are, and as of immediately prior to the execution of the Assignment Agreements will be, the owner of the Assigned Assets and have the power and authority to transfer, sell, assign and convey to CS&L and its Subsidiaries the Assigned Assets free and clear of any Liens, except for Permitted Liens, and, upon delivery of the consideration for such Assigned Assets as provided in this Agreement, CS&L will, except for Permitted Liens and as set forth in Schedules 1.1(a) and 2.2(b), acquire good and valid title thereto, free and clear of any Liens. Except as provided for or contemplated by this Agreement, there are no rights, subscriptions, warrants, options, conversion rights, preemptive rights, agreements, instruments or understandings of any kind outstanding (a) relating to the Assigned Assets or (b) to purchase, transfer or to otherwise acquire, or to in any way encumber, any of the Assigned Assets.

(b) Windstream or its Subsidiaries have good and marketable title in fee simple to all Land included within the Assigned Assets, free and clear of all Liens, other than Permitted Liens. There is no existing or, to WHI's or Windstream's knowledge, proposed or threatened condemnation, eminent domain or similar proceeding, or private purchase in lieu of such a proceeding, in respect of all or any material portion of any Land included within the Assigned Assets.

25

# Exhibit N

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

## FORM 10-Q

**(Mark One)**

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended March 31, 2018

OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 001-36708

# Uniti Group Inc.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Maryland** | **46-5230630** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **10802 Executive Center Drive** | |
| **Benton Building Suite 300** | |
| **Little Rock, Arkansas** | **72211** |
| **(Address of principal executive offices)** | **(Zip Code)** |

Registrant's telephone number, including area code: **(501) 850-0820**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

As of May 3, 2018, the registrant had 175,703,882 shares of common stock, $0.0001 par value per share, outstanding.

Table of Contents

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q includes forward-looking statements as defined under U.S. federal securities law. Forward-looking statements include all statements that are not historical statements of fact and those regarding our intent, belief or expectations, including, but not limited to, statements regarding: our expectations regarding the future growth and demand of the telecommunication industry; future financing plans, business strategies, growth prospects and operating and financial performance; expectations regarding the impact and integration of Hunt Telecommunications, LLC ("Hunt") and Southern Light, LLC ("Southern Light"), including expectations regarding operational synergies with Uniti Towers and Uniti Fiber; expectations regarding settling conversion of our 3% convertible preferred stock in cash upon conversion; expectations regarding the probability of our obligation to pay contingent consideration upon Tower Cloud, Inc.'s ("Tower Cloud") or Hunt's achievement of certain defined operational and financial milestones; expectations regarding future deployment of fiber strand miles and recognition of revenue related thereto; expectations regarding levels of capital expenditures; expectations regarding the deductibility of goodwill for tax purposes; expectations regarding the reclassification of accumulated other comprehensive income (loss) related to derivatives to interest expense; expectations regarding the amortization of intangible assets; expectations regarding the U.S. TelePacific Holdings Corp ("TPx") transaction; and expectations regarding the payment of dividends.

Words such as "anticipate(s)," "expect(s)," "intend(s)," "plan(s)," "believe(s)," "may," "will," "would," "could," "should," "seek(s)" and similar expressions, or the negative of these terms, are intended to identify such forward-looking statements. These statements are based on management's current expectations and beliefs and are subject to a number of risks and uncertainties that could lead to actual results differing materially from those projected, forecasted or expected. Although we believe that the assumptions underlying the forward-looking statements are reasonable, we can give no assurance that our expectations will be attained. Factors which could have a material adverse effect on our operations and future prospects or which could cause actual results to differ materially from our expectations include, but are not limited to:

- the ability and willingness of our customers to meet and/or perform their obligations under any contractual arrangements entered into with us, including master lease arrangements;

- the ability of our customers to comply with laws, rules and regulations in the operation of the assets we lease to them;

