# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| SLF HOLDINGS, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 19-1813-LPS |
| | : | |
| UNITI FIBER HOLDINGS, INC., UNITI GROUP, INC., KENNETH GUNDERMAN, and JOHN P. FLETCHER, | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

Stephen B. Brauerman and Emily A. Letcher, BAYARD, P.A., Wilmington, DE

Edward S. Sledge IV, Dylan C. Black, Zachary A. Madonia, Emily M. Ruzic, and Stanley E. Blackmon, BRADLEY ARANT BOULT CUMMINGS LLP, Birmingham, AL

     Attorneys for Plaintiff


John P. DiTomo and Sabrina M. Hendershot, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

Jerome E. Speegle and Anthony M. Hoffman, SPEEGLE, HOFFMAN, HOLMAN & HOLIFIELD, LLC, Mobile, AL

     Attorneys for Defendant John P. Fletcher

Blake Rohrbacher and Kelly E. Farnan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE

Edmund Polubinski III and Brian M. Burnovski, DAVIS POLK & WARDWELL LLP, New York, NY

     Attorneys for Defendants Uniti Group Inc., Uniti Fiber Holdings Inc., and Kenneth Gunderman

## <u>MEMORANDUM OPINION</u>

November 4, 2020
Wilmington, Delaware

**EXHIBIT 1**

**STARK, U.S. District Judge:**

## I.     INTRODUCTION

On December 18, 2019, Defendants Uniti Group Inc. ("Uniti Group"), Uniti Fiber Holdings Inc. ("Uniti Fiber," and with Uniti Group, "Uniti"), and Kenneth Gunderman (together with Uniti, "Defendants") moved to dismiss the claims asserted against them in the Amended Complaint (D.I. 71) ("Cmplt.") filed by Plaintiff SLF Holdings, LLC ("SLF" or "Plaintiff"), pursuant to Federal Rule of Civil Procedure 12(b)(6).  (D.I. 76)  On the same date, Defendant John P. Fletcher ("Fletcher") separately moved to dismiss the claims asserted against him, also pursuant to Rule 12(b)(6).  (D.I. 74)

SLF's Amended Complaint alleges a "complex and multifaceted financial fraud" arising out of Uniti's spinoff from Windstream Services, LLC and Windstream Holdings, Inc. (together, "Windstream").  (Cmplt. ¶ 9; *see also, e.g.*, *id.* ¶¶ 13-15, 17-18, 21-23, 28, 42, 46, 56-58, 64-66, 69-73, 76, 81, 84, 92-94, 96-104, 109-10, 125, 128-33)  SLF asserts 11 fraud-based claims, principally under federal securities law and Alabama law, as follows:

*Count 1*:     Fraud in the Inducement against Uniti Group, Uniti Fiber, and Gunderman

*Count 2*:     Conspiracy against Uniti Group, Uniti Fiber, Gunderman, and Fletcher

*Count 3*:     Violation of Alabama Securities Act ("ASA") § 8-6-17(a)(1) against Uniti Group, Uniti Fiber, and Gunderman

*Count 4*:     Violation of ASA § 8-6-17(a)(2) against Uniti Group, Uniti Fiber, and Gunderman

*Count 5*:     Violation of ASA § 8-6-17(a)(3) against Uniti Group, Uniti Fiber, and Gunderman

*Count 6*:     Violation of ASA § 8-6-19(c) against Gunderman and Fletcher

*Count 7*:     Violation of Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and SEC Rule 10b-5(a) promulgated thereunder, 17 C.F.R. § 240.10b-5(a), against Uniti Group, Uniti Fiber, and Gunderman

1

*Count 8:*     Violation of Exchange Act, including Rule 10b-5(b), against Uniti Group, Uniti Fiber, and Gunderman

*Count 9*:     Violation of Exchange Act, including Rule 10b-5(c), against Uniti Group, Uniti Fiber, and Gunderman

*Count 10*:    Violation of Exchange Act, 15 U.S.C. § 78t, against Gunderman

*Count 11*:    Declaratory Judgment for Indemnification against Uniti Group

The Court has carefully considered the parties' briefing (*see* D.I. 75, 77, 79-82) as well as the Amended Complaint and exhibits (D.I. 71).  The Court also heard argument on both motions on May 12, 2020.  (D.I. 92) ("Tr.")  Based on its review,[1] and for the reasons stated below, the Court will grant the motions to dismiss.

## II.    BACKGROUND[2]

Uniti was created in April 2015 when its former parent, Windstream Holdings, Inc. ("Windstream Holdings"), spun it off into a separate, publicly-traded real estate investment trust ("REIT").  (Cmplt. ¶¶ 2, 9, 66)  Windstream Services, LLC ("Windstream Services" and, together with Windstream Holdings, "Windstream"), a subsidiary of Windstream Holdings, caused its operating subsidiaries to convey fiber and copper network assets to Uniti.  (*Id.* ¶¶ 9-10,

---

[1] "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

[2] The Court's recitation of the background facts is based on taking the Complaint's well-pleaded factual allegations as true, which the Court is obligated to do at this stage of the proceedings. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) ("A motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief.").

25, 76, 81) Uniti entered into a master lease with Windstream Holdings (the "Master Lease"), pursuant to which Windstream Holdings leased those assets from Uniti. (*Id.* ¶¶ 10, 93)

Windstream was required to abide by a restrictive covenant in Windstream Services' debt indentures, which prohibited Windstream Services or its operating subsidiaries from entering into a "Sale and Leaseback Transaction." (*Id.* ¶¶ 43-48) Moreover, Windstream and Uniti also sought to ensure that the Master Lease would meet the requirements of a "true lease," which was necessary in order for Uniti to meet the requirements of a REIT. (*Id.* ¶¶ 26, 42, 72)

Windstream's General Counsel, Defendant John Fletcher, was involved in Windstream's legal and regulatory strategy for the proposed REIT spinoff. (*Id.* ¶ 39) Fletcher drafted, reviewed, and submitted various applications, affidavits, and other regulatory documents to regulators to obtain approval of the sale of Windstream's assets. (*Id.* ¶¶ 53-55)

Windstream engaged outside legal counsel, Skadden Arps Slate Meagher & Flom ("Skadden"), to provide a legal opinion to Uniti regarding the Master Lease. (*Id.* ¶¶ 26, 74, 85-86) Ernst & Young, LLP ("E&Y") provided Windstream with an independent appraisal of the "useful life" of the assets being leased, which was a factor in concluding that the Master Lease was a "true lease," and was not financing. (*Id*. ¶¶ 26, 75) Skadden's opinion noted: "the IRS 'may argue that the proposed lease is merely a financing arrangement and that the purported lessor [Uniti] is, in substance, a secured creditor but holds no equity interest in the property.'" (*Id.* ¶ 85)

Before and after the April 2015 spinoff, Uniti made public disclosures regarding Uniti's business, Master Lease, and spinoff. (*Id.* ¶ 130) These disclosures included that Windstream Holdings "represented a significant portion of [Uniti's] business and that Uniti's success depended significantly on the viability of Windstream." (*Id.* ¶ 109)

