UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**In re UNITI GROUP, INC.**
**SECURITIES LITIGATION**

**MASTER FILE NO. 4:19-CV-00756-BSM**

### ORDER

Defendants' motion to dismiss [Doc. No. 63] is denied.

### I. BACKGROUND

This is a securities class action. Plaintiffs purchased or acquired Uniti's publicly-traded securities during the April 24, 2015 – June 24, 2019 class period. Plaintiffs allege violations of the Securities and Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission Rule 10-b. The facts, as alleged in the complaint, are as follows.

Windstream Holdings is a telecommunications provider that owns wireless telecommunications networks. Am. Compl. ¶ 3, Doc. No. 62. In 2013, Windstream's advisors consulted with Kenny Gunderman, a financial advisor at Stephens, Inc., about how to come up with cash needed for an investment. Gunderman and the advisors devised the following "spin-off" transaction proposal: Windstream Holdings would create a real estate investment trust ("REIT," eventually defendant Uniti), sell the REIT its telecommunications assets, and then lease them back—allowing Windstream to still use and operate those assets, with the benefit of receiving significant cash. *Id*. ¶ 6. Windstream, however, had an indenture that governed unsecured notes ("the indenture"). It prohibited Windstream

Services or its subsidiaries from selling network assets to an entity and then leasing them back. *Id.* ¶ 8. If the indenture was breached, note holders could seek to accelerate payment on the notes, potentially triggering bankruptcy.

Internal emails, documents, and board minutes indicate that Windstream knew that it had to obtain approvals from certain regulatory agencies, as well as ensure that the Master Lease it entered into with Uniti appeared to be a "true lease" and not disguised financing. *Id.* ¶ 9. Windstream Services Executives created Windstream Holdings, a holding company, which would be the entity to technically "lease" the spun-off telecommunications assets from Uniti. *Id.* ¶¶ 11–14. The Master Lease, structured with the indenture's restrictions in mind, was not negotiated at arms-length. *Id.* ¶ 13. Upon the Master Lease's April 24, 2015 signing, Windstream became Uniti's largest customer. *Id.* ¶ 14. Several parties, including defendants Gunderman and Fletcher, operated on both sides of the transaction. *Id.* ¶ 13.

Windstream's and Uniti's Management adopted a public relations strategy to conceal the known risk that the spin-off violated the indenture. *Id.* ¶¶ 15, 16. Internal documents show that Gunderman and Wallace were advised to "hide the truth if ever asked why Windstream Holdings – rather than Windstream Services – signed the Master Lease." *Id.*

When Windstream eliminated its dividends in August 2017, a series of disclosures exposed the spin-off information. *Id.* ¶ 18. On September 25, 2017 Windstream filed an 8-K report disclosing that it had received a "purported notice of default" from a noteholder, Aurelius Capital, "alleging that the transfer of certain assets and the subsequent lease of those

assets in connection with the spin-off" violated the indenture. *Id.* Litigation with Aurelius followed. *Id*. ¶ 20. Between August 3, 2017 and September 27, 2019, Uniti's stock price fell 40%. At an investor conference, Uniti executive Gunderman said of a Windstream default: "We've looked very, very closely at the legal claim, and we're very confident that the legal arguments are on Windstream's side. So [we] think that that's going to resolve itself." *Id*. ¶ 21.

In February 2019, however, a federal court ruled in the Aurelius litigation that the spin-off and Master Lease violated the indenture, and entered a $300 million judgment. *Id*. ¶ 24. Uniti's stock price plummeted. *Id*. ¶ 25. Windstream Holdings filed for bankruptcy. *Id*. ¶ 26. Since then, Uniti executives have publicly stated that Uniti was seeing no impact on business due to Windstream's bankruptcy. *Id*. ¶ 29. On June 24, 2019, after the market closed, Uniti announced a $300 million notes offering, and its stock price declined more than 10% the following day. *Id*. ¶ 30.

## II. LEGAL STANDARD

Rule 12(b)(6) permits dismissal when a plaintiff fails to state a claim upon which relief may be granted. To meet the 12(b)(6) standard, a complaint must allege sufficient facts to entitle the plaintiff to the relief sought. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The Private Securities Litigation Reform Act ("PLSRA") places heightened pleading requirements on securities actions in order to prevent "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers."

*See Horizon Asset Mgmt. Inc., v. H&R Block, Inc.*, 580 F.3d 755, 761 (8th Cir. 2009).

### III. DISCUSSION

A.     False Statement Liability: §10(b) of the 1934 Act and Rule 10b-5(b)

Defendants' motion to dismiss is denied on plaintiffs' false statement liability claims under §10(b)-5(b) because they have sufficiently pleaded misrepresentation, scienter, and loss causation.

