# EXHIBIT A

**No. 20-3427**

In the
# United States Court of Appeals
## for the Third Circuit

---

**SLF HOLDINGS, LLC,**

*Plaintiff-Appellant,*

**v.**

**UNITI FIBER HOLDINGS, INC; UNITI GROUP INC.; KENNETH GUNDERMAN; JOHN P. FLETCHER,**

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Delaware
Case No. 1:19-cv-01813

---

**BRIEF OF APPELLANT**

---

Edward S. Sledge IV
Matthew H. Lembke
Scott Burnett Smith
BRADLEY ARANT BOULT CUMMINGS LLP
1819 5th Avenue North
Birmingham, AL 35203
esledge@bradley.com
mlembke@bradley.com
ssmith@bradley.com

*Counsel for Plaintiff-Appellant*

## DISCLOSURE STATEMENT

Plaintiff-Appellant SLF Holdings, LLC has no parent corporation, and no publicly held corporation owns 10% or more of its stock. No publicly owned corporation that is not a party to this appeal has a financial interest in the outcome of this litigation.

# TABLE OF CONTENTS

Disclosure Statement................................................................................. ii

Table of Contents ...................................................................................... iii

Table of Authorities ................................................................................. vi

Introduction.................................................................................................1

Jurisdictional Statement .............................................................................1

Statement of the Issues................................................................................2

Statement of Related Cases and Proceedings ............................................3

Statement of the Case..................................................................................3

I. In lieu of $65 million cash, SLF accepted private partnership interests. ........5

II. Uniti made four fraudulent statements to SLF that convinced SLF to take equity instead of cash. ..............................................................6

III. The truth behind Uniti's four statements to SLF.............................8

    A. Uniti was not a properly constituted REIT. ...........................8

    B. Uniti did not have a dependable long-term lease with a stable lessee................................................................................10

    C. Uniti's dividend was not "iron-clad." ..................................12

    D. Uniti did not have Windstream's consent to acquire SLF. .................12

IV. Uniti's false statements and material omissions caused SLF to accept private partnership interests in lieu of $65 million cash. .............................13

V. Uniti's diminution in value after the truth came out. ...................13

VI. SLF sues Uniti in federal court in Alabama. ................................14

VII. The District Court's ruling. .........................................................15

Summary of the Argument........................................................................16

Argument...................................................................................................18

I.      The District Court erred in dismissing SLF's claim for fraudulent inducement under Alabama law. ...................................................18

        A.      Standard of review......................................................................19

        B.      SLF plausibly alleged a claim for fraudulent inducement by suppression under Alabama law........................................................21

                1.      SLF alleged a duty to disclose. ................................................22

                2.      The District Court erred in concluding that SLF did not allege an actionable omission under Alabama law....................27

            a.      SLF has not challenged "litigation risks.".............................27
            b.      SLF has not alleged "fraud by hindsight." .............................30
            c.      SLF has not challenged mere "puffery.".................................33
            d.      SLF has not challenged mere statements of opinion.........................35
                3.      SLF alleged that Uniti concealed material facts. .......................37

            a.      Uniti concealed the flaws beneath the REIT.........................37
            b.      Uniti concealed that Windstream was not stable. ...............38
            c.      Uniti concealed that its dividend was not "iron-clad." .......................40
                4.      SLF alleged inducement. .........................................................41

                5.      SLF alleged that its reliance was reasonable. ...........................41

        C.      SLF plausibly alleged a claim for fraudulent inducement by misrepresentation under Alabama law................................................43

II.     The District Court erred in dismissing the Alabama Securities Act claims..................................................................................................45

        A.      Standard of review......................................................................45

        B.      The District Court erred in applying federal securities concepts to SLF's Alabama Securities Act claims. ..........................................45

                1.      The Alabama Securities Act is a strict liability statute.............45

                2.      The heightened pleading requirements of the PSLRA do not apply to SLF's Alabama Securities Act claims..................47

iv

3.  The District Court's federal law analysis does not apply to SLF's Alabama Securities Act claims. ....................................48

III.  The District Court erred in dismissing SLF's civil conspiracy and declaratory judgment claims...................................................49

    A.  Standard of review.........................................................49

    B.  SLF plausibly alleged that Kenneth Gunderman, John Fletcher, and Uniti conspired to defraud SLF. ...................................49

    C.  SLF plausibly alleged a claim for declaratory judgment. ...................52

Conclusion ....................................................................................54

Certificate of Compliance ...............................................................56

Certificate of Bar Admission ..........................................................57

Electronic Document Certificate......................................................58

Certificate of Service ......................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ala. River Grp., Inc. v. Conecuh Timber, Inc.*,
261 So. 3d 226 (Ala. 2017)......................................................................23, 25, 30

*Ex parte Alamo Title Co.*,
128 So. 3d 700 (Ala. 2013).......................................................................................49

*Aliant Bank v. Four Star Invs., Inc.*,
244 So. 3d 896 (Ala. 2017)...............................................................................23, 51

*In re Allergan ERISA Litig.*,
975 F.3d 348 (3d Cir. 2020) ...................................................................................49

*AmerUs Life Ins. Co. v. Smith*,
5 So. 3d 1200 (Ala. 2008).........................................................................................43

*AT & T Info. Sys., Inc. v. Cobb Pontiac-Cadillac, Inc.*,
553 So. 2d 529 (Ala. 1989).......................................................................................41

*Banton v. Hackney*,
557 So. 2d 807 (Ala. 1989)...............................................................................46, 47

*In re Bennitt*,
348 B.R. 820 (Bankr. N.D. Ala. 2006).................................................................42

*United States ex rel. Bookwalter v. UPMC*,
946 F.3d 162 (3d Cir. 2019) ...................................................................................20

*Bruni v. City of Pittsburgh*,
824 F.3d 353 (3d Cir. 2016) ...................................................................................19

*In re Burlington Coat Factory Sec. Litig*,
114 F.3d 1410 (3d Cir. 1997) .................................................................................33

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004) ........................................................28, 29, 30

*CNH Am., LLC v. Ligon Capital, LLC*,
160 So. 3d 1195 (Ala. 2013)...........................................................21, 22, 23, 28

*Cooper & Co. v. Lester*,
832 So. 2d 628 (Ala. 2000)........................................................................35

*Core Const. & Remediation, Inc. v. Vill. of Spring Valley, NY*,
2007 WL 2844870 (E.D. Pa. Sept. 27, 2007).........................................53

*Davis v. Sterne, Agee & Leach, Inc.*,
965 So. 2d 1076 (Ala. 2007).................................................................22, 43

*Ex parte Day*,
584 So. 2d 493 (Ala. 1991)........................................................................45

*DeGennaro v. Am. Bankers Ins. Co. of Fla.*,
737 F. App'x 631 (3d Cir. 2018) ..............................................................20

*DGB, LLC v. Hinds*,
55 So. 3d 218 (Ala. 2010)..........................................................................51

*Dorsey v. Portfolio Equities, Inc.*,
540 F.3d 333 (5th Cir. 2008) .......................................................20, 35, 47

*Dunn v. Borta*,
369 F.3d 421 (4th Cir. 2004) ....................................................................48

*Eidson v. Olin Corp.*,
527 So. 2d 1283 (Ala. 1988)......................................................................52

*Envtl. Sys., Inc. v. Rexham Corp.*,
624 So. 2d 1379 (Ala. 1993)......................................................................42

*Ex parte ERA Marie McConnell Realty, Inc.*,
774 So. 2d 588 (Ala. 2000)........................................................................42

*Farmers Ins. Exch. v. Morris*,
228 So. 3d 971 (Ala. 2016).................................................................40, 42

*Fed. Sav. & Loan Ins. Corp. v. Haralson*,
813 F.2d 370 (11th Cir. 1987) ..................................................................39

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) ....................................................29

*Glatthorn v. Ind. Blue Cross*,
34 F. App'x 420 (3d Cir. 2002) ................................................................45

*Grippo v. Perazzo*,
  357 F.3d 1218 (11th Cir. 2004) ...................................................................47

*Halbert v. Credit Suisse AG*,
  402 F. Supp. 3d 1288 (N.D. Ala. 2019)......................................................46

*In re Harbor City Capital*,
  2020 WL 3629612 (Ala. Sec. Comm'n June 25, 2020) ..........................46, 48

*Heilbrunn v. Sun Chem. Corp.*,
  150 A.2d 755 (Del. 1959) ...........................................................................44

*Huckleberry v. M.C. Dixon Lumber Co.*,
  503 So. 2d 1209 (Ala. 1987)........................................................................52

*Hudson's Bay Co. Luxembourg, S.A.R.L. v. JZ LLC*,
  2011 WL 3082339 (Del. Super. July 26, 2011)...........................................53

*Hughes v. Hertz Corp.*,
  670 So. 2d 882 (Ala. 1995)..........................................................................33

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d. Cir. 2010) .......................................................................21

*Intercorp, Inc. v. Pennzoil Co.*,
  877 F.2d 1524 (11th Cir. 1989) ...................................................................22

*Interim Healthcare, Inc. v. Spherion Corp.*,
  884 A.2d 513 (Del. Super. 2005)..................................................................53

*Keith v. Witt Auto Sales, Inc.*,
  578 So. 2d 1269 (Ala. 1991)........................................................................50

*Klotz v. Celentano Stadtmauer & Walentowicz LLP*,
  991 F.3d 458 (3d Cir. 2021) ........................................................................19

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) .......................................................................29

*Maloof v. John Hancock Life Ins. Co.*,
  60 So. 3d 263 (Ala. 2010)............................................................................22

*Mason & Dixon Lines, Inc. v. Byrd*,
  601 So. 2d 68 (Ala. 1992).......................................................................33, 34

*McCutchen Co., Inc. v. Media Gen., Inc.*,
  988 So. 2d 998 (Ala. 2008)..............................................................................35

*Mid-Am. Salt, LLC v. Morris Cnty. Coop. Pricing Council*,
  964 F.3d 218 (3d Cir. 2020) ...........................................................................19

*Oakwood Labs. LLC v. Thanoo*,
  2021 WL 2325127 (3d Cir. June 8, 2021).......................................................19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension*
  *Fund*,
  575 U.S. 175 (2015)........................................................................................36

*Owner Operator Indep. Drivers Ass'n v. Pa. Tpk. Comm'n*,
  934 F.3d 283 (3d Cir. 2019) ...........................................................................49

*Ritch v. Robinson-Humphrey Co.*,
  748 So. 2d 861 (Ala. 1999)..............................................................................46

*Singleton v. Protective Life Ins. Co.*,
  857 So. 2d 803 (Ala. 2003)..............................................................................50

*Spence v. ESAB Grp., Inc.*,
  623 F.3d 212 (3d Cir. 2010) ...........................................................................29

*Sperau v. Ford Motor Co.*,
  674 So. 2d 24 (Ala. 1995), *vacated on other grounds*, 517 U.S.
  1217 (1996).........................................................................................35, 36, 38

*Standifer v. Best Buy Stores*,
  364 F. Supp. 3d 1286 (N.D. Ala. 2019)...........................................................23

*Stanley Black & Decker, Inc. v. Gulian*,
  70 F. Supp. 3d 719 (D. Del. 2014) (Stark, J.)..................................................21

