UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| In re UNITI GROUP INC. SECURITIES LITIGATION | ) ) ) | Master File No. 4:19-cv-00756-BSM |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) ) | MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION |
| ALL ACTIONS. | ) ) ) | FOR CLASS CERTIFICATION |

4825-2151-7055.v1

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................. 3

    A.    Nature of the Action ............................................................................... 3

    B.    The Proposed Class Representatives ..................................................... 10

III.  ARGUMENT ................................................................................................... 11

    A.    The Proposed Class Satisfies the Requirements of Rule 23(a) ................... 12

        1.    The Class Is so Numerous that Joinder Is Impracticable ................. 12

        2.    Questions of Law and Fact Are Common to the Class .................... 13

        3.    The Proposed Class Representatives' Claims Are Typical.............. 14

        4.    The Proposed Class Representatives Will Adequately and
            Fairly Protect the Interests of the Class........................................... 15

    B.    The Proposed Class Satisfies Rule 23(b)(3)............................................... 17

        1.    Common Factual and Legal Questions Predominate ....................... 17

            a.    The "Fraud-on-the Market" Presumption of Reliance
               Applies ................................................................................ 19

               (1)    The *Cammer* Factors................................................... 21

               (2)    The *Krogman* Factors................................................. 24

               (3)    Additional Factors Support a Finding of Market
                     Efficiency ............................................................. 25

               (4)    Uniti Options Likewise Traded in an Efficient
                     Market .................................................................. 26

            b.    Plaintiffs Are Entitled to a Presumption of Reliance
                Pursuant to *Affiliated Ute* ................................................ 27

        2.    Damages Are Measurable on a Class-Wide Basis .......................... 28

4825-2151-7055.v1

**Page**

3.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action .......................... 30

4.    The Court Should Appoint Labaton and Robbins Geller as Class Counsel ................................................................................. 31

IV.    CONCLUSION ............................................................................................. 32

4825-2151-7055.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Affiliated Ute Citizens v. United States*,
406 U.S. 128 (1972)..................................................................................3, 19, 27

*Alpern v. UtiliCorp United, Inc.*,
84 F.3d 1525 (8th Cir. 1996) ...................................................................29

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)..................................................................................17

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013).............................................................................*passim*

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..........................................................................2, 3, 11, 19

*Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
No. 14-786 ADM/TNL, 2016 WL 4098741
(D. Minn. July 28, 2016).......................................................................*passim*

*Billhofer v. Flamel, Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012) .........................................................24, 26

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) .........................................................*passim*

*Carpenters Pension Tr. Fund v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ...........................................................23

*City of Pontiac Gen. Emps' Ret. Sys. v. Wal-Mart Stores, Inc.*,
No. 5:12-cv-5162, 2016 WL 5400373
(W.D. Ark. Sept. 20, 2016)...................................................................*passim*

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..................................................................................28

*Cromeans v. Morgan Keegan & Co.*,
303 F.R.D. 543 (W.D. Mo. 2014).........................................................29

*Deutchsman v. Beneficial Corp.*,
132 F.R.D. 359 (D. Del. 1990) .............................................................15

**Page**

*Donaldson v. Pillsbury Co.*,
  554 F.2d 825 (8th Cir. 1977) ...................................................................... 11

*Första AP-Fonden v. St. Jude Med., Inc.*,
  312 F.R.D. 511 (D. Minn. 2015)...............................................................*passim*

*Gulf Oil Co. v. Bernard*,
  452 U.S. 89 (1981) ........................................................................................ 11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ........................................................................... 12, 19, 28

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ..................................................................................... 11

*In re Alstom SA Sec. Litig.*,
  253 F.R.D. 266 (S.D.N.Y. 2008) ................................................................ 25

*In re Am. Realty Cap. Props., Inc. Litig.*,
  No. 15-mc-40 AKH, 2017 WL 3835881
  (S.D.N.Y. Aug. 31, 2017) ............................................................................ 25

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
  337 F.R.D. 193 (D. Minn. 2020)................................................................. 24

*In re Groupon, Inc. Sec. Litig.*,
  No. 12 CV 2450, 2014 WL 5245387
  (N.D. Ill. Sept. 23, 2014)............................................................................. 19

*In re Jeld-Wen Holding, Inc. Sec. Litig.*,
  No. 3:20-cv-112-JAG, 2021 WL 1186326
  (E.D. Va. Mar. 29, 2021) ............................................................................. 31

*In re Juniper Networks Sec. Litig.*,
  264 F.R.D. 584 (N.D. Cal. 2009)................................................................ 15

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
  No. 04 Civ. 8144(CM), 2009 WL 5178546
  (S.D.N.Y. Dec. 23, 2009)............................................................................. 14

*In re NeoPharm, Inc. Sec. Litig.*,
  225 F.R.D. 563 (N.D. Ill. 2004)................................................................. 10

**Page**

*In re Pfizer Sec. Litig.*,
  282 F.R.D. 38 (S.D.N.Y. 2012) ............................................................................... 15

*In re Retek Inc., Sec. Litig.*,
  236 F.R.D. 431 (D. Minn. 2006)............................................................................... 15

*In re Select Comfort Corp. Sec. Litig.*,
  202 F.R.D. 598 (D. Minn. 2001)............................................................................... 14

*In re Sepracor Inc.*,
  233 F.R.D. 52 (D. Mass. 2005)................................................................................. 15

*In re Signet Jewelers Ltd. Sec. Litig.*,
  No. 16 Civ. 6728 (CM), 2019 WL 3001084
  (S.D.N.Y. July 10, 2019) ........................................................................................ 23

*In re St. Jude Med., Inc.*,
  425 F.3d 1116 (8th Cir. 2005) ................................................................................. 11

*In re St. Jude Med. Inc. Sec. Litig.*,
  No. 10-cv-0851, 2014 WL 6908434
  (D. Minn. Dec. 8, 2014) .................................................................................... 16, 29

*In re Vicuron Pharms., Inc. Sec. Litig.*,
  233 F.R.D. 421 (E.D. Pa. 2006)............................................................................... 10

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
  No. 08-MDL-1958, 2013 WL 716088
  (D. Minn. Feb. 27, 2013) ........................................................................................ 13

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ....................................................................... *passim*

*Leyva v. Medline Indus.*,
  716 F.3d 510 (9th Cir. 2013) ................................................................................... 28

*Lumen v. Anderson*,
  280 F.R.D. 451 (W.D. Mo. 2012).................................................................. 20, 21, 22

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014)......................................................................... 24

4825-2151-7055.v1

**Page**

*McKeage v. TMBC, LLC*,
847 F.3d 992 (8th Cir. 2017) ................................................................ 12

*Medoff v. CVS Caremark Corp.*,
No. 09-cv-554-JNL, 2016 WL 632238
(D.R.I. Feb. 17, 2016) ......................................................................... 31

*Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*,
278 F.R.D. 454 (D. Minn. 2011)........................................................... 16

*Pirnik v. Fiat Chrysler Autos., N.V.*,
327 F.R.D. 38 (S.D.N.Y. 2018) ............................................................ 23

*Plymouth Cnty. Ret. Sys. v. Patterson Cos.*,
No. 18-871 (MJD/HB), 2020 WL 5757695
(D. Minn. Sept. 28, 2020) ................................................................ *passim*

*Portz v. St. Cloud State Univ.*,
297 F. Supp. 3d 929 (D. Minn. 2018)..................................................... 13

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
821 F.3d 992 (8th Cir. 2016) ................................................................ 18

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148 (2008)............................................................................. 27

*Strougo v. Barclays PLC*,
312 F.R.D. 307 (S.D.N.Y. 2016),
*aff'd sub nom. Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)................................................................... 24

*Stuart v. State Farm Fire & Cas. Co.*,
910 F.3d 371 (8th Cir. 2018) ................................................................ 11

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
325 F.R.D. 280 (D. Minn. 2018)......................................................... *passim*

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)............................................................................. 11

