# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

|  |  |
|---|---|
| In re UNITI GROUP INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) |

Case No. 4:19-cv-00756-BSM

**<u>EXPERT REPORT OF CHAD COFFMAN, CFA</u>**

**October 25, 2021**

# Table of Contents

**Page**

I.     INTRODUCTION ..................................................................................................3

II.    QUALIFICATIONS..............................................................................................4

III.   SUMMARY OF OPINIONS .................................................................................4

IV.    OVERVIEW OF THE COMPANY AND ALLEGATIONS...............................5

V.     DISCUSSION OF RELIANCE ELEMENT ........................................................7

VI.    *CAMMER* FACTORS AND OTHER FACTORS RELEVANT TO MARKET
EFFICIENCY.......................................................................................................10

VII.   APPLICATION OF EFFICIENCY FACTORS TO UNITI COMMON STOCK ..........12

       A.    OVERVIEW.............................................................................................12

       B.    *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME................13

       C.    *CAMMER* FACTOR 2: ANALYST COVERAGE .........................................15

       D.    *CAMMER* FACTOR 3: MARKET MAKERS ...............................................17

       E.    *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY ...........................19

       F.    *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION...........20

       G.    *KROGMAN* FACTOR 1: MARKET CAPITALIZATION ....................................29

       H.    *KROGMAN* FACTOR 2: THE BID-ASK SPREAD..........................................31

       I.    *KROGMAN* FACTOR 3: PUBLIC FLOAT .......................................................32

       J.    ADDITIONAL FACTOR: INSTITUTIONAL OWNERSHIP.............................32

       K.    ADDITIONAL FACTOR: AUTOCORRELATION .............................................33

       L.    ADDITIONAL FACTOR: OPTIONS .................................................................34

VIII.  EFFICIENCY FOR CALL AND PUT OPTIONS ON UNITI COMMON STOCK .......35

IX.    DAMAGES...........................................................................................................40

X.     CONCLUSION....................................................................................................43

## I.    INTRODUCTION

1.    I, Chad Coffman, am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, securities litigation. I have been asked by counsel for the Lead Plaintiffs in this matter to examine and opine on whether the markets for Uniti Group, Inc. ("Uniti" or the "Company") publicly traded securities were efficient during the period from April 24, 2015 through June 24, 2019, inclusive (the "Class Period").[1] The Uniti publicly traded securities (collectively, "Uniti Securities") I have been asked to consider include Uniti common stock ("Uniti Common Stock" or "Common Stock"), and Uniti put and call options ("Uniti Options" or "Options"). In addition, I have been asked to opine on whether calculating damages in this action is subject to a common methodology under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 adopted thereunder (collectively "Section 10(b)").

2.    The materials I have considered in forming my opinions are summarized in **Appendix A**. Global Economics Group is being compensated at an hourly rate of $900 per hour for my work on this matter, and at rates between $200 and $450 for members of my staff who performed work in connection with this report under my direction and supervision. My compensation is in no way contingent on the outcome of this case. My qualifications are described below.

---

[1] Consolidated Amended Class Action Complaint, May 11, 2020, In *re Uniti Group Inc. Securities Litigation*, No. 4:19-cv-00756-BSM ("Complaint") p. 1.

## II.    QUALIFICATIONS

3.    I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's of Public Policy from the University of Chicago. I am also a CFA charter-holder. The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

4.    I, along with several others, founded Global Economics Group on March 25, 2008.[2] Prior to starting Global Economics Group, I was employed by Chicago Partners LLC for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination, and antitrust. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers, and a prominent mediator (Retired Judge Daniel Weinstein) to provide economic analysis and opinions in dozens of securities class actions as well as other matters. As a result of my involvement in these cases, much of my career has been spent analyzing and making inferences about how quickly and reliably, and to what degree, new information impacts securities prices.

5.    My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

## III.    SUMMARY OF OPINIONS

6.    After analyzing Uniti's Common Stock and Options during the Class Period and giving careful consideration to the efficiency factors described in detail throughout this report, I

---

[2] Prior to March 16, 2011, Global Economics Group was known as Winnemac Consulting, LLC.

have formed the opinion that the markets for Uniti Common Stock and Uniti Call and Put Options (together, "Uniti Securities") were efficient during the Class Period.

7.    I have also formed the opinion that damages in this action can be calculated on a class-wide basis using a common methodology for Uniti Securities. These opinions are based upon my analysis described below.

8.    The remainder of this report is organized as follows: **Section IV** of this report provides an overview of Uniti's business operations and the allegations in this case. **Section V** discusses the reliance requirement for the claims under Section 10(b) of the Exchange Act and the "fraud on the market" theory. **Section VI** introduces the *Cammer* factors and other factors that financial economists and courts apply when evaluating market efficiency under the "fraud on the market" theory. **Section VII** provides the results of my empirical evaluation of each *Cammer* factor and other factors for Uniti's Common Stock during the Class Period. **Section VIII** analyzes market efficiency for Uniti Options. **Section IX** addresses how the calculation of damages in this matter is subject to a common approach and methodology that can be applied class-wide for all relevant securities. Finally, **Section X** offers my conclusions.

9.    I reserve the right to amend this report, including to reflect new information that becomes available to me, including in light of the discovery process and/or future rulings from the Court.

## IV.    OVERVIEW OF THE COMPANY AND ALLEGATIONS

10.    Uniti is an independent, internally managed real estate investment trust ("REIT") engaged in the acquisition and construction of mission critical infrastructure in the communication industry, including fiber optic broadband networks, wireless communications

towers, copper and coaxial broadband networks and data center.[3] Uniti described its business during the Class Period as follows:

> We are an independent, internally-managed REIT engaged in the acquisition and construction of mission critical infrastructure in the communications industry. We manage our operations in four separate lines of business: *Uniti Fiber*, *Uniti Towers*, *Uniti Leasing* and *Talk America*. [4]

11.   Uniti, originally named Communications Sales & Leasing, Inc. ("CSAL"), was formed on April 24, 2015 after it was spun off and separated from its parent company, Windstream Holdings.[5] For the fiscal year ended December 2017, Uniti reported revenue of $916 million, operating loss of $129 million, and listed total assets of $4.3 billion.[6] As of December 31, 2017, Uniti employed approximately 654 full-time employees[7] and its Common Stock traded on the NASDAQ Global Select Market ("NASDAQ") under the ticker "UNIT."[8]

12.   Lead Plaintiffs' Complaint alleges that Uniti and the Individual Defendants[9,10] issued materially false and misleading statements and omitted material information from investors during the Class Period, ultimately causing damages to purchasers of Uniti Common Stock and Options, who unknowingly bought Uniti Securities at artificially inflated prices and were damaged when the price ultimately reflected the concealed information.[11]

---

[3] Uniti SEC Form 10-K for the fiscal year ended December 31, 2017, p. 5.

[4] Uniti SEC Form 10-K for the fiscal year ended December 31, 2017, p. 5.

[5] Uniti SEC Form 10-K for the fiscal year ended December 31, 2017, p. 5.

[6] Uniti SEC Form 10-K for the fiscal year ended December 31, 2019, p. 25, S-2.

[7] Uniti SEC Form 10-K for the fiscal year ended December 31, 2017, p. 10.

[8] Uniti SEC Form 10-K for the fiscal year ended December 31, 2017, p. 23.

[9] Complaint ¶¶33-37.

[10] The Individual Defendants are Uniti's CEO and President, Kenneth A. Gunderman; and Uniti's CFO, Treasurer, and Executive Vice President Mark A. Wallace. *See*, Complaint ¶¶41-43.

[11] Complaint ¶¶ 38,44.

13.   More specifically, the claims at issue in this case concern Defendants' alleged materially false and misleading statements, and material omissions, regarding the Spin Off of Uniti from Windstream Holdings and structuring of the Master Lease by which Uniti leased telecommunication assets back to Windstream. Lead Plaintiffs' Complaint alleges that the Defendants knew, and actively concealed the material risk that the Spin Off was a prohibited transaction by Windstream's Indenture and that Uniti was at a greater financial risk in the event Windstream filed for bankruptcy.[12] Lead Plaintiffs further allege that Defendants mislead investors and omitted the true risks facing the Company should the Spin-Off transaction, or Master Lease, be challenged, or should Windstream declare bankruptcy.[13] The Complaint alleges that, through a series of disclosures, the market finally learned the truth about these subjects and that, as these risks materialized, the price of Uniti Securities fell—harming investors who had purchased Uniti Securities during the Class Period at artificially inflated prices.[14]

## V.   DISCUSSION OF RELIANCE ELEMENT

14.   Class members' reliance on the alleged material misstatements and omissions is a required element for Lead Plaintiffs' Section 10(b) claims. Lead Plaintiffs assert the fraud on the market theory of reliance in this matter.[15] In addition, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).[16] The "fraud on the market" theory is based on the fact that, in an efficient market (*i.e.*, one in which widely-disseminated public information is quickly incorporated into

---

[12] Complaint ¶6-9.

[13] Complaint ¶¶168-228.

[14] Complaint ¶¶19-28, 241-266.

[15] Complaint ¶268.

[16] Complaint ¶267.

the market price of a security), all purchasers of a security implicitly rely on any material misrepresentations or omissions, since the value of those misrepresentations or omissions is incorporated into the security's purchase price. The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic Inc. v. Levinson*:

> … [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[17]

15.   The Supreme Court reaffirmed this theory in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[18]

16.   As indicated in *Basic* and reaffirmed in *Halliburton II*, in an open, developed and efficient market, market prices reflect what is publicly known about a company. In an efficient market, if a company provides the market with materially misleading information (such as materially misleading information regarding its financial strength or business practices or prospects), the market price of securities like common stock or options will be inflated (or deflated) compared to what the price would have been if the truth were known. Thus, in an efficient market, where the plaintiffs assert there were material misrepresentations or omissions, all purchasers implicitly relied on those misrepresentations and/or lack of disclosure by paying the inflated (or deflated) price.

---

[17] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) ("*Basic*").

[18] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2417 (2014) ("*Halliburton II*").

8

17.    Determining whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance under the "fraud on the market" theory is an empirical exercise.[19] The esteemed economist Dr. Eugene Fama, in his seminal research, first outlined definitions of an "efficient market."[20] He described different levels of efficiency which he called "weak-form," "semi-strong-form," and "strong-form" efficiency.[21]

18.    The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II* as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-strong form" efficiency. "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price. This in turn implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. The Supreme Court stated in *Basic*: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[22] The Supreme Court's effective adoption of the "semi-strong form" efficiency standard is economically

---

[19] To recognize the presumption of reliance, the *Basic* Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic*, 485 U.S. at 248 n.28. The *Basic* Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Basic*, 485 U.S. at 246 n.24. *Basic*'s presumption of reliance thus does not rest on a "binary" view of market efficiency.  Rather, market efficiency is seen as a matter of degree or as running along a market efficiency spectrum.

[20] Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin. 383 (1970).

[21] "Weak-form" efficiency requires that historical prices are not predictive of future prices. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time. "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns. "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

[22] *Basic,* 485 U.S. at 241.

9

sensible because it recognizes that insiders often possess non-public information and that securities prices do not necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.

19.   In the next section, I explain the factors that are regularly considered by financial economists and courts in determining whether the market for a particular security is efficient.

## VI.   *CAMMER* FACTORS AND OTHER FACTORS RELEVANT TO MARKET EFFICIENCY

20.   In *Cammer v. Bloom*, the court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.[23]

21.   The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency. As articulated below, the adopted definition of efficiency is consistent with Fama's definition of "semi-strong" efficiency. For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.
>
> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).
>
> An *efficient market* is one which rapidly reflects new information in price.

---

[23] *Cammer, v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*").

These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[24]

22.    While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient." In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory. I also consider a number of other factors that courts have utilized beyond the *Cammer* factors. However, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics is determinative as to whether a particular market is efficient.

23.    In addition to the five *Cammer* factors, I also evaluate, in subsequent sections, the three widely recognized *Krogman* factors in order to further examine the efficiency of the market for Uniti Common Stock during the Class Period.[25] The *Krogman* factors are: 1) the company's market capitalization, 2) the Common Stock bid-ask spread, and 3) the percentage of shares not held by insiders (the "float"). Finally, in subsequent sections, I also consider three additional factors to assess market efficiency during the Class Period: 1) the amount of institutional ownership of Uniti Common Stock, 2) autocorrelation (meaning whether there is a pattern in a security's returns such that future returns can be predicted based upon past returns), and 3) options trading. Consideration of these three factors can provide additional evidence of market efficiency (or inefficiency), alongside the *Cammer* and *Krogman* factors.

---

[24] *Cammer,* 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988) ("Bromberg & Lowenfels")) (emphasis added).

[25] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

## VII.  APPLICATION OF EFFICIENCY FACTORS TO UNITI COMMON STOCK

### A.  OVERVIEW

24.    After carefully considering each of the efficiency factors described in detail below, I find that each factor supports the conclusion that the market for Uniti Common Stock was efficient throughout the Class Period. In addition to the discussion below, **Exhibit 1** summarizes how, for each of the factors examined, the empirical evidence supports a finding that Uniti Common Stock traded in an efficient market. As further background to my analyses, **Exhibit 2** displays Uniti Common Stock's closing price and trading volume for each day throughout the Class Period.

25.    In summary, and as discussed more fully below, Uniti Common Stock traded in an efficient market during the Class Period. First, the average weekly trading volume of Uniti Common Stock during the Class Period far exceeded benchmarks that courts have established in assessing whether the market for a particular security is efficient. During the Class Period, the average weekly trading volume for Uniti Common Stock was 9.74 million shares, which represents 5.76% of shares outstanding, higher than the average trading volume for securities traded on the New York Stock Exchange ("NYSE") and/or NASDAQ. Second, numerous securities analysts followed and reported on Uniti during the Class Period**.** Third, Uniti Common Stock was actively traded on the NASDAQ, thus fulfilling the *Cammer* factor regarding market makers. Fourth, Uniti filed Form S-3ASR during and after the Class Period. Fifth, there was a strong cause-and-effect relationship between new Company-specific information and the market price of Uniti Common Stock during the Class Period. Sixth, Uniti Common Stock had a large market capitalization. Seventh, Uniti Common Stock had a low bid-ask spread relative to exchange-traded common stocks. Eighth, insider holdings were low while institutional ownership was high during the Class Period. Ninth, the autocorrelation coefficient was far from

statistically significant at the 95% confidence level for the Class Period. Finally, there was active

trading in Uniti Options throughout the Class Period. My analyses of all of these factors support

the conclusion that Uniti Common Stock traded in an open, developed, and efficient market at all

relevant times during the Class Period.

### B. *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

26.     The first *Cammer* factor is the average weekly trading volume of a security.

According to one authority cited by the *Cammer* court,

> Turnover measured by average weekly trading of 2% or more of the outstanding
> shares would justify a strong presumption that the market for the security is an
> efficient one; 1% would justify a substantial presumption.[26]

27.     Volume as a fraction of shares outstanding is an important indicator of market

efficiency. First, volume is objectively quantifiable and comparable across securities. Second,

high volume is generally indicative of continuity, liquidity, and market depth – which are highly

indicative of market efficiency.[27] Third, substantial volume would indicate there is likely a

market for the collection and distribution of information about the security. As Thomas and

Cotter explain, "[t]rading volume was also considered as an eligibility standard because it affects

---

[26] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

[27] Continuity means that trades may occur at any time. Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information). William Sharpe, Gordon J. Alexander & Jeffrey W. Bailey, *Investments*, Prentice Hall, 44-45 (5th ed. 1995).

Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes." *Cammer*, 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels).

Market depth refers to "the number of shares that [can] be traded at the quoted bid and ask prices." A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price. *See* Amihud, Y., et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269, 317 (2005).

information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[28]

28.    Uniti Common Stock easily surpasses the threshold level of average weekly trading volume necessary for an efficient market. The average weekly trading volume for Uniti Common Stock during the Class Period was 5.76% of shares outstanding, compared to 2.03% for the NYSE and NASDAQ. Based on this figure, the weekly trading volume for Uniti Common Stock far exceeds the 1% or 2% threshold cited by *Cammer.*[29] **Exhibit 3** plots Uniti Common Stock trading volume as a fraction of shares outstanding for each week during the Class Period.[30] Indeed, the average weekly trading volume for Uniti Common Stock during the Class Period was 9.74 million shares. This volume of trading is a factor that supports the conclusion that the market for this security was efficient throughout the Class Period.

29.    Another way to measure trading volume is annualized turnover velocity, which is essentially the first *Cammer* factor expressed in dollar terms.[31] Specifically, instead of looking at shares traded divided by shares outstanding, turnover velocity is the dollar value of shares traded (*i.e.*, shares traded multiplied by price per share) divided by the dollar value of all shares outstanding (*i.e.*, shares outstanding multiplied by price per share). This is the same ratio because the numerator and denominator are each multiplied by price per share. The advantage of this measure is that, once quoted in annualized terms, Uniti's Common Stock turnover velocity can

---

[28] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 105, 108 (2000).

[29] *Cammer* 711 F. Supp. at 1293-94 (D.N.J. 1989).

[30] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days, which may not follow the calendar week.

[31] Turnover velocity is simply the average trading volume as a percentage of shares outstanding (the first *Cammer* Factor) expressed in dollar terms:

**Turnover Velocity Ratio** = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding.

be compared directly with those of other publicly traded stocks based on exchange-reported statistics.

30. For example, over the Class Period, the annualized turnover velocity for Uniti's Common Stock was 288%, as compared with the NYSE and NASDAQ average of 105.64% over the same period.[32] Thus, Uniti Common Stock had an average annualized turnover velocity that was substantially higher than that of the average stock trading on the NYSE and NASDAQ, further supporting that it traded in an efficient market.

31. In short, the relatively high trading volume in Uniti Common Stock throughout the Class Period supports the conclusion that the market for Uniti Common Stock was efficient.

### C. *CAMMER* FACTOR 2: ANALYST COVERAGE

32. The *Cammer* decision stated the following related to analyst coverage:

> … [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[33]

33. Analyst coverage can be important evidence of efficiency. Significant analyst coverage implies that there is sufficient interest in a company and its securities, that there is an active market for information regarding the company and its securities, and that the information is widely distributed.

34. During the Class Period, there was an abundance of analyst coverage for Uniti. **Exhibit 4** shows that there were at least 346 reports issued during the Class Period and 11 separate firms that had equity analysts issue reports on Uniti, including major firms such as JP

---

[32] Turnover velocity for the NYSE and NASDAQ is calculated from data provided by the World Federation of Exchanges. *See* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

[33] *Cammer*, 711 F. Supp. at 1286.

Morgan, Morgan Stanley, and RBC.[34] These reports served the purpose of disseminating

publicly available information along with commentary, news, updates, analyses, and

recommendations of the analysts to investors. Additionally, analysts from major firms, such as,

Citigroup Inc., Bank of America Merrill Lynch, and Raymond James & Associates, participated

on earnings conference calls throughout the Class Period.[35] The coverage of Uniti by securities

analysts also supports the conclusion that Uniti Common Stock traded in an efficient market

throughout the Class Period.

35.     Since 1989, when the *Cammer* decision was rendered, there has been an increase in

alternative methods by which publicly available information about publicly-traded securities is

disseminated to investors. For example, since the *Cammer* decision, through the Internet, 24-

hour cable news networks, email, RSS feeds,[36] and other media, the ability of individual and

institutional investors to obtain information about publicly traded securities and the market in

general has revolutionized the manner in which investors and investment professionals receive

and process information.

36.     Moreover, information regarding the market price, the current bid-ask spread, and

the ability to trade online is available almost instantaneously via the Internet for anyone with an

online brokerage account. Thus, in addition to the substantial analyst coverage of Uniti, there

were many other sources of public information dissemination. For example, there was substantial

public press regarding Uniti. A search for articles classified as related to Uniti by Factiva over

---

[34] I obtained Uniti analyst reports from Counsel. I also obtained a collection of reports from Seeking Alpha, an investor-based website. The number of analyst reports I identify is likely understated. For example, it is clear that analysts from Citigroup Inc., Bank of America Merrill Lynch and Raymond James & Associates participated on earnings conference calls during the Class Period but, at the time of writing this report, I did not have access to research reports of those firms. (*See*, "FQ1 2017 Earnings Call Transcripts," *S&P Capital IQ*, May 4, 2017).

[35] *See, e.g.*, "FQ1 2018 Earnings Call Transcripts," *S&P Capital IQ*, May 10, 2018.

[36] RSS feeds provide content summaries of news, blogs, forums or website content.

the Class Period resulted in 1,486 unique articles.[37] In addition, there were numerous SEC filings available online at the SEC EDGAR search database at no cost, as well as various other sources of public information (such as Twitter, other social media platforms, blogs, etc.) available throughout the Class Period that I do not attempt to quantify. The degree of news coverage and publicly available information further supports the conclusion that there was substantial supply of, and demand for, information regarding Uniti in the public arena throughout the Class Period.

37.    In summary, the number of analyst reports and the substantial public dissemination of news and other information regarding Uniti provides evidence of a robust and active market for public information about the Company and additional evidence that Uniti Common Stock traded in an efficient market during the Class Period.

### D.  *CAMMER* FACTOR 3: MARKET MAKERS

38.    A market maker is a firm that is ready to buy or sell a particular stock on a regular and continuous basis.[38] The third *Cammer* factor states:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[39]

---

[37] Factiva is a business information and research tool owned by Dow Jones & Company. Factiva aggregates content from both licensed and free sources, and provides organizations with search, alerting, dissemination, and other information management capabilities. I first identified 1,695 unique articles as a result of two searches: 1) one search for "All Sources" with the company field "Uniti Group Inc.", and 2) a separate search for "Major News and Business Sources" excluding the company field "Uniti Group Inc" and including the keyword field "Uniti". Both searches were conducted for the period "April 24, 2015 – June 24, 2019". I then removed 209 articles that were not news specific to the company and were titled "NASDAQ New 52-Week Highs And Lows" which resulted in the final number of 1,486 unique articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder. I acknowledge that this may not reflect all news as the Factiva database is limited to certain sources and content type.

[38] *See* http://www.sec.gov/answers/mktmaker.htm.

[39] *Cammer*, 711 F. Supp. at 1293.

39.    The premise that the number of market makers can serve as an efficiency criterion relates to the notion that market makers are:

> … [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[40]

40.    Uniti Common Stock traded on a major exchange (*i.e.*, the NASDAQ) with continuous public price and volume reporting, as opposed to an over-the-counter market without volume reporting, which is the context in which *Cammer* indicated this was a relevant criterion.[41] On such over-the-counter markets, there may be reason for concern regarding liquidity and information dissemination. However, these concerns are generally not applicable to stocks trading on large, modern exchanges such as the NYSE and NASDAQ, which are presumed to be efficient, report volume and trade details, and tend to have rules that virtually guarantee a liquid market.[42]

41.    The NYSE and NASDAQ are two of the largest and most liquid security exchanges in the world with billions of shares traded each day. Unlike over-the-counter markets that rely on decentralized market makers providing liquidity for trading, the NYSE and NASDAQ rely on a computerized system to match orders and provide quotes.[43] The minimum requirements for a

---

[40] Barber, B., et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency,* 19 J. CORP. L. 285 (1994), 291.

[41] *See Cammer,* 711 F. Supp. at 1292, citing Bromberg & Lowenfels: "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

[42] For example, there are rules for minimal market capitalization and specialists are *required* to maintain an orderly market; s*ee Section 102* http://wallstreet.cch.com/LCM/Sections/. *See also*, William Sharpe, Gordon J. Alexander & Jeffrey W. Bailey, *Investments*, Prentice Hall, 45-53 (5th ed. 1995); Frank J. Fabozzi, Franco Modigliani & Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Chapter 18 – Appendix A (4th ed. 2010).

[43] For NYSE, *see* https://www.nyse.com/market-model. For NASDAQ, *see* https://www.nasdaqtrader.com/Trader.aspx?id=TradingUSEquities.

security to be listed on the NYSE or NASDAQ and remain in good standing virtually guarantee a liquid market for that security, irrespective of the number of "market makers" for that security.

42.   Nevertheless, according to Bloomberg, throughout the Class Period, there were at least 129 market makers for Uniti Common Stock.[44] Therefore, Uniti Common Stock easily meet both the letter and spirit of this factor, further supporting the efficiency of the market during the Class Period.

### E. *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY

43.   The fourth *Cammer* factor is SEC Form S-3 eligibility, which states,

…[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[45]

44.   SEC Form S-3 allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[46] A Form S-3 allows a company to register unspecified amounts of different specified types of securities using a single form. In order to be eligible to issue a Form S-3, among other things, a company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year, 2) must have filed all documents in a timely manner for the past twelve months, and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted

---

[44] Bloomberg RANK function.

[45] *Cammer*, 711 F. Supp. at 1287.

[46] For additional information, *see* www.sec.gov/about/forms/forms-3.pdf.

on debts or material leases. Eligibility to file a Form S-3 is confirmatory evidence of efficiency, not a requirement.

45.    Uniti filed Form S-3ASR, a type of Form S-3 exclusive to "well-known seasoned issuers", during and after the Class Period, on June 15, 2016, and March 12, 2020.[47] I understand that Uniti was S-3 eligible throughout the Class Period except perhaps for a very brief time from March 4, 2019 to March 18, 2019 while Uniti was delayed in their 10-K filing.[48] This very short period towards the end of the Class Period does not raise any concerns, however, about whether Uniti traded in an efficient market, and certainly with the weight of the other factors, is fully supportive of  market efficiency. Therefore, Uniti meets this *Cammer* efficiency factor, which supports the conclusion that Uniti Common Stock traded in an efficient market.

## F.  *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION

46.    The fifth *Cammer* factor relates to how the price of a security reacts to new, company-specific information, and states:

> … [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[49]

47.    Establishing a causal connection between new company-specific events and movements in the market price is convincing evidence of market efficiency. A well-accepted technique often relied upon, both inside and outside of the context of litigation, to establish such a causal connection is called an "event study." Indeed, event studies have been used for over 40

---

[47] https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001620280&type=S-3&dateb=20201231&owner=include&count=100&search_text=.

[48] Uniti SEC Form NT 10-K for the fiscal year ended December 31, 2018, p. 4.

[49] *Cammer,* 711 F. Supp. 1291.

years and have appeared in hundreds if not thousands of academic articles as scientific evidence in evaluating how new information affects securities prices.[50]

48.    An event study is a well-accepted statistical method used to measure the effect of new information on the market prices of a company's publicly traded securities.[51] New information may include, for example, company press releases, earnings reports, SEC filings, and news reports or analyst reports. An event study is conducted by specifying a model of expected price movements conditioned on outside market factors and then testing whether the deviation from expected price movements in the wake of new information is sufficiently large that simple random movement can be rejected as the cause.

49.    To analyze cause and effect, I performed an event study to determine whether the price of Uniti Common Stock reacted to earnings announcements in a manner significantly different from how it moved on days with no Uniti-related news. Based on the event study I performed, which explicitly controls for market and industry factors, I find that there is a clear cause-and-effect relationship between the release of new public information about Uniti and the market price of Uniti Common Stock. I now describe in further detail the event study methodology, the events I test, and the results.

50.    A well-accepted method for performing an event study is to estimate a regression model over some period of time (an "estimation window") to observe the typical relationship between the market price of the relevant security and broad market factors.[52] I have performed

---

[50] John J. Binder, *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT., 111 (1998).

[51] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE, 13 (1997).

[52] A "regression" or "regression model" is a statistical technique for measuring the ability of one or more variables (the "independent variables") to "explain" another variable of interest (the "dependent variable"). In this case, the daily percentage change in Uniti Common Stock (the Uniti daily return) is the dependent variable and the contemporaneous daily returns for a market and industry indices are the independent variables. For a general

21

such an analysis by evaluating the relationship between Uniti Common Stock daily returns (percentage change in price) and the daily returns for the S&P 500 Total Return Index (the "Market Index"), MSCI US REIT Total Return Index, and the S&P Composite 1500 Telecommunications Services Total Return Index (the "Industry Indices").[53,54]

51.   For each trading day analyzed, I constructed a regression model using data from the prior 120 trading days (roughly six months).[55,56] By using such a "rolling" estimation window, my regression model allows for the relationships between Uniti Common Stock returns and the Market Index and Industry Indices, as well as firm-specific volatility, to update over time according to the data observed over the most recent 120 trading day period. Use of a rolling model to account for changing volatility and evolving relationships with indices is accepted in peer-reviewed literature.[57]

52.   The model indicates that there is a positive correlation between Uniti Common Stock and the control variables. In other words, the movement of the Market Index and Industry Indices helps explain the price movements of Uniti Common Stock during the Class Period. For instance, choosing October 25, 2016 (a day in the Class Period) purely as an example, and looking at the regression results based on the 120 days prior to that day, the estimated coefficient

---

discussion of regression analysis, see Damodar N. Gujarati, *Basic Econometrics*, McGraw Hill, Chapters 1-3 (3rd ed. 1995).

[53] The MSCI US REIT Index is a free float-adjusted market capitalization weighted index that is comprised of equity real estate investment trusts (REITs), while the S&P Composite 1500 Telecommunications Services comprises those companies included in the S&P Composite 1500 that are classified as members of the GICS Communication Services sector. The former one is included since Uniti compares itself against this index in its 10-K filings while the latter one controls for the general industry where Uniti operates.

[54] The returns of the Industry Indices are net of the S&P 500 Total Return Index.

[55] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE, 15 (1997): "For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."

[56] The first 120 trading days of the event study follow a "fixed to rolling" model to account for Uniti's Spin-Off.

[57] Phillip A. Braun, *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575, 1597 (1995).

for the S&P 500 is 1.62, which means that a 1% rise in the S&P 500 predicts a 1.62% increase in returns for Uniti Common Stock. The estimated coefficients for the Industry Indices are 0.64 and 0.09 respectively, meaning that the expected return for Uniti Common Stock increases by approximately 0.64% for every 1% increase in the MSCI US REIT Total Return Index and 0.09% for every 1% increase in the S&P Composite 1500 Telecommunication Services Total Return Index, both of these over and above the return of the S&P 500. **Exhibit 5** plots the estimated coefficients for the rolling regression models for each day during the Class Period.

