**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS**

|  |  |
|---|---|
| IN RE UNITI GROUP INC. SECURITIES LITIGATION | No. 4:19-cv-00756-BSM |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
<u>MOTION FOR CLASS CERTIFICATION</u>
<u>(redacted)</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................iii

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND .............................................................................................................. 3

    A.    Uniti's Spinoff from Windstream and Entry into the Master Lease ...................... 3

    B.    The Aurelius Litigation.......................................................................................... 4

    C.    Windstream's Bankruptcy and Adversary Proceeding........................................... 6

    D.    Plaintiffs Initiate this Action................................................................................. 8

    E.    Plaintiffs' Theories of Liability ............................................................................ 9

        1.    The Sale-Leaseback Theory.................................................................... 10

        2.    The True Lease Theory............................................................................ 11

        3.    The Navigating the Bankruptcy Theory ................................................. 12

ARGUMENT.................................................................................................................... 12

I.    PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN ON
PREDOMINANCE.................................................................................................... 14

    A.    No Class Can Be Certified Because Plaintiffs Have Not Demonstrated that
Damages Can Be Measured on a Class-Wide Basis Consistent with Their
Theories of Liability .............................................................................................. 15

        1.    Mr. Coffman Fails to Adequately Identify How He Would
Calculate Damages on a Class-Wide Basis in this Case........................... 15

        2.    Mr. Coffman Fails to Explain How He Would Measure Damages
from Plaintiffs' Materialization-of-the-Risk Theory of Loss
Causation.................................................................................................. 19

    B.    Even If a Class Could Otherwise Be Certified, Plaintiffs Have Not Shown
that Common Issues of Reliance Predominate for the Class as Proposed............ 22

        1.    No Class Can Be Certified with Respect to the True Lease Theory
Because Plaintiffs Cannot Invoke the Basic Presumption of
Reliance with Respect to that Theory ...................................................... 25

        2.    Plaintiffs' Proposed Class Period Is Grossly Overbroad and
Inconsistent with the Separate and Non-Overlapping Sale-

Leaseback Theory and Navigating the Bankruptcy Theory Must Be Narrowed.................................................................................. 28

    (a)    Even If a Class Could Otherwise Be Certified, Any Class Period Related to the Sale-Leaseback Theory Could Be No Broader Than April 24, 2015 to September 25, 2017................... 29

    (b)    Even If a Class Could Otherwise Be Certified, Any Class Period Related to the Navigating the Bankruptcy Theory Could Be No Broader Than March 18, 2019 to June 24, 2019.................................................................................. 31

C.    A Class Cannot Be Certified for Investors in Uniti Options ............................... 32

    1.    Plaintiffs Lack Standing to Pursue Options-Based Claims....................... 32

    2.    Plaintiffs Have Not Established that Uniti Options Traded in an Efficient Market .................................................................................... 34

II.    PLAINTIFFS ARE NOT ADEQUATE CLASS REPRESENTATIVES ........................ 37

A.    The Court Must Undertake a Searching Inquiry Into Adequacy to Effect the PSLRA's Intent to Avoid Lawyer-Driven Actions......................................... 37

B.    Plaintiffs Are Not Adequate Class Representatives Because They Do Not Exercise Any Meaningful Control Over the Litigation ....................................... 38

CONCLUSION.................................................................................................................. 42

INDEX OF EXHIBITS....................................................................................................... 44

## TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Abu Dhabi Com. Bank v. Morgan Stanley & Co.*,
651 F. Supp. 2d 155 (S.D.N.Y. 2009) ................................................................................ 32

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
2007 WL 276150 (D.N.J. Jan. 22, 2007) ............................................................................ 30

*In re Allstate Corp. Secs. Litig.*,
966 F.3d 595 (7th Cir. 2020) ............................................................................................. 24

*In re Am. Italian Pasta Co. Sec. Litig.*,
2007 WL 927745 (W.D. Mo. Mar. 26, 2007) ........................................................ 30, 32, 33

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997) ........................................................................................................... 13

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ........................................................................................................... 23

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act Litig.*,
2011 WL 3211472 (S.D.N.Y. July 29, 2011) ..................................................................... 32

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ........................................................................................................... 23

*Berger v. Compaq Comput. Corp.*,
257 F.3d 475 (5th Cir. 2001) ....................................................................................... 37, 38

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) ....................................................................................... 13, 14

*In re BP P.L.C. Sec. Litig.*,
2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ..................................................................... 17

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ....................................................................................... 34

*Carpenters Pension Tr. Fund of St. Louis v. Barclays Pub. Ltd. Co.*,
310 F.R.D. 69 (S.D.N.Y. 2015) ......................................................................................... 28

iii

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ....................................................................... 1, 13, 15, 18

*Ctr. City Periodontists, P.C. v. Dentsply Int'l, Inc.*,
  321 F.R.D. 193 (E.D. Pa. 2017) ...................................................................... 18, 19

*Curtis-Bauer v. Morgan Stanley & Co.*,
  2008 WL 7748874 (N.D. Cal. July 7, 2008) ..................................................... 3, 38

*Deutschman v. Beneficial Corp.*,
  132 F.R.D. 359 (D. Del. 1990) ..................................................................... 33

*Donelson v. United States Through Dep't of the Interior*,
  730 F. App'x 597 (10th Cir. 2018) .................................................................... 32

*In re Donnkenny Inc. Sec. Litig.*,
  171 F.R.D. 156 (S.D.N.Y. 1997) ..................................................................... 41

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  309 F.R.D. 251 (N.D. Tex. 2015) ................................................................. 22, 26

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ..................................................................... 24

*Ford v. TD Ameritrade Holding Corp.*,
  995 F.3d 616 (8th Cir. 2021) ..................................................................... 13

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) ................................................................. 16, 17

*Goldman Sachs Group., Inc. v. Arkansas Teacher Ret. Sys.*,
  141 S. Ct. 1951 (2021) ................................................................. 2, 24, 26, 27, 28

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ..................................................................... *passim*

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
  818 F.3d 775 (8th Cir. 2016) ..................................................................... 28

*In re IndyMac Mortgage-Backed Sec. Litig.*,
  718 F. Supp. 2d 495 (S.D.N.Y. 2010) ................................................................. 32

*In re Initial Pub. Offering Sec. Litig.*,
  399 F. Supp. 2d 298 (S.D.N.Y. 2005) ................................................................. 19

iv

*In re Intuitive Surgical Sec. Litig.*,

   2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ........................................................ 27

*Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, L.L.C.* ,

   616 F. Supp. 2d 461 (S.D.N.Y. 2009) ................................................................... 39

*In re Juniper Networks Sec. Litig.*,

   264 F.R.D. 584 (N.D. Cal. 2009) ......................................................................... 33

*Kirkpatrick v. J.C. Bradford & Co.*,

   827 F.2d 718 (11th Cir. 1987) ............................................................................. 42

*Krogman v. Sterritt*,

   202 F.R.D. 467 (N.D. Tex. 2001) ........................................................................ 34

*Kushner v. Beverly Enters.*,

   317 F.3d 820 (8th Cir. 2003) ............................................................................... 10

*Laventhall v. Gen. Dynamics Corp.*,

   704 F.2d 407 (8th Cir. 1983) ............................................................................... 33

*Lerner v. SciMed Life Sys.*,

   1994 WL 374319 (D. Minn. Feb. 9, 1994) ............................................................ 33

*Loritz v. Exide Techs.*,

   2015 WL 6790247 (C.D. Cal. July 21, 2015) ........................................................ 18

*Ludlow v. BP, Pub. Ltd. Co.*,

   800 F.3d 674 (5th Cir. 2015) ............................................................................... 19

*In re McDonnell Douglas Corp. Sec. Litig.*,

   567 F. Supp. 126 (E.D. Mo. 1983) ....................................................................... 33

*Mulderrig v. Amyris, Inc.*,

   2021 WL 5832786 (N.D. Cal. Dec. 8, 2021)..................................................... 21, 22

*In re Moody's Corp. Sec. Litig.*,

   274 F.R.D. 480 (S.D.N.Y. 2011) .................................................................... 25, 26

*In re NationsMart Corp. Sec. Litig.*,

   130 F.3d 309 (8th Cir. 1997) ............................................................................... 23

*New Hampshire v. Maine*,

   532 U.S. 742 (2001) ........................................................................................... 10

*Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ...................................................................... 17

*Raab v. Gen. Physics Corp.*,
  4 F.3d 286 (4th Cir. 1993) ........................................................................................................ 20

*In re Rail Freight Fuel Surcharge Antitrust Litig*,
  725 F.3d 244 (D.C. Cir. 2013) ................................................................................................. 15

*Rattray v. Woodbury Cnty.*,
  614 F.3d 831 (8th Cir. 2010) .................................................................................................... 37

*In re Razorfish, Inc. Sec. Litig.*,
  143 F. Supp. 2d 304 (S.D.N.Y. 2001) ...................................................................................... 41

*In re Ribozyme Pharms., Inc. Sec. Litig.*,
  205 F.R.D. 572 (D. Colo. 2001) ............................................................................................... 28

*In re Salomon Analyst Level 3 Litig.*,
  350 F. Supp. 2d 477 (S.D.N.Y. 2004) ...................................................................................... 32

*In re Sepracor Inc.*,
  233 F.R.D. 52 (D. Mass. 2005) ................................................................................................. 33

*Shiring v. Tier Techs., Inc.*,
  244 F.R.D. 307 (E.D. Va. 2007) ......................................................................................... 37, 38

*Sicav v. Jun Wang*,
  2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ............................................................................. 17

*Sondel v. Nw. Airlines, Inc.*,
  1993 WL 559031 (D. Minn. Sept. 30, 1993) ........................................................................... 38

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) ...................................................................................... 27

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) .................................................................................................................. 13

*Vervaecke v. Chiles, Heider & Co.*,
  578 F.2d 713 (8th Cir. 1978) .................................................................................................... 23

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
  325 F.R.D. 280 (D. Minn. 2018) .................................................................................... 28, 29, 30

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ...................................................................................................... 12, 13

*West v. Prudential Sec., Inc.*,
  282 F.3d 935 (7th Cir. 2002) ............................................................................................. 14

*Withrow v. FCA US L.L.C.*,
  2021 WL 2529847 (E.D. Mich. June 21, 2021) ................................................................ 33

## STATUTES & RULES

Fed. R. Civ. P. 23 ......................................................................................................... *passim*

## PRELIMINARY STATEMENT

Defendants oppose Plaintiffs' motion for class certification (the "Motion" or "Mot.") because Plaintiffs fail to meet their burden of proving that their proposed class satisfies two key requirements of Rule 23—predominance and adequacy.[1]  Plaintiffs' Motion cannot survive the "rigorous analysis" that the Supreme Court requires at class certification and should be denied.

***Predominance.***  Because Plaintiffs attempt to certify a class under Rule 23(b)(3), they must demonstrate that common issues predominate over individual ones.  Plaintiffs' proposed class (the "Class") fails to establish predominance with respect to both damages and reliance.

*First*, the Supreme Court has made clear that Plaintiffs must *prove* that damages can be calculated on a class-wide basis consistent with their theories of liability.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013).  Plaintiffs fail to do so here.  Instead, they offer only a boilerplate opinion from Chad Coffman, a retained consultant, who opines without support that he *believes* he *could* quantify damages in this case.  Mr. Coffman makes no attempt to explain *how* damages would be calculated consistent with Plaintiffs' specific theories of liability and harm; indeed, he testified that he did not even consider Plaintiffs' theories of liability in forming his opinion.  Critically, his purported damages model offers no way to disaggregate damages amongst Plaintiffs' disparate theories of liability, as required under *Comcast*.  Nor does he offer any methodology to measure damages under the "materialization of risk" theory of loss causation that Plaintiffs are pursuing in this case.  Faced with a similar report in a similar case, another federal court recently concluded that plaintiffs had failed to satisfy *Comcast* and declined to certify the relevant class.  The same failure precludes certification of *any* class here.

