# EXHIBIT A

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2018

OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the transition period from _____ to _____**

Commission File Number 001-36708

# Uniti Group Inc.
**(Exact name of Registrant as specified in its Charter)**

| | |
|---|---|
| **Maryland** | **46-5230630** |
| **( State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **10802 Executive Center Drive** | |
| **Benton Building Suite 300** | |
| **Little Rock, Arkansas** | **72211** |
| **(Address of principal executive offices)** | **(Zip Code)** |

Registrant's telephone number, including area code: **(501) 850-0820**

Securities registered pursuant to Section 12(b) of the Act:

| | Name of each exchange |
|---|---|
| Title of each class | on which registered |
| Common Stock, $0.0001 Par Value | The NASDAQ Global Select Market |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   YES ☒   NO ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.   YES ☐   NO ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   YES ☒   NO ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files).   YES ☒   NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act).   YES ☐   NO ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the Registrant, based on the closing price of the shares of common stock on The NASDAQ Global Select Market on June 30, 2018, was $2,842,783,509

The number of shares of the Registrant's common stock outstanding as of March 6, 2019 was 183,103,947.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's definitive proxy statement relating to the 2019 annual meeting of stockholders are incorporated by reference into Part III of this Annual Report on Form 10-K.

Table of Contents

**Table of Contents**

|  |  | **Page** |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 5 |
| Item 1A. | Risk Factors | 13 |
| Item 1B. | Unresolved Staff Comments | 22 |
| Item 2. | Properties | 22 |
| Item 3. | Legal Proceedings | 25 |
| Item 4. | Mine Safety Disclosures | 26 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 27 |
| Item 6. | Selected Financial Data | 29 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 30 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 53 |
| Item 8. | Financial Statements and Supplementary Data | 55 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 106 |
| Item 9A. | Controls and Procedures | 106 |
| Item 9B. | Other Information | 107 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 108 |
| Item 11. | Executive Compensation | 108 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 108 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 109 |
| Item 14. | Principal Accounting Fees and Services | 109 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 110 |
| Item 16. | Form 10-K Summary | 116 |

ii

Table of Contents

**CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K includes forward-looking statements as defined under U.S. federal securities law. Forward-looking statements include all statements that are not historical statements of fact and those regarding our intent, belief or expectations, including, but not limited to, statements regarding: our expectations regarding the effect of Windstream Holdings, Inc.'s ("Windstream Holdings" and together with its subsidiaries, "Windstream") bankruptcy and Windstream's performance under its long-term exclusive triple-net lease with us (the "Master Lease"); our expectations with respect to the treatment of the Master Lease in Windstream's petition for relief under Chapter 11 of the Bankruptcy Code; our expectations regarding the effect of substantial doubt about our ability to continue as a going concern; our expectations regarding the future growth and demand of the telecommunication industry, future financing plans, business strategies, growth prospects, operating and financial performance, and our future liquidity needs and access to capital; expectations regarding the impact and integration of Information Transport Solutions, Inc. ("ITS"), CableSouth Media, LLC ("CableSouth") and $M^2$ Connections, including expectations regarding operational synergies with Uniti Towers and Uniti Fiber; expectations regarding settling conversion of our 3% convertible preferred stock in cash upon conversion; expectations regarding the probability of our obligation to pay contingent consideration upon Tower Cloud, Inc.'s ("Tower Cloud") or Hunt's achievement of certain defined operational and financial milestones; expectations regarding future deployment of fiber strand miles and recognition of revenue related thereto; expectations regarding levels of capital expenditures; expectations regarding the deductibility of goodwill for tax purposes; expectations regarding reclassification of accumulated other comprehensive income (loss) related to derivatives to interest expense; expectations regarding the amortization of intangible assets; expectations regarding the closing of the OpCo-PropCo partnership with Macquarie Infrastructure Partners ("MIP") and related acquisition of Bluebird Network, LLC ("Bluebird"); expectations regarding the closing of the sale of Uniti Towers' business in Latin America (the "Towers Disposition"); and expectations regarding the payment of dividends.

Words such as "anticipate(s)," "expect(s)," "intend(s)," "plan(s)," "believe(s)," "may," "will," "would," "could," "should," "seek(s)" and similar expressions, or the negative of these terms, are intended to identify such forward-looking statements. These statements are based on management's current expectations and beliefs and are subject to a number of risks and uncertainties that could lead to actual results differing materially from those projected, forecasted or expected. Although we believe that the assumptions underlying the forward-looking statements are reasonable, we can give no assurance that our expectations will be attained. Factors which could have a material adverse effect on our operations and future prospects or which could cause actual results to differ materially from our expectations include, but are not limited to:

- the future prospects of our largest customer, Windstream Holdings, which, following a finding that it is in default of certain of its debt, on February 25, 2019, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code;

- our ability to continue as a going concern if Windstream Holdings were to reject the Master Lease or be unable or unwilling to perform its obligations under the Master Lease;

- the ability and willingness of our customers to meet and/or perform their obligations under any contractual arrangements entered into with us, including master lease arrangements;

- the ability of our customers to comply with laws, rules and regulations in the operation of the assets we lease to them;

- the ability and willingness of our customers to renew their leases with us upon their expiration, and the ability to reposition our properties on the same or better terms in the event of nonrenewal or in the event we replace an existing tenant;

- our ability to renew, extend or retain our contracts or to obtain new contracts with significant customers (including customers of the businesses that we acquire);

- the availability of and our ability to identify suitable acquisition opportunities and our ability to acquire and lease the respective properties on favorable terms or operate and integrate the acquired businesses;

- our ability to generate sufficient cash flows to service our outstanding indebtedness;

3

Table of Contents

- our ability to access debt and equity capital markets;

- the impact on our business or the business of our customers as a result of credit rating downgrades, and fluctuating interest rates;

- adverse impacts of litigation or disputes involving us or our customers;

- our ability to retain our key management personnel;

- our ability to maintain our status as a real estate investment trust ("REIT"), including as a result of the effects of the recent events with respect to our largest customer, Windstream Holdings;

- changes in the U.S. tax law and other federal, state or local laws, whether or not specific to REITs, including the impact of the recently enacted U.S. tax reform legislation;

- covenants in our debt agreements that may limit our operational flexibility;

- the possibility that we may experience equipment failures, natural disasters, cyber attacks or terrorist attacks for which our insurance may not provide adequate coverage;

- the risk that we fail to fully realize the potential benefits of or have difficulty in integrating the companies we acquire;

- other risks inherent in the communications industry and in the ownership of communications distribution systems, including potential liability relating to environmental matters and illiquidity of real estate investments;

- the risk that the agreements regarding the Bluebird acquisition may be modified or terminated prior to expiration or that the conditions to the Bluebird acquisition may not be satisfied;

- the risk that the agreements regarding the Towers Disposition may be modified or terminated or that the conditions to the Towers Disposition may not be satisfied; and

- additional factors discussed in Part I, Item 1A "Risk Factors" and Part II, Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations" of this Annual Report on Form 10-K, as well as those described from time to time in our future reports filed with the U.S. Securities and Exchange Commission (the "SEC").

Forward-looking statements speak only as of the date of this Annual Report. Except in the normal course of our public disclosure obligations, we expressly disclaim any obligation to release publicly any updates or revisions to any forward-looking statements to reflect any change in our expectations or any change in events, conditions or circumstances on which any such statement is based.

4

Table of Contents

**PART I**

**Item 1. Business.**

**The Company**

Uniti Group Inc. (the "Company", "Uniti", "we", "us" or "our") was incorporated in the state of Maryland on September 4, 2014. Uniti is an independent, internally managed real estate investment trust ("REIT") engaged in the acquisition and construction of mission critical infrastructure in the communications industry. We are principally focused on acquiring and constructing fiber optic broadband networks, wireless communications towers, copper and coaxial broadband networks and data centers.

On April 24, 2015, we were separated and spun-off (the "Spin-Off") from Windstream Holdings, Inc. ("Windstream Holdings" and together with its subsidiaries, "Windstream") pursuant to which Windstream contributed certain telecommunications network assets, including fiber and copper networks and other real estate (the "Distribution Systems") and a small consumer competitive local exchange carrier ("CLEC") business (the "Consumer CLEC Business") to Uniti and Uniti issued common stock and indebtedness and paid cash obtained from borrowings under Uniti's senior credit facilities to Windstream. In connection with the Spin-Off, we entered into a long-term exclusive triple-net lease (the "Master Lease") with Windstream, pursuant to which a substantial portion of our real property is leased to Windstream and from which a substantial portion of our leasing revenues are currently derived.

Uniti operates as a REIT for U.S. federal income tax purposes. As a REIT, the Company is generally not subject to U.S. federal income taxes on income generated by its REIT operations, which includes income derived from the Master Lease. We have elected to treat the subsidiaries through which we operate our fiber business, Uniti Fiber, and Talk America Services, LLC, which operates the Consumer CLEC Business ("Talk America"), as taxable REIT subsidiaries ("TRSs"). TRSs enable us to engage in activities that result in income that does not constitute qualifying income for a REIT. Our TRSs are subject to U.S. federal, state and local corporate income taxes.

The Company operates through a customary up-REIT structure, pursuant to which we hold substantially all of our assets through a partnership, Uniti Group LP, a Delaware limited partnership (the "Operating Partnership"), that we control as general partner. This structure is intended to facilitate future acquisition opportunities by providing the Company with the ability to use common units of the Operating Partnership as a tax-efficient acquisition currency. As of December 31, 2018, we are the sole general partner of the Operating Partnership and own approximately 97.7% of the partnership interests in the Operating Partnership.

For the year ended December 31, 2018, we had revenues of $1,017.6 million, net income attributable to common shareholders of $8.0 million, Funds From Operations ("FFO") of $373.7 million and Adjusted Funds From Operations ("AFFO") of $443.8 million. Both FFO and AFFO are non-GAAP financial measures, which we use to analyze our results. Refer to Part II, Item 7 *Management's Discussion and Analysis of Financial Condition and Results of Operations,* of this Annual Report for additional information regarding these non-GAAP measures. As of December 31, 2018, we managed our operations in four reportable business segments, which are described in more detail in Note 14 to our consolidated financial statements contained in Part II, Item 8 *Financial Statements and Supplementary Data*.

**Business**

We are an independent, internally-managed REIT engaged in the acquisition and construction of mission critical infrastructure in the communications industry. We manage our operations in four separate lines of business: *Uniti Fiber*, *Uniti Towers*, *Uniti Leasing* and *Talk America*.

Refer to Part II, Item 7 *Management's Discussion and Analysis of Financial Condition and Results of Operations—Overview—Significant Business Developments,* of this Annual Report for additional information regarding significant developments in our business in 2018.

5

Table of Contents
*Uniti Fiber*

Uniti Fiber is a leading provider of infrastructure solutions, including cell site backhaul and small cell for wireless operators and ethernet, wavelengths and dark fiber for telecommunications carriers and enterprises. With Uniti Fiber, our goal is to capitalize on the rising demand by carriers and enterprises for dark fiber, establish ourselves as a proven small-cell systems provider and leverage wholesale enterprise opportunities as well as opportunities through the School and Libraries Program (commonly referred to as E-Rate) administered by the Universal Service Administrative Company. We believe fiber is the mission-critical focal point in the modern communications infrastructure industry and that Uniti Fiber will accelerate our growth and diversification strategy and expand our relationships with high quality national and international wireless carriers.

At December 31, 2018, Uniti Fiber's revenues under contract were over $1.3 billion, with a network consisting of 1.7 million strand miles of fiber and approximately 18,200 customer connections. Results for Uniti Fiber are reported in our consolidated financial statements in our Fiber Infrastructure business segment.

*Uniti Towers*

Uniti Towers' primary business is constructing and leasing space on communications towers to wireless service providers and other tenants in a number of other industries. Uniti Towers' leadership has substantial experience in the telecommunications industry and has been overseeing construction and operation of thousands of wireless towers both domestically and abroad for decades. Uniti Towers provides build-to-suit opportunities using customized master lease agreements designed for long-term carrier partnerships. We believe that our strategy of focusing on fiber and towers through Uniti Fiber and Uniti Towers is highly synergistic and will drive incremental growth opportunities.

At December 31, 2018, Uniti Towers' portfolio consisted of 430 wireless communications towers located in 26 states across the eastern and central regions in the United States, and 498 wireless communications towers in Latin America. Results for Uniti Towers are reported in our consolidated financial statements in our Towers business segment.

On February 19, 2019, the Company announced it had agreed to sell Uniti Towers' Latin America business to an entity controlled by Phoenix Towers International ("PTI") for cash consideration of approximately $100 million. PTI will acquire approximately 500 towers located across Mexico, Colombia and Nicaragua. The transaction is subject to customary closing conditions and is expected to close by the end of the first quarter of 2019.

*Uniti Leasing*

Uniti Leasing is engaged in acquiring mission-critical communications assets, such as fiber, data centers, next-generation consumer broadband, coaxial and upgradeable copper, and leasing them back to anchor customers on either an exclusive or shared-tenant basis. Presently, a substantial portion of Uniti Leasing's revenue is rental revenues from leasing the Distribution Systems to Windstream pursuant to the Master Lease. We believe our attractive cost of capital and advantaged REIT structure will enable Uniti Leasing to provide creative and tax-efficient solutions to additional customers, including (i) sale leaseback transactions, whereby Uniti Leasing acquires existing infrastructure assets from communications service providers and leases them back on a long-term basis; (ii) capital investment financing, whereby Uniti Leasing offers communications service providers a cost-efficient method of raising funds for discrete capital investments to upgrade or expand their network; and (iii) mergers and acquisitions financing, whereby Uniti Leasing facilitates mergers and acquisition transactions as a capital partner. Results for Uniti Leasing are reported in our consolidated financial statements in our Leasing business segment.

*Talk America*

We conduct the Consumer CLEC Business through Talk America Services, LLC. Talk America provides local telephone, high-speed Internet and long-distance service to approximately 22,500 customers principally located in 17 states across the eastern and central United States. Substantially all of the network assets used to provide these services to customers are contracted through interconnection agreements with other telecommunications carriers.

6

Table of Contents
Results for Talk America are reported in our consolidated financial statements in our Consumer CLEC business segment.

**Industry**

The current communications infrastructure industry is marked by the growing demand for and use of bandwidth-intensive devices and applications, such as smart devices, real-time and online streaming video, cloud-based applications, social media and mobile broadband. This growth in consumption requires the support of robust communications infrastructure, of which fiber networks and communications towers are critical components. Substantial investments have been made in recent years in fiber networks, lit services and colocation facilities to keep pace with the increased bandwidth use of both enterprise- and consumer-end users. As companies attempt to keep pace with this rapidly evolving business sector, communications infrastructure continues to increase in priority and economic importance. We believe this considerable demand creates tremendous opportunities for us as an acquirer and operator and as a funding source for operators seeking to capitalize on these trends through build outs and acquisitions of infrastructure assets.

The wireless communications industry is a prime example of the growing importance of the bandwidth infrastructure industry. As wireless traffic and mobile data consumption continue to grow worldwide, participants in the wireless communications industry are increasing their network capacity through the development of new wireless cell sites and the addition of bandwidth capacity.  Consumers are demanding network quality and coverage, and as a result wireless carriers are making significant capital investments to improve quality, expand their coverage and remain relevant in a highly competitive industry. We expect this continued growth in capital expenditures to generate high demands for wireless towers (including strong growth in long-term tower leasing), tower space and bandwidth infrastructure services.

**Strategy**

Our primary goal is to create long-term stockholder value by (i) generating reliable and growing cash flows, (ii) diversifying our tenant and asset base, (iii) paying a dividend, and (iv) maintaining our financial strength and liquidity. To achieve this goal, we employ a business strategy that leverages our first mover advantages in the sector and our strong access to the capital markets. The key components of our business strategy are:

*Acquire Additional Infrastructure Assets Through Sale Leaseback Transactions*

We actively seek to acquire communications infrastructure assets from communication service providers and lease these assets back to the communication service providers on a long-term basis. We believe this type of transaction benefits the communication service providers with incremental liquidity which can be used to reduce indebtedness or for other investments, while they continue to focus on their existing business. We will employ a disciplined, opportunistic acquisition strategy and seek to price transactions appropriately based on, among other things, growth opportunities, the mix of assets acquired, length and terms of the lease, and credit worthiness of the tenant.

This strategy will also expand our mix of tenants and other real property and will reduce our revenue concentration with Windstream. We expect that this objective will be achieved over time as part of our overall strategy to acquire new distribution systems and other real property within the communications infrastructure industry to further diversify our overall portfolio.

*Capitalize on the Market Demand for Increased Bandwidth Infrastructure and Performance*

Bandwidth intensive devices and applications are rapidly fueling worldwide consumption of bandwidth, which in turn fuels a continuously growing demand for stable and secure bandwidth options.  Communications service providers and other enterprises whose services and businesses require substantial amounts of bandwidth are increasingly looking to infrastructure providers to support their bandwidth needs and to expand the reach, performance and security of their networks.  We believe Uniti Fiber is well positioned to capitalize on this ongoing demand for bandwidth infrastructure solutions.

7

Table of Contents

*Fund Capital Extensions to Existing and New Tenants for Improvements of Infrastructure Assets*

We believe the communications infrastructure industry in the United States is currently going through an upgrade cycle driven by consumers' general desire for greater bandwidth and wireless services. These upgrades require significant capital expenditures, and we believe Uniti provides an attractive, non-competitive funding source for communication service providers to help accelerate the improvement and expansion of their networks at an attractive cost of capital.

We intend to support our tenant operators and other communication service providers by providing capital to them for a variety of purposes, including capacity augmentation projects, tower construction and network expansions. We expect to structure these investments as lease arrangements that produce additional rents.

*Facilitate M&A Transactions in the Communication Service Sector as a Capital Partner*

We believe Uniti can provide cost efficient funds to potential acquirers in the communication service sector, and thereby facilitate M&A transactions as a capital partner, including by partnering with operators through use of "OpCo-PropCo" structures, pursuant to we acquire the underlying network and other assets and the operator acquires the operations. The highly fragmented nature of the communication service sector is expected to result in more consolidation, which we believe will provide us ample opportunity to pursue these types of transactions.

*Maintain Balance Sheet Strength and Liquidity*

We seek to maintain a capital structure that provides the resources and financial flexibility to position us to capitalize on strategic growth opportunities. Our access to, and cost of, external capital is dependent on various factors, including general market conditions, credit ratings on our securities, interest rates and expectations of our future business performance. We intend to maintain a strong balance sheet through disciplined use of leverage, aiming to lower our relative cost of capital over time, and continuing to have access to multiple sources of capital and liquidity. As of December 31, 2018, we had $38.0 million of unrestricted cash and cash equivalents, and $110 million of undrawn borrowing capacity under our revolving credit facility, although we have since drawn substantially all of our revolver capacity. As of December 31, 2018, with the exception of our revolving credit facility, all of our debt is either fixed-rate debt, or floating-rate debt that we have fixed through the use of interest rate swaps.

## Competition

We compete for investments in the communications industry with telecommunications companies, investment companies, private equity funds, hedge fund investors, sovereign funds and other REITs who focus primarily on specific segments of the communications infrastructure industry. The communications infrastructure industry is characterized by a high degree of competition among a large number of participants, including many local, regional and global corporations.  Some of our competitors are significantly larger and have greater financial resources and lower costs of capital than we have. In addition, revenues from our network properties are dependent, to an extent, on the ability of our operating partners, like Windstream, to compete with other communication service providers.

However, we believe we are positioned to identify and successfully capitalize on acquisition opportunities that meet our investment objectives and that we have significant competitive advantages that support our leadership position in owning, funding the construction of and leasing communications infrastructure, including:

*First-Mover Advantage; Uniquely Positioned to Capitalize on Expansion Opportunities*

We are the first and only REIT primarily focused on the acquisition and construction of mission critical infrastructure in the communications industry. We believe this provides us with a significant first-mover competitive advantage to capitalize on the large and fragmented communications infrastructure industry. Additionally, we believe our position, scale and national reach will help us achieve operational efficiencies and support future growth opportunities.

Table of Contents

***Large Scale Anchor Tenant***

We believe the assets we lease to Windstream under the Master Lease are critical for Windstream to successfully run its business and operations, and that Windstream will need the assets subject to the Master Lease while it undergoes its restructuring as set forth under "Risk Factors". Windstream, as our anchor tenant, provides us with a base of rent revenues as an initial platform for us to grow and diversify our portfolio and tenant base.

Windstream is a publicly-traded company that provides advanced network communications and technology solutions for businesses across the United States. Windstream also offers broadband, entertainment and security solutions to consumers and small businesses primarily in rural areas. Windstream continues to operate the Distribution Systems, hold the associated regulatory licenses and own and operate other assets, including distribution systems in select states not included in the Spin-Off.

Windstream has a diverse customer base, encompassing enterprise and small business customers, carriers and consumers. The Distribution Systems we lease to Windstream are located in 29 different states across the continental United States. The fiber assets in any one state do not account for more than 20% of the total route miles in our network. We believe this geographic diversification will limit the effect of changes in any one market on our overall performance.

Windstream is subject to the reporting requirements of the SEC, which include the requirements to file annual reports containing audited financial information and quarterly reports containing unaudited financial information. Windstream's filings with the SEC can be found at www.sec.gov. Windstream's filings are not incorporated by reference into this Annual Report.

***Strong Relationships with Communication Service Providers***

Members of our management team have developed an extensive network of relationships with qualified local, regional and national communication service providers across the United States. This extensive network has been built by our management team through decades of operating experience, involvement in industry trade organizations and the development of banking relationships and investor relations within the communications infrastructure industry. We believe these strong relationships will allow us to effectively source investment opportunities from communication service providers other than Windstream. We intend to work collaboratively with our operating partners in providing expansion capital at attractive rates to help them achieve their growth and business objectives. We will seek to partner with communication service providers who possess local market knowledge, demonstrate hands-on management and have proven track records.

***Experienced and Committed Management Team***

Our senior management team is comprised of veteran leaders with strong backgrounds in their respective disciplines. Our senior management team has extensive experience managing telecommunications operations, consummating mergers and acquisitions and accessing both debt and equity capital markets to fund growth and maintain a flexible capital structure.

**Insurance**

We maintain, or will require in our leases (including the Master Lease), that our tenants maintain, all applicable lines of insurance on our properties and their operations. Under the Master Lease, Windstream has the right to self-insure or use a captive provider with respect to its insurance obligations. We believe that the amount and scope of insurance coverage provided by our policies and the policies maintained by our tenants are customary for similarly situated companies in the telecommunications industry. However, our tenants may elect not to, or be able to, maintain the required insurance coverages, and the failure by any of them to do so could have a material adverse effect on us. We may not continue to require the same levels of insurance coverage under our leases, including the Master Lease, and such insurance may not be available at a reasonable cost in the future or fully cover all losses on our properties upon the occurrence of a catastrophic event.  Moreover, we cannot guarantee the future financial viability of the insurers.

Table of Contents

**Employees**

At December 31, 2018, we had 798 full-time employees. Except for 18 employees in Mexico, none of our employees are subject to a collective bargaining agreement.

**Significant Customers**

For the years ended December 31, 2018, 2017 and 2016, 68.2%, 74.8% and 87.9% of our revenues, respectively, were derived from leasing our Distribution Systems to Windstream Holdings pursuant to the Master Lease.

On February 25, 2019, Windstream filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York. For a discussion of the impact that Windstream's bankruptcy may have on the Master Lease, see Part I, Item 1A "Risk Factors" in this Annual Report on Form 10-K.

**Government Regulation, Licensing and Enforcement**

*U.S. Telecommunications Regulatory Overview*

*Market Overview*

Our subsidiaries and our tenants operate in a regulated market. As operators of telecommunications facilities and services, both we and the current and future tenants of our telecommunications assets are typically subject to extensive and complex federal, state and local telecommunications laws and regulations. The Federal Communications Commission ("FCC") regulates the provision of interstate and international telecommunications services, and state public utility commissions ("PUCs") regulate intrastate telecommunications services. Federal and state telecommunications laws and regulations are wide-ranging, and violations of them can subject us and our tenants to civil, criminal and administrative sanctions. We expect that the telecommunications industry, in general, will continue to face increased regulation. Changes in laws and regulations and violations of federal or state laws or regulations by us or our tenants could have a significant direct or indirect effect on our operations and financial condition, as detailed below and set forth under "Risk Factors—Risks Related to Our Business."

Our operations require that certain of our subsidiaries across all segments hold licenses or other forms of authorization from the FCC and state PUCs in those states where we operate, and in some jurisdictions our subsidiaries must file tariffs or other price lists describing their rates, terms and conditions of the services they provide. The FCC and PUCs can modify or terminate a service provider's license or other authority to provide telecommunications services for failure to comply with applicable laws and regulations. The FCC and PUCs may also investigate our subsidiaries' operations and may impose fines or other penalties for violations of the same. In addition, our subsidiaries are required to submit periodic reports to the FCC and PUCs documenting their revenues and other data. Some of this information is used as the basis for the imposition of various regulatory fees and other assessments. In order to engage in certain transactions in some jurisdictions, including changes of control, the encumbrance of certain assets, the issuance of securities, the incurrence of indebtedness, the guarantee of indebtedness of other entities, including subsidiaries of ours, and the transfer of assets, we are required to provide notice and/or obtain prior approval from certain governmental agencies. Failure to obtain such approvals could subject us to fines or other penalties.

Our subsidiaries are subject to a number of federal and state regulations that govern the way we can conduct our business. Such regulations also impose certain operating costs on our businesses. These regulations can include restrictions on pricing flexibility for certain products, minimum service quality standards, service reporting, intercarrier compensation, contributions to universal service, and other obligations.

We have sought to structure the operations for our core real estate business in a manner that will not require us to become regulated as a public utility or common carrier by the FCC or PUCs, but a number of our business operations are nonetheless subject to federal, state, and local regulation, and we cannot guarantee that our core real estate business will not become further subject to federal, state, and local regulation in the future.

10

Table of Contents
*Consumer CLEC Business*

Talk America operates the Consumer CLEC Business as a reseller of telecommunication services pursuant to a Wholesale Master Services Agreement and a Master Service Agreement with Windstream. In almost all cases, Windstream does not own the underlying telecommunication facilities required to support the Consumer CLEC Business, rather it is a reseller of facility-based services pursuant to wholesale interconnection agreements with third-party carriers that own the underlying telecommunication facilities. Talk America is authorized and regulated as a CLEC and an interexchange (long-distance) service provider in most states where it has Consumer CLEC Business customers. These certifications subject Talk America to regulations requiring it to file and maintain tariffs for the rates charged to its Consumer CLEC Business customers for regulated services and to comply with service quality, service reporting and other regulatory obligations. Talk America's ability to operate the Consumer CLEC Business is dependent on existing telecommunication regulations that allow access to such underlying facilities of other carriers at reasonable rates. The FCC is considering proposals to eliminate the requirement that incumbent local exchange carriers offer unbundled network elements to companies like Windstream and Talk America. We cannot predict how the FCC will resolve those proposals, nor whether such network elements will continue to be available in the future at the rates they are available today.

With respect to the broadband Internet services that we provide, traditionally, the FCC has recognized that broadband Internet access services are "information services" subject to limited regulation. In 2015, the FCC issued a "network neutrality" decision that declared broadband Internet access services to be subject to certain "telecommunications services" regulation under Title II of the Communications Act of 1934. These regulations would have limited the ways that broadband Internet access service providers could structure business arrangements and manage their networks and spurred additional restrictions, including rate regulation, which could adversely affect broadband investment and innovation. In 2017, the FCC voted to return broadband Internet access service to its prior classification as "information services." As a result of these decisions, state legislators and governors have introduced, and in some cases passed, state laws and executive orders requiring different levels of adherence to "network neutrality" principles for broadband Internet access service providers active in the applicable states. As a result of these laws and regulations, it is unclear at this time how broadband services will be regulated in the future, and the potential impact those regulations may have on our broadband Internet service business.

*Uniti Towers*

Uniti Towers is subject to international, federal, state and local regulatory requirements with respect to the registration, siting, construction, lighting, marking and maintenance of our towers. In the United States, the construction of new towers or modifications to existing towers may require pre-approval by the FCC and the Federal Aviation Administration ("FAA"), depending on factors such as tower height and proximity to public airfields. Towers requiring pre-approval must be registered with the FCC and maintained in accordance with FCC and FAA standards. Similar requirements regarding pre-approval of the construction and modification of towers are imposed by regulators in other countries where Uniti Towers owns and operates towers. Non-compliance with applicable tower-related requirements may lead to monetary penalties or site deconstruction orders.

Regulatory regimes outside of the United States and its territories vary by country and locality; however, these regulations typically require approval from local officials or government agencies prior to tower construction or modification or the addition of a new antenna to an existing tower. Additionally, some regulations include ongoing obligations regarding painting, lighting and maintenance. Our international operations may also be subject to limitations on foreign ownership of land in certain areas. Non-compliance with such regulations may lead to monetary penalties or deconstruction orders. Our international operations are also subject to various regulations and guidelines regarding employee relations and other occupational health and safety matters.

In all countries where Uniti Towers operates, it is subject to zoning restrictions and restrictive covenants imposed by local authorities or community organizations. While these regulations vary, they typically require approval from local authorities or community standards organizations prior to tower construction or the addition of a new antenna to an existing tower. Opposition by local zoning authorities and community residents can delay or prevent new tower construction or site upgrade projects, thereby increasing the costs and timing of new tower construction and modifications or site upgrades.

Table of Contents

The failure to properly maintain towers pursuant to applicable regulatory requirements, such as but not limited to, lighting, painting, and other safety standards, can subject us to significant enforcement actions, including monetary penalties both within the United States and abroad.

*Uniti Fiber*

Our subsidiaries that compose Uniti Fiber own and operate significant fiber and other communications backhaul facilities throughout various regions of the United States. The provision of such services is subject to FCC and PUC licensure in many jurisdictions, and the companies are typically licensed as CLECs and/or interexchange carriers in those states where they operate. The companies also hold various FCC wireless licenses in order to provide microwave backhaul services. Because of the nature of the licenses that these companies hold, and the nature of the services that they provide, they are subject to various federal and state regulatory requirements, including, but not limited to, revenue and other reporting requirements and tariffing requirements. The companies must also maintain their wireless licenses with the FCC, which requires construction and notification reporting and other regulatory requirements. New fiber network construction is also subject to certain state and local governmental permitting and licensing requirements. Delays in the local and state permitting process can delay the construction of new facilities. Failure to abide by permit requirements can subject the company to fines and other penalties.

*Regulatory Changes*

Future revenues, costs and capital investment in the communication businesses of our tenants, Talk America, Uniti Fiber, Uniti Towers, and other related entities could be adversely affected by material changes to, or decisions regarding applicability of, government requirements, including, but not limited to, changes in rules governing inter-carrier compensation, interconnection access to network facilities, state and federal universal service fund ("USF") support, rules governing the prices that can be charged for business data services, infrastructure location and siting rules, access to unbundled network elements, and other requirements. Federal and state communications laws and regulations may be amended in the future, and other new laws and regulations may affect our business. In addition, certain laws and regulations applicable to us and our competitors may be, and have been, challenged in the courts and could be vacated or modified at any time. We cannot predict future developments or changes to the regulatory environment or the impact such developments or changes would have on our business.

In addition, regulations could create significant compliance costs for us. Delays in obtaining FCC and PUC certifications and regulatory approvals could cause us to incur substantial legal and administrative expenses, and conditions imposed in connection with such approvals could adversely affect the rates that we are able to charge our customers. Both our subsidiaries and our tenants may also be affected by legislation and/or regulation imposing new or additional obligations related to, for example, law enforcement assistance, cyber-security protection, intellectual property rights protections, environmental protections, consumer privacy, tax, or other areas. We cannot predict how any such future changes may impact our business, or the business of our tenants.

**Environmental Matters**

A wide variety of federal, state and local environmental and occupational health and safety laws and regulations affect telecommunications operations and facilities. These laws and regulations, and their enforcement, involve complex and varied requirements, and many such laws and regulations impose strict liability for violations. Some of these federal, state and local laws may directly impact us. Under various federal, state and local environmental laws, ordinances and regulations, an owner of real property, such as us, may be liable for the costs of removal or remediation of hazardous or toxic substances at, under or disposed of in connection with such property, as well as other potential costs relating to hazardous or toxic substances (including government fines and damages for injuries to persons and adjacent property). The cost of any required remediation, removal, fines or personal property damages and the owner's liability therefore could exceed or impair the value of the property and/or the assets of the owner. In addition, the presence of such substances, or the failure to properly dispose of or remediate such substances, may adversely affect the owner's ability to sell or rent such property or to borrow using such property as collateral, which, in turn, could reduce revenues.

12

Table of Contents
**Available Information**

Our principal executive offices are located at 10802 Executive Center Drive, Benton Building Suite 300, Little Rock, AR 72211 and our telephone number is (501) 850-0820. We maintain a website at www.uniti.com. Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and any amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act") are available on our website, free of charge, as soon as reasonably practicable after we electronically file such materials with, or furnish them to, the SEC. Our Exchange Act filings can also be found at www.sec.gov.

Current copies of our Code of Business Conduct and Ethics & Whistleblower Policy, Corporate Governance Guidelines, and the charters for our Audit, Compensation and Governance Committees are posted in the *Corporate Governance* section of the About Us page of our website at www.uniti.com.

**Item 1A. Risk Factors.**

**Risks Related to Our Business**

***We are dependent on Windstream Holdings to make payments to us under the Master Lease, and an event that materially and adversely affects Windstream's business, financial position or results of operations, including as a result of its recent petition for relief under Chapter 11 of the Bankruptcy Code, could materially and adversely affect our business, financial position or results of operations.***

Windstream is the lessee of the Distribution Systems pursuant to the Master Lease and, therefore, is presently the source of a substantial portion of our revenues. There can be no assurance that Windstream will have sufficient assets, income and access to financing to enable it to satisfy its payment and other obligations under the Master Lease. In recent years, Windstream has experienced annual declines in its total revenue, sales and cash flow, and has had its credit ratings downgraded by nationally recognized credit rating agencies multiple times over the past 12 months. Windstream has been involved in litigation with an entity who acquired certain Windstream debt securities and thereafter issued a notice of default as to such securities relating to the Spin-Off. Windstream challenged the matter in federal court and a trial was held in July 2018. On February 15, 2019, the federal court judge issued a ruling against Windstream, finding that its attempts to waive such default were not valid; that an "event of default" occurred with respect to such debt securities; and that the holder's acceleration of such debt in December 2017 was effective.

In response to the adverse outcome, on February 25, 2019, Windstream filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.

In bankruptcy, Windstream has the option to assume or reject the Master Lease. We believe that the Master Lease is essential to Windstream's operations, however it is difficult to predict what could occur in a bankruptcy restructuring, and even a temporary disruption in payments to us may require us to fund certain expenses and obligations (e.g., real estate taxes, insurance and maintenance expenses) to preserve the value of our properties and avoid the imposition of liens on our properties and could impact our ability to fund other cash obligations, including dividends necessary to maintain REIT status, non-essential capital expenditures and, in an extreme case, our debt service obligations. A rejection by Windstream of the Master Lease or its inability or unwillingness to meet its rent and other obligations under the Master Lease could materially adversely affect our consolidated results of operations, liquidity, and financial condition, including our ability to service debt and pay dividends to our stockholders as required to maintain our status as a REIT.

In the event of a rejection of the Master Lease, we cannot assure you that we will be able to locate a suitable replacement tenant or if we are successful in locating a replacement tenant, that the rental payments from the new tenant would not be significantly less than the existing rental payments. In addition, a rejection of the Master Lease by Windstream would result in an "event of default" under our Credit Agreement if we are unable to enter into a replacement lease that satisfies certain criteria set forth in the Credit Agreement within ninety (90) calendar days and we do not maintain pro forma compliance with a consolidated secured leverage ratio, as defined in the Credit Agreement, of 5.00 to 1.00.

13

Table of Contents

***There is substantial doubt about our ability to continue as a going concern.***

There is substantial doubt about our ability to continue as a going concern and in its opinion on our December 31, 2018 financial statements, PricewaterhouseCoopers LLP, our independent registered public accounting firm, expressed substantial doubt as to whether we could continue as a going concern within one year after the date the financial statements are issued as a result of Windstream's bankruptcy petition and the bankruptcy's uncertain effects on the Master Lease. Our financial statements do not include any adjustments that may result from the outcome of this uncertainty. While the outcome is uncertain, we expect Windstream will continue to perform on the Master Lease and believe the probability of Windstream rejecting the lease in bankruptcy to be remote because the Master Lease is central to Windstream's operations. We intend to reduce our capital expenditures and dividend as well as seek external funding in order to sustain our operations. If we do not succeed in raising such funds and reducing such expenditures and if Windstream elects to reject the Master Lease, we could experience a material adverse effect on our business and our stockholders may lose some or all of their investment in us. In addition, a failure to provide 2018 audited financial statements without a going concern opinion to the lenders under our Credit Agreement by March 31, 2019 would constitute a breach of the covenants of our Credit Agreement and, unless such default is waived by our lenders, would constitute an immediate event of default.  If an event of default were to occur under our Credit Agreement, the Credit Agreement's administrative agent could declare all outstanding loans immediately due and payable. Such an acceleration would trigger cross-default provisions within the indentures governing our senior notes and thereby entitle the trustee and noteholders to accelerate the repayment of the senior notes.

On March 18, 2019, we received a limited waiver from our lenders under our Credit Agreement, waiving an event of default related solely to the receipt of a going concern opinion from our auditors for our 2018 audited financial statements.  The limited waiver was issued in connection with the fourth amendment (the "Amendment") to our Credit Agreement. During the pendency of Windstream's bankruptcy, or at such earlier time when certain other conditions are specified, the Amendment generally limits our ability under the Credit Agreement to (i) prepay unsecured indebtedness and (ii) pay cash dividends in excess of 90% of our REIT taxable income, determined without regard to the dividends paid deduction and excluding any net capital gains. The Amendment also increases the interest rate on our Term Loan Facility, which will now bear a rate of LIBOR, subject to a 1.0% floor, plus an applicable margin equal to 5.0%, a 200 basis point increase over our previous rate. This increase will be in effect though the remaining term of the facility, which matures on October 24, 2022.

***If the Spin-Off, together with certain related transactions, fails to qualify as a tax-free transaction for U.S. federal income tax purposes, both we and Windstream could be subject to significant tax liabilities and, in certain circumstances, we could be required to indemnify Windstream for material taxes pursuant to indemnification obligations under the tax matters agreement entered into in connection with the Spin-Off.***

Windstream received a private letter ruling (the "IRS Ruling") from the Internal Revenue Service (the "IRS") to the effect that, on the basis of certain facts presented and representations and assumptions set forth in the request submitted to the IRS, the Spin-Off will qualify as tax-free under Sections 355 and 368(a)(1)(D) of the Internal Revenue Code of 1986, as amended (the "Code"). Although a private letter ruling from the IRS generally is binding on the IRS, if the factual representations and assumptions made in the letter ruling request are untrue or incomplete in any material respect, then Windstream will not be able to rely on the IRS Ruling. In addition, the IRS Ruling does not address certain requirements for tax-free treatment of the Spin-Off under Sections 355 and 368(a)(1)(D) of the Code and Windstream's use of Uniti indebtedness and common stock to retire certain of Windstream's indebtedness (the "debt exchanges"). Accordingly, the Spin-Off was conditioned upon the receipt by Windstream of a tax opinion from its counsel with respect to the requirements on which the IRS did not rule, which concluded that such requirements also should be satisfied. The tax opinion was based on, among other things, the IRS Ruling, then current law and certain representations and assumptions as to factual matters made by Windstream and us. Any change in currently applicable law, which may or may not be retroactive, or the failure of any factual representation or assumption to be true, correct and complete in all material respects, could adversely affect the conclusions reached in the tax opinion. In addition, the tax opinion is not binding on the IRS or the courts, and the IRS or the courts may not agree with the tax opinion.

14

Table of Contents

If the Spin-Off were determined to be taxable, Windstream would recognize taxable gain. Under the terms of the tax matters agreement entered into with Windstream in connection with the Spin-Off (the "Tax Matters Agreement"), we are generally responsible for any taxes imposed on Windstream that arise from the failure of the Spin-Off and the debt exchanges to qualify as tax-free for U.S. federal income tax purposes, within the meaning of Section 355 and Section 368(a)(1)(D) of the Code, as applicable, to the extent such failure to qualify is attributable to certain actions, events or transactions relating to our stock, indebtedness, assets or business, or a breach of the relevant representations or any covenants made by us in the Tax Matters Agreement, the materials submitted to the IRS in connection with the request for the IRS Ruling or the representations provided in connection with the tax opinion. Our indemnification obligations to Windstream are not limited by any maximum amount and such amounts could be substantial. If we are required to indemnify Windstream under the circumstances set forth in the Tax Matters Agreement, we may also be subject to substantial tax liabilities.

In addition, if the Spin-Off or the debt exchanges failed to qualify as tax free for U.S. federal income tax purposes, Windstream may incur significant tax liabilities that could materially affect Windstream's ability to make payments under the Master Lease.

***Our level of indebtedness could materially and adversely affect our financial position, including reducing funds available for other business purposes and reducing our operational flexibility.***

As of December 31, 2018, we had outstanding long term indebtedness of approximately $4.5 billion consisting of a combination of senior notes and term loans. Additionally, we have a revolving credit facility in an aggregate principal amount of up to $750 million, $110 million of which was undrawn as of December 31, 2018, provided by a syndicate of banks and other financial institutions. We have since drawn substantially all of our revolver capacity. Subject to the restrictions set forth in our debt agreements, our board of directors may establish and change our leverage policy at any time without stockholder approval. Any significant additional indebtedness could require a substantial portion of our cash flow to make interest and principal payments due on our indebtedness. Greater demands on our cash resources may reduce funds available to us to pay dividends, make capital expenditures and acquisitions, or carry out other aspects of our business strategy. Increased indebtedness can also limit our ability to adjust rapidly to changing market conditions, make us more vulnerable to general adverse economic and industry conditions and create competitive disadvantages for us compared to other companies with relatively lower debt levels. Increased future debt service obligations may limit our operational flexibility, including our ability to acquire assets, finance or refinance our assets or sell assets as needed, and our ability to pay dividends. Please see "Management's Discussion and Analysis of Financial Condition and Results of Operations —Liquidity and Capital Resources—Credit Agreement" for information about the terms of the limited waiver we received from the lenders to our Credit Agreement.

In addition, we continuously evaluate opportunities to refinance or repurchase existing debt. However, in light of recent developments and uncertainty surrounding Windstream and the effect of substantial doubt about our ability to continue as a going concern, there can be no assurance that any debt refinanced would be on similar or more favorable terms than our existing agreements. This would include the risk that interest rates could increase and/or there may be changes to our existing covenants.

***We anticipate that we will have sufficient access to liquidity to fund our cash needs; if we are unable to do so, we would need to reduce our spending and it could have an adverse effect on us.***

We anticipate continuing to invest in our network infrastructure across our Uniti Leasing, Uniti Fiber and Uniti Towers portfolios. We have also committed to spend $175 million on our proposed acquisition of Bluebird (for which we have obtained committed financing), net of the collection of prepaid rent. We anticipate declaring dividends for the 2019 tax year to comply with our REIT distribution requirements. We anticipate that we will partially finance these needs, together with operating expenses (including our debt service obligations) from our $38 million of cash on hand and $110 million of borrowing availability under the Revolving Credit Facility (although we have since drawn substantially all of our revolver capacity), cash flows provided by operating activities, together with funds anticipated from announced divestures. However, we may need to access the capital markets to generate additional funds in an amount sufficient to fund our business operations, announced investment activities, capital expenditures, debt service and distributions to our shareholders. We are closely monitoring the equity and debt markets and will seek to access them promptly when we determine market conditions are appropriate. The amount,

15

Table of Contents

nature and timing of any capital markets transactions will depend on: our operating performance and other circumstances; our then-current commitments and obligations; the amount, nature and timing of our capital requirements; any limitations imposed by our current credit arrangements; and overall market conditions. These expectations are forward-looking and subject to a number of uncertainties and assumptions. If our expectations about our liquidity prove to be incorrect or we are unable to access the capital markets as we anticipate, we would be subject to a shortfall in liquidity in the future which could lead to a reduction in our capital expenditures and/or dividends and, in an extreme case, our ability to pay our debt service obligations. If this shortfall occurs rapidly and with little or no notice, it could limit our ability to address the shortfall on a timely basis.

In light of recent developments and uncertainty surrounding Windstream, we may take measures to conserve cash as we anticipate that it may be difficult for us to access the capital markets at attractive rates until such uncertainty is clarified. Accordingly, we may elect to suspend, delay or reduce success-based capital expenditures and dividend payments to conserve cash and if necessary, we may pay one or more dividends that are required to maintain or REIT status in shares to the extent allowed under IRS REIT rules. If our assumptions are incorrect, we could need additional sources of liquidity to fund our cash needs and cannot assure that we will obtain them.

***We intend to pursue acquisitions of additional properties and seek other strategic opportunities, which may result in the use of a significant amount of management resources or significant costs, and we may not fully realize the potential benefits of such transactions.***

We intend to pursue acquisitions of additional properties and seek acquisitions and other strategic opportunities. Accordingly, we currently are, and expect in the future to be, engaged in evaluating potential transactions and other strategic alternatives. Although there is uncertainty that any of these discussions will result in definitive agreements or the completion of any transaction, we may devote a significant amount of our management resources to such a transaction, which could negatively impact our operations. We may incur significant costs in connection with seeking acquisitions or other strategic opportunities regardless of whether the transaction is completed. In the event that we consummate an acquisition or strategic alternative in the future, there is no assurance that we would fully realize the potential benefits of such a transaction. Integration may be difficult and unpredictable, and acquisition-related integration costs, including certain non-recurring charges, could materially and adversely affect our results of operations. Moreover, integrating assets and businesses may significantly burden management and internal resources, including the potential loss or unavailability of key personnel. If we fail to successfully integrate the assets and businesses we acquire, we may not fully realize the potential benefits we expect, and our operating results could be adversely affected.

In light of Windstream developments, we may curtail our acquisition activities during the pendency of Windstream's bankruptcy in an effort to conserve cash.

***We are dependent on the communications industry and may be susceptible to the risks associated with it, which could materially adversely affect our business, financial position or results of operations.***

As the owner, lessor and provider of communications services and distribution systems serving the communications industry, we are impacted by the risks associated with the communications industry. Therefore, our success is to some degree dependent on the communications industry, which could be adversely affected by economic conditions in general, changes in consumer trends and preferences, changes in communications technology designed to enhance the efficiency of communications distribution systems (including lit fiber networks and wireless equipment), and other factors over which we and our tenants have no control. As we are subject to risks inherent in substantial investments in a single industry, a decrease in the communications business or development and implementation of any such new technologies would likely have an adverse effect on our revenues.

***Our business is subject to government regulations and changes in current or future laws or regulations could restrict our ability to operate our business in the manner currently contemplated.***

Our business, and that of our tenants, is subject to federal, state, local and foreign regulation. In certain jurisdictions these regulations could be applied or enforced retroactively. Local zoning authorities and community organizations are often opposed to construction in their communities and these regulations can delay, prevent or increase the cost of new distribution system construction and modifications, thereby limiting our ability to respond to customer

16

Table of Contents

demands and requirements. Existing regulatory policies may materially and adversely affect the associated timing or cost of such projects and additional regulations may be adopted which increase delays or result in additional costs to us, or that prevent such projects in certain locations. These factors could materially and adversely affect our business, results of operations or financial condition. For more information regarding the regulations we are subject to, please see the section entitled "Business – Government Regulation, Licensing and Enforcement."

***If we determine that our goodwill has become impaired, we may incur impairment charges, which would negatively impact our operating results.***

At December 31, 2018, we had $692.4 million of goodwill on our consolidated balance sheet. Goodwill represents the excess of cost over the fair value of net assets acquired in business combinations. We assess potential impairment of our goodwill at least annually. Impairment may result from significant changes in the manner of use of the acquired assets, negative industry or economic trends and/or any changes in key assumptions regarding our fair value, including any potential impacts of recent developments surrounding Windstream, as set forth in the first risk factor. Changes in these events and conditions or other assumptions could result in an impairment charge in the future, which could have a significant adverse impact on our reported earnings. For a discussion of our goodwill impairment testing, see "Critical Accounting Policies-Evaluation of Goodwill Impairment" in Part II, Item 7A-Management's Discussion and Analysis of Financial Condition and Results of Operations.

***Our foreign operations are subject to economic, political and other risks that could materially and adversely affect our results of operations and financial condition.***

Our international business operations expose us to potential adverse financial and operational problems not typically experienced in the United States, including:

- international political, economic and legal conditions;
- compliance with foreign regulations and/or laws affecting operations and projects;
- difficulties in attracting and retaining staff and business partners to operate internationally;
- language and cultural barriers;
- seasonal reductions in business activities and operations in the countries where our international projects are located;
- integration of foreign operations;
- potential adverse tax consequences; and
- potential foreign currency fluctuations.

In addition, many of our tenants in our international operations are subsidiaries of global telecommunications companies. These subsidiaries may not have the explicit or implied financial support of their parent entities. Any of these factors could adversely affect our results of operations and financial condition.

***Our continued operations outside the United States increase the risk of violations of applicable anti-corruption laws in the future.***

Our internal policies provide for compliance with all applicable anti-corruption laws, but despite our training and compliance programs, we cannot ensure that our internal control policies and procedures will always protect us from unauthorized, reckless or criminal acts committed by our employees, agents or partners. A finding that the Company or its affiliates have violated the U.S. Foreign Corrupt Practices Act ("FCPA") or similar foreign anti-corruption laws may result in severe criminal or civil sanctions, which could disrupt our business and result in a material adverse effect on our reputation, financial condition and results of operations.

***We or our tenants may experience uninsured or underinsured losses, which could result in a significant loss of the capital we have invested in a property, decrease anticipated future revenues or cause us to incur unanticipated expenses.***

Table of Contents

The Master Lease requires, and we expect that new lease agreements that we enter into will require, that the tenant maintain comprehensive insurance and hazard insurance or self-insure its insurance obligations. However, there are certain types of losses, generally of a catastrophic nature, such as earthquakes, hurricanes and floods that may be uninsurable or not economically insurable. Insurance coverage may not be sufficient to pay the full current market value or current replacement cost of a loss. Inflation, changes in ordinances, environmental considerations, and other factors also might make it infeasible to use insurance proceeds to replace the property after such property has been damaged or destroyed. Under such circumstances, the insurance proceeds received might not be adequate to restore the economic position with respect to such property.

In addition, even if damage to our properties is covered by insurance, a disruption of business caused by a casualty event may result in loss of revenue for our tenants or us. Any business interruption insurance may not fully compensate them or us for such loss of revenue. If one of our tenants experiences such a loss, it may be unable to satisfy its payment obligations to us under its lease with us.

***We rely on information technology in our operations, and any material failure, inadequacy, interruption or security failure of that technology could harm our business.***

We rely on information technology networks and systems, including the Internet, to process, transmit and store electronic information and to manage or support a variety of our business processes, including financial transactions and maintenance of records. We rely on commercially available systems, software, tools and monitoring to provide security for processing, transmitting and storing confidential information. Although we have taken steps to protect the security of the data maintained in our information systems, it is possible that our security measures will not be able to prevent the systems' improper functioning, or the improper disclosure of information in the event of cyber-attacks. Physical or electronic break-ins, computer viruses, attacks by hackers and similar security breaches, can create system disruptions, shutdowns or unauthorized disclosure of confidential information. Any failure to maintain proper function, security and availability of our information systems could interrupt our operations, damage our reputation, subject us to liability claims or regulatory penalties and could materially and adversely affect us.

***Any failure of Uniti Fiber's physical infrastructure or services could lead to significant costs and disruptions.***

Uniti Fiber's business depends on providing customers with highly reliable service. The services provided are subject to failure resulting from numerous factors, including human error, power loss, improper maintenance, physical or electronic security breaches, fire, earthquake, hurricane, flood and other natural disasters, water damage, the effect of war, terrorism and any related conflicts or similar events worldwide, and sabotage and vandalism. Problems within Uniti Fiber's networks or facilities, whether within our control or the control of third-party providers, could result in service interruptions or equipment damage. We may not be able to efficiently upgrade or change Uniti Fiber's networks or facilities to meet new demands without incurring significant costs that we may not be able to pass on to customers. Given the service guarantees that may be included in Uniti Fiber's agreements with customers, such disruptions could result in customer credits; however, we cannot assume that customers will accept these credits as compensation in the future, and we may face additional liability or loss of customers.

**Risks Related to the Status of Uniti as a REIT**

***If we do not qualify as a REIT, or fail to remain qualified as a REIT, we will be subject to U.S. federal income tax as a regular corporation and could face a substantial tax liability, which could reduce the amount of cash available for distribution to our stockholders and to service debt.***

We operate as a REIT for U.S. federal income tax purposes.  Our qualification as a REIT will depend on our satisfaction of certain highly technical and complex asset, income, organizational, distribution, stockholder ownership and other requirements on a continuing basis. Our ability to satisfy the asset tests depends upon our analysis of the characterization and fair market values of our assets, some of which are not susceptible to a precise determination and for which we may not obtain independent appraisals.

If we were to fail to qualify as a REIT in any taxable year, we would be subject to U.S. federal income tax on our taxable income at regular corporate rates and dividends paid to our stockholders would not be deductible by us in computing our taxable income. Any resulting corporate liability could be substantial and could reduce the amount of

18

Table of Contents

cash available for distribution to our stockholders, which in turn could have an adverse impact on the value of our common stock and to service debt. Unless we were entitled to relief under certain Code provisions, we also would be disqualified from re-electing to be taxed as a REIT for the four taxable years following the year in which we failed to qualify as a REIT.

In addition, as a result of the limited waiver and amendment to our Credit Agreement (discussed in the second risk factor) our ability to make cash distributions to our shareholders in amounts exceeding 90% of our REIT taxable income, determined without regard to the dividends paid deduction and excluding any capital gains, generally will be restricted.  As a result, we may be required to record a provision in our Consolidated Financial Statements for U.S. federal income taxes related to the activities of the REIT and its passthrough subsidiaries for any undistributed income. We are subject to the statutory requirements of the locations in which we conduct business, and state and local income taxes are accrued as deemed required in the best judgment of management based on analysis and interpretation of respective tax laws.

***Legislative or other actions affecting REITs could have a negative effect on us.***

The rules dealing with federal income taxation are constantly under review by persons involved in the legislative process and by the IRS and the U.S. Department of the Treasury ("Treasury"). Changes to the tax laws affecting REITs or TRSs, which may have retroactive application, could adversely affect our stockholders or us. We cannot predict how changes in the tax laws might affect our stockholders or us. Accordingly, we cannot provide assurance that new legislation, Treasury regulations, administrative interpretations or court decisions will not significantly affect our ability to remain qualified as a REIT, the federal income tax consequences of such qualification, the determination of the amount of REIT taxable income or the amount of tax paid by the TRSs.

***We could fail to qualify as a REIT if income we receive from sale-leaseback transactions, such as income from Windstream pursuant to the Master Lease, is not treated as qualifying income.***

Under applicable provisions of the Code, we will not be treated as a REIT unless we satisfy various requirements, including requirements relating to the sources of our gross income. Rents received or accrued by us from Windstream or other lessees will not be treated as qualifying rent for purposes of these requirements if the relevant lease is not respected as a true lease for U.S. federal income tax purposes and is instead treated as a service contract, joint venture or some other type of arrangement. If any of our leases, including the Master Lease, is not respected as a true lease for U.S. federal income tax purposes, we may fail to qualify as a REIT.

***REIT distribution requirements could adversely affect our ability to execute our business plan, and we could elect to pay dividends substantially in the form of additional shares of our common stock.***

We generally must qualify as a REIT and distribute annually at least 90% of our REIT taxable income, determined without regard to the dividends paid deduction and excluding any net capital gains, for the U.S. federal corporate income tax not to apply to earnings that we distribute (assuming that certain other requirements are also satisfied). To the extent that we satisfy this distribution requirement and qualify for taxation as a REIT but distribute less than 100% of our REIT taxable income, determined without regard to the dividends paid deduction and excluding any net capital gains, we will be subject to U.S. federal corporate income tax on our undistributed net taxable income. In addition, we will be subject to a 4% nondeductible excise tax if the actual amount that we distribute to our stockholders in a calendar year is less than a minimum amount specified for REITs under U.S. federal income tax laws. We currently intend to make distributions to our stockholders to comply with the REIT requirements of the Code.  However, as indicated in the risk factors above, as a result of recent developments surrounding Windstream, we may suspend, delay or reduce our dividend to conserve cash, and during the pendency of Windstream's bankruptcy, or at such earlier time when certain other conditions are specified, (discussed in the second risk factor) our ability to make cash distributions to our shareholders in amounts exceeding 90% of our REIT taxable income, determined without regard to the dividends paid deduction and excluding any net capital gains, generally will be restricted. Accordingly, because we are required to make distributions in certain amounts to our shareholders in order to maintain our REIT status and avoid incurring entity-level income and excise tax, we may elect to pay one or more dividends to our shareholders substantially in the form of additional shares of common stock.  If we do so, the common stock that we distribute would be taxable dividend income to our shareholders, in whole or in part, based on the fair market value of our common stock at the time the dividend is paid.

Table of Contents

Our FFO is currently generated largely by rents paid under the Master Lease. From time to time, we may generate taxable income greater than our cash flow as a result of differences in timing between the recognition of taxable income and the actual receipt of cash or the effect of nondeductible capital expenditures, the creation of reserves or required debt or amortization payments. If we do not have other funds available in these situations, we could be required to borrow funds on unfavorable terms, sell assets at disadvantageous prices or distribute amounts that would otherwise be invested in future acquisitions in order to make distributions sufficient to enable us to pay out enough of our taxable income to satisfy the REIT distribution requirement and to avoid corporate income tax and the 4% excise tax in a particular year. These alternatives could increase our costs or reduce our equity. Thus, compliance with the REIT requirements may hinder our ability to grow, which could adversely affect the value of our common stock and decrease cash available to service debt.

***Recent developments surrounding Windstream could adversely affect our ability to continue to qualify as a REIT.***

In addition to satisfying the distribution requirement described above in the immediately preceding risk factor, we must satisfy a number of other requirements in order to qualify as a REIT. Recent developments surrounding Windstream, as described above in the first risk factor, could adversely affect our ability to satisfy several of these requirements and thus our ability to continue to qualify as a REIT.

For example, in order to qualify as a REIT for any year, at the end of each calendar quarter, at least 75% of the value of our assets must consist of cash, cash items, government securities and "real estate assets" (as defined in the Code), and no more than 20% of the value of our total assets can be represented by securities (other than qualified real estate assets) of one or more TRSs, If we fail to comply with either of these requirements at the end of any calendar quarter, we must correct the failure within 30 days after the end of the calendar quarter or qualify for certain statutory relief provisions to avoid losing our REIT qualification. Our ability to satisfy these requirements depends in substantial part on the value of the assets that are the subject of the Master Lease with Windstream, and any diminution in the value of such assets, including as a result of any diminution in the implied value of the Master Lease as a result of changes in the financial condition or creditworthiness of Windstream, Windstream's rejection of the Master Lease in bankruptcy or Windstream's inability or unwillingness to meet its rent and other obligations under the Master Lease, could adversely affect our ability to satisfy these requirements at the end of any calendar quarter, and there can be no assurance that we would be able to timely correct any such failure or otherwise qualify for any statutory relief provision.

In addition, under applicable provisions of the Code, we will not be treated as a REIT for any year unless we satisfy various requirements, including requirements relating to the sources of our gross income in such year. Our ability to satisfy these gross income tests depends in substantial part on our receipt of rents paid under the Master Lease. The rejection by Windstream of the Master Lease, Windstream's inability or unwillingness to meet its rent and other obligations under the Master Lease, or any suspension, delay or other reduction in the amount of rent that we receive under the Master Lease could adversely affect our ability to qualify as a REIT.

***Even if we remain qualified as a REIT, we may face other tax liabilities that reduce our cash flow.***

Even if we remain qualified for taxation as a REIT, we may be subject to certain U.S. federal, state and local taxes on our income and assets, including taxes on any undistributed income and state or local income, property and transfer taxes. For example, we hold some of our assets and conduct certain of our activities through a TRS that is subject to U.S. federal, state and local corporate-level income taxes as a regular C corporation. In addition, we may incur a 100% excise tax on transactions with a TRS if they are not conducted on an arm's-length basis. Any of these taxes could decrease cash available for distribution to our stockholders and servicing our debt.

***Complying with the REIT requirements may cause us to forego otherwise attractive acquisition opportunities.***

To qualify as a REIT for U.S. federal income tax purposes, we must ensure that, at the end of each calendar quarter, at least 75% of the value of our assets consists of cash, cash items, government securities and "real estate assets" (as defined in the Code). The remainder of our investments (other than government securities, qualified real estate assets and securities issued by a TRS) generally cannot include more than 10% of the outstanding voting securities of any one issuer or more than 10% of the total value of the outstanding securities of any one issuer. In addition, in

Table of Contents

general, no more than 5% of the value of our total assets (other than government securities, qualified real estate assets and securities issued by a TRS) can consist of the securities of any one issuer, no more than 20% of the value of our total assets can be represented by securities (other than qualified real estate assets) of one or more TRSs, and no more than 25% of the value of our total assets can be represented by nonqualified publicly offered REIT debt instruments (as defined in the Code). If we fail to comply with these requirements at the end of any calendar quarter, we must correct the failure within 30 days after the end of the calendar quarter or qualify for certain statutory relief provisions to avoid losing our REIT qualification and suffering adverse tax consequences. As a result of such asset limitations, we may be required to forego otherwise attractive investments. These actions could have the effect of reducing our income and amounts available for distribution to our stockholders and servicing our debt.

**Risks Related to Our Common Stock**

***We cannot guarantee our ability to pay dividends in the future.***

To qualify as a REIT, our annual dividend must not be less than 90% of our REIT taxable income on an annual basis, determined without regard to the dividends paid deduction and excluding any net capital gains. Our ability to pay dividends may be adversely affected by a number of factors, including the risk factors herein. Dividends will be authorized by our board of directors and declared by us based upon a number of factors, including actual results of operations, restrictions under Maryland law or applicable debt covenants, our financial condition, our taxable income, the annual distribution requirements under the REIT provisions of the Code, our operating expenses and other factors our directors deem relevant. We cannot ensure that we will achieve investment results that will allow us to make a specified level of cash dividends or year-to-year increases in cash dividends in the future.  As a result of recent actions related to Windstream, as set forth in the first risk factor, we may choose to reduce or suspend our dividend for a period of time until the situation is clarified. Moreover, during the pendency of Windstream's bankruptcy, or at such earlier time when certain other conditions are specified, (discussed in the second risk factor and "Risks Related to the Status of Uniti as a REIT – REIT distribution requirements could adversely affect our ability to execute our business plan") our ability to make cash distributions to our shareholders in amounts exceeding 90% of our REIT taxable income, determined without regard to the dividends paid deduction and excluding any net capital gains, generally will be restricted. Accordingly, because we are required to make distributions in certain amounts to our shareholders in order to maintain our REIT status and avoid incurring entity-level income and excise tax, we may elect to pay one or more dividends to our shareholders substantially in the form of additional shares of common stock.  If we do so, the common stock that we distribute would be taxable dividend income to our shareholders, in whole or in part, based on the fair market value of our common stock at the time the dividend is paid.

Furthermore, while we are required to pay dividends in order to maintain our REIT status (as described above under "Risks Related to the Status of Uniti as a REIT—REIT distribution requirements could adversely affect our ability to execute our business plan"), we may elect not to maintain our REIT status, in which case we would no longer be required to pay such dividends. Moreover, even if we do maintain our REIT status, after completing various procedural steps, we may elect to comply with the applicable distribution requirements by distributing, under certain circumstances, shares of our common stock in lieu of cash. If we elect not to maintain our REIT status or to satisfy any required distributions in shares of common stock in lieu of cash, such action could negatively affect our business and financial condition as well as the market price of our common stock. No assurance can be given that we will pay any dividends on shares of our common stock in the future.

***The market price and trading volume of our common stock may fluctuate widely.***

We cannot predict the prices at which our common stock may trade.  The market price of our common stock has fluctuated significantly since February 15, 2019 and may continue to fluctuate significantly, depending upon many factors, some of which may be beyond our control, including the collateral consequences that have resulted, or could result, from Windstream's bankruptcy.

***Our charter restricts the ownership and transfer of our outstanding stock, which may have the effect of delaying, deferring or preventing a transaction or change of control of our company.***

21

Table of Contents

In order for us to qualify as a REIT, not more than 50% in value of our outstanding shares of stock may be owned, beneficially or constructively, by five or fewer individuals at any time during the last half of each taxable year after the first year for which we elect to be taxed and qualify as a REIT. Additionally, at least 100 persons must beneficially own our stock during at least 335 days of a taxable year (other than the first taxable year for which we elect to be taxed and qualify as a REIT). Our charter, with certain exceptions, authorizes our board of directors to take such actions as are necessary or advisable to preserve our qualification as a REIT. Our charter also provides that, unless exempted by the board of directors, no person may own more than 9.8% in value or in number, whichever is more restrictive, of the outstanding shares of our common stock or more than 9.8% in value of the aggregate of the outstanding shares of all classes and series of our stock. The constructive ownership rules are complex and may cause shares of stock owned directly or constructively by a group of related individuals or entities to be constructively owned by one individual or entity. These ownership limits could delay or prevent a transaction or a change in control of us that might involve a premium price for shares of our stock or otherwise be in the best interests of our stockholders.

**Item 1B. Unresolved Staff Comments.**

None

**Item 2. Properties.**

Uniti and its subsidiaries own approximately 112,300 fiber network route miles, representing approximately 5.6 million fiber strand miles, approximately 215,100 route miles of copper cable lines, central office land and buildings across 42 states and beneficial rights to permits, pole agreements and easements.

*Leasing Segment*

Uniti Leasing's network properties include its fiber route miles and copper route miles. Below is a geographic distribution summary as of December 31, 2018:

22

Table of Contents

| Location | Fiber Route Miles | Copper Route Miles | Total Route Miles |
|---|---|---|---|
| GA | 10,000 | 43,800 | 53,800 |
| TX | 9,500 | 33,400 | 42,900 |
| IA | 8,600 | 32,700 | 41,300 |
| KY | 8,200 | 30,200 | 38,400 |
| NC | 4,700 | 18,200 | 22,900 |
| IL | 3,700 | — | 3,700 |
| OH | 3,500 | 10,300 | 13,800 |
| AR | 3,400 | 11,100 | 14,500 |
| IN | 2,700 | — | 2,700 |
| FL | 2,200 | 7,700 | 9,900 |
| MI | 2,100 | — | 2,100 |
| WI | 2,100 | — | 2,100 |
| CA | 1,800 | — | 1,800 |
| OK | 1,700 | 10,800 | 12,500 |
| MO | 1,600 | 8,400 | 10,000 |
| PA | 1,400 | 100 | 1,500 |
| TN | 1,300 | — | 1,300 |
| NM | 1,100 | — | 1,100 |
| VA | 1,100 | 4,800 | 5,900 |
| WV | 900 | — | 900 |
| AL | 700 | — | 700 |
| NV | 700 | 2,200 | 2,900 |
| CO | 600 | — | 600 |
| AZ | 500 | — | 500 |
| OR | 500 | — | 500 |
| KS | 500 | — | 500 |
| WY | 500 | — | 500 |
| MS | 400 | 1,400 | 1,800 |
| Other[1] | 1,000 | 100 | 1,100 |
| Total | 77,000 | 215,200 | 292,200 |

[1] Includes 13 states.

23

Table of Contents

*Fiber Segment*

Uniti Fiber's network properties include its fiber route miles and wireless communication towers. Below is a geographic distribution summary as of December 31, 2018:

| Location | Fiber Route Miles |
|---|---:|
| GA | 5,700 |
| LA | 5,500 |
| FL | 5,100 |
| PA | 4,400 |
| AL | 3,500 |
| MS | 2,800 |
| IL | 2,400 |
| VA | 1,600 |
| NY | 1,500 |
| TX | 900 |
| Other[1] | 1,900 |
| Total | 35,300 |

[1] Includes 14 states.

Table of Contents

*Towers Segment*

Uniti Towers' network properties include its wireless communication towers. Below is a geographic distribution summary as of December 31, 2018:

| Location | Towers |
|---|---:|
| LA | 154 |
| TX | 65 |
| WI | 25 |
| IL | 24 |
| AR | 22 |
| AL | 20 |
| NM | 20 |
| MS | 19 |
| GA | 17 |
| NE | 12 |
| KY | 9 |
| MN | 7 |
| OK | 6 |
| PA | 5 |
| TN | 5 |
| OH | 3 |
| NC | 3 |
| SC | 3 |
| Other[1] | 11 |
| Total Domestic | 430 |
| | |
| Mexico | 342 |
| Colombia | 101 |
| Nicaragua | 55 |
| Total International | 498 |
| | |
| Total | 928 |

[1] Includes 8 states.

**Item 3. Legal Proceedings.**

In the ordinary course of our business, we are subject to claims and administrative proceedings, none of which we believe are material or would be expected to have, individually or in the aggregate, a material adverse effect on our business, financial condition, cash flows or results of operations.

Pursuant to the Master Lease, Windstream has agreed to indemnify us for, among other things, any use, misuse, maintenance or repair by Windstream with respect to the Distribution Systems. Windstream is currently a party to various legal actions and administrative proceedings, including various claims arising in the ordinary course of its telecommunications business, which are subject to the indemnities provided by Windstream to us. If Windstream assumes the Master Lease, it would be obligated to honor all indemnification claims. If Windstream were to reject the Master Lease, any indemnification claims would be treated as unsecured claims, and, if that were to occur, there can be no assurance we would receive any indemnification payments from Windstream. While these actions and proceedings are not believed to be material, individually or in the aggregate, the ultimate outcome of these matters cannot be predicted. The resolution of any such legal proceedings, either individually or in the aggregate, could have a material adverse effect on Windstream's business, financial position or results of operations, which, in turn, could have a material adverse effect on our business, financial position or results of operations if Windstream is unable to meet its indemnification obligations.

Table of Contents

Windstream has been involved in litigation with an entity who acquired certain Windstream debt securities and thereafter issued a notice of default as to such securities relating to the Spin-Off. Windstream challenged the matter in federal court and a trial was held in July 2018. On February 15, 2019, the federal court judge issued a ruling against Windstream, finding that Windstream's attempts to waive such default were not valid; that an "event of default" occurred with respect to such debt securities; and that the holder's acceleration of such debt in December 2017 was effective.

In response to the adverse outcome, on February 25, 2019, Windstream filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.

In bankruptcy, Windstream has the option to assume or reject the Master Lease. While we believe that the Master Lease is essential to Windstream's operations, it is difficult to predict what could occur in a restructuring, and even a temporary disruption in payments to us may require us to fund certain expenses and obligations (e.g., real estate taxes and maintenance expenses) to preserve the value of our properties and avoid the imposition of liens on our properties and could impact our ability to fund other cash obligations, including dividends necessary to maintain REIT status, non-essential capital expenditures and, in an extreme case, our debt service obligations. See Item 1A Risk Factors for additional information concerning the impact Windstream's bankruptcy may have on our operations and financial conditions. A rejection by Windstream of the Master Lease or its inability or unwillingness to meet its rent and other obligations under the Master Lease could materially adversely affect our consolidated results of operations, liquidity, and financial condition, including our ability to service debt, comply with debt covenants and pay dividends to our stockholders as required to maintain our status as a REIT. A rejection of the Master Lease by Windstream would result in an "event of default" under our Credit Agreement if we are unable to enter into a replacement lease that satisfies certain criteria set forth in the Credit Agreement within ninety (90) calendar days and we do not maintain pro forma compliance with a consolidated secured leverage ratio, as defined in the Credit Agreement, of 5.00 to 1.00.

**Item 4. Mine Safety Disclosures.**

None

Table of Contents

**PART II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

**Market Information**

Our common stock is traded on the NASDAQ Global Select Market under the symbol "UNIT."

**Holders**

As of March 6, 2019, the closing price of our common stock was $8.63 per share as reported on the NASDAQ Global Select Market. As of March 6, 2019, we had 183,103,947 outstanding shares of common stock, 21,340 record holders and approximately 155,003 beneficial owners of our common stock.

**Dividends (Distributions)**

Distributions with respect to our common stock is characterized for federal income tax purposes as taxable ordinary dividends, capital gains dividends, non-dividend distribution or a combination thereof. It has been our policy to declare dividends to common shareholders so as to comply with the provisions of the Internal Revenue Code governing REITs.

Any dividends must be declared by our Board of Directors, which will take into account various factors including our current and anticipated operating results, our financial position, REIT requirements, conditions prevailing in the market, restrictions in our debt documents and additional factors they deem appropriate. Dividend payments are not guaranteed and our Board of Directors may decide, in its absolute discretion, at any time and for any reason, not to pay dividends or to change the amount paid as dividends. As a result of recent actions related to Windstream, as set forth in Item 1A Risk Factors, we may choose to reduce or suspend our dividend for a period of time until the situation is clarified. In addition, during the pendency of Windstream's bankruptcy, or at such earlier time when certain other conditions are specified, the Amendment to our Credit Agreement (as set forth in Item 1A Risk Factors) generally limits our ability under the Credit Agreement to pay cash dividends in excess of 90% of our REIT taxable income, determined without regard to the dividends paid deduction and excluding any net capital gains.

**Stock Performance**

The following graph shows a comparison from April 20, 2015 (the date our common stock commenced trading on the NASDAQ Global Select Market) through December 31, 2018 of the cumulative total return for our common stock, the Standard & Poor's 400 Stock Index (S&P 400 Index), and the MSCI US REIT Index. The graph assumes that $100 was invested at the market open on April 20, 2015 and that all dividends were reinvested in the common stock of Uniti, the S&P 400 Index and the MSCI US REIT Index. The stock price performance of the following graph is not necessarily indicative of future stock price performance.

27

Table of Contents



Cumulative Total Stockholder Returns
Based on Investment of $100.00 Beginning on April 20, 2015

|  | 4/20/2015 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 |
|---|---|---|---|---|---|
| Uniti Group Inc. | $ 100.00 | $ 72.33 | $ 107.65 | $ 84.94 | $ 84.93 |
| S&P 400 Index | 100.00 | 92.56 | 111.76 | 129.90 | 115.50 |
| MSCI US REIT Index | 100.00 | 100.78 | 109.46 | 115.08 | 109.89 |

**Issuer Purchases of Equity Securities**

The table below provides information regarding shares withheld from Uniti employees to satisfy minimum statutory tax withholding obligations arising from the vesting of restricted stock granted under the Uniti Group Inc. 2015 Equity Incentive Plan. The shares of common stock withheld to satisfy tax withholding obligations may be deemed purchases of such shares required to be disclosed pursuant to this Item 5.

| Period | Total Number of Shares Purchased | Average Price Paid per Share(1) | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Number of Shares that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| October 1, 2018 to October 31, 2018 | 300 $ | 19.82 | — | — |
| November 1, 2018 to November 30, 2018 | 3,940 | 20.10 | — | — |
| December 1, 2018 to December 31, 2018 | — | — | — | — |
| Total | 4,240 $ | 20.08 | — | — |

28

Table of Contents

(1)    The weighted-average price per share is the weighted-average of the fair market prices at which we calculated the number of shares withheld to cover tax withholdings for the employees.

**Item 6. Selected Financial Data.**

The following table sets forth selected financial data for Uniti on a consolidated and combined historical basis as of the dates and for the years indicated.

Prior to April 24, 2015, we did not operate the Consumer CLEC Business separately from Windstream, nor did we commence our leasing business. The selected historical financial data as of December 31, 2014 and for the period from January 1, 2015 to April 24, 2015 and the year ended December 31, 2014 has been derived from the audited financial statements of the Consumer CLEC Business and Distribution Systems.

The following should be read in conjunction with the combined financial statements, accompanying notes and *Management's Discussion and Analysis of Financial Condition and Results of Operations*, each of which are included elsewhere in this Form 10-K.

| | Year Ended December 31, | | | April 24 - December 31, | January 1 - April 24, | Year Ended December 31, |
|---|---|---|---|---|---|---|
| (Thousands, except per share data) | 2018 | 2017 | 2016 | 2015 | 2015 | 2014 |
| **Statement of Income Data:** | | | | | | |
| Total revenue(1) | $ 1,017,634 | $ 916,032 | $ 770,408 | $ 476,314 | $ 10,149 | $ 36,015 |
| Interest expense | 319,591 | 305,994 | 275,394 | 181,797 | * | * |
| Net income (loss) attributable to common shareholders | 7,989 | (16,552) | (5,497) | 23,718 | * | * |
| Earnings (loss) per common share - basic | 0.05 | (0.10) | (0.04) | 0.16 | * | * |
| Earnings (loss) per common share - diluted | $ 0.04 | $ (0.13) | $ (0.04) | $ 0.16 | * | * |
| **Balance Sheet Data:** | | | | | | |
| Total assets(2) | $ 4,592,937 | $ 4,330,082 | $ 3,318,752 | $ 2,542,636 | * | $ 2,588,450 |
| Notes and other debt(3) | 4,901,515 | 4,539,026 | 4,082,749 | 3,505,228 | * | * |
| Total shareholders' (deficit) equity(4) | (1,493,203) | (1,207,142) | (1,402,445) | (1,166,906) | * | 2,580,565 |
| **Other Data:** | | | | | | |
| Dividends paid | 426,094 | 400,210 | 367,830 | 156,854 | * | * |
| Dividends declared per common share | 2.40 | 2.40 | 2.40 | 1.64 | * | * |
| Funds from operations ("FFO")(5) | 373,741 | 352,477 | 346,051 | 259,829 | * | * |
| Diluted FFO per common share | 2.11 | 2.09 | 2.27 | 1.73 | * | * |
| Adjusted funds from operations ("AFFO")(5) | 443,755 | 424,824 | 398,537 | 267,077 | * | * |
| Diluted AFFO per common share | $ 2.51 | $ 2.51 | $ 2.61 | $ 1.78 | * | * |

\* Information not applicable for periods presented
(1)    For periods prior to April 24, 2015, amounts represent revenues of the Consumer CLEC Business as an integrated operation within Windstream.
(2)    As of December 31, 2014 amounts represent the combined assets of the Consumer CLEC Business and the Distribution Systems.
(3)    As of December 31, 2018, 2017, and 2016, amount includes $55.3 million, $56.3 million, and $54.5 million of capital lease obligations, respectively.
(4)    As of December 31, 2014 amounts include the net assets contributed of the Consumer CLEC Business and the Distribution Systems.
(5)    For a more detailed discussion and reconciliation of FFO and AFFO, see "Non-GAAP Financial Measures" in Item 7.

Table of Contents

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

The following management's discussion and analysis of financial condition and results of operations describes the principal factors affecting the results of our operations, financial condition, and changes in financial condition, as well as our critical accounting estimates.

**Overview**

*Company Description*

Uniti Group Inc. (the "Company", "Uniti", "we", "us" or "our") is an independent, internally managed real estate investment trust ("REIT") engaged in the acquisition and construction of mission critical infrastructure in the communications industry. We are principally focused on acquiring and constructing fiber optic broadband networks, wireless communications towers, copper and coaxial broadband networks and data centers.

On April 24, 2015, we were separated and spun-off (the "Spin-Off") from Windstream Holdings, Inc. ("Windstream Holdings" and together with its subsidiaries, "Windstream") pursuant to which Windstream contributed certain telecommunications network assets, including fiber and copper networks and other real estate (the "Distribution Systems") and a small consumer competitive local exchange carrier ("CLEC") business (the "Consumer CLEC Business"), to Uniti and Uniti issued common stock and indebtedness and paid cash obtained from borrowings under Uniti's senior credit facilities to Windstream. In connection with the Spin-Off, we entered into a long-term exclusive triple-net lease (the "Master Lease") with Windstream, pursuant to which a substantial portion of our real property is leased to Windstream and from which a substantial portion of our leasing revenues are currently derived.

Uniti operates as a REIT for U.S. federal income tax purposes. As a REIT, the Company is generally not subject to U.S. federal income taxes on income generated by its REIT operations, which includes income derived from the Master Lease. We have elected to treat the subsidiaries through which we operate our fiber business, Uniti Fiber, and Talk America Services, LLC, which operates the Consumer CLEC Business ("Talk America"), as taxable REIT subsidiaries ("TRSs"). TRSs enable us to engage in activities that result in income that does not constitute qualifying income for a REIT. Our TRSs are subject to U.S. federal, state and local corporate income taxes.

The Company operates through a customary up-REIT structure, pursuant to which we hold substantially all of our assets through a partnership, Uniti Group LP, a Delaware limited partnership (the "Operating Partnership"), that we control as general partner. This structure is intended to facilitate future acquisition opportunities by providing the Company with the ability to use common units of the Operating Partnership as a tax-efficient acquisition currency. As of the date of this report, we are the sole general partner of the Operating Partnership and own approximately 97.7% of the partnership interests in the Operating Partnership.

We expect to grow and diversify our portfolio and tenant base by pursuing a range of transaction structures with communication service providers, including, (i) sale leaseback transactions, whereby we acquire existing infrastructure assets from third parties, including communication service providers, and lease them back on a long-term triple net basis; (ii) whole company acquisitions, which may include the use of one or more TRSs that are permitted under the tax laws to acquire and operate non-REIT businesses and assets subject to certain limitations; (iii) capital investment financing, whereby we offer communication service providers a cost efficient method of raising funds for discrete capital investments to upgrade or expand their network; and (iv) mergers and acquisitions financing, whereby we facilitate mergers and acquisition transactions as a capital partner, including through operating company/property company ("OpCo-PropCo") structures.

We manage our operations as four reportable business segments in addition to our corporate operations:

*Leasing Segment*: Represents a component of our REIT operations and includes the results from our leasing business, Uniti Leasing, which is engaged in the acquisition of mission-critical communications assets and leasing them to anchor customers on either an exclusive or shared-tenant basis.

Table of Contents

*Fiber Infrastructure Segment*: Represents the operations of our fiber business, Uniti Fiber, which is a leading provider of infrastructure solutions, including cell site backhaul and dark fiber, to the telecommunications industry.

*Towers Segment*: Represents the operations of our towers business, Uniti Towers, through which we acquire and construct tower and tower-related real estate and lease space on communications towers to wireless service providers and other tenants. Uniti Towers is a component of our REIT operations.

*Consumer CLEC Segment*: Represents the operations of Talk America through which we operate the Consumer CLEC Business that prior to the Spin-Off was reported as an integrated operation within Windstream. Talk America provides local telephone, high-speed internet and long distance services to customers in the eastern and central United States.

*Corporate Operations*: Represents our corporate office and shared service functions. Certain costs and expenses, primarily related to headcount, information technology systems, insurance, professional fees and similar charges, that are directly attributable to operations of our business segments are allocated to the respective segments.

We evaluate the performance of each segment based on Adjusted EBITDA, which is a segment performance measure we define as net income determined in accordance with GAAP, before interest expense, provision for income taxes, depreciation and amortization, stock-based compensation expense, the impact, which may be recurring in nature, of transaction and integration related expenses, the write off of unamortized deferred financing costs, costs incurred as a result of the early repayment of debt, gains or losses on dispositions, changes in the fair value of contingent consideration and financial instruments, and other similar items. For more information on Adjusted EBITDA, see "Non-GAAP Financial Measures." Detailed information about our segments can be found in Note 13 to our consolidated financial statements contained in Part II, Item 8 *Financial Statements and Supplementary Data*.

**Significant Business Developments**

*Windstream Bankruptcy Filing.*  Windstream has been involved in litigation with an entity who acquired certain Windstream debt securities and thereafter issued a notice of default as to such securities relating to the Spin-Off. Windstream challenged the matter in federal court and a trial was held in July 2018. On February 15, 2019, the federal court judge issued a ruling against Windstream, finding that Windstream's attempts to waive such default were not valid; that an "event of default" occurred with respect to such debt securities; and that the holder's acceleration of such debt in December 2017 was effective.

In response to the adverse outcome, on February 25, 2019, Windstream filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.

In bankruptcy, Windstream has the option to assume or reject the Master Lease.  While we believe that the Master Lease is essential to Windstream's operations, it is difficult to predict what could occur in a restructuring, and even a temporary disruption in payments to us may require us to fund certain expenses and obligations (e.g., real estate taxes and maintenance expenses) to preserve the value of our properties and avoid the imposition of liens on our properties and could impact our ability to fund other cash obligations, including dividends necessary to maintain REIT status, non-essential capital expenditures and, in an extreme case, our debt service obligations. See Item 1A Risk Factors for additional information concerning the impact Windstream's bankruptcy may have on our operations and financial condition.  A rejection by Windstream of the Master Lease or its inability or unwillingness to meet its rent and other obligations under the Master Lease could materially adversely affect our consolidated results of operations, liquidity, and financial condition, including our ability to service debt, comply with debt covenants and pay dividends to our stockholders as required to maintain our status as a REIT.

In addition, a rejection of the Master Lease by Windstream would result in an "event of default" under our Credit Agreement if we are unable to enter into a replacement lease that satisfies certain criteria set forth in the Credit Agreement within ninety (90) calendar days and we do not maintain pro forma compliance with a consolidated secured leverage ratio, as defined in the Credit Agreement, of 5.00 to 1.00.

Table of Contents

*Going Concern.* There are conditions and events which raise substantial doubt about our ability to continue as a going concern and in its opinion on our December 31, 2018 financial statements, PricewaterhouseCoopers LLP, our independent registered public accounting firm, expressed substantial doubt as to whether we could continue as a going concern within one year after the date the financial statements are issued as a result of Windstream's bankruptcy petition and its potential uncertain effects on the Master Lease. Our financial statements do not include any adjustments that may result from the outcome of this uncertainty. We expect Windstream will continue to perform on the Master Lease and believe it is unlikely that Windstream will reject the Master Lease because the Master Lease is central to Windstream's operations. We also intend to reduce our capital expenditures and dividend as well as seek external funding in order to sustain our operations. The failure to provide 2018 audited financial statements without a going concern opinion to the lenders under our Credit Agreement by March 31, 2019 would constitute a breach of the covenants of our Credit Agreement and, unless such default is waived by our lenders, would constitute an immediate event of default. If an event of default were to occur under our Credit Agreement, the Credit Agreement's administrative agent could declare all outstanding loans immediately due and payable. Such an acceleration would trigger cross-default provisions within the indentures governing our senior notes and thereby entitle the trustee and noteholders to accelerate the repayment of the senior notes.

On March 18, 2019, we received a limited waiver from our lenders under our Credit Agreement, waiving an event of default related solely to the receipt of a going concern opinion from our auditors for our 2018 audited financial statements. The limited waiver was issued in connection with the Amendment to our Credit Agreement. During the pendency of Windstream's bankruptcy, or at such earlier time when certain other conditions are specified, the Amendment generally limits our ability under the Credit Agreement to (i) prepay unsecured indebtedness and (ii) pay cash dividends in excess of 90% of our REIT taxable income, determined without regard to the dividends paid deduction and excluding any net capital gains. The Amendment also increases the interest rate on our Term Loan Facility, which will now bear a rate of LIBOR, subject to a 1.0% floor, plus an applicable margin equal to 5.0%, a 200 basis point increase over our previous rate. This increase will be in effect though the remaining term of the facility, which matures on October 24, 2022.

*Sale of Latin American Tower Portfolio.* On February 19, 2019, the Company announced it had agreed to sell its Uniti Towers' business in Latin America to an entity controlled by Phoenix Towers International ("PTI") for cash consideration of approximately $100 million. PTI will acquire approximately 500 towers located across Mexico, Colombia and Nicaragua. The transaction is subject to customary closing conditions and is expected to close by the end of the first quarter of 2019. This sale will realize value for our stockholders and allows us to focus on growth opportunities in the United States. Uniti Towers will continue to be a significant component of our strategy to provide a full suite of solutions to wireless carriers and other customers.

*Bluebird Network, LLC Operating Company – Property Company Transaction.* On January 15, 2019, the Company entered into an OpCo-PropCo transaction with Macquarie Infrastructure Partners ("MIP") to acquire Bluebird Network, LLC ("Bluebird"). MIP operates within the Macquarie Infrastructure and Real Assets ("MIRA") division of Macquarie Group. Bluebird's network consists of approximately 178,000 fiber strand miles in the Midwest across Missouri, Kansas, Illinois and Oklahoma. In the transaction, Uniti has agreed to purchase the Bluebird fiber network and MIP has agreed to purchase the Bluebird operations. In addition, Uniti has agreed to sell Uniti Fiber operations to MIP, while Uniti will retain its existing Midwest fiber network. Uniti is acquiring the fiber network of Bluebird for $319 million, of which $175 million will be funded by Uniti in cash and $144 million from pre-paid rent to be received from MIP at closing. In connection with the sale of the Company's Midwest operations, we will receive total upfront cash of approximately $37 million, including related pre-paid rent to be received from MIP at closing. These transactions are subject to regulatory and other closing conditions and are expected to close by the end of the third quarter of 2019. Concurrently with the closing of these transactions, Uniti will lease the Bluebird fiber network and its Midwest fiber network on a combined basis to MIP, under a long-term triple net lease, with initial annual cash rents of approximately $20.3 million. The lease will be reported within the results of our Leasing segment. The Midwest operations that will be sold to MIP are currently reported in our Fiber Infrastructure segment.

*Acquisition of Information Transport Solutions, Inc.* On October 19, 2018, we completed the acquisition of Information Transport Solutions, Inc. ("ITS"). We acquired all the outstanding membership interests of ITS for approximately $59.6 million in cash, including the payoff of existing indebtedness and unpaid transaction expenses. ITS is a full-service provider of technology solutions, primarily to educational institutions in Alabama and Florida.

32

Table of Contents

Over 30% of ITS's total revenue is on Uniti Fiber's network, which is expected to increase under Uniti Fiber's ownership. The results of operations of ITS are reflected in the Fiber Infrastructure segment beginning October 19, 2018.

*Hurricane Michael.* During October 2018 Hurricane Michael made landfall as a Category 4 hurricane. The storm resulted in significant damage to the Uniti Fiber network in Florida's Bay County and surrounding areas. Shortly after landfall we dedicated substantial internal and third-party resources to repair and replace the damaged network, as well as to make enhancements to the network in the impacted areas. As of December 31, 2018, we incurred $3.0 million of costs associated with the restoration efforts and wrote off $3.7 million of network assets that were destroyed. We anticipate full recovery of these costs and expense through insurance proceeds.

*Acquisition and Lease-back of CableSouth Media, LLC Fiber Assets.* On October 9, 2018, we completed the acquisition of fiber assets from CableSouth Media, LLC ("CableSouth") for cash consideration of $31 million. In the transaction, Uniti acquired 43,000 fiber strand miles located across Arkansas, Louisiana and Mississippi, of which 34,000 fiber strand miles were leased back to CableSouth on a triple-net basis. Uniti has exclusive use of 9,000 fiber strand miles, which are adjacent to Uniti Fiber's southern network footprint. The initial lease term is 20 years with four 5-year renewal options at CableSouth's discretion. Annual cash rent is initially $2.9 million with a fixed annual escalator of 2.0%. The results of this transaction are recorded within our Leasing segment.

*Acquisition and Lease-back of U.S. TelePacific Holding Corp. Fiber Assets.* On September 19, 2018, we completed the acquisition and lease-back of the California fiber assets of U.S. Telepacific Holding Corp. ("TPx"), for total cash consideration of $70 million. On May 1, 2018, we completed the acquisition and lease-back of the non-California fiber assets of TPx, which included exclusive use fiber strand miles in Texas, for total cash consideration of $25 million. The initial lease term is 15 years with five 5-year renewal options at TPx's discretion. Initial annual cash rent related to the non-California and California assets is $8.8 million with a fixed annual escalator of 1.5%. The results of these transactions are recorded within our Leasing segment.

*IRS Private Letter Ruling.* During July 2018, we received a favorable private letter ruling ("PLR") from the Internal Revenue Service ("IRS") in connection with our request for guidance to clarify the treatment of income the Company receives from certain communication infrastructure assets. In the PLR, the IRS addressed and favorably ruled that the revenues generated from certain communication infrastructure assets that presently are part of our TRSs would be considered rent from real property.

*Dark Fiber Acquisition and Anchor Tenant Lease.* On May 10, 2018, the Company acquired from CenturyLink, Inc. 30 long-haul intercity dark fiber routes totaling 11,000 route miles and 270,000 fiber strand miles across 25 states. This transaction was approved by the U.S. Department of Justice as a condition of the merger between CenturyLink, Inc. and Level 3 Communications, Inc., and adds attractive, high demand assets to Uniti Leasing. Simultaneously with this purchase, the Company executed an anchor tenant lease with a Fortune 100 company for 11% of the fiber strand miles. During August 2018, the Company executed a lease agreement with a national multiple system operator ("MSO") on existing Uniti Leasing fiber. The lease term will be 20 years covering approximately 9,900 route miles or 41,000 fiber strand miles. Annual results related to the agreements are reported within our Leasing segment.

**Comparison of the years ended December 31, 2018 and 2017**

The following tables sets forth, for the periods indicated, our results of operations expressed as dollars and as a percentage of total revenues:

33

Table of Contents

| (Thousands) | Year Ended December 31, 2018 | | % of Revenues | Year Ended December 31, 2017 | | % of Revenues |
|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | |
| Leasing | $ | 699,847 | 68.8% | $ | 685,099 | 74.8% |
| Fiber Infrastructure | | 289,239 | 28.4% | | 202,791 | 22.1% |
| Tower | | 14,617 | 1.4% | | 10,055 | 1.1% |
| Consumer CLEC | | 13,931 | 1.4% | | 18,087 | 2.0% |
| Total revenues | | 1,017,634 | 100.0% | | 916,032 | 100.0% |
| **Costs and Expenses:** | | | | | | |
| Interest expense, net | | 319,591 | 31.4% | | 305,994 | 33.4% |
| Depreciation and amortization | | 451,750 | 44.4% | | 434,205 | 47.4% |
| General and administrative expense | | 85,198 | 8.4% | | 72,045 | 7.9% |
| Operating expense (exclusive of depreciation and amortization) | | 137,065 | 13.4% | | 102,176 | 11.2% |
| Transaction related costs | | 17,410 | 1.7% | | 38,005 | 4.1% |
| Other (income) expense | | (4,504) | (0.4%) | | 11,284 | 1.2% |
| Total costs and expenses | | 1,006,510 | 98.9% | | 963,709 | 105.2% |
| | | | | | | |
| **Income (loss) before income taxes** | | 11,124 | 1.1% | | (47,677) | (5.2%) |
| Income tax benefit | | (5,421) | (0.5%) | | (38,849) | (4.2%) |
| **Net income (loss)** | | 16,545 | 1.6% | | (8,828) | (1.0%) |
| Net income attributable to noncontrolling interests | | 358 | 0.0% | | 611 | 0.1% |
| **Net income (loss) attributable to shareholders** | | 16,187 | 1.6% | | (9,439) | (1.0%) |
| Participating securities' share in earnings | | (2,594) | (0.2%) | | (1,509) | (0.2%) |
| Dividends declared on convertible preferred stock | | (2,624) | (0.3%) | | (2,624) | (0.3%) |
| Amortization of discount on convertible preferred stock | | (2,980) | (0.3%) | | (2,980) | (0.3%) |
| **Net income (loss) attributable to common shareholders** | $ | 7,989 | 0.8% | $ | (16,552) | (1.8%) |

The following table sets forth, for the years ended December 31, 2018 and 2017, revenues and Adjusted EBITDA of our reportable segments:

| (Thousands) | Year Ended December 31, 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Leasing | | Fiber Infrastructure | | Towers | | Consumer CLEC | | Corporate | | Total of Reportable Segments |
| Revenues | $ | 699,847 | $ | 289,239 | $ | 14,617 | $ | 13,931 | $ | - $ | 1,017,634 |
| | | | | | | | | | | | |
| Adjusted EBITDA | $ | 697,545 | $ | 123,389 | $ | 355 | $ | 3,353 | $ | (21,759) $ | 802,883 |
| Adjusted EBITDA margin | | 99.7% | | 42.7% | | 2.4% | | 24.1% | | - | 78.9% |
| Less: | | | | | | | | | | | |
| Interest expense, net | | | | | | | | | | | 319,591 |
| Depreciation and amortization | | 337,126 | | 105,651 | | 6,704 | | 1,994 | | 275 | 451,750 |
| Other income | | | | | | | | | | | (4,504) |
| Transaction related costs | | | | | | | | | | | 17,410 |
| Stock-based compensation | | | | | | | | | | | 8,064 |
| Income tax benefit | | | | | | | | | | | (5,421) |
| Other | | | | | | | | | | | (552) |
| Net income | | | | | | | | | | $ | 16,545 |

34

Table of Contents

| (Thousands) | | Year Ended December 31, 2017 | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Leasing | Fiber Infrastructure | Towers | Consumer CLEC | Corporate | Total of Reportable Segments | |
| Revenues | $ 685,099 | $ 202,791 | $ 10,055 | $ 18,087 | $ - | $ 916,032 |
| | | | | | | |
| Adjusted EBITDA | $ 683,651 | $ 83,987 | $ (831) | $ 4,556 | $ (21,839) | $ 749,524 |
| Adjusted EBITDA margin | 99.8% | 41.4% | (8.3%) | 25.2% | - | 81.8% |
| Less: | | | | | | |
| Interest expense, net | | | | | | 305,994 |
| Depreciation and amortization | 347,999 | 78,307 | 4,907 | 2,607 | 385 | 434,205 |
| Other expense | | | | | | 11,284 |
| Transaction related costs | | | | | | 38,005 |
| Stock-based compensation | | | | | | 7,713 |
| Income tax benefit | | | | | | (38,849) |
| Net loss | | | | | | $ (8,828) |

### *Revenues*

*Leasing* – Leasing revenues are primarily attributable to rental revenue from leasing our Distribution Systems to Windstream Holdings pursuant to the Master Lease. Under the Master Lease, Windstream Holdings is responsible for the costs related to operating the Distribution Systems, including property taxes, insurance, and maintenance and repair costs. As a result, we do not record an obligation related to the payment of property taxes, as Windstream makes direct payments to the taxing authorities. The Master Lease has an initial term of 15 years with four 5-year renewal options and encompasses properties located in 29 states. Cash rent under the Master Lease is currently $657 million and is subject to an annual escalation of 0.5% each May through the initial term. Rental revenues over the initial term of the Master Lease are recognized in the financial statements on a straight-line basis, representing approximately $670.8 million per year.

The Master Lease provides that tenant funded capital improvements ("TCIs"), defined as maintenance, repair, overbuild, upgrade or replacement to the leased network, including without limitation, the replacement of copper distribution systems with fiber distribution systems, automatically become property of Uniti upon their construction by Windstream. We receive non-monetary consideration related to TCIs as they automatically become our property, and we recognize the cost basis of TCIs that are capital in nature as real estate investments and deferred revenue. We depreciate the real estate investments over their estimated useful lives and amortize the deferred revenue as additional leasing revenues over the same depreciable life of the TCI assets.

For the year ended December 31, 2018, we recognized $693.9 million of revenue under the Master Lease, which included $23.1 million of non-cash TCI revenue and $15.1 million of non-cash straight-line rental revenue. For the year ended December 31, 2017, we recognized $685.1 million of revenue under the Master Lease, which included $14.3 million of non-cash TCI revenue and $17.3 million of non-cash straight-line rental revenue. The increase in TCI revenue is attributable to continued investment by Windstream in TCIs. Windstream invested $153.6 million in TCIs during the year ended December 31, 2018, a decrease from $228.0 million it invested in TCIs during the year ended December 31, 2017. Since the inception of the Master Lease, Windstream has invested a total of $607.1 million in such improvements.

Because a substantial portion of our revenue and cash flows are derived from lease payments by Windstream pursuant to the Master Lease, there could be a material adverse impact on our consolidated results of operations, liquidity, financial condition and/or ability to pay dividends and service debt if Windstream were to default under the Master Lease or otherwise experiences operating or liquidity difficulties and becomes unable to generate sufficient cash to make payments to us. In recent years, Windstream has experienced annual declines in its total revenue, sales and cash flow, and has had its credit ratings downgraded by nationally recognized credit rating agencies multiple times over the past 12 months. In addition, Windstream has been involved in litigation with an entity who acquired certain Windstream debt securities and thereafter issued a notice of default as to such securities

Table of Contents

relating to our spin-off from Windstream. On December 7, 2017, the entity issued a notice of acceleration to Windstream claiming that the alleged default had matured into an "event of default" and that the principal amount, along with accrued interest, of such securities was due and payable immediately. Windstream challenged the matter in federal court and a trial was held in July 2018. On February 15, 2019, the federal court judge issued a ruling against Windstream, finding that Windstream's attempts to waive such default were not valid; that an "event of default" occurred with respect to such debt securities; and that the holder's acceleration of such debt in December 2017 was effective.

In response to the adverse outcome, on February 25, 2019, Windstream filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.

In bankruptcy, Windstream has the option to assume or reject the Master Lease. While we believe that the Master Lease is essential to Windstream's operations, it is difficult to predict what could occur in a restructuring, and even a temporary disruption in payments to us may require us to fund certain expenses and obligations (e.g., real estate taxes and maintenance expenses) to preserve the value of our properties and avoid the imposition of liens on our properties and could impact our ability to fund other cash obligations, including dividends necessary to maintain REIT status, non-essential capital expenditures and, in an extreme case, our debt service obligations. See Item 1A Risk Factors for additional information concerning the impact Windstream's bankruptcy may have on our operations and financial condition. A rejection by Windstream of the Master Lease or its inability or unwillingness to meet its rent and other obligations under the Master Lease could materially adversely affect our consolidated results of operations, liquidity, and financial condition, including our ability to service debt and pay dividends to our stockholders as required to maintain our status as a REIT.

Windstream is a publicly traded company and is subject to the periodic filing requirements of the Securities Exchange Act of 1934, as amended. Windstream filings can be found at www.sec.gov. Windstream filings are not incorporated by reference in this Annual Report on Form 10-K.

For the year ended December 31, 2018, we recognized $6.0 million of leasing revenues from non-Windstream triple-net leasing and dark fiber indefeasible rights of use ("IRU") arrangements. No such revenues were recognized for the year ended December 31, 2017.

*Fiber Infrastructure* – For the years ended December 31, 2018 and 2017, we recognized $289.2 and $202.8 of revenue, in our Fiber Infrastructure segment. The increase is primarily attributable to the timing of the acquisitions of Southern Light, LLC ("Southern Light") and Hunt Telecommunications LLC ("Hunt"), which were both acquired on July 3, 2017. Southern Light and Hunt contributed revenues of $132.8 million and $61.9 million, to our consolidated results for the year-ended December 31, 2018 and for the period from the date of acquisition through December 31, 2017, respectively. In addition, we acquired ITS on October 19, 2018, which contributed $8.9 million of revenues from the date of acquisition to December 31, 2018. Revenue components for the Fiber Infrastructure segment for the years ended December 31, 2018 and 2017 consisted of the following:

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2018** | | | **2017** | |
| (Thousands) | | **Amount** | **% of Segment Revenues** | | **Amount** | **% of Segment Revenues** |
| **Fiber Infrastructure revenues:** | | | | | | |
| Lit backhaul services | $ | 132,361 | 45.8% | $ | 117,574 | 58.0% |
| Enterprise and wholesale | | 63,519 | 22.0% | | 36,542 | 18.0% |
| E-Rate and government | | 74,752 | 25.8% | | 43,021 | 21.2% |
| Dark fiber and small cells | | 14,115 | 4.9% | | 5,200 | 2.6% |
| Other services | | 4,492 | 1.5% | | 454 | 0.2% |
| Total Fiber Infrastructure revenues | $ | 289,239 | 100.0% | $ | 202,791 | 100.0% |

At December 31, 2018, we had approximately 18,200 customer connections, up from 16,750 customer connections at December 31, 2017.

36

Table of Contents

*Towers* – Towers revenues for the years ended December 31, 2018 and 2017 consisted of the following:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | | | **2017** | | |
| (Thousands) | **Amount** | | **% of Segment Revenues** | **Amount** | | **% of Segment Revenues** |
| **Towers revenues:** | | | | | | |
| United States | $ | 5,207 | 35.6% | $ | 2,599 | 25.8% |
| Latin America | | 9,410 | 64.4% | | 7,456 | 74.2% |
| Total | $ | 14,617 | 100.0% | $ | 10,055 | 100.0% |

The increased revenue for the year ended December 31, 2018, compared to the year ended December 31, 2017, is primarily driven by our development activities in the United States and acquisition of additional NMS development towers in Latin America pursuant to our purchase agreement with Network Management Holdings LTD ("NMS"). During 2018 we completed the construction of 203 towers in the U.S. and added 58 towers in Latin America, of which 39 were NMS development towers. As of December 31, 2018 we acquired 89 of the 105 towers that were under development at the time of the NMS acquisition, and the remaining 16 development towers were cancelled and will not be completed and purchased.

At December 31, 2018, the Uniti Towers' portfolio consisted of 430 wireless communications towers located in 26 states across the eastern and central regions in the United States, and 498 wireless communications towers in Latin America.

*Consumer CLEC* – For the year ended December 31, 2018, we recognized $13.9 million of revenue from the Consumer CLEC Business, compared to $18.1 million for the year ended December 31, 2017. The decrease is primarily attributable to a loss of customers during the period. We served approximately 22,500 customers as of December 31, 2018, a 21.1% decrease from 28,500 at December 31, 2017. The decrease in customers is due to the effects of competition and customer attrition.

**Interest Expense, net**

Interest expense for the year ended December 31, 2018, totaled $319.6 million, which includes non-cash interest expense of $24.6 million resulting from the amortization of our debt discounts and debt issuance costs, partially offset by $5.6 million of capitalized interest. Interest expense for the year ended December 31, 2017, totaled $306.0 million, which includes non-cash interest expense of $23.1 million resulting from the amortization of our debt discounts and debt issuance costs. The increase is related to $5.9 million of interest expense on the 2024 Notes issued in May of 2017, an increase in interest expense incurred on the revolving credit facility of $10.8 million due to increased borrowings and LIBOR rates compared to the prior year. This was partially offset by a decrease in interest expense related to capitalized interest of $5.6 million, which was not incurred in the year ended December 31, 2017.

**Depreciation and Amortization Expense**

We incur depreciation and amortization expense related to our property, plant and equipment, corporate assets and intangible assets. Charges for depreciation and amortization for the year ended December 31, 2018 totaled $451.8 million (44.4% of revenue), which included property, plant and equipment depreciation of $425.2 million and intangible asset amortization of $26.6 million. Charges for depreciation and amortization for the year ended December 31, 2017 totaled $434.2 million (47.4% of revenue), which included property, plant and equipment depreciation of $415.9 million and intangible asset amortization of $18.3 million. The increase is primarily driven by the timing of the acquisitions of Southern Light and Hunt that closed on July 3, 2017.

Table of Contents

***General and Administrative Expense***

General and administrative expenses include compensation costs (including stock-based compensation awards), professional and legal services, corporate office costs and other costs associated with the administrative activities of our segments. For the year ended December 31, 2018, general and administrative costs totaled $85.2 million (8.4% of revenue), which includes $8.1 million of stock-based compensation expense. For the year ended December 31, 2017, general and administrative costs totaled $72.0 million (7.9% of revenue), which includes $7.7 million of stock-based compensation expense. The increase is primarily driven by the timing of the acquisitions of Southern Light and Hunt that closed on July 3, 2017.

***Operating Expense***

Operating expense for the year ended December 31, 2018, totaled $137.1 million (13.4% of revenue) compared to $102.2 million (11.2% of revenue) for the year ended December 31, 2017.  Operating expense for our reportable segments for the years ended December 31, 2018 and 2017 consisted of the following:

| | Year Ended December 31, | | | | | |
| | 2018 | | | 2017 | | |
| (Thousands) | | Amount | % of Consolidated Revenues | | Amount | % of Consolidated Revenues |
|---|---|---|---|---|---|---|
| **Operating expense by segment:** | | | | | | |
| Fiber Infrastructure | $ | 117,781 | 11.5% | $ | 83,515 | 9.1% |
| Towers | | 7,989 | 0.8% | | 5,131 | 0.6% |
| CLEC | | 10,576 | 1.0% | | 13,530 | 1.5% |
| Leasing | | 719 | 0.1% | | - | 0.0% |
| Total operating expenses | $ | 137,065 | 13.4% | $ | 102,176 | 11.2% |

*Fiber Infrastructure* – The increase to Fiber Infrastructure operating expense is primarily driven by the timing of the acquisitions of Southern Light and Hunt.  For the year ended December 31, 2018, Fiber Infrastructure operating expenses totaled $117.8 million as compared to $83.5 million for the year ended December 31, 2017.  The remaining increase was primarily driven by an increase in construction-related expenses and network costs, specifically lit service and maintenance expenses.

*Towers* – Our Towers segment operating expense consists primarily of ground rent, some or all of which may be passed to our tenants, as well as regulatory fees and maintenance and repairs.  For the year ended December 31, 2018, Towers operating expense included $5.1 million of ground rent expense, compared to $3.2 million of ground rent expense for the year ended December 31, 2017.  The change is attributable to an increase in completed towers at December 31, 2018 from December 31, 2017, driven by our development activity in the United States and acquisition of additional NMS development towers in Latin America.

*Consumer CLEC* – Expense associated with the Consumer CLEC Business is primarily attributable to the Wholesale Agreement and the Master Services Agreement entered into between us and Windstream in connection with the Spin-Off, and also includes costs arising under the interconnection agreements with other telecommunication carriers. Expense associated with the Wholesale Agreement and Master Services Agreement for the year ended December 31, 2018 totaled $7.8 million (0.8% of revenue) and $0.7 million (0.1% of revenue), respectively, and expense associated with the Wholesale Agreement and the Master Services Agreement for the year ended December 31, 2017 totaled $10.2 million (1.1% of revenue) and $1.3 million (0.1% of revenue), respectively.

***Other (Income) Expense***

Other income for the year ended December 31, 2018, totaled $4.5 million (0.4% of revenue), primarily as a result of a net unrealized gain of $3.7 million for mark-to-market adjustments on our contingent consideration arrangements.  Other expense for the year ended December 31, 2017, totaled $11.3 million (1.2% of revenue), primarily as a result

38

Table of Contents

of a net unrealized loss of $10.7 million for mark-to-market adjustments on our contingent consideration arrangements.

*Income Tax Benefit*

We recorded $5.4 million in income tax benefit for the year ended December 31, 2018. This benefit was primarily driven by pre-tax losses in our Fiber Infrastructure Segment which resulted in an income tax benefit of approximately $6.1 million, including $1.3 million of income tax benefit related to the impact of the Tax Bill on certain purchase accounting adjustments related to 2017 acquisitions that were recorded in 2018. We recorded a combined income tax expense of approximately $0.7 million related to our Leasing Segment and Consumer CLEC Segment. This was primarily driven by pre-tax income in our Consumer CLEC Segment and state tax expense recorded in our Leasing Segment.

**Comparison of the years ended December 31, 2017 and 2016**

The following tables sets forth, for the periods indicated, our results of operations expressed as dollars and as a percentage of total revenues:

| (Thousands) | | Year Ended December 31, 2017 | % of Revenues | | Year Ended December 31, 2016 | % of Revenues |
|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | |
| Leasing | $ | 685,099 | 74.8% | $ | 676,868 | 87.8% |
| Fiber Infrastructure | | 202,791 | 22.1% | | 70,568 | 9.2% |
| Tower | | 10,055 | 1.1% | | 500 | 0.1% |
| Consumer CLEC | | 18,087 | 2.0% | | 22,472 | 2.9% |
| Total revenues | | 916,032 | 100.0% | | 770,408 | 100.0% |
| **Costs and Expenses:** | | | | | | |
| Interest expense, net | | 305,994 | 33.4% | | 275,394 | 35.7% |
| Depreciation and amortization | | 434,205 | 47.4% | | 375,970 | 48.8% |
| General and administrative expense | | 72,045 | 7.9% | | 35,402 | 4.6% |
| Operating expense (exclusive of depreciation and amortization) | | 102,176 | 11.2% | | 49,668 | 6.4% |
| Transaction related costs | | 38,005 | 4.1% | | 33,669 | 4.4% |
| Other expense | | 11,284 | 1.2% | | - | 0.0% |
| Total costs and expenses | | 963,709 | 105.2% | | 770,103 | 100.0% |
| | | | | | - | |
| **(Loss) income before income taxes** | | (47,677) | (5.2%) | | 305 | 0.0% |
| Income tax (benefit) expense | | (38,849) | (4.2%) | | 517 | 0.1% |
| **Net loss** | | (8,828) | (1.0%) | | (212) | (0.0%) |
| Net income attributable to noncontrolling interests | | 611 | 0.1% | | - | 0.0% |
| **Net loss attributable to shareholders** | | (9,439) | (1.0%) | | (212) | (0.0%) |
| Participating securities' share in earnings | | (1,509) | (0.2%) | | (1,557) | (0.2%) |
| Dividends declared on convertible preferred stock | | (2,624) | (0.3%) | | (1,743) | (0.2%) |
| Amortization of discount on convertible preferred stock | | (2,980) | (0.3%) | | (1,985) | (0.3%) |
| **Net loss attributable to common shareholders** | $ | (16,552) | (1.8%) | $ | (5,497) | (0.7%) |

39

Table of Contents

The following table sets forth, for the years ended December 31, 2017 and 2016, revenues and Adjusted EBITDA of our reportable segments:

| (Thousands) | | Leasing | | Fiber Infrastructure | | Towers | | Consumer CLEC | | Corporate | | Total of Reportable Segments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Year Ended December 31, 2017** | | | | | | | |
| Revenues | $ | 685,099 | $ | 202,791 | $ | 10,055 | $ | 18,087 | $ | - | $ | 916,032 |
| | | | | | | | | | | | | |
| Adjusted EBITDA | $ | 683,651 | $ | 83,987 | $ | (831) | $ | 4,556 | $ | (21,839) | $ | 749,524 |
| Adjusted EBITDA margin | | 99.8% | | 41.4% | | (8.3%) | | 25.2% | | - | | 81.8% |
| Less: | | | | | | | | | | | | |
| Interest expense, net | | | | | | | | | | | | 305,994 |
| Depreciation and amortization | | 347,999 | | 78,307 | | 4,907 | | 2,607 | | 385 | | 434,205 |
| Other expense | | | | | | | | | | | | 11,284 |
| Transaction related costs | | | | | | | | | | | | 38,005 |
| Stock-based compensation | | | | | | | | | | | | 7,713 |
| Income tax benefit | | | | | | | | | | | | (38,849) |
| Net loss | | | | | | | | | | | $ | (8,828) |

| (Thousands) | | Leasing | | Fiber Infrastructure | | Towers | | Consumer CLEC | | Corporate | | Total of Reportable Segments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Year Ended December 31, 2016** | | | | | | | |
| Revenues | $ | 676,868 | $ | 70,568 | $ | 500 | $ | 22,472 | $ | - | $ | 770,408 |
| | | | | | | | | | | | | |
| Adjusted EBITDA | $ | 675,114 | $ | 25,912 | $ | (1,123) | $ | 5,074 | $ | (14,793) | $ | 690,184 |
| Adjusted EBITDA margin | | 99.7% | | 36.7% | | (224.6%) | | 22.6% | | - | | 89.6% |
| Less: | | | | | | | | | | | | |
| Interest expense, net | | | | | | | | | | | | 275,394 |
| Depreciation and amortization | | 343,368 | | 28,629 | | 337 | | 3,258 | | 378 | | 375,970 |
| Other expense | | | | | | | | | | | | - |
| Transaction related costs | | | | | | | | | | | | 33,669 |
| Stock-based compensation | | | | | | | | | | | | 4,846 |
| Income tax expense | | | | | | | | | | | | 517 |
| Net loss | | | | | | | | | | | $ | (212) |

***Revenues***

*Leasing* – For the year ended December 31, 2017, we recognized $685.1 million of revenue under the Master Lease, which included $14.3 million of TCI revenue. For the year ended December 31, 2016, we recognized $677.4 million of revenue under the Master Lease, which included $6.1 million of TCI revenue. The increase in TCI revenue is attributable to increased investment by Windstream in TCIs. Windstream invested $228 million in TCIs during the year ended December 31, 2017, an increase from $157 million it invested in TCIs during the year ended December 31, 2016.

*Fiber Infrastructure* – In our Fiber Infrastructure segment, we recognized $202.8 million of revenue for the year ended December 31, 2017, of which approximately 55.1% was derived from lit backhaul services, approximately 20.6% was derived from internet and voice revenue, approximately 11.3% was derived from construction revenue and approximately 13.0% was derived from other services. For the year ended December 31, 2016, we recognized $70.6 million of revenue in the Fiber Infrastructure segment, approximately 78% of which was derived from lit backhaul services. The revenue increase is primarily driven by the timing of the acquisitions of PEG Bandwidth,

Table of Contents

LLC ("PEG" or "PEG Bandwidth"), Tower Cloud Inc. ("Tower Cloud"), Southern Light and Hunt. At December 31, 2017, we had approximately 16,750 customer connections, up from 5,450 customer connections at December 31, 2016. The increase is primarily attributable to the July 3, 2017 acquisitions of Southern Light and Hunt.

*Towers* – For the year ended December 31, 2017, we recognized $10.1 million of revenue in our Towers segment, of which $7.5 million relates to our Latin American operations, primarily driven by revenues associated with our January 2017 acquisition of NMS.

At December 31, 2017, the Uniti Towers' portfolio consisted of 227 wireless communications towers located in 20 states across the eastern and central regions of the United States, and 440 wireless communications towers in Latin America.

*Consumer CLEC* – For the year ended December 31, 2017, we recognized $18.1 million of revenue from the Consumer CLEC Business, compared to $22.5 million for the year ended December 31, 2016. The decrease is primarily attributable to a loss of customers during the period. We served approximately 28,500 customers as of December 31, 2017, a 23% decrease from 37,000 at December 31, 2016. The decrease in customers is due to the effects of competition and customer attrition.

### Interest Expense, net

Interest expense for the year ended December 31, 2017, totaled $306.0 million, which includes non-cash interest expense of $23.1 million resulting from the amortization of our debt discounts and debt issuance costs. Interest expense for the year ended December 31, 2016, totaled $275.4 million, which includes non-cash interest expense of $16.0 million resulting from the amortization of our debt discounts and debt issuance costs. The increase is primarily related to interest expense on the additional $150 million aggregate principal amount of 6.00% Senior Secured Notes issued on June 16, 2016 as an add-on to the Company's existing senior secured notes (the "add-on Secured Notes") and the 2024 Notes of $41 million. This increase was partially offset by approximately $19 million of interest savings related to the repricing of $2.1 billion of term loans outstanding under our senior secured credit agreement. Effective February 9, 2017, interest on the term loans was LIBOR plus 3.00% per annum (with a minimum LIBOR rate of 1.0%), compared to LIBOR plus 4.0% per annum (with a minimum LIBOR rate of 1.0%) for the year ended December 31, 2016.

### Depreciation and Amortization Expense

We incur depreciation and amortization expense related to our property, plant and equipment, corporate assets and intangible assets. Charges for depreciation and amortization for the year ended December 31, 2017 totaled $434.2 million (47.4% of revenue), which included property, plant and equipment depreciation of $415.9 million and intangible asset amortization of $18.3 million. Charges for depreciation and amortization for the year ended December 31, 2016 totaled $376.0 million (48.8% of revenue), which included property, plant and equipment depreciation of $369.9 million and intangible asset amortization of $6.1 million. The increase is primarily driven by the timing of the acquisitions of PEG, Tower Cloud, Southern Light and Hunt.

### General and Administrative Expense

General and administrative expenses include compensation costs (including stock-based compensation awards), professional and legal services, corporate office costs and other costs associated with the administrative activities of our segments. For the year ended December 31, 2017, general and administrative costs totaled $72.0 million (7.9% of revenue), which includes $7.7 million of stock-based compensation expense. For the year ended December 31, 2016, general and administrative costs totaled $35.4 million (4.6% of revenue), which includes $4.8 million of stock-based compensation expense. The increase is primarily driven by the timing of the acquisitions of PEG and Tower Cloud, which closed on May 2, 2016 and August 31, 2016, respectively, as well as the acquisitions of Southern Light and Hunt that closed on July 3, 2017.

41

Table of Contents

*Operating Expense*

Operating expense for the year ended December 31, 2017, totaled $102.2 million (11.2% of revenue), and consisted of $83.5 million (9.1% of revenue) of expense related to the Fiber Infrastructure segment operations, $5.1 million (0.6% of revenue) of expense related to the Towers segment operations and $13.5 million (1.5% of revenue) of expense related to the Consumer CLEC Business. For the year ended December 31, 2016, operating expenses totaled $49.7 million (6.4% of revenue), which related to the operation of the Consumer CLEC Business ($17.4 million) and Fiber Infrastructure operations ($32.1 million).

The increase to Fiber Infrastructure operating expense is primarily driven by the timing of the acquisitions of PEG and Tower Cloud, which closed on May 2, 2016 and August 31, 2016, respectively, as well as the acquisition of Southern Light and Hunt that closed on July 3, 2017. For the year ended December 31, 2017, Fiber Infrastructure operating expenses included $21.1 million of construction-related expense, $15.9 million of lit service expense, $11.0 million of tower rent, $10.4 million of maintenance expense, $7.0 million of dark fiber rent and $4.8 million of payroll-related expense. For the year ended December 31, 2016, Fiber Infrastructure operating expenses included $7.0 million of tower rent, $5.3 million of payroll-related expense and $4.3 million of lit service expense.

The increase to Towers operating expense is primarily driven by the timing of the acquisition of NMS, which closed on January 31, 2017. For the year ended December 31, 2017, Tower operating expenses included $3.2 million of tower rent, $0.9 million of site monitoring expenses and $0.2 million of insurance expense.

Expense associated with the Consumer CLEC Business is primarily attributable to the Wholesale Agreement and the Master Services Agreement entered into between us and Windstream in connection with the Spin-Off, and also included costs arising under the interconnection agreements with other telecommunication carriers. Expense associated with the Wholesale Agreement and Master Services Agreement for the year ended December 31, 2017 totaled $10.2 million (1.1% of revenue) and $1.3 million (0.1% of revenue), respectively, and expense associated with the Wholesale Agreement and the Master Services Agreement for the year ended December 31, 2016 totaled $12.5 million (1.6% of revenue) and $1.7 million (0.2% of revenue), respectively.

*Other Expense*

Other expense for the year ended December 31, 2017, totaled $11.3 million (1.2% of revenue), primarily as a result of a net unrealized loss of $10.7 million for mark-to-market adjustments on our contingent consideration arrangements.

*Income Tax (Benefit) Expense*

We recorded $38.8 million in income tax benefit for the year ended December 31, 2017. This benefit was primarily driven by the release of valuation allowance and impact of corporate tax reform. Income tax benefit of $8.2 million was recorded for the release of a valuation allowance related to the acquisitions of Southern Light and Hunt. The Southern Light and Hunt transactions resulted in the recording of a deferred tax liability, and this future reversal of taxable temporary differences supports the realization of deferred tax assets which previously had a valuation allowance. $17.0 million relates to revision of ending net deferred tax asset balances to the lower future corporate tax rate.

**Non-GAAP Financial Measures**

We refer to EBITDA, Adjusted EBITDA, Funds From Operations ("FFO") (as defined by the National Association of Real Estate Investment Trusts ("NAREIT")) and Adjusted Funds From Operations ("AFFO") in our analysis of our results of operations, which are not required by, or presented in accordance with, accounting principles generally accepted in the United States ("GAAP"). While we believe that net income, as defined by GAAP, is the most appropriate earnings measure, we also believe that EBITDA, Adjusted EBITDA, FFO and AFFO are important non-GAAP supplemental measures of operating performance for a REIT.

42

Table of Contents

We define "EBITDA" as net income, as defined by GAAP, before interest expense, provision for income taxes and depreciation and amortization. We define "Adjusted EBITDA" as EBITDA before stock-based compensation expense and the impact, which may be recurring in nature, of transaction and integration related costs (collectively, "transaction related costs"), the write-off of unamortized deferred financing costs, costs incurred as a result of the early repayment of debt, changes in the fair value of contingent consideration and financial instruments, and other similar items (although we may not have had such charges in the periods presented). We believe EBITDA and Adjusted EBITDA are important supplemental measures to net income because they provide additional information to evaluate our operating performance on an unleveraged basis. Since EBITDA and Adjusted EBITDA are not measures calculated in accordance with GAAP, they should not be considered as an alternative to net income determined in accordance with GAAP.

Because the historical cost accounting convention used for real estate assets requires the recognition of depreciation expense except on land, such accounting presentation implies that the value of real estate assets diminishes predictably over time. However, since real estate values have historically risen or fallen with market and other conditions, presentations of operating results for a REIT that uses historical cost accounting for depreciation could be less informative. Thus, NAREIT created FFO as a supplemental measure of operating performance for REITs that excludes historical cost depreciation and amortization, among other items, from net income, as defined by GAAP. "FFO" is defined by NAREIT as net income applicable to common shareholders computed in accordance with GAAP, excluding gains or losses from real estate dispositions, plus real estate depreciation and amortization and impairment charges. We compute FFO in accordance with NAREIT's definition.

We define "AFFO" as FFO excluding (i) transaction related costs; (ii) certain non-cash revenues and expenses such as stock-based compensation expense, amortization of debt and equity discounts, amortization of deferred financing costs, depreciation and amortization of non-real estate assets, straight-line revenues, non-cash income taxes, and the amortization of other non-cash revenues to the extent that cash has not been received, such as revenue associated with the amortization of TCIs; (iii) the impact, which may be recurring in nature, of the write-off of unamortized deferred financing fees, additional costs incurred as a result of the early repayment of debt, gains or losses on dispositions, changes in the fair value of contingent consideration and financial instruments and similar items less maintenance capital expenditures. We believe that the use of FFO and AFFO, and their respective per share amounts, combined with the required GAAP presentations, improves the understanding of operating results of REITs among investors and analysts, and makes comparisons of operating results among such companies more meaningful. We consider FFO and AFFO to be useful measures for reviewing comparative operating performance. In particular, we believe AFFO, by excluding certain revenue and expense items, can help investors compare our operating performance between periods and to other REITs on a consistent basis without having to account for differences caused by unanticipated items and events, such as transaction related costs. The Company uses FFO and AFFO, and their respective per share amounts, only as performance measures, and FFO and AFFO do not purport to be indicative of cash available to fund our future cash requirements. While FFO and AFFO are relevant and widely used measures of operating performance of REITs, they do not represent cash flows from operations or net income as defined by GAAP and should not be considered an alternative to those measures in evaluating our liquidity or operating performance.

Further, our computations of EBITDA, Adjusted EBITDA, FFO and AFFO may not be comparable to that reported by other REITs or companies that do not define FFO in accordance with the current NAREIT definition or that interpret the current NAREIT definition or define EBITDA, Adjusted EBITDA and AFFO differently than we do.

The reconciliation of our net income to EBITDA and Adjusted EBITDA and of our net income attributable to common shareholders to FFO and AFFO for the years ended December 31, 2018, 2017 and 2016 is as follows:

43

Table of Contents

| (Thousands) | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2018 | | 2017 | | 2016 |
| Net income (loss) | $ | 16,545 | $ | (8,828) | $ | (212) |
| Depreciation and amortization | | 451,750 | | 434,205 | | 375,970 |
| Interest expense, net | | 319,591 | | 305,994 | | 275,394 |
| Income tax (benefit) expense | | (5,421) | | (38,849) | | 517 |
| EBITDA | $ | 782,465 | $ | 692,522 | $ | 651,669 |
| Stock based compensation | | 8,064 | | 7,713 | | 4,846 |
| Other (income) expense | | (5,056) | | 11,284 | | - |
| Transaction related costs | | 17,410 | | 38,005 | | 33,669 |
| Adjusted EBITDA | $ | 802,883 | $ | 749,524 | $ | 690,184 |

| (Thousands) | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2018 | | 2017 | | 2016 |
| Net income (loss) attributable to common shareholders | $ | 7,989 | $ | (16,552) | $ | (5,497) |
| Real estate depreciation and amortization | | 374,388 | | 373,449 | | 351,548 |
| Participating securities' share in earnings | | 2,594 | | 1,509 | | 1,557 |
| Participating securities' share in FFO | | (2,594) | | (1,509) | | (1,557) |
| Adjustments for noncontrolling interests | | (8,636) | | (4,420) | | - |
| FFO attributable to common shareholders | $ | 373,741 | $ | 352,477 | $ | 346,051 |
| Transaction related costs | | 17,410 | | 38,005 | | 33,669 |
| Change in fair value of contingent consideration | | (3,721) | | 10,736 | | - |
| Amortization of deferred financing costs and debt discount | | 24,614 | | 23,102 | | 16,002 |
| Stock-based compensation | | 8,064 | | 7,713 | | 4,846 |
| Non-real estate depreciation and amortization | | 77,362 | | 60,756 | | 24,422 |
| Straight-line revenue | | (15,048) | | (15,136) | | (17,293) |
| Maintenance capital expenditures | | (5,686) | | (4,434) | | (3,327) |
| Amortization of discount on convertible preferred stock | | 2,980 | | 2,980 | | 1,985 |
| Adjustment to deferred tax valuation allowance and tax rate change | | - | | (36,240) | | - |
| Other non-cash (revenue) expense, net | | (34,426) | | (14,871) | | (7,818) |
| Adjustments for noncontrolling interests | | (1,535) | | (264) | | - |
| AFFO attributable to common shareholders | $ | 443,755 | $ | 424,824 | $ | 398,537 |

**Critical Accounting Estimates**

We make certain judgments and use certain estimates and assumptions when applying accounting principles in the preparation of our financial statements. The nature of the estimates and assumptions are material due to the levels of subjectivity and judgment necessary to account for highly uncertain factors or the susceptibility of such factors to change. We have identified the accounting for income taxes, revenue recognition, useful lives of assets, the impairment of property, plant and equipment, goodwill impairment and business combinations as critical accounting estimates, as they are the most important to our financial statement presentation and require difficult, subjective and complex judgments.

We believe the current assumptions and other considerations used to estimate amounts reflected in our financial statements are appropriate. However, if actual experience differs from the assumptions and other considerations used in estimating amounts reflected in our financial statements, the resulting changes could have a material adverse effect on our results of operations and, in certain situations, could have a material adverse effect on our financial condition.

Table of Contents

**Income Taxes**

We elected on our initial U.S. federal income tax return to be treated as a REIT under the Internal Revenue Code of 1986, as amended (the "Code"). To qualify as a REIT, we must distribute at least 90% of our annual REIT taxable income to shareholders, and meet certain organizational and operational requirements, including asset holding requirements. As a REIT, we will generally not be subject to U.S. federal income tax on income that we distribute as dividends to our shareholders. If we fail to qualify as a REIT in any taxable year, we will be subject to U.S. federal income tax, including any applicable alternative minimum tax for open taxable years through 2018, on our taxable income at regular corporate income tax rates, and we could not deduct dividends paid to our shareholders in computing taxable income. Any resulting corporate liability could be substantial and could materially and adversely affect our net income and net cash available for distribution to shareholders. Unless we were entitled to relief under certain Code provisions, we also would be disqualified from reelecting to be taxed as a REIT for the four taxable years following the year in which we failed to qualify as a REIT.

Subject to the restrictions imposed by the waiver and amendment to our Credit Agreement (as discussed below under "—Liquidity and Capital Resources—Credit Agreement"), our ability to make cash distributions to our shareholders in amounts exceeding 90% of our REIT taxable income, determined without regard to the dividends paid deduction and excluding any capital gains, generally will be restricted. As a result, we may be required to record a provision in our Consolidated Financial Statements for U.S. federal income taxes related to the activities of the REIT and its passthrough subsidiaries for any undistributed income. We are subject to the statutory requirements of the locations in which we conduct business, and state and local income taxes are accrued as deemed required in the best judgment of management based on analysis and interpretation of respective tax laws.

We have elected to treat the subsidiaries through which we operate Uniti Fiber and Talk America as TRSs. TRSs enable us to engage in activities that result in income that does not constitute qualifying income for a REIT. Our TRSs are subject to U.S. federal, state and local corporate income taxes.

Deferred tax assets and liabilities are recognized under the asset and liability method for the estimated future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax balances are adjusted to reflect tax rates based on currently enacted tax laws, which will be in effect in the years in which the temporary differences are expected to reverse. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the results of operations in the period of the enactment date. A valuation allowance is recorded to reduce the carrying amounts of deferred tax assets unless it is more likely than not that such assets will be realized.

We recognize the benefit of tax positions that are "more likely than not" to be sustained upon examination based on their technical merit. The benefit of a tax position is measured at the largest amount that has a greater than 50 percent likelihood of being realized upon ultimate settlement. If applicable, we will report tax-related penalties and interest expense as a component of income tax expense.

The Company will be subject to a federal corporate level tax on any gain recognized from the sale of assets occurring within a five year recognition period after the Spin-Off up to the amount of the built in gain that existed on April 24, 2015, which is based on the fair market value of the assets in excess of the Company's tax basis as of such date.

**Revenue Recognition**

Leasing revenues are primarily derived from providing access to or usage of leased networks and facilities. Leasing revenues are recognized on a straight-line basis over the initial lease term. Revenues derived from other telecommunications services, including broadband, long distance and enhanced service revenues are recognized monthly as services are provided. Sales of customer premise equipment are recognized when products are delivered to and accepted by customers.

Service revenues are primarily derived from providing broadband transport and backhaul communications services and are recognized when (i) persuasive evidence of an arrangement exists, (ii) the services have been provided to the

45

Table of Contents

customer, (iii) the sales price is fixed or determinable, and (iv) the collection of the sales price is reasonably assured. Services provided to the Company's customers are pursuant to contractual fee-based arrangements, which generally provide for recurring fees charged for the use of designated portions of the Company's network and typically range for a period of three to ten years. The Company's revenue arrangements often include upfront fees charged to the customer for the cost of establishing the necessary components of the Company's network prior to the commencement of use by the customer. Fees charged to customers for the recurring use of the Company's network are recognized during the related periods of service. Upfront fees that are billed in advance of providing services are deferred until such time the customer accepts the Company's network and then are recognized as service revenues ratably over a period in which substantive services required under the revenue arrangement are expected to be performed, which is the initial term of the arrangement.

**Useful Lives of Assets**

The calculation of depreciation and amortization expense is based on the estimated economic useful lives of the underlying property, plant and equipment and customer lists, tenant contracts and network intangible assets. Some of our Distribution Systems assets use a group composite depreciation method. Under this method, when a plant is retired, the original cost, net of salvage value, is charged against accumulated depreciation and no immediate gain or loss is recognized on the disposition of the plant.

Rapid changes in technology or changes in market conditions could result in significant changes to the estimated useful lives of our property, plant and equipment that could materially affect the carrying value of these assets and our future operating results. An extension of the average useful life of our property, plant and equipment of one year would decrease depreciation expense by approximately $27.2 million per year, while a reduction in the average useful life of one year would increase depreciation expense by approximately $36.6 million per year.

At December 31, 2018, our unamortized finite lived intangible assets totaled $432.8 million, and are amortized using the straight-line method over their estimated useful lives with the exception of the customer list intangible assets related to our Consumer CLEC Business, which were brought over at carry-over basis at the time of the Spin-Off, and are amortized using the sum-of-the-years'-digits method over their estimated useful lives. A reduction in the average useful lives of our finite lived intangible asset of one year would have increased the amount of amortization expense recorded in 2018 by approximately $1.2 million.

**Impairment of Property, Plant and Equipment**

We continually monitor events and changes in circumstances that could indicate that the carrying amount of our property, plant and equipment may not be recoverable or realized. When indicators of potential impairment suggest that the carrying value may not be recoverable, we assess the recoverability by estimating whether we will recover the carrying value of those assets through its undiscounted future cash flows and the eventual disposition of the asset. If, based on this analysis, we do not believe that we will be able to recover the carrying value of our property, plant and equipment, we would record an impairment loss to the extent that the carrying value exceeds the estimated fair value of the related assets. During the years ended December 31, 2018, 2017 and 2016, no impairment losses were recognized.

**Business Combinations**

We apply the acquisition method of accounting for acquisitions meeting the definition of a business combination or asset acquisition, where assets acquired and liabilities assumed are recorded at fair value at the date of each acquisition, and the results of operations are included with those of the Company from the dates of the respective acquisitions. The fair value of the acquired assets and liabilities are estimated using the income, market and/or cost approach. The income approach utilizes the present value of estimated future cash flows that a business or asset can be expected to generate, while under the market approach, the fair value of an asset or business reflects the price at which comparable assets are purchased under similar circumstances. Inherent in our preparation of cash flow projections are significant assumptions and estimates derived from a review of operating results, business plans, expected growth rates, capital expenditure plans, cost of capital and tax rates. We also make certain forecasts about future economic conditions, interest rates and other market data. Many of the factors used in assessing fair value are outside the control of management. Small changes in these assumptions or estimates could materially affect the cash

46

Table of Contents

flow projections, and therefore could affect the estimated fair value.  Impact these assumptions or estimates include customer retention, execution of our business plans, which impact growth, cost escalation impacting margin, the level of capital expenditures required to sustain our growth and market factors, including stock price fluctuations and increased rates, impacting our cost of capital.

For acquisitions meeting the definition of a business combination, any excess of the purchase price paid by the Company over the amounts recognized for assets acquired and liabilities assumed is recorded as goodwill. ASC 805, *Business Combinations*, also requires acquirers to, among other things, estimate the acquisition date fair value of any contingent consideration and recognize any subsequent changes in the fair value of contingent consideration in earnings. When provisional amounts are initially recorded, the Company continues to evaluate acquisitions for a period not to exceed one year after the applicable acquisition date of each transaction to determine whether any additional adjustments are needed to the allocation of the purchase price paid for the assets acquired and liabilities assumed. For acquisitions meeting the definition of an asset acquisition, the fair value of the consideration transferred, including transaction costs, is allocated to the assets acquired and liabilities assumed based on their relative fair values.  No goodwill is recognized in an asset acquisition.

**Goodwill**

Goodwill is recognized for the excess of purchase price over the fair value of net assets of businesses acquired. Goodwill is reviewed for impairment at least annually. In accordance with ASC 350-20, Intangibles-Goodwill and Other, we evaluate goodwill for impairment between annual impairment tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount. Unless circumstances otherwise dictate, the annual impairment test is performed in the fourth quarter. Application of the goodwill impairment test requires significant judgment, including: the identification of reporting units; assignment of assets and liabilities to reporting units; assignment of goodwill to reporting units; determination of the fair value of each reporting unit; and an assumption as to the form of the transaction in which the reporting unit would be acquired by a market participant (either a taxable or nontaxable transaction).

We estimate the fair value of our reporting units (which are our segments) using a combination of an income approach based on the present value of estimated future cash flows and a market approach based on market data of comparable businesses and acquisition multiples paid in recent transactions.  If the carrying value of a reporting unit's net assets is less than its fair value, no indication of impairment exists. If the carrying amount of the reporting unit is greater than the fair value of the reporting unit, an impairment loss must be recognized for the excess and charged to operations not exceed the carrying value of goodwill.

Inherent in our preparation of cash flow projections are significant assumptions and estimates derived from a review of our operating results, business plans, expected growth rates, capital expenditure plans, cost of capital and tax rates. We also make certain forecasts about future economic conditions, interest rates and other market data. Many of the factors used in assessing fair value are outside the control of management, and these assumptions and estimates may change in future periods. Small changes in these assumptions or estimates could materially affect our cash flow projections, and therefore could affect the likelihood and amount of potential impairment.  Potential events that could negatively impact these assumptions or estimates include customer losses or poor execution of our business plans, which impact growth, cost escalation impacting margin, the level of capital expenditures required to sustain our growth and market factors, including stock price fluctuations and increased rates, impacting our cost of capital.  The market approach uses market data of comparable business and acquisition multiples paid in recent transactions to estimate fair value, and a declines in these multiples could affect the likelihood and amount of potential impairment.

As of December 31, 2018 and 2017, all of our Goodwill is included in our Fiber Infrastructure segment.  We performed our goodwill impairment analysis during the fourth quarter and we concluded the implied fair value of our Fiber Infrastructure reporting unit was in excess of its carrying value by less than 5%.  During the years ended December 31, 2018 and 2017, no impairment losses were recognized.

In light of the recent developments surrounding Windstream, as noted in Item 1A Risk factors, if there were to be a material change in the forecasted cash flows at Uniti Fiber, including the level of capital expenditures, our conclusions regarding the likelihood and amount of any potential impairment could change.

47

Table of Contents

**Liquidity and Capital Resources**

Our principal liquidity needs are to fund operating expenses, meet debt service requirements, fund investment activities, and make dividend distributions. Our primary sources of liquidity and capital resources are cash on hand, cash provided by operating activities (primarily arising under the Master Lease with Windstream), borrowings under our credit agreement by and among the Operating Partnership, CSL Capital, LLC and Uniti Group Finance Inc., the guarantors and lenders party thereto and Bank of America, N.A., as administrative agent and collateral agent (the "Credit Agreement"), and proceeds from the issuance of debt and equity securities.

As of December 31, 2018, we had $38.0 million of unrestricted cash and cash equivalents, and $110.0 million of undrawn borrowing capacity under the senior secured revolving credit facility pursuant to the Credit Agreement, variable rate, that matures April 24, 2020 (the "Revolving Credit Facility"). Subsequent to December 31, 2018, we have borrowed substantially all remaining capacity under the Revolving Credit Facility.

Cash provided by operating activities totaled $472.8 million, $405.3 million and $376.0 million for the years ended December 31, 2018, 2017 and 2016, respectively. Cash provided by operating activities is primarily attributable to our leasing activities.

Cash used in investing activities was $480.5 million for the year ended December 31, 2018, which was driven by capital expenditures ($423.6 million), primarily related to our Uniti Fiber and Uniti Leasing businesses, and the acquisition of ITS ($53.7 million). Cash used in investing activities was $1.0 billion for the year ended December 31, 2017, which was driven by the acquisitions of Southern Light ($636.1 million), Hunt ($126.0 million), NMS assets ($69.7 million), ground lease investments ($21.8 million), partially offset by a Tower Cloud working capital adjustment ($0.2 million) and capital expenditures ($166.0 million), primarily related to our Uniti Fiber and Uniti Towers businesses. Cash used in investing activities was $535.2 million for the year ended December 31, 2016, which was driven by the acquisitions of PEG Bandwidth ($315.4 million) and Tower Cloud ($173.4 million) and capital expenditures ($46.4 million).

Cash used in financing activities was $13.8 million for the year ended December 31, 2018, which was driven by dividend payments ($426.1 million), principal payments on our senior secured term loan ($21.1 million), contingent consideration payments ($18.6 million), distributions to noncontrolling interest ($9.9 million), partially offset by net borrowings under the Revolving Credit Facility ($360.0 million) and net proceeds under our ATM Program ($109.4 million). Cash provided by financing activities was $502.0 million for the year ended December 31, 2017, which primarily represents the net proceeds from the sale of common stock through a public offering ($498.9 million) and proceeds from the 2024 Notes issued in May 2017 ($201.0 million), which were used to fund the acquisitions of Southern Light and Hunt, and net borrowings under the Revolving Credit Facility ($280.0 million), partially offset by dividend payments ($400.2 million), deferred financing costs related to the term loan repricing and 2024 Notes issued in May 2017 ($28.5 million), contingent consideration payments ($19.9 million), and principal payments related to the senior secured term loan ($21.1 million). Cash provided by financing activities was $188.8 million for the year ended December 31, 2016, which primarily represents the proceeds from the 2024 Notes ($400 million), add-on Notes issued in June 2016 ($148.9 million), proceeds from the sale of common stock ($54.2 million), partially offset by dividend payments ($367.8 million) and principal payments related to the Term Loan Facility ($22.0 million).

<u>Windstream Master Lease</u>

A substantial portion of our leasing revenue and cash flow from operations is derived from the Master Lease with Windstream. The Master Lease has an initial term of 15 years which, at the option of Windstream, may be extended for up to four renewal terms of five years each beyond the initial term. In addition, Windstream has the right to extend the initial term from 15 years to 20 years and, if exercised, the number of renewal terms will be reduced to three so that the maximum term (taking into account all renewals) is 35 years. Commencing with the fourth year, the rent is subject to annual escalation of 0.5%, and cash rents recorded during the year ended December 31, 2018 was $655.7 million. The rent for the first year of each renewal term will be an amount agreed to by us and Windstream, or if we are unable to agree, the renewal rent will be determined by an independent appraisal process. Commencing with the second year of each renewal term, the renewal rent will increase at an escalation rate of 0.5%. In addition, if we fund any capital improvements requested by Windstream, the rent will be increased to account for such funding.

48

Table of Contents

On February 15, 2019, the federal court judge issued a ruling against Windstream, finding that Windstream's attempts to waive such default were not valid; that an "event of default" occurred with respect to such debt securities; and that the holder's acceleration of such debt in December 2017 was effective. In response to the adverse outcome, on February 25, 2019, Windstream filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.

In bankruptcy, Windstream has the option to assume or reject the Master Lease. While we believe that the Master Lease is essential to Windstream's operations, it is difficult to predict what could occur in a restructuring, and even a temporary disruption in payments to us may require us to fund certain expenses and obligations (e.g., real estate taxes, insurance and maintenance expenses) to preserve the value of our properties and avoid the imposition of liens on our properties and could impact our ability to fund other cash obligations, including dividends necessary to maintain REIT status, non-essential capital expenditures, compliance with debt covenants and, in an extreme case, our debt service obligations. See Item 1A Risk Factors for additional information concerning the impact Windstream's bankruptcy may have on our operations and financial condition. A rejection by Windstream of the Master Lease or its inability or unwillingness to meet its rent and other obligations under the Master Lease could materially adversely affect our consolidated results of operations, liquidity, and financial condition, including our ability to service debt and pay dividends to our stockholders as required to maintain our status as a REIT.

In the event of a rejection of the Master Lease, we cannot assure you that we will be able to locate a suitable replacement tenant or if we are successful in locating a replacement tenant, that the rental payments from the new tenant would not be significantly less than the existing rental payments. In addition, a rejection of the Master Lease by Windstream would result in an "event of default" under our Credit Agreement if we are unable to enter into a replacement lease that satisfies certain criteria set forth in the Credit Agreement within ninety (90) calendar days and we do not maintain pro forma compliance with a consolidated secured leverage ratio, as defined in the Credit Agreement, of 5.00 to 1.00.

At-the-Market Common Stock Offering Program

We have an effective shelf registration statement on file with the SEC (the "Registration Statement") to offer and sell various securities from time to time. Under the Registration Statement, we have established an at-the-market common stock offering program (the "ATM Program") to sell shares of common stock having an aggregate offering price of up to $250.0 million. During the year ended December 31, 2018, we issued and sold 5.5 million shares of common stock at a weighted average price of $20.19 per share under the ATM Program, receiving net proceeds of $109.4 million, after commissions of $1.4 million and other offering costs. As of December 31, 2018, we have approximately $139.0 million available for issuance under the ATM Program. This program provides additional financial flexibility and an alternative mechanism to access the capital markets at an efficient cost as and when we need financing.

UPREIT Operating Partnership Units

During 2017, the Company completed its reorganization (the "up-REIT Reorganization") to operate through a customary "up-REIT" structure. Under this structure, the Operating Partnership now holds substantially all of the Company's assets and is the parent company of, among others, CSL Capital, LLC, Uniti Group Finance Inc. and Uniti Fiber Holdings Inc.

Our UPREIT structure, enables us to acquire properties by issuing to sellers, as a form of consideration, limited partnership interests in our operating partnership, (commonly called "OP Units"). The limited partner equity interests in the Operating Partnership are exchangeable on a one-for-one basis for shares of our common stock or, at our election, cash of equivalent value. We believe that this structure will facilitate our ability to acquire individual properties and portfolios of properties by enabling us to structure transactions which will defer taxes payable by a seller while preserving our available cash for other purposes, including the possible payment of dividends. We issued limited partnership interests as part of the acquisition consideration for the acquisitions of Hunt and Southern Light in 2017.

49

Table of Contents

Senior Notes

At December 31, 2018, the Operating Partnership and its wholly-owned subsidiaries, CSL Capital, LLC, and Uniti Group Finance Inc. (collectively, the "Borrowers") had outstanding $550.0 million aggregate principal amount of 6.00% Senior Secured Notes due April 15, 2023 (the "Secured Notes"), $1.11 billion aggregate principal amount of 8.25% Senior Notes due October 15, 2023 (the "2023 Notes") and $600 million aggregate principal amount of 7.125% Senior Unsecured Notes due December 15, 2024 (the "2024 Notes," and together with the Secured Notes and 2023 Notes, the "Notes").

In connection with the up-REIT Reorganization, the Operating Partnership replaced the Company and assumed its obligations as an obligor under the Notes and Facilities. The Company subsequently became a guarantor of the Notes and Facilities. Because the Operating Partnership is not a corporation, a corporate co-obligor that is a subsidiary of the Operating Partnership was also added to the Notes and Credit Agreement as part of the up-REIT Reorganization. Uniti Group Finance Inc. is the corporate co-obligor under the Credit Agreement and co-issuer of the Secured Notes and the 2023 Notes, and Uniti Fiber Holdings Inc. is the co-issuer of the 2024 Notes. Separate financial statements of the Operating Partnership have not been included since the Operating Partnership is not a registrant.

Credit Agreement

The Borrowers are party to the Credit Agreement, which provides for the Term Loan Facility (in an initial principal amount of $2.14 billion) and the Revolving Credit Facility (in an aggregate principal amount of up to $750 million). The term loans bear interest at a rate equal to LIBOR, subject to a 1.0% floor, plus an applicable margin equal to 3.00%, and are subject to amortization of 1.0% per annum. All obligations under the Credit Agreement are guaranteed by (i) the Company and (ii) certain of the Operating Partnership's wholly-owned subsidiaries (the "Subsidiary Guarantors") and are secured by substantially all of the assets of the Borrowers and the Subsidiary Guarantors, which assets also secure the Secured Notes. The Revolving Credit Facility bears interest at a rate equal to LIBOR plus 1.75% to 2.25% based on our consolidated secured leverage ratio, as defined in the Credit Agreement.

The Borrowers are subject to customary covenants under the Credit Agreement, including an obligation to maintain a consolidated secured leverage ratio, as defined in the Credit Agreement, not to exceed 5.00 to 1.00. We are permitted, subject to customary conditions, to incur (i) incremental term loan borrowings and/or increased commitments under the Credit Agreement in an unlimited amount, so long as, on a pro forma basis after giving effect to any such borrowings or increases, our consolidated secured leverage ratio, as defined in the Credit Agreement, does not exceed 4.00 to 1.00 and (ii) other indebtedness, so long as, on a pro forma basis after giving effect to any such indebtedness, our consolidated total leverage ratio, as defined in the Credit Agreement, does not exceed 6.50 to 1.00 and our consolidated secured leverage ratio, as defined in the Credit Agreement, does not exceed 4.00 to 1.00. In addition, the Credit Agreement contains customary events of default, including a cross default provision whereby the failure of the Borrowers or certain of their subsidiaries to make payments under other debt obligations, or the occurrence of certain events affecting those other borrowing arrangements, could trigger an obligation to repay any amounts outstanding under the Credit Agreement. In particular, a repayment obligation could be triggered if (i) the Borrowers or certain of their subsidiaries fail to make a payment when due of any principal or interest on any other indebtedness aggregating $75.0 million or more, or (ii) an event occurs that causes, or would permit the holders of any other indebtedness aggregating $75.0 million or more to cause, such indebtedness to become due prior to its stated maturity. As of December 31, 2018, the Borrowers were in compliance with all of the covenants under the Credit Agreement. However, we would be in breach of the requirement to deliver audited financial statements without a going concern opinion if we are unable to provide 2018 audited financial statements without a going concern opinion to lenders under our Credit Agreement by March 31, 2019.

On March 18, 2019, we received a limited waiver from our lenders under our Credit Agreement, waiving an event of default related solely to the receipt of a going concern opinion from our auditors for our 2018 audited financial statements. The limited waiver was issued in connection with the Amendment to our Credit Agreement. During the pendency of Windstream's bankruptcy, or at such earlier time when certain other conditions are specified, the Amendment generally limits our ability under the Credit Agreement to (i) prepay unsecured indebtedness and (ii) pay cash dividends in excess of 90% of our REIT taxable income, determined without regard to the dividends paid

Table of Contents

deduction and excluding any net capital gains. The Amendment also increases the interest rate on our Term Loan Facility, which will now bear a rate of LIBOR, subject to a 1.0% floor, plus an applicable margin equal to 5.0%, a 200 basis point increase over our previous rate. This increase will be in effect though the remaining term of the facility, which matures on October 24, 2022.

Interest Rate Swaps

We are party to interest rate swap agreements to mitigate the interest rate risk inherent in our variable rate Term Loan Facility. These interest rate swaps are designated as cash flow hedges and have a notional value of $2.07 billion and mature on October 24, 2022. The weighted average fixed rate paid is 2.105%, and the variable rate received resets monthly to the one-month LIBOR subject to a minimum rate of 1.0%.

Outlook

We anticipate continuing to invest in our network infrastructure across our Uniti Leasing, Uniti Fiber and Uniti Towers portfolios. We have also committed to spend $175 million on our proposed acquisition of Bluebird (for which we have obtained committed financing), net of the collection of prepaid rent. We anticipate declaring dividends for the 2019 tax year to comply with our REIT distribution requirements. We anticipate that we will partially finance these needs, together with operating expenses (including debt service) from our $38 million of cash on hand and $110 million of borrowing availability under the Revolving Credit Facility (although we have since drawn substantially all of our revolver capacity), cash flows provided by operating activities, together with funds anticipated from announced divestures. However, we may need to access the capital markets to generate additional funds that will be sufficient to fund our business operations, announced investment activities, capital expenditures, debt service and distributions to our shareholders. We are closely monitoring the equity and debt markets and will seek to access them promptly when we determine market conditions are appropriate.

The amount, nature and timing of any capital markets transactions will depend on: our operating performance and other circumstances; our then-current commitments and obligations; the amount, nature and timing of our capital requirements; any limitations imposed by our current credit arrangements; and overall market conditions. These expectations are forward-looking and subject to a number of uncertainties and assumptions. If our expectations about our liquidity prove to be incorrect or we are unable to access the capital markets as we anticipate, we would be subject to a shortfall in liquidity in the future which could lead to a reduction in our capital expenditures and/or dividends. If this shortfall occurs rapidly and with little or no notice, it could limit our ability to address the shortfall on a timely basis.

In addition to exploring potential capital markets transactions, the Company regularly evaluates market conditions, its liquidity profile, and various financing alternatives for opportunities to enhance its capital structure. If opportunities are favorable, the Company may refinance or repurchase existing debt. However, there can be no assurances that any debt refinancing would be on similar or more favorable terms than our existing arrangements. This would include the risk that interest rates could increase and/or there may be changes to our existing covenants.

In light of recent developments and uncertainty surrounding Windstream and the effect of substantial doubt about our ability to continue a going concern, each as set forth under "Risk Factors", we may take measures to conserve cash as we anticipate that it may be difficult for us to access the capital markets at attractive rates until such uncertainty is clarified. Accordingly, we may elect to suspend, delay or reduce success-based capital expenditures and dividend payments to conserve cash. If our assumptions are incorrect, we could need additional sources of liquidity to fund our cash needs and cannot assure that we will obtain them. Because our Master Lease is essential to Windstream's operations, we expect that any disruption in payments by Windstream would be limited, and we believe that if we take such actions, we would have enough liquidity to fund our cash needs within one year after the date the financial statements are issued. If our assumptions are incorrect, we could need additional sources of liquidity to fund our cash needs and cannot assure that we will obtain them.

51

Table of Contents

**Contractual Obligations**

As of December 31, 2018, we had contractual obligations and commitments as follows:

| (millions) | Less than 1 Year | | 1-3 Years | | 3-5 Years | | More than 5 Years | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Payments Due by Period** | | | | | | |
| Long-term debt(a) | $ | 21 | $ | 682 | $ | 3,663 | $ | 600 | $ | 4,966 |
| Interest payments on long-term debt obligations(b) | | 250 | | 497 | | 384 | | 42 | | 1,173 |
| Operating leases | | 11 | | 12 | | 6 | | 15 | | 44 |
| Capital leases | | 9 | | 14 | | 13 | | 52 | | 88 |
| Network deployment(c) | | 38 | | - | | - | | - | | 38 |
| Other Long-Term Liabilities | | | | | | | | | | |
| Contingent consideration(d) | | 56 | | 17 | | - | | - | | 73 |
| **Total projected obligations and commitments(e)** | $ | 385 | $ | 1,222 | $ | 4,066 | $ | 709 | $ | 6,382 |

(a)    Excludes $119.6 million of unamortized discounts on long-term debt and deferred financing costs.
(b)    Interest rates on our Term Loan Facility are based on our swap rates. Excludes the impact to the fourth amendment to our Credit Agreement discussed above in "Liquidity and Capital Resources—Credit Agreement".
(c)    Network deployment purchase commitments are for success-based projects for which we have a signed customer contract before we commit resources to expand our network.
(d)    Cash settled contingent consideration related to the August 31, 2016 acquisition of Tower Cloud, Inc. Excludes $10.0 million of share settled contingent consideration.
(e)    Excludes $31.0 million of derivative asset related to interest rate swaps maturing on October 24, 2022.

**Dividends**

We have elected to be taxed as a REIT for U.S. federal income tax purposes. U.S. federal income tax law generally requires that a REIT distribute annually at least 90% of its REIT taxable income, without regard to the deduction for dividends paid and excluding net capital gains, and that it pay tax at regular corporate rates to the extent that it annually distributes less than 100% of its taxable income. In order to maintain our REIT status, we intend to make dividend payments of all or substantially all of our taxable income to holders of our common stock out of assets legally available for this purpose, if and to the extent authorized by our board of directors. Before we make any dividend payments, whether for U.S. federal income tax purposes or otherwise, we must first meet both our operating requirements and debt service obligations. If our cash available for distribution is less than our taxable income, we could be required to sell assets or borrow funds to make cash dividends or we may make a portion of the required dividend in the form of a taxable distribution of stock or debt securities.

The following table below sets out details regarding our cash dividends on our common stock:

| Period | Payment Date | Cash Dividend Per Share | | Record Date |
|---|---|---|---|---|
| October 1, 2017 - December 31, 2017 | January 12, 2018 | $ | 0.60 | December 29, 2017 |
| January 1, 2018 - March 31, 2018 | April 13, 2018 | $ | 0.60 | March 30, 2018 |
| April 1, 2018 - June 30, 2018 | July 13, 2018 | $ | 0.60 | June 29, 2018 |
| July 1, 2018 - September 30, 2018 | October 15, 2018 | $ | 0.60 | September 28, 2018 |
| October 1, 2018 - December 31, 2018 | January 15, 2019 | $ | 0.60 | December 31, 2018 |

Table of Contents

Any dividends must be declared by our Board of Directors, which will take into account various factors including our current and anticipated operating results, our financial position, REIT requirements, conditions prevailing in the market, restrictions in our debt documents and additional factors they deem appropriate. Dividend payments are not guaranteed and our Board of Directors may decide, in its absolute discretion, at any time and for any reason, not to pay dividends or to change the amount paid as dividends.  In light of recent developments with Windstream, we may take measures to conserve cash, which may include a suspension, delay or reduction in our dividend.  Moreover, during the pendency of Windstream's bankruptcy, or at such earlier time when certain other conditions are specified, (discussed in the second risk factor and "Risk Related to the Status of Uniti as a REIT – REIT distribution requirements could adversely affect our ability to execute our business plan") our ability to make cash distributions to our shareholders in amounts exceeding 90% of our REIT taxable income, determined without regard to the dividends paid deduction and excluding any net capital gains, generally will be restricted.

**Capital Expenditures**

Capital expenditures for the Distribution Systems leased under the Master Lease are generally the responsibility of Windstream. The Master Lease stipulates that Windstream can request that we fund $50 million of capital expenditures per year for five years (but in no event to extend beyond the end of the sixth year of the Master Lease); however, Windstream cannot require Uniti to make such capital expenditures. If we elect to fund requested capital expenditures, the annual lease payments will be increased at a floating rate based on our cost of capital. No capital expenditure funding requests were made by Windstream for the year ended December 31, 2018.

We categorize our capital expenditures as either (i) success-based, (ii) maintenance, (iii) integration or (iv) corporate and non-network.  We define success-based capital expenditures as those related to installing existing or anticipated contractual customer service orders. Maintenance capital expenditures are those necessary to keep existing network elements fully operational.  Integration capital expenditures are those made specifically with respect to recent acquisitions that are essential to integrating acquired companies in our business.  We anticipate continuing to invest in our network infrastructure across our Uniti Leasing, Uniti Fiber and Uniti Towers portfolios, and expect that cash on hand, borrowings under our Revolving Credit Facility, and cash flows provided by operating activities will be sufficient to support these investments.

In light of recent developments with Windstream, we may to take measures to conserve cash, which may include a suspension, delay or reduction in success-based capital expenditures.  We are closely monitoring developments of the Windstream bankruptcy and continually assess our capital expenditure plans in light of such developments.

**Off Balance-Sheet Arrangements**

As of the date of this Annual Report on Form 10-K, we do not have any off-balance sheet arrangements.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk.**

*Interest Rate Risk*

Our primary market risk exposure is interest rate risk with respect to our variable rate indebtedness under our Term Loan Facility. In addition, we have a variable rate Revolving Credit Facility in an aggregate principal amount of $750 million, which has $110 million of undrawn borrowing capacity as of December 31, 2018. To manage this exposure under our Term Loan Facility, we have entered into interest rate swap agreements in order to mitigate the interest rate risk inherent in our variable rate Term Loan Facility. As of December 31, 2018, the interest rate risk for our Term Loan Facility has been mitigated through this interest rate swap agreement, and, with the exception of our Revolving Credit Facility, the interest rate for our remaining debt has a fixed rate.  A hypothetical 10% change in interest rates effective at December 31, 2018, would have had a $2.0 million impact on Uniti's results of operations for the year ended December 31, 2018.

An increase in interest rates could make the financing of any acquisition by us more costly. Rising interest rates could also limit our ability to refinance our debt when it matures or cause us to pay higher interest rates upon refinancing and increase interest expense on refinanced indebtedness.

Table of Contents

In connection with the fourth amendment to our Credit Agreement obtained on March 18, 2019, the interest rate on our Term Loan Facility increased 200 basis points to LIBOR, subject to a 1.0% floor, plus an applicable margin equal to 5.0%.

*Foreign Currency Exchange Rate Fluctuation*

Approximately 1% of our revenues were denominated in foreign currencies for the year ended December 31, 2018.  Cost of sales and operating costs related to these sales are largely denominated in the same respective currencies, thereby partially limiting our transaction risk exposure.  A uniform 10% strengthening in the value of the U.S. dollar relative to the currencies in which our transactions are denominated would have resulted in an increase in net income of less than $0.1 million for the year ended December 31, 2018.  This hypothetical calculation assumes that each exchange rate would change in the same direction relative to the U.S. dollar.

54

Table of Contents
**Item 8. Financial Statements and Supplementary Data.**

**Uniti Group Inc.**
**Consolidated Financial Statements**
**Index to Financial Statements**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 56 |
| **Uniti Group Inc.** |  |
| Consolidated Balance Sheets | 58 |
| Consolidated Statements of Income | 59 |
| Consolidated Statements of Comprehensive Income (Loss) | 60 |
| Consolidated Statements of Shareholders' Deficit | 61 |
| Consolidated Statements of Cash Flows | 63 |
| Notes to Consolidated Financial Statements | 64 |

55

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Shareholders of Uniti Group Inc.

***Opinions on the Financial Statements and Internal Control over Financial Reporting***

We have audited the accompanying consolidated balance sheets of Uniti Group Inc. and its subsidiaries (the "Company") as of December 31, 2018 and 2017, and the related consolidated statements of income, comprehensive income (loss), shareholders' deficit and cash flows for each of the three years in the period ended December 31, 2018, including the related notes and financial statement schedules listed in the index appearing under Item 15 (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

*Substantial Doubt About the Company's Ability to Continue as a Going Concern*

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 2 to the consolidated financial statements, the Company's most significant customer, Windstream Holdings, Inc., which accounts for approximately 68.2% of consolidated total revenues for the year ended December 31, 2018, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and uncertainties surrounding potential impacts to the Company resulting from Windstream Holdings, Inc.'s bankruptcy filing raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 2. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

***Basis for Opinions***

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Annual Report on Internal Control Over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the

56

Table of Contents

consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

As described in Management's Annual Report on Internal Control Over Financial Reporting, management has excluded Information Transport Solutions, Inc. from its assessment of internal control over financial reporting as of December 31, 2018, because it was acquired by the Company in a purchase business combination during 2018.  We have also excluded Information Transport Solutions, Inc. from our audit of internal control over financial reporting.  Information Transport Solutions, Inc. is a wholly-owned subsidiary whose total assets and total revenues excluded from management's assessment and our audit of internal control over financial reporting represent 0.4% and 0.9%, respectively, of the related consolidated financial statement amounts as of and for the year ended December 31, 2018.

### *Definition and Limitations of Internal Control over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/PricewaterhouseCoopers LLP

Little Rock, Arkansas
March 18, 2019

We have served as the Company's auditor since 2014.

Table of Contents

**Uniti Group Inc.**
**Consolidated Balance Sheets**

| (Thousands, except par value) | | December 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Property, plant and equipment, net | $ | 3,209,006 | $ | 3,053,889 |
| Cash and cash equivalents | | 38,026 | | 59,765 |
| Accounts receivable, net | | 104,063 | | 43,652 |
| Goodwill | | 692,385 | | 673,729 |
| Intangible assets, net | | 432,821 | | 429,357 |
| Straight-line revenue receivable | | 61,785 | | 47,041 |
| Derivative asset | | 31,043 | | 6,793 |
| Other assets | | 23,808 | | 15,856 |
| **Total Assets** | $ | 4,592,937 | $ | 4,330,082 |
| | | | | |
| **Liabilities, Convertible Preferred Stock and Shareholders' Deficit:** | | | | |
| **Liabilities:** | | | | |
| Accounts payable, accrued expenses and other liabilities, net | $ | 94,179 | $ | 77,634 |
| Accrued interest payable | | 28,097 | | 28,684 |
| Deferred revenue | | 726,262 | | 537,553 |
| Dividends payable | | 113,744 | | 109,557 |
| Deferred income taxes | | 52,434 | | 55,478 |
| Capital lease obligations | | 55,282 | | 56,329 |
| Contingent consideration | | 83,401 | | 105,762 |
| Notes and other debt, net | | 4,846,233 | | 4,482,697 |
| Total liabilities | | 5,999,632 | | 5,453,694 |
| | | | | |
| Commitments and contingencies (Note 15) | | | | |
| | | | | |
| **Convertible Preferred Stock,** Series A, $0.0001 par value, 88 shares authorized, issued and outstanding, $87,500 liquidation value | | 86,508 | | 83,530 |
| | | | | |
| **Shareholders' Deficit:** | | | | |
| Preferred stock, $0.0001 par value, 50,000 shares authorized, no shares issued and outstanding | | - | | - |
| Common stock, $0.0001 par value, 500,000 shares authorized, issued and outstanding: 180,536 shares at December 31, 2018 and 174,852 at December 31, 2017 | | 18 | | 17 |
| Additional paid-in capital | | 757,517 | | 644,328 |
| Accumulated other comprehensive income (loss) | | 30,105 | | 7,821 |
| Distributions in excess of accumulated earnings | | (2,373,218) | | (1,960,715) |
| Total Uniti shareholders' deficit | | (1,585,578) | | (1,308,549) |
| Noncontrolling interests - operating partnership units | | 92,375 | | 101,407 |
| Total shareholders' deficit | | (1,493,203) | | (1,207,142) |
| **Total Liabilities, Convertible Preferred Stock, and Shareholders' Deficit** | $ | 4,592,937 | $ | 4,330,082 |

The accompanying notes are an integral part of these consolidated financial statements.

58

Table of Contents

**Uniti Group Inc.**
**Consolidated Statements of Income**

| (Thousands, except per share data) | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2018** | | **2017** | | **2016** |
| **Revenues:** | | | | | | |
| Leasing | $ | 699,847 | $ | 685,099 | $ | 676,868 |
| Fiber Infrastructure | | 289,239 | | 202,791 | | 70,568 |
| Tower | | 14,617 | | 10,055 | | 500 |
| Consumer CLEC | | 13,931 | | 18,087 | | 22,472 |
| Total revenues | | 1,017,634 | | 916,032 | | 770,408 |
| **Costs and Expenses:** | | | | | | |
| Interest expense, net | | 319,591 | | 305,994 | | 275,394 |
| Depreciation and amortization | | 451,750 | | 434,205 | | 375,970 |
| General and administrative expense | | 85,198 | | 72,045 | | 35,402 |
| Operating expense (exclusive of depreciation, accretion and amortization) | | 137,065 | | 102,176 | | 49,668 |
| Transaction related costs | | 17,410 | | 38,005 | | 33,669 |
| Other (income) expense | | (4,504) | | 11,284 | | - |
| Total costs and expenses | | 1,006,510 | | 963,709 | | 770,103 |
| | | | | | | |
| **Income (loss) before income taxes** | | 11,124 | | (47,677) | | 305 |
| Income tax (benefit) expense | | (5,421) | | (38,849) | | 517 |
| **Net income (loss)** | | 16,545 | | (8,828) | | (212) |
| Net income attributable to noncontrolling interests | | 358 | | 611 | | - |
| **Net income (loss) attributable to shareholders** | | 16,187 | | (9,439) | | (212) |
| Participating securities' share in earnings | | (2,594) | | (1,509) | | (1,557) |
| Dividends declared on convertible preferred stock | | (2,624) | | (2,624) | | (1,743) |
| Amortization of discount on convertible preferred stock | | (2,980) | | (2,980) | | (1,985) |
| **Net income (loss) attributable to common shareholders** | $ | 7,989 | $ | (16,552) | $ | (5,497) |
| | | | | | | |
| **Earnings (loss) per common share (Note 13):** | | | | | | |
| Basic | $ | 0.05 | $ | (0.10) | $ | (0.04) |
| Diluted | $ | 0.04 | $ | (0.13) | $ | (0.04) |
| | | | | | | |
| **Weighted-average number of common shares outstanding** | | | | | | |
| Basic | | 176,169 | | 168,693 | | 152,473 |
| Diluted | | 177,071 | | 168,989 | | 152,473 |

The accompanying notes are an integral part of these consolidated financial statements.

59

Table of Contents

**Uniti Group Inc.**
**Consolidated Statements of Comprehensive Income (Loss)**

| (Thousands) | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2018 | | 2017 | | 2016 |
| Net income (loss) | $ | 16,545 | $ | (8,828) | $ | (212) |
| Other comprehensive income (loss): | | | | | | |
|   Unrealized gain (loss) on derivative contracts | | 24,251 | | 12,895 | | (675) |
|   Changes in foreign currency translation | | (1,440) | | 1,660 | | (267) |
| Other comprehensive income (loss) | | 22,811 | | 14,555 | | (942) |
| Comprehensive income (loss) | | 39,356 | | 5,727 | | (1,154) |
| Comprehensive income attributable to noncontrolling interest | | 884 | | 976 | | - |
| **Comprehensive income (loss) attributable to common shareholders** | $ | 38,472 | $ | 4,751 | $ | (1,154) |

The accompanying notes are an integral part of these consolidated financial statements.

60

Table of Contents

**Uniti Group Inc.**
**Consolidated Statements of Shareholders' Deficit**

| (Thousands, except share data) | Preferred Stock Shares | Preferred Stock Amount | Common Stock Shares | Common Stock Amount | Additional Paid-in Capital | Accumulated Other Comprehensive (Loss) Income | Distributions in Excess of Accumulated Earnings | Noncontrolling Interests | Total Shareholders' Deficit |
|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2015 | - | $ - | 149,862,459 | $ 15 | $ 1,392 | $ (5,427) | $ (1,162,886) | $ - | $ (1,166,906) |
| 2016 Activity: | | | | | | | | | |
| Net loss | - | - | - | - | - | - | (212) | - | (212) |
| Issuance of common stock | - | - | 5,077,629 | - | 137,665 | - | - | - | 137,665 |
| Amortization of discount on convertible preferred stock | - | - | - | - | (1,985) | - | - | - | (1,985) |
| Other comprehensive loss | - | - | - | - | - | (942) | - | - | (942) |
| Common stock dividends | - | - | - | - | - | - | (370,186) | - | (370,186) |
| Convertible preferred stock dividends | - | - | - | - | - | - | (1,743) | - | (1,743) |
| Equity issuance cost | - | - | - | - | (623) | - | - | - | (623) |
| Net share settlement | - | - | - | - | (203) | - | (2,156) | - | (2,359) |
| Stock-based compensation | - | - | 198,549 | - | 4,846 | - | - | - | 4,846 |
| Balance at December 31, 2016 | - | $ - | 155,138,637 | $ 15 | $ 141,092 | $ (6,369) | $ (1,537,183) | $ - | $ (1,402,445) |
| 2017 Activity: | | | | | | | | | |
| Net (loss) income | - | - | - | - | - | - | (9,439) | 611 | (8,828) |
| Issuance of common stock | - | - | 19,528,302 | 2 | 517,499 | - | - | - | 517,501 |
| Amortization of discount on convertible preferred stock | - | - | - | - | (2,980) | - | - | - | (2,980) |
| Other comprehensive income | - | - | - | - | - | 14,190 | - | 365 | 14,555 |
| Common stock dividends | - | - | - | - | - | - | (410,054) | - | (410,054) |
| Distributions to noncontrolling interest | - | - | - | - | - | - | - | (4,978) | (4,978) |
| Convertible preferred stock dividends | - | - | - | - | - | - | (2,624) | - | (2,624) |
| Equity issuance cost | - | - | - | - | (18,575) | - | - | - | (18,575) |
| Contributions from noncontrolling interest holders | - | - | - | - | - | - | - | 105,969 | 105,969 |
| Purchase of noncontrolling interest | - | - | - | - | - | - | - | (560) | (560) |
| Net share settlement | - | - | - | - | (421) | - | (1,415) | - | (1,836) |
| Stock-based compensation | - | - | 184,575 | - | 7,713 | - | - | - | 7,713 |
| Balance at December 31, 2017 | - | $ - | 174,851,514 | $ 17 | $ 644,328 | $ 7,821 | $ (1,960,715) | $ 101,407 | $ (1,207,142) |
| 2018 Activity: | | | | | | | | | |
| Cumulative effect adjustment for adoption of new accounting standard | - | - | - | - | - | - | 1,859 | - | 1,859 |

61

Table of Contents

**Uniti Group Inc.**
**Consolidated Statements of Shareholders' Deficit**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Net income | - | - | - | - | - | - | 16,187 | 358 | 16,545 |
| At-the-market issuance of common stock, net of offering costs | - | - | 5,496,763 | 1 | 109,441 | - | - | - | 109,442 |
| Amortization of discount on convertible preferred stock | - | - | - | - | (2,980) | - | - | - | (2,980) |
| Other comprehensive income | - | - | - | - | - | 22,284 | - | 527 | 22,811 |
| Common stock dividends | - | - | - | - | - | - | (427,656) | - | (427,656) |
| Distributions to noncontrolling interest | - | - | - | - | - | - | - | (9,917) | (9,917) |
| Convertible preferred stock dividends | - | - | - | - | - | - | (2,624) | - | (2,624) |
| Net share settlement | - | - | - | - | (1,336) | - | (269) | - | (1,605) |
| Stock-based compensation | - | - | 187,694 | - | 8,064 | - | - | - | 8,064 |
| Balance at December 31, 2018 | - | $ - | 180,535,971 | $ 18 | $ 757,517 | $ 30,105 | $(2,373,218) | $ 92,375 | $(1,493,203) |

The accompanying notes are an integral part of these consolidated financial statements.

62

Table of Contents

**Uniti Group Inc.**
**Consolidated Statements of Cash Flows**

| (Thousands) | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2018 | | 2017 | | 2016 |
| **Cash flow from operating activities** | | | | | | |
| Net income (loss) | $ | 16,545 | $ | (8,828) | $ | (212) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | | | | |
| Depreciation and amortization | | 451,750 | | 434,205 | | 375,970 |
| Amortization of deferred financing costs and debt discount | | 24,614 | | 23,102 | | 16,002 |
| Deferred income taxes | | (7,385) | | (41,171) | | (2,186) |
| Straight-line rental revenues | | (15,048) | | (15,136) | | (17,293) |
| Stock-based compensation | | 8,064 | | 7,713 | | 4,846 |
| Change in fair value of contingent consideration | | (3,721) | | 10,736 | | - |
| Other | | 7,818 | | 872 | | 936 |
| Changes in assets and liabilities, net of acquisitions: | | | | | | |
| Accounts receivable | | (52,792) | | (10,524) | | (3,516) |
| Other assets | | 1,755 | | (1,560) | | (1,365) |
| Accounts payable, accrued expenses and other liabilities | | 41,218 | | 5,851 | | 2,806 |
| Net cash provided by operating activities | | 472,818 | | 405,260 | | 375,988 |
| **Cash flow from investing activities** | | | | | | |
| Acquisition of businesses, net of cash acquired | | (53,669) | | (761,887) | | (488,788) |
| Acquisition of ground lease investments | | - | | (21,764) | | (11,543) |
| NMS asset acquisition (Note 5) | | (3,299) | | (69,729) | | - |
| Capital expenditures - other | | (423,575) | | (166,028) | | (34,900) |
| Net cash used in investing activities | | (480,543) | | (1,019,408) | | (535,231) |
| **Cash flow from financing activities** | | | | | | |
| Principal payment on debt | | (21,080) | | (21,080) | | (22,027) |
| Dividends paid | | (426,094) | | (400,210) | | (367,830) |
| Payments of contingent consideration | | (18,640) | | (19,999) | | - |
| Proceeds from issuance of Notes | | - | | 201,000 | | 548,875 |
| Borrowings under revolving credit facility | | 500,000 | | 845,000 | | 641,000 |
| Payments under revolving credit facility | | (140,000) | | (565,000) | | (641,000) |
| Capital lease payments | | (5,946) | | (3,237) | | (1,549) |
| Deferred financing costs | | - | | (28,539) | | (20,557) |
| Common stock issuance, net of costs | | 109,441 | | 498,926 | | 54,213 |
| Purchase of noncontrolling interest | | - | | (560) | | - |
| Distributions paid to noncontrolling interest | | (9,917) | | (2,498) | | - |
| Net share settlement | | (1,605) | | (1,836) | | (2,359) |
| Net cash (used in) provided by financing activities | | (13,841) | | 501,967 | | 188,766 |
| Effect of exchange rates on cash and cash equivalents | | (173) | | 192 | | (267) |
| Net (decrease) increase in cash and cash equivalents | | (21,739) | | (111,989) | | 29,256 |
| Cash and cash equivalents at beginning of period | | 59,765 | | 171,754 | | 142,498 |
| Cash and cash equivalents at end of period | $ | 38,026 | $ | 59,765 | $ | 171,754 |
| **Non-cash investing and financing activities:** | | | | | | |
| Property and equipment acquired but not yet paid | $ | 17,901 | $ | 15,285 | $ | 5,752 |
| Tenant capital improvements | $ | 153,615 | $ | 227,969 | $ | 156,972 |
| Acquisition of businesses through non-cash consideration | $ | - | $ | 122,395 | $ | 259,996 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

**Uniti Group Inc.**
**Notes to the Consolidated Financial Statements**

**Note 1. Organization and Description of Business**

Uniti Group Inc. (the "Company," "Uniti," "we," "us," or "our") was incorporated in the state of Maryland on September 4, 2014. We are an independent, internally managed real estate investment trust ("REIT") engaged in the acquisition and construction of mission critical infrastructure in the communications industry. We are principally focused on acquiring and constructing fiber optic broadband networks, wireless communications towers, copper and coaxial broadband networks and data centers. We manage our operations in four separate lines of business: Uniti Fiber, Uniti Towers, Uniti Leasing, and the Consumer CLEC Business.

The Company operates through a customary "up-REIT" structure, pursuant to which we hold substantially all of our assets through a partnership, Uniti Group LP, a Delaware limited partnership (the "Operating Partnership"), that we control as general partner, with the only significant difference between the financial position and results of operations of the Operating Partnership and its subsidiaries compared to the consolidated financial position and consolidated results of operations of Uniti is that the results for the Operating Partnership and its subsidiaries do not include Uniti's Consumer CLEC segment, which consists of Talk America Services. The up-REIT structure is intended to facilitate future acquisition opportunities by providing the Company with the ability to use common units of the Operating Partnership as a tax-efficient acquisition currency.  As of December 31, 2018, we are the sole general partner of the Operating Partnership and own approximately 97.7% of the partnership interests in the Operating Partnership.

**Note 2. Basis of Presentation and Consolidation**

The accompanying Consolidated Financial Statements include all accounts of the Company and, its wholly-owned and/or controlled subsidiaries, which includes the Operating Partnership. Under the Accounting Standards Codification 810, Consolidation ("ASC 810"), the Operating Partnership is considered a variable interest entity and is consolidated in the Consolidated Financial Statements of Uniti Group Inc. as the Company has determined to be the primary beneficiary.  All material intercompany balances and transactions have been eliminated.

ASC 810 provides guidance on the identification of entities for which control is achieved through means other than voting rights ("variable interest entities" or "VIEs") and the determination of which business enterprise, if any, should consolidate the VIEs.  Generally, the consideration of whether an entity is a VIE applies when either: (1) the equity investors (if any) lack (i) the ability to make decisions about the entity's activities through voting or similar rights, (ii) the obligation to absorb the expected losses of the entity, or (iii) the right to receive the expected residual returns of the entity; (2) the equity investment at risk is insufficient to finance that entity's activities without additional subordinated financial support; or (3) the equity investors have voting rights that are not proportionate to their economic interests and substantially all of the activities of the entity involve or are conducted on behalf of an investor with a disproportionately small voting interest.  The Company consolidates VIEs in which it is considered to be the primary beneficiary.  The primary beneficiary is defined by the entity having both of the following characteristics: (1) the power to direct the activities that, when taken together, most significantly impact the VIE's performance; and (2) the obligation to absorb losses and right to receive the returns from the VIE that would be significant to the VIE.

The accompanying consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for financial information set forth in the Accounting Standards Codification ("ASC"), as published by the Financial Accounting Standards Board ("FASB"), and with the applicable rules and regulations of the Securities and Exchange Commission ("SEC").

<u>Going Concern</u>

In accordance with Accounting Standards Update ("ASU") 2014-15, *Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern (Subtopic 205-40)*, the Company's management has evaluated whether there

64

Table of Contents

are conditions and events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern within one year after the date of the financial statements are issued.

We are party to a Master Lease agreement (the "Master Lease") with Windstream Holdings, Inc. ("Windstream Holdings" and together with its consolidated subsidiaries "Windstream"), from which 68.2% of our revenue for the year ended December 31, 2018 was derived. Windstream has been involved in litigation with an entity who acquired certain Windstream debt securities and thereafter issued a notice of default as to such securities related to our spin-off from Windstream ("Spin-Off"). Windstream challenged the matter in federal court and a trial was held in July 2018. On February 15, 2019, the federal court judge issued a ruling against Windstream, finding that an "event of default" occurred with respect to such debt securities, and that the holder's acceleration of such debt in December 2017 was effective. In response to the adverse outcome, on February 25, 2019, Windstream filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.

In bankruptcy, Windstream has the option to assume or reject the Master Lease. Because the Master Lease is a single indivisible Master Lease with a single rent payment, the lease must be assumed or rejected in whole and cannot be sub-divided by facility or market. A significant amount of Windstream's revenue is generated from the use of our network included in the Master Lease, and we believe that the Master Lease is essential to Windstream's operations. Furthermore, Windstream is designated as a "carrier of last resort" in certain markets where it utilizes the Master Lease to provide service to its customers, and Windstream would require approval from the Public Utility Commissions and the Federal Communications Commission to cease providing service in those markets. As a result, we believe the probability of Windstream rejecting the lease in bankruptcy to be remote. However, a rejection of the Master Lease, or even a temporary disruption in payments to us, may require us to fund certain expenses and obligations (e.g., real estate taxes, insurance and maintenance expenses) to preserve the value of our properties, and could materially adversely affect our consolidated results of operations, liquidity and financial condition, including our ability to service debt, comply with debt covenants and pay dividends to our stockholders as required to maintain our status as a REIT. As a result, conditions or events have been identified that are present that raise substantial doubt about the Company's ability to continue as a going concern.

The Company has considered the mitigating effects of management's plans to alleviate the substantial doubt about the ability to continue as going concern in the event there is a disruption in the payments due to us under the Master Lease prior to Windstream's assumption or rejection of the lease. Those plans include deferring, reducing or delaying cash dividends and capital expenditures, if necessary, paying one or more dividends that are required to maintain our REIT status in shares to the extent allowed under the IRS REIT rules, curtailing acquisition activities, accessing the capital markets and identifying alternative sources of liquidity. Based on our analysis, including consideration of the timing of petitioners' requirements to make post-petition lease payments under U.S. bankruptcy law, we believe that we have adequate liquidity to continue to fund our operations for twelve months after the issuance of the financial statements.

Although management has concluded the probability of a rejection of the Master Lease to be remote, and has noted the absence of any provision in the Master Lease that contemplates renegotiation of the lease and the lack of any ability of the bankruptcy court to unilaterally reset the rent or terms of the lease, it is difficult to predict what could occur in Windstream's bankruptcy restructuring. The Company has evaluated its ability to continue as a going concern in light of the possibility of a consensual renegotiation of the Master Lease, and the impact of any renegotiated lease on our compliance with our debt covenants. We note that our Credit Agreement prohibits the Company from amending the Master Lease that, among other provisions, pro forma for any such amendment, would result in a consolidated secured leverage ratio that exceeds 5.0 to 1.0. Furthermore, management has no intention to enter into a lease amendment that would violate our debt covenants.

However, because there can be no certainty as of the outcome of Windstream's decision to assume or reject the Master Lease, uncertainties exist as to the outcome or impacts of any potential consensual renegotiation of the Master Lease. Therefore, substantial doubt about our ability to continue as a going concern within one year after the issuance of the financial statements exists.

The accompanying consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and satisfaction of liabilities in the ordinary course of business. The financial

Table of Contents

statements do not include any adjustments that might be necessary if the Company is unable to continue as a going concern.

**Note 3. Summary of Significant Accounting Policies**

Use of Estimates—The preparation of financial statements, in accordance with GAAP, requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses and disclosure of contingent assets and liabilities. The estimates and assumptions used in the accompanying financial statements are based upon management's evaluation of the relevant facts and circumstances as of the date of the financial statements. Actual results may differ from the estimates and assumptions used in preparing the accompanying financial statements, and such differences could be material.

Property, Plant and Equipment—Property, plant and equipment is stated at original cost, net of accumulated depreciation. The Company capitalizes costs incurred in bringing property, plant and equipment to an operational state, including all activities directly associated with the acquisition, construction, and installation of the related assets it owns. The Company capitalizes a portion of the interest costs it incurs for assets that require a period of time to get them ready for their intended use. The amount of interest that is capitalized is based on the average accumulated expenditures made during the period involved in bringing the assets comprising a network to an operational state at the Company's weighted average interest rate during the respective accounting period.

The Company also enters into leasing arrangements providing for the long-term use of constructed fiber that is then integrated into the Company's network infrastructure. For each lease that qualifies as a capital lease, the present value of the lease payments, which may include both periodic lease payments over the term of the lease as well as upfront payments to the lessor, is capitalized at the inception of the lease and included in property and equipment. As of December 31, 2018 and 2017, the accumulated amortization of our capital lease assets was $15.8 million and $10.1 million, respectively.

Certain property, plant and equipment acquired as part of our spin-off from Windstream is depreciated using a group composite depreciation method. Under this method, when property is retired, the original cost, net of salvage value, is charged against accumulated depreciation and no immediate gain or loss is recognized on the disposition of the property. For all other property, which includes amortization of capital lease assets, depreciation is computed using the straight-line method over the estimated useful life of the respective property. When the property is retired or otherwise disposed of, the related cost and accumulated depreciation are written-off, with the corresponding gain or loss reflected in operating results. Construction in progress includes direct materials and labor related to fixed assets during the construction period. Depreciation will begin once the construction period has ceased and the related asset has been placed into service, in which it will be depreciated over its useful life.

Costs of maintenance and repairs to property, plant and equipment subject triple-net leasing arrangements are the responsibility of our tenant. Costs of maintenance and repairs to property, plant and equipment not subject to triple-net leasing arrangements are expensed as incurred.

We acquire real property interests from third parties who own land where communications infrastructure assets are located and desire to monetize the underlying real property. These real property interests entitle us to receive rental payments from leases on our sites. The financial results of the acquired real property interests are included in the Leasing segment from the date of acquisition and were not material, individually or in the aggregate, to our results of operations. Real property interests are recorded in property, plant and equipment on our Consolidated Balance Sheet.

Tenant Capital Improvements—Our lease with Windstream provides that tenant funded capital improvements ("TCIs"), defined as maintenance, repair, overbuild, upgrade or replacements to the leased network, including, without limitation, the replacement of copper distribution systems with fiber distribution systems, automatically become property of Uniti upon their construction by Windstream. We receive non-monetary consideration related to the TCIs as they automatically become our property, and we recognize the cost basis of TCIs that are capital in nature as real estate investments and deferred revenue. We depreciate the real estate investments over their estimated useful lives and amortize the deferred revenue as additional leasing revenues over the same depreciable life of the TCI assets. At December 31, 2018 and 2017, the net book value of TCIs recorded as a component of property, plant

66

Table of Contents

and equipment on our Consolidated Balance Sheet was $562.9 million and $432.4 million, respectively. For the years ended December 31, 2018, 2017 and 2016, we recognized $23.1 million, $14.3 million, and $6.1 million of revenue and depreciation expense related to TCIs, respectively.

Impairment of Long-Lived Assets—We review long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset group may not be recoverable from future undiscounted net cash flows we expect the asset group to generate. If the asset group is not fully recoverable, an impairment loss would be recognized for the difference between the carrying value of the asset group and its estimated fair value based on discounted net future cash flows. During the years ended December 31, 2018, 2017 and 2016, there were no events or changes in circumstances indicating that the carrying amount of any of our assets groups to not be recoverable from future undiscounted net cash flows we expect the asset groups to generate, and no impairment losses were recognized.

Asset Retirement Obligations—The Company records obligations to perform asset retirement activities, primarily including requirements to remove equipment from leased space or customer sites as required under the terms of the related lease and customer agreements. The fair value of the liability for asset retirement obligations, which represents the net present value of the estimated expected future cash outlay, is recognized in the period in which it is incurred and the fair value of the liability can reasonably be estimated. The liability accretes as a result of the passage of time and related accretion expense is recognized in the Consolidated Statements of Income. The associated asset retirement costs are capitalized as an additional carrying amount of the related long-lived asset and depreciated on a straight-line basis over the asset's useful life. As of December 31, 2018 and 2017, our aggregate carrying amount of asset retirement obligations totaled $10.4 million and $9.4 million, respectively. During the year ended December 31, 2018 and 2017, we incurred liabilities of $0.1 million and $4.4 million related to asset retirement obligations, respectively.  During the year ended December 31, 2018, 2017, and 2016, we recognized $0.9 million, $4.4 million, and $0.8 million of accretion expense related to asset retirement obligations, respectively.

Cash and Cash Equivalents—Cash and cash equivalents include all non-restricted cash held at financial institutions and other non-restricted highly liquid short-term investments with original maturities of three months or less.

Derivative Instruments and Hedging Activities—We account for our derivatives in accordance with FASB ASC 815, *Derivatives and Hedging*, in which we reflect all derivative instruments at fair value as either assets or liabilities on our Consolidated Balance Sheet. For derivative instruments that are designated and qualify as hedging instruments, we record the effective portion of the gain or loss on the hedged instruments as a component of accumulated other comprehensive income or loss. Any ineffective portion of a derivative's change in fair value is immediately recognized within net income. For derivatives that do not meet the criteria for hedge accounting, changes in fair value are immediately recognized within net income. See Note 6 and Note 8.

Intangible Assets—Intangible assets are presented in the financial statements at cost less accumulated amortization and are amortized using the straight-line method over their estimated useful lives with the exception of the customer list intangible assets related to our Consumer CLEC Business, which were brought over at carry-over basis at the time of Spin-Off, and are amortized using the sum-of-the-years'-digits method over their estimated useful lives.

Foreign Currency Translation—The financial statements of our international subsidiaries whose functional currency is the local currency, and includes the Mexican Peso and Colombian Peso, are translated into U.S. dollars using the exchange rate at the balance sheet date for assets and liabilities and the weighted average exchange rate for the applicable period for revenues, expenses, gains and losses. Translation adjustments are recorded as a separate component of comprehensive income in stockholders' equity.

Reclassifications—During 2017 and forward, we managed and reported our operations in four reportable business segments: Leasing, Fiber Infrastructure, Towers and Consumer CLEC. Certain prior year asset categories and related amounts in Note 7 have been reclassified to conform with current year presentation.

Transaction Related Costs—The Company expenses transaction related costs in the period in which they are incurred and services are received. Transaction related costs include incremental acquisition pursuit, transaction and integration costs, including unsuccessful acquisition pursuit costs.  Pursuit and transaction costs include professional services (legal, accounting, advisory, regulatory, etc.), finder's fees, travel expenses, and other direct expenses

67

Table of Contents

associated with an acquisition. Integration costs include direct costs necessary to integrate an acquired business, including professional services, systems and data conversion, severance and retention bonuses payable to employees of an acquired business.

Debt Issuance Costs—The Company recognizes debt issuance costs related to a recognized debt liability as a direct deduction from the carrying amount of the debt liability, consistent with debt discounts. The costs, which include underwriting, legal, and other direct costs related to the issuance of debt, are amortized over the contractual term of the debt using the effective interest method.

Revenue Recognition—We recognize leasing revenues on a straight-line basis over the applicable lease term when collectability is reasonably assured. Recognizing leasing income on a straight-line basis generally results in recognized revenues during the first half of the lease term in excess of cash amounts contractually due from our tenants, creating a straight-line rent receivable.

We evaluate the collectability of straight-line rent receivables and record a provision for doubtful accounts if management believes the receivables to be uncollectible. At December 31, 2018 and 2017, no allowance was recorded related to our straight-line rent receivable.

We lease certain assets to Windstream under a triple-net lease, whereby Windstream is responsible for the costs related to operating the Distribution Systems, including property taxes, insurance and maintenance and repair costs. As a result, we do not record an obligation related to the payment of property taxes or insurance, as Windstream makes direct payments to the taxing authorities and insurance carriers, respectively.

The Company adopted ASU No. 2014-09, *Revenue from Contracts with Customers (Topic 606)* ("Topic 606") on January 1, 2018 (see Note 4). Prior to the adoption of Topic 606, the Company recognized service revenues related to its broadband transport and backhaul communications services when (i) persuasive evidence of an arrangement exists, (ii) the services have been provided to the customer, (iii) the sales price was fixed or determinable, and (iv) the collection of the sales price is reasonably assured. Services provided to the Company's customers are rendered pursuant to contractual fee-based arrangements, which generally provide for recurring fees charged for the use of designated portions of the Company's network and typically range for a period of three to ten years. The Company's revenue arrangements often include upfront fees charged to the customer for the cost of establishing the necessary components of the Company's network prior to the commencement of use by the customer. Fees charged to customers for the recurring use of the Company's network are recognized during the related periods of service. Upfront fees that are billed in advance of providing services are deferred until such time the customer accepts the Company's network and then are recognized as service revenues ratably over a period in which substantive services required under the revenue arrangement are expected to be performed, which is the initial term of the arrangement.

We evaluate the collectability of service receivables by considering a variety of factors. The Company typically does not require collateral. When the Company becomes aware of a specific customer's inability to meet its financial obligations, the Company records a specific reserve for bad debt to reduce the related accounts receivable to the amount the Company reasonably believes is collectible. When appropriate, the Company also records reserves for bad debts for all other customers based on a variety of factors including the length of time the receivable is past due, the financial health of the customer, macroeconomic considerations and historical experience. If circumstances related to specific customers change, the Company adjusts its estimates of the recoverability of receivables as needed. At December 31, 2018 and 2017, the allowance recorded for service receivables was $2.3 million and $1.0 million, respectively.

Consumer CLEC Business revenues are primarily derived from providing access to or usage of leased networks and facilities and are recognized over the period that the corresponding services are rendered to customers. Revenues derived from other telecommunications services, including broadband, long distance and enhanced service revenues are recognized monthly as services are provided. Sales of customer premise equipment and modems are recognized when products are delivered to and accepted by customers.

Stock-Based Compensation—We account for stock-based compensation using the fair value method of accounting. We have determined that our stock-based payment awards granted in exchange for employee services qualify as equity classified awards, which are measured based on the fair value of the award on the date of the grant. The fair

68

Table of Contents

value of restricted stock-based payments is based on the market value of our common stock on the date of grant. The fair value of performance-based awards, which have performance conditions, is based on a Monte Carlo simulation. The fair value of all stock-based compensation is recognized over the period during which an employee is required to provide services in exchange for the award. See Note 11.

Income Taxes—We elected on our initial U.S. federal income tax return to be treated as a REIT under the Internal Revenue Code of 1986, as amended (the "Code"). To qualify as a REIT, we must distribute at least 90% of our annual REIT taxable income to shareholders, and meet certain organizational and operational requirements, including asset holding requirements. As a REIT, we will generally not be subject to U.S. federal income tax on income that we distribute as dividends to our shareholders. If we fail to qualify as a REIT in any taxable year, we will be subject to U.S. federal income tax, including any applicable alternative minimum tax for open taxable years through 2018, on our taxable income at regular corporate income tax rates, and we could not deduct dividends paid to our shareholders in computing taxable income. Any resulting corporate liability could be substantial and could materially and adversely affect our net income and net cash available for distribution to shareholders. Unless we were entitled to relief under certain Code provisions, we also would be disqualified from reelecting to be taxed as a REIT for the four taxable years following the year in which we failed to qualify as a REIT.

Subject to the temporary restriction imposed by the waiver and amendment to our Credit Agreement (see Note 10), our ability to make cash distributions to our shareholders in amounts exceeding 90% of our REIT taxable income, determined without regard to the dividends paid deduction and excluding any capital gains, generally will be restricted.  As a result, we may be required to record a provision in our Consolidated Financial Statements for U.S. federal income taxes related to the activities of the REIT and its passthrough subsidiaries for any undistributed income. We are subject to the statutory requirements of the locations in which we conduct business, and state and local income taxes are accrued as deemed required in the best judgment of management based on analysis and interpretation of respective tax laws.

We have elected to treat the subsidiaries through which we operate Uniti Fiber and Talk America as taxable REIT subsidiaries ("TRSs").  TRSs enable us to engage in activities that result in income that does not constitute qualifying income for a REIT.  Our TRSs are subject to U.S. federal, state and local corporate income taxes.

Deferred tax assets and liabilities are recognized under the asset and liability method for the estimated future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax balances are adjusted to reflect tax rates based on currently enacted tax laws, which will be in effect in the years in which the temporary differences are expected to reverse. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the results of operations in the period of the enactment date. A valuation allowance is recorded to reduce the carrying amounts of deferred tax assets unless it is more likely than not that such assets will be realized.

We recognize the benefit of tax positions that are "more likely than not" to be sustained upon examination based on their technical merit. The benefit of a tax position is measured at the largest amount that has a greater than 50 percent likelihood of being realized upon ultimate settlement.  If applicable, we will report tax-related penalties and interest expense as a component of income tax expense. We currently have unrecognized tax benefits of $3.0 million recorded in deferred incomes taxes on our Consolidated Balance Sheet.

The Company will be subject to a federal corporate level tax on any gain recognized from the sale of assets occurring within a five year recognition period after the Spin-Off up to the amount of the built in gain that existed on April 24, 2015, which is based on the fair market value of the assets in excess of the Company's tax basis as of such date.

Business Combinations—In accordance with ASC 805, *Business Combinations*, we apply the acquisition method of accounting for acquisitions meeting the definition of a business combination or asset acquisition, where assets acquired and liabilities assumed are recorded at fair value at the date of each acquisition, and the results of operations are included with those of the Company from the dates of the respective acquisitions. The fair value of the acquired assets and liabilities are estimated using the income, market and/or cost approach.  The income approach utilizes the present value of estimated future cash flows that a business or asset can be expected to generate, while under the market approach, the fair value of an asset or business reflects the price at which

69

Table of Contents

comparable assets are purchased under similar circumstances.  Inherent in our preparation of cash flow projections are significant assumptions and estimates derived from a review of operating results, business plans, expected growth rates, capital expenditure plans, cost of capital and tax rates. We also make certain forecasts about future economic conditions, interest rates and other market data. Many of the factors used in assessing fair value are outside the control of management. Small changes in these assumptions or estimates could materially affect the cash flow projections, and therefore could affect the estimated fair value.  Impact these assumptions or estimates include customer retention, execution of our business plans, which impact growth, cost escalation impacting margin, the level of capital expenditures required to sustain our growth and market factors, including stock price fluctuations and increased rates, impacting our cost of capital.

For acquisitions meeting the definition of a business combination, any excess of the purchase price paid by the Company over the amounts recognized for assets acquired and liabilities assumed is recorded as goodwill. ASC 805 also requires acquirers to, among other things, estimate the acquisition date fair value of any contingent consideration and recognize any subsequent changes in the fair value of contingent consideration in earnings. When provisional amounts are initially recorded, the Company continues to evaluate acquisitions for a period not to exceed one year after the applicable acquisition date of each transaction to determine whether any additional adjustments are needed to the allocation of the purchase price paid for the assets acquired and liabilities assumed.  For acquisitions meeting the definition of an asset acquisition, the fair value of the consideration transferred, including transaction costs, is allocated to the assets acquired and liabilities assumed based on their relative fair values.  No goodwill is recognized in an asset acquisition.

Noncontrolling Interest—The limited partner equity interests in our operating partnership are exchangeable on a one-for-one basis for shares of our common stock or, at our election, cash of equivalent value.  All of the limited partner equity interests in our operating partnership not held by the Company are reflected as noncontrolling interests. In the consolidated statements of operations, we allocate net income (loss) attributable to noncontrolling interests to arrive at net income (loss) attributable to shareholders based on their proportionate share.

For transactions that result in changes to the Company's ownership interest in our operating partnership, the carrying amount of noncontrolling interests is adjusted to reflect such changes. The difference between the fair value of the consideration received or paid and the amount by which the noncontrolling interest is adjusted is reflected as an adjustment to additional paid-in capital on the consolidated balance sheets.

Goodwill—Goodwill is recognized for the excess of purchase price over the fair value of net assets of businesses acquired. Goodwill is reviewed for impairment at least annually. In accordance with ASC 350-20, *Intangibles-Goodwill and Other*, we evaluate goodwill for impairment between annual impairment tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount. Unless circumstances otherwise dictate, the annual impairment test is performed in the fourth quarter. Application of the goodwill impairment test requires significant judgment, including: the identification of reporting units; assignment of assets and liabilities to reporting units; assignment of goodwill to reporting units; determination of the fair value of each reporting unit; and an assumption as to the form of the transaction in which the reporting unit would be acquired by a market participant (either a taxable or nontaxable transaction).

We estimate the fair value of our reporting units (which are our segments) using a combination of an income approach based on the present value of estimated future cash flows and a market approach based on market data of comparable businesses and acquisition multiples paid in recent transactions.  If the carrying value of a reporting unit's net assets is less than its fair value, no indication of impairment exists. If the carrying amount of the reporting unit is greater than the fair value of the reporting unit, an impairment loss must be recognized for the excess and charged to operations not exceed the carrying value of goodwill.

Inherent in our preparation of cash flow projections are significant assumptions and estimates derived from a review of our operating results, business plans, expected growth rates, capital expenditure plans, cost of capital and tax rates. We also make certain forecasts about future economic conditions, interest rates and other market data. Many of the factors used in assessing fair value are outside the control of management, and these assumptions and estimates may change in future periods. Small changes in these assumptions or estimates could materially affect our cash flow projections, and therefore could affect the likelihood and amount of potential impairment.  Potential

70

Table of Contents

events that could negatively impact these assumptions or estimates include customer losses or poor execution of our business plans, which impact growth, cost escalation impacting margin, the level of capital expenditures required to sustain our growth and market factors, including stock price fluctuations and increased rates, impacting our cost of capital.  The market approach uses market data of comparable business and acquisition multiples paid in recent transactions to estimate fair value.  Declines in the comparable business and acquisitions multiples could affect the likelihood and amount of potential impairment.

As of December 31, 2018 and 2017, all of our Goodwill is included in our Fiber Infrastructure segment.  We performed our goodwill impairment analysis during the fourth quarter and we concluded the implied fair value of our Fiber Infrastructure reporting unit was in excess of its carrying value by less than 5%.  During the years ended December 31, 2018 and 2017, no impairment losses were recognized.

In light of the recent developments below surrounding Windstream, as discussed in "Concentration of Credit Risks", if there were to be changes in assumptions impacting the forecasted cash flows at Uniti Fiber, our conclusions regarding the likelihood and amount of any potential impairment could change.

Earnings per Share—Outstanding restricted stock awards that contain rights to non-forfeitable dividends are deemed to be participating securities, requiring the application of the two-class method of computing basic and dilutive earnings per share.

Basic earnings per share includes only the weighted average number of common shares outstanding during the period. Dilutive earnings per share includes the weighted average number of common shares and the dilutive effect of restricted stock and performance-based awards outstanding during the period, when such awards are dilutive. See Note 13.

Concentration of Credit Risks—We are party to a Master Lease with Windstream from which substantially all of Uniti's leasing revenues and operating cash flows are currently derived. Revenue under the Master Lease provided 68.2% of our revenue for the year ended December 31, 2018, 74.8% of our revenue for the year ended December 31, 2017, and 87.9% of our revenue for the year ended December 31, 2016. Because a substantial portion of our revenue and cash flows are derived from lease payments by Windstream pursuant to the Master Lease, there could be a material adverse impact on our consolidated results of operations, liquidity, financial condition and/or ability to pay dividends and service debt if Windstream were to default under the Master Lease or otherwise experiences operating or liquidity difficulties and becomes unable to generate sufficient cash to make payments to us. In recent years, Windstream has experienced annual declines in its total revenue, sales and cash flow, and has had its credit ratings downgraded by nationally recognized credit rating agencies multiple times over the past 12 months. In addition, Windstream has been involved in litigation with an entity who acquired certain Windstream debt securities and thereafter issued a notice of default as to such securities relating to our spin-off from Windstream. On December 7, 2017, the entity issued a notice of acceleration to Windstream claiming that the alleged default had matured into an "event of default" and that the principal amount, along with accrued interest, of such securities was due and payable immediately. Windstream challenged the matter in federal court and a trial was held, in July 2018.  On February 15, 2019, the federal court judge issued a ruling against Windstream, finding that Windstream's attempts to waive such default were not valid; that an "event of default" occurred with respect to such debt securities; and that the holder's acceleration of such debt in December 2017 was effective.

In response to the adverse outcome, on February 25, 2019, Windstream filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.

In bankruptcy, Windstream has the option to assume or reject the Master Lease.  While we believe that the Master Lease is essential to Windstream's operations, it is difficult to predict what could occur in a restructuring, and even a temporary disruption in payments to us may require us to fund certain expenses and obligations (e.g., real estate taxes, insurance and maintenance expenses) to preserve the value of our properties and avoid the imposition of liens on our properties and could impact our ability to fund other cash obligations, including dividends necessary to maintain REIT status, non-essential capital expenditures and, in an extreme case, our debt service obligations. See Note 2.  A rejection by Windstream of the Master Lease or its inability or unwillingness to meet its rent and other obligations under the Master Lease could materially adversely affect our consolidated results of operations,

71

Table of Contents

liquidity, and financial condition, including our ability to service debt, comply with debt covenants and pay dividends to our stockholders as required to maintain our status as a REIT.

Windstream is a publicly traded company and is subject to the periodic filing requirements of the Securities Exchange Act of 1934, as amended. Windstream filings can be found at www.sec.gov. Windstream filings are not incorporated by reference in this Annual Report on Form 10-K.

Recently Adopted Accounting Pronouncements

In August 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments* ("ASU 2016-15"). ASU 2016-15 provides guidance on reducing the diversity in how certain cash receipts and cash payments are presented and classified in the statement of cash flows. In addition to other specific cash flow issues, ASU 2016-15 provides clarification on when an entity should separate cash receipts and cash payments into more than one class of cash flows and when an entity should classify those cash receipts and payments into one class of cash flows on the basis of predominance. The new guidance is effective for the fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. We adopted ASU 2016-15 effective January 1, 2018, and there was no material impact on our financial position.

In August 2017, the FASB issued ASU No. 2017-12, *Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities* ("ASU 2017-12"), which amends and simplifies existing guidance in order to allow companies to more accurately present the economic effects of risk management activities in the financial statements. ASU 2017-12 is effective for annual periods beginning after December 15, 2018 and interim periods within those annual periods, and earlier adoption is permitted. We adopted ASU 2017-12 effective January 1, 2018, and there was no material impact on our financial position.

In February 2017, the FASB issued ASU No. 2017-05, *Other Income - Gains and Losses from the Derecognition of Nonfinancial Assets (Subtopic 610-20): Clarifying the Scope of Asset Derecognition Guidance and Accounting for Partial Sales of Nonfinancial Assets* ("ASU 2017-05"), which provides guidance for recognizing gains and losses from the transfer of nonfinancial assets and for partial sales of nonfinancial assets, and is effective for financial statements issued for fiscal years and interim periods beginning after December 15, 2017. We adopted ASU 2017-05 effective January 1, 2018, using the modified retrospective approach and there was no material impact on our financial position.

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*. This update outlines a single comprehensive revenue recognition model for entities to follow in accounting for revenue from contracts with customers and supersedes most current revenue recognition guidance, including industry-specific guidance. The core principle of the revenue model is that an entity should recognize revenue for the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to receive for those goods or services. Topic 606 is effective for annual periods beginning after December 15, 2017 and interim periods within those annual periods. We adopted Topic 606 as of January 1, 2018 using the modified retrospective transition method. See Note 4.

Recent Accounting Pronouncements Not Yet Adopted

In February 2016, the FASB issued ASU No. 2016-02, *Leases* ("ASC 842"), which sets out the principles for the recognition, measurement, presentation and disclosure of leases for both parties to a contract (i.e. lessees and lessors). The new standard requires lessees to apply a dual approach, classifying leases as either finance or operating leases based on the principle of whether or not the lease is effectively a financed purchase by the lessee. This classification will determine whether lease expense is recognized based on an effective interest method or on a straight-line basis over the term of the lease, respectively. A lessee is also required to record a right-of-use asset and a lease liability for all leases with a term of greater than 12 months regardless of their classification. The accounting for lessors remains largely unchanged from existing guidance. Leases with a term of 12 months or less will be accounted for similar to existing guidance for operating leases today. The provisions of this guidance are effective for annual periods beginning after December 31, 2018, and for interim periods therein, and it is required to applied using the modified retrospective approach for all leases existing as of the effective date. The Company is currently evaluating this guidance to determine the impact it will have on our financial statements by reviewing its existing

72

Table of Contents

operating lease contracts, including ground, tower, equipment, office and fiber lease arrangements, in which we are the lessee and service contracts that may include embedded leases. The Company expects a gross-up of its Consolidated Balance Sheets as a result of recognizing lease liabilities and right-of-use assets; the extent of the impact of a gross-up is under evaluation. The Company does not anticipate material changes to the recognition of operating lease expense in its Consolidated Statements of Income.

In January 2018, the FASB issued ASU 2018-01, *Leases* (Topic 842) – Land Easement Practical Expedient for Transition to Topic 842. This standard permits an entity to elect an optional transition practical expedient to not evaluate land easements that exist or expire before the Company's adoption of ASC 842 and that were not previously accounted for as leases under ASC 840. The Company intends to elect this transition provision.

**Note 4. Revenues**

Adoption of ASC Topic 606, *Revenue from Contracts with Customers*

Except for the changes below, we have consistently applied the accounting policies to all periods presented in these Consolidated Financial Statements.

On January 1, 2018, we adopted Topic 606 using the modified retrospective method, whereby the cumulative effect of initially applying Topic 606 is recognized as an adjustment to the opening balance of equity at January 1, 2018. Therefore, comparative information has not been adjusted and continues to be reported under ASC 605, *Revenue Recognition*. We recorded a net increase to opening retained earnings of $1.9 million as of January 1, 2018 due to the cumulative impact of adopting Topic 606, with the impact primarily related to commission costs that are capitalized under Topic 606 which were previously expensed.

The details of the significant changes and quantitative impact of the changes are set out below. We have applied this guidance only to contracts that were not completed as of January 1, 2018, the date of initial application.

*Commissions*

We previously recognized commission fees related to obtaining a contract as selling expenses when incurred. Under Topic 606 and Topic 340, *Other Assets and Deferred Costs*, when they are incremental or expected to be recovered, we capitalize those commission fees as costs of obtaining a contract and amortize them consistently with the pattern of transfer of the product or service to which the asset relates. These amortized costs are included in general and administrative expense on the Consolidated Statements of Income.  These deferred balances were $2.5 million and $4.9 million at January 1, 2018 and December 31, 2018, respectively, and included in Other Assets on the Consolidated Balance Sheets; Other Assets would have been lower by those amounts under revenue recognition and cost guidance applicable to us prior to the adoption of Topic 606 and Topic 340.  For the year ended December 31, 2018, the impact to costs as a result of applying Topic 606 was a decrease of $2.4 million, as compared to what the general and administrative expense would have been under previous revenue and cost recognition guidance.  There would have been no other differences in our Consolidated Balance Sheets as of December 31, 2018 or Consolidated Statements of Income for the year ended December 31, 2018 under previous revenue and cost recognition guidance as compared to Topic 606 and Topic 340.

Nature of goods and services

The following is a description of principal activities, separated by reportable segments (see Note 14), from which the Company generates its revenues.

*Leasing*

Leasing revenue represents the results from our leasing program, Uniti Leasing, which is engaged in the acquisition of mission-critical communications assets and leasing them back to anchor customers on either an exclusive or shared-tenant basis. Due to the nature of these activities, they are outside the scope of the guidance of Topic 606, and are recognized under other applicable guidance, including ASC 840, *Leases* ("Topic 840").

Table of Contents

*Fiber Infrastructure*

The Fiber Infrastructure segment represents the operations of our fiber business, Uniti Fiber, which provides (i) consumer, enterprise, wholesale and backhaul lit fiber, (ii) E-rate, (iii) small cell, (iv) construction services, (v) dark fiber and (vi) other revenue generating activities.

i. Consumer, enterprise, wholesale, and backhaul lit fiber fall under the guidance of Topic 606. Revenue is recognized over the life of the contracts in a pattern that reflects the satisfaction of Uniti's stand-ready obligation to provide lit fiber services. The transaction price is equal to the monthly-recurring charge multiplied by the contract term, plus any non-recurring or variable charges. For each contract, the customer is invoiced monthly.

ii. E-rate contracts involve providing lit fiber services to schools and libraries, and is governed by Topic 606. Revenue is recognized over the life of the contract in a pattern that reflects the satisfaction of Uniti's stand-ready obligation to provide lit fiber services. The transaction price is equal to the monthly-recurring charge multiplied by the contract term, plus any non-recurring or variable charges. For each contract, the customer is invoiced monthly.

iii. Small cell contracts provide improved network connection to areas that may not require or accommodate a tower. Small cell arrangements typically contain five streams of revenue: site development, radio frequency ("RF") design, dark fiber lease, construction services, and maintenance services. Site development, RF design and construction are each separate services and are considered distinct performance obligations under Topic 606. Dark fiber and associated maintenance services constitute a lease, and as such, they are outside the scope of Topic 606 and are governed by other applicable guidance.

iv. Construction revenue is generated from contracts to provide various construction services such as equipment installation or the laying of fiber.  Construction revenue is recognized over time as construction activities occur as we are either enhancing a customer's owned asset or constructing an asset with no alternative use to us and we would be entitled to our costs plus a reasonable profit margin if the contract was terminated early by the customer.  We are utilizing our costs incurred as the measure of progress of satisfying our performance obligation.

v. Dark fiber arrangements represent operating leases under Topic 840 and is outside the scope of Topic 606.  When (i) a customer makes an advance payment or (ii) a customer is contractually obligated to pay any amounts in advance, which is not deemed a separate performance obligation, deferred leasing revenue is recorded. This leasing revenue is recognized ratably over the expected term of the contract, unless the pattern of service suggests otherwise.

vi. The Company generates revenues from other services, such as consultation services and equipment sales.  Revenue from the sale of customer premise equipment and modems that are not provided as an essential part of the telecommunications services, including broadband, long distance, and enhanced services is recognized when products are delivered to and accepted by the customer. Revenue from customer premise equipment and modems provided as an essential part of the telecommunications services, including broadband, long distance, and enhanced services are recognized over time in a pattern that reflects the satisfaction of the service performance obligation.

*Towers*

The Towers segment represents the operations of our towers business, Uniti Towers, through which we acquire and construct tower and tower-related real estate, which we then lease to our customers in the United States and Latin America. Revenue from our towers business qualifies as a lease under Topic 840 and is outside the scope of Topic 606.

*Consumer CLEC*

74

Table of Contents

The Consumer CLEC segment represents the operations of Talk America Services ("Talk America") through which we operate the Consumer CLEC Business, which provides local telephone, high-speed internet and long-distance services to customers in the eastern and central United States. Customers are billed monthly for services rendered based on actual usage or contracted amounts. The transaction price is equal to the monthly-recurring charge multiplied by the initial contract term (typically 12 months), plus any non-recurring or variable charges.

Disaggregation of Revenue

The following table presents our revenues disaggregated by revenue stream.

| (Thousands) | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2018 | | 2017(1) | | 2016(1) |
| *Revenue disaggregated by revenue stream* | | | | | | |
| Revenue from contracts with customers | | | | | | |
| Fiber Infrastructure | | | | | | |
| Lit backhaul | $ | 132,361 | $ | 117,574 | $ | 54,739 |
| Enterprise and wholesale | | 63,519 | | 36,542 | | 7,140 |
| E-Rate and government | | 74,752 | | 43,021 | | 8,062 |
| Other | | 4,492 | | 454 | | 252 |
| Fiber Infrastructure | $ | 275,124 | $ | 197,591 | $ | 70,193 |
| Consumer CLEC | | 13,931 | | 18,087 | | 22,472 |
| Total revenue from contracts with customers | | 289,055 | | 215,678 | | 92,665 |
| Revenue accounted for under other applicable guidance | | 728,579 | | 700,354 | | 677,743 |
| Total revenue | $ | 1,017,634 | $ | 916,032 | $ | 770,408 |

(1)    As noted above, prior period amounts have not been adjusted under the modified retrospective method.

At January 1, 2018 and December 31, 2018 lease receivables were $10.9 million and $45.5 million, respectively, and receivables from contracts with customers were $31.2 million and $57.1 million, respectively.

Contract Assets (Unbilled Revenue) and Liabilities (Deferred Revenue)

Contract assets primarily consist of unbilled construction revenue where we are utilizing our costs incurred as the measure of progress of satisfying our performance obligation.  When the contract price is invoiced, the related unbilled receivable is reclassified to trade accounts receivable, where the balance will be settled upon the collection of the invoiced amount.  Contract liabilities are generally comprised of upfront fees charged to the customer for the cost of establishing the necessary components of the Company's network prior to the commencement of use by the customer. Fees charged to customers for the recurring use of the Company's network are recognized during the related periods of service. Upfront fees that are billed in advance of providing services are deferred until such time the customer accepts the Company's network and then are recognized as service revenues ratably over a period in which substantive services required under the revenue arrangement are expected to be performed, which is the initial term of the arrangement. During the year ended December 31, 2018, we recognized revenues of $14.7 million that was included in the January 1, 2018 contract liabilities balance.

The following table provides information about contract assets and contract liabilities accounted for under Topic 606.

| (Thousands) | | Contract Assets | | Contract Liabilities |
|---|---|---|---|---|
| Balance at January 1, 2018 | $ | 2,490 | $ | 26,256 |
| Balance at December 31, 2018 | $ | 5,540 | $ | 15,473 |

Transaction Price Allocated to Remaining Performance Obligations

75

Table of Contents

Performance obligations within contracts to stand ready to provide services are typically satisfied over time or as those services are provided. Contract assets primarily relate to costs incremental to obtaining contracts and contract liabilities primarily relate to deferred revenue from non-recurring charges. The deferred revenue is recognized, and the liability reduced, over the contract term as the Company completes the performance obligation. As of December 31, 2018, our future revenues (i.e. transaction price related to remaining performance obligations) under contract accounted for under Topic 606 totaled $646.7 million, of which $572.0 million is related to contracts that are currently being invoiced and have an average remaining contract term of 2.7 years, while $74.7 million represents our backlog for sales bookings which have yet to be installed and have an average remaining contract term of 4.5 years.

Practical Expedients and Exemptions

We do not disclose the value of unsatisfied performance obligations for contracts that have an original expected duration of one year or less.

We exclude from the transaction price any amounts collected from customers for sales taxes and therefore, they are not included in revenue.

**Note 5. Business Combinations and Asset Acquisitions**

**Asset Acquisitions**

*Network Management Holdings LTD*

On January 31, 2017, we completed the acquisition of NMS. The Company accounted for the acquisition of NMS as an asset purchase. At close, NMS owned and operated 366 wireless communications towers in Latin America with an additional 105 build to suit tower sites under development. The NMS portfolio spans three Latin American countries with 212 towers in Mexico, 54 towers in Nicaragua, and 100 towers in Colombia. The consideration for the 366 wireless towers in operation as of the transaction close date was $62.6 million, which was funded through cash on hand, and is presented in NMS asset acquisition on the Consolidated Statements of Cash Flows. NMS conducts its operations through three non-U.S. subsidiaries and the Company has determined that the functional currencies for the Mexican, Nicaraguan and Colombian subsidiaries are the Mexican Peso, U.S. Dollar and Colombian Peso, respectively. The non-U.S. subsidiaries in which NMS conducts its operations are subject to income tax in the jurisdictions in which they operate. The acquisition did not result in a step up in tax basis under local law. The Company recorded a net deferred tax liability of $18.4 million and a liability for unrecognized tax benefits of $5.3 million in connection with the acquisition. The deferred tax liability is primarily related to the excess of the recorded amounts for Property, Plant and Equipment and Intangibles over their respective historical tax bases. Under the terms of the purchase agreement, we will acquire the towers under development when construction is completed. The NMS towers are reflected in our Towers segment. See Note 14. The following is a summary of the estimated fair values of the assets acquired and liabilities assumed as of the acquisition date:

|  | | (thousands) |
|---|---|---:|
| Property, plant and equipment | $ | 36,417 |
| Accounts receivable | | 2,826 |
| Other assets | | 1,623 |
| Intangible assets | | 52,437 |
| Accounts payable, accrued expenses and other liabilities | | (8,895) |
| Intangible liabilities | | (3,440) |
| Deferred income taxes | | (18,403) |
| Total purchase consideration | $ | 62,565 |

Of the $52.4 million of acquired intangible assets, $37.4 million was assigned to tenant contracts (22 year life), $13.5 million was assigned to network (22 year life) and $1.5 million was assigned to acquired above-market leases (10 year life). The acquired below-market lease intangible liability of $3.4 million has a 10 year life. See Note 9.

Table of Contents

As of December 31, 2018, we have acquired 89 of the 105 towers that were under development at the time of the NMS acquisition, and 16 of the development towers were cancelled and will not be completed and purchased.

**Business Combinations**

2018 Transactions

*Information Transport Solutions, Inc.*

On October 19, 2018, we acquired 100% of the outstanding equity of Information Transport Solutions, Inc. ("ITS") for cash consideration of $59.6 million. ITS is a full-service managed services provider of technology solutions, primarily to educational institutions in Alabama and Florida. This acquisition expands Uniti Fiber's product offerings and strengthens relationships with new and existing E-Rate customers.  The acquisition was recorded by allocating the costs of the assets acquired based on their estimated fair values at the acquisition date. The excess of the cost of the acquisition over the fair value of the assets acquired is recorded as goodwill within our Fiber Infrastructure segment. See Note 14. The following is a summary of the estimated fair values of the assets acquired and liabilities assumed as of the acquisition date:

| | (thousands) |
|---|---|
| Property, plant and equipment | $ 4,270 |
| Cash and cash equivalents | 5,931 |
| Accounts receivable | 3,909 |
| Other assets | 7,238 |
| Goodwill | 11,210 |
| Intangible assets | 30,254 |
| Accounts payable, accrued expenses and other liabilities | (2,645) |
| Deferred revenue | (567) |
| Total purchase consideration | $ 59,600 |

The above purchase price allocation is considered preliminary and is subject to revision when the valuation of assets and liabilities is finalized upon receipt of the final valuation report from a third party valuation specialist, and resolution of contractual adjustments, such as working capital adjustments, set forth in the merger agreement, which is anticipated to be finalized during the first half of 2019.

The goodwill arising from the transaction is primarily attributable to strategic opportunities that arose from the acquisition of ITS, including strengthening relationships with new and existing E-Rate customers and anticipated incremental sales and cost savings. For federal income tax purposes, the transaction was treated as a taxable acquisition. Thus, all of the goodwill is expected to be deductible for tax purposes.

We acquired an intangible asset that was assigned to customer relationships of $30.3 million (14 year life). The Company determined the useful life for the customer relationship by applying an income approach (using the multi-period excess earnings method with a discount rate commensurate to the risk of the asset) and resulted from two key considerations: attrition rate and cumulative present value of cash flows, including assessing the period over which the asset is expected to contribute to the Company's future cash flows.

The acquired business contributed revenue of $9.0 million and an operating income of $0.5 million, which excludes transaction related costs, to our consolidated results from the date of acquisition through December 31, 2018. We recorded transaction related costs related to the acquisition of ITS for the year ended December 31, 2018 of $0.3 million within transaction related costs on the Consolidated Statement of Income.

The following table presents the unaudited pro forma summary of our financial results as if the ITS acquisition had occurred on January 1, 2017. The pro forma results include additional amortization resulting from purchase accounting adjustments related to the intangible asset. The pro forma results do not include any synergies or other benefits of the acquisition. The pro forma results are not indicative of future results of operations, or results that might have been achieved had the acquisition been consummated on January 1, 2017.

Table of Contents

| (Thousands, except per share data) | Year Ended December 31, 2018 | | Year Ended December 31, 2017 | |
|---|---|---|---|---|
| Pro forma revenue | $ | 1,054,192 | $ | 967,512 |
| Pro forma net income (loss) | | 17,727 | | (6,763) |

2017 Transactions

*Southern Light, LLC*

On July 3, 2017, we acquired 100% of the outstanding equity of Southern Light for $638.1 million in cash and 2.5 million common units in the Operating Partnership with an acquisition date fair value of $64.3 million. Southern Light is a leading provider of data transport services along the Gulf Coast region serving twelve attractive Tier II and Tier III markets across Florida, Alabama, Louisiana, and Mississippi. The acquisition was recorded by allocating the costs of the assets acquired based on their estimated fair values at the acquisition date. The excess of the cost of the acquisition over the fair value of the assets acquired is recorded as goodwill within our Fiber Infrastructure segment. See Note 14. The following is a summary of the estimated fair values of the assets acquired and liabilities assumed as of the acquisition date:

| | | (thousands) |
|---|---|---|
| Property, plant and equipment | $ | 279,467 |
| Cash and cash equivalents | | 1,992 |
| Accounts receivable | | 11,139 |
| Other assets | | 1,287 |
| Goodwill | | 319,508 |
| Intangible assets | | 160,100 |
| Accounts payable, accrued expenses and other liabilities | | (19,846) |
| Deferred revenue | | (38,134) |
| Deferred income taxes | | (9,892) |
| Capital lease obligations | | (3,189) |
| Total purchase consideration | $ | 702,432 |

During the second quarter of 2018, the purchase price allocation was adjusted to record $0.9 million of deferred tax liabilities that existed at the date of acquisition.

The goodwill arising from the transaction is primarily attributable to the expansion of our fiber network through the complementary nature of Southern Light's fiber network to our existing fiber network, including anticipated incremental sales and cost savings. For federal income tax purposes, the transaction was treated as partially taxable (for portion paid in cash) and partially non-taxable (for portion paid with common units in the Operating Partnership). The portion of the acquisition that was treated as a taxable acquisition resulted in tax deductible goodwill. No tax deductible goodwill resulted from the portion of the acquisition that was treated as non-taxable.

We acquired an intangible asset that was assigned to customer relationships of $160.1 million (15 year life). The Company determined the useful life for the customer relationship by applying an income approach (using the multi-period excess earnings method with a discount rate commensurate to the risk of the asset) and resulted from two key considerations: attrition rate and cumulative present value of cash flows, including assessing the period over which the asset is expected to contribute to the Company's future cash flows.

The acquired business contributed revenue of $45.5 million and an operating income of $4.6 million, which excludes transaction related costs, to our consolidated results from the date of acquisition through December 31, 2017. We recorded transaction related costs related to the acquisition of Southern Light for the year ended December 31, 2017 of $14.8 million within transaction related costs on the Consolidated Statement of Income.

78

Table of Contents

The acquisition of Southern Light was structured in a manner such that Southern Light ended up being owned by a subsidiary of ours with a pre-existing valuation allowance primarily related to deferred tax assets associated with net operating loss carryforwards. The acquisition of Southern Light also resulted in a change to our assessment of the need for a valuation allowance against these deferred tax assets, which resulted in a decrease to the valuation allowance of $8.0 million.  The decrease in valuation allowance was recorded as an income tax benefit during the year ended December 31, 2017.

*Hunt Telecommunications, LLC*

On July 3, 2017, we acquired 100% of the outstanding equity of Hunt for $129.3 million in cash and 1.6 million common units in the Operating Partnership with an acquisition date fair value of $41.6 million.  Additional contingent consideration of up to $17 million, with an acquisition date fair value of $16.4 million, may be paid upon the achievement of certain financial revenue milestones by delivering shares of our common stock. See Note 6.  Hunt is a leading provider of data transport to K-12 schools and government agencies with a dense fiber network in Louisiana. The acquisition was recorded by allocating the costs of the assets acquired based on their estimated fair values at the acquisition date. The excess of the cost of the acquisition over the fair value of the assets acquired is recorded as goodwill within our Fiber Infrastructure segment.  See Note 14.  The following is a summary of the estimated fair values of the assets acquired and liabilities assumed as of the acquisition date:

| | (thousands) |
|---|---:|
| Property, plant and equipment | $ 59,682 |
| Cash and cash equivalents | 3,181 |
| Accounts receivable | 4,906 |
| Other assets | 413 |
| Goodwill | 99,580 |
| Intangible assets | 73,000 |
| Accounts payable, accrued expenses and other liabilities | (3,741) |
| Deferred revenue | (6,036) |
| Deferred income taxes | (43,550) |
| Capital lease obligations | (164) |
| Total purchase consideration | $ 187,271 |

During the first quarter of 2018, the purchase price allocation was adjusted to record certain deferred revenues and accrued liabilities that existed at the date of acquisition. Deferred revenue and accrued liabilities increased $2.2 million and $1.2 million, respectively.

During the second quarter of 2018, the purchase price allocation was adjusted to record $3.2 million of deferred tax liabilities that existed at the date of acquisition.

The goodwill arising from the transaction is primarily attributable to the expansion of our fiber network through the complementary nature of Hunt's fiber network to our existing fiber network, including anticipated incremental sales and cost savings. The goodwill is not expected to be deductible for tax purposes.

We acquired an intangible asset that was assigned to customer relationships of $73 million (18 year life). The Company determined the useful life for the customer relationship by applying an income approach (using the multi-period excess earnings method with a discount rate commensurate to the risk of the asset) and resulted from two key considerations: attrition rate and cumulative present value of cash flows, including assessing the period over which the asset is expected to contribute to the Company's future cash flows.

The acquired business contributed revenue of $16.5 million and an operating income of $2.7 million, which excludes transaction and transition costs, to our consolidated results from the date of acquisition through December 31, 2017. We recorded transaction related costs related to the acquisition of Hunt for the year ended December 31, 2017 of $5.9 million within transaction related costs on the Consolidated Statement of Income.

Table of Contents

The following table presents the unaudited pro forma summary of our financial results as if the Southern Light and Hunt business combinations had occurred on January 1, 2016. The pro forma results include additional depreciation and amortization resulting from purchase accounting adjustments, and interest expense associated with debt used to fund the acquisition. The pro forma results do not include any synergies or other benefits of the acquisition. The pro forma results are not indicative of future results of operations, or results that might have been achieved had the acquisition been consummated on January 1, 2016.

| (Thousands, except per share data) | Year Ended December 31, 2017 | | Year Ended December 31, 2016 |
|---|---|---|---|
| Pro forma revenue | $ | 980,303 | $ | 891,373 |
| Pro forma net income (loss) | | 4,267 | | (2,482) |

2016 Transactions

*Tower Cloud, Inc.*

On August 31, 2016, we acquired 100% of the outstanding equity of Tower Cloud, Inc. ("Tower Cloud") for $187.5 million in cash and 1.9 million shares of our common stock with an acquisition date fair value of $58.5 million.  Additional contingent consideration of up to $130 million, with an acquisition date fair value of $98.6 million, may be paid upon the achievement of certain defined operational and financial milestones. At the Company's discretion, a combination of cash and Uniti common shares may be used to satisfy the contingent consideration payments, provided that at least 50% of the aggregate amount of payments is satisfied in cash. Tower Cloud provides data transport services, with particular focus on providing infrastructure solutions to the wireless and enterprise sectors, including fiber-to-the-tower backhaul, small cell networks, and dark fiber deployments. Following the close of the transaction, the Tower Cloud business and the previously acquired PEG Bandwidth business were combined into a unified fiber infrastructure organization, Uniti Fiber. The operating results from this acquisition are included in the consolidated financial statements from the acquisition date. The acquisition was recorded by allocating the costs of the assets acquired based on their estimated fair values at the acquisition date. The excess of the cost of the acquisition over the fair value of the assets acquired is recorded as goodwill within our Fiber Infrastructure segment. See Note 14. During the first quarter of 2017, certain contractual working capital adjustments resulted in a $0.2 million reduction of the purchase price and goodwill. The following is a summary of the estimated fair values of the assets acquired and liabilities assumed as of the acquisition date:

| | (thousands) |
|---|---|
| Property, plant and equipment | $ 163,680 |
| Cash and cash equivalents | 14,346 |
| Accounts receivable | 3,043 |
| Other assets | 2,595 |
| Goodwill | 117,032 |
| Intangible assets | 116,218 |
| Accounts payable, accrued expenses and other liabilities | (16,782) |
| Deferred revenue | (23,900) |
| Deferred income taxes | (24,866) |
| Capital lease obligations | (6,750) |
| Total purchase consideration | $ 344,616 |

The goodwill is primarily attributable to strategic opportunities that arose from the acquisition of Tower Cloud. The acquisition was treated as a taxable acquisition of the outstanding stock of Tower Cloud, Inc. Thus, none of the goodwill is expected to be deductible for tax purposes.

We acquired an intangible asset that was assigned to customer relationships of $116.2 million (30 year life). The Company determined the useful life for the customer relationship by applying an income approach (using the multi-period excess earnings method with a discount rate commensurate to the risk of the asset) and resulted from two key

80

Table of Contents

considerations: attrition rate and cumulative present value of cash flows, including assessing the period over which the asset is expected to contribute to the Company's future cash flows.

Tower Cloud had federal net operating loss ("NOL") carryforwards of approximately $81.2 million at the date of the acquisition, which will expire between 2026 and 2036. As a result of the change in ownership, the utilization of NOL carryforwards is subject to limitations imposed by the Internal Revenue Code. The gross deferred tax assets associated with the NOL and other temporary differences as of August 31, 2016 were approximately $37.0 million. A net deferred tax liability of $24.8 million was recorded in connection with the acquisition, which is primarily related to the excess of the recorded amounts for Property, Plant and Equipment and Intangible Assets over their respective historical tax bases.

The acquired business contributed revenue of $13.5 million and an operating loss of $2.1 million, which excludes transaction and transition costs, to our consolidated results from the date of acquisition through December 31, 2016. We recorded transaction related costs related to the acquisition of Tower Cloud for the year ended December 31, 2016 of $9.1 million within transaction related costs on the Consolidated Statement of Income.

The following table presents the unaudited pro forma summary of our financial results as if the business combination had occurred as of the Spin-Off. The pro forma results include additional depreciation and amortization resulting from purchase accounting adjustments, adjustments to amortized deferred revenue, and interest expense associated with debt used to fund the acquisition. The pro forma results do not include any synergies or other benefits of the acquisition. The pro forma results are not indicative of future results of operations, or results that might have been achieved had the acquisition been consummated as of the Spin-Off.

| (Thousands, except per share data) | Year Ended December 31, 2016 | |
|---|---|---|
| Pro forma revenue | $ | 798,054 |
| Pro forma net (loss) income | | (3,581) |

*PEG Bandwidth, LLC*

On May 2, 2016, we acquired 100% of the outstanding equity of PEG Bandwidth for $322.5 million in cash, the issuance of 87,500 shares of our 3.00% Series A Convertible Preferred Stock ("Series A Shares") with a fair value of $78.6 million and 1 million shares of our common stock with an acquisition date fair value of $23.2 million. PEG Bandwidth is a leading provider of infrastructure solutions, including cell site backhaul and dark fiber, to the telecommunications industry. The operating results from this acquisition are included in the consolidated financial statements from the acquisition date. The acquisition was recorded by allocating the costs of the assets acquired based on their estimated fair values at the acquisition date. The excess of the cost of the acquisition over the fair value of the assets acquired is recorded as goodwill within our Fiber Infrastructure segment. See Note 14. The following is a summary of the estimated fair values of the assets acquired and liabilities assumed as of the acquisition date:

| | (thousands) | |
|---|---|---|
| Property, plant and equipment | $ | 293,030 |
| Cash and cash equivalents | | 7,003 |
| Accounts receivable | | 6,584 |
| Other assets | | 5,161 |
| Goodwill | | 145,054 |
| Intangible assets | | 38,000 |
| Accounts payable, accrued expenses and other liabilities | | (8,643) |
| Deferred revenue | | (12,700) |
| Capital lease obligations | | (49,195) |
| Total purchase consideration | $ | 424,294 |

81

Table of Contents

The goodwill is primarily attributable to strategic opportunities that arose from the acquisition of PEG Bandwidth. The goodwill is expected to be deductible for tax purposes.

Of the $38 million of acquired intangible assets, $36 million was assigned to customer relationships (weighted average 17 year life) and $2 million was assigned to trademarks (indefinite life). The Company determined the useful life for the customer relationship by applying an income approach (using the multi-period excess earnings method with a discount rate commensurate to the risk of the asset) and resulted from two key considerations: attrition rate and cumulative present value of cash flows, including assessing the period over which the asset is expected to contribute to the Company's future cash flows.

The acquired business contributed revenue of $57.0 million and an operating loss of $8.8 million, which excludes transaction and transition costs, to our consolidated results from the date of acquisition through December 31, 2016. We recorded transaction related costs related to the acquisition of PEG Bandwidth for the year ended December 31, 2016 of $11.2 million within transaction related costs on the Consolidated Statement of Income.

The following table presents the unaudited pro forma summary of our financial results as if the business combination had occurred as of the Spin-Off. The pro forma results include additional depreciation and amortization resulting from purchase accounting adjustments, adjustments to amortized deferred revenue, and interest expense associated with debt used to fund the acquisition. The pro forma results do not include any synergies or other benefits of the acquisition. The pro forma results are not indicative of future results of operations, or results that might have been achieved had the acquisition been consummated as of the Spin-Off.

| (Thousands, except per share data) | Year Ended December 31, 2016 | |
|---|---|---|
| Pro forma revenue | $ | 797,637 |
| Pro forma net income | | 6,264 |

*Summit Wireless Infrastructure, LLC*

On January 22, 2016, we acquired 100% of the outstanding equity of Summit Wireless Infrastructure LLC ("Summit"). Summit builds, owns and operates telecommunication infrastructure serving wireless carriers in Mexico. Consideration given to acquire Summit included performance-based shares of common equity valued at $1.1 million, which will vest in full on the third anniversary of the closing date, subject to Summit meeting certain performance targets, and the assumption of Summit's existing debt. The financial results of Summit are included in the Towers segment from the date of acquisition and were not material, individually or in the aggregate, to our results of operations and therefore, pro forma financial information has not been presented.

**Note 6. Fair Value of Financial Instruments**

FASB ASC 820, *Fair Value Measurements*, establishes a hierarchy of valuation techniques based on the observability of inputs utilized in measuring assets and liabilities at fair values. This hierarchy establishes market-based or observable inputs as the preferred source of values, followed by valuation models using management assumptions in the absence of market inputs. The three levels of the hierarchy are as follows:

*Level 1* – Quoted prices (unadjusted) in active markets for identical assets or liabilities that the reporting entity can access at the assessment date

*Level 2* – Inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly

*Level 3* – Unobservable inputs for the asset or liability

Table of Contents

Our financial instruments consist of cash and cash equivalents, accounts and other receivables, derivative instruments, contingent consideration, our outstanding notes and other debt, and accounts, interest and dividends payable.

The following table summarizes the fair value of our financial instruments at December 31, 2018 and 2017:

| (Thousands) | Total | Quoted Prices in Active Markets (Level 1) | Prices with Other Observable Inputs (Level 2) | Prices with Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **At December 31, 2018** | | | | |
| Assets | | | | |
| Derivative asset | $ 31,043 | $ — | $ 31,043 | $ — |
| Total | $ 31,043 | $ — | $ 31,043 | $ — |
| | | | | |
| **Liabilities** | | | | |
| Senior secured term loan B - variable rate, due October 24, 2022 | $ 1,877,303 | $ — | $ 1,877,303 | $ — |
| Senior secured notes - 6.00% , due April 15, 2023 | 504,625 | — | 504,625 | — |
| Senior unsecured notes - 8.25%, due October 15, 2023 | 965,700 | — | 965,700 | — |
| Senior unsecured notes - 7.125%, due December 15, 2024 | 496,500 | — | 496,500 | — |
| Senior secured revolving credit facility, variable rate, due April 24, 2020 | 639,936 | — | 639,936 | — |
| Contingent consideration | 83,401 | — | — | 83,401 |
| Total | $ 4,567,465 | $ — | $ 4,484,064 | $ 83,401 |

| (Thousands) | Total | Quoted Prices in Active Markets (Level 1) | Prices with Other Observable Inputs (Level 2) | Prices with Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **At December 31, 2017** | | | | |
| Assets | | | | |
| Derivative asset | $ 6,793 | $ — | $ 6,793 | $ — |
| Total | $ 6,793 | $ — | $ 6,793 | $ — |
| | | | | |
| **Liabilities** | | | | |
| Senior secured term loan B - variable rate, due October 24, 2022 | $ 2,011,237 | $ — | $ 2,011,237 | $ — |
| Senior secured notes - 6.00% , due April 15, 2023 | 540,375 | — | 540,375 | — |
| Senior unsecured notes - 8.25%, due October 15, 2023 | 1,073,925 | — | 1,073,925 | — |
| Senior unsecured notes - 7.125%, due December 15, 2024 | 542,250 | — | 542,250 | — |
| Senior secured revolving credit facility, variable rate, due April 24, 2020 | 279,972 | — | 279,972 | — |
| Contingent consideration | 105,762 | — | — | 105,762 |
| Total | $ 4,553,521 | $ — | $ 4,447,759 | $ 105,762 |

83

Table of Contents

The carrying value of cash and cash equivalents, accounts and other receivables, and accounts, interest and dividends payable approximate fair values due to the short-term nature of these financial instruments.

The total principal balance of our Notes and other debt was $5.0 billion at December 31, 2018, with a fair value of $4.5 billion. The estimated fair value of the Notes and other debt was based on available external pricing data and current market rates for similar debt instruments, among other factors, which are classified as Level 2 inputs within the fair value hierarchy. Derivative instruments are carried at fair value. See Note 8. The fair value of our interest rate swap is determined based on the present value of expected future cash flows using observable, quoted LIBOR swap rates for the full term of the swap and also incorporate credit valuation adjustments to appropriately reflect both Uniti 's own non-performance risk and non-performance risk of the respective counterparties. The Company has determined that the majority of the inputs used to value its derivative instruments fall within Level 2 of the fair value hierarchy; however the associated credit valuation adjustments utilized Level 3 inputs, such as estimates of credit spreads, to evaluate the likelihood of default by the Company and its counterparties. As of December 31, 2018, the Company has assessed the significance of the impact of the credit valuation adjustments on the overall valuation of its derivative positions and has determined that the credit valuation adjustment is not significant to the overall value of the derivatives. As such, the Company classifies its derivative instruments valuation in Level 2 of the fair value hierarchy.

As part of the acquisition of Hunt on July 3, 2017, we may be obligated to pay contingent consideration (the "Hunt Contingent Consideration") upon the achievement of certain defined revenue milestones; therefore, we have recorded the estimated fair value of contingent consideration of approximately $10.0 million as of December 31, 2018. See Note 5. In accordance with the Hunt merger agreement, Uniti common shares will be used to satisfy the contingent consideration payment. The fair value of the Hunt Contingent Consideration at December 31, 2018 was determined using the closing price of our common shares in the active market and probability estimates of future earnings and is classified as Level 3. On January 4, 2019, we settled the Hunt Contingent Consideration in full satisfaction of the obligation through the issuance of 645,385 common shares having a fair value of $11.2 million.

As part of the acquisition of Tower Cloud on August 31, 2016, we may be obligated to pay contingent consideration upon achievement of certain defined operational and financial milestones; therefore, we recorded the estimated fair value of future contingent consideration of $73.4 million as of December 31, 2018. The fair value of the contingent consideration as of December 31, 2018, was determined using a discounted cash flow model and probability adjusted estimates of the operational milestones and is classified as Level 3. During the year ended December 31, 2018, we paid $18.6 million for the achievement of certain milestones in accordance with the Tower Cloud merger agreement.

Changes in the fair value of contingent consideration will be recorded in our Consolidated Statement of Income in the period in which the change occurs. For the year ended December 31, 2018, there was a $3.7 million decrease in the fair value of the contingent consideration that was recorded in Other expense on the Consolidated Statements of Income.

The following is a roll forward of our liability measured at fair value on a recurring basis using unobservable inputs (Level 3):

| (Thousands) | December 31, 2017 | Transfers into Level 3 | (Gain)/Loss included in earnings | Settlements | December 31, 2018 |
|---|---|---|---|---|---|
| Contingent consideration | $ 105,762 | $ — | $ (3,721) | $ (18,640) | $ 83,401 |

84

Table of Contents

**Note 7. Property, Plant and Equipment**

The carrying value of property, plant and equipment is as follows:

| (Thousands) | Depreciable Lives | December 31, 2018 | December 31, 2017 |
|---|---|---|---|
| Land | Indefinite | $ 29,304 | $ 27,110 |
| Building and improvements | 3 - 40 years | 340,238 | 333,121 |
| Real property interests | See Note 3 | 34,878 | 34,580 |
| Poles | 30 years | 248,989 | 243,710 |
| Fiber | 30 years | 3,005,304 | 2,671,216 |
| Equipment | 5 - 7 years | 256,838 | 201,490 |
| Copper | 20 years | 3,721,649 | 3,656,384 |
| Conduit | 30 years | 89,692 | 91,210 |
| Tower assets | 20 years | 120,073 | 59,610 |
| Capital lease assets | See Note 3 | 123,017 | 93,465 |
| Construction in progress | See Note 3 | 137,585 | 112,489 |
| Other assets | 15 - 20 years | 11,524 | 10,232 |
| Corporate assets | 3 - 7 years | 4,214 | 7,970 |
| | | 8,123,305 | 7,542,587 |
| Less accumulated depreciation | | (4,914,299) | (4,488,698) |
| Property, plant and equipment, net | | $ 3,209,006 | $ 3,053,889 |

Capital lease assets above represent fiber leases, where we have the exclusive, unrestricted, and indefeasible right to use one, a pair, or more strands of fiber of a fiber cable.

Depreciation expense for the years ended December 31, 2018, 2017, and 2016 was $425.2 million, $415.9 million and $369.9 million, respectively.

**Note 8. Derivative Instruments and Hedging Activities**

The Company uses derivative instruments to mitigate the effects of interest rate volatility inherent in our variable rate debt, which could unfavorably impact our future earnings and forecasted cash flows. The Company does not use derivative instruments for speculative or trading purposes.

We are party to interest rate swap agreements to mitigate the interest rate risk inherent in our variable rate Senior Secured Term Loan B facility. These interest rate swaps are designated as cash flow hedges and have a notional value of $2.07 billion and mature on October 24, 2022. The weighted average fixed rate paid is 2.105%, and the variable rate received resets monthly to the one-month LIBOR subject to a minimum rate of 1.0%. The Company does not currently have any master netting arrangements related to its derivative contracts.

The following table summarizes the fair value and the presentation in our Consolidated Balance Sheet:

| (Thousands) | Location on Consolidated Balance Sheet | December 31, 2018 | December 31, 2017 |
|---|---|---|---|
| Interest rate swaps | Derivative asset | $ 31,043 | $ 6,793 |

As of December 31, 2018 and 2017, all of the interest rate swaps were valued in net unrealized gain positions and recognized as an asset balance within the derivative asset balance on the Consolidated Balance Sheets. For the years ended December 31, 2018, 2017 and 2016, the amount recorded in other comprehensive income related to the unrealized gain on derivative instruments was $21.6 million, $7.7 million and $24.5 million, respectively. The amount reclassified out of other comprehensive income into interest expense on our Consolidated Statement of Income for the years ended December 31, 2018, 2017 and 2016 was $2.6 million, $20.6 million and $23.8 million,

Table of Contents

respectively. For the years ended December 31, 2018, 2017 and 2016, there were no ineffective portions of the change in fair value derivatives.

Amounts reported in accumulated other comprehensive income related to derivatives will be reclassified to interest expense as interest payments are made on our variable-rate debt. During the next twelve months, ending December 31, 2019, we estimate that $4.1 million will be reclassified as a decrease to interest expense.

### Note 9. Goodwill and Intangible Assets

Changes in the carrying amount of goodwill occurring during the year ended December 31, 2018 and 2017, are as follows:

| (Thousands) | Fiber Infrastructure | Total |
|---|---|---|
| Goodwill at December 31, 2016 | $ 262,334 | $ 262,334 |
| Goodwill purchase accounting adjustments | (248) | (248) |
| Goodwill associated with 2017 acquisitions | 411,643 | 411,643 |
| Goodwill at December 31, 2017 | 673,729 | 673,729 |
| Goodwill purchase accounting adjustments | 7,446 | 7,446 |
| Goodwill associated with 2018 acquisitions | 11,210 | 11,210 |
| Goodwill at December 31, 2018 | 692,385 | 692,385 |

The carrying value of our other intangible assets is as follows:

| (Thousands) | December 31, 2018 | | | December 31, 2017 | | |
|---|---|---|---|---|---|---|
| | Cost | Cumulative Translation Adjustment | Accumulated Amortization | Cost | Cumulative Translation Adjustment | Accumulated Amortization |
| **Indefinite life intangible assets:** | | | | | | |
| Trade name | $ 2,000 | $ - | $ - | $ 2,000 | $ - | $ - |
| | | | | | | |
| **Finite life intangible assets:** | | | | | | |
| Customer lists | 451,997 | - | (69,393) | 421,743 | - | (46,049) |
| Tenant contracts | 37,386 | 411 | (3,293) | 37,386 | 1,141 | (1,605) |
| Network[1] | 13,541 | 144 | (1,192) | 13,541 | 410 | (581) |
| Acquired below-market leases | 1,509 | - | (289) | 1,509 | - | (138) |
| | | | | | | |
| Total intangible assets | 506,988 | | | 477,730 | | |
| Less: Accumulated amortization | (74,167) | | | (48,373) | | |
| Total intangible assets, net | $ 432,821 | | | $ 429,357 | | |
| | | | | | | |
| **Finite life intangible liabilities:** | | | | | | |
| Acquired above-market leases | $ 3,440 | $ (182) | $ (624) | $ 3,440 | $ 15 | $ (317) |
| | | | | | | |
| Total intangible liabilities | 3,258 | | | 3,455 | | |
| Less: Accumulated amortization | (624) | | | (317) | | |
| Total intangible liabilities, net[2] | $ 2,634 | | | $ 3,138 | | |

Table of Contents

(1)    Reflects the potential to lease additional tower capacity on the existing towers due to their geographical location and capacity as of the valuation date.

(2)    Recorded in accounts payable, accrued expenses and other liabilities, net on the Consolidated Balance Sheet.

As of December 31, 2018, the remaining weighted average amortization period of the Company's intangible assets was 18.3 years. Amortization expense for the years ended December 31, 2018, 2017 and 2016 was $25.5 million, $18.3 million and $6.1 million, respectively. Amortization expense is estimated to be $26.6 million in 2019, $26.1 million in 2020, $25.6 million in 2021, $25.2 million in 2022 and $25.1 million in 2023.

**Note 10. Notes and Other Debt**

All debt, including the senior secured credit facility and notes described below, are obligations of the Operating Partnership and certain of its subsidiaries as discussed below.  The Company is, however, a guarantor of such debt.

Notes and other debt is as follows:

| (Thousands) | | December 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| Principal amount | $ | 4,965,808 | $ | 4,626,887 |
| Less unamortized discount, premium and debt issuance costs | | (119,575) | | (144,190) |
| Notes and other debt less unamortized discount and debt issuance costs | $ | 4,846,233 | $ | 4,482,697 |

Notes and other debt at December 31, 2018 and 2017 consisted of the following:

| (Thousands) | | December 31, 2018 | | | | December 31, 2017 | | |
|---|---|---|---|---|---|---|---|---|
| | | Principal | | Unamortized Discount, Premium and Debt Issuance Costs | | Principal | | Unamortized Discount and Debt Issuance Costs |
| Senior secured term loan B - variable rate, due October 24, 2022 (discount is based on imputed interest rate of 5.66%) | $ | 2,065,808 | $ | (70,337) | $ | 2,086,887 | $ | (87,140) |
| Senior secured notes - 6.00%, due April 15, 2023 (discount is based on imputed interest rate of 6.29%) | | 550,000 | | (7,116) | | 550,000 | | (8,508) |
| Senior unsecured notes - 8.25%, due October 15, 2023 (discount is based on imputed interest rate of 9.06%) | | 1,110,000 | | (34,900) | | 1,110,000 | | (40,467) |
| Senior unsecured notes - 7.125%, due December 15, 2024 | | 600,000 | | (7,222) | | 600,000 | | (8,075) |
| Senior secured revolving credit facility, variable rate, due April 24, 2020 | | 640,000 | | - | | 280,000 | | - |
| Total | $ | 4,965,808 | | (119,575) | $ | 4,626,887 | $ | (144,190) |

At December 31, 2018, notes and other debt included the following: (i) $2.1 billion under the senior secured term loan B facility that matures on October 24, 2022 ("Term Loan Facility") pursuant to the credit agreement by and among the Operating Partnership, CSL Capital, LLC and Uniti Group Finance Inc., the guarantors and lenders party thereto and Bank of America, N.A., as administrative agent and collateral agent (the "Credit Agreement"); (ii) $550.0 million aggregate principal amount of 6.00% Senior Secured Notes due April 15, 2023 (the "Secured Notes"); (iii) $1.11 billion aggregate principal amount of 8.25% Senior Unsecured Notes due October 15, 2023 (the "2023 Notes"); and (iv) $600.0 million aggregate principal amount of 7.125% Senior Unsecured Notes due December 15, 2024 (the "2024  Notes" and together with the Secured Notes and 2023 Notes, the "Notes"), and (v) $640.0 million under the senior secured revolving credit facility, variable rate, that matures April 24, 2020 pursuant

87

Table of Contents

to the Credit Agreement (the "Revolving Credit Facility" and, together with the Term Loan Facility, the "Facilities").

During 2017, the Company completed its reorganization (the "up-REIT Reorganization") to operate through a customary "up-REIT" structure. Under this structure, the Operating Partnership now holds substantially all of the Company's assets and is the parent company of, among others, CSL Capital, LLC, Uniti Group Finance Inc. and Uniti Fiber Holdings Inc.  In connection with the up-REIT Reorganization, the Operating Partnership replaced the Company and assumed its obligations as an obligor under the Notes and Facilities.  The Company subsequently became a guarantor of the Notes and Facilities.  Because the Operating Partnership is not a corporation, a corporate co-obligor that is a subsidiary of the Operating Partnership was also added to the Notes and Credit Agreement as part of the up-REIT Reorganization. As discussed below, Uniti Group Finance Inc. is the corporate co-obligor under the Credit Agreement and co-issuer of the Secured Notes and the 2023 Notes, and Uniti Fiber Holdings Inc. is the co-issuer of the 2024 Notes.  Separate financial statements of the Operating Partnership have not been included since the Operating Partnership is not a registrant.

Credit Agreement

The Operating Partnership and its wholly-owned subsidiaries, CSL Capital, LLC, and Uniti Group Finance Inc. (collectively, the "Borrowers") are party to the Credit Agreement, which provides for the Term Loan Facility (in an initial principal amount of $2.14 billion) and the Revolving Credit Facility. The term loans were repriced on February 9, 2017 and now bear interest at a rate equal to LIBOR, subject to a 1.0% floor, plus an applicable margin equal to 3.00%, and are subject to amortization of 1.0% per annum. All obligations under the Credit Agreement are guaranteed by (i) the Company and (ii) certain of the Operating Partnership's wholly-owned subsidiaries (the "Subsidiary Guarantors"), and are secured by substantially all of the assets of the Borrowers and the Subsidiary Guarantors, which assets also secure the Secured Notes. The Revolving Credit Facility bears interest at a rate equal to LIBOR plus 1.75% to 2.25% based on our consolidated secured leverage ratio, as defined in the Credit Agreement. On April 28, 2017, we amended the Credit Agreement to increase the commitments under our Revolving Credit Facility from $500 million to $750 million. Other terms of the Revolving Credit Facility remain unchanged.

The Borrowers are subject to customary covenants under the Credit Agreement, including an obligation to maintain a consolidated secured leverage ratio, as defined in the Credit Agreement, not to exceed 5.00 to 1.00. We are permitted, subject to customary conditions, to incur (i) incremental term loan borrowings and/or increased commitments under the Credit Agreement in an unlimited amount, so long as, on a pro forma basis after giving effect to any such borrowings or increases, our consolidated secured leverage ratio, as defined in the Credit Agreement, does not exceed 4.00 to 1.00 and (ii) other indebtedness, so long as, on a pro forma basis after giving effect to any such indebtedness, our consolidated total leverage ratio, as defined in the Credit Agreement, does not exceed 6.50 to 1.00 and our consolidated secured leverage ratio, as defined in the Credit Agreement, does not exceed 4.00 to 1.00.  In addition, the Credit Agreement contains customary events of default, including a cross default provision whereby the failure of the Borrowers or certain of their subsidiaries to make payments under other debt obligations, or the occurrence of certain events affecting those other borrowing arrangements, could trigger an obligation to repay any amounts outstanding under the Credit Agreement. In particular, a repayment obligation could be triggered if (i) the Borrowers or certain of their subsidiaries fail to make a payment when due of any principal or interest on any other indebtedness aggregating $75.0 million or more, or (ii) an event occurs that causes, or would permit the holders of any other indebtedness aggregating $75.0 million or more to cause, such indebtedness to become due prior to its stated maturity. As of December 31, 2018, the Borrowers were in compliance with all of the covenants under the Credit Agreement.  However, we would be in breach of the requirement to deliver audited financial statements without a going concern opinion if we were unable to provide 2018 audited financial statements without a going concern opinion to the lenders under our Credit Agreement by March 31, 2019.

On March 18, 2019, we received a limited waiver from our lenders under our Credit Agreement, waiving an event of default related solely to the receipt of a going concern opinion from our auditors for our 2018 audited financial statements.  The limited waiver was issued in connection with the fourth amendment (the "Amendment") to our Credit Agreement. During the pendency of Windstream's bankruptcy, or at such earlier time when certain other conditions are specified, the Amendment generally limits our ability under the Credit Agreement to (i) prepay

88

Table of Contents

unsecured indebtedness and (ii) pay cash dividends in excess of 90% of our REIT taxable income, determined without regard to the dividends paid deduction and excluding any net capital gains. The Amendment also increases the interest rate on our Term Loan Facility, which will now bear a rate of LIBOR, subject to a 1.0% floor, plus an applicable margin equal to 5.0%, a 200 basis point increase over our previous rate. This increase will be in effect though the remaining term of the facility, which matures on October 24, 2022.

A termination of the Master Lease would result in an "event of default" under the Credit Agreement, if a replacement lease was not entered into within ninety (90) calendar days and we do not maintain pro forma compliance with a consolidated secured leverage ratio, as defined in the Credit Agreement, of 5.00 to 1.00.

The Notes

The Borrowers, as co-issuers, have outstanding $550 million aggregate principal amount of the Secured Notes, of which $400 million was originally issued on April 24, 2015 at an issue price of 100% of par value and the remaining $150 million was issued on June 9, 2016 at an issue price of 99.25% of the par value as an add-on to the existing Secured Notes. The Borrowers, as co-issuers, also have outstanding $1.11 billion aggregate principal amount of the 2023 Notes that were originally issued on April 24, 2015 at an issue price of 97.055% of par value. The Secured Notes and the 2023 Notes are guaranteed by the Company and the Subsidiary Guarantors.

The Operating Partnership and its wholly-owned subsidiaries, CSL Capital, LLC and Uniti Fiber Holdings Inc., as co-issuers, have outstanding $600 million aggregate principal amount of the 2024 Notes, of which $400 million was originally issued on December 15, 2016 at an issue price of 100% of par value and the remaining $200 million of which was issued on May 8, 2017 at an issue price of 100.50% of par value under a separate indenture and was mandatorily exchanged on August 11, 2017 for 2024 Notes issued as "additional notes" under the indenture governing the 2024 Notes. The 2024 Notes are guaranteed by the Company, Uniti Group Finance Inc. and the Subsidiary Guarantors.

The failure to provide 2018 financial statements without a going concern opinion to the lenders under our Credit Agreement by March 31, 2019 would constitute a breach of the covenants of our Credit Agreement and, absent the waiver by our lenders, would constitute an immediate event of default. If any event of default were to occur under our Credit Agreement and the Credit Agreement's administrative agent declares all outstanding loans immediately due and payable, such an acceleration would trigger cross-default provisions within the indentures governing our senior notes and thereby entitle the trustee and noteholders to accelerate the repayment of the Secured Notes, the 2023 Notes and the 2024 Notes.

Deferred Financing Cost

Deferred financing costs were incurred in connection with the issuance of the Notes and the Facilities. These costs are amortized using the effective interest method over the term of the related indebtedness, and are included in interest expense in our Consolidated Statements of Income. For the year ended December 31, 2018, 2017 and 2016, we recognized $14.7 million, $13.6 million and $7.8 million of non-cash interest expense, respectively, related to the amortization of deferred financing costs.

Aggregate annual maturities of our long-term obligations at December 31, 2018 are as follows:

| (Thousands) | | |
|---|---|---|
| 2019 | $ | 21,080 |
| 2020 | | 661,080 |
| 2021 | | 21,080 |
| 2022 | | 2,002,568 |
| 2023 | | 1,660,000 |
| Thereafter | | 600,000 |
| Total | $ | 4,965,808 |

89

Table of Contents

As discussed in Note 7, we have acquired property pursuant to capital leases. At December 31, 2018, future minimum lease payments under capital lease obligations are as follows:

| (Thousands) | | |
|---|---|---:|
| 2019 | $ | 8,683 |
| 2020 | | 7,357 |
| 2021 | | 6,638 |
| 2022 | | 6,484 |
| 2023 | | 6,457 |
| Thereafter | | 52,533 |
| Total minimum payments | | 88,152 |
| Less amount representing interest | | (32,870) |
| Total | $ | 55,282 |

**Note 11. Stock-Based Compensation**

The Company's Board of Directors adopted the Uniti Group Inc. 2015 Equity Incentive Plan (the "Equity Plan"), which is administered by the Compensation Committee of the Board of Directors. Awards issuable under the Equity Plan include incentive stock options, "non-qualified" stock options, stock appreciation rights, performance units and performance shares, restricted shares, and restricted stock units.

*Restricted Awards*

During the year ended December 31, 2018, the Company granted 396,705 shares of restricted stock to employees, which had a fair value of $5.5 million as of the date of grant. We calculate the grant date fair value of non-vested shares of restricted stock awards using the closing sale prices on the trading day on the grant date. The restricted stock awards are amortized on a straight-line basis to expense over the vesting period, which is generally three years. As of December 31, 2018, there were 4,724,876 shares available for future issuance under the Equity Plan. The following table sets forth the number of unvested restricted stock awards and the weighted-average fair value of these awards at the date of grant:

| | Restricted Awards | Weighted Average Fair Value at Grant Date | | Aggregate Intrinsic Value(1) ($000s) | |
|---|---:|---|---:|---|---:|
| Unvested balance December 31, 2017 | 588,188 | $ | 24.00 | | |
| Granted | 396,705 | $ | 14.02 | | |
| Forfeited | (35,559) | $ | 19.62 | | |
| Vested | (281,706) | $ | 24.42 | | |
| Unvested balance, December 31, 2018 | 667,628 | $ | 18.03 | $ | 10,395 |

(1) The aggregate intrinsic value is calculated as the market value of our common stock as of December 31, 2018. The market value as of December 31, 2018 was $15.57 per share, which was the closing price of our common stock reported for transactions effected on the NASDAQ Global Select Market on December 31, 2018, the final trading day of 2018.

During the year ended December 31, 2017, there were 234,294 shares of restricted stock granted with a weighted-average fair value of $25.56 per share. During the year ended December 31, 2016, there were 308,146 shares of restricted stock granted with a weighted-average fair value of $20.56 per share.

The total fair value of shares vested for the years ended December 31, 2018 and 2017 was $6.9 million and $2.9 million, respectively.

As of December 31, 2018, total unrecognized compensation expense on restricted awards was approximately $6.2 million, and the expense is expected to be recognized over a weighted average vesting period of 0.9 years.

Table of Contents

*Performance Awards*

The Company grants long-term incentives to members of management in the form of performance-based restricted stock units ("PSUs") under the Equity Plan. The number of PSUs earned is based on the Company's achievement of specified performance goals, over a specified performance period, and may range from 0% to 200% of the target shares. The PSUs have a service condition that will expire at the end of the three-year performance period provided that the holder continues to be employed by the Company at the end of the performance period. Holders of PSUs are entitled to dividend equivalents, which will be accrued and paid in cash upon the vesting of a PSU. Dividend equivalents are forfeited to the extent that the underlying PSU is forfeited.

On February 6, 2018, we issued 169,549 PSUs equal to 100% of the target amount, with an aggregate value of $3.3 million on the grant date. The PSUs, in addition to a service condition, are subject to the Company's performance versus the total return of the MSCI US REIT Index and a triple-net lease peer group, as defined by the Compensation Committee. Upon evaluating the results of the market conditions, the final number of shares is determined, and such shares vest based on satisfaction of the service condition. The PSUs are amortized on a straight-line basis over the vesting period. During the year ended December 31, 2018, no PSUs were forfeited due to termination of service. The following table sets forth the number of unvested PSUs and the weighted-average fair value of these awards at the date of grant:

| | Performance Awards | Weighted Average Fair Value at Grant Date | Aggregate Intrinsic Value(1) ($000s) |
|---|---|---|---|
| Unvested balance December 31, 2017 | 254,625 | $ 25.69 | |
| Granted | 169,549 | $ 19.30 | |
| Forfeited | (60,970) | $ 21.82 | |
| Vested | — | $ — | |
| Unvested balance, December 31, 2018 | 363,204 | $ 23.35 | $ 5,655 |

(1) The aggregate intrinsic value is calculated as the market value of our common stock as of December 31, 2018. The market value as of December 31, 2018 was $15.57 per share, which was the closing price of our common stock reported for transactions effected on the NASDAQ Global Select Market on December 31, 2018, the final trading day of 2018.

During the year ended December 31, 2017, there were 91,995 PSUs granted with a weighted-average fair value of $33.75 per share. During the year ended December 31, 2016, there were 101,660 PSUs granted with a weighted-average fair value of $20.71 per share.

As of December 31, 2018, total unrecognized compensation expense related to PSUs was approximately $3.7 million, and the weighted-average vesting period was 1.4 years. The fair value of each PSU award is estimated at the date of grant using a Monte Carlo simulation. The simulation requires assumptions for expected volatility, risk-free return, and dividend yield. Our assumptions include a 0% dividend yield, which is the mathematical equivalent to reinvesting the dividends over the three-year performance period as is consistent with the terms of the PSUs. The following table summarizes the assumptions used to value the PSUs granted during the years ended December 31, 2018, 2017 and 2016:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| Expected term (years) | 3.0 | 3.0 | 3.0 |
| Expected volatility | 48.5% | 33.6% | 48.8% |
| Expected annual dividend | 0.0% | 0.0% | 0.0% |
| Risk free rate | 2.3% | 1.5% | 0.9% |

*Employee Stock Purchase Plan*

On May 17, 2018, our stockholders approved and adopted the Uniti Group Inc. Employee Stock Purchase Plan (the "ESPP"). The ESPP authorizes us to issue up to 2,000,000 shares of our common stock to any of our employees so

91

Table of Contents

long as the employee is employed on the first day of the applicable offering period. Under the ESPP, there are two six-month plan periods during each calendar year, one beginning January 1 and ending on June 30, and one beginning on July 1 and ending on December 31. Under the terms of the ESPP, employees can choose each plan period to have up to 15% of their annual base earnings, limited to $25,000 withheld to purchase our common stock. The purchase price of the stock is 85% of the lower of its beginning-of-period or end-of-period market price. Under the ESPP, no shares were sold to employees during the year ended 2018. As of December 31, 2018, there were 2,000,000 shares available for future issuance under the ESPP. The following table summarizes the assumptions used to value the purchase rights granted under the ESPP during the year ended December 31, 2018:

|  | Year Ended December 31, 2018 |
| --- | --- |
| Expected term (years) | 0.5 |
| Expected volatility | 37.0% |
| Expected annual dividend | 11.3% |
| Risk free rate | 2.1% |

For the years ended December 31, 2018, 2017 and 2016, we recognized $8.1 million, $7.7 million and $4.8 million, respectively, of compensation expense related to restricted stock awards, performance-based awards and the ESPP, which is recorded in general and administrative expense on our Consolidated Statement of Income.

**Note 12. Related Party Transactions**

In connection with the Spin-Off, we issued approximately 149.8 million shares of our common stock, par value $0.0001 per share, to Windstream as partial consideration for the contribution of the Distribution Systems and the Consumer CLEC Business. Windstream Holdings distributed approximately 80.4% of the Uniti shares it received to existing stockholders of Windstream Holdings and retained a passive ownership interest of approximately 19.6% of the common stock of Uniti. As a result of this ownership Windstream was deemed to be a related party.

On June 15, 2016, Windstream Holdings disposed of 14.7 million shares of our common stock, representing approximately half of its retained ownership interest. On June 24, 2016, Windstream Holdings disposed of its remaining 14.7 million shares of our common stock as part of a public offering. The Company did not receive any proceeds resulting from the disposition of these shares. Accordingly, upon its disposition of these shares, Windstream was no longer deemed a related party under applicable accounting regulations. Our consolidated financial statements reflect the following transactions with Windstream during the periods in which Windstream was deemed a related party.

Revenues – The Company records leasing revenue pursuant to the Master Lease. For the six months ended June 30, 2016, we recognized leasing revenues of $337.6 million related to the Master Lease.

General and Administrative Expenses – We are party to a Transition Services Agreement ("TSA") pursuant to which Windstream and its affiliates provide, on an interim basis, various services, including but not limited to information technology services, payment processing and collection services, financial and tax services, regulatory compliance and other support services. On April 1, 2016, the TSA ceased and we incurred $19,000 of related TSA expense for the three months ended March 31, 2016.

CLEC Operating Expenses – We are party to a Wholesale Master Services Agreement ("Wholesale Agreement") and a Master Services Agreement with Windstream related to the Consumer CLEC Business. Under the Wholesale Agreement, Windstream provides us transport services (local and long distance telecommunications service), provisioning services (directory assistance, directory listing, service activation and service changes), and repair services (routine and emergency network maintenance, network audits and network security). Under the Master Services Agreement, Windstream provides billing and collections services to Uniti. During the six months ended June 30, 2016, we incurred expenses of $6.6 million and $0.9 million related to the Wholesale Agreement and Master Services Agreement, respectively.

Employee Matters Agreement – We are party to an Employee Matters Agreement ("Employee Matters Agreement") with Windstream that governs the respective compensation and employee benefit obligations of the Company and

Table of Contents

Windstream in connection with and following the Spin-Off. Under the Employee Matters Agreement, if requested by a Windstream employee, the Company is required to withhold shares to satisfy the employee's tax obligations arising from the recognition of income and the vesting of shares related to awards of Uniti restricted stock held by the employee that were granted in connection with the Spin-Off. In that case, the Company must pay to Windstream an amount of cash equal to the amount required to be withheld to satisfy minimum statutory tax withholding obligations or, at the request of Windstream, remit such cash directly to the applicable taxing authorities. During the six months ended June 30, 2016, we withheld 91,412 common shares to satisfy these minimum statutory tax-withholding obligations and delivered $1.9 million to Windstream for remittance to the applicable taxing authorities.

Tower Purchase – In May, 2016, we completed the previously announced transaction with Windstream to acquire 32 wireless towers owned by Windstream and operating rights for 49 wireless towers previously conveyed to the Company in the Spin-Off for a purchase price of approximately $3 million.

Lease Amendment – During the quarter ended March 31, 2016, we amended the Master Lease with Windstream (the "Master Lease Amendment") to allow for the transfer of ownership rights or exchanges of indefeasible rights of use (an "IRU") and other long term rights in certain fiber and associated assets constituting leased property under the Master Lease. We will enter into such transactions pursuant to certain fiber exchange agreements under which we will grant to a third party ownership rights in certain fiber assets or an IRU in certain fiber assets that constitute leased property under the Master Lease in exchange for Uniti receiving ownership rights in certain fiber assets or an IRU in certain fiber assets of the third party, which we will then lease to Windstream as leased property under the Master Lease. Under the terms of the Master Lease Amendment, Windstream is responsible for any taxes imposed on Uniti related to the sale, exchange or other disposition of the fiber assets delivered to a third party or the granting of rights to the leased property that arise from fiber exchange agreements. As of June 30, 2016, no such transactions had been consummated. The Master Lease Amendment also permits us to install, own and operate certain wireless communication towers, antennas and related equipment on designated portions of the leased property.

**Note 13. Earnings Per Share**

Our restricted stock awards are considered participating securities as they receive non-forfeitable rights to dividends at the same rate as common stock. As participating securities, we included these instruments in the computation of earnings per share under the two-class method described in FASB ASC 260, *Earnings per Share*.

We also issue PSUs; however these units contain forfeitable rights to receive dividends and are therefore considered non-participating restrictive shares and are not dilutive under the two-class method until performance conditions are met. During the years ended December 31, 2017 and 2016, approximately76,000 and 220,000 PSUs, respectively, were excluded from the computation of diluted net loss per share because their effect is anti-dilutive as a result of our net loss for these periods.

The earnings per share impact of the Series A Shares (See Note 19) is calculated using the net share settlement method, whereby the redemption value of the instrument is assumed to be settled in cash and only the conversion premium, if any, is assumed to be settled in shares. The Series A Shares provide Uniti the option to cash or share settle the instrument, and as of December 31, 2018, it is our policy to settle the instrument in cash upon conversion.

As part of the acquisition of Tower Cloud on August 31, 2016, we may be obligated to pay contingent consideration upon achievement of certain defined operational and financial milestones. See Note 5. At the Company's discretion, a combination of cash and Uniti common shares may be used to satisfy the contingent consideration payments, provided that at least 50% of the aggregate amount of payments is satisfied in cash. The arrangement provides Uniti the option to cash settle, and it is our policy to settle 100% of the obligation in cash upon the achievement of the defined milestones. As such, there is no impact to our share count for the purposes of the earnings per share calculation.

The Hunt merger agreement provides for the issuance of additional common shares upon the achievement of certain defined revenue milestones. See Note 5. The earnings per share impact of the Hunt Contingent Consideration is calculated under the method described in ASC 260 for the treatment of contingently issuable shares in weighted-average shares outstanding. See the accompanying table for the impact.

93

Table of Contents

The following sets forth the computation of basic and diluted earnings per share under the two-class method:

| (Thousands, except per share data) | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2018 | | 2017 | | 2016 |
| Basic earnings per share: | | | | | | |
| Numerator: | | | | | | |
| Net income (loss) attributable to shareholders | $ | 16,187 | $ | (9,439) | $ | (212) |
| Less: Income allocated to participating securities | | (2,594) | | (1,509) | | (1,557) |
| Dividends declared on convertible preferred stock | | (2,624) | | (2,624) | | (1,743) |
| Amortization of discount on convertible preferred stock | | (2,980) | | (2,980) | | (1,985) |
| Net income (loss) attributable to common shares | $ | 7,989 | $ | (16,552) | $ | (5,497) |
| Denominator: | | | | | | |
| Basic weighted-average common shares outstanding | | 176,169 | | 168,693 | | 152,473 |
| Basic earnings (loss) per common share | $ | 0.05 | $ | (0.10) | $ | (0.04) |

| (Thousands, except per share data) | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2018 | | 2017 | | 2016 |
| Diluted earnings per share: | | | | | | |
| Numerator: | | | | | | |
| Net income (loss) attributable to shareholders | $ | 16,187 | $ | (9,439) | $ | (212) |
| Less: Income allocated to participating securities | | (1,665) | | (1,509) | | (1,557) |
| Dividends declared on convertible preferred stock | | (2,624) | | (2,624) | | (1,743) |
| Amortization of discount on convertible preferred stock | | (2,980) | | (2,980) | | (1,985) |
| Mark-to-market gain on share settled contingent consideration arrangements | | (1,433) | | (4,944) | | — |
| Net income (loss) attributable to common shares | $ | 7,485 | $ | (21,496) | $ | (5,497) |
| Denominator: | | | | | | |
| Basic weighted-average common shares outstanding | | 176,169 | | 168,693 | | 152,473 |
| Contingent consideration (See Note 5) | | 645 | | 296 | | — |
| Effect of dilutive non-participating securities | | 257 | | — | | — |
| Weighted-average shares for dilutive earnings per common share | | 177,071 | | 168,989 | | 152,473 |
| Dilutive earnings (loss) per common share | $ | 0.04 | $ | (0.13) | $ | (0.04) |

**Note 14. Segment Information**

Our management, including our chief executive officer, who is our chief operating decision maker, manages our operations as four operating business segments in addition to our corporate operations and include:

94

Table of Contents

*Leasing*: Represents a component of our REIT operations and includes the results from our leasing business, Uniti Leasing, which is engaged in the acquisition of mission-critical communications assets and leasing them back to anchor customers on either an exclusive or shared-tenant basis.

*Fiber Infrastructure*: Represents the operations of our fiber business, Uniti Fiber, which is a leading provider of infrastructure solutions, including cell site backhaul and dark fiber, to the telecommunications industry.

*Towers*: Represents the operations of our towers business, Uniti Towers, through which we acquire and construct tower and tower-related real estate in the United States and Latin America. Uniti Towers is a component of our REIT operations.

*Consumer CLEC*: Represents the operations of Talk America Services ("Talk America") through which we operate the Consumer CLEC Business, that prior to the Spin-Off was reported as an integrated operation within Windstream. Talk America provides local telephone, high-speed internet and long distance services to customers in the eastern and central United States.

*Corporate:* Represents our corporate office and shared service functions. Certain costs and expenses, primarily related to headcount, insurance, professional fees and similar charges, that are directly attributable to operations of our business segments are allocated to the respective segments.

Management evaluates the performance of each segment using Adjusted EBITDA, which is a segment performance measure defined as net income determined in accordance with GAAP, before interest expense, provision for income taxes, depreciation and amortization, stock-based compensation expense, the impact, which may be recurring in nature, of transaction related expenses, the write off of unamortized deferred financing costs, costs incurred as a result of the early repayment of debt, changes in the fair value of contingent consideration and financial instruments, and other similar items. The Company believes that net income, as defined by GAAP, is the most appropriate earnings metric; however we believe that Adjusted EBITDA serves as a useful supplement to net income because it allows investors, analysts and management to evaluate the performance of our segments in a manner that is comparable period over period. Adjusted EBITDA should not be considered as an alternative to net income as determined in accordance with GAAP.

Selected financial data related to our segments is presented below for the years ended December 31, 2018, 2017 and 2016:

| (Thousands) | Leasing | Fiber Infrastructure | Towers | Consumer CLEC | Corporate | Total of Reportable Segments |
|---|---|---|---|---|---|---|
| | | | **Year Ended December 31, 2018** | | | |
| Revenues | $ 699,847 | $ 289,239 | $ 14,617 | $ 13,931 | $ - | $ 1,017,634 |
| Adjusted EBITDA | $ 697,545 | $ 123,389 | $ 355 | $ 3,353 | $ (21,759) | $ 802,883 |
| Adjusted EBITDA margin | 99.7% | 42.7% | 2.4% | 24.1% | - | 78.9% |
| Less: | | | | | | |
| Interest expense | | | | | | 319,591 |
| Depreciation and amortization | 337,126 | 105,651 | 6,704 | 1,994 | 275 | 451,750 |
| Other income | | | | | | (4,504) |
| Transaction related costs | | | | | | 17,410 |
| Stock-based compensation | | | | | | 8,064 |
| Income tax benefit | | | | | | (5,421) |
| Other | | | | | | (552) |
| Net income | | | | | | $ 16,545 |
| Capital expenditures [1] | $ 152,140 | $ 199,689 | $ 74,932 | $ - | $ 114 | $ 426,875 |

95

Table of Contents

| (Thousands) | | Leasing | | Fiber Infrastructure | | Towers | | Consumer CLEC | | Corporate | | Total of Reportable Segments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Year Ended December 31, 2017** | | | | | | |
| Revenues | $ | 685,099 | $ | 202,791 | $ | 10,055 | $ | 18,087 | $ | - | $ | 916,032 |
| | | | | | | | | | | | | |
| Adjusted EBITDA | $ | 683,651 | $ | 83,987 | $ | (831) | $ | 4,556 | $ | (21,839) | $ | 749,524 |
| Adjusted EBITDA margin | | 99.8% | | 41.4% | | (8.3%) | | 25.2% | | - | | 81.8% |
| Less: | | | | | | | | | | | | |
| Interest expense | | | | | | | | | | | | 305,994 |
| Depreciation and amortization | | 347,999 | | 78,307 | | 4,907 | | 2,607 | | 385 | | 434,205 |
| Other expense | | | | | | | | | | | | 11,284 |
| Transaction related costs | | | | | | | | | | | | 38,005 |
| Stock-based compensation | | | | | | | | | | | | 7,713 |
| Income tax benefit | | | | | | | | | | | | (38,849) |
| Net loss | | | | | | | | | | | $ | (8,828) |
| | | | | | | | | | | | | |
| Capital expenditures (1) | $ | - | $ | 152,918 | $ | 104,540 | $ | - | $ | 63 | $ | 257,521 |

| (Thousands) | | Leasing | | Fiber Infrastructure | | Towers | | Consumer CLEC | | Corporate | | Total of Reportable Segments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Year Ended December 31, 2016** | | | | | | |
| Revenues | $ | 676,868 | $ | 70,568 | $ | 500 | $ | 22,472 | $ | - | $ | 770,408 |
| | | | | | | | | | | | | |
| Adjusted EBITDA | $ | 675,114 | $ | 25,912 | $ | (1,123) | $ | 5,074 | $ | (14,793) | $ | 690,184 |
| Adjusted EBITDA margin | | 99.7% | | 36.7% | | (224.6%) | | 22.6% | | - | | 89.6% |
| Less: | | | | | | | | | | | | |
| Interest expense | | | | | | | | | | | | 275,394 |
| Depreciation and amortization | | 343,368 | | 28,629 | | 337 | | 3,258 | | 378 | | 375,970 |
| Other expense | | | | | | | | | | | | - |
| Transaction related costs | | | | | | | | | | | | 33,669 |
| Stock-based compensation | | | | | | | | | | | | 4,846 |
| Income tax expense | | | | | | | | | | | | 517 |
| Net loss | | | | | | | | | | | $ | (212) |
| | | | | | | | | | | | | |
| Capital expenditures (1) | $ | - | $ | 31,006 | $ | 15,262 | $ | - | $ | 175 | $ | 46,443 |

(1)    Segment capital expenditures represents capital expenditures, the NMS asset acquisition and ground lease investments as reported in the investing activities section of the Consolidated Statement of Cash Flows.

96

Table of Contents

Total assets by business segment as of December 31, 2018 and December 31, 2017 are as follows:

| (Thousands) | December 31, | | | |
| --- | --- | --- | --- | --- |
| | | 2018 | | 2017 |
| Leasing | $ | 2,119,045 | $ | 2,121,857 |
| Fiber Infrastructure | | 2,194,311 | | 2,009,175 |
| Towers | | 231,749 | | 157,180 |
| Consumer CLEC | | 10,374 | | 10,919 |
| Corporate | | 37,458 | | 30,951 |
| Total of reportable segments | $ | 4,592,937 | $ | 4,330,082 |

Our principal geographical regions consist of the United States and Latin America, which includes Mexico, Colombia and Nicaragua. Summarized geographical information related to the Company's revenues for the years ended December 31, 2018, 2017 and 2016 is as follows:

| (Thousands) | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2018 | | 2017 | | 2016 |
| United States revenues | $ | 1,008,224 | $ | 908,576 | $ | 770,351 |
| Latin America revenues | | 9,410 | | 7,456 | | 57 |
| Total revenues | $ | 1,017,634 | $ | 916,032 | $ | 770,408 |

Summarized geographical information related to the Company's long-lived assets as of December 31, 2018 and 2017 is as follows:

| (Thousands) | December 31, | | | |
| --- | --- | --- | --- | --- |
| | | 2018 | | 2017 |
| United States long-lived assets | $ | 3,543,874 | $ | 3,382,894 |
| Latin America long-lived assets | | 96,894 | | 98,352 |
| Total long-lived assets | $ | 3,640,768 | $ | 3,481,246 |

**Note 15. Commitments and Contingencies**

In the ordinary course of our business, we are subject to claims and administrative proceedings, none of which we believe are material or would be expected to have, individually or in the aggregate, a material adverse effect on our business, financial condition, cash flows or results of operations.

We have fiber lease agreements and office space lease agreements under non-cancelable operating leases. Rental expense under operating leases for the years ended December 31, 2018, 2017 and 2016 approximated $28.7 million, $25.2 million and $10.9 million, respectively. Future minimum payments, by year and in the aggregate, under non-cancellable operating leases with initial or remaining lease terms of one year or more, are as follows:

| (Thousands) | | |
| --- | --- | --- |
| 2019 | $ | 10,585 |
| 2020 | | 7,543 |
| 2021 | | 4,815 |
| 2022 | | 3,186 |
| 2023 | | 2,382 |
| Thereafter | | 15,269 |
| Total | $ | 43,780 |

97

Table of Contents

Pursuant to the Separation and Distribution Agreement, Windstream has agreed to indemnify us (including our subsidiaries, directors, officers, employees and agents and certain other related parties) for any liability arising from or relating to legal proceedings involving Windstream's telecommunications business prior to the Spin-Off, and, pursuant to the Master Lease, Windstream has agreed to indemnify us for, among other things, any use, misuse, maintenance or repair by Windstream with respect to the Distribution Systems. Windstream is currently a party to various legal actions and administrative proceedings, including various claims arising in the ordinary course of its telecommunications business, which are subject to the indemnities provided to us by Windstream. If Windstream assumes the Separation and Distribution Agreement and or the Master Lease in bankruptcy, it would be obligated to honor all indemnification claims arising under such agreement. If the Separation and Distribution Agreement and or the Master Lease are rejected in Windstream's bankruptcy, any claims on the applicable indemnity would be treated as unsecured claims, and, if that were to occur, there can be no assurance we would receive any related indemnification payments from Windstream in connection with the applicable indemnity claims.

Under the terms of the Tax Matters Agreement entered into with Windstream, we are generally responsible for any taxes imposed on Windstream that arise from the failure of the Spin-Off and the debt exchanges to qualify as tax-free for U.S. federal income tax purposes, within the meaning of Section 355 and Section 368(a)(1)(D) of the Code, as applicable, to the extent such failure to qualify is attributable to certain actions, events or transactions relating to our stock, indebtedness, assets or business, or a breach of the relevant representations or any covenants made by us in the Tax Matters Agreement, the materials submitted to the IRS in connection with the request for the private letter ruling or the representations provided in connection with the tax opinion. We believe that the probability of us incurring obligations under the Tax Matters Agreement are remote; and therefore, have recorded no such liabilities in our consolidated balance sheet.

**Note 16. Accumulated Other Comprehensive Income**

Changes in accumulated other comprehensive income (loss) by component is as follows for the years ended December 31, 2018, 2017 and 2016:

| (Thousands) | | 2018 | | 2017 | | 2016 |
|---|---|---|---|---|---|---|
| Cash flow hedge changes in fair value gain (loss): | | | | | | |
| Balance at beginning of period | $ | 6,351 | $ | (6,102) | $ | (5,427) |
| Other comprehensive income (loss) before reclassifications | | 21,626 | | (7,735) | | (24,465) |
| Amounts reclassified from accumulated other comprehensive income | | 2,624 | | 20,630 | | 23,790 |
| Net other comprehensive income (loss) | | 30,601 | | 6,793 | | (6,102) |
| Less: Other comprehensive income attributable to noncontrolling interest | | 559 | | 442 | | — |
| Balance at end of period | | 30,042 | | 6,351 | | (6,102) |
| Foreign currency translation gain (loss): | | | | | | |
| Balance at beginning of period | | 1,470 | | (267) | | — |
| Translation adjustments | | (1,440) | | 1,660 | | (267) |
| Net other comprehensive income (loss) | | 30 | | 1,393 | | (267) |
| Less: Other comprehensive loss attributable to noncontrolling interest | | (33) | | (77) | | — |
| Balance at end of period | | 63 | | 1,470 | | (267) |
| Accumulated other comprehensive income (loss) at end of period | $ | 30,105 | $ | 7,821 | $ | (6,369) |

**Note 17. Income Taxes**

We elected on our initial U.S. federal income tax return to be treated as a REIT under the Internal Revenue Code of 1986, as amended (the "Code"). To qualify as a REIT, we must distribute at least 90% of our annual REIT taxable

98

Table of Contents

income to shareholders, and meet certain organizational and operational requirements, including asset holding requirements. As a REIT, we will generally not be subject to U.S. federal income tax on income that we distribute as dividends to our shareholders. If we fail to qualify as a REIT in any taxable year, we will be subject to U.S. federal income tax, including any applicable alternative minimum tax for open taxable years through 2018, on our taxable income at regular corporate income tax rates, and we could not deduct dividends paid to our shareholders in computing taxable income. Any resulting corporate liability could be substantial and could materially and adversely affect our net income and net cash available for distribution to shareholders. Unless we were entitled to relief under certain Code provisions, we also would be disqualified from reelecting to be taxed as a REIT for the four taxable years following the year in which we failed to qualify as a REIT.

Subject to the temporary restriction imposed by the waiver and amendment to our Credit Agreement (see Note 10), our ability to make cash distributions to our shareholders in amounts exceeding 90% of our REIT taxable income, determined without regard to the dividends paid deduction and excluding any capital gains, generally will be restricted.  As a result, we may be required to record a provision in our Consolidated Financial Statements for U.S. federal income taxes related to the activities of the REIT and its passthrough subsidiaries for any undistributed income. We are subject to the statutory requirements of the locations in which we conduct business, and state and local income taxes are accrued as deemed required in the best judgment of management based on analysis and interpretation of respective tax laws.

We have elected to treat the subsidiaries through which we operate Uniti Fiber and Talk America as TRSs.  TRSs enable us to engage in activities that result in income that does not constitute qualifying income for a REIT.  Our TRSs are subject to U.S. federal, state and local corporate income taxes.

Income tax (benefit) expense for the years ended December 31, 2018, 2017 and 2016 as reported in the accompanying Consolidated Statements of Income was comprised of the following:

| (Thousands) | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2018 | | 2017 | | 2016 |
| Current | | | | | | |
| Federal | $ | 674 | $ | 1,456 | $ | 1,596 |
| State | | 1,290 | | 866 | | 1,107 |
| Total current expense | | 1,964 | | 2,322 | | 2,703 |
| | | | | | | |
| Deferred | | | | | | |
| Federal | | (5,451) | | (36,956) | | (1,488) |
| State | | (1,770) | | (3,837) | | (698) |
| Foreign | | (164) | | (378) | | - |
| Total deferred expense | | (7,385) | | (41,171) | | (2,186) |
| Total income tax (benefit) expense | $ | (5,421) | $ | (38,849) | $ | 517 |

Table of Contents

An income tax expense reconciliation between the U.S. statutory tax rate and the effective tax rate is as follows:

| | | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|
| (Thousands) | | 2018 | | 2017 | | 2016 | |
| Income from continuing operations, before tax | $ | 11,124 | $ | (47,667) | $ | 305 | |
| Income tax at U.S. statutory federal rate | | 2,336 | | (16,687) | | 107 | |
| Increases (decreases) resulting from: | | | | | | | |
| State taxes, net of federal benefit | | (655) | | (429) | | (224) | |
| Benefit of REIT status | | (5,687) | | 8,836 | | (4,016) | |
| Capitalized transaction costs | | - | | (4,820) | | (3,915) | |
| Change in valuation allowance | | - | | (8,176) | | 8,176 | |
| Adjustment of deferred tax balances | | (26) | | (217) | | 149 | |
| Permanent differences | | 41 | | 60 | | 52 | |
| Foreign taxes | | (111) | | (378) | | - | |
| Rate differential | | (1,319) | | (17,038) | | 188 | |
| Income tax (benefit) expense | $ | (5,421) | $ | (38,849) | $ | 517 | |

The effective tax rate on income from continuing operations differs from tax at the statutory rate primarily due to our status as a REIT and the impact of corporate tax reform on certain adjustments to deferred taxes related to 2017 acquisitions, discussed below.

The Tax Cuts and Jobs Act ("Tax Bill") was enacted on December 22, 2017. The Tax Bill reduced the U.S. federal corporate tax rate from 35% to 21%, required companies to pay a one-time transition tax on earnings of certain foreign subsidiaries that were previously tax deferred and created new taxes on certain foreign sourced earnings. Consistent with Staff Accounting Bulletin No. 118 issued by the SEC, which provided for a measurement period of one year from the enactment date to finalize the accounting for effects of the Tax Bill, the Company provisionally recorded income tax benefit of $17.0 million related to the Tax Bill in the fourth quarter of 2017. During the second quarter of 2018, the purchase price allocations related to our acquisitions of Hunt Telecommunications, LLC and Southern Light, LLC were adjusted to record additional deferred tax liabilities of $3.2 million and $0.9 million, respectively, that existed as of the acquisition date. These deferred tax liabilities were recorded at the tax rate in effect as of the date of acquisition. Upon enactment of the Tax Bill, the incremental deferred tax liability would have been adjusted to the newly enacted corporate tax rate. This resulted in a decrease to the deferred tax liability and an income tax benefit of $1.3 million recorded in the second quarter of 2018.

As of December 31, 2018, we have completed our accounting for the tax effects of enactment of the Tax Bill and recorded no significant adjustments to our provisional amounts other than as described above.

Future regulatory and rulemaking interpretations or other guidance clarifying provisions of the Tax Bill may impact the Company's tax position.

Deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases.

100

Table of Contents

The components of the Company's deferred tax assets and liabilities are as follows:

| (Thousands) | | December 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| Deferred tax assets: | | | | |
| Deferred revenue | $ | 20,373 | $ | 17,114 |
| Accrued bonuses | | 298 | | 101 |
| Stock based compensation | | 823 | | |
| Accrued expenses and other | | 857 | | 506 |
| Asset retirement obligation | | 1,458 | | 2,023 |
| Inventory reserve | | 544 | | 1,341 |
| Other | | 904 | | 248 |
| Net operating loss carryforwards | | 92,443 | | 36,229 |
| Deferred tax assets | | 117,700 | | 57,562 |
| Valuation allowance | | - | | - |
| Deferred tax assets, net of valuation allowance | | 117,700 | | 57,562 |
| | | | | |
| Deferred tax liabilities: | | | | |
| Property, plant and equipment | $ | (97,651) | $ | (43,817) |
| Customer list intangible | | (67,382) | | (68,795) |
| Other intangible amortization | | (3,954) | | (291) |
| Deferred or prepaid costs | | (1,147) | | - |
| Other | | - | | (137) |
| Deferred tax liabilities | $ | (170,134) | $ | (113,040) |
| | | | | |
| Deferred tax liability, net | $ | (52,434) | $ | (55,478) |

As of December 31, 2018, the Company's deferred tax assets were primarily the result of U.S. federal and state NOL carryforwards.

As of each reporting date, the Company's management considers new evidence, both positive and negative, that could impact management's view with regard to future realization of deferred tax assets. Given the Company has significant deferred tax liabilities which are not limited by Sec. 269(a)(1) of the Code, management determined that sufficient positive evidence exists as of December 31, 2018, to conclude that it is more likely than not that all of its deferred tax assets are realizable, and therefore, no valuation allowance has been recorded.

On August 31, 2016, we acquired 100% of the outstanding equity of Tower Cloud, Inc., which had federal NOL carryforwards of approximately $81.2 million at the date of the acquisition. As a result of the change in ownership, the utilization of Tower Cloud, Inc. NOL carryforwards is subject to limitations imposed by the Code. Approximately $18.3 million of the Tower Cloud, Inc. NOL carryforward was utilized in 2017. The remaining Tower Cloud, Inc. NOL carryforwards will expire between 2026 and 2036.

We have total federal NOL carryforwards as of December 31, 2018 of approximately $165.2 million which will expire between 2026 and 2037, and approximately $189.2 million which will not expire but the utilization of which will be limited to 80% of taxable income annually under provisions enacted in the Tax Bill.

With the exception of Tower Cloud, Inc., our 2015 returns remain open to examination. As Tower Cloud, Inc. has NOLs available to carry forward, the applicable tax years will generally remain open to examination several years after the applicable loss carryforwards have been utilized or expire.

The Company or its subsidiaries file tax returns in the U.S. federal jurisdiction, various state and local jurisdictions, and certain foreign jurisdictions. A reconciliation of the Company's beginning and ending liability for unrecognized tax benefits is as follows:

Table of Contents

| (Thousands) | | 2018 | | 2017 |
|---|---|---|---|---|
| Balance at January 1 | $ | 3,036 | $ | - |
| Additions related to acquisitions | | - | | 3,036 |
| Additions for tax positions for the current year | | - | | - |
| Additions for tax positions of prior years | | - | | - |
| Reductions for tax positions of prior years | | - | | - |
| Settlements | | - | | - |
| Balance at December 31 | $ | 3,036 | $ | 3,036 |

The Company's entire liability for unrecognized tax benefit would affect the annual effective tax rate if recognized. On February 19, 2019 the Company announced it had agreed to sell its Uniti Towers' business in Latin America. The transaction is subject to customary closing conditions and is expected to close in the first quarter of 2019. See Note 23. As a result of the sale, the balance of unrecognized tax benefits will decrease within the next 12 months.

The Company recognizes accrued interest and penalties related to unrecognized tax benefits as additional tax expense. The Company recorded no interest expense or penalties for the period ending December 31, 2018. The Company's balance of accrued interest and penalties related to unrecognized tax benefits as of December 31, 2018 was $2.3 million.

**Note 18. Supplemental Cash Flow Information**

Cash paid for interest expense and income taxes is as follows:

| (Thousands) | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2018 | | 2017 | | 2016 |
| **Cash payments for:** | | | | | | |
| Interest (net of capitalized interest) | $ | 281,364 | $ | 276,071 | $ | 255,945 |
| Income Taxes | $ | 1,688 | $ | 4,388 | $ | 3,003 |

**Note 19. Capital Stock**

We have an effective shelf registration statement on file with the SEC (the "Registration Statement") to offer and sell various securities from time to time. Under the Registration Statement, we have established an at-the-market common stock offering program (the "ATM Program") to sell shares of common stock having an aggregate offering price of up to $250.0 million. As of December 31, 2018, Company has issued and sold an aggregate of 5.5 million shares of common stock at a weighted average price of $20.19 per share under the ATM Program, receiving net proceeds of $109.4 million, after commissions of $1.4 million and other offering costs.

On April 25, 2017, we issued 19.5 million shares of our common stock, par value $0.0001 per share. The shares were sold at a public offering price of $26.50, generating proceeds of approximately $518 million, before underwriter discounts and transaction costs. The Company used the proceeds from this offering to fund a portion of the cash consideration paid in connection with the acquisitions of Southern Light and Hunt that closed on July 3, 2017.

On May 2, 2016, we issued 87,500 shares of the Company's 3% Series A Convertible Preferred Stock, $0.0001 par value, with a liquidation value of $87.5 million. The Series A Shares are non-voting and entitle the holders to receive cumulative dividends at the rate per annum of 3.0%, payable in cash. Holders of the Series A Shares have the option to convert at any time after three years, or are mandatorily convertible after eight years at a conversion rate of 28.5714 shares of common stock per Series A Share, subject to adjustment for certain dilutive events not to exceed a conversion rate of 50.5305 shares of common stock per Series A Share. The Series A Shares provide us the option to cash or share settle, and it is our policy to settle in cash upon conversion. Upon liquidation, each holder of the Series A Shares shall be entitled to receive the liquidation preference per share of $1,000 plus an amount equal to the accumulated and unpaid dividends on such shares. The Series A Shares were recorded at inception on the Consolidated Balance Sheet as mezzanine equity at fair value.

Table of Contents

We are authorized to issue up to 500,000,000 shares of voting common stock and 50,000,000 shares of preferred stock, of which 180,535,971 and 0 shares, respectively, were outstanding at December 31, 2018. We had 319,464,029 shares of voting common stock available for issuance at December 31, 2018.

**Note 20. Dividends (Distributions)**

Distributions with respect to our common stock is characterized for federal income tax purposes as taxable ordinary dividends, capital gains dividends, non-dividend distribution or a combination thereof. For the years ended December 31, 2018, 2017, and 2016, our common stock distribution per share was $2.40, $2.40 and $2.40, respectively, characterized as follows:

|  | Year Ended December 31, | | | | | |
|  | 2018 | | 2017 | | 2016 | |
|---|---|---|---|---|---|---|
| Ordinary dividends | $ | 1.53 | $ | 1.22 | $ | 1.31 |
| Non-dividend distributions |  | 0.87 |  | 1.18 |  | 1.09 |
| Total | $ | 2.40 | $ | 2.40 | $ | 2.40 |

**Note 21. Future Minimum Rents**

Future minimum lease payments to be received, excluding operating expense reimbursements, from tenants under non-cancelable operating leases as of December 31, 2018, are as follows:

| (Thousands) | | |
|---|---|---|
| 2019 | $ | 724,269 |
| 2020 | | 693,596 |
| 2021 | | 696,713 |
| 2022 | | 699,561 |
| 2023 | | 702,663 |
| Thereafter | | 4,706,951 |
| Total | $ | 8,223,753 |

**Note 22. Employee Benefit Plan**

We sponsor a defined contribution plan under section 401(k) of the Internal Revenue Code, which covers employees who are 21 years of age and over. Under this plan, we match voluntary employee contributions at a rate of 100% for the first 3% of an employee's annual compensation and at a rate of 50% for the next 2% of an employee's annual compensation. Employees vest in our contribution immediately. Our expense related to the plan recognized for the years ended December 31, 2018, 2017 and 2016 was $1.2 million, $0.8 million and $0.4 million, respectively.

We sponsor a deferred compensation plan. The plan is established and maintained by the Company primarily to permit certain management or highly compensated employees of the Company and its subsidiaries, within the meaning of Section 301(a) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), to defer a percentage of their compensation. The plan is an unfunded deferred compensation plan intended to qualify for the exemptions provided in, and shall be administered in a manner consistent with Section 201, 301 and 401 of ERISA and Section 409A of the Internal Revenue Code of 1986, as amended.

**Note 23. Subsequent Events**

On January 15, 2019, the Company entered into an OpCo-PropCo transaction with Macquarie Infrastructure Partners ("MIP") to acquire Bluebird Network, LLC ("Bluebird"). MIP operates within the Macquarie Infrastructure and Real Assets ("MIRA") division of Macquarie Group. Bluebird's network is located in the Midwest across Missouri, Kansas, Illinois, and Oklahoma. In the transaction, Uniti agreed to purchase the Bluebird fiber network

103

Table of Contents

and MIP agreed to purchase the Bluebird operations. In addition, Uniti has agreed to sell Uniti Fiber's Midwest operations to MIP for $37 million, including related pre-paid rent to be received from MIP at closing, while Uniti will retain its existing Midwest fiber network. Uniti is acquiring the fiber network of Bluebird for $319 million, of which $175 million will be funded by Uniti in cash and $144 million from pre-paid rent to be received from MIP at closing. These transactions are subject to regulatory and other closing conditions and are expected to close by the end of the third quarter of 2019. Concurrently with the closing of these transactions, Uniti will lease the Bluebird fiber network and its Midwest fiber network on a combined basis to MIP, under a long-term triple net lease, with initial annual cash rents of approximately $20.3 million. The lease will be reported within the results of our Leasing segment.

On February 19, 2019, the Company announced it had agreed to sell Uniti Towers' Latin America business to an entity controlled by Phoenix Towers International ("PTI") for cash consideration of approximately $100 million. PTI will acquire approximately 500 towers located across Mexico, Colombia and Nicaragua. The transaction is subject to customary closing conditions and is expected to close by the end of the first quarter of 2019.

As a result of the adverse court ruling Windstream received on February 15, 2019 (see Note 2), the Company has evaluated the potential impacts to our Consolidated Financial Statements as of and for the year ended December 31, 2018, concluding that no adjustments were required to be made to amounts reported on the financial statements at this time. We will continue to monitor the situation and evaluate any potential impacts to our first quarter 2019 Condensed Consolidated Financial Statements including, but not limited to, compliance with debt covenants, our quarterly REIT compliance test, goodwill impairment and long-lived asset impairment tests, the collectability of our straight line rent receivable related to the Master Lease and our assertion that we will cash settle any contingent consideration arrangements or Series A Shares upon conversion by the holders.

We may take measures to conserve cash as we anticipate that it would be difficult for us to access the capital markets at attractive rates until uncertainty is clarified and because of the risk of disruptions in payments by Windstream during its bankruptcy proceeding. Accordingly, we may elect to suspend, delay or reduce success-based capital expenditures and our dividend to conserve cash. Because our Master Lease is essential to Windstream's operations, we expect that any disruption in payments by Windstream would be limited, and we believe that if we take such actions, we would have adequate liquidity to fund our operations for twelve months after the date the financial statements are issued.

## Note 24. Quarterly Results of Operations (unaudited)

Selected quarterly information for each of the four quarters in the year ended December 31, 2018:

| | 2018 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | First Quarter | | Second Quarter | | Third Quarter | | Fourth Quarter | |
| (Thousands, except per share data) | | | | | | | | |
| Total revenues | $ | 246,915 | $ | 247,329 | $ | 252,636 | $ | 270,754 |
| Income (loss) before income taxes | | 135 | | (6,239) | | 2,758 | | 14,470 |
| Net income (loss) | | 1,231 | | (3,593) | | 4,224 | | 14,683 |
| Net (loss) income attributable to common shareholders | | (870) | | (5,562) | | 2,075 | | 12,346 |
| | | | | | | | | |
| Basic (loss) earnings per common share | $ | (0.00) | $ | (0.03) | $ | 0.01 | $ | 0.07 |
| Diluted (loss) earnings per common share | $ | (0.01) | $ | (0.03) | $ | 0.01 | $ | 0.05 |
| Dividends declared per common share | $ | 0.60 | $ | 0.60 | $ | 0.60 | $ | 0.60 |

Table of Contents

Selected quarterly information for each of the four quarters in the year ended December 31, 2017:

| | 2017 | | | | | | | |
| | First Quarter | | Second Quarter | | Third Quarter | | Fourth Quarter | |
| (Thousands, except per share data) | | | | | | | | |
| Total revenues | $ | 211,473 | $ | 213,013 | $ | 245,210 | $ | 246,336 |
| Loss before income taxes | | (20,379) | | (16,385) | | (3,837) | | (7,076) |
| Net (loss) income | | (20,000) | | (16,460) | | 4,835 | | 22,797 |
| Net (loss) income attributable to common shareholders | | (21,788) | | (18,242) | | 2,939 | | 20,539 |
| | | | | | | | | |
| Basic (loss) earnings per common share | $ | (0.14) | $ | (0.11) | $ | 0.02 | $ | 0.12 |
| Diluted (loss) earnings per common share | $ | (0.14) | $ | (0.11) | $ | (0.02) | $ | 0.12 |
| Dividends declared per common share | $ | 0.60 | $ | 0.60 | $ | 0.60 | $ | 0.60 |

Table of Contents

**Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure.**

None

**Item 9A. Controls and Procedures.**

*Evaluation of Disclosure Controls and Procedures*

We have established disclosure controls and procedures, as such term is defined in Rule 13a-15(e) under the Exchange Act, that are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our principal executive and principal financial officers as appropriate, to allow timely decisions regarding required disclosure.

Our management, with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2018. Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective as of December 31, 2018.

*Management's Annual Report on Internal Control Over Financial Reporting*

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) of the Exchange Act. The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles, and includes those policies and procedures that:

- Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company;
- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and
- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate.

On October 19, 2018, the Company completed the acquisitions of Information Transport Solutions, Inc. ("ITS")  Management excluded ITS from its assessment of internal control over financial reporting as of December 31, 2018 because ITS was acquired by the Company in a purchase business combination in 2018.  ITS represents 0.4% of total assets and 0.9% of total revenue, of the related consolidated financial statement amounts as of and for the year ended December 31, 2018.

Our management, with the participation of our principal executive officer and principal financial officer, evaluated the effectiveness of our internal control over financial reporting as of December 31, 2018. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control - Integrated Framework (2013)*.

106

Table of Contents

Based on this evaluation under the framework in *Internal Control - Integrated Framework (2013)* issued by COSO, management concluded the Company's internal control over financial reporting was effective as of December 31, 2018.

The Company's independent registered public accounting firm, PricewaterhouseCoopers LLP, who has audited the consolidated financial statements included in this Annual Report on Form 10-K, has also audited the effectiveness of the Company's internal control over financial reporting as of December 31, 2018, as stated in their report which appears in Part II, Item 8 of this Annual Report on Form 10-K.

*Changes in Internal Control Over Financial Reporting*

There were no changes in our internal control over financial reporting that occurred during the quarter ended December 31, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information.**

As noted above, on March 18, 2019, we entered into the fourth amendment and limited waiver (the "Amendment") to our Credit Agreement among Uniti Group LP, Uniti Group Finance Inc. and CSL Capital, LLC, as borrowers, the guarantors party thereto, the lenders party thereto, and Bank of America, N.A., as administrative agent and collateral agent. Please see "Management's Discussion and Analysis of Financial Condition and Results of Operations —Liquidity and Capital Resources—Credit Agreement" for additional information about the material terms of the Amendment. The foregoing descriptions of the Amendment are qualified in their entirety by reference to the Amendment, a copy of which is filed as Exhibit 10.11 hereto.

107

Table of Contents

**PART III**

**Item 10. Directors, Executive Officers and Corporate Governance.**

Except as set forth below, the information required by this item is incorporated by reference from the definitive proxy statement to be filed within 120 days after December 31, 2018, pursuant to Regulation 14A under the Exchange Act in connection with our 2019 annual meeting of stockholders.

We have a code of ethics as defined in Item 406 of Regulation S-K, which code applies to all of our directors and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, and persons performing similar functions. A copy of this code of ethics, titled "Code of Business Conduct and Ethics & Whistleblower Policy," is available free of charge in the *Corporate Governance* section of the About Us page on our website at www.uniti.com.  We intend to satisfy the disclosure requirements of Form 8-K regarding any amendment to, or a waiver from, any provision of our code of ethics by posting such amendment or waiver on our website.

**Item 11. Executive Compensation.**

The information required by this item is incorporated by reference from the definitive proxy statement to be filed within 120 days after December 31, 2018, pursuant to Regulation 14A under the Exchange Act in connection with our 2019 annual meeting of stockholders.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

Except as set forth below, the information required by this item is incorporated by reference from the definitive proxy statement to be filed within 120 days after December 31, 2018, pursuant to Regulation 14A under the Exchange Act in connection with our 2019 annual meeting of stockholders.

*Securities Authorized for Issuance Under Equity Compensation Plans*

The following table contains information about our equity compensation plan as of December 31, 2018:

**Equity Compensation Plan Information**

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders | – | – | 6,724,876[1] |
| Equity compensation plans not approved by security holders | – | – | – |
| Total | – | – | 6,724,876 |

[1] Amount includes 4,724,876 shares available for issuance under the Uniti Group Inc. 2015 Equity Incentive Plan and 2,000,000 shares Uniti Group Inc. Employee Stock Purchase Plan.

Table of Contents

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

The information required by this item is incorporated by reference from the definitive proxy statement to be filed within 120 days after December 31, 2018, pursuant to Regulation 14A under the Exchange Act in connection with our 2019 annual meeting of stockholders.

**Item 14. Principal Accounting Fees and Services.**

The information required by this item is incorporated by reference from the definitive proxy statement to be filed within 120 days after December 31, 2018, pursuant to Regulation 14A under the Exchange Act in connection with our 2019 annual meeting of stockholders.

109

Table of Contents

PART IV

**Item 15. Exhibits, Financial Statement Schedules.**

**Financial Statements**

See Index to Consolidated Financial Statements in "Financial Statements and Supplementary Data."

**Financial Statement Schedules**

Uniti Group Inc. Schedule I – Condensed Financial Information of the Registrant (Parent Company) Condensed Balance Sheets as of December 31, 2018 and 2017, and the related Condensed Statements of Comprehensive Income and Cash Flows for each of the three years in the period ended December 31, 2018, including the related notes, appearing on pages S-1, S-2, S-3, and S-4 of this report.

Uniti Group Inc. Schedule II – Valuation and Qualifying Accounts for each of the three years in the period ended December 31, 2018 appearing on page S-5 of this report.

Uniti Group Inc. Schedule III – Schedule of Real Estate Investments and Accumulated Depreciation as of December 31, 2018 appearing on page S-6 of this report.

**Index to Exhibits**

| Exhibit No. | Description |
| --- | --- |
| 2.1 | Separation and Distribution Agreement, dated as of March 26, 2015, by and among Windstream Holdings, Inc., Windstream Services, LLC and Communications Sales & Leasing, Inc. (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of March 26, 2015 (File No. 001-36708)) |
| 2.2 | Agreement and Plan of Merger, dated as of January 7, 2016, by and among Communications Sales & Leasing, Inc., CSL Bandwidth Inc., Penn Merger Sub, LLC, PEG Bandwidth, LLC, PEG Bandwidth Holdings, LLC, and PEG Bandwidth Holdings, LLC, as Unitholders' Representative (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of January 12, 2016 (File No. 001-36708)) |
| 2.3** | Agreement and Plan of Merger, dated as of June 20, 2016, by and among Communications Sales & Leasing, Inc., CSL Fiber Holdings LLC, Thor Merger Sub, Inc., Tower Cloud, Inc. and Shareholder Representative Services LLC, as representative of the equityholders of Tower Cloud, Inc. (incorporated by reference to Exhibit 2.1 to the Company's Quarterly Report on Form 10-Q dated and filed with the SEC as of August 11, 2016 (File No. 001-36708)) |
| 2.4 | First Amendment, dated as of August 11, 2016, to the Agreement and Plan of Merger, dated as of June 20, 2016, by and among Communications Sales & Leasing, Inc., CSL Fiber Holdings LLC, Thor Merger Sub, Inc., Tower Cloud, Inc. and Shareholder Representative Services LLC, as representative of the equityholders of Tower Cloud, Inc. (incorporated by reference to Exhibit 2.2 to the Company's Quarterly Report on Form 10-Q dated and filed with the SEC as of August 11, 2016 (File No. 001-36708)) |
| 2.5 | Membership Interests Purchase Agreement, dated as of April 7, 2017, by and among Uniti Group Inc., Uniti Fiber Holdings Inc. and SLF Holdings, LLC (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of April 11, 2017 (File No. 001-36708)) |
| 2.6 | Amended and Restated Agreement of Limited Partnership of Uniti Group LP, dated July 3, 2017, by and between Uniti and Uniti Group LP LLC (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of July 3, 2017 (File No. 001-36708)) |

110

Table of Contents

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Articles of Amendment and Restatement of Communications Sales & Leasing, Inc. (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of April 10, 2015 (File No. 001-36708)) |
| 3.2 | Articles of Amendment of Communications Sales & Leasing, Inc. (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of February 28, 2017 (File No. 001-36708)) |
| 3.3 | Articles of Amendment of Uniti Group Inc. (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of May 18, 2018 (File No. 001-36708)) |
| 3.4 | Amended and Restated Bylaws of Uniti Group Inc. (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K dated as of May 1, 2017 and filed with the SEC as of May 2, 2017 (File No. 001-36708)) |
| 4.1 | Indenture, dated as of April 24, 2015, among Communications Sales & Leasing, Inc. and CSL Capital, LLC, as Issuers, the guarantors named therein, and Wells Fargo Bank, National Association, as trustee, governing the 8.25% Senior Notes due 2023 (incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8-K dated and filed with the SEC as of April 27, 2015 (File No. 001-36708)) |
| 4.2 | Form of 8.25% Senior Note due 2023 (included in Exhibit 4.1 above) (incorporated by reference to Exhibit 4.4 to the Company's Current Report on Form 8-K dated and filed with the SEC as of April 27, 2015 (File No. 001-36708)) |
| 4.3 | Second Supplemental Indenture (8.25% Senior Notes due 2023), dated as of October 19, 2016, among Communications Sales & Leasing, Inc. and CSL Capital, LLC, as Issuers, the guarantors thereto and Wells Fargo Bank, National Association (incorporated by reference to Exhibit 4.3 to the Company's Annual Report on Form 10-K dated and filed with the SEC as of February 23, 2017 (File No. 001-36708)) |
| 4.4 | Fifth Supplemental Indenture, dated as of May 9, 2017, to the indenture dated as of April 24, 2015, among Uniti Group LP, Uniti Group Finance Inc., CSL Capital, LLC, Uniti Group Inc., the guarantors named therein and Wells Fargo Bank, National Association, as trustee, governing the 8.25% Senior Notes due 2023 (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of May 9, 2017 (File No. 001-36708)) |
| 4.5 | Sixth Supplemental Indenture, dated as of May 9, 2017, to the indenture dated as of April 24, 2015, among Uniti Group LP, Uniti Group Finance Inc., CSL Capital, LLC, Uniti Group Inc., the guarantors named therein and Wells Fargo Bank, National Association, as trustee, governing the 8.25% Senior Notes due 2023 (incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8-K dated and filed with the SEC as of May 9, 2017 (File No. 001-36708)) |
| 4.6 | Indenture, dated as of April 24, 2015, among Communications Sales & Leasing, Inc. and CSL Capital, LLC, as Issuers, the guarantors named therein, and Wells Fargo Bank, National Association, as trustee and as collateral agent, governing the 6.00% Senior Secured Notes due 2023 (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of April 27, 2015 (File No. 001-36708)) |
| 4.7 | Form of 6.00% Senior Secured Note due 2023 (included in Exhibit 4.6 above) (incorporated by reference to Exhibit 4.3 to the Company's Current Report on Form 8-K dated and filed with the SEC as of April 27, 2015 (File No. 001-36708)) |
| 4.8 | Second Supplemental Indenture (6.00% Senior Secured Notes due 2023), dated as of June 14, 2016, among Communications Sales & Leasing, Inc. and CSL Capital, LLC, as Issuers, the guarantors thereto and Wells Fargo Bank, National Association (incorporated by reference to Exhibit 4.6 to the Company's Annual Report on Form 10-K dated and filed with the SEC as of February 23, 2017 (File No. 001-36708)) |

Table of Contents

| Exhibit No. | Description |
| --- | --- |
| 4.9 | Third Supplemental Indenture (6.00% Senior Secured Notes due 2023), dated as of October 19, 2016, among Communications Sales & Leasing, Inc. and CSL Capital, LLC, as Issuers, the guarantors thereto and Wells Fargo Bank, National Association (incorporated by reference to Exhibit 4.7 to the Company's Annual Report on Form 10-K dated and filed with the SEC as of February 23, 2017 (File No. 001-36708)) |
| 4.10 | Sixth Supplemental Indenture, dated as of May 9, 2017, to the indenture dated as of April 24, 2015, among Uniti Group LP, Uniti Group Finance Inc., CSL Capital, LLC, Uniti Group Inc., the guarantors named therein and Wells Fargo Bank, National Association, as trustee and collateral agent, governing the 6.00% Senior Secured Notes due 2023 (incorporated by reference to Exhibit 4.3 to the Company's Current Report on Form 8-K dated and filed with the SEC as of May 9, 2017 (File No. 001-36708)) |
| 4.11 | Seventh Supplemental Indenture, dated as of May 9, 2017, to the indenture dated as of April 24, 2015, among Uniti Group LP, Uniti Group Finance Inc., CSL Capital, LLC, Uniti Group Inc., the guarantors named therein and Wells Fargo Bank, National Association, as trustee and collateral agent, governing the 6.00% Senior Secured Notes due 2023 (incorporated by reference to Exhibit 4.4 to the Company's Current Report on Form 8-K dated and filed with the SEC as of May 9, 2017 (File No. 001-36708)) |
| 4.12 | Articles Supplementary for 3.00% Series A Convertible Preferred Stock (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of May 4, 2016 (File No. 001-36708)) |
| 4.13 | Articles of Amendment to Articles Supplementary for 3.00% Series A Convertible Preferred Stock (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of May 9, 2017 (File No. 001-36708)) |
| 4.14 | Indenture, dated as of December 15, 2016, among Communications Sales & Leasing, Inc. and CSL Capital, LLC, as Issuers, the guarantors named therein, and Wells Fargo Bank, National Association, as trustee, governing the 7.125% Senior Notes due 2024 (incorporated by reference to Exhibit 4.1 of the Company's Current Report on Form 8-K dated and filed with the SEC as of December 15, 2016 (File No. 001-36708)) |
| 4.15 | Form of 7.125% Senior Note due 2024 (included in Exhibit 4.14 above) (incorporated by reference to Exhibit 4.2 of the Company's Current Report on Form 8-K dated and filed with the SEC as of December 15, 2016 (File No. 001-36708)) |
| 4.16 | First Supplemental Indenture, dated as of February 22, 2017, to the Indenture, dated as of December 15, 2016, among Communications Sales & Leasing, Inc. and CSL Capital, LLC, as Issuers, the guarantors named therein, and Wells Fargo Bank, National Association, as trustee, governing the 7.125% Senior Notes due 2024 (incorporated by reference to Exhibit 4.11 to the Company's Annual Report on Form 10-K dated and filed with the SEC as of February 23, 2017 (File No. 001-36708)) |
| 4.17 | Third Supplemental Indenture, dated as of May 9, 2017, to the indenture dated as of December 15, 2016, among Uniti Group LP, Uniti Fiber Holdings Inc., CSL Capital, LLC, Uniti Group Inc., the guarantors named therein and Wells Fargo Bank, National Association, as trustee, governing the 7.125% Senior Notes due 2024 (incorporated by reference to Exhibit 4.5 to the Company's Current Report on Form 8-K dated and filed with the SEC as of May 9, 2017 (File No. 001-36708)) |
| 4.18 | Fourth Supplemental Indenture, dated as of May 9, 2017, to the indenture dated as of December 15, 2016, among Uniti Group LP, Uniti Fiber Holdings Inc., CSL Capital, LLC, Uniti Group Inc., the guarantors named therein and Wells Fargo Bank, National Association, as trustee, governing the 7.125% Senior Notes due 2024 (incorporated by reference to Exhibit 4.6 to the Company's Current Report on Form 8-K dated and filed with the SEC as of May 9, 2017 (File No. 001-36708)) |
| 4.19 | Fifth Supplemental Indenture, dated as of August 11, 2017, among Uniti Group LP, Uniti Fiber Holdings Inc., and CSL Capital, LLC, as Issuers, the guarantors named therein, and Wells Fargo Bank, National Association, as trustee, relating to the 7.125% Senior Notes due 2024 (incorporated by reference to Exhibit 4.1 to the Company's Quarterly Report on Form 10-Q dated and filed with the SEC as of November 2, 2017 (File No. 001-36708)) |

112

Table of Contents

| Exhibit No. | Description |
|---|---|
| 10.1 | Master Lease, entered into as of April 24, 2015, by and among CSL National, L.P. and the other entities listed therein, as Landlord, and Windstream Holdings, Inc., as Tenant (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of April 27, 2015 (File No. 001-36708)) |
| 10.2 | Tax Matters Agreement, entered into as of April 24, 2015, by and among Windstream Holdings, Inc., Windstream Services, LLC and Communications Sales & Leasing, Inc. (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K dated and filed with the SEC as of April 27, 2015 (File No. 001-36708)) |
| 10.3 | Transition Services Agreement, dated April 24, 2015, by and between Windstream Services, LLC and CSL National, L.P., on behalf of itself and its Affiliates, including Talk America Services, LLC (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K dated and filed with the SEC as of April 27, 2015 (File No. 001-36708)) |
| 10.4 | Intellectual Property Matters Agreement, dated as of April 24, 2015, by and among Windstream Services, LLC, individually and on behalf of its subsidiaries that may hold certain intellectual property as described therein, CSL National, LP, and Talk America Services, LLC (incorporated by reference to Exhibit 10.5 to the Company's Current Report on Form 8-K dated and filed with the SEC as of April 27, 2015 (File No. 001-36708)) |
| 10.5 | Wholesale Master Services Agreement, dated April 24, 2015, between Windstream Communications, Inc. and Talk America Services, LLC (incorporated by reference to Exhibit 10.6 to the Company's Current Report on Form 8-K dated and filed with the SEC as of April 27, 2015 (File No. 001-36708)) |
| 10.6 | Master Services Agreement, dated as of April 24, 2015, by and between Windstream Services, LLC, on behalf of itself and its competitive local exchange and interexchange carrier affiliates, and Talk America Services, LLC (incorporated by reference to Exhibit 10.8 to the Company's Current Report on Form 8-K dated and filed with the SEC as of April 27, 2015 (File No. 001-36708)) |
| 10.7 | Credit Agreement, dated as of April 24, 2015, by and among Communications Sales & Leasing, Inc. and CSL Capital, LLC, as Borrowers, the guarantors party thereto, the lenders party thereto from time to time and Bank of America, N.A., as administrative agent, collateral agent, swing line lender and L/C issuer (incorporated by reference to Exhibit 10.10 to the Company's Current Report on Form 8-K dated and filed with the SEC as of April 27, 2015 (File No. 001-36708)) |
| 10.8 | Amendment No. 1 to the Credit Agreement, dated as of October 21, 2016 by and among Communications Sales & Leasing, Inc. and CSL Capital, LLC, as borrowers, the guarantors party thereto, the lenders party thereto, and Bank of America, N.A., as administrative agent and collateral agent (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of October 21, 2016 (File No. 001-36708)) |
| 10.9 | Amendment No. 2 to the Credit Agreement, dated as of February 9, 2017 by and among Communications Sales & Leasing, Inc. and CSL Capital, LLC, as borrowers, the guarantors party thereto, the lenders party thereto, and Bank of America, N.A., as administrative agent and collateral agent (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of February 9, 2017 (File No. 001-36708)) |
| 10.10 | Amendment No. 3 to the Credit Agreement, dated as of April 28, 2017 by and among Uniti Group Inc. and CSL Capital, LLC, as borrowers, the guarantors party thereto, the lenders party thereto, and Bank of America, N.A., as administrative agent and collateral agent (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated as of May 1, 2017 and filed with the SEC as of May 2, 2017 (File No. 001-36708)) |
| 10.11* | Amendment No. 4 to the Credit Agreement, dated as of March 18, 2019, among Uniti Group LP, Uniti Group Finance Inc. and CSL Capital, LLC, as borrowers, the guarantors party thereto, the lenders party thereto, and Bank of America, N.A., as administrative agent and collateral agent. |

Table of Contents

| Exhibit No. | Description |
| --- | --- |
| 10.12 | Borrower Assumption Agreement and Joinder, dated as of May 9, 2017 by and among Uniti Group Inc., as initial borrower, Uniti Group LP and Uniti Group Finance Inc., as borrowers, the guarantors party thereto, the lenders party thereto, and Bank of America, N.A., as administrative agent and collateral agent  (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of May 9, 2017 (File No. 001-36708)) |
| 10.13 | Recognition Agreement, dated April 24, 2015, by and among CSL National, LP and the other entities listed therein, as Landlord, and Windstream Holdings, Inc., as Tenant, and JPMorgan Chase Bank, N.A., as administrative agent (incorporated by reference to Exhibit 10.11 to the Company's Current Report on Form 8-K dated and filed with the SEC as of April 27, 2015 (File No. 001-36708)) |
| 10.14+ | Employment Agreement between Uniti Group Inc. and Kenneth Gunderman, effective as of December 14, 2018 (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of December 14, 2018 (File No. 001-36708)) |
| 10.15+ | Severance Agreement, dated as of September 10, 2018, by and between Uniti Group Inc. and Mark A. Wallace (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of September 14, 2018 (File No. 001-36708)) |
| 10.16+ | Severance Agreement, dated as of September 10, 2018, by and between Uniti Group Inc. and Daniel L. Heard (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K dated and filed with the SEC as of September 14, 2018 (File No. 001-36708)) |
| 10.17+ | Uniti Group Inc. 2015 Equity Incentive Plan, as amended and restated effective March 28, 2018 (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of March 29, 2018 (File No. 001-36708)) |
| 10.18+ | Form of Restricted Shares Agreement for employees (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K dated and filed with the SEC as of June 3, 2015 (File No. 001-36708)) |
| 10.19+* | Form of Restricted Shares Agreement for employees |
| 10.20+ | Form of Performance-Based Restricted Stock Unit Agreement (incorporated by reference to Exhibit 10.4 to the Company's Current Report on Form 8-K dated and filed with the SEC as of June 3, 2015 (File No. 001-36708)) |
| 10.21+* | Form of Performance-Based Restricted Stock Unit Agreement |
| 10.22+ | Form of Restricted Shares Agreement for non-employees (incorporated by reference to Exhibit 10.5 to the Company's Current Report on Form 8-K dated and filed with the SEC as of June 3, 2015 (File No. 001-36708)) |
| 10.23+ | Form of Restricted Shares Agreement for non-employee directors (incorporated by reference to Exhibit 10.5 to the Company's Current Report on Form 8-K dated and filed with the SEC as of June 3, 2015 (File No. 001-36708)) |
| 10.24+ | Form of Indemnity Agreement (incorporated by reference to Exhibit 10.20 to the Company's Registration Statement on Form S-4 dated and filed with the SEC as of July 2, 2015 (File No. 333-205450)) |
| 10.25+ | Communications Sales & Leasing, Inc. Deferred Compensation Plan, effective August 10, 2015 (incorporated by reference to Exhibit 10.20 to the Company's Quarterly Report on Form 10-Q dated and filed with the SEC as of August 13, 2015 (File No. 001-36708)) |

Table of Contents

| Exhibit No. | Description |
| --- | --- |
| 10.26+ | Uniti Group Inc. Amended and Restated Employee Stock Purchase Plan (incorporated by reference to Exhibit 99.1 to the Company's Registration Statement on Form S-8 dated and filed with the SEC as of June 7, 2018 (File No. 333-225501)) |
| 10.27 | Stockholders' and Registration Rights Agreement, dated May 2, 2016, by and between Communications Sales and Leasing, Inc. and PEG Bandwidth Holdings, LLC (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated and filed with the SEC as of May 4, 2016 (File No. 001-36708)) |
| 10.28 | Amendment No. 1 to Master Lease, entered into as of February 12, 2016, by and among CSL National, L.P. and the other entities listed therein, as Landlord, and Windstream Holdings, Inc., as Tenant (incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q dated and filed with the SEC as of May 12, 2016 (File No. 001-36708)) |
| 10.29 | Registration Rights Agreement by and among each of the parties listed on the signature pages thereto and Communications Sales & Leasing, Inc. dated as of June 15, 2016 (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q dated and filed with the SEC as of August 11, 2016 (File No. 001-36708)) |
| 10.30+ | Communications Sales & Leasing, Inc. 2017 Short Term Incentive Plan (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q dated and filed with the SEC as of May 10, 2018 (File No. 001-36708)) |
| 10.31+*** | Uniti Group Inc. 2018 Short Term Incentive Plan (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q dated and filed with the SEC as of May 10, 2018 (File No. 001-36708)) |
| 21.1* | List of Subsidiaries of Uniti Group Inc. |
| 23.1* | Consent of PricewaterhouseCoopers LLP, independent registered public accounting firm |
| 31.1* | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1* | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2* | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Extension Schema Document |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document |

\*     Filed herewith

115

Table of Contents

**      Certain portions of this exhibit have been omitted pursuant to a request for confidential treatment granted by, and have been filed separately with, the Securities and Exchange Commission. Also, certain exhibits and schedules to this exhibit have been omitted pursuant to Item 601(b)(2) of Regulation S-K. The Company agrees to furnish a supplemental copy of any such omitted exhibit or schedule to the Securities and Exchange Commission upon request but may request confidential treatment for any exhibit or schedule so furnished.

***     Certain portions of this exhibit have been omitted pursuant to a request for confidential treatment granted by, and have been filed separately with, the Securities and Exchange Commission.

+      Constitutes a management contract or compensation plan or arrangement.

**ITEM 16. FORM 10-K SUMMARY**

None.

116

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

UNITI GROUP INC.

Date: March 18, 2019                                            By:    /s/ Kenneth A. Gunderman
                                                                            **Kenneth A. Gunderman**
                                                                            **President and Chief Executive Officer**

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant in the capacities and on the dates indicated.

| Name | Title | Date |
| --- | --- | --- |
| /s/ Kenneth A. Gunderman<br>**Kenneth A. Gunderman** | President and Chief Executive Officer<br>*(Principal Executive Officer)* | March 18, 2019 |
| /s/ Mark A. Wallace<br>**Mark A. Wallace** | Executive Vice President – Chief Financial Officer and Treasurer<br>*(Principal Financial Officer)* | March 18, 2019 |
| /s/ Blake Schuhmacher<br>**Blake Schuhmacher** | Senior Vice President – Chief Accounting Officer<br>*(Principal Accounting Officer)* | March 18, 2019 |
| /s/ Francis X. Frantz<br>**Francis X. Frantz** | Chairman and Director | March 18, 2019 |
| /s/ Jennifer S. Banner<br>**Jennifer S. Banner** | Director | March 18, 2019 |
| /s/ Scott G. Bruce<br>**Scott G. Bruce** | Director | March 18, 2019 |
| /s/ Andrew Frey<br>**Andrew Frey** | Director | March 18, 2019 |
| /s/ David L. Solomon<br>**David L. Solomon** | Director | March 18, 2019 |

117

Table of Contents

**Uniti Group Inc.**
**Schedule I – Condensed Financial Information of**
**The Registrant (Parent Company)**
**Condensed Balance Sheets**

| (Thousands, except par value) | | December 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Cash and cash equivalents | $ | 261 | $ | 2,188 |
| Accounts receivable, net | | - | | - |
| Other assets | | - | | - |
| **Total Assets** | $ | 261 | $ | 2,188 |
| | | | | |
| **Liabilities:** | | | | |
| Accrued other liabilities | $ | 30 | $ | 9 |
| Dividends payable | | 111,265 | | 107,078 |
| Cash distributions and losses in excess of investments in consolidated subsidiaries | | 1,388,036 | | 1,120,120 |
| Contingent consideration | | - | | - |
| Notes and other debt, net | | - | | - |
| Total liabilities | | 1,499,331 | | 1,227,207 |
| | | | | |
| **Convertible Preferred Stock**, Series A, $0.0001 par value, 88 shares authorized, issued and outstanding, $87,500 liquidation value | | 86,508 | | 83,530 |
| | | | | |
| **Shareholders' Deficit:** | | | | |
| Preferred stock, $0.0001 par value, 50,000 shares authorized, no shares issued and outstanding | | - | | - |
| Common stock, $0.0001 par value, 500,000 shares authorized, issued and outstanding:  180,536 shares at December 31, 2018 and 174,852 at December 31, 2017 | | 18 | | 17 |
| Additional paid-in capital | | 757,517 | | 644,328 |
| Accumulated other comprehensive income | | 30,105 | | 7,821 |
| Distributions in excess of accumulated earnings | | (2,373,218) | | (1,960,715) |
| Total Uniti shareholders' deficit | | (1,585,578) | | (1,308,549) |
| **Total Liabilities, Convertible Preferred Stock, and Shareholders' Deficit** | $ | 261 | $ | 2,188 |

See notes to Consolidated Financial Statements of Uniti Group Inc. included in Financial Statements and Supplementary Data.

Table of Contents

**Uniti Group Inc.**
**Schedule I – Condensed Financial Information of**
**The Registrant (Parent Company)**
**Condensed Statements of Comprehensive Income**

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
| (Thousands) | 2018 | 2017 | 2016 |
| **Costs and Expenses:** | | | |
| Interest expense | $ - | $ 119,702 | $ 267,959 |
| General and administrative expense | 22 | 40 | 4,829 |
| Transaction related costs | - | - | 3,945 |
| Other expense | - | 9,253 | - |
| Total costs and expenses | 22 | 128,995 | 276,733 |
| **Operating loss** | (22) | (128,995) | (276,733) |
| Earnings from consolidated subsidiaries | 16,209 | 119,556 | 276,521 |
| Income (loss) before income taxes | 16,187 | (9,439) | (212) |
| Net income (loss) | 16,187 | (9,439) | (212) |
| **Comprehensive income (loss)** | $ 38,472 | $ 4,751 | $ (1,154) |

See notes to Consolidated Financial Statements of Uniti Group Inc. included in Financial Statements and Supplementary Data.

S-2

Table of Contents

**Uniti Group Inc.**
**Schedule I – Condensed Financial Information of**
**The Registrant (Parent Company)**
**Condensed Statements of Cash Flows**

| | Year Ended December 31, | | |
|---|---|---|---|
| (Thousands) | 2018 | 2017 | 2016 |
| **Cash flow from operating activities** | | | |
| Net cash provided by (used in) operating activities | $ 425,771 | $ (602,530) | $ (59,076) |
| | | | |
| **Cash flow from investing activities** | | | |
| Consideration paid to Windstream Services | - | - | - |
| Net cash used in investing activities | - | - | - |
| | | | |
| **Cash flow from financing activities** | | | |
| Principal payment on debt | - | (5,270) | (22,027) |
| Dividends paid | (426,094) | (400,210) | (367,830) |
| Proceeds from issuance of Notes | - | 201,000 | 548,875 |
| Borrowings under revolving credit facility | - | 350,000 | 641,000 |
| Payments under revolving credit facility | - | (125,000) | (641,000) |
| Payments of contingent consideration | - | (18,791) | - |
| Purchase of noncontrolling interests | - | (560) | - |
| Deferred financing costs | - | (24,686) | (20,557) |
| Common stock issuance, net of costs | 109,441 | 498,926 | 54,213 |
| Net share settlement | (1,604) | (1,836) | (2,359) |
| Intercompany transactions, net | (109,441) | - | (111) |
| Cash in-lieu of fractional shares | - | - | - |
| Net cash (used in) provided by financing activities | (427,698) | 473,573 | 190,204 |
| Effect of exchange rates on cash and cash equivalents | - | - | - |
| Net (decrease) increase in cash and cash equivalents | (1,927) | (128,957) | 131,128 |
| Cash and cash equivalents at beginning of period | 2,188 | 131,145 | 17 |
| Cash and cash equivalents at end of period | 261 | 2,188 | 131,145 |

See notes to Consolidated Financial Statements of Uniti Group Inc. included in Financial Statements and Supplementary Data.

S-3

Table of Contents

**Uniti Group Inc.**
**Schedule I – Condensed Financial Information of**
**The Registrant (Parent Company)**
**Notes to Condensed Financial Statements**

**Note 1.  Background and Basis of Presentation**

Uniti Group Inc.'s parent company financial information has been derived from its consolidated financial statements and should be read in conjunction with the consolidated financial statements and notes of Uniti and its subsidiaries included in Item 8 Financial Statements and Supplementary Data in this Annual Report on Form 10-K.

**Note 2. Subsidiary Transactions**

*Investment in Subsidiaries*

During 2017, the parent company completed its reorganization (the "up-REIT Reorganization") to operate through a customary "up-REIT" structure, pursuant to which we hold substantially all of our assets through a partnership, Uniti Group LP, a Delaware limited partnership (the "Operating Partnership"), that we control as general partner, with the only significant difference between the financial position and results of operations of the Operating Partnership and its subsidiaries compared to the consolidated financial position and consolidated results of operations of Uniti is that the results for the Operating Partnership and its subsidiaries do not include Uniti's Consumer CLEC segment, which consists of Talk America Services.  The up-REIT structure is intended to facilitate future acquisition opportunities by providing the Company with the ability to use common units of the Operating Partnership as a tax-efficient acquisition currency.  As of December 31, 2018, we are the sole general partner of the Operating Partnership and own approximately 97.7% of the partnership interests in the Operating Partnership.

*Dividends*

Cash dividends received from subsidiaries and recorded in Cash Flow from Operating Activities in the Condensed Statement of Cash Flows were $426.1 million and $104.9 million for the year ended December 31, 2018 and 2017, respectively. No cash dividends were received for the year ended December 31, 2016.

Table of Contents

**Uniti Group Inc.**
**Schedule II – Valuation and Qualifying Accounts**
**(dollars in thousands)**

| Column A | Column B | Column C | | Column D | Column E |
|---|---|---|---|---|---|
| | | Additions | | | |
| Description | Balance at Beginning of Period | Charged to Cost and Expenses | Charged to Other Accounts | Deductions | Balance at End of Period |
| Valuation allowance for deferred tax assets: | | | | | |
| Year Ended December 31, 2018 | $ - | $ - | $ - | $ - | $ - |
| Year Ended December 31, 2017 | $ 8,176 | $ - | $ - | $ (8,176) | $ - |
| Year Ended December 31, 2016 | $ - | $ - | $ 8,176 | $ - | $ 8,176 |
| Allowance for Doubtful Accounts | | | | | |
| Year Ended December 31, 2018 | $ 1,011 | $ 1,333 | $ - | $ (56) | $ 2,288 |
| Year Ended December 31, 2017 | $ 1,352 | $ (86) | $ 45 | $ (300) | $ 1,011 |
| Year Ended December 31, 2016 | $ - | $ 1,352 | $ - | $ - | $ 1,352 |

S-5

Table of Contents

**Uniti Group Inc.**
**Schedule III – Real Estate Investments and Accumulated Depreciation**
**As of December 31, 2018**
**(dollars in thousands)**

| Col. A | Col. B | Col. C | Col. D | | Col. E | Col. F | Col. G | Col. H | Col. I |
|---|---|---|---|---|---|---|---|---|---|
| | | | Cost capitalized subsequent to acquisition(1)(3) | | | | | | Life on which Depreciation in Latest Income |
| Description | Encumbrances | Initial cost to company(1) | Improvements | Carry Costs | Gross Amount Carried at Close of Period(5) | Accumulated Depreciation | Date of Construction(2) | Date Acquired(2) | Statements is Computed |
| Land | $ — | (1) | (1) | (1) | $ 26,672 | $ — | (2) | (2) | Indefinite |
| Building and improvements | — | (1) | (1) | (1) | 327,280 | (165,604) | (2) | (2) | 3 - 40 years |
| Poles | — | (1) | (1) | (1) | 248,989 | (182,577) | (2) | (2) | 30 years |
| Fiber | — | (1) | (1) | (1) | 2,399,415 | (1,077,827) | (2) | (2) | 30 years |
| Equipment | — | (1) | (1) | (1) | 52 | (21) | (2) | (2) | 5 -7 years |
| Copper | — | (1) | (1) | (1) | 3,721,649 | (3,243,626) | (2) | (2) | 20 years |
| Conduit | — | (1) | (1) | (1) | 89,692 | (59,905) | (2) | (2) | 30 years |
| Towers | — | (1) | (1) | (1) | 115,351 | (6,486) | (2) | (2) | 20 years |
| Real property interest | — | (1) | (1) | (1) | 34,878 | (1,135) | (2) | (2) | See Note 3 |
| Other assets | — | (1) | (1) | (1) | 11,524 | (1,945) | (2) | (2) | 15 - 20 years |
| Construction in progress | — | (1) | (1) | (1) | 24,597 | — | (2) | (2) | See Note 3 |

(1) Given the voluminous nature and variety of our real estate investment assets, this schedule omits columns C and D from the schedule III presentation.

(2) Because additions and improvements to our real estate investment assets are ongoing, construction and acquisition dates are not applicable.

(3) For the year ended December 31, 2018, the amount of capitalized costs related to the Distribution Systems is as follows (millions):

Tenant capital improvements(4)          $    153.6

(4) Tenant capital improvements represent, maintenance, repair, overbuild, upgrade or replacements to the leased network, including, without limitation, the replacement of copper distribution systems with fiber distribution systems. We receive non-monetary consideration related to the TCIs as they automatically become our property, and we recognize the cost basis of TCIs that are capital in nature.

(5) Aggregate cost for Federal income tax purposes related to our real estate investment assets is $6.5 billion.

S-6

Table of Contents

**Uniti Group Inc.**
**Schedule III – Real Estate Investments and Accumulated Depreciation**
**As of December 31, 2018**
**(dollars in thousands)**

|  | | 2018 | | 2017 |
|---|---|---|---|---|
| Gross amount at beginning | $ | 6,603,480 | $ | 6,256,248 |
| Additions during period: | | | | |
|   Tenant capital improvements | | 153,615 | | 227,969 |
|   Acquisitions | | 231,142 | | 80,132 |
|   Other | | 18,439 | | 45,552 |
| Total additions | | 403,196 | | 353,653 |
| | | | | |
| Deductions during period: | | | | |
|   Cost of real estate sold or disposed | | 6,577 | | 6,421 |
|   Other | | - | | - |
| Total deductions | | 6,577 | | 6,421 |
| | | | | |
| Balance at end | $ | 7,000,099 | $ | 6,603,480 |

|  | | 2018 | | 2017 |
|---|---|---|---|---|
| Gross amount of accumulated depreciation at beginning | $ | 4,399,789 | $ | 4,054,748 |
| Additions during period: | | | | |
|   Depreciation | | 343,282 | | 351,332 |
|   Other | | (423) | | (45) |
| Total additions | | 342,859 | | 351,287 |
| | | | | |
| Deductions during period: | | | | |
|   Amount of accumulated depreciation for assets sold or disposed | | 3,522 | | 6,246 |
|   Other | | - | | - |
| Total deductions | | 3,522 | | 6,246 |
| | | | | |
| Balance at end | $ | 4,739,126 | $ | 4,399,789 |

S-7

**Exhibit 10.11**

EXECUTION VERSION

**AMENDMENT NO. 4 AND LIMITED WAIVER**

This Amendment No. 4 and Limited Waiver (this "Agreement" or "Amendment No. 4 and Limited Waiver"), dated as of March 18, 2019, to the Credit Agreement, dated as of April 24, 2015 (as amended by Amendment No. 1 thereto dated October 21, 2016, as further amended by Amendment No. 2 dated February 9, 2017, as further amended by Amendment No. 3 dated April 27, 2017 and after giving effect to the Borrower Assumption Agreement and Joinder, dated as of May 9, 2017, the "Credit Agreement"; capitalized terms used in this Amendment No. 4 and Limited Waiver and not otherwise defined herein shall have the respective meanings given thereto in the Credit Agreement), is made by and among Uniti Group Inc. (f/k/a Communications Sales & Leasing, Inc.), a Maryland corporation (the "Parent Guarantor"), Uniti Group LP, a Delaware limited partnership (the "Assumed Borrower"), Uniti Group Finance Inc., a Delaware corporation ("FinCo"), CSL CAPITAL, LLC ("CSL Capital" and, collectively with the Assumed Borrower and Finco, the "Borrowers"), the Lenders party hereto and Bank of America, N.A., as Administrative Agent and Collateral Agent (the "Administrative Agent").

**W I T N E S S E T H:**

**WHEREAS**, the Borrowers have advised the Administrative Agent and the Lenders that PricewaterhouseCoopers LLP may include a going concern or like qualification or exception (the "Going Concern Qualification") in its audit opinion with respect to the financial statements of Holdings and its Subsidiaries for the fiscal year ended December 31, 2018 (the "2018 Audited Financial Statements") required to be delivered pursuant to Section 6.01(a) of the Credit Agreement and the penultimate paragraph of Section 6.01 of the Credit Agreement;

**WHEREAS**, the delivery of 2018 Audited Financial Statements accompanied by an auditor's report containing the Going Concern Qualification would violate Section 6.01(a) of the Credit Agreement and would result in a Default or Event of Default under Section 8.01(b) of the Credit Agreement (any such Default or Event of Default being, collectively, the "Specified Default");

**WHEREAS**, the Loan Parties have requested that the Required Lenders waive the Specified Default arising from such breach of the terms of Section 6.01(a) of the Credit Agreement;

**WHEREAS**, pursuant to Section 10.01 of the Credit Agreement, the Loan Parties and the Required Lenders may amend or waive any provision of the Credit Agreement or any other Loan Document pursuant to an agreement in writing; and

**WHEREAS**, pursuant to Section 10.01 of the Credit Agreement, the Loan Parties and each of the undersigned Lenders, together constituting the Required Lenders, are willing to amend the Credit Agreement and waive the Specified Default with respect to the 2018 Audited Financial Statements on the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the premises and further valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.          Limited Waiver.  Subject to the terms and conditions set forth herein, the Lenders signatory hereto hereby waive the Specified Default arising solely from the Borrowers' delivery of an audit report containing the Going Concern Qualification with respect to the 2018 Audited Financial Statements.

The limited waiver set forth in this Section 1 (the "Default Waiver") is limited to the extent expressly set forth above and no other terms, covenants or provisions of the Credit Agreement or any other Loan Document shall in any way be affected hereby. The Default Waiver is granted only with respect to the Specified Default relating to the 2018 Audited Financial Statements, and shall not apply to any financial statements for any other fiscal year or period, any other breach of the terms of the Credit Agreement, or any actual or prospective default or breach of any other provision of the Credit Agreement or any other Loan Document. The Default Waiver shall not in any manner create a course of dealing or otherwise impair the future ability of the Administrative Agent or the Lenders to declare a Default or Event of Default under or otherwise enforce the terms of the Credit Agreement or any other Loan Document with respect to any matter other than the Specified Default specifically and expressly waived in, and subject to the terms of, the Default Waiver.

2.     Amendments to the Credit Agreement. The Credit Agreement is, effective as of the Effective Date (as defined below), hereby amended as follows:

(a)                Section 1.01 of the Credit Agreement is hereby amended by adding the following definitions in appropriate alphabetical order:

"Amendment No. 4 and Limited Waiver" means that certain Amendment No. 4 and Limited Waiver, dated as of March 18, 2019, by and among the Loan Parties, the Administrative Agent and the Lenders party thereto.

"Amendment No. 4 and Limited Waiver Effective Date" means March 18, 2019.

"Reversion Date" means the date on which (i)(A) either Tenant, Windstream and all subsidiaries or affiliates thereof that are parties to the Master Lease from time to time (the "Windstream Master Lease Parties") have all emerged from the Chapter 11 bankruptcy cases under the United States Bankruptcy Code or (B) the Windstream Master Lease Parties shall have assumed the Master Lease pursuant to an order of the Bankruptcy Court or the Windstream Master Lease Parties shall have entered into any Permitted Replacement Lease (subject to any amendment, modification or waiver thereof that is permitted by the Credit Agreement) approved by the Bankruptcy Court (it being understood and agreed that any rejection of the Master Lease (or any Permitted Replacement Lease) or any violation of the terms thereof by any of the Windstream Master Lease Parties or any other party thereto including any party to any Master Lease Guaranty that would permit termination thereof by Parent, CSL National, LP or any of its applicable Subsidiaries after the condition in clause (i)(B) shall have been satisfied shall result in all the terms and restrictions set forth in this Agreement that apply solely prior to the Reversion Date being reinstated as if the Reversion Date did not occur until such time as a Permitted Replacement Lease is agreed to and is in effect or all relevant defaults shall have been cured)), (ii) the Master Lease (or any Permitted Replacement Lease) and any Master Lease Guaranties are in full force and effect with no amendment, modification or waiver thereof that is not permitted by the Credit Agreement, (iii) the Consolidated Secured Leverage Ratio, determined on a Pro Forma Basis (including after giving effect to any such amendment, modification or waiver thereof that is permitted by the Credit Agreement), as of the last day of the most recently ended Test Period for which financial statements have been delivered pursuant to Section 6.01(a) or 6.01(b) is equal to or less than 5.00 to 1.00 and (iv) no Event of Default has occurred and is continuing.

-2-

(b)        Clause (a) of the definition of "Applicable Rate" in Section 1.01 of the Credit Agreement is hereby amended and restated as follows:

"(a)      with respect to Term Loans, 5.00% in the case of Eurodollar Rate Loans and      4.00% in the case of Base Rate Loans; and"

(c)      The definition of "Available Amount" in Section 1.01 of the Credit Agreement is amended and restated as follows:

"**Available Amount**" means, at any time, the sum of (a) $50 million *plus* (b) 95% of Funds From Operations (or, if Funds From Operations is a loss, *minus* 100% of the amount of such loss) for the period (taken as one accounting period) beginning on the first day of the fiscal quarter during which (x) the Closing Date occurs but excluding the period beginning from April 1, 2019 until the beginning of the fiscal quarter immediately following the Reversion Date or (y) solely with respect to use of the Available Amount pursuant to clause (s) of the definition of Permitted Investments, the Amendment No. 4 and Limited Waiver Effective Date occurs, to the end of Parent's most recently completed fiscal quarter for which financial statements have been delivered pursuant to Section 6.01(a) or Section 6.01(b) at the time of such Restricted Payment *plus* (c) 100% of the aggregate net cash proceeds and the fair market value, as determined in good faith by Parent, of marketable securities or other property received at or prior to such time by Parent or, in connection with "UPREIT" acquisitions, by CSL National following (x) the Closing Date but excluding the period from the Amendment No. 4 and Limited Waiver Effective Date until the Reversion Date or (y) solely with respect to use of the Available Amount pursuant to clause (s) of the definition of Permitted Investments, the Amendment No. 4 and Limited Waiver Effective Date, from the issue or sale of (i) Equity Interests of Parent or CSL National and (ii) Indebtedness or Disqualified Stock of Parent or a Restricted Subsidiary that has been converted into or exchanged for Equity Interests of Parent (*provided*, *however*, that this clause (ii) shall not include the proceeds of (x) Equity Interests, Indebtedness or Disqualified Stock of Parent or CSL National sold to a Restricted Subsidiary or Parent or (y) Disqualified Stock or Indebtedness that has been converted or exchanged into Disqualified Stock) *plus* (d) 100% of the aggregate amount of cash and the fair market value, as determined in good faith by Parent, of marketable securities or other property contributed to the capital of Parent or, in connection with "UPREIT" acquisitions, of CSL National (other than by a Restricted Subsidiary or Parent) following (x) the Closing Date but excluding the period from the Amendment No. 4 and Limited Waiver Effective Date until the Reversion Date or (y) solely with respect to use of the Available Amount pursuant to clause (s) of the definition of Permitted Investments, the Amendment No. 4 and Limited Waiver Effective Date, at or prior to such time *minus* (e) the aggregate amount of Restricted Payments made in reliance on the final paragraph of Section 7.05 at or prior to such time (or solely with respect to use of the Available Amount pursuant to clause (s) of the definition of Permitted Investments, made after the Amendment No. 4 and Limited Waiver Effective Date and at or prior to such time) *minus* (f) the aggregate amount of Restricted Payments made in reliance on Section 7.05(a) at or prior to such time (or solely with respect to use of the Available Amount pursuant to clause (s) of the definition of Permitted Investments, made after the Amendment No. 4 and Limited Waiver Effective Date and at or prior to such time) *minus* (g) the aggregate amount of Investments made in reliance on clause (s) of the definition of "Permitted Investment" at or prior to such time (or solely with respect to use of the Available Amount pursuant to clause (s) of the definition of Permitted Investments, made

-3-

after the Amendment No. 4 and Limited Waiver Effective Date and at or prior to such time)."

(d)          The definition of "Collateral" in Section 1.01 of the Credit Agreement is amended by adding the following immediately preceding the period at the end thereof:

"; for the avoidance of doubt, in addition to all other rights, interests and privileges of the Collateral Agent hereunder and under the other Loan Documents, and notwithstanding any exclusions or limitations set forth in the Loan Documents, it is the intention of the parties that the Master Lease and all rights and interests therein and all proceeds thereof shall constitute Collateral under, and for all purposes of, the Loan Documents".

(e)          The definition of "Permitted Investments" in Section 1.01 of the Credit Agreement is amended by amending and restating clause (s) as follows:

"(19)  so long as no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof and Parent and its Restricted Subsidiaries shall be in Pro Forma Compliance with Section 7.09 for the most recently ended Test Period for which internal financial statements are available, Investments (other than Investments in any Restricted Subsidiary that is not a Loan Party or in any Unrestricted Subsidiary) in an aggregate amount not toexceed the Available Amount and"

(f)          The definition of "Restricted Indebtedness" in Section 1.01 of the Credit Agreement is amended by adding immediately prior to the comma the phrase "(including the 7.125% Senior Unsecured Notes due December 15, 2024)".

(g)          Section 7.05 of the Credit Agreement is amended by adding the following additional final paragraph of Section 7.05:

"Notwithstanding any other provision of this Section 7.05, from and after the Amendment No. 4 and Limited Waiver Effective Date until the Reversion Date, Parent and its Restricted Subsidiaries shall not, directly or indirectly:

(i) declare or make any Restricted Payment other than (A) pursuant to Sections 7.05(b), (c), (d) (subject to clause (ii) below), (e), (f), (h), (i), (l), (o) and (q), (B) any dividend or distribution (including any cash dividend or cash distribution) on or in respect of (x) Parent's Capital Stock, in each case constituting a Restricted Payment, to holders of such Capital Stock (including, for the avoidance of doubt, dividends or distributions that are made on a pro rata basis to all holders, including unrelated holders, of any class of such Capital Stock) solely to the extent that Parent believes in good faith that Holdings qualifies as a REIT and solely to the extent that Parent believes in good faith that the declaration or payment of a dividend or making of a distribution in such amount is necessary to (i) maintain Holdings' status as a REIT (including, for the avoidance of doubt, Holdings' eligibility to be taxed as a REIT under Section 857(b)) for any taxable year, determined without regard to any ability of Holdings to maintain its status as a REIT (and eligibility to be taxed as a REIT under Section 857(b)) for any taxable year by declaring or paying a dividend or making a distribution in whole or in part in any form other than cash, including shares of Parent's or Holdings' Capital Stock, with such dividend to be paid or distribution to be made as and when determined by Parent, whether during or after the end of the relevant taxable year, and (ii) permit Holdings to pay an amount equal to any corporate-level U.S. federal and applicable state and local  income

-4-

taxes payable by Holdings with respect to any undistributed taxable income (including any undistributed capital gains) (collectively, for each taxable year, the "Minimum Required Distribution Amount") or (y) shares of preferred stock issued on customary terms by a Restricted Subsidiary solely to permit such Restricted Subsidiary to qualify as a REIT, not to exceed in the aggregate for all such dividends and distributions pursuant to this clause (y) $50,000 per annum; *provided* that (i) no cash dividend or distribution shall be permitted under this clause (B) to the extent that a Specified Event of Default has occurred and is continuing or the Obligations have been accelerated following any other Event of Default; (ii) notwithstanding the foregoing, any distributions made pursuant to subclause (x) of this clause (B) shall not exceed the amount of dividends or distributions that could have been paid or made by Parent at such time pursuant to such subclause (x) if, in the relevant taxable year, Holdings had held no assets, other than a direct or indirect equity interest in Parent, and had recognized no income, gain, loss, deduction or other tax items, other than such items of Parent allocable directly or indirectly to Holdings or, if Holdings is a REIT, dividends from Parent, and prior to or concurrent with paying or making any such dividend or distribution in reliance on this paragraph, Parent shall provide the Administrative Agent a certification in reasonable detail to such effect and (iii) dividends and distributions paid or made pursuant to this clause (B) shall be permitted only so long as Parent is a REIT, a disregarded qualified REIT subsidiary, a disregarded entity or a partnership for U.S. federal income tax purposes; and *provided*, *however*, that (i) Parent shall be permitted to make or pay cash dividends or distributions pursuant to subclause (x) of this clause (B) in amounts and at times sufficient to permit Holdings to declare and pay quarterly cash dividends in each taxable year, in each case, not to exceed one quarter of Parent's good faith estimate, as of the date on which the first quarterly dividend for each taxable year is declared by Holdings, of the Minimum Required Distribution Amount for such taxable year (with any unused capacity for the taxable year carrying forward to subsequent quarters of such taxable year), and (ii) Parent shall not declare or pay cash dividends or distributions pursuant to subclause (x) of this clause (B) for any taxable year except (u) as provided in the immediately preceding clause (i) of this proviso or (y) in or after the last fiscal quarter of such taxable year and (C) without duplication of any amounts used pursuant to any subsection of Section 7.05 or section (ii) below, Restricted Payments in an aggregate amount not to exceed 100% of the aggregate net cash proceeds received at or prior to such time by Parent following the Amendment No. 4 and Limited Waiver Effective Date from the issuance or sale of Equity Interests of Parent; *provided*, *however*, that this clause (C) shall not include the proceeds of Equity Interests of Parent sold to a Restricted Subsidiary or of Disqualified Stock; or

(ii) (A) make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value (including by any exchange or conversion) in each case, prior to any scheduled repayment, sinking fund payment or maturity any Junior Financing other than (i) pursuant to Sections 7.05(c) and (h), (ii) pursuant to Section 7.05(d) with the proceeds of any Refinancing Indebtedness permitted by Section 7.02(b)(xii); *provided* that such Refinancing Indebtedness shall also not (w) have a shorter final maturity than the Junior Financing being refinanced, (x) have any issuers, borrowers or guarantors other than the Junior Financing being refinanced, (y) have any collateral and (z) have any mandatory prepayment requirements other than customary asset sale or change of control provisions consistent with those of the Junior Financing being refinanced or (iii) without duplication of any amounts used pursuant to any subsection of Section 7.05 or section (i) above, with 100% of the net cash proceeds received at or prior to such time by Parent following the Amendment No. 4 and Limited Waiver Effective Date from the issuance or sale of Equity Interests of Parent; *provided*, *however*, that this clause (iii) shall not

-5-

include the proceeds of Equity Interests of Parent sold to a Restricted Subsidiary or of Disqualified Stock or (B) amend or modify the terms or provisions of any Junior Financing to the extent such amendments or modifications would not be permitted with respect to any Refinancing Indebtedness thereof pursuant to Section 7.02(b)(xii) and the proviso to the preceding clause (A)(ii)."

3.  <u>Amendments to the Security Agreement</u>.  The Security Agreement is, effective as of the Effective Date (as defined below), hereby amended as follows:

(a)  The definition of "Excluded Assets" in Section 1.02 of the Security Agreement is hereby amended by (x) adding "subject to the definition of "Collateral" in the Credit Agreement" after the term "means" and before "(a)" and (y) deleting clauses (j) and (l) of the definition of "Excluded Assets" in their entirety and replacing such clauses with "[reserved]".

(b)  Section 1.02 of the Security Agreement is hereby amended by adding the following definitions in appropriate alphabetical order:

"<u>Excluded Deposit Account</u>" shall mean a segregated Deposit Account that holds solely (a) funds used or to be used for payroll and payroll taxes and other employee benefit payments to or for the benefit of the employees of the Borrowers sand the Guarantors, (b) funds used or to be used to pay any taxes required to be collected, remitted or withheld during the current period, (c) funds which the Borrowers or a Guarantor holds in escrow or as a fiduciary for the benefit of a third person that is not the Borrowers, Holdings, Parent or a Subsidiary, (d) any deposit account that is a zero-balance disbursement account  and (e) any Deposit Account holding less than an average daily balance of $2,000,000 with all such Deposit Accounts excluded pursuant to this clause (e) not to exceed an aggregate average daily balance of $25,000,000.  For the avoidance of doubt, no Rent Account shall constitute an Excluded Deposit Account."

(c)  Section 3.01 of the Security Agreement is hereby amended by deleting clause (f) thereof and replacing such clause (f) with the following:

"(f)  Notwithstanding anything to the contrary in the Loan Documents, none of the Grantors shall be required to perfect the Security Interests granted by this Security Agreement (including Security Interests in Investment Property and Fixtures) by any means other than by (A) filings pursuant to the Uniform Commercial Code of the relevant State(s), (B) filings in USPTO or the USCO, as applicable, with respect to Intellectual Property as expressly required elsewhere herein, (C) delivery to the Collateral Agent to be held in its possession of all Collateral consisting of Instruments or Pledged Securities as expressly required elsewhere herein or in the Credit Agreement, (D) Fixture filings in the applicable real estate records with respect to any Fixtures associated with Material Real Property that is subject to a Mortgage and (E) with respect to any Deposit Account (other than any Excluded Deposit Account), entry into Deposit Account Control Agreements. No Grantor shall be required (i) to establish Collateral Agent's "control" over any Electronic Chattel Paper; (ii) to establish the Agent's "control" (within the meaning of Section 16 of the Uniform Electronic Transactions Act as in effect in the applicable jurisdiction (the "UETA")) over any "transferable records" (as defined in UETA), (iii) to take any action (other than the actions listed in clauses (A) and (C) of the preceding sentence) with respect to any assets located outside of the United States or (iv) to perfect in any assets subject to a certificate of title statute."

-6-

(d)        Section 3.05 of the Security Agreement is hereby amended by deleting such Section in its entirety and replacing such Section 3.05 with the following:

Section 3.05. *Rents; Controlled Deposit Accounts.* Each Grantor represents, warrants and covenants as follows:

(a)        As of the Amendment No. 4 and Limited Waiver Effective Date, no Grantor has any Rent Accounts other than Deposit Account listed in the Perfection Certificate that was delivered by the Grantors on the Closing Date, and such Rent Account is a Controlled Deposit Account.

(b)        At all times, all Rents will be deposited, upon or promptly after the receipt thereof, in one or more Controlled Deposit Accounts.

(c)        To the extent not constituting a Controlled Deposit Account on the Amendment No. 4 and Limited Waiver Effective Date, each Grantor shall promptly, and in any event, within 15 days (or such later date as the Collateral Agent may agree) of the Amendment No. 4 and Limited Waiver Effective Date (or such later date as the Collateral Agent may agree) deliver to the Collateral Agent a duly executed Deposit Account Control Agreement with respect to each Deposit Account (other than an Excluded Deposit Account) maintained by such Grantor as of the Amendment No. 4 and Limited Waiver Effective Date. In the event a Grantor shall hereafter establish (including by acquisition) any Deposit Account (other than an Excluded Deposit Account) it shall deliver a duly executed Deposit Account Control Agreement to the Collateral Agent with respect to such Deposit Account, promptly and in any event within 15 days (or such later date as the Collateral Agent may agree) of the establishment or acquisition of such Deposit Account. In respect of each Controlled Deposit Account, the Depositary Bank's jurisdiction (determined as provided in UCC Section 9-304) will at all times be a jurisdiction in which Article 9 of the Uniform Commercial Code is in effect.

(d)        So long as the Collateral Agent has Control of a Controlled Deposit Account, the Security Interest in such Controlled Deposit Account will be perfected, subject to no prior Liens or rights of others (except the Depositary Bank's right to deduct its normal operating charges and any uncollected funds previously credited thereto) and other non-consensual liens arising as a matter of law.

4.        Conditions Precedent. This Amendment No. 4 and Limited Waiver shall become effective on the date when the following conditions are met (the "Effective Date"):

(i)        the Administrative Agent shall have received a counterpart signature page of this Amendment No. 4 and Limited Waiver duly executed by each of the Parent Guarantor, the Borrowers, the Guarantors, the Administrative Agent and Lenders constituting the Required Lenders;

(ii)        the Borrowers shall have paid to the Administrative Agent, for the account of each Lender that has delivered a counterpart to this Amendment No. 4 and Limited Waiver, a consent fee equal to 1.25% of the aggregate principal amount of the Commitments and outstanding Loans held by such Lender;

(iii)        the Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization,

-7-

existence and good standing of each Loan Party, the authorization of execution, delivery and performance of this Amendment No. 4 and Limited Waiver, the performance of the Credit Agreement and each other applicable Loan Document and any other legal matters relating to the Loan Documents, all in form and substance reasonably satisfactory to the Administrative Agent and its counsel;

(iv) the Loan Parties shall have provided to the Administrative Agent an updated Perfection Certificate in form and substance reasonably satisfactory to the Administrative Agent and its counsel;

(v)                   the Administrative Agent shall have received a certificate, dated as of the Effective Date, signed by a Responsible Officer certifying that each of the Master Lease and the Recognition Agreement (and in each case any amendments thereto) are in full force and effect and attaching executed copies of the Master Lease and the Recognition Agreement (and in each case any amendments thereto); and

(vii) the Borrowers shall have paid all fees and amounts due and payable pursuant to this Amendment No. 4 and Limited Waiver, including, to the extent invoiced, reimbursement or payment of documented and reasonable out-of-pocket expenses in connection with this Amendment No. 4 and Limited Waiver and related matters (including the reasonable and documented fees and expenses of Cahill Gordon & Reindel LLP, counsel to the Administrative Agent and Weil, Gotshal & Manges LLP, counsel to the ad-hoc group of Term Lenders), any other out-of-pocket expenses of the Administrative Agent required to be paid or reimbursed pursuant to the Credit Agreement and any fees and expense payable to the Administrative Agent or its affiliates as separately agreed.

5.       Representations and Warranties. Each Loan Party represents and warrants to the Administrative Agent and the Lenders as of the Effective Date:

(i)                         the representations and warranties of each Loan Party contained in Article 5 of the Credit Agreement and in each other Loan Document (and acknowledging that this Amendment No. 4 and Limited Waiver is a Loan Document) are true and correct in all material respects as of the date hereof (except to the extent that such representations and warranties specifically refer to an earlier date, in which case they were true and correct as of such earlier date); *provided* that, to the extent that such representations and warranties are qualified by materiality, material adverse effect or similar language, they are true and correct in all respects;

(ii)                   no Default or Event of Default exists or will result from this Amendment No. 4 and Limited Waiver;

(iii)                   the Persons appearing as Borrowers and Guarantors on the signature pages to this Agreement constitute all Persons who are required to be Borrowers or Guarantors pursuant to the terms of the Credit Agreement and the other Loan Documents, including without limitation all Persons who were required to become Borrowers or Guarantors after the Closing Date, the Borrowers and each such Person that is a Guarantor has executed and delivered the Credit Agreement as a Borrower or a Guaranty as a Guarantor and the Loan Parties have complied with their obligations under Sections 6.02(c) and 6.11 of the Credit Agreement and under the Collateral Documents; and

(iv) Attached hereto as Schedule 1 is a true and complete list of all Deposit Accounts (as defined in the Security Agreement) maintained by each Loan Party, including the name of each

-8-

institution where each such account is held, the name of each such account, the name of each entity that holds each account and stating if such account is required to be subject to a control agreement pursuant to the Security Agreement and the reason for such account to be excluded from the control agreement requirement.

6.    Costs and Expenses. The Borrowers agree to pay (i) all reasonable and documented out-of-pocket costs and expenses of the Administrative Agent (including the reasonable and documented fees and expenses of Cahill Gordon & Reindel LLP, counsel to the Administrative Agent) in connection with the preparation, execution, delivery and administration of this Amendment No. 4 and Limited Waiver, the other instruments and documents to be delivered hereunder and related matters with respect to the Loan Documents and transactions contemplated hereby and (ii) all reasonable and documented out-of-pocket costs and expenses of the ad-hoc group of Term Lenders (limited to the reasonable and documented fees and expenses of Weil, Gotshal & Manges LLP, counsel to the ad-hoc group of Term Lenders) in connection with the preparation, execution, delivery and administration of this Amendment No. 4 and Limited Waiver (or any subject matter contained herein) and the other instruments and documents to be delivered hereunder.

7. Governing Law.  This Amendment No. 4 and Limited Waiver shall be governed by and construed in accordance with the law of the State of New York.

8. Counterparts.  This Amendment No. 4 and Limited Waiver may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

9.    Waiver of Right of Trial by Jury.  Section 10.16 of the Credit Agreement is incorporated herein by reference, *mutatis mutandis*.

10.    Effect of Amendment No. 4 and Limited Waiver. Except as expressly set forth herein, (i) this Amendment No. 4 and Limited Waiver shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of the Lenders, the Administrative Agent or any other Agent, in each case under the Credit Agreement or any other Loan Document, and (ii) shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other provision of either such agreement or any other Loan Document.  Each and every term, condition, obligation, covenant and agreement contained in the Credit Agreement as amended hereby, or any other Loan Document, is hereby ratified and re-affirmed in all respects and shall continue in full force and effect.  This Amendment No. 4 and Limited Waiver shall constitute a Loan Document for all purposes and from and after the Effective Date, all references to the Credit Agreement in any Loan Document and all references in the Credit Agreement to "this Agreement", "hereunder", "hereof" or words of like import referring to the Credit Agreement, shall, unless expressly provided otherwise, refer to the Credit Agreement after giving effect to this Amendment No. 4 and Limited Waiver.  Each of the Loan Parties hereby consents to this Amendment No. 4 and Limited Waiver and confirms and reaffirms (i) that all obligations of such Loan Party under the Loan Documents to which such Loan Party is a party shall continue to apply to the Credit Agreement as amended hereby, (ii) its guaranty of the Obligations, (iii) its prior pledges and grants of security interests and Liens on the Collateral to secure the Obligations pursuant to the Collateral Documents and (iv) such Guarantees, prior pledges and grants of security interests and liens on the Collateral to secure the Obligations, as applicable, shall continue to be in full force and effect and shall continue to inure to the benefit of the Collateral Agent, the Lenders and the other Secured Parties.  This Agreement shall not constitute a novation of the Credit Agreement or any other Loan Document.

-9-

11.        <u>Amendment No. 4 and Limited Waiver Lead Arranger</u>.  Merrill Lynch, Pierce, Fenner & Smith Incorporated is acting as lead arranger in connection with the Amendment No. 4 and Limited Waiver and shall be entitled to all rights, indemnities, privileges and immunities applicable to the "Arrangers" under the Loan Documents in connection herewith.

[Signature pages follow]

-10-

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 4 and Limited Waiver to be duly executed as of the date first above written.

UNITI GROUP INC.

By:      /s/ Daniel Heard
            Name:  Daniel Heard
            Title: Executive Vice President – General Counsel and Secretary

UNITI GROUP LP

By:      /s/ Daniel Heard
            Name: Daniel Heard
            Title: Executive Vice President – General Counsel and Secretary

UNITI GROUP FINANCE INC.

By:      /s/ Daniel Heard
            Name: Daniel Heard
            Title: Executive Vice President – General Counsel and Secretary

UNITI FIBER HOLDINGS INC.

By:      /s/ Daniel Heard
            Name: Daniel Heard
            Title: Executive Vice President – General Counsel and Secretary

CSL CAPITAL, LLC

By:      /s/ Daniel Heard
            Name: Daniel Heard

[Signature Page to Amendment No. 4 and Limited Waiver]

Title:Executive Vice President – General Counsel
and Secretary

[Signature Page to Amendment No. 4 and Limited Waiver]

CONTACT NETWORK, LLC
CSL NATIONAL GP, LLC
CSL ALABAMA SYSTEM, LLC
CSL ARKANSAS SYSTEM, LLC
CSL FLORIDA SYSTEM, LLC
CSL IOWA SYSTEM, LLC
CSL MISSISSIPPI SYSTEM, LLC
CSL MISSOURI SYSTEM, LLC
CSL NEW MEXICO SYSTEM, LLC
CSL OHIO SYSTEM, LLC
CSL OKLAHOMA SYSTEM, LLC
CSL REALTY, LLC
CSL TEXAS SYSTEM, LLC
CSL NORTH CAROLINA REALTY GP, LLC
CSL TENNESSEE REALTY PARTNER, LLC
CSL TENNESSEE REALTY, LLC
HUNT TELECOMMUNICATIONS, LLC
INFORMATION TRANSPORT SOLUTIONS, INC.
NEXUS SYSTEMS, INC.
PEG BANDWIDTH DC, LLC
PEG BANDWIDTH DE, LLC
PEG BANDWIDTH IA, LLC
PEG BANDWIDTH LA, LLC
PEG BANDWIDTH MA, LLC
PEG BANDWIDTH MS, LLC
PEG BANDWIDTH TX, LLC
PEG BANDWIDTH VA, LLC
UNITI DARK FIBER LLC
UNITI FIBER LLC
UNITI LEASING LLC
UNITI LEASING X LLC
UNITI LEASING XI LLC
UNITI TOWERS LLC
UNITI TOWERS NMS HOLDINGS LLC
UNITI TOWERS – NMS INVESTOR LLC

By:      /s/ Daniel Heard
         Name:Daniel Heard
         Title:Executive Vice President – General Counsel and Secretary


[Signature Page to Amendment No. 4 and Limited Waiver]

CSL NATIONAL, LP, as a Guarantor

By:  CSL NATIONAL GP, LLC, as its general partner

By:  /s/ Daniel Heard
Name:Daniel Heard
Title:Executive Vice President – General
Counsel and Secretary

CSL NORTH CAROLINA REALTY, LP, as a Guarantor

By:  CSL NORTH CAROLINA REALTY GP, LLC, as
its general partner

By:  /s/ Daniel Heard
Name:Daniel Heard
Title:Executive Vice President – General
Counsel and Secretary

CSL NORTH CAROLINA SYSTEM, LP, as a Guarantor

By:  CSL NORTH CAROLINA REALTY GP, LLC, as
its general partner

By:  /s/ Daniel Heard
Name: Daniel Heard
Title:  Executive Vice President –
General Counsel and Secretary

[Signature Page to Amendment No. 4 and Limited Waiver]

UNITI HOLDINGS LP, as a Guarantor

By:  UNITI HOLDINGS GP LLC, as its general partner

By:        /s/ Daniel Heard
           Name: Daniel Heard
           Title:  Executive Vice President –
                   General Counsel and Secretary

UNITI LATAM  LP, as a Guarantor

By:  UNITI LATAM GP LLC, as its general partner

By:        /s/ Daniel Heard
           Name:Daniel Heard
           Title:    Executive Vice President –
                   General Counsel and Secretary

UNITI QRS HOLDINGS LP, as a Guarantor

By:  UNITI QRS Holdings GP LLC, as its general partner

By:        /s/ Daniel Heard
           Name:Daniel Heard
           Title:Executive Vice President – General
                   Counsel and Secretary

[Signature Page to Amendment No. 4 and Limited Waiver]

BANK OF AMERICA, N.A.,
as Administrative Agent

By:      /s/ Laura L. Olson
              Name: Laura L. Olson
              Title: Vice President

[*Signature Page to Amendment No. 4 and Limited Waiver to Credit Agreement*]

Lender Signature Pages:

[On File with the Administrative Agent]

[*Signature Page to Amendment No. 4 and Limited Waiver to Credit Agreement*]

**Exhibit 10.19**

**UNITI GROUP INC.**
**2015 EQUITY INCENTIVE PLAN**

**RESTRICTED SHARES AGREEMENT - TIME-BASED VESTING ONLY**

Summary of Restricted Share Grant

      Uniti Group Inc., a Maryland corporation (the "Company"), grants to the Grantee named below, in accordance with the terms of the Uniti Group Inc. 2015 Equity Incentive Plan (the "Plan"), and this Restricted Shares Agreement (the "Agreement"), the following number of Restricted Shares covered by this Agreement (the "Restricted Shares"), on the Date of Grant set forth below:

      Name of Grantee:

  Number of Restricted Shares:

  Date of Grant:       _____

Terms of Agreement

      **1.**       **Grant of Restricted Shares**. Subject to and upon the terms, conditions, and restrictions set forth in this Agreement and in the Plan, the Company hereby grants to the Grantee as of the Date of Grant, the total number of Restricted Shares (the "Restricted Shares") set forth above.  The Restricted Shares shall be fully paid and nonassessable.

      **2.**       **Vesting of Restricted Shares**.

  (a)       The Restricted Shares shall become vested and nonforfeitable ("Vested") if the Grantee shall have remained in the continuous employ of the Company or a Subsidiary through the vesting dates set forth below with respect to the percentage of Restricted Shares set forth next to such date:

| Vesting Date | Percentage of Restricted Shares Vesting on such Vesting Date |
|---|---|
| | |

  (b)       Notwithstanding the provisions of Section 2(a), in the event the Grantee experiences a Company-approved retirement (as determined in the sole discretion of the Committee), the Grantee shall immediately become Vested in a pro rata portion of his Restricted Shares based on the number of days the Grantee was employed by the Company between the Date of Grant and the Vesting Date.

  (c)       Notwithstanding the provisions of Section 2(a) or 2(b), all of the Restricted Shares covered by this Agreement shall immediately become Vested if, during the vesting period, the Grantee's employment with the Company and its Subsidiaries is terminated without Cause, the Grantee terminates his employment with the Company or a Subsidiary for

Good Reason, or the Grantee dies or becomes permanently disabled (as determined by the Committee) while in the employ of the Company or a Subsidiary.

(d)            Notwithstanding anything contained in this Agreement to the contrary, the Committee may, in its sole discretion, accelerate the time at which the Restricted Shares become vested and nonforfeitable on such terms and conditions as it deems appropriate.

**3.        Forfeiture of Shares**.  The Restricted Shares that have not yet Vested pursuant to Section 2 (including without limitation any cash dividends or distributions and any non-cash proceeds related to the Restricted Shares for which the record date occurs on or after the date of forfeiture) shall be forfeited automatically without further action or notice if the Grantee ceases to be employed by the Company or a Subsidiary other than as provided in Section 2(b). In the event of a forfeiture of the Restricted Shares, the stock book entry account representing the Restricted Shares covered by this Agreement shall be cancelled and all Restricted Shares shall be returned to the Company.

**4.        Transferability**.  The Restricted Shares may not be sold, exchanged, assigned, transferred, pledged, encumbered or otherwise disposed of by the Grantee, except to the Company, until the Restricted Shares have become nonforfeitable as provided in Section 2.  Any purported transfer or encumbrance in violation of the provisions of this Section 4 shall be void, and the other party to any such purported transaction shall not obtain any rights to or interest in such Restricted Shares.  The Committee, in its sole discretion, when and as is permitted by the Plan, may waive the restrictions on transferability with respect to all or a portion of the Restricted Shares, provided that any permitted transferee (other than the Company) shall remain subject to all the terms and conditions applicable to the Restricted Shares prior to such transfer.

**5.        Dividend, Voting and Other Rights**.  Except as otherwise provided herein, from and after the Date of Grant, the Grantee shall have all of the rights of a stockholder with respect to the Restricted Shares, including the right to vote the Restricted Shares and receive any cash dividends that may be paid thereon (which such dividends shall be paid no later than the end of the calendar year in which the dividends are paid to the holders of the Common Shares or, if later, the 15th day of the third month following the date the dividends are paid to the holders of the Common Shares); provided, however, that any additional Common Shares or other securities that the Grantee may become entitled to receive pursuant to a stock dividend, stock split, combination of shares, recapitalization, merger, consolidation, separation or reorganization or any other change in the capital structure of the Company shall be considered Restricted Shares and shall be subject to the same restrictions as the Restricted Shares covered by this Agreement.  Any cash dividends paid with respect to the Restricted Shares shall be reported on the Grantee's annual wage and tax statement (Form W-2) as compensation and shall be subject to all applicable tax withholdings as provided in Section 10.

**6.        Custody of Restricted Shares**; **Stock Power.**  Until the Restricted Shares have become Vested as provided in Section 2, the Restricted Shares shall be issued in book-entry only form and shall not be represented by a certificate.  The restrictions set forth in this Agreement shall be reflected on the stock transfer records maintained by or on behalf of the Company. By execution of this Agreement and effective until the Restricted Shares have become Vested as provided in Section 2, the Grantee hereby irrevocably constitute and appoint a person or persons of the Company's choosing, or any of them, attorneys-in-fact to transfer the Restricted Shares on

2

the stock transfer records of the Company with full power of substitution.  The Grantee agrees to take any and all other actions (including without limitation executing, delivering, performing and filing such other agreements, instruments and documents) as the Company may deem necessary or appropriate to carry out and give effect to the provisions of this Agreement.

**7.        Continuous Employment**.  For purposes of this Agreement, the continuous employment of the Grantee with the Company and its Subsidiaries shall not be deemed to have been interrupted, and the Grantee shall not be deemed to have ceased to be an employee of the Company and its Subsidiaries, by reason of the transfer of his employment among the Company and its Subsidiaries or a leave of absence approved by the Committee.

**8.        No Employment Contract; Disclaimer**.  Nothing contained in this Agreement shall confer upon the Grantee any right with respect to continuance of employment by the Company and its Subsidiaries, nor limit or affect in any manner the right of the Company and its Subsidiaries to terminate the employment or adjust the compensation of the Grantee, in each case with or without cause.  By acceptance of this Agreement, the Grantee acknowledges and agrees that neither this Agreement nor any other agreement awarded prior to the date hereof under any equity compensation plan of the Company or its subsidiaries has created or shall create, or be deemed or construed to create or have created, (i) a contractual, equitable, or other right to receive future grants of equity awards, or other benefits in lieu of equity awards, or (ii) a fiduciary duty or other comparable duty of trust or confidence owed to the Grantee (or any successor, assign, affiliate or family member of the Grantee) by the Company and its affiliates and their respective officers, directors, employees, agents or contractors.

**9.        Relation to Other Benefits**.  Any economic or other benefit to the Grantee under this Agreement or the Plan shall not be taken into account in determining any benefits to which the Grantee may be entitled under any profit-sharing, retirement or other benefit or compensation plan maintained by the Company or a Subsidiary and shall not affect the amount of any life insurance coverage available to any beneficiary under any life insurance plan covering employees of the Company or a Subsidiary.

**10.        Taxes and Withholding**.  The Grantee is responsible for any federal, state, local or other taxes with respect to the Restricted Shares (including the grant, the Vesting, the receipt of Common Shares, the sale of Common Shares and the receipt of dividends or distributions, if any).  The Company does not guarantee any particular tax treatment or results in connection with the grant or Vesting of the Restricted Shares or the payment of dividends or distributions. If the Company or any Subsidiary is required to withhold any federal, state, local or other taxes in connection with the delivery or vesting of the Restricted Shares, the Grantee shall pay the tax or make provisions that are satisfactory to the Company or such Subsidiary for the payment thereof.  The Grantee may elect to satisfy all or any portion of any such withholding obligation by surrendering to the Company or such Subsidiary a portion of the Common Shares that become Vested hereunder, and the Common Shares so surrendered by the Grantee shall be credited against any such withholding obligation at the Market Value per Share of such Common Shares on the date of such surrender.

**11.        Section 83(b) Election Prohibited.** As a condition to receiving this award, the Grantee acknowledges and agrees that he or she shall not file an election under Section 83(b) of the Code with respect to all or any portion of the Restricted Shares.

3

12.     **Compliance with Law**.  The Company shall make reasonable efforts to comply with all applicable federal and state securities laws and listing requirements of the NASDAQ or any national securities exchange with respect to the Restricted Shares; provided, however, notwithstanding any other provision of this Agreement, the Restricted Shares shall not be delivered or become Vested if the delivery or vesting thereof would result in a violation of any such law or listing requirement.

13.     **Amendments**.  Subject to the terms of the Plan, the Committee may modify this Agreement upon written notice to the Grantee.  Any amendment to the Plan shall be deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto.  Notwithstanding the foregoing, no amendment of the Plan or this Agreement shall adversely affect the rights of the Grantee under this Agreement regarding Restricted Shares that are then vested under the Plan without the Grantee's consent.

14.     **Severability**.  In the event that one or more of the provisions of this Agreement shall be invalidated for any reason by a court of competent jurisdiction, any provision so invalidated shall be deemed to be separable from the other provisions hereof, and the remaining provisions hereof shall continue to be valid and fully enforceable.

15.     **Relation to Plan**.  This Agreement is subject to the terms and conditions of the Plan.  This Agreement and the Plan contain the entire agreement and understanding of the parties with respect to the subject matter contained in this Agreement, and supersede all prior written or oral communications, representations and negotiations in respect thereto.  In the event of any inconsistency between the provisions of this Agreement and the Plan, the Plan shall govern.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Plan.  The Committee acting pursuant to the Plan, as constituted from time to time, shall, except as expressly provided otherwise herein, have the right to determine any questions which arise in connection with the grant of the Restricted Shares.

16.     **Successors and Assigns**.  Without limiting Section 4, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, administrators, heirs, legal representatives and assigns of the Grantee, and the successors and assigns of the Company.

17.     **Governing Law**.  The interpretation, performance, and enforcement of this Agreement shall be governed by the laws of the State of Maryland, without giving effect to the principles of conflict of laws thereof.

18.     **Electronic Delivery.**  The Grantee hereby consents and agrees to electronic delivery of any documents that the Company may elect to deliver (including, but not limited to, prospectuses, prospectus supplements, grant or award notifications and agreements, account statements, annual and quarterly reports, and all other forms of communications) in connection with this and any other award made or offered under the Plan. The Grantee understands that, unless earlier revoked by the Grantee by giving written notice to the Secretary of the Company, this consent shall be effective for the duration of the Agreement.  The Grantee also understands that he or she shall have the right at any time to request that the Company deliver written copies of any and all materials referred to above at no charge. The Grantee hereby consents to any and all procedures the Company has established or may establish for an electronic signature system

4

for delivery and acceptance of any such documents that the Company may elect to deliver, and agrees that his or her electronic signature is the same as, and shall have the same force and effect as, his or her manual signature. The Grantee consents and agrees that any such procedures and delivery may be effected by a third party engaged by the Company to provide administrative services related to the Plan.

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed on its behalf by its duly authorized officer and the Grantee has also executed this Agreement, as of the Date of Grant.

UNITI GROUP INC.

By:        Kenny Gunderman
Title:      President and CEO

By clicking the **[I Accept]** button, the Grantee hereby acknowledges that a copy of the Plan, Plan Summary and Prospectus and the Company's most recent Annual Report and Proxy Statement (the "Prospectus Information") are available for viewing on the Company's intranet site at [web address].  The Grantee hereby consents to receiving this Prospectus Information electronically, or, in the alternative, agrees to contact [name and phone number] to request a paper copy of the Prospectus Information at no charge. The Grantee represents that he or she is familiar with the terms and provisions of the Prospectus Information and hereby accepts the award of Restricted Shares on the terms and conditions set forth herein and in the Plan.  These terms and conditions constitute a legal contract that will bind both you and the Company as soon as you click the **[I Accept]** button.

5

**Exhibit 10.21**

**UNITI GROUP INC.**
**2015 EQUITY INCENTIVE PLAN**

**PERFORMANCE-BASED RESTRICTED STOCK UNIT AGREEMENT**

<u>Summary of Restricted Stock Unit Award</u>

As of the Date of Grant set forth below, Uniti Group Inc., a Maryland corporation (the "Company"), grants to the Grantee named below, in accordance with the terms of the Uniti Group Inc. 2015 Equity Incentive Plan (the "Plan"), and this Restricted Stock Unit Agreement (the "Agreement"), the contingent right to receive all, a portion or a multiple of the Target Number of Restricted Stock Units set forth below:

Name of Grantee:

Target Number of Restricted Stock Units:

Date of Grant:

<u>Terms of Agreement</u>

1.      **Grant of Restricted Stock Units**. Subject to and upon the terms, conditions, and restrictions set forth in this Agreement and in the Plan, the Company hereby grants to the Grantee as of the Date of Grant this Performance-Based Restricted Stock Unit Award, which represents the contingent right to receive all, a portion, or a multiple of the Target Number of Restricted Stock Units (the "Restricted Stock Units") set forth herein.  Except as otherwise provided herein, each Restricted Stock Unit shall represent the right to receive one Common Share and shall at all times be equal in value to one Common Share.

2.      **Right to Receive Payment**.

(a)      <u>In General</u>.

(i) The Grantee shall vest in all or a portion of the Target Number of Restricted Stock Units on _____, 2018 (the "Vesting Date"), in accordance with the performance matrix attached hereto as <u>Appendix A</u> (the "Performance Matrix"); provided that the Grantee shall have remained in the continuous employ of the Company or any Subsidiary through the Vesting Date.

(ii) Notwithstanding the provisions of Section 2(a)(i), in the event the Grantee's employment with the Company and its Subsidiaries is terminated without Cause, the Grantee terminates his employment with the Company or a Subsidiary for Good Reason, the Grantee experiences a Company-approved retirement (as determined in the sole discretion of the Committee), or the Grantee dies or becomes permanently disabled (as determined by the Committee) while in the employ of the Company or any Subsidiary, the Grantee shall remain eligible to vest in his Restricted Stock Units on the Vesting Date subject to the Performance Matrix and actual performance achieved.  On the Vesting Date following such termination of employment, the Grantee shall vest in a pro-rated portion of the Restricted Stock Units which

Grantee would have been entitled had such termination of employment not occurred, based on the number days the Grantee was employed by the Company between the Date of Grant and the Vesting Date.

(iii)Notwithstanding the provisions of Section 2(a)(i) or 2(a)(ii), the Target Number of Restricted Stock Units covered by this Agreement (and not previously vested under Section 2(a) or forfeited under Section 3) shall immediately become vested if, prior to the applicable Vesting Date, the Grantee's employment with the Company or any Subsidiary is terminated without Cause or the Grantee terminates his employment with the Company or any Subsidiary for Good Reason, in each case within the one year period immediately following a Change in Control.

(iv)Notwithstanding anything contained in this Agreement to the contrary, the Committee may, in its sole discretion, at any time declare the Restricted Stock Units vested and nonforfeitable on such terms and conditions as it deems appropriate.

(c)       Adjustment of Performance Goals.  If the Committee determines that a change in the business, operations, corporate structure or capital structure of the Company or any Subsidiary, the manner in which it conducts business or other events or circumstances render any of the Performance Goals to be unsuitable, the Committee may modify such Performance Goal or the level of achievement, in whole or in part, as the Committee deems appropriate.

3.       **Forfeiture**.  The Restricted Stock Units that have not yet vested pursuant to Section 2(a) (and any right to unpaid Dividend Equivalents under Section 7 with respect to the Restricted Stock Units) shall be forfeited automatically without further action or notice (i) except as otherwise provided pursuant to Section 2(a)(ii), to the extent that the Performance Goal for a fiscal year has not been achieved, but only with respect to the percentage of the Target Number of Restricted Stock Units allocated to such fiscal year; or (ii) in the event the Grantee ceases to be employed by the Company or any Subsidiary other than as provided in Section 2(a)(ii).

4.       **Payment of Restricted Stock Units**.

(a)       In General.  Except as may be otherwise provided in this Section 4, the Company shall deliver to the Grantee (or the Grantee's estate in the event of death) the Shares underlying the vested Restricted Stock Units within sixty (60) days after the date that they become vested in accordance with Section 2.

(b)       Special Payment Terms.  To the extent that the Grantee's right to receive payment of the Restricted Stock Units constitutes a "deferral of compensation" within the meaning of Section 409A of the Code, then notwithstanding Section 4(a), the Shares underlying the Restricted Stock Units that become vested pursuant to Section 2(a)(ii), if any, shall be subject to the following rules:

(i)       Except as provided in Section 4(b)(ii), the Shares underlying the Restricted Stock Units that become vested pursuant to Section 2(a)(ii) shall be delivered to the Grantee (or the Grantee's estate in the event of death) within sixty (60) days after the earlier of (x) the Grantee's "separation from service" within the meaning of Section 409A of the Code; or (y) the Vesting Date next following the date that the Restricted Stock Units become vested pursuant to Section 2(a)(ii).

2

(ii)    If the Restricted Stock Units would otherwise become payable as a result of Section 4(b)(i)(x) but the Grantee is a "specified employee" at that time within the meaning of Section 409A of the Code (as determined pursuant to Company's policy for identifying specified employees), then to the extent required to comply with Section 409A of the Code, payment of the Restricted Stock Units shall not be made as described Section 4(b)(i) and (x) in the case of a separation from service pursuant to Section 2(a)(ii)(A) the Shares shall instead be delivered to the Grantee within sixty (60) days after the first business day that is more than six months after the date of his or her separation from service or, if the Grantee dies during such six-month period, within ninety (90) days after the Grantee's death (such date the "409A Settlement Date") and (y) in the case of a separation from service pursuant to Section 2(a)(ii)(B) payment of the Restricted Stock Units shall be made on the 409A Settlement Date in cash (in lieu of payment in Shares) with a value equal to the number of Shares that otherwise would have been paid multiplied by the Market Value per Share as of the date of such separation from service, together with interest from the date of such separation from service until the 409A Settlement Date at the applicable Federal short-term rate, compounded semi-annually, in effect under 1274(d) of the Code as of the date of such separation from service.

(c)    Satisfaction of the Company's Obligations.  The Company's obligations with respect to the Restricted Stock Units shall be satisfied in full upon the delivery of the Shares underlying the Vested Restricted Stock Units or the cash payment described in Section 4(b)(ii)(y).

5.    **Transferability**.  The Restricted Stock Units or the right to the cash payment described in Section 4(b)(ii)(y) may not be sold, exchanged, assigned, transferred, pledged, encumbered or otherwise disposed of by the Grantee, unless otherwise provided under the Plan.  Any purported transfer or encumbrance in violation of the provisions of this Section 5 shall be void, and the other party to any such purported transaction shall not obtain any rights to or interest in such Restricted Stock Units or cash payment right.

6.    **No Dividend, Voting or Other Rights**.  The Grantee shall not possess any incidents of ownership (including, without limitation, dividend and voting rights) in the Common Shares underlying the Restricted Stock Units credited to his or her account until such Common Shares have been delivered to the Grantee in accordance with Section 4.  The obligations of the Company under this Agreement will be merely that of an unfunded and unsecured promise of the Company to deliver Common Shares or cash as the case may be (and pay Dividend Equivalents as defined in Section 7) in the future, and the rights of the Grantee will be no greater than that of an unsecured general creditor. No assets of the Company or any Subsidiary will be held or set aside as security for the obligations of the Company under this Agreement.

7.    **Dividend Equivalents**.  Upon payment of a vested Restricted Stock Unit, the Grantee shall be entitled to a cash payment equal to the aggregate cash dividends declared and paid or payable with respect to one (1) Common Share for each record date that occurs during the period beginning on the Date of Grant and ending on the date the vested Restricted Stock Unit is paid or, in the case of a separation from service pursuant to Section 2(a)(ii)(B), the date of the separation from service (the "Dividend Equivalent").  The Dividend Equivalents shall be forfeited to the extent that the underlying Restricted Stock Unit is forfeited and shall be paid to the Grantee, if at all, at the same time that the related vested Restricted Stock Unit is paid to the Grantee in accordance with Section 4.

3

8.    **Continuous Employment**.  For purposes of this Agreement, the continuous employment of the Grantee with the Company or any Subsidiary shall not be deemed to have been interrupted, and the Grantee shall not be deemed to have ceased to be an employee of the Company or any Subsidiary, by reason of the transfer of his or her employment among the Company and any Subsidiary, or a leave of absence approved by the Committee.

9.    **No Employment Contract; Disclaimer**.  Nothing contained in this Agreement shall confer upon the Grantee any right with respect to continuance of employment by the Company or any Subsidiary, nor limit or affect in any manner the right of the Company and any Subsidiary to terminate the employment or adjust the compensation of the Grantee, in each case with or without Cause.  By acceptance of this Agreement, the Grantee acknowledges and agrees that neither this Agreement nor any other agreement awarded prior to the date hereof under any equity compensation plan of the Company or its Subsidiaries has created or shall create, or be deemed or construed to create or have created, (i) a contractual, equitable, or other right to receive future grants of equity awards, or other benefits in lieu of equity awards, or (ii) a fiduciary duty or other comparable duty of trust or confidence owed to the Grantee (or any successor, assign, affiliate or family member of the Grantee) by the Company and its affiliates and its respective officers, directors, employees, agents or contractors.

10.    **Relation to Other Benefits**.  Any economic or other benefit to the Grantee under this Agreement or the Plan shall not be taken into account in determining any benefits to which the Grantee may be entitled under any profit-sharing, retirement or other benefit or compensation plan maintained by the Company or any Subsidiary and shall not affect the amount of any life insurance coverage available to any beneficiary under any life insurance plan covering employees of the Company or any Subsidiary.

11.    **Taxes and Withholding**.  The Grantee is responsible for any federal, state, local or other taxes with respect to the Restricted Stock Units (including the vesting of the Restricted Stock Units, the receipt of Common Shares or cash and the receipt of Dividend Equivalents).  The Company does not guarantee any particular tax treatment or results in connection with the grant or vesting of the Restricted Stock Units, the delivery of Common Shares or cash or the payment of Dividend Equivalents.  To the extent the Company or any Subsidiary of the Company is required to withhold any federal, state, local, foreign or other taxes in connection with the delivery of Common Shares or cash under this Agreement, the Grantee shall pay the tax or make provisions that are satisfactory to the Company or such Subsidiary for the payment thereof.  The Grantee may elect (on a form provided by the Company) for the Company or any Subsidiary (as applicable) to retain a number of Common Shares otherwise deliverable hereunder (to the extent any cash otherwise payable is insufficient) with a value equal to the required withholding (based on the Market Value of the Common Shares on the date of delivery) in order to satisfy the withholding obligation; provided that in no event shall the value of the Common Shares together with any cash retained exceed the minimum amount of taxes required to be withheld or such other amount that will not result in a negative accounting impact.  If the Company or any Subsidiary is required to withhold any federal, state, local or other taxes at any time other than upon delivery of Common Shares or cash under this Agreement, then the Company or the Subsidiary (as applicable) shall have the right in its sole discretion to (a) require the Grantee to pay or provide for payment of the required tax withholding, or (b) deduct the required tax withholding from any amount of salary, bonus, incentive compensation or other

4

amounts otherwise payable in cash to the Grantee (other than deferred compensation subject to Section 409A of the Code).   If the Company or any Subsidiary is required to withhold any federal, state, local or other taxes with respect to Dividend Equivalents, then the Company or Subsidiary (as applicable) shall have the right in its sole discretion to reduce the cash payment related to the Dividend Equivalent by the applicable tax withholding.

12.        **Compliance with Law**.  The Company shall make reasonable efforts to comply with all applicable federal and state securities laws and listing requirements of the NASDAQ or any national securities exchange with respect to the Restricted Stock Units; provided, however, notwithstanding any other provision of this Agreement, the Restricted Stock Units shall not be delivered if the delivery thereof would result in a violation of any such law or listing requirement.

13.        **Amendments**.  Subject to the terms of the Plan, the Committee may modify this Agreement upon written notice to the Grantee.  Any amendment to the Plan shall be deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto.  Notwithstanding the foregoing, and except as specifically provided in Sections 2(a)(iii) and 2(b), no amendment of the Plan or this Agreement shall adversely affect the rights of the Grantee under this Agreement regarding vested Restricted Share Units under the Plan and this Agreement without the Grantee's consent.

14.        **Severability**.  In the event that one or more of the provisions of this Agreement shall be invalidated for any reason by a court of competent jurisdiction, any provision so invalidated shall be deemed to be separable from the other provisions hereof, and the remaining provisions hereof shall continue to be valid and fully enforceable.

15.        **Claw-Back Policy**.  Notwithstanding any provision contained herein to the contrary, this Agreement, the Restricted Stock Units and any Common Shares that the Grantee may receive pursuant to this Agreement, are subject to the Uniti Group Inc. Claw-Back Policy then in affect (the "Policy"), and the Claw-Back Policy Acknowledgement and Agreement that the Grantee signed in accordance with the Policy (the "Claw-Back Agreement").

16.        **Relation to Plan**.  This Agreement is subject to the terms and conditions of the Plan.  This Agreement, the Policy, the Claw-Back Agreement and the Plan contain the entire agreement and understanding of the parties with respect to the subject matter contained in this Agreement, and supersede all prior written or oral communications, representations and negotiations in respect thereto.  In the event of any inconsistency between the provisions of this Agreement and the Plan, the Plan shall govern.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Plan.  The Committee acting pursuant to the Plan, as constituted from time to time, shall, except as expressly provided otherwise herein, have the right to determine any questions which arise in connection with the grant of the Restricted Stock Units.

17.        **Successors and Assigns**.  Without limiting Section 5, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, administrators, heirs, legal representatives and assigns of the Grantee, and the successors and assigns of the Company and its affiliates.

5

18.      **Governing Law**.  The interpretation, performance, and enforcement of this Agreement shall be governed by the laws of the State of Maryland, without giving effect to the principles of conflict of laws thereof.

19.      **Electronic Delivery.**  The Grantee hereby consents and agrees to electronic delivery of any documents that the Company may elect to deliver (including, but not limited to, prospectuses, prospectus supplements, grant or award notifications and agreements, account statements, annual and quarterly reports, and all other forms of communications) in connection with this and any other award made or offered under the Plan. The Grantee understands that, unless earlier revoked by the Grantee by giving written notice to the Secretary of the Company, this consent shall be effective for the duration of the Agreement.  The Grantee also understands that he or she shall have the right at any time to request that the Company deliver written copies of any and all materials referred to above at no charge. The Grantee hereby consents to any and all procedures the Company has established or may establish for an electronic signature system for delivery and acceptance of any such documents that the Company may elect to deliver, and agrees that his or her electronic signature is the same as, and shall have the same force and effect as, his or her manual signature. The Grantee consents and agrees that any such procedures and delivery may be effected by a third party engaged by the Company or any Subsidiary to provide administrative services related to the Plan.

REOF, the Company has caused this Agreement to be executed on its behalf by its duly authorized officer and the Grantee has also executed this Agreement, as of the Date of Grant.

UNITI GROUP INC.

By:       Kenny Gunderman
Title:     President and CEO

By clicking the **[I Accept]** button, the Grantee hereby acknowledges that a copy of the Plan, Plan Summary and Prospectus and the Company's most recent Annual Report and Proxy Statement (the "Prospectus Information") are available for viewing on the Company's intranet site at [web address].  The Grantee hereby consents to receiving this Prospectus Information electronically, or, in the alternative, agrees to contact [name and phone number] to request a paper copy of the Prospectus Information at no charge. The Grantee represents that he or she is familiar with the terms and provisions of the Prospectus Information and hereby accepts the award of Restricted Shares on the terms and conditions set forth herein and in the Plan.  These terms and conditions constitute a legal contract that will bind both you and the Company as soon as you click the **[I Accept]** button.

6

**APPENDIX A**
**PERFORMANCE MATRIX**

7

**APPENDIX B**

8

Exhibit 21.1

**Subsidiaries of the Registrants**

| Subsidiary | State or other jurisdiction of incorporation or organization |
|---|---|
| CSL Capital, LLC | Delaware |
| Contact Network, LLC | Alabama |
| CSL Alabama System, LLC | Delaware |
| CSL Arkansas System, LLC | Delaware |
| CSL Florida System, LLC | Delaware |
| CSL Georgia Realty, LLC | Delaware |
| CSL Georgia System, LLC | Delaware |
| CSL Iowa System, LLC | Delaware |
| CSL Kentucky System, LLC | Delaware |
| CSL Mississippi System, LLC | Delaware |
| CSL Missouri System, LLC | Delaware |
| CSL National, LP | Delaware |
| CSL National GP, LLC | Delaware |
| CSL New Mexico System, LLC | Delaware |
| CSL North Carolina Realty, LP | Delaware |
| CSL North Carolina Realty GP, LLC | Delaware |
| CSL North Carolina System, LP | Delaware |
| CSL Ohio System, LLC | Delaware |
| CSL Oklahoma System, LLC | Delaware |
| CSL Realty, LLC | Delaware |
| CSL Tennessee Realty, LLC | Delaware |
| CSL Tennessee Realty Partner, LLC | Delaware |
| CSL Texas System, LLC | Delaware |
| Hunt Brothers of Louisiana, L.L.C. | Louisiana |
| Hunt Telecommunications, LLC | Louisiana |
| Information Transport Solutions | Alabama |
| InLine Services, LLC | Delaware |
| Integrated Data Systems, L.L.C. | Louisiana |
| Network Management Holdings, Ltd | Cayman Islands |
| Network Mgmt. Services, S.A. | Nicaragua |
| Nexus Systems, Inc. | Louisiana |
| Nexus Wireless, L.L.C. | Louisiana |
| NMS Delaware Subsidiary, LLC | Delaware |
| NMS NewCo 1, LLC | Delaware |
| NMS NewCo 2, LLC | Delaware |
| NMS Towers De Colombia SAS | Colombia |
| NMS Towers de Mexico, S. De R.L. de C.V. | Mexico |
| PEG Bandwidth DC, LLC | Delaware |
| PEG Bandwidth DE, LLC | Delaware |
| PEG Bandwidth IA, LLC | Delaware |
| PEG Bandwidth IL, LLC | Delaware |
| PEG Bandwidth LA, LLC | Delaware |
| PEG Bandwidth MA, LLC | Delaware |
| PEG Bandwidth MD, LLC | Delaware |
| PEG Bandwidth MS, LLC | Delaware |
| PEG Bandwidth NJ, LLC | Delaware |
| PEG Bandwidth NY, LLC | Delaware |
| PEG Bandwidth NY Telephone Corp. | New York |

| | |
|---|---|
| PEG Bandwidth PA, LLC | Delaware |
| PEG Bandwidth Services, LLC | Delaware |
| PEG Bandwidth TX, LLC | Delaware |
| PEG Bandwidth VA, LLC | Delaware |
| Southern Light, LLC | Alabama |
| Summit Wireless Infrastructure de México, S. de R.L. de C.V. | Mexico |
| Summit Wireless Infrastructure Servicios, S. de R.L. de C.V. | Mexico |
| Talk America Services, LLC* | Delaware |
| Uniti Dark Fiber LLC | Delaware |
| Uniti Fiber Holdings Inc. | Delaware |
| Uniti Fiber LLC | Delaware |
| Uniti Group Finance Inc. | Delaware |
| Uniti Group LP* | Delaware |
| Uniti Group LP LLC* | Delaware |
| Uniti Holdings GP LLC | Delaware |
| Uniti Holdings LP | Delaware |
| Uniti LATAM GP LLC | Delaware |
| Uniti LATAM LP | Delaware |
| Uniti Leasing LLC | Delaware |
| Uniti Leasing X LLC | Delaware |
| Uniti Leasing XI LLC | Delaware |
| Uniti QRS Holdings GP LLC | Delaware |
| Uniti QRS Holdings LP | Delaware |
| Uniti Towers LLC | Delaware |
| Uniti Towers NMS Holdings LLC | Delaware |
| Uniti Towers – NMS Investor LLC | Delaware |
| Uniti Wireless Holdings LLC | Delaware |
| Uniti Wireless Infrastructure LLC | Delaware |

_____

*Uniti Group LP LLC and Talk America Services LLC are direct, wholly-owned subsidiaries of Uniti Group Inc.  Uniti Group LP is a direct, majority-owned subsidiary of Uniti Group Inc. The remaining subsidiaries are direct or indirect, wholly-owned subsidiaries of Uniti Group LP.

**Exhibit 23.1**

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (No. 333-203591 and No. 333-225501) and S-3 (No. 333-212046) of Uniti Group Inc. of our report dated March 18, 2019 relating to the financial statements, financial statement schedules and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.


/s/ PricewaterhouseCoopers LLP

Little Rock, Arkansas
March 18, 2019

**Exhibit 31.1**

**CERTIFICATION PURSUANT TO**
**RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Kenneth A. Gunderman, certify that:

1.   I have reviewed this Annual Report on Form 10-K of Uniti Group Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant, as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

     (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

     (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

     (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

     (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 18, 2019                    By:                    /s/ Kenneth A. Gunderman
                                                              **Kenneth A. Gunderman**
                                                              **President and Chief Executive Officer**

**Exhibit 31.2**

**CERTIFICATION PURSUANT TO**
**RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Mark A. Wallace, certify that:

1. I have reviewed this Annual Report on Form 10-K of Uniti Group Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant, as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 18, 2019                    By: _____ /s/ Mark A. Wallace _____

                                                                            **Mark A. Wallace**
                                                                **Executive Vice President – Chief Financial Officer**
                                                                            **and Treasurer**

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Uniti Group Inc. (the "Company") for the period ending December 31, 2018 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, to my knowledge, that:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 18, 2019                    By:                    /s/ Kenneth A. Gunderman
                                                                **Kenneth A. Gunderman**
                                                                **President and Chief Executive Officer**

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Uniti Group Inc. (the "Company") for the period ending December 31, 2018 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, to my knowledge, that:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 18, 2019                         By:                    /s/ Mark A. Wallace

                                                          **Mark A. Wallace**
                                          **Executive Vice President – Chief Financial Officer**
                                                          **and Treasurer**