# EXHIBIT D



Editors' Pick     REITs

# Uniti Group - The Facts Behind The Action

Oct. 03, 2017 12:34 PM ET | **Uniti Group Inc. (UNIT)** | CORR, WINMQ | 198 Comments

## Summary

- Uniti Group is being buffeted by pressures on its largest tenant, Windstream.

- I present the facts of the issues and the filings in which they are contained.

- My thoughts on the situation.

Let me start by saying this note will be focused on delivering information on the events currently surrounding Uniti Group (UNIT) and Windstream (WIN), at times in length. Understanding the pressures faced by Uniti which have driven their equity down entails understanding the events taking place at Windstream. I am not a lawyer, and as a result, I cannot professionally opine on the merits of any legal argument; I can only present the issues being discussed and debated so that investors have a deeper understanding of the topics that are shaping the market for these companies.

In a nutshell, shares of Uniti Group have been pushed lower by concerns that its largest tenant, Windstream, is headed towards bankruptcy. Moreover, they are being punished by the belief that they could land on the steps of the courthouse sooner than later and a potential bankruptcy filing will negatively impact the revenue stream of Uniti and, therefore, necessitate a dividend cut (at best).

I have arranged this note in the following sequence (and provided links to further information when and where possible):

1. Backstory

2. The Bondholder Notice

3. The covenant in question

4. Bondholder thoughts (my thoughts on the bondholder issue as well as other folks thoughts)

5. The ISDA Notice

6. ISDA Thoughts

7. Bankruptcy Considerations (including the master lease between WIN and UNIT)

8. Price and yield on WIN and UNIT bonds.

9. Covenants for UNIT bonds.

10. Final thoughts

## The Backstory:

Windstream, dealing with customer losses and a shrinking rural landline business, spun off its telecommunications business two years ago into a real estate investment trust, known at the time as Communication Sales and Leasing, now Uniti. Turning its networks into a REIT was designed to cut debt by about $3.2 billion and help produce about $115 million a year in extra free cash flow to support faster Internet service.

Now, two years later, a bondholder is maintaining that the spinoff violated terms of Windstream's debt and amounts to a default, according to a regulatory filing (while the bondholder wasn't named, people "familiar with the situation" have said it's Aurelius Capital Management). The holder, who claims a 25 percent stake in Windstream's 6.375 percent senior notes due 2023, alleges that the deal amounts to a sale-and-leaseback transaction and thus violates a covenant in the debt. Windstream also allegedly violated terms of the debt by failing to deliver a key certificate and by making a prohibited payment. Oh yeah, the same bondholder is long CDS protection on WIN (say people familiar - ugh, feel like the Washington Post).

## The Bondholder Notice

As a result of this notice, Windstream responded:

> Item 7.01. Regulation FD Disclosure

On September 22, 2017, **Windstream Services**, LLC (the "Company") received a purported notice of default dated September 21, 2017 (the "Notice") from a noteholder that claims to hold greater than 25% in aggregate principal amount of the Company's 6 3/8% Senior Notes due 2023 (the "Notes") issued under the indenture dated January 23, 2013 (as amended and supplemented, the "Indenture"), between the Company (as successor to Windstream Corporation), as issuer, Windstream Finance Corp., as co-issuer, the guarantors party thereto and U.S. Bank National Association, as trustee (the "Trustee").

The Notice alleges that the transfer of certain assets and the subsequent lease of those assets in connection with the spinoff of Communications Sales & Leasing, Inc. (now known as Uniti Group, Inc.) in April 2015 constituted a Sale and Leaseback Transaction (as defined in the Indenture) which did not comply with the Sale and Leaseback covenant under the Indenture. *The transactions did not constitute a Sale and Leaseback Transaction, and the Company asserts no default occurred, and that no default is continuing, under the Sale and Leaseback covenant under the Indenture.*

The Notice further alleges that the Company violated the restricted payment covenant under the Indenture by not delivering an officers' certificate as required by the Indenture and that it made a restricted payment in reliance on the restricted payment builder basket during the pendency of an alleged default which is prohibited by the Indenture. The Company delivered the requisite officers' certificate and was not in default when it made any restricted payments.

If the alleged default claimed by the noteholder is not cured by 60 days after the date the Notice was received or not waived by holders representing a majority of the aggregate principal amount of the Notes, the noteholder or the Trustee may allege that an "Event of Default" has occurred under the Indenture. An actual occurrence of an "Event of Default" would permit the Trustee or holders of at least 25% in aggregate principal amount of outstanding Notes to declare the principal amount of all outstanding Notes to be immediately due and payable.

