"

"

"

"

"

"

"

"

"

EXHIBIT

**Covenant Review**

THE AUTHORITY ON BOND AND LOAN COVENANTS

**Research Date: September 27, 2017**

# Windstream: Initial Impressions on the Notice of Default under the 6.375% Senior Notes due 2023

## The Bottom Line:™

- In April 2015, Windstream Holdings completed the spin-off of its fiber and copper networks and other real estate into an independent, publicly traded REIT (formerly Communications Sales & Leasing, Inc. and now known as Uniti Group Inc.) and entered into an agreement with Uniti to leaseback the network assets.

- On September 25, 2017, Windstream Holdings filed an 8-K disclosing that Windstream Services received a purported Notice of Default dated September 21, 2017 from a noteholder claiming to hold greater than 25% of Windstream Services' 6.375% Senior Notes due 2023.

- The Notice primarily alleges that the transfer of certain assets and the subsequent lease of those assets in connection with the Spin-Off constituted a Sale and Leaseback Transaction that did not comply with the Sale / Leaseback covenant of the indenture for the 2023s.

- Windstream Services states that these transactions did not constitute a Sale and Leaseback Transaction, and consequently there was no breach of the Sale / Leaseback covenant of the indenture for the 2023s.

- In this report, we provide our initial impressions on the Notice of Default.

- The transfer of certain assets and the subsequent lease of those assets in connection with the Spin-Off most likely did not violate the Sale / Leaseback covenant of the Windstream bonds, for the reasons we explain in this report.

- We remind our subscribers that litigation is inherently unpredictable, and we are not predicting how a judge would rule in this dispute.

## Overview

In April 2015, Windstream Holdings, Inc. ("Holdings") completed the spin-off (the "Spin-Off") of its fiber and copper networks and other real estate into an independent, publicly traded REIT. This REIT was initially named Communications Sales & Leasing, Inc., and was subsequently renamed Uniti Group Inc. in 2017. In this report, we refer to this REIT entity as "CSAL / Uniti." In connection with the Spin-Off, Holdings entered into a Master Lease dated April 24, 2015 (the "Master Lease") with affiliates of CSAL / Uniti to lease the network assets.

Holdings is the direct parent of Windstream Services, LLC[1] ("Services" or the "Company"), which is the issuer of the

---

[1] Windstream Services, LLC was previously known as Windstream Corporation, before converting to an LLC in connection with the Spin-Off.

ANALYST CONTACT
Anthony P. Canale
1-212-716-5780
acanale@covenantreview.com

Covenant Review, LLC
25 West 45th Street, 10th Floor
New York, New York 10036
**www.covenantreview.com**



Windstream Bonds (defined below).

Pursuant to the Spin-Off, 80.4% of the common stock of CSAL / Uniti was distributed to Holdings' shareholders, and Services retained a passive ownership interest in 19.6% of the common stock of CSAL / Uniti, according to Holdings' disclosure in its 10-K report for fiscal 2016.

On September 25, 2017, Holdings filed an 8-K (the "8-K") disclosing that Services received a purported Notice of Default dated September 21, 2017 (the "Notice") from a noteholder claiming to hold greater than 25% of Services' 6.375% Senior Notes due August 1, 2023 (the "August 2023s").  According to the 8-K, the Notice primarily alleges that the transfer of certain assets and the subsequent lease of those assets in connection with the Spin-Off in April 2015 constituted a Sale and Leaseback Transaction that did not comply with the Sale / Leaseback covenant of the indenture for the August 2023s (the "August 2023s Indenture").[2]

Services states that these transactions did not constitute a "Sale and Leaseback Transaction" within the meaning of the August 2023s Indenture, and consequently there was no breach of the Sale / Leaseback covenant of the August 2023s Indenture.

**Capital Structure**

At June 30, 2017, Services had the following high yield bonds outstanding:

- $700 million of 7.75% Senior Notes due 2020 (the "2020s");

- $809.3 million of 7.75% Senior Notes due 2021, which were issued under two separate indentures[3] (collectively, the "2021s");

- $441.2 million of 7.5% Senior Notes due 2022 (the "2022s");

- $343.5 million of 7.5% Senior Notes due April 1, 2023 (the "April 2023s"); and

- $585.7 million of August 2023s.

We refer to these bonds collectively as the "Windstream Bonds" and we refer to the various indentures under which the Windstream Bonds were issued as the "Windstream Indentures."[4][5]  The Sale / Leaseback covenants of the various Windstream Indentures are substantially identical to those of the August 2023s Indenture with respect to matters discussed

---

[2] Per the 8-K, the Notice also alleges that Services violated the Restricted Payments covenant of the August 2023s Indenture by making Restricted Payments using basket build capacity during the pendency of an alleged default that is prohibited by the August 2023s Indenture (presumably a reference to the alleged breach of the Sale / Leaseback covenant).  The Notice also alleges that the Company violated the Restricted Payments covenant by not delivering an officers' certificate as required by the August 2023s Indenture, and Services states that it delivered the requisite officer's certificate.  Accordingly, the question of whether the Restricted Payments covenant was breached as alleged in the Notice will largely depend on whether there was a default under the Sale / Leaseback covenant.

[3] Services issued $450 million of 7.75% Senior Notes due 2021 under a March 28, 2011 Indenture and issued $500 million of 7.75% Senior Notes due 2021 under an August 26, 2013 Indenture, prior to several open market repurchases.

[4] The Windstream Indentures are available on the Covenant Review website.

[5] In this report, we are not analyzing the terms of the 6.75% Notes due 2028 issued by Windstream Holdings of the Midwest, Inc., a subsidiary of the Company, as those bonds do not have high yield style restrictive covenants.  These bonds are secured equally with Windstream Services' senior secured credit facility with respect to the assets of Windstream Holdings of the Midwest, Inc.



in this report.

Importantly, Holdings is not an obligor in respect of any of the Windstream Bonds, and Holdings is generally not subject to the restrictive covenants of the Windstream Indentures.

**The Master Lease**

As stated earlier, in connection with the Spin-Off, Holdings entered into the Master Lease with affiliates of CSAL / Uniti to lease the network assets.  Services and its subsidiaries are not parties to the Master Lease.

**The Sale / Leaseback Covenant**

The Sale / Leaseback covenant of the August 2023s Indenture[6] *(Section 4.19 – Sale and Leaseback Transactions)* provides that "the Company shall not, and shall not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction," followed by a proviso that sets forth the conditions upon which the Company and Restricted Subsidiaries may enter into a Sale and Leaseback Transaction.

As Services has stated in the 8-K that the transactions did not constitute a Sale and Leaseback Transaction, we are not reviewing the portion of the Sale / Leaseback covenant that addresses permissible Sale and Leaseback Transactions. Instead, we focus our analysis on the definition of "Sale and Leaseback Transaction," which must be analyzed in order to determine whether the transactions consummated in the Spin-Off fall within the meaning of that definition and, therefore, within the scope of the Sale / Leaseback covenant.

The August 2023s Indenture defines "Sale and Leaseback Transaction" as follows:

> **"Sale and Leaseback Transaction" means, with respect to any Person**[7], any transaction involving any of the assets or properties **of such Person** whether now owned or hereafter acquired, **whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof** or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred."  [emphasis ours]

With this definition in mind, we review the relevant facts of the transactions that occurred in connection with the Spin-Off.  Did the transaction involve the assets or properties of Services or its Restricted Subsidiaries?  Clearly, the answer to that question is yes.  Did "such Person" (i.e., the Person owning the assets) sell or otherwise transfer such assets or properties and then or thereafter lease such assets or properties or any part thereof?  The answer to this question, based on all publicly available facts, is no.  While Services did transfer the applicable assets or properties (i.e., to Holdings in connection with the Spin-Off), Services and its Restricted Subsidiaries have ***not*** then or thereafter leased "such assets or properties or any part thereof."  It is Holdings, ***and not Services or any Restricted Subsidiary of Services***, that is party to the Master Lease with CSAL / Uniti, and as we explained earlier, Holdings is not subject to the restrictive covenants of the August 2023s Indenture.  Further, thus far there has been no evidence to support speculation that Services may be leasing the telecommunications network assets from Holdings.  Accordingly, we think that the best interpretation of this language, in light of all available facts, is that these transactions do not constitute a "Sale and Leaseback Transaction,"

---

[6] As noted earlier in this report, the Sale / Leaseback covenant is substantially identical across all of the Windstream Bonds.

[7] "Person" is generally defined to mean "any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity."



and as a result it does not appear that these transactions breached the Sale / Leaseback covenant of the August 2023s Indenture (and other Windstream Indentures).

We suspect that the bondholder(s) that sent the Notice will argue that, because Holdings is a holding company with no operating assets of its own, and because the leased assets are being used by Services and its subsidiaries, that these transactions should be treated by a court as constructively constituting a lease by Services that would fall within the "Sale and Leaseback Transaction" definition of the August 2023s Indenture.  This is an equitable argument that is not supported by a plain reading of the language of the Sale / Leaseback covenant (which clearly only applies to leases by Services and its Restricted Subsidiaries), and we do not think it is the right read of this language.

**<u>A Reminder of the Inherent Unpredictability of Future Litigation</u>**

In conclusion, we once again briefly remind our subscribers of the inherently unpredictable nature of litigation.  While seasoned high yield practitioners are generally very familiar with the covenant issues implicated by the Spin-Off and related transactions, most courts generally are not familiar with these issues.

Factors compounding the unpredictability in any future litigation would likely include (1) the possibility that a court determines that Services should be treated as a party to the Master Lease, which could potentially accelerate Services' entire capital structure and force Services into bankruptcy and (2) the fact that Windstream employs approximately 13,000 people.  These and other factors could potentially influence a judge to seek to avoid an outcome that may result in a bankruptcy filing for a large business that employs thousands of people and only benefit parties that a court may perceive as "opportunistic hedge funds seeking a windfall."

Covenant Review will continue to closely monitor this situation and publish updates to our research as additional details become available.

— *Covenant Review*



**Disclosures**

All content is copyright 2017 by Covenant Review, LLC. The recipient of this report may not redistribute or republish any of the information contained herein, in part or whole, without the express written permission of Covenant Review, LLC and we will criminally and civilly prosecute copyright violations against firms and individuals who unlawfully distribute our work. The use of this report is further limited as described in the subscription agreement between Covenant Review, LLC and the subscriber. The information contained in this report is intended to generally describe certain covenant features. This report is not comprehensive, is not confidential to any person or entity, and should not be treated as a substitute for professional advice in any specific situation. Covenant Review, LLC makes no warranty, express or implied, as to the fitness of the information in this report for any particular purpose. If you require legal or other expert advice, you should seek the services of a qualified attorney or investment professional. Covenant Review, LLC does not render, and nothing in this report constitutes, legal or investment advice, and recipients of this report will not be treated or considered by Covenant Review, LLC as clients or customers except as described in the subscription agreement between Covenant Review, LLC and the subscriber. The covenants discussed herein may be based on those published in the preliminary offering memorandum distributed by the issuer in connection with the issuance of the notes, and the covenants published in the final offering memorandum or contained in the final indenture may differ from those presented herein. The reader should be aware that the final interpretation of any bond indenture will generally be determined by the issuer or its counsel, or in certain circumstances, by a court or administrative body.