# EXHIBIT I

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

|  |  |  |
|---|---|---|
|  | x |  |
| In re UNITI GROUP INC. SECURITIES LITIGATION | : | No. 4:19-cv-00756-BSM |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | x |  |

**EXPERT REPORT OF CHRISTOPHER M. JAMES, PH.D.**
December 23, 2021

# Table of Contents

I.      Qualifications ........................................................................................................... 1

II.     Assignment .............................................................................................................. 2

III.    Background and Summary of Plaintiffs' Allegations ..................................................... 3

        A.      Windstream, Uniti, and the Spin-off Transaction .............................................. 3

        B.      Aurelius Litigation ....................................................................................... 4

        C.      Plaintiffs' Allegations and Theories of Liability ............................................... 5

IV.     Summary of Opinions .............................................................................................. 7

V.      Background Regarding Security Prices in an Efficient Market ..................................... 9

        A.      Market Efficiency from the Perspective of a Financial Economist ................... 9

        B.      Event Studies ............................................................................................ 10

VI.     Price Impact Analysis ........................................................................................... 12

        A.      The Alleged Misrepresentations Did Not Have a Price Impact on
        Uniti's Stock In Connection With the Alleged Corrective Disclosure on
        August 3, 2017 ..................................................................................................... 14

        B.      The Alleged Misrepresentations Under Plaintiffs' True Lease Theory
        and Navigating the Bankruptcy Theory Did Not Have a Price Impact on
        Uniti's Stock In Connection With the Alleged Corrective Disclosure on
        September 25, 2017 ............................................................................................... 19

        C.      The Alleged Misrepresentations Did Not Have a Price Impact on
        Uniti's Stock In Connection With the Alleged Corrective Disclosure on
        February 15, 2019 ................................................................................................. 21

                1.      There Were No Negative and Statistically Significant Stock
                Returns Following Aurelius' Complaint or Proposed Finding of Fact ............ 23

                2.      The Factual Information Cited by Judge Furman in Reaching
                His Sale-Leaseback Opinion Was Publicly Disclosed Well Before His
                Opinion Was Issued ................................................................................. 26

                3.      The Alleged Misrepresentations Regarding the Sale-Leaseback
                Theory Could Not Have Had an Impact on Uniti's Stock Price In
                Connection With the Alleged Corrective Disclosure on February 15,
                2019 ...................................................................................................... 31

        D.      The Alleged Misrepresentations Under Plaintiffs' Sale-Leaseback
        Theory and True Lease Theory Did Not Have a Price Impact on Uniti's Stock
        In Connection With the Alleged Corrective Disclosure on June 24, 2019 ................. 35

VII.    Mr. Coffman Fails to Put Forth a Class-Wide Damages Methodology That Can
        Reliably Measure Damages in a Manner That Is Consistent with Plaintiffs' Theories
        of Liability ........................................................................................................... 37

A.      Mr. Coffman Does Not Provide a Reliable Methodology to Measure Inflation Throughout the Proposed Class Period Attributable to an Allegedly Concealed Risk ..................................................................................................39

B.      Mr. Coffman Does Not Explain How He Would Determine Inflation Associated with Each Theory of Liability and Alleged Misstatement .........................43

VIII.   Mr. Coffman Has Not Reliably Demonstrated That Uniti's Options Traded in an Efficient Market Throughout the Proposed Class Period .............................................44

A.      Background on Options and Efficiency of Options Markets...........................44

B.      The At-Issue Options Constitute More Than 700 Unique Securities with Different Contractual Terms, Prices, and Liquidity That Cannot Be Considered Fungible ...................................................................................................46

C.      Mr. Coffman's Purported Tests of Market Efficiency for the Uniti Options Are Flawed and Unreliable ............................................................................48

1.      Mr. Coffman Does Not Address Evidence of Illiquidity and Large Transaction Costs for Some Option Series.............................................50

2.      Mr. Coffman Erroneously Uses Model-Derived Prices, Not Quoted or Traded Prices, in His "News No News" Test .................................54

3.      Mr. Coffman's Aggregate "News No News" Test Overlooks That Many Option Series Did Not Trade or Did Not Have a Significant Stock Price Reaction on Any of Mr. Coffman's "News" Days.......................57

## I.    Qualifications

1.    I am the William H. Dial/Sun Bank Eminent Scholar and Professor of Finance and Economics at the University of Florida.  I have previously taught at Cambridge University, the University of Oregon, and the University of Michigan.  I have also held positions at the Federal Reserve Bank of San Francisco, the Federal Deposit Insurance Corporation ("FDIC") and the U.S. Department of the Treasury Office of the Comptroller of the Currency.  Additionally, I have served as the Securities and Exchange Commission ("SEC")-approved independent distribution consultant for the Janus Mutual Fund complex.

2.    My academic research has been in the areas of securities pricing, corporate finance, mortgage markets, bank lending, private equity investments, and financial institutions.  I have published numerous articles on issues related to corporate finance, bank lending, private equity, and the performance of mortgage-related securities.

3.    I served on the Board of Directors and the Advisory Board to SunTrust Bank of Florida (subsidiary of SunTrust Bank) between 1989 and 2006.  As part of my Board duties, I served on the executive committee and the audit committee of the Bank.

4.    From 1990 to 2002, I also served on the academic board of the Turnaround Management Association.   I currently serve on the board of directors of two private companies and as a senior advisor to Cornerstone Research.

5.    I have served on the editorial boards of three scholarly journals. I served as an associate editor of the *Journal of Financial Economics* between 1993 and 2016, as associate editor of the *Journal of Finance* from 1988 through 2000, and as a founding co-editor of the *Journal of Financial Intermediation* from 1988 through 1999.  I have provided consulting services to a number of government agencies and corporate entities on issues concerning the valuation of corporate assets, bank management, corporate finance, and real estate-related issues.  I have also provided expert witness testimony on issues concerning loss causation, the estimation of damages, the corporate financing process, and corporate restructurings.

6.    My curriculum vitae, which includes a list of the publications I have authored, is included as **Appendix A**.  A list of my deposition and trial testimony over the last four years is included as **Appendix B**.

**II.    Assignment**

7.    I have been retained by counsel for Uniti Group Inc. ("Uniti" or the "Company") to evaluate whether the allegedly misrepresented or omitted information (hereafter, "alleged misrepresentations") under Plaintiffs' various theories of liability had a price impact on Uniti's stock in connection with the alleged corrective disclosures identified by Plaintiffs on August 3, 2017, September 25, 2017, February 15, 2019, and June 24, 2019.  Specifically, I have been asked to assess whether the alleged misrepresentations, as purportedly revealed by those alleged corrective disclosures, impacted Uniti's stock price, assuming the market for Uniti's stock was efficient from April 24, 2015 through June 24, 2019 (the "proposed Class Period") as Plaintiffs claim.

8.    I have also been asked by counsel to review and respond to the expert report submitted by Chad Coffman dated October 25, 2021 ("Coffman Report").  Specifically, I have been asked to review and evaluate:  (1) whether Mr. Coffman has put forth a methodology capable of reliably measuring class-wide damages in a manner consistent with Plaintiffs' theories of liability, and (2) Mr. Coffman's analysis and conclusion that Uniti's options traded in an efficient market during the proposed Class Period.

9.    A complete list of the documents that I have considered in forming my opinions is attached as **Appendix C**.  My work in this matter is ongoing.  The opinions presented in this report are based on the information available to me as of the report date.  I reserve the right to supplement or modify my opinions if new information comes to light, and to respond to any additional report(s), opinions, or arguments offered by Plaintiffs or their experts.

10.    In connection with my services, including the preparation of this report and any testimony I will provide at deposition or in court, I am being compensated at my regular hourly rate of $1,000.  I am also being reimbursed for reasonable expenses, such as travel expenses.  My compensation does not depend on the opinions that I express, on the outcome of this litigation, or on the outcome of any proceedings within the litigation.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.

## III.    Background and Summary of Plaintiffs' Allegations

### A.    Windstream, Uniti, and the Spin-off Transaction

11.    Windstream Holdings, Inc. ("Windstream Holdings") is a provider of network communications and technology solutions for businesses across the U.S. and offers broadband, entertainment, and security solutions to consumers and small businesses.[1]  On April 24, 2015, Windstream Holdings spun off certain of its telecommunications network assets, including fiber optic and copper wire network assets and other real estate, into an independent, publicly traded real estate investment trust ("REIT") that became Uniti. Concurrent with the transaction, Uniti entered into a long-term exclusive triple-net lease (the "Master Lease") with Windstream Holdings.[2]

12.    At the time of the spin-off, two transactions occurred:  1) Windstream Services, LLC ("Windstream Services" and, together with Windstream Holdings, "Windstream"), a subsidiary of Windstream Holdings, caused its operating subsidiaries to convey, among other things, fiber and copper fiber network assets to Uniti,[3] and 2) a Uniti affiliate entered into the Master Lease with Windstream Holdings, pursuant to which Windstream Holdings leased those assets from Uniti.[4]

13.    Prior to the spin-off, on January 23, 2013, Windstream Services issued unsecured notes ("January 2013 Notes"), the indenture for which included a provision prohibiting Windstream Services or its operating subsidiaries from entering into a "Sale and Leaseback Transaction."[5]  I understand that Windstream worked with its outside advisors to structure the spin-off and Master Lease in a manner intended to avoid any violation of this sale-leaseback provision,[6] and also engaged outside legal counsel from Skadden, Arps, Slate, Meagher &

---

[1] Windstream Holdings, Inc., Form 10-K for the Fiscal Year Ended December 31, 2018, Filed on March 15, 2019, p. 3.

[2] Uniti Group Inc., Form 10-K for the Fiscal Year Ended December 31, 2017, Filed on March 1, 2018, p. 5.

[3] Uniti Group Inc., Form 8-K, Filed on March 26, 2015, EX-2.1 Separation and Distribution Agreement by and among Windstream Holdings, Inc., Windstream Services, LLC, and Communications Sales & Leasing, Inc., pp. 12–13.

[4] Uniti Group Inc., Form 10-K, for the Fiscal Year Ended December 31, 2017, Filed on March 1, 2018, p. 5.

[5] Windstream Holdings, Inc., Form 8-K, Filed on January 23, 2013, and the attached indenture.  A "Sale and Leaseback Transaction" was defined in the indenture (p. 24) as: "[W]ith respect to any Person, any transaction involving any of the assets or properties of such Person whether now owned or hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred".

[6] Consolidated Class Action Complaint, *In re Uniti Group Inc. Securities Litigation*, May 11, 2020 ("Complaint"), ¶¶11, 75, 86, 103; *see also* Defendants' Opening Brief in Support of Defendants' Motion to Dismiss the Consolidated Amended Complaint, *In re Uniti Group Inc. Securities Litigation*, July 10, 2020 ("Defendants' Brief in Support of Motion to Dismiss") p. 5.

Flom LLP and accounting firm Ernst & Young LLP to provide it with an opinion on whether the Master Lease could be considered a "true lease."[7]

## B.    Aurelius Litigation

14.    On September 25, 2017, Windstream disclosed in an SEC filing that it had received a "purported notice of default" from Aurelius Capital Master, Ltd. ("Aurelius"), a hedge fund which had acquired a short position in certain Windstream securities as well as a substantial long position in Windstream's January 2013 Notes.[8]  On October 12, 2017, the indenture trustee, U.S. Bank National Association, filed suit against Windstream on behalf of Aurelius (the "Aurelius Complaint"), claiming that the spin-off and Master Lease constituted a "Sale and Leaseback Transaction" and thereby breached the covenant in Windstream's debt indenture.[9]

15.    In response, Windstream Services brought counterclaims against the indenture trustee and Aurelius, seeking a judicial declaration that the spin-off and Master Lease did not breach the sale-leaseback covenant in the indenture.[10]  Aurelius brought counterclaims of its own, seeking a declaration that Windstream Services was in default and a money judgment for the aggregate principal amount of its Notes plus interest.[11]  Windstream Services also undertook a series of exchange offers and consent solicitations that aimed to obtain a waiver of any default arising from the alleged sale-leaseback covenant violation from a majority of Windstream's other noteholders.[12]  The litigation culminated in a bench trial that took place in July 2018, in connection with which the trustee, Aurelius, and Windstream Services submitted Proposed Findings of Fact and Conclusions of Law.[13]

16.    On February 15, 2019, U.S. District Court Judge Jesse M. Furman – the judge presiding over the Aurelius litigation – ruled against Windstream, finding, among other things, that Windstream breached its debt indenture by engaging in an impermissible sale-

---

[7] Complaint, ¶¶ 128–135.  Defendants' Brief in Support of Motion to Dismiss, p. 6.

[8] Windstream Holdings, Inc., Form 8-K, Filed on September 25, 2017.  *See also*, Complaint, ¶177.  Windstream Services, LLC's Proposed Findings of Fact and Conclusions of Law, *U.S. Bank National Association v. Windstream Services, LLC v. Aurelius Capital Master, Ltd.*, June 15, 2018, ¶123 ("[Aurelius's October 24 Letter] neglected to inform that market of the material information about Aurelius's CDS position (giving Aurelius a short-position as to Services)").

[9] Complaint, *U.S. Bank National Association v. Windstream Services, LLC*, October 12, 2017, ¶¶1–2.

[10] Findings of Fact and Conclusions of Law, *U.S. Bank National Association v. Windstream Services, LLC v. Aurelius Capital Master, Ltd.*, February 15, 2019 ("Judge Furman Ruling"), p. 2.

[11] Judge Furman Ruling, p. 2.

[12] Judge Furman Ruling, p. 2.

[13] Judge Furman Ruling, which cites the trustee, Aurelius, and Windstream Services' Proposed Findings of Fact and Conclusions of Law, or "PFFCL."

leaseback transaction, declaring certain of Windstream's notes immediately due and payable and awarding to Aurelius a money judgment in the amount of more than $300 million.[14]

17.     On February 25, 2019, ten days after Judge Furman's ruling, Windstream Holdings filed for bankruptcy.[15]  On July 25, 2019, in connection with its ongoing bankruptcy proceedings, Windstream's bankruptcy estate filed an adversary proceeding against Uniti,[16] which included claims challenging the status of the Master Lease as a "true lease" and seeking to re-characterize the Master Lease as long-term financing (based on, among other things, allegations related to the estimated useful life of certain of the transferred network assets, namely the copper wire that made up part of the network).[17]  On March 2, 2020, Windstream and Uniti reached a settlement of Windstream's claims.[18]  As part of the settlement agreement, Windstream released any claim "to characterize the Master Lease as anything other than a true lease," and agreed that it would not take any position in any judicial or other proceeding "that is in any way inconsistent with the position that the Master Lease is a true lease transaction ...."[19]

### C.     Plaintiffs' Allegations and Theories of Liability

18.     Plaintiffs allege in the Complaint that Defendants concealed from the market "(i) the material risk that the Spin-Off was a prohibited sale-leaseback transaction that violated the indenture" ("Sale-Leaseback Theory") and "(ii) the true extent of the risk that the Master Lease was not a true lease, but rather a carefully disguised financing arrangement" ("True Lease Theory").[20]

19.     Specifically, with respect to the True Lease Theory, Plaintiffs allege that Defendants knew but failed to disclose that the status of the Master Lease as a "true lease" depended on supposedly false and inflated estimate about the useful life of the leased copper wire assets (as alleged by Windstream in the adversary proceeding).[21]

---

[14] Judge Furman Ruling, pp. 54–55.
[15] Windstream Press Release, "Windstream Holdings, Inc. Files for Voluntary Reorganization Under Chapter 11 of the U.S. Bankruptcy Code Following Judge Furman's Decision," February 25, 2019.
[16] Complaint, *In re: Windstream Holdings, Inc., et al.*, Adversary Proceeding, July 25, 2019.
[17] Complaint, *In re: Windstream Holdings, Inc., et al.*, Adversary Proceeding, July 25, 2019, p. 2.
[18] Uniti Group Inc., Form 8-K, Filed on March 2, 2020, EX-10.1.
[19] Uniti Group Inc., Form 8-K, Filed on May 15, 2020, EX-10.1, pp. 8, 10.
[20] Complaint, ¶16.
[21] Complaint, ¶¶127–133.

20.     Plaintiffs also allege that between March 18 and June 20, 2019, Defendants made false and misleading statements regarding Uniti's ability "to navigate the Windstream bankruptcy proceedings without having to raise external capital," i.e., they falsely represented that Uniti could withstand the financial impact of Windstream's bankruptcy without raising additional capital ("Navigating the Bankruptcy Theory").[22]

21.     Plaintiffs allege that "when the truth about the Spin-Off and the hidden risks materialized and became known to the market, the price of Uniti's securities declined precipitously as the prior artificial inflation was removed from the price of the stock."[23]

22.     Plaintiffs identify the following dates when these risks allegedly materialized and the truth was purportedly revealed.

    a.  August 3, 2017:  Plaintiffs allege that "Windstream announced that it was eliminating its dividend" on August 3, 2017,[24] and that Uniti's stock price declined on August 3 and 4, 2017 due to this disclosure.  Plaintiffs further allege that Uniti's stock price continued to drop after Defendants "falsely reassured the market that the lease payment … was not in jeopardy" and "when rumors circulated that the Spin-Off violated Windstream's debt covenants" on unidentified dates in August.[25]

    b.  September 25, 2017:  Plaintiffs allege that, on September 25, 2017, "Windstream filed a Form 8-K with the SEC disclosing that it had received a 'purported notice of default' from Aurelius," and that Uniti's stock price declined on September 26 and 27, 2017 due to this disclosure.[26]

    c.  February 15, 2019:  Plaintiffs allege that, on February 15, 2019, "U.S. District Court Judge Jesse M. Furman – the judge presiding over the Aurelius Litigation – entered his Findings of Fact and Conclusions of Law (which followed a bench trial held in July 2018), finding that the Spin-Off and execution of the Master Lease violated the Indenture," and that Uniti's stock price declined on February 19, 2019, the next trading day, due to this disclosure.[27]  Subsequently, on February 21, 2019, "Fitch Ratings ('Fitch') and Standard & Poor's Global Ratings ('S&P') both downgraded Uniti's credit ratings, and revised their outlooks to 'Negative' citing Judge Furman's February 15, 2019 ruling as the catalyst for the changes."[28] Plaintiffs allege that Uniti's stock price continued to fall on this day and the next day.[29]

    d.  June 24, 2019:  Plaintiffs allege that, "on June 24, 2019, after the close of the market, Defendants caused the Company to issue a press release announcing a $300 million aggregate principle amount of exchangeable senior notes due

---

[22] Complaint, ¶¶29, 212–226.
[23] Complaint, ¶243.
[24] Complaint, ¶¶168, 247.
[25] Complaint, ¶¶248–249.
[26] Complaint, ¶¶177, 254.
[27] Complaint, ¶¶201, 256.
[28] Complaint, ¶207.
[29] Complaint, ¶259.

2024," and that Uniti's stock price fell on the next trading day, June 25, 2019 due to this disclosure.[30]

## IV.   Summary of Opinions

23.   I have reached the following opinions in this matter.  The bases for these opinions are discussed in detail in the sections that follow, and include detailed explanations of my analyses, reasoning, and support.[31]

24.   In **Section VI**, I perform an economic analysis to assess the price impact of the alleged misrepresentations in connection with the alleged corrective disclosures, assuming the market for Uniti's stock was efficient during the proposed Class Period.  I find that (1) with respect to two of Plaintiffs' alleged corrective disclosures, the alleged misrepresentations had *no* price impact under *any* of Plaintiffs' three theories of liability; and (2) with respect to the remaining two alleged corrective disclosures, the alleged misrepresentations had *no* price impact under two of Plaintiffs' three theories of liability.

   a. August 3, 2017 (Windstream's announcement of a dividend cut):  There is no economic connection between the announcement of Windstream's dividend cut and the alleged misrepresentations under *any* of Plaintiffs' theories of liability.  Rather, the price decline following the announcement reflects Uniti's previously disclosed exposure to Windstream's financial performance.

   b. September 25, 2017 (Aurelius notice of default):  There is no economic connection between the disclosure of the notice of default and the alleged misrepresentations under Plaintiffs' True Lease or Navigating the Bankruptcy Theories.  The stock price decline following the disclosure cannot be attributed to information that either revealed the risk that the Master Lease was not a "true lease," or that cast doubt on Uniti's ability to navigate Windstream's bankruptcy, which did not occur until February 2019.

   c. February 15, 2019 (Aurelius decision):  Based on my review of the relevant information mix, all the factual findings that are cited by Judge Furman in support of his legal conclusion that the spinoff and Master Lease constituted a prohibited sale-leaseback transaction had been revealed to the market at least six months before the decision was issued.  Assuming Uniti's stock traded in an efficient market during the proposed Class Period, such factual information was already incorporated into Uniti's stock price and therefore could not have impacted Uniti's stock price on February 19, 2019 or on any later date.  Rather, the market was reacting to Judge Furman's unexpected legal opinion as well as the resulting rating agency actions, which could not have been disclosed at the beginning of the proposed Class Period (and I understand that

---

[30] Complaint, ¶¶227, 263.
[31] These findings are based on the information available to me to date.  I reserve the right to supplement my current analysis if additional information becomes available.

Plaintiffs are not alleging that Defendants should have disclosed predictions about such events).

d. June 24, 2019 (Uniti's announcement of a notes offering): There is no economic connection between the announcement of Uniti's notes offering and the alleged misrepresentations under Plaintiffs' Sale-Leaseback and True Lease Theories. Judge Furman had already issued his ruling that the spin-off transaction constituted a sale-leaseback transaction three months prior in February, 2019. Further, the stock price reaction is not attributable to information that could have revealed that the Master Lease was not a "true lease," such as information pertaining to the estimate of the copper wire's useful life.

25. In **Section VII**, I explain that Mr. Coffman has not proposed a methodology that can reliably measure damages consistent with Plaintiffs' theories of liability.

a. Mr. Coffman's proposed approach relies primarily on using the price reactions on the alleged corrective disclosure dates as a measure of price inflation. However, as discussed above, on certain such dates, the price reaction is entirely unreflective of the removal of price inflation due to a lack of economic linkage (i.e., mismatch) between the information released and the alleged misrepresentations.

b. In addition, Plaintiffs claim that Uniti's stock price dropped due to the "materialization of risks" allegedly concealed by the alleged misrepresentations. However, Mr. Coffman does not provide a reliable methodology to measure inflation attributable to an allegedly concealed risk. Under such a theory, and if Plaintiffs' allegations were true, a damages approach based on the stock price declines following the alleged corrective disclosures would measure the realization of the risk (i.e., a risk turning into certainty). It would not reliably measure inflation due to the purported concealment of the risk (i.e., the "true" level of risk not being incorporated into the stock price due to the alleged misrepresentations).

c. Mr. Coffman does not explain how his damages approach would disentangle the impact of any of the distinct theories of liability advanced by Plaintiffs, apportion inflation among the various alleged misrepresentations in this case, or account for non-fraud related company-specific (or "confounding") information, which is especially problematic given the complexity of the information mix and Plaintiffs' allegations.

26. In **Section VIII**, I explain that Mr. Coffman fails to provide reliable evidence that Uniti's options traded in an efficient market throughout the proposed Class Period.

a. Mr. Coffman does not address the same factors that he used to analyze market efficiency for Uniti's stock, and fails to recognize that certain of these factors, such as low trading volumes and high bid ask spreads, could indicate potential impediments to market efficiency for Uniti's options.

b. Furthermore, the two tests that Mr. Coffman runs in order to assess market efficiency for Uniti's options do not in fact demonstrate that Uniti's options traded in an efficient market. Mr. Coffman's test of "put-call parity" cannot establish semi-strong form market efficiency (the standard of efficiency that

he purports to test), which Mr. Coffman appeared to have conceded during his deposition.  And his other test, a "news no news" test to purportedly demonstrate "cause and effect," is flawed according to his own admission.  While Mr. Coffman stressed during his deposition the importance of using actual market prices in this test, a review of the underlying computer code used to run his analysis reveals that he in fact used only "theoretical" model prices.  Further, his test treats the more than 700 unique Uniti option series effectively as a single security and analyzes them in aggregate, even though t each is a unique security.  As a result, Mr. Coffman's test does not assess whether individual option series reacted to the "news" in a manner consistent with market efficiency.

## V.   Background Regarding Security Prices in an Efficient Market

### A.   Market Efficiency from the Perspective of a Financial Economist

27.   In a "semi-strong form" efficient market,[32] the price of a stock should react quickly and fully to new, value-relevant public information.[33]  This means that in an efficient market, security prices always "fully reflect" the total mix of publicly available information in the marketplace about a company's expected future cash flows (this information can be company-specific, or related to the industry or the market).[34]  If security prices "fully reflect" all public information, then in an efficient market security prices should only respond to new, value-relevant information, and would not respond to information that is not new or that is already expected by the market, such as the re-publication of information that was previously disclosed.

28.   In other words, finding that the reiteration of previously publicly disclosed information impacts the stock price would be inconsistent with a finding of market efficiency.  As stated in a corporate finance textbook:

> Any information released before then, though, should have no effect on abnormal returns in this period, because all of its influence should have been felt before.  In other words, an efficient market would already have incorporated previous information into prices.[35]

---

[32] "Semi-strong form" efficiency is the standard Mr. Coffman purports to be testing, and the standard that I understand to be relevant for Plaintiffs to demonstrate "the fraud on the market" presumption of reliance. *See*, Expert Report of Chad Coffman, CFA, October 25, 2021 ("Coffman Report"), ¶¶18, 21.

[33] Fama, Eugene F. 1991. "Efficient Capital Markets: II." *The Journal of Finance* 46 (5): 1575–1617 ("Fama (1991)").

[34] Fama (1991) at p. 1575.

[35] Ross, Stephen A., et al. 2002. *Corporate Finance*, 6th ed. New York: McGraw-Hill/Irwin, p. 351.  Mr. Coffman likewise agrees with this principle.  At his deposition, he testified that "generally, what I am saying

29.     In addition, in an efficient market, information does not need to be widely distributed for it to be incorporated into security prices.  The academic literature has documented that security prices react not only to events such as earnings announcements or mergers that are widely reported on in news articles, but also to public information such as court rulings and regulatory proceedings.[36]  Whether information is incorporated in security prices in an efficient market does not depend on how many investors know the information or how many security analysts write reports about the information, but rather on the cost of accessing that piece of information relative to the benefit.  Fama (1991) indicates that in an efficient market, "prices reflect information to the point where the marginal benefits of acting on information (the profits to be made) do not exceed the marginal costs" of acting on that information.[37]  If the stock price does not react to a piece of publicly available information (i.e., few investors try to obtain or act on the information), it could be that the information is stale, the information is not value-relevant, or the market is not efficient.

## B.     Event Studies

30.     Event studies are a widely employed approach in the academic literature that can be used to measure the impact of a company-specific event, such as the release of earnings information, on security prices.[38]  When a security trades in an efficient market, an event study can measure the price impact (if any) of new, public information, because the price will react quickly and fully if an event alters the total mix of public information.

---

there is that the market is not expected to react to stale information, information that has already been given and that doesn't get updated with either replacement information or given again in some sort of new context that gives it new value relevance.  If it's just a repetition of something that was previously stated that has no new context, then you wouldn't expect that to move stock prices."  *See*, Coffman Deposition, 58:25–59:12.

[36] *See*, *e.g.*, Brous, Peter A. and Keith Leggett. 1996. "Wealth Effects of Enforcement Actions Against Financially Distressed Banks." *Journal of Financial Research* 19 (4): 561–577 at 561 ("We examine the stock price reaction for a sample of commercial banks to the signing of cease-and-desist orders, written agreements, and formal agreements with bank regulators … Our finding of a significantly negative mean signing-day abnormal return suggests that these enforcement actions are not fully anticipated by the market and that, on average, these enforcement actions are perceived as being unfavorable for bank shareholders.").  Albuquerque, Ana M., Mary Ellen Carter, and Luann J. Lynch. 2015. "Court Intervention as a Governance Mechanism Over CEO Pay: Evidence from the Citigroup Derivative Lawsuit." *European Accounting Review* 24 (4): 637–658 at 638 ("On 24 February 2009, the Delaware Court of Chancery denied a motion to dismiss a corporate waste claim filed in a derivative lawsuit against Citigroup regarding the pay package offered to its departing CEO … We find, on average, significantly negative abnormal returns for the three days beginning on February 24, suggesting that shareholders do not welcome court intervention as an avenue to influence executive pay practices.").

[37] Fama (1991), p. 1575.

[38] For a discussion of event study methodology, *see*, MacKinlay, A. Craig. 1997. "Event Studies in Economics and Finance." *Journal of Economic Literature* 35 (1): 13–39 ("MacKinlay (1997)").

31.    The first step in conducting an event study is to identify the event dates on an ex-ante basis—i.e., before examining the price movements of the security (or securities) at issue.  For example, the event dates can be days on which information that purportedly corrected the alleged misrepresentations was released to the market.

32.    The second step in an event study analysis is to assess whether the release of information on the event date (e.g., information that is potentially corrective of the alleged misrepresentations) led to statistically significant company-specific price declines.  To do this, researchers can use a regression model to isolate the portion of a security's price movement that is attributable to company-specific information, as distinguished from the portion of the price movement attributable to market and industry effects.  A regression model analyzes the relationship between the company's security price movements and market and industry factors over a control period in order to generate expected price movements. The company-specific return (also known as the "residual" price return) can be estimated using the difference between expected and observed price returns on a given day.[39]

33.    The third step in an event study analysis is to quantify the "normal" level of estimated daily residual price returns and apply statistical tests to determine which estimated daily residual price returns are abnormal (i.e., "statistically significant").[40]  In an efficient market, a statistically significant abnormal return can be interpreted as indicating significant changes in the total mix of public information about the company.  Residual returns that are not statistically significant cannot be reliably attributed to any information regarding the company, as they cannot be distinguished from the typical fluctuations in the security's price in the absence of new information (i.e., they are not statistically different from zero).

34.    An event study analysis is subject to limitations.  An event study measures the price impact of *all new* information revealed during the study's event window; it cannot apportion

---

[39] Note that besides market and industry movements, researchers sometimes control for the portion of a security price movement attributable to other non-firm-specific factors in estimating the residual returns.  For example, academic studies sometimes adjust the market value of a parent company for the market value of a public subsidiary.  *See, e.g.*, Mitchell, Mark, et al. 2002. "Limited Arbitrage in Equity Markets." *Journal of Finance* 57 (2): 551–584; Lamont, Owen A. and Richard H. Thaler. 2003. "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-outs." *Journal of Political Economy* 111 (2): 227–268; Bayar, O., et al. 2011. "A Theory of Equity Carve-outs and Negative Stub Values under Heterogeneous Beliefs." *Journal of Financial Economics* 100 (3): 616–638.

[40] The 5% level of significance (or the 95% level of confidence) is typically used to determine whether the residual change in a company's security price on a particular day is statistically significant.  The 5% threshold is the accepted standard for determining statistical significance.  *See, e.g.,* Kaye, David H. and David A. Freedman. 2011. *Reference Guide on Statistics*, 3rd ed., p. 521 ("In practice, statistical analysts typically use levels of 5% and 1%.  The 5% level is the most common in social science, and an analyst who speaks of significant results without specifying the threshold probably is using this figure.").  As such, unless specified otherwise, any reference to statistical significance in this report is based on a two-tailed 5% significance level.

the price impact of an individual piece of information when multiple pieces of information are disclosed simultaneously.  Put differently, even if the event study regression analysis results in a statistically significant residual price decline on a given alleged corrective disclosure date, that in and of itself does not allow one to discern whether the decline can be attributed to company-specific information that is corrective of alleged misrepresentations versus other non-fraud-related company-specific information (i.e., "confounding information").[41]  If the information released on the alleged corrective disclosure date is economically unrelated to the alleged misrepresentations (i.e., there is a mismatch), then one cannot attribute the price movement to the alleged misrepresentations.  Thus, one needs to review all publicly available information on event days to determine what information may have contributed to the residual price decline.

35.     As part of this review, one should also determine whether information released on a given day was truly new, that is, it had not been released previously.  As discussed above, in an efficient market, information impacts security prices quickly after its release, and reiteration of previously publicly available information will not impact security prices.

## VI.     Price Impact Analysis

36.     In this section, I will discuss the stock price movements following the four sets of alleged corrective disclosures, as well as the information released on those dates, and assess whether there was any "price impact" attributed to the alleged misrepresentations under each of Plaintiffs' theories of liability.  By "price impact," I mean whether the alleged misrepresentations impacted Uniti's stock price in connection with the alleged corrective disclosures.[42]

37.     I focus on the stock price movement and information mix on the alleged corrective disclosure dates because I understand that Plaintiffs primarily allege an omissions case under

---

[41] Mr. Coffman agrees that it is important to consider non-fraud related information, or confounding information, in assessing stock price returns following the alleged corrective disclosures.  Coffman Report, ¶97.
[42] Plaintiff allege that partial corrective disclosures occurred on August 3, 2017, September 25, 2017 (after market close), February 15, 2019 (after market close), and June 24, 2019 (after market close), which caused Uniti's stock price to decline on August 3-4, 2017, September 26-27, 2017, February 19, 21-22, 2019, and June 25, 2019.  For the purpose of my analysis, I refer to them collectively as "alleged corrective disclosure dates."  I will discuss how Plaintiffs have failed to explain how the alleged price drops during multi-day windows can be consistent with their claim that Uniti stock traded in an efficient market where information would be incorporated into stock price fully and quickly.  Nonetheless, my conclusions with respect to price impact and Plaintiffs' failure to put forth a damages methodology consistent with their theory of liability do no change regardless of whether I focus on one-day returns or multi-day returns following the alleged corrective disclosures.

which Uniti "failed to disclose … that the structure of the [spin-off] transaction … violated Windstream's Indenture from inception."[43]  Plaintiffs claim that the alleged misrepresentations largely occurred before the proposed Class Period, and that additional alleged misrepresentations during the proposed Class Period "maintained the artificial inflation in the price of Uniti's securities."[44]  In addition, Mr. Coffman acknowledged at deposition that Plaintiffs' theories are "omission theories" that concern allegedly "omitted information."[45]  Assuming these claims made by Plaintiffs and Mr. Coffman were true, from an economic perspective, one would not expect the alleged misrepresentations during the proposed Class Period to cause Uniti's stock price to increase when they were made.  As such, whether the stock price increased at the time of the alleged misrepresentations would not necessarily be instructive in assessing price impact in this matter.

38.     To assess price impact, I evaluate whether the purported revelation of the "truth" regarding the alleged misrepresentations changed Uniti's stock price in a statistically significant manner on a given day.  This involves assessing (1) whether there was a statistically significant stock price decline following the alleged corrective disclosures based on a properly conducted event study model,[46] and if so, (2) whether the stock price decline on each alleged corrective disclosure date can be attributed to the purported revelation of the alleged misrepresentations.  Even if there was a statically significant price decline on a given date, the price decline could be attributable to other factors that were economically unrelated to the alleged fraud rather than revelation of the alleged misrepresentations.  Additionally, the stock price decline would not be attributable to the alleged misrepresentations if the purported "truth" regarding the alleged misrepresentations had already been fully disclosed and thus would not impact the stock price in an efficient market.  In those cases, I conclude that the alleged misrepresentations had no "price impact" in connection with that alleged corrective disclosure.

---

[43] Plaintiffs' Opposition to MTD, p. 24 (emphasis removed from original).
[44] Complaint, ¶254.
[45] Coffman Deposition, 282:25–283:9 ("Q.  Is it fair to say that the theory or theories that we were talking about in connection with paragraph 16 of the complaint are omission theories? … A.  I generally understand that part of what the Plaintiffs are stating is that the company omitted information, if that's the question, yes.").
[46] My event study model is described in detail in **Appendix D**.

**A.      The Alleged Misrepresentations Did Not Have a Price Impact on Uniti's Stock In Connection With the Alleged Corrective Disclosure on August 3, 2017**

39.      On the morning of August 3, 2017, Windstream announced that it was eliminating its quarterly dividend payment to shareholders.[47]  Plaintiffs identify this dividend elimination as a "partial disclosure" where "the truth and concealed risks materialized."[48]  They assert that "[a]s a result of Windstream's disclosure, the price of Uniti's stock fell more than 8% on August 3, 2017."[49]  They attribute this price decline as well as the price decline on the next trading date to "firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific non-fraud factors."[50]

40.      However, based on my analysis of the stock price movement and information released on that date, there is no economic connection between the information revealed by the dividend elimination and the alleged misrepresentations under Plaintiffs' theories of liability. As such, the alleged misrepresentations had *no* price impact in connection with that alleged corrective disclosure.

41.      In the Complaint, Plaintiffs do not identify which alleged misrepresentations the August 3, 2017 disclosure purportedly revealed or corrected, or what risks supposedly materialized in connection with the announced dividend cut.  There is no economic connection between the announcement that Windstream was cutting its dividend and the risk of whether the spin-off was a prohibited sale-leaseback transaction, or of whether the Master Lease was not in fact a "true lease."  Moreover, the dividend cut entirely predated the alleged misstatements by Defendants regarding Unity's ability to navigate Windstream's bankruptcy (and, indeed, Windstream's bankruptcy itself) and, thus, has no economic connection to any

---

[47] Windstream Press Release, "Windstream Board of Directors Revises Capital Allocation Strategy," August 3, 2017.

[48] Complaint, ¶246.

[49] Complaint, ¶247.

[50] Complaint, ¶246.  The dividend announcement was made in the morning of August 3, and in an efficient market, the stock price would incorporate value relevant information quickly, usually within a day.  In his 1991 review of the market efficiency literature at the time, Professor Fama notes that the "typical result in event studies on daily data is that, on average, stock prices seem to adjust within a day to event announcements."  *See*, Fama (1991), p. 1601.  Plaintiffs fail to explain how the assertion that the stock price decline on August 4, 2017 could be attributed to the dividend elimination announcement is consistent with Mr. Coffman's conclusion on market efficiency.  Regardless, even if the price movement on August 4, 2017 can be attributed to the dividend elimination, the allegedly misrepresented information did not have a price impact on this day, for the same reasons there was no price impact on August 3, 2017.  Plaintiffs further assert that "partial disclosures relating to the default of Windstream's debt covenants caused by the Spin-Off began to enter the market during August 2017 when rumors circulated that the Spin-Off violated Windstream's debt covenants."  *See*, Complaint, ¶249. At deposition, Mr. Coffman admitted that the Complaint doesn't provide "sufficient information" to assess these claims.  *See*, Coffman Deposition, 307:24–308:24.  Indeed, absent further information, it is not clear how an economist could reliably evaluate the impact of unspecified "rumors" over a month-long period.

such alleged misrepresentations. Nor, to my understanding, do Plaintiffs allege any misrepresentations by Uniti regarding the amount of Windstream's dividend payment.

42. Rather than constituting evidence of the impact of the alleged misrepresentations under any of Plaintiffs' theories of liability, from an economic perspective, Uniti's stock price reaction following the announced Windstream dividend cut on August 3, 2017 instead reflects Uniti's previously disclosed exposure to Windstream's financial performance. This is a risk factor that had been disclosed by Uniti and discussed extensively by analysts since the beginning of the proposed Class Period.

43. Specifically, Uniti disclosed in its SEC filings prior to August 3, 2017 that Windstream's lease payments to Uniti accounted for a substantial portion of Uniti's revenues, and that if Windstream encountered liquidity or financial difficulties, that would negatively impact Uniti. For example, Uniti disclosed in its Information Statement filed with its Form 8-K dated March 26, 2015, prior to the proposed Class Period, that:[51]

> Immediately following the Spin-Off, Windstream Holdings will be the lessee of the Distribution Systems pursuant to the Master Lease and, therefore, will be the source of substantially all of our revenues … There can be no assurance that Windstream Holdings will have sufficient assets, income and access to financing to enable it to satisfy its payment obligations under the Master Lease. The inability or unwillingness of Windstream Holdings to meet its rent obligations under the Master Lease could materially adversely affect our business, financial position or results of operations, including our ability to pay dividends to our shareholders as required to maintain our status as a REIT.

44. Uniti also disclosed in its Form 10-Q for the quarter ending March 31, 2017 filed on May 4, 2017, its last quarterly filing prior to the Windstream dividend cut, that:[52]

> "Because a substantial portion of our revenue is derived from lease payments by Windstream pursuant to the Master Lease, there could be a material adverse impact on our consolidated results of operations, liquidity and/or financial condition if Windstream experiences operating difficulties and becomes unable to generate sufficient cash to make payments to us."

---

[51] Uniti Group Inc., Form 8-K, Filed on March 26, 2015, EX-99.1 Information Statement, p. 25.
[52] Uniti Group Inc., Form 10-Q for the Quarterly Period Ended March 31, 2017, Filed on May 4, 2017, p. 33. Uniti made similar disclosure in its 2016 Form 10-K. *See also,* Uniti Group Inc., Form 10-K for the Fiscal Year Ended December 31, 2016, Filed on February 23, 2017, p. 31.

45.     In addition, from the beginning of the proposed Class Period, analysts noted the risk to Uniti of its significant dependence on Windstream.  For example, analysts commented:[53]

- "Current primary source of revenue is the $650 million annual cash lease payment from Windstream holding… Should worse come to worst and Windstream's revenue and EBITDA do not stabilize by 2017 as we currently project, and Windstream isn't able to cover both its lease and interest payments even after cutting its dividends and capex as described above, there is risk that Windstream could be pushed into bankruptcy by its creditors. Should Windstream fall into bankruptcy, the priority of [Uniti]'s lease payments is unpredictable at best."[54]  (J.P. Morgan, June 22, 2015)

- "Investors remain concerned about [Uniti]'s tenant risk given Windstream accounts for 100% of its leasing revenue … We expect [Uniti]'s tenant risk to diversify over time, though we expect Windstream to remain the primary tenant for the foreseeable future."[55] (Morgan Stanley, November 4, 2015)

- "SIGNIFICANT DEPENDENCE ON WINDSTREAM – As mentioned, over 85% of [Uniti]'s revenue comes from Windstream. This much customer concentration is a concern.  As we have written, we expect [Uniti] to continue to diversify this revenue based on its pipeline but today much of [Uniti]'s outlook depends on the stability of WIN."[56]  (Wells Fargo, February 16, 2017)

- "[Uniti] largely relies on rent payments from Windstream and any risk to the Windstream OpCo could heighten concerns on the future risk of the leasing stream."[57]  (Citi, February 23, 2017)

- "Windstream's lease payments make up ~70% of pro forma total revenue, linking the investment narratives of the two companies.  A risk to Uniti would result if Windstream experiences operating and financial difficulties and becomes unable to generate sufficient cash to

---

[53] For the purpose of the price impact analysis, I have reviewed all the analyst reports covering Uniti and Windstream that were submitted in the materials produced in support of Coffman Report.  I supplemented these reports with additional reports obtained from counsel and from searches in *Capital IQ* and *Refinitiv* from the day prior through the week following the alleged corrective disclosures as well as the day prior to July 23 through the week following July 31, 2018, when the trial of the Aurelius litigation took place.

[54] "Initiating with an Overweight Rating and YE2016 Price Target of $31," *J.P. Morgan*, June 22, 2015.

[55] "3Q15 Preview:  Unlocking the Pipeline," *Morgan Stanley*, November 4, 2015.

[56] "CSAL:  Initiating Coverage With An Outperform Rating Unique REIT With Communications Infrastructure Opportunity," *Wells Fargo*, February 16, 2017.

[57] "Results: Steady C4Q Results and Guidance," *Citi*, February 23, 2017.

make payments under the Master Lease."[58]  (RBC Capital Markets, June 19, 2017)

46.     Given that more than two-thirds of Uniti's revenue was from a single customer, Windstream, Uniti's stock price would be expected to be sensitive to changes in Windstream's business or financial performance.  To put it in another way, regardless of the alleged misrepresentations, Uniti's stock price would have been expected to drop on this date given Uniti's concentrated exposure to Windstream and the dividend cut's negative signal regarding Windstream's financial condition.  Indeed, Windstream's *own* stock price declined by close to 40% on that day.

47.     To illustrate how such a price drop could be expected to impact Uniti based on the known relationship between the companies, I have estimated how Uniti's stock price return historically could be explained by Windstream's stock price movement in addition to market and industry returns, by including Windstream's stock return as an additional explanatory factor in my event study model.[59]  Doing so, I find that Uniti's residual return on August 3, 2017 was negative 1.05% and not statistically significant, meaning that once the movement in Windstream's stock price was controlled for (in addition to the market and industry effects), Uniti's stock did not have a statistically significant price reaction on that day.[60]  To put it in another way, Uniti's stock price moved in a way as expected on August 3, 2017 based on how its stock price historically moved in relation to Windstream's stock price.

48.     As further evidence that the price movement following the announcement of Windstream's dividend cut does not constitute evidence of the price impact of the alleged misrepresentations under any of Plaintiffs' theories of liability, no securities analyst reports published in the week following the August 3, 2017 disclosure discussed the risk that the

---

[58] "Initiating at Outperform; Favorable Growth, Diversification, and Dividend," *RBC Capital Markets*, June 19, 2017.

[59] In this case, Uniti's stock price was known to be exposed to the financial performance of Windstream given that Windstream was Uniti's largest customer.  Such an exposure could be expected in a normal business situation where a company's financial performance is linked to a concentrated (sometimes a single) set of customers or suppliers.  Academic studies have documented linkages between a company and its customers. *See, e.g.*, Hertzel, Michael G., et al. 2008. "Inter-firm Linkages and the Wealth Effects of Financial Distress Along the Supply Chain." *Journal of Financial Economics* 87 (2): 374–387 at p. 374 ("distress related to bankruptcy filings is associated with negative and significant stock price effects for suppliers.").  Campello, Murillo, and Janet Gao. 2017. "Customer Concentration and Loan Contract Terms." *Journal of Financial Economics* 123 (1): 108–136 at p. 110 ("customer concentration ultimately bears negative effects on firm creditworthiness.").  However, to the extent that Plaintiffs allege that some of such exposure could be attributed to alleged misrepresentations, I have not controlled for Windstream's stock returns in my event study regression model when analyzing price impact on every alleged corrective disclosure date.

[60] The results of this analysis are documented in **Exhibit 1**.

spin-off transaction represented a prohibited sale-leaseback or the risk that the Master Lease was not a "true lease."[61]

49.    Nor did analysts tie the reason for Windstream's dividend cut to either the risk that the spin-off was a prohibited sale-leaseback or the risk that the Master Lease was not a "true lease."  Rather, securities analysts viewed Windstream's dividend cut as driven by a change in its "capital allocation" strategy in order to generate free cash flows to de-lever.  They also discussed it in the context of Windstream's "elusive" revenue stabilization, as a signal of potential financial weakness.  For example:

- "[Windstream's dividend cut] could bring forth a new era, ending the decades-old institution of large telcos as dividend stocks.  The changeover of WINs yield-mandated investor base will be painful… All in, fundamentals remain mostly unchanged-to slightly-weaker, as today's stock pullback had far more to do with a change in capital allocation philosophy and a painful changeover of the investor base than any large fundamental erosion."[62]  (Cowen, August 3, 2017)

- "Additionally, the unchanged guidance now includes Broadview, resulting in a de facto guidance cut. The loss of high-margin legacy revenue, and declining broadband subscribers will continue to weigh on results and sentiment [for Windstream].  We lower our PT to $2.50 … Management announced a change in the capital allocation strategy, eliminating the dividend, and announcing a $90mn share repurchase authorization … Management identified valuation, and the company's strategic direction as reasons to reallocate the use of cash, but investors sold the shares aggressively on the news, with the stock down over 36%. … Strategic revenue stabilization remains elusive, with Enterprise softness in the quarter."[63]  (Jefferies, August 4, 2017)

---

[61] Plaintiffs' complaint cites a *J.P. Morgan* analyst report dated October 2, 2017, stating that "Uniti shares have fallen 40% to $14.66 (vs SPX +2%) since reporting in-line 2Q17 earnings on August 3rd, driven by fears surrounding the stability of the Windstream business and the viability of the WIN/UNIT spin structure." Complaint, ¶252, *see also* Plaintiffs' Opposition to MTD, p. 53 (referencing "Shift in Risk/Reward as WIN Structure in Question.  Downgrade to Neutral," *J.P. Morgan*, October 2, 2017).  The report makes a general reference to the "WIN/UNIT spin structure" in the context of discussing Uniti's financial exposure to Windstream as well as Windstream's financial distress.  In addition, the Complaint cites to a *SunTrust Robinson Humphrey* analyst report dated October 3, 2017, stating that "[u]nder pressure since WIN cut its dividend, last week's disclosure that a 25%WIN noteholder issued the company a notice of default alleging breach of the Sale and Leaseback covenant two years ago from the spin-off that added to the UNIT sell-off."  Complaint, ¶252, *see also* Plaintiffs' Opposition to MTD, p. 53 (citing "Default Allegation Unreasonable; Master Lease Likely To Survive; Buy," *SunTrust Robinson Humphrey*, October 3, 2017).  Neither report ties the Windstream's dividend cut to the risk that the spin-off transaction represented a prohibited sale-leaseback, or the risk that the Master Lease was not a "true lease."  Moreover, both of these analyst reports were issued approximately two months after the August 3, 2017 dividend cut.

[62] "WIN Rips the Band-Aid Off, Opens Pandora's Box for RLEC 'Identity Crisis,'" *Cowen*, August 3, 2017.

[63] "Dividend Eliminated; Guidance Reduced," *Jefferies*, August 4, 2017.

- "[Uniti's] largest tenant (Windstream [WIN, $2.27, NR], ~70% of pro forma revenues) is showing signs of continued distress … WIN weakness, elimination of dividend likely puts pressure on the stock near term and increases the risk of its roll-up story … We believe this will remain an overhang on the stock until it is clear that WIN operations stabilize or UNIT acquisitions can reduce its concentration on WIN."[64]  (SunTrust Robinson Humphrey, August 7, 2017)

50.    In summary, given the absence of any economic linkage between the alleged misrepresentations under any of Plaintiffs' theories of liabilities and the disclosure of Windstream's elimination of its dividend, the alleged misrepresentations had no price impact on Uniti's stock in connection with the disclosure on August 3, 2017.

**B.    The Alleged Misrepresentations Under Plaintiffs' True Lease Theory and Navigating the Bankruptcy Theory Did Not Have a Price Impact on Uniti's Stock In Connection With the Alleged Corrective Disclosure on September 25, 2017**

51.    On September 25, 2017, after the market closed, Windstream filed a Form 8-K, announcing that it had "received a purported notice of default" from Aurelius, alleging that "the transfer of certain assets and the subsequent lease of those assets in connection with the spinoff … in April 2015 constituted a Sale and Leaseback Transaction (as defined in the indenture) which did not comply with the Sale and Leaseback covenant under the Indenture."[65]  Plaintiffs identify Aurelius' notice of default as a "partial disclosure" where "[t]he truth and concealed risks materialized."[66]  They claim that Uniti's stock price dropped on the next two trading days due to this alleged corrective disclosure.[67]

52.    The Aurelius notice of default claiming a breach of the Sale and Leaseback covenant of the indenture appears to relate to Plaintiffs' Sale-Leaseback Theory, i.e., the allegedly misrepresented and concealed risk that "the Spin-Off was a prohibited sale-leaseback transaction that violated the indenture."[68]  Nonetheless, given the absence of new incremental factual information regarding the spin-off contained in the notice of default itself, the stock

---

[64] "Mixed 2Q17, Guidance Raised; Reiterate Buy, $30 Target," *SunTrust Robinson Humphrey*, August 7, 2017 (emphasis removed from original).

[65] Windstream Holdings, Inc., Form 8-K, Filed on September 25, 2017.  *See also*, Complaint, ¶177.

[66] Complaint, ¶246.

[67] Complaint, ¶254.  Again, Plaintiffs appear to claim that the stock price movement on September 27, 2017 could be attributed to the announcement of the notice of default.  However, as mentioned above, in an efficient market, stock prices react to information fully and quickly.  Plaintiffs fail to explain how their attempt to include the stock price decline on September 27, 2017 as attributed to the announcement on September 25, 2017 is consistent with Mr. Coffman's conclusion on market efficiency.

[68] Complaint, ¶16.

price movement could be a response to the fact that a third party was bringing a legal action related to the spin-off (a risk that Uniti had previously disclosed) rather than any new information that revealed the "truth" about the spin-off transaction.[69]

53.     In any event, from an economic perspective, the Aurelius notice of default provided no new information—and, indeed, is economically unrelated to—Plaintiffs' other two theories of liability, i.e., the True Lease Theory and the Navigating the Bankruptcy Theory. The notice of default contains no discussion or information related to assessing whether the characterization of the Master Lease as a "true lease" could be challenged, such as information related to the useful life of the copper wire assets.  Nor does the disclosure bear any economic connection with the alleged misrepresentations under the Navigating the Bankruptcy Theory, as those alleged misrepresentations did not take place until later— beginning in February 2019 when Windstream filed bankruptcy.

54.     Consistent with the notion that the announcement of the Aurelius notice of default has no economic connection with the allegations under Plaintiffs' True Lease Theory, no securities analyst reports published immediately following the September 25, 2017 disclosure discussed the risk that the Master Lease's characterization as a "true lease" could be challenged.[70]  Nor have I seen in any analyst reports published during that period any discussion or information related to the copper wire asset useful life estimate.

55.     Given the absence of any economic connection (i.e., mismatch) between Plaintiffs' True Lease Theory and their Navigating the Bankruptcy Theory and the disclosure of the Aurelius notice of default, the allegations under these theories had no price impact on Uniti's stock following the announcement of Aurelius' notice of default.

---

[69] Uniti had already disclosed the risk that someone may challenge the spin-off structure well before this date, which is acknowledged in the Complaint: "Disputes with third parties could also arise out of these [spin-off] transactions. … These increased expenses, changes to operations, disputes with third parties, or other effects could materially and adversely affect our business, financial position or results of operations."  (Complaint, ¶162; Uniti Group Inc., Form 10-Q for the Quarterly Period Ended June 30, 2015, Filed on August 13, 2015, p. 44.)  Indeed, given the Aurelius' notice of default contains no new information about the spin-offs, it is unclear (and Mr. Coffman certainly has not addressed) how the price drop reflects revelation of the alleged misrepresentations, rather than the market's wariness about the uncertainty and costs involved in Windstream's potential future legal disputes and any potential negative impact on Uniti.

[70] I have considered analyst reports for Uniti and Windstream published between September 25, 2017 and October 2, 2017, the week following the alleged disclosure.

C.      **The Alleged Misrepresentations Did Not Have a Price Impact on Uniti's Stock In Connection With the Alleged Corrective Disclosure on February 15, 2019**

56.     Plaintiffs allege that "[a]fter the close of the market on February 15, 2019, another partial disclosure was made … Judge Furman … issued his ruling determining that the Spin-Off did violate Windstream's Indenture, and finding that a $300 million judgment should be entered against Windstream.  As a result of this information, the price of Uniti stock declined more than 37% ... on February 19, 2019, the first trading day after Judge Furman's decision was issued."[71]  Plaintiffs further allege that "on February 21, 2019, S&P and Fitch, respectively, downgraded the credit ratings of Uniti as the markets digested the revelations about the Spin-Off," and that "[a]s a direct result, the price of Uniti's stock fell further, over 18% ... [and] continued to fall on February 22, 2019 as the market absorbed this news, losing another 8%."[72]

57.     In this section, I show that the alleged misrepresentations under any of Plaintiffs three theories of liability did not have a price impact on Uniti's stock on February 19 and 21–22, 2019.

58.     *First*, from an economic perspective, for the same reasons discussed in **Section VI.B**, the price movements on February 19 and 21–22, 2019 are not evidence of price impact with respect to Plaintiffs' True Lease Theory or Navigating the Bankruptcy Theory.  In short, there is no economic connection between the information disclosed on the February dates and the alleged misrepresentations under these two theories.

59.     *Second*, with respect to the Sale-Leaseback Theory, as detailed further below, assuming that Uniti's stock traded in an efficient market during the proposed Class Period, the price movements on these dates were not attributable to the purported revelation of the truth of the alleged misrepresentations (i.e., information that would allow the market to assess the true risk that the transaction was a sale-leaseback).  Instead, the price movements were attributable to Judge Furman reaching a legal opinion, based on facts that were already publicly available, that had negative financial implications for Windstream and in turn Uniti.

60.     Based on my review of the relevant information mix, the market was aware that a third party was alleging the covenant violation by no later than September 25, 2017, by virtue of Windstream's disclosure of Aurelius' notice of default on that date.  Thus, if the market for

---

[71] Complaint, ¶¶255–256.
[72] Complaint, ¶259.

Uniti's stock was efficient, and if Plaintiffs' allegations about the "concealed" risk under the Sale-Leaseback Theory were correct, the stock price should have incorporated the risk as reflected by this disclosure. In any event, even if, according to Plaintiffs, this disclosure alone were not sufficient to reveal the allegedly concealed risk, Aurelius' detailed allegations regarding the violation and ultimate factual basis for its claims were further disclosed to the market in the Aurelius Complaint filed on October 12, 2017 and in the Proposed Findings of Fact and Conclusions of Law by U.S. Bank, the trustee for Windstream notes, filed on June 15, 2018 (the "U.S. Bank Proposed Findings of Fact"), both of which were publicly available. Furthermore, all of the factual information cited in the judge's opinion in connection with his conclusion regarding the sale-leaseback covenant violation had been revealed to the market well before February 2019 through Windstream's public statements to regulators, Uniti's and Windstream's publicly available financial statements, the legal proceedings, and the trial itself, which concluded more than six months prior to the ruling. Therefore, any "concealed" risk as alleged by Plaintiffs had been fully disclosed well before the ruling was issued. The only thing that was not known was how the judge would rule.

61.      Assuming Uniti's stock traded in an efficient market, information that had previously been disclosed could not have impacted Uniti's stock price in February 2019. It follows, therefore, that it was the judge's legal opinion, which exacerbated the risk of a Windstream bankruptcy and subsequently was the catalyst for the ratings agency downgrades of Uniti, that impacted Uniti's stock price. Prior to the ruling, securities analysts indicated that market participants appeared to consider that there was a high likelihood that Windstream would prevail in the litigation, despite the market having access to all of the factual findings underlying the legal dispute. Given the potential negative consequence of this ruling on Windstream, and in turn on Uniti, it is not surprising that the stock prices of the two companies reacted negatively to the unexpected legal conclusion.

62.      I understand that Plaintiffs do not allege that Defendants should have predicted, let alone disclosed, the judge's ultimate legal opinion or the resulting ratings agency actions at an earlier point in the proposed Class Period. As Mr. Coffman acknowledged at his deposition, "[Uniti] could not have disclosed the decision before the decision occurred nor is that the basis for [P]laintiffs' claims."[73] Thus, Uniti's stock price movements on February 19 and 21–22, 2019 are attributable to information that could not have been previously disclosed by the Company.

---

[73] Deposition of Chad Coffman, December 6, 2021 ("Coffman Deposition"), 314:6–14.

63.     The remainder of this section is organized as follows.

    a.  In **Section VI.C.1**, I show that when Aurelius and the trustee laid out their arguments and factual support (on which they ultimately prevailed, as reflected in Judge Furman's Opinion), there was no statistically significant stock price decline and no offsetting information that could have obscured an otherwise statistically significant stock price decline.

    b.  In **Section VI.C.2**, I discuss in detail the factual information cited by Judge Furman in reaching the conclusion that Windstream engaged in a prohibited sale-leaseback transaction, and the timeline of when that information was publicly available. I find that the information that he cites was publicly available well before February 2019.

    c.  In **Section VI.C.3**, I explain that, because the facts cited by Judge Furman in reaching his conclusion and referenced in the ratings agency actions had been publicly available prior to February 15, 2019, there was no longer concealed risk by the date of his decision.  It was therefore the judge's legal opinion, which in turn was the catalyst for the ratings agency downgrade—not any new information that supposedly revealed the alleged misrepresentations or unmasked the true risk—that impacted Uniti's stock price on February 19 and 21–22, 2019.

    **1.  There Were No Negative and Statistically Significant Stock Returns Following Aurelius' Complaint or Proposed Finding of Fact**

64.     As noted above, the market was aware that a third party was alleging a violation of the indenture due to the spin-off being a sale-leaseback transaction by September 25, 2017, when Windstream disclosed that Aurelius had served a notice of default on the basis of such a violation.  To the extent that Plaintiffs are alleging that this did not fully disclose the allegedly concealed "risk" under the Sale Leaseback Theory, residual risk would have been further disclosed when Aurelius filed its Complaint on October 12, 2017 and when U.S. Bank filed the U.S. Bank Proposed Findings of Fact on June 15, 2018.[74]  These documents lay out in detail Aurelius' arguments regarding why the spin-off was a sale-leaseback transaction, as

---

[74] Plaintiff-Counterclaim Defendant U.S. Bank National Association's Proposed Findings of Fact and Conclusions of Law, *U.S. Bank National Association v. Windstream Services, LLC v. Aurelius Capital Master, Ltd.*, June 15, 2018.

well as the underlying factual information that Aurelius was using to support its claims, which, as explained further in the next section, largely overlap with the information cited by Judge Furman in his legal opinion.  However, I find that there was no statistically significant negative movement in Uniti's stock price when these documents were filed, which is consistent with the notion that the risk of a violation of the sale-leaseback covenant had already been disclosed and incorporated into Uniti's stock price.

65.     As detailed below, Judge Furman primarily cites three categories of relevant facts in his ruling when analyzing the sale-leaseback related claims:  (1) Windstream's statements to state utilities regulators representing that the Transferor Subsidiaries[75] would still have the exclusive rights, control and obligations over the same assets,[76] (2) facts showing that Windstream subsidiaries had exclusive control over the transferred assets and entered into subleases with third parties,[77] and (3) facts showing that Windstream subsidiaries incurred substantial expenses for capital improvements and categorized the rent payments as long-term lease obligations.[78]

66.     The Aurelius Complaint references the same facts, noting:[79]

- "As regulated entities, the Transferor Subsidiaries were required to obtain (and did obtain) prior approval for the transfer of the Transferred Assets to CSL from the utilities regulators of numerous states.  The Transferor Subsidiaries' written applications and supplemental responses, as well as testimony by Windstream officers, contain repeated assurances that the Transferor Subsidiaries would lease back the assets they transferred to CSL.  For example:  In every application, the Transferor Subsidiaries represented that they would have the exclusive, long-term right to use, operate, and control the Leased Property."

- "Consistent with Windstream's representations to regulators that the Transferor Subsidiaries would have the right to 'sublease access to the system'… the Transferor Subsidiaries have granted access to the Leased Property to third parties for consideration."

- "From the closing of the transaction on April 24, 2015 through to the present, the Transferor Subsidiaries have funded at least $339 million

---

[75] *See*, Judge Furman Ruling, p. 2 ("certain subsidiaries of Services (the 'Transferor Subsidiaries') …[which] transferred assets to a real estate investment trust, which then leased the assets to Services' parent holding company, Windstream Holdings.").
[76] Aurelius Complaint, ¶¶4, 54.
[77] Aurelius Complaint, ¶¶5, 59–60.
[78] Aurelius Complaint, ¶¶6, 61–64.
[79] Aurelius Complaint, ¶¶54, 60, 62, 64.

in capital improvements to the Leased Property.  Under Master Lease Section 10.2(c), such tenant-funded capital improvements become part of the Leased Property owned by CSL … In recognition of the lease arrangement with the Transferor Subsidiaries, Holdings' and the subsidiaries' respective financial statements report the rent payments from the subsidiaries to Holdings as payments on a lease, and the Company's subsidiaries record corresponding long-term lease obligations on their financial statements."

67.    Similarly, the U.S. Bank Proposed Findings of Fact details these facts.  For example, it notes:[80]

- "[T]he Transferor Subsidiaries (as well as Holdings) repeatedly represented to the regulators that after transferring their assets to CSL, the Transferor Subsidiaries would 'lease them back on an exclusive, long-term basis' and would 'continue to have long term access to and control over the facilities used to provide regulated services,' including the right to "sublease access to the system" to third parties."

- "Services' financial statements filed with the SEC reflect that the Transferor Subsidiaries have billions of dollars of 'long-term lease obligations' with respect to the Leased Property, in an amount equal to the present value of the scheduled rent payments under the Master Lease as calculated by Services.  Likewise, those financial statements report the Transferor Subsidiaries annually making hundreds of millions of dollars of rent payments, recorded as 'payment under long-term lease obligations' and related interest expense, equal to the scheduled rental payments under the Master Lease."

- "Since the closing of the Transaction on April 24, 2015 the Transferor Subsidiaries have entered into more than 120 such agreements, with terms as long as 29 years.  These include: ... Collocation agreements ... Fiber exchange agreements ... Dark or dim fiber agreements ... Pole attachment agreements ... [and] Sublease of real estate."

- "From the closing of the Transaction through the present, the Transferor Subsidiaries have made capital improvements to the Leased Property, spending more than $339 million through the first half of 2017 to maintain, repair, overbuild, upgrade, and replace portions of the Leased Property … all of which capital improvements become property of CSL … The Transferor Subsidiaries record these capital expenditures in their individual financial statements."

---

[80] U.S. Bank Proposed Findings of Fact ¶¶7, 9, 74, 77 (emphasis removed from original).

68.     Therefore, Aurelius' arguments regarding why the spin-off was a sale-leaseback transaction that violated the terms of the indenture, as well as the underlying factual information cited by Aurelius to support its arguments, which Judge Furman ultimately credits in his ruling, were already disclosed to the market by October 12, 2017, when Aurelius filed its complaint, and by June 15, 2018, when the U.S. Bank Proposed Findings of Fact was filed (and Windstream filed its own Proposed Findings of Fact).

69.     Notably, however, on October 12, 2017 and June 15, 2018, as well as the next trading days after these two dates, Uniti's residual stock price returns were not statistically significant.[81]  In addition, I have not found any positive value-relevant news that would have offset an otherwise statistically significant negative price return on those days.[82]  The lack of statically significant price movements associated with these earlier disclosures regarding the risk that the spin-off could constitute a prohibited sale-leaseback transaction provides further evidence that revelation of the same information could *not* have impacted the price in February 2019, assuming Uniti's stock traded in an efficient market.

### 2.  The Factual Information Cited by Judge Furman in Reaching His Sale-Leaseback Opinion Was Publicly Disclosed Well Before His Opinion Was Issued

70.     In this section, I analyze whether there was any additional information, beyond what was revealed by the Notice of Default, the Aurelius Complaint, and the U.S. Bank Proposed Findings of Fact, that Judge Furman cites in his opinion, and whether that information had been previously disclosed to the public.  I discuss the documents that Judge Furman cites in reaching his opinion, and the timing of when the relevant information was released to the public.  I show that all of the information that he cites was already public prior to the ruling.

### a)  Facts Cited by Judge Furman and Methodology for Assessing Such Information

71.     Judge Furman reaches his opinion that the spin-off was a sale-leaseback transaction that violated the indenture "for two independent reasons."[83]

---

[81] I provide detail on my event study model used to evaluate the statistical significance of Uniti stock residual returns in **Appendix D**.

[82] I have reviewed Windstream and Uniti analyst reports and public press headlines surrounding October 12, 2017 and June 15, 2018 (between market close on the day prior and market close on the next trading day).

[83] Judge Furman Ruling, p. 28.

72.     First, Judge Furman "concludes that the Transferor Subsidiaries lease the transferred assets as a matter of law."[84]  He notes that the Windstream subsidiaries "plainly hold the Transferred Assets in a manner consistent with leasehold interest" given that the subsidiaries had exclusive control over the transferred assets and entered into subleases with third parties.[85]  To support this conclusion, he cites documents including the Master Lease, the requests for admission in the case, and subleases between Windstream and third parties.  He further notes that the "Transferor Subsidiaries are paying consideration … in exchange for their right to use and occupy the Transferred Assets."[86]  This includes both indirect payments made through Windstream Holdings, which are funded by the subsidiaries as the holding company has no revenue of its own, and direct payments "in the form of maintenance, taxes, utilities, insurance, and capital improvements."[87]  He cites evidence including Windstream and Uniti's public financial statements, testimony at trial, requests for admissions, and affidavits to support this conclusion.

73.     Second, Judge Furman concludes that "[Windstream] Services is judicially estopped from denying that the Transferor Subsidiaries 'lease' the Transferred Assets" because, as part of the process of seeking regulatory approval for the transaction, "Windstream… made explicit representations to nine state regulatory bodies that the Transferor Subsidiaries would transfer ownership of the Transferor Assets and then 'lease them back on an exclusive, long-term basis'" and "state regulators adopted these representations by relying on them to approve the transaction."[88]  He cites Windstream's applications to regulators, and the regulators' approvals to support this conclusion.

74.     To analyze whether the factual findings cited in Judge Furman's ruling were previously publicly available, I use the following methodology:  I analyze all documents that Judge Furman cites in sub sections a. and b. of Section B.1 of his opinion, in which he provides his "two independent reasons" for concluding that the transaction was a sale-

---

[84] Judge Furman Ruling, p. 28.
[85] Judge Furman Ruling, pp. 28–29.
[86] Judge Furman Ruling, p. 30.
[87] Judge Furman Ruling, pp. 30–32.
[88] Judge Furman Ruling, pp. 33–34.

leaseback.[89],[90]  For completeness, I also consider incremental documents cited by Judge Furman in the "Factual Findings" Sections A–D of his ruling.[91]

75.    **Exhibit 2** provides a list of these documents.

b)    **Timeline of Public Disclosure of Documents Cited by Judge Furman**

76.    Some of the information contained in the documents cited by Judge Furman and identified in **Exhibit 2** was publicly disclosed in the normal course of business, such as through the financial statements that Uniti and Windstream regularly filed with the SEC, or through regulatory submissions posted on public state regulator websites.  Other information became publicly available as part of the Aurelius litigation, such as through documents cited in the Aurelius Complaint filed on October 12, 2017, the U.S. Bank Proposed Findings of Fact filed on June 15, 2018, trial exhibits and other documents available through the docket, and testimony during the public bench trial held in July 2018.

77.    Notably, the trial that took place on July 23–25 and 31, 2018 was open to the public and attended by securities analysts and other market commentators.[92]  For example, securities analysts from Raymond James stated in an analyst report published on July 31, 2018 that they "attended the closing arguments" of the trial and outlined a few issues discussed during the closing arguments.[93]  An analyst from Bank of America stated in a report published on August 1, 2018 that they "sat in on the trial and oral arguments."[94]  *The Wall Street Journal* published an article on August 1, 2018 quoting certain statements made by Judge Furman during the trial on July 31, 2018.[95]  *Bloomberg* published several articles covering the trial.[96]

---

[89] I do not include documents from these sub sections that are cited by Windstream to support their arguments, i.e., Windstream Services, LLC Officers' Certificate, Dividend Payment, dated April 7, 2017 (DX-26) and Minutes of a Meeting of the Board of Directors of Windstream Holdings, Inc. and Windstream Services, LLC (DX-51). Judge Furman Ruling, pp. 31–32.

[90] I also consider documents in sub section c. ("Services' other arguments are without merit") that Judge Furman cites in rejecting Services arguments.  I do not include documents from this section that are cited by Windstream Services in support of their arguments.  *See* **Exhibit 2**.

[91] I do not include documents cited in "Factual Findings" Sections E–F, which concern the history of Aurelius' litigation against Windstream and Windstream's subsequent noteholders exchange offer in 2017.

[92] Trial Transcripts, *U.S. Bank National Association v. Windstream Services, LLC v Aurelius Capital Master, Ltd.*, July 23–25, 31, 2018.

[93] "Windstream Trial Wraps Up; Remain Positive on Outcome," *Raymond James*, July 31, 2018.

[94] "The Wait Begins as WIN Court Case Wraps Up," *Bank of America Merrill Lynch*, August 1, 2018.

[95] "Last Showdown Between Aurelius and Windstream Draws a Crowd in New York Court," *Wall Street Journal Pro*, August 1, 2018.

[96] *See, e.g.*, "Windstream-Aurelius Trial Starts With Statements Given to States," *Bloomberg*, July 23, 2018; "No Advantage in Day 1 of Windstream-Aurelius Trial:  CreditSights," *Bloomberg*, July 24, 2018; "Windstream-Aurelius Trial Adjourned to July 31 After Testimony," *Bloomberg*, July 25, 2018; "Windstream Concludes Default Trial with No Date for Decision," *Bloomberg*, July 31, 2018.

Moreover, the trial transcripts were filed and available through the court on August 23, 2018. None of the trial days (or the next trading days) was associated with a statistically significant decline in Uniti's stock price.

78.     For each document cited by Judge Furman, I have reviewed public information to assess whether and when the document was made publicly available.  In particular:

      a.  Documents concerning Windstream's statements to state utilities regulators, with one exception discussed below, are publicly available via state regulator websites and were overwhelmingly filed prior to the proposed Class Period. For these documents, I consider the date on which the document was filed with the regulator.

      b.  Windstream and Uniti financial filings, which include copies of the Master Lease and indenture, and financial statements with information on Windstream subsidiaries incurring substantial expenses for capital improvements and categorizing rent payments as long-term lease obligations were available through the SEC's EDGAR database.  To the extent that an earlier SEC filing contained similar information, I consider that earlier filing as well.  For example, as discussed above, Judge Furman cites Windstream's 2016 Form 10-K to support the statement that Windstream recognized the monthly rent payments as "Long-term lease obligations."  The same information was first included in Windstream's Form 10-Q for the quarter ended March 31, 2015, filed on May 7, 2015.[97]  These SEC filings are dated and timestamped with when the document was accepted by and publicly available from the EDGAR database.

      c.  Documents produced as part of the Aurelius litigation, such as internal emails or presentations that became exhibits to motion filings, trial exhibits, and sworn affidavits could have become available during the litigation process. For each such document, I have searched the docket to determine if and when that document was posted and available from PACER.[98]  For these documents, I use the date of the associated docket entry.

---

[97] Windstream Holdings, Inc., Form 10-Q for the Quarterly Period Ended March 31, 2015, Filed on May 7, 2015, p. 42.

[98] For each of these documents, I searched the docket using keywords in the document title, the date the original document was filed, and/or the trial exhibit number (if any).

d.  For other key legal documents cited by Judge Furman, including the Aurelius Complaint, the U.S. Bank Proposed Findings of Fact, Windstream Services, LLC's Objections and Responses to U.S. Bank National Association's and Aurelius Capital Master, Ltd.'s Requests for Admission ("Services' Responses to RFAs"), the Amended Answer to the Aurelius Complaint, Windstream Services, LLC's Objections and Responses to National Association's and Aurelius Capital Master, Ltd.'s First Set of Interrogatories, I consider the date on which the original version of the document was filed.[99]

e.  Testimony at trial would have been public given that securities analysts, newspaper reporters, and other market participants attended the trial. Out of caution, in addition to the trial days themselves, I also consider August 23, 2018, when the trial transcript was made available.

79.  **Exhibit 2** details the results of this analysis. The exhibit lists each of the documents cited by Judge Furman and the date by which I have determined that document was publicly available. For the 11 documents I was unable to verify if they were publicly available, as detailed in **Appendix E**, for each I was able to find other documents Judge Furman cites that contain the same point and were publicly available or the information was publicly available from another source not cited by Judge Furman. For these documents, I include the date of the publicly available sources. All of these documents were publicly available well before Judge Furman's ruling in February 2019.

80.  In **Appendix D**, I assess Uniti's stock price movements on the dates when the documents cited by Judge Furman in reaching the conclusion that Windstream engaged in a prohibited sale-leaseback transaction were available to the market. Plaintiffs do not allege these days as corrective disclosures. However, looking at the stock price movements on these days is instructive: the absence of a statistically significant Uniti stock price decline on these days, in an efficient market, would indicate that the information released on these days was either (a) not value relevant to the extent it could impact the price, or (b) had previously been disclosed and already incorporated into the stock price. I indeed find that there was no statistically significant decline in Uniti's stock price on any of these days (or the next trading days), and there was no offsetting information that would have obscured an otherwise

---

[99] The original version of the U.S. Bank Proposed Findings of Fact was filed on June 15, 2018 and two corrected versions were later filed on June 21 and June 28, 2018, respectively. Judge Furman cites the second corrected version filed on June 28, 2018. The original version contains the same information cited by Furman. Out of caution, I consider all three dates in my analysis.

statistically significant stock price decline on these days. This provides further evidence that following the February 2019 ruling, the market was reacting to Judge Furman's unexpected legal opinion, not any new information revealing the truth regarding the allegedly misrepresented information or true risk purportedly masked by such information.

81.    In summary, based on the analysis described above, I determine that the factual information cited by Judge Furman in reaching his conclusion that the spin-off was a prohibited sale-leaseback transaction was publicly available prior to February 15, 2019, and thus Judge Furman's ruling did not reveal previously undisclosed facts that would have otherwise "concealed" the risk about the 2015 spin-off transaction. I further find that the prior public release of the information cited by Judge Furman was not associated with any statistically significant declines in Uniti's stock price. These findings provide further support that revelation of the same information could *not* have impacted the price in February 2019, assuming Uniti's stock traded in an efficient market.

### 3.    The Alleged Misrepresentations Regarding the Sale-Leaseback Theory Could Not Have Had an Impact on Uniti's Stock Price In Connection With the Alleged Corrective Disclosure on February 15, 2019

82.    As explained above, the factual information cited by Judge Furman in reaching his opinion regarding the sale-leaseback transaction was already disclosed to the market prior to February 15, 2019, through regulatory disclosures, financial disclosures, legal filings, and a public bench trial in July 2018, which took place more than six months before the ruling. If the market for Uniti's stock was efficient, as Mr. Coffman contends, such publicly available information would have been fully incorporated in the stock price long before February 2019.[100]

83.    Hence, from a financial economist's perspective, if Uniti's stock traded in an efficient market, its price could not have reacted to the revelation of any allegedly concealed or misrepresented facts or risks following Judge Furman's decision. Rather, the price was instead reacting to Judge Furman's ultimate legal conclusion, which came as a surprise to the

---

[100] As discussed in **Section V**, in an efficient market, security prices will rapidly adjust to reflect new, value relevant, public information. Academic literature has shown that stock prices react to new information usually within a day, but could be in a matter of minutes. *See, e.g.*, Chordia, Tarun, et al. 2005. "Evidence on the Speed of Convergence to Market Efficiency." *Journal of Financial Economics* 76 (2): 271–92; Busse, Jeffrey and T. Green. 2002. "Market Efficiency in Real Time." *Journal of Financial Economics* 65 (3): 415–37. Mr. Coffman asserts that even in an efficient market, stock prices could take longer to fully incorporate news, but even he agrees that "once you get beyond three or four [days], unless there is the introduction of really new information, it's hard to argue that the stock is still reacting." *See,* Coffman Deposition, 63:2–5.

market even though market participants had for a long time had full access to the underlying facts and the risks associated with them.

84.    Indeed, based on the information discussed above, which was available for more than six months by the time of the decision, the possibility of an unfavorable legal opinion by Judge Furman was well known prior to February 15, 2019, but viewed as unlikely by sophisticated market participants.  For example, as mentioned in a Cowen analyst report dated February 19, 2019, "[t]he outcome is an unequivocal surprise to many in the equity investor community, as we believe legal experts and the St[reet] pegged a favorable ruling [i.e., a ruling in favor of Windstream] at 70-80%+."[101]

85.    There is extensive commentary from analysts that the market's reaction on February 19, 2019 (the first trading day after the decision) was to the negative consequences and uncertainty caused by this surprise ruling, not to any new factual information regarding Plaintiffs' allegations.  For example, analysts noted:

- "The unfavorable ruling will be seen as a meaningful surprise to the equity investors, and we expect the stock to re-rate to factor in said risk [of potential lease payment cuts] … As noted, the outcomes are highly variable (a combination back with Windstream is not outside the realm of possibilities), the process will be prolonged, and the specific outcome lacks visibility to recommend the stock at this time."[102] (Cowen, February 19, 2019)

- "We – and we suspect both company managements and many investors – are surprised by the court's ruling, which now puts significant uncertainty on Uniti … Though the stock is likely to be punished today, we believe the appeals process may be lengthy and could produce a different result."[103]  (SunTrust Robinson Humphrey, February 19, 2019)

- "Though we did not expect Windstream to lose this trial, we felt it was in danger of bankruptcy nonetheless … We also think Uniti is affected immediately, even though the appeal will be pending, and we don't

---

[101] "Downgrade:  Win Court Ruling Could Mean Rental Payment Cuts, Levels Uncertain," *Cowen*, February 19, 2019.

[102] "Downgrade:  Win Court Ruling Could Mean Rental Payment Cuts, Levels Uncertain," *Cowen*, February 19, 2019.

[103] "Adverse Court Ruling Raises Risk, Creates Uncertainty; Focus Shifts to Post-Trial Appeals," *SunTrust Robinson Humphrey*, February 19, 2019.

expect an outcome before 2020 … We expect the added uncertainty will weigh on Uniti's stock."[104] (Morningstar, February 19, 2019)

86. In summary, the available evidence indicates that the market was reacting to Judge Furman's unexpected legal opinion, not to any factual information revealing the "truth" regarding the allegedly misrepresented information revealed on February 15, 2019. Plaintiffs do not allege that Uniti could have predicted, let alone disclosed, the Judge's decision (or the subsequent ratings agency actions) at an earlier point in time during the proposed Class Period. As Mr. Coffman acknowledged at deposition, "[Uniti] could not have disclosed the decision before the decision occurred nor is that the basis for Plaintiffs' complaint."[105] Thus, the stock price movement on that day does not constitute evidence of any price impact of the revelation of the alleged misrepresentations made by Defendants.

87. Similarly, on February 21–22, 2019, Uniti's stock price reacted, at least in part, to the announcements of the ratings agency downgrades resulting from Judge Furman's ruling. From an economic perspective, these price drops do not represent the impact of the information Defendants allegedly misrepresented regarding the spin-off transaction, or any purportedly concealed risk resulting from such alleged misrepresentations.

88. The ratings agency announcements indicate that the downgrades were in response to Judge Furman's ruling and the associated financial implications for Windstream, not because of any new factual information revealed regarding the spin-off.

a. Specifically, S&P published a report on February 21, 2019 downgrading Uniti from CCC+ to CCC-.[106] S&P noted that the downgrade was based on Judge Furman's ruling against Windstream and reflected "the tight linkage of Uniti's credit profile to that of Windstream," as well as S&P's speculation of "greater uncertainty regarding the durability of Uniti's master lease" in a potential bankruptcy of Windstream (i.e., the possibility that in order for Windstream to successfully reorganize in bankruptcy, it may need to achieve rent relief or other concessions from Uniti), which is an issue analysts had previously discussed and recognized well before the ratings downgrades.[107]

---

104 "Windstream's Trial Loss Marginally Increases Its Bankruptcy Risk and Has Implications for Uniti," Morningstar, February 19, 2019.

105 Coffman Deposition, 314:6–16 ("Q. Would you agree that prior to the actual decision [by Judge Furman on February 15, 2019], Uniti could not have disclosed that decision, in other words, Uniti couldn't have predicted the future, correct? … A. My understanding is that they could not have disclosed the decision before the decision occurred nor is that the basis of Plaintiffs' complaint, as far as I understand.").

106 Based on my review, the report was first covered by public press at 2:47 PM ET on that day. See, "*S&PGR Downgrades Uniti Group To 'CCC-', Outlook Negative," Dow Jones Institutional News, February 21, 2019.

107 "*S&PGR Downgrades Uniti Group To 'CCC-', Outlook Negative," Dow Jones Institutional News, February 21, 2019. See, e.g., "Initiating with an Overweight Rating and YE2016 Price Target of $31," J.P. Morgan, June 22, 2015 ("Should Windstream fall into bankruptcy, the priority of [Uniti]'s lease payments is unpredictable at best.").

b. Similarly, Fitch issued a press release on February 21, 2019, downgrading Uniti from B+ to BB-.[108] Fitch noted that the downgrade was a "consequence" of Judge Furman's ruling and also speculated that the ruling would introduce "some uncertainty regarding Uniti's ability to access the debt and equity markets at reasonable cost."[109]

c. In addition, even though not mentioned by the Complaint, Moody's also issued a report on February 22, 2019, downgrading Uniti from Caa1 to Caa2.[110] Moody's noted that the downgrade "was prompted by … [Judge Furman's] ruling on February 15 against Windstream," and speculated that "liquidity could be negatively impacted if lease payments from Windstream are renegotiated meaningfully lower under default or restructuring scenarios."[111]

89.     These downgrades reflect rating agencies' opinions about Uniti's credit worthiness as a result of Judge Furman's legal opinion and ruling. The downgrades do not reflect any new factual information about the alleged misrepresentations concerning the Sale-Leaseback Theory—indeed, the fact that the judge had found a violation of the covenant had been revealed several days earlier—or about any of Plaintiffs' other theories of liability. Consistent with the observed stock price drops, academic literature has documented that rating agencies' opinions on corporate credit worthiness could have an impact on a company's stock price even though the ratings changes were triggered by previously announced corporate news.[112]

90.     In summary, assuming Uniti's stock traded in an efficient market, the alleged misrepresentations under the Sale-Leaseback Theory (or the other theories) did not have a price impact in connection with the Aurelius Decision and the credit ratings downgrades disclosed on February 15, 21–22, 2019. This is because the information cited in Judge Furman's ruling that could be associated with the alleged misrepresentations or any purportedly concealed risk had already been publicly disclosed prior to February 15, 2019.

---

[108] Based on my review, the press release was first covered by public press at 3:48 PM ET on that day. *See*, "*Fitch Downgrade's Uniti's IDR to 'B+'; Revises Outlook to Negative," *Dow Jones Institutional News*, February 21, 2019.

[109] "*Fitch Downgrade's Uniti's IDR to 'B+'; Revises Outlook to Negative," *Dow Jones Institutional News*, February 21, 2019.

[110] Based on my review, the report was first covered by public press at 2:48 PM ET on that day. *See*, "Moody's Downgrades Uniti To Caa2, Outlook Remains Negative Following Windstream's Adverse Court Ruling," *Dow Jones Institutional News*, February 22, 2019.

[111] "Rating Action:  Moody's Downgrades Uniti to Caa2, Outlook Remains Negative Following Windstream's Adverse Court Ruling," *Moody's Investors Service*, February 22, 2019.

[112] Even-Tov, Omri. and Naim Bugra Ozel. 2021. "What Moves Stock Prices Around Credit Rating Changes?" *Review of Accounting Studies* 26: 1390–1427 at 1391–1392 ("We also confirm findings that stock returns around rating change announcements are statistically and economically significant and that downgrades elicit stronger responses than upgrades … We find that most rating change announcements (86%) across the three agencies either cite recent corporate news or are issued within five days of such an event.").

Rather, Uniti's stock price reacted to an unexpected, negative legal outcome, which in turn was the catalyst for the ratings agency downgrades.

    **D.**    **The Alleged Misrepresentations Under Plaintiffs' Sale-Leaseback Theory and True Lease Theory Did Not Have a Price Impact on Uniti's Stock In Connection With the Alleged Corrective Disclosure on June 24, 2019**

91.    On June 24, 2019, after market close, Uniti filed a Form 8-K and issued a press release announcing a planned offering of "$300 million aggregate principal amount of exchangeable senior notes due 2024 (the 'Exchangeable Notes')."[113]  Plaintiffs identify this announcement of a notes offering as a "partial disclosure," and claim that Uniti's stock price declined on June 25, 2019 as a result.

92.    Plaintiffs assert that the $300 million note offering "implicitly acknowledg[ed] that Uniti's business was impacted by Windstream's bankruptcy and, as a result, Uniti could not maintain its business operations without accessing the capital markets, contrary to the Company's and Defendants Kenny Gunderman's and Wallace's repeated representations."[114] Thus, Plaintiffs appear to claim that this alleged corrective disclosure relates to Plaintiffs' Navigating the Bankruptcy Theory, i.e., the alleged misrepresentations regarding Uniti's ability "to navigate the Windstream bankruptcy proceedings without having to raise external capital."[115]

93.    The announcement of the June 24, 2019 notes offering has no economic connection to the alleged misrepresentations made under the Sale-Leaseback Theory.  As explained above, by the time of the notes offering, Judge Furman's decision regarding the violation of the sale-leaseback covenant had already been disclosed.

94.    Regarding the True Lease Theory, in Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint ("Plaintiffs' Opposition to MTD"), Plaintiffs assert that the bond offering was a "materialization of the known risk that the Master Lease was a disguised financing."[116]

95.    Nevertheless, I similarly find that there is no economic connection between the alleged misrepresentations regarding Plaintiffs' True Lease Theory and the disclosure on June 24, 2019 of a notes offering.  I understand that the True Lease Theory relates to

---

[113] Uniti Group Inc., Form 8-K, Filed on June 24, 2019.
[114] Complaint, ¶262.
[115] Complaint, ¶29.
[116] Plaintiffs' Opposition to MTD, p. 54.

Defendants' alleged misrepresentation of the risk that the Master Lease could be re-characterized as something other than a "true lease" by concealing the actual useful life of the copper wire assets leased under the Master Lease.

96.     I have found no information released on that day regarding the risk that the Master Lease could be re-characterized as a long-term financing rather than a "true lease" based on the allegedly inflated useful life of the copper wire assets (which is the specific factual information that I understand that Plaintiffs allege was concealed).  Rather, Uniti announced that it was raising capital to retire debt and to fund acquisitions.  Specifically, it disclosed that it "intends to use a portion of the net proceeds of the offering to repay the $101.6 million of outstanding borrowings under the revolving credit facility . . . , pay the cost of the exchangeable note hedge transactions . . . and for general corporate purposes, which may include funding acquisitions (including the previously announced acquisition of Bluebird Networks, LLC) and the repayment of additional borrowings under our revolving credit facility."[117]

97.     Nor did securities analyst reports issued following the notes offering contain any discussion of the useful life of the copper wire assets.  Hence, from an economic perspective, there is no linkage between the alleged corrective disclosure on June 24, 2019 and the alleged misrepresentations under Plaintiffs' True Lease Theory.

98.     Based on my review of public information, market participants had hypothesized that Windstream would be incentivized to try to renegotiate the Master Lease terms with Uniti even before the bankruptcy.[118]  In fact, one securities analyst noted that the market was already baking in a 20% reduction in the rent payments from Windstream in Uniti's stock price as early as March 2019.[119]  It was not until July 25, 2019, more than a month after the bond offering announcement, that Windstream filed an adversary proceeding against Uniti as

---

[117] Uniti Press Release, "Uniti Group Inc. Announces Launch of Exchangeable Notes Offering and extension of Revolving Credit Facility," June 24, 2019.

[118] For example, *Morningstar* stated in an analyst report issued on January 4, 2019 that "Windstream currently provides about two thirds of Uniti's revenue, and we think a real chance exists that Windstream eventually either will have to declare bankruptcy or will only be able to avoid bankruptcy by renegotiating its Uniti lease. We believe the lease between the two parties calls for above-market rents, so in a scenario that requires restructuring, we expect the rent would come down."  *See,* "Uniti Group Inc. – It's Not for Proverbial Widows and Orphans, but We Like Uniti; Initiating With $23 FVE," *Morningstar*, January 4, 2019.  J.P. Morgan stated in an analyst report issued on November 5, 2018 that "Windstream's business could continue to deteriorate, putting the lease payments at risk … If revenue declines come in worse than expected, it is possible Windstream may need to cut its capex or potentially renegotiate its lease payments to Uniti."  *See*, "Uniti Group Inc. – Model update," *J.P. Morgan*, November 5, 2018.

[119] *See*, "Uncertainty Clouds Investment Case; Cutting Price Target to $8," *Deutsche Bank*, March 21, 2019 ("we also believe it is impractical to expect UNIT's MLA with Windstream to emerge unscathed through this process, while bondholders 'bear the brunt' of any reorganization impacts.  As such, we now model a 20% rent cut starting in 2020.").

part of the bankruptcy, seeking to re-characterize the Master Lease as long-term financing rather than a "true lease" based on the allegedly undisclosed information regarding the estimated useful life of the copper wire assets.[120]  And even then, there was no statistically significant Uniti stock price reaction following the filing of the adversary complaint on July 25, 2019.[121]

99.     Given the absence of an economic linkage between the allegations under Plaintiffs' True Lease Theory and the Sale-Leaseback Theory and the disclosure of Uniti's notes offering, the alleged misrepresentations under these theories had no price impact on Uniti's stock on June 25, 2019.

## VII.   Mr. Coffman Fails to Put Forth a Class-Wide Damages Methodology That Can Reliably Measure Damages in a Manner That Is Consistent with Plaintiffs' Theories of Liability

100.    Mr. Coffman was "asked [] to opine on whether per share damages could be measured for all Class members under Section 10(b) of the Exchange Act using a common methodology that is consistent with the Lead Plaintiffs' theory of liability."[122]  Mr. Coffman briefly outlines a three step approach that he claims can be used to calculate damages in this matter:

  a.  First, he claims that "the most widely-used technique…starts from an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or

---

[120] Complaint, *In re: Windstream Holdings, Inc., et al.*, Adversary Proceeding, July 25, 2019.

[121] With respect to the Navigation the Bankruptcy Theory, I note that the stock price decline on June 25, 2019 could be attributed to reasons other than the alleged misrepresentations.  According to Uniti's announcement of the notes offering, the goal of the offering was to retire existing debt, including its "revolving credit facility," and to fund acquisitions, including "the previously announced acquisition of Bluebird Networks, LLC." (*See*, Uniti Press Release, "Uniti Group Inc. Announces Launch of Exchangeable Notes Offering and extension of Revolving Credit Facility," June 24, 2019.)  No securities analyst reports published immediately following the June 24, 2019 disclosure commented on the notes offering as revealing Uniti's lack of financial resources to navigate Windstream's bankruptcy.  In fact, none of those analyst reports even mentioned the $300 million note offering.  In addition, the offering was for convertible notes, which could be exchanged on certain terms "into cash, shares of common stock of the Company … or a combination thereof." (Uniti Press Release, "Uniti Group Inc. Announces Launch of Exchangeable Notes Offering and extension of Revolving Credit Facility," June 24, 2019.)  Various academic studies have found evidence that a convertible notes offering can impact a company's stock price due to potential dilution of existing stockholders. *See, e.g.*, Billingsley, Randall S. and David M. Smith. 1996. "Why Do Firms Issue Convertible Debt?" *Financial Management* 25 (2): 93–9 at 95 ("stockholders react more negatively as there is an increase in the potential dilution implied by the issuance of a convertible."); Gillet, Roland L. and Hubert de La Bruslerie. 2010. "The Consequences of Issuing Convertible Bonds: Dilution And/Or Financial Restructuring?" *European Financial Management* 16 (4): 552–84 at 552 ("The announcement of a [convertible bond] issue will bring about a future dilution of the firm's capital, and is often followed by a drop in share price.").

[122] Coffman Report, ¶94.

misrepresentations."[123]  He further notes that this analysis would "need to consider whether and to what extent any non-fraud related information (i.e., 'confounding information') contributed to the observed price movement."[124] If there is confounding information it could be disaggregated using "commonplace valuation techniques."

b.  Second, he notes that measuring damages would require "a determination of how inflation per share may have evolved over the Class Period."[125]  Mr. Coffman refers to both "'constant dollar inflation,' i.e., that the artificial inflation was the same dollar amount during the Class Period" and "constant percentage inflation."[126]  He also references the possibility that inflation could vary over time.[127]  He asserts that "[t]he determination of how artificial inflation evolved over the Class Period is a case specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above."[128]

c.  Third, he asserts that per-share damages are equal "to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale…subject to the Private Securities Litigation Reform Act of 1995's ('PSLRA') '90-day lookback' provision."[129]

101.    As explained below, Mr. Coffman has not proposed a methodology for measuring damages that is consistent with Plaintiffs' theories of liability.  Simply listing economic tools, such as an event study and valuation, does not demonstrate that there exists a methodology that can measure class-wide damages.  In fact, Mr. Coffman does not mention the word "Uniti," any of Plaintiffs' allegations or theories of liability, or any of the facts of this case in his brief damages discussion.  His discussion does not appear to be tailored in any way to this case.

102.    Given the facts of this case and Plaintiffs' theories of liability, Mr. Coffman's proposed approach, which begins by measuring the price declines following alleged

---

[123] Coffman Report, ¶97.
[124] Coffman Report, ¶97
[125] Coffman Report, ¶98.
[126] Coffman Report, ¶98.
[127] Coffman Report, ¶98.
[128] Coffman Report, ¶98
[129] Coffman Report, ¶94.

corrective disclosures, would not reliably measure damages. A valid methodology would need to reliably measure price inflation, which depends on how Uniti's stock price would have changed in a but-for scenario in the absence of the alleged misrepresentations. An approach that examines the stock price drops upon alleged corrective disclosures would not be valid if the but-for disclosure that Defendants could or should have made does not correspond with the information revealed on an alleged corrective disclosure date in this case.

103.   As Mr. Coffman acknowledged at deposition, "to the extent there is a stock price decline on [an alleged corrective disclosure date] the relevant economic question is to what extent can that stock price decline or some portion of that stock price decline be inferred to represent inflation earlier in time."[130]  Mr. Coffman fails to consider, however, in this case the price reaction on certain such alleged corrective disclosure dates is entirely unreflective of the removal of price inflation due to a lack of economic linkage (i.e., mismatch) between the information released and the alleged misrepresentations. In addition, as set forth below, there are a number of other reasons why Mr. Coffman's damages model is unable to answer that question in this case. As such, he has failed to put forth a class-wide damages methodology that can reliably measure damages consistent with Plaintiffs' theories of liability.

### A.   Mr. Coffman Does Not Provide a Reliable Methodology to Measure Inflation Throughout the Proposed Class Period Attributable to an Allegedly Concealed Risk

104.   Plaintiffs' allegations pertain at least in part to allegedly misrepresented or concealed risks, specifically, "(i) the material risk that the Spin-Off was a prohibited sale-leaseback transaction that violated the Indenture, and (ii) the true extent of the risk that the Master Lease was not a true lease."[131]  Plaintiffs allege that "the truth and concealed risks materialized" through a series of alleged corrective disclosures.[132]  In Plaintiffs' Opposition to MTD, they further note that "[a]s alleged in the Complaint, Plaintiffs explicitly plead *a materialization of the risk theory of loss causation*."[133]

105.   Accordingly, under Plaintiffs' theories of liability for the Sale-Leaseback and the True Lease Theories, any measure of purported inflation in Uniti's security prices should reflect

---

[130] Coffman Deposition, 230:5–13.
[131] Complaint, ¶16.
[132] Complaint, ¶18.
[133] Plaintiffs' Opposition to MTD, p. 52 (emphasis in original).

the value impact of the concealed or misrepresented risks, which in turn depends on how the market's perception of those risks would incrementally change in response to but-for disclosures without alleged misrepresentations. Mr. Coffman appears to agree. At his deposition, he stated that, in order to determine price inflation, "[y]ou would need to understand how the market would have perceived the risk … [a]nd then you're trying to assess how would the incremental disclosure of further risk have impacted the stock price."[134]

106.    It is worth noting that, as previously discussed, the alleged misrepresentations occurred even before the proposed Class Period started,[135] and according to Plaintiffs, the subsequent misrepresentations mainly served to "maintain[]" the price inflation.[136] Mr. Coffman also acknowledged at deposition that Plaintiffs rely on "omission theories."[137] Thus, one cannot use the stock price increases following the alleged misrepresentations to measure inflation. On the other hand, the stock price decline on the alleged corrective disclosure dates, when Plaintiffs assert this risk materialized with certainty, cannot be used to reliably measure inflation, either.

107.    A simplified example can illustrate this point. Consider a company involved in a litigation, where if a negative outcome occurred, the financial impact would be $100 per share. The company disclosed to the market on day 1 only partial information pertaining to this litigation. Based on this partial information, the market understands that the risk of a negative litigation outcome occurring was 10%. Also assume that if the full facts had been disclosed, i.e., the risk of a negative outcome had not been misrepresented, the market's assessment of the risk that the negative outcome would occur would have been 30%. In this instance, inflation on day 1 would be the difference between the value of the risk actually priced into the stock ($10 or 10% x $100) and the value of the risk that would have been priced into the stock had it been accurately disclosed ($30 or 30% x $100), resulting in total inflation of $20 per share. Assume that this risk ultimately "materialized" on day 50, when the negative litigation outcome occurred with certainty. If the market was previously pricing

---

[134] Coffman Deposition, 233:15–25.

[135] For example, Plaintiffs allege that Uniti's March 26, 2015 Information Statement contained "materially false and misleading statements with respect to Uniti's risk disclosures," among other allegations. *See*, Complaint ¶¶140–153.

[136] *See, e.g.*, Complaint, ¶254 ("Defendants' continued false and misleading statements, and material omissions, that the Master Lease was 'well-crafted' and the claims of default 'manufactured,' made in the following 15 months, however, maintained the artificial inflation in the price of Uniti's securities.").

[137] Coffman Deposition, 282:25–283:9 ("Q. Is it fair to say that the theory or theories that we were talking about in connection with paragraph 16 of the complaint are omission theories? … A. I generally understand that part of what the Plaintiffs are stating is that the company omitted information, if that's the question, yes.").

in the disclosed risk of 10%, the stock price would be expected to decline by $90 (risk increasing from 10% to 100%, so 90% x $100).

108. As the above example demonstrates, the price decline on the day when the risk materialized ($90) has little, if any, bearing on the measure of inflation ($20). Mr. Coffman conceded as much. At his deposition, he testified that, under this simplified example, "the full $90" price decline on the day when the risk materialized "would not necessarily reflect artificial inflation."[138] Indeed, there would still have been a price decline on day 50, when the risk ultimately materialized, even if the company had truthfully disclosed the risk of 30% on day 1. To put it in another way, the price would have dropped regardless of the alleged misstatements, and therefore cannot be reliably attributed to them in its entirety. Using stock price declines when the risk ultimately materialized would vastly overstate damages related to the concealed risk on day 1.

109. Mr. Coffman faces the same challenge in proposing to calculate damages based on the price declines on the alleged corrective disclosure days here. These days represent the risk materializing with certainty, and thus do not reflect the value impact of the concealed facts pertaining to the incremental risk that should have been disclosed under Plaintiffs' theory of liability. The relevant question for assessing price inflation or damages is therefore determining how but-for disclosures altering the market's perception of the risk could have changed Uniti's stock price.[139]

110. To be clear, I am not faulting Mr. Coffman for failing to perform such an analysis, nor am I suggesting that Mr. Coffman needs to perform a loss causation or damages analysis at this stage. Rather, his vague and generic references to an event study and valuation tools provide no indication that he (or the Plaintiffs) have a reliable method to ultimately do so.

111. As an example, consider the Aurelius ruling issued by Judge Furman. As discussed above, according to securities analysts, after the information cited by Judge Furman had become known but before the ultimate ruling, "legal experts and the St[reet] pegged a favorable ruling [i.e., a ruling in favor of Windstream] at 70-80%+."[140] Assuming this assessment is correct, it means after the market had access to the full sets of facts surrounding the spin-off/sale-leaseback transaction issues (i.e., true risk had been fully revealed), it estimated a 20-30% chance of a legal ruling in favor of Aurelius. After the Furman ruling,

---

[138] Coffman Deposition, 245:14–246:4.
[139] Complaint, ¶¶16–17.
[140] "Downgrade: Win Court Ruling Could Mean Rental Payment Cuts, Levels Uncertain," *Cowen*, February 19, 2019.

that chance increased from 20-30% to virtually 100%,[141] resulting in a large stock price decline. However, by Mr. Coffman's own admission during his deposition, this decline has no bearing on price inflation due to the true risk being purportedly concealed or masked by the alleged misrepresentations. Mr. Coffman has not articulated any methodology that can reliably measure how the market would have altered its risk assessment in the absence of the alleged misrepresentations under but-for disclosures and the associated price impact.

112.    Apart from the inability to use the price decline on the alleged corrective disclosure days—on which the risk materialized—as a measure of price inflation, the materialization of risk theory creates other challenges to calculating inflation and measuring damages.

113.    As explained above, calculating inflation will require determining how the market's perception of risk would incrementally change in response to a but-for disclosure, which depends on (i) the market's prior perception of the risk—which itself could change over time, (ii) the nature of the but-for disclosure that could have been made, (iii) how the market's expectation of that risk would change in response to the but-for disclosure, and (iv) how that change in risk assessment would affect the stock price. Yet Mr. Coffman fails to explain how he would make these determinations.

114.    As an example, consider the allegedly undisclosed risk that the spin-off and Master Lease constituted a prohibited sale-leaseback transaction. A large amount of factual information regarding the spin-off transaction had been disclosed prior to September 25, 2017. This includes much of the factual information cited by Judge Furman in ultimately reaching his conclusion that the spin-off was a sale-leaseback transaction. For example, as detailed in **Section VI.C.2.b**, information on Windstream's statements to state utilities regulators representing that the Transferor Subsidiaries would still have the exclusive rights, control and obligations over the transferred assets were publicly available prior to the proposed Class Period. Uniti and Windstream also filed a series of financial statements in 2015 and 2016 that included information that Windstream subsidiaries incurred substantial expenses for capital improvements and categorized the rent payments as long-term lease obligations. Moreover, Uniti had already disclosed the risk that someone may challenge the spin-off structure well before Aurelius' notice of default, which is acknowledged in the Complaint: Uniti had disclosed that "Disputes with third parties could also arise out of these [spin-off] transactions. … These increased expenses, changes to operations, disputes with

---

[141] This assumes that the likelihood of success of a potential legal appeal, which was discussed by market participants at the time, was low.

third parties, or other effects could materially and adversely affect our business, financial position or results of operations."[142]

115.    Yet, Mr. Coffman has not articulated how he would assess what the market's perception of the disclosed risk could have been based on the information that had already been disclosed, or what the market's perception of the "true risk" would have been in response to a but-for disclosure.  Nor has he explained an approach to assess how these assessments may vary over time, i.e., how the market's perception of risk may have changed—for example, as a result of the developments in the Aurelius litigation—or how additional disclosures may have affected the market's perception of the true risk.

### B.    Mr. Coffman Does Not Explain How He Would Determine Inflation Associated with Each Theory of Liability and Alleged Misstatement

116.    As discussed above, this matter involves complex fact patterns and multiple alleged theories of liability.  I understand that Plaintiffs allege different sets of alleged misrepresentations associated with the Sale-Leaseback Theory, True Lease Theory, and Navigating the Bankruptcy Theory.  Mr. Coffman does not explain how his damages approach would disentangle the impact of any particular theory of liability or apportion inflation among the various misstatements associated with each theory.

117.    For example, as discussed in **Section VI.D** above, Plaintiffs allege that the June 24, 2019 alleged corrective disclosure is related to both the Navigating the Bankruptcy Theory[143] and the materialization of the risk associated with the True Lease Theory.  As explained above, from an economic perspective, there is no price impact attributable to the True Lease Theory on this date.  However, to the extent that Plaintiffs assert there is, Mr. Coffman will need a methodology to separate the price reactions under the two theories.

118.    One reason such an apportionment may be necessary is to account for alternative findings of fact.  The finder of fact could determine that Uniti is liable for allegations related to one, but not both, of the theories on this disclosure date.  If Uniti was liable for damages under the Navigating the Bankruptcy Theory, but not under the True Lease Theory, the price impact (if any) attributable to each theory must be separated so that only the damages related to the prevailing theory of liability are measured.

---

[142] Complaint, ¶162; Uniti Group Inc., Form 10-Q for the Quarterly Period Ended June 30, 2015, Filed on August 13, 2015, p. 44.
[143] Complaint, ¶29.

119. Further, Plaintiffs allege multiple misrepresentations associated with these theories of liability, which were made at different points in time during (and prior to) the proposed Class Period. For example, the alleged misrepresentations regarding Uniti's ability to navigate Windstream's bankruptcy without raising external capital were not made until after Windstream's bankruptcy in 2019,[144] while the misrepresentations under the True Lease Theory were at least in part made prior to the proposed Class Period.[145] Thus, Mr. Coffman would need to account for how inflation under each theory evolved over time.

120. Finally, as discussed in **Section VI** above, Plaintiffs and Mr. Coffman claim that their claims chiefly concern "omission" theories. Nonetheless, Plaintiffs also allege that Defendants made a series of misstatements "[b]etween February 19 and June 20, 2019."[146] To the extent that Plaintiffs assert that these misstatements introduced incremental inflation into Uniti's stock price, Mr. Coffman's damages methodology will need to estimate the incremental impact of a given misstatement. He does not address how he would account for these considerations.

## VIII. Mr. Coffman Has Not Reliably Demonstrated That Uniti's Options Traded in an Efficient Market Throughout the Proposed Class Period

121. I understand from counsel that to establish "fraud-on-the-market" reliance at the class certification stage, Plaintiffs must prove that the markets for Uniti's options were efficient throughout the proposed Class Period. In this section, I first provide an overview of options and options markets. I then demonstrate that Mr. Coffman has not provided reliable evidence that Uniti's options traded in an efficient market throughout the proposed Class Period.

### A.    Background on Options and Efficiency of Options Markets

122. An equity option gives its buyer the right to either buy (call options) or sell (put options) a particular stock at a pre-specified price (the "strike price") before or at a particular

---

[144] Uniti Group Inc. Q4 2018 Earnings Conference Call Transcript, March, 20, 2019, 4:15 PM ET.
[145] Complaint, ¶¶88, 127, 128, 132, 133.
[146] Complaint, ¶29.

point in time (the "maturity date").[147]  A unique combination of option type (call or put), strike price, and maturity date defines an "option series."[148]

123.    The two most common types of option contracts are "European" and "American" options.  The difference between those contracts is that European options can only be exercised at the maturity date, whereas American options can be exercised at any time up to or on the maturity date.[149]  In certain circumstances, it may be optimal to exercise a call or put option before the maturity date, in which case an American option provides valuable flexibility to do so.[150]  The Uniti options at issue were American options.[151]

124.    An equity option's value depends on at least six factors:  the current price of the underlying stock, the strike price, the remaining time to maturity, the volatility of the underlying stock price, the risk-free rate until maturity, and any expected dividends.[152]  Changes in any of these factors can affect the value of an option.

125.    One way to theoretically value options is using the Black-Scholes model, which is a model of option prices that was developed by Fisher Black, Myron Scholes, and Robert Merton in the 1970s and for which they received the Nobel Prize in Economic Sciences in 1997.  The model requires the absence of certain market frictions and depends on numerous assumptions that may not hold in practice (*e.g.*, that the underlying stock price volatility is constant during the life of the option).[153]  According to the classic Black-Scholes model, the price of European options on non-dividend paying stocks can be determined as a function of five factors:  strike price, the time to maturity of the option the underlying stock price, the risk-free interest rate, and the future variability of the returns on the underlying stock (known

---

[147] Hull, John C. 2015. *Options, Futures, and Other Derivatives*, 9th ed. Saddle River: Pearson ("Hull (2015)"), p. 213.  One equity option contract gives the holder of the call (put) option the right to buy (sell) 100 shares of the underlying stock.  *See*, Coffman Report, ¶83.  *See also*, "Equity Options Product Specifications," *CBOE*, Undated, https://www.cboe.com/exchange_traded_stock/equity_options_spec/, accessed December 20, 2021 ("Underlying:  Generally, 100 shares of the underlying equity security.).

[148] Hull (2015), p. 220.  *See also*, Coffman Deposition, 140:4–13 ("Q. When you use the term "option series," what do you mean by series? A. A particular type of option contract is called a series. So it's a particular contract for an option to purchase. So if we're talking about a call, it's an option to purchase Uniti stock at a particular price through a particular date of expiration, so that would define one series.").

[149] Hull (2015), p. 213.

[150] *See, e.g.*, Hull (2015), p. 250 ("When dividends are expected, we can no longer assert that an American call option will not be exercised early.  Sometimes it is optimal to exercise an American call immediately prior to an ex-dividend date.").

[151] Coffman Report, ¶83.

[152] Hull (2015), p. 234.

[153] The following assumptions are used to derive the Black-Scholes model:  stock prices follow a continuous-time stochastic process; short selling is permitted for securities with full use of proceeds; there are no transaction costs or taxes, and all securities are perfectly divisible; there are no dividends during the life of the derivative; there are no riskless arbitrage opportunities; security trading is continuous; and the risk-free rate of interest is constant and the same for all maturities.  *See*, Hull (2015), p. 331.

as stock price volatility).[154]  In practice, however, observed market prices are determined by the supply and demand for option contracts and can depart from the model prices.  It has been well established in academic literature that there could be meaningful discrepancies between the Black-Scholes model price and the actual market price for an option due to the assumptions made by the Black-Scholes model not fully reflecting market reality.[155]

> **B.      The At-Issue Options Constitute More Than 700 Unique Securities with Different Contractual Terms, Prices, and Liquidity That Cannot Be Considered Fungible**

126.     Mr. Coffman references the "Uniti Options" collectively in his report, but those "Uniti Options" consist of hundreds of distinct series—each of which has a unique combination of attributes, including strike price, expiration date, and whether it is a put or a call.[156]  Mr. Coffman acknowledges that "[d]uring the Class Period, a total of 611 call option series and 611 put option series were listed," of which "372 call option series and 378 put option series had non-zero trading volumes."[157]

127.     Mr. Coffman conceded during his deposition that each of the more than 700 option series that traded during the proposed Class Period constitutes a unique and separate security that was independently listed and traded on exchanges including the CBOE and NASDAQ Option Exchange.[158]  This means that a quote published by a market maker or a trade executed by an investor are for a particular option series, and there is no single security an investor could purchase that incorporates the economic characteristics and payoff of all of the different "Uniti Options."

128.     Because these distinct option series traded separately on exchanges, they all had different prices at which they could be bought and sold.[159]  While option prices for all call or

---

[154] Hull (2015), Chapter 15.  For stocks that pay dividends, the option price would also depend on the expected future dividend payments.

[155] *See*, *e.g.*, Macbeth, James and Larry Merville. 1979. "An Empirical Examination of the Black-Scholes Call Option Pricing Model." *The Journal of Finance* 34 (5): 1173–1186 ("Then, under certain assumptions, these systematic differences in variance rates are translated into systematic differences between observed market prices of call options and B-S model predicted prices.").  Mr. Coffman agreed with this fact in deposition.  *See*, Coffman Deposition, 133:11–14 ("Q. Just to be clear, theoretical prices may differ from actual market prices; is that right? A. Yes, they can and do.").

[156] Coffman Report, ¶1.  Mr. Coffman simply defines the term "Uniti Options" to refer to "Uniti put and call options."

[157] Coffman Report, ¶83.

[158] Coffman Deposition, 140:14–23 ("Q. And during the class period, each series traded as or was listed as a distinct security on the NASDAQ Options Exchange and the Chicago Board Options Exchange, correct? A. Correct. Q. And to your understanding, each option series is, in fact, a separate distinct security; is that right? A. That's how I think of it, yeah.").

[159] Coffman Deposition, 142:10–12 ("Q. And each option series has its own distinct market price, correct? A. Yes.").

put options are influenced by certain common factors (i.e., the underlying stock price, stock price volatility), depending on their time to maturity as well as their strike price relative to the current stock price (also known as "moneyness"),[160] they have different sensitivities to price fluctuations and volatility fluctuations in the underlying stock. That means a buyer or seller of two different Uniti call (or put) options could experience vastly different economic outcomes depending on how the price of each of the separate options changed during the time the option positions were held.

129. Because of these differences in their characteristics, some options can be more actively traded while others are not. Any given option series can differ with respect to trading volume, trading frequency, or bid-ask spread.[161] A study by Etling and Miller (2000), among others, shows that an option with a strike price that is close to the current price of the underlying stock (i.e., "in the money" or "close to the money") may trade in a market with market depth and liquidity that are very different from an option that is deeply "out of the money" (i.e., with a strike price that is far above (below) the current price of the underlying stock for a call (put) option).[162]

130. From an economics perspective, the "Uniti Options" therefore cannot be considered uniform for the purpose of testing market efficiency. Even if the prices of some option series rapidly and fully incorporated new information, the prices of other option series may have reacted differently or not reacted at all, as Mr. Coffman conceded during his deposition.[163] Given that it is possible for the prices of some option series to react quickly and fully to news on a particular day and for the prices of other option series not to do so, as Mr. Coffman

---

[160] Hull (2015), p. 440.

[161] Coffman Deposition, 141:14–142:9 ("Q. Different option series may have different levels of liquidity, correct? A. That's not a feature of the contract like the other things we were just talking about. But it's possible that different series could have different levels of liquidity in the market, yes. Q. And is it possible that the liquidity of a particular series may differ over time? A. Yes. Q. And different option series may have different bid-ask spreads, correct? A. Yes. Q. And the bid-ask spreads of a particular series may differ over time as well, correct? A. Yes.").

[162] Etling, Cheri and Thomas W. Miller, Jr. 2000. "The Relationship between Index Option Moneyness and Relative Liquidity." *Journal of Futures Market* 20 (10): 971–87.

[163] Coffman Deposition, 145:4–146:8 ("Q. Is it possible that the price of one option series changes in response to new information in the market while the price of another option series does not change? … A. Are we talking about with respect to the given piece of information, so contemporaneously at one moment in time there is a new piece of information is it possible that done series reacts to that and another does not? Q. Correct. A. Yes, that's certainly possible. For certain options that are, you know, for example, a call option that's way in the money, you would expect the call option price to react fairly similarly to the common stock. Not exactly. But much closer to what the common stock did. For a call option that's way out of the money, that might not be a big enough piece of information or a price movement to really impact the value of the option, you know, in an observable way. So that's certainly possible, yes.").

acknowledged,[164] it is inappropriate for him to pool and analyze Uniti's options only in aggregate. Rather, a reliable test of market efficiency requires examining each individual option series and determining whether it rapidly and fully incorporated new information throughout the proposed Class Period.

### C.    Mr. Coffman's Purported Tests of Market Efficiency for the Uniti Options Are Flawed and Unreliable

131.    To evaluate market efficiency for Uniti's options, Mr. Coffman conducts two tests.

132.    First, he tests "put-call parity," a no arbitrage relationship between the prices of a put option, a call option, and the underlying stock.[165] Put–call parity defines a theoretical relationship between the prices of a European call option and a European put option, both with an identical strike price and expiration date, namely that a portfolio of a long call option and a short put option is equivalent in value to a single forward contract that allows one to purchase the stock at that exact strike price and expiration date.[166] Mr. Coffman purports to test whether "the prices of a put-call pair are not consistent with each other and the underlying security," and finds few violations of put-call parity.[167] He then concludes that this indicates "that the market prices of Uniti Options consistently reacted contemporaneously with changes in the market price of Uniti Common Stock so as to prevent arbitrage opportunities," which provides "strong evidence that Uniti Options traded efficiently."[168]

133.    However, Mr. Coffman conceded at deposition that he could not reach an opinion regarding market efficiency solely based on a test of put-call parity.[169] Indeed, from a financial economics perspective, put-call parity is not a test of semi-strong form market efficiency. As noted above, put-call parity defines a relationship between the prices of a stock and a put option and call option on that stock with identical strike prices and expiration

---

[164] Coffman Deposition 153:17–23 ("Q. And you testified that the market efficiency – there could be market efficiency for one series and not for another, correct? … A. That's theoretically possible, yes.").

[165] Coffman Report, ¶85.

[166] *See*, Hull (2015), p. 242 ("This relationship is known as put–call parity. It shows that the value of a European call with a certain exercise price and exercise date can be deduced from the value of a European put with the same exercise price and exercise date, and vice versa."). *See also*, Ross, Stephen A., et al. 2002. Corporate Finance, 6th Edition, McGraw-Hill, p. 625 ("This relationship now states that you can replicate the purchase of a share of stock by buying a call, selling a put, and buying a zero-coupon bond.").

[167] Coffman Report, ¶¶85, 87.

[168] Coffman Report, ¶87.

[169] Coffman Deposition, 164:5–14 ("Q. As an economist, could you opine that a company's stock options traded in a semi-strong efficient market based solely on a finding of put-call parity? … A. I don't want to speak for all economists. This financial economist would want to see some measure of cause and effect evidence, as well.").

dates, such that if the put-call parity relationship is satisfied, there are no opportunities for profitable arbitrage. However, the lack of consistent arbitrage opportunities could simply be due to high costs or risks faced by arbitrageurs to correct "mispricing," which is referred to as "limits to arbitrage" in financial economics.[170] There may be situations where security prices fail to incorporate information (i.e., the market is *not* semi-strong form efficient), but there is no consistent arbitrage opportunity simply due to high transaction costs in the form of high bid-ask spreads, an issue particularly relevant here, as I discuss below.[171]

134.    Therefore, even if put-call parity is satisfied, further analysis is still required to test whether the price of a given option series incorporated information quickly and fully. Consistent with this, Mr. Coffman stated that he "would want to see some measure of cause and effect evidence as well" in order to provide an opinion on market efficiency.[172]

135.    Second, to that end, Mr. Coffman also purports to test whether the "Uniti Option Prices react to new news."[173] To do so, he compares changes in option prices implied by the Black-Scholes model on 16 earnings days relative to a set of 414 "no news" days where there were no Uniti analyst reports, press releases, SEC filings, or news headlines (subsequently referred to as Mr. Coffman's "news no news" test).[174,175] He finds that for Uniti's options considered in aggregate, there is a statistically significant difference in the prevalence of abnormal returns at the 95% level on earnings dates as opposed to his "no news days," which

---

[170] Shleifer, Andrei and Robert W. Vishny. 1997. "The Limits of Arbitrage." *The Journal of Finance* 51 (1): 35–55.

[171] The formula Mr. Coffman uses to test put-call parity incorporates bid-ask spreads and thus evaluates whether profitable arbitrage opportunities existed *after accounting for transaction costs*. As discussed in **Section VIII.C.1.b**, the bid-ask spreads for many of the Uniti option series were wide during the proposed Class Period, and therefore a wide range of prices are able to satisfy put-call parity. An example from Mr. Coffman's backup illustrates this point. Mr. Coffman tested put-call parity for a call and put option series with a strike price of $17.50 and an expiration date of January 17, 2020. On March 1, 2018, the Uniti stock price could be as high as $18.30 or as low as $7.83 and Mr. Coffman would still not find a violation of put call parity for this option series.

[172] Coffman Deposition, 163:17–164:14 ("Q. Is a finding of put-call parity standing alone sufficient to find option market efficiency? … A. Again, I don't know what the Courts might find sufficient. In terms of my opinion, I think that goes a long way towards showing market efficiency of the option markets. But, you know, there is a reason why I also ran a cause and effect test. I wanted to see that evidence as well. Q. As an economist, could you opine that a company's stock options traded in a semi-strong efficient market based solely on a finding of put-call parity? … A. I don't want to speak for all economists. This financial economist would want to see some measure of cause and effect evidence as well.").

[173] Coffman Report, ¶89

[174] Coffman Report, ¶¶60, 62 ("I then compared these results against the 414 days during the Class Period where I identified no Uniti-related news from the Factiva database and when there were no analyst reports, SEC filings, or press releases issued.").

[175] Mr. Coffman referred to this test in deposition as a "news no news" test. *See, e.g.*, Coffman Deposition, 31:7–18 ("Q. And what role did it play in forming your opinions? A. … all of the filings were used to inform the news/no news analysis that is part of the cause and effect portion of my market efficiency analysis."); Coffman Deposition, 86:11–18 ("Q. And you refer to this as a news/no news task with 16 days that had earnings announcements constituting your news sample and the 414 days where you didn't identify any Uniti-specific news as constituting the no news sample; is that right? A. Yes").

he interprets as "further evidence of a cause-and-effect relationship between firm-specific news and changes in Uniti Option prices, and thus that the Uniti Options traded efficiently."[176]

136.    Mr. Coffman's assessment of market efficiency for Uniti's options is flawed and unreliable.

      a.    In **Section VIII.C.1**, I explain that Mr. Coffman does not address the same factors that he used to analyze market efficiency for Uniti's stock. An analysis of certain of these factors, trading volume and bid-ask spreads, suggests that there are frictions in the form of illiquidity and large transaction costs that could impede market efficiency.

      b.    For the factors that Mr. Coffman does consider, his approach is fundamentally flawed. I have already explained that Mr. Coffman's test of put-call parity cannot demonstrate semi-strong form market efficiency, which is the standard of efficiency that Mr. Coffman purports to be testing.[177] In **Section VIII.C.2** and **3**, I explain that Mr. Coffman's test of "cause and effect" is fundamentally flawed, because it uses model-derived theoretical prices, not actual market prices, and because it aggregates all of Uniti's options together, masking the fact that 78% of call and 74% of put option series do not exhibit a statistically significant price reaction on any of Mr. Coffman's "news" days.

### 1.   Mr. Coffman Does Not Address Evidence of Illiquidity and Large Transaction Costs for Some Option Series

137.    Notably absent from Mr. Coffman's analysis of market efficiency for the Uniti options is an evaluation of the *Cammer* and *Krogman* factors that provided the basis for his analysis of efficiency for Uniti's stock.[178] Mr. Coffman stated that he analyzed the five *Cammer* factors for the Uniti's stock because they identify "important metrics to consider when evaluating efficiency for purposes of the 'fraud on the market' theory."[179] Mr. Coffman "also consider[ed] a number of other factors that courts have utilized beyond the

---

[176] Coffman Report, ¶¶92–93.
[177] Coffman Report, ¶¶18, 21.
[178] *See*, Coffman Report, 20–23, 85, 89. *See also*, Coffman Deposition, 148:23–149:11 ("Q. . . . [T]here are other factors that you looked at for Uniti's common stock that would apply specifically to Uniti's options that you did not look at, correct? A. I think that's a fair statement, yes. I mean we would have to go factor by factor to talk about those and certain reasons you couldn't make an apples-to-apples comparison in certain cases. But, yes, there are factors that I analyzed for the stock that I did not analyze for the options.").
[179] Coffman Report, ¶22.

*Cammer* factors,"[180] such as the *Krogman* factors,[181] as "it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics is determinative as to whether a particular market is efficient."[182]

138. From the perspective of a financial economist, only *Cammer* Factor No. 5, which concerns whether a security price reacts to new, company specific information, is a direct test of market efficiency. The other factors that Mr. Coffman considers are structural features often observed in efficient markets that can indicate whether market conditions are conducive to new information being quickly and fully incorporated into security prices. Nonetheless, if certain of these structural features are *absent*, that could indicate the presence of frictions that may impede market efficiency.

139. Two of these factors, trading volume and bid-ask spreads, could be relevant for the options market, but Mr. Coffman did not analyze such factors for Uniti's options (despite having done so for Uniti's stock). An analysis of these factors indeed suggests the existence of market frictions for some Uniti option series, which in turn could impede market efficiency. An efficient market relies on arbitrage by informed traders to incorporate new information in security prices and quickly correct mispricing. Illiquidity in the form of low trading volume or high transaction costs, which as explained below are present for many of the Uniti option series, could impede the ability of arbitrageurs to perform this function.[183]

### a) Many Option Series Traded Infrequently, Suggesting Potential Impediments to Market Efficiency

140. During the proposed Class Period, many of the Uniti option series traded infrequently. While a market being liquid does not necessarily mean that the market is efficient, low liquidity in the form of high transaction costs or delays in investors' ability to execute trades in the desired quantity could present impediments to market efficiency. Mr. Coffman appears to agree. In his analysis of the Uniti stock, Mr. Coffman stresses the importance of trading volume as an indicator of market efficiency, stating that "high volume is generally indicative of continuity, liquidity, and market depth – which are highly indicative of market efficiency

---

[180] Coffman Report, ¶22.
[181] Coffman Report, ¶23. As described in the Coffman Report, the *Krogman* factors are "1) the company's market capitalization, 2) the Common Stock bid-ask spread, and 3) the percentage of shares not held by insiders (the 'float')."
[182] Coffman Report, ¶22.
[183] Chordia, Tarun, et al. 2008. "Liquidity and Market Efficiency." *Journal of Financial Economics* 87 (2): 249–268.

… substantial volume would indicate there is likely a market for the collection and distribution of information about the security."[184]

141.    However, Mr. Coffman does not assess the liquidity or market depth of Uniti's options either in aggregate or for individual option series.[185]  An analysis of their trading activity reveals that many of the Uniti option series traded infrequently during the proposed Class Period.  **Exhibit 3** presents the percentage of days on which each option series traded out of the days it was available to trade during the proposed Class Period.[186]  **Exhibit 3** shows that approximately 50% of call and 58% of put options series analyzed by Mr. Coffman traded on fewer than 25% of the days it was available to be traded – meaning these option series had a trade on only 1 out of every 4 days.  Further, 72% of call and 78% of put options series traded on fewer than 50% of the days they were available to be traded.

**b)    Many Option Series Had Wide Bid-Ask Spreads, Suggesting Potential Impediments to Market Efficiency**

142.    Another factor that Mr. Coffman addresses for Uniti's stock but not for Uniti's options is bid-ask spreads.  The bid-ask spread for a security refers to the difference between the "ask" price (the lowest quoted price at which market participants is willing to sell the security) and the "bid" price (the highest quoted price at which market participants is willing to buy).[187]  Similar to low volume, wide bid-ask spreads represent high transaction costs that can limit the ability of arbitrageurs to ensure that information gets impounded in prices fully and rapidly.  If the size of the potential profit an arbitrageur can make by trading a mispriced security is less than the transaction cost associated with that security (such as the difference

---

[184] Coffman Report, ¶27.

[185] In his report, Mr. Coffman notes the aggregate amount of trading volume across all options series for the full proposed Class Period, but he does not analyze the frequency or volume for individual option series.  *See,* Coffman Deposition, 152:6–18 ("Q. And you didn't do any analysis at all to look at trading volume for Uniti's options on a series-by-series basis correct?  A. Other than to verify which series actually had trading of some kind; that's correct.  And other than looking at the aggregate amount of trading -- which is described in my options analysis of the last factor under, that I looked at for the common stock -- beyond that, I did not.  There was clear evidence of substantial trading based on that alone.").  *See also,* Coffman Report, Exhibit 1 ("There were 1,693,843 Uniti Common Stock put contracts and 1,375,210 Uniti Common Stock call contracts that traded during the Class Period.").

[186] An option series is considered to have been traded on a day on which it had positive volume in the iVolatility data produced in Mr. Coffman's backup materials.  An option series is considered available to be traded if it has an end-of-day observation in the iVolatility data.  The percentage of days traded is calculated as the number of days an option series was traded divided by the number of days the option series was available to be traded.

[187] These refer to the market best two-way price quotes.  The ask price of a security is higher than the bid price, because market makers will not sell a security at a price lower than they are willing to pay for it.

between the price at which an investor can buy and sell a security), then the arbitrageur will not have the economic incentives to correct the mispricing.[188]

143.    In his analysis of Uniti's stock, Mr. Coffman stresses the importance of bid-ask spreads as an indicator of efficiency, stating that "[w]ider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price," and that "the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies because the cost of the trade could be greater than the perceived inefficiency."[189]

144.    However, Mr. Coffman does not assess the size of the bid-ask spreads of Uniti options.  When Mr. Coffman analyzes the bid-ask spreads of the Uniti's stock, he finds monthly average bid-ask spreads of "between 0.017% and 0.097%."[190]  He then compares these average spreads to "a randomly selected group of 100 other common stocks on the NYSE and NASDAQ [that] had a monthly average bid-ask spread of 0.91%."[191]

145.    The bid-ask spreads of the Uniti options that traded during the proposed Class Period were considerably wider than the average spreads Mr. Coffman finds for Uniti's stock. **Exhibit 4** provides the distribution of Uniti options that Mr. Coffman analyzes during the proposed Class Period by their average percentage bid-ask spread.  As **Exhibit 4** shows, average bid-ask spreads over the proposed Class Period range between 5.2% and 157.8% for call option series, and between 3.8% and 169.2% for put option series.[192]  To put these bid-ask spreads in context, a bid-ask spread of 100% would mean that an investor would need to pay three times as much to buy an option as the price at which the investor could sell that option—for instance, on a day when an investor could buy an option for $3, the investor could sell it for only $1.[193]

---

[188] A stylized example can help illustrate this point.  Suppose Stock A is traded on both the New York Stock Exchange (NYSE) and the London Stock Exchange (LSE).  Usually the prices on the two exchanges move in tandem.  On Monday, the closing stock price on both exchanges is $10.00.  However, on Tuesday, a piece of value-relevant positive news was released, and the closing price on the NYSE increased to $11.00 while the price on the LSE remained at $10.00.  If there were no transaction costs, an investor could buy the stock for $10.00 on the LSE and sell it on the NYSE for $11.00 to make a $1.00 profit.  But if there were large transaction costs, such that investors had to pay $2.00 every time they purchased a stock on the LSE, the $2.00 an investor would have to pay means they would buy the stock on the LSE for a total of $12.00 and would only be able to sell it on the NYSE for $11.00.  Therefore, no riskless profitable arbitrage opportunity exists, and the pricing discrepancy could remain.

[189] Coffman Report, ¶71.

[190] Coffman Report, ¶72.

[191] Coffman Report, ¶72.

[192] For each option series, the average percentage bid-ask spread is calculated as the average over the proposed Class Period of the daily differences between closing bid and ask prices as a percentage of the bid-ask mid-price prices.

[193] With a bid price of $1 and an ask price of $3, the bid-ask spread as measured in a way consistent with how Mr. Coffman measures the stock bid-ask spread would be 100% (($3 - $1) / $2) and an investor would need to pay three times as much to buy the option as to sell the option.

### 2.  Mr. Coffman Erroneously Uses Model-Derived Prices, Not Quoted or Traded Prices, in His "News No News" Test

146.    As described above, Mr. Coffman tests for a "cause and effect" relationship between news and the prices of Uniti options by conducting his "news no news" test.  Mr. Coffman's analysis suffers from flaws and errors from the outset, as he does not use market prices, in the form of actual trades or quotes, to evaluate whether option prices rapidly and fully incorporated new information.  Rather, he uses model-derived "theoretical" prices, which could meaningfully deviate from the prices at which market participants could and did trade and which, as Mr. Coffman agreed at deposition, are inappropriate to use in a test of market efficiency.  Such flaws render his analysis and conclusion unreliable.

### a)    Mr. Coffman Erroneously Uses Model-Derived Prices, Not Actual Transaction Prices, Contrary to His Stated Methodology

147.    To analyze market efficiency, Mr. Coffman purports to be testing whether new information is associated with a change in a security's "market price."[194]  If Mr. Coffman's intention was to use market prices in his "news no news" test, then he made an error, as his backup code for this test does not incorporate any prices that could reasonably be considered "market prices."  In economics, a "market price" is understood to be the price at which a buyer and a seller of a security agree to trade, which could take the form of executed prices or executable quotes.[195]  Mr. Coffman did not analyze or include in his production any data with "traded prices."  While he did produce data with end of day "quoted prices" from iVolatility, he did not use these quoted prices in his "news no news" analysis.  Instead, his backup code relies entirely on model-derived "theoretical" prices that are calculated using the Black-Scholes model.[196]

---

[194] *See*, *e.g.*, Coffman Report, ¶87 ("This provides evidence that the *market prices of Uniti Options* consistently reacted contemporaneously with changes in the market price of Uniti Common Stock so as to prevent arbitrage opportunities.") (emphasis added).

[195] *See, e.g.*, Ross, Stephen A., et al. 2002. *Corporate Finance, 6th Edition*, McGraw-Hill, p. 45 ("The market price of a share of common stock is the price that buyers and sellers establish when they trade the stock.").

[196] The key variable in Mr. Coffman analysis is the "actual observed return," which he does not define in his report.  *See*, Coffman Report ¶90.  In Mr. Coffman's production materials, the "actual observed return" is calculated using a variable named "Option":

$$return = (Option - lag\_price\_bs)/lag\_price\_bs;$$

148.    By his own admission, the approach implemented in Mr. Coffman's analysis is not informative to evaluating market efficiency. When asked at deposition "[w]ould it have been appropriate to have used Black-Scholes Model prices in calculating the actual observed return," he responded "[n]o, I think you – for the purposes of performing the underlying event study, it's important to use an observed market return. Not a theoretical price."[197, 198] Nonetheless, instead of testing whether option prices actually moved in response to "news," he tests whether the Black-Scholes model implies that the option prices *should* move, which would be analogous to running his "news no news" test for Uniti's stock using predicted prices from a valuation model rather than actual stock prices. This renders his "news no news" test, and thus his opinion that Uniti's options traded in an efficient market, deeply flawed.

149.    In fact, his model-based prices can differ substantially from actual market prices. As an example, consider his analysis of a call option with a strike price of $37.5 and an expiration date of February 17, 2017 following the earnings announcement on November 14, 2016. Mr. Coffman identifies this option series as one of the 21 option series with a significant return on November 14, 2016 following this earnings announcement.[199] The quoted mid-price (i.e., the average of quoted best bid and best ask) on November 11, 2016 (the trading day prior to the earnings announcement) was $0.30 and remained the same at $0.30 on November 14, 2016, for an actual return of 0.00%. However, Mr. Coffman calculates a model-based price of $0.018 on November 11, 2016 and $0.012 on November

---

The variable "lag_price_bs" is equal to the "Option" variable on the prior date, and is therefore calculated the same way. The "Option" variable is calculated using a function "BLKSHCLPRC" which uses the Black Scholes model to create a "theoretical" price.

$$\text{Option} = \text{BLKSHCLPRC}(\text{strike, Maturity, stock\_price\_for\_iv, rf, LAG\_iv});$$

Therefore, the quoted prices in the iVolatility data are not included in Mr. Coffman's calculation of the "actual observed return." *See*, Coffman Backup Materials, "4. Black Scholes Options Program.sas". See also, "BLKSHCLPRC Function," *SAS Help Center*,
https://go.documentation.sas.com/doc/en/pgmsascdc/9.4_3.4/lefunctionsref/n1q3r8hgb7nv59n1i6d9kmyfy307.htm.

[197] *See*, Coffman Deposition, 185:4–23. *See also*, Coffman Deposition, 183:9–15 ("Q. And you also calculated the actual observed return using the Black-Scholes Model as well, correct? A. No, the actual expected return is the actual observed change in the market prices according to [iVolatility].").

[198] Consistent with Mr. Coffman's statements in deposition, the economic literature has recognized the drawbacks of using such derived or "matrix" prices. For example, Elton et al. (2004) state that they remove matrix prices in the context of research in the corporate bond market because "[e]mploying matrix prices might mean that all our analysis uncovers is the formula used to matrix price bonds rather than the economic influences at work in the market." *See*, Elton, Edwin J., et al. 2004. "Factors Affecting the Valuation of Corporate Bonds." *Journal of Banking and Finance* 28 (11): 2747–67 ("Elton et al. (2004)") at p. 2750.

[199] *See*, Coffman Report, Exhibit 15.

14, 2016, for a model-derived statistically significant "actual return" of -32.82%. In this example, Mr. Coffman finds that his model price moved in a statistically significant manner in response to this earnings announcement, but he does not provide any evidence that the *actual market price* did so.[200]

150.    The potential issues caused by relying on theoretical, or model, prices are not isolated concerns. An analysis of the data demonstrates that the theoretical prices Mr. Coffman estimates for an option can and do differ substantially from quoted prices. To measure how large these differences are across all option series, I compute the deviation between the theoretical and actual prices by taking the difference between Mr. Coffman's theoretical price for each option series on each date that he uses to calculate the "actual" return in his "news no news" test, and the mid-price of that option series on that date from the iVolatility data analyzed by Mr. Coffman.[201]  **Exhibit 5A** presents this analysis. I find that the average daily deviation between Mr. Coffman's theoretical price for a given option and the mid-price of the quoted price is $0.49 for call options and $0.52 for put options. The median daily deviations are at $0.22 for call options and $0.28 for put options.[202]  In percentage terms, the average difference is 27.4% of the mid-price for calls and 21.3% for puts, and the median difference is 11.0% for calls and 15.8% for puts.[203, 204]

---

[200] As another example, consider his analysis of a call option with a strike price of $25.0 and an expiration date of January 17, 2020 following the earnings announcement on November 2, 2018. Mr. Coffman identifies this option series as one of the 3 call option series with a statistically significant return following this earnings announcement. The quoted mid-price on November 1, 2018 (the trading day prior to the earnings announcement) was $1.025 and increased to $1.050 on November 2, 2018, for an actual return of 2.44%. However, Mr. Coffman analyzes his model-derived prices on this day. He calculates a price of $0.249 on November 1, 2018 and $1.341 on November 2, 2018, for a model-derived "actual return" of 438.45%. In this example, Mr. Coffman found that his model price moved in a statistically significant manner in response to this news, but he has not provided any evidence that the actual market price did.

[201] The mid-price is calculated as (ask + bid) / 2 where the bid and ask prices are the end of day quoted prices in the iVolatility data.

[202] If these deviations are calculated on a per option series basis (i.e., as the distribution of the median deviation for each option series), then the median deviation is $0.14 for calls and $0.15 for puts, and the average is $0.25 for calls and $0.30 for puts. *See*, **Exhibit 5B**.

[203] The percentage difference is calculated as Mr. Coffman's theoretical price minus the actual mid-price divided by the actual mid-price.

[204] If these deviations are calculated on a per option series basis (i.e., as the distribution of the median deviation for each option series), then the median deviation is 8.5% for calls and 14.3% for puts, and the average is 20.6% for calls and 21.6% for puts.

          **b)**      **The Use of Model-Derived Prices Obscures That Many Options Series Did Not Trade on Mr. Coffman's "News" Days**

151.    Mr. Coffman's "news no news" analysis purports to demonstrate that "on days when important firm-specific information was released to the market (earnings announcements), Uniti Option prices move much more than on days where there was no news."[205]  However, as discussed above, his analysis addresses only whether model prices move more on these days, as opposed to whether actual market prices move in response to "important firm-specific information."[206]

152.    In fact, many Uniti options series did not have any trades on Mr. Coffman's "news" days because no investors actually bought or sold those option series.  Mr. Coffman identifies statistically significant abnormal returns for 95 of the 584 call option "news days" and 110 of the 565 put option "news days."[207]  However, 50 (53%) and 65 (59%) of the statistically significant returns for call and put options, respectively, are associated with *no traded volume.*

153.    For example, on May 11, 2018, based on Mr. Coffman's analysis, Uniti's stock had a statistically significant and positive abnormal return of 3.22%.[208]  In his Exhibit 15, Mr. Coffman identifies four call option series with statistically significant abnormal returns out of the 57 call option series he analyzed on this date.  However, none of these four options series had any traded volume on this date.  Furthermore, many option series did not have any trading volume on any of the earnings dates that Mr. Coffman considers in his "news no news" analysis.  Of the 560 option series for which Mr. Coffman calculates a return on any earnings date, 233 do not have any traded volume on any of the earning dates.

          **3.**    **Mr. Coffman's Aggregate "News No News" Test Overlooks That Many Option Series Did Not Trade or Did Not Have a Significant Stock Price Reaction on Any of Mr. Coffman's "News" Days**

154.    As described above, Mr. Coffman's "news no news" test considers whether "there is a greater prevalence of statistically significant price movements, magnitude of price movements, and trading volume on earnings events compared to "no news" days."[209]  Even

---

[205] Coffman Report, ¶93.
[206] Coffman Report, ¶93.
[207] Coffman Report, Exhibits 16–17.
[208] Coffman Report, Exhibit 15.
[209] Coffman Report, ¶92.

assuming that this type of test is capable of demonstrating semi-strong form market efficiency,[210] Mr. Coffman's implementation of it is seriously flawed. Specifically, Mr. Coffman applies this test collectively to all Uniti options in aggregate, even though each option series is its own security with its own market characteristics. Rather than calculating the "prevalence of statistically significant price movements" by counting significant returns for each option series individually, he adds the number of significant returns across the different series to create an overall percentage. Doing so prevents him from determining whether any *individual options series* reacted to "news." Some option series could rapidly and fully incorporate new information, while others do not, and his test is not capable of distinguishing between the two. Mr. Coffman appeared to agree with this possibility, stating in deposition that he intended to "conduct a cause-and-effect analysis at the option series level" and to "look[] at price responses at the option series level."[211]

155.    In fact, the majority of Uniti's option series did *not* have a statistically significant price reaction on any of Mr. Coffman's "news" days. **Exhibit 6** shows the results of Mr. Coffman's event study for individual option series. As shown in the exhibit, Mr. Coffman does not find a statistically significant price movement on any earnings date for 78% of the call options and 74% of the put options he analyzed.[212] As such, he has no basis to conclude that the prices of these series reacted to new information at all, let alone fully and quickly.

Executed this 23rd day of December, 2021

_____

Christopher M. James, Ph.D.

---

[210] From the perspective of a financial economist, such a test cannot reliably demonstrate semi-strong form market efficiency. Mr. Coffman does not put forth an objective, replicable methodology to assess whether the events he examines actually contain unexpected, value relevant information. Further, he fails to provide any ex ante hypothesis or test of the expected price reaction following these events. As such he is not evaluating whether the price incorporates the news fully and quickly.

[211] Coffman Deposition, 125:15–126:15 ("Q. Why? A. Because it allows me [] to, essentially, conduct a cause-and-effect analysis at the option series level rather than relying on this aggregation method that I've used in prior cases, which was the subject of a lot of questions and criticisms, and overall I just think there is a better way to do it. Q. Do you believe it's important to do the analysis on an option series level rather than on an aggregate level? A. I think it, as with any analysis, it introduces some of its own issues as well as avoids others. I think on balance, this is a, in my view, a better way to do it. Because it allows for looking at price responses at the option series level, rather than making broad assumptions that are necessary when aggregating across option series to an index level, there are a number of different statistical assumptions being made.").

[212] Further, Mr. Coffman does not find a statistically significant price movement on any earnings date that was associated with traded volume for 88% of call options and 89% of put options he analyzed. *See*, **Exhibit 6**.

EXHIBIT 1

# Uniti Group Inc.
## Additional Event Study Results on Windstream's Dividend Cut Announcement[1]
8/3/17

| Raw Returns | | | | | Estimated Coefficients[2] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Uniti Return | Market Index | Industry Index | Telecom Index | Windstream | Market Index | Industry Index | Telecom Index | Windstream | Residual Return | P-Value | Statistical Significance[3] |
| -8.59% | -0.22% | -0.23% | 0.06% | -36.02% | 0.37 | 0.89 | -0.05 | 0.20 | -1.05% | 0.61 | Not Significant |

Source: *CRSP; Bloomberg; S&P Global; Refinitiv;* Consolidated Amended Class Action Complaint ("Amended Complaint") dated 5/11/20

Note:
[1] The residual and p-value are estimated from a regression using Uniti stock returns as the dependent variable and the CRSP NYSE/AMEX/Nasdaq/Arca value weighted Index ("Market Index"), MSCI US Real Estate Investment Trusts (REITs) index ("Industry Index"), the S&P Composite 1500 Telecommunication Services Index ("Telecom Index"), and Windstream stock as independent variables. For the first 120 trading days since 4/24/15, the estimation window is the first 120 trading days. For the remaining days, the estimation window is 120 trading days ending prior to that day. Returns from the impact dates of alleged corrective disclosures and alleged misrepresentation dates identified in the Amended Complaint are removed from the regression models. The estimation window used in regressions is expanded to always include 120 observations to the extent that certain days in the window are excluded. Uniti's residual return on 8/4/17 is not statistically significant under this regression model. Event study results are shown for analysis performed in addition to the regression using the Market Index, Industry Index, and Telecom Index as independent variables and Uniti stock returns as a dependent variable, under which Uniti's residual return on 8/3/17 is -8.18% and statistically significant.
[2] Estimated coefficient on the Market Index or the Telecom Index is not statistically significant at a 5% level. Estimated coefficients on the Industry Index and Windstream stock returns are statistically significant at a 5% level.
[3] Statistical significance is assessed at the 5% level.

# UNITI Group Inc.
## List of Documents Cited by Judge Furman

| Docket/Trial Exhibit No. | Date Filed[1] | Document Description | Judge Furman Ruling Page No.[2] |
|---|---|---|---|
| **1. Documents referenced in Section "Discussion" B.1.a-b.** [3] | | | |
| **1.1. Documents relating to Windstream's statements to state utilities regulators representing that the Transferor Subsidiaries would still have the exclusive rights, control and obligations over the same assets** | | | |
| PX-6 | 7/31/14 | Application to the **Alabama** Public Services Commission for Approval of the Transaction | 34 |
| PX-25 | 8/5/14 | Request to the **North Carolina** Utilities Commission for a Declaratory Ruling related to the Transaction | 34 |
| PX-10 | 8/12/14 | Application to the **Georgia** Public Service Commission for a Declaratory Ruling related to the Transaction | 34 |
| PX-31 | 8/29/14 | Petition to the **West Virginia** Public Service Commission for Approval of the Transfer of Assets related to the Transaction. | 34 |
| PX-7 | 9/30/14 | Order of the **Alabama** Public Service Commission | 34 |
| PX-26 | 10/13/14 | Declaratory Ruling by the **North Carolina** Utilities Commission | 35 |
| PX-21 | 11/26/14 | Transcript of a Public Hearing Before the **Kentucky** Public Service Commission | 34–35 |
| PX-68 | 4/27/15 | Master Lease | 29, 32, 35 |
| Docket No. 230, 232 | 8/23/18 | Trial Transcripts | 27, 31, 35 |
| DX-190 | N.A | Fletcher Affidavit | 27 |
| DX-193 | N.A | Gunderman Affidavit | 27 |

**EXHIBIT 2**

| Docket/Trial Exhibit No. | Date Filed[1] | Document Description | Judge Furman Ruling Page No.[2] |
|---|---|---|---|
| *1.2. Documents relating to Windstream subsidiaries' exclusive control over transferred assets and entering into sub leases with third parties* | | | |
| PX-129/Docket No. 115-5 | 2/16/18 | Services' Responses to RFAs | 27, 29, 33, 38–40 |
| PX-109.52 | N.A | Fiber Exchange Agreement among Windstream KDL, LLC, CSL Realty, LLC, and Fiber light, LLC | 30 |
| *1.3. Documents relating to Windstream subsidiaries incurring expenses for capital improvements and categorizing rent payments as long term lease obligations* | | | |
| PX-103 | 8/3/17 | Uniti Group, Inc., Form 10-Q, for the quarter ended June 30, 2017, filed on August 3, 2017 at 5:16 PM | 32 |
| Docket No. 115-3 | 2/16/18 | Eichler Deposition | 33 |
| PX-66/Docket No. 131-33 | 3/19/18 | Windstream Intercompany Memo from External Reporting to the Files, re: "Spinoff/ Leaseback Accounting Considerations" | 31 |
| Docket No. 115-4 | 3/19/18 | Fletcher Deposition | 31 |
| Docket No. 131-2 | 3/19/18 | Gunderman Deposition | 33 |
| PX-200 | N.A | La Rue Affidavit | 27, 31 |
| *1.4 Other documents included in the analysis* | | | |
| N.A | N.A | Solomon Affidavit | 27 |
| PX-137 | N.A | E-mail from I. Spain, counsel to U.S. Bank, to D. Rapport, counsel to Windstream Services | 27 |
| DX-191 | N.A | Eichler Affidavit | 27 |

**EXHIBIT 2**

| Docket/Trial Exhibit No. | Date Filed[1] | Document Description | Judge Furman Ruling Page No.[2] |
|---|---|---|---|
| **2. Additional Documents referenced in Section "Factual Findings" A-D** | | | |
| **2.1. Documents relating to Windstream's statements to state utilities regulators representing that the Transferor Subsidiaries would still have the exclusive rights, control and obligations over the same assets** | | | |
| PX-15 | 8/7/14 | Application to **Kentucky** Public Service Commission for Approval of the Transfer of Assets | 6 |
| PX-27 | 8/19/14 | Application to the **Ohio** Public Utilities Commission to Transfer Assets related to the Transaction | 6 |
| PX-30 | 8/29/14 | Application to the **Pennsylvania** Public Utilities Commission for Approval of the Transfer of Assets related to the Transaction | 6 |
| PX-8 | 9/22/14 | Application to the **Arizona** Corporation Commission for the Waiver of Certain Rules related to Transaction | 6 |
| PX-16 | 10/1/14 | Responses to the **Kentucky** Public Service Commission's First Information Request | 6 |
| PX-17 | 11/3/14 | Responses to the **Kentucky** Public Service Commission's Second Request for Information | 6, 7 |
| PX-23 | 11/21/14 | Responses to the **Kentucky** Public Service Commission's Post-Hearing Requests | 6, 8 |
| PX-12/Docket No. 131-12 | 3/19/18 | Application to the **Indiana** Utility Regulatory Commission for Certificate of Territorial Authority to Provide Communications Services | 6 |
| PX-11 | N.A | Application to the **Indiana** Utility Regulatory Commission to Change Certificate of Territorial Authority to Provide Communications Services | 6 |

**EXHIBIT 2**

| Docket/Trial Exhibit No. | Date Filed[1] | Document Description | Judge Furman Ruling Page No.[2] |
|---|---|---|---|
| **2.2. Documents relating to Windstream subsidiaries' exclusive control over transferred assets and entering into sub leases with third parties** | | | |
| Docket No. 1 | 10/12/17 | Aurelius COMPLAINT against Windstream Services, LLC | 12 |
| Docket No. 91 | 12/15/17 | Amended Answer to Aurelius Litigation Complaint | 12 |
| PX-63/Docket No. 131-30 | 3/19/18 | E-mail from B. Gunderman to T. Thomas, both of Windstream re: Fwd.: WIN/CS&L; Investor strategy materials | 9 |
| Docket No. 174 | 6/28/18 | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW [Corrected 2] by **U.S. Bank National Association** | 12 |
| PX-109.4, 109.37,  109.59, 109.55, 109.62, 109.72, 109.135 | N.A | Agreements between Windstream Service Subsidiaries and Third Parties granting various rights to use Transferred Assets in exchange of consideration | 12 |
| **2.3. Documents relating to Windstream subsidiaries incurring expenses for capital improvements and categorizing rent payments as long term lease obligations** | | | |
| PX-83 | 3/1/17 | Windstream Holdings, Inc. and Windstream Services, LLC Form 10-K, for the year 2016, filed on March 1, 2017 at 3:18 PM | 13 |
| **2.4. Other documents included in the analysis** | | | |
| PX-1 | 1/23/13 | The Indenture and Amendments to the Indenture | 3, 4 |
| PX-74 | 2/24/15 | Windstream Holdings, Inc. and Windstream Services, LLC Form 10-K, for the year 2014 | 5 |
| DX-185 | 3/26/15 | Separation and Distribution Agreement By and Among Windstream Holdings, Inc., Windstream Services, LLC and communications Sales & Leasing, Inc. | 9 |
| PX-37 | N.A | Windstream Board of Directors, Meeting Materials | 5 |
| PX-35 | N.A | Board of Directors Materials REIT Overview and Considerations | 5 |
| DX-49 | N.A | Minutes of a Meeting of the Board of Directors of Windstream Holdings, Inc. and Windstream Services, LLC, dated March 25, 2015 | 8 |

**EXHIBIT 2**

| Docket/Trial Exhibit No. | Date Filed[1] | Document Description | Judge Furman Ruling Page No.[2] |
|---|---|---|---|
| *3. Documents referenced in Section "Discussion" B.1.c "Services' Other Arguments Are Without Merit" included in the analysis* | | | |
| PX-128/Docket No. 115-5 | 2/16/18 | Windstream Services' Objections and Responses to U.S. Bank's and Aurelius Capital Master, Ltd.'s First Set of Interrogatories | 37 |

Source: *U.S Bank National Association v Windstream v Aurelius* Findings of Fact and Conclusions of Law by Judge Furman, filed on 2/15/19 ("Judge Furman Ruling"), and other docket documents; Windstream Holdings, Inc. SEC Filings

Note:
[1]   Date filed for documents concerning Windstream's statements to state utilities regulators, with one exception (PX-12/ Docket No. 131-12), is the date on which the document was filed with the regulator, according to the state's regulators website.  Date filed for Windstream and Uniti financial filings is the date when the document was accepted by and publicly available from the EDGAR database.  Date filed for documents produced as part of the Aurelius litigation is the date of the associated docket entry.  Date filed for other key legal documents cited by Judge Furman, including trial transcripts, is the date on which the original version of the document was filed according to PACER or the court.  Date for PX-12/ Docket No. 131-12 is the date the document was filed according to PACER.
[2]   Indicates the pages within the relevant sub-section of Judge Furman's ruling, where the underlying document was referenced.  Page numbers for references in other sections of the ruling were not included.
[3]   Documents from these sub sections that are cited by Windstream to support their arguments are excluded from the analysis, i.e., Windstream Services, LLC Officers' Certificate, Dividend Payment, dated April 7, 2017 (DX-26) and Minutes of a Meeting of the Board of Directors of Windstream Holdings, Inc. and Windstream Services, LLC (DX-51).  Judge Furman Ruling, pp.31–32.

**EXHIBIT 3**

# Uniti Group Inc.
# Distribution of Option Series by Percentage of Days Traded[1]
## Proposed Class Period: 4/24/2015 – 6/24/2019

| | Percentage of Days Traded[2] | | | | |
|---|---|---|---|---|---|
| | >0 – <25% | 25 – <50% | 50 – <75% | 75 – <100% | 100% |
| Call Options | 49.7% | 22.0% | 17.5% | 9.1% | 1.6% |
| Put Options | 58.2% | 19.3% | 13.5% | 8.2% | 0.8% |

Source:  Backup Materials to the Expert Report of Chad Coffman dated October 25, 2021

Note:
[1]  Option series are limited to the 372 call and 378 put option series with at least one day of positive trading volume during the proposed Class Period.
[2]  Percentage of days traded is calculated as the number of days an option series was traded divided by the number of days the option series was available to be traded.  An option series is considered to have been traded on a day on which it had positive volume in the iVolatility data produced in Mr. Coffman's backup materials.  An option series is considered available to be traded if it has an end-of-day observation in the iVolatility data.  Percentages outlined in red represent the proportion of option series which trade on less than half of the available dates within the proposed Class Period.

**EXHIBIT 4**

# Uniti Group Inc.

# Distribution of Option Series by Average Percentage Bid-Ask Spread[1]

| | Minimum | 25th Percentile | Median | 75th Percentile | Maximum | Mean |
|---|---|---|---|---|---|---|
| **Proposed Class Period: 4/24/2015 – 6/24/2019** | | | | | | |
| Call Options | 5.2% | 16.0% | 29.8% | 56.6% | 157.8% | 41.2% |
| Put Options | 3.8% | 15.5% | 29.8% | 61.6% | 169.2% | 41.7% |

Source:  Backup Materials to the Expert Report of Chad Coffman dated October 25, 2021

Note:

[1] Option series are limited to the 372 call and 378 put option series with at least one day of positive trading volume during the proposed Class Period.  Analysis excludes observations on days for which the bid price is zero.  For each option series, the average percentage bid-ask spread is calculated as the average over the proposed Class Period of the daily differences between closing bid and ask prices as a percentage of the quoted bid-ask mid-price.

**EXHIBIT 5A**

# Uniti Group Inc.
# Distribution of Deviation Between
# Actual and Theoretical Options Prices[1]

| | Minimum | 25th Percentile | Median | 75th Percentile | Maximum | Mean |
|---|---|---|---|---|---|---|
| **Proposed Class Period: 4/24/2015 – 6/24/2019** | | | | | | |
| **Dollar Amount Deviation[2]** | | | | | | |
| Call Options | $0.00 | $0.08 | $0.22 | $0.52 | $7.38 | $0.49 |
| Put Options | $0.00 | $0.10 | $0.28 | $0.65 | $5.02 | $0.52 |
| **Percent Deviation[3]** | | | | | | |
| Call Options | 0.0% | 2.5% | 11.0% | 32.5% | 1167.8% | 27.4% |
| Put Options | 0.0% | 6.6% | 15.8% | 28.0% | 396.6% | 21.3% |

Source:  Backup Materials to the Expert Report of Chad Coffman dated October 25, 2021

Note:
[1]  Analysis is limited to days included in Mr. Coffman's "news no news" test, as presented in Coffman Report Exhibits 16 and 17.  The days included are either "Earnings Announcements" or "Days with No News" as defined by Mr. Coffman, and days where the quoted bid price is nonzero. Option series are limited to the 372 call and 378 put option series with at least one day of positive trading volume during the proposed Class Period.
[2]  Dollar Amount Deviation between actual and theoretical options prices is calculated as Mr. Coffman's theoretical option price minus the quoted mid-price from the iVolatility data analyzed by Mr. Coffman.  The mid price is calculated as (ask + bid) / 2 where the bid and ask prices are the end of day quoted prices in the iVolatility data.
[3]  Percent Deviation between actual and theoretical options prices is calculated as Mr. Coffman's theoretical option price minus the quoted mid-price divided by the quoted mid-price.

**EXHIBIT 5B**

# Uniti Group Inc.
# Distribution of the Median Deviation by Options Series Between Actual and Theoretical Options Prices[1]

| | Proposed Class Period: 4/24/2015 – 6/24/2019 | | | | | |
|---|---|---|---|---|---|---|
| | Minimum | 25th Percentile | Median | 75th Percentile | Maximum | Mean |
| **Dollar Amount Deviation[2]** | | | | | | |
| Call Options | $0.00 | $0.07 | $0.14 | $0.24 | $2.94 | $0.25 |
| Put Options | $0.01 | $0.07 | $0.15 | $0.38 | $3.84 | $0.30 |
| **Percent Deviation[3]** | | | | | | |
| Call Options | 0.2% | 2.5% | 8.5% | 27.0% | 426.0% | 20.6% |
| Put Options | 0.3% | 5.4% | 14.3% | 28.4% | 93.7% | 21.6% |

Source:  Backup Materials to the Expert Report of Chad Coffman dated October 25, 2021

Note:
[1]  Analysis is limited to days included in Mr. Coffman's "news no news" test, as presented in Coffman Report Exhibits 16 and 17.  The days included are either "Earnings Announcements" or "Days with No News" as defined by Mr. Coffman, and days where the quoted bid price is nonzero. Option series are limited to the 372 call and 378 put option series with at least one day of positive trading volume during the proposed Class Period.
[2]  Dollar Amount Deviation between actual and theoretical options prices is calculated as Mr. Coffman's theoretical option price minus the quoted mid-price from the iVolatility data analyzed by Mr. Coffman.  The mid price is calculated as (ask + bid) / 2 where the bid and ask prices are the end of day quoted prices in the iVolatility data.  For each option series, the deviation is calculated as the median of these differences for all observations for a given option series.
[3]  Percent Deviation between actual and theoretical options prices is calculated as Mr. Coffman's theoretical option price minus the quoted mid-price divided by the quoted mid-price.

**EXHIBIT 6**

# Uniti Group Inc.
# Option Series Returns on "News" Days

| Count of Option Series: | Call Options | | Put Options | |
|---|---|---|---|---|
| | Count of Option Series | Percentage of Series Analyzed | Count of Option Series | Percentage of Series Analyzed |
| Analyzed By Coffman [1] | 372 | – | 378 | – |
| For Which Coffman Calculated A Return On Any Of The 16 Earnings Dates In Coffman Exhibit 15 [2] | 287 | 77% | 273 | 72% |
| For Which Coffman Calculated A Statistically Significant Return At The 95% Level On Any Of The 16 Earnings Dates In Coffman Exhibit 15 | 83 | 22% | 98 | 26% |
| For Which Coffman Calculated A Statistically Significant Return At The 95% Level That Was Associated With Traded Volume > 0 On Any Of The 16 Earnings Dates In Coffman Exhibit 15 [3] | 43 | 12% | 42 | 11% |

Source:  Backup Materials to the Expert Report of Chad Coffman dated October 25, 2021

Note:

[1] Mr. Coffman analyzed the "372 call option series and 378 put option series had non-zero trading volumes" during the proposed Class Period.  *See* , Coffman Report, ¶83.

[2] These 287 and 273 options series correspond to the 584 call and 565 put option daily observations Mr. Coffman included as "Earnings Announcements" in his Exhibits 15, 16, and 17.  *See* , Coffman Report, Exhibit 16, fn 1 ("Each observation represents a date for a specific call option series where a return can be calculated.").

[3] A significant return is considered to be associated with traded volume if it occurred on a day for which that option series had positive volume in the iVolatility data produced in Mr. Coffman's backup materials.

EXHIBIT A.1

## UNITI Group Inc.
## Stock Price Movements On Days When Documents Referenced or Events Supporting Judge Furman Finding of Facts Were Released

| Date Filed[1] | Document/ Event Description[2] | Docket/Trial Exhibit No. | UNITI Stock Returns[3] | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Date Filed or Nearest Trading Day Following Filing[4] | | | Next Trading Day[4] | | |
| | | | Raw Returns | Residual | P-Value | Raw Returns | Residual | P-Value |
| 1/23/13 | **Indenture** for 6 3/8% Senior Notes due 2023 among Windstream Corporation, the Guarantors, and U.S. Bank National Association, as Trustee | PX-1 | | | | | | |
| 7/31/14 | Application to the **Alabama** Public Services Commission for Approval of the Transaction | PX-6 | | | | | | |
| 8/5/14 | Request to the **North Carolina** Utilities Commission for a Declaratory Ruling related to the Transaction | PX-25 | | | | | | |
| 8/7/14 | Application to **Kentucky** Public Service Commission for Approval of the Transfer of Assets | PX-15 | | | | | | |
| 8/12/14 | Application to the **Georgia** Public Service Commission for a Declaratory Ruling related to the Transaction | PX-10 | | | | | | |
| 8/19/14 | Application to the **Ohio** Public Utilities Commission to Transfer Assets related to the Transaction | PX-27 | | | | | | |
| 8/29/14 | Application to the **Pennsylvania** Public Utilities Commission for Approval of the Transfer of Assets related to the Transaction, Petition to the West Virginia Public Service Commission for Approval of the Transfer of Assets related to the Transaction. | PX-30, PX-31 | | | | | | |
| 9/22/14 | Application to the **Arizona** Corporation Commission for the Waiver of Certain Rules related to Transaction | PX-8 | | | | | | |
| 9/30/14 | Order of the **Alabama** Public Service Commission | PX-7 | | | | | | |
| 10/1/14 | Responses to the **Kentucky** Public Service Commission's First Information Request | PX-16 | | | | | | |

**EXHIBIT A.1**

| Date Filed[1] | Document/ Event Description[2] | Docket/Trial Exhibit No. | UNITI Stock Returns[3] | | | | | |
| | | | Date Filed or Nearest Trading Day Following Filing[4] | | | Next Trading Day[4] | | |
| | | | Raw Returns | Residual | P-Value | Raw Returns | Residual | P-Value |
|---|---|---|---|---|---|---|---|---|
| 10/13/14 | Declaratory Ruling by the **North Carolina** Utilities Commission | PX-26 | | | | | | |
| 11/3/14 | Responses to the **Kentucky** Public Service Commission's Second Request for Information | PX-17 | | | | | | |
| 11/21/14 | Responses to the **Kentucky** Public Service Commission's Post-Hearing Requests | PX-23 | | | | | | |
| 11/26/14 | Transcript of a Public Hearing Before the **Kentucky** Public Service Commission | PX-21 | | | | | | |
| 2/24/15 | Windstream Holdings, Inc. and Windstream Services, LLC Form 10-K, for the year 2014 | PX-74 | | | | | | |
| 3/26/15 | **Separation and Distribution Agreement** By and Among Windstream Holdings, Inc., Windstream Services, LLC and communications Sales & Leasing, Inc. | DX-185 | | | | | | |
| 4/27/15 | Master Lease among CSL National, LP, et al., and Windstream Holdings, Inc. | PX-68 | -3.81% | -3.03% | 0.11 | 7.16% | 6.02% | 0.00 |
| 5/7/15 | Windstream Holdings, Inc. and Windstream Services, LLC Form 10-Q, for the quarter ended March 31, 2015, filed on May 7, 2015 at 3:38 PM | | -3.29% | -2.50% | 0.19 | 0.11% | -0.73% | 0.70 |
| 8/13/15 | Uniti Group, Inc., Form 10-Q, for the quarter ended June 30, 2015, filed on August 13, 2015 at 4:31 PM | | 4.71% | 5.60% | 0.00 | 3.83% | 3.75% | 0.05 |
| 2/25/16 | Windstream Holdings, Inc. and Windstream Services, LLC Form 10-K, for the year 2015, filed on February 25, 2016 at 4:44 PM | | 1.98% | 0.46% | 0.84 | 5.66% | 5.85% | 0.01 |
| 2/23/17 | Uniti Group, Inc., Form 10-K, for the year 2016, filed on February 23, 2017 at 5:23 PM | | 3.51% | 2.80% | 0.03 | 2.26% | 1.63% | 0.21 |
| 3/1/17 | Windstream Holdings, Inc. and Windstream Services, LLC Form 10-K, for the year 2016, filed on March 1, 2017 at 3:18 PM | PX-83 | -0.59% | -1.01% | 0.45 | -0.52% | 0.14% | 0.91 |

**EXHIBIT A.1**

| | | | UNITI Stock Returns[3] | | | | | |
| | | | Date Filed or Nearest Trading Day Following Filing[4] | | | Next Trading Day[4] | | |
| Date Filed[1] | Document/ Event Description[2] | Docket/Trial Exhibit No. | Raw Returns | Residual | P-Value | Raw Returns | Residual | P-Value |
|---|---|---|---|---|---|---|---|---|
| 8/3/17 | Uniti Group, Inc., Form 10-Q, for the quarter ended June 30, 2017, filed on August 3, 2017 at 5:16 PM | PX-103 | -8.59% | -8.18% | 0.00 | -3.23% | -3.64% | 0.01 |
| 10/12/17 | Aurelius COMPLAINT against Windstream Services, LLC | Docket No. 1 | 0.86% | 1.18% | 0.56 | -0.26% | -0.34% | 0.86 |
| 12/15/17 | Amended Answer to Aurelius Litigation Complaint | Docket No. 91 | -0.62% | -1.80% | 0.39 | -0.40% | -1.47% | 0.48 |
| 2/16/18 | Eichler Deposition, Letter Motion to Seal Documents and Seeking Leave to Redact. Document filed by Aurelius Capital Master, Ltd., Services' Responses to RFAs, Windstream Services' Objections and Responses to U.S. Bank's and Aurelius Capital Master, Ltd.'s First Set of Interrogatories | Docket No. 115-3, Docket No. 115, PX-129/Docket No. 115-5, PX-128/Docket No. 115-5 | 1.07% | 0.28% | 0.90 | -4.28% | -2.57% | 0.23 |
| 3/19/18 | Application to the **Indiana** Utility Regulatory Commission for Certificate of Territorial Authority to Provide Communications Services, E-mail from B. Gunderman to T. Thomas, both of Windstream re: Fwd.: WIN/CS&L; Investor strategy materials, Fletcher Deposition, Gunderman Deposition, Windstream Intercompany Memo from External Reporting to the Files, re: "Spinoff/ Leaseback Accounting Considerations", Letter Motion to Seal Documents and Seeking Leave to Redact. Document filed by Aurelius Capital Master, Ltd. | PX-12/Docket No. 131-12, PX-63/Docket No. 131-30, Docket No. 131-4, Docket No. 131-2, PX-66/Docket No. 131-33, Docket No. 131 | -2.59% | -1.33% | 0.51 | -0.59% | -0.29% | 0.89 |
| 6/15/18 | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW. Document filed by **U.S. Bank National Association** | Docket No. 156 | -2.48% | -2.70% | 0.08 | 2.32% | 2.12% | 0.18 |
| 6/16/18 | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW. Document filed by **Aurelius Capital Master, Ltd.** | Docket No.160 | 2.32% | 2.12% | 0.18 | 0.66% | 0.72% | 0.65 |
| 6/21/18 | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW [Corrected]. Document filed by **Aurelius Capital Master, Ltd.**, PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW [Corrected1]. Document filed by **U.S. Bank National Association** | Docket No.167, Docket No. 168 | -0.96% | -1.27% | 0.42 | 0.58% | -0.34% | 0.82 |

**EXHIBIT A.1**

| Date Filed[1] | Document/ Event Description[2] | Docket/Trial Exhibit No. | UNITI Stock Returns[3] | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Date Filed or Nearest Trading Day Following Filing[4] | | | Next Trading Day[4] | | |
| | | | Raw Returns | Residual | P-Value | Raw Returns | Residual | P-Value |
| 6/28/18 | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW [Corrected 2] by **U.S. Bank National Association** | Docket No. 174 | 0.39% | -0.65% | 0.69 | 0.75% | 0.35% | 0.83 |
| 7/23/18 | Trial Day | | -0.57% | -0.71% | 0.73 | -1.04% | -0.87% | 0.68 |
| 7/24/18 | Trial Day | | -1.04% | -0.87% | 0.68 | -0.93% | -2.21% | 0.31 |
| 7/25/18 | Trial Day | | -0.93% | -2.21% | 0.31 | 1.65% | 1.49% | 0.48 |
| 7/31/18 | Trial Day | | 2.73% | 1.11% | 0.61 | 0.91% | 0.46% | 0.83 |
| 8/23/18 | Trial Transcripts | Docket No. 230, 232 | -0.72% | -0.65% | 0.74 | -0.63% | -1.54% | 0.44 |

Source: *CRSP; Bloomberg; S&P Global; Refinitiv;* Consolidated Amended Class Action Complaint ("Amended Complaint") dated 5/11/20; *U.S Bank National Association v Windstream v Aurelius* Findings of Fact and Conclusions of Law by Judge Furman, filed on 2/15/19 ("Judge Furman Ruling"), and other docket documents; Windstream Holdings, Inc. and Uniti Group Inc. SEC Filings

Note:
[1]   Date filed for documents concerning Windstream's statements to state utilities regulators, with one exception (PX-12/ Docket No. 131-12), is the date on which the document was filed with the regulator, according to the state's regulators website.  Date filed for Windstream and Uniti financial filings is the date when the document was accepted by and publicly available from the EDGAR database.  Date filed for documents produced as part of the Aurelius litigation is the date of the associated docket entry.  Date filed for other key legal documents, cited by Judge Furman, including trial transcripts, is the date on which the original version of the document was filed according to PACER or the court.  Date for PX-12/ Docket No. 131-12 is the date the document was filed according to PACER.  Date for Trial Days is the date on which the trial took place.
[2]   Includes all documents referenced in Exhibit 2 that were publicly available as well as other selected documents referencing information cited by Judge Furman.
[3]   The residual and p-value are estimated from a regression using Uniti stock returns as the dependent variable and the CRSP NYSE/AMEX/Nasdaq/Arca value weighted Index, MSCI US Real Estate Investment Trusts (REITs) index, and the S&P Composite 1500 Telecommunication Services Index as independent variables.  For the first 120 trading days since 4/24/15, the estimation window is the first 120 trading days.  For the remaining days, the estimation window is 120 trading days ending prior to that day.  Returns from the impact dates of alleged corrective disclosures and alleged misrepresentation dates identified in the Amended Complaint are removed from the regression models. The estimation window used in regressions is expanded to always include 120 observations to the extent that certain days in the window are excluded.
[4]   Uniti stock returns and event study results for documents filed prior to 4/27/15 are left blank as residuals are calculated from the start of the proposed Class Period.  Stock returns and event study results for date filed and the next trading day are shown.  In the case when date filed is not a trading day, stock returns for the next trading day and the following trading day are shown.

**APPENDIX A**

# CHRISTOPHER M. JAMES

William H. Dial/SunTrust Eminent Scholar in Finance
Eugene Brigham Department of Finance, Insurance and Real
Estate
Warrington College of Business
University of Florida
Gainesville, FL 32611
(352)392-3486 (Office)
Email: christopher.james@warrington.ufl.edu

## EDUCATION BACKGROUND

B.A.    Michigan State University (Economics, Mathematics)
M.B.A. University of Michigan (Finance)
Ph.D.   University of Michigan (Economics: Industrial Organization, Econometrics, Finance)

## FIELDS OF INTEREST

Financial Institutions, Corporate Finance, Applied Econometrics

## PROFESSIONAL EXPERIENCE

William H. Dial/SunTrust Eminent Scholar in Finance and Economics, University of Florida, 1989-present

Pembroke Scholar, University of Cambridge, Judge Business School, 2015-2016

Visiting Scholar, Federal Reserve Bank of San Francisco, 1987-1988 and 2008-2014

Visiting Professor, University of New South Wales, 1995

Consultant, FDIC, 1988-1991

U.S. Bank/ John B. Rogers Professor of Finance, University of Oregon, 1984-1989

Professor of Finance, University of Michigan, 1986

Associate Professor of Finance, University of Oregon, 1982-1984

Senior Economic Advisor, Comptroller of the Currency, Department of Treasury, 1980-1982

Assistant Professor of Finance, University of Oregon, 1978-80

Instructor, University of Michigan, 1978

**APPENDIX A**

**PAPERS AND PUBLICATIONS**

"The Technology of Risk and Return," <u>American Economic Review</u>, June, 1981.

"Self-Selection and the Pricing of Bank Services, An Analysis of the Market for Bank Loan Commitments and the Role of Compensating Balance Requirements," <u>Journal of Financial and Quantitative Analysis</u>, December, 1981.

"An Analysis of Bank Loan Rate Indexation," <u>Journal of Finance</u>, June, 1982.

"An Analysis of the Impact of Deposit Rate Ceilings on the Market Values of Thrift Institutions," (with L.Y. Dann), <u>Journal of Finance</u>, December, 1982.

"Pricing Alternatives for Loan Commitments:  A Note," <u>Journal of Bank Research</u>, Winter, 1983.

"An Analysis of Intra-Industry Differences in the Effect of Regulation:  The Case of Deposit Rate Ceilings," <u>Journal of Monetary Economics</u>, August, 1983.

"Is Illiquidity a Bar to Buying Small Cap Stocks?" (with R.O. Edmister), <u>Journal of Portfolio Management</u>, Summer, 1983.

"The Relation Between Common Stocks Returns, Trading Activity and Market Value," (with R.O. Edmister), <u>Journal of Finance</u>, September, 1983.

"Regulation and the Determination of Bank Capital Changes:  A Note," (with J.K. Dietrich), <u>Journal of Finance</u>, December, 1983.

"An Analysis of the Effect of State Acquisition Laws on Managerial Efficiency:  The Case of Bank Holding Company Acquisitions," <u>Journal of Law and Economics</u>, April 1984, Abstracted in <u>Regulation</u> as "Do Corporate Takeovers Keep Managements Lean?" May/June, 1984.

"The Effect of Interest Rate Changes on the Common Stock Returns of Financial Institutions," (with M.J. Flannery), <u>Journal of Finance</u>, September, 1984.

"Market Evidence on the Effective Maturity of Bank Assets and Liabilities," (with M.J. Flannery), <u>Journal of Money, Credit and Banking</u>, November, 1984, Presented at the American Finance Association meetings in San Francisco, December, 1983.

"The Effects of Government Regulatory Agencies on Organizations in High Technology and Woods Products Industries," (with G. Ungson and B. Spicer), <u>Academy of Management Journal</u>, 1985.

"A VARMA Analysis of the Causal Relations Among Stock Returns, Real Output and Nominal Interest Rates," (with S. Koreisha and M. Partch), <u>Journal of Finance</u>, December, 1985.

"Access to Deposit Insurance, Insolvency Rules and the Stock Returns of Financial Institutions," (with J. Brickley), <u>Journal of Financial Economics</u>, July, 1986.

"The Takeover Market, Corporate Board Composition, and Ownership Structure:  The Case of Banking," (with J. Brickley), <u>Journal of Law and Economics</u>, April, 1987.

"Returns to Acquirers and Competition in the Acquisition Market:  The Case of Banking," (with P. Wier), <u>Journal of Political Economy</u>, April, 1987.

"An Analysis of FDIC Failed Bank Auctions," (with P. Wier), <u>Journal of Monetary Economics</u>, July, 1987.

"Some Evidence on the Uniqueness of Bank Loans," <u>Journal of Financial Economics</u>, December, 1987.

"The Use of Loan Sales and Standby Letters of Credits by Commercial Banks," <u>Journal of Monetary Economics</u>, November, 1988.

"Empirical Evidence on Implicit Guarantees of Bank Foreign Loan Exposure," <u>Carnegie Rochester Conference Series on Public Policy</u>, April, 1989.

"Heterogeneous Creditors and the Market Value of Bank LDC Loan Portfolios," <u>Journal of Monetary Economics</u>, December, 1990.

"Borrowing Relationships, Intermediation and the Cost of Issuing Public Securities," (with P. Wier), <u>Journal of Financial Economics</u>, November, 1990.

"The Losses Realized in Bank Failures," <u>Journal of Finance</u>, September, 1991.

"Relationship-Specific Assets and the Pricing of Underwriter Services," <u>Journal of Finance</u>, December, 1992.

"Management and Organizational Changes in Banking:  A Comparison of Regulatory Intervention with Private Creditor Actions in Nonbank Firms," (with J. Houston), <u>Carnegie Rochester Conference Series on Public Policy</u>, 1993.

"The Information Content of Distressed Restructurings involving Public and Private Debt Claims," (with D. Brown and B. Mooradian), <u>Journal of Financial Economics</u>, February, 1993.

"Asset Sales by Financially Distress Firms," (with D. Brown and R.M. Mooradian), <u>Journal of Corporate Finance</u>, April, 1994.

"When Do Banks Take Equity in Debt Restructurings?" <u>Review of Financial Studies</u>, Winter, 1995.

"CEO Compensation and Bank Risk:  Is Compensation Structured in Banking Structured to Promote Risk-Taking?" (with J. Houston), <u>Journal of Monetary Economics</u>, November, 1995.

"Bank Debt Restructurings and the Composition of Exchange Offers in Financial Distress," <u>Journal of Finance</u>, June, 1996.

"Bank Information Monopolies and the Mix of Private and Public Debt Claims," (with J. Houston), <u>Journal of Finance</u>, December, 1996.

"Capital Market Frictions and the Role of Internal Capital Markets in Banking," (with J. Houston and D. Marcus), <u>Journal of Financial Economics</u>, November, 1997.

**APPENDIX A**

"Do Bank Internal Capital Markets Promote Lending?" (with J. Houston), Journal of Banking and Finance, November, 1998.

"Where Do Merger Gains Come From?  Bank Mergers from the Perspective of Insiders and Outsiders," (with J. Houston and M. Ryngaert), Journal of Financial Economics, May, 2001.

"Do Relationships Have Limits?  Banking Relationships, Financial Constraints and Investment," (with J. Houston), Journal of Business, July, 2001.

"Do Banks Provide Financial Slack?" (with C. Hadlock), Journal of Finance, June, 2002.

"What a Difference a Month Makes:  Stock Analyst Valuations Following Initial Public Offerings," (with J. Karceski and J. Houston), Journal of Financial and Quantitative Analysis, March 2006, Presented at Hong Kong Corporate Finance Conference, December, 2003.

"The Strength of Analyst Coverage Following IPO's," (with J. Karceski), Journal of Financial Economics, October 2006, Presented at 2005 American Finance Association Meetings.

"Investor Monitoring and Differences in Mutual Fund Performance," (with J. Karceski), Journal of Banking and Finance, 2006, Presented at 2001 American Finance Association Meetings.

"Banks and Bubbles:  How Good are Bankers at Spotting Winners?," (with L. Gonzalez), Journal of Financial Economics, October, 2007.

"The Role of Private Equity Group Reputation in LBO Financing," (with C. Demiroglu), Journal of Financial Economics, May, 2010.

"The Information Content of Bank Loan Covenants," (with C. Demiroglu), Review of Financial Studies, October 2010. Presented at American Finance Association Meetings, 2008.

"The Use of Bank Lines of Credit in Corporate Liquidity Management: A Review of the Empirical Evidence," (with C. Demiroglu), Journal of Banking and Finance, 2011.

"Bank Lending Standards and Access to Lines of Credit," (with C. Demiroglu and A. Kizilaslan), Journal of Money, Credit, and Banking, September, 2012.

"How Important Is Having Skin in the Game? Originator-Sponsor Affiliation and Losses on Mortgage Backed Securities," (with C. Demiroglu), Review of Financial Studies, November 2012, presented at American Finance Association Meetings, 2012.

"State Foreclosure Laws and the Incidence of Mortgage Default," (with C. Demiroglu and E. Dudley), Journal of Law and Economics, February, 2014.

"Asset Specificity, Industry Driven Recovery Risk and Loan Pricing" (with A. Kizilaslan), Journal of Financial and Quantitative Analysis, October, 2014, presented at American Finance Association Meetings, 2012.

**APPENDIX A**

"Bank Loans and Troubled Debt Restructurings," (with C. Demiroglu), <u>Journal of Financial Economics,</u> October, 2015.

"The Determinants of Long-Term Corporate Debt Issuances," (with D. C. Badoer), <u>Journal of Finance</u>, February, 2016.

"Indicators of Collateral Misreporting," (with C. Demiroglu), <u>Management Science</u>, December, 2016.

"Capital Structure Changes Around IPOs," (with E. Dudley), <u>Critical Finance Review</u>, March, 2018.

"Ratings Quality and Borrowing Choice," (with D. C. Badoer and C. Demiroglu), <u>Journal of Finance</u>, October 2019.

"Priority Spreading of Corporate Debt," (with D. C. Badoer and E. Dudley), <u>Review of Financial Studies</u>, January 2020.

"I Can See Clearly Now: The impact of Disclosure Requirements on 401(k) fees,"  (with D.C. Badoer and C. Costello), <u>Journal of Financial Economics,</u> May 2020.

"Why Are Loan Rates So Sticky?" (with C. Demiroglu and G. Velioglu) Forthcoming <u>Journal of Financial Economics</u>.

"Time Is Money: Relationship Lending and the Role of Community Banks in Paycheck Protection Program," (with J. Lu and Y. Sun) Forthcoming <u>Journal of Banking and Finance</u>.

## CURRENT RESEARCH

"Return Smoothing and Loan Fund Performance: Can Investors See Through to Fair Value" (with M. Emin.)

"Exogenously Unsecured Creditors and Pricing and Use of Secured Debt" (with D. Badoer and M. Emin). Under review.

"Reputation and Contracting Costs" (D. Badoer and M. Emin). Under review.

 "Crowded out from the Beginning: Impact of Government Debt on Corporate Financing" (with C. Akkoyun and N. Ersahin). Under review.

"Contracting Costs and Reputational Contracts" (with D. Badoer and M. Emin).

"Cash Flow Volatility and Capital Structure Choice," (with E. Dudley). Best Paper Award Midwest Finance Association Meeting 2015.

"The Effects of Leverage on Operating Performance:  An Analysis of Firms' Responses to Poor Performance," (with M. Ryngaert and D. Brown).

## OTHER PAPERS AND PUBLICATIONS

"The Dodd-Frank Act and the Regulation of Risk Retention in Mortgage-Backed Securities," (with C. Demiroglu) in <u>Dodd Frank and the Future of Finance</u> edited by Paul Schultz,

**APPENDIX A**

MIT Press, 2014."How Important is Having Skin in the Game?," <u>Economic Letter</u>, Federal Reserve Bank of San Francisco, December, 2010.

**"**Credit Market Conditions and Use of Bank Lines of Credit," <u>Economic Letter</u>, Federal Reserve Bank of San Francisco, August, 2009.

"Are Banks Still Special?  New Evidence in the Corporate Capital-Raising Process," (with D. Smith), <u>Journal of Applied Corporate Finance</u>, Spring, 2000.

"Why Are Value Enhancing Mergers In Banking So Hard to Find?  A Discussion of 'Is the Bank Merger Wave of the 90's Efficient?  Lessons from Nine Case Studies,'" Kaplan, Steven (ed.), <u>Mergers and Productivity</u>, University of Chicago Press, Chicago, IL, 1999.

"Comment on Esty, Narasimhan, and Tufano," <u>Journal of Banking and Finance</u>, 23, 1999, 286-290.

"Using Internal Capital Markets to Lower Capital Costs in Banking," (with J. Houston), <u>Journal of Applied Corporate Finance</u>, Summer, 1998.

Discussion of "Financial Institutions and Regulations:  The Dilemma in a Deregulated World," <u>Proceedings from Riksbank Conference:  Forces for and Implications of Structural</u> <u>Changes in the Financial Sector</u>, June, 1997.

"Evolution of Extinction:  Where are Banks Headed," (with J. Houston), <u>Journal of Applied Corporate Finance</u>, Summer, 1996.

"RAROC at Bank of America:  From Theory to Practice, <u>Journal of Applied Corporate Finance</u>, Summer, 1996.

"Bank Equity Positions in Distressed Firms," Saunders, Anthony and Ingo Walter (ed.), <u>Universal Banking:  Financial System Design Reconsidered</u>, (Irwin), 1996.

"The Use of Index Amortizing Swaps by Banc One," (with C. Smith), <u>Journal of Applied Corporate Finance</u>, Fall, 1994.

"Private Versus Public Creditor Experience in Distressed Firm Debt Restructurings," (with D. Brown and M. Mooradian), Altman, Edward (ed.), <u>Bankruptcy and Distressed Restructurings:  Analytical Issues and Investment Opportunities</u>, (Business One Irwin), 1994.

"Banc One's Index Amortizing Swap Strategy," (with C. Smith), <u>Journal of Applied Corporate Finance</u>, 1994.

"Studies in Financial Institution," (with C. Smith), <u>Commercial Banks</u>, 1994.

Statement of Christopher James, Professor, College of Business, The University of Florida at Gainesville at Hearing before the Senate Committee on Banking, Housing and Urban Affairs – 102nd Congress, 4/26/91 (BIF Recapitalization).

"Off-Balance Sheet Activities and the Under Investment Problem in Banking," <u>Journal of Accounting, Auditing, and Finance</u>, Spring, 1989."The Incidence of Mispriced Deposit Insurance," Presented at 1989 American Economic Association Meetings.

**APPENDIX A**

"Are Bank Loans Different? Some Evidence From the Stock Market," (with P. Wier), Journal of Applied Corporate Finance, Summer, 1988.

"Acquisitions in Banking," Weekly Letter, Federal Reserve Bank of San Francisco.

"Off-Balance Sheet Banking," Weekly Letter, Federal Reserve Bank of San Francisco.

"Are Bank Loans Special?" Weekly Letter, Federal Reserve Bank of San Francisco.

"Off-Balance Sheet Banking," Economic Review, Federal Reserve Bank of San Francisco, Fall, 1987.

Discussion of "The Search for Financial Stability:  The Past Fifty Years," Proceedings from the Federal Reserve Bank of San Francisco Conference on the Search for Financial Stability, June, 1985.

"An Analysis of FDIC Failed Bank Auction Procedures," (with P. Wier), Proceedings of a Conference on Bank Structure and Competition, May, 1985.

"Bank Holding Company Acquisitions and Managerial Efficiency," Proceedings of a Conference on Bank Structure and Competition, May, 1984.

"Market Based Measures of Risk for Banks and Savings and Loan Associations," Report prepared for the Federal Home Loan Bank Board, May, 1987.

"An Economic Analysis of Inter-industry Acquisitions of Thrift Institutions," Report prepared for the Office of the Comptroller of the Currency, February, 1982.

"Loan Rate Indexation and the Allocation of Bank Credit," Proceedings of a Conference on Bank Structure and Competition, May, 1980.


**SERVICE ACTIVITIES**

Advisory Editor: Journal of Banking and Finance, 2007-present.

Advisory Editor: Journal of Financial Markets, 2010-present.

Associate Editor:  Journal of Financial Services Research, 1989-present.

Associate Editor:  Journal of Managerial and Decision Economics, 1988-present.

Founding Co-Editor:  Journal of Financial Intermediation, 1988-1999.

Associate Editor:  Journal of Financial Economics, 1993-2016.

Associate Editor:  Journal of Finance, 1988-2000.

**APPENDIX A**

Associate Editor:  <u>Journal of Financial and Quantitative Analysis</u>, 1982-1984.

Editorial Board:  Federal Reserve Bank of New York:  <u>Economic Review</u>, 1997-2007.

Academic Board:  Turnaround Management Association, 1990-2002.

Associate Editor:  <u>Journal of Banking and Finance</u>, 1999-2001.

Reviewer:  <u>Journal of Finance</u>; <u>Journal of Money, Credit and Banking</u>; <u>Journal of Financial Economics</u>; <u>Journal of Financial Management</u>; <u>Journal of Banking and Finance</u>; <u>Journal of Business and Economics</u>; <u>Journal of Monetary Economics</u>; <u>American Economic Review</u>; <u>Journal of Political Economy</u>; <u>Review of Financial Studies</u>; <u>Journal of Corporate Finance</u>; <u>Journal of Law and Economics</u>; <u>Journal of Accounting and Economics</u>.

Program Committee:  Financial Management Association, Western Finance Association, American Finance Association, European Finance Association and Utah Winter Finance Conference.


## CONSULTING/EXECUTIVE EDUCATION ACTIVITIES

Board of Directors ID$^2$, Inc.

Senior Advisor, Cornerstone Research.

Independent Distribution Consultant, Janus Funds, 2004-2010.

Advisory Board Big Brothers Big Sisters of North Central Florida 2000-2016.

Advisory Board and Board of Directors, SunTrust Bank of Florida 1989-2006.

Consultant, Federal Reserve Bank of New York, 1997, 2004.

Consultant, Federal Reserve Board of Governors, 1995, 1998.

Research Director, Garn Institute of Finance, Salt Lake City, Utah, 1987-1989.

Instructor, Pacific Coast Banking School: Commercial Lending, Financial Markets, Workout Lending.

Instructor, Bank Board of Directors School:  Workout Lending.

Instructor, Swiss National Bank, Gerzensee, Switzerland, Bank Safety and Soundness Regulation.

Executive Seminars on bank deregulation, valuation, venture capital, strategic management, lender liability, and asset and liability management.

**APPENDIX A**

Expert Witness:  Cases involving antitrust, portfolio management, securities valuation, market efficiency, damages, bank management, structured finance, valuation, and regulatory matters.

Consultant:  Product pricing, valuation, structured finance, portfolio management, utilities regulation, valuation of securities, mergers and acquisitions, and risk management.

Consultant to the Office of the Comptroller of the Currency, 1982-1983: Bank and Thrift Mergers.

Consultant to the Investment Company Institute, 1983: Bank Offerings of Mutual Funds.

Consultant to the FDIC, Costs of Resolving Bank and Thrift Failures.

Recipient of a grant from MidAmerica Institute to study management compensation in banking, 1992.

Recipient of grant from Federal Home Loan Bank Board to study the information content of savings and loan accounting information.

Member:  Research Committee: Garn Institute of Finance, 1989-1992.

Research Associate at the Business Regulation Study Center, 1980.


**AWARDS**

Outstanding Teaching Award: MBA Association, University of Florida, 1994, 1996, 1998, 1999, 2000, 2010.

Outstanding Teaching Award: MBA Association, University of Oregon, 1985.

Harry R. Jacobs, Professional Service Award, University of Oregon, 1985.

Valedictorian, Michigan State University, 1973.

**APPENDIX B**

# Testimony of Christopher M. James in the Previous Four Years

*Washtenaw County Employees' Retirement System, Individually and on Behalf of All Others Similarly Situated v. Walgreen Co., Gregory D. Wasson and Wade Miquelon*, United States District Court Northern District of Illinois, Eastern Division, Case No. 1:15-cv-03187, deposition, 2017.

*Federal Home Loan Bank of Chicago v. Banc of America Funding Corporation, et al.*, In the Circuit Court of Cook County, Illinois, County Department, Chancery Division, Case No. 10-CH-45033, deposition, 2017.

*Lifeplan Australia Friendly Society Limited & Big Sky Building Society v. McGraw-Hill Financial, Inc. & Ors* [NSD 417/2016]; *MDA National Insurance Pty Ltd v. McGraw-Hill Financial, Inc. & Ors* (consolidated with *Mitsub Pty Limited, as Trustee for the Chris Carroll Superannuation Fund ACN 130 784 333 v. McGraw-Hill Financial, Inc. & Anor* (NSD 1344/2015)) [NSD 414/2016]; *Clurname Pty Ltd & Goulburn Mulwaree Council v. McGraw-Hill Financial, Inc. & Anor* [NSD 957/2015]; *Coffs Harbour City Council v. McGraw-Hill Financial, Inc. & Anor* [NSD 1020/2014]; and *Liverpool City Council v. McGraw-Hill Financial, Inc. & Anor* [NSD 1018/2014], Federal Court of Australia, trial testimony, 2018.

*U.S. Bank National Association, solely in its capacity as Trustee of the Morgan Stanley Mortgage Loan Trust 2007-2AX (MSM 2007-2AX) v. Morgan Stanley Mortgage Capital Holdings LLC, as Successor-by-Merger to Morgan Stanley Mortgage Capital Inc. and GreenPoint Mortgage Funding, Inc.*, Supreme Court of the State of New York, County of New York, Index No. 650339/2013, deposition, 2018.

*Financial Guaranty Insurance Company v. Morgan Stanley ABS Capital I Inc., Morgan Stanley Mortgage Capital Holdings LLC, Morgan Stanley & Co. LLC, as Successor to Morgan Stanley & Co. Inc., Morgan Stanley, and Saxon Mortgage Services, Inc.*, Supreme Court of the State of New York, County of New York, Index No. 652914/2014, deposition, 2019.

*Financial Guaranty Insurance Company v. Morgan Stanley ABS Capital I Inc. and Morgan Stanley Mortgage Capital Holdings LLC, as Successor to Morgan Stanley Mortgage Capital Inc.*, Supreme Court of the State of New York, County of New York, Index No. 652853/2014, deposition, 2019.

*Commerzbank AG v. U.S. Bank National Association and Bank of America, NA*, United States District Court Southern District of New York, Case No. 1:16-cv-04569-WHP, deposition, 2019.

*Alicia Hernandez, et al., Individually and on Behalf of All Others Similarly Situated v. Wells Fargo Bank, N.A.*, United States District Court Northern District of California, Case No. 3:18-cv-07354-WHA, deposition, 2020.

*Ambac Assurance Corporation and The Segregated Account of Ambac Assurance Corporation v. Countrywide Home Loans, Inc., Countrywide Securities Corp., Countrywide Financial Corp., and Bank of America Corp.*, Supreme Court of the State of New York, County of New York, Index No. 651612/2010, deposition, 2020.

**APPENDIX B**

*AB Stable VIII LLC v. MAPS Hotels and Resorts One LLC, Mirae Asset Capital Co., Ltd., Mirae Asset Daewoo Co., Ltd., Mirae Asset Global Investments, Co., Ltd., and Mirae Asset Life Insurance Co., Ltd.*, Court of Chancery of the State of Delaware, C.A. No. 2020-0310-JTL, deposition and trial testimony, 2020.

*In re: Teva Securities Litigation*, United States District Court for the District of Connecticut, Case No. 3:17-cv-00558 (SRU), deposition, 2020.

*Eduardo De La Torre v. CashCall, Inc.*, Superior Court of the State of California, County of San Mateo, Case No. 19-CIV-01235, trial testimony, 2021.

*In re: Woodbridge Investments Litigation*, United States District Court for the Central District of California, Western Division, Case No. 2:18-cv-00103-DMG-MRW, deposition, 2021.

*In re: Teva Securities Litigation*, United States District Court for the District of Connecticut, Case No. 3:17-cv-00558 (SRU), deposition, 2021.

*Ambac Assurance Corporation v. U.S. Bank National Association*, United States District Court for the Southern District of New York, No. 17-cv-2614-WHP-KHP, deposition, 2021.

*In re: Teva Securities Litigation*, United States District Court for the District of Connecticut, Case No. 3:17-cv-00558 (SRU), deposition, 2021.

*Commerzbank AG v. U.S. Bank National Association*, United States District Court for the Southern District of New York, Case No. 16-cv-04569-WHP, deposition, 2021.

**APPENDIX C**

# Expert Report of Christopher M. James
# List of Documents Considered

**Academic Articles**

- Albuquerque, Ana M., Mary Ellen Carter, and Luann J. Lynch. 2015. "Court Intervention as a Governance Mechanism Over CEO Pay: Evidence from the Citigroup Derivative Lawsuit." *European Accounting Review* 24 (4): 637–658.

- Bayar, O., et al. 2011. "A Theory of Equity Carve-outs and Negative Stub Values under Heterogeneous Beliefs." *Journal of Financial Economics* 100 (3): 616–638.

- Billingsley, Randall S. and David M. Smith. 1996. "Why Do Firms Issue Convertible Debt?" *Financial Management* 25 (2): 93–9.

- Brous, Peter A. and Keith Leggett. 1996. "Wealth Effects of Enforcement Actions Against Financially Distressed Banks." *Journal of Financial Research* 19 (4): 561–577.

- Busse, Jeffrey and T. Green. 2002. "Market Efficiency in Real Time." *Journal of Financial Economics* 65 (3): 415–37.

- Campello, Murillo, and Janet Gao. 2017. "Customer Concentration and Loan Contract Terms." Journal of Financial Economics 123 (1): 108–136.

- Chordia, Tarun, et al. 2005. "Evidence on the Speed of Convergence to Market Efficiency." *Journal of Financial Economics* 76 (2): 271–92.

- Chordia, Tarun, et al. 2008. "Liquidity and Market Efficiency." *Journal of Financial Economics* 87 (2): 249–268.

- Elton, Edwin J., et al. 2004. "Factors Affecting the Valuation of Corporate Bonds." *Journal of Banking and Finance* 28 (11): 2747–67.

- Etling, Cheri and Thomas W. Miller, Jr. 2000. "The Relationship between Index Option Moneyness and Relative Liquidity." *Journal of Futures Market* 20 (10): 971–87.

- Even-Tov, Omri. and Naim Bugra Ozel. 2021. "What Moves Stock Prices Around Credit Rating Changes?" *Review of Accounting Studies* 26: 1390–1427 at 1391–1392.

- Fama, Eugene F. 1991. "Efficient Capital Markets: II." *The Journal of Finance* 46 (5):1575–1617.

- Gillet, Roland L. and Hubert de La Bruslerie. 2010. "The Consequences of Issuing Convertible Bonds: Dilution And/Or Financial Restructuring?" *European Financial Management* 16 (4): 552–84.

- Hertzel, Michael G., et al. 2008. "Inter-firm Linkages and the Wealth Effects of Financial Distress Along the Supply Chain." *Journal of Financial Economics* 87 (2): 374–387.

- Lamont, Owen A. and Richard H. Thaler. 2003. "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-outs." *Journal of Political Economy* 111 (2): 227–268.

APPENDIX C

- Macbeth, James and Larry Merville. 1979. "An Empirical Examination of the Black-Scholes Call Option Pricing Model." *The Journal of Finance* 34 (5); 1173–1186.

- MacKinlay, A. Craig. 1997. "Event Studies in Economics and Finance." *Journal of Economic Literature* 35 (1): 13–39.

- Mitchell, Mark, et al. 2002. "Limited Arbitrage in Equity Markets." *Journal of Finance* 57 (2): 551–584.

- Shleifer, Andrei. and Robert W. Vishny. 1997. "The Limits of Arbitrage." *The Journal of Finance* 51 (1): 35–55.

**Analyst Reports**

Analyst reports covering Uniti and Windstream considered include analyst reports submitted as part of the materials produced in support of the Coffman Report and additional reports obtained either through counsel or from searches in *Capital IQ* and *Refinitiv* from the day prior through the week following the alleged corrective disclosures, as well as the day prior to July 23, 2018 through the week following July 31, 2018, when the trial between Windstream and Aurelius took place. A full set of the reports I considered are included in my backup materials. These include but are not limited to:

- "3Q15 Preview: Unlocking the Pipeline," *Morgan Stanley*, November 4, 2015.

- "Adverse Court Ruling Raises Risk, Creates Uncertainty; Focus Shifts to Post-Trial Appeals," *SunTrust Robinson Humphrey*, February 19, 2019.

- "CSAL: Initiating Coverage With An Outperform Rating Unique REIT With Communications Infrastructure Opportunity," *Wells Fargo*, February 16, 2017.

- "Dividend Eliminated; Guidance Reduced," *Jefferies*, August 4, 2017.

- "Downgrade: Win Court Ruling Could Mean Rental Payment Cuts, Levels Uncertain," *Cowen*, February 19, 2019.

- "Initiating at Outperform; Favorable Growth, Diversification, and Dividend," *RBC Capital Markets*, June 19, 2017.

- "Initiating with an Overweight Rating and YE2016 Price Target of $31," *J.P. Morgan*, June 22, 2015.

- "Mixed 2Q17, Guidance Raised; Reiterate Buy, $30 Target," *SunTrust Robinson Humphrey*, August 7, 2017.

- "Results: Steady C4Q Results and Guidance," *Citi*, February 23, 2017.

- "The Wait Begins as WIN Court Case Wraps Up," *Bank of America Merrill Lynch*, August 1, 2018.

- "Uncertainty Clouds Investment Case; Cutting Price Target to $8," *Deutsche Bank*, March 21, 2019.

- "Uniti Group Inc. – It's Not for Proverbial Widows and Orphans, but We Like Uniti; Initiating With $23 FVE," *Morningstar*, January 4, 2019.

**APPENDIX C**

- "Uniti Group Inc. – Model update," *J.P. Morgan*, November 5, 2018.
- "WIN Rips the Band-Aid Off, Opens Pandora's Box for RLEC 'Identity Crisis,'" *Cowen*, August 3, 2017.
- "Windstream Trial Wraps Up; Remain Positive on Outcome," *Raymond James*, July 31, 2018.
- "Windstream's Trial Loss Marginally Increases Its Bankruptcy Risk and Has Implications for Uniti," *Morningstar*, February 19, 2019.

## Books

- Hull, John C. 2015. *Options, Futures, and other Derivatives*, 9th ed. Saddle River: Pearson.
- Kaye, David H. and David A. Freedman. 2011. *Reference Guide on Statistics*, 3rd ed.
- Ross, Stephen A., et al. 2002. *Corporate Finance*, 6th ed. New York: McGraw-Hill/Irwin.

## Data

- Capital IQ
- CRSP
- Factiva
- Refinitiv
- SEC Edgar

## Depositions

- Deposition of Chad Coffman, December 6, 2021.

## Expert Reports

- Expert Report of Chad Coffman, CFA, October 25, 2021, and production materials.

## Legal Documents

- Complaint, *In re: Windstream Holdings, Inc., et al.*, Adversary Proceeding, July 25, 2019.
- Complaint, *U.S. Bank National Association v. Windstream Services, LLC*, October 12, 2017.
- Consolidated Class Action Complaint, *In re Uniti Group Inc. Securities Litigation*, May 11, 2020.

**APPENDIX C**

- Defendants' Opening Brief in Support of Defendants' Motion to Dismiss the Consolidated Amended Complaint, *In re Uniti Group Inc. Securities Litigation*, July 10, 2020.

- Findings of Fact and Conclusions of Law, *U.S. Bank National Association v. Windstream Services, LLC v. Aurelius Capital Master, Ltd.*, February 15, 2019.

- Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint, *In re Uniti Group Inc. Securities Litigation*, September 8, 2020.

- Plaintiff-Counterclaim Defendant U.S. Bank National Association's Proposed Findings of Fact and Conclusions of Law, *U.S. Bank National Association v. Windstream Services, LLC v. Aurelius Capital Master, Ltd.*, June 15, 2018.

- Responses to U.S. Bank National Association's and Aurelius Capital Master, LTD.'s Request for Admission, *In re U.S. Bank National Association v. Windstream Services, LLC v. Aurelius Capital Master, Ltd.,* November 3, 2017.

- Trial Transcripts, U*.S. Bank National Association v. Windstream Services, LLC v Aurelius Capital Master, Ltd.*, July 19, 23–25, 31, 2018.

- Verified Counterclaims, Answer, and Affirmative Defenses, *U.S. Bank National Association v. Windstream Services, LLC v Aurelius Capital Master, Ltd.*, October 13, 2017.

- Windstream Services, LLC's Proposed Findings of Fact and Conclusions of Law, filed on June 15, 2018.


**Public Press**

Public press articles for Uniti and Windstream from *Bloomberg* and the following publications and newswires from *Factiva* have been considered:  *Dow Jones Newswire*, *Business Wire*, *PR Newswire*, *Reuters News*, *CQ FD Disclosure* (for conference call transcripts), *Barron's*, *Financial Times*, *Forbes*, *Investor's Business Daily*, *The Economist (United Kingdom)*, *The New York Times*, and *The Wall Street Journal*.  A full set of the articles I considered are included in my backup materials.  These include but are not limited to:


- "*Fitch Downgrade's Uniti's IDR to 'B+'; Revises Outlook to Negative," Dow Jones Institutional News, February 21, 2019.

- "*S&PGR Downgrades Uniti Group To 'CCC-', Outlook Negative," Dow Jones Institutional News, February 21, 2019.

- "Last Showdown Between Aurelius and Windstream Draws a Crowd in New York Court," *Wall Street Journal Pro*, August 1, 2018.

- "Moody's Downgrades Uniti To Caa2, Outlook Remains Negative Following Windstream's Adverse Court Ruling," Dow Jones Institutional News, February 22, 2019.

- "No Advantage in Day 1 of Windstream-Aurelius Trial:  CreditSights," Bloomberg, July 24, 2018.

Page 4

**APPENDIX C**

- "Press Release: Windstream Receives State Regulatory Approvals for REIT Spinoff," *Dow Jones Institutional News*, January 21, 2015.
- "Rating Action:  Moody's Downgrades Uniti to Caa2, Outlook Remains Negative Following Windstream's Adverse Court Ruling," Moody's Investors Service, February 22, 2019.
- "Windstream Concludes Default Trial with No Date for Decision," Bloomberg, July 31, 2018.
- "Windstream to Spin Off Assets Into Publicly Traded REIT," *Dow Jones Institutional News*, July 29, 2014.
- "Windstream-Aurelius Trial Adjourned to July 31 After Testimony," Bloomberg, July 25, 2018.
- "Windstream-Aurelius Trial Starts With Statements Given to States," Bloomberg, July 23, 2018.

**Other Publicly Available Documents**

- Uniti Press Release, "Uniti Group Inc. Announces Launch of Exchangeable Notes Offering and extension of Revolving Credit Facility," June 24, 2019.
- Windstream Press Release, "Windstream board of directors revises capital allocation strategy," August 3, 2017.
- Windstream Press Release, "Windstream Holdings, Inc. Files for Voluntary Reorganization Under Chapter 11 of the U.S. Bankruptcy Code Following Judge Furman's Decision," February 25, 2019.
- Uniti Group Inc. Q4 2018 Earnings Conference Call Transcript, March, 20, 2019, 4:15 PM ET.
- Windstream Intercompany Memo, dated April 24, 2015.

**SEC Filings**

- Windstream Holdings, Inc., Form 8-K, Filed on January 23, 2013.
- Windstream Holdings, Inc., Form 8-K, Filed on August 30, 2013.
- Uniti Group Inc., Form 8-K, Filed on March 26, 2015.
- Windstream Holdings, Inc., Form 8-K, Filed on March 26, 2015.
- Windstream Holdings, Inc., Form 10-Q for the Quarterly Period Ended March 31, 2015, Filed on May 7, 2015.
- Uniti Group Inc., Form 10-Q for the Quarterly Period Ended June 30, 2015, Filed on August 13, 2015.
- Uniti Group Inc., Form 10-K for the Fiscal Year Ended December 31, 2016, Filed on February 23, 2017.

APPENDIX C

- Uniti Group Inc., Form 10-Q for the Quarterly Period Ended March 31, 2017, Filed on May 4, 2017.

- Windstream Holdings, Inc., Form 8-K, Filed on September 25, 2017.

- Uniti Group Inc., Form 10-K for the Fiscal Year Ended December 31, 2017, Filed on March 1, 2018.

- Windstream Holdings, Inc., Form 10-K for the Fiscal Year Ended December 31, 2018, Filed on March 15, 2019.

- Uniti Group Inc., Form 8-K, Filed on June 24, 2019.

- Uniti Group Inc., Form 8-K, Filed on March 2, 2020.

- Uniti Group Inc., Form 10-K for the Fiscal Year Ended December 31, 2019, Filed on March 12, 2020.

- Uniti Group Inc., Form 8-K, Filed on May 15, 2020.

**Websites**

- "BLKSHCLPRC Function," SAS Help Center, https://go.documentation.sas.com/doc/en/pgmsascdc/9.4_3.4/lefunctionsref/n1q3r8hgb7n v59n1i6d9kmyfy307.htm.

- "Equity Options Product Specifications," *CBOE*, https://www.cboe.com/exchange_traded_stock/equity_options_spec/.

- "MSCI US REIT Index (USD)," *MSCI*, https://www.msci.com/documents/10199/08f87379-0d69-442a-b26d-46f749bb459b.

- "Stock File Indexes," *Center for Research in Securities Prices*, http://www.crsp.org/products/documentation/stock-file-indexes-0.

- S&P Composite 1500 Communication Services Factsheet," *S&P Global*, https://www.spglobal.com/spdji/en/idsenhancedfactsheet/file.pdf?calcFrequency=M&for ce_download=true&hostIdentifier=48190c8c-42c4-46af-8d1a-0cd5db894797&indexId=1817.

Note: In addition to the documents on this list, I considered all documents cited in my report and my exhibits to form my opinions.

**APPENDIX D**

**There Was No Negative and Statistically Significant Uniti Stock Price Reaction On the Dates When the Factual Information Cited by Judge Furman Concerning the Sale-Leaseback Was Previously Revealed to the Market**

1.      In this section, I assess Uniti's stock price movements on the dates when the factual information cited by Judge Furman in reaching the conclusion that Windstream engaged in a prohibited sale-leaseback transaction was revealed to the market.  Plaintiffs do not identify these days as alleged corrective disclosures.  However, looking at these days is instructive.  To the extent that there is no Uniti stock price decline on these days, in an efficient market, this indicates that the information released on these days either (a) was not value relevant or (b) had previously been disclosed.  I find that there was indeed no statistically significant decline in Uniti's stock price on any of those dates, and also that there was no offsetting information that would have obscured an otherwise statistically significant stock price decline on these days.  This provides further evidence that, on February 19, 2019, and February 21–22, 2019, the market was reacting to Judge Furman's unexpected legal opinion, not to any new factual information revealing the truth regarding the allegedly misrepresented information.

2.      I first discuss the event study methodology that I use to isolate Uniti's residual stock price returns and evaluate the statistical significance of the residual returns.  I then discuss the dates on which the documents Judge Furman cited were publicly available, Uniti's stock price reaction on those dates, and whether there was positive confounding news on those dates that could obscure an otherwise statistically significant and negative stock price reaction.

    A.      **Event Study Methodology**

3.      I conduct an event study analysis to determine whether Uniti's residual stock price return is statistically significant on the dates at issue.  For each date on which the document is made public or the next trading day, I estimate a rolling regression of the relationship between Uniti's daily stock returns and the corresponding daily returns of the market and industry indices.[1]  Specifically, I estimate separate rolling regression models for each date at

---

[1] I expand the control periods used in my regression models to include 120 observations to the extent that certain days in the prior 120-trading-day window are excluded.

issue using a 120-trading-day "control period." That is, the expected price movement for Uniti's stock on a given day is based on the estimated relationship between Uniti's stock price movement and market and industry movements over the prior 120 trading days. To estimate Uniti's residual stock returns for days within the first 120 trading days following the stock's issuances, I use the first 120 trading days as the control period. In constructing each 120-trading-day control period, I exclude impact days for the alleged misrepresentations and alleged corrective disclosures as identified in the Complaint.

4.    To calculate residual returns for Uniti's stock, I control for market factors using the CRSP NYSE/NYSEMKT/Nasdaq/Arca Value-Weighted Index ("CRSP Market Index") and control for industry factors using the MSCI US Real Estate Investment Trusts (REITs) Index ("REIT Industry Index") and the S&P Composite 1500 Communication Services Index ("Telecom Industry Index").[2,3]

5.    The CRSP Market Index is a broad index of stocks listed on the New York Stock Exchange, NYSE MKT (formerly known as the American Stock Exchange, i.e., Amex), Nasdaq Stock Market, and Arca Exchange. The index is weighted by market capitalization.[4]

6.    The REIT Industry Index is a market capitalization weighted index comprised of REITs.[5] Uniti compared its stock performance with the REIT Industry Index in its Form 10-Ks filed during the proposed Class Period.[6] The Telecom Industry Index comprises companies included in the S&P Composite 1500 that are classified as members of the communication services sector.[7] This index controls for the telecommunication industry in which Uniti operated and engaged in acquisitions.

---

[2] Uniti's stock returns are calculated using closing prices reported by *CRSP* and *Refinitiv*.

[3] My conclusions wouldn't change using an alternative control period of 252 trading days for the rolling regression models or using S&P MidCap 400 Index as an alternative market index.

[4] The CRSP Market Index "is a Value-Weighted Portfolio built each calendar period using all issues listed on the selected exchanges with available shares outstanding and valid prices in the current and previous periods, excluding American Depositary Receipts." *See*, "Stock File Indexes," *Center for Research in Securities Prices*, Undated, http://www.crsp.org/products/documentation/stock-file-indexes-0.

[5] *See*, "MSCI US REIT Index (USD)," *MSCI*, Undated, https://www.msci.com/documents/10199/08f87379-0d69-442a-b26d-46f749bb459b.

[6] *See, e.g.*, Uniti Group Inc., Form 10-K for the Fiscal Year Ended December 31, 2019, Filed on March 12, 2020, pp. 32–33.

[7] *See*, S&P Composite 1500 Communication Services Factsheet," *S&P Global*, Undated, https://www.spglobal.com/spdji/en/idsenhancedfactsheet/file.pdf?calcFrequency=M&force_download=true&hostIdentifier=48190c8c-42c4-46af-8d1a-0cd5db894797&indexId=1817.

**APPENDIX D**

7.    I summarize in **Exhibit A.1** Uniti's residual stock returns on each date on which a document cited by Judge Furman in reaching his conclusion regarding the sale-leaseback transaction was disclosed to the market, as well as the next trading day.[8]

8.    For each publicly available document that contains factual information cited by Judge Furman, I examine Uniti's stock price reaction on the date that the document was made publicly available.  For documents with available timestamps, I examine Uniti's stock price movement (1) on the day it was publicly disclosed if the document was disclosed during market hours or (2) on the next trading day if the document was disclosed after the market closed.  For documents without available timestamps, where I cannot determine if the document became available during market hours or after the market closed, I examine Uniti's stock price movements on both the date that document was disclosed and the next trading day.

9.    In addition, for each day with available Uniti stock price information presented in **Exhibit A.1**, I reviewed analyst reports covering Windstream and Uniti and public press headlines surrounding that day[9] to determine whether there was positive confounding information that could have offset negative price movement for Uniti.[10]  I do not find such positive, value-relevant news.

### B.    Uniti's Stock Price Movements On Days When Allegation-Related Factual Information Cited by Judge Furman Became Publicly Available

10.    **Exhibit A.1** presents the residual price movement of Uniti's residual stock return on each of the days on which a document cited by Judge Furman was released to the market.  As shown in the exhibit, for 19 out of 20 days, Uniti's stock did not have a negative and

---

[8] My event study methodology and Mr. Coffman's event study methodology do not yield qualitatively different results.  My conclusions in this report would hold under either methodology.

[9] For documents with available timestamps, I have reviewed analyst reports covering Windstream and Uniti and public press headlines between market close on the day prior to the impact day of the document publication date and market close on the impact day of the document publication date.  For documents without available timestamps, where I cannot determine if the document became available during market hours or after the market closed, I have reviewed analyst reports covering Windstream and Uniti and public press headlines between market close on the day prior and market close on the next trading day.

[10] Public press articles for Uniti and Windstream from *Bloomberg* and the following publications and newswires from *Factiva* have been considered:  *Dow Jones Newswire*, *Business Wire*, *PR Newswire*, *Reuters News*, *CQ FD Disclosure* (for conference call transcripts), *Barron's*, *Financial Times*, *Forbes*, *Investor's Business Daily*, *The Economist (United Kingdom)*, *The New York Times*, and *The Wall Street Journal*.  Analyst reports covering Uniti and Windstream considered include analyst reports submitted as part of the materials produced in support of the Coffman Report and additional reports obtained either through counsel or from searches in *Capital IQ* and *Refinitiv* from the day prior through the week following the alleged corrective disclosures, as well as the day prior to July 23, 2018 through the week following July 31, 2018, when the trial between Windstream and Aurelius took place.

statistically significant price movement.[11]  Nor was there positive confounding news that could have offset an otherwise statistically significant and negative return on these days.

11.     Among the days I have studied in **Exhibit A.1**, only one day was associated with a negative and statistically significant return.  On August 3, 2017, at 5:16 PM, i.e., after market close, Uniti filed its Form 10-Q for the quarter ending on June 30, 2017 ("Uniti 2017 Q3 Form 10-Q").  Given that the filing was made after market close, the relevant day for assessing price impact is the subsequent trading day, August 4, 2017.  Uniti's price had a statistically significant decline of 4% on August 4, 2017.

12.     As a starting point, I note that Plaintiffs identify August 3, 2017 as an alleged corrective disclosure date, due to Windstream's announcement of the elimination of its dividend on that day.  Plaintiffs allege that "[a]s a result of Windstream's disclosure, the price of Uniti's stock fell more than 8% on August 3, 2017 [] and another nearly 4% on August 4, 2017."[12]  As such, Plaintiffs appear to be asserting that Uniti's negative stock price reaction on August 4, 2017 was due to the dividend cut, not any information contained in its Form 10-Q.

13.     Further, Judge Furman cites this Form 10-Q to support the point that the Windstream subsidiaries made "substantial capital improvements" to the transferred assets.[13]  Specifically, Judge Furman notes that:

> [T]he Transferor Subsidiaries have made substantial capital improvements to the Transferred Assets; as of mid-2017, they had spent more than $339 million to maintain, repair, overbuild, upgrade, and replace portions of the Transferred Assets.  PX-103, at 29; Eichler Dep. 130-35.

14.     However, it was publicly known prior to the filing of the Uniti 2017 Q3 Form 10-Q that the transferor subsidiaries were making capital improvements.  Uniti repeatedly disclosed that Windstream funded such capital improvements, including reporting the cumulative amount of those capital improvements in prior SEC filings.  For example, in its Form 10-Q for the quarter ending on June 30, 2015, filed on August 13, 2015 at 4:31 PM, Uniti stated:[14]

> Our lease with Windstream provides that tenant funded capital improvements ('TCI's'), defined as maintenance, repair, overbuild, upgrade or replacements

---

[11] Uniti stock price information was not available for days prior to April 27, 2015, as Uniti began trading on Nasdaq on that day.
[12] Complaint, ¶247.
[13] Judge Furman Ruling, p. 12. *See also*, Judge Furman Ruling, p. 40.
[14] Uniti Group Inc., Form 10-Q for the Quarterly Period Ended June 30, 2015, Filed on August 13, 2015, p. 11.

**APPENDIX D**

to the leased network, including, without limitation, the replacement of copper distribution systems with fiber distribution systems, automatically become property of CS&L upon their construction by Windstream.

15.    Uniti made similar disclosures regarding "tenant funded capital improvements" in its Form 10-K for the fiscal year ending on December 31, 2016, filed on February 23, 2017 at 5:23 PM, stating that "[a]t December 31, 2016 and December 31, 2015, the net book value of TCI's recorded as a component of property, plant and equipment on our Consolidated Balance Sheet was $218.7 million and $67.8 million, respectively."[15]  Thus, prior to August 3, 2017, the market would have access to the information that Windstream funded millions of dollars of capital improvements for the Transferred Assets.  To the extent that this information was not new, it could not have impacted Uniti's stock price on August 4, 2017, in an efficient market.

16.    In short, the factual information cited by Judge Furman in reaching his decision had already been revealed to the public prior to February 2019.  I have not found any of such prior releases of information to be associated with a statistically significant and negative stock price reaction.  Thus, the allegedly misrepresented or concealed information did not impact Uniti's stock price on February 19, 2019 or February 21–22, 2019, assuming Uniti's stock traded in an efficient market.

---

[15] Uniti Group Inc., Form 10-K for the Fiscal Year Ended December 31, 2016, Filed on February 23, 2017, p. 51.

**APPENDIX E**

## Documents Referenced by Judge Furman that Were Potentially Not Publicly Available

17.     As explained in **Section VI.C.2.b** of my report, all but 11 documents cited by Judge Furman in support of his conclusion that the spin-off and Master Lease violated the sale-leaseback covenant in Windstream's debt indenture—as listed in **Exhibit 2**—were publicly available well before Judge Furman's opinion was issued on February 15, 2019.

18.     With respect to the remaining 11 documents, even though it is not clear whether the documents were publicly available before February 15, 2019, I assess whether the factual information contained in those documents that Judge Furman cites in reaching his decision was released to the market via other sources prior to February 15, 2019.

19.     As detailed below, for each of the 11 documents, Judge Furman either cites multiple documents to support the relevant factual point, of which at least one document was publicly available prior to February 2019, or cites documents in which the same or similar information supporting the relevant factual point made in the document had been made publicly available through another source.  I discuss each of these documents in turn.

20.     *First*, Judge Furman cites three Windstream board meeting materials or minutes that may not have been publicly available.  Specifically, he cites Meeting Materials of the Windstream Board of Directors, dated April 29, 2013 (PX-37), to support the statement that "[o]n August 30th of [2013], in order to provide 'greater flexibility with respect to future strategic actions,' PX-37, at WIN_00012382, the Services Board approved the formation of a new parent holding company, Windstream Holdings, Inc. ('Holdings'), *see* PX-74, at 33."[16] Based on my review of the public record, Windstream had previously disclosed in its Form 8-K filed on August 30, 2013 that Windstream "desires to create a new holding company structure" and "desires to effect the Exchange and Merger to achieve greater financial flexibility and for other corporate purposes."[17]

21.     *Second*, Judge Furman cites a presentation to the Windstream Board of Directors, titled REIT Overview and Considerations, dated March 29, 2013 (PX-35), to support the statement that "[a]round [August 30, 2013], the Services Board began to consider forming a real estate investment trust ('REIT') to 'hold and lease certain of Services' (and its subsidiaries') telecommunications properties,' purportedly to improve the company's

---

[16] Judge Furman Ruling, p. 5.
[17] Windstream Holdings, Inc., Form 8-K, EX.-2.1, Filed on August 30, 2013.

**APPENDIX E**

financial flexibility, attract investment, and improve tax and cash flow efficiency. Fletcher Aff. ¶¶ 13-14; *see* PX-35."[18,19]  John Fletcher, the former General Counsel of Windstream, testified during the Aurelius trial that "[Windstream] began working on the transaction initially in March 2013," and the spin-off transaction "reduced debt," "improved our free cash flow profile, which [Windstream] used to reinvest in the business," and improved "capital expenditures divided by revenue."[20]  Given that the Aurelius trial (and the transcript) was public, this information would have been publicly available well before February 15, 2019.

22.     *Third*, Judge Furman cites minutes of a meeting of the Board of Directors of Windstream Holdings, Inc. and Windstream Services, LLC, dated March 25, 2015 (DX-49), to support the statement that "on March 25, 2015, Services' and Holdings' Boards each approved the creation and spin-off of a REIT. *Id*. ¶ 29; DX-49."[21,22]  Windstream had previously disclosed in its Form 8-K filed on March 26, 2015 that it "announced today the company's board of directors has given final approval … for the tax-free spinoff of select telecommunications network assets into Communications Sales & Leasing, Inc."[23]

23.     *Fourth*, Judge Furman cites an affidavit by John Eichler, Senior Vice President and Controller of Windstream, submitted in connection with the Aurelius Litigation (DX-191), to support the following two statements:[24]

- In 2017, CS&L was renamed Uniti Group, Inc. *See* DX-191 ("Eichler Aff."), ¶ 5; Fletcher Aff. ¶ 8.[25]

- The parties spill considerable ink addressing whether the 2015 Transaction qualifies as a sale and leaseback transaction under Generally Accepted Accounting Principles ("GAAP"), *see* Eichler Aff. ¶¶ 5-13; LaRue Aff. ¶¶ 25-42; Solomon Aff. ¶¶ 11-17, 30-35; Trustee PFFCL ¶¶ 86-93, but that question is ultimately irrelevant because

---

[18] Judge Furman Ruling, p. 5.

[19] Judge Furman also cites the Fletcher Affidavit from the Aurelius Litigation (DX-190) to support this same statement.

[20] Trial Transcript, *U.S. Bank National Association v. Windstream Services, LLC v Aurelius Capital Master, Ltd.*, July 23, 2018, pp. 115, 124.

[21] Judge Furman Ruling, p. 8.

[22] Judge Furman also cites the Fletcher Affidavit from the Aurelius Litigation (DX-190) to support this same statement.

[23] Windstream Holdings, Inc., Form 8-K, EX-99.1, Filed on March 26, 2015.

[24] Judge Furman Ruling, fns. 3, 7.

[25] Judge Furman also cites the Fletcher Affidavit from the Aurelius Litigation (DX-190) to support this same statement.

"Sale and Leaseback Transaction" is a defined term in the Indenture, *see* Indenture § 1.01, at 24.[26]

As for the first piece of information, Uniti had previously disclosed in its Form 10-K filed on February 23, 2017 that it would "change its corporate name to Uniti Group Inc."[27]  As for the second, in Windstream Services, LLC's Proposed Findings of Fact and Conclusions of Law ("Windstream Proposed Findings of Fact"), which were filed on the public court docket on June 15, 2018 and were publicly available through PACER, Windstream stated that "Aurelius contends that Windstream's accounting of the 2015 Transaction is indicative of a sale/leaseback under GAAP," but "Windstream determined that the 2015 Transaction did not constitute a sale under GAAP due to continued involvement in the Transferred Assets by the Transferor Subsidiaries, and therefore could not be accounted for as a sale and leaseback under GAAP."[28]  In addition, Mr. Eichler testified during the trial, consistent with his affidavit, that "[Windstream] determined that the 2015 transaction could not be classified as a sale-leaseback under GAAP because it did not constitute a sale under GAAP due to the continued involvement in the transferred assets by the transferor subsidiaries."[29]  Given that the trial (and ultimately the transcript) was public, this information would have been publicly available by that point, and thus well before February 15, 2019.

24.    *Fifth*, Judge Furman cites the affidavit of Mr. Fletcher, submitted in connection with the Aurelius Litigation (DX-190), to support as the following propositions:

- "[The Notes issued to Aurelius] are governed by the Indenture, a lengthy and 'complex document that resulted from arms-length negotiations between a number of sophisticated parties and their counsel.'  DX-190 ('Fletcher Aff.'), ¶ 44."[30]  However, Windstream previously stated in the Verified Counterclaims, Answer, and Affirmative Defenses, publicly available via PACER and filed on October 13, 2017, that "[t]he Indenture is a complex and heavily negotiated document that is the result of arms-length discussions between multiple sophisticated parties and their counsel."[31]

- "Between July and December 2014, Services and the Transferor Subsidiaries sought and obtained advanced approval for the transaction from various state

---

[26] Judge Furman also cites the Solomon Affidavit and LaRue Affidavit from the Aurelius Litigation to support this same statement.  *See also*, Judge Furman Ruling, fn. 9.

[27] Uniti Group Inc., Form 10-K for the fiscal year ending on December 31, 2016, Filed on February 23, 2017.

[28] Windstream Services, LLC's Proposed Findings of Fact and Conclusions of Law, filed on June 15, 2018, pp. 8–9.

[29] Trial Transcript, *U.S. Bank National Association v. Windstream Services, LLC v Aurelius Capital Master, Ltd.*, July 23, 2018, p. 147.

[30] Judge Furman Ruling, p. 3.

[31] Verified Counterclaims, Answer, and Affirmative Defenses, *U.S. Bank National Association v. Windstream Services, LLC v Aurelius Capital Master, Ltd.*, October 13, 2017, ¶47.

utilities regulators.  *See, e.g.*, Fletcher Aff. ¶¶ 25, 33-34; DX-193 ('Gunderman Aff.'), ¶¶ 18-22."[32,33]  However, it was already publicly known that Windstream sought and received approval for the transaction from state regulators.  As already discussed, the applications to various state utilities regulators were publicly available.  Further, prior to the transaction, Windstream management publicly discussed that it received approval for the transaction from state regulators.[34]

- "[O]n July 29, 2014 Services announced its plan to split the 'business into two distinct publicly traded companies.'  Fletcher Aff. ¶ 25."[35]  Windstream previously disclosed in a press release dated July 29, 2014, that Windstream "today announced plans to spin off certain telecommunications network assets into an independent, publicly traded real estate investment trust (REIT)."[36]

- "The next day [on March 26, 2015], Holdings and Services entered into a Separation and Distribution Agreement, pursuant to which Services transferred to that REIT—a wholly owned subsidiary called Communications Sales & Leasing, Inc. and its subsidiaries (together, "CS&L") — various telecommunications assets, including fiber optic and copper cable lines; office land and buildings; rights to certain permits, agreements, and easements; and a local exchange carrier business (the "Transferred Assets").  Fletcher Aff. ¶¶ 8-9; DX-185 . . . .  In return for the Transferred Assets, Services received all of CS&L's common stock, $1.035 billion in cash, and $2.5 billion in debt comprised of term loans and unsecured notes.  Fletcher Aff. ¶ 10; *see* DX-185."[37]  Judge Furman also cites, however, the Separation and Distribution Agreement, which was attached to and publicly disclosed as part of Windstream's Form 8-K filed on March 26, 2015 (DX-185), to support the same statements.  In addition, he further cites the Fletcher Affidavit to support the statement that "the Court need not and does not address Services' efforts to demonstrate that it had valid business reasons—separate and apart from compliance with the terms of the Indenture—to structure the 2015 Transaction as it did.  Fletcher Aff. ¶ 13; Gunderman Aff. ¶ 21; Tr. 275-80."[38,39]  And Judge Furman also cites to the trial transcripts in connection with these propositions.  Given that the trial (and ultimately the transcript) was public, this information would have been publicly available at that point.  Accordingly, I conclude that all of this information was public prior to February 15, 2019.

---

[32] Judge Furman Ruling, p. 5.

[33] Judge Furman also cites the Gunderman Affidavit from the Aurelius Litigation (DX-193) to support this same statement.

[34] "Windstream Receives State Regulatory Approvals for REIT Spinoff," *Dow Jones Institutional News*, January 21, 2015.

[35] Judge Furman Ruling, p. 8.

[36] "Windstream to Spin Off Assets into Publicly Traded REIT," *Dow Jones Institutional News*, July 29, 2014.

[37] Judge Furman Ruling, p. 9.

[38] Judge Furman Ruling, fn. 7.

[39] Judge Furman also cites the Gunderman Affidavit from the Aurelius Litigation (DX-193) to support this same statement.

25.    *Sixth*, Judge Furman cites to statements in numerous documents submitted to state regulators in connection with applications by Windstream seeking approval of the spin-off and Master Lease.  While all the other state regulator documents cited by Judge Furman are available from the respective regulator's websites, one document, the Application to the Indiana Utility Regulatory Commission to Change Certificate of Territorial Authority to Provide Communications Services, dated August 29, 2014 (PX-11), is not available.  Judge Furman cites this document to support the following statements:[40]

- "[I]n applications to at least nine state utilities regulators, the Transferor Subsidiaries (sometimes joined by Holdings) described the 2015 Transaction and sought approval for it (or a ruling that no approval was needed).  *See* PX-6; PX-8; PX-10; PX-11; PX-12; PX-15; PX-16; PX-17; PX-21; PX-23; PX-25; PX-27; PX-30; PX-31."

- "Windstream repeatedly assured the regulators that, after the Transferor Subsidiaries transferred the assets, the Transferor Subsidiaries would have 'exclusive' and 'long-term' 'usage rights' and 'control' over the same assets.  *See* PX-6, ¶ 28 (Alabama); PX-10, ¶ 31 (Georgia), PX-11, ¶ 13 (Indiana), PX-15, ¶ 21 (Kentucky); PX-27, at WIN_00004569 (Ohio); *see also* PX-17, at WIN_00003961 (Kentucky)."

- "Windstream repeatedly represented that the Transferor Subsidiaries would have the same obligations with respect to the assets, including responsibility for operations, capital improvements, and maintenance.  *See* PX-15, ¶ 44 (Kentucky); accord PX-6, ¶ 3 (Alabama); PX-10, ¶ 29 (Georgia); PX-11, ¶ 5 (Indiana); PX-27 at WIN_00004570 (Ohio); PX-30 at WIN_00004763 (Pennsylvania)."

Because Judge Furman also references eight other applications for regulatory approval that contains the same information in support of the propositions above—all of which were publicly available—I conclude that the above information was public well before February 15, 2019.

26.    *Seventh*, Judge Furman cites 120 agreements between Windstream Services subsidiaries and third parties (which were marked together as a single trial exhibit, PX-109), in connection with the following statements, regarding the fact that the subsidiaries had granted rights to use Transferred Assets in exchange for certain consideration:[41]

---

[40] Judge Furman Ruling, pp. 5–6.
[41] Judge Furman Ruling, pp. 12, 30.

**APPENDIX E**

> [T]he Transferor Subsidiaries have continued to enter into agreements granting third parties various rights to use the Transferred Assets in exchange for consideration, including "collocation agreements"; . . . "fiber exchange agreements"; . . . "dark or dim fiber agreements"; . . . "pole attachment agreements"; . . . and more conventional real estate subleases . . . *see, e.g. PX-109.4. See also* Am. Ans. ¶¶ 12, 60, Compl. ¶ 12 n.2.
> . . .
>
> [I]n any number of these agreements, the Transferor Subsidiaries have explicitly represented that they are lessees under the Master Lease. *See, e.g.*, PX-109.52, at 1 (noting in a fiber exchange agreement that Windstream KDL, LLC "leases" certain rights and property "pursuant to a Master Lease").

Again, the same information had been made public previously via other sources. For example, Judge Furman also cites the Aurelius Complaint, filed on the court docket on October 12, 2017, and publicly available via PACER, which states that "[c]onsistent with Windstream's representations to regulators that the Transferor Subsidiaries would have the right to 'sublease access to the system'. . . the Transferor Subsidiaries have granted access to the Leased Property to third parties for consideration."[42] In addition, the U.S. Bank Proposed Findings of Fact, which was filed and publicly available on June 15, 2018, provided additional detail about those agreements and listed them in an appendix:[43] Accordingly, even if PX-109, which includes actual copies of the 120 underlying sub lease agreements, was not public, the existence and purported import of those agreements had previously been disclosed in the Aurelius Complaint and the U.S. Bank Proposed Findings of Fact, well before February 15, 2019.

27.    *Eighth*, Judge Furman cites an affidavit submitted in the Aurelius litigation by David LaRue (an expert retained by the indenture trustee) to support several factual propositions— all of which were publicly disclosed through other sources prior to February 15, 2019:

    a.  Judge Furman cites the LaRue Affidavit to support the statement that "[t]he Transferor Subsidiaries . . . together, account for approximately eighty percent of Windstream's total annual revenue."[44] This statement is in the "Factual Findings" section, in which Judge Furman introduces Windstream Transferor Subsidiaries and the origins of the spin-off. The U.S. Bank Proposed Findings of Fact, which were filed on the court docket on June 15, 2018, and publicly

---

[42] Aurelius Complaint, ¶60.

[43] Plaintiff-Counterclaim Defendant U.S. Bank National Association's Proposed Findings of Fact and Conclusions of Law, *U.S. Bank National Association v. Windstream Services, LLC v. Aurelius Capital Master, Ltd.*, June 15, 2018, ¶74 & Appendix B.

[44] Judge Furman Ruling, p. 5.

**APPENDIX E**

available via PACER, includes the same information (likewise citing the LaRue Affidavit).[45]

b. Judge Furman also cites the LaRue Affidavit to support the fact that the payments made by Windstream's subsidiaries to the holding company matched the amount the holding company paid Uniti.[46] But LaRue publicly testified to that fact at trial, stating that "[t]he total amount of the lease obligation reflected on all of the transferor subsidiaries equaled the total lease obligation reflected by the parent corporation on the master lease. So those items, those items matched up."[47] Given that the trial (and ultimately the transcript) was public, this information would have been publicly available at the time of his testimony—months before February 15, 2019.

c. Judge Furman further cites the LaRue Affidavit to support the proposition that Windstream "Holdings itself reflects the payments from the Transferor Subsidiaries as a form of revenue—'[l]easing income from subsidiaries'—and the Transferor Subsidiaries reflect their corresponding liabilities as '[l]ong-term lease obligations' and associated '[p]ayments under long-term lease obligations.'"[48] But Judge Furman cites multiple public documents, including "public filings," trial testimony, and the Fletcher Deposition to support the same point. As such, this information was publicly available from these other sources.[49]

d. Finally, Judge Furman cites the LaRue Affidavit to rebut Windstream's contention that its subsidiaries had "no obligation" to fund the rent payments, finding that such a contention was "without merit" for "several reasons," including that "it is, of course, inconsistent with Windstream's own statements—to regulators and in the financial statements of both Holdings and the Transferor Subsidiaries."[50] Again, in addition to the LaRue Affidavit, Judge Furman also cites to Services' Responses to RFAs, which were filed on the court docket on February 16, 2018, and publicly available via PACER, which states: "Transferor Subsidiaries recognize in their financial statements: (i) a liability for rent under the Master Lease, and (ii) taxes, insurance, other operating expenses and capital expenditures for the Leased Properties."[51]

---

[45] Plaintiff-Counterclaim Defendant U.S. Bank National Association's Proposed Findings of Fact and Conclusions of Law, *U.S. Bank National Association v. Windstream Services, LLC v. Aurelius Capital Master, Ltd.*, June 15, 2018, ¶28.

[46] Judge Furman Ruling, p. 31 (citing LaRue Aff. ¶ 54).

[47] Trial Transcript, *U.S. Bank National Association v. Windstream Services, LLC v Aurelius Capital Master, Ltd.*, July 23, 2018, p. 220.

[48] Judge Furman Ruling, p. 31 (citing LaRue Aff. ¶¶ 53-56, 65-70; Tr. 144-46; Fletcher Dep. 82-83).

[49] In the same paragraph for the above statement, Judge Furman also cites the LaRue Affidavit to conclude that "[i]n short, Holdings itself recognizes the payments made by the Transferor Subsidiaries as consideration for the right to use the Transferred Assets provided to them by Holdings. *See,* LaRue Affidavit, ¶¶ 78-80, 95-105." This appears to be a concluding sentence for the series of findings by Judge Furman discussed above, for which he also cites the LaRue Affidavit and other publicly available documents. *See,* Judge Furman Ruling, p. 31.

[50] Judge Furman Ruling, p. 40 (citing LaRue Aff. ¶¶ 47-53, 74-77, 81; Services' Responses to RFAs No. 7).

[51] Windstream Services, LLC's Objections and Responses to U.S. Bank National Association's and Aurelius Capital Master, LTD.'s Request for Admission, *In re U.S. Bank National Association v. Windstream Services, LLC v. Aurelius Capital Master, Ltd.*, November 3, 2017, p. 3.

**APPENDIX E**

28.     *Ninth*, Judge Furman cites an email from U.S. Bank's counsel to Windstream Services' counsel, dated February 20, 2018 (PX-137), to support the statement that "there is no dispute that the 2015 Transaction involved the sale or transfer by the Transferor Subsidiaries of the Transferred Assets to CS&L."[52]  But Uniti had previously disclosed in the Separation and Distribution Agreement that it entered into with Windstream, publicly available via Uniti's Form 8-K filed on March 26, 2015, that Windstream and Uniti's board "have approved the transfer by Windstream and its Subsidiaries of the Assigned Assets . . . to CS&L."[53]  Further, Windstream's intercompany memo dated April 24, 2015, which was filed on the court docket on March 19, 2018, and was publicly available via PACER, stated that "[a]s of the April 24, 2015 closing date, the Transaction met the four criteria for a 'sale of real estate.'"[54]  In addition, in Windstream's Proposed Findings of Fact, filed on the court docket on June 15, 2018, and publicly available via PACER, Windstream mentioned the transferal of assets from the Transferor Subsidiaries to Uniti.[55]  In other words, this information was publicly available prior to February 15, 2019.

29.     In summary, even though 11 of the documents cited by Judge Furman in support of his decision may not have been public prior to February 15, 2019, all of the relevant factual information that he refers to in citing those documents *was* publicly disclosed to the market well before that date, either through other sources cited by Judge Furman for the same propositions, which were public, or via other publicly available documents with this information.

---

[52] Judge Furman Ruling, p. 27.

[53] Uniti Group Inc., Form 8-K, Filed on March 26, 2015, EX-2.1 Separation and Distribution Agreement, p. 2.

[54] Windstream Intercompany Memo, dated April 24, 2015, p. 7.

[55] Windstream Services, LLC's Proposed Findings of Fact and Conclusions of Law, filed on June 15, 2018, p. 5 ("Pursuant to the Board of Directors' approval, Windstream executed upon the proposed transactions that comprise the 2015 Transaction.  In connection with the 2015 Transaction, Holdings and Services entered into a Separation and Distribution Agreement with Uniti, whereby on April 24, 2015 Services and certain of its subsidiaries (the 'Transferor Subsidiaries') contributed to Uniti and certain of Uniti's subsidiaries certain assets consisting of approximately 66,000 route miles of fiber optic cable lines, 235,000 route miles of copper cable lines, central office land and buildings, beneficial rights to permits, pole attachment agreements and easements, and a small consumer competitive local exchange carrier business owned by Services (the 'Transferred Assets'). (Fletcher Direct ¶ 9; WIN Ex. 185.)").