# EXHIBIT K

**Covenant Review**

THE AUTHORITY ON BOND AND LOAN COVENANTS

Research Date: February 19, 2019

## Windstream: Initial Reactions to the Court's Ruling

**The Bottom Line:™**

- On July 31, 2018, the parties to the Windstream litigation presented oral argument before Judge Furman of the Southern District of New York.

- On February 15, 2019, Judge Furman issued his eagerly anticipated ruling on this closely-watched case.

- In what can only be described as a stunning development, Judge Furman ruled that Aurelius is entitled to a judgment in its favor.

- In this report, we provide our initial reactions to the court's ruling.

- This situation is extremely fluid, and we will continue to publish additional reports as additional developments arise.

### Overview

Windstream Services, LLC ("Services"), Aurelius Capital Master, Ltd. ("Aurelius"), and U.S. Bank National Association, as trustee (the "Trustee") under the indenture for the 6.375% Senior Notes due 2023 (the "August 2023s"), presented their cases in federal court in July 2018. The August 2023s were issued by Services under a January 23, 2013 Indenture, as supplemented (the "August 2023s Indenture"). Services is a wholly-owned subsidiary of Windstream Holdings, Inc. ("Holdings").

The parties are generally litigating the questions of (1) whether the Uniti spin-off and related transactions in April 2015 (the "2015 Transactions") violated the restrictive covenants of the August 2023s Indenture and (2) whether the consent solicitation and exchange offer transactions consummated in 2017 (the "2017 Transactions") violated the August 2023s Indenture.

On February 15, 2019, Judge Furman issued his long-anticipated ruling on this closely-watched case, which we refer to in this report as the "Ruling." The opinion is available here. In what can only be described as a shocker, Judge Furman ruled that Aurelius is entitled to a judgment in its favor. In this report, we provide our initial reaction to the Ruling. This situation is extremely fluid, and we will continue to publish additional reports as additional developments emerge.

### Previous Research

Covenant Review has published extensive research regarding this dispute between Services and Aurelius, as well as on the Windstream credit in general. In this report, we are not summarizing the detailed history of this dispute, but instead assume that all readers of this report have read our previous research on this litigation.

ANALYST CONTACT
Anthony P. Canale
1-212-716-5780
acanale@covenantreview.com

Covenant Review, LLC
25 West 45th Street, 10th Floor
New York, New York 10036
www.covenantreview.com



**Windstream: Initial Reactions to the Court's Ruling**

## What did the Court rule?

On pages 54-55 of the Ruling, the Court ruled that Aurelius is entitled to a judgment to the effect of the following:

1. That the 2015 Transactions breached the Sale/Leaseback covenant of the August 2023s Indenture;
2. That Services' breaches of the Sale/Leaseback covenant constitute a default under Section 6.01(a)(v) of the August 2023s Indenture;
3. That the new notes purportedly issued under the August 2023s Indenture as a result of the 2017 Transactions do not constitute Additional Notes under that indenture;
4. That Aurelius' Notice of Default sent on September 21, 2017 with respect to the breaches described above was valid and effective;
5. That those breaches ripened into Events of Default under the August 2023s Indenture on December 6, 2017;
6. That the December 7, 2017 Notice of Acceleration sent by Aurelius to Services with respect to those Events of Default was valid and effective, and all principal together with accrued and unpaid interest on the August 2023s held by Aurelius became immediately due and payable as of that date;
7. That Services is enjoined from taking any additional action to issue additional August 2023s in contravention of, or to otherwise violate, the August 2023s Indenture;
8. That Aurelius is entitled to a money judgment of $310,459,959.10, plus interest from and after July 23, 2018; and
9. That Services' counterclaims against Aurelius and the Trustee are dismissed with prejudice.

However, Judge Furman has not yet entered a judgment ordering all of the above. On page 55 of the Ruling, Judge Furman requires that Aurelius must confer with the other parties and draft a proposed judgment consistent with the above findings, and must file this proposed judgment for the Court's approval no later than February 25, 2019.

## Windstream's Response

On Friday night, following the release of the Ruling, Windstream issued a statement in response to the Court's ruling. Windstream's president and CEO Tony Thomas stated that Windstream "will be taking immediate steps to pursue all available options, including post-trial motions and an appeal." Additionally, Mr. Thomas indicated that Windstream plans to "work with our creditors on the next course of action."

Yesterday, Windstream issued another press release postponing the release of its fourth quarter and full year 2018 financial results to no later than March 18, 2019. In that statement, Windstream indicates that "[t]he company is continuing to evaluate its options, including post-trial motions and an appeal."

## Aurelius' Response to Windstream's Response

Earlier today, Aurelius released a celebratory press release that chastised Windstream for not earlier settling this case, and also taunted other Windstream noteholders that chose to participate in the various exchange offers. This press release makes for excellent reading, as Aurelius unabashedly "spikes the football" after scoring a touchdown at trial.



**How did the Court come to its conclusions?**

As we discussed in our previous research, in order for Aurelius to prevail, the Court first had to find that the 2015 Transactions breached the Sale/Leaseback covenant of the August 2023s Indenture. In addition, the Court also had to find that the 2017 Transactions (which resulted in the third supplemental indenture to the August 2023s Indenture) did not cure all alleged defaults relating to the 2015 Transactions, even though the Trustee of the August 2023s Indenture took the position that 2017 Transactions were permitted under the August 2023s Indenture, and the additional August 2023s were validly issued. The Court found that both the 2015 Transactions breached the August 2023s Indenture and that the 2017 Transactions did not cure these defaults. As a result, the Court handed a stunning victory to Aurelius.

*The 2015 Transactions:* The Court found that the Transferor Subsidiaries (i.e., the subsidiaries of Services that transferred the assets and subsequently used those assets) were in fact leasing back those assets. The Court found that, in spite of the fact that Services and the Transferor Subsidiaries are not parties to the Master Lease (which was between Holdings and the applicable Uniti entities), the Transferor Subsidiaries in substance leased back those assets, and therefore the 2015 Transactions qualified as a Sale and Leaseback Transaction within the meaning of the August 2023s Indenture, which would be a breach of the Sale/Leaseback covenant of the August 2023s Indenture. The Court ruled in this way for two independent reasons. First, the Court found that the Transferor Subsidiaries lease the transferred assets as a matter of law, based on the meaning of the word "lease." Second, the Court ruled that Services was judicially estopped[1] from denying the existence of a lease, based on statements that Services made to various state regulators in order to gain approval for the 2015 Transactions.[2] The Court summed up its conclusions on the 2015 Transactions on page 41 of the Ruling:

> In sum, the Transferor Subsidiaries' use and enjoyment of the Transferred Assets walks like a lease and talks like a lease. That is because it is a lease. And, regardless, Services cannot be heard to argue otherwise in these proceedings because it previously took a contrary position in the legal proceedings before state regulators and that position was adopted by the regulators. Accordingly, the Court holds that the 2015 Transaction constitutes a Sale and Leaseback Transaction within the meaning of the Indenture. It follows that, unless excused or cured by the 2017 Transaction, the 2015 Transaction constitutes a breach of Section 4.19 of the Indenture.

*The 2017 Transactions:* As we explained in previous reports, Windstream's position was that even if the Court were to find that the 2015 Transactions constituted a breach of the August 2023s Indenture, the 2017 Transactions (which resulted in the third supplemental indenture to the August 2023s Indenture) cured all alleged defaults relating to the 2015 Transactions. Windstream's position was that the 2017 Transactions were permitted under the August 2023s Indenture, and even if one assumes that Services did not have Ratio debt capacity to issue the new notes that were issued in exchange for existing Windstream bonds, the new notes could have been incurred as "Permitted Refinancing Indebtedness" under the August 2023s Indenture. The Trustee's position was that the 2017 Transactions were permitted under the August 2023s Indenture, and the additional August 2023s were validly issued. Aurelius' position was that the 2017 Transactions did not cure the breaches under the August 2023s Indenture because the 2017 Transactions themselves were not permitted under the August 2023s Indenture. In particular, the new notes issued in the exchange offers could not have been incurred as "Permitted Refinancing Indebtedness" under the Debt covenant of the August 2023s Indenture.

---

[1] The doctrine of "judicial estoppel" generally prevents a party from asserting a position in one legal proceeding that directly contradicts a position taken by that same party in an earlier proceeding. In other words, Judge Furman is saying that the statements that the Court finds that Services made to regulators in the past prevent Services from now arguing something that is inconsistent with those earlier statements.

[2] The Court found that this judicial estoppel was warranted based on a number of statements that Services made in regulatory applications to various state regulators during the process of obtaining approval for the 2015 Transactions. However, Windstream's attorneys argued at trial that these statements were "cherrypicked" from the comprehensive regulatory submissions that Windstream submitted to these regulators, each of which submissions included the draft of Master Lease and correctly spelled out the actual structure (with Holdings as the sole obligor under the Master Lease). For example, see pages 701-702 of the Court Transcript. Obviously, Judge Furman did not see it this way.

The Court agreed with Aurelius' position in the Ruling, holding that the new notes issued in the exchange offers were not "Additional Notes" within the meaning of the August 2023s Indenture. This means that the breach of the Sale/Leaseback covenant that the Court found had occurred in the 2015 Transactions was never cured by the 2017 Transactions. The Court found this for two reasons. First, the Court found that the issuance of the new debt to refinance the existing debt tendered in the exchange offers was not "Permitted Refinancing Indebtedness" within the meaning of the August 2023s Indenture, due to some complicated arguments regarding whether a premium was paid in connection with the 2017 Transactions.[3] Second, the Court found that flaws in one of the exchange offers that were a part of the 2017 Transactions mean that the applicable exchange offer "never closed and expired on its own terms."[4] Because of this, the Court found that the notes issued as a result of that exchange offer do not count as "Additional Notes" within the meaning of the August 2023s Indenture, and that the consents provided by holders of those bonds must be disregarded.[5] Accordingly, the Court ruled that the breaches of the August 2023s Indenture that the Court found had occurred as a result of the 2015 Transactions were not cured as a result of the 2017 Transactions.

We plan to examine the reasoning behind Judge Furman's rulings on both the 2015 Transactions and the 2017 Transactions in depth in future reports.

**<u>One Major Confusing Consequence of the Court's Ruling</u>**

The Court's stunning ruling has resulted in a number of confusing consequences that the market is currently struggling to understand. One big issue concerns the question of the nature and status of the new notes that were presumably issued under the August 2023s Indenture as a result of the exchange offers in the 2017 Transactions.

The Court has apparently stated in the Ruling that there was no capacity under the August 2023s Indenture to issue the new bonds, because there was no Ratio capacity (as a result of the breach of the Sale/Leaseback covenant as a result of the 2015 Transactions) and the new bonds do not meet the definition of "Permitted Refinancing Indebtedness." Independently, the Court also stated that because of flaws in one of the exchange offers comprising the 2017 Transactions, the applicable exchange offer "never closed and expired on its own terms." So what does this mean for the holders of bonds that exchanged into what they believed were Additional 2023s in order to eliminate the threat of Aurelius accelerating Services' capital structure?

The Court further confuses the matter by stating[6] that it does not hold that the new notes issued in connection with the 2017 Transactions are invalid:

> **To be clear, the Court does not hold that the New Notes issued in connection with the 2017 Transaction are invalid. (Aurelius is clear that it does not seek such a ruling. Docket No. 184 ("Aurelius's Opp'n"), ¶ 99; Tr. 712.)** Instead, the Court merely holds that the New Notes do not constitute "Additional Notes" within the meaning of the Indenture. [emphasis ours]

So, to sum this up, it appears that the Court is saying that the new notes issued under the August 2023s Indenture as a result of the 2017 Transactions are somehow validly issued and outstanding, although Judge Furman didn't come out and expressly state this in the Ruling. In fact, the Judge appears to be referring to the scenario described by Aurelius' counsel

---

[3] For the Court's full explanation on this issue, please see pages 43-47 of the Ruling.
[4] See page 50 of the Ruling.
[5] For the Court's full explanation on this issue, please see pages 48-51 of the Ruling.
[6] See page 51 of the Ruling.



at trial, Mr. Lawrence Robbins, when counsel was explaining the relief sought by Aurelius[7]:

> What we are not doing and what we are accused of doing but it is simply not so is we are not seeking to invalidate the debt exchange or ask that the new notes be declared invalid. The relief that we are seeking would not entail any of those things. **Indeed the new notes would continue to exist, trade in the market. They are issued pursuant to an entirely separate CUSIP which allows them to be easily and separately identified. And what happens to the rights of the holders of those notes is a question for another day that can be resolved in a variety of ways**, including through any number of transactions that the company has at its disposal, including but not limited to the recent exchange they just undertook which leaves very little of these new notes even in existence to be concerned about. [emphasis ours]

If the new notes issued under the August 2023s Indenture are in fact to be treated as validly issued and outstanding, which is part of the relief sought by Aurelius, then this would be a head-scratcher, for two reasons.

First, the Court has held that there was no debt capacity to incur the new bonds under the August 2023s Indenture, so how were the new bonds apparently validly issued under that indenture? How did Services issue the new debt if the Court has found that there was no debt capacity under the August 2023s Indenture to do so?

Second, the Court has held that the new bonds, though validly issued and outstanding, are not "Additional Notes" within the meaning of the August 2023s Indenture. This begs the question: what are these additional bonds, and how were they issued under the August 2023s Indenture?

The August 2023s Indenture was only created and authorized by Services to issue "Notes," meaning the 6.375% Senior Notes due 2023 issued on the issue date and any Additional Notes that are later issued under that indenture, all of which are to be treated as a single class. The "Notes" are defined as follows in the August 2023s Indenture:

> "**Notes**" means the 6 3/8% Senior Notes due 2023 of the Company issued on the date hereof and any Additional Notes, including any Exchange Notes issued in exchange therefor. The Notes and the Additional Notes (including any Exchange Notes issued in exchange therefor), if any, shall be treated as a single class for all purposes under this Indenture.

In other words, the August 2023s Indenture was only authorized by Services to be used to issue August 2023s, including any Additional Notes that are also August 2023s. If Judge Furman's ruling was intended to provide the relief Aurelius' counsel referred to above, then this would provide that the new bonds issued under the August 2023s Indenture pursuant to the 2017 Transactions are apparently somehow validly issued and outstanding, but are not August 2023s within the meaning of the August 2023s Indenture.

So to recap, if Judge Furman's ruling was intended to provide the relief Aurelius' counsel referred to above (and Aurelius has been tasked with drafting the proposed judgment), then the bonds issued in the 2017 Transactions would be deemed to be validly issued as bonds that are not August 2023s, despite apparently being issued without requisite debt capacity pursuant to an indenture that was never authorized by Services to issue any securities other than the August 2023s.

Unfortunately, the Court's ruling does not explain how this is supposed to work in practice, but merely directs Aurelius to confer with the other parties and draft a proposed judgment that is consistent with the Court's rulings by February 25, 2019.

---

[7] See pages 712-713 of the Court Transcript.



**Where do we go from here?**

This is a very difficult question to answer.

The Court has ordered Aurelius to confer with the other parties and draft a proposed judgment consistent with the above findings, and to file that proposed judgment for the Court's approval no later than February 25, 2019.  Aurelius could draft a proposed judgment consistent with the Court's findings, and once Judge Furman issues this order, this would have the effect of accelerating the August 2023s, and presumably the entire Windstream capital structure as a result.

Windstream could appeal (and according to their February 15, 2019 statement, they plan to), and presumably this would result in the stay of Judge Furman's order pending the results of the appeal, although we are not litigators and are generally not familiar with how the appeals process technically works.

Also, Windstream and Aurelius could settle the matter ahead of the entry of a final judgment, which could eliminate the controversy without accelerating the Windstream capital structure.

**Another Sobering Reminder of the Unpredictability of Court Rulings**

Covenant Review has published significant research on a number of indenture disputes over the last 14 years, and we've said each time that we cannot accurately predict how a court would rule on the applicable matter.  While we can and do provide the analysis of seasoned leveraged finance attorneys to the facts of a given indenture dispute, court rulings are inherently unpredictable.  Judge Furman's ruling is just the latest example of a court ruling that was stunning and unexpected.

We will continue to closely monitor developments in this matter, and will be publishing additional research on the implications to the Windstream capital structure as a result.


*— Covenant Review*



**Disclosures**

This report is the product of Covenant Review. Covenant Review is an affiliate of Fitch Group, which also owns Fitch Ratings. Covenant Review is solely responsible for the content of this report, which was produced independently from Fitch Ratings.

All content is copyright 2019 by Covenant Review, LLC. The recipient of this report may not redistribute or republish any of the information contained herein, in part or whole, without the express written permission of Covenant Review, LLC and we will criminally and civilly prosecute copyright violations against firms and individuals who unlawfully distribute our work. The use of this report is further limited as described in the subscription agreement between Covenant Review, LLC and the subscriber. The information contained in this report is intended to generally describe certain covenant features. This report is not comprehensive, is not confidential to any person or entity, and should not be treated as a substitute for professional advice in any specific situation. Covenant Review, LLC makes no warranty, express or implied, as to the fitness of the information in this report for any particular purpose. If you require legal or other expert advice, you should seek the services of a qualified attorney or investment professional. Covenant Review, LLC does not render, and nothing in this report constitutes, legal or investment advice, and recipients of this report will not be treated or considered by Covenant Review, LLC as clients or customers except as described in the subscription agreement between Covenant Review, LLC and the subscriber. Any covenants discussed herein may be based on those contained in the preliminary offering memorandum or draft credit agreement distributed by the issuer or borrower in connection with the issuance of the bonds or loans, and the covenants published in the final offering memorandum or contained in the final indenture or credit agreement may differ from those presented herein. The reader should be aware that the final interpretation of any bond indenture, credit agreement, security or guarantee agreement, or other bond or loan documents, will generally be determined by the issuer or its counsel, or in certain circumstances, by a court or administrative body.