- the ability and willingness of our customers to renew their leases with us upon their expiration, and the ability to reposition our properties on the same or better terms in the event of nonrenewal or in the event we replace an existing tenant;

- our ability to renew, extend or retain our contracts or to obtain new contracts with significant customers (including customers of the businesses that we acquire);

- the availability of and our ability to identify suitable acquisition opportunities and our ability to acquire and lease the respective properties on favorable terms or operate and integrate the acquired businesses;

- our ability to generate sufficient cash flows to service our outstanding indebtedness;

- our ability to access debt and equity capital markets;

- the impact on our business or the business of our customers as a result of credit rating downgrades, and fluctuating interest rates;

- adverse impacts of litigation or disputes involving us or our customers;

- our ability to retain our key management personnel;

- our ability to maintain our status as a real estate investment trust ("REIT");

- changes in the U.S. tax law and other federal, state or local laws, whether or not specific to REITs, including the impact of the recently enacted U.S. tax reform legislation;

- covenants in our debt agreements that may limit our operational flexibility;

- the possibility that we may experience equipment failures, natural disasters, cyber attacks or terrorist attacks for which our insurance may not provide adequate coverage;

- the risk that we fail to fully realize the potential benefits of or have difficulty in integrating the companies we acquire;

2

Table of Contents

- other risks inherent in the communications industry and in the ownership of communications distribution systems, including potential liability relating to environmental matters and illiquidity of real estate investments;

- the risk that the TPx transaction agreements may be modified or terminated prior to expiration or that the conditions to the TPx transaction may not be satisfied; and

- additional factors discussed in Part I, Item 2 "Management's Discussion and Analysis of Financial Condition and Results of Operations" of this Quarterly Report on Form 10-Q and in Part I, Item 1A "Risk Factors" of our Annual Report on Form 10-K for the year ended December 31, 2017, as well as those described from time to time in our future reports filed with the U.S. Securities and Exchange Commission ("the SEC").

Forward-looking statements speak only as of the date of this Quarterly Report. Except in the normal course of our public disclosure obligations, we expressly disclaim any obligation to release publicly any updates or revisions to any forward-looking statements to reflect any change in our expectations or any change in events, conditions or circumstances on which any such statement is based.

3

Table of Contents

**Uniti Group Inc.**
**Table of Contents**

|  |  | Page |
|---|---|---|
| **PART I.** | **FINANCIAL INFORMATION** |  |
| Item 1. | Financial Statements (Unaudited) | 5 |
|  | **Uniti Group Inc.** |  |
|  | Condensed Consolidated Balance Sheets | 5 |
|  | Condensed Consolidated Statements of Income | 6 |
|  | Condensed Consolidated Statements of Comprehensive Income (Loss) | 7 |
|  | Condensed Consolidated Statements of Shareholders' Deficit | 8 |
|  | Condensed Consolidated Statements of Cash Flows | 9 |
|  | Notes to Condensed Consolidated Financial Statements | 10 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 29 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 39 |
| Item 4. | Controls and Procedures | 39 |
| **PART II.** | **OTHER INFORMATION** |  |
| Item 1. | Legal Proceedings | 41 |
| Item 1A. | Risk Factors | 41 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 41 |
| Item 3. | Defaults Upon Senior Securities | 41 |
| Item 4. | Mine Safety Disclosures | 41 |
| Item 5. | Other Information | 41 |
| Item 6. | Exhibits | 42 |
| Signatures |  | 43 |

Table of Contents

**Uniti Group Inc.**
**Notes to the Condensed Consolidated Financial Statements**
**(unaudited)**

**Note 1. Organization and Description of Business**

Uniti Group Inc. (the "Company," "Uniti," "we," "us," or "our"), formerly known as Communications Sales & Leasing, Inc., was incorporated in the state of Delaware in February 2014 and reorganized in the state of Maryland on September 4, 2014. We are an internally managed real estate investment trust ("REIT") engaged in the acquisition and construction of mission critical infrastructure in the communications industry. We are principally focused on acquiring and constructing fiber optic broadband networks, wireless communications towers, copper and coaxial broadband networks and data centers. We manage our operations in four separate lines of business: Uniti Fiber, Uniti Towers, Uniti Leasing, and the Consumer CLEC Business.

The Company operates through a customary "up-REIT" structure, pursuant to which we hold substantially all of our assets through a partnership, Uniti Group LP, a Delaware limited partnership (the "Operating Partnership"), that we control as general partner, with the only significant difference between the financial position and results of operations of the Operating Partnership and its subsidiaries compared to the consolidated financial position and consolidated results of operations of Uniti is that the results for the Operating Partnership and its subsidiaries do not include Uniti's Consumer CLEC segment, which consists of Talk America Services. The up-REIT structure is intended to facilitate future acquisition opportunities by providing the Company with the ability to use common units of the Operating Partnership as a tax-efficient acquisition currency. We are the sole general partner of the Operating Partnership and own approximately 97.7% of the partnership interests in the Operating Partnership as of March 31, 2018 and December 31, 2017, respectively.

**Note 2. Basis of Presentation and Summary of Significant Accounting Policies**

The accompanying Condensed Consolidated Financial Statements include all accounts of the Company, its wholly-owned and/or controlled subsidiaries, which consist of the Operating Partnership. Under the Accounting Standards Codification 810, *Consolidation* ("ASC 810"), the Operating Partnership is considered a variable interest entity and is consolidated in the Condensed Consolidated Financial Statements of Uniti Group Inc. because the Company is the primary beneficiary. All material intercompany balances and transactions have been eliminated.

ASC 810 provides guidance on the identification of entities for which control is achieved through means other than voting rights ("variable interest entities" or "VIEs") and the determination of which business enterprise, if any, should consolidate the VIEs. Generally, the consideration of whether an entity is a VIE applies when either: (1) the equity investors (if any) lack (i) the ability to make decisions about the entity's activities through voting or similar rights, (ii) the obligation to absorb the expected losses of the entity, or (iii) the right to receive the expected residual returns of the entity; (2) the equity investment at risk is insufficient to finance that entity's activities without additional subordinated financial support; or (3) the equity investors have voting rights that are not proportionate to their economic interests and substantially all of the activities of the entity involve or are conducted on behalf of an investor with a disproportionately small voting interest. The Company consolidates VIEs in which it is considered to be the primary beneficiary. The primary beneficiary is defined by the entity having both of the following characteristics: (1) the power to direct the activities that, when taken together, most significantly impact the VIE's performance; and (2) the obligation to absorb losses and right to receive the returns from the VIE that would be significant to the VIE.

The accompanying Condensed Consolidated Financial Statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial information set forth in the Accounting Standards Codification ("ASC"), as published by the Financial Accounting Standards Board ("FASB"), and with the applicable rules and regulations of the Securities and Exchange Commission ("SEC"). Accordingly, they do not include all of the information and footnotes required by GAAP for complete financial statements. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair statement of results for the interim period have been included. Operating results from any interim period are not necessarily indicative of the results that may be expected for the full fiscal year. The accompanying Condensed Consolidated Financial Statements and related notes should be read in conjunction with the audited consolidated financial statements and notes thereto included in our Annual Report on Form 10-K for the year ended December 31, 2017 ("Annual Report"), filed with the SEC on March 1, 2018. Accordingly, significant accounting policies and other disclosures normally provided have been omitted from the accompanying Condensed Consolidated Financial Statements and related notes since such items are disclosed in our Annual Report.

Concentration of Credit Risks—We are party to a Master Lease agreement with from Windstream Holdings, Inc. ("Windstream Holdings" and together with its subsidiaries, "Windstream") from which substantially all of Uniti's leasing revenues and operating

10

**Uniti Group Inc.**
**Notes to the Condensed Consolidated Financial Statements – Continued**
**(unaudited)**

cash flows are currently derived. Revenue under the Master Lease provided 70.0% and 80.5% of our revenue for the three months ended March 31, 2018 and 2017, respectively.  Because a substantial portion of our revenue and cash flows are derived from lease payments by Windstream pursuant to the Master Lease, there could be a material adverse impact on our consolidated results of operations, liquidity, financial condition and/or ability to pay dividends and service debt if Windstream were to default under the Master Lease or otherwise experiences operating or liquidity difficulties and becomes unable to generate sufficient cash to make payments to us. In recent years, Windstream has experienced annual declines in its total revenue, sales and cash flow, and has had its credit ratings downgraded by nationally recognized credit rating agencies. Most recently, Windstream is involved in litigation with an entity who acquired certain Windstream debt securities and immediately claimed an "event of default" under such securities relating to our spin-off from Windstream. On December 7, 2017, the entity issued a notice of acceleration to Windstream claiming that the principal amount, along with accrued interest, of such securities was due and payable immediately. Windstream is challenging the matter in federal court and a trial date has been scheduled for July 23, 2018.   If Windstream receives a final, unappealable adverse ruling, an "event of default" would be declared.  An actual "event of default" would trigger cross-default provisions in Windstream's other debt instruments, including Windstream Services' existing credit facility, which, in turn, would trigger a default under the Master Lease.  If an adverse outcome occurs with respect to this matter and Windstream does not have the ability to pay under the Master Lease, there could be a material adverse impact to us as disclosed above.

Accordingly, we monitor the credit quality of Windstream through numerous methods, including by (i) reviewing the credit ratings of Windstream by nationally recognized credit rating agencies, (ii) reviewing the financial statements of Windstream that are publicly available and that are required to be delivered to us pursuant to the Master Lease, (iii) monitoring ongoing litigation and news reports regarding Windstream and its businesses, (iv) conducting research to ascertain industry trends potentially affecting Windstream, and (v) monitoring the timeliness of its lease payments.

Windstream is a publicly traded company and is subject to the periodic filing requirements of the Securities Exchange Act of 1934, as amended. Windstream filings can be found at www.sec.gov. Windstream filings are not incorporated by reference in this Quarterly Report on Form 10-Q.

Income Taxes—The Tax Cuts and Jobs Act ("Tax Bill") was enacted on December 22, 2017. The Tax Bill reduces the U.S. federal corporate tax rate from 35% to 21%, requires companies to pay a one-time transition tax on earnings of certain foreign subsidiaries that were previously tax deferred and creates new taxes on certain foreign sourced earnings. Consistent with Staff Accounting Bulletin No. 118 issued by the SEC, which provides for a measurement period of one year from the enactment date to finalize the accounting for effects of the Tax Bill, the Company provisionally recorded income tax benefit of $17.0 million related to the Tax Bill in the fourth quarter of 2017.  As of March 31, 2018, we have not yet completed our accounting for the tax effects of the enactment of the Tax Bill.  Future regulatory and rulemaking interpretations or other guidance clarifying provisions of the Tax Bill could affect the Company's analysis and tax position.

Reclassifications—Certain prior year asset categories and related amounts in Note 6 have been reclassified to conform with current year presentation.

Recently Issued Accounting Standards

In August 2017, the FASB issued Accounting Standards Update ("ASU") No. 2017-12, *Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities* ("ASU 2017-12"), which amends and simplifies existing guidance in order to allow companies to more accurately present the economic effects of risk management activities in the financial statements. ASU 2017-12 is effective for annual periods beginning after December 15, 2018 and interim periods within those annual periods, and earlier adoption is permitted. We adopted ASU 2017-12 effective January 1, 2018, and there was no material impact on our financial position.

In February 2017, the FASB issued ASU No. 2017-05, *Other Income - Gains and Losses from the Derecognition of Nonfinancial Assets (Subtopic 610-20): Clarifying the Scope of Asset Derecognition Guidance and Accounting for Partial Sales of Nonfinancial Assets* ("ASU 2017-05"), which provides guidance for recognizing gains and losses from the transfer of nonfinancial assets and for partial sales of nonfinancial assets, and is effective for financial statements issued for fiscal years and interim periods beginning after December 15, 2017. We adopted ASU 2017-05 effective January 1, 2018, using the modified retrospective approach and there was no material impact on our financial position.

11

# Exhibit O

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

## FORM 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended June 30, 2018

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 001-36708

# Uniti Group Inc.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Maryland** | **46-5230630** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **10802 Executive Center Drive** | |
| **Benton Building Suite 300** | |
| **Little Rock, Arkansas** | **72211** |
| **(Address of principal executive offices)** | **(Zip Code)** |

Registrant's telephone number, including area code: (501) 850-0820

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

As of August 3, 2018, the registrant had 175,686,990 shares of common stock, $0.0001 par value per share, outstanding.

Table of Contents

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q includes forward-looking statements as defined under U.S. federal securities law. Forward-looking statements include all statements that are not historical statements of fact and those regarding our intent, belief or expectations, including, but not limited to, statements regarding: our expectations regarding the future growth and demand of the telecommunication industry; future financing plans, business strategies, growth prospects and operating and financial performance; expectations regarding the impact and integration of Hunt Telecommunications, LLC ("Hunt") and Southern Light, LLC ("Southern Light"), including expectations regarding operational synergies with Uniti Towers and Uniti Fiber; expectations regarding settling conversion of our 3% convertible preferred stock in cash upon conversion; expectations regarding the probability of our obligation to pay contingent consideration upon Tower Cloud, Inc.'s ("Tower Cloud") or Hunt's achievement of certain defined operational and financial milestones; expectations regarding future deployment of fiber strand miles and recognition of revenue related thereto; expectations regarding levels of capital expenditures; expectations regarding the deductibility of goodwill for tax purposes; expectations regarding the reclassification of accumulated other comprehensive income (loss) related to derivatives to interest expense; expectations regarding the amortization of intangible assets; expectations regarding the U.S. TelePacific Holdings Corp ("TPx") and CableSouth Media, LLC ("CableSouth") transactions; and expectations regarding the payment of dividends.

Words such as "anticipate(s)," "expect(s)," "intend(s)," "plan(s)," "believe(s)," "may," "will," "would," "could," "should," "seek(s)" and similar expressions, or the negative of these terms, are intended to identify such forward-looking statements. These statements are based on management's current expectations and beliefs and are subject to a number of risks and uncertainties that could lead to actual results differing materially from those projected, forecasted or expected. Although we believe that the assumptions underlying the forward-looking statements are reasonable, we can give no assurance that our expectations will be attained. Factors which could have a material adverse effect on our operations and future prospects or which could cause actual results to differ materially from our expectations include, but are not limited to:

- the ability and willingness of our customers to meet and/or perform their obligations under any contractual arrangements entered into with us, including master lease arrangements;

- the ability of our customers to comply with laws, rules and regulations in the operation of the assets we lease to them;

- the ability and willingness of our customers to renew their leases with us upon their expiration, and the ability to reposition our properties on the same or better terms in the event of nonrenewal or in the event we replace an existing tenant;

- our ability to renew, extend or retain our contracts or to obtain new contracts with significant customers (including customers of the businesses that we acquire);

- the availability of and our ability to identify suitable acquisition opportunities and our ability to acquire and lease the respective properties on favorable terms or operate and integrate the acquired businesses;

- our ability to generate sufficient cash flows to service our outstanding indebtedness;

- our ability to access debt and equity capital markets;

- the impact on our business or the business of our customers as a result of credit rating downgrades, and fluctuating interest rates;

- adverse impacts of litigation or disputes involving us or our customers;

- our ability to retain our key management personnel;

- our ability to maintain our status as a real estate investment trust ("REIT");

- changes in the U.S. tax law and other federal, state or local laws, whether or not specific to REITs, including the impact of the recently enacted U.S. tax reform legislation;

- covenants in our debt agreements that may limit our operational flexibility;

- the possibility that we may experience equipment failures, natural disasters, cyber attacks or terrorist attacks for which our insurance may not provide adequate coverage;

- the risk that we fail to fully realize the potential benefits of or have difficulty in integrating the companies we acquire;

2

Table of Contents

- other risks inherent in the communications industry and in the ownership of communications distribution systems, including potential liability relating to environmental matters and illiquidity of real estate investments;

- the risk that the TPx or CableSouth transaction agreements may be modified or terminated prior to expiration or that the conditions to the TPx or CableSouth transactions may not be satisfied; and

- additional factors discussed in Part I, Item 2 "Management's Discussion and Analysis of Financial Condition and Results of Operations" of this Quarterly Report on Form 10-Q and in Part I, Item 1A "Risk Factors" of our Annual Report on Form 10-K for the year ended December 31, 2017, as well as those described from time to time in our future reports filed with the U.S. Securities and Exchange Commission ("SEC").

Forward-looking statements speak only as of the date of this Quarterly Report. Except in the normal course of our public disclosure obligations, we expressly disclaim any obligation to release publicly any updates or revisions to any forward-looking statements to reflect any change in our expectations or any change in events, conditions or circumstances on which any such statement is based.

3

Table of Contents

**Uniti Group Inc.**
**Table of Contents**

| | | Page |
|---|---|---|
| **PART I.** | **FINANCIAL INFORMATION** | |
| Item 1. | Financial Statements (Unaudited) | 5 |
| | **Uniti Group Inc.** | |
| | Condensed Consolidated Balance Sheets | 5 |
| | Condensed Consolidated Statements of Income | 6 |
| | Condensed Consolidated Statements of Comprehensive Income (Loss) | 7 |
| | Condensed Consolidated Statements of Shareholders' Deficit | 8 |
| | Condensed Consolidated Statements of Cash Flows | 9 |
| | Notes to Condensed Consolidated Financial Statements | 10 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 30 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 45 |
| Item 4. | Controls and Procedures | 45 |
| **PART II.** | **OTHER INFORMATION** | |
| Item 1. | Legal Proceedings | 46 |
| Item 1A. | Risk Factors | 46 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 46 |
| Item 3. | Defaults Upon Senior Securities | 46 |
| Item 4. | Mine Safety Disclosures | 46 |
| Item 5. | Other Information | 46 |
| Item 6. | Exhibits | 47 |
| Signatures | | 48 |

Table of Contents

**Uniti Group Inc.**
**Notes to the Condensed Consolidated Financial Statements**
**(unaudited)**

**Note 1. Organization and Description of Business**

Uniti Group Inc. (the "Company," "Uniti," "we," "us," or "our") was incorporated in the state of Delaware in February 2014 and reorganized in the state of Maryland on September 4, 2014. We are an internally managed real estate investment trust ("REIT") engaged in the acquisition and construction of mission critical infrastructure in the communications industry. We are principally focused on acquiring and constructing fiber optic broadband networks, wireless communications towers, copper and coaxial broadband networks and data centers. We manage our operations in four separate lines of business: Uniti Fiber, Uniti Towers, Uniti Leasing, and the Consumer CLEC Business.

The Company operates through a customary "up-REIT" structure, pursuant to which we hold substantially all of our assets through a partnership, Uniti Group LP, a Delaware limited partnership (the "Operating Partnership"), that we control as general partner, with the only significant difference between the financial position and results of operations of the Operating Partnership and its subsidiaries compared to the consolidated financial position and consolidated results of operations of Uniti is that the results for the Operating Partnership and its subsidiaries do not include Uniti's Consumer CLEC segment, which consists of Talk America Services. The up-REIT structure is intended to facilitate future acquisition opportunities by providing the Company with the ability to use common units of the Operating Partnership as a tax-efficient acquisition currency. We are the sole general partner of the Operating Partnership and own approximately 97.7% of the partnership interests in the Operating Partnership as of June 30, 2018 and December 31, 2017, respectively.

**Note 2. Basis of Presentation and Summary of Significant Accounting Policies**

The accompanying Condensed Consolidated Financial Statements include all accounts of the Company, its wholly-owned and/or controlled subsidiaries, which consist of the Operating Partnership. Under the Accounting Standards Codification 810, *Consolidation* ("ASC 810"), the Operating Partnership is considered a variable interest entity and is consolidated in the Condensed Consolidated Financial Statements of Uniti Group Inc. because the Company is the primary beneficiary. All material intercompany balances and transactions have been eliminated.

ASC 810 provides guidance on the identification of entities for which control is achieved through means other than voting rights ("variable interest entities" or "VIEs") and the determination of which business enterprise, if any, should consolidate the VIEs. Generally, the consideration of whether an entity is a VIE applies when either: (1) the equity investors (if any) lack (i) the ability to make decisions about the entity's activities through voting or similar rights, (ii) the obligation to absorb the expected losses of the entity, or (iii) the right to receive the expected residual returns of the entity; (2) the equity investment at risk is insufficient to finance that entity's activities without additional subordinated financial support; or (3) the equity investors have voting rights that are not proportionate to their economic interests and substantially all of the activities of the entity involve or are conducted on behalf of an investor with a disproportionately small voting interest. The Company consolidates VIEs in which it is considered to be the primary beneficiary. The primary beneficiary is defined by the entity having both of the following characteristics: (1) the power to direct the activities that, when taken together, most significantly impact the VIE's performance; and (2) the obligation to absorb losses and right to receive the returns from the VIE that would be significant to the VIE.

The accompanying Condensed Consolidated Financial Statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial information set forth in the Accounting Standards Codification ("ASC"), as published by the Financial Accounting Standards Board ("FASB"), and with the applicable rules and regulations of the Securities and Exchange Commission ("SEC"). Accordingly, they do not include all of the information and footnotes required by GAAP for complete financial statements. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair statement of results for the interim period have been included. Operating results from any interim period are not necessarily indicative of the results that may be expected for the full fiscal year. The accompanying Condensed Consolidated Financial Statements and related notes should be read in conjunction with the audited consolidated financial statements and notes thereto included in our Annual Report on Form 10-K for the year ended December 31, 2017 ("Annual Report"), filed with the SEC on March 1, 2018. Accordingly, significant accounting policies and other disclosures normally provided have been omitted from the accompanying Condensed Consolidated Financial Statements and related notes since such items are disclosed in our Annual Report.

Concentration of Credit Risks—We are party to a Master Lease agreement with from Windstream Holdings, Inc. ("Windstream Holdings" and together with its subsidiaries, "Windstream") from which substantially all of Uniti's leasing revenues and operating

10

Table of Contents

**Uniti Group Inc.**
**Notes to the Condensed Consolidated Financial Statements – Continued**
**(unaudited)**

cash flows are currently derived. Revenue under the Master Lease provided 70.0% and 80.4% of our revenue for the six months ended June 30, 2018 and 2017, respectively.  Because a substantial portion of our revenue and cash flows are derived from lease payments by Windstream pursuant to the Master Lease, there could be a material adverse impact on our consolidated results of operations, liquidity, financial condition and/or ability to pay dividends and service debt if Windstream were to default under the Master Lease or otherwise experiences operating or liquidity difficulties and becomes unable to generate sufficient cash to make payments to us. In recent years, Windstream has experienced annual declines in its total revenue, sales and cash flow, and has had its credit ratings downgraded by nationally recognized credit rating agencies multiple times over the past 12 months, and as recently as June 2018. In addition, Windstream is involved in litigation with an entity who acquired certain Windstream debt securities and thereafter issued a notice of default as to such securities relating to our spin-off from Windstream. On December 7, 2017, the entity issued a notice of acceleration to Windstream claiming that the alleged default had matured into an "event of default" and that the principal amount, along with accrued interest, of such securities was due and payable immediately. Windstream challenged the matter in federal court and a trial was held, in July 2018.  A verdict is expected to be issued during the third quarter of 2018.  If Windstream receives an adverse ruling (and the ruling is not stayed or is final and unappealable), an actual "event of default" would result.  An actual "event of default" would trigger cross-default provisions in Windstream's other debt instruments, including Windstream Services' existing credit facility and notes, which, in turn, would trigger a default under the Master Lease.  In addition, Windstream is dependent upon distributions from its subsidiaries to fund its rental payments, and its subsidiaries' debt instruments generally prohibit such distributions upon any event of default.  If an adverse outcome occurs with respect to this matter and Windstream does not have the ability to pay under the Master Lease, there could be a material adverse impact to us.

Accordingly, we monitor the credit quality of Windstream through numerous methods, including by (i) reviewing the credit ratings of Windstream by nationally recognized credit rating agencies, (ii) reviewing the financial statements of Windstream that are publicly available and that are required to be delivered to us pursuant to the Master Lease, (iii) monitoring ongoing litigation and news reports regarding Windstream and its businesses, (iv) conducting research to ascertain industry trends potentially affecting Windstream, and (v) monitoring the timeliness of its lease payments.

Windstream is a publicly traded company and is subject to the periodic filing requirements of the Securities Exchange Act of 1934, as amended. Windstream filings can be found at www.sec.gov. Windstream filings are not incorporated by reference in this Quarterly Report on Form 10-Q.

Income Taxes—The Tax Cuts and Jobs Act ("Tax Bill") was enacted on December 22, 2017. The Tax Bill reduces the U.S. federal corporate tax rate from 35% to 21%, requires companies to pay a one-time transition tax on earnings of certain foreign subsidiaries that were previously tax deferred and creates new taxes on certain foreign sourced earnings. Consistent with Staff Accounting Bulletin No. 118 issued by the SEC, which provides for a measurement period of one year from the enactment date to finalize the accounting for effects of the Tax Bill, the Company provisionally recorded income tax benefit of $17.0 million related to the Tax Bill in the fourth quarter of 2017.  During the second quarter of 2018, the purchase price allocations related to our acquisitions of Hunt Telecommunications, LLC and Southern Light, LLC were adjusted to record additional deferred tax liabilities of $3.2 million and $0.9 million, respectively, that existed as of the acquisition date. These deferred tax liabilities were recorded at the tax rate in effect as of the date of acquisition. Upon enactment of the Tax Bill, the incremental deferred tax liability would have been adjusted to the newly enacted corporate tax rate. This resulted in a decrease to the deferred tax liability and an income tax benefit of $1.3 million recorded for the three months ended June 30, 2018. As of June 30, 2018, we have not yet completed our accounting for the tax effects of the enactment of the Tax Bill.  Future regulatory and rulemaking interpretations or other guidance clarifying provisions of the Tax Bill could affect the Company's analysis and tax position.

Reclassifications—Certain prior year asset categories and related amounts in Note 6 have been reclassified to conform with current year presentation.

Recently Issued Accounting Standards

In August 2017, the FASB issued Accounting Standards Update ("ASU") No. 2017-12, *Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities* ("ASU 2017-12"), which amends and simplifies existing guidance in order to allow companies to more accurately present the economic effects of risk management activities in the financial statements. ASU 2017-12 is effective for annual periods beginning after December 15, 2018 and interim periods within those annual periods, and earlier adoption is permitted. We adopted ASU 2017-12 effective January 1, 2018, and there was no material impact on our financial position.

11