3

On March 26, 2015, Uniti filed an initial information statement (the "Information Statement") with the Securities and Exchange Commission ("SEC"), which disclosed the Master Lease.  (D.I. 78 Ex. C Ex. 10.1; *id.* Ex. D Ex. 99.1 at 104)  The Information Statement disclosed that "[t]he subsidiaries of Windstream Holdings will have the right to use, occupy and operate the Distribution Systems and discharge any of Windstream Holdings' obligations under the Master Lease."  (*Id.*)  Moreover, the Information Statement disclosed that "[a]ll of [Windstream Holdings'] operations are conducted by its wholly owned subsidiary," Windstream Services, and by Windstream Services' own "direct and indirect wholly owned subsidiaries."  (*Id.* at 1)

In July 2017, Plaintiff SLF sold its membership interests in Southern Light, LLC ("Southern Light"), an Alabama fiber optic network provider, to Uniti Fiber.  (Cmplt. ¶¶ 11, 19)  As described in the April 7, 2017, Membership Interests Purchase Agreement (the "Purchase Agreement") (D.I. 78 Ex. A), in the transaction SLF received $700 million, split into $635 million in cash and $65 million in Uniti stock equivalents (Cmplt. ¶ 132).  When Uniti had approached SLF in 2016 about purchasing Southern Light, Gunderman and other Uniti executives advertised the REIT structure, the Master Lease, Windstream's $650 million in annual rental payments, and the "iron-clad" dividend that Uniti would be able to pay.  (*Id.* ¶¶ 115-16)  Neither the E&Y analysis nor the Skadden opinion was disclosed to SLF during the negotiations preceding the Southern Light transaction.  (*Id.* ¶¶ 119, 125, 128)

A few months after the Uniti-SLF transaction closed, Windstream was sued by a hedge fund, Aurelius Capital Master, Ltd. ("Aurelius"), which had been buying certain notes issued by Windstream.  (*Id.* ¶¶ 19-20)  Aurelius claimed that the spinoff and Master Lease agreement between Windstream and Uniti violated Windstream's debt covenants.  (*Id.* ¶¶ 19-20, 138)  Specifically, on October 12, 2017, Aurelius caused the trustee on the Windstream notes to

initiate breach of contract litigation against Windstream in the United States District Court for the Southern District of New York, claiming that the spinoff and Master Lease breached the "Sale and Leaseback" covenant in Windstream's debt indentures.  (*Id.* ¶¶ 19, 144)  On February 15, 2019, the Southern District of New York ruled against Windstream, finding, among other things, that the spinoff and Master Lease did breach Windstream Services' debt indenture (D.I. 71 Ex. A at 33-35), and declaring over $300 million of Windstream notes immediately due and payable (Cmplt. ¶ 151; *see also U.S. Bank Nat'l Ass'n v. Windstream Servs., LLC*, 2019 WL 948120, at *1 (S.D.N.Y. Feb. 15, 2019)).

On February 25, 2019, Windstream Holdings filed for bankruptcy.  (Cmplt. ¶ 154)  On July 25, 2019, as part of the bankruptcy proceeding, Windstream sued Uniti, seeking, *inter alia*, a declaration that the Master Lease was not a "true lease" but, rather, a disguised financing arrangement.  (*Id.* ¶ 159)  This contention was based on several factors, including the publicly-disclosed terms of the Master Lease (*id.* ¶ 71) and an "inflated" projection of the useful life of the leased assets (*id.* ¶ 74).  Windstream also alleged that Uniti failed to obtain Windstream's consent to the Southern Light transaction and certain other transactions, in violation of a provision precluding Uniti from "merg[ing] or consolidat[ing] with or into a Competitor" without such consent.  (*Id.* ¶¶ 120-21)

On July 3, 2019, SLF filed the instant action in the United States District Court for the Southern District of Alabama, which later transferred the case to this Court pursuant to a forum selection provision in the Southern Light agreement.  (*See* D.I. 53)

5

### III.    LEGAL STANDARDS

#### A.    Motion to Dismiss for Failure to State a Claim

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted). Thus, the Court may grant such a motion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted).

A well-pleaded complaint must contain more than mere labels and conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff must plead facts sufficient to show that a claim has substantive plausibility. *See Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014). A complaint may not be dismissed, however, for imperfect statements of the legal theory supporting the claim asserted. *See id.* at 346.

"To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. At bottom, "[t]he complaint must state enough

6

facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

The Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

**B. Pleading Requirements for Securities Fraud**

Securities fraud is defined in § 10(b) of the Securities Exchange Act of 1934. As the Supreme Court explained in *Dura Pharms., Inc. v. Broudo*, § 10(b) forbids the use or employment of any deceptive device "in connection with the purchase or sale of any security . . . in contravention of Securities and Exchange Commission rules and regulations." 544 U.S. 336, 341 (2005) (internal quotation marks omitted). Pursuant to its statutory authority, the SEC promulgated Rule 10b-5, making it unlawful to, (a) "employ any device, scheme, or artifice to defraud;" (b) "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;" or (c) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. §§ 240.10b-5(a)-(c).

In order to state a claim for securities fraud under § 10(b), a plaintiff must allege:

> (1) a material misrepresentation (or omission);

> (2) scienter, i.e., a wrongful state of mind;

(3) a connection with the purchase or sale of a security;

(4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation;"

(5) economic loss; and

(6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.

*Dura Pharms.*, 544 U.S. at 341-42 (internal citations omitted).

When making these allegations, plaintiffs are required to satisfy the heightened pleading requirements imposed by the Private Securities Law Reform Act ("PSLRA") and by Rule 9(b) of the Federal Rules of Civil Procedure. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006). The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, [for allegations] made on information and belief, the . . . facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *see also In re Suprema*, 438 F.3d at 276.

The PSLRA also requires plaintiffs to plead the required state of mind with particularity. *See* 15 U.S.C. § 78u-4(b)(2) ("[T]he complaint [must] . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."); *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004).

In addition, the PSLRA "immunizes from liability any forward-looking statement" if it is "'accompanied by meaningful cautionary language; or it is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood.'" *In re Wilmington Tr. Sec. Litig.*, 852 F. Supp. 2d 477, 490 (D. Del. 2012) (quoting *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 254 (3d Cir. 2009)).

8

Rule 9(b) requires that plaintiffs "support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' – that is, the 'who, what, when, where and how' of the events at issue." *Schwartz v. Perseon Corp.*, 175 F. Supp. 3d 390, 397-98 (D. Del. 2016) (citing *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)).[3]

### 1. Actionable Omission or Misrepresentation

"[N]on-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information." *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000). Material information is "information that would be important to a reasonable investor in making his or her investment decision." *Id.* at 282 (citing *Burlington Coat Factory*, 114 F.3d at 1425). A duty to disclose arises where a defendant makes "an inaccurate, incomplete or misleading prior disclosure." *Oran*, 226 F.3d at 285-86. In other words, one who chooses to speak is "bound to speak truthfully." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992), *as amended* (May 28, 1992).

For purposes of evaluating securities fraud allegations, courts review the allegedly fraudulent statements or omissions in light of all of the company's disclosures and the entirety of market information; if allegedly fraudulent statements or omissions are contradicted by the company's public disclosures, there can be no § 10(b) claim. *See Schwartz*, 175 F. Supp. 3d at 400. There is no duty to disclose specific "litigation risks" that were not "substantially certain to occur." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006). "[F]raud by

---

[3] To the extent that the pleading requirements of the PSLRA conflict with those of Fed. R. Civ. P. Rule 9(b), the PSLRA takes priority. *See In re Suprema*, 438 F.3d at 276.

hindsight" has been "long rejected," as a matter of law, as a basis for liability. *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004); *see also Williams v. Globus Med., Inc.*, 869 F.3d 235, 244 (3d Cir. 2017) ("[A]llegations cannot rely exclusively on hindsight, but must be sufficient to show that the challenged statements were 'actionably unsound when made.'") (internal citation omitted).

To state a claim, a plaintiff must identify affirmative statements that were plausibly rendered misleading by the alleged omissions. *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 174 (3d Cir. 2014) (no duty to disclose information where company neither makes affirmative statement about issue, nor characterizes it in any manner); *see also Williams*, 869 F.3d at 243 (no duty to disclose risk that had not "actually materialized at the time of" allegedly misleading partial disclosures).

## 2. Scienter

The PSLRA requires that a securities fraud complaint plead facts that lead to a "strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2)(A); that is, an intent "to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Scienter may include "either reckless or conscious behavior." *Avaya*, 564 F.3d at 276 (internal quotation marks omitted).

In *Tellabs*, the Supreme Court prescribed three rules for assessing scienter on a motion to dismiss. 551 U.S. at 322-23. "First, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Id.* at 322. "Second, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the

10

complaint by reference, and matters of which a court may take judicial notice." *Id.* This includes documents that are "integral to or explicitly replied upon" in the complaint. *Burlington Coat Factory*, 114 F.3d at 1426 (internal quotation marks omitted). "Third, in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. The pertinent inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323. To survive dismissal, the inference of scienter "must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324.

"Allegations of scienter need not be irrefutable, i.e., of the smoking-gun genre." *Avaya*, 564 F.3d at 269 (internal citations omitted). The inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* (quoting *Tellabs*, 551 U.S. at 323). Accordingly, as with all totality-of-the circumstances tests, the analysis will be case-specific. *Avaya*, 564 F.3d at 269 "It will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Id.*

### 3. Reliance

In considering whether reliance is reasonable under § 10(b), courts in the Third Circuit consider "(1) whether a fiduciary relationship existed between the parties; (2) whether the plaintiff had the opportunity to detect the fraud; (3) the sophistication of the plaintiff; (4) the existence of long standing business or personal relationships; and (5) the plaintiff's access to the relevant information." *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 178-79 (3d Cir. 2003); *see*

*also Fulton Bank, N.A. v. UBS Sec., LLC*, 2011 WL 5386376, at \*11 (E.D. Pa. Nov. 7, 2011) (analyzing state securities claim under Rule 10b-5 standard and finding, on motion to dismiss, that reliance was not pleaded under *AES Corp.*, where investor was "a sophisticated plaintiff, with no longstanding business relationship with [defendant], and had at least minimal access to the relevant information").

Federal securities fraud claims cannot be dismissed based solely on the presence of a contractual anti-reliance provision. Section 29(a) of the Exchange Act provides: "Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void." 15 U.S.C. § 78cc(a). The Third Circuit has held Section 29(a) "forecloses anticipatory waivers of compliance with the duties imposed by Rule 10b–5." *AES Corp.*, 325 F.3d at 180 ("We believe the conclusion inescapable that enforcement of the non-reliance clauses to bar [the buyer's] fraud claims as a matter of law would be inconsistent with Section 29(a).").

### 4. Loss Causation

To prevail on a Section 10(b) claim, the plaintiff bears "the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4). In the context of pleading a Section 10(b) claim, a plaintiff must plead "a causal connection between the material misrepresentation and the loss." *Dura Pharms.*, 544 U.S. at 345-46; *see also McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 425 (3d Cir. 2007) (stating plaintiff must show "loss causation, i.e., that the fraudulent misrepresentation or omission actually caused the economic loss suffered"). "Similar to the concept of proximate cause in the tort context, loss causation focuses on whether the defendant should be held

responsible as a matter of public policy for the losses suffered by the plaintiff." *Id.* (quoting

*Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006).

To satisfy the loss causation requirement in a § 10(b) action, a plaintiff must show that

the defendant misrepresented or omitted the very facts that were a substantial factor in causing

the plaintiff's economic loss. *See McCabe*, 494 F.3d at 426. "[A]n inflated purchase price will

not itself constitute or proximately cause the relevant economic loss" because a subsequent lower

price may be the result of "changed economic circumstances, changed investor expectations, new

industry-specific or firm-specific facts, conditions, or other events, which taken separately or

together account for some or all of that lower price." *Dura Pharms.*, 544 U.S. at 342-43.

### C. Alabama Securities Act ("ASA"), Ala. Code § 8-6-17(a)

Under the Alabama Securities Act, Section 8-6-17(a), it is unlawful for any person, in

connection with the offer, sale, or purchase of any security, directly or indirectly, to:

> (1) Employ any device, scheme, or artifice to defraud;
>
> (2) Make any untrue statement of a material fact or to omit to state
> a material fact necessary in order to make the statements made, in
> the light of the circumstances under which they are made, not
> misleading; or
>
> (3) Engage in any act, practice or course of business which
> operates or would operate as a fraud or deceit upon any person.

This section 8-6-17 is Alabama's counterpart to federal securities Rule 10b-5. *See Altrust Fin.*

*Servs., Inc. v. Adams*, 76 So. 3d 228, 236 n.4 (Ala. 2011).

### D. Control Person Claims Under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and the ASA

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), provides that "every person who,

directly or indirectly, controls any person liable under any provision of this chapter or of any rule

or regulation thereunder shall also be liable jointly and severally with and to the same extent as

13

such controlled person." 15 U.S.C. § 78t(a). A defendant is liable as a controlling person under Section 20(a) if she possesses "directly or indirectly, [] the power to direct or cause the direction of the management and policies . . . ." *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir. 1975).

Under the Alabama Securities Act, a party can be secondarily liable if she is either a "control person" who controls the person who engaged in the sale or offer to sell securities or if she was an employee or agent of such a person who "materially aids" in such sale or offer to sell. *See* Alabama Code § 8-6-19(c).

### E.    Common Law Fraud in the Inducement and Fraudulent Suppression

"Under Alabama law, to prevail on fraudulent inducement claim, [a plaintiff] must prove: (1) [the defendant] had duty to speak the truth; (2) [the defendant] made a false representation of material fact; (3) [the plaintiff] justifiably relied upon [a] false representation; and, (4) as a proximate result, [the plaintiff] suffered loss, harm, or damage." *McGriff v. Minnesota Mut. Life Ins. Co.*, 127 F.3d 1410 (11th Cir. 1997) (citing *Kidder v. AmSouth Bank, N.A.*, 639 So.2d 1361, 1362 (Ala. 1994); *Alfa Mut. Ins. Co. v. Northington*, 561 So.2d 1041, 1045 (Ala. 1990)).

"In order to establish a prima facie claim of fraudulent suppression, a plaintiff must produce substantial evidence establishing the following elements: (1) that the defendant had a duty to disclose an existing material fact; (2) that the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge of the fact; (4) that the defendant's suppression of the fact induced the plaintiff to act or to refrain from acting; and (5) that the plaintiff suffered actual damage as a proximate result." *Johnson v. Sorensen*, 914 So. 2d 830, 837 (Ala. 2005) (internal citations omitted); *see also McGriff*, 127 F.3d at 1415 ("[T]o succeed on a claim of fraudulent suppression, [the plaintiff] must show that [the defendant] failed to disclose a material

14

fact, thereby creating a false impression on which plaintiff relied, believing it to be true, which proximately caused damages.") (citing *Ford New Holland, Inc. v. Proctor-Russell Tractor Co.*, 630 So. 2d 395, 398 (Ala. 1993)).

### F. Common Law Conspiracy Claim

To establish a conspiracy under Alabama law, a plaintiff must allege "(1) concerted action by two or more persons (2) to achieve an unlawful purpose or a lawful purpose by unlawful means." *Ex parte Alamo Title Co.*, 128 So. 3d 700, 713 (Ala. 2013). "In order to prove conspiracy, a plaintiff must allege and prove that the defendant . . . agreed with at least one other coconspirator to accomplish an unlawful end . . . and intended to have that unlawful end brought about." *Vakili v. First Commercial Bank*, 2009 WL 10670148, at \*21 (N.D. Ala. Aug. 13, 2009) (citing *First Bank of Childersburg v. Florey*, 676 So. 2d 324, 327 (Ala. Civ. App. 1996)).

## IV. DISCUSSION

### A. Exchange Act Claims Against Uniti Group, Uniti Fiber, And Gunderman

SLF's claims under section 10(b) of the Exchange Act against Uniti Group, Uniti Fiber, and Gunderman must be dismissed because SLF has not adequately and plausibly pled each of the elements of such a claim. That is, SLF has not pled, with sufficient particularity satisfying the standards of Rule 9(b), (1) a material misrepresentation or omission, (2) scienter or knowledge of a suppressed fact in connection with a purchase or sale of securities, (3) reasonable reliance, (4) economic loss, and (5) loss or proximate causation. *See generally In re Suprema*, 438 F.3d at 276. Because of its many deficiencies, any effort to amend yet again to restate the section 10(b) claims (or, as will be explained, any other claims) would be futile. Accordingly, the Court will dismiss Counts 7, 8, and 9 of SLF's Amended Complaint.

15

### 1.     Misrepresentation or Omission

For the actionable omission or material misrepresentation element, SLF alleges that Uniti representatives "touted the REIT and spinoff as a cutting-edge transaction that uniquely positioned Uniti as an industry thought leader." (Cmplt. ¶ 115)  SLF further points to representations that the Master Lease was "very favorable to Uniti" (*id.* ¶ 116), the "stability of Windstream as a customer would allow Uniti to pay an 'iron-clad' dividend over time" (*id.*), and "the stream of payments to come from Windstream during the initial 15-year term of the Master Lease was a particular strength of its business" (*id.*).  Moreover, SLF alleges that Uniti omitted from the Information Statement the risks of the Uniti-Windstream business structure.  (*Id.* ¶¶ 93-97)  To SLF, the general statements that Uniti would be dependent on Windstream Holdings to make payments under the Master Lease and events could materially and adversely affect Uniti's business (*id.* ¶¶ 98-99) were allegedly misleading because they failed to disclose the full spectrum of risk, including those identified by Skadden and E&Y (*id.* ¶¶ 85-89).

For several reasons, these statements and omissions are insufficient to state a claim.

Uniti had no duty to disclose the alleged, unmaterialized risks.  The undisclosed information identified by SLF consists of potential "risks" of future adverse legal rulings: for example, that the spinoff and Master Lease violated Windstream's debt indentures and that the Master Lease was not a "true lease." (*Id.* ¶ 128)  But SLF has failed to plead facts to support the contention that, at the time of the Southern Light transaction in July 2017, litigation was substantially certain. *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d at 377.  As part of the transaction, Windstream and Uniti agreed that the Master Lease was a "true lease." (D.I. 78 Ex. C at 33-34)  Windstream did not take a contrary position or contemplate such a claim (prior to filing its complaint in bankruptcy court).

16

Uniti's statements – which confirmed that Windstream retained ownership of certain assets after the spinoff (Cmplt. ¶ 95), that Uniti depended on Windstream (*id.* ¶ 98), and that Windstream should be able to meet its annual lease obligations for the foreseeable future (*id.* ¶ 100) – were not rendered misleading due to litigation that was not substantially certain to occur.[4]  Uniti had no duty to disclose a risk that had not "actually materialized" at the time of the allegedly misleading prior disclosure.  *Williams*, 869 F.3d at 243.

Uniti's statements describing the "iron-clad" nature of Uniti's dividend, and Windstream's "stable" lease payments, did not create a duty to disclose the known risks that threatened Windstream's viability.  (Cmplt. ¶ 116)  "[V]ague and general statements of optimism" constitute nonactionable "puffery."  *Burlington Coat Factory*, 114 F.3d at 1428 n.14; *see also Schwartz*, 175 F. Supp. 3d at 399 ("Generalized claims that the Individual Defendants 'tout[ed] impressive revenue figures and purported sales' d[id] not identify any specific statement or press release [and therefore were] not sufficiently specific to satisfy the particularity requirements of the PSLRA.").

That Uniti was "'extremely pleased with Windstream's performance' and acquisitions," had "a lot of confidence in Windstream," and viewed improvements in Windstream's financial

---

[4] In one paragraph of the Amended Complaint (Cmplt. ¶ 110), SLF alleges that Uniti failed to disclose in its SEC Regulation S-K, Item 303 ("S-K 303") that Windstream was potentially in default of the indenture's restrictive covenants as a result of the Master Lease.  S-K 303 requires a company to include in its SEC filings a discussion of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  *Oran*, 226 F.3d at 287 (citing 17 C.F.R. § 229.303(a)(3)(ii)).  SLF has not plausibly and sufficiently alleged that Defendants knew of or reasonably expected any trends or uncertainties that it had not already disclosed.  Moreover, "a violation of SK-303's reporting requirements does not automatically give rise to a material "omission under Rule 10b-5;" rather, a plaintiff must plead an actionable misrepresentation or omission under the specific standards applicable to Rule 10b-5.  *Oran*, 226 F.3d at 288.  SLF has failed to do so.

profile as "good news," are subjective opinions.  (Cmplt. ¶¶ 106-07)  Plaintiff has failed to plead facts from which it may plausibly be alleged that the Uniti defendants did not believe these opinions at the time they expressed them.  *See, e.g.*, *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) ("[A] sincere statement of pure opinion is not an 'untrue statement of material fact.'").

This case is unlike *In re Crown American Realty Trust Securities Litigation*, 1997 WL 599299, at *9 (W.D. Pa. Sept. 15, 1997), because there – unlike here – the plaintiff alleged that a particular dividend amount had been guaranteed.  SLF has not pled that Uniti failed to pay a dividend or missed a rent payment.  This case is also unlike *In re U.S. Interactive, Inc. Class Action Sec. Litig.*, 2002 WL 1971252, at *16-19 (E.D. Pa. Aug. 23, 2002), as there – unlike here – the statements at issue (e.g., boasting of high demand for the company's services) were alleged to have been known to the defendants to be misrepresentations (because, e.g., sales to large clients were declining).

SLF has failed to plead an actionable omission also because Defendants sufficiently disclosed the risks regarding the spinoff and REIT in their public filings.  (*See, e.g.*, D.I. 83 Ex. F (2017 Uniti 10-K) at 20 (Uniti stating "we cannot assure you of our ability to pay dividends in the future . . . .  Our ability to pay dividends may be adversely affected by a number of factors, including the risks factors herein"); *id.* at 13 (Uniti warning that "[t]he inability or unwillingness of Windstream Holdings to meet its rent obligations under the Master Lease could materially adversely affect our business, financial position or results of operations, including our ability to pay dividends to our stockholders as required to maintain our status as a REIT")[5]

---

[5] The buried facts doctrine does not save SLF's claim.  Under the "buried facts doctrine," a disclosure is deemed inadequate under securities law if it is presented in a way that conceals or obscures information sought to be disclosed.  *See Werner v. Werner*, 267 F.3d 288, 297 (3d Cir.

The spinoff documents, the Master Lease, the indentures, and Windstream's statements to regulators were all publicly available. (*See* D.I. 77 at 7 n.5; D.I. 78 Ex. C Ex. 10.1 (Master Lease); D.I. 78 Ex. B Ex. 4.1 (Windstream Services' debt indentures); D.I. 78 Ex. D Ex. 99.1 at 104 (March 2015 Information Statement))  The information disclosed in these materials identified the risks pertaining to the Master Lease, including that it "could be recharacterized as something other than a true lease."  (Cmplt. ¶ 70)  It also disclosed that Uniti's "copper wiring had a useful life of 7-40 years."  (*Id.* ¶ 78)  These disclosures put Uniti's shareholders and SLF on notice that the useful life of the copper assets could be shorter than the 15-year term of the Master Lease.  Having made these public disclosures, which SLF admits it reviewed (*Id.* ¶ 130), Defendants were not obligated to disclose the specific risks identified in the assessments of Skadden and E&Y.  *See Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 931 (3d Cir. 1992); *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (no duty to disclose "'soft information,' such as . . . predictions, or a belief as to the legality of the company's own actions" unless information is "virtually as certain as hard facts"); *Abbott Labs. v. Adelphia Supply USA*, 2017 WL 6014322, at *9 (E.D.N.Y. Aug. 14, 2017) (no duty to disclose legal opinion that sale of products was illegal, which, even "if accurate, was not certain at the time of sale").[6]

---

2001).  Here, Uniti explicitly disclosed, among other things, the risk that the Master Lease might "not [be] respected as a true lease."  (D.I. 78 Ex. D Ex. 99.1 at 23)  Moreover, another investor, Aurelius, discovered the allegedly undisclosed indenture breach based on the very same public filings to which SLF points.  (*See* Cmplt. ¶ 144)

[6] Plaintiffs filed a Notice of Subsequent Authority, drawing the Court's attention to *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701 (3d Cir. 2020).  (*See* D.I. 93; *see also* D.I. 94, 95)  *Jaroslawicz* does not help SLF.  Instead, it reaffirms that "[l]ater litigation or regulatory enforcement does not create a retroactive duty to disclose," supporting this Court's conclusion that Uniti owed no duty to disclose speculative future litigation risks.  962 F.3d at 716 & n.15.

SLF has further failed to allege facts supporting a claim of misrepresentation relating to the Southern Light Agreement. SLF alleges that Uniti Fiber falsely represented that it did not require any consent to enter into the Southern Light transaction (§ 4.3) and that the transaction would not violate any material agreements to which Uniti was a party (§ 4.4). (Cmplt. ¶¶ 29, 120-23, 181-84) SLF has not made allegations in this context that rise above the speculative level, particularly given that the terms of the Master Lease provide that Windstream's consent was not required for Uniti to enter into the Southern Light Transaction, which was structured as an asset purchase, and not a "merger" or "consolidation." (D.I. 78 Ex. C Ex. 10.1 § 18.2; *see also* Tr. at 13)[7]

This case is unlike *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *13 (S.D.N.Y. Dec. 2, 2013), in which the court denied a motion to dismiss a § 10(b) claim where a defendant was alleged to have failed to disclose a contract dispute with a major commercial partner. Although the contract dispute had not yet escalated to litigation at the time of the investor presentation at issue, the defendant's commercial partner had already asserted a breach of contract and had already tried to terminate the contract. *See id.* at *8. Further, the defendant "had publicly hyped the importance of its relationship" with the major partner, and emphasized the contribution of this investment toward the defendant's "long-term cash flow stability," even after the defendant had received a letter providing notice that the partner was terminating the pertinent agreement. *Id.* at *7, 14. Here, by contrast, during the Southern Light sale negotiations, the parties never discussed the risk that the Master Lease was not a "true lease."

---

[7] Plaintiff's allegation that the Southern Light transaction was a "consolidation" (Cmplt. ¶ 121) is a legal conclusion which the Court need not – and does not – credit. Instead, based on the documents the Court is permitted to consider, the Court understands the transaction to have been an asset purchase.

Instead, as already noted, up until the bankruptcy proceedings, Windstream had expressly represented that the Master Lease was a "true lease." (D.I. 78 Ex. C Ex. 10.1 § 6.1)

Similarly, in *Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *1-5 (E.D.N.Y. Mar. 30, 2012), a district court found that plaintiffs sufficiently pled an actionable material omission where the nutritional supplement supplier defendant did not disclose the prospect of losing its largest customer, Wal-Mart, at a time the defendant allegedly knew Wal-Mart was (for the first time in a decade) soliciting competitive bids from other suppliers and, therefore, the defendant knew it would have to lower its prices. SLF alleges nothing comparable as having actually been known to Defendants here at the time of the challenged statements and omissions. Instead, here, all that Defendants are alleged to have known were potential risks of future adverse legal rulings, i.e., the risks that the Master Lease would be viewed as a prohibited sale-leaseback and not a true lease. (Cmplt. ¶¶ 15, 128) The lawsuit between Aurelius and Windstream raising these issues, and Windstream's subsequent bankruptcy, came about two years after the April 2015 spinoff July. (*Id.* ¶¶ 138-65) That lawsuits were filed in 2017, two years after the spinoff and the allegedly materially false and misleading disclosures, does not show that litigation was substantially certain as of the date of the statements (October 2016). *See Williams*, 869 F.3d at 244 ("[A]llegations cannot rely exclusively on hindsight, but must be sufficient to show that the challenged statements were actionably unsound when made.").[8]

In sum, SLF has failed to adequately plead that Defendants made an actionable material omission or misrepresentation. For at least this reason, SLF's section 10(b) claims must be dismissed.

---

[8] Defendants had no obligation to preemptively admit that the Master Lease "violated the Indenture" or "was not a true lease" (*see, e.g.*, Cmplt. ¶¶ 94, 177), as the securities laws do not "require a company to accuse itself of wrongdoing," *In re Citigroup*, 330 F. Supp. 2d at 377.

## 2.     Scienter

The PSLRA requires a section 10(b) claim to be pled in a manner allowing for a plausible inference of scienter, which is a mental state embracing intent to deceive, manipulate, or defraud. *See Avaya, Inc.*, 564 F.3d at 252.  SLF has failed to meet this requirement.

SLF does not allege that Defendants knew that the spinoff and Master Lease constituted a violation of Windstream's indentures, or that Defendants had any intent to deceive SLF.  The Amended Complaint itself alleges that the 2015 spinoff and Master Lease agreement were structured by Windstream, with the advice of counsel, to ensure that the Master Lease would constitute a "true lease."  (Cmplt. ¶¶ 47, 58, 188)  SLF has not pled the type of "concrete and personal benefit" required to give rise to an inference of scienter.  *See Avaya*, 564 F.3d at 278.

SLF alleges that Defendants had "motive" and "economic incentives" "to hide the risks associated with the 2015 Uniti Spinoff and the Master Lease from investors like SLF."  (Cmplt. ¶¶ 224-25)  In particular, SLF contends that Windstream structured the spinoff and Master Lease in a way it knew could lead to bankruptcy, and that Uniti knowingly participated in that scheme. (D.I. 79 at 24-26)  It points to allegations that Windstream was in a "precarious financial position" with "little access to capital," that Windstream needed to upgrade its infrastructure, that it hoped spinning off certain assets into a REIT would "increase its financial flexibility, improve its tax flow and cash flow efficiency, and . . . attract outside investment," and that Windstream had seen its stock value decline between 2010 and 2012.  (Cmplt. ¶¶ 30-34)

The Third Circuit has rejected "motive and opportunity" allegations as "an independent means of establishing scienter."  *Avaya*, 564 F.3d at 276.  "Corporate officers always have an incentive to improve the lot of their companies[;] this is not, absent unusual circumstances, a motive to commit fraud."  *Id.* at 279.  Thus, "'catch-all allegations that defendants stood to

benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are [not] sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter.' . . . In addition, '[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud.'" *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 490 (D. Del. 2019) (quoting *GSC Partners*, 368 F.3d at 237).

In addition, SLF has pled only generic motives, not the type of "concrete and personal benefit" required to infer scienter. *Avaya*, 564 F.3d at 278. Moreover, Windstream's alleged motives cannot be imputed to Uniti, a separate corporate entity. *See Youngers v. Virtus Inv. Partners Inc.*, 2017 WL 5991800, at *5 (S.D.N.Y. Dec. 4, 2017) ("[A] parent-subsidiary relationship is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate. . . . Rather, a plaintiff must show that the parent or affiliate possessed some degree of control over, or awareness about, the fraud.") (internal citations and quotation marks omitted).

SLF further argues that in 2015, Mr. Gunderman "parlayed his role in structuring the spinoff into the CEO job at the new Uniti." (D.I. 79 at 26) Even taking this contention as true, it does not follow that Gunderman was motivated to mislead SLF two years later. *See generally Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("[A] plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold. . . . Such motive allegations . . . were common to all corporate executives, and, thus, too generalized to demonstrate scienter.").

SLF points to additional details in its Amended Complaint, but none of them demonstrates an adequate pleading of scienter.

23

Plaintiff cites to Skadden's opinion that, as structured, the Master Lease could be deemed a "sale-leaseback."  (Cmplt. ¶ 86) ("[T]he Spin-Off and Master Lease involve a contribution of property to [Uniti] by Windstream and a leaseback of those properties from [Uniti] to Windstream . . . that could be viewed as similar to a sale-leaseback arrangement.")  Nevertheless, as Plaintiff concedes, Windstream and Uniti "structur[ed] the 2015 Uniti Spinoff in a way *designed* to avoid the Indenture's restrictive covenants."  (*Id.* ¶ 188) (emphasis added)  Moreover, the Amended Complaint describes a November 2014 hearing with Kentucky regulators, during which a Windstream executive stated that "[a]s part of this transaction, [Windstream] ha[d] no concerns with any covenants within [its] indentures or [its] existing credit agreement."  (*Id.* ¶ 59)  Read as a whole, the Amended Complaint does not allege that Defendants believed, or had reason to believe (at any point prior to August 2017, upon hearing rumors that Aurelius was preparing a lawsuit), that the Master Lease violated Windstream's indentures.  Scienter is not, as it must be, a strong or compelling inference from SLF's allegations.  *See Avaya*, 564 F.3d at 273.

SLF's allegations based on Uniti's April 12, 2015 talking points fare no better.  The talking points suggest that in response to the question "[w]hy is the lease with WIN Holdings VS WIN Services?" Defendants should answer "corporate structure, tax, accounting, [and] debt," but do not suggest pointing out the sale and leaseback covenant.  (Cmplt. ¶ 111)  That the talking points did not mention the restrictive covenant does not suggest that the Windstream executive who prepared and circulated the presentation knew that the transactions violated Windstream's indentures or was in any way trying to hide the truth.

Nor do the allegations about what Defendants knew about the useful life of the copper wiring lead to a conclusion that scienter is adequately pled.  Uniti explicitly disclosed the risk

24

associated with the useful life of the leased copper assets, which it disclosed could be far lower than 40 years (even as low as seven years). (D.I. 71 Ex. D Ex. 99.1 at F-12; Cmplt. ¶ 78) Uniti's disclosure put its shareholders and SLF on notice that the useful life of the copper assets could be shorter than the Master Lease's initial 15-year term. And Windstream itself assured Uniti that the Master Lease was a "true lease." (D.I. 78 Ex. C Ex. 10.1 § 6.1) For these reasons, and contrary to the requirements of the law, SLF does not state allegations giving rise to "a strong inference" of scienter; that is, one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Avaya*, 564 F.3d at 273.

Thus, the Amended Complaint fails to plead scienter.

### 3. Reasonable Reliance

SLF has also failed to adequately allege that it "reasonably and justifiably relied on an alleged misrepresentation." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 174 (3d Cir. 2001), *as amended* (Oct. 16, 2001); *see also McCabe*, 494 F.3d at 425 ("A § 10(b) plaintiff must show . . . [it] entered the transaction at issue in reliance on the claimed misrepresentation or omission (transaction causation)."). The reliance element of a section 10(b) claim requires that the plaintiff relied on a defendant's conduct and was injured as a result, despite exercising reasonable diligence. *See AES Corp.*, 325 F.3d at 178.

SLF alleges that it accepted Uniti stock equivalents as partial consideration because it did not know that Uniti's representations were false. Had SLF known of the misrepresentations, it continues, SLF would not have executed the Purchase Agreement and accepted non-cash consideration. (Cmplt. ¶¶ 184-85) SLF's allegations are insufficient.

SLF has failed to allege facts supporting an inference that a fiduciary or other special relationship existed between the parties. *See AES Corp.*, 325 F.3d at 178-79. SLF had access to

25

Uniti's publicly available information, including Uniti's Form 10-K (Cmplt. ¶ 109), Uniti's Information Statement (*Id.* ¶ 93), and Uniti's Master Lease (D.I. 78 Ex. C). Moreover, SLF was a sophisticated business entity, represented by three different law firms during the course of a $700 million dollar transaction. (D.I. 29 at 27) SLF conducted its own "due diligence related to Uniti's stock to determine whether it was willing to accept Uniti market risk." (Cmplt. ¶ 130) Taking all these allegations as true, SLF has failed to allege that it did not have access to the relevant information and did not have ample opportunity to detect any purported fraud, rendering its reliance allegations deficient. *See AES Corp.*, 325 F.3d at 179.

Further supporting this conclusion is the fact that, in the Purchase Agreement, SLF expressly disclaimed any reliance on representations and warranties not contained in that Purchase Agreement. (D.I. 78 Ex. A (Section 4.11 of Purchase Agreement) at 35-56) The Purchase Agreement also includes a merger clause, providing that the Agreement "contain[s] the entire understanding of the parties" and "supersedes all prior agreements and understandings relating to the subject matter hereof and thereof." (D.I. 78 Ex. A § 12.3 at 72) Although these non-reliance clauses do not provide "immunity" to SLF's section 10(b) claim, they help establish – when considered in combination with the other factors discussed above – that SLF has failed to plausibly allege that, had it known the omitted facts, it would not have agreed to accept and enter into the transaction. *See AES Corp.*, 325 F.3d at 183.[9]

---

[9] It is not always possible to evaluate the sufficiency or plausibility of reliance allegations at the motion to dismiss stage. *See, e.g.*, *Universal Am. Corp. v. Partners Healthcare Solutions Holdings, L.P.*, 176 F. Supp. 3d 387, 397 (D. Del. 2016) (holding that certain "allegations, taken as true, are sufficient to plausibly suggest that [the plaintiff] entered the transaction . . . in reliance on the claimed misrepresentation[s] or omission[s]") (internal citation and quotation marks omitted); *Starr Investments Cayman II, Inc. v. China MediaExpress Holdings, Inc.*, 2014 WL 4180331, at *4 (D. Del. Aug. 21, 2014) (holding "whether that [alleged] reliance was reasonable is a factual question"). Here, for the reasons stated, the Court finds it appropriate to evaluate this required element of Plaintiff's claim at the pleadings stage. *See generally Fulton*

### 4.    Loss Causation

SLF alleges that Uniti's stock price fell after rumors surfaced that the spinoff and Master Lease violated the "sale-leaseback" covenant in Windstream's indentures.  (Cmplt. ¶ 138)  SLF alleges that the gradual drop in stock price from 2017 to 2019 resulted from the disclosures of Aurelius's short position in Uniti's equity, Aurelius's notice of default, the judicial decision in the Aurelius litigation, and the ensuing bankruptcy litigation.  (*Id.* ¶¶ 138-43, 152-55)  Moreover, SLF claims that Defendants failed to disclose the risk that the Master Lease was not a "true lease," which created negative pressure on Uniti's stock price.  (*See id.* ¶ 165)  These allegations do not amount to a plausible or sufficient pleading of loss causation.

With respect to the "sale-leaseback" claims, Defendants' disclosures did not reveal any new facts regarding the alleged omissions, and so could not have caused Plaintiff's losses associated with the decline in stock price.  *See McCabe*, 494 F.3d at 426.  Defendants' disclosures were not "a release of information that reveal[ed] to the market the pertinent truth that was previously concealed or obscured by the company's fraud . . . ."  *Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013); *see also FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1310 & 1311 n.28 (11th Cir. 2011) (a corrective disclosure "obviously must disclose new information," as "information already known by the market . . . will not cause a change in stock price"); *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 551-52 (S.D.N.Y. 2008) ("[T]he disclosed fact must be new to the market. . . .  A recharacterization of previously

*Bank*, 2011 WL 5386376, at *11 (finding on motion to dismiss that reliance was not adequately pled – in connection with state securities claim governed by Rule 10(b) standards – were case involved "a sophisticated plaintiff, with no longstanding business relationship with [defendant], [who] had at least minimal access to the relevant information"); *see also Blattman v. Siebel*, 2016 WL 1450946, at *3 (D. Del. Apr. 12, 2016) ("A nonreliance clause is only one factor district courts should consider when determining whether a plaintiff can establish the element of reasonable reliance.").

27

disclosed facts cannot qualify as a corrective disclosure.") (internal citations omitted), *aff'd*, 597

F.3d 501 (2d Cir. 2010).  The information that SLF contends caused Uniti's stock price to fall

was already known by the market.[10]  *See Meyer*, 710 F.3d at 1198 ("Because a corrective

disclosure obviously must disclose *new* information, the fact that the sources used in the . . .

Presentation were already public is fatal to the Investors' claim of loss causation.") (internal

citation and quotation marks omitted; emphasis in original).[11]

SLF also alleges that "market-moving" news relating to the risk that the Master Lease

was not a "true lease" caused Uniti's stock price to decline from $9.69 to $7.20 per share

between June 19, 2017 and November 15, 2019.  (D.I. 79 at 3; Cmplt. ¶ 165)  This allegation is

unavailing, for reasons including that, as the Court has already held, the structure of the

arrangements and the associated risks had been disclosed prior to the period to which SLF's

allegations are directed.  (*See supra* Part A.1)  Moreover, the Amended Complaint alleges that

much else was occurring at the same time, including that Aurelius was aggressively pursuing its

strategy of shorting Uniti's stock.  (*Id.* ¶ 20)  As in *Meyer*, the stock price decline may have

stemmed from a claimed default and an adverse judicial decision reflecting the negative views of

"an investor who wielded great clout in the industry."  710 F.3d at 1198-1200; *see also id.* at

1201 ("To be sure, stock prices may fall upon the announcement of an SEC investigation, but

that is because the investigation can be seen to portend an added risk of future corrective action.

That does not mean that the investigations, in and of themselves, reveal to the market that a

---

[10] Aurelius's suit claiming default was based on publicly available SEC filings.

[11] *See also In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261 (3d Cir. 2005) (in addressing materiality, finding that plaintiff could not state § 10(b) claim based on stock price drop following *Wall Street Journal* article that simply analyzed information that was previously public).

company's previous statements were false or fraudulent."). The Court agrees with Defendants that these other events disrupt the "chain of causation" necessary for SLF to plead loss causation as required under section 10(b). *Gold v. Ford Motor Co.*, 852 F. Supp. 2d 535, 542 (D. Del. 2012).

* * *

Accordingly, again, the Court will dismiss SLF's section 10(b) claims against Uniti Group, Uniti Fiber, and Gunderman (Counts 7, 8, and 9).

### B.    ASA Claims Against Uniti Group, Uniti Fiber, And Gunderman

Defendants contend that because the alleged misrepresentations are not actionable under section 10(b) of the Exchange Act, SLF also fails to state a claim under Alabama's securities laws. The Court agrees and will dismiss the ASA claims. SLF's allegations of materially misleading statements and omissions relating to the spinoff and Master Lease fail for all the same reasons already given in connection with SLF's section 10(b) claims. (*See supra* Part A.1)[12]

The Alabama Supreme Court has explained that Alabama § 8-6-17 "is identical 'in all respects' . . . to Rule 10b-5 of the Securities and Exchange Commission." *Buffo v. State*, 415 So. 2d 1158, 1161-62 (Ala. 1982) (quoting *Manson v. State*, 349 So. 2d 67, 73 (Ala. Cr. App. 1977)); *see also Dekle v. Glob. Digital Sols., Inc.,* 2015 WL 5734451, at *3 n.9 (S.D. Ala. Sept. 30, 2015) ("[T]he Alabama Securities Act . . . has generally been construed by reference to its

---

[12] To briefly summarize, Uniti publicly disclosed the Master Lease and Windstream publicly disclosed its indentures, that SLF admittedly reviewed. (D.I. 78 Ex. C Ex. 10.1; D.I. 78 Ex. B Ex. 4.1; Cmplt. ¶ 130) Uniti also warned in its 10-K that "[t]he inability or unwillingness of Windstream Holdings to meet its rent obligations under the Master Lease could materially adversely affect our business, financial position or results of operations, including our ability to pay dividends to our stockholders as required to maintain our status as a REIT." (D.I. 83 Ex. F (2017 Uniti 10-K) at 13)

federal counterpart in all relevant respects."). In applying Section 8-6-19(a) (which sets out remedies for violations of Section 8-6-17), the Alabama Supreme Court has explicitly relied on the same standard for materially misleading statements or omissions as applies under section 10(b) of the Exchange Act. *See Blackmon v. Nexity Fin. Corp.*, 953 So. 2d 1180, 1191 (Ala. 2006); *see also Halbert v. Credit Suisse AG*, 402 F. Supp. 3d 1288, 1321 (N.D. Ala. 2019) (same).

SLF has also failed to plead a duty to disclose and reliance, which are required elements under Section 8-6-17(a), just as they are for section 10(b) claims. *See Buffo*, 415 So. 2d at 1162 ("[F]ederal cases should be reviewed to aid in the proper interpretation of the corresponding sections of Alabama statutory law inasmuch as the sections are virtually identical."). On these elements, too, then, SLF's ASA claims fail for the same reasons its section 10(b) claims fail. (*See supra* Part A.1 and 3)[13]

Thus, the same deficiencies the Court identified with respect to these required elements of SLF's section 10(b) claims (*see supra* Part A) also render SLF's ASA Section 8-6-17 claims deficient. In any event (and even if Plaintiff were correct that its ASA claims do not require pleading scienter or loss causation, *see* D.I. 79 at 29), SLF has also (as already noted) failed to adequately and plausibly plead materially misleading statements and omissions with sufficient specificity, which is indisputably a required element of SLF's ASA Section 8-6-17 claims.

Accordingly, the Court will dismiss the ASA claims set out in Counts 3, 4, and 5.

---

[13] Given the deficiencies already identified with Plaintiff's ASA Section 8-6-17 claims, it is not necessary to address Defendants' contention that these claims fail also because Plaintiff seeks a remedy (damages) not available to it (which is limited to rescission or return of consideration upon tender of the security). (*See, e.g.*, Tr. at 63; *see also* Cmplt. ¶¶ 200, 207, 214)

**C.** **Fraud In The Inducement Against Uniti Group, Uniti Fiber, And Gunderman**

SLF's failure to plead a misstatement or actionable omission under section 10(b) leads the Court to further conclude that SLF's common law fraudulent inducement claims must also be dismissed. *See McGriff*, 127 F.3d at 1414 ("Under Alabama law, to prevail on a fraudulent inducement claim, [Plaintiff] must prove . . . [Defendant] made a false representation of material fact. . . ."). The Court need not address whether these claims also suffer from other pleading deficiencies.[14]

**D.** **Conspiracy Against Uniti Group, Uniti Fiber, Gunderman, And Fletcher**

SLF alleges that "Windstream and Uniti combined to defraud SLF by misleading regulators and structuring the 2015 Uniti Spinoff in a way designed to avoid the Indenture's restrictive covenants, encouraging SLF to invest in Uniti, and failing to disclose material facts." (Cmplt. ¶ 188) SLF further alleges that Fletcher engaged in a conspiracy related to the fraud allegedly perpetrated by Defendants Uniti, Uniti Fiber, and Gunderman at the time of the Southern Light transaction in 2017. (*Id.* ¶¶ 131, 137) Fletcher was General Counsel of both Windstream and Uniti during negotiations. (*Id.* ¶ 39) Because SLF has failed to plead a valid fraud claim, SLF has also plausibly alleged a common law conspiracy claim (under Alabama or Delaware law). *See Haynes v. Metro. Life Ins. Co.*, 94 F. App'x 956, 959 (3d Cir. 2004) ("'[A] conspiracy claim must fail if the underlying act itself would not support an action.'") (quoting *Triple J Cattle, Inc. v. Chambers*, 621 So. 2d 1221, 1225 (Ala. 1993)).

---

[14] The parties contest whether Alabama or Delaware law applies to Plaintiff's common law fraud and conspiracy claims. Given the Court's other conclusions, it is unnecessary to resolve this dispute.

The Amended Complaint also fails to adequately allege that Defendants engaged in concerted action with Windstream for an unlawful purpose. Plaintiff alleges that "for years before 2012," Gunderman, Fletcher, and Windstream "discussed the concept of spinning Windstream's fiber and copper network into a REIT" in order to, among other things, "attract outside investment" (Cmplt. ¶ 33); Gunderman and others discussed ways to try to avoid the Indenture's sale-leaseback restriction (*id.* ¶¶ 47-48); and the Uniti Defendants hid the spinoff's risks by not talking about why the spinoff had been structured as it was (*id.* ¶ 65; *see also id.* ¶¶ 111-12). These allegations do not plausibly allege that anyone conspired to "hide" the spinoff's risks in 2014 and 2015 or to defraud SLF years later, in 2017. Defendants' structuring of the spinoff to "attract outside investment" is not a plausible allegation of concerted action to achieve an unlawful purpose. In short, Plaintiff's Amended Complaint fails to allege specific facts showing how Gunderman, Fletcher, Uniti, and Windstream conspired to hide risks and purposefully mislead investors.

Accordingly, the Court will dismiss the conspiracy claim (Count 2).

### E. Control Person Claims Against Gunderman And Fletcher

Plaintiff pleads control person claims arise under 15 U.S.C. § 78t(a) and ASA § 8-6-19(c). The ASA statute further provides for aiding and abetting liability. Because Plaintiff has failed to sufficiently plead a primary securities claim under either the Exchange Act or the ASA, its secondary liability claims likewise fail. *See In re Suprema*, 438 F.3d at 285 (holding that "[i]f no controlled person is liable, there can be no controlling person liability"). Accordingly, the Court will dismiss Counts 6 and 10.

### F. Declaratory Judgment Against Uniti Group

SLF's declaratory judgment claim for indemnification alleges that Uniti breached the contractual representation and warranty in the Purchase Agreement that it would file a post-

closing Prospectus supplement that was free from material misstatements.  (Cmplt. ¶¶ 251-58)  It

contends that Uniti is required to indemnify SLF based on the Uniti Prospectus' untrue or

misleading statements or omissions.  (*Id.* ¶ 134) (quoting § 5.23 of the Purchase Agreement)

This claim fails because, as Defendants point out, it is based on the same alleged

misrepresentations and omissions addressed already found to be deficient as bases for Plaintiff's

alleged Exchange Act and Alabama Securities Act claims.[15]  Accordingly, the declaratory

judgment claim (Count 11) will be dismissed.

### G.        Amendment

SLF requests that, if the Court is inclined to dismiss any of the claims of the Amended

Complaint, it be provided an opportunity to, yet again, amend its claims.  (*See, e.g.*, Tr. at 43-47)

The Court will deny this request.  Given the Court's conclusions set our throughout this Opinion,

Plaintiff's proposed amendment would be futile.  Amending to allege more about whether the

Master Lease would meet the requirements of a "true lease" and that the Windstream bankruptcy

has now been settled with a payment of $1.2 billion in cash and other consideration from Uniti to

Windstream would not result in claims that would survive a motion to dismiss.  *See Prof'l*

*Cleaning & Innovative Bldg. Servs. v. Kennedy Funding, Inc.*, 245 F. App'x. 161, 165 (3d Cir.

2007) (holding that although "[l]iberality is the keystone of Rule 15(a), . . . [f]utility is [a] basis

for denying a motion to amend").  No amendment can change the historical facts about, for

example, what Defendants disclosed to the market.  Additionally, SLF has already had two

opportunities to plead its claims (including once after seeing Defendants' motion to dismiss), and

it would be unfairly prejudicial to permit it yet another chance to do so.  *See Mullin v. Balicki*,

---

[15] Section 5.23 of the Purchase Agreement provides for indemnification only if, among other
things, there is a violation of the Exchange Act, any state securities law, or of any rule
promulgated thereunder.  (*See* D.I. 78 Ex. A)

875 F.3d 140, 149 (3d Cir. 2017) (holding that denial of leave to amend can be based on repeated failure to cure deficiencies and prejudice to opposing party).

## V. CONCLUSION

For the foregoing reasons, the Court will grant the Uniti Defendants' motion to dismiss, as well as Fletcher's motion to dismiss, in full. All claims in the Amended Complaint will be dismissed with prejudice. An appropriate order follows.