To succeed on a false statement liability claim, a plaintiff must allege "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." *Horizon Asset Mgmt. Inc.*, 580 F.3d at 760 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)). Defendants move to dismiss based on the misrepresentation, scienter, and loss causation elements. *See* Reply Br. Mot. Dismiss at 3, 15, 28, Doc. No. 68. Each is discussed below.

*1. Material Misrepresentation or Omission*

Plaintiffs have sufficiently alleged material misrepresentations because they have pleaded that defendants failed to disclose the prohibited structure of the spin-off transaction and Master Lease.

Defendants argue that plaintiffs do not allege an actionable misrepresentation or omission. Reply Br. Mot. Dismiss at 3. They argue that plaintiffs' theory is that defendants

failed to disclose the "risks" that (1) the spin-off and Master Lease violated the indenture, and (2) that the Master Lease was really a disguised financing arrangement. Br. Mot. Dismiss at 15, Doc. No. 64. Defendants contend that silence as to risk is inactionable "soft information." They argue that, per *Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820 (8th Cir. 2003), "there is no duty to disclose . . . a belief as to the legality of the company's own actions." Br. Mot. Dismiss at 16. Defendants state that the argument based on risk would not be adjudicated until years after the statements were allegedly made, and defendants only had an obligation to disclose "hard facts" *Id*. at 17.

Defendants also argue that plaintiffs' allegations of "affirmatively false statements" fail under the PLSRA's safe harbor because the statements were forward-looking. Br. Mot. Dismiss at 23. PLSRA's safe harbor protects against liability for forward-looking statements, accompanied by cautionary language. *See* 15 U.S.C. § 78u–5(c)(1). Defendants argue that their disclosure that Uniti believed it had "the ability to navigate the Windstream bankruptcy proceedings without having to raise external capital" reflected their earnest position at the time it was made. *See* Br. Mot. Dismiss at 23; *see* Am. Compl. ¶¶ 214, 217.

Plaintiffs respond that they have not pleaded "soft information" because they do not allege that defendants failed to predict future litigation. Resp. Mot. Dismiss at 24, Doc. No. 66. Rather, plaintiffs argue, they have alleged that defendants failed to disclose that the structure of the spin-off transaction violated the indenture from the inception. *Id*. Moreover, plaintiffs allege that defendants affirmatively represented in SEC filings that the spin-off and

5

Master Lease did not violate the indenture. *See* Am. Compl. ¶¶ 99, 150. While defendants did not have a duty to "publicly opine" on the legality of their actions, *see Kushner*, they had the duty to disclose what their actions were. *See* Resp. Mot. Dismiss at 27.

Plaintiffs also argue that the PLSRA's safe harbor is inapplicable because defendants' statement actually was: "[A]s a result of several other steps we're taking, we believe we *now* have the ability to navigate the Windstream bankruptcy proceedings without having to raise external capital." Am. Compl. ¶ 214 (emphasis added). This statement, plaintiffs argue, is not forward-looking, since defendants' belief that they "now" would not have to raise external capital was a statement about a then-fact. Resp. Mot Dismiss at 35, Doc. No. 66. Because defendants' statement concerned the belief they held at the time the statement was made, the PLSRA safe harbor does not apply. *See In re CenturyLink Sales Practices & Sec. Litig.*, 403 F. Supp. 3d 712, 729 (D. Minn. 2019).

## 2. Scienter

Plaintiffs have sufficiently pleaded scienter because at this stage, competing inferences are drawn in plaintiffs' favor.

Defendants argue that plaintiffs fail to plead scienter for several reasons. Br. Mot. Dismiss at 25–27. They argue that plaintiffs' allegations do not meet PLSRA pleading requirements because plaintiffs merely state "generalized allegations of corporate profit motive" and do not allege particularized facts. Br. Mot. Dismiss at 27. Plaintiffs allege that if it were publicly disclosed that Windstream violated the Indenture, causing a default, "the

6

Case 4:19-cv-00756-BSM   Document 74   Filed 03/31/21   Page 7 of 10

value of Uniti securities would crater." Am. Compl. ¶ 240. Defendants argue that corporations universally want to appear profitable, and generalized allegations like this do not support scienter. Defendants also argue that plaintiffs do not claim that defendants sought to profit on alleged fraud by selling Uniti stock, which undermines an inference of scienter. *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881 (8th Cir. 2002). Defendants argue that plaintiffs do not allege facts giving rise to a "strong inference" that defendants either intended to defraud investors or were severely reckless, Br. Mot Dismiss at 28–34. *See Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008).

Plaintiffs respond that they have pleaded facts that give rise to a strong inference of scienter. Resp. Mot. Dismiss at 38. Plaintiffs argue that defendants had information indicating that their public statements were materially misleading. This is because defendants were "intimately involved" in conceiving and negotiating the spin-off and master lease. *Id*. at 41; Am. Compl. ¶¶104–110. Plaintiffs point to an April 2013 email, which indicates that Windstream and defendants specifically structured the spin-off transaction in order to evade the restrictions of the indenture. Resp. Mot. Dismiss at 41; Am. Compl. ¶¶ 75–76.

Defendants argue the opposite, which is that the April 2013 email indicates they believed the spin-off transaction complied with the indenture. To the extent that defendants have created a competing inference at this stage, however, plaintiffs' claims survive. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

### *3. Loss Causation*

Plaintiffs have sufficiently pleaded loss causation because they have alleged that defendants could have foreseen their economic loss, and plaintiffs actually suffered economic loss.

Defendants argue that plaintiffs fail to plead the loss causation element of a §10(b) claim. Plaintiffs seek to establish loss causation by identifying a "corrective disclosure." A corrective disclosure is a public disclosure of improperly withheld information that caused defendants' stock price to decline, thereby injuring investors who purchased before the corrective disclosure. Br. Mot. Dismiss at 35. Defendants argue, however, that plaintiffs do not include "a single allegation that Uniti's stock price dropped when [] allegedly concealed information was revealed to the market." Br. Mot. Dismiss at 35. Corrective disclosures present entirely new information to the market, and defendants argue that the disclosures plaintiffs identify pertain to information that the public already had. *Id.* at 36; *see Rand-Heart of New York, Inc. v. Dolan*, 812 F.3d 1172, 1179 (8th Cir. 2016).

Plaintiffs correctly respond that they have sufficiently pleaded loss causation and that they do not only rely on a "corrective disclosure" theory. Resp. Mot. Dismiss at 51. Plaintiffs point out that they have explicitly pleaded a "materialization of the risk" theory of loss causation. *Id.* at 52. Under this theory, plaintiffs plead that the "loss was foreseeable and caused by the materialization of the concealed risk." *Id.* (citing *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008)). This is true because plaintiffs allege

8

known risks that defendants concealed, and "when those risks materialized," plaintiffs suffered a loss. Am. Compl. ¶¶ 241–266.

B. Scheme Liability §10(b) of the Exchange Act and Rule 10b-5(a) and (c)

Defendants' motion to dismiss plaintiffs' scheme liability claim is denied because plaintiffs have sufficiently pleaded defendants' conduct beyond misrepresentations and omissions.

To succeed on a scheme liability claim, plaintiffs must show that: defendants committed a deceptive act with scienter; that the act was in connection with the purchase or sale of securities; and that defendants' actions caused plaintiffs' injuries. *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 389 (8th Cir. 2016).

Defendants argue that the spin-off was "effectuated by Windstream" and "not Defendants," so plaintiffs' scheme liability claim fails. Br. Mot. Dismiss at 40. Plaintiffs respond that they have explicitly pleaded defendants' conduct beyond misrepresentations and omissions. Resp. Mot. Dismiss at 59–62. Defendants do not contest that "the involved Windstream executives were simultaneously Uniti executives" when the spin-off was conceived, through the regulatory approval process, and during negotiations. *Id*. at 61; *see* Am. Compl. ¶¶ 103–108. Plaintiffs allege that Uniti and Gunderman worked to obtain the necessary approvals from state regulators for the spin-off. Resp. Mot. Dismiss at 59; Am. Compl. ¶¶ 88–90. Plaintiffs allege that defendants negotiated and finalized the Master Lease and back-filled financial terms in the Master Lease. Am. Compl. ¶ 232. Plaintiffs argue that

9

while defendants' actions may have resulted in public misstatements, their conduct with respect to the spin-off and Master Lease "amounts to more than making a false statement." Resp. Mot. Dismiss at 62 (citing *S.E.C. v. Langford*, No. 8:12-CV-344, 2013 WL 1943484 (D. Neb. May 9, 2013)).

    C.    <u>Control-Person Liability §20(a) of 1934 Act</u>

Defendants' motion to dismiss plaintiffs' control-person liability claims is denied because plaintiffs have sufficiently pleaded their false statement and scheme liability claims.

Plaintiffs allege control-person liability under §20(a) against Gunderman and Wallace. Am. Compl. ¶¶ 300–303. The purpose of the control-person statute, 15 U.S.C. § 78t(a), is to "prevent people and entities from using . . . agents acting on their behalf fo accomplish ends that would be forbidden directly by securities laws." *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010) (quoting *Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 721 (11th Cir. 2008) (per curiam)). Defendants argue that plaintiffs' control-person liability claims fail because plaintiffs have failed to allege underlying securities laws violations. Mot. Dismiss at 41. As explained in the above sections, plaintiffs have sufficiently pleaded their underlying claims, so defendants' motion is denied.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss [Doc. No. 63] is denied.

IT IS SO ORDERED this 31st day of March, 2021.

                                                    _____
                                                    UNITED STATES DISTRICT JUDGE