*In re Stillwater Capital Partners Inc. Litig.*,
  858 F. Supp. 2d 277 (S.D.N.Y. 2013) .............................................................40

*In re Takata Airbag Products Liability Litigation*,
  193 F. Supp. 3d 1324 (S.D. Fla. 2016)...................................................24, 25, 34

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)........................................................................................20

*Thomas v. Henderson*,
  297 F. Supp. 2d 1311 (S.D. Ala. 2003) .....................................................34, 36

*U.S. Bank Nat'l Ass'n v. Windstream Servs., LLC*,
   2019 WL 948120 (S.D.N.Y. Feb. 15, 2019) (attached to SLF's
   amended complaint, JA.143-98) ................................................................11, 12, 13

*In re Uniti Grp., Inc. Sec. Litig.*,
   2021 WL 1238889 (E.D. Ark. Mar. 31, 2021) ..................................3, 24, 26, 30

*In re Van der Moolen Holdings N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005) ........................................................28, 29

*Werner v. Werner*,
   267 F.3d 288 (3d Cir. 2001) ...............................................................................40

*White v. Sanders*,
   650 F.2d 627 (5th Cir. 1981) ..............................................................................46

*Williams v. Globus Med., Inc.*,
   869 F.3d 235 (3d Cir. 2017) ...............................................................................31

*Yarger v. ING Bank, FSB*,
   285 F.R.D. 308 (D. Del. 2012) (Stark, J.) .........................................................21

**Statutes**

15 U.S.C. Ch. 2B ......................................................................................................47

15 U.S.C. § 78u-4(b)(2) ......................................................................................20, 47

28 U.S.C. § 1291 ........................................................................................................2

28 U.S.C. § 1331 ........................................................................................................1

28 U.S.C. § 1332 ........................................................................................................1

ALA. CODE § 6-5-102 ...............................................................................................23

ALA. CODE § 8-6-19 ............................................................................................46, 47

Alabama Securities Act ......................................................................................*passim*

ASA § 8-6-17 .....................................................................................................15, 46, 47

Exchange Act .............................................................................................................52

Exchange Act § 10(b) .......................................................................................*passim*

Private Securities Litigation Reform Act ..........................................................*passim*

x

Uniform Securities Act ...................................................................47, 48

**Other Authorities**

17 C.F.R. § 240.10b-5 .........................................................................28

Ala. R. App. P. 18 ................................................................................44

Fed. R. Civ. P. 8(a) .............................................................................53

Fed. R. Civ. P. 9(b) ............................................................20, 31, 32, 33

Fed. R. Civ. P. 12(b)(6) .......................................................................19

Rest. (2d) of Conflict of Laws ............................................................21

Rest. (2d) of Torts § 529 cmt. b .........................................................24

Rest. (2d) of Torts § 529 cmts. a & b, illus. 2 ....................................23

**INTRODUCTION**

The District Court gave short shrift to Alabama law in erroneously dismissing the state law claims in this securities case. A federal court deciding a case like this with federal law and state law claims must give appropriate attention to the separate bodies of law that govern the different claims. That did not happen here. The District Court predominantly focused on the federal securities claims and concluded they should be dismissed. But the District Court then bootstrapped that analysis into a cursory conclusion that the Alabama state law claims should also be dismissed. The District Court failed to acknowledge the different pleading standards and different substantive law applicable to the state law claims. Had the District Court applied the correct standards and law, the Alabama statutory and common law claims would have survived.

**JURISDICTIONAL STATEMENT**

The District Court had diversity jurisdiction over the state law claims (Counts I-VI and XI) under 28 U.S.C. § 1332. Citizenship of the parties is completely diverse. JA.65-66. The amount in controversy exceeds $75,000.00. JA.67; 71. The District Court had federal question jurisdiction over the federal securities claims (Counts VII-X) under 28 U.S.C. § 1331. JA.134-39.

1

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. SLF timely filed this appeal on December 1, 2020, following a final judgment entered November 4, 2020. JA.1-3.

### STATEMENT OF THE ISSUES

1.      Did the District Court err in holding that SLF Holdings failed to plead an actionable fraudulent inducement claim under Alabama law? JA.504-08, 544-46 (raised); JA.1122-31, 1159-62 (objected to); JA.35 (ruled on).

2.      Did the District Court err in holding SLF Holdings did not plead a valid claim under the Alabama Securities Act? JA.508-09, 543-44 (raised); JA.1144-45, 1162-66 (objected to); JA.33-34 (ruled on).

3.      Do the District Court's errors also require reversing dismissal of SLF's claims for (a) civil conspiracy and (b) declaratory judgment for contractual indemnification?  JA.502-08, 546-47(conspiracy, raised); JA.1132-34, 1154-62 (objected to); JA.35-36 (ruled on); JA.547 (indemnification, raised); JA.1145 (objected to); JA.36-37 (ruled on).

(SLF does not agree with the District Court's reasons for dismissing its federal securities claims, but SLF is not appealing the dismissal of those claims. To the extent applicable, SLF is appealing the erroneous findings made by the District Court in its analysis of federal law that it also used to justify dismissal of the Alabama law claims.)

**STATEMENT OF RELATED CASES AND PROCEEDINGS**

This case has not previously been before this Court. There is a related, parallel class action against Uniti pending in the Eastern District of Arkansas, *In re Uniti Grp. Sec. Litig.*, No. 4:19-CV-00756-BSM, 2021 WL 1238889 (E.D. Ark. Mar. 31, 2021).

**STATEMENT OF THE CASE**

This case arises from the $700 million sale of SLF's fiber optic network to Uniti.[1] JA.112. As partial payment of the agreed sale price, Uniti solicited SLF to accept $65 million worth of private partnership interests in lieu of cash. JA.109-10; 112. SLF would never have agreed to Uniti's equity-instead-of-cash proposal had SLF known what it was receiving. JA.28.

The partnership interests received by SLF are redeemable for public shares of Uniti—a publicly traded real estate investment trust ("REIT"). JA.67-68. Uniti convinced SLF to take the partnership interests in lieu of cash by representing that (1) Uniti was a properly constituted REIT, (2) Uniti had a long-term $650 million per year lease with a "stable" lessee, (3) Uniti would pay a regular and "iron-clad" dividend from that income stream, and (4) Uniti had the necessary consents to purchase SLF's network. All four of these statements were false or misleading: (1)

---

[1] "Uniti" refers to Defendant Uniti Group, Inc. ("Uniti Group"), a publicly traded real estate investment trust, and its subsidiaries, including Defendant Uniti Fiber Holdings Inc. ("Uniti Fiber"), and Uniti Group, LP. JA.108.

3

the REIT improperly contained a limited-life copper wire network that was quickly losing competitive ground to fiber optic cables, (2) the lessee was prohibited from leasing the network assets, (3) the dividend depended entirely on an unstable lessee, and (4) the lessee was required to but did not consent to the purchase of SLF, a competitor.

When the truth came out, SLF sued Uniti for fraudulent inducement under Alabama law and for violations of the Alabama Securities Act and federal securities laws. Doc. No. 1. The District Court dismissed each of SLF's claims after finding that SLF's complaint could not satisfy the heightened pleading standards of the Private Securities Litigation Reform Act (the "PSLRA"), which apply only to SLF's *federal* securities fraud claims. JA.33-37. The District Court erred by dismissing SLF's state law claims without thoroughly and separately analyzing the distinct features and requirements of Alabama law. SLF adequately pleaded its fraudulent inducement and conspiracy claims under the applicable pleading standards and substantive Alabama law. JA.123-30. Further, the District Court erred in failing to view the allegations in the light most favorable to SLF, instead drawing numerous inferences against it.

In sum, the District Court committed reversible error by dismissing SLF's state law claims with prejudice.

## I.  In lieu of $65 million cash, SLF accepted private partnership interests.

As partial payment for the sale of its fiber optic network, SLF accepted $65 million worth of partnership interests in Uniti Group, LP, a limited partnership for which Uniti is the general partner. JA.67-68.[2] While not publicly traded, these interests are redeemable for shares of Uniti stock or their cash equivalent. *Id.*

Uniti was a wholly owned subsidiary of Windstream until 2015, when Windstream[3] spun it off into a separate, publicly traded REIT. Several former Windstream executives and investment advisors became officers of Uniti after the spinoff. JA.66-67. They touted Uniti as a "pioneering" REIT because it was the first telecommunications-backed REIT approved by the IRS. JA.66-67; 75. Uniti's REIT status depended on investment in property with dependable, long-term dividends. But Uniti's REIT was not built on real estate; it was built on a network of copper wires that was fast becoming technologically obsolete as the market shifted to fiber

---

[2] SLF's fiber optic network was held by a separate entity, Southern Light, LLC, of which SLF was the 100% owner. JA67-68. To sell its fiber optic network, SLF sold 100% of its membership interests in Southern Light, LLC. JA.70.

[3] "Windstream" refers to Windstream Holdings, a publicly traded holding company, and its subsidiaries. Specific Windstream-entity names will be used when distinction is important or necessary. Windstream Holdings was created in 2013 to serve as the publicly traded holding company for all of the Windstream entities. JA.66. Before that, the publicly traded holding company for all the Windstream entities was Windstream Corporation. Windstream Corporation is now known as Windstream Services, LLC ("Windstream Services") and is a wholly owned subsidiary of Windstream Holdings. Windstream Services is itself a holding company, and its subsidiaries are the operating entities of Windstream. *Id.*

optic cable. Windstream orchestrated a complex "sale leaseback" transaction, in which Uniti purported to purchase the network assets from Windstream subsidiaries and then immediately lease them back to Windstream Holdings. JA.67-69; 71; 83; 101-02; 107; 125-26. When Uniti purchased SLF's network, Windstream was by far Uniti's largest customer, responsible for about 80% of Uniti's annual revenues. So, the value of Uniti's stock depended on Windstream's stability. JA.111.

Appellee Kenneth Gunderman (a former Windstream advisor) came up with Uniti's non-traditional REIT structure prior to the spinoff and now serves as its president and CEO. JA.66-69; 74-76; 85; 97; 121. Appellee John Fletcher was counsel for Uniti and Windstream simultaneously until December 2014, at which point he ostensibly represented only Windstream. JA.76-77; 83; 85-86; 88; 93; 96; 101; 121-22; 130. The various executives, advisors, and counsel involved in spinning off Uniti and negotiating Windstream's sale-leaseback of its copper network to Uniti operated on both sides of the negotiations. JA.76-77; 130. Thus, the transactions that spun off Uniti were not arms-length. JA.76; 130.

## II. Uniti made four fraudulent statements to SLF that convinced SLF to take equity instead of cash.

In October 2016, Uniti had a preliminary meeting with SLF about purchasing SLF's fiber optic network. JA.106. Uniti made four misleading statements to SLF during that meeting and in subsequent negotiations that convinced SLF to take illiquid partnership interests in lieu of cash.

6

First, Uniti touted its status as a properly constituted REIT. JA.68; 106. Uniti represented that its network would outlast the life of the lease and be as dependable as investing in real property. JA.92-93; 106-07; 111.

Second, Uniti emphasized that the Master Lease was very favorable to Uniti. JA.106. Uniti represented to SLF that the stream of payments coming from Windstream over the entire term of the Master Lease was a particular strength of Uniti's business. *Id.*

Third, Uniti emphasized Windstream's stability as its primary lessee. Because Windstream was a dependable lessee, Uniti's dividends in turn would be "iron-clad." JA.95; 106.

Fourth, Uniti represented and warranted to SLF that Uniti had obtained all consents necessary for Uniti to acquire SLF's network. JA.107-08.

Additionally, Uniti promised that it would file a prospectus supplement with the SEC that would not contain any "untrue statement of a material fact or omit to state a material fact." JA.112. But that supplement incorporated Uniti's prior misleading statements, further corroborating the false statements Uniti had made to SLF in private negotiations. For example, in its 2015 10-K, Uniti stated that "Windstream, as our anchor tenant, provides us with a base of stable and highly predictable rent revenues." JA.102.

## III.    The truth behind Uniti's four statements to SLF.

All four statements that Uniti made to SLF were false, misleading, or materially incomplete. Uniti kept the truth from SLF to induce it to accept illiquid partnership interests instead of $65 million cash.

### A.    Uniti was not a properly constituted REIT.

Contrary to the first statement, Uniti was not a properly constituted REIT. Uniti's network (acquired from Windstream) was primarily copper wire, which fiber optics were quickly overtaking. JA.72; 78; 93. The creeping obsolescence of Uniti's copper wire network created a structural problem because Uniti's main source of income—the Master Lease with Windstream—had a 15-year term. JA.88-91. If the useful life of Uniti's copper network would wind down before 15 years, then the Master Lease would not qualify as a "true lease." JA.72; 88-89; 90. Instead, the Master Lease would be a disguised financing arrangement in which Windstream would be purchasing, not renting, the network, and its $650 million annual payment to Uniti would be an installment on a *de facto* loan. JA.67. If the Master Lease was not a true lease, then the $650 million payment would not qualify as rent income. And if Windstream's payment to Uniti was not rent, then Uniti's status as an IRS-certified REIT would be a sham. JA.68; 78.

The Windstream executives and advisors who became Uniti's officers knew about this fundamental flaw. JA94-95. Skadden, who represented both Uniti and

8

Windstream in the spinoff and Master Lease negotiations, JA.76-77, had warned Uniti that the IRS "may argue that the proposed lease is merely a financing arrangement and that the purported lessor [Uniti] is, in substance, a secured creditor but holds no equity interest in the property." JA.94-95. Uniti tried to cure this flaw by inflating the useful life and value of its network to support the 15-year term of the Master Lease. JA.72; 90-93. At the same time, Uniti knew that an Ernst & Young appraisal that Uniti used to support the Master Lease's 15-year term relied on two overinflated and unrealistic assumptions: (a) the copper network had a useful life of 40+ years, JA.72; 92, and (b) the network would retain 33% of its value and 46% of its useful life at the end of the 15-year Master Lease, JA.93. Uniti's officers knew that other analysts were much more pessimistic than E&Y on the remaining useful life of copper wire networks. JA.91; 93. Those analysts believed a useful life of 1.3 to 7.7 years more accurately accounted for a copper network's inability to keep pace with market demands for faster internet speeds. JA.91-92.

Skadden had also warned of a different REIT-jeopardizing flaw. Uniti's formative documents did not transfer legal title to the related easements, permits, and pole attachment agreements. JA.95-96. Without legal title, Uniti lacked the very assets that were key to turning personal property like wires and cables into real property that could support a REIT. JA.96.

9

Uniti and its officers knew about, but failed to disclose, these fundamental, structural flaws during negotiations with SLF. JA.95; 107; 109-10.

### B.     <u>Uniti did not have a dependable long-term lease with a stable lessee.</u>

Contrary to Uniti's second statement, Uniti did not have a dependable $650 million long-term lease with a stable lessee. Rather, Windstream's critical contracts prohibited it from leasing anything, so it did not qualify as a lessee. JA.68; 79.

The indenture governing several hundred million dollars of Windstream's long-term debt prohibited it from selling its assets to Uniti and simultaneously entering a long-term leaseback:

> <u>Sale and Leaseback Transactions</u>.
> The Company shall not, and shall not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction.

JA.79. The indenture defines a "Sale and Leaseback Transaction" as:

> any transaction involving any of the assets or properties of such Person whether now owned or hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred.

*Id.* As later confirmed by Judge Jesse Furman of the Southern District of New York, Uniti's attempt to circumvent the sale-leaseback bar by leasing the network assets to a new entity, Windstream Holdings, was "too cute by half" and violated the

10

indenture from Uniti's inception. JA.79-80; 117-18; 197-98. *U.S. Bank Nat'l Ass'n v. Windstream Servs., LLC*, 2019 WL 948120, at *23 (S.D.N.Y. Feb. 15, 2019) (attached to SLF's amended complaint, JA.143-98).

Skadden had warned Uniti's officers that the economic substance of the spinoff was analogous to a sale-leaseback transaction. JA.95. Skadden concluded: "the Spin-Off and Master Lease involve a contribution of property to [Uniti] by Windstream and a leaseback of those properties from [Uniti] to Windstream. Thus, there is a transfer of legal ownership of the Distribution Systems followed by a leaseback of that property that could be viewed as similar to a sale leaseback arrangement." *Id.* Internal documents confirm that Uniti's officers were aware that the Master Lease violated the sale-leaseback bar, yet they chose to hide that fact from investors. Specifically, in April 2015, Windstream's CFO emailed his brother, Appellee Gunderman, instructions on how to publicly discuss the Master Lease and the Uniti-Windstream relationship. JA.104. If asked "Why is the lease with WIN Holdings VS WIN Services?", the talking points supplied a dodgy answer: "This is a complex transaction and after considering many factors we concluded that having the lease at WIN Holdings was the best structure." *Id.* "If pressed," the talking points only permitted them to repeat the "[f]actors evaluated," including "corporate structure, tax, accounting, [and] debt." JA.104-05. The talking points did not

11

disclose the sale-leaseback bar, which was the true reason for creating Windstream's complex "HoldCo" structure. *Id.*

## C. Uniti's dividend was not "iron-clad."

Contrary to Uniti's third statement, Uniti's dividend was not "iron-clad." Uniti's $650 million income stream was undermined by Windstream's existing violation of the sale-leaseback bar. JA.95. If Windstream and its subsidiaries suddenly had to pay hundreds of millions of dollars in debt, Windstream would be severely stressed by also having to make the Master Lease rental payments to Uniti. JA.89. Without this income stream, Uniti could not deliver its promised dividend. Uniti's structure was rife with flaws, all of which Uniti knew but hid from SLF. JA.95; 105.

## D. Uniti did not have Windstream's consent to acquire SLF.

Uniti's representation that it had obtained all consents necessary for it to acquire SLF's network was false. Although the Master Lease prohibited Uniti from "merg[ing] or consolidat[ing] with or into a Competitor" without Windstream's consent, Windstream never consented. JA.108. Worse, Uniti never disclosed to SLF that Windstream's consent had not been obtained or that the lack of consent may violate the Master Lease. JA.108-09. Uniti misrepresented to SLF that its purchase of SLF's network did not require consents material to Uniti or violate any material agreement. *Id.*

12

**IV. Uniti's false statements and material omissions caused SLF to accept private partnership interests in lieu of $65 million cash.**

SLF would never have agreed to forego $65 million in cash had it known that Uniti was a fundamentally flawed REIT. JA.112, 127. Nor would SLF have sacrificed $65 million in cash had it known that Windstream was contractually barred from leasing the network. JA.112. Given the inflated useful life of Uniti's copper network and Windstream's violation of the sale-leaseback bar, SLF's illiquid partnership interests are worth nothing close to $65 million. JA.114-19; 123-28; 130.

**V. Uniti's diminution in value after the truth came out.**

The hedge fund Aurelius sued Windstream for violating the sale-leaseback bar just three months after Uniti's deal with SLF. JA.115. Judge Furman held that the Master Lease breached the sale-leaseback bar and declared over $300 million of debt immediately due. JA.118. *Windstream Servs.*, 2019 WL 948120, at *23 (explaining that the Windstream operating subsidiaries' use of the network assets "walks like a lease and talks like a lease . . . because it is a lease"). Judge Furman "judicially estopped" Windstream from denying that the Windstream operating subsidiaries would lease the network assets transferred to Uniti, because it "benefitted from repeated statements to state regulators" (in Alabama and elsewhere) representing the opposite. JA.118; 176-78. Judge Furman also held that Windstream knew that a sale leaseback to its subsidiaries would violate the indenture's bar, so the flaws inherent in Uniti's structure were there from the beginning, in 2015.

13

JA.154. Uniti's stock crashed after Judge Furman's ruling. JA.118-19. When SLF

filed its amended complaint, Uniti stock was worth 71% less than when the SLF deal

closed. JA.119.

Windstream filed for Chapter 11 bankruptcy protection ten days after Judge

Furman's ruling. JA.118. As part of the bankruptcy, Windstream alleged that it—

not Uniti—was the true owner of the network assets. JA.89. Windstream argued that

the Master Lease was not a true lease, stating that "no amount of legal structuring

could deny the true financing nature of the arrangement" and that that the terms of

the spinoff were "fig leaves" meant to obscure its illegality. JA.88-89.

## VI.    SLF sues Uniti in federal court in Alabama.

Following Uniti's stock crash, SLF sued Uniti in the Southern District of

Alabama. Doc. No. 1. SLF alleged claims under the Alabama Securities Act against

all defendants. JA.130-34. SLF also alleged common law claims under Alabama

law: fraudulent inducement by suppression and misrepresentation against Uniti and

its CEO, and civil conspiracy against all defendants. JA.123-30. Additionally, SLF

sought a declaratory judgment that it was entitled to indemnity from Uniti for its

misrepresentations. JA.139-41. SLF also alleged violations of federal securities laws

against Uniti and its CEO. JA.134-39.

The Alabama District Court transferred the case to the District of Delaware,

JA.55-64, and the defendants then moved to dismiss SLF's amended complaint,

14

JA.493-511; 512-48. Uniti's argument focused on the PSLRA, addressing all of SLF's claims as if each must satisfy the PSLRA's heightened pleading standard. JA.528-47.

## VII.  The District Court's ruling.

The District Court dismissed SLF's amended complaint with prejudice. JA.3-40. Like Uniti's motion to dismiss, the court's order focused predominantly on the PSLRA. The District Court dismissed SLF's Alabama statutory claim because it concluded that "the deficiencies the Court identified with respect to these required elements of SLF's section 10(b) claims also render SLF's ASA Section 8-6-17 claims deficient." JA.34. As to SLF's fraudulent inducement claims, the District Court concluded that it "need not address whether these claims also suffer from other pleading deficiencies" because "SLF's failure to plead a misstatement or actionable omission under section 10(b) leads the Court to further conclude that SLF's common law fraudulent inducement claims must also be dismissed." JA.35. The District Court also dismissed SLF's conspiracy and declaratory judgment claims under Alabama law based on its finding that SLF had failed to plead a valid securities fraud claim. JA.35-37.

In various instances in its ruling, the District Court did not treat SLF's allegations as true, nor did it construe the complaint in a light most favorable to SLF. JA.28. The District Court ignored SLF's extensive allegations when it concluded

15

that "SLF has failed to plausibly allege that, had it known the omitted facts, it would not have agreed to accept and enter into the transaction." JA.30. And when analyzing Uniti's fraudulent statements, the District Court focused on certain public filings of Windstream, which Uniti never provided to SLF and which SLF had no duty to investigate. JA.17-19; 28; 1129. As to Uniti's assurances that it had a dependable long-term $650 million lease with a "stable" lessee whose income stream would permit Uniti to pay an "iron-clad" dividend, the District Court concluded that Uniti's misleading statements were mere puffery, ignoring their present, material nature and the truth of what was hidden from SLF. JA.21.

## SUMMARY OF THE ARGUMENT

The District Court erred in dismissing SLF's state law fraudulent inducement by suppression claim. Rather than analyze that claim under controlling Alabama law, the District Court simply held that its conclusion that SLF had not pleaded an actionable omission or misstatement for purposes of *federal securities law* resolved the question under *Alabama law*. That was not correct. The District Court's conclusions do not carry over for multiple reasons:

- Alabama has not adopted an exception to suppression law for statements about litigation risks, and, in any event, the statements in question were about known, present facts, not litigation risks.

16

- Federal law about "fraud by hindsight" does not apply because SLF adequately alleged defendants' knowledge of the suppressed facts at the time they made the statements in question.

- Categorization of the statements at issue as "puffery" or "opinions" does not foreclose the claims because those statements can still be actionable based upon knowledge of the suppressed facts.

The District Court did not address the other elements of the fraudulent inducement claims, but SLF plausibly alleged each of the remaining elements.

The District Court also erroneously dismissed the fraudulent inducement by misrepresentation claim. SLF plausibly alleged that Uniti misrepresented that it had obtained all necessary consents to its acquisition of the SLF assets. Under Delaware law, which governed the acquisition, the transaction amounted to a *de facto* merger, which required the consent of Windstream. SLF pled that Uniti did not obtain that consent.

The District Court erroneously assumed that the Alabama Securities Act is the mirror image of Section 10(b), which led to the District Court's improper dismissal of SLF's claims based on that Act. In fact, unlike Section 10(b), the Alabama Securities Act is a strict liability statute with no scienter or loss causation requirements. Any false or misleading statement by the seller of securities creates liability under the Alabama Act. The Alabama Act also has no heightened pleading

17

requirements akin to those in the PSLRA. Had the District Court understood these fundamental differences, it would not have dismissed SLF's state statutory claim.

Finally, the District Court also erred in dismissing SLF's civil conspiracy and declaratory judgment claims. Because the fraud claims should not have been dismissed, there is an underlying wrong to support the conspiracy claim, and SLF adequately alleged the nature of the conspiracy. As for the declaratory judgment claim, which is based on a contractual indemnification provision, the dismissal of the federal securities claims has no bearing on the viability of that claim. The District Court should not have dismissed it.

If this Court has any doubt about the controlling issues of Alabama law, it should certify any questions it has to the Alabama Supreme Court to answer.

## ARGUMENT

### I.     The District Court erred in dismissing SLF's claim for fraudulent inducement under Alabama law.

The District Court erred in its cursory dismissal of SLF's state law claims for fraudulent inducement. In a single, conclusory sentence, the District Court held that "SLF's failure to plead a misstatement or actionable omission under section 10(b) leads the Court to further conclude that SLF's common law fraudulent inducement claims must also be dismissed." JA.35. This was error. The substantive and pleading standards applicable to SLF's federal securities fraud claims are materially different from (and materially more difficult to meet than) the standards applicable to SLF's

18

Alabama law fraudulent inducement claims. For example, the PSLRA, which played a central role in the District Court's dismissal of SLF's 10(b) claims, does not apply to SLF's Alabama law fraudulent inducement claims.

Had the District Court utilized the correct pleading standard and the apposite substantive law, the state law fraudulent inducement claims would not have been dismissed.

### A. Standard of review.

This Court "review[s] de novo a district court's grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021). "A motion to dismiss pursuant to Federal Rule 12(b)(6) should be granted only if, accepting as true the facts alleged and all reasonable inferences that can be drawn therefrom there is *no reasonable reading* upon which the plaintiff may be entitled to relief." *Mid-Am. Salt, LLC v. Morris Cnty. Coop. Pricing Council*, 964 F.3d 218, 226 (3d Cir. 2020) (emphasis added); *see also Oakwood Labs. LLC v. Thanoo*, 2021 WL 2325127, at *7-8 (3d Cir. June 8, 2021) (noting that courts must avoid "factual skepticism" that leads to an erroneous pleading standard tougher than plausibility). "The defendant bears the burden of showing that no claim has been presented." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 361 n.11 (3d Cir. 2016) (internal citations omitted).

Claims alleging fraud "are subject to the heightened pleading standard imposed by Federal Rule of Civil Procedure 9(b)," which "requires a plaintiff to state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which [it is] charged." *DeGennaro v. Am. Bankers Ins. Co. of Fla.*, 737 F. App'x 631, 635 (3d Cir. 2018) (internal quotation marks omitted). This includes "all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where, and how of the events at issue." *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 176 (3d Cir. 2019) (internal citations omitted).

Notably, however, the heightened pleading standards of the PSLRA, which applied to SLF's federal securities fraud claims, do not apply to SLF's fraudulent inducement claims under Alabama law. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 341 (5th Cir. 2008). Unlike the PSLRA, which requires plaintiffs to plead "with particularity facts giving rise to a strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2), Rule 9(b) permits "[i]ntent, knowledge, and other conditions of a person's mind [to] be alleged generally," FED. R. CIV. P. 9(b). And unlike the PSLRA, which requires courts to consider "opposing inference[s] one could draw from the facts alleged" and "plausible, nonculpable explanations for the defendant's conduct," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007), courts applying Rule 9(b) must accept as true "all reasonable inferences" that may be drawn from

20

the allegations and must also view the allegations "in the light most favorable to"

the plaintiff, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d. Cir. 2010).

**B.     SLF plausibly alleged a claim for fraudulent inducement by suppression under Alabama law.**

SLF plausibly alleged a state law claim for fraudulent inducement by

suppression. Under Alabama law, "[t]he elements of a cause of action for fraudulent

suppression are: (1) a duty on the part of the defendant to disclose facts; (2)

concealment or nondisclosure of material facts by the defendant; (3) inducement of

the plaintiff to act; [and] (4) action by the plaintiff to his or her injury." *CNH Am.,*

*LLC v. Ligon Capital, LLC*, 160 So. 3d 1195, 1201 (Ala. 2013).[4] Additionally, a

---

[4] Alabama law applies to SLF's fraud and conspiracy claims. Although the Purchase Agreement provides that "[t]his Agreement shall be governed by and construed in accordance with" Delaware law, that choice of law provision does not apply to tort claims. *See Yarger v. ING Bank, FSB*, 285 F.R.D. 308, 322 (D. Del. 2012) (Stark, J.). Instead, for SLF's fraud and conspiracy claims, Delaware applies the "most significant relationship" test of the Restatement (Second) of Conflict of Laws to choice-of-law issues. *Stanley Black & Decker, Inc. v. Gulian*, 70 F. Supp. 3d 719, 732-33 (D. Del. 2014) (Stark, J.). When deciding the state with the most significant relationship, courts consider "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (3) the place where the relationship, if any, between the parties is centered." *Id*. Here, those factors overwhelmingly establish that Alabama law applies. SLF suffered injury in Alabama, negotiations between SLF and Uniti occurred in Alabama, the subject matter of those negotiations was also located in Alabama, SLF received representations from Uniti in Alabama, and SLF is domiciled (and has its principal place of business) in Alabama. JA.65; 105-07; 131-32. In addition, Uniti waived any argument that Delaware law applies to SLF's fraud claims. Doc. No. 47 at 2-5, 11, 13; Doc. No. 50 at 28-30.

plaintiff must show that it "reasonably relied on the state of affairs as it appeared in the absence of the suppressed information." *Maloof v. John Hancock Life Ins. Co.*, 60 So. 3d 263, 268 (Ala. 2010) (internal quotation and citation omitted).

Fraudulent intent (or scienter) is not an element of a fraudulent suppression claim under Alabama law. *See, e.g., Davis v. Sterne, Agee & Leach, Inc.*, 965 So. 2d 1076, 1091 (Ala. 2007) ("The breach of an obligation to disclose is sufficient to trigger liability for fraudulent suppression."); *Intercorp, Inc. v. Pennzoil Co.*, 877 F.2d 1524, 1535 (11th Cir. 1989). Nor is "knowledge of the falsity of the misrepresentation . . . an element of fraudulent suppression." *Sterne, Agee & Leach*, 965 So. 2d at 1091. Additionally, loss causation is not an element of an Alabama suppression claim. *See CNH*, 160 So. 3d at 1201.

### 1. SLF alleged a duty to disclose.

SLF properly alleged that Uniti had a duty to disclose. In Alabama, although a party engaged in an arm's-length commercial negotiation has "no general obligation to disclose any specific information to the other," a duty to disclose arises when a party elects to speak: "once a party elects to speak, he or she assumes a duty not to suppress or conceal those facts that materially qualify the facts already stated." *CNH*, 160 So. 3d at 1201-02. The "duty imposed on the speaking party is to disclose those facts that are material to the ones already stated so as to make them truthful." *Id*. at 1203. "The obligation to communicate may arise from the confidential

relations of the parties or from the particular circumstances of the case." ALA. CODE § 6-5-102.

Applying this settled rule, Alabama courts have held that a defendant who voluntarily speaks on a subject assumes an independent duty to qualify the statements with other relevant information. *See Aliant Bank v. Four Star Invs., Inc.*, 244 So. 3d 896, 932 (Ala. 2017) (defendant's representation that bond proceeds would be used to develop future lots, when most of the funds would actually be used to pay for prior development work, created "a duty to make a full disclosure as to how those proceeds would be used" and "not to suppress or conceal those facts that materially qualify the facts already stated"). In other words, a party who voluntarily speaks has a duty to refrain from communicating a "half-truth." *Ala. River Grp., Inc. v. Conecuh Timber, Inc.*, 261 So. 3d 226, 244 (Ala. 2017). The speaker must "make a full and fair disclosure without concealing other relevant facts within [its] knowledge." *CNH*, 160 So. 3d at 1203.

"[A] statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue." REST. (2D) OF TORTS § 529 cmts. a & b, illus. 2, *applied by Ala. River Grp.*, 261 So. 3d at 244; *see Standifer v. Best Buy Stores*, 364 F. Supp. 3d 1286, 1301 (N.D. Ala. 2019) (choosing to speak creates an "independent duty to qualify" statements). The Eastern District of Arkansas so held in the parallel litigation against

23

Uniti. *In re Uniti Grp., Inc. Sec. Litig.*, No. 4:19-CV-00756-BSM, 2021 WL 1238889, *3 (E.D. Ark. Mar. 31, 2021) ("While [Uniti] did not have a duty to 'publicly opine' on the legality of their actions," they had a duty to disclose "that the structure of the spin-off transaction violated the indenture from the inception"). Even if a defendant believes that the concealed information "would not affect the value of the bargain which he is offering," he still has a duty to disclose it if he knows or believes "that the undisclosed facts *might* affect" the counterparty's consideration of the deal. REST. (2D) OF TORTS § 529 cmt. b (emphasis added).

A case about exploding airbags illustrates the breadth of the Alabama duty to disclose once a party elects to speak. In *In re Takata Airbag Products Liability Litigation*, 193 F. Supp. 3d 1324 (S.D. Fla. 2016), Mazda "made various statements regarding the safety of its vehicles," including representations "in brochures that its cars possessed 'inspiring performance' and 'reassuring safety features'" and "stated on its website that 'in every configuration, you'll enjoy Mazda's legendary performance, function, style and safety.'" *Id*. The court denied Mazda's motion to dismiss the Alabama fraudulent suppression claim and held that by "voluntarily" making these statements, Mazda was "bound not only to state the truth but also not to suppress or conceal any facts within [its] knowledge which will materially qualify those stated; if [Mazda] speaks at all, [it] must make a full and fair disclosure." *Id*. (internal quotation marks omitted). Having made "incomplete statements," Mazda

24

"had a duty to disclose additional facts about the safety of its vehicles," including its knowledge of the defective airbags. *Id.* at 1338.

Here, SLF alleges that Uniti made materially incomplete statements to induce SLF into accepting Uniti partnership interests as partial payment, instead of only cash. Specifically, at the parties' October 14, 2016 introductory meeting, Uniti and its CEO, Appellee Gunderman, "emphasized" "that the Master Lease was very favorable to Uniti and that the stability of Windstream as a customer would allow Uniti to pay an 'iron-clad' dividend over time." JA.106. Uniti and Gunderman also represented to SLF that "the stream of payments to come from Windstream during the initial 15-year term of the Master Lease was a particular strength of its business," emphasizing Uniti's $9 billion enterprise value, derived mostly from the expected future rental payments from Windstream. *Id.*

As detailed above in the Statement of the Case, *see supra* at 8-12, these statements at best were misleading "half-truths." Under settled Alabama law, Uniti had a duty to disclose facts that materially qualified those statements. *Ala. River Grp.*, 261 So. 3d at 244 ("To tell half a truth has been declared to be equivalent to the concealment of the other half. A partial and fragmentary disclosure, accompanied by the willful concealment of material and qualifying facts is not a true statement, and is as much a fraud as an actual misrepresentation, which, in effect, it is.") (quoting *Am. Bonding v. Fourth Nat'l Bank*, 206 Ala. 639, 641 (1921), among

others). Uniti and its officers knew the material and fundamental flaws in the Master Lease structure that threatened Windstream's and Uniti's viability. *See supra* at 8-12. These omitted facts "materially qualified" Uniti's representations to SLF about the spinoff and Master Lease. As a result, Alabama law imposed on Uniti a duty to disclose them. *Cf. Uniti Grp.*, 2021 WL 1238889, at *2 ("Plaintiffs have sufficiently alleged material misrepresentations because they have pleaded that [Uniti] failed to disclose the prohibited structure of the spin-off transaction and the Master Lease.").

Similarly, in its public filings provided to SLF in connection with the transaction, Uniti also misleadingly extolled the financial stability of Windstream and its "ability to pay the annual lease obligations to [Uniti] for the foreseeable future" due to Windstream's "liquidity position, modest leverage and ability to generate significant free cash flow." JA.100. Uniti likewise repeatedly stated publicly that "Windstream, as our anchor tenant, provides us with a base of stable and highly predictable rent revenues as an initial platform for us to grow and diversify our portfolio and tenant base." JA.102. Again, by touting Windstream's stability and ability to provide "a base of stable and highly predictable rent revenues," Uniti also had a duty under Alabama law to disclose facts that materially qualified those statements. The flaws in the Master Lease structure threatened the continued viability of *both* Windstream *and* Uniti, and materially undermined

26

Uniti's public statements touting Windstream's stability. Under controlling Alabama law, the flaws should have been disclosed.

In sum, SLF adequately alleged a duty to disclose in its amended complaint.

### 2. The District Court erred in concluding that SLF did not allege an actionable omission under Alabama law.

The District Court erred in concluding that SLF did not plead an actionable omission under Alabama law. In reaching that mistaken conclusion, the District Court did not address any of the foregoing Alabama authority. Instead, the District Court relied solely on its analysis under federal law of whether SLF had stated an actionable omission for its federal securities claim. JA.35. This was error. Federal securities fraud claims and Alabama fraudulent inducement claims involve materially different substantive law. They are also different in terms of the applicable pleading standard. *See supra* Argument § I.A. Had the District Court applied the correct substantive law and pleading standard, there would have been no dismissal of SLF's Alabama fraudulent suppression claim.

SLF will explain in turn why the District Court's reasons that SLF supposedly did not plead an actionable omission under federal securities law do not compel dismissal of the Alabama suppression claim.

### a. SLF has not challenged "litigation risks."

In concluding that SLF did not allege an actionable omission for its *federal* securities fraud claims, the District Court characterized SLF's claims as arising from

the alleged failure to disclose "litigation risks." The District Court then held that "litigation risks" are exempted from disclosure under the federal securities laws unless they are "substantially certain" to occur. JA.13; 20-21. There is no "litigation risks" exception under Alabama suppression law. In addition, the District Court's analysis of Uniti's statements as involving "litigation risks" was incorrect.

Under Alabama law, there are no separate disclosure standards for so-called "litigation risks." Instead, the same disclosure standards that apply to all concealed facts also apply to concealed facts that may relate to litigation. That is, a party who elects to speak "assumes a duty not to suppress or conceal those facts that materially qualify the facts already stated," *CNH*, 160 So. 3d at 1202, whether or not those facts relate to or could be exposed in litigation.

In applying a more circumscribed disclosure standard to "litigation risks" for federal securities claims, the District Court relied on a single federal district court decision from the Southern District of New York. *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004). But that decision—and its approach to "litigation risks"—has never been cited by any Alabama court, nor is there any indication that the Alabama Supreme Court would adopt the principle.[5] The District

---

[5] Indeed, the approach to "litigation risks" articulated in *Citigroup* is far from settled *federal* law. In *In re Van der Moolen Holdings N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005), the Southern District of New York declined to follow *Citigroup*, and instead held that "the better view" is that "although a defendant does not have a Rule 10b-5 duty to speculate about the risk of future

Court thus erred by engrafting that concept onto Alabama law. *See Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 217 (3d Cir. 2010) ("We must be mindful that 'our duty is to apply state law . . . irrespective of what we may regard as its merits'; we may not impose our own view of what state law should be, nor 'expand state law in ways not foreshadowed by state precedent.'") (citations omitted).

In any event, the District Court also erred in holding that SLF had relied on a statement about a "litigation risk." *In re Citigroup* involved a claim for "mismanagement" of public shares, rather than fraud in a private sale of private shares. As part of their mismanagement claim, the plaintiffs alleged that Citigroup should have disclosed that its faulty accounting work for Enron exposed it to potential litigation from defrauded Enron shareholders. 330 F. Supp. 2d at 375-77. In other words, at its core, *Citigroup* was about the failure to disclose potential exposure to future litigation.

Here, by contrast, SLF's claims are not based on the failure to disclose some remote possibility that Uniti or Windstream might face liability in future litigation.

---

investigation or litigation, if it puts the topic of the cause of its financial success at issue, then it is 'obligated to disclose information concerning the source of its success." Other courts have followed the approach of *Van der Moolen. See, e.g., In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 368 (E.D.N.Y. 2013); *accord Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009) ("The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action") (collecting federal circuit cases).

29

Rather, SLF challenges Uniti's failure to disclose known, fundamental, and inescapable flaws in Uniti's structure and known, fundamental, and inescapable flaws involving Uniti's primary customer. JA.69-70; 72; 92-96. Specifically, SLF alleges that Uniti suppressed material information that would have revealed that Uniti's supposedly "stable" lessee, Windstream, was fundamentally unstable, and hid the fact that the Master Lease violated Windstream's own indentures and may not be a lease at all, threatening Uniti's very existence as a REIT. *Id.* Those were known, "present, material fact[s]" suppressed from SLF, not predictions of future events. *Ala. River Grp.*, 261 So. 3d at 246-47. These undisclosed flaws existed whether or not litigation was ever filed. Whether it collapses or not, a house of cards is still a house of cards. Uniti's failure to disclose these known flaws was fraudulent under controlling Alabama law and resulted in SLF's acceptance of interests in a fundamentally flawed Uniti entity instead of $65 million in cash. *See Uniti Grp.*, 2021 WL 1238889, at *2-3 (rejecting Uniti's characterization of plaintiffs' claims as a failure to predict future litigation).

### b. SLF has not alleged "fraud by hindsight."

In concluding that SLF did not allege an actionable omission for its federal securities fraud claim, the District Court also applied another federal concept— "fraud by hindsight" (JA.13-14; 21; 25)—that does not bar SLF's Alabama fraud claims. Federal courts apply the concept of "fraud by hindsight" to preclude

30

plaintiffs from asserting federal securities fraud claims based on the occurrence of unforeseen, future events. *Williams v. Globus Med., Inc.*, 869 F.3d 235, 244 (3d Cir. 2017).

The District Court misconstrued SLF's claims as "fraud by hindsight" after finding that Uniti did not believe at the time of the challenged statements that the Master Lease was a prohibited sale-leaseback and that the Master Lease was not a lease at all. JA.24-25 ("SLF alleges nothing . . . as having been known to Defendants [] at the time of the challenged statement."). But the District Court's conclusions about Uniti's knowledge and intent were based on its application of the heightened scienter pleading standards of the PSLRA. In effect, the District Court credited Uniti's explanations for its conduct and disregarded the allegations and reasonable inferences of SLF's amended complaint.

Under Rule 9(b), the pleading standard applicable to SLF's Alabama fraud claims, this was improper. SLF thoroughly alleged that Uniti knew at the time it was negotiating with SLF that the Master Lease was a contractually barred sale leaseback. JA.80, 104-05. Indeed, SLF alleged that Uniti, its CEO, and Windstream carefully curated their message to investors about why Windstream Holdings was the lessee. JA.81; 104-05. No one was to mention the sale-leaseback bar in Windstream's indenture for fear of raising shareholder suspicions. JA.104-05.

31

Instead, the talking points instructed anyone who was asked to answer with vague statements about "factors evaluated" and "corporate structure." *Id.*

SLF also thoroughly alleged that Uniti knew that its characterization as a REIT depended upon unreasonable assumptions on the remaining useful life of its copper wire network, yet Uniti never disclosed this key flaw. JA.68; 72; 85; 87-88; 91-93; 106-07; 111; 123-26; 129. Purporting to apply the PSLRA, the District Court improperly disregarded these allegations of knowledge and instead credited Uniti's assertions and inferences that it had no scienter. But that analysis does not apply to the state law claims. SLF alleged that Uniti and its CEO knew the concealed information and knew it was material. Nothing more was required for the state law claim because under Rule 9(b) intent and knowledge "may be alleged generally."

The District Court's conclusion also ignores the critical timeline of Uniti's fraud later exposed in Judge Furman's decision. As part of the ruling, Judge Furman estopped Windstream from denying that it leased the network from Uniti. JA.117-18; 176-78. The Master Lease thus violated Windstream's indenture from the outset, in 2015. Judge Furman also noted that the entire transaction was the result of self-dealing and "was not negotiated at arm's length." JA.154. As Judge Furman held, Windstream and Uniti (whose executives were former Windstream insiders) were aware of the flaws from the beginning because the entire structure of Uniti and Windstream Holdings was created to avoid "a clear violation" of the indenture:

> [Windstream] understood and believed at the time that if the Transferor Subsidiaries signed the Master Lease and thus leased back the property they had transferred to [Uniti], the 2015 Transaction would have indisputably constituted a Sale and Leaseback Transaction prohibited by Section 4.19 of the Indenture.

*Id.* Uniti was therefore aware of the indenture violation in 2015. Judge Furman's opinion, which SLF attached to the amended complaint, further shows that SLF adequately alleged Uniti's knowledge.

### c. SLF has not challenged mere "puffery."

The District Court also erred in applying to the state law claims its federal analysis that certain Uniti statements did not create a "duty to disclose" because they were nonactionable "puffery." JA.21. Puffery refers to "vague and general statements of optimism," *In re Burlington Coat Factory Sec. Litig*, 114 F.3d 1410, 1428 n.14 (3d Cir. 1997), including "statements of opinion amounting to sales talk." *Hughes v. Hertz Corp.*, 670 So. 2d 882, 885 (Ala. 1995). In ruling on the federal claims, the District Court stated that Uniti's touting of the "iron-clad" nature of its dividend and Windstream's "stable" lease payments were mere puffery. JA.21.

But under Alabama law, whether a statement is nonactionable puffery is not something that can be decided on a motion to dismiss. Puffery is an offshoot of materiality. *Mason & Dixon Lines, Inc. v. Byrd*, 601 So. 2d 68, 72 (Ala. 1992) (defining "material representations" as not "mere puffery"). And under settled Alabama law, materiality is a question of fact that may rarely be resolved on the

33

pleadings. *Id.* ("A jury should resolve the question of whether a statement constates a misrepresentation sufficient to support a fraud claim or is mere puffery."); *Thomas v. Henderson*, 297 F. Supp. 2d 1311, 1316 (S.D. Ala. 2003). To determine whether a statement is nonactionable puffery requires examining the statement in question as well as the facts known to the defendant that make the statement misleading or incomplete. *See id.*, 601 So. 2d at 72 ("In making a [puffery] determination, the jury should examine the alleged misrepresentation in the context in which it was made.").

Under the controlling Alabama law, SLF has made sufficient allegations to avoid a conclusion at this stage of the case that the statements were puffery. In *Takata Airbag*, the court, applying Alabama law, concluded that the defendant's election to speak about a vehicle's "inspiring performance," "reassuring safety features," and "legendary performance, function, style, and safety" created a duty to disclose "additional facts about the safety of its vehicles." *In re Takata Airbag*, 193 F. Supp. 3d at 1337-38. Here, Uniti's statements touting its "iron clad" dividend and Windstream's stability were even more specific and material than the optimistic statements the court in *Takata Airbag* found to be actionable. Uniti's statements concerned the stability of Uniti's largest customer, and Uniti's present expectations of its ability to pay dividends as a result of the "stable" rent revenues it expected from that customer. Given the context in which they were made—a private solicitation to convince a party to accept Uniti partnership interests as payment for

34

a fiber optic network, rather than cash—a reasonable prospective investor would have found the statements to be material. *See Dorsey*, 540 F.3d at 342. And SLF has certainly alleged sufficient facts that Uniti knew important information that undermined its statements. *See supra* at 8-12.

### d. SLF has not challenged mere statements of opinion.

Finally, the District Court erred in carrying over its federal law analysis about Uniti's so-called statements of opinion. JA.21-22. Like puffery, a statement of opinion does not foreclose a fraud or suppression claim under Alabama law. *See Sperau v. Ford Motor Co.*, 674 So. 2d 24, 34 (Ala. 1995) (holding the jury properly decided that an opinion was fraudulent and affirming liability for suppression where defendant elected to speak), *vacated on other grounds*, 517 U.S. 1217 (1996). The Alabama Supreme Court has explained that "[c]lassifying a defendant's statement as an opinion is not necessarily fatal to a plaintiff's claim for fraud." *Cooper & Co. v. Lester*, 832 So. 2d 628, 633 (Ala. 2000). "Where the representation of an opinion is involved, a person must prove . . . that there was an intent to deceive," and that its "reliance was reasonable." *McCutchen Co., Inc. v. Media Gen., Inc.*, 988 So. 2d 998, 1002 (Ala. 2008). "Whether a given representation is an expression of opinion or a statement of fact depends upon all the circumstances of the particular case, such as the form and subject matter of the representation and the knowledge, intelligence, and relation of the respective parties." *Lester*, 832 So. 2d at 633 (Ala. 2000).

Accordingly, "Alabama courts have frequently recognized that the question of whether a particular statement is properly classified as opinion or fact should typically be resolved by a jury unless no reasonable jury could find it to be a statement of fact." *Thomas*, 297 F. Supp. 2d at 1316.

SLF has made sufficient allegations to avoid dismissal on the ground that the statements in question were nonactionable opinions under Alabama law. *See supra* at 8-12.

Contrary to the District Court's suggestion, federal law is in accord with Alabama law. The Supreme Court held that a statement of opinion could be misleading if a "reasonable investor . . . understand[s the] opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188 (2015). "[I]f the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Id.* And "whether an omission makes an expression of opinion misleading always depends on context." *Id.* at 176. The Court noted that "[t]hese principles are not unique" to federal securities law; "[t]hey inhere, too, in much common law respecting the tort of misrepresentation." *Id.* at 191 (citing RESTATEMENT (SECOND) OF TORTS § 539); *see Sperau*, 674 So. 2d at 34 (same, under Alabama law).

36

### 3.     SLF alleged that Uniti concealed material facts.

SLF plausibly alleged that Uniti concealed material facts during its negotiations with SLF: (1) that it was not a properly-constituted REIT; (2) that Windstream was not a stable lessee, because the Master Lease violated the sale-leaseback bar in Windstream's indenture; and (3) that as a result, Uniti's dividend was not "iron-clad." JA. 67-68; 71-72; 76-78; 88-96; 107: 109-10.

### a.     Uniti concealed the flaws beneath the REIT.

SLF alleged that Uniti never disclosed the flaws beneath its status as a REIT. Specifically, Uniti never disclosed that the characterization of the Master Lease as a "true lease" was contingent on unreasonable assumptions for the remaining useful life of the copper networks at issue. JA.88-96; 107; 111; 123-25; 129. And Uniti never disclosed that it did not have legal title to the easements, permits, and pole attachment agreements related to its copper wire network, which were essential assets to turning personal property like wires and cables into real property that could support a REIT. JA.95-96.

But in dismissing SLF's federal securities fraud claims, the District Court incorrectly concluded that Uniti fully disclosed "the risks pertaining to the Master Lease, including that it could be recharacterized as something other than a true lease." JA.23. This was wrong. To be clear, in its public filings provided to SLF as part of the transaction, Uniti generally disclosed that "[i]f the Master Lease is not

37

respected as a true lease for U.S. federal income tax purposes, we may fail to qualify as a REIT." JA.1221. But this generic risk factor did nothing to disclose to SLF the true nature of the risk that the Master Lease could be recharacterized as a financing, nor Uniti's "own involvement in helping create" that risk with Windstream. JA.88. The clearest warning that the Master Lease could be recharacterized as a financing came from the Skadden opinion, *see supra* at 8-9, but the Skadden opinion was neither provided to SLF nor made public. JA.95. As SLF extensively alleged, "[r]ather than disclosing the risks highlighted by Skadden, Uniti kept quiet about them during discussions with SLF." *Id.* Uniti certainly did not disclose that the Skadden opinion was based on inflated assumptions about the remaining useful life for the copper network and that the network's remaining useful life was more likely 7.7 years or less, not 40 years or more. JA.90-92; 94-95.

### b. Uniti concealed that Windstream was not stable.

SLF also alleged that Uniti concealed that Windstream was not actually a stable lessee. Specifically, Uniti never disclosed that the Windstream operating subsidiaries were the *de facto* lessees under the Master Lease and that, as a result, the Master Lease violated the sale-leaseback bar. There is no dispute that Uniti never told SLF, either directly or in a Uniti public filing provided to SLF, about Windstream's sale-leaseback violation. JA.68-69; 88-90; 95; 99-101; 105; 107; 110.

38

Nevertheless, in its evaluation of SLF's federal securities fraud claims, the District Court examined the "entirety of market information," JA.13, including Windstream public filings from years before the SLF transaction and Windstream's statements to regulators concerning the spinoff and Master Lease. JA.24. Based on that review, the District Court concluded that SLF should have discovered the sale-leaseback violation on its own. JA.24. The District Court should not have imported its findings based on its review of the "entirety of market information" to SLF's state law claims.

Under Alabama law, the fact that concealed information could have been discovered by searching the "entirety of the market information" does not absolve a defendant from its failure make a full and fair disclosure to a plaintiff during negotiations. Alabama law is settled that, absent something to arouse the plaintiff's suspicions, if a representation "is made by one who may be fairly assumed to know what he is talking about, it may be accepted as true, without question and without inquiry." *Fed. Sav. & Loan Ins. Corp. v. Haralson*, 813 F.2d 370, 374 (11th Cir. 1987) (internal quotation marks omitted). This is so even if "the means of correct information are *easily within reach*." *Id*. (emphasis added).

As such, Uniti cannot rely on information buried in public filings (including *Windstream*'s public filings from years before the deal, which were never provided to SLF) or in statements to regulators (which also were never provided to SLF) to

39

satisfy its Alabama law duty to speak truthfully and completely to SLF. *See Farmers Ins. Exch. v. Morris*, 228 So. 3d 971, 987 (Ala. 2016) (holding "a jury could find that it was reasonable for Morris to rely upon the representations made by Farmers representatives and for him to be unaware of the single, noncontractual statement to the contrary" that was "buried in a 200-page manual among dozens of other documents provided for training modules"). Even if it were true that SLF could possibly have discovered the sale-leaseback violation on its own, that does not absolve Uniti from its duty to disclose the concealed information.[6]

### c. Uniti concealed that its dividend was not "iron-clad."

SLF alleged that Uniti never disclosed that as a result of the foregoing flaws, its dividend was not "iron-clad," but was in peril. JA.88-89; 95; 105. Although Uniti's public filings provided to SLF contained risk disclosures, none revealed the

---

[6] At best, the undisclosed sale-leaseback violation was buried in the public record. No hint of it appears on the face of any of Uniti's public filings. To even attempt to discover it, SLF would have had to review years of public filings of both Uniti and Windstream, including mining the voluminous debt instruments and contracts of both. JA.1572-74. Even federal securities law does not impose upon shareholders such an obligation to sift through a voluminous public record for buried information. *Werner v. Werner*, 267 F.3d 288, 297 (3d Cir. 2001) (disclosure that prevents a reasonable shareholder from realizing the "correlation and overall import of the various facts interspersed throughout" the document is insufficient); *see also In re Stillwater Capital Partners Inc. Litig.*, 858 F. Supp. 2d 277, 287 (S.D.N.Y. 2013) (public disclosure of omitted information "would not preclude a finding by a trier of fact that [the information was] disclosed to investors in a materially misleading way. Such 'scattered disclosures' are not sufficient for defendants to prevail at the motion to dismiss stage."). There certainly is no such obligation under Alabama law.

aforementioned flaws underlying Uniti's REIT structure or Windstream's instability.

### 4.    SLF alleged inducement.

SLF plausibly alleged that Uniti's statements induced it into accepting the partnership interests in lieu of $65 million cash. JA.112; 125; 128. Uniti did not contest that SLF had properly pleaded the inducement element.

### 5.    SLF alleged that its reliance was reasonable.

SLF plausibly alleged that its reliance was reasonable. JA.112, 127. The reasonableness of reliance under Alabama law is a question of fact, *AT & T Info. Sys., Inc. v. Cobb Pontiac-Cadillac, Inc.*, 553 So. 2d 529, 532 (Ala. 1989). The District Court ruled against SLF on the reasonable reliance issue based on federal legal doctrines inconsistent with Alabama law. The District Court did not independently discuss or even mention reliance when it dismissed SLF's fraudulent inducement claim. JA.35.

In concluding that SLF failed to plead reasonable reliance for its federal securities fraud claims, the District Court imputed to SLF knowledge of "Uniti's publicly available information," suggesting that SLF had "ample opportunity to detect any purported fraud." JA.30. But under Alabama law, "in the absence of independent knowledge sufficient to arouse the purchaser's suspicion," a plaintiff "is not obligated to make an independent investigation as to the truth of the seller's

41

representations absent such knowledge." *Ex parte ERA Marie McConnell Realty, Inc.*, 774 So. 2d 588, 591 (Ala. 2000). Thus, there is no "duty to affirmatively investigate and determine for himself whether or not the defendant is telling the truth," "absent suspicious circumstances, or patent falsity[.]" *In re Bennitt*, 348 B.R. 820, 828 (Bankr. N.D. Ala. 2006) (citing *Shahan v. Brown*, 52 So. 737 (Ala. 1910)). As SLF alleged, it "had been given no reason to doubt the accuracy, or the fullness," of Uniti's representations. JA.113. Therefore, SLF had no duty to investigate further.

In its analysis of the federal securities claims, the District Court also cited various non-reliance clauses in the parties' agreements. JA.30. But whatever their effect on SLF's federal securities claims, those clauses do not bar SLF's Alabama law claims. The Alabama Supreme Court "has consistently held that although a written contract stipulates that there were no oral understandings not incorporated therein, such a stipulation does not foreclose a party, as a matter of law, from establishing his reliance on fraudulent representations that induced him to enter the contract." *Farmers Ins. Exch. v. Morris*, 228 So. 3d 971, 983 (Ala. 2016); *Envtl. Sys., Inc. v. Rexham Corp.*, 624 So. 2d 1379, 1384 (Ala. 1993).

In sum, SLF adequately alleged all the elements of its fraudulent inducement by suppression claim under Alabama law. The District Court erred in dismissing it.

42

### C. SLF plausibly alleged a claim for fraudulent inducement by misrepresentation under Alabama law.

SLF plausibly alleged an Alabama law claim for fraudulent inducement by misrepresentation. To plead inducement by misrepresentation under Alabama law, a plaintiff must allege "(1) that [the defendant] made a false representation, (2) that the misrepresentation involved a material fact, (3) that [the plaintiff] relied on the misrepresentation, and (4) that the misrepresentation damaged [the plaintiff]." *AmerUs Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1207 (Ala. 2008). A misrepresentation claim does not require proof of intent to deceive. *Davis v. Sterne, Agee & Leach, Inc.*, 965 So. 2d 1076, 1091 (Ala. 2007).

Uniti represented to SLF that it had obtained all necessary consents for it to enter the transaction with SLF. JA.73; 107-08; 127. This representation was false. JA.73. The Master Lease required Windstream's consent before Uniti could "merge or consolidate with or into a Competitor," JA.107-08; 334. But Windstream never provided such consent to Uniti to enter into the SLF transaction and acquire SLF's fiber optic network. JA.107-08. Windstream admitted as much in its bankruptcy proceeding against Uniti. *Id.*

There is no dispute that SLF alleged materiality, reliance, and damage. JA. 67-68; 71-72; 76-78; 88-96; 107: 109-10, 112, 119, 124, 127. But the District Court erroneously concluded that the representation was not false. According to the District Court, Windstream's consent was not required because the SLF transaction

43

"was structured as an asset purchase, and not a 'merger' or 'consolidation.'" JA.24. But in so concluding, the District Court ignored the substance and structure of the SLF transaction. SLF's fiber optic network was held by Southern Light, LLC, of which SLF was the sole and 100% member. SLF sold all of its membership interests in Southern Light to Uniti Fiber. As a result, the transaction amounted to a *de facto* consolidation of Southern Light into Uniti Fiber. JA.108. *See Heilbrunn v. Sun Chem. Corp.*, 150 A.2d 755, 757-58 (Del. 1959) (recognizing that an asset purchase may constitute a de facto merger under Delaware law). Uniti, therefore, was required to obtain Windstream's consent. Uniti's misrepresentation that it had obtained all necessary consents was false.

*     *     *

If the Court has any doubt on the points of Alabama law discussed above pertaining to the fraudulent inducement claims, SLF asks this Court to certify any such question to the Alabama Supreme Court. *See* ALA. R. APP. P. 18. The District Court's order involves the following controlling questions of Alabama law:

1. Does Alabama law recognize a "litigation risks" doctrine?

2. Can a defendant obtain a dismissal of fraud or suppression claims in Alabama by characterizing its statements as "puffery" or "opinions" when the plaintiff has alleged that present, material facts were concealed?

44

3. Does Alabama law excuse a plaintiff who asserts a suppression claim from having to dig through "buried facts" potentially available in the public record to find information that was concealed?

## II. The District Court erred in dismissing the Alabama Securities Act claims.

### A. Standard of review.

This Court's review of the District Court's dismissal of SLF's Alabama Securities Act claims is also de novo. *Glatthorn v. Ind. Blue Cross*, 34 F. App'x 420, 421 (3d Cir. 2002).

### B. The District Court erred in applying federal securities concepts to SLF's Alabama Securities Act claims.

The District Court erred in applying federal securities concepts to SLF's Alabama Securities Act ("ASA") claims. Unlike federal securities fraud claims, the ASA does not require scienter, loss causation, or reliance. The ASA is a strict liability statute. In addition, the PSLRA does not apply to the ASA. Therefore, the District Court erred in concluding that because "the alleged misrepresentations are not actionable under section 10(b) of the Exchange Act, SLF also fails to state a claim under Alabama's securities laws." JA.33.

#### 1. The Alabama Securities Act is a strict liability statute.

The ASA "prohibit[s] all fraudulent schemes in connection with the offer, sale, or purchase of securities . . . whether or not the artifices employed involve a garden-type variety of fraud, or present a unique form of deception." *Ex parte Day*,

45

584 So. 2d 493, 495 (Ala. 1991). The civil remedy provided by the ASA is found at § 8-6-19, which imposes liability on any person who fraudulently sells or advises on the sale of securities, including secondary liability on any "control persons." ALA. CODE § 8-6-19.

Unlike a federal securities claim, there is no scienter requirement for an ASA claim. *See Banton v. Hackney*, 557 So. 2d 807, 826-27 (Ala. 1989); *White v. Sanders*, 650 F.2d 627, 631 (5th Cir. 1981). Instead, the ASA is a "strict liability" statute: "[t]here need be no showing of 'reckless disregard' for the truth of a representation or that such representations were 'knowingly' made." *Halbert v. Credit Suisse AG*, 402 F. Supp. 3d 1288, 1321 (N.D. Ala. 2019) (quoting *Banton*, 557 So. 2d at 826). Nor does the ASA have a causation requirement. *Ritch v. Robinson-Humphrey Co.*, 748 So. 2d 861, 862 (Ala. 1999). Rather, a plaintiff need only prove that "the seller violated the rule when the buyer purchased a security from the seller." *Id.*; *see also In re Harbor City Capital*, 2020 WL 3629612, *3 (Ala. Sec. Comm'n June 25, 2020) (finding a violation of § 8-6-17(a) where defendants "caused unrealistic claims of investment performance and unrealistic predictions of market profitability to be displayed on their web site in order to induce investors to purchase their securities in violation of the Act").

SLF pleaded all that was required under the plain terms of the ASA. It claimed Uniti made "untrue statement[s] of material fact" or misleading "omissions," ALA.

CODE § 8-6-19(a)(2). JA.112-13; 131-33. SLF pleaded that it did "not know[] of the untruth or omission." *Id*. Under the text, SLF does not need to plead reliance, nor does it have a duty to investigate. To the extent knowledge is pertinent, it is an affirmative defense that the defendant must plead and prove. *See* § 8-6-19(a)(2) (requiring the defendant to "sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission"). Resolution of that issue on a motion to dismiss, before the defendants had answered, was reversible error. *Banton*, 557 So. 2d at 827.

### 2. The heightened pleading requirements of the PSLRA do not apply to SLF's Alabama Securities Act claims.

The heightened pleading requirements of the PSLRA do not apply to SLF's ASA claims. Sections 8-6-17(a) and 8-6-19(a) of the ASA were passed in 1959 (based on the Uniform Securities Act) and revised in 1990. Congress passed the PSLRA in 1995. But Alabama's Legislature has not enacted a state-law equivalent of the PSLRA. By its terms, the requirements of the PSLRA apply only to actions arising under "this Chapter," *i.e.*, Chapter 2B of the 1934 Securities Exchange Act. 15 U.S.C. § 78u-4(b). Thus, the PSLRA does not apply to the ASA. Both the Fifth and the Eleventh Circuits have confirmed that the PSLRA's heightened pleading standards do not apply to state securities law claims. *Dorsey*, 540 F.3d at 342-43; *Grippo v. Perazzo*, 357 F.3d 1218, 1224-25 (11th Cir. 2004). This Court should follow their lead; it should not create a Circuit split on this issue.

### 3. The District Court's federal law analysis does not apply to SLF's Alabama Securities Act claims.

The District Court failed to recognize the divergence between Section 10(b) and the ASA and misapplied Alabama law in the process. For example, the District Court concluded that Uniti's statements about the stability of Windstream's rent payment and Uniti's ability to pay an "iron-clad" dividend were puffery under federal law. JA.21. But a representation that a return is "secure" is actionable under the ASA. *See Harbor City Capital*, 2020 WL 3629612, at *1. The District Court also concluded, without analysis or reference to the amended complaint, that SLF failed to plead reliance. JA.34. But under the Uniform Securities Act, on which the ASA is based, "the investor has no due diligence obligation to make any investigation concerning the investment or to verify any information. ... [T]he investor is not charged with information which he might have acquired or with constructive knowledge." *Dunn v. Borta*, 369 F.3d 421, 429 (4th Cir. 2004).

\* \* \*

If there is any remaining doubt, SLF asks this Court to certify to the Alabama Supreme Court the questions under the ASA. The District Court's order involves the following controlling questions of law:

1. Does the ASA incorporate the heightened pleading standards of the PSLRA?

2. Are scienter, reliance, and loss causation elements of an ASA claim?

48

3. Is a representation that a dividend is "iron-clad" actionable under the ASA?

4. Under the ASA, must an investor undertake a due diligence investigation of publicly available information for information that was not disclosed to the investor in a private solicitation?

## III. The District Court erred in dismissing SLF's civil conspiracy and declaratory judgment claims.

### A. Standard of review.

This Court's review of the District Court's dismissal of SLF's civil conspiracy and declaratory judgment claims is also de novo. *In re Allergan ERISA Litig.*, 975 F.3d 348, 353 n.9 (3d Cir. 2020); *Owner Operator Indep. Drivers Ass'n v. Pa. Tpk. Comm'n*, 934 F.3d 283, 290 n.7 (3d Cir. 2019).

### B. SLF plausibly alleged that Kenneth Gunderman, John Fletcher, and Uniti conspired to defraud SLF.

The District Court erred in dismissing SLF's civil conspiracy claim arising out of Appellees Gunderman, Fletcher, and Uniti's conspiracy to defraud SLF. The District Court dismissed the conspiracy claim under Alabama law because (1) "SLF has failed to plead a valid fraud claim" and (2) the amended complaint "fails to allege specific facts showing how Gunderman, Fletcher, Uniti, and Windstream conspired to hide risks and purposefully mislead investors." JA.35-36.

"The elements of civil conspiracy in Alabama are: (1) concerted action by two or more persons (2) to achieve an unlawful purpose or a lawful purpose by unlawful means." *Ex parte Alamo Title Co.*, 128 So. 3d 700, 713 (Ala. 2013). There must be

49

some underlying "actionable wrong" to establish liability for the conspiracy. *Singleton v. Protective Life Ins. Co.*, 857 So. 2d 803, 814 (Ala. 2003). The "gist of an action alleging civil conspiracy is not the conspiracy itself but, rather, the wrong committed." *Keith v. Witt Auto Sales, Inc.*, 578 So. 2d 1269, 1274 (Ala. 1991) (citing *Sadie v. Martin*, 468 So. 2d 162 (Ala. 1985)).

The District Court's erroneous dismissal of SLF's conspiracy claim was two-fold. Its first ground—that SLF failed to plead a valid fraud claim—is wrong for the reasons described above. The District Court's second ground—that the amended complaint does not plead specific facts showing how the defendants "conspired to hide risks and purposefully mislead investors"—is wrong because it ignores SLF's numerous and detailed allegations of the participants' actions and knowledge of their roles in the spinoff scheme.

Specifically, the amended complaint alleges that Appellee Gunderman and Windstream executives concocted a scheme to spin off its assets into a REIT (which became Uniti) and installed Appellee Fletcher, who was Windstream's general counsel, as one of the architects of the scheme. JA.74-77. Fletcher served dual roles as General Counsel for both Windstream and Uniti, and he was at least partially responsible for structuring the transaction and preparing the deal documents to conceal the fact that the overall traction was a sale-leaseback prohibited by Windstream's debt covenants. JA.76-77; 86-87; 104-05.

The amended complaint details the relationships among the co-conspirators leading up to the spinoff, JA.74-77; lays out the conspirators' discussions about how to avoid the indenture's sale-leaseback restriction, JA.80-81; and alleges that Uniti purposefully hid the risks associated with the spinoff, including by inventing a strategy to avoid talking about *why* the spinoff had been structured as it was, JA.86-87; 104-05. The amended complaint also alleges that the co-conspirators devised different, inconsistent stories for different stakeholders: one story for state regulators, and another for investors. JA.81. In October 2016, Uniti (via Gunderman) told SLF the investor version of the story to induce SLF to take partnership interests in lieu of $65 million cash. JA.105-13.

The fact that Fletcher was not involved in the SLF deal is beside the point. A defendant who conspires to defraud investors cannot evade liability because he did not know which specific investor would be defrauded. As the Alabama Supreme Court has explained, "it is not necessary that each alleged conspirator be the subject of an underlying cause of action, only that there be a valid cause of action against at least one of the alleged conspirators." *Aliant Bank*, 244 So. 3d at 932 (emphasis in original). That is, a defendant "may be liable for conspiracy" even if it is "not liable for the underlying fraud." *Id.* at 933. "A civil conspiracy claim operates to extend, beyond the active wrongdoer, liability in tort to actors who have merely *assisted, encouraged, or planned* the wrongdoer's acts." *DGB, LLC v. Hinds*, 55 So. 3d 218,

51

234 (Ala. 2010) (emphasis added) (citation omitted)). This is so "whether or not the conspirator profited from the result of the conspiracy." *Eidson v. Olin Corp.*, 527 So. 2d 1283, 1287 n.1 (Ala. 1988) (citation omitted).

SLF plainly alleged that Fletcher "assisted, encouraged, or planned" the wrongdoing, even if he did not directly participate in the fraud perpetrated upon SLF. In a conspiracy claim, the defendant who loads the gun and hands it to the triggerman is just as liable as the triggerman. *Huckleberry v. M.C. Dixon Lumber Co.*, 503 So. 2d 1209, 1210-11 (Ala. 1987) (allowing conspiracy claim even though the defendants "had little or no direct contact with the plaintiffs throughout the entire transaction" and had not "dealt with the plaintiffs").

## C. SLF plausibly alleged a claim for declaratory judgment.

The District Court also erred in dismissing SLF's declaratory judgment claim. SLF seeks a declaratory judgment that it is entitled to indemnification from Uniti under Section 5.23 of its Purchase Agreement with Uniti, which obligated Uniti to file an accurate prospectus supplement. JA.139-41; 613-15. The District Court dismissed this claim because "it is based on the same alleged misrepresentations and omissions already found to be deficient as bases for [SLF's] alleged Exchange Act and Alabama Securities Act claims." JA.37.

52

But SLF did allege that the prospectus supplement contained inaccurate and false statements. JA.73;112-13; 139-41. And the District Court was wrong to analyze SLF's indemnification claim under federal securities fraud principles.

A plaintiff pursuing an indemnification claim "need only put forth a 'short and plain' statement of the facts pursuant to the liberal pleading requirement of Federal Rule of Civil Procedure 8(a), and need not plead the existence of a contract with particularity." *Core Const. & Remediation, Inc. v. Vill. of Spring Valley, NY*, 2007 WL 2844870, at *11 (E.D. Pa. Sept. 27, 2007). A plaintiff need not allege an actual violation of the securities law to prevail on its contract claim. *See Hudson's Bay Co. Luxembourg, S.A.R.L. v. JZ LLC*, 2011 WL 3082339, at * 2 (Del. Super. July 26, 2011) ("A claim for indemnification resulting from the breach of a representation and warranty is a claim for breach of contract.") (citation omitted).

Additionally, Section 5.23 of the Purchase Agreement does not require SLF to allege a violation of federal securities law to be entitled to indemnification. Nor does it require proof of scienter, reliance, or loss causation—as is true in a federal securities claim. *Id.*; *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. 2005) ("No such reasonable reliance is required to make a *prima facie* claim for breach."). Instead, Section 5.23(d) of the Purchase Agreement provides for indemnification if the false or misleading statements in the prospectus supplement violate "any state securities law," including the ASA. JA.614-15. In addition,

Section 10.2 provides for indemnification for any inaccuracy or breach of any representation or warranty and any nonfulfillment or breach of any covenant or agreement in the Purchase Agreement, including Section 5.23(a)'s obligation for Uniti to file a prospectus supplement with no "untrue" or "misleading" statements of material fact. JA.621; 1578.

As a result, Section 5.23 provides indemnity if Uniti's prospectus contains *any* untrue or misleading statements. JA.112; 613-15 (emphasis added). Whether those untrue or misleading statements rise to the level of *fraud*, under the federal securities laws, is irrelevant.

SLF pleaded more than enough to state an actionable claim for indemnification. The District Court erred in holding otherwise. If this Court concludes SLF pleaded a valid claim under the ASA and reverses, it should also reverse dismissal of SLF's indemnification claim.

### CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's order dismissing SLF's Alabama state law claims alleging fraudulent inducement and civil conspiracy, SLF's ASA claims, and SLF's declaratory judgment claim.

Respectfully submitted,

/s/ Matthew H. Lembke

Edward S. Sledge IV
Matthew H. Lembke
Scott Burnett Smith
BRADLEY ARANT BOULT CUMMINGS LLP
1819 5th Avenue North
Birmingham, AL 35203
mlembke@bradley.com
esledge@bradley.com
ssmith@bradley.com

*Counsel for Plaintiff-Appellant*

55

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,990 words. Fed. R. App. P. 28(a)(10), 32(g)(1).

/s/ Matthew H. Lembke
Matthew H. Lembke
*Counsel for Plaintiff-Appellant*

### CERTIFICATE OF BAR ADMISSION

I certify that at least one of the attorneys whose names appear on the brief is

a member of the bar of this court. 3d Cir. L.A.R. 28.3(d).

*/s/ Matthew H. Lembke*

Matthew H. Lembke

*Counsel for Plaintiff-Appellant*

**ELECTRONIC DOCUMENT CERTIFICATE**

I certify that the text of the electronic brief is identical to the text in the paper copies. I certify that the electronic brief was scanned for viruses using Trend Micro Apex One and that no virus was detected. 3d Cir. L.A.R. 31.1(c).

/s/ Matthew H. Lembke
Matthew H. Lembke
*Counsel for Plaintiff-Appellant*

58

## CERTIFICATE OF SERVICE

I certify that on June 15, 2021, I filed the foregoing with the Clerk of the Court

via CM/ECF, which will serve the following counsel of record:

Edmund Polubinski III
Brian M. Burnovski
Daniel S. Magy
DAVIS POLK & WARDELL LLP
450 Lexington Avenue
New York, NY 10017
edmund.polubinski@davispolk.com
brian.burnovski@davispolk.com
daniel.magy@davispolk.com

Blake Rohrbacher
Kelly E. Farnan
RICHARDS, LAYTON & FINGER, P.A.
920 N. King Street
Wilmington, DE 19801
rohrbacher@rlf.com
farnan@rlf.com

*Counsel for appellees Uniti Fiber Holdings INC, Uniti Group Inc., and Kenneth Gunderman*

Jerome E. Speegle
Anthony M. Hoffman
SPEEGLE, HOFFMAN, HOLMAN &
HOLIEFIELD, LLC
Five Dauphin Street, Suite 301
Mobile, AL 36601
jspeegle@speeglehoffman.com
thoffman@speeglehoffman.com

John P. DiTomo
Sabrina M. Hendershot
MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
1201 North Market Street
Wilmington, DE 19801
jditomo@mnat.com
shendershot@mnat.com

*Counsel for appellee John P. Fletcher*

/s/ Matthew H. Lembke
Matthew H. Lembke
*Counsel for Plaintiff-Appellant*

59