4825-2151-7055.v1

**Page**

*Wilson v. LSB Indus., Inc.*,
   No. 15 Civ. 7614 (RA), 2018 WL 3913115
   (S.D.N.Y. Aug. 13, 2018) ...................................................................................... 21

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §78j(b) ................................................................................................ *passim*
   §78t(a) ........................................................................................... 1, 3, 14

Federal Rules of Civil Procedure
   Rule 23 ................................................................................................... 11
   Rule 23(a) ........................................................................................... *passim*
   Rule 23(a)(1) ......................................................................................... 12
   Rule 23(a)(2) ......................................................................................... 13
   Rule 23(a)(3) ......................................................................................... 14
   Rule 23(a)(4) ......................................................................................... 15
   Rule 23(b) .............................................................................................. 11
   Rule 23(b)(3) ...................................................................................... *passim*
   Rule 23(g)(1) ......................................................................................... 31
   Rule 23(g)(1)(A)(i) ................................................................................ 31
   Rule 23(g)(1)(A)(ii) ............................................................................... 31
   Rule 23(g)(1)(A)(iii) .............................................................................. 31
   Rule 23(g)(1)(A)(iv) .............................................................................. 31
   Rule 26 .................................................................................................. 16

17 C.F.R.
   §240.10b-5 ......................................................................................... 3, 18

## SECONDARY AUTHORITIES

William Rubenstein, et al.,
   *Newberg on Class Actions*, (Winter 2013 Supp.)
   §4:54 ...................................................................................................... 29

## LEGISLATIVE HISTORY

Private Securities Litigation Reform Act of 1995 ("PSLRA")
   Pub. L. No. 104-67, 109 Stat. 737 (1995) ................................................. 17

Lead Plaintiffs Steamfitters Local 449 Pension Plan ("Local 449"), Wayne County

Employees' Retirement System ("Wayne County ERS"), and David McMurray, on behalf of

himself and as sole beneficiary of the David McMurray R/O IRA, ("McMurray,"

collectively, "Plaintiffs") submit this Memorandum of Law in Support of Plaintiffs' Motion

for Class Certification and respectfully request that the Court: (1) certify this case as a class

action; (2) appoint Plaintiffs as Class Representatives; and (3) appoint Labaton Sucharow

LLP ("Labaton") and Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class

counsel.[1]

## I.    INTRODUCTION

Pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure ("Rule" or

"Rules"), Plaintiffs seek certification of the following Class:

> All persons or entities who, during the period from April 24, 2015 to June 24,
> 2019, inclusive (the "Class Period") purchased or otherwise acquired the
> publicly traded common stock or call options or sold the put options of Uniti
> Group Inc. f/k/a Communications Sales & Leasing, Inc. ("Uniti" or the
> "Company"), and were damaged thereby.  Excluded from the Class are: (i)
> Defendants; (ii) members of the immediate family of any Defendant who is an
> individual; (iii) any person who was an officer or director of Uniti during the
> Class Period; (iv) any firm, trust, corporation, or other entity in which any
> Defendant has or had a controlling interest; (v) Uniti's employee retirement
> and benefit plan(s) and their participants or beneficiaries, to the extent they

---

[1]    This action (the "Action") asserts claims against defendants Uniti Group Inc. f/k/a
Communications Sales & Leasing, Inc. ("Uniti" or the "Company"), Kenneth A. Gunderman
("Kenny Gunderman"), and Mark A. Wallace ("Wallace," collectively, "Defendants") for violations
of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.
§§78j(b) and 78t(a).  Unless otherwise noted herein: (i) capitalized terms and abbreviations have the
same meanings as in the Consolidated Amended Class Action Complaint (the "Complaint") (ECF
No. 62); (ii) references to "¶" or "¶¶" refer to paragraphs of the Complaint; (iii) all emphasis is
added and citations are omitted; (iv) references to "Ex." are to documents attached as exhibits to the
Declaration of Debra J. Wyman in Support of Plaintiffs' Motion for Class Certification ("Wyman
Decl."), filed concurrently herewith; and (v) references to "Coffman Report" or "Coffman Rpt." are
to the Expert Report of Chad Coffman, CFA, attached as Exhibit A to the Wyman Decl.

4825-2151-7055.v1

made purchases through such plan(s); (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person; (vii) Windstream; and (viii) any person who was an officer or director of Windstream during the Class Period.

Courts have consistently recognized that a class action is particularly appropriate to resolve claims for violation of the securities laws. *See, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988); *Första AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 522 (D. Minn. 2015) (recognizing that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy"); *City of Pontiac Gen. Emps' Ret. Sys. v. Wal-Mart Stores, Inc.*, No. 5:12-cv-5162, 2016 WL 5400373, at *7 (W.D. Ark. Sept. 20, 2016) (finding it "undisputed" that "[j]udicial economy and the best interests of the class members favor class certification"). This case is no exception.

As set forth below, and supported by the Expert Report of Chad Coffman, CFA, a widely respected expert whose opinions have been relied upon and accepted by courts across the country in certifying securities fraud class actions, all of the prerequisites for class certification under Rule 23(a) – numerosity, commonality, typicality, and adequacy – are met here. **First**, given the number of Uniti Securities (defined herein) traded during the Class Period, the Class easily consists of more than 40 members and thus numerosity is satisfied. **Second**, because the Class' claims arise from the same alleged misrepresentations and omissions and rely on the same theory of liability, there are numerous questions of law and fact common to all Class members. **Third**, Plaintiffs' claims are typical of those of the Class, as Plaintiffs were damaged by the same alleged misconduct by Defendants as other Class members. **Fourth**, Plaintiffs have prosecuted and will continue to prosecute this Action vigorously and in the best interests of the Class, and have retained two of the most

- 2 -

successful and experienced securities class action law firms in the country.  Plaintiffs are more than adequate to serve as Class Representatives and Lead Counsel as Class Counsel.

Additionally, this Action meets the predominance and superiority requirements of Rule 23(b)(3).  Predominance, as with commonality, is met because the core elements of Plaintiffs' §§10(b) and 20(a) claims are susceptible to common proof, including falsity, materiality, scienter, loss causation, and damages.  Similarly, reliance can be presumed on a class-wide basis under the "fraud-on-the-market" presumption articulated by the Supreme Court in *Basic*, as Uniti's common stock and Uniti put and call options (collectively, "Uniti Securities") traded in an efficient market throughout the Class Period.  Reliance can also be presumed on a class-wide basis under the test set forth in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).  Lastly, a class action promotes judicial economy and is undoubtedly the superior method of resolving the claims of the thousands of geographically dispersed investors that were similarly harmed by Defendants' fraudulent conduct.

For these reasons and the reasons further explained below, Plaintiffs' Motion for Class Certification should be granted.

## II.   STATEMENT OF FACTS

### A.   Nature of the Action

This is a straightforward securities fraud action brought pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5.  Plaintiffs allege that Defendants engaged in a scheme to mislead the public, various state regulators, and investors about the validity of the Spin-Off transaction that resulted in Uniti becoming a public-company and the

4825-2151-7055.v1

lease entered into as a result of the Spin-Off transaction, and the true risk facing the Company should the Spin-Off transaction be declared invalid. *See generally* Complaint; ECF No. 74 (order denying Defendants' motion to dismiss) ("MTD Order").

Uniti operates as a REIT that owns and leases the use of its wireless networks to telecommunications companies. ¶¶5-6. By 2013, Windstream Holdings needed an infusion of capital to make critical upgrades to its aging telecommunications networks to keep up with its peers that were offering faster network speeds. ¶57. Defendant Kenny Gunderman, who was at the time Windstream's lead adviser at investment banking firm Stephens, Inc., and also the brother of Windstream's Senior Vice President, Financial Planning and Treasurer Robert Gunderman, proposed that Windstream create and spin-off a REIT owning Windstream's copper wire and fiber optic cable networks. ¶58.

The structure of the Spin-Off would require the following steps: (1) Windstream Services – Windstream's predecessor holding company – would create a new holding company specifically for purposes of the Spin-Off; (2) Windstream Services would direct the Windstream Operating Subsidiaries – which actually owned and operated the telecommunication networks – to execute an intra-company transfer of certain critical assets, including 300,000 miles of copper wire and fiber optic cables, to Uniti, a newly formed REIT, also a wholly-owned subsidiary of Windstream Holdings; (3) Uniti would then lease those assets back to Windstream Holdings via a "Master Lease"; and (4) Windstream Holdings would spin-off Uniti as an independent public company. ¶¶47, 59.

However, though the formation of Uniti would solve Windstream's capital needs, Windstream's Indenture governing certain unsecured notes (the "Notes") prohibited sale-

- 4 -

4825-2151-7055.v1

leaseback transactions and restricted the amount of debt Windstream could carry on its books.  If such covenants were breached, noteholders representing 25% or more of the aggregate principal amount of the Notes could seek to accelerate payments on the Notes, a figure in the hundreds of millions of dollars, and potentially trigger a Windstream bankruptcy.  ¶¶8, 66.

Internal emails, documents, and Board of Directors minutes "indicate that Windstream knew that it had to . . . ensure that the Master Lease it entered into with Uniti appeared to be a 'true lease' and not a disguised financing."  MTD Order at 2.  In fact, in April 2013, Windstream's then-Chief Financial Officer Tony Thomas (who is currently Windstream's Chief Executive Officer) emailed Robert Gunderman (Windstream's then-Treasurer and Defendant Kenny Gunderman's brother) specifically flagging the restrictive covenants in the Indenture as a potential problem for executing the Spin-Off:

> We need a capital structure that works with the Indenture; we may be able to use the HoldCo strategy here.  Create HoldCo and put Windstream Financial underneath HoldCo. . . .  Remember the sales – leaseback provision in the Indenture can be a limiting factor here.

¶75.  Additionally, Windstream's and Uniti's management "adopted a public relations strategy to conceal the known risk that the spin-off violated the indenture." MTD Order at 2. Specifically, internal documents show that Kenny Gunderman and Wallace were advised to hide the truth if ever asked why Windstream Holdings – rather than Windstream Services – signed the Master Lease.  ¶¶15-16.  Nevertheless, despite the Indenture's restrictions, Windstream's Board of Directors approved the use of this "HoldCo" strategy, which resulted in the formation of Windstream Holdings on August 30, 2013, and incorporation of Uniti, as a wholly-owned subsidiary of Windstream Holdings, in February 2014.  ¶¶77-78.

4825-2151-7055.v1

On March 26, 2015, Uniti announced the completion of the Spin-Off, stating that it would be finalized on April 24, 2015. ¶140. But by August 2017, rumors began to circulate that New York-based hedge fund Aurelius was buying Windstream's Notes in an effort to gain a 25% position, fueling speculation that Aurelius believed the Spin-Off violated the Indenture. ¶172. In response, Defendants assured investors that the Master Lease was "fair," that Defendants had "a lot of confidence" in Windstream's executives, and that the Master Lease "[was] designed to be well structured for distressed situations." ¶¶173-175.

Then, on September 25, 2017, Windstream filed a Form 8-K announcing that it had received a "purported notice of default" from Aurelius (the "Notice of Default"), contending that the Spin-Off transaction violated the Indenture's prohibition against sale-leaseback transactions. ¶177. Just a few weeks later, Aurelius instructed the trustee of the Notes, U.S. Bank National Association, to file suit in the U.S. District Court for the Southern District of New York, alleging that the Spin-Off violated Windstream's Indenture (the "Aurelius Litigation"). ¶181.

Despite Defendants repeatedly and expressly disclaiming the possibility of a ruling in favor of Aurelius, on February 15, 2019, Judge Jesse Furman held that the Spin-Off and execution of the Master Lease violated the Indenture. ¶¶201-204. Because of these findings, Judge Furman declared more than $300 million of the Notes immediately due and payable. ¶204. As a direct result, on February 25, 2019, Windstream filed for Chapter 11 bankruptcy protection. ¶¶208-209.

In response to Judge Furman's ruling and Windstream's bankruptcy filing, Defendants began proclaiming that Windstream would "successfully navigate through the

- 6 -

4825-2151-7055.v1

reorganization process" and attempted to reassure Uniti investors that Windstream's business was continuing to operate in the "ordinary course" and that it was "pay[ing] in full its service providers," *i.e.*, Uniti. ¶209. Defendants also shifted their message to Uniti investors, telling the market that Uniti had the "ability to navigate the Windstream bankruptcy proceedings without having to raise external capital" and that it would continue "to invest uninterrupted" in its business platforms. ¶¶214-217. But, just a month later, Defendants announced that it was issuing $300 million in exchangeable senior notes due 2024, with an option to issue an additional $45 million within the first two weeks the exchangeable notes were issued. ¶227.

A few days later, on June 28, 2019, the trustee of Windstream's Notes asked the bankruptcy court to order Windstream to cease its payments to Uniti under the Master Lease, asserting that the Master Lease was actually a disguised financing and that the rental payments could therefore not continue during the bankruptcy. ¶229. Then, on July 25, 2019, Windstream initiated an adversarial proceeding in connection with its bankruptcy action against Uniti, similarly arguing that the Master Lease was not a true lease at all, but was instead a disguised financing (the "Adversary Proceeding"). ¶¶124, 231. The allegations in the Adversary Proceeding demonstrate that Defendants knew the Master Lease was a financing all along and could be recharacterized as such in the event of a Windstream bankruptcy. ¶¶125-138.

Defendants' fraud was revealed through a series of partial disclosures. On the heels of rumors in the market that Windstream was in financial distress, on August 3, 2017, Windstream announced that it was eliminating its dividend payment to its investors. As a result of Windstream's disclosure, the price of Uniti's stock fell more than 8% on August 3,

2017, on a volume of more than 4 million shares, to close at $22.57 per share, and another nearly 4% on August 4, 2017 to close at $21.84 per share, with over 7 million shares trading that day. ¶¶247-250. On August 3, 2017, Defendants attempted to reverse the decline in Uniti's stock by making false statements reassuring the market that despite Windstream's elimination of its dividend, its lease payments from Windstream were "very, very safe." ¶169. On August 8, 2017, Defendants again falsely reassured the market that the lease payment from Windstream was not in jeopardy and that the Master Lease had safe-guards to protect the Company "in all cases." ¶171. Uniti's stock price, however, continued its decline, falling more than 12% between August 8 and August 11, 2017 as the market absorbed this information, closing on August 11, 2017 at $19.37 per share. ¶248.

On September 25, 2017, after market close, Windstream filed a Form 8-K disclosing that it had received a "purported notice of default" from Aurelius claiming that the Spin-Off violated Windstream's debt covenants. ¶251. As a result of this partial disclosure, the price of Uniti's stock declined more than 10% on a trading volume of nearly 12 million shares to close at $15.66 per share on September 26, 2017, and another 5% on September 27, 2017 to close at $14.73 per share. ¶¶252-254.

Thereafter, on February 15, 2019, Judge Furman issued his ruling determining that the Spin-Off violated Windstream's Indenture, and found that a $300 million judgment should be entered against Windstream. ¶255. As a result of this information, the price of Uniti stock declined more than 37% on a trading volume of almost 49 million shares to close at $12.51 per share on February 19, 2019. ¶256. Credit agencies likewise reacted negatively. ¶259. As a direct result, the price of Uniti's stock fell further, over 18%, to close at $9.99

per share with over 24 million shares trading.  *Id.*  Uniti's stock price continued to fall on February 22, 2019 as the market absorbed this news, losing another 8% to close at $9.23 per share on heavy trading of nearly 20 million shares.  *Id.*  Between February 19 and June 20, 2019, Defendants continued to reassure investors that Uniti would be able "to navigate the Windstream bankruptcy proceedings without having to raise external capital," that the Master Lease was designed structurally to withstand a bankruptcy filing by Windstream, and that Uniti was seeing no impact to its business due to Windstream's bankruptcy.  ¶261. Defendants' misstatements and omissions maintained the artificial inflation in the price of Uniti's securities.  *Id.*

On June 24, 2019, after the market closed, Defendants announced a $300 million note offering that included an option to purchase an additional $45 million notes.  ¶262.  Uniti's stock price immediately declined closing at $9.38 per share, an over 10% loss from the prior day's closing price, with over 10 million shares traded.  ¶263.[2]  As a result of these partial disclosures, Plaintiffs and other Class members who purchased Uniti common stock, and options, and those who sold Uniti put options, at artificially inflated prices suffered significant damages as the truth about, and impact associated with, Defendants' misstatements and scheme to defraud was revealed to the market.  This Action seeks to recover for these losses.

---

[2]   The price reaction of Uniti common stock had a direct impact on the value of Uniti's options. Coffman Rpt., ¶¶81-93.

### B.    The Proposed Class Representatives

On March 12, 2020, Local 449, Wayne County ERS, and McMurray were appointed as Lead Plaintiffs.   ECF No. 44.   Local 449, established in 1913, is a Pittsburgh, Pennsylvania-based labor fund with approximately $500 million in assets under management, representing nearly 2,700 union-trained steamfitters.   ECF No. 30-4, ¶2. Wayne County ERS, established in 1944, is a Detroit, Michigan-based pension fund with approximately $920 million in assets under management, representing 10,000 active and retired public employees.   *Id.*, ¶3.   McMurray is a resident of Inman, South Carolina and has been investing for approximately 20 years.   *Id.*, ¶4.   Local 449, Wayne County ERS, and McMurray are prepared to actively oversee this matter and are available to confer via telephone and/or email, with or without counsel, to ensure that timely decisions can be made. *Id.*, ¶10.[3]

Furthermore, the proposed Class Representatives have already expended significant time and effort prosecuting this Action on behalf of the proposed Class – actively participating in discovery and monitoring and reviewing the work of Lead Counsel Robbins Geller and Labaton.   Court-appointed Lead Counsel Robbins Geller and Labaton, in turn, have conducted an extensive investigation into Defendants' alleged misconduct, drafted a comprehensive Complaint, successfully opposed Defendants' motion to dismiss, and are

---

[3]    Like many investors, Plaintiffs Local 449 and Wayne County ERS utilized the services of professional investment managers to direct the purchase and sale of Uniti Securities on its behalf. *Id.*   This practice is typical among pension funds due to the fiduciary duties owed to the fund's beneficiaries.   *See, e.g.*, *In re Vicuron Pharms., Inc. Sec. Litig.*, 233 F.R.D. 421, 427 (E.D. Pa. 2006) ("trustees or directors of investment funds would likely violate their fiduciary duties if they invested the assets of the pensions without professional guidance"); *In re NeoPharm, Inc. Sec. Litig.*, 225 F.R.D. 563, 567 (N.D. Ill. 2004) ("more likely than not, [pension fund's] fiduciary duties would preclude it from making investment decisions on behalf of its beneficiaries").

diligently pursuing the discovery necessary to prove the Class' claims. *See, e.g.*, Complaint; MTD Order.

## III.    ARGUMENT

"Class actions serve an important function in our system of civil justice" (*Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981)), and are an indispensable tool for enforcing the federal securities laws. *See, e.g.*, *Basic*, 485 U.S. at 229-31; *Herman & MacLean v. Huddleston*, 459 U.S. 375, 380 n.10 (1983). Courts in this Circuit have consistently certified securities fraud cases as class actions.[4] Nothing suggests a different conclusion here.

Class certification requires a showing by a preponderance of the evidence that all of the requirements under Rule 23(a) and one of the three subsections of Rule 23(b) are satisfied. *See In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005). District courts have "'broad discretion' to determine whether certification is appropriate." *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 375 (8th Cir. 2018). Using that discretion, courts interpret Rule 23 liberally to effectuate its policy of fostering the class-wide resolution of similar claims against a common defendant. *See Donaldson v. Pillsbury Co.*, 554 F.2d 825, 831 (8th Cir. 1977). While the Rule 23 analysis "must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013) (quoting *Wal-Mart Stores, Inc. v.*

---

[4]    *See, e.g.*, *Plymouth Cnty. Ret. Sys. v. Patterson Cos.*, No. 18-871 (MJD/HB), 2020 WL 5757695, at *16 (D. Minn. Sept. 28, 2020); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 296 (D. Minn. 2018); *Wal-Mart*, 2016 WL 5400373, at *8; *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, No. 14-786 ADM/TNL, 2016 WL 4098741, at *15 (D. Minn. July 28, 2016); *Första*, 312 F.R.D. at 522-23.

- 11 -

4825-2151-7055.v1

*Dukes*, 564 U.S. 338, 350-52 (2011)).  Therefore, the elements underlying Plaintiffs' claims – falsity, materiality, scienter, and loss causation – are not ripe for resolution now.  *See, e.g.*, *Amgen*, 568 U.S. at 459-60, 467-70, 475 (materiality and loss causation confined to merits stage); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 282-83 (2014) ("*Halliburton II*") (same).  As demonstrated below, because all of Rule 23(a)'s and Rule 23(b)(3)'s requirements are satisfied, the proposed Class should be certified.

### A.    The Proposed Class Satisfies the Requirements of Rule 23(a)

Rule 23(a) establishes four requisite elements for class certification:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)-(4); *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017).  Additionally, the Eighth Circuit considers an "implicit requirement that a class '"must be adequately defined and clearly ascertainable."'"  *Id.*  Here, the proposed Class meets each of these requirements.

### 1.    The Class Is so Numerous that Joinder Is Impracticable

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Numerosity is established here, as Uniti Securities are traded on the National Association of Securities Dealers Automated Quotations ("NASDAQ") under the ticker "UNIT" – one of the largest stock exchanges in the world.  *See* Coffman Rpt., ¶11.  Evidencing numerosity, the weekly trading volume for Uniti common stock during the Class Period was 9.74 million shares, which represents

5.76% of shares outstanding, higher than the 2.03% average security traded on the NASDAQ

and/or New York Stock Exchange ("NYSE"). *Id.*, ¶¶25, 28. Further, over 943 institutions

owned Uniti common stock during the Class Period, holding on average 66.32% of the

public float. *Id.*, ¶74. Based on the volume of trading and the number of institutional

shareholders, numerosity is satisfied. *See Wal-Mart*, 2016 WL 5400373, at *4 (numerosity

"generally satisfied" where nationally traded securities involved); *Patterson*, 2020 WL

5757695, at *4 (numerosity satisfied where 105 million shares of Patterson common stock

traded on the NASDAQ); *In re Zurn Pex Plumbing Prods. Liab. Litig.*, No. 08-MDL-1958

ADM/AJB, 2013 WL 716088, at *3 (D. Minn. Feb. 27, 2013) (citing cases certifying classes

with 20, 40, and 48 members).

### 2.    Questions of Law and Fact Are Common to the Class

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."

*See* Fed. R. Civ. P. 23(a)(2). Commonality is "easily satisfied in securities cases"

(*Medtronic*, 325 F.R.D. at 286) because it does "not require[] that every question of law or

fact be common to every member of the class." *Wal-Mart*, 2016 WL 5400373, at *4.

Rather, "[a] single common question" will do. *Portz v. St. Cloud State Univ.*, 297 F. Supp.

3d 929, 945 (D. Minn. 2018). This case is no different.

Here, each Class member's claims regarding Defendants are based on identical claims

and will be decided together based on common evidence:

> (1) whether Defendants were engaged in a scheme to defraud [investors
> concerning the validity of the Spin-Off and the Master Lease]; (2) whether
> Defendants knowingly or recklessly made material misrepresentations or
> omitted material information in their public statements; (3) whether the price
> of [Uniti Securities] artificially inflated during the class period [as a result of

- 13 -

Defendants' misrepresentations]; and (4) the extent of damages sustained by Class members and the appropriate measure of damages.

*Wal-Mart*, 2016 WL 5400373, at \*4.  Thus, commonality is satisfied.

### 3.      The Proposed Class Representatives' Claims Are Typical

Rule 23(a)(3) requires a showing that "the claims or defenses of the representative parties are typical of the claims and defenses of the class."  Fed. R. Civ. P. 23(a)(3). Typicality is closely connected to commonality, as "'a finding of one generally compels a finding of the other.'" *In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 604 (D. Minn. 2001).  The typicality requirement of Rule 23(a) is satisfied "'if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory,'" and "[t]he burden is 'fairly easily met so long as other class members have claims similar to the named plaintiff.'" *Id.*

Plaintiffs' claims are typical of the proposed Class as they arise out of the same course of conduct – "[a]ll allegedly bought [Uniti Securities] during the proposed class period, relying on the truth of [Uniti's] materially misleading statements, and were damaged when the truth came to light through a series of corrective disclosures." *Första*, 312 F.R.D at 515-16; *Medtronic*, 325 F.R.D. at 286.  Accordingly, all of Plaintiffs' claims – *i.e.*, the alleged violations of §§10(b) and 20(a) of the Exchange Act – will be proven by the same evidence on a class-wide basis.

Further, as courts consistently recognize, trivial "[f]actual differences involving the date of acquisition, type of securities purchased and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct." *In re Marsh &*

- 14 -

4825-2151-7055.v1

*McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144(CM), 2009 WL 5178546, at \*10 (S.D.N.Y. Dec. 23, 2009).[5]  Similarly, the delegation of trading authority to an investment advisor does not render Plaintiffs atypical.  *See In re Pfizer Sec. Litig.*, 282 F.R.D. 38, 45 (S.D.N.Y. 2012); *Tile Shop*, 2016 WL 4098741, at \*5-\*6.

In short, Plaintiffs and the putative Class suffered losses from the same course of conduct and share identical interests in holding Defendants accountable and maximizing the Class' recovery.  The claims are therefore typical.

### 4. The Proposed Class Representatives Will Adequately and Fairly Protect the Interests of the Class

The adequacy requirement of Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4). Plaintiffs need only show that they have (1) "common interests with the members of the class," and (2) "will vigorously prosecute the interests of the class through qualified counsel." *Wal-Mart*, 2016 WL 5400373, at \*6; *In re Retek Inc., Sec. Litig.*, 236 F.R.D. 431, 435 (D. Minn. 2006).  This showing is easily made here.

---

[5]  Because the price of Uniti put or call options is impacted by movement in the price of Uniti common stock, Plaintiffs (who transacted in Uniti common stock) each have standing to represent Class members who transacted in Uniti put or call options.  Coffman Rpt., ¶¶81, 84-93; *see In re Sepracor Inc.*, 233 F.R.D. 52, 56 (D. Mass. 2005) (certifying class of common stock purchasers where class representative was only options trader because "purchasers of different types of securities have often been found qualified to represent purchasers of other types of securities of the same issuer"); *In re Juniper Networks Sec. Litig.*, 264 F.R.D. 584, 594 (N.D. Cal. 2009) (finding that plaintiffs have standing to represent class of note purchasers even where they themselves did not purchase notes because "'[c]ourts often appoint purchasers of one type of securities to represent purchasers of other types of securities of the same issuer where the interests of those purchasers are aligned'"); *Deutchsman v. Beneficial Corp.*, 132 F.R.D. 359, 371 (D. Del. 1990) (certifying options purchaser plaintiff who had never purchased common stock as representative of class of both common stock and call options purchasers because "[i]t is clear the [Third Circuit] considers the positions of stock purchasers and options purchasers substantially the same vis-à-vis securities fraud").

Plaintiffs' interests are neither antagonistic to nor in conflict with the interests of the other Class members. To the contrary, Plaintiffs acquired Uniti Securities during the Class Period and sustained damages as a result of the same alleged material misrepresentations and omissions as other Class members. Indeed, Plaintiffs collectively incurred losses of more than $650,000 on their Class Period transactions in Uniti Securities as calculated on a last-in-first-out ("LIFO") basis. ECF No. 29 at 2; *see Patterson*, 2020 WL 5757695, at \*7 (adequacy satisfied where lead plaintiff, like other class members sought damages based on stock purchases following defendants' misrepresentations).

In addition to their financial stakes, Plaintiffs have demonstrated a willingness and ability to take an active role in the litigation to protect the interests of Class members. They have, among other things, filed a consolidated complaint with a comprehensive set of claims, defended those claims through motion-to-dismiss briefing, and are in the process of gathering evidence proving those claims in discovery. Plaintiffs have also diligently complied with their own discovery obligations by filing Rule 26 Initial Disclosures and responding to Defendants' interrogatories and document requests.

Moreover, Plaintiffs have also demonstrated their adequacy by retaining attorneys with considerable experience in securities class actions. Robbins Geller, a 200-attorney firm, regularly represents investors in nationwide securities litigation and has prosecuted securities class actions within this Circuit resulting in tens of millions of dollars in recoveries for investors. *See, e.g.*, Ex. B (Robbins Geller firm resume) at 8 ($50 million recovery in *In re St. Jude Med., Inc. Sec. Litig.*, No. 10-cv-0851 (SRN/TNL) (D. Minn.)); *Minneapolis*

- 16 -

*Firefighters' Relief Ass'n v. Medtronic, Inc.*, 278 F.R.D. 454, 457 (D. Minn. 2011) ($85 million recovery).

Labaton is also a leader in securities litigation with more than 60 full-time attorneys and is a trusted advisor to more than 300 institutional investors. *See, e.g.*, Ex. C (Labaton firm resume). Since the passage of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Labaton has recovered more than $9 billion in the aggregate for injured investors through securities class actions prosecuted throughout the United States and against numerous public corporations and other corporate wrongdoers. *Id.* These recoveries include more than $1 billion in *In re Am. Int'l Grp., Inc. Sec. Litig.*, No. 04-cv-8141 (S.D.N.Y.), $671 million in *In re HealthSouth Sec. Litig.*, No. 03-cv-01500 (N.D. Ala.), $624 million in *In re Countrywide Fin. Corp. Sec. Litig.*, No. 07-cv-05295 (C.D. Cal.), and $473 million in *In re Schering-Plough/ENHANCE Sec. Litig.*, No. 08-cv-00397 (D.N.J.). *Id.*

The Class' interests are therefore protected.

### B.     The Proposed Class Satisfies Rule 23(b)(3)

The proposed class also satisfies Rule 23(b)(3)'s requirements that common questions of law or fact "predominate" over individual questions and a class action is the "superior" method in adjudicating the controversy. *See* Fed. R. Civ. P. 23(b)(3).

#### 1.     Common Factual and Legal Questions Predominate

"'Predominance is a test readily met in certain cases alleging . . . securities'" law claims and exists where the proposed class is "'sufficiently cohesive to warrant an adjudication by representation.'" *Wal-Mart*, 2016 WL 5400373, at *6 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 625 (1997)). Indeed, the Supreme Court has held

- 17 -

that the "essential element[s]" of a §10(b) claim are subject to common proof. *Amgen*, 568 U.S. at 459-60, 467-70, 475. Further, "Rule 23(b)(3) [does not] require[] a showing that *questions* common to the class . . . will be answered, on the merits, in favor of the class." *Id.* at 459.

As discussed above, the Class' claims are all premised on the same factual circumstances: Defendants' scheme and course of conduct that concealed from investors the true state of affairs regarding the propriety of Uniti's very existence, the validity of the Spin-Off transaction that resulted in Uniti becoming a public company and the lease entered into as a result of the Spin-Off transaction, and the true risk facing the Company should the Spin-Off transaction be declared invalid. *See generally* Complaint; MTD Order. Plaintiffs allege this conduct caused Uniti's Securities prices to be artificially inflated during the Class Period, and that Plaintiffs and the Class were harmed when the price of Uniti's Securities declined and when the true state of affairs was publicly disclosed. In sum, the Class' claims will be proven through common evidence.

With respect to the Class' §10(b) and Rule 10b-5 claims, the Supreme Court has held that questions of whether a defendant knowingly and/or recklessly made public material misstatements and/or omissions (*i.e.*, the scienter, falsity, and materiality elements) and whether the revelation(s) of the alleged fraud proximately caused that company's securities prices to decline (*i.e.*, loss causation) are all common questions. *See Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 998 (8th Cir. 2016) (holding that because "'the same evidence will suffice for each member to make a prima facie showing'" on falsity, materiality, scienter, and loss causation "'common question[s]'" exist).

- 18 -

4825-2151-7055.v1

These questions of Defendants' class-wide liability predominate over any individualized issues and are fundamental to all Class members' claims. As to reliance, predominance is met because of the presumption afforded to the Class pursuant to *Basic* and *Affiliated Ute*. ¶¶236-238. As set forth below, damages will also be determined on a class-wide basis using the same formula and measure of artificial inflation attributable to Defendants' conduct.

### a. The "Fraud-on-the-Market" Presumption of Reliance Applies

"In a securities fraud class action, the fraud-on-the-market doctrine makes it rather easy for a lead plaintiff to establish that common questions predominate over individual ones." *In re Groupon, Inc. Sec. Litig.*, No. 12 CV 2450, 2014 WL 5245387, at *2 (N.D. Ill. Sept. 23, 2014). "The fraud-on-the-market theory rests on the premise that certain well developed markets are efficient processors of public information. In such markets, the 'market price of shares' will 'reflec[t] all publicly available information.'" *Amgen*, 568 U.S. at 461 (quoting *Basic*, 485 U.S. at 246).

To invoke the presumption, plaintiffs must demonstrate: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268. Once the presumption is invoked, the burden shifts to Defendants to rebut the presumption. *Basic*, 485 U.S. at 248. Notably, materiality need not be proven at class certification. *Amgen*, 568 U.S. at 459-60, 467-70, 475. Here, there is no dispute that the alleged misrepresentations in this case were publicly issued (*see* ¶¶139-228) or that Plaintiffs

- 19 -

traded in Uniti Securities between the misrepresentations and the ultimate revelation of the truth (ECF No. 30-2). As described in the Coffman Report, Uniti traded in an efficient market. Coffman Rpt., §VII.

Indeed, the market for Uniti common stock was open, active, and efficient throughout the Class Period. Professor Coffman, who founded Global Economic Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in the context of securities litigation (*id.*, ¶1), concluded that Uniti was widely traded on the NASDAQ during the Class Period, and efficiency is generally presumed for stock traded on the NASDAQ. *Id.*, ¶¶25, 28; *see Lumen v. Anderson*, 280 F.R.D. 451, 459-60 (W.D. Mo. 2012) (cases "too numerous to cite" "establish the . . . NASDAQ [is] at least entitled to a ***presumption*** of efficiency – making it incumbent upon Defendants to rebut the presumption" and that it would be "remarkable for a court to conclude NASDAQ is not an efficient market").

Although the fact that Uniti stock trades on the NASDAQ ***alone*** is sufficient to demonstrate market efficiency, courts also often look to the factors set out in both *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). *See, e.g.*, *Tile Shop*, 2016 WL 4098741, at *8-*11 (relying on both *Cammer* and *Krogman* factors in evaluating market efficiency). The *Cammer* factors are: (1) average weekly trading volume; (2) analyst coverage; (3) number of market makers; (4) eligibility to file Form S-3 Registration Statements; and (5) stock price reaction to unexpected news. *See id.* at *9; *Lumen*, 280 F.R.D. at 460 (*Cammer* does not provide a "checklist" but rather "factors to be considered"). The *Krogman* factors are: (1) market

- 20 -

capitalization; (2) bid-ask spread; and (3) the stock's float. *See Tile Shop*, 2016 WL 4098741, at *9.

All of the *Cammer* and *Krogman* factors are met here. Coffman Rpt., ¶¶26-73.

### (1)    The *Cammer* Factors

**(i) Uniti Had a High Average Trading Volume**: During the Class Period, Uniti common stock traded on the NASDAQ, with an average weekly trading volume of 9.74 million shares, which represents 5.76% of shares outstanding, compared to 2.03% for stocks trading on both the NYSE and NASDAQ (Coffman Rpt., ¶28), exceeding the 1% or 2% threshold for a "strong presumption" of market efficiency. *Cammer*, 711 F. Supp. at 1286, 1293 (an average weekly trading volume exceeding 2% of outstanding shares supports a "'strong presumption'" of market efficiency); *see also Första*, 312 F.R.D. at 519 (4.58% average weekly trading volume supported finding of market efficiency). Therefore, the trading volume factor weighs in favor of market efficiency. Coffman Rpt., ¶¶26-31.

**(ii) A Substantial Number of Securities Analysts Followed the Company**: Further evidence of an efficient market is that there were 11 separate firms that issued equity analyst reports on Uniti, including major firms such as JP Morgan, Morgan Stanley, and RBC, *see Wilson v. LSB Indus., Inc.*, No. 15 Civ. 7614 (RA) (GWG), 2018 WL 3913115, at *11 (S.D.N.Y. Aug. 13, 2018) (finding at least five analyst firms publishing 45 or more reports sufficient to satisfy the second *Cammer* factor), and at least 346 reports issued during the Class Period (Coffman Rpt., ¶¶32-37), indicating that new information was rapidly being disseminated to and acted upon by investors. *See Cammer*, 711 F. Supp. at 1286; *Lumen*, 280 F.R.D. at 460. The public press also regularly covered Uniti, with more than 1,487

- 21 -

unique articles published during the Class Period. Coffman Rpt., ¶36. Therefore, the analyst coverage factor weighs in favor of market efficiency. *Id.*, ¶¶32-37.

**(iii) Uniti Was Listed on the NASDAQ, and There Were Market Makers for Uniti Common Stock**: There were 129 market makers for Uniti common stock throughout the Class Period (*id.*, ¶¶38-42), justifying a "'substantial presumption'" of market efficiency. *Cammer*, 711 F. Supp. at 1293 ("'[t]en market makers for a security would justify a substantial presumption that the market for the security is an efficient one'"); *see also Lumen*, 280 F.R.D. at 460 (12 market makers sufficient). Uniti's broad array of market makers further supports a finding that the market for Uniti was efficient.

**(iv) Eligibility to File an S-3 Registration Statement**: Courts also consider eligibility to file a Form S-3 registration statement in assessing market efficiency. *Cammer*, 771 F. Supp. at 1284 (Form S-3 registration is "'predicated on the Commission's belief that the market operates efficiently for these companies'"). A company must meet certain float and other requirements to be eligible for S-3 registration. Coffman Rpt., ¶¶43-45. Here, Uniti filed Form S-3ASR, a type of Form S-3 exclusive to "'well-known seasoned issuers,'" during and after the Class Period, on June 15, 2016 and March 12, 2020. *Id.*, ¶45. Therefore, this factor weighs in favor of market efficiency. *Id.*, ¶¶43-45.

**(v) Uniti's Stock Price Reacted to New, Company Specific Information**: Although not necessary to demonstrate market efficiency (*Tile Shop*, 2016 WL 4098741, at *10; *Första*, 312 F.R.D. at 520), evidence that a company's stock price reacted immediately to unexpected news favors market efficiency. *Cammer*, 711 F. Supp. at 1287. Here, the first four *Cammer* factors, and all of the *Krogman* factors discussed below, support market

efficiency, obviating the Court's need to analyze the fifth *Cammer* factor. *Första*, 312 F.R.D. at 520 (citing to cases to hold that "[a] plaintiff's shortfall on the fifth *Cammer* factor alone does not outweigh, as here, showings on many other relevant factors"); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 45 n.3 (S.D.N.Y. 2018) ("As Plaintiffs easily satisfy the first four *Cammer* factors, the Court need not and does not analyze the fifth *Cammer* factor, which asks for direct evidence of price impact."); *Carpenters Pension Tr. Fund v. Barclays PLC*, 310 F.R.D. 69, 86 (S.D.N.Y. 2015) ("In the usual case of common or other highly traded and analyzed stock, there is no reason to burden the court with review of an event study and the opposing expert's attack of it."); *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM) (RWL), 2019 WL 3001084, at *13 (S.D.N.Y. July 10, 2019) (finding market efficiency on basis of first four *Cammer* factors and three *Krogman* factors).

However, Plaintiffs have also established the fifth *Cammer* factor. Mr. Coffman performed an event study to determine whether the price of Uniti common stock reacted to earnings announcements in a manner significantly different from how it moved on days with no Uniti-related news. Coffman Rpt., ¶¶46-67. An event study is a well-accepted statistical method used to measure the effect of new information on the market prices of a company's publicly traded securities. *Id.*, ¶48. After controlling for market and industry factors, Mr. Coffman's event study found "a clear cause-and-effect relationship between the release of new public information about Uniti and the market price of Uniti Common Stock." *Id.*, ¶49. As the report details, Mr. Coffman has shown through empirical analyses based on the results of his event study that Uniti's common stock reacted in an efficient manner to new information about the Company. *Id.*, ¶¶46-67; *see, e.g.*, *Patterson*, 2020 WL 5757695, at

- 23 -

*10 (event study demonstrated fifth *Cammer* factor); *In re CenturyLink Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 208 (D. Minn. 2020) (same).  Accordingly, the price-reaction factor weighs in favor of market efficiency.

### (2)   The *Krogman* Factors

An analysis of the *Krogman* factors also supports a finding of market efficiency. Coffman Rpt., ¶¶68-73; *Krogman*, 202 F.R.D. at 478.  Uniti had a market capitalization of 120.4 million shares of Uniti common stock outstanding throughout the Class Period (Coffman Rpt., ¶69), an average percentage bid-ask spread in each month between 0.017% and 0.097% (*id.*, ¶72), and a public float that exceeded 95.02% of shares outstanding (*id.*, ¶73).

*Krogman* **One: Market Capitalization**.   During the Class Period, Uniti had an average market capitalization of $3.44 billion.  Coffman Rpt., ¶¶68-70.  This supports a finding of market efficiency.  *See, e.g.*, *Första*, 312 F.R.D. at 519; *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (market capitalization of $292 to $585 million supported market efficiency); *Billhofer v. Flamel, Techs., S.A.*, 281 F.R.D. 150, 154 (S.D.N.Y. 2012) ($288 million to $717 million market capitalization supported efficiency).

*Krogman* **Two: Bid-Ask Spread**.  The bid-ask spread is the difference between the prices at which investors are willing to buy and current stockholders are willing to sell shares. *See Krogman*, 202 F.R.D. at 478.  "[A] small bid-ask spread indicate[s] that trading in the stock [is] inexpensive, suggesting efficiency."  *Strougo v. Barclays PLC*, 312 F.R.D. 307, 316 (S.D.N.Y. 2016), *aff'd sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir.

- 24 -

2017).  During the Class Period, the time-weighted average percentage bid-ask spread for Uniti common stock in each month was between 0.017% and 0.097%.  Coffman Rpt., ¶72. This is well within what courts have found indicative of market efficiency.  *See Patterson*, 2020 WL 5757695, at *10; *In re Am. Realty Cap. Props., Inc. Litig.*, No. 15-mc-40 AKH, 2017 WL 3835881, at *1 (S.D.N.Y. Aug. 31, 2017) (bid-ask spread averaging 0.18% supported efficiency).

*Krogman* **Three: Public Float**.  A stock's public float is the number of shares outstanding, excluding shares held by insiders and affiliated corporate entities.  A higher public float indicates greater market efficiency.  *Krogman*, 202 F.R.D. at 478.  Here, during the Class Period, insiders held just 4.98% of all outstanding shares of Uniti common stock, meaning that 95.02% of Uniti's shares were held by non-insiders.  Coffman Rpt., ¶73.  This large percentage of shares held by non-insiders supports market efficiency.

For the reasons set forth above, there can be no credible dispute that the market for Uniti Securities was efficient throughout the Class Period, thereby triggering the fraud-on-the-market presumption.

### (3)   Additional Factors Support a Finding of Market Efficiency

The Coffman Report also addresses three additional factors that demonstrate market efficiency: institutional ownership (*id.*, ¶74); autocorrelation (*id.*, ¶¶75-78); and the presence of option trading (*id.*, ¶79).

High institutional ownership has been considered indicative of market efficiency. *See, e.g.*, *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008).  Here, 943 major institutions owned Uniti stock during the Class Period, further supporting a finding of market

4825-2151-7055.v1

efficiency. Coffman Rpt., ¶74. Mr. Coffman also ran accepted autocorrelation analyses, which "test[] for the presence of a statistical relationship between price changes (also known as returns) on successive trading dates," *Billhofer*, 281 F.R.D at 160, and found that this factor also supports the conclusion that Uniti common stock traded in an efficient market throughout the Class Period. Coffman Rpt., ¶78. Finally, there was also considerable option trading in Uniti common stock during the Class Period, supporting a finding of market efficiency. *Id.*, ¶79.

Because all of the *Cammer* and *Krogman* factors, as well as additional market analyses, demonstrate here that the market for Uniti common stock was efficient during the Class Period, Plaintiffs are entitled to rely on the fraud-on-the-market presumption of reliance.

### (4)   Uniti Options Likewise Traded in an Efficient Market

Mr. Coffman also found that the pricing index of Uniti options also exhibited a cause-and-effect relationship to new firm-specific news. Coffman Rpt., ¶¶81-93. Because options are derivative securities, their value is dependent on the market price of an underlying security or asset. In this case, during the Class Period, the pricing for the Uniti options at issue was dependent on the market price of Uniti common stock. *Id.*, ¶¶81, 84.

Mr. Coffman conducted statistical analysis specifically to determine if Uniti options traded in an efficient market, performing a test known as "put-call parity," which refers to a specific relationship that must exist between the price of the underlying security and prices of put and call options with the same expiration date and strike price. *Id.*, ¶85. His analysis confirmed that the market prices of Uniti options consistently reacted contemporaneously

- 26 -

with changes in the market price of Uniti common stock providing strong evidence that Uniti options traded efficiently and that any mispricing due to the alleged misstatements and omissions would translate into the prices of Uniti options.  *Id.*, ¶¶85-88.

Mr. Coffman also conducted additional statistical analysis using the results from his event study analysis and the generally accepted Black-Scholes pricing model to quantify the expected price movement for an individual option series on each relevant date.  *Id.*, ¶¶89-93. Mr. Coffman's analysis confirmed that on days when important firm-specific information was released to the market (earnings announcements), Uniti option prices moved much more than on days where there was no news, providing additional evidence of a cause-and-effect relationship between firm-specific news and changes in Uniti option prices, and thus that Uniti options traded efficiently.  *Id.*, ¶¶91-93.

### b.  Plaintiffs Are Entitled to a Presumption of Reliance Pursuant to *Affiliated Ute*

With respect to reliance, predominance is also met because Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute*.  Plaintiffs' claims are based, in part, on Defendants' scheme to artificially inflate the value of Uniti Securities by omitting material information in its disclosures to investors – *Affiliated Ute* applies to such scheme claims, as well as claims "involving primarily a failure to disclose."  406 U.S. at 153; *see, e.g.*, *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008).  In such cases, "positive proof of reliance is not a prerequisite to recovery."  *Affiliated Ute*, 406 U.S. at 153-54.  Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision."  *Id.*  Moreover, because materiality itself is a common question, Plaintiffs need not

- 27 -

prove materiality at the class certification stage. *Amgen*, 568 U.S. at 467 ("[B]ecause '[t]he question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor,' materiality can be proved through evidence common to the class."); *Halliburton II*, 573 U.S. at 281-83 (same).

Here, Plaintiffs allege that Defendants engaged in a scheme to defraud by, *inter alia*, "fail[ing] to disclose the prohibited structure of the spin-off transaction and Master Lease" and because "plaintiffs have sufficiently pleaded defendants' conduct beyond misrepresentations and omissions."  MTD Order at 4, 9.  Accordingly, *Affiliated Ute*'s presumption of reliance also applies.

### 2. Damages Are Measurable on a Class-Wide Basis

A plaintiff must "establish[] that damages are capable of measurement on a class wide basis," using a model that is "'consistent with its liability case.'"  *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-35 (2013); *see also Leyva v. Medline Indus.*, 716 F.3d 510, 514 (9th Cir. 2013) ("plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability").

Mr. Coffman explains that there "is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act" known as the "'out-of-pocket'" method, which measures damages as "the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale" subject to the PSLRA's "'90-day lookback'" provision.  Coffman Rpt., ¶94.  The out-of-pocket method has been applied in virtually every §10(b) matter Mr. Coffman has observed

- 28 -

or participated in as a consulting, testifying, or neutral expert and would be common to all Class members. *Id.*

To quantify artificial inflation, Mr. Coffman proposes the use of an "event study," which will "measure[] price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations." *Id.*, ¶97. Once the inflation per share has been quantified on each day during the Class Period, the computation of damages for each Class member is formulaic based upon information collected in the claims process. *Id.*, ¶98. This a viable calculation of damages that can be made in this case. *See Tile Shop*, 2016 WL 4098741, at *11. Indeed, the event study methodology – "'the standard measurement of damages in Section 10(b) securities cases'" (*Patterson*, 2020 WL 5757695, at *14) – has been widely accepted at the class certification stage as an appropriate method of calculating damages on a class-wide basis. *See, e.g.*, *id.* at *14-*15; *Medtronic*, 325 F.R.D. at 290; *Första*, 312 F.R.D. at 516-17. Any disagreement Defendants may have with Mr. Coffman's "event study" methodology to calculate damages does not defeat predominance. *In re St. Jude Med. Inc. Sec. Litig.*, No. 10-cv-0851 (SRN/TNL), 2014 WL 6908434, at *8-*9 (D. Minn. Dec. 8, 2014); *Tile Shop*, 2016 WL 4098741, at *12.

The fact that specific damages amounts may differ among Class members is also of no import. Indeed, "'courts in every circuit have uniformly held that the [Rule] 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations.'" *Cromeans v. Morgan Keegan & Co.*, 303 F.R.D. 543, 560 (W.D. Mo. 2014) (quoting William Rubenstein, et al., *Newberg on Class Actions*, §4:54 (Winter 2013 Supp.)); *see also Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).

- 29 -

Accordingly, Plaintiffs' proffer of a class-wide approach to calculating damages further supports predominance.

### 3.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action

The majority of the superiority factors also weighs in favor of certification. *See* Fed. R. Civ. P. 23(b)(3); *Medtronic,* 325 F.R.D. at 290 ("[s]ecurities cases easily satisfy Rule 23(b)(3)'s superiority requirement"). First, there is "no reason to believe that the class members have any interest in individually controlling the prosecution of separate actions," particularly as "the cost and complexity of securities actions often prevent individual shareholders from bringing such claims." *Medtronic*, 325 F.R.D. at 290; *see also Patterson*, 2020 WL 5757695, at *15 (recognizing that in securities cases "individual damages might be too small to make the expense of litigation worthwhile"). In any event, any Class member will have the opportunity to opt out of the Class. Second, "concentrating the litigation in this case is desirable to promote judicial efficiency by resolving the complaints of thousands of shareholders in one case." *Medtronic*, 325 F.R.D. at 290. Third, this case does not "present[] any likely difficulties that would make a class action inferior to individual adjudication"; rather, "due to the large number of possible class members – a class action is necessary to avoid potentially crowding the docket with thousands of similar cases." *Id.* Accordingly, it is apparent that a class action is superior to any other method of resolving the claims at issue in this Action. *See, e.g.*, *Wal-Mart*, 2016 WL 5400373, at *7; *Första*, 312 F.R.D. at 522; *Patterson*, 2020 WL 5757695, at *15.

- 30 -

4825-2151-7055.v1

**4.     The Court Should Appoint Labaton and Robbins Geller
as Class Counsel**

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel."

Fed. R. Civ. P. 23(g)(1).  In appointing class counsel, the Court considers counsel's work "in

identifying or investigating potential claims in the action," "counsel's experience in handling

class actions," "counsel's knowledge of the applicable law," and "the resources that counsel

will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).  As discussed

above, Labaton and Robbins Geller have ably identified, investigated, and vigorously

pursued the Class' claims in this Action and will continue to do so.  *See* §III.A.4., *supra*.

And as the firm resumes confirm, Labaton and Robbins Geller have extensive experience

litigating class actions and have proven their willingness to commit substantial time and

resources to representing the Class.  *See* Exs. B-C.  Indeed, acknowledging the firms'

experience and ability, courts have frequently appointed Labaton and Robbins Geller as class

counsel in actions alleging violations of the federal securities laws.  *See, e.g.*, *In re Jeld-Wen

Holding, Inc. Sec. Litig.*, No. 3:20-cv-112-JAG, 2021 WL 1186326, at *10 (E.D. Va. Mar.

29, 2021) (appointing Labaton as class counsel); *Medoff v. CVS Caremark Corp.*, No. 09-cv-

554-JNL, 2016 WL 632238, at *7 (D.R.I. Feb. 17, 2016) (noting that Labaton and Robbins

Geller had been appointed as class counsel prior to settlement); Memorandum of Law &

Order, *Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, No. 18-cv-00871-MJD-HB (D.

Minn. Sept. 28, 2020), ECF No. 175 at 23 (appointing Robbins Geller as class counsel as it is

"highly qualified and ha[s] extensive experience in securities class action litigation").  In

sum, Labaton and Robbins Geller overwhelmingly satisfy Rule 23(g)(1)'s requirements, and

Plaintiffs' request for their appointment as Class Counsel should be granted.

4825-2151-7055.v1

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the motion in its entirety.

DATED:  October 25, 2021

Respectfully submitted,

DEBRA J. WYMAN
California Bar No. 190812
Attorney for Lead Plaintiff
ROBBINS GELLER RUDMAN
   & DOWD LLP
TING H. LIU
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:  debraw@rgrdlaw.com
              tliu@rgrdlaw.com

LABATON SUCHAROW LLP
CAROL C. VILLEGAS
CHRISTINE M. FOX
ROSS M. KAMHI
CHARLES FARRELL
140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)
E-mail:  cvillegas@labaton.com
              cfox@labaton.com
              rkamhi@labaton.com
              cfarrell@labaton.com

Lead Counsel for Lead Plaintiffs

- 32 -

4825-2151-7055.v1

GEOFFREY P. CULBERTSON
Arkansas Bar No. 2014011
PATTON TIDWELL & CULBERTSON,
LLP
2800 Texas Boulevard
Texarkana,  TX  75503
Telephone:  903/792-7080
903/792-8233 (fax)
E-mail:  gpc@texarkanalaw.com

Liaison Counsel for the Class

SCHALL LAW FIRM
BRIAN SCHALL
1880 Century Park East, Suite 404
Los Angeles, CA  90067
Telephone:  424/303-1964
877/590-0483 (fax)
Email:  brian@schallfirm.com

THORNTON LAW FIRM LLP
GUILLAUME BUELL
1 Lincoln Street, 25th Floor
Boston, MA  02111
Telephone:  617/720-1333
617/720-2445 (fax)
Email:  gbuell@tenlaw.com

Additional Plaintiffs' Counsel

- 33 -

4825-2151-7055.v1