53.    Another important statistic from the regression is the standard deviation of the errors, which measures the degree of imprecision in the predictions from the model. Put another way, this measure provides a metric for how much unexplained price movement remains in Uniti Common Stock after controlling for the Market Index and Industry Indices. For instance, on the example date of October 25, 2016, the model predicted that, absent any value relevant new firm-specific information, the price of Uniti Common Stock would decrease by 0.34%, because the S&P 500 was down 0.38% and the Industry Indices were up 0.14% and down 0.19%, respectively.[58] Because of the inherent randomness observed in price returns, I do not expect the model to predict returns exactly; the standard deviation of the errors provides a means to determine whether the "abnormal return"—the model's prediction error, or the difference between the actual return and the return predicted by the model—is more extreme than would be expected due to inherent randomness alone.

54.    In this example, I observe an actual return of -1.97%. Thus, the abnormal return for this day is approximately -1.63%—the actual return of -1.97% minus the predicted return of

---

[58] The predicted return of -0.34% is found as follows: 1.62 * -0.38% (Coefficient on Market Index *times* Market Index return) + 0.64 * 0.14% + 0.09 * -0.19% (Coefficient on Industry Indices Return *times* Industry Indices Return) + 0.002 (constant term from regression).

-0.34%. Using the standard deviation of the errors from the regression model, I can tell if this abnormal return is sufficiently large to allow me to reject random movement as the explanation for it, and therefore to conclude that new information caused a change to the stock price.

55.    The test for whether randomness can be rejected is done by calculating what is known as a "t-statistic," which represents the number of standard deviations between the actual observation and the prediction. For the example date, an abnormal return of -1.63% represents -1.51 standard deviations or a t-statistic of -1.51 (abnormal return of -1.63% divided by the standard deviation of the errors of 0.011).[59] Using the standard assumption that, in the absence of new value relevant company-specific news, abnormal returns will be normally distributed around zero, probability theory implies that, based on randomness alone, and using a 95% confidence level and large sample size, the abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) only 5% of the time.[60,61] Stating this point another way, there is a 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation.

56.    Since our example date has a t-statistic of -1.51, the abnormal return is not statistically significant at the 95% confidence level, and I cannot reject randomness as the cause of the abnormal price movement with greater than 95% confidence. By contrast, if, on a

---

[59] The standard deviation of the errors is plotted in **Exhibit 6.** The standard deviation of the error is also known as the standard error. "An estimate based on a sample is likely to be off the mark, at least by a small amount, because of random error. The standard error gives the likely magnitude of this random error, with smaller standard errors indicating better estimates." The National Academies Press, *Reference Manual on Scientific Evidence*, Third Edition, 2011, p. 243.

[60] Basic statistics state that for a normally distributed variable, 5% of the observations are expected to fall outside 1.96 standard deviations from the mean. "The normal distribution has the property that the area within 1.96 standard errors of the mean is equal to 95% of the total area." The National Academies Press, Reference Manual on Scientific Evidence, Third Edition, 2011, p. 342.

[61] The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well. David I. Tabak & Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert*, Ch. 19, (3rd ed. 2001).

particular day, one observes an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95% confidence level) and one observes new value relevant firm-specific information, one would reject randomness as the explanation with at least 95% confidence and infer that the new information is the cause of the price movement.

57. **Exhibit 6** shows that the standard deviation of the errors for Uniti Common Stock varied over the Class Period. As noted above, by adopting a rolling regression model, my event study explicitly adjusts for changing Company-specific volatility.

58. To analyze cause-and-effect, I examined the price response of Uniti Common Stock to the sixteen earnings announcements during the Class Period. *See* **Exhibit 7**.

59. There are many academic articles and financial treatises that explain theoretically and demonstrate empirically that the release of company earnings information often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security.[62] Also, newly released earnings reports by a company are an objective set of news to identify and test. Considering the seventh earnings release listed in **Exhibit 7** as an example, before market hours on February 23, 2017, the Company announced positive fourth quarter and full year results that were in line with expectations.[63] In response, the market price of Uniti Common Stock increased by 3.51%, compared to the predicted return, based solely on the

---

[62] William H. Beaver, "The Information Content of Annual Earnings Announcements: New Insights from Intertemporal and Cross-Sectional Behavior," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 67-92 (1968); Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 119-163(1971); Joseph Aharony & Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, 1-12 (1980).

[63] *See*, "Communications Sales & Leasing, Inc. Reports Fourth Quarter and Full Year 2016 Results," *GlobeNewswire,* February 23, 2017, 7 AM ET ; "In-Line 4Q16 Results, Let the Good Times Roll (Up)," *Cowen and Company*, February 23, 2017; "4Q16 Quick Comment: Results In-line, Diversification Continues," *Morgan Stanley*, February 23, 2017.

Market Index and Industry Indices, of 0.76%. Thus, the abnormal return on February 23, 2017 was 2.75%. With a t-statistic of 2.13, this abnormal price movement is statistically significant at the 95% level, and I therefore have scientific evidence that Uniti Common Stock reacted rapidly to this new information.

60.    Similar to this example, I analyzed the market reaction to Uniti's other earnings announcements I identified above. In total, of the sixteen earnings announcements Uniti issued during the Class Period, six resulted in statistically significant price movements above the 95% confidence level.[64] Of the six earnings announcements statistically significant at the 95% confidence level, two were also statistically significant at the 99% level.

61.    **Exhibit 7** presents a summary of the earnings releases during the Class Period.

62.    I then compared these results against the 414 days during the Class Period where I identified no Uniti-related news from the Factiva database and when there were no analyst reports, SEC filings, or press releases issued.[65]  Of these 414 days, there were 23 days with a statistically significant price movement. Thus, during the Class Period, there was a statistically significant price reaction at the 95% confidence level or greater on 37.5% of the days with earnings announcements, but on 5.56% of the days with no Uniti-related news.[66,67] This is powerful scientific evidence of a cause-and-effect relationship between new publicly released information concerning the Company and changes in the price of Uniti Common Stock.

---

[64] It is not unusual to observe many earnings announcements that are not statistically significant.  This happens, for instance, in quarters where the firm roughly met expectations, if the firm offered little change in guidance, and/or if there was a mix of both positive and negative information.

[65] Through Uniti's press releases, I found one article that was not included on the Factiva database. The press release not included was released on October 6, 2016.

[66] This difference between 37.5% and 5.56% is itself statistically significant at the 99% confidence level.

[67] Based on randomness alone, one would expect 5% of the no news days to be statistically significant.  The observed rate of 5.56% is not statistically significantly different from 5%.

26

63.   Furthermore, on the 414 days with no news, the average change in price of Uniti Common Stock was 1.26% after controlling for market and industry factors, while on the 16 earnings announcement dates, the average change in price of Uniti Common Stock was 2.71% after controlling for market and industry factors. In other words, the average magnitude of abnormal price movement on earnings announcement days was about 2 times higher on earnings announcement days than on days with no news.[68] Again, this demonstrates that, on days when important company-specific information is released to the market, Uniti's price generally moves much more than on days where there is no company-specific news. This provides further evidence of a cause-and-effect relationship between company-specific news and changes in the price of Uniti Common Stock, and thus an efficient market.

64.   The bar charts below summarize this analysis while **Exhibit 8** gives more detail.



**Percentage of Days Significant at the 95% Confidence Level**

---

[68] This difference between 2.71% and 1.26% is itself statistically significant at the 99% confidence level.



65.     Finally, when important Company-specific news is released to the market (*e.g.*, earnings announcements), the daily trading volume of Uniti Common Stock also tends to be much higher[69] than on days where there is no news. *See* Ex. 8. For instance, the average daily trading volume of the 16 days with earnings announcements was 3.3 million. Compare this to the average daily trading volume of 1.3 million on the 414 days where there was no Uniti news, analyst reports, SEC filings, or press releases during the Class Period.[70] The bar chart below summarizes this analysis.

---

[69] William H. Beaver, "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 69, 84 (1968).

[70] This difference between 3.3 million and 1.3 million is itself statistically significant at the 99% confidence level.



**Average Daily Trading Volume**

66.  The bar charts above reveal a strong cause-and-effect relationship between new, Company-specific news and rapid changes in the price of Uniti Common Stock. The earnings announcement days have a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significantly larger price changes than those found on days with no news.

67.  In conclusion, the event study analysis presented in this section demonstrates a clear cause-and-effect relationship between new material news and changes in the market price of Uniti Common Stock during the Class Period.

## G. *KROGMAN* FACTOR 1: MARKET CAPITALIZATION

68.  In *Krogman v. Sterritt*, the court noted that economic theory points to other possible relevant factors for determining whether a stock trades in an efficient market, in addition to the

*Cammer* factors.[71] The Court in *Krogman* held that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[72] Furthermore, Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[73] Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

69.    Uniti Common Stock had a higher market capitalization than the majority of NYSE and NASDAQ stocks during the Class Period, thus suggesting this factor is supportive of efficiency. There were at a minimum 120.4 million shares of Uniti Common Stock outstanding throughout the Class Period.[74] The market capitalization for Uniti Common Stock averaged $3.44 billion during the Class Period, as shown in **Exhibit 9.** Meanwhile, **Exhibit 10** shows that during the Class Period, Uniti Common Stock market capitalization ranged from the 65th to 82nd percentile of the combined NYSE and NASDAQ markets for the applicable quarters during the Class Period.[75] In other words, over the Class Period, Uniti Common Stock had a higher market capitalization than at least 65% of the firms on the combined NYSE and NASDAQ exchanges.

---

[71] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*"). The factors identified by the *Krogman* Court are 1) market capitalization, 2) size of float of common stock, and 3) bid-ask spread.

[72] *Krogman*, 202 F.R.D. at 478.

[73] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 117 (2000).

[74] Shares outstanding data obtained from SEC filings.

[75] Bloomberg EQS Function.

70.    Given that the market capitalization for Uniti Common Stock was consistently large relative to other publicly traded companies, this factor is supportive of market efficiency for Uniti Common Stock.

### H.  *KROGMAN* FACTOR 2: THE BID-ASK SPREAD

71.    The second *Krogman* factor considers the bid-ask spread for a security, reasoning that: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[76] The bid-ask spread is a measurement of the difference between what buyers are bidding to acquire a security and what sellers are asking to sell the security, and therefore being a measure of the cost to transact in a market. Bid-ask spread is an important indicator of the degree to which a market is developed. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies because the cost of the trade could be greater than the perceived inefficiency. Thus, a narrow bid-ask spread supports the presence of an efficient market where the prices reflect publicly available information.

72.    I analyzed bid-ask spreads for Uniti Common Stock during the Class Period. **Exhibit 11** shows that, during this period, the time-weighted average percentage bid-ask spread for Uniti Common Stock in each month was between 0.017% and 0.097%. This is well below the average and median bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in September 2015 (the full month of the Class Period during which

---

[76] *Krogman*, 202 F.R.D. at 478.

Uniti had the largest percentage bid-ask spread).[77,78] **Exhibit 11** demonstrates that, in September 2015, Uniti Common Stock had a monthly average bid-ask spread of 0.097%, while a randomly selected group of 100 other common stocks on the NYSE and NASDAQ had a monthly average bid-ask spread of 0.91%.[79] Accordingly, Uniti Common Stock bid-ask spread was low during the Class Period, and this factor further supports market efficiency for Uniti Common Stock.

## I. *KROGMAN* FACTOR 3: PUBLIC FLOAT

73.    The *Krogman* Court's final factor is the proportion of the float that is public (*i.e.*, the proportion of shares not held by insiders), with a large proportion considered to be indicative of market efficiency.  As shown in **Exhibit 12**, during the Class Period, insiders held just 4.98% of all outstanding shares of Uniti Common Stock, meaning that 95.02% of Uniti's shares were held by non-insiders.  This large percentage of shares held by non-insiders supports market efficiency.

## J. ADDITIONAL FACTOR: INSTITUTIONAL OWNERSHIP

74.    Institutional investors are considered to be sophisticated and well-informed, with access to most publicly available information for the stocks that they own. These investors

---

[77] Quote data for Uniti and other publicly traded stocks were obtained from the TICK database. *See* https://tickapi.tickdata.com/.

[78] I constructed a random sample because I am not aware of any exchange-wide reporting of average or median bid-ask spreads. Determining the average bid-ask spread for the entire market would be a very costly and data intensive process, therefore I adopted a random sampling methodology. I determined the constituents of the NYSE and NASDAQ for September 2015 and then randomly generated a list of 100 common stock securities. I then calculated the time-weighted average monthly bid-ask spread for September 2015. Uniti Common Stock averaged a spread of 0.045% for the entirety of the Class Period, compared to the monthly average spread of the 100 other common stocks in September 2015 of 0.91%

[79] The time-weighted average bid-ask spread was calculated by taking the average of the spread during trading hours on the primary exchange of each security, weighted by the amount of time each quote prevails in the market. That is, I take the weighted average quote, with the weight being the number of seconds between that quote and the next quote that occurs. Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang & Hans R. Stoll, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).

include mutual funds, pension funds, investment banks, and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios. As **Exhibit 12** shows, 943 separate institutions owned Uniti Common Stock during the Class Period, holding on average 66.32% of the public float. The substantial level of institutional ownership of Uniti Common Stock during the Class Period, coupled with the high trading volume described above, further supports a conclusion of market efficiency.

### K.  ADDITIONAL FACTOR: AUTOCORRELATION

75.   If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated." Autocorrelation is relevant to efficiency because, if the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of it, then past price movements, which are public information, are not fully reflected in the current price—which in turn suggests that the market is inefficient.

76.   Autocorrelation may occur from time to time for random reasons or due to the pattern of firm-specific news. Efficiency would only be violated, however, if the autocorrelation were large enough and persistent enough that a trader could consistently earn riskless profits over time.[80]

77.   A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has a statistically significant effect on the abnormal return today.[81] If the previous day's abnormal

---

[80] Doron Avramov, Tarun Chordia & Amit Goyal, *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. 2365, 2367-68 (2006); Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. 95-101 (1978).

[81] William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.

return has no statistically significant predictive power, then the null hypothesis of an absence of autocorrelation (which would be consistent with market efficiency) cannot be rejected.

78.     **Exhibit 13** displays the autocorrelation coefficient for Uniti Common Stock using the abnormal returns from the event study model described above. The coefficient for the Class Period is not statistically different than zero.[82] This result is thus inconsistent with the notion that an investor could consistently predict abnormal movements using prior price movements and earn arbitrage profits. Therefore, this factor also supports the conclusion that Uniti Common Stock traded in an efficient market throughout the Class Period.

## L.  ADDITIONAL FACTOR: OPTIONS

79.     In addition to the factors analyzed above, there was also considerable option trading in Uniti Common Stock during the Class Period.[83] Academic articles have demonstrated that options written on existing assets can improve efficiency by permitting an expansion of the contingent payout available to investors based on changes in the price of the security.[84] Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks.[85] Thus, this factor also supports that Uniti Common Stock traded in an efficient market throughout the Class Period.

---

[82] There have been 4 outlier dates (July 19, 2018, February 20, 2019, February 22, 2019, and February 26, 2019) removed from the estimation.

[83] For instance, according to iVolatility, there were 1,693,843 Uniti Common Stock put contracts and 1,375,210 Uniti Common Stock call contracts that traded during the Class Period. Uniti options do not begin trading until April 27, 2015, so my analyses of options contracts do not begin until April 27, 2015.

[84] Stephen A. Ross, *Options and Efficiency*, 90 Q. J. ECON. 75 (1976).

[85] Raman Kumar, Atulya Sarin & Kuldeep Shastri, *The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis*, 53 J. FIN. 717 (1998).

80.     To summarize, each of the *Cammer*, *Krogman*, and other factors I analyzed supports the conclusion that the market for Uniti Common Stock was efficient.

## VIII.  EFFICIENCY FOR CALL AND PUT OPTIONS ON UNITI COMMON STOCK

81.     Options are derivative securities, a type of security whose value is dependent on the market price of an underlying security or asset. In this case, during the Class Period, the pricing for the Uniti Options at issue was dependent on the market price of Uniti Common Stock.

82.     There are two basic types of options: call options and put options. A call option gives the holder of the option the right to buy an asset (in this case, Uniti Common Stock) by a certain date, called the expiration date, and at a certain price, called the strike price or exercise price. A put option gives the holder the right to sell an asset (in this case, Uniti Common Stock) by an expiration date at the strike price. Options can be either American or European, with the distinction being that American options can be exercised at any time up until the expiration date, whereas European options can be exercised only on the expiration date itself.[86] The price of an option, also referred to as the "premium," depends on a number of factors, including how the current stock price compares to the exercise price, the amount of time to expiration, anticipated dividends,[87] expected volatility of the underlying stock, and interest rates.[88]

83.     All of the Uniti Options traded during the Class Period were American options and were listed on multiple major options exchanges including the NASDAQ Options Exchange[89] and the Chicago Board Options Exchange ("CBOE").[90] During the Class Period, a total of 611

---

[86] John Hull, *Options, Futures and Other Derivatives*, 7th Edition, Prentice Hall, 2009, p. 6.

[87] Uniti paid dividends to investors throughout the Class Period.

[88] John Hull, "Chapter 9: Properties of Stock Options" in *Options, Futures and Other Derivatives*, 7th Edition, Prentice Hall, 2003, pp. 201-204.

[89] http://www.nasdaq.com/options/.

[90] https://www.cboe.com/us/options/symboldir/equity_index_options/?sid=U

call option series and 611 put option series were listed; 372 call option series and 378 put option series had non-zero trading volumes during this period. The expiration dates for these options ranged from May 15, 2015 to January 15, 2021, and the strike prices ranged from $2.50 to $45.00.[91] For example, one call option series had an expiration date of July 19, 2019 and an exercise price of $10 per share. This call option gave the holder the right to buy Uniti Common Stock at $10 per share any time prior to July 19, 2019.

84.    As I demonstrated in **Section VII**, Uniti Common Stock satisfied each of the efficiency factors. If one concludes that Uniti Common Stock was priced efficiently and therefore reflected the value of the alleged misstatements and omissions, it is then logical and natural to conclude that because option pricing is dependent on the stock price, the inflation caused by the misrepresentations and omissions affecting the stock price would translate into the value of derivative instruments such as call and put options by definition (so long as the options traded efficiently).[92]

85.    A standard method for evaluating efficient trading in options markets is to test what is known as "put-call parity."[93] Put-call parity refers to a specific relationship that must exist between the price of the underlying security and prices of put and call options with the same expiration date and strike price. If the prices of a put-call pair are not consistent with each other

---

[91] Data on options for Uniti Common Stock were provided by iVolatility. *See* www.ivolatility.com. For each option series, the iVolatility data contains on a daily basis, the following: bid price, ask price, mean transaction price, volume, open interest, implied volatility, and standard option sensitivities (known as delta, gamma, vega/kappa, theta, and rho).

[92] This point is clear from the fact that option valuation models, such as the Black-Scholes model, depend directly on the current underlying stock price, *see* John Hull, "Chapter 12: The Black-Scholes Model" in *Options, Futures and Other Derivatives*, 5th Edition, Prentice Hall, 2003.

[93] Robert C. Klemkosky and Bruce G. Resnick, "Put-Call Parity and Market Efficiency," *The Journal of Finance*, Vol. 34, No. 5, December 1979, pp. 1141-1155; Avraham Kamara and Thomas W. Miller, Jr., "Daily and Intradaily Tests of European Put-Call Parity," *The Journal of Financial and Quantitative Analysis*, Vol. 30, No. 4, December 1995, pp. 519-539; Leng Y. Goh and David Allen, "A Note on Put-call Parity and the Market Efficiency of the London Traded Options Market," *Managerial and Decision Economics*, Vol. 5, No. 2, June 1984, pp. 85-90.

and the underlying security, there would be a violation of put-call parity and a potential arbitrage opportunity. An arbitrage opportunity exists when a trader has the ability to earn a risk-free profit based on inconsistent pricing of securities. Prices that exhibit a consistent pattern of arbitrage opportunities would be inconsistent with market efficiency.

86.     For American options on dividend paying stocks, the put-call parity relation implies an upper and lower bound on the value of the put and call option prices such that:

$$S_0 - D - K \leq C - P \leq S_0 - Ke^{-rT}$$

where $S_0$ denotes the current price of the underlying common stock, $D$ denotes the present value of future dividends that will occur prior to expiration of the option,[94] $K$ denotes the exercise price of the options, $C$ is the call option price, $P$ is the put option price, $r$ is the risk-free interest rate and $T$ is the time to expiration of the options.[95]

87.     I tested both the upper and lower bounds over the pairs of Uniti Options with valid bid and ask prices.[96] Of the 54,169 tests of put-call parity over the option series and the 1,048 option trading days during the Class Period, put-call parity held for 54,125 of the tests, or 99.92% of the time. In fact, there were only 44 violations to put call parity that occurred, which

---

[94] As noted earlier, Uniti paid dividends to investors throughout the Class Period. For purposes of the put-call parity test, I assume that investors expected the company to pay the same dividend rate that had been most recently declared on a quarterly basis until expiration. The only exception to this is that I assume that the reduction in the dividend rate from $0.60 per share to $0.05 per share that was declared on 3/19/19 was anticipated starting on 2/19/19 when Uniti's stock price fell from trading around $20 per share to, in the days following, below $10 per share.  At that point, the market would have anticipated that Uniti was unlikely to continue paying a dividend of $0.60 per share on a quarterly basis.

[95] For details, *see* John Hull, *Options, Futures and Other Derivatives*, 7th Edition, Prentice Hall, 2009, pp. 214-215.

[96] To summarize, I tested put-call parity for Uniti Call and Uniti Options on a daily basis using the closing stock price and the last bid and ask prices for each option series. All inputs necessary to test put-call parity were obtained from iVolatility except for the risk-free interest rate, which was obtained from FRED. The ask price for the Call Option and the bid price for the Put Option were used for the lower bound; and the bid price for the Call Option and the ask price for the Put Option were used for the upper bound in the put-call parity inequality.

represents 0.08% of all tests (see **Exhibit 14**). This provides evidence that the market prices of Uniti Options consistently reacted contemporaneously with changes in the market price of Uniti Common Stock so as to prevent arbitrage opportunities. This is strong evidence that Uniti Options traded efficiently and that any mispricing due to the alleged misstatements and omissions would translate into the prices of Uniti Options.

88.    Because the put-call parity relationship incorporates the price of Uniti Common Stock, the evidence of efficiency for Uniti Options also bolsters the evidence that Uniti Common Stock traded in an efficient market during the Class Period. The put-call parity analysis indicates that there was no evidence of consistent arbitrage opportunities between Uniti Options and Uniti Common Stock.

89.    Similar to how I test for a cause-and-effect relationship between new news and changes in Uniti Common Stock prices, I also perform such a test for Uniti Options and find that there is strong statistical evidence that Uniti Option Prices react to new news.  The price of an option can change based on a number of factors even if the price of the underlying stock is constant.  These factors include, but are not limited to, the level of the stock price in relation to the strike price, time to maturity, and volatility. Therefore, I utilize the well-known and standard Black-Scholes pricing model, along with the expected changes in Uniti stock price based upon the regression analysis described in **Section VII** to quantify the expected price movement for an individual option series on each relevant date.[97]  In other words, by using the Uniti Common Stock expected return and the Black Scholes formula, I control for option price movements expected based upon changes in the Market Index, Industry Index, and the value of other factors

---

[97]  The Black-Scholes model was developed by Fischer Black and Myron Scholes in the 1970s, for which Myron Scholes received the Nobel Prize.  The Black-Scholes formula holds that an option price is a function of the time to expiration, the underlying stock price, the strike price, the risk-free interest rate, and the volatility of the underlying security.

in the Black Scholes Model including the strike price, time to maturity, risk free rate of interest, and volatility of Uniti Common Stock.[98]

90.    I am able to quantify the abnormal price return for each option by subtracting the expected return from the actual observed return.  Once I have the abnormal return, I can then test whether the abnormal return is statistically significant.[99]

91.    **Exhibit 15** summarizes the results for each earnings announcement day.  As one would expect in an efficient market, there are a substantial number of option series that have statistically significant returns on earnings announcements when there is a significant change in the underlying common stock and far less when there is no significant change in the underlying stock price.

92.    To more formally test cause and effect, I undertake the same methodology I applied to Uniti Common Stock. In other words, I analyze whether there is statistical evidence showing that there is a greater prevalence of statistically significant price movements, magnitude of price movements, and trading volume on earnings events compared to "no news" days.[100] These results are shown on **Exhibit 16** for Uniti Call Options and **Exhibit 17** for Uniti Put Options.

---

[98] More specifically, to obtain the predicted return for each option series on day $t$, I determine how much of a price change is expected by using the Black-Scholes Formula on both day $t$-$1$ and day $t$.  On day $t$-$1$, I compute a theoretical price ($P_{t-1}$) using the observed underlying stock price on day $t$-$1$, the strike price, the time to maturity as of $t$-$1$, the risk-free rate of interest on day $t$-$1$, and the implied volatility on day $t$-$1$.  I then calculate a theoretical price for day $t$ ($P_t$) where the underlying stock price is equal to the stock price on day $t$ times $(1+r^{expected})$ where $r^{expected}$ is the expected return from my market model regression for Uniti Stock described above, the time to maturity as of day $t$, the risk-free rate of interest on day $t$, the strike price (which did not change) and the implied volatility from day $t$-$1$.  I use the implied volatility from day $t$-$1$ instead of day $t$ because the news itself may be a contributor to changes in implied volatility of the underlying security.  Then I calculate an expected return for the option series as $(P_t/P_{t-1}) - 1$.

[99] To test for statistical significance I compute a t-statistic by dividing the abnormal return by the standard deviation of abnormal returns for that particular series over the prior 20 trading days.  Abnormal returns for days that are excluded from the common stock market model regression are also excluded from the calculation of the standard deviation for each option series.

[100] *See* ¶ 62 above for a description of how "no news" days were identified.

93. **Exhibit 16** shows that I observe statistically significant price changes on Uniti Call Option series at the 95% significance level on 95 of 584 of the observable returns on earnings announcement days (or 16.27%), while on "no news" days, the rate of statistical significance is only 7.32%. This difference is statistically significant. Likewise, the average abnormal price movement on earnings announcement days is statistically significantly higher than the same figure for "no news" days. **Exhibit 17** shows qualitatively similar results for Uniti Put Options. As I found for Uniti Common Stock, these comparisons indicate that on days when important firm-specific information was released to the market (earnings announcements), Uniti Option prices move much more than on days where there was no news. Together, this provides further evidence of a cause-and-effect relationship between firm-specific news and changes in Uniti Option prices, and thus that Uniti Options traded efficiently.[101]

## IX. DAMAGES

94. Counsel for the Lead Plaintiffs also asked me to opine on whether per share damages could be measured for all Class members under Section 10(b) of the Exchange Act using a common methodology that is consistent with the Lead Plaintiffs' theory of liability. There is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act. This method, typically referred to as the "out-of-pocket" method, equates damages to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision, a

---

[101] As shown on **Exhibit 16** and **Exhibit 17**, I also tested whether there was increased volume on earnings announcement days as well. While both puts and calls showed increases in volume on earnings announcement days, the difference was statistically significant for puts, but not for calls.

formulaic limit on damages that also can be applied class-wide).[102] [103] The out-of-pocket method has been applied in virtually every Section 10(b) matter I have observed or participated in as a consulting, testifying, or neutral expert.

95. Once the inflation per share has been quantified on each day during the Class Period, the computation of damages for each class member is formulaic based upon information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Therefore, there is a well-accepted method to compute damages on a class-wide basis in Section 10(b) matters such as this.

96. Separate and apart from whether there is a common method for computing damages is the question of how to quantify the artificial inflation per share that is an input to the damages methodology. The quantification of the artificial inflation per share requires a detailed loss causation analysis.[104]   Nevertheless, whatever the method for determining the artificial inflation per share, it would be common to all class members.

97. For example, the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations (*i.e.* a "corrective

---

[102] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See* Private Securities Litigation Reform Act of 1995, § 78u-4(e)(1).

[103] For sellers of put options, the formula should focus on the change in artificial "deflation" rather than "inflation," but the economic concept that the damages are based on the change in the distortion of the price caused by the misrepresentations or omissions is precisely the same.

[104] I have not been asked to conduct a loss causation analysis at this time.

disclosure").[105] Such an event study would also need to consider whether and to what extent any non-fraud related information (*i.e.* "confounding information") contributed to the observed price movement on the days on or following the alleged corrective disclosures.  If there is such confounding information, disaggregating the price impact of corrective disclosures from confounding information may utilize commonplace valuation techniques and may depend on information learned through discovery. Determining the specific valuation approach necessary to perform a loss causation analysis that reasonably disaggregates corrective and confounding information is an inherently case-specific question that depends on specific facts and circumstances. Examples of such techniques include, but are not limited to, fundamental valuation analysis such as discounted cash flow methods, valuation multiple methods (*i.e.* price to earnings multiples, price to EBITDA multiples, price to revenue multiples, etc.), use of academic studies regarding the value of certain types of information, and other available valuations whether from securities analysts or made available through discovery. Regardless of the technique used, it is performed on a class-wide basis – in other words, the specific methodology applies regardless of the identity or circumstances of any individual class member.

98.    The loss causation analysis would also require a determination of how inflation per share may have evolved over the Class Period. Again, the nature of this analysis is intensely factual, case-specific, and may depend on information learned through discovery. For example, an often-used method is to assume "constant dollar inflation," *i.e.*, that the artificial inflation was the same dollar amount throughout the Class Period (except to the extent inflation was removed by disclosures that partially—but not fully—revealed the truth to the market during the Class

---

[105] The event study I have performed for this report is for Market Efficiency purposes and is not an attempt at valuing artificial inflation.

Period). In certain circumstances, it may be more reasonable to assume "constant percentage inflation"—that the price was inflated by the same percentage throughout the Class Period (except to the extent that partial disclosures removed some inflation during the Class Period). In other cases, it may make sense to assume that artificial inflation evolved during the Class Period based upon the nature and timing of specific misstatements, or that artificial inflation varied on a daily basis as a result of information contained in internal documents obtained in discovery. The determination of how artificial inflation evolved over the Class Period is a case-specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above. Critically, however, all of these methodologies apply class-wide and do not depend on the identity or circumstance of any specific investor.

99.    Accordingly, although I have not been asked to calculate class-wide damages in this report, and such calculations would likely depend, at least in part, on the completion of discovery and full development of the case record, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole.

## X.    CONCLUSION

100.  In sum, every factor analyzed supports my opinion that Uniti Common Stock and Uniti Options traded in efficient markets during the Class Period. Furthermore, class-wide damages in this matter can be calculated on a class-wide basis for all of Uniti Securities using a common methodology for the eligible Uniti Securities.

101.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on October 25, 2021.

_____
Chad Coffman

**Exhibit 1**
**Summary of Efficiency Factors for Uniti Group Inc.**

| Factor | Summary of Factor | Uniti |
|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | • The average weekly trading volume of 5.76%, as a percentage of shares outstanding, exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 9.74 million shares traded weekly on average during the Class Period). |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | • During the Class Period at least 11 securities analysts issued 346 analyst reports which implies that important information relevant to trading Uniti Common Stock was widely communicated to the market. |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | • Because Uniti shares were exchange-traded on the Nasdaq during the Class Period, not over the counter, this factor is satisfied. According to Bloomberg, throughout the Class Period, there were at least 129 market makers for Uniti Common Stock. |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | • Uniti filed Form S-3ASR's during and after the Class Period (on June 15, 2016, and March 3, 2020). I understand that because on March 4, 2019 Uniti filed a notification they would be non-timely for their fiscal year 2018 10-K, that Uniti may not have been S-3 eligible for a short period. However, this occurred late in the Class Period and Uniti was timely and S-3 eligible represents over 92% of the Class Period. For the remaning percent of the Class Period the weight of the other factors supporting market efficiency, far allay any concern about inefficiency. Therefore, Uniti meets this efficiency factor. |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | • The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for Uniti Common Stock.. |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | • As of 6/30/2015 and 6/30/2019, Uniti's market capitalization was $3.7 billion and $1.75 billion, respectively, which is at least the 65th percentile of all NYSE and NASDAQ stocks. Uniti's market capitalization for the Class Period averaged $3.44 billion. Uniti Common Stock therefore easily meets this criterion. |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | • During the Class Period, the average percentage bid-ask spread for Uniti Common Stock in each month ranged from 0.017% to 0.097%. Uniti's average percentage bid-ask spread was well below the mean and median bid-ask spread of a random sample of 100 other common stocks trading on the NASDAQ and NYSE in September 2015 (the full month when Uniti had the largest bid-ask spread). This supports a finding of efficiency. |
| Float and Institutional Ownership | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | • On average over 95% of Uniti shares were held by non-insiders. 943 institutions held the vast majority of the public float throughout the Class Period which further supports the finding that Uniti Common Stock traded in an efficient market. |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | • There was no evidence of statistically significant autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading Uniti Common Stock based solely on its past price movements. This supports a finding of efficiency. |
| Options | Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks. | • There were 1,693,843 Uniti Common Stock put contracts and 1,375,210 Uniti Common Stock call contracts that traded during the Class Period. Uniti Common Stock therefore easily meets this criterion. |



**Exhibit 2**
**Uniti Common Stock Price & Volume**
**4/24/2015 - 7/31/2019**

Sources: Complaint and S&P Capital IQ.

**Exhibit 3**
**Uniti Common Stock Average Weekly Trading Volume**
**as a Percentage of Shares Outstanding**
**4/24/2015 - 6/24/2019**



Source: S&P Capital IQ.

■ Volume as a Percentage of Shares Outstanding

Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period on April 24, 2015 through June 24, 2019. The last week consists of four trading days (ie. 6/19/2019, 6/20/2019, 6/21/2019, and 6/24/2019) and therefore, the average of the daily trading volume on these days is multiplied by five to get a comparable measure for the average weekly trading volume as a percentage of shares outstanding. The last week is excluded from the median calculation.

# Exhibit 4
# Summary of Securities Analyst Reports Issued for Uniti

| | Analyst Name | Reports Issued During the Class Period: 4/24/2015 - 6/24/2019 |
|---|---|---|
| [1] | SEEKING ALPHA | 133 |
| [2] | MORGAN STANLEY | 32 |
| [3] | STEPHENS INC. | 32 |
| [4] | JPMORGAN | 26 |
| [5] | WELLS FARGO | 26 |
| [6] | RBC CAPITAL MARKETS | 23 |
| [7] | DEUTSCHE BANK | 19 |
| [8] | MORNINGSTAR | 18 |
| [9] | COWEN & COMPANY | 18 |
| [10] | SUNTRUST ROBINSON HUMPHREY | 18 |
| [11] | THESCREENER | 1 |
| | **Total** | **346** |

Source: Counsel

**Exhibit 5**
**Coefficients from Rolling Event Study Regression for Uniti**
**4/24/2015 - 6/24/2019**



Note: The results are based on a fixed to rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index), and two industry indices, the MSCI US REIT Index and the S&P Composite 1500 Telecommunication Services. The MSCI US REIT Index (compared against Uniti in its 10-Ks during the Class Period) is a free float-adjusted market capitalization weighted index that is comprised of equity real estate investment trusts (REITs), while the S&P Composite 1500 Telecommunications Services comprises those companies included in the S&P Composite 1500 that are classified as members of the GICS Communication Services sector. Both indices are net of the S&P 500 Total Return Index. Earnings announcements, the alleged corrective disclosure dates and 6 outlier dates of 1/7/2016 (when Uniti aquired PEG Bandwidth LLC), 7/18/2018 (when Uniti and Windstream were downgraded by analysts), 12/12/2018 (when Uniti was downgraded by analysts), 2/21/2019 and 2/22/2019 (when Uniti was downgraded by analysts), and 2/25/2019 (when trading was halted twice for Uniti Common Stock)  have been removed from estimation.

## Exhibit 6
## Standard Deviation of the Errors for Rolling Event Study
## Regression for Uniti Common Stock
## 4/24/2015 - 6/24/2019



Note: The results are based on a fixed to rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index), and two industry indices, the MSCI US REIT Index and the S&P Composite 1500 Telecommunication Services. The MSCI US REIT Index (compared against Uniti in its 10-Ks during the Class Period) is a free float-adjusted market capitalization weighted index that is comprised of equity real estate investment trusts (REITs), while the S&P Composite 1500 Telecommunications Services comprises those companies included in the S&P Composite 1500 that are classified as members of the GICS Communication Services sector. Both indices are net of the S&P 500 Total Return Index. Earnings announcements, the alleged corrective disclosure dates and 6 outlier dates of 1/7/2016 (when Uniti aquired PEG Bandwidth LLC), 7/18/2018 (when Uniti and Windstream were downgraded by analysts), 12/12/2018 (when Uniti was downgraded by analysts), 2/21/2019 and 2/22/2019 (when Uniti was downgraded by analysts), and 2/25/2019 (when trading was halted twice for Uniti Common Stock) have been removed from estimation.

Exhibit 7

## Event Study Analysis of Uniti Earnings Announcements

| # | Date | Time | Market Date | Event | Headline | Closing Price | Raw Return | Abnormal Return | Abnormal Dollar Change | t-Stat | Sig Level |
|---|------|------|-------------|-------|----------|---------------|------------|-----------------|------------------------|--------|-----------|
| | | | | | | | | Fixed To Rolling Regression Model (120-day window) | | | |
| 1 | 8/13/2015 | 7:00 AM | 8/13/2015 | Q2 2015 Earnings | Communications Sales & Leasing, Inc. Reports Results for the Period From April 24, 2015 Through June 30, 2015 *Source -GlobeNewswire* | $22.21 | 4.71% | 5.53% | $1.17 | 2.89 | *** |
| 2 | 11/13/2015 | 7:00 AM | 11/13/2015 | Q3 2015 Earnings | Communications Sales & Leasing, Inc. Reports 2015 Third Quarter Results *Source -GlobeNewswire* | $19.03 | -3.89% | -2.46% | -$0.49 | -1.39 | |
| 3 | 3/3/2016 | 7:00 AM | 3/3/2016 | Q4 FYE 2015 Earnings | Communications Sales & Leasing, Inc. Reports Fourth Quarter and Year End 2015 Financial Results *Source -GlobeNewswire* | $20.76 | 2.82% | 2.34% | $0.47 | 1.03 | |
| 4 | 5/12/2016 | 7:00 AM | 5/12/2016 | Q1 2016 Earnings | Communications Sales & Leasing, Inc. Reports 2016 First Quarter Financial Results *Source -GlobeNewswire* | $24.03 | 1.26% | 0.86% | $0.20 | 0.38 | |
| 5 | 8/11/2016 | 7:00 AM | 8/11/2016 | Q2 2016 Earnings | Communications Sales & Leasing, Inc. Reports 2016 Second Quarter Financial Results *Source -GlobeNewswire* | $30.30 | 0.26% | -0.55% | -$0.17 | -0.36 | |
| 6 | 11/14/2016 | 7:00 AM | 11/14/2016 | Q3 2016 Earnings | Communications Sales & Leasing, Inc. Reports 2016 Third Quarter Results *Source -GlobeNewswire* | $24.34 | -4.88% | -6.56% | -$1.68 | -5.38 | *** |
| 7 | 2/23/2017 | 7:00 AM | 2/23/2017 | Q4 FYE 2016 Earnings | Communications Sales & Leasing, Inc. Reports Fourth Quarter and Full Year 2016 Results *Source -GlobeNewswire* | $28.30 | 3.51% | 2.75% | $0.75 | 2.13 | ** |
| 8 | 5/4/2017 | 4:05 PM | 5/5/2017 | Q1 2017 Earnings | Uniti Group Inc. Reports First Quarter 2017 Results *Source -GlobeNewswire* | $25.34 | 0.24% | -1.15% | -$0.29 | -0.83 | |
| 9 | 8/3/2017 | 4:01 PM | 8/4/2017 | Q2 2017 Earnings | Uniti Group Inc. Reports Second Quarter 2017 Results *Source -GlobeNewswire* | $21.84 | -3.23% | -3.63% | -$0.82 | -2.50 | ** |
| 10 | 11/2/2017 | 4:02 PM | 11/3/2017 | Q3 2017 Earnings | Press Release: Uniti Group Inc. Reports Third Quarter 2017 Results *Source -GlobeNewswire* | $16.47 | 0.61% | 0.93% | $0.15 | 0.42 | |
| 11 | 3/1/2018 | 4:02 PM | 3/2/2018 | Q4 FYE 2017 Earnings | Uniti Group Inc. Reports Fourth Quarter and Full Year 2017 Results *Source -GlobeNewswire* | $14.69 | -3.99% | -4.44% | -$0.68 | -2.08 | ** |
| 12 | 5/10/2018 | 4:03 PM | 5/11/2018 | Q1 2018 Earnings | Press Release: Uniti Group Inc. Reports First Quarter 2018 Results *Source -GlobeNewswire* | $20.30 | 3.81% | 3.22% | $0.63 | 2.07 | ** |
| 13 | 8/9/2018 | 4:05 PM | 8/10/2018 | Q2 2018 Earnings | Uniti Group Inc. Reports Second Quarter 2018 Results *Source -GlobeNewswire* | $18.80 | 2.01% | 2.86% | $0.53 | 1.86 | * |
| 14 | 11/1/2018 | 4:03 PM | 11/2/2018 | Q3 2018 Earnings | Uniti Group Inc. Reports Third Quarter 2018 Results *Source -GlobeNewswire* | $20.01 | 1.16% | 2.54% | $0.50 | 1.57 | |
| 15 | 3/20/2019 | 4:05 PM | 3/21/2019 | Q4 FYE 2018 Earnings | Press Release: Uniti Group Inc. Reports Fourth Quarter and Full Year 2018 Results *Source -GlobeNewswire* | $10.20 | 2.00% | -0.07% | -$0.01 | -0.04 | |
| 16 | 5/9/2019 | 5:18 PM | 5/10/2019 | Q1 2019 Earnings | Press Release: Uniti Group Inc. Reports First Quarter 2019 Results *Source -GlobeNewswire* | $11.79 | 4.71% | 3.51% | $0.40 | 1.65 | |

Sources: S&P Capital IQ and Factiva.

Notes:

(1) The results are based on a fixed to rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index), and two industry indices, the MSCI US REIT Index and the S&P Composite 1500 Telecommunication Services. The MSCI US REIT Index (compared against Uniti in its 10-Ks during the Class Period) is a free float-adjusted market capitalization weighted index that is comprised of equity real estate investment trusts (REITs), while the S&P Composite 1500 Telecommunications Services comprises those companies included in the S&P Composite 1500 that are classified as members of the GICS Communication Services sector. Both indices are net of the S&P 500 Total Return Index. Earnings announcements, the alleged corrective disclosure dates, and 6 outlier dates of 1/7/2016 (when Uniti aquired PEG Bandwidth LLC), 7/18/2018 (when Uniti and Windstream were downgraded by analysts), 12/12/2018 (when Uniti was downgraded by analysts), 2/21/2019 and 2/22/2019 (when Uniti was downgraded by analysts), and 2/25/2019 (when trading was halted twice for Uniti Common Stock) have been removed from estimation.

(2) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater. "*" Denotes statistical significance at the 90% confidence level or greater.

**Exhibit 8**

**Comparison of Statistical Significance and Abnormal Returns**
**for Uniti Earnings Announcements**
**vs. Days with No News during the Class Period**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 16 | 414 |
| Significant Days at 95% Confidence Level | 6 | 23 |
| % Significant Days at 95% Confidence Level [2] | 37.5% | 5.56% |
| Average Absolute Abnormal Return [3] | 2.71% | 1.26% |
| Average Volume (Millions) [4] | 3.3 | 1.3 |

Notes:

(1) Results are based on the Class Period. For the purposes of this analysis, I selected the 414 days with no news. Days with no news were days that had zero news articles via the Factiva database, and no analyst reports or SEC filings were issued.

(2) 37.5% rate of statistical significance is statistically significantly different than 5.56% at the 99% confidence level using either a Chi-Square test or Fisher's Exact test.

(3) 2.71% absolute return is statistically significantly different than 1.26% based on a t-test for difference of means at the 99% confidence level.

(4) The difference between 3.3 million and 1.3 million is statistically significant at the 99% confidence level.

**Exhibit 9**
**Uniti Common Stock Market Capitalization**
**4/24/2015 - 7/31/2019**



Sources: Complaint, S&P Capital IQ, and SEC Filings.

**Exhibit 10**
**Uniti Common Stock**
**Market Capitalization Rankings**

| Last trading day of: | Market Capitalization (billions) | Percentile Rank on NYSE & NASDAQ |
|---|---|---|
| Q2 2015 | $3.70 | 77% |
| Q3 2015 | $2.68 | 75% |
| Q4 2015 | $2.80 | 75% |
| Q1 2016 | $3.34 | 78% |
| Q2 2016 | $4.43 | 81% |
| Q3 2016 | $4.87 | 82% |
| Q4 2016 | $3.96 | 78% |
| Q1 2017 | $4.01 | 78% |
| Q2 2017 | $4.39 | 79% |
| Q3 2017 | $2.57 | 70% |
| Q4 2017 | $3.12 | 73% |
| Q1 2018 | $2.85 | 72% |
| Q2 2018 | $3.52 | 75% |
| Q3 2018 | $3.54 | 75% |
| Q4 2018 | $2.81 | 75% |
| Q1 2019 | $2.05 | 68% |
| Q2 2019 | $1.75 | 65% |

Source: Bloomberg and S&P Capital IQ.



**Exhibit 11**
**Uniti Common Stock Average Monthly Bid-Ask Percentage Spread**
**4/24/2015 - 6/24/2019**

Source: Thomson Reuters Eikon and TICK Data.
Note: April 2015 and June 2019 data are limited to the Class Period.

**Exhibit 12**

## Uniti Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 6/30/2015 | 149,832 | 362 | 29,747 | 12,246 | 132,331 | 19.85% | 73,074 | 49% | 55% |
| 9/30/2015 | 149,836 | 359 | 29,741 | 9,821 | 129,916 | 19.85% | 73,342 | 49% | 56% |
| 12/31/2015 | 149,862 | 339 | 29,747 | 6,103 | 126,218 | 19.85% | 74,407 | 50% | 59% |
| 3/31/2016 | 150,034 | 328 | 29,870 | 3,770 | 123,934 | 19.91% | 69,998 | 47% | 56% |
| 6/30/2016 | 153,244 | 364 | 491 | 4,175 | 156,928 | 0.32% | 105,337 | 69% | 67% |
| 9/30/2016 | 155,123 | 389 | 527 | 6,073 | 160,669 | 0.34% | 110,662 | 71% | 69% |
| 12/31/2016 | 155,790 | 379 | 527 | 2,732 | 157,995 | 0.34% | 98,533 | 63% | 62% |
| 3/31/2017 | 155,276 | 365 | 617 | 2,248 | 156,907 | 0.40% | 107,607 | 69% | 69% |
| 6/30/2017 | 174,813 | 383 | 632 | 3,947 | 178,129 | 0.36% | 130,225 | 74% | 73% |
| 9/30/2017 | 175,449 | 370 | 647 | 12,246 | 187,047 | 0.37% | 130,818 | 75% | 70% |
| 12/31/2017 | 175,463 | 408 | 647 | 29,559 | 204,375 | 0.37% | 138,378 | 79% | 68% |
| 3/31/2018 | 175,428 | 396 | 786 | 27,050 | 201,692 | 0.45% | 136,661 | 78% | 68% |
| 6/30/2018 | 175,704 | 410 | 743 | 19,996 | 194,957 | 0.42% | 128,630 | 73% | 66% |
| 9/30/2018 | 175,687 | 396 | 743 | 15,239 | 190,183 | 0.42% | 127,656 | 73% | 67% |
| 12/31/2018 | 180,536 | 393 | 741 | 14,096 | 193,891 | 0.41% | 134,012 | 74% | 69% |
| 3/31/2019 | 183,104 | 358 | 747 | 23,999 | 206,357 | 0.41% | 150,066 | 82% | 73% |
| 6/30/2019 | 184,157 | 340 | 1,098 | 20,354 | 203,413 | 0.60% | 162,538 | 88% | 80% |

| Total Institutions over Class Period: | 943 | | | Class Period Average: | 4.98% | | 68.40% | 66.32% |
|---|---|---|---|---|---|---|---|---|

Sources: S&P Capital IQ and SEC filings.

**Exhibit 13**
**Uniti Common Stock**
**Test for Autocorrelation During the Class Period**

| Quarter | Coefficient on Previous Day's Abnormal Return[1] | t-Statistic | Significance Level [2] |
|---|---|---|---|
| Q2 2015 | 0.14 | 0.99 | |
| Q3 2015 | 0.15 | 1.18 | |
| Q4 2015 | -0.06 | -0.48 | |
| Q1 2016 | 0.00 | 0.00 | |
| Q2 2016 | -0.13 | -1.04 | |
| Q3 2016 | 0.15 | 1.17 | |
| Q4 2016 | 0.16 | 1.24 | |
| Q1 2017 | 0.14 | 1.09 | |
| Q2 2017 | -0.05 | -0.42 | |
| Q3 2017 | 0.07 | 0.54 | |
| Q4 2017 | 0.10 | 0.76 | |
| Q1 2018 | -0.08 | -0.63 | |
| Q2 2018 | 0.15 | 1.21 | |
| Q3 2018 | 0.00 | 0.00 | |
| Q4 2018 | -0.16 | -1.22 | |
| Q1 2019 | 0.11 | 0.32 | |
| Q2 2019 | 0.02 | 0.17 | |
| **Class Period** | **0.06** | **1.55** | |

Source: S&P Capital IQ.

Notes:

(1)  For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable. There have been 4 outlier dates (July 19, 2018, February 20, 2019, February 22, 2019, and February 26, 2019) removed from the estimation.

(2) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater. "*" Denotes statistical significance at the 90% confidence level or greater.

**Exhibit 14**
**Summary of Put-Call Parity Test**

| | |
|---|---|
| Option-Date Pairs | 54,169 |
| Violations of Put-Call Parity | 44 |
| Violations as % of Total Observations | 0.08% |

**Constraints:**

$$S_0 - D - K \leq C_{ask} - P_{bid}$$

$$C_{bid} - P_{ask} \leq S_0 - Ke^{-rT}$$

Sources: iVolatility.com and S&P Capital IQ.

Notes:

(1) The ask price for the Call option and the bid price for the Put option was used for the lower bound; and the bid price for the Call and the ask price for the Put option was used for the upper bound in the inequality above.
(2) If the mean price from iVolatility was 0, I used the midpoint between the bid price and ask price.

<u>Definition of Variables:</u>

$S_0$      Current stock price for Uniti (adjusted for dividends).

$$\sum_{j=1}^{n} \frac{D_j}{(1+r)^{T_j}}$$

D      Present Value of future dividends, calculated as:

where $D_j$ is the dividend amount, $r$ is the risk-free (and constant) interest rate covering the life of the option and ending closest to the expiration date, and $T_j$ time until dividend payout expressed in years, and $n$ is the number of dividend payments expected before option expiration.

K      Strike price of the option.

C      Call price.

P      Put price.

r      Risk-free (and constant) interest rate covering the life of the option and ending closest to the expiration date.

T      Time until expiration expressed in years.

**Exhibit 15**
**Summary of Event Study Results for Uniti Options on Earnings Announcement Dates**

| # | Market Date | Event | Common Stock Event Study | | | Call Option Event Studies | | | | | Put Option Event Studies | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Abnormal Return | t-Stat | Sig Level | Total Number of Series with a Return | Statistically Significant at 90% | Statistically Significant at 95% | Statistically Significant at 99% | Percent of Series Statistically Sig 95% or Above | Total Number of Series with a Return | Statistically Significant at 90% | Statistically Significant at 95% | Statistically Significant at 99% | Percent of Series Statistically Sig 95% or Above |
| 1 | 8/13/2015 | Q2 2015 Earnings | 5.53% | 2.89 | *** | 18 | 0 | 0 | 17 | 94.4% | 17 | 0 | 10 | 7 | 100.0% |
| 2 | 11/13/2015 | Q3 2015 Earnings | -2.46% | -1.39 | | 19 | 0 | 1 | 2 | 15.8% | 19 | 1 | 2 | 1 | 15.8% |
| 3 | 3/3/2016 | Q4 FYE 2015 Earnings | 2.34% | 1.03 | | 23 | 0 | 1 | 0 | 4.3% | 21 | 0 | 0 | 0 | 0.0% |
| 4 | 5/12/2016 | Q1 2016 Earnings | 0.86% | 0.38 | | 25 | 0 | 0 | 0 | 0.0% | 21 | 0 | 0 | 0 | 0.0% |
| 5 | 8/11/2016 | Q2 2016 Earnings | -0.55% | -0.36 | | 31 | 0 | 0 | 0 | 0.0% | 21 | 0 | 0 | 0 | 0.0% |
| 6 | 11/14/2016 | Q3 2016 Earnings | -6.56% | -5.38 | *** | 24 | 1 | 2 | 19 | 87.5% | 24 | 2 | 10 | 11 | 87.5% |
| 7 | 2/23/2017 | Q4 FYE 2016 Earnings | 2.75% | 2.13 | ** | 23 | 0 | 3 | 13 | 69.6% | 22 | 0 | 0 | 16 | 72.7% |
| 8 | 5/5/2017 | Q1 2017 Earnings | -1.15% | -0.83 | | 18 | 0 | 1 | 0 | 5.6% | 21 | 0 | 0 | 0 | 0.0% |
| 9 | 8/4/2017 | Q2 2017 Earnings | -3.63% | -2.50 | ** | 22 | 0 | 6 | 9 | 68.2% | 25 | 11 | 2 | 3 | 20.0% |
| 10 | 11/3/2017 | Q3 2017 Earnings | 0.93% | 0.42 | | 63 | 0 | 0 | 0 | 0.0% | 62 | 0 | 0 | 0 | 0.0% |
| 11 | 3/2/2018 | Q4 FYE 2017 Earnings | -4.44% | -2.08 | ** | 51 | 20 | 7 | 5 | 23.5% | 47 | 26 | 8 | 2 | 21.3% |
| 12 | 5/11/2018 | Q1 2018 Earnings | 3.22% | 2.07 | ** | 57 | 22 | 4 | 0 | 7.0% | 53 | 10 | 22 | 11 | 62.3% |
| 13 | 8/10/2018 | Q2 2018 Earnings | 2.86% | 1.86 | * | 53 | 10 | 1 | 1 | 3.8% | 52 | 8 | 4 | 0 | 7.7% |
| 14 | 11/2/2018 | Q3 2018 Earnings | 2.54% | 1.57 | | 57 | 3 | 1 | 2 | 5.3% | 54 | 5 | 1 | 0 | 1.9% |
| 15 | 3/21/2019 | Q4 FYE 2018 Earnings | -0.07% | -0.04 | | 52 | 0 | 0 | 0 | 0.0% | 54 | 0 | 0 | 0 | 0.0% |
| 16 | 5/10/2019 | Q1 2019 Earnings | 3.51% | 1.65 | | 48 | 19 | 0 | 0 | 0.0% | 52 | 1 | 0 | 0 | 0.0% |

Sources: S&P Capital IQ, iVolatility, and Factiva.
Notes:

(1) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater. "*" Denotes statistical significance at the 90% confidence level or greater.
(2) To obtain the predicted return for each option series on day t, I determine how much of a price change is expected by using the Black Scholes Formula on both day t-1 and day t. On day t-1, I compute a theoretical price (Pt-1) using the observed underlying stock price on day t-1, the strike price, the time to maturity as of t-1, the risk-free rate of interest on day t-1, and the implied volatility on day t-1. I then calculate a theoretical price for day t (Pt) where the underlying stock price is equal to the stock price on day t times (1+rexpected) where rexpected is the expected return from my market model regression for Uniti Stock described above, the time to maturity as of day t, the risk-free rate of interest on day t, the strike price (which did not change) and the implied volatility from day t-1. I use the implied volatility from day t-1 instead of day t because the news itself may be a contributor to changes in implied volatility of the underlying security. Then I calculate an expected return for the option series as (Pt/Pt-1) – 1.

**Exhibit 16**
**Comparison of Statistical Significance and Abnormal**
**Returns for Uniti Call Options**
**for Uniti Earnings Announcements**
**vs. Days with No News during the Class Period**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| $N^{(1)}$ | 584 | 13,084 |
| Significant Days at 95% Confidence Level | 95 | 958 |
| % Significant Days at 95% Confidence Level$^{(2)}$ | 16.27% | 7.32% |
| Average Absolute Abnormal Return$^{(3)}$ | 19.86% | 10.15% |
| Average Volume (Shares) | 4,187 | 2,779 |

Notes:

(1) Each observation represents a date for a specific call option series where a return can be calculated.

(2) 16.27% rate of statistical significance is statistically significantly different than 7.32% at the 99% confidence level using a Chi-Square test.

(3) 19.86% absolute return is statistically significantly different than 10.15% based on a t-test for difference of means at the 99% confidence level.

## Exhibit 17
### Comparison of Statistical Significance and Abnormal Returns for Uniti Put Options for Uniti Earnings Announcements vs. Days with No News during the Class Period

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N[1] | 565 | 12,197 |
| Significant Days at 95% Confidence Level | 110 | 921 |
| % Significant Days at 95% Confidence Level[2] | 19.47% | 7.55% |
| Average Absolute Abnormal Return[3] | 15.27% | 7.81% |
| Average Volume (Shares)[4] | 5,671 | 2,620 |

Notes:

(1) Each observation represents a date for a specific put option series where a return can be calculated.

(2) 19.47% rate of statistical significance is statistically significantly different than 7.55% at the 99% confidence level using a Chi-Square test.

(3) 15.27% absolute return is statistically significantly different than 7.81% based on a t-test for difference of means at the 99% confidence level.

(4) The difference between 5,671 and 2,620 is statistically significant at the 99% confidence level.

# Appendix A
# Documents Considered

## Court Documents

- Consolidated Amended Class Action Complaint, May 11, 2020, In re Uniti Group Inc. Securities Litigation, No. 4:19-cv-00756-BSM
- Decision and Order Denying Defendants' Motion to Dismiss filed March 31, 2021, In re Uniti Group Inc. Securities Litigation, No. 4:19-cv-00756-BSM

## Court Decisions and Securities Law

- *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).
- Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6. (Aug. 1988).
- *Cammer, et al., v. Bruce M. Bloom, et al.*, 711 F. Supp. 1264 (D.N.J. 1989).
- *Halliburton Co., et al., v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014).
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

## SEC Filings

- Uniti Group Inc. SEC Form 10-K filings submitted throughout the Class Period.
- Uniti Group Inc. SEC Form 10-Q filings submitted throughout the Class Period.
- Uniti Group Inc. SEC Form 8-K filings submitted during the Class Period.
- Uniti Group Inc. SEC Forms S-3ASR filed on June 15, 2016 and March 12, 2020.

## Security Data

- Historical data for Uniti Group Inc. Common Stock, MSCI US REIT Total Returns Index, S&P Composite 1500 Telecommunications Services, and the S&P 500 Total Return Index were obtained from S&P Capital IQ.
- Trade and quote data for Uniti Group Inc. Common Stock during the Class Period and one hundred randomly selected companies trading on the New York Stock Exchange and NASDAQ for September 2015 were obtained from Tick Data, *see* https://tickapi.tickdata.com/. Companies trading on the New York Stock Exchange and NASDAQ for October 2017 were identified using Thomson Reuters Eikon.
- Institutional and insider holdings data was obtained from S&P Capital IQ.
- Uniti Group Inc. Common Stock options data was obtained from iVolatility.
- Uniti Group Inc. Common Stock market makers data was obtained from Bloomberg, using the RANK function.
- Uniti Group Inc. Common Stock market capitalization percentiles were obtained from Bloomberg.

- Turnover velocity data for NYSE and NASDAQ were obtained from the World Federation of Exchanges, *see* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.
- The risk-free interest rate was obtained from FRED.

## Uniti Group Inc. News

- Uniti Group Inc. news headlines and select articles downloaded from Factiva for the Class Period. The Factiva search for news over the Class Period resulted in 1,695 unique articles as a result of two searches: 1) one search for "All Sources" with the company field "Uniti Group Inc." and 2) a separate search for "Major News and Business Sources" with keyword field "Uniti" but excluding news with the company field "Uniti Group Inc." Both searches were conducted for the period "April 24, 2015 – June 24, 2019". Of these, 209 articles that were identified as unrelated to Uniti's underlying business and were titled "NASDAQ New 52-Week Highs and Lows.". I removed these articles from estimation when running my cause-and-effect analysis, which resulted in 1,486 unique articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.
- Uniti Group Inc. earnings conference call and investor call transcripts during the Class Period, including but not limited to:
  - "FQ1 2017 Earnings Call Transcripts," *S&P Capital IQ*, May 4, 2017.
  - "FQ1 2018 Earnings Call Transcripts," *S&P Capital IQ*, May 10, 2018.
- Uniti Group Inc. earnings and guidance update press releases during the Class Period, including but not limited to:
  - "Communications Sales & Leasing, Inc. Reports Fourth Quarter and Full Year 2016 Results," *GlobeNewswire*, February 23, 2017, 7 AM ET.

## Uniti Group Inc. Analyst Reports

- Uniti Group Inc. analyst reports supplied by Counsel for the period of April 24, 2015 – June 24, 2019, including but not limited to:
  - "In-Line 4Q16 Results, Let the Good Times Roll (Up)," *Cowen and Company*, February 23, 2017.
  - "4Q16 Quick Comment: Results In-line, Diversification Continues*," Morgan Stanley*, February 23, 2017.
- Seeking Alpha articles or reports for Uniti Group Inc. published during the Class Period under the site's "Analysis" section.

## Academic Articles

- Aharony, J., and Swary, I., "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980.

- Amihud, Y., et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005).
- Avramov, D., et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. (2006).
- Barber, B., et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. 285 (1994).
- Beaver, William H., "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968.
- Binder, J., *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. (1998).
- Braun, P., et al., *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575 (1995).
- Fabozzi, F., Modigliani, F., Jones, F., *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010.
- Fama, E., *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383 (1970).
- Greene, W., *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008.
- Gujarati, D., *Basic Econometrics*, Third Edition, McGraw Hill, 1995.
- Huang, R., and Stoll, H., *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).
- Hull, J., *Options, Futures and Other Derivatives*, 5th Edition, Prentice Hall, 2003.
- Hull, J., *Options, Futures and Other Derivatives*, 7th Edition, Prentice Hall, 2009.
- Jensen, M., *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. 95 (1978).
- Kamara, A., and Miller, T., "Daily and Intradaily Tests of European Put-Call Parity," *The Journal of Financial and Quantitative Analysis*, Vol. 30, No. 4, December 1995.
- Klemkosky, R., and Resnick, B., "Put-Call Parity and Market Efficiency," *The Journal of Finance*, Vol. 34, No. 5, December 1979.
- Kumar, R., et al., *The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis*, 53 J. FIN. 717 (1998).
- Goh, L., and Allen, D., "A Note on Put-Call Parity and the Market-Efficiency of the London Traded Options Market," *Managerial and Decision Economics*, Vol. 5, No. 2, June 1984.
- MacKinlay, A., *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE (1997).
- May, R., "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 1971.
- The National Academies Press, *Reference Manual on Scientific Evidence*, Third Edition, 2011

- Ross, S., *Options and Efficiency*, 90 Q. J. ECON. 75 (1976).
- Sharpe, W., Alexander, G., and Bailey, J., *Investments*, Prentice Hall, Fifth Edition, 1995.
- Tabak, D., and Dunbar, F., "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.
- Thomas, R., and Cotter, J., *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. 105 (2000).

**Other**

- https://investor.uniti.com/stock-information/dividend-history
- https://www.cboe.com/us/options/symboldir/equity_index_options/?sid=U
- http://www.sec.gov/answers/mktmaker.htm.
- https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001620280&type=S-3&dateb=20201231&owner=include&count=100&search_text=
- http://wallstreet.cch.com/LCM/Sections/
- https://www.nyse.com/market-model
- http://www.nasdaq.com/options/
- https://www.nasdaqtrader.com/Trader.aspx?id=TradingUSEquities
- http://www.rss-specifications.com/
- http://www.rss-specifications.com/what-is-rss.htm.
- SEC Form S-3 eligibility information from www.sec.gov/about/forms/forms-3.pdf.

# Appendix B

### CHAD W. COFFMAN, MPP, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:        (312) 470-6500
Mobile:      (815) 382-0092
Email:        ccoffman@globaleconomicsgroup.com

## EMPLOYMENT:

### Global Economics Group, LLC
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats. MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

## EDUCATION:

**CFA**    Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.** Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing: Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

## PROFESSIONAL EXPERIENCE:

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

    o In Re: Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation. Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
    o In Re: Schering-Plough Corporation/ Enhance Securities Litigation. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
    o In Re: REFCO Inc. Securities Litigation. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
    o In Re: Computer Sciences Corporation Securities Litigation. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
    o Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options. Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies. One led to restatement of previously issued financial statements and both involved SEC investigations.

## Testimony:

- Testifying expert in the matter of Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836. Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court for the Western District of Washington at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory.  Filed expert report April 30, 2010.  Filed expert rebuttal report August 4, 2010.  Filed declaration re: Plan of Allocation September 25, 2011.

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed expert rebuttal report December 17, 2008. Deposition January 27, 2009. Filed expert rebuttal report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court for the Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009.  Filed declaration re: Plan of Allocation September 9, 2009.

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>.  Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court for the Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed expert rebuttal report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed expert rebuttal report July 8, 2010.  Deposition September 1, 2010. Filed supplemental expert rebuttal report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD, United States District Court for the Southern District of New York</u>.  Filed expert rebuttal report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed expert rebuttal report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Expert declaration in <u>Grady Scott Weston et. al v. RCS Capital Corporation, et. al, Civil Action No. 1:14-CV-10136-GBD, United States District Court for the Southern District of New York</u>. Filed declaration re: aggregate damages August 11, 2017.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>.  Filed expert report August 29, 2011. Filed expert rebuttal report September 26, 2011. Filed expert report March 16, 2012. Filed expert rebuttal report April 9, 2012. Filed expert rebuttal report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February 17, 2012. Deposition March 28, 2012. Filed expert rebuttal report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court for the Southern District of Florida</u>. Filed expert report July 20, 2012. Deposition September 14, 2012. Filed expert rebuttal report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed expert rebuttal report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee, Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013. Filed expert rebuttal report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in <u>In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division</u>. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed expert rebuttal report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed expert rebuttal report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in <u>In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York</u>. Filed expert report June 14, 2013. Filed expert rebuttal report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in <u>In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts</u>. Filed expert report October 28, 2013.

- Testifying expert in <u>In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York</u>. Filed expert report November 25, 2013. Filed expert rebuttal report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016. Filed expert rebuttal report March 27, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert rebuttal report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert rebuttal report May 13, 2016. Deposition June 10, 2016. Hearing testimony re: Plan of Allocation July 31, 2017.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed expert rebuttal report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015.  Filed expert rebuttal report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc. and Apple Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015. Filed expert report September 20, 2018. Deposition December 7, 2018. Filed expert rebuttal report February 22, 2019. Filed expert report June 7, 2019. Deposition September 6, 2019.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report September 1, 2015. Filed expert rebuttal report November 16, 2015. Filed expert report November 8, 2016. Filed expert report February 8, 2017. Deposition December 12, 2017.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed expert rebuttal report December 7, 2015. Filed expert report November 18, 2016. Filed expert rebuttal report January 17, 2017. Filed declaration March 6, 2017. Deposition March 7, 2017.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed expert rebuttal report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court for the Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016. Filed expert report July 1, 2016. Deposition July 26, 2016. Filed expert reply report August 15, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed expert rebuttal report February 2, 2016. Filed rebuttal reply expert report March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert reply report June 17, 2016. Deposition June 24, 2016.

- Testifying expert in <u>In Re Genworth Financial, Inc. Securities Litigation, Civ. A. No. 3:14-cv-00682-JAG, United States District Court for the Eastern District of Virginia, Richmond Division</u>. Filed declaration re: Plan of Allocation June 2, 2016.

- Testifying expert in <u>Zubair Patel, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. L-3 Communications Holdings, Inc., et al., Defendants, No. 1:14-cv-06038-VEC, United States District Court for the Southern District of New York.</u> Filed expert report June 30, 2016. Deposition July 20, 2016. Filed expert rebuttal report August 26, 2016.

- Testifying expert in <u>Leonard Howard, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Liquidity Services, Inc., et al., Defendants, No. 1:14-cv-01183-BAH, United States District Court for the District of Columbia.</u> Filed expert report September 2, 2016.

- Testifying expert in <u>James Quinn, Derivatively on Behalf of Nominal Defendant Apple REIT Ten, Inc., Plaintiff, v. Glade M. Knight, Justin Knight, Kent W. Colton, R. Garnett Hall, Jr., David J. Adams, Anthony F. Keating III, David Buckley, Kristian Gathright, David McKenney, Bryan Peery, and Apple Hospitality REIT, Inc., Defendants, and Apple REIT Ten, Inc., Nominal Defendant, No. 3:16-cv-610, United States District Court for the Eastern District of Virginia, Richmond Division.</u> Filed expert report October 14, 2016. Deposition October 20, 2016.

- Testifying expert in <u>Dr. Joseph F. Kasper, et al., Plaintiff, v. AAC Holdings, Inc., et al., Defendants, No. 3:15-cv-00923, United States District Court for the Middle District of Tennessee, Nashville Division.</u> Filed expert report October 18, 2016. Deposition November 29, 2016. Filed expert rebuttal report February 10, 2017. Filed expert report December 4, 2017.

- Testifying expert in <u>KBC Asset Management NV, et al., Plaintiff, v. 3D Systems Corporation, Abraham N. Reichental, Damon J. Gregoire, and Ted Hull, Defendants, No. 15-cv-02393-MGL, United States District Court for the District of South Carolina, Rock Hill Division.</u> Filed expert report October 31, 2016. Deposition January 5, 2017. Filed expert report April 21, 2017.

- Testifying expert in <u>Arkansas Teacher Retirement System, et al., Plaintiff, v. Virtus Investment Partners, Inc., Defendants, No. 15-cv-1249-WHP, United States District Court for the Southern District of New York.</u> Filed expert report November 7, 2016. Filed expert rebuttal report February 17, 2017. Deposition February 28, 2017. Filed expert report June 16, 2017. Filed expert rebuttal report July 26, 2017. Deposition August 9, 2017. Filed declaration re: prior reports December 4, 2017.

- Testifying expert in <u>Laborers Pension Trust Fund – Detroit, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. Conn's, Inc., et al., Defendants, No. 4:14-cv-00548 (KPE), United States District Court for the Southern District of Texas, Houston Division.</u> Filed expert report November 10, 2016. Deposition December 9, 2016. Filed expert rebuttal report March 27, 2017.

- Testifying expert in <u>Glen Hartsock, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., and Rajesh C. Shrotriya, Defendants, No. 16-cv-02279-RFB-GWF and Olutayo Ayeni, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., Rajesh C. Shrotriya, Kurt A. Gustafson, Joseph Turgeon, and Lee Allen, Defendants, No. 16-cv-02649-KJD-VCF, United States District Court for the District of Nevada.</u> Filed declaration re: damages December 8, 2016.

- Testifying expert in <u>In Re: ARIAD Pharmaceuticals, Inc. Securities Litigation, No. 1:13-cv-12544 (WGY), United States District Court District of Massachusetts</u>. Filed expert report March 6, 2017.

- Testifying expert in <u>Washtenaw County Employees' Retirement System, individually and on behalf of all others similarly situated, Plaintiff, v. Walgreen Co., Gregory D. Wasson, and Wade Miquelon, Defendants, No. 15-cv-3187, United States District Court for the Northern District of Illinois</u>. Filed expert report April 21, 2017. Deposition June 15, 2017. Filed expert rebuttal report September 15, 2017. Filed expert report November 11, 2020. Filed expert rebuttal report December 14, 2020. Deposition January 29, 2021.

- Testifying expert in <u>Lou Baker, individually and on behalf of all others similarly situated, Plaintiff, v. SeaWorld Entertainment, Inc., James Atchison, James M. Heaney, Marc Swanson, and The Blackstone Group L.P., Defendants, No. 3:14-cv-02129-MMA-KSC, United States District Court for the Southern District of California</u>. Filed expert report May 19, 2017. Deposition July 20, 2017. Filed expert rebuttal report September 14, 2017. Filed expert report January 22, 2019. Filed expert rebuttal report March 1, 2019. Deposition March 26, 2019.

- Testifying expert in <u>Benjamin Gross, individually and on behalf of all others similarly situated, Plaintiff, v. GFI Group, Inc., Colin Heffron, and Michael Gooch, Defendants, No. 3:14-cv-09438-WHP, United States District Court for the Southern District of New York</u>. Filed expert report May 30, 2017. Filed expert report August 7, 2017. Filed expert rebuttal report August 28, 2017. Deposition September 27, 2017.

- Testifying expert in <u>Murray Rubinstein, Jeffrey F. St. Clair, William McWade, Harjot Dev and Vikas Shah, individually and on behalf of all others similarly situated, Plaintiffs, v. Richard Gonzalez and Abbvie Inc., Defendants, No. 14-cv-9465, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report December 21, 2017. Deposition February 22, 2018. Filed supplemental expert report March 9, 2018. Filed expert reply report June 14, 2018. Filed expert sur-sur reply report August 28, 2018.

- Testifying expert in <u>In Re: SanDisk LLC Securities Litigation, No. 3:15-cv-01455-VC, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report January 19, 2018. Deposition January 31, 2018. Filed expert report August 30, 2018. Filed expert report October 23, 2018. Deposition November 15, 2018. Filed declaration re: Plan of Allocation and calculation of aggregate damages May 6, 2019.

- Testifying expert in <u>In Re: EZCORP, Inc. Securities Litigation, No. 1:15-cv-00608-SS, United States District Court for the Western District of Texas.</u> Filed expert report January 31, 2018. Deposition March 6, 2018.

- Testifying expert in <u>Kevin Murphy, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Precision Castparts Corp., Mark Donegan, and Shawn R. Hagel, Defendants, No. 3:16-cv-00521-SB, United States District Court for the District of Oregon, Portland Division</u>. Filed expert report March 2, 2018. Filed expert report March 22, 2019. Filed expert reply report June 19, 2019. Deposition July 19, 2019.

- Testifying expert in <u>In Re: Rent-A-Center, Inc. Securities Litigation, No. 4:16-cv-00978-ALM-CMC, United States District Court for the Eastern District of Texas, Sherman Division</u>. Filed expert report March 13, 2018. Filed rebuttal reply report July 12, 2018. Deposition August 21, 2018.

- Testifying expert in <u>Public Employees' Retirement Systems of Mississippi, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. TreeHouse Foods, Inc., Sam K. Reed, Dennis F. Riordan and Christopher D. Silva, Defendants, No. 1:16-cv-10632, United States District Court for the Northern District of Illinois</u>. Filed expert report July 13, 2018. Deposition September 21, 2018. Filed rebuttal reply report May 17, 2019.

- Testifying expert in <u>Gary Hefler, et al., Plaintiffs, v. Wells Fargo & Company, et al., Defendants, No. 1:16-cv-05479-JST, United States District Court for the Northern District of California</u>. Filed declaration re: Plan of Allocation July 27, 2018.

- Testifying expert in <u>In re Banco Bradesco S.A. Securities Litigation, No. 1:16-cv-04155-GHW, United States District Court for the Southern District of New York</u>. Filed expert report August 17, 2018. Filed supplemental expert report October 11, 2018. Deposition October 12, 2018. Filed expert report December 14, 2018. Filed expert report March 8, 2019. Filed declaration re: Plan of Allocation July 19, 2019.

- Testifying expert in <u>Richard Di Donato, et al., Plaintiffs, v. Insys Therapeutics Incorporated, et al. Defendants, No. CV-16-00302-PHX-NVW, United States District Court for the District of Arizona.</u> Filed expert report August 31, 2018. Deposition October 4, 2018. Filed expert report November 30, 2018. Filed expert report July 26, 2019. Filed expert report November 1, 2019.

- Consulting expert in <u>In Re: Wilmington Trust Securities Litigation, Master File No. 10-cv-00990-ER, United States District Court for the District of Delaware.</u> Filed declaration re: Plan of Allocation and calculation of aggregate damages September 17, 2018.

- Testifying expert in <u>Atul Singh Deora, Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. Nanthealth, Inc., Patrick Soon-Shiong, Paul A. Holt, Michael S. Sitrick, Kirck K. Calhoun, Mark Bennett, Edward Miller, Michael Blaszyk, Jefferies Llc, First Analysis Securities Corporation, Canaccord Genuity Inc., And Fbr Capital Markets & CO., Defendants., No. 2:17-CV-01825-BRO-MRW, United States District Court for the Central District of California Western Division.</u> Filed expert report September 20, 2018.

- Testifying expert in <u>City of Sunrise General Employees' Retirement Plan, Plaintiff vs. FleetCor Technologies, Inc., et al., Defendants, No. 1:17-CV-02207-LMM, United States District Court for the Northern District of Georgia Atlanta Division</u>. Filed expert report January 4, 2019. Deposition March 20, 2019. Filed expert report May 6, 2019.

- Testifying expert in <u>Guevoura Fund LTD., On Behalf of Itself and All Others Similarly Situated, Plaintiffs, v. Robert F.X. Sillerman, D. Geoffrey Armstrong, John Miller, Michael John Meyer, and SFX Entertainment, Inc., Defendants, Case No. 1:15-cv-07192-CM, Case No. 1:18-cv-09784-CM,</u>

United States District Court for the Southern District of New York. Filed expert report January 18, 2019.

- Testifying expert in <u>Leon D. Milbeck On Behalf of Himself and All Others Similarly Situated, v. TrueCar, Inc, et al., Defendants, No. 2:18-cv-02612-SVW, United States District Court for the Central District of California</u>. Filed expert report March 8, 2019. Deposition April 8, 2019.

- Testifying expert in <u>Lewis Cosby, Kenneth R. Martin, as Beneficiary of the Kenneth Ray Martin Roth IRA, and Martin Weakly On Behalf of Themselves and All Others Similarly Situated, vs. KPMG, LLP, Case No. 3:16-cv-00121, United States District Court for the Eastern District of Tennessee, Knoxville Division</u>. Filed expert report March 15, 2019. Deposition April 12, 2019. Filed supplemental expert report April 19, 2019. Deposition April 25, 2019. Filed rebuttal reply report June 14, 2019.

- Testifying expert in <u>Shawn Sanawaz, Individually and On Behalf of All Other Similarly Situated, v. Intellipharmaceutics International Inc., Isa Odidi, and Domenic Della Penna, Defendants, No. 1:17-cv-05761-JPO, United States District Court for the Southern District of New York.</u> Filed expert report May 06, 2019.

- Testifying expert in <u>Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated, v. Esperion Therapeutics, Inc., et al., Defendants, No. 2:16-cv-10089-AJT-RSW, United States District Court for the Eastern Michigan of Michigan</u>. Filed expert report June 6, 2019. Deposition July 26, 2019. Filed rebuttal reply report October 7, 2019. Filed expert report May 15, 2020. Deposition July 31, 2020.

- Testifying expert in <u>West Virginia Investment Management Board, Stichting Blue Sky Global Equity Active Low Volatility Fund, and Stitching Blue Sky Active Large Cap Equity USA Fund vs. SCANA Corporation., et al., Civ. A. No. 3:17-cv-2616-MBS, United States District Court for the District of South Carolina.</u> Filed expert report June 28, 2019. Deposition August 16, 2019.

- Testifying expert in <u>Eric Weiner, Individually and on Behalf of All Others Similarly Situated, vs. Tivity Health, Inc., Donato Tramuto, Glenn Hargreaves and, Adam Holland, Defendants, Case No.: 3:17-cv-01469 United States District Court for the Middle District of Tennessee.</u> Filed expert report July 1, 2019. Deposition September 4, 2019. Filed rebuttal reply report December 20, 2019. Filed expert report July 30, 2020. Filed rebuttal reply report September 30, 2020. Deposition October 22, 2020.

- Testifying expert in <u>In Re Dr. Reddy's Laboratories Limited Securities Litigation, No. 3:17-cv-06436-PGS-DEA, United States District Court for the District of New Jersey.</u> Filed expert report July 19, 2019. Deposition September 10, 2019.

- Testifying expert in <u>Peace Officers' Annuity and Benefit Fund of Georgia, Individually and On Behalf of All Others Similarly Situated, and Jacksonville Police and Fire Pension Fund, Individually and On Behalf of All Others Similarly Situated vs. DaVita, Inc. et al., No. 1:17-cv-00304-WJM-NRN, United States District Court for the District of Colorado.</u> Filed expert report January 31, 2020. Deposition May 27, 2020.

- Testifying Expert in <u>In Re Avon Securities Litigation, No. 19 Civ. 01420- CM, United States District Court for the Southern District of New York.</u> Filed expert report February 13, 2020.

- Testifying Expert in <u>In Re Allergan Generic Drug Pricing Securities Litigation, Civil Action No. 2:16-9449 (KSH) (CLW), United States District Court for the District of New Jersey</u>. Filed expert report March 20, 2020. Deposition July 16, 2020. Filed expert reply report November 25, 2020.

- Expert declaration in <u>Martin Cohen, Individually and On Behalf of All Others Similarly Situated, v. Luckin Coffee Inc., Jenny Zhiya Qian, and Reinout Hendrik Schakel, Case no. 1:20-cv-01293-LJL, United States District Court for the Southern District of New York</u>. Filed declaration May 13, 2020.

- Testifying Expert in <u>In RE Navient Corporation Securities Litigation, No. 1:17-cv-08373-RBK-AMD, United States District Court of New Jersey.</u> Filed expert report May 15, 2020. Deposition July 23, 2020. Filed declaration August 21, 2020. Filed expert report April 16, 2021. Deposition June 3, 2021.

- Testifying Expert in <u>Yellowdog Partners, LP, Individually and on Behalf of All Others Similarly Situated, vs. CURO Group Holdings Corp., *et al*., Civil Action No. 2:18-cv-02662-JWL-KGG, United States District Court for the District of Kansas, Kansas City.</u> Filed expert report May 18, 2020.

- Testifying Expert in <u>Julian Keippel, Individually and On Behalf of All Others Similarly Situated, vs. Health Insurance Innovations, Inc., Gavin Southwell, and Michael D. Hershberger, No. 8:19-CV-00421-WFJ-CPT, United States District Court Middle District of Florida Tampa Division.</u> Filed expert report May 21, 2020. Deposition June 15, 2020.

- Testifying Expert in <u>In Re Perrigo Company plc Securities Litigation, No: 1:19-cv-00070-DLC, United States District Court for the Southern District of New York.</u> Filed expert report July 10, 2020. Deposition August 4, 2020. Filed expert report October 6, 2020. Filed expert rebuttal reply report December 4, 2020. Deposition March 4, 2021.

- Testifying Expert in <u>Plymouth County Retirement System, Individually and On Behalf of All Others Similarly Situated, vs. GTT Communications, Inc., Richard D. Calder, Jr., Chris Mckee, Michael Sicoli, And Gina Nomellini, Case No. 1:19-cv-00982-CMH-MSN, United States District Court for the Eastern District of Virginia Alexandria Division.</u> Filed expert report August 7, 2020. Filed expert report September 25, 2020.

- Testifying Expert in <u>Thomas W. Luczak, Individually and On Behalf of All Others Similarly Situated, vs. National Beverage Corp., Nick A. Caporella, and George R. Bracken, Case No. 0:18-cv-61631-KMM, United States District Court for the Southern District of Florida.</u> Filed expert report September 25, 2020. Deposition November 5, 2020.

- Expert declaration in In re: PG&E Corporation – and – Pacific Gas and Electric Company Debtors, Case No. 19-30088 (DM), United States Bankruptcy Court for the Northern District of California, San Francisco Division. Filed declaration September 28, 2020.

- Testifying Expert in Oklahoma Police Pension Fund and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Teligent, Inc. and Jason Grenfell-Gardner, Defendants, Case No. 1:19-cv-03354-VM, United States District Court for the Southern District of New York. Filed expert report September 30, 2020. Deposition March 11, 2021.

- Testifying Expert in John Utesch, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Lannett Company, Inc., Arthur P. Bedrosian, and Martin P. Galvan, Defendants, Civil Action No. 2:16-cv-05932-WB, United States District Court for the Eastern District of Pennsylvania. Filed expert report October 1, 2020. Deposition December 10, 2020. Filed expert rebuttal report on May 13, 2021. Hearing testimony July 27, 2021.

- Testifying Expert in City of Warren Police and Fire Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. World Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios and Michelle D. Wilson, Defendants, Civil Action No. 1:20-cv-02031-JSR, United States District Court for the Southern District of New York. Filed expert report on October 6, 2020. Deposition October 14, 2020.

- Testifying Expert in Employees' Retirement System of the Puerto Rico Electric Power Authority, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh, Defendants, Case No. 2:19-cv-08237-SDW, United States District Court for the District of New Jersey. Filed expert report on December 7, 2020. Deposition December 22, 2020.

- Testifying Expert in The Police Retirement System of St. Louis, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Granite Construction Incorporated, James H. Roberts, Jigisha Desai, and Laurel J. Krzeminski, Defendants, Case No. 3:19-cv-04744-WHA, United States District Court for the Northern District of California. Filed expert report on November 25, 2020. Filed declaration re: Plan of Allocation May 25, 2021.

- Testifying Expert in Plumbers & Pipefitters National Pension Fund and Juan Francisco Nieves, as Trustee of the Gonzalez Coronado Trust, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Kevin Davis and Amir Rosenthal (Performance Sports Group Ltd.), Defendants, Case No.: 1:16-CV-3591-GHW, United States District Court for the Southern District of New York. Filed expert report on December 18, 2020. Deposition February 5, 2021. Filed expert rebuttal report on April 6, 2021.

- Testifying Expert in Mayuko Holwill, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. AbbVie Inc., Richard A. Gonzalez, and William J. Chase, Defendants, Case No. 1:18-cv-6790, United States District Court for the Northern District of Illinois. Filed expert report on February 1, 2021. Filed expert rebuttal report on September 20, 2021.

- Testifying Expert in <u>Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Newell Brands Inc., Michael B. Polk, John K. Stipancich, Scott H. Garber, Bradford R. Turner, Michael T. Cowhig, Thomas E. Clarke, Kevin C. Conroy, Scott S. Cowen, Domenico De Sole, Cynthia A. Montgomery, Christopher D. O'Leary, Jose Ignacio Perez-Lizaur, Steven J. Strobel, Michael A. Todman, and Raymond G. Viault, Defendants, Case No: HUD-L-3492-18, Superior Court of New Jersey Law Division (Hudson County).</u> Filed expert report on May 3, 2021. Filed expert rebuttal report on June 15, 2021. Deposition July 21, 2021.

- Testifying Expert in <u>Carmignac Gestion, S.A., Mason Capital L.P., et al., Pentwater Equity Opportunities Master Fund LTD., et al., First Manhattan Co., Nationwide Mutual Funds, on behalf of its series Nationwide S&P 500 Index Fund, et. al., WCM Alternatives: Event-Driven Fund, et al., Hudson Bay Master Fund LTD., et al., Schwab Capital Trust on behalf of its series Schwab S&P 500 Index Fund, et al., Sculptor Master Fund, LTD. f/k/a OZ Master Fund, Ltd., et al., Aberdeen Canada Funds – Global Equity Fund, a series of Aberdeen Canada Funds, et al., Discovery Global Citizens Master Fund, LTD., et al., York Capital Management, L.P., et al., Burlington Loan Management DAC, Universities Superannuation Scheme LTD., Principal Funds, Inc., et al., Kuwait Investment Authority et al., Blackrock Global Allocation Fund Inc., et al., Plaintiffs, vs. Perrigo Company PLC, et al, Defendants, Civil Action No(s): 17-10467 (MCA) (LDW), 18-1119 (MCA) (LDW), 18-1121 (MCA) (LDW), 18-2291 (MCA) (LDW), 18-15382 (MCA) (LDW), 18-16204 (MCA) (LDW), 18-16206 (MCA) (LDW), 19-3973 (MCA) (LDW), 19-4900 (MCA) (LDW), 19-6560 (MCA) (LDW), 19-21502 (MCA) (LDW), 19-21732 (MCA) (LDW), 20-1484 (MCA) (LDW), 20-2262 (MCA) (LDW), 20-2410 (MCA) (LDW), 20-3431 (MCA) (LDW), 20-4748 (MCA) (LDW), United States District Court for the District of New Jersey.</u> Filed expert report on June 23, 2021. Filed expert report on September 29, 2021.

- Testifying Expert in <u>In Re Nielsen Holdings PLC Securities Litigation, Case No. 18-CV-07143-JMF, United States District Court Southern District of New York</u>. Filed expert report on July 14, 2021. Deposition September 30, 2021.

- Testifying Expert in <u>Allegheny County Employees Retirement System et al. v. Energy Transfer LP et al., Case No. 2:20-cv-00200-GAM, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report on September 17, 2021.

- Testifying Expert in <u>Julia Junge and Richard Junge et al. v. Geron Corporation et al., Case No. 3:20-cv-00547-WHA, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report on September 30, 2021. Deposition October 15, 2021.

- Testifying Expert in <u>In Re MINDBODY, Inc. Securities Litigation, Civil Action No. 1:19-cv-08331-VEC, United States District Court Southern District of New York</u>. Filed expert report on October 15, 2021.

- Testifying Expert in <u>Plymouth County Retirement System and Oklahoma Police Pension and Retirement System, Individually and On Behalf of All Others Similarly Situated, v. Evolent Health, Inc., Frank Williams, Nicholas McGrane, Seth Blackley, Christie Spencer, and Steven Wigginton, Case No. 1:19-cv-01031-RDA-TCB, United States District Court Eastern District of Virginia, Alexandria Division</u>. Filed expert report on October 19, 2021.

Experience in Labor Economics and Discrimination-Related Cases:

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.– Filed report re: lost wages and benefits.

- Testifying expert in Richard Akins v. NCR Corporation. Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division. Filed expert report October 12, 2011. Deposition November 10, 2011.

- Testifying expert in Vincent Torbio, et al. against Feldor Billiards Inc. D/B/A Fatcat Billiards, et al., Index No. 153384/14, Supreme Court of the State of New Your, County of New York. Filed expert report May 29, 2018. Deposition July 24, 2018.

Selected Experience in Antitrust, General Damages, and Other Matters:

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation. Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

**TEACHING EXPERIENCE:**

KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**AWARDS:**

1994  Ford Fellowship Recipient for Summer Research.
1993  Arnold Prize for Best Research Proposal.
1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.