---

[1] Defendants are Uniti Group Inc. ("Uniti"), Kenneth A. Gunderman, and Mark A. Wallace.  Plaintiffs are Steamfitters Local 449 Pension Plan ("Local 449"), Wayne County Employees' Retirement System ("Wayne County" and, together with Local 449, the "Pension Funds"), and David McMurray, on behalf of himself and as sole beneficiary of the David McMurray R/O IRA ("Mr. McMurray").

*Second*, Plaintiffs fail to show that common reliance issues predominate over individualized ones for the Class, as proposed. Just last summer, the Supreme Court made clear that where, as here, plaintiffs invoke the "fraud-on-the-market" presumption to show class-wide reliance, defendants may rebut the presumption with expert evidence, which the court must consider and analyze rigorously. *Goldman Sachs Group Inc. v. Arkansas Teachers Retirement System*, 141 S. Ct. 1951, 1959–61 (2021). In *Goldman*, the Court held that defendants can rebut the fraud-on-the market presumption by showing that the alleged misrepresentation did not actually affect the stock's price—referred to as a lack of "price impact"—including where there is a "mismatch" between the alleged misrepresentation and the later disclosure or other event that allegedly revealed the truth to the market.

Here, as explained in the accompanying report of Professor Christopher James, there is no plausible price impact with respect to many of the alleged categories of misstatements and omissions at issue in the case, as there is no rational economic connection between the alleged misstatements and the disclosures that supposedly revealed the concealed "truth." For example, with respect to Plaintiffs' theory that Defendants misrepresented the risk that the lease between Uniti and its largest customer was not a "true lease," there is a complete mismatch between the alleged misrepresentations and the subsequent alleged revelation of the "truth"—a textbook application of *Goldman*. This precludes certification of any class for that theory. Moreover, as explained below, even if Plaintiffs could plausibly establish price impact for their other theories of liability, that would support, at most, certification of markedly shorter class periods.

*Adequacy.* Plaintiffs' proposed class independently fails because Plaintiffs fail to show that they would be adequate representatives of the class, as required under Rule 23(a). The three Lead Plaintiffs have exercised no control over this litigation, undermining any claim that they will "vigorously prosecute" it. Instead, discovery has shown that this case is fundamentally

2

being driven by counsel, in contravention of Congress's attempts to curb lawyer-driven securities litigation. For example, since the Complaint was filed, Lead Plaintiffs have *not once* directly discussed the case with each other, including to discuss case strategy, which they concede is being led by counsel instead. In short, Plaintiffs are little more than "figurehead[s] lending [their] name to a suit controlled entirely by the class attorney." *Curtis-Bauer v. Morgan Stanley & Co.*, 2008 WL 7748874, at \*2 (N.D. Cal. July 7, 2008) (internal quotation marks omitted).

For these and other reasons set forth below, Plaintiffs' Motion should be denied.

## BACKGROUND

### A.      Uniti's Spinoff from Windstream and Entry into the Master Lease

Uniti is a publicly traded telecommunications company, organized as a real estate investment trust (or REIT). It acquires and builds communications infrastructure, including fiber optic, copper and coaxial broadband networks and data centers. (Ex. A (Mar. 18, 2019 Uniti Form 10-K) at 30.) Uniti was created in April 2015 when it was spun off from its former corporate parent, Windstream Holdings, Inc. ("Windstream" or "Windstream Holdings"). (ECF No. 62 (the "Complaint" or "Compl.") ¶¶ 52–53.) When Uniti separated from Windstream (the "Spinoff"), Windstream's operating subsidiaries contributed to Uniti certain assets—primarily fiber optic and copper cable lines—which Uniti then leased back to Windstream Holdings pursuant to a master lease (the "Master Lease"). (*Id.* ¶¶ 53–54, 59.) Following the Spinoff, Windstream was Uniti's only customer and, to this day, remains its largest customer. (*Id.* ¶¶ 14, 55, 148.) Accordingly, as analysts have recognized, Uniti's financial prospects (and stock price) has always been closely tied to Windstream.[2]

---

[2] *See, e.g.*, Ex. B (May 21, 2017 Deutsche Bank Analyst Report) at 7 ("Uniti's [l]easing revenues do rely on the sustained financial well-being of [Windstream]"); *id.* at 23 (noting that "Uniti and Windstream have traded largely in tandem since the spin-off"); Ex. C (June 19, 2017 RBC Capital Markets Analyst Report) at 12 ("While Uniti has made progress diversifying its business, Windstream's lease payments make up ~70% of pro forma total revenue, linking the investment narratives of the two companies.").

Years before the Spinoff, one of Windstream's operating subsidiaries, Windstream Services, LLC ("Windstream Services") issued debt (i.e., bonds) to the public.  As is customary, the debt indentures—i.e., the agreements governing the terms of the bonds—contained certain restrictive covenants.  One of those covenants prohibited Windstream Services or its operating subsidiaries from entering into a so-called "Sale and Leaseback Transaction."  The bond indenture specifically defined that term to preclude a restricted Windstream entity from selling assets to another person and then having the *same restricted Windstream entity* lease back those assets.  (*Id.* ¶¶ 8, 70.)  Mindful of these contractual commitments, Windstream worked with sophisticated outside advisors to structure the Spinoff and Master Lease in a manner that they believed would comply with the sale-leaseback covenant.[3]  (*Id.* ¶ 86.)

The terms of Windstream's debt indentures, the Spinoff and the Master Lease were all fully disclosed.  Not a single noteholder objected or claimed any violation of the sale-leaseback covenant at the time of the Spinoff in 2015, or at any point in the following two years.

### B.    The Aurelius Litigation

In August 2017, rumors first surfaced that an opportunistic hedge fund, Aurelius Capital Master, Ltd. ("Aurelius"), was buying Windstream debt with the goal of claiming a default under the terms of the debt indenture.  (*Id.* ¶¶ 177–78, 181.)  Aurelius was uniquely positioned among Windstream's noteholders to profit if Windstream faced economic difficulty.  That is because, in addition to Windstream debt, Aurelius had also amassed an even larger short position in Windstream's equity and certain other financial instruments—making a massive bet that Windstream's stock would drop and/or that it would default on its debt.  (*See* Ex. D (Oct. 3, 2017 Rubicon Associates Analyst Report) at 4.)  Thus, if Aurelius could allege and later convince a

---

[3] Specifically, Windstream structured the Spinoff and Master Lease so that the Windstream entities that sold the assets (Windstream *Services* and its operating subsidiaries) were different from the entity that leased them back (Windstream *Holdings*, which was not a party to, and faced no restrictions under, the indenture).  (Compl. ¶ 11.)

court that Windstream defaulted on its debt, Aurelius stood to profit enormously. (*Id.*)

On September 22, 2017, Aurelius delivered a notice of default to Windstream, claiming a violation of the sale-leaseback covenant (the "Notice of Default"). (*Id.* ¶ 177.) Windstream publicly disclosed the notice on September 25, 2017, but denied any violation. (*Id.*) Market analysts independently assessed the Notice of Default and also concluded that it was unlikely there was any violation. For example, a September 27, 2017 Covenant Review article concluded that the Spinoff and Master Lease "most likely did not violate the Sale / Leaseback covenant." (Ex. E (Sept. 27, 2017 Covenant Review Article) at 1.)

Undeterred, a few weeks later, on October 12, 2017, Aurelius caused the indenture trustee to file a complaint against Windstream, laying out in detail why Aurelius believed the Spinoff and Master Lease violated the sale-leaseback covenant, and seeking a judicial declaration that a default had occurred. (*Id.* ¶ 181.) Thereafter, beginning in mid-October 2017, Windstream Services launched a series of transactions to, among other things, dilute Aurelius's debt holdings and solicit consent from a majority of other noteholders to waive any purported default.[4] In early November 2017, Windstream announced that its efforts were successful.[5]

Neither Uniti nor the individual Defendants in this action were parties to the Aurelius lawsuit or had any role in Windstream's attempts to obtain noteholder consent to waive the alleged default. As the litigation proceeded, third-party analysts concluded that Windstream would likely prevail, based on a review of publicly available court filings and the record at trial—which was attended and closely watched by market participants. For example, one analyst

---

[4] *See, e.g.*, Ex. F (Oct. 19, 2017 SunTrust Robinson Humphrey Analyst Report) at 1 (noting that Windstream "announced two actions intended to thwart [Aurelius's] claim of default:" (1) "a debt exchange, which appears to be an attempt to dilute [Aurelius]" and (2) "consent solicitations from noteholders to waive certain alleged defaults related to the [Uniti] spin and amend governing indentures accordingly").

[5] *See, e.g.*, Ex. G (Nov. 8, 2017 SunTrust Robinson Humphrey Analyst Report) at 1 ("WIN's successful Consent Solicitations as well as the Debt Exchange Offering has at least complicated the Noteholder's allegation of default, if not rendering it moot altogether . . . .").

noted that "legal experts and the [Street] *pegged a favorable ruling at 70–80%+*." (Ex. H (Feb. 19, 2019 Cowen Analyst Report) at 1 (emphasis added); *see also* Ex. I (Expert Report of Christopher M. James, Ph.D. ("James Rep.")) ¶¶ 84–85.) [6] Uniti likewise believed that Windstream would prevail. (*See, e.g.*, Compl. ¶ 186.)

At the same time, both Uniti and market participants recognized the risk that the court might rule for Aurelius and find a default. (*See, e.g.*, Compl. ¶ 188 (opining that the "probability" of the "downside scenario," i.e., a Windstream loss and potential bankruptcy, was "low" but discussing protections in the event of a bankruptcy); *id.* ¶ 195 (acknowledging that, despite Uniti's expectation that Windstream would win, "there's always some risk").) [7]

### C.   Windstream's Bankruptcy and Adversary Proceeding

Ultimately, the risk of a ruling in favor of Aurelius materialized. On February 15, 2019, the court unexpectedly found that the Spinoff and Master Lease violated the sale-leaseback covenant in Windstream's debt indentures and awarded Aurelius a $300 million judgment. (*Id.* ¶¶ 201, 204.) Market participants described the decision as a "stunning development" and a "shocker." (Ex. K (Feb. 19, 2019 Covenant Review Article) at 1.) Ten days later, on February 25, 2019, Windstream filed for Chapter 11 bankruptcy protection. (Compl. ¶ 208.)

Both before and during the bankruptcy, Uniti publicly opined that it would have strong protections in a Windstream bankruptcy. (*Id.* ¶¶ 171, 213–23). This was because, among other

---

[6] *See also, e.g.*, Ex. F (Oct. 19, 2017 SunTrust Robinson Humphrey Analyst Report) at 2 ("Although handicapping outcomes such as these are always extremely difficult to do, we remain reasonably confident that the legality of its spin-off will be upheld . . . ."); Ex. G (Nov. 8, 2017 SunTrust Robinson Humphrey Analyst Report) at 1–2 ("The risk remains [that Aurelius] may still prevail in its claim, but now [also] needs to prove the Debt Exchange and Consent Solicitations were invalid. . . . [G]iven the majority of [Windstream's other] bondholders have agreed to the Consent Solicitations, we find it difficult to believe the court will find [Windstream's] actions invalid.").

[7] *See also, e.g.*, Compl. ¶ 195; Ex. J (Nov. 3, 2017 J.P. Morgan Analyst Report) at 5 ("The WIN/Unit structure could be found to violate credit covenants. If the sale-leaseback structure is found to have violated credit covenants, events may trigger a Windstream default. This could force Windstream into bankruptcy . . . . If Windstream is forced into a bankruptcy, a court may prioritize debt payments prior to Uniti lease payments, thus removing up to 75% of Uniti's current revenue.").

things, (1) Windstream was substantially dependent on the leased assets in order to operate its business; (2) Windstream was obligated to accept or reject the Master Lease in whole in any bankruptcy; (3) Windstream would face regulatory pressure to accept the lease, in order to ensure uninterrupted service to its customers as a "Carrier of Last Resort"; and (4) a bankruptcy court could not modify the rent or any other lease terms without Uniti's consent. (*See, e.g.*, Ex. L (Nov. 7, 2017 Uniti Wells Fargo Presentation) at 15; Ex. M (May 9, 2019 Uniti Form 10-Q) at 11.) Consistent with Uniti's belief that Windstream would face pressure to maintain the Master Lease, Windstream never rejected the lease at any point during the bankruptcy, and continued to pay all rent throughout the proceeding. (Compl. ¶ 28.)

Of course, that is not to say that Windstream did not *attempt* to avoid or modify its contractual obligations. On July 25, 2019, several months after Windstream filed for bankruptcy—and more than a month *after* the end of the class period in this action—the trustee for Windstream's bankruptcy estate filed an adversary proceeding (i.e., separate litigation within the bankruptcy) against Uniti. Windstream alleged that the Master Lease was a disguised long-term financing rather than a "true lease" and sought to "recharacterize" it as such. (*Id.* ¶¶ 124–25.) Even though the prominent law firm Skadden, Arps, Meagher & Flom LLP provided a legal opinion at the time of the Spinoff that the Master Lease was a "true lease," Windstream alleged that certain assumptions about the useful life of the copper wires that formed part of the leased network (i.e., the estimated lifespan of the copper assets, which were expected to depreciate over time) were inaccurate and inflated. (*Id.* ¶¶ 126–27.) By seeking to recharacterize the lease, Windstream was attempting to obtain more favorable treatment in the bankruptcy, so that it could avoid making its lease payments while nonetheless preserving access to the leased network (which, as noted, was essential to its business). At a minimum, Windstream hoped to obtain leverage to seek to negotiate a rent reduction as part of a plan of reorganization.

Windstream's claim was never adjudicated or proven. Uniti and Windstream eventually settled the adversary proceeding as part of Windstream's broader reorganization. Thus, there has never been a determination that the Master Lease was not a "true lease" or that any underlying assumptions regarding the useful life of the network assets (including the copper wires) were inaccurate or inflated. Nor will there *ever* be such a determination, as Windstream agreed in the settlement to release any claim to recharacterize the Master Lease and covenanted not to take any position in any future proceeding that was inconsistent with the position that the Master Lease is a "true lease." (Ex. N (May 15, 2020 Uniti Form 8-K), Ex. 10.1 at 8, 10.)

### D.    Plaintiffs Initiate this Action

Unsurprisingly, given the significant financial interdependence between Uniti and Windstream, Uniti's stock price fell following certain of the events described above, including the disclosure of Aurelius's Notice of Default, the judicial decision ultimately ruling in favor of Aurelius, and certain other events during Windstream's bankruptcy. (Compl. ¶¶ 177–78.) In October 2019, in the wake of these stock price drops, several Uniti investors filed suit, asserting securities fraud claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

In accordance with the terms of the Private Securities Litigation Reform Act (the "PSLRA"), Local 449 and Wayne County (the "Pension Funds") and Mr. McMurray, all represented by Labaton Sucharow LLP ("Labaton"), collectively moved to consolidate the lawsuits and to be appointed lead plaintiffs. A separate investor, Mr. Zhengxu He, represented by Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), also moved to be appointed lead plaintiff. Pursuant to a stipulation of those plaintiffs (and certain other shareholders who sought to be appointed lead plaintiff but later withdrew), this Court appointed all four plaintiffs as Lead Plaintiffs and appointed both Labaton and Robbins Geller as co-Lead Counsel.

Lead Plaintiffs filed the Complaint on May 11, 2020.  Much of the Complaint was copied nearly verbatim from a separate, earlier-filed lawsuit brought by another Uniti shareholder in the District of Delaware, captioned, *SLF Holdings, LLC v. Uniti Fiber Holdings Inc.*, No. 1:19-cv-01813-LPS, which asserted both federal securities claims as well as common law fraud claims under Alabama state law.  On November 4, 2020, Chief Judge Leonard P. Stark dismissed that action with prejudice, finding that the plaintiff had not alleged, among other things, a material misstatement or omission, scienter, or loss causation—all required elements of a Section 10(b) claim.  Although the plaintiff in that case has appealed Chief Judge Stark's decision as to the Alabama state law claims to the United States Court of Appeals for the Third Circuit, it did not attempt to appeal his dismissal of the federal claims.  *See* No. 20-3427 (3d. Cir.), Dkt. No. 30-1 at 2.  The appeal of the state law claims is still pending.

On July 10, 2020, Defendants filed a motion to dismiss the Complaint (ECF No. 63), which the Court denied on March 31, 2021 (ECF No. 74).  On October 25, 2021, three of the four Lead Plaintiffs—Plaintiffs Local 449, Wayne County, and Mr. McMurray—filed the Motion, which seeks to certify the following class pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure (ECF No. 90):

> All persons or entities who, during the period from April 24, 2015 to June 24, 2019, inclusive (the "Class Period") purchased or otherwise acquired the publicly traded common stock or call options or sold the put options of Uniti Group Inc. f/k/a Communications Sales & Leasing, Inc. ("Uniti" or the "Company"), and were damaged thereby [excluding certain persons, including Defendants].

Mr. He did not join in the Motion because, as Robbins Geller has represented, he has decided to withdraw as a Lead Plaintiff and now wishes to participate in the action solely as an absent class member.  (Ex. O (Oct. 26, 2021 Letter from N. Williams) at 1.)

### E.      Plaintiffs' Theories of Liability

Although Plaintiffs allege over 40 different misrepresentations over a four-year Class

Period (Compl. ¶¶ 139–228), their claims can be grouped into three distinct theories of liability.

### 1.   *The Sale-Leaseback Theory*

First, Plaintiffs claim that Defendants concealed that the Spinoff and Master Lease violated the sale-leaseback covenant in Windstream's debt indentures (the "Sale-Leaseback Theory").  In the Complaint, Plaintiffs alleged that Defendants concealed the mere "*risk*" of a violation.  (*See* Compl. ¶¶ 15–17, 20, 24, 87, 122, 242.)  However, Defendants argued in their motion to dismiss that, under Eighth Circuit law, there is no duty to disclose "soft information"—"such as a matter of opinion, predictions, or a belief as to the legality of the company's own actions"—unless "virtually as certain as hard facts."  (ECF No. 64 at 16 (quoting *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003)).)  In response, and in order to avoid dismissal under *Kushner*, Plaintiffs insisted that they were not alleging that Defendants failed to disclose the *risk* of a violation of the sale-leaseback covenant, but instead that Defendants failed to disclose "*hard facts*: that the *structure* of the transaction . . . violated Windstream's Indenture from *inception*."  (ECF No. 66 at 24.)  Thus, to prevail on the Sale-Leaseback theory, Plaintiffs must now prove that Defendants *knew* at the time of the Spinoff that a violation of the sale-leaseback covenant was "virtually as certain as [a] hard fact"—notwithstanding that Windstream itself vigorously contested the existence of a violation throughout the Aurelius litigation and that no court found that there was a violation until February 2019—after more than a year of litigation and nearly four years after the Spinoff.[8]

---

[8] Apparently recognizing the difficulty of proving that claim, Plaintiffs' Motion again seems to shift positions—falling back on the argument that Defendants concealed the "*risk* facing [Uniti] *should* the Spin-Off transaction be declared invalid." (Mot. at 3–4 (emphasis added).)  However, having disclaimed the "risk" theory to avoid dismissal at the pleading stage, Plaintiffs are estopped from reasserting it going forward in this litigation.  *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("[J]udicial estoppel[] generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." (citation omitted)).

## 2.    *The True Lease Theory*

Second, Plaintiffs claim that Defendants concealed that the Master Lease was purportedly a "disguised financing" rather than a "true lease" and that the Master Lease could supposedly be recharacterized by Windstream in the event of a Windstream bankruptcy (the "True Lease Theory"). (Compl. ¶¶ 122–38.) Again, the precise nature of the True Lease Theory has shifted over the course of this action. In their Complaint, Plaintiffs allege that Defendants concealed the "risk" that the Master Lease was not a true lease and could be recharacterized. (*See, e.g.*, *id.* ¶¶ 16, 101.) But in opposing Defendants' motion to dismiss—again recognizing that, under the Eighth Circuit's decision in *Kushner*, there is no obligation to disclose "soft information"— Plaintiffs described their theory as follows:

> Plaintiffs allege that Defendants failed to disclose *facts* – specifically that in order to obtain the determination that the Master Lease was a "true lease" at the time of the Spin-Off (and not a financing prohibited by the Indenture), Defendants provided economically unsupportable assumptions about the useful life of copper wire – i.e., the leased asset – to make it appear that the assets would outlive the terms of the Master Lease, a condition necessary to a "true lease" determination.

(ECF No. 66 at 25.) Plaintiffs claim—based solely on unadjudicated *allegations* made by Windstream in its adversary complaint—that the failure to disclose these hard "facts" regarding the useful life of the leased copper wire assets supposedly concealed the "true risk" that the Master Lease was not a "true lease" and could purportedly be recharacterized.

In any event, the present Motion barely addresses the True Lease Theory. That is likely because the Master Lease was never successfully recharacterized by Windstream, and there was never any finding that the useful life of any portion of the leased network (including the copper wires or otherwise) was inflated, nor will there ever be. (*See supra* at 8.) Accordingly, Plaintiffs are wholly unable to show that any purported "truth" was ever revealed to the market or that any concealed risk ultimately materialized.

11

### 3.    *The Navigating the Bankruptcy Theory*

Third, and finally, Plaintiffs claim that between March 18, 2019 and June 2019, after Windstream filed for bankruptcy, Defendants made various allegedly misleading statements regarding the impact of the bankruptcy on Uniti's business and operations, and Uniti's ability to navigate the bankruptcy without raising external capital (the "Navigating the Bankruptcy Theory").  (Compl. ¶¶ 212–26.)

\* \* \*

Plaintiffs claim that "the truth about the Spin-Off and the hidden risks materialized and became known to the market" through four "partial disclosures" (Compl. ¶¶ 243, 244, 265):

- Windstream's August 3, 2017 announcement that it was eliminating its dividend (*id.* ¶ 168);

- Windstream's September 25, 2017 announcement that it had received the Notice of Default from Aurelius (*id.* ¶¶ 177–78);

- the February 15, 2019 decision in the Aurelius litigation, which concluded that the Spinoff and Master Lease violated the sale-leaseback provision in Windstream's indenture (*id.* ¶¶ 201–06), together with subsequent credit ratings downgrades of Windstream and Uniti on February 21, 2019 (*id.* ¶ 207); and

- Uniti's June 24, 2019 announcement that it was offering $300 million in exchangeable senior notes (*id.* ¶¶ 227–28).

However, Plaintiffs have never clearly identified which of their three separate categories of misstatements and omissions were purportedly "corrected" by each of the "partial" disclosures—most of which, on their face, bear no discernible relationship to the allegedly concealed "risks" or supposedly concealed or misrepresented "facts" at issue in the case.

### **ARGUMENT**

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).  The Court may certify a class only if Plaintiffs "affirmatively demonstrate [their]

compliance" with the requirements of Federal Rule of Civil Procedure 23. *Id.* at 350. Rule 23 "does not set forth a mere pleading standard," and Plaintiffs cannot satisfy the rule with allegations or conclusory assertions. *Id.* Instead, Plaintiffs must "actually *prove*—not simply plead—that their proposed class satisfies each requirement" of the Rule. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014); *see also Ford v. TD Ameritrade Holding Corp.*, 995 F.3d 616, 620 (8th Cir. 2021).

To certify a class, the Court must find that Plaintiffs have met their burden of proving that they satisfy each of the requirements of Rule 23(a)—i.e., numerosity, commonality, typicality, and adequacy—and, further, that the proposed class falls into at least one of the types of class actions in Rule 23(b). *See Ford*, 995 F.3d at 620. Here, Plaintiffs invoke Rule 23(b)(3), which requires them to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). As the Supreme Court has explained, "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," and courts have a "duty to take a 'close look' at whether common questions predominate over individual ones." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

In evaluating a class certification motion, district courts must undertake a "rigorous analysis" to ensure that the plaintiff meets all of the Rule 23 requirements. *Wal-Mart*, 564 U.S. at 350–51. This analysis "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* It may also require the Court to "resolve disputes concerning the factual setting of the case," including the "resolution of expert disputes concerning the import of evidence concerning the factual setting." *Blades v. Monsanto*

*Co.*, 400 F.3d 562, 575 (8th Cir. 2005).  "A district judge may not duck hard questions by observing that each side has some support, or that considerations relevant to class certification also may affect the decision on the merits."  *West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002).  Instead, "[t]ough questions must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives."  *Id.*

Under the required rigorous evaluation of Plaintiffs' Motion, Plaintiffs' proposed class cannot be certified, as Plaintiffs fail to meet either the predominance or adequacy requirements.

## I.     PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN ON PREDOMINANCE

Plaintiffs have failed to meet their burden of establishing that common issues predominate over individual issues, as required under Rule 23(b)(3), for three reasons.

*First*, Plaintiffs fail to show that damages can be measured on a class-wide basis consistent with their distinct and complex theories of liability and harm.  For that reason, no class can be certified *at all*.

*Second*, even if Plaintiffs could overcome that fatal infirmity, common issues of reliance do not predominate with respect to the Class, as proposed, because Plaintiffs cannot invoke a presumption of reliance for each of their various claims and/or for the entire proposed class period.  Specifically, as described in greater detail below, (1) *no* class can be certified in connection with Plaintiffs' True Lease Theory; (2) any class related to the Sale-Leaseback Theory must be limited to the period from April 24, 2015 to September 25, 2017; and (3) any class related to the Navigating the Bankruptcy Theory must be limited to the period from March 18, 2019 to June 24, 2019.

*Third*, Plaintiffs cannot certify a class on behalf of options traders because they lack standing to assert such claims and fail to show that the market for Uniti options was efficient, as necessary to invoke the fraud-on-the-market presumption of reliance.

14

A.      **No Class Can Be Certified Because Plaintiffs Have Not Demonstrated that Damages Can Be Measured on a Class-Wide Basis Consistent with Their Theories of Liability**

The Court should deny Plaintiffs' Motion in its entirety because Plaintiffs have failed to show that damages are measurable on a class-wide basis. The Supreme Court has made clear that, to meet the predominance requirement with respect to damages, plaintiffs bear the burden of proving that damages can be calculated on a class-wide basis consistent with their theory of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35–36 (2013). Courts must conduct a "rigorous analysis" to ensure this burden has been met. *Id.* at 35. Under *Comcast*, a model purporting to serve as evidence of damages in a class action must measure only those damages attributable to the plaintiffs' theory of liability in the action. "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* As the D.C. Circuit succinctly put it: "No damages model, no predominance, no class certification." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013).

Here, Plaintiffs and their retained consultant, Chad Coffman, have put forward no viable model that would even begin to measure damages reliably in this case. The only "methodology" Mr. Coffman proffers is entirely generic and fails to address, much less meaningfully grapple with, Plaintiffs' actual claims. This approach fails *Comcast* for two independent reasons: Mr. Coffman's purported damages model (1) fails to distinguish among Plaintiffs' specific and distinct theories of liability and harm; and (2) fails to take into account that Plaintiffs are proceeding on a "materialization of the risk" theory of loss causation.

1.      *Mr. Coffman Fails to Adequately Identify How He Would Calculate Damages on a Class-Wide Basis in this Case*

Mr. Coffman's boilerplate damages opinion consists of a scant six paragraphs and is materially identical to the opinion he has offered on behalf of plaintiffs in myriad other securities

15

class actions.[9]   (Coffman Rep. ¶¶ 94–99; Ex. P (Coffman Tr.) 211:5–11.)   The first two paragraphs, which are the crux of his opinion, describe the so-called "out-of-pocket" method, which generally "equates damages to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale"; according to Mr. Coffman, "[o]nce the inflation per share has been quantified on each day during the Class Period, the computation of damages for each class member is formulaic based upon information collected in the claims process."   (Coffman Rep. ¶¶ 94–95.)   In the subsequent paragraphs, Mr. Coffman notes that the most widely used technique to quantify inflation (an essential input for damages) is an "event study," which measures price reactions at the time of an alleged corrective disclosure or other revelatory event—which, in turn, is used to indirectly measure inflation at the time of an alleged misstatement; Mr. Coffman then describes various other techniques that could be used to potentially disaggregate the impact of "confounding information" from the impact of the alleged revelation of the fraud and to measure how inflation may have changed over time.   (*Id.* ¶¶ 96–98.)

But Mr. Coffman does not explain how damages *actually* would be calculated under the facts of this case, or what methodologies *actually* would be applied or are appropriate.   (*See* Ex. I (James Rep.) ¶ 101 ("Simply listing economic tools, such as an event study and valuation, does not demonstrate that there exists a methodology that can measure class-wide damages.").)   Rather, he simply asserts that his "model" can measure damages on a class-wide basis and then asks this Court to trust him.   (Coffman Rep. ¶ 99.)   Under *Comcast*, that is not enough: "[W]ithout assurance beyond [Mr. Coffman's] say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a class wide basis."   *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014).

---

[9] The Expert Report of Chad Coffman, CFA ("Coffman Rep.") is attached as Exhibit A to Plaintiffs' Motion.

16

Indeed, courts have repeatedly rejected such "trust me" opinions in denying class certification motions in cases like this.  For example, in *In re BP P.L.C. Sec. Litig.*, the plaintiffs likewise relied on an opinion by Mr. Coffman to try to show that damages could be measured on a class-wide basis.  2013 WL 6388408, at *16 (S.D. Tex. Dec. 6, 2013).  The court noted that *Comcast* "signal[ed] a significant shift in the scrutiny required for class certification," and held that, "[w]ithout a more complete explication of how Plaintiffs propose to use an event study to calculate class members' damages, and how that event study will incorporate—and, if necessary, respond to—the [plaintiffs'] various theories of liability, the Court cannot certify this litigation for class action treatment."  *Id.* at *17; *see also, e.g.*, *Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018) ("When a class plaintiff presents a damages model that is vague, indefinite, and unspecific, or simply asserts . . . that there are unspecified 'tools' available to measure damages, the model amounts to 'no damages model at all,' and the class cannot be certified."); *Fort Worth*, 301 F.R.D. at 141–42 (rejecting damages model and denying class certification, where plaintiffs' expert cited three methods of calculating damages but failed to identify which method he would use); *Sicav v. James Jun Wang*, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015) (denying class certification where "plaintiffs have not shown or explained, concretely, how damages would be calculated as to any individual purchaser" because "the Court must understand, concretely, how plaintiffs propose to reliably establish damages").

Here, Mr. Coffman's generic damages "model" is particularly inappropriate and incapable of meeting Plaintiffs' burden under *Comcast*, given the uniquely complex allegations underlying Plaintiffs' claims.  Plaintiffs allege over 40 supposed misstatements by Defendants, falling within at least three distinct categories, and claim that the "truth" was "partially" revealed through at least four distinct disclosure events that caused Uniti's stock price to drop—all over

the course of a more than four-year class period. *See Loritz v. Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (rejecting damages model where expert failed to explain "how he would use these techniques in concert to calculate damages" in case involving "multiple alleged misrepresentations," "corrective information . . . disclosed at multiple times," and "corrective information regarding different alleged misrepresentations"). Moreover, Plaintiffs broadly allege that some or all of the four alleged "corrective" disclosures revealed the "truth" with respect to *multiple* theories of liability. (Compl. ¶ 246.) For example, Plaintiffs argued in opposition to Defendants' motion to dismiss that Uniti's June 24, 2019 announcement of a convertible note offering constituted a "materialization of the risk[s]" concealed under the True Lease Theory *and* the Navigating the Bankruptcy Theory. (ECF No. 66 at 54–55.) But neither Plaintiffs nor Mr. Coffman provide a way to identify or disaggregate the damages resulting from those distinct liability theories (Ex. I (James Rep.) ¶¶ 116–20)—precisely the issue that precluded class certification in *Comcast*. 569 U.S. at 36–37.

Indeed, despite testifying as to the importance to his damages opinion of ensuring that Plaintiffs' theories of liability and harm were "economically coherent" (Ex. P (Coffman Tr.) 223:11–224:12), Mr. Coffman could not answer basic questions about Plaintiffs' theories[10] and has not even attempted to develop a methodology that could reliably "apportion . . . damages amongst [them], or to the extent there even is different theories in this case, how to do that." (*Id.* at 329:6–330:15.) If Plaintiffs were to succeed in establishing liability for only one of their theories, Mr. Coffman's damages model would be incapable of ensuring that damages are attributable to that theory and only that theory. Under *Comcast*, that alone is fatal to certification of a class. *See, e.g.*, *Ctr. City Periodontists, P.C. v. Dentsply Int'l, Inc.*, 321 F.R.D. 193, 204

---

[10] *See, e.g.*, Ex. P (Coffman Tr.) 273:21–274:4 (unaware of information allegedly concealed as part of True Lease Theory); *id.* at 274:5–25 (unaware of information allegedly concealed as part of Sale-Leaseback theory); *id.* at 264:13–24 (unaware that Sale-Leaseback Theory and True Lease Theory were distinct theories of liability).

(E.D. Pa. 2017) (declining to certify class where plaintiffs had alleged multiple theories of liability, the court dismissed some of those theories, but plaintiffs' damages model was based on all the theories).

### 2.    *Mr. Coffman Fails to Explain How He Would Measure Damages from Plaintiffs' Materialization-of-the-Risk Theory of Loss Causation*

Mr. Coffman's damages model should also be rejected for another reason: Plaintiffs survived dismissal of their complaint based on the fact that they are relying on a "materialization of the risk" theory of loss causation (ECF No. 66 at 52; ECF No. 74 at 8), but Mr. Coffman's model offers no methodology to calculate damages under such a theory.

A materialization of the risk theory differs from a "corrective disclosure" theory, as Plaintiffs acknowledge. (ECF No. 66 at 52 (quoting *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005)).) Among other things, even when a company accurately describes the risks it faces, its stock price can drop if those risks later materialize. In such a case, the "corrective" disclosure does "not reflect the value impact of the facts pertaining to the incremental risk" but rather "represent the risk materializing with certainty." (Ex. I (James Rep.) ¶ 109.) Thus, where a risk is fraudulently understated, the proper measure of damages is not the entire stock drop (unlike in the case of a truly "corrective" disclosure). *See, e.g.*, *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 689–90 (5th Cir. 2015).

Instead, in such a case, any purported inflation—and any resulting damages—must be limited solely to the "the value impact of the concealed or misrepresented risks." (Ex. I (James Rep.) ¶ 105.) Notably, Mr. Coffman agrees with Dr. James in that regard, testifying that, in order to calculate artificial inflation for a materialization of the risk, one "would need to understand how the market would have perceived the risk," how the "incremental disclosure of further risk ha[s] impacted the stock price," and "how the risk profile of the company would be different if the full truth were told." (Ex. P (Coffman Tr.) 233:4–234:2, 242:5–9.) But Mr.

19

Coffman's proposed damages model does not address any of those factors.

Instead, the only technique that Mr. Coffman references (but does not commit to using) to calculate artificial inflation is based on using the stock price declines on the alleged partial disclosure dates as a proxy for the inflation that existed earlier in the class period. (Coffman Rep. ¶ 97.) But as Dr. James explains, that technique would not reliably measure inflation and would "vastly overstate damages" in a materialization of the risk case. (Ex. I (James Rep.) ¶¶ 108–09.) Indeed, awarding plaintiffs as damages the entirety of a stock drop following a materialization of a risk (including plaintiffs who would have purchased even if they knew the true likelihood of the risk) would effectively provide class members with insurance against the risk itself, which is contrary to the purpose of the securities laws. *See Raab v. Gen. Physics Corp.*, 4 F.3d 286, 291 (4th Cir. 1993) ("[T]he securities laws do not serve as investment insurance.").

Dr. James provides a simplified example to illustrate the point. Consider a company involved in litigation, where there is a 30% risk of a negative outcome that would result in a stock price decline of $100 a share. (Ex. I (James Rep.) ¶ 107.) Therefore, the expected value of the negative outcome, when taking into account the likelihood of the risk materializing, is $30 (30% of $100). If, prior to the lawsuit being decided, the company misleadingly discloses *some*, but not all, of the information regarding the litigation, and the market perceives the risk of a negative legal outcome to be only 10% (rather than 30%), then the stock would reflect only an expected loss of $10 (10% of $100) in its price. At that point, the artificial inflation in the company's stock price would be $20 a share, or the difference between the expected value of the negative outcome based on the "true" risk ($30) and the expected value of the negative outcome based on the disclosed risk ($10). (*Id.*) If a negative legal outcome ultimately materializes and the court renders a decision against the company, its stock price would be expected to drop an additional $90 on top of the $10 it had already fallen. (*Id.*) However, the $90 stock price drop is

20

irrelevant to calculating damages in a later securities lawsuit based on the failure to disclose the "true risk" of a negative outcome, which must instead be based on the artificial inflation *prior* to the risk materializing ($20).  In contrast, using the stock price decline when the risk ultimately materialized would vastly overstate damages resulting from the concealed risk.  (*Id.* ¶ 108.)

Dr. James' simplified example is similar to what Plaintiffs allege happened here, and what Mr. Coffman's model fails to address.  Indeed, the challenges of developing a workable damages model are even more difficult here.  *First*, unlike in the example above where the "true" risk is given, in the real world, it is extremely difficult to predict the probability of a risk materializing *ex ante* (i.e., *before* it has materialized).  Mr. Coffman offers no method for doing so here (e.g., for determining, at the time of the Spinoff, the perceived, or actual, risk of a sale-leaseback covenant violation or of a successful claim that the Master Lease was a "true lease").  *Second*, that difficulty is exacerbated because the relevant risks changed over time.  For example, as noted above, in response to Aurelius's Notice of Default, Windstream launched debt exchange offers and solicited consent from other noteholders to waive the alleged default.  (*Supra* at 5.)  Although the court ultimately found for technical reasons that Windstream's efforts were ineffective (Ex. Q (Aurelius Opinion) at 48–51), the possibility of a waiver unquestionably impacted the market's view of the risks related to any alleged violation of the sale-leaseback covenant in Windstream's debt indenture.  (*See supra* at 5 nn.4–5.)

Notably, the Northern District of California recently denied a class certification motion based on a materialization of the risk theory on these grounds.  In *Mulderrig v. Amyris, Inc.*, the court rejected the plaintiffs' out-of-pocket damages methodology—the same methodology Mr. Coffman proposes here—precisely because their expert "d[id] not at all explain how the proposed model calculates damages based on the materialization of the risk theory."  2021 WL 5832786, at *11 (N.D. Cal. Dec. 8, 2021).  The court emphasized that where an expert fails to

21

"identif[y] the materialized risk that plaintiffs allege" or "explain[] how such risk would be factored into the damages model," plaintiffs have not established a class-wide damages model. *Id*. Mr. Coffman's damages model should be rejected here for the same reason.[11]

## B.      Even If a Class Could Otherwise Be Certified, Plaintiffs Have Not Shown that Common Issues of Reliance Predominate for the Class as Proposed

Just as Plaintiffs cannot meet their predominance burden with respect to damages, Plaintiffs' proposed class, as currently delineated, also fails for the independent reason that Plaintiffs cannot show that common questions of reliance will predominate over individual ones. Plaintiffs attempt to certify a single, unitary class spanning more than four years—in connection with several distinct categories of alleged misstatements and omissions that do not overlap substantively or temporally.  As explained below, their attempt to do so is inherently flawed. Accordingly, assuming a class can be certified at all, it must be substantially limited.

By way of background, Plaintiffs acknowledge that to obtain class certification under Rule 23(b)(3), they must rely on a "presumption of reliance."  (Mot. at 19.)  As the Supreme Court has explained, without that presumption, "a Rule 10b-5 suit cannot proceed as a class action:  Each plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 281–82 (2014).  Moreover, Plaintiffs must demonstrate entitlement to a presumption of reliance for *each* misrepresentation—or class of misrepresentations—alleged in the Complaint.  *See id.* at 278–79; *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269–80 (N.D. Tex. 2015) (on remand, limiting class to one of six alleged corrective disclosures).  Accordingly, if Plaintiffs

---

[11] In *Mulderrig*, the court ultimately found that the plaintiffs could nonetheless proceed based on a "corrective disclosure theory."  2021 WL 5832786, at *11.  Here, by contrast, Plaintiffs have made clear that, with respect to at least some (if not all) of their theories of liability, they are proceeding *solely* on a "*materialization of risk theory of loss causation*." (ECF No. 66 at 52; *see also id.* at 53 ("Here, the Complaint plainly alleges the material risks that Defendants concealed, that they were aware of those risks, and when those risks materialized, Plaintiffs suffered a loss. . . . Nothing more is required to plead loss causation under a materialization of the risk theory.").)

22

fail to demonstrate their entitlement to a presumption of reliance for any of their three theories, a class cannot be certified as to that theory.

Plaintiffs' Motion primarily seeks to invoke the fraud-on-the-market presumption under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).[12] (Mot. at 19.)  The *Basic* presumption rests on the "fraud-on-the-market" theory, which provides "that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."  *Basic*, 485 U.S. at 246.  Under the *Basic* presumption, "courts may presume that investors trading in efficient markets indirectly rely on public, material misrepresentations through their 'reliance on the integrity of the price set by the market.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 462 (2013).  To invoke the *Basic* presumption, a plaintiff must make a prima facie showing of four elements: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed."  *Halliburton*, 573 U.S. at 268.

Even if Plaintiffs make such a prima facie showing, Defendants can rebut the presumption by "show[ing] that the alleged misrepresentation did not actually affect the stock's price—that is, that the misrepresentation had no 'price impact.'"  *Id.* at 263–64.  In that event, "*Basic*'s fraud-on-the-market theory and presumption of reliance collapse."  *Id*. at 278. Defendants can prove a lack of price impact through "[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff"; absent such a

---

[12] Plaintiffs cannot rely on the *Affiliated Ute* presumption of reliance as an alternative to the *Basic* presumption. (Mot. at 27–28.)  The Eighth Circuit has held that the *Affiliated Ute* presumption only applies "to situations where the parties deal directly with one another in face-to-face transactions," *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 321 (8th Cir. 1997), and where plaintiffs are alleging *pure omissions*—not "misrepresentations, and omissions in the nature of misrepresentations (misleading statements, half-truths)," *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 716–17 & n.2 (8th Cir. 1978).  Here, Plaintiffs do not allege any "face-to-face" transactions between Defendants and any class member, and the alleged omissions are based on alleged misrepresentations and "half-truths." (*See, e.g.*, Compl. ¶¶ 146–47, 160–62, 166, 190–92.)

link, "the basis for finding that the fraud had been transmitted through market price would be gone." *Id.* at 281.

The Supreme Court provided further guidance on this issue earlier this year. In *Goldman Sachs Group., Inc. v. Arkansas Teacher Retirement System*, the Court held that defendants can demonstrate a lack of "price impact"—and rebut the presumption of reliance—by showing that there is a "mismatch between the contents of the misrepresentation and the corrective disclosure." 141 S. Ct. 1951, 1961 (2021). When there is a "mismatch," "it is less likely that the specific disclosure actually corrected the . . . misrepresentation, which means that there is less reason to infer . . . price impact." *Id.* Moreover, the Court instructed that, "[i]n assessing price impact at class certification, courts should be open to all probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense," and "regardless whether that evidence overlaps with materiality or any other merits issue."[13] *Id.* at 1960–61.

Under this framework, as set forth in greater detail below, Plaintiffs cannot establish that common issues of reliance predominate with respect to each of their three theories for the class as proposed: (1) With respect to their True Lease Theory, Plaintiffs cannot invoke the *Basic* presumption of reliance for *any* period of time, and thus cannot certify *any* class; and (2) the class period for Plaintiffs' remaining two theories is overbroad and must be narrowed.

---

[13] To be clear, Defendants acknowledge that Plaintiffs need not demonstrate loss causation to satisfy the *Basic* presumption. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011). But, as *Goldman* reflects and other courts have recognized, "[t]he best way to determine the [price] impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 (7th Cir. 2020) (citation omitted). Thus, although assessing the price impact of a misrepresentation by looking to the alleged corrective disclosures is an analysis that "looks very much like one of loss causation," the Court "must be willing to consider evidence offered by the defense to show that the alleged misrepresentations did not actually affect the price of the securities." *Id.* at 608, 611; *see Goldman*, 141 S. Ct. at 1961.

### 1.    *No Class Can Be Certified with Respect to the True Lease Theory Because Plaintiffs Cannot Invoke the Basic Presumption of Reliance with Respect to that Theory*

Plaintiffs have not validly invoked—and cannot invoke—the *Basic* presumption with respect to the True Lease Theory because the alleged misstatements and omissions had no impact on Uniti's stock price.  Indeed, the facts here present a textbook "mismatch" under *Goldman*.

The crux of Plaintiffs' True Lease Theory is that Defendants allegedly knew that the Master Lease was not a "true lease" and failed to disclose specific facts regarding the useful life of certain of the leased assets, which Plaintiffs claim would have revealed to investors the "true risk" that the Master Lease could purportedly be recharacterized as a long-term financing in the event of a Windstream bankruptcy.  (*See supra* at 11; Compl. ¶¶ 101, 122–29.)  Plaintiffs allege that the "truth" was "revealed" when, on July 25, 2019, Windstream filed an adversary proceeding against Uniti, as part of its bankruptcy.  (Compl. ¶¶ 231–34.)  According to Plaintiffs, "[t]he allegations in the Adversary Proceeding"—specifically, those related to the useful life of the copper wire assets—"*laid bare* the fact that Defendants knew that the Master Lease was a financing and could be recharacterized as such in the event of Windstream bankruptcy."  (*Id.* ¶ 233 (emphasis added); *see also* Mot. at 7.)

The problem for Plaintiffs, however, is that the adversary proceeding was filed **after** the class period.  Thus, it cannot be used to demonstrate that there was any "price impact" related to the alleged omissions **during** the class period, as would be necessary to invoke the *Basic* presumption.  *See, e.g.*, *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) (because certain disclosures fell "outside of the class period," they could not "serve as a basis of proving a link between the misrepresentation and the price for the class as Plaintiffs seek to define it").  Nor could Plaintiffs solve that problem by extending the class period to July 25, 2019, when Windstream filed the adversary proceeding.  As Dr. James has demonstrated, Uniti's

25

stock price did not exhibit any statistically significant abnormal decline on that date, when the "truth" was allegedly "laid bare." (Ex. I (James Rep.) ¶ 98.) That is sufficient to show a lack of "price impact" with respect to the True Lease Theory, and is fatal to class certification in connection with that claim. *See Halliburton*, 309 F.R.D. at 269–76 (denying certification as to corrective disclosures that did not trigger statistically significant price declines); *Moody's*, 274 F.R.D. at 492–93 (same).

Applying a "good dose of common sense," that should end the matter. *Goldman*, 141 S. Ct. at 1960. Plaintiffs nevertheless attempted to get around that fatal flaw by arguing, in opposition to Defendants' motion to dismiss, that "the known risk that the Master Lease was a disguised financing" purportedly "materializ[ed]" on June 24, 2019, when Uniti announced that it was issuing $300 million in convertible notes, which Plaintiffs argued "placed a spotlight on the economic viability of the assets originally transferred from Windstream to Uniti in the Spin-Off." (ECF No. 66 at 54.) That argument is meritless, and is certainly not sufficient under *Goldman* to save Plaintiffs' claims under the True Lease Theory.

As an initial matter, Plaintiffs' theory makes no sense, given that the June 24, 2019 notes offering was announced over a month *before* Windstream filed its adversary complaint (on July 25, 2019) and first claimed that there was any purported basis to recharacterize the Master Lease (based, in part, on its allegations regarding the useful life of the leased copper wire assets). Moreover, it ignores that Windstream's claim represented mere allegations that have since been settled; there has not been, nor will there ever be, any actual *finding* that the Master Lease was not a "true lease" or that the useful life of the leased copper assets was inflated. (*Supra* at 8.)

In any event, as explained by Dr. James, there is no economic relationship (or, in the words of *Goldman*, there is a complete "mismatch") between the June 24, 2019 notes offering and Defendants' alleged misstatements and omissions regarding the useful life of the copper

26

assets, which underlie the True Lease Theory.[14]  (Ex. I (James Rep.) ¶¶ 94–99.)   Although a

disclosure need not "precisely mirror[] the substance of a prior undisclosed fraud," it still "must

somehow reveal to the market some part of the truth" that was allegedly concealed.  *In re Take-*

*Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 285 (S.D.N.Y. 2008).   Uniti's announcement of

its notes offering (*see* Ex. R (June 24, 2019 Uniti Form 8-K), Ex. 99.1) does not come close.   On

its face, the announcement plainly had nothing to do with, and revealed no information with

respect to, whether the Master Lease was a "true lease" or could be recharacterized.   Nor did it

reveal anything about the supposedly inflated useful life of the leased copper assets that Plaintiffs

claim to have been concealed by Defendants and which forms the crux of their True Lease

Theory.   Likewise, securities analysts covering the notes offering drew no such connection.   (Ex.

I (James Rep.) ¶¶ 97–98.)   Thus, any price drop following Uniti's announcement of its notes

offering cannot reflect any "price impact" from any alleged misstatement or omission underlying

the True Lease Theory.[15]  *See In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at \*16 (N.D.

Cal. Dec. 22, 2016) (no price impact despite evidence of a price drop following an

announcement because "the court is not convinced the [announcement] w[as] a corrective

disclosure at all").

As the Eighth Circuit has made clear, in such circumstances, a class cannot be certified.

---

[14] Aside from the June 24, 2019 notes offering, the Complaint also points to three other disclosure events (Compl. ¶¶ 244–64), but Plaintiffs do not—and cannot—allege that those events revealed the falsity of Defendants' statements regarding the Master Lease, nor have they ever even argued as much.   Like the notes offering, those disclosures happened well before the adversary complaint was filed, none of them revealed anything about whether the Master Lease was a "true lease" or the useful life of the leased copper, and Dr. James found no evidence that the price movements on those days were related to the True Lease Theory.   (Ex. I (James Rep.) ¶¶ 40–50, 53–55, 58.)

[15] This conclusion is bolstered by the completely generic nature of the alleged misrepresentations, which *Goldman* held is relevant to the price impact analysis.   *Goldman*, 141 S. Ct. at 1960 (noting that "the generic nature of an alleged misrepresentation often will be important evidence of price impact because, as a rule of thumb, a more-general statement will affect a security's price less than a more-specific statement on the same question." (internal quotation marks omitted)).   The misstatements at issue here, such as "I don't really view the lease itself as . . . the problem" and "we continue to think that our lease is well structured" (*see, e.g.*, Compl. ¶¶ 173, 175) are entirely generic and say nothing about whether the Master Lease was a "true lease" or make any representation whatsoever about the useful life of the copper wires or any other portion of the leased assets.

*See IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782–83 (8th Cir. 2016) (defendants demonstrated lack of price impact where price movement on corrective disclosure date resulted from release of information not connected to the alleged fraudulent misstatements).

### 2. *Plaintiffs' Proposed Class Period Is Grossly Overbroad and Inconsistent with the Separate and Non-Overlapping Sale-Leaseback Theory and Navigating the Bankruptcy Theory Must Be Narrowed*

With respect to Plaintiffs' other two theories—the Sale-Leaseback Theory and the Navigating the Bankruptcy Theory—Plaintiffs cannot invoke the *Basic* presumption of reliance for the full four-year class period, as proposed.

As noted above, to invoke the *Basic* presumption, Plaintiffs must show that they traded in Uniti securities "between the time the misrepresentations were made and when the truth was revealed." *Halliburton*, 573 U.S. at 268. This is because "[t]he 'fundamental premise' of the fraud-on-the-market theory underlying *Basic*'s presumption is 'that an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction.'" *Goldman*, 141 S. Ct. at 1958. Accordingly, a class period can *begin* only when the alleged misstatements were first made. And it must *end* when the truth was revealed—i.e., "when curative information is publicly announced or otherwise effectively disseminated to the market."[16] *In re Ribozyme Pharms., Inc. Sec. Litig.*, 205 F.R.D. 572, 579 (D. Colo. 2001). After that point, "[o]nce the deception is publicly revealed for the first time by a corrective disclosure, a reasonable investor cannot be said to have relied on the company's misrepresentation or omission in deciding to invest." *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,

---

[16] Courts routinely "examine[] the date of corrective disclosure at the class-certification stage in order to decide whether the class period should be modified." *Medtronic*, 325 F.R.D. at 293 n.5 (collecting cases); *Carpenters Pension Tr. Fund St. Louis v. Barclays plc*, 310 F.R.D. 69, 97 (S.D.N.Y. 2015) ("In the case of a securities fraud class action, courts are required to cut off the class period on the date of a statement or event that cures the market."). To the extent some courts, before *Goldman*, have found that this is not an issue for class certification, such findings are inconsistent with *Goldman*, which makes clear that courts must consider "all probative evidence" on price impact "regardless whether the evidence is also relevant to a merits question like materiality.'" 141 S. Ct. at 1960 (citations omitted).

325 F.R.D. 280, 291 (D. Minn. 2018).  Applying those principles here, Plaintiffs' proposed class period is grossly overbroad and inconsistent with the allegations underlying Plaintiffs' Sale-Leaseback Theory and Navigating the Bankruptcy Theory.  Even if Plaintiffs could overcome the additional hurdles to the certification of *any* class (*see* Point I.A *supra* and Point II *infra*), a class related to these two remaining theories would need to be narrowed substantially.

**(a)** ***Even If a Class Could Otherwise Be Certified, Any Class Period Related to the Sale-Leaseback Theory Could Be No Broader Than April 24, 2015 to September 25, 2017***

The crux of Plaintiffs' Sale-Leaseback Theory is that "Defendants repeatedly concealed . . . the material risk that the Spin-Off was a prohibited sale-leaseback transaction that violated [Windstream's] Indenture." (Compl. ¶ 16.)  Plaintiffs allege that this risk was revealed through a series of partial disclosures, including the September 25, 2017 announcement of the Notice of Default, the February 15, 2019 decision in the Aurelius litigation, and credit rating downgrades of Uniti on February 21, 2019.  (*Id.* ¶¶ 251–63.)

However, any class period for the Sale-Leaseback Theory could not extend later than September 25, 2017, when the Notice of Default was disclosed, because the relevant risk necessarily had been fully disclosed by that point in time.[17]  *See Medtronic*, 325 F.R.D. at 295 (limiting end of class period to date on which the "crux" of the allegedly undisclosed information was "disclosed to the public").  As Plaintiffs allege, the disclosure of the Notice of Default revealed that a Windstream noteholder (Aurelius) was claiming that the Spinoff "constituted a Sale and Leaseback Transaction . . . which did not comply with the Sale and Leaseback covenant under the Indenture" and that Aurelius was claiming that, as a result, a default under the indenture had occurred.  (Compl. ¶ 177.)  In other words, by September 25, 2017, the *very risk*

---

[17] To be clear, Defendants dispute that any new information was disclosed on September 25, 2017.  But even if the Notice of Default did disclose some new piece of information, there is no doubt that all relevant information concerning the risk at issue had been disclosed by that time.

that Plaintiffs allege to have been concealed (*e.g.*, *id.* ¶ 16 (alleging that Defendants hid "the

material risk that the Spin-Off was a prohibited sale-leaseback transaction that violated the

Indenture")) was *expressly* disclosed.  Thus, no class member could have reasonably relied on

Defendants' allegedly misleading statements underlying the Sale-Leaseback Theory after that

date.[18]

That Plaintiffs characterize the September 25, 2017 Notice of Default as a "partial"

disclosure (and identify several subsequent, allegedly revelatory disclosures) does not alter this

conclusion.  As Dr. James explains, these later disclosures did not reveal any *new* information

about the allegedly concealed risk of a sale-leaseback violation and are therefore economically

irrelevant, *see Medtronic*, 325 F.R.D. at 295 ("[T]he Court need not consider whether there was a

decrease in stock price [after a disclosure] if no new information was revealed to the public."):

- *Aurelius Decision.*  Dr. James reviewed the Aurelius decision and found that all of the information cited in support of that decision had previously been disclosed through regulatory disclosures, financial disclosures, legal filings, and a July 2018 public bench trial. (Ex. I (James Rep.) ¶¶ 70–81.) Indeed, the only *new* information revealed by the decision was the court's *legal opinion.*  (*Id.* ¶¶ 85–86.)  But, as Mr. Coffman concedes (Ex. P (Coffman Tr.) 314:6–14), and common sense confirms, Defendants could not have disclosed the court's legal opinion before it was issued.  In fact, in opposing Defendants' motion to dismiss, Plaintiffs specifically disclaimed that they were alleging that "Defendants failed to accurately predict how Judge Furman would rule in the Aurelius Litigation."  (ECF No. 66 at 29.)

- *Credit Rating Downgrades.*  For similar reasons, Uniti's subsequent credit rating downgrades on February 21, 2019, cannot constitute "corrective" disclosures because they, too, did not reveal any new information

---

[18] The fact that Defendants subsequently opined on several occasions that Windstream would win the Aurelius litigation (*see, e.g.*, Mot. at 6; Compl. ¶¶ 173–75, 186–88) is irrelevant and does not alter the conclusion that the *risk* of a sale-leaseback violation, or, indeed, the "fact" of an alleged default, was fully disclosed to the market by no later than September 25, 2017, when Windstream disclosed the Notice of Default.  *See, e.g.*, *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 2007 WL 276150, at *4 (D.N.J. Jan. 25, 2007) (ending class period on February 7, 2001 because "prior to February 6th [purchasers] . . . could no longer reasonably rely on Defendants' positive statements"); *In re Am. Italian Pasta Co. Sec. Litig.*, 2007 WL 927745, at *4 (W.D. Mo. Mar. 26, 2007) (closing class after first disclosure because "investors (and the market) knew on [the date of the first disclosure] that financial information previously disseminated by Defendants was suspect and should not be relied upon").

regarding the risk that the Spinoff violated the sale-leaseback covenant. By that point, the risk—and indeed, the fact—of a violation had been fully disclosed to the market.[19]  (Ex. I (James Rep.) ¶¶ 82–90.)

Accordingly, Plaintiffs cannot invoke the *Basic* presumption of reliance for their Sale-Leaseback Theory for any period before April 24, 2015 (when Uniti was first spun off from Windstream and began trading publicly) or after September 25, 2017 (when the Notice of Default was disclosed).  Even if Plaintiffs could overcome all other hurdles to class certification, any class certified for the Sale-Leaseback Theory would need to be limited to that period.

**(b)      *Even If a Class Could Otherwise Be Certified, Any Class Period Related to the Navigating the Bankruptcy Theory Could Be No Broader Than March 18, 2019 to June 24, 2019***

The proposed class period for Plaintiffs' Navigating the Bankruptcy Theory is also vastly overbroad.   That theory alleges that, beginning on March 18, 2019, Defendants made misstatements regarding the potential impact of Windstream's bankruptcy on Uniti and its ability to navigate Windstream's bankruptcy without raising additional capital.  (Compl. ¶¶ 209, 212–25.)  Plaintiffs allege that the truth was revealed on June 24, 2019, when Uniti announced that it was issuing additional debt in the form of exchangeable notes.  (*Id.* ¶ 228.)

As explained above, Plaintiffs cannot invoke the *Basic* presumption for the period before the alleged misstatement was made or after the alleged truth was revealed.  *Halliburton*, 573 U.S. at 268.  Accordingly, even if Plaintiffs could otherwise overcome the other obstacles to class certification, any class period for Plaintiffs' Navigating the Bankruptcy Theory could never encompass the full four-year period that Plaintiffs seek to certify.  Instead, it could be no broader than the period between March 18, 2019 (the date of the first alleged misrepresentations

---

[19] Nor can Plaintiffs show that Uniti's announcement of its planned notes offering on June 25, 2019—more than four months after the Aurelius decision—revealed any information regarding the risk that the Spinoff violated the indenture.  As Dr. James concluded, Uniti's announcement is wholly unrelated to the risk regarding the Spinoff and "contain[ed] no relevant information pertaining to the Sale-Leaseback Theory."  (Ex. I (James Rep.) ¶ 93.)

regarding the theory), and June 24, 2019 (the date the truth was allegedly revealed).

### C.    A Class Cannot Be Certified for Investors in Uniti Options

Plaintiffs cannot certify *any* class on behalf of buyers of Uniti call options or sellers of Uniti put options for two independent reasons: (1) Plaintiffs lack standing to assert a claim on behalf of Uniti options traders; and (2) Plaintiffs fail to establish that the market for Uniti options is efficient, as necessary to invoke the *Basic* presumption.

### 1.    *Plaintiffs Lack Standing to Pursue Options-Based Claims*

To satisfy Article III of the Constitution, "at least one *named* plaintiff must have standing to pursue each claim alleged." *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 496 (S.D.N.Y. 2004); *accord Donelson v. United States Through Dep't of the Interior*, 730 F. App'x 597, 602 (10th Cir. 2018). Thus, while Plaintiffs "may be deemed adequate class representatives for claims based on securities they did not purchase, one of the named plaintiffs must have purchased those securities" to have standing. *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 175 (S.D.N.Y. 2009); *see also In re Indymac Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 501 (S.D.N.Y. 2010) ("[N]amed plaintiffs have standing only with respect to the offering in which they purchased securities.").

Here, none of the entities seeking to be appointed *named* plaintiffs—i.e., the two Pension Funds and Mr. McMurray—personally purchased or sold Uniti options, much less suffered any injury in connection with Uniti options.[20] Accordingly, they do not have standing to assert claims on behalf of options investors. *See, e.g.*, *id.*; *In re Am. Italian Pasta Co. Sec. Litig.*, 2007

---

[20] Mr. He, who was originally appointed as a Lead Plaintiff (ECF No. 44), traded in options, but he has since decided to participate in the action solely as an absent class member; accordingly, he did not join in the Motion, and will not be a named plaintiff going forward. (*See supra* at 9.) The remaining Lead Plaintiffs did not trade any Uniti options (Mot. at 15 n.5 (Plaintiffs "transacted in Uniti common stock")), which is fatal to their standing to pursue claims on behalf of options traders. *See, e.g.*, *In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, 2011 WL 3211472, at *14 & n.11 (S.D.N.Y. July 29, 2011) (holding that, where class representative purchased only a single series of call options, lead plaintiffs had standing to pursue claims solely on behalf of traders in that particular option series, and rejecting argument that standing could be established based on trading by absent class member).

WL 927745, at *6 (W.D. Mo. Mar. 26, 2007) ("Lead Plaintiff could not have been appointed to represent a class of option traders because it did not trade options.").

Contrary to Plaintiffs' assertion (Mot. at 15 n.5), whether "the price of Uniti put or call options is impacted by movement in the price of Uniti common stock" is irrelevant to Article III standing, and the cases Plaintiffs cite are inapposite. Two of those cases—*In re Sepracor Inc.*, 233 F.R.D. 52 (D. Mass. 2005), and *Deutchsman v. Beneficial Corp.*, 132 F.R.D. 359 (D. Del. 1990)—did not even address the question of Article III standing. The third—*In re Juniper Networks Sec. Litig.*, 264 F.R.D. 584, 594 (N.D. Cal. 2009)—improperly conflated Article III standing with the distinct issue of whether a purchaser of one security could adequately represent purchasers of other securities. *See Withrow v. FCA US LLC*, 2021 WL 2529847, at *7 (E.D. Mich. June 21, 2021) ("[T]he standing inquiry and Rule 23 inquiry are fundamentally different. Standing is rooted in the Constitution. . . . Rule 23, on the other hand, is a procedural device.").

In any event, even if Plaintiffs' failure to trade Uniti options did not alone preclude them from representing a class of options traders, they would still lack standing. Under Eighth Circuit law, options traders cannot pursue Section 10(b) claims in nondisclosure and misrepresentation cases such as this one. *Laventhall v. General Dynamics Corp.*, 704 F.2d 407, 412 (8th Cir. 1983). Although *Laventhall* involved insider trading, courts within this Circuit have held that its rule also applies to Section 10(b) claims like those here. *See, e.g.*, *Lerner v. SciMed Life Sys.*, 1994 WL 374319, at *1–2 (D. Minn. Feb. 9, 1994) ("[T]he *Laventhall* court did not limit its holding to insider trading cases" and therefore "*Laventhall* precludes options trader standing in non-disclosure and misrepresentation cases brought under Section 10(b) and Rule 10b-5."); *In re McDonnell Douglas Corp. Secs. Litig.*, 567 F. Supp. 126, 127 (E.D. Miss. June 6, 1983) ("To allow the maintenance of nondisclosure claims on behalf of [options trading] plaintiffs after *Laventhall* would contradict the court of appeals' clearly expressed intention."). *Laventhall* is

33

thus independently fatal to Plaintiffs' effort to certify a class on behalf of options traders.

### 2.   *Plaintiffs Have Not Established that Uniti Options Traded in an Efficient Market*

Plaintiffs also cannot certify a class on behalf of options traders for the separate reason that they have failed to meet their burden of showing that Uniti options traded in an efficient market during the Class Period, as necessary to invoke the *Basic* presumption.  *See Halliburton*, 573 U.S. at 265–66, 268.   Indeed, Mr. Coffman fails even to consider a number of factors relevant to options market efficiency, and the tests he does perform are flawed and unreliable.

*Failure to Address Factors Relevant to Options Market Efficiency.*  In connection with showing that the market for Uniti's common stock traded in an efficient market (which Defendants do not dispute), Mr. Coffman analyzed 11 distinct factors (Mot. 20–26; Coffman Rep. ¶¶ 20–78), which he described as the factors that are "regularly considered by financial economists and courts in determining whether the market for a particular security is efficient" (Coffman Rep. ¶ 19).[21]  Yet Plaintiffs and Mr. Coffman ignore all but one of those factors when attempting to show that the market for Uniti's options was efficient.[22]  (Mot. at 26–27; Ex. P (Coffman Tr.) 149:20–22 ("I did not do all of the same analyses for the options as for the common stock.").)

In particular, notably absent from Mr. Coffman's analysis of market efficiency for Uniti options is any analysis of trading volume and bid-ask spreads for Uniti options.  Mr. Coffman

---

[21] These include eight factors recognized in two seminal cases on market efficiency, *Cammer v. Bloom*, 711 F. Supp. 1264, 1285–87 (D.N.J. 1989), and *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001)—which are (1) average weekly trading volume; (2) analyst coverage; (3) number of market makers; (4) eligibility to file Form S-3 Registration Statements; (5) the security's price reaction to unexpected news; (6) market capitalization; (7) bid-ask spread; and (8) the security's public float—and three additional factors that Mr. Coffman identified as relevant: (9) institutional ownership; (10) autocorrelation; and (11) the presence of option trading.  (Mot. at 20–21, 25.)

[22] Importantly, as Mr. Coffman concedes, one cannot assume that the market for Uniti options was efficient simply because the market for Uniti common stock was efficient.  (Ex. P (Coffman Tr.) 127:12–128:8 ("I don't think the very fact that [options] are derivative [of the underlying stock] necessarily means it trades efficiently.").)

acknowledges that both factors are "important" in assessing market efficiency (Ex. P (Coffman Tr.) 150:4–7; 156:9–12), and he looked at both factors in opining that the market for Uniti *common stock* was efficient (Coffman Rep. ¶¶ 28, 72). Yet Mr. Coffman made no attempt to analyze either factor in assessing whether the market for Uniti *options* was efficient. That is significant because, as Dr. James explains, many series of Uniti options traded infrequently (James Rpt. ¶¶ 140–41) and many series likewise had large bid-ask spreads (*id.* ¶¶ 142–45). According to Dr. James, these observations suggest the existence of potential impediments to market efficiency. (*Id.* ¶ 139.) Mr. Coffman acknowledges as much. (Ex. P (Coffman Tr.) 72:23–73:5, 74:3–12, 116:19–117:18.) Because *Plaintiffs* bear the burden of establishing market efficiency, *Halliburton*, 573 U.S. at 268, Mr. Coffman's failure even to consider these issues is alone grounds for rejecting the proposed class of Uniti options traders.

**Flawed and Unreliable Analyses.** More importantly, the only two tests that Mr. Coffman does perform to assess market efficiency for Uniti options—a put-call parity test and a cause-and-effect test (Mot. at 26–27; Coffman Rep. ¶¶ 85–93)—are flawed and unreliable. Mr. Coffman concedes that a put-call parity test alone cannot establish market efficiency, as it provides no "direct evidence" of "how quickly and fully a given option series incorporates new public information into its price"—the cornerstone of the efficient market theory. (Ex. P (Coffman Tr.) 164:5–20; *see also* Ex. I (James Rep.) ¶¶ 133–34.) To address that gap, Mr. Coffman performs a so-called "cause-and-effect" test to analyze whether Uniti options move in reaction to Uniti-specific news. (Mot. at 27; Coffman Rep. ¶¶ 89–93.) But that analysis is fatally flawed in several respects.

*First*, as explained in Dr. James' report, Mr. Coffman's analysis improperly relies solely on *theoretical* option prices derived from the Black-Scholes pricing model—rather than actual observed market prices or bid-ask quotes. (Ex. I (James Rep.) ¶¶ 147–50 & Ex. 5.) Mr.

Coffman testified that he *intended* to use actual prices (Ex. P (Coffman Tr.) 183:9–15), and expressly conceded that the exclusive use of model prices would be inappropriate (*id.* at 184:2–21 ("[F]or the purposes of performing the underlying event study, it's important to use an observed market return. Not a theoretical price . . . . I think you have to use the actual market prices.")). Nonetheless, the computer script that Mr. Coffman wrote to calculate Uniti options prices relied (either inadvertently or otherwise) solely on model pricing. (Ex. I (James Rep.) ¶¶ 147–49.) Accordingly, Mr. Coffman's test merely assesses whether the prices of Uniti's options should *in theory* have responded to Uniti-specific news, not whether they actually did. (*Id.*) That is insufficient to demonstrate market efficiency.

*Second*, even if Mr. Coffman corrected that flaw, his cause-and-effect test would still fail to demonstrate market efficiency for Uniti options. As Mr. Coffman acknowledges, 611 call option series and 611 put option series were listed on national exchanges during the Class Period, of which 372 call option series and 378 put option series had non-zero trading volumes. Yet rather than analyze each of those 750 option series separately, Mr. Coffman instead analyzed the aggregated results of his cause-and-effect test across *all* the call series and *all* the put series—effectively treating all series of call options and all series of put options each as a single security. (Coffman Rep. ¶¶ 92–93 & Exs. 16 & 17; Ex. I (James Rep.) ¶ 154.) That is not the case.

As Mr. Coffman concedes, each "series" of call or put options has a distinct set of characteristics—with distinct strike prices and expiration dates—and is listed and treated as its own security on national exchanges, with distinct prices, bid-ask spreads, and trading activity. (Ex. P (Coffman Tr.) 141:7–144:18; *see also* Ex. I (James Rep.) ¶¶ 126–29.) And critically, Mr. Coffman further concedes that some options series could trade in an efficient market while others might not. (Ex. P (Coffman Tr.) 146:9–14; *see also* Ex. I (James Rep.) ¶ 130.) Accordingly, it is important to analyze the efficiency of the options market *at the series level*.

36

Indeed, as Dr. James explains, analyzing the results of Mr. Coffman's cause-and-effect test at the aggregate level tells one nothing about whether each individual *series* responded to Uniti-specific news, or otherwise traded in an efficient market.  (Ex. I (James Rep.) ¶¶ 130, 154–55.)  Nor is this a theoretical concern.  When analyzed on a series-by-series level—as Dr. James shows—*the vast majority* of Uniti options series either did not trade or did not exhibit any statistically significant price reaction in response to Uniti-specific news; indeed, 78% of the call option series and 74% of the put options series had no statistically significant price movement on *any* earnings date that Mr. Coffman analyzed (Ex. I (James Rep.) ¶ 155 & Ex. 6)—which is inconsistent with any finding that these series of options traded in an efficient market (*id.* ¶ 140).

In short, Mr. Coffman's failure to individually analyze each put option series and call option series undermines his conclusions and precludes any finding of options market efficiency.

## II.   PLAINTIFFS ARE NOT ADEQUATE CLASS REPRESENTATIVES

In addition to failing to satisfy the predominance requirements of Rule 23(b)(3), Plaintiffs have also failed to bear their burden under Rule 23(a) of demonstrating that they "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4); *Rattray v. Woodbury Cnty., IA*, 614 F.3d 831, 835 (8th Cir. 2010).  As set forth below, discovery has shown that *counsel* is controlling this litigation, while the proposed class representatives—Local 449, Wayne County, and Mr. McMurray—are mere "figureheads" who have simply lent their names to the suit, with no meaningful role in or oversight over the action.

### A.   The Court Must Undertake a Searching Inquiry Into Adequacy to Effect the PSLRA's Intent to Avoid Lawyer-Driven Actions

In a securities litigation, "the adequacy inquiry must be particularly searching . . . because the PSLRA was intended to empower investors so that they, not their lawyers, control securities litigation."  *Shiring* v. *Tier Techs., Inc.*, 244 F.R.D. 307, 315 (E.D. Va. 2007); *see also Berger v. Compaq Computer Corp.*, 257 F.3d 475, 481 (5th Cir. 2001) (explaining that courts must not

apply "an impermissibly lax standard for adequacy that ignores the PSLRA's mandate that class representatives, and not lawyers, must direct and control the litigation").

A class representative may not merely "lend[] his name to a suit controlled entirely by the class attorney," *Curtis-Bauer v. Morgan Stanley & Co.*, 2008 WL 7748874, at *2 (N.D. Cal. July 7, 2008) (citation omitted), with the intent to simply "defer to counsel, relying on information from and communications with counsel to monitor and manage the litigation," *Shiring*, 244 F.R.D. at 316. Instead, a class representative must show a "willingness and ability actively to pursue and to take control of the litigation." *Sondel v. Nw. Airlines, Inc.*, 1993 WL 559031, at *9 (D. Minn. Sept. 30, 1993). A class representative must also "possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation," *Berger*, 257 F.3d at 482–83, which "should not be limited to derivative knowledge acquired solely from counsel," *id.* at 483 n.18. In short, a class representative must "be genuinely involved in the litigation, not just a figurehead." *Curtis-Bauer*, 2008 WL 7748874, at *2.

### B.    Plaintiffs Are Not Adequate Class Representatives Because They Do Not Exercise Any Meaningful Control Over the Litigation

Here, the evidence demonstrates that the two Pension Funds and Mr. McMurray are simply figureheads who have played no meaningful role in the litigation and have taken no steps to exercise control or adequate oversight over the prosecution thereof.

As an initial matter, contrary to the representation of the Pension Funds and Mr. McMurray in support of their earlier-filed lead plaintiff application—that, "[u]pon learning of the pending action against Defendants," each of them "independently consulted with [Labaton] to discuss the merits of the case" (ECF No. 30-4 ¶ 6)—discovery has made clear that the decision to bring this litigation was generated entirely by counsel. ████████████████

████████████████████████████████████████

38

██████████████████████████████████████████ ▪ ████████████████

███████████████████████████████████████

More importantly, since the Complaint was filed, the Pension Funds and Mr. McMurray have failed to take any steps to supervise or provide any meaningful oversight over counsel. When they originally sought to be appointed lead plaintiffs, the Pension Funds and Mr. McMurray jointly represented that they intended to "litigate this Action independently of counsel" (ECF No. 29 at 12) and that their "collective experience, resources, and ability to engage in joint decision-making [would] materially benefit and advance the interests of the Class in this case" (ECF No. 30-4 ¶ 8). They purported to acknowledge that the PSLRA required them to "effectively oversee lead counsel in an independent manner." (*Id.* ¶ 9.) And to that end, they represented to this Court that they were "prepared to actively oversee this matter" (*id.* ¶ 10); were "available to confer via telephone and/or email, with or without counsel, to ensure that [they were] able to make timely decisions" (*id.*); and were "firmly committed in good faith to reach consensus with respect to all litigation decisions," but were prepared to make decisions by "majority vote" if "a disagreement does arise during the course of the litigation which [they were] unable to resolve through thoughtful and extensive deliberation" (*id.* ¶¶ 12–13).

Discovery has revealed that the proposed class representatives have done none of these things. ████████████████████████████████████████████████████

---

[23] As courts have noted, such agreements—in which law firms monitor investors' portfolios to identify potential securities claims for free—tend to "foster[] the very tendencies toward lawyer-driven litigation that the PSLRA was designed to curtail." *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461, 464 (S.D.N.Y. 2009). That is because they "create[] a clear incentive for [the law firm] to discover 'fraud' in the investments it monitors and to recommend [that the investor], at no cost to itself, bring a class action lawsuit." *Id.* That is exactly the case here: █████████████████████████████

████████████████████████████████████████████



Indeed, it recently became apparent that Local 449 does not even perform the basic task of carefully reviewing key filings.  For example, just three days ago, Local 449 filed a notice of errata admitting that the certification filed in support of its earlier lead plaintiff application erroneously contained Uniti stock transactions that Local 449 did not actually make (ECF No. 103)—overstating its claimed losses by approximately $100,000—

---

[24] Indeed, far from litigating independently of counsel, Mr. McMurray lacks even a basic understanding of Plaintiffs' own allegations, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—an assertion that is not only nonsensical but also bears no resemblance to any theory of liability advanced in this case.

[25] That is evidenced by the fact that Local 449, similar to Mr. McMurray, lacks a basic understanding of key aspects of Plaintiffs' own allegations. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████

Tellingly, despite going to great lengths (as described above) to convince this Court that they would act as a cohesive group that would "actively" oversee the action and collectively make decisions about litigation strategy, ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████ In fact, contrary to their prior representations to the Court, the proposed class representatives appear to no longer believe they even have any obligation to try to collectively manage the case: ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ ████████████████

Given their complete lack of engagement and failure to take any steps to coordinate, it is unsurprising that the Pension Funds and Mr. McMurray have exercised no control over counsel. Indeed, they have deferred to counsel on one of the most critical decisions they can make—who to select as lead counsel. The Motion seeks to appoint two law firms as co-lead counsel—Labaton and Robbins Geller—but the only reason Robbins Geller is in this case is because it represented Mr. Zhengxu He before he declined to seek appointment as a class representative.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[26] Plaintiffs' demonstrated lack of interest in working as a group to oversee the matter is significant, as courts have expressed concern about the ability of a group of plaintiffs to effectively supervise counsel in securities actions. *See, e.g.*, *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157–58 (S.D.N.Y. 1997) (explaining that, "[t]o allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing a lead plaintiff" and run contrary to the "legislative purposes of the PSLRA" to "prevent lawyer-driven litigation"); *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 309 (S.D.N.Y. 2001) ("[T]here is nothing to suggest that [a group of investors] will collectively ride herd on counsel anywhere as well as could a single sophisticated entity.").

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████    ████████████████████████████████    ██

██████████████████████████████████████████████

██████████████████████████████████████████████

██████    In short, despite purporting to "recognize[] the importance" of prosecuting the litigation "in a cost-effective manner" (ECF No. 30-4 ¶ 11), the Pension Funds and Mr. McMurray seek to appoint as lead counsel an extra law firm with which they have no relationship in connection with this case, which will serve only to drive up costs to the detriment of the class.

In short, the proposed class representatives' "blind reliance" on counsel and failure to exercise any oversight or control over the litigation represents exactly the type of lawyer-driven litigation that the PSLRA was intended to prevent. *See Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987) (class is "entitled to 'more than blind reliance upon even competent counsel by uninterested and inexperienced representatives'" (citation omitted)). This Court should make clear that such a situation—which is directly contrary to the Plaintiffs' prior certifications—is not proper, and should deny class certification on that basis.

## CONCLUSION

For the reasons set forth in Points I.A and II, the Court should deny Plaintiffs' motion for class certification in its entirety. In the alternative, even if the Court were to certify a class, for the reasons set forth in Point I.B, no class can be certified for Plaintiffs' True Lease Theory; any Class Period for Plaintiffs' Sale-Leaseback and Navigating the Bankruptcy Theories must be narrowed substantially; and for the reasons set forth in Point I.C, no class can be certified on behalf of investors in Uniti options.

42

Dated: December 23, 2021


OF COUNSEL:

Edmund Polubinski III*
Brian M. Burnovski*
Daniel S. Magy*
Nikolaus J. Williams*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
edmund.polubinski@davispolk.com
brian.burnovski@davispolk.com
daniel.magy@davispolk.com
nikolaus.williams@davispolk.com

*admitted pro hac vice

Jess Askew III, Ark. Bar No. 86005
Andrew King, Ark. Bar No. 2007176
Frederick H. Davis, Ark. Bar No. 2012271
KUTAK ROCK LLP
124 West Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201-3706
Telephone: (501) 975-3000
jess.askew@kutakrock.com
andrew.king@kutakrock.com
frederick.davis@kutakrock.com


*Counsel for Defendants Uniti Group Inc.,
Kenneth A. Gunderman, and Mark A. Wallace*

43

**INDEX OF EXHIBITS**

Ex. A.  Uniti Group Inc. 2018 Form 10-K (Mar. 18, 2019)

Ex. B.  Matthew Niknam, *Seeing 3D: Defensive, Diversifying, and Discounted; Initiate at Buy*, Deutsche Bank Markets Research (May 21, 2017)

Ex. C.  Jonathan Atkin et al., *Uniti Group, Inc.: Initiating at Outperform; Favorable Growth, Diversification, and Dividend*, RBC Capital Markets (June 19, 2017)

Ex. D.  Rubicon Associates, *Uniti Group – The Facts Behind the Action*, Seeking Alpha (Oct. 3, 2017)

Ex. E.  Anthony P. Canale, *Windstream: Initial Impressions on the Notice of Default under the 6.375% Senior Notes due 2023*, Covenant Review (Sept. 27, 2017)

Ex. F.  Greg P. Miller et al., *WIN Debt Exchange, Consent Solicitation Seek to Cut Off Bondholder*, SunTrust Robinson Humphrey (Oct. 19, 2017)

Ex. G.  Greg P. Miller et al., *Court Hearing Modestly Positive*, SunTrust Robinson Humphrey (Nov. 8, 2017)

Ex. H.  Gregory Williams et al., *Downgrade: WIN Court Ruling Could Mean Rental Payment Cuts, Levels Uncertain*, Cowen (Feb. 19, 2019)

Ex. I.  Expert Report of Christopher M. James, Ph.D. (Dec. 23, 2021)

Ex. J.  Philip Cusick et al., *Uniti Group Inc.: Model Update*, J.P. Morgan (Nov. 3, 2017)

Ex. K.  Anthony P. Canale, *Windstream: Initial Reactions to the Court's Ruling*, Covenant Review (Feb. 19, 2019)

Ex. L.  Uniti Presentation at Wells Fargo Securities 2017 Media & Telecom Conference (Nov. 7-8, 2017)

Ex. M. Uniti Group Inc. Q1 2019 Form 10-Q (May 9, 2019)

Ex. N.  Uniti Group Inc. Form 8-K (May 15, 2020)

Ex. O.  Letter from N. Williams to C. Fox (Oct. 26, 2021)

Ex. P.  Deposition Transcript of Chad Coffman (Dec. 6, 2021)

Ex. Q.  Findings of Facts and Conclusions of Law, *U.S. Bank Nat'l Ass'n v. Windstream Services, LLC*, No. 17-cv-7857 (JFM) (S.D.N.Y. Feb. 15, 2019)

Ex. R.  Uniti Group Inc. Form 8-K (June 24, 2019)

Ex. S.  Excerpted Deposition Transcript of Gerard Grysko (Dec. 10, 2021)

Ex. T.  Excerpted Deposition Transcript of Joseph Little (Dec. 8, 2021)

Ex. U.  Excerpted Deposition Transcript of David McMurray (Dec. 7, 2021)