If an "Event of Default" is deemed to have occurred under the Indenture, then such "Event of Default" could also constitute an "Event of Default" under the Sixth Amended and Restated Credit Agreement, originally dated as of July 17, 2006, and as amended and restated as of April 24, 2015, among the Company, as borrower, the lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent. In addition, if an "Event of Default" is deemed to have occurred under the Indenture and the Company's obligations under the Indenture and the Notes are accelerated, this could also constitute an "Event of Default" under the indentures governing the Company's other senior notes.

Further, Windstream has asked a judge to rule that a transfer of assets in 2015 doesn't breach the company's debt documents or constitute a default, according to a lawsuit filed in the Delaware Court of Chancery on Friday.

- Company asks court to issue injunction barring bond trustee from declaring a default.

- Windstream "is in compliance with the provisions of the indenture," according to suit.

- Bondholder Aurelius Capital's allegations of default were "erroneous assertions" made "in an effort to extort value through simultaneously purchasing credit default swaps to cash in on the very default it is manufacturing".

## The Covenant in Question:

The covenant being discussed is the following (from the exchange offer):

***Sale and Leaseback Transactions:*** Windstream will not, and will not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction; *provided* that Windstream or any Restricted Subsidiary thereof may enter into a Sale and Leaseback Transaction if:

1. Windstream or such Restricted Subsidiary, as applicable, could have (A) Incurred Indebtedness in an amount equal to the Attributable Debt relating to such Sale and Leaseback Transaction pursuant to the covenant described above under the caption " — Certain Covenants — Incurrence of Indebtedness" and (B) incurred a Lien to secure such Indebtedness pursuant to the covenant described above under the caption " — Certain Covenants — Liens" in which case such Indebtedness and Liens shall be deemed to have been so incurred;

2. the gross cash proceeds of that Sale and Leaseback Transaction are at least equal to the Fair Market Value of the property that is the subject of that Sale and

Leaseback Transaction; and

3. the transfer of assets in that Sale and Leaseback Transaction is permitted by, and Windstream applies the proceeds of such transaction in compliance with, the covenant described above under the caption "—Repurchase at the Option of Holders —Asset Sales."

**Repurchase at the option of holders - Asset Sales:** Within 365 days after the receipt by Windstream or any of its Restricted Subsidiaries of any Net Proceeds from an Asset Sale, Windstream or such Restricted Subsidiary may apply such Net Proceeds at its option:

1. to repay (X) Indebtedness secured by assets of Windstream or its Restricted Subsidiaries (to the extent of the value of the assets securing such Indebtedness), (Y) Obligations under the Credit Agreement or (Z) Indebtedness of a Restricted Subsidiary of Windstream that is not a Guarantor (to the extent of the value of the assets of such Restricted Subsidiary); or

2. to purchase Replacement Assets.

- Pending the final application of any such Net Proceeds, Windstream or such Restricted Subsidiary may temporarily reduce revolving credit borrowings or otherwise invest such Net Proceeds in any manner that is not prohibited by the Indenture.

- On the 366th day after an Asset Sale or such earlier date, if any, as Windstream determines not to apply the Net Proceeds relating to such Asset Sale as set forth in the preceding paragraph (each such date being referred as an Excess Proceeds Trigger Date), such aggregate amount of Net Proceeds that has not been applied on or before the Excess Proceeds Trigger Date as permitted in the preceding paragraph, or the Excess Proceeds, will be applied by Windstream to make an offer, or an Asset Sale Offer, to all Holders of notes and all holders of other Indebtedness that is *pari passu* with the notes or any Note Guarantee containing provisions similar to those set forth in the Indenture with respect to offers to purchase with the proceeds of sales of assets, to purchase the maximum principal amount of notes and such other *pari passu* Indebtedness that may be purchased out of the Excess Proceeds. The offer price in any Asset Sale Offer will be equal to 100% of the principal amount of the notes and such other *pari passu* Indebtedness plus accrued and unpaid interest, if any, to the date of purchase, and will be payable in cash.

## Bondholder Thoughts

I have to give credit to the bondholder. Imagine seeing debt trading at a decent

discount, looking at the covenants and determining that there was a covenant violation - two years ago - and trying to force the corporation to tender for the notes. If there was a covenant violation, this is a good thing in that it forces a company to live up to their covenants. If there wasn't a violation (as the company maintains), this is potentially a ploy to influence bond prices.

Other firms have also commented on the situation, mainly stating that Windstream appears to have a better argument:

- Creditsights has said that Windstream is likely to prevail.

- Covenant Review has stated that the transfer of assets from services to holdings (holdings isn't subject to the covenant) and no evidence that services is leasing the network back from holdings makes it relatively straightforward.

- Fitch has stated the outcome is unclear (BB-/neg).

- Moody's has stated the outcome is unclear (B1/neg).

## The ISDA Notice

Discovery Capital has asked for a ruling from ISDA as to whether there has been a credit even, which hinges on the alleged default. From ISDA:

> **Event Publicly Available Information:**
>
> On April 24, 2015, Windstream completed a transaction in which it contributed certain telecommunications network assets, including its fiber and copper networks and other real estate, into a real estate investment trust Uniti Group, Inc. ("Uniti") (formerly Communications Sales & Leasing, Inc.). The transaction also included substantially all of Windstream's consumer CLEC business. According to Windstream's 2016 Form 10-K, the contributed telecommunications network assets had a net book value of approximately $2.5 billion at the time of the transaction. In exchange for the telecommunications network assets and the consumer CLEC business Windstream received: (i) all of the common stock of Uniti, of which 80.4% percent of the shares were distributed on a pro rata basis to Windstream's stockholders, (ii) a cash payment in the amount of $1.035 billion and (iii) a distribution of approximately $2.5 billion of debt securities issued by Uniti.

As part of the April 24, 2015 transaction, Windstream Holdings, the parent of Windstream, entered into a long-term triple-net master lease with the transferee of Windstream's assets to lease back the telecommunications network assets. Windstream stated in its 2016 10-K, "As the master lease was entered into by Windstream Holdings for the direct benefit of Windstream Services and its subsidiaries, Windstream Services is also deemed to have continuing involvement due to retaining its regulatory obligations associated with operating the telecommunications network assets." The master lease provides for an annual rent of $650 million paid in equal monthly installments in advance and is fixed for the first three years. Thereafter, rent increases on an annual basis at a base rent escalator of 0.5%. Windstream stated in its 2016 10-K that "[a]t inception of the master lease, we recorded a long-term lease obligation of approximately $5.1 billion equal to the sum of the minimum future annual lease payments over the 15-year lease term discounted to the present value based on Windstream Services' incremental borrowing rate."

Indenture Violations:

The April 2015 transaction violates Windstream's Indenture, dated as of January 23, 2013, pursuant to which it issued the 6 3/8% Senior Notes due 2023. Windstream's incurrence of indebtedness under the master lease caused it to fail the Consolidated Leverage Ratio test under Section 4.09 of the Indenture; therefore, precluding Windstream from making restricted payments using the capacity provided for in Section 4.07 of the Indenture. Moreover, because the April 2015 transaction constituted a sale leaseback transaction, Section 4.19(III) of the Indenture required Windstream to apply the proceeds of the transaction in compliance with Section 4.10 of the Indenture. Any excess consideration from the 2015 transaction, after payment of debt under Windstream's credit agreement and the purchase of replacement assets, was not, and continues not to be, used to repurchase its indebtedness, including the 6 3/8% Senior Notes within 366 days after the April 2015 transaction in violation of Section 4.10 of the Indenture. The failure to use excess cash to repurchase 6 3/8% Senior Notes and other indebtedness when required under Section 4.10 constitutes a Failure to Pay Credit Event.

## ISDA Thoughts

The ISDA filing is obviously premised on the same claim that a default has occurred, and is continuing, under the covenants of the WIN senior notes.

The ISDA panel's first meeting to deliberate whether credit event occurred at Windstream Services that triggers CDS payments is October 3rd (today). The outcome of this (or these) meetings will shape the outcome of the default claim under the senior notes (it will give a feel for how the spin-off and its effect on the covenant is viewed).

Lastly, consider the following: If the company delays their coupon payment (and yet keeps it within the "grace" period), they can trigger the CDS (failure to pay) and take out those bondholders who are long protection. This could clear some of the field and relieve pressure, buying the company time to "right the ship" before their next maturity is due.

## Bankruptcy Considerations

The following is from Uniti's presentation at the Goldman Sachs Communicopia Conference, and I think it is worth sharing:

> Windstream is Substantially Dependent on Network Leased from Uniti for its Business Operations
>
> - WIN is Dependent on Lease and Access to Uniti's Network to Serve Vast Majority of Customers.
>
> - WIN Replacement Cost to Overbuild the Uniti Leased Network would Exceed Several Billion Dollars.
>
> - Time to Replicate, if Possible, Would be Several Years.
>
> - No other Vendor Could Lease the Identical Network to WIN to Replace Uniti.
>
> Master Lease Provides Landlord Protections and Must Be Accepted or Rejected in Whole in Bankruptcy
>
> - Single Indivisible Master Lease and Single Rent Payment (i.e., Cannot be Sub-Divided or "Cherry Picked" by Facility or Market).
>
> - Acceptance Requires Full Compliance with the Lease Terms, including Payment of All Rent Due.
>
> - Court has No Authority to Reset Rent Amount or Terms.
>
> - WIN has Recently Re-Stated its Intent and Ability to Pay Rent in Full Compliance with the Lease.

WIN is Obligated as "Carrier of Last Resort" to Provide Service to Customers Under Regulatory Law and requires Access to Uniti's Network to Satisfy State PUC and FCC Obligations.

No Provision in the Lease Permits or Contemplates Re-Negotiation of Rent.

In other words, in a bankruptcy proceeding, the master lease requires the entire lease (it is an indivisible lease) be accepted or rejected, the court cannot force a renegotiation of terms or the rent amount and replacing these assets would be expensive and take a number of years. This sounds exactly like the situation that CorEnergy Infrastructure (CORR) dealt with when their two main tenants (also approximately 70% of their revenues) went into bankruptcy.

At this point, it might help to introduce the lease that anchors the deal.

## The Master Lease

The master lease can be found here. From the lease (all emphasis mine):

This MASTER LEASE (the "Master Lease") is entered into as of April 24, 2015, by and among CSL NATIONAL, LP, a Delaware limited partnership ("CS&L National", and THE ENTITIES SET FORTH ON SCHEDULE 1 ATTACHED HERETO (collectively, together with CS&L National and their respective permitted successors and assigns, "Landlord"), and WINDSTREAM HOLDINGS, INC., a Delaware corporation (together with its permitted successors and assigns, "Tenant").

1.2 Single, Indivisible Lease. *This Master Lease constitutes one indivisible lease of the*

*Leased Property and not separate leases governed by similar terms. The Leased Property constitutes one economic unit, and the Rent and all other provisions have been negotiated and agreed to be based on a demise of all of the Leased Property to Tenant as a single, composite, inseparable transaction* and would have been substantially different had separate leases or a divisible lease been intended. Except as expressly provided in this Master Lease for specific, isolated purposes (and then only to the extent expressly otherwise stated), all provisions of this Master Lease apply equally and uniformly to all of the Leased Property as one unit. *An Event of Default with respect to any portion of the Leased Property is an Event of Default as to all of the Leased Property.* The parties intend that the provisions of this Master Lease shall at all times be construed, interpreted and applied so as to carry out their mutual objective to create an indivisible lease of all of the Leased Property and, in particular but without limitation, that, *for purposes of any assumption, rejection or assignment of this Master Lease under 11 U.S.C. Section 365, or any successor or replacement thereof or any analogous state law, this is one indivisible and non-severable lease and executory contract dealing with one legal and economic unit and that this Master Lease must be assumed, rejected or assigned as a whole with respect to all (and only as to all) of the Leased Property.* The parties may amend this Master Lease from time to time to include one or more additional Facilities as part of the Leased Property and such future addition to the Leased Property shall not in any way change the indivisible and nonseverable nature of this Master Lease and all of the foregoing provisions shall continue to apply in full force.

16.1 Events of Default. Any one or more of the following shall constitute an "Event of Default":

- (A) (I) *Tenant shall fail to pay any installment of Rent when due and such failure is not cured by Tenant within ten (10) days after Notice from Landlord of Tenant's failure to pay* such installment of Rent when due, or (ii) Tenant shall fail to pay any Additional Charge when due and such failure is not cured by Tenant within thirty (30) days after Notice from Landlord of Tenant's failure to pay such Additional Charges when due;

- **5.1 No Termination, Abatement, etc**. Except as otherwise specifically provided in this Master Lease including, without limitation, Section 3.4, Tenant shall remain bound by this Master Lease in accordance with its terms and shall not seek or be entitled to any abatement, deduction, deferment or reduction of Rent, or set-off against the Rent. ... *Tenant hereby specifically waives all rights arising from any occurrence whatsoever*

*which may now or hereafter be conferred upon it by law (A) to modify, surrender or terminate this Master Lease or quit or surrender the Leased Property or any portion thereof, or (B) which may entitle Tenant to any abatement, reduction, suspension or deferment of the Rent or other sums payable by Tenant hereunder* except in each case as may be otherwise specifically provided in this Master Lease...

It is important to understand that I am not a lawyer and, as a result, I cannot definitively opine on the lease, the nature of the lease or the rights of the tenant in a bankruptcy proceeding. I can, however, say that I believe these are mission critical assets for Windstream (or any successor company) and, as such, the lease would be affirmed in the event of a bankruptcy filing by the Tenant, Windstream Holdings.

What is the debt saying:

The following charts show the price and yield action on the debt of both UNIT and WIN:

Windstream:





Uniti Group:





If you are considering the senior unsecured debt of Uniti Group (Caa1/CCC+/BB-), you will get the following covenants:

- ***Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock.*** The Issuer will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently, or otherwise (collectively, "incur" and collectively, an "incurrence") with respect to any Indebtedness ... if the Consolidated Leverage Ratio at the time such additional Indebtedness is incurred or such Disqualified Stock or Preferred Stock is issued would have been no greater than 6.5 to 1.0, determined on a *pro forma* basis...

- ***Limitation on Restricted Payments.*** The Issuer will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly... such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Issuer and its Restricted Subsidiaries (and not rescinded or refunded) after the Issue Date ... is less than the sum of (without duplication):

  - 95% of the aggregate amount of Funds From Operations accrued on a cumulative basis during the period beginning on the first day of the fiscal quarter during which the Issue Date occurs to the end of the Issuer's most recently completed fiscal quarter for which internal financial statements are available at the time of such Restricted Payment.

  - 100% of the aggregate net cash proceeds and the fair market value, as determined in good faith by the Issuer, of marketable securities or other property received by the Issuer.

  - 100% of the aggregate amount of cash and the fair market value, as determined in good faith by the Issuer, of marketable securities or other property contributed to the capital of the Issuer.

  - $50.0 million

- ***Liens:*** The Issuer will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create, incur or assume any Lien (except Permitted Liens) that secures obligations under any Indebtedness or any related guarantee or on any asset or property of the Issuer or any Restricted Subsidiary, unless:

- in the case of Liens securing Subordinated Indebtedness, the notes and related

  Guarantees are secured by a Lien on such property, assets or proceeds that is senior in priority to such Liens; or

- in all other cases, the notes or the Guarantees are equally and ratably secured.

- ... *provided*, that at the time of any Incurrence of such Pari Passu Indebtedness and after giving *pro forma* effect thereto and the application of the net proceeds therefrom) under this clause (D), the Consolidated Secured Leverage Ratio shall not be greater than 4.00 to 1.00.

***Limitation on Guarantees of Indebtedness by Restricted Subsidiaries.*** The Issuer will not permit any Restricted Subsidiary that is not the Co-Issuer or a Guarantor to guarantee the payment of any Indebtedness under the Senior Credit Facilities, unless:

- within 20 business days, the parties execute and deliver a supplemental indenture to the Indenture providing for a Guarantee by such Restricted Subsidiary;

- the Issuer shall within 20 business days deliver to the Trustee an Officer's Certificate and Opinion of Counsel reasonably satisfactory to the Trustee; *provided* that this covenant shall not be applicable to any guarantee of any Restricted Subsidiary that existed at the time such Person became a Restricted Subsidiary and was not incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary.

## Final Thoughts

As I reviewed the situation when I was considering getting long the equity of Uniti Group (which I an now long), two things dawned on me:

1. The market is assuming that WIN will be in bankruptcy court sooner than later, and

2. The lease between Uniti and Windstream will be renegotiated lower.

Investing in Uniti at these levels makes sense if you believe that WIN will not be filing for bankruptcy soon. If they do file, UNIT's price will be lower and provide a better entry point. Further, an investment embeds the belief that the lease - at its current rate - will hold up in the event of a Windstream bankruptcy filing.

I do not believe that Windstream will be found to be in default, nor do I believe that they will be on the courthouse steps in the near future. I also believe that should WIN end up in a Ch.11 proceeding, the lease will be affirmed.

As nothing is certain in litigation (covenant breach/event of default) or bankruptcy (lease

acceptance/rejection and price), I am legging into my position, willing to give up some upside in order to protect from downside.

It has to be stated that this is a higher risk investment with multiple moving parts. An investor has to have a higher degree of risk tolerance to become involved in this name and should only do so with a moderate amount of capital.

How have the equities done:



WIN data by YCharts



UNIT Dividend Yield (TTM) data by YCharts

Announcement of spin-off

Spin-off presentation

Uniti - 8.25% due 2023 prospectus

---

This article was written by



**Rubicon Associates**
5.65K Followers

Rubicon Associates is headed by a Chartered Financial Analyst charter holder with over 20 years of experien...
**more**

**Disclosure:** I am/we are long UNIT, CORR. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.

198 Comments