# EXHIBIT P

**Page 1**

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF ARKANSAS

NO. 4:19-cv-00756-BSM

----------------------------------x

IN RE UNITI GROUP INC.

SECURITIES LITIGATION

----------------------------------x

December 6, 2021

10:59 a.m.


        Remote Videotaped Deposition of

CHAD COFFMAN, an Expert Witness, held via

Zoom before Dawn Matera, a Shorthand

Reporter and Notary Public of the State

of New York.


            *      *      *

A P P E A R A N C E S :


ROBBINS GELLER RUDMAN & DOWD LLP
Attorneys for Plaintiffs and the Witness
        655 West Broadway, Suite 1900
        San Diego, California 92101
By:   DEBRA WYMAN, ESQ.
        debraw@rgrdlaw.com
        TING LIU, ESQ.
        tliu@rgrdlaw.com
        JOSEPH TULL, ESQ.
        jtull@rgrdlaw.com


DAVIS POLK & WARDWELL LLP
Attorneys for Defendants Uniti Group Inc., Kenneth A. Gunderman and Mark A. Wallace
        450 Lexington Avenue
        New York, New York 10017
        (212) 450-4000
By:   BRIAN M. BURNOVSKI, ESQ.
        brian.burnovski@davispolk.com
        DANIEL MAGY, ESQ.
        daniel.magy@davispolk.com
        JANE RAMAGE, ESQ.
        jane.ramage@davispolk.com
        NIKOLAUS WILLIAMS,  ESQ.
        nikolaus.williams@davispolk.com

Also Present:
    KYLE MILLIKEN, Cornerstone Research
    STEPHEN KENT, Videographer
    THOMAS MUNK, Concierge
                ~oOo~

CHAD COFFMAN

THE VIDEOGRAPHER:  Good morning. We are going on the record at 10:59 a.m. on December 6th, 2021.  Please mute your audio input if you are not a speaking party as your microphone is sensitive and can pick up whispering and background noise.  Please turn off all cell phones or place them away from your computer as they can interfere with the deposition audio. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit 1 of the video-recorded deposition of Chad Coffman in the matter of In Re Uniti Group Securities Litigation filed in the United States District Court for the Eastern District of Arkansas, case number 4:19-cv-00756-BSM.

This deposition is being held via videoconference with the witness being located in Illinois.  My name is Steven Kent from the firm of Veritext

Page 4

CHAD COFFMAN

Legal Solutions and I am the videographer. The court reporter is Dawn Matera, also from Veritext Legal Solutions.

I am not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome.

Counsel and all present in the room and everyone attending remotely will now state their appearances and affiliations for the record.

MR. BURNOVSKI: This is Brian Burnovski from Davis Polk & Wardwell on behalf of defendants. With me are my colleagues Daniel Magy and Jane Ramage. Also present is Kyle Milliken from Cornerstone Research.

MS. WYMAN: Debra Wyman from Robbins Geller Rudman & Dowd on behalf of the witness and the proposed class. And with me are my colleagues Ting Liu and Joseph Tull.

THE VIDEOGRAPHER: Will the

Page 5

CHAD COFFMAN

reporter please swear in the witness.

C H A D   C O F F M A N, having been first duly sworn by Dawn Matera, a Notary Public, was examined and testified as follows:

EXAMINATION BY MR. BURNOVSKI:

Q.    Good morning, Mr. Coffman.  As I said, my name is Brian Burnovski.  I will be asking you questions today.  Can you please state your name and address for the record?

A.    Sure.  Chad William Coffman. Do you want my home address or business address?

Q.    Business is fine.

A.    Business address is Global Economics Group, 140 South Dearborn Street, Suite 1000, Chicago, Illinois, 60603.

Q.    And you understand that you're under oath today?

A.    I do.

Q.    Where are you located today?

A.    I am in my office at that

CHAD COFFMAN

address.

Q.    Is anyone else in the room with you?

A.    No.

Q.    Are you aware that the parties have entered into a stipulation regarding protocols for conducting remote depositions?

A.    I am not aware of that stipulation, no.

Q.    Do you have any electronic devices with you other than the computer you're using to access the deposition or the Exhibit Share software?

A.    My cell phone is in the room but it's far away from me right now.

Q.    Do you agree that during the pendency of the deposition you will not access or view any other computer, tablet or mobile device other than the computer you're using to access the deposition or Exhibit Share software?

A.    Yes.

Q.    Other than the deposition

CHAD COFFMAN

window and the Exhibit Share window on your computer or other electronic device, do you have any browser windows or other applications open on your device?

A.    No.

Q.    Do you agree that while on the record, you will not communicate with anyone including plaintiffs' counsel except as reflected on the record?

A.    Yes.

Q.    Okay.  Mr. Coffman, I know you've done this many times so I won't waste your time with a bunch of ground rules.  I'll just ask that if any of my questions today are not clear to you, that you please let me know and I will do my best to clarify the question.  If you answer the question, I will assume you understood it, okay?

A.    Okay.

Q.    Is there any reason why you won't be able to testify fully and truthfully today?

A.    No.

CHAD COFFMAN

Q.    What do you do for a living?

A.    I'm a consultant who does work in the fields of economics, statistics, valuation.  I think that's a fair summary.

Q.    And you're employed by Global Economics Group?

A.    Yes.

Q.    How are you compensated by Global Economics Group?

A.    I receive payments for the amount of my own time.  I work and charge to clients.  I earn a portion of staff revenues on cases for which I am considered the finder of the case.  And I also have an equity interest in the firm, so I receive some compensation from the profits of the firm.

Q.    What percentage of your annual income is earned from performing litigation consulting services?

A.    Do you have a specific time period in mind?

Q.    Last five years.

CHAD COFFMAN

A.    That's never a number I've ever calculated.  It would clearly be a majority, but I don't know an exact percentage.

Q.    More than 75 percent?

A.    That's likely true, yes.

Q.    More than 90 percent?

A.    Possibly, but I'm not sure.

Q.    And just so the record is clear, when I use the term "litigation consulting services," that would be assignments where you're retained as an expert witness similar to this case, correct?

A.    I was including in that percentage cases where I was hired as a consultant as well.  So not necessarily preparing to give testimonial work, just doing work in litigation, in a litigation context, but not necessarily working towards an expert opinion or written opinion for testimony.

Q.    Okay.  So you're working on litigation either as a consulting expert

CHAD COFFMAN

or a testifying expert?

A.    That's what I was interpreting your question to be, yes.

Q.    Prior to being retained as an expert in this case, how many times have you been retained as an expert in a securities class action?

A.    I don't know an exact number.

Q.    What's your best estimate?

A.    It would certainly be over 100 times.  Whether it's over 200 is possible.  Beyond that, I would be speculating.

Q.    And in how many of those cases were you retained by the plaintiff?

A.    Well, over the years, again, that's not something I ever calculated. I have been engaged over the years by plaintiffs, by defendants, by neutrals. By D&O insurers.  So I have been engaged by a number of different parties to perform consulting services in this area. So without being specific about -- that's not a percentage I've ever calculated.

CHAD COFFMAN

Q.    Is it fair to say that in securities class actions, you've been retained by plaintiffs in the vast majority of the cases?

MS. WYMAN:  Objection to form.

A.    I think counting all of my experience up through today, it's fair to say that would probably be a majority, yes.

Q.    A fairly large majority?

MS. WYMAN:  Objection to form.

A.    Could you be more specific what you mean by that.

Q.    Well, is it 51 percent or significantly more than 51 percent?

A.    Again, I think that's varied over time.  But going back to your question about the last five years, that would be a fairly substantial majority. Almost certainly over 75 percent.

Q.    Have you ever been retained as an expert by a defendant in a securities class action?

A.    Yes.

Page 12

CHAD COFFMAN

Q.    And in what securities class actions do you recall being retained by the defendant?

A.    I don't think my role ever became public in those cases.  It was either as a consulting expert where it was potentially going to be testimony. Ultimately it never got to that stage. So I don't think I can disclose specific names.

Q.    How many times do you recall being retained by a defendant in a securities class action?

MS. WYMAN:  Objection to form.

A.    Well, over the years I've worked as a consultant with a number of experts for certain defendants.  I don't know an exact number.  And I was also in a number of cases where I was, you know, probably a couple of dozen cases where I was retained as a neutral expert by a mediator.  In those cases both sides had to agree to my retention.  So clearly defendants agreed to my retention in

CHAD COFFMAN

those matters.  So I am sure it's a few dozen times over the years.  But I don't have a precise number.

Q.    How many times in the last five years do you recall being retained by a defendant in a securities class action?

A.    I don't have a specific recollection in the last five years of being retained by a defendant in a securities class action.

Q.    How about ten years?

A.    Certainly there were examples of being engaged by a neutral expert where defendants agreed to my participation as a consultant.  I don't have a precise number, but it would probably be a handful.  Maybe up to ten, but no more than that.

Q.    And do you remember being retained just by a defendant in the last ten years in a securities class action, putting aside the instances where you recall being retained by a neutral?

A.    There is one case I recall.  It

CHAD COFFMAN

would be pretty close to whether it was ten years ago now or not.  I don't remember precisely when it took place where I was retained by a defendant.

Q.    So fair to say that in the last ten years, the overwhelming majority of your work in connection with securities litigation has been on the plaintiff's side?

MS. WYMAN:  Objection to form.

A.    By overwhelming, you mean, you know, more than 75 percent but not 100 percent, yes.

Q.    In this case you were retained by lead plaintiff counsel on behalf of the punitive plaintiff class, correct?

A.    That's my understanding, yes.

Q.    And lead counsel for the plaintiffs to your understanding consist of two different law firms, correct?

A.    That's my understanding, yes.

Q.    One is Robbins Geller Rudman & Dowd and the other one is Labaton Sucharow?

Page 15

CHAD COFFMAN

A.    Yes.

Q.    Have you ever previously been retained as an expert witness by either of those firms or their clients prior to this case?

A.    Yes.

Q.    How many times to the best of your recollection?

MS. WYMAN:  Objection to form.

A.    I don't have a precise number.

Q.    More than ten?

MS. WYMAN:  Objection to form.

A.    With respect to Labaton, the answer to that is certainly yes.  With respect to Robbins Geller, I am not certain.  I don't know if it's been that many times.

Q.    Are you currently working with either of those firms in any other cases?

A.    Yes.

Q.    Which cases?

MS. WYMAN:  Objection to form. I am only objecting just in case, Mr. Coffman, your retention hasn't

CHAD COFFMAN

been disclosed yet in those other cases, and so I just caution you to think about that before you answer Mr. Burnovski's question.

THE WITNESS:  Sure.

Q.    Let me start with a different question, Mr. Coffman.  How many other cases are you working on currently with Robbins Geller or Labaton?

A.    Robbins Geller, I'm not sure there are others.  It's possible that I am and they are co-counsel in a case or there is one I am just not thinking of right now.

With Labaton, I know there's one other case that springs to mind that I am working with them on and there likely are other cases that are technically active that I have filed reports in the past.  But I don't know a specific number.

Q.    Of the ones that are public, do you recall any of those others that you're working on that remain active as

CHAD COFFMAN

of today?

A.    The one case that comes to mind that I am working on with Labaton is the Nielson matter.  Again, I am sure there are probably others that are still active, but I just can't think of them as I sit here.

Q.    When were you first contacted about working on this matter?

A.    I don't recall when the first contact was.

Q.    Do you recall approximately?

A.    Well, I know it would have at least been several months prior to the filing of the report.  I recall doing substantial work leading up to that.  There may have been some contact well before that, but I don't recall spending a lot of time on this matter until within a few months of when the report was filed.

Q.    Do you recall who first contacted you about working on this matter?

CHAD COFFMAN

A.    It was either Ms. Wyman or Ms. Fox.  I seem to recall an early conversation with one of those two people.

Q.    Was anyone else involved in that conversation at the time?

A.    I don't remember it well enough to know.

Q.    Do you recall what information you were provided about the matter at that time?

A.    No.  I believe I was provided a copy of the operative complaint at that time and I don't really remember much else from that.

Q.    Was there a time when you were formally retained as an expert witness in this action?

A.    I believe -- I certainly recall being given the task of answering the questions that are stated in my report in terms of evaluating market efficiency.  I don't remember exactly when that occurred.

CHAD COFFMAN

Q.   Did you sign an engagement letter for this action?

A.   It's my standard practice to have an engagement letter.  I believe there is one.  A lot of that is handled by my administrative staff, so I just don't have a specific recollection of it. But I believe that was done, yes.

Q.   Other than your work in connection with your expert report, did you perform any work on this action?

MS. WYMAN:  Objection to form.

A.   There may have been a couple of things me and my staff were asked to do on a consulting basis outside the preparation of the report.

Q.   Can you describe what those things were?

MS. WYMAN:  Objection to form.

If you haven't been retained to -- I caution you to elaborate on this.

A.   I don't -- I don't -- outside of the forming of the opinions that are

Page 20

CHAD COFFMAN

in my report, and the work done for the report, my understanding is those, anything else that was done was, is attorney work product, and I have not been asked to form any actual expert opinions beyond what's in my expert report.

Q.    Okay.  Other than the work that you did in connection with your expert report, the other work that you're alluding to, when did that work take place?

A.    I don't have a specific recollection of exactly when that took place.  I am trying to remember.  It would have been before the issuance of my expert report.  How long before, I just don't recall.

Q.    Would it have before or after plaintiff filed their complaint in this matter?

A.    I believe it would have been after.

Q.    Do you recall approximately how

CHAD COFFMAN

long before the work you did on your expert report it would have been?

A.    I just don't have a clear recollection of that, no.

Q.    Have you ever owned any Uniti securities?

A.    I don't believe so, no. Unless, other than through an exchange traded fund or something like that or a mutual fund that owned it, but not directly.  I don't recall ever buying Uniti securities, no.

Q.    Let's mark as Exhibit 1 a copy of your expert report.

(Exhibit 1, Expert report, was so marked for identification, as of this date.)

Q.    I believe that should be on Exhibit Share now.

A.    I opened it.  I am just paging through it.

Q.    Do you recognize this document as a true and correct copy of the expert report that you submitted in this case

Page 22

CHAD COFFMAN

along with the exhibits and appendices to that report?

A. It appears to be, yes.

Q. And if you look on page 44 of the report, I believe, is that your signature?

A. It is, yes.

Q. Have you reviewed this report since you submitted it?

A. Yes.

Q. Is there anything in the report that you would like to change or correct?

A. No.

Q. Who drafted this report?

A. Well, the actual putting words on the page with a word processor was a combination of myself and my staff working at my direction. But every word in the report is something I ultimately reviewed and approved, so it's my report.

Q. So members of your staff assisted you in preparing the report?

A. Yes.

Q. Who on your staff assisted you?

CHAD COFFMAN

A.     Mark Hedstrom.  Matt Keefer. Kelly Bryant.  Guillermo Rodriguez and Mary Kubik are the ones I recall interacting with.  There may have been small tasks, other things done by certain other members of my staff, but those are the people that I remember working directly with on this.

Q.     And what role did they play in drafting or preparing the report?

A.     Well, it would have involved everything from data collection. Performing analyses.  Preparing the exhibits.  Preparing an initial draft of certain sections of the report or at least putting together certain sections of the report.  Double-checking calculations.  Answering any questions I had.  Verifying facts for me.  So really virtually in all aspects of preparing the report.

Q.     Which sections of the report would they have helped prepare?

A.     Well, certainly all the

CHAD COFFMAN

exhibits I had assistance on preparing. The underlying calculations to the report. If we want to page through the report. Certainly the introduction, I would have asked them to help prepare an initial draft of that section.

The qualification section of my report really doesn't change from case to case, so that's probably not something that any one of those people really helped assisting in drafting at this point. It's really taken from another report. The summary of opinions section is something that I would have had an initial draft prepared by my staff and then I would have reviewed it. The same thing with the overview of the company and the allegations.

The discussion of the reliance elements, Section 5, is something I had in numerous different reports. It's really just providing background information. So I don't think there is any additional drafting that really

Page 25

CHAD COFFMAN

occurred in that section for this case.

Section 6, the discussion of the Cammer Factors.  Again, that's a very general discussion that I believe was probably not drafted new for the purposes of this report.

And then the application of the efficiency factors to the Uniti common stock.  I would have had, my staff certainly would have assisted in preparing initial drafts of each of those subsections.  Although I would have specified which sections were necessary.

And then the Section 8, the efficiency for put and call options on Uniti common stock.  Certain language in there describing options is language I used before.  The portions that are specific to Uniti, I would have had my staff assist in preparing that as well.

The damages section is, again, a section that once I performed the analysis, I need to make sure that in my view this section applies, much of that

Page 26

CHAD COFFMAN

language that has been used in a number of different reports.

So I don't think there was any initial drafting, but rather just a review and making sure it applied in this case. And I think that pretty much summarizes the report. And I would have had their assistance in putting together the documents considered appendix. And then my CV is mine, obviously.

Q. Did plaintiffs' counsel assist you in drafting your report?

A. They did not assist in preparing an initial draft. I am sure at some point I shared a draft with them and may have gotten suggestions or comments that I would have then evaluated each one to determine whether or not it was something I wanted to consider. But they did not do any initial drafting of the report.

Q. You include as Appendix A to your report a list of the materials that you considered in preparing your report;

CHAD COFFMAN

is that correct?

A.    Yes.  And in some bullet points I summarize information.  I don't list every single article or analyst report or anything like that.  But I certainly provide a complete summary of the documents I considered.

Q.    How did you choose what documents to review in connection with preparing your report?

A.    I think it differs depending on the type of document we're talking about. If you go to Appendix A, the court documents, those were things that were provided to me by counsel.  Their complaint in the case and court's order on the motion to dismiss.  The court decisions and securities law, those are sources that inform some discussion of the background and provide support for certain points in my report.  That stays consistent from case to case, so I didn't necessarily go back and review each one of those, but do cite to them as

CHAD COFFMAN

authority for certain points I am making.

The SEC filings, it's my standard practice when performing analyses of the questions I was being asked here to collect the 8-Ks, 10-Ks, 10-Qs and any S-3s that are issued during the relevant period.

The security data was all data that I collected in support of performing the analysis of market efficiency, so that was all data that was collected by my staff at my direction.

The same thing with the news section. That's all material that was -- that I collected or my staff collected in performing the market efficiency analysis. The analyst reports were something that I asked counsel to provide me. All the analyst reports they had available to them. Certain seeking out articles were something I collected on my own.

The academic article section again is materials that I cite to and

CHAD COFFMAN

rely upon in virtually all of my market efficiency reports.  So I didn't have to collect any of that material new for this particular case, but reflects material that I cite in the report.  And then and under the other section, these are things that I either cite to regularly or represents information collected by me or my staff in performing the analysis.

Q.    Let's just talk about a couple of those sections, Mr. Coffman.  Under court documents you reference that plaintiff provided you a copy of the complaint and the decision on the motion to dismiss; is that right?

A.    Yes.

Q.    Did you request any other court documents to review in connection with forming your opinions?

A.    No.

Q.    Did you look at a copy of the Aurelius complaint, for example?

A.    No, that was not necessary for me to perform the analysis that I was

CHAD COFFMAN

performing.

Q.    You're familiar with the Aurelius complaint?

A.    Well, I am generally familiar with what it is.  I don't recall ever having read the complaint.

Q.    And what is it?

A.    Well, my understanding is that at some point there was a suit filed by Aurelius claiming that the sale leaseback transaction that was essentially the spinoff of Uniti, challenging whether that breached a covenant of a lending agreement of some kind.

Q.    Under the section titled SEC Filings, you said it was your standard practice to collect all of the 10-Ks, 10-Qs and 8-Ks and S-3s from the relevant period; is that right?

A.    Yes.

Q.    Did you review all of those filings from the class period in forming your opinions?

A.    I certainly had access to them.

CHAD COFFMAN

I did not review all of them cover to cover, nor did my staff.  That really wasn't necessary for the analysis that we were performing.  But it was certainly materials that I reviewed portions of.

Q.    And what role did it play in forming your opinions?

A.    For the 10-Ks, I would say that was looked at certainly to get an understanding of the nature of the company's business.  To get an understanding of who they compared their performance against.  It was and then -- and then all of the filings were used to inform the news/no news analysis that is part of the cause and effect portion of my market efficiency analysis.

The S-3s were relevant for looking at the Cammer factor related to S-3s.  Those were the primary ones.  And like I said, I think I may have reviewed portions of like the management discussion and analysis and some of the 10-Qs and things like that.  But I did

Page 32

CHAD COFFMAN

not -- it was not necessary for me to read all of those documents cover to cover, nor my staff.

Q.    Did you consider any Windstream SEC filings in forming your opinion?

A.    No, that was not part of my process.

Q.    Would Windstream's SEC's filings be relevant in any way to any of your opinions?

MS. WYMAN:  Objection to form.

A.    Well, I suppose it's plausible that a Windstream SEC filing could contain some potential relevant news regarding Uniti, but that's not really a portion -- that was not a source I was considering, because it would not necessarily make sense for every Windstream communication to have some relevance to Uniti, and what I was focused on was identifying days on which there was clearly news related to Uniti.

Q.    When you say it would not necessarily make sense for every

CHAD COFFMAN

Windstream communication to have relevance to Uniti?

A.    I don't know that I can say it any different than that, other than it's not clear why each and every Windstream SEC filing would necessarily contain or would be likely to contain value relevant news for Uniti.

Q.    Under the section titled Uniti Group News, you list various materials, do you see that?

A.    Yes.

Q.    And under the first bullet, you reference Uniti Group news headlines and select articles downloaded from Factiva based on a search that you describe later on in that bullet.  Do you see that?

A.    Yes, I do, yes.

Q.    What do you mean by select articles?

A.    Well, I think there was a search for all articles that met the criteria that I described and then there was a process also described in that

CHAD COFFMAN

bullet point describing how certain articles were identified as unrelated to Uniti's business.  That's what I mean by select, that there was a process of eliminating some of the articles that was returned by that search.

Q.    And ultimately the search yielded 1,486 unique news articles?

A.    Give me just a moment.  Yes.

Q.    Did you or your staff actually review all of those articles?

A.    No, it was not necessary to review each and every one of those articles.

Q.    Was it not necessary in connection with your news/no news test?

A.    Well, again, I think it's -- certainly each of them was considered in the sense that it went into the analysis of which days there was no news.  But it wasn't necessary to review the actual content of each of those articles for purposes of identifying the no news days.

Q.    You said you considered

CHAD COFFMAN

earnings conference call and investor call transcripts including and not limited to two particular transcripts that are listed here.  Do you see that?

A.    Yes.

Q.    Is there any significance to the two transcripts that you listed?

A.    Typically, although I would have to go back and double-check to make sure this is entirely accurate, but I typically, I would call out the ones that I specifically reference in the text of the report.  But that does not mean those are the only two I looked at.

Q.    Did you personally review any of the transcripts?

A.    I recall reviewing at least portions of a few of them, but I don't recall reading every single one cover to cover.  That wasn't necessary.

Q.    And under analyst reports, you say that those were supplied by counsel; is that right?

A.    Yes.

CHAD COFFMAN

Q.   And do you know how counsel collected the analyst reports that they provided to you?

A.   I asked for every analyst report that they had.  It wasn't any more specific than that.  And they purported to give me everything that they had in terms of analyst reports.

Q.   Other than the news/no news test, what relevance did those analyst reports play in your opinion?

A.   Cammer Factor 2, which makes reference to analyst coverage of a company.  I certainly considered them for that portion of my opinion as well.

Q.   And again you list a couple of specific analyst reports, is that because you believe they were likely cited in the text of your report?

A.   Again, that's what's typically done, so I would have to go back to check to be sure, but yes, I believe that's why those two are cited in particular.

Q.   And under that, you reference

CHAD COFFMAN

the Seeking Alpha articles that you collected, is that right?

A.   Yes.

Q.   And what are Seeking Alpha articles?

A.   I think what they are can differ from article to article.  Seeking Alpha allows people to publish their analysis and views on stocks.  I would say there is a wide variety of quality and sophistication amongst those.  But these are essentially articles that individuals are posting providing their thoughts, detailed -- in some cases detailed analysis and views on a particular stock, or Uniti, in this case.

Q.   And if you look at Appendix B of your report, the copy of your CV that you mentioned earlier; is that right?

A.   Yes.

Q.   And on the second page, there is a section called Professional Experience, do you see that?

A.   Yes.

CHAD COFFMAN

Q.    And under that, there is a section called Testimony under a heading Securities, Valuation and Market Manipulation Cases, do you see that?

A.    Yes.

Q.    To your knowledge, does that list of cases under testimony reflect an accurate list of all of the securities, valuation and market manipulation cases in which you've submitted an expert report or provided testimony?

MS. WYMAN:  Objection to form.

A.    Certainly it was complete as of the date this report was filed.  I believe there is likely other things that have been added since, but as of the date of the report, it was complete and accurate, yes.

Q.    Do you recall any other cases that would be added to this list through today?

A.    I recall giving a deposition in the Energy Transfer case recently.  I recall filing a report in the Pareteum

CHAD COFFMAN

case recently.  To be sure if there is anything else, I would have to go back and check.  Certainly something I could easily do.  I don't recall any others off the top of my head.

Q.   And this list of cases would not include expert engagements in which you have been retained as an expert but did not submit a report or provide testimony, correct?

A.   That's correct.

Q.   Would those be cases where you were retained as a consulting expert or cases where you were retained to be a testifying expert, but it just never got to that case?

A.   Those would be excluded in this list, correct.

Q.   Any other circumstances which you would be retained as an expert but it wouldn't appear on this list?

A.   I don't believe so.  I've always thought of this list as being prepared from the point of view of once I

CHAD COFFMAN

issue a report or any kind of testimony, then it makes the list. Everything else stays off the list.

Q. And roughly what portion of your total expert engagements would be reflected in this list?

A. That is not something I ever calculated. There is a substantial number of cases that never get to me providing testimony. But in terms of having an actual proportion, that's not something I ever calculated.

Q. Can you give an estimate of roughly half or more than half?

A. Again, just based off my expert or mental impression, that there is probably at least one case that doesn't make this list for every case that does. The total number of engagements is probably twice as many of this. But beyond that, I would be speculating.

Q. Can you take a look at the third bullet under securities valuation and market manipulation cases, the third

Page 41

CHAD COFFMAN

black bullet?

A.    Give me just a second, I moved off of that for a minute.  Give me just a second.

So the third bullet on page 3 you're saying?

Q.    I'm sorry, the third bullet under Professional Experience, I believe on page 2 of Appendix B.  Expert consultant for the American Stock Exchange, do you see that?

A.    Yes.

Q.    Can you briefly describe the nature of that engagement?

A.    Sure.  That was a case where the options exchanges were being sued for, I believe it was antitrust violations for agreeing not to compete on which exchange certain options were listed on.  So it had to do with single listing or dual listing of options across multiple exchanges.  And I was engaged to provide consulting expertise in performing analyses in that case.

Page 42

CHAD COFFMAN

Q.    What was the nature of your opinion in that case?

A.    I didn't offer an opinion in that case.  I was not a testifying expert.  I was retained as a consult expert.

Q.    What was the nature of your analysis in that case?

A.    I have to be careful not to share too much detail.  But generally speaking, it was calculating the -- it was looking at very detailed data and calculating the theoretical prices of options for, across the exchanges and looking at metrics of how prices moved and various other measures of cost to trade across the different options platforms, I would say.  It's been a long time and I don't remember a lot of the exact details of what was.  But it was a lot of very detailed statistical analysis of the options trading on multiple exchanges.

Q.    When did that engagement take

CHAD COFFMAN

place?

A.    I believe that occurred while I was still at Chicago Partners.  So it was pre-2008.  It would have occurred towards the end of my or at least on the second half of my employment at Chicago Partners.  So my best guess is it would have been in the early 2000's, early to mid-2000's.

Q.    And other than that engagement and any cases in which you provided an opinion about market efficiency for stock options, are there any other expert engagements that you recall that touch on options that you've worked on?

A.    There have been many dozen securities cases in which I have been asked to perform analyses of various different types on the trading of options, yes.

Q.    Can you explain that, Mr. Coffman?

A.    Well, I think that you are -- there have been a number of cases or

Page 44

CHAD COFFMAN

dozens of different times I performed analyses that haven't led specifically to opinions about market efficiency or were more generally involved looking at options trading for various different securities and their price movements and what implication it may or may not have had for damages as well in a consulting role. And a couple of times, at least a number of times in a testifying role as well.

Q. If you could turn to paragraph 6 of your report. And if you'll look at paragraph 6 and 7, do those two paragraphs provide an accurate summary of your opinions in this matter?

A. Those are certainly an accurate summary of my overall opinions. Obviously underneath each one is different analyses and sub-opinions. But those two, that accurately describes the two overall opinions I am giving, yes.

Q. The first opinion as summarized in paragraph 6, is that the markets for

CHAD COFFMAN

Uniti common stock and Uniti's call options and put options were efficient during the class period; is that right?

A.   Yes.

Q.   And the second opinion as summarized in paragraph 7 is that damages in this action can be calculated on a class-wide basis using a common methodology for Uniti securities; is that right?

A.   Yes.

Q.   Do those opinions reflect all of the opinions that you presently intend to offer in support of plaintiffs' class certification motion in this case?

A.   I think there is a lot built into that question.  How these opinions are being used.  I view myself as an independent expert giving these opinions. It's not really in support of anything beyond what's in the opinions.  I have not been asked to nor do I intend to, as I sit here right now, offer any further opinions outside of these two opinions.

CHAD COFFMAN

In my opinion, to the extent there is other expert testimony given in this case, I may be asked to review that and provide additional opinions. Or to the extent this case moves beyond class certification, I understand that I may or may not be asked to analyze other questions. But as I sit here right now, these are the only opinions -- these are the only questions I have been asked to address and the only opinions I have formed and the only opinions, as I sit here, intending to form.

Q.    So other than these two opinions, you don't presently intend to offer any other opinions in this case?

A.    That's correct.

Q.    Have you been asked by plaintiffs in this case to work on this case past the class certification stage, if it reaches that stage?

MS. WYMAN:    Objection to form.

A.    No, I have not been formally asked to do that and I have not agreed to

Page 47

CHAD COFFMAN

do that.

Q.     How much has your firm billed for this matter to date?

A.     I don't know the answer to that question, as I sit here.

Q.     Approximately?

A.     Probably more than $30,000. Less than $100,000.

Q.     Approximately how many hours did you spend working on your report?

A.     I don't have an exact number. There are obviously billing records to reflect that.  But I believe it would be more than -- certainly more than ten. Probably more than 20.  But almost certainly less than 40 of my own time.

Q.     And what about your team?

A.     My team would have certainly spent over 100 hours on this.  How much more than that, I don't know.  I would have to go back to the billing records.

Q.     Of the total number of hours that you or your colleague spent working on the report, can you estimate how many

CHAD COFFMAN

hours were spent on the damages opinion as distinct from the efficiency opinion?

A.    The damages opinion really would have been several hours of my own time and not really anything from my staff.  Just in considering what plaintiffs' overall theory of the case was and the type of claims they were making and what the nature of the allegations were and making sure I understood that before being willing to give that opinion.  But there was not a lot of formal analysis in terms of data work or anything like that that went into that opinion.  So it would probably just be a few hours of my own time.

Q.    And when you say a few hours of your own time, how many hours do you think you spent on the damages opinion?

A.    Well, that's a little bit hard to answer just because, you know, I think there probably would have been an initial, you know, two or three hours in terms of reviewing the claim.  Discussing

CHAD COFFMAN

the theory of the case with plaintiffs' counsel to get comfortable with that opinion.  But throughout my work on this case, I am always on the lookout to see if there is anything in anything else I see that might raise a question about the relevance or propriety of that opinion.

So I don't think -- to get to the initial opinion that's there, it was probably a couple of hours of my own time thinking about the case.  But all the time spent on the case, I am always looking for whether there is any contrary information.

Q.    Of the total number of hours you or your colleague spent on the portions of the report addressing market efficiency, can you estimate how many hours were spent on efficiency with respect to Uniti's common stock versus efficiency with respect to Uniti options?

A.    I would have to go back to the billing records.  I really don't know. There was a substantial amount of time

CHAD COFFMAN

spent on both.

Q.    Was it roughly even?

A.    I don't know.  I would have to go back and look.

Q.    Let's turn our attention to your opinions regarding the market efficiency for Uniti's common stock, okay?

A.    Okay.

Q.    Let's just discuss, your opinion is that the market for Uniti's common stock during the class period was efficient, correct?

A.    Yes.

Q.    And when you say a market is efficient for purposes of your opinion, is it fair to say you're referring to the semi-strong form of market efficiency?

A.    Yes.

Q.    And in paragraph 18 of your report, you write that semi-strong form efficiency implies that all publicly available information is reflected in a securities current market price, and that

CHAD COFFMAN

this in turn implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information.  Do you see that?

A.    I see that, yes.

Q.    Is that a fair definition of semi-strong form market efficiency as you use that term in your report?

A.    Generally, yes.  I think you have to keep in mind when I am discussing semi-strong efficiency -- I'm sorry, semi-strong form efficiency here, I am giving the sort of textbook definition of it and what perfect efficiency looks like.  I think there is a realization that no market is perfectly efficiency.  But generally speaking, that for a market to be semi-strong form efficient, you expect that all publicly, at least widely disseminated public information will be rapidly incorporated in the market price, yes.

Page 52

CHAD COFFMAN

Q.    And what constitutes publicly available information?

A.    Well, I think there is certain types of information that financial economists recognize as generally widely disseminated publicly available information without much further analysis, and that would include things like earnings announcements, SEC filings, press releases of the company.  Articles in major financial and news sources.

I think there is another layer of information that's clearly public, but, you know, might not be quite as widely disseminated.  Things sort of like local news stories or -- and I'm sorry, analyst reports are also considered generally public information that the market has access to rapidly.

I think you can come up with examples of things that are technically publicly available, but not necessarily widely disseminated and not necessarily always rapidly reflected in the market

CHAD COFFMAN

price.  So I've certainly seen examples of let's say news reported in foreign languages only overseas.  I have seen evidence that it takes time for that to be reflected in the United States.

But I think when we're saying publicly available information, I think it's the things that, you know, financial economists would agree are widely disseminated and generally publicly available.  So things likes news articles, analyst reports, SEC filings, press releases.  Those sorts of documents.  I think once you get beyond that, it can turn into a little bit more of a question of what the evidence actually shows about whether something was publicly available or not.  Or how often it was accessed, et cetera.

Q.    Are analyst reports widely disseminated?

A.    I think generally speaking, analyst reports are considered widely disseminated.  I mean some of them can

CHAD COFFMAN

only be received by clients of brokerage firms and things like that.  So their dissemination is clearly not universal. But I believe the general belief is that enough well informed investors, institution, traders, et cetera, have access to analyst reports for market efficiency purposes that are considered publicly available information.

Q.    So when you refer to public information being widely disseminated, is that the standard you use whether enough well informed investors, traders, et cetera, have access to the information?

A.    I think that's a fair description.  I wasn't meaning that as a formal definition, but, yes, that is generally the idea.  That if information is disseminated such that, you know, it's widespread amongst the investment community and is the type of information that would be reviewed in a detailed way by the investment community and traders,

CHAD COFFMAN

then yes, that would be widely disseminated public information, in my view.

Q.   Would documents on public court docket be publicly available for this purpose?

A.   I have seen circumstances where that is not necessarily the case.  I think there could be a difference between theoretically public available, meaning it's out there to be seen, but there might not be a whole lot of evidence that anyone focused on it.  To the extent, you know, the information in those sorts of documents is not ever reported by analysts or in any news articles, I think that becomes an empirical question of whether there is evidence out there to suggest that it's really something that's been fully appreciated by the market. That is something I would want to look much deeper into rather than giving an overarching answer to.

Q.   The question of whether that

CHAD COFFMAN

sort of information is publicly available would depend on the sorts of documents reported on or referenced by analysts or news articles, is that what you're saying?

A.    Well, again, I want to differentiate between the generic term publicly available.  If it's posted on a public website, I am not disputing it's not publicly available in that sense.  I was referring to publicly available as it's being used in the sentence to define market efficiency, which to me encapsulates widely disseminated amongst the investment community.  One would expect prices to reflect that, but not necessarily something that's sitting on a public server that no one has accessed or very few people have accessed.  So that's the distinction I am drawing.

Q.    Sorry, it was a bad question, Mr. Coffman.  I meant for purposes of market efficiency, this type of document, documents on a public, you know, court

Page 57

CHAD COFFMAN

docket would be considered publicly available for purposes of market efficiency if there was evidence that analysts were paying attention to it and it was being reported in news articles, is that what you're saying?

A.    That would be one of the things I would look to to evaluate that question.  Now, how much is enough, I think in terms of assuming it was widely publicly available or what part of it is widely available or were the implications widely understood, I am not going to try to speculate what you would need for that.  But certainly looking for whether something was reported in news articles or analyst reports would certainly be one thing I would do to evaluate the degree to which something was widely disseminated.

Q.    And just going back to paragraph 18, you refer to new publicly available information.  What do you mean by information being new?

CHAD COFFMAN

A.    I think something that provides an update to the market in terms of the information set that's available to them. So generally speak, something that has not been previously stated, at least in the same context.  So I think you have to be a little bit careful about that. so, for example, if a company reports that it has a billion dollars in the bank and then three months later at its next quarterly earnings announcement, as expected, they announce, again, that they still have a billion dollars in the bank, that's still new information, even though it's a repetition of the words said previously.  The fact that the money is there is a relevant fact in that context.

I think when you're evaluating whether something is new, you also have to evaluate whether the specific information is value relevant in the particular context, not just whether it's been uttered before.

But generally, what I am saying

CHAD COFFMAN

there is that the market is not expected to react to stale information, information that has already been given and that doesn't get updated with either replacement information or given again in some sort of new context that gives it new value relevance.  If it's just a repetition of something that was previously stated that has no new context, then you wouldn't expect that to move stock prices.

Q.   Is there any standard for what constitutes a new context that gives information new value relevance?

A.   I don't think there is a -- I can't think of an overall standard that applies in all situations.  I think a valuation of whether something represents new information is a pretty fact-intensive, time-intensive, context-specific analysis.  So I hesitate to try to say that there is some standard, standard that gets applied to that to define whether something is new.

Page 60

CHAD COFFMAN

Q.    Generally speaking, is it fair to say that in a semi-strong form efficient market, a stock price would not be expected to be impacted by the republication of stale or previously disclosed information?

A.    Again, as long as it's also not providing some additional new context, yes, I would generally agree with that.

Q.    Why is that?

A.    Because the basis of the semi-strong efficient market hypothesis is that the market reacts rapidly to news so that one can't earn excess profits by just rehashing the old news.  So that's the underlying theoretical reason why you wouldn't expect the market to react again to redistributed information.

Q.    And when you say that market prices respond to new publicly available information rapidly, what do you mean by rapidly?

A.    When I use rapidly there, I mean a day or a small number of days.  So

Page 61

CHAD COFFMAN

I think in the real world it does take some time for the market to process new information.  Things don't happen instantaneously.  The cost of processing valuation, it's not free.  And not having knowledge of how all investors interpret all of that information is not obvious or instantaneous.

So in my view, it does take some time for the market to fully reflect new information.  And there is some -- there is evidence that that process of fully reflecting information can take up to a small number of days.  But for purposes of my testing of cause and effect, I am looking at a one day window as the standard by which to test rapid movement.  But that's not to say that some news isn't fully digested over some slightly longer time period than that.  But generally, once you get beyond a small number of days, two or three days, in a semi-strong efficient market, you wouldn't expect to see the stock price to

CHAD COFFMAN

continue to react beyond that.

Q.    In an efficient market, could full price reaction take more than two or three days?

MS. WYMAN:  Objection to form.

A.    Again, you know, there might be some unique circumstances where that's the case.  But again, usually there is evidence to why that is happening.  So, for example, in my experience, if there is some unexpected new information that's complex and it's not exactly clear how it affects the value of a company and there is continued reporting of that news and analysis of that news by analyst reports, as to how they view the new information affects the company and you observe multiple days of heightened volume, heightened volatility of the security, heightened amount of analyst coverage, heightened amount of news coverage.  You know, I have seen examples of that process taking certainly on numerous occasions at least two days.  Sometimes

Page 63

CHAD COFFMAN

three or four.  Once you get beyond three or four, unless there is the introduction of really new information, it's hard to argue that the stock is still reacting.

Q.    Are you trying to say that most instances you would expect that prices for a stock that trades in an efficient would generally respond within a full day to new information?

MS. WYMAN:  Objection to form.

A.    I have certainly seen a number of different cases where it's taken up to two days to fully reflect the information, and just based on my experience seeing how it could take a day for analysts to put out reports describing how they see the information affecting their views and recommendations and valuation of the company.  And the number of times I have seen heightened volume and volatility the day after an announcement, I would say, like I said, I often see evidence that it could take up to two days.

Page 64

CHAD COFFMAN

There is also some literature out there in that space performed by a firm that normally does defense work in this area.

NERA suggests that on average, information revealed at the end of proposed class periods take somewhere between one or two days to be fully reflected on market prices, even in an efficient market.  So I would say it's not always within one day, but certainly within a very small number of days.

Q.    To determine whether the market for Uniti's common stock was efficient, you looked at 11 separate factors, correct?

A.    I believe that's right.  But let me just double-check.  I think it was ten, not 11, but I could be miscounting. I guess there is one category that you could think of as two separate --

Q.    What are you looking at?

A.    I am looking at Exhibit 1 to my report, which is a summary of the

CHAD COFFMAN

efficiency factors used, and I count a list of ten.  But I see there is float and institutional holding is listed as one factor.  So 11 technically, yes.

Q.   So I believe the 11 factors included what are commonly referred to as the five Cammer Factors, three additional Krogman Factors, and three additional factors beyond that; is that right?

A.   I think that's a fair summary, yes.

Q.   And a description of each of the 11 factors and your valuation of those is summarized in Exhibit 1 that you were just looking at; is that right?

A.   Yes.

Q.   So just so the record is clear, Exhibit 1 lists only ten factors, but that's because you combined float and institutional ownership into a single row; is that right?

A.   Yes.

Q.   Was that for space reasons or any substantive reasons?

Page 66

CHAD COFFMAN

A.    Not for any substantive reason, no.

Q.    In forming your opinion on market efficiency for Uniti's common stock, why did you decide to analyze those 11 factors in particular?

A.    I use those factors consistently in analyzing market efficiency for virtually all of the securities that I am asked to form an opinion about market efficiency about, these are the factors I apply.

Q.    And you say in your report that these are the factors that are regularly considered by financial economists and courts in determining whether the market for a particular security is efficient, do you agree with that?

MS. WYMAN:    Objection to form.

A.    Yes.

MS. WYMAN:    I don't mean to interrupt you, do you mind if we take a few minute break?  I left my glasses in my office and if we are going to

CHAD COFFMAN

get into the report, I would like to have them with me if I could.

MR. BURNOVSKI:  Can I finish a couple more questions and then it would be a natural breaking point?

MS. WYMAN:  Absolutely.

MR. BURNOVSKI:  I have a question about one more paragraph. But it's sort of a preliminary one.  I don't think you'll need your glasses, Deb, but I appreciate that.

Q.    Mr. Coffman, you say in paragraph 22 of your report that although there are no broadly accepted bright line empirical tests that allow one to classify a particular market as efficient or inefficient, in your view, the Cammer decision identified important metrics to consider when evaluating efficiency for purposes of the fraud on the market theory.  Do you see that?

A.    Yes.

Q.    What did you mean by important metrics?

Page 68

CHAD COFFMAN

A.    Economically relevant factors to consider.

Q.    You didn't limit your valuation to the Cammer Factors, correct?

A.    Correct, I did not.

Q.    Are the Cammer Factors any more important than the other factors that you examined?

A.    I don't know that I would say that the Cammer Factors as a whole are. I would say that there are certain of the factors that in my view I certainly weigh heavier than some of the other factors. But I don't really think of it as Cammer versus the rest in terms of making that evaluation.

Q.    When you say there are other factors that you weigh more heavily, you mean among the 11, there are others that you weigh more heavily; is that right?

A.    Generally speaking, yes.

Q.    Which of those factors are those?

A.    Well, again, I don't know that

CHAD COFFMAN

I have a specific ranking in mind, but again, generally speaking, I think having actual evidence of trading activity and regular trading activity and relatively high levels of trading activity and continuity are an important factor.  So the volume factor I think is important.

The cause and effect test, I think Cammer 5, is weighted somewhat higher than the others, because, again, there is no absolute direct definitive test, but that's closer to a test to the heart of the theory.

I think the autocorrelation test is an important test.  I think the bid-ask spread analysis is a relatively important factor.  Now, in certain circumstances other factors might be, take on, you know, depending on what those factors look like, other factors might take on additional importance.  But when I think of the factors that I think weigh most in my mind, I think those are the factors, with cause and effect being

Page 70

CHAD COFFMAN

probably the closest to a direct test.

MR. BURNOVSKI:  Why don't we take a break now.

THE VIDEOGRAPHER:  We are now off the record.  The time on the video monitor is 12:16.

(Off the record.)

THE VIDEOGRAPHER:  We are now on the record.  The time on the video monitor is 12:26.

BY MR. BURNOVSKI:

Q.    Welcome back, Mr. Coffman. During the break did you talk to plaintiffs' counsel about the substance of your testimony?

A.    No.

Q.    Mr. Coffman, I have one follow-up question about some testimony that you provided earlier in connection with the assignment, consulting assignments that you worked on for the American Stock Exchange.  You indicated that as part of that work, you calculated the theoretical prices of options.  Do

CHAD COFFMAN

you remember that?

A.    Yes.

Q.    What do you mean by theoretical prices?

A.    Prices using option pricing formulas.

Q.    Is that different than a market price?

A.    Yes.

Q.    Okay.  Going back to the factors you reviewed with respect to market efficiency for Uniti's common stock, let's talk about Cammer Factor 1, which looks at the trading volume of a security; is that right?

A.    Yes.

Q.    And in paragraph 26 of your report, you state that -- sorry, strike that.

In paragraph 27 of your report, you state that "Volume as a fraction of shares outstanding is an important indicator of market efficiency," and then you go on to list several reasons why

CHAD COFFMAN

that is the case.  Do you see that?

A.    Yes.

Q.    And you said earlier, just prior to the break, that in fact volume is one of the factors that you would weight somewhat heavier than the other, than some of the other factors that you've looked at; is that right?

A.    Yeah.  And when I said that, just for me to be clear, I am not -- when I say that looking at volume is one of the important indicators, it's less about looking at, you know, say something that trades, you know, 4 percent on an average weekly basis is, you know, a lot different than something that trades at 3 percent on a weekly basis.  The question is whether there is, you know, consistent evidence of transactions occurring and there being a liquid market, et cetera.

So it's more about, you know, if there was a market that had no trading at all, that would be, you know, a market

CHAD COFFMAN

that would be hard to find efficient.  So that's what I mean by its presence is certainly a very important factor in what I would look at.  But I don't, I don't want to suggest that like slightly different levels of volume or even substantial different levels of volume, as long as there is clear evidence of substantial trading in an active liquid market, that's really what I am talking about.

Q.    And in paragraph 27 you say that "High volume is generally indicative of continuity, liquidity and market depth, which are highly indicative of market efficiency."  Do you see that?

A.    Yes.

Q.    What do you mean by that?

A.    Meaning if there is a lot of volume throughout days and day after day, that suggests that there is evidence of continuously available market, a liquid market and a market with depth.  That there is some demand for trades

Page 74

CHAD COFFMAN

regularly.

Q.     If a security goes many days without trading at all and has a low trading volume, what would that imply regarding liquidity and market depth?

A.     Well, it would raise questions about continuity.  It would mean, it would potentially indicate there is not a lot of market depth for that security.  So all else equal, that would provide less evidence of market efficiency.  Again, it's not -- like any factor, it's not determinative, but that would certainly suggest a lower market efficiency, if you went days and days without seeing trades.

Q.     Is it fair to say that a security with infrequent or no trading volume would be less likely to trade in an efficient market?

MS. WYMAN:  Objection to form.

A.     Well, certainly a security that had no trading for some extended period of time, I think it would be hard to

CHAD COFFMAN

argue that that is -- that that particular security would be efficient or at least you would want to see other indicators of efficiency, that the volume itself doesn't provide a factor that provides support for market efficiency.

When you say infrequent, I think we would have to establish what you mean precisely by infrequent.  I don't know that you need an enormous amount of frequency to see that a market is efficient, but you would certainly want some trading to suggest that there is an efficient market.

MS. WYMAN:  Brian, I'm sorry to interrupt you, my realtime is not working.  I wonder if there was a problem with everyone else's.

THE VIDEOGRAPHER:  We are now off the record.  The time on the video monitor is 12:32.

(Off the record.)

THE VIDEOGRAPHER:  Now on the record.  The time on the video monitor

Page 76

CHAD COFFMAN

is 12:38.

BY MR. BURNOVSKI:

Q.    Thank you, Mr. Coffman.  Sorry about the technical difficulties.

Later on in paragraph 27, which we were just talking about, you indicate that "substantial volume would indicate there is likely a market for the collection and distribution of information about the security."  Do you see that?

A.    Yes.

Q.    And what do you mean by that?

A.    Meaning that it's not costless for people to collect, analyze and distribute information on a firm like analysts or et cetera.  And the more volume there is, the more economic activity that's related to that security where such information would clearly be more valuable or would be valuable to investors that actually traded in securities.

To the extent there is an

CHAD COFFMAN

active market for a security, that creates more active market for information for that security as well.  A demand for it.  Sorry, I might have said that wrong.  It doesn't create more information, it creates the potential for more demand for information regarding the security, if people are actively trading that security.

Q.    And how does that relate to market efficiency?

A.    Because that is also reflected as a relevant factor in certain of the other factors.  So for example, analyst coverage is a certain factor.  So to the extent -- and the logic behind analyst coverage being a relevant factor is the presence of analysts reflects that there is a demand for information and analysis related to a security.  So to the extent there is more volume, there is more economic activity that might demand that information, these factors reinforce each other, to a certain extent.

Page 78

CHAD COFFMAN

Q.    You conclude in your report that Cammer Factor 1 supports a finding of efficiency for Uniti's common stock, based on the fact that Uniti's average weekly trading volume far exceeded 2 percent of shares outstanding and because its annual turnover velocity was more than double the average for the New York Stock Exchange and NASDAQ over the same period; is that right?

A.    That's correct, yes.

Q.    Suppose hypothetically a security did not trade at all on half of the days it was available to trade, would that be relevant to assessing market efficiency?

MS. WYMAN:  Objection to form.

A.    Are we talking about a common stock, a note or a derivative security? That could matter to a certain extent.

Q.    In what way would that matter?

A.    Well, to the extent an underlying security or common stock itself didn't trade on more than half of

CHAD COFFMAN

the days, that's something that would certainly be something I would want to consider carefully and how that may have, how that may relate to continuity and market depth, et cetera, especially given most common stocks listed on the major exchanges essentially have rules that suggest there is a continuous market, and you often, I don't come across major stocks trading on major exchanges that don't trade on certain days, so that is something that would be a big red flag for me if looking at a common stock.

Looking at a derivative security, those just on average tend not to trade as much and are more constrained in their values because they are relying primarily on the value of the underlying security when valuing those securities. So I think you see that much more often for things like derivative securities. And in those circumstances, while it wouldn't necessarily be a factor, then that would argue for market efficiency,

CHAD COFFMAN

it's much, it's much less rare to see fewer trades in derivative securities in a way that doesn't necessarily upset efficiency as much because they are derivative by nature.

Sorry, let me add one thing, and governed by principles that would constrain their value regardless of whether there is trading or not.

Q.    Would the amount of trading for a derivative security be relevant for assessing market efficiency?

MS. WYMAN:  Objection to form.

A.    It could be, sure.  If there was a particular derivative security that never traded, them it's hard to argue that market is efficient.  There also wouldn't be any potential class members. So I think, I am not going to say it's irrelevant, but I think it's certainly, given the fact that it's a derivative security and derives its value from the common stock and that there is an active market for the common stock, that would

CHAD COFFMAN

imply that the pricing of the derivative security isn't as dependent on volume to establish its value.

Q. Let's turn to Cammer Factor 5, which relates to how a price of a security reacts to new company-specific information; is that right?

A. Yes.

Q. And in paragraph 47 of your report, you state that "Establishing a causal connection between new company-specific events and movements in the market price is convincing evidence of market efficiency." Do you see that?

A. Yes.

Q. Do you agree with that statement?

A. I do, by convincing, I don't mean to say it's an absolute demonstrative test, because there aren't any absolute demonstrative tests, but I think it provides convincing evidence, yes.

Q. And you go on to say that "A

Page 82

CHAD COFFMAN

well accepted technique often relied upon to establish such a causal connection is an event study"; is that right?

A.    Yes.

Q.    And do you perform such an event study to test the market efficiency of Uniti's common study, right?

A.    Again, to test the cause and effect, evaluate whether there's clear evidence of cause and effect, not directly to test efficiency, but yes.

Q.    You performed an event study to test whether there was a cause and effect relationship between the price of Uniti's common stock and new information, new company-specific information; is that right?

A.    That's correct, yes.

Q.    And could you explain in layman's terms what you did in connection with that event study?

A.    Sure.  So I think it helps to start from the end and work backwards. At the end of the day my test for a cause

CHAD COFFMAN

and effect relationship is looking at a sample of days, which objectively, clearly had firm-specific news and a type of announcement that often contains new value relevant information.  So one would find it generally accepted that those type of announcements would often, not always, but often move the stock price, and compare what occurs on those days to essentially a control group or placebo group, which is days on which there's no firm-specific news identified.

So I performed a comparison of three metrics.  One is the proportion of days that are statistically significant between those two groups.  The other is the average size of the price movement between those two groups.  And the third is the observed volume between those two groups.  And I find that there is a statistically significant difference between the two groups on those three metrics.

So there is clear evidence of a

CHAD COFFMAN

greater incidence of statistically significant price movements. There is a greater size of stock price movements. And there is greater trading volume on days with clear, firm-specific Uniti news than on the control dates where there is no firm specific Uniti news. In my view, that provides clear scientific evidence of a cause and effect relationship.

Now, for each of the events I am testing, I am doing an event study, which is to determine whether or not, first to quantify the amount of unexpected price movement on each day. And then at least for part of that analysis, test whether or not there is a statistically significant stock price movement on those given days.

So I can go deeper into the detail of how that's done, if that's part of your question.

Q.    No, that's very helpful, thank you, Mr. Coffman. So the three metrics you looked at, price response, size of

CHAD COFFMAN

price movement and trading volume, is it fair to say that your analysis compared those metrics in connection with, for 16 days during the class period in which Uniti issued earnings announcements with separate group of 414 days that you identified during the class period on which you identified no Uniti-related news, analyst reports, SEC filings or press releases?

A.    That's a fair summary.  There is 16 what I would call treatment dates or earnings announcement dates, where there is clear evidence of firm specific news being released.  And 414 days where there is none of the types of information being released that you described.

Q.    So you were effectively comparing Uniti's stock movement and volume on days when you expected there to be material company-specific news with days on which there was no material company-specific news; is that right?

A.    That's correct.  And just to be

Page 86

CHAD COFFMAN

clear, and I say in the report clearly as well, just because there is material company-specific news doesn't mean that you expect in every instance for there to be a statistically specific stock price movement, but, yes, it is generally trying to compare events where there is material new public company-specific news to days where there wasn't, yes.

Q.    And you refer to this as a news/no news task with 16 days that had earnings announcements constituting your news sample and the 414 days where you didn't identify any Uniti-specific news as constituting the no news sample; is that right?

A.    Yes.

Q.    And you found that there was a statistically significant abnormal price movement in Uniti stock on six of the 16 days in the news sample or 37-1/2 percent versus 23 of the 414 days in the no news sample or 5.56 percent; is that right?

A.    That's a fair summary, correct.

Page 87

CHAD COFFMAN

Q.    And you conclude that powerful scientific evidence of a cause and effect relationship between new publicly released information concerning Uniti and changes in the price of its common stock, correct?

A.    Yes.  The earnings announced, you're more than six times as likely to see a statistically significant stock price reaction on the earnings announcement days than on a no news days, yes.  And I do a specific statistical test, actual multiple specific statistical tests that show that difference between 37-1/2 percent and 5.56 percent is itself statistically significant and a greater than 99 percent confidence level.

Q.    Did you do anything as part of your analysis to determine if the price response to news was rapid in Uniti stock?

A.    All of the returns here are measured as one day return.  So I'm only

Page 88

CHAD COFFMAN

measuring price responses within one day. So that falls within my definition of rapid. So, yes, that's ensuring a rapid price response as part of the test.

Q.    Why did you choose a one day measurement period?

A.    It's a fairly standard period to use. There are daily event studies used for doing event studies all the time, both in the literature and in the context of litigation and other areas. Not to say different event windows, you couldn't do the same thing with different event windows, but a daily event window is a standard approach I use, and I have seen many, many others use as well.

Q.    If you can look at Exhibit 5 of your report.

A.    Okay.

Q.    Are you there?

A.    Yes.

Q.    There is a footnote that indicates that you excluded from your regression model the dates of earnings

CHAD COFFMAN

announcements, the alleged corrective disclosure dates and six so called outlier dates.  Do you see that?

A.   I see that, yes.

Q.   Why did you exclude the dates of the earnings announcements?

A.   Well, again, when I say exclude, what I am saying is I am excluding them from the estimation of the normal relationship between the market factors and Uniti's common stock.  So the purpose, the purpose of the underlying regression is to identify how these factors relate to each other and what volatility you would expect to see in the absence of news.

So removing the particular dates of interest, including earnings announcements, from the estimation window is a standard approach I use and one that's recognized in the literature and one that's often undertaken in this context as well.

Q.   At the risk of being redundant,

CHAD COFFMAN

why did you exclude the alleged corrective disclosure dates among the dates that you excluded?

A.    Because those are dates that plaintiffs were alleging that there was important new public material information about the public being disclosed.  So again, if the purpose of the underlying estimation is to identify the relationships in the absence of news, one would not want to include days that are, which there is clear indication that there is a company-specific news that might relate to a stock price.  It has nothing to do with whether it's related to a fraud or not.  It's just that the allegation was that there was important new public information about the company issued on that day.

Q.    And the six outlier dates that you excluded were January 7th, 2016, July 18th, 2018, December 12th, 2018, February 21st, 2019, February 22nd, 2019, and February 25th, 2019; is that right?

Page 91

CHAD COFFMAN

A.      Yes.

Q.      Why did you exclude those six additional outlier dates?

A.      When one is performing this analysis, one of the things you have to be on the lookout for is specific individual events that are impacting your estimation in some important way.  So, for example, if you're looking at Exhibit 5 or Exhibit 6, and you see that the coefficients or the root squared error -- I'm sorry, the standard deviation of the error is how I refer to it in Exhibit 6, if those variables exhibit a large discrete jump at some point, that's suggesting that there is some individual event that's having a big outlier impact on your estimation.  And to the extent that's being driven by clear company-specific news, that's something you want to remove from the estimation.

That was really generated by an iterative process by looking at these charts and looking at the results of, not

Page 92

CHAD COFFMAN

of the ultimate event studies, but of how these variables were performing and identifying the estimation itself was being affected in a large way by individual events.

And so I had a process of iteratively identifying those events, and to the extent there was clear evidence of the estimation being impacted substantially by an event, removing that event. As long as there was clear evidence that there was firm-specific information driving that.

Q.    Are the outlier dates that you excluded incremental to the earnings announcement and corrective disclosure dates?

MS. WYMAN:  Objection to form.

A.    I believe so, yes.

Q.    Is there any overlap between the outlier dates and the other two sets of dates that you excluded?

A.    I don't believe so.  I would have to go back to be absolutely sure.  I

CHAD COFFMAN

can certainly as we're sitting here compare against the earnings announcement dates. Give me just a second.

They are certainly incremental to the earnings announcement dates. I don't remember all of the corrective disclosure dates off the top of my head. But I believe I would have only listed them here if they were incremental to those. But I am not absolutely positive. I would have to double-check.

Q. And you said there was an iterative process in deciding which dates to exclude; is that right?

A. There would be an iterative component to the process, yes, where I would look at a plot of like Exhibit 5 and Exhibit 6 and identify if there were any discontinuities that needed to be potentially addressed, and then once those were addressed, you know, were there any others that were still there that might need to be addressed. So, yeah, there were probably a couple of

CHAD COFFMAN

iterations in that.

Q.     Were there any objective ex ante criteria or methodology that you applied to determine which outlier dates to exclude?

A.     Again, the objective criteria was to study the results in Exhibits 5 and 6 and look for any obvious discontinuities.  My goal in doing this is remove the fewest number of days possible.  So those discontinuities would have been obvious from looking at Exhibit 5 or 6 on one of those iterations, so I believe I applied an objective test, yes.

Q.     Well, was there a particular level of discontinuity that you decided would be appropriate to remove or to address?

A.     No, I don't believe so, no.

Q.     It was just a matter of judgment, is that what you're saying?

A.     There was some level of judgment applied, yes, in terms of, I mean if you were to look at one of these

CHAD COFFMAN

exhibits with one of those left in there, it would be clear and obvious that there was a discontinuity.

Q.    Some of the dates that you excluded were dates on which Uniti was downgraded by analysts, correct?

A.    Yes.

Q.    Did you make any attempt to exclude all days during the class period when Uniti was downgraded by analysts?

A.    No.  Again, the process was really to identify large outliers and to exclude as few days as possible as to reduce as much as possible that subjectiveness.  So, no, there was not an effort to remove every time an analyst downgraded the company.

Q.    But effectively you just eyeballed the data and looked for dates with large price movements that you thought suggested discontinuities and then made a judgment call based on your experience to exclude those dates if you determined there was material news on

CHAD COFFMAN

that day; is that right?

MS. WYMAN:  Objection to form.

A.    Again, the criteria was not a large price movement.  The criteria was a sufficient price movement to clearly disrupt the relationship being measured by the event study regression.

Now, realistically, that's usually caused by a large price movement.  But I was not just looking for large price movements and excluding them.  I was looking for particular events that were clearly causing discontinuities in the results of the estimation of the relationships between the variables of interest.

Q.    But you were just eyeballing the data based on that criteria and then you made a judgment call to exclude that day if you determined that there was material news on that day; is that right?

MS. WYMAN:  Objection to form.

A.    At a certain level that's accurate.  I think the idea again was, I

CHAD COFFMAN

think the general proposition that you don't want outliers to exhibit undue influence on a statistical procedure that you're performing, especially in light of the underlying goal of the analysis itself to be able to identify the relationships in the absence of news that to leave in clear outliers that are impacting that, the measurement of those relationships, would be contrary to the goal of the analysis. And so I think the removal of outliers in that context is certainly well accepted. Certainly part of what should be done.

And to the extent -- to a certain extent removal of outliers involves some level of judgment, and so, yes, there is a subjective, at least partially subjective evaluation of the extent to which there is a clear outlier and then removing it.

Q. But there were no ex ante criteria for removing the outliers, that was something that you determined after

Page 98

CHAD COFFMAN

running the data once and then there was an iterative process after that; is that right?

A.    I think that's a fair characterization, as long as we understand when you say running the data, it's running these regressions and evaluating the relationships amongst them and the amount of volatility that's being suggested by the model and whether there is any discrete discontinuities in those measurements.  It has nothing to do with looking at the final results or how it impacts the outcome of the ultimate test I am doing.  It's just looking at these parameters and whether there is clear evidence of discontinuity.

Q.    You did not exclude any of the alleged misstatement days; is that right?

A.    Well, I don't know to what extent there were misstatements on any of the earnings announcements.  That's not something I really focused on.  I did not seek to necessarily exclude all of the

CHAD COFFMAN

alleged misstatement days.  No, that was not part of my process.

Q.    Why not?

A.    Because my understanding is that plaintiffs' allegations reflect the failure to disclose or to -- reflect an omission of particular risks.  And so an omission or failure to state a risk that had been not stated before is not something you would expect to move a stock price necessarily.  So it's not clear that those statements would provide or there is lack of statements, lack of disclosure, would be a reason for the stock price to move on those particular days.  It would be impacted potentially, it would provide an impact potentially by creating a divergence between the observed price and what the price would have traded at otherwise, but it wouldn't necessarily be expected to cause a change in the stock price.

Q.    As discussed earlier in your news sample, you identified 16 days --

CHAD COFFMAN

sorry, strike that.

As discussed earlier, you identified 16 days where you identified Uniti earnings news that you included as part of your news sample; is that right?

A.    Yes, during the class period there were 16 earnings announcements.

Q.    Did you look at whether there was any Windstream-specific news released on those days?

A.    That was not specifically a part of my study, no.

Q.    Would it be relevant to your analysis if Windstream-specific news was released on those earnings days?

A.    No.    Because to the extent that news was irrelevant to Uniti, it wouldn't be reflected in the stock price.    To the extent it was relevant and I was already considering those days, it would be part of the mix of information that my measurement would already be taking into account.

Q.    And what about for the no news

CHAD COFFMAN

sample, did you look at whether there was any Windstream-specific news released on those 414 days?

A.     No.  But in my experience in looking at this, and it's not clear it happened on every single day, but every time -- there were many examples of when news stream -- I'm sorry, Windstream released important information or information that was important to Uniti investors.  There would be news articles related to Uniti that conveyed that information or analyst reports written by, Uniti analyst reports that reflected that information.

So to the extent there was -- there was clear recognition that certain information from Windstream could affect Uniti securities, and to the extent, I certainly saw many examples of when that occurred.  There would be Uniti analyst reports or other type of news that would mention Uniti in that context.  So I relied on that linkage to pick up that

Page 102

CHAD COFFMAN

type of information.

Q.    Would you expect Uniti's and Windstream's stock prices to be correlated?

MS. WYMAN:  Objection to form.

A.    It certainly would not surprise me if they were correlated.

Q.    Why do you say that?

A.    Because I think there was general recognition, certainly among analysts, and it makes sense as an economic matter that Windstream's ability to continue to pay lease payments to Uniti was an important factor in Uniti's financial health and value.

Q.    Under those circumstances would you expect news about Windstream's financial condition to have an impact on Uniti's stock price?

MS. WYMAN:  Objection to form.

A.    It certainly could, yes.

Q.    Would it be likely in your view?

MS. WYMAN:  Again, objection to

CHAD COFFMAN

form.

A.     I think it would depend on the nature and severity of the information. But if there was a new piece of news that in investors' minds materially impacted Windstream's ability to pay under the lease, it would not at all be surprising to me and there would be some expectation that would affect how investors viewed Uniti's value, yes.

Q.     Did you account for any correlation between Uniti's and Windstream's stock prices in any way in any of your analyses?

MS. WYMAN:  Objection to form.

A.     I don't see how controlling for Windstream's price movements would be appropriate.

Q.     What do you mean by that?

A.     Again, the purpose of the analysis is to identify, I'm sorry, to evaluate whether there was evidence of a cause and effect relationship between Uniti-specific news and movements in the

Page 104

CHAD COFFMAN

stock price.  And I believe I've tested that.

To the extent that Windstream news was contributing to the news being released by Uniti, and impacting the stock price, that would be the last thing I would want to control for, because that cause and effect is a part of what I would -- would certainly be a part of a cause and effect that I would not be trying to exclude.  It would be relevant to the question.  It wouldn't make any sense for me to control for Windstream's stock price movements.

Q.    What if Windstream news was not picked up in any of the measures that you used to determine whether there was Uniti-specific news on a given day?

MS. WYMAN:  Objection to form.

A.    Well, first I would raise a question of whether that Windstream news really did impact Uniti in any way.  But again, there is nothing about the -- what I hear you asking is there some influence

Page 105

CHAD COFFMAN

between Windstream news and Uniti that is in some way interfering with the test I'm performing, and my answer to that is no. So to the extent, and I already explained, to the extent Windstream news is occurring concurrent with the earnings announcements and impacting Uniti stock, I am already picking that up, because I am treating it as a news day.

To the extent there is Windstream news that might have an influence on Uniti, on what I am calling a no news day, if anything, that would increase the likelihood of a significant movement on a no news day and be biasing against my finding of a difference between the news dates and the no news dates.

So I don't see the possibility of a cause and effect relationship between Windstream news events and Uniti stock price movements as interfering in any way whatsoever with the test I am performing.

CHAD COFFMAN

Q.    Separate from the event study that you performed to test Cammer Factor 5, the cause and effect relationship, you conducted a separate regression analysis to test for autocorrelation during the class period; is that right?

A.    Yes.

Q.    And autocorrelation is an additional factor you deemed relevant as to whether a security trades in an efficient market, correct?

A.    Yes.

Q.    And it was another factor that you listed among the four factors that you tended to weight a little more heavily; is that right?

A.    And again, just to be clear, if there was obvious consistent statistically significant autocorrelation, that's something that would get my attention and something that would need to be investigated further. It doesn't mean necessarily that the stock is necessarily inefficient, but

Page 107

CHAD COFFMAN

it's something that would gather my attention that didn't occur for Uniti common stock.

Q.    At a minimum, it's a factor that you would want to look at, is that right?

A.    Certainly that's a factor for, if there was a stock trading on a major exchange that exhibited autocorrelation, that's something I would definitely -- I always look at autocorrelation as part of my evaluation of that, yes.

Q.    And the results of the autocorrelation analysis you did are summarized in Exhibit 13 of your report; is that right?

A.    Yes.

Q.    And if you look at footnote 1 of Exhibit 13, it indicates that you excluded four outlier dates from the estimation, do you see that?

A.    I see that, yes.

Q.    And those outlier dates are July 19th, 2018, February 20th, 2019,

CHAD COFFMAN

February 22nd, 2019, and February 26th, 2019; is that right?

A. That's what's shown here. I am questioning in my mind why that list is different from the six before. My intent would have been to run it with the same exclusion dates as per the general event study. So that's something that I would have to go back and study carefully. I don't know why that list is different from the list of six from the prior slide we're talking about. That may just be a clerical error.

Q. You anticipated my question, Mr. Coffman, which is whether you know why these six -- why these four dates are different than the six listed in connection with the prior exhibit we were talking about?

A. As I sit here, I don't. That's something I would want to go back and look at to see if there is some reason for that I don't recall or if that's just a clerical error in that somehow, somehow

CHAD COFFMAN

that list of dates was entered in improperly.  I would have to go back, and I would like to go back and investigate that.  Again, I can't imagine it would have any influence, any meaningful influence on the results of this test, but I would normally, that list of dates should match the list of dates from the earlier exhibit.  So I think that's probably a clerical error.  But that's something I would want to go back and look.

Q.   If it was a clerical error, would you consider that to be a mistake in your report and something that you would want to correct?

A.   Again, I am not going to go that far.  I would want to understand if there was some logical reason for that.  But I just don't recall as you sit here, but that is something I would want to go back and investigate.

Q.   Let's talk about Krogman Factor 2, which looks at the bid/ask spread for

Page 110

CHAD COFFMAN

a given security; is that right?

A.    Yes.

Q.    What is a bid-ask spread?

A.    So a bid-ask spread measures the difference between the prices that are being offered to purchase a security or the bid prices and the prices that are being offered for which the securities, current holders are offering to sell the security at, which is the ask price.  And it's a measure of the difference between those two over time.  And the wider the bid-ask spread, the more expensive it is to trade and the more difficult it is for small inefficiencies to be arbitraged away.

So in my view, it's a good measure for or one of the measures you can use to evaluate whether there is potentials for inefficiencies.  A small bid-ask spread would reflect that there is a small cost to trade.  And that small inefficiencies would be arbitraged away.

Q.    And that would be consistent

CHAD COFFMAN

with a finding of market efficiency?

A.   Well, again, this is not a bright line test of market efficiency like none of the tests are.  Maybe it would help to give an example.  So if -- and these numbers are completely made up -- but if the stock, if the bid price for the stock is $9.99 and the ask price is $10.01, so there is only a 2 cent bid-ask spread and a very small percentage of bid-ask spread, then for there to be ambiguity as to what the true value of the stock is, you know, based on the trading, and if you believe the stock is mispriced by 5 cents, clearly the cost to trade is small, so you would be incentivized to make that trade.

On the other hand, if the price, if the bid price was $9.50 and the ask price was $10.50, and there was a one dollar bid-ask spread, even if you were right that the stock was mispriced by 5 cents, that gets -- then the trading costs swamp any ability to profit off of

CHAD COFFMAN

that.

So that's how small bid-ask spreads relate to efficiencies. The smaller the bid-ask spread is, the less likely that some inefficiency could be hid inside the bid-ask spread. And that the incentive to trade, the cost of the trade to arbitrage away that inefficiency would be small, and therefore incentivized people to move the price in the right direction.

Q. You say at the end of paragraph 71 of your report that a narrow bid-ask spread supports the presence of an efficient market.

A. Yes.

Q. Do you see that?

A. Yes.

Q. And that's consistent with what you were just describing, correct?

A. Yes.

Q. What constitutes a narrow bid-ask spread?

A. Again, when you look at -- the

CHAD COFFMAN

most effective way I can think of to think about that is that there is generally an acceptance by financial economists. Nothing is universal, but generally, financial economists that work in this area and think about these issues believe that most, if not all, securities that trade on the major exchanges, at least common stocks that trade on the major exchanges are likely to trade in an efficient market. And therefore, if a stock has a small bid-ask spread relative to other stocks that trade on the exchange, then that would provide supporting evidence. And even not smaller, but even just consistent with the bid-ask spread of other stocks trading on the major exchange, that would provide evidence that there is certainly nothing unusual about this particular stock that would work against market efficiency, and that's why I perform the comparison that's on slide 11 which shows that the Uniti common stock bid-ask

CHAD COFFMAN

spread is actually quite a bit lower than even the median or mean bid-ask spread for stocks that trade on the major exchanges.

So again, I am not looking at it without context. I am looking at it relative to other exchange traded stocks that are presumed to trade efficiently.

Q. Is there any absolute level of bid-ask spread on a dollar or percentage basis that would indicate a security has a narrow bid-ask spread or wide bid-ask spread?

A. I don't have one in mind, no. When it comes to Uniti common stock, the values were very low relative to the market. And so I really didn't have to go to the level of considering, you know, what some threshold bid-ask spread would be where I would question that.

Q. So if a narrow bid-ask spread supports the presence of an efficient market, would the converse be true, would a wide bid-ask spread for a security

Page 115

CHAD COFFMAN

suggest the market is less likely to be an efficient market?

A.    Again, I would -- just because there is a wide bid-ask spread doesn't mean it trades inefficiently.  It's not that definitive.  What I would be looking for is whether there is an abnormally high bid-ask spread relative to other stocks that trade on the exchange, and if that were the case, that would raise some questions in my mind that I would want to see stronger evidence from some of the other factors or I would look more deeply of when that's occurring, and if there is some reason that that is occurring, that would provide some explanation for what I was seeing.  I just didn't see that here, so I never had to get to that level.

            When you're talking about other types of securities, especially derivative securities where the value is really constrained by the underlying instrument, then you wouldn't necessarily conclude anything from higher bid-ask

Page 116

CHAD COFFMAN

spreads.  I think other securities, especially options, regularly trade with much higher bid spreads, which again because their values are constrained by looking at the underlying and theoretical pricing relationships amongst instruments, that's somewhat less of a concern and to be expected, just because those markets are far less trading in some circumstances and are far less liquid.  So it's not at all unusual to see larger bid-ask spreads in those contexts.

But for a common stock, if it traded at an abnormally large bid compared to the market, that is something I would want to take a look at.

Q.    Is it fair to say that wider bid-ask spreads hinder the arbitrage mechanism and therefore can impede efficiency?

MS. WYMAN:  Objection to form.

A.    That's certainly possible.  If there is large bid-ask spreads, that can

Page 117

CHAD COFFMAN

impede, that can impede the arbitrage mechanism, yes.

Q.    Would that also be true for derivative securities like options?

A.    It's possible.  Certainly I think you would have to look at more than just the bid-ask spread.  You have to see if there is actual trading that occurs well within the bid-ask spreads that you're seeing and things like that.  So it's a more complicated task than just looking at the bid-ask spread.

But certainly, a wide bid-ask spread without evidence of trading well with inside that spread on a regular basis, that could impede efficiency, sure.

MR. BURNOVSKI:  Can we take another break?

MS. WYMAN:  Sounds good.

THE VIDEOGRAPHER:  Stand by.  We are now off the record.  The time on the video monitor is 1:27.

(Lunch recess:  1:27 p.m.)

Page 118

CHAD COFFMAN

Afternoon Session

2:03 p.m.

C H A D  C O F F M A N, having been previously duly sworn, was examined and testified further as follows:

THE VIDEOGRAPHER:  Now on the record.  The time on the video monitor is 2:03.

EXAMINATION (Continued)

BY MR. BURNOVSKI:

Q.    Welcome back, Mr. Coffman.

During the break did you have any conversations with plaintiffs' counsel regarding the substance of your testimony?

A.    Not the substance of my testimony other than that it made sense to reach out to my staff to see if I could get an answer on the question you were raising towards the end of the last segment on the exclusion of certain outlier dates with the autocorrelation analysis, which I did.

Q.    And what was the conclusion --

CHAD COFFMAN

strike that.

Did you get an answer from your staff?

A.    Yes.  So let me clarify my testimony on that.  Obviously, because the autocorrelation test is using the abnormal returns from the event study, in the obtaining of those abnormal returns, all the same exclusion dates that were discussed on Exhibit 5 and Exhibit 6 are relevant to that.  But then once you have the abnormal returns that are adjust for those outlier dates, there is no need to necessarily exclude all of those dates from the correlation test, which is testing whether or not there is a clear, or whether or not there is a relationship between the prior day movement to the next day movement.

In performing the autocorrelation test, it was clear that test itself was being impacted by four outliers that once removed provided clear evidence that there was no systematic

CHAD COFFMAN

autocorrelation in Uniti common stock.

So the exhibit is accurate in reflecting that there were four outlier dates removed in the autocorrelation test. And obviously, again, the underlying abnormal returns were generated using the exact same procedure that was described here.

Q.    Were there any objective ex-ante criteria for removing the four outlier dates in connection with the autocorrelation analysis?

A.    No.  There was not an ex-ante objective test.  Again, the best way to describe how those were identified is when you're running an autocorrelation test, you can simply look at a scatter plot of the returns on a given day versus the returns on a prior day.

And when you look at that scatter plot, there were clearly four outlier dates that had much larger abnormal returns than the rest of the data that were contributing to a bias in

CHAD COFFMAN

the autocorrelation coefficient, and once excluded, you know, resulted in a much more reasonable range of data where there were not massive outliers to the remainder of the data.

Q.    And your conclusion with respect to whether or not those were outliers was just a matter of judgment based on your experience; is that right?

A.    That's correct.  And again, it goes back to what you're really trying to test for.

You're trying to test for whether or not there is some consistent relationship between the price movement on the day before and the price movement on the day after or on the next day.  And to the extent the measurement of that relationship is being really driven by a very, very small number of data points and impacting the coefficient in a substantial way, that's getting in the way of what you're really trying to test for, which is whether there is a

CHAD COFFMAN

consistent significance between the day before and the day before abnormal returns.  And once these particular outliers were removed, it was clear there was no relationship.

Q.    Let's turn to your opinion regarding the efficiency of the market for Uniti's call options and put options during the class period; okay?

A.    Okay.

Q.    First, other than this case, how many times have you prepared an opinion or offered an opinion in a case regarding the efficiency of the market for stock options?

A.    I don't know the precise number.  But I would say it's about a handful, maybe a couple more.

Q.    Prior to this case, do you remember the last time you provided such an opinion?

A.    It may not have been the last one, but I recall the Abbvie matter is one in which I did an options analysis.

CHAD COFFMAN

Again, I can recall several occasions doing it, but the names of the cases are escaping me right now.

Q.    Are there any other cases in particular that you remember conducting such an analysis?

A.    Give me a second.

(Witness reviews document.)

Q.    It's okay if you can't, Mr. Coffman, I was just asking.

A.    I was just looking at my list of cases to see if it jogged a memory of any specific case.

As I sit here right now, I can't remember.  If you want me to look at it to see if I can jog a memory I will.  But as I sit here right now, I can't think of another case.  The actual case name, I mean I recall having analyzed market efficiency for options in past cases.  But I don't remember the specific cases.

Q.    I appreciate that.  In each of the cases in which you offered an opinion

CHAD COFFMAN

regarding market efficiency for options, did you use the same methodology for testing market efficiency that you did in this case?

A.    I certainly used put-call parity, and attempted to conduct a cause-and-effect type of analysis.  The method by which I did a cause-and-effect type of analysis in those previous differed.  The put-call parity is essentially the same.  The method by which I did cause and effect is somewhat different in this case than in previous cases.

Q.    In what way was it different?

A.    Well, in terms of the overall approach and methodology of comparing results for news days versus no news days, that overall methodological approach consistent with what I do for the common stock isn't any different.  The specific methods by which I did it is somewhat different.

In the past I constructed a,

Page 125

CHAD COFFMAN

essentially, a call price index and a put price index and then analyzed whether there were significant changes in that index as a way to sort of shortcut doing cause and effect without looking at individual option series.  But really trying to aggregate to a higher level before performing the analysis, whereas in this case I determined that based on my work in those prior cases and thinking about a better way to do it, I think this, how I've done it in this case reflects a better way to do it.

Q.    Why?

A.    Because it allows me me to, essentially, conduct a cause-and-effect analysis at the option series level rather than relying on this aggregation method that I've used in prior cases, which was the subject of a lot of questions and criticisms, and overall I just think there is a better way to do it.

Q.    Do you believe it's important

CHAD COFFMAN

to do the analysis on an option series

level rather than on an aggregate level?

    A.    I think it, as with any

analysis, it introduces some of its own

issues as well as avoids others.  I think

on balance, this is a, in my view, a

better way to do it.  Because it allows

for looking at price responses at the

option series level, rather than making

broad assumptions that are necessary when

aggregating across option series to an

index level, there are a number of

different statistical assumptions being

made.  Here, the way I am doing it now

they don't require any of those

assumptions.

    Q.    As discussed earlier,

Mr. Coffman, when we were talking about

the summary of your opinions, it's your

opinion that the markets for Uniti's call

options and put options were efficiency

during the class period; is that correct?

    A.    That's correct, yes.  I

believe, based on showing that there are

CHAD COFFMAN

virtually no, and certainly not consistent violations of put-call parity and evidence of a cause-and-effect relationship, along with the fact that these are securities that are directly derivative of the common stock, that is clearly efficient.  But taken together, that provides me sufficient evidence that I am willing to say the options traded efficiently.

Q.    You mentioned the relationship to the underlying stock.  Would you agree that the mere fact that a company's stock trades in an efficient market is not dispositive as to whether its options also trade in an efficient market?

A.    In terms of -- I don't know what legal considerations there might be for that or precedent for that or reasons for considering that.  But from an economist point of view, I don't think the very fact that they are derivative necessarily means it trades efficiently.

Q.    And in your report you did not

Page 128

CHAD COFFMAN

simply assume that because you concluded that Uniti's common stock traded in an efficient market, that Uniti's options also traded in an efficient market, correct?

A.   I did not make that assumption, no, for purposes of my analysis.

Q.   And in your view was it important to conduct additional analysis specific to Uniti's options in order to assess the efficiency of the markets for Uniti's options?

A.   As an economist that was important to me, yes, notwithstanding that for whatever legal precedential reasons or other reasons, sometimes I know plaintiffs have asserted that option markets are efficient as a result of the stock market being proven efficient. From an economists point of view, I wanted, for me, personally to give the opinion I was giving, I wanted additional evidence.

Q.   From an economist point of

CHAD COFFMAN

view, you do not agree that simply because the common stock is efficient, that necessarily means the options market is efficient, correct?

A.    I as an economist would not draw that conclusion.

Q.    Now, in paragraph 84 of your report, you say that option pricing is dependent on the stock price; do you see that?

A.    Let me get there, just a moment.

Q.    Take your time.

MS. WYMAN:  I am going to insert an objection to form to that question.

A.    Yeah, in paragraph 84 I say that option pricing is dependent on the stock price, yes.  The value of an option is directly dependent on the price of the underlying security.

MR. BURNOVSKI:  Can I ask what the basis of the objection is?

MS. WYMAN:  Just because you only quoted a portion of the sentence

Page 130

CHAD COFFMAN

and there is a clause before that that, in my view, is important to understanding the portion that you quoted.  So it was incomplete.

Q.    Mr. Coffman, would you agree that the price of an option is also dependent on a number of factors other than the price of the underlying stock?

A.    Yes.

Q.    And you would include at least some of those factors in paragraph 82 of your report; is that right?

A.    Yes.

Q.    And some of those factors include how the current stock price compares to the exercise price of the option, the amount of time to expiration of the option, anticipated dividends, expected volatility of the underlying stock and interest rates; is that right?

A.    Yes.

Q.    Are there any other factors that you believe would impact the price of an option beyond the ones I identified

CHAD COFFMAN

that are mentioned in paragraph 82?

A.    These are the factors that are generally recognized in option pricing formulas.  So I think these are sufficient to what is usually considered to impact the theoretical value of an option.  Whether there is other specific things that might come into play at given moments at given times, I don't want to necessarily exclude it.  But generally speaking, these are the factors that financial economists agree are the primary influencers of option prices.

Q.    And when you say, when you reference theoretical price in that answer, are you distinguishing theoretical price from some other price?

A.    Well, I think the financial economics literature recognizes that there are certain assumptions in these option pricing formulas that might not always hold.  And so I think it reflects that these -- that there might be other dimensions of variables that might

Page 132

CHAD COFFMAN

matter.

So, for example, when I say expected volatility, that assumes that volatility is, can be expressed through, essentially, one number and that the returns are, and if you're using a Black-Scholes formula, it assumes that the returns are log-normally distributed. And there has been a lot of literature that suggests that might not hold true over certain time periods and ranges, et cetera. And there is, what is sort of referred to as the "fat tail" problem, which is that there could be large spikes in volatility.

So that there could be other variables like that that matter when in explaining actual trading prices. But these factors as described here are the ones that are typically used to evaluate the value of an option.

Q. To evaluate the theoretical value of an option?

MS. WYMAN: Objection to form.

Page 133

CHAD COFFMAN

A.    Yeah, or to take trading prices of options and back into elements of these measures.  So, for example, one can take an actual trading price in the theoretical option pricing formula to back out what the implied volatility is.

So it gets used in both ways. But these are theoretical pricing models. Not complete reflections of reality.

Q.    Just to be clear, theoretical prices may differ from actual market prices; is that right?

A.    Yes, they can and do.

Q.    And earlier you were talking, you were giving an example the expected volatility of the underlying stock, and that's one of the factors that would influence the price of an option, correct?

A.    Yes.

Q.    How would the expected volatility of the underlying stock impact the price of an option?

MS. WYMAN:  Objection to form.

CHAD COFFMAN

A.    Holding everything else equal, the higher the volatility in the underlying security the higher the value of the option.

Q.    Does it matter whether it's a put option or a call option?

A.    In terms of talking about the holder of the call or the holder of the put, yes.  The premium or the quote, unquote price of the option is positively correlated with the volatility.

Q.    You would agree that option prices do not move one-for-one with the underlying asset, correct?

MS. WYMAN:  Objection to form.

A.    That's correct.  It depends on a number of different factors.  How much you would expect the option price to move.

Q.    In your report, Mr. Coffman, you noted that during the class period, a total of 611 call option series and 611 put option series were listed; is that right?  I think that's in paragraph 83.

Page 135

CHAD COFFMAN

A.    Yes, and then in the very next part of that sentence I quantify how many had non-zero trading volume, which is a lower number.

Q.    For the options series that traded during the class period, were all of those series traded on the Chicago Board Options Exchange and the NASDAQ Options Exchange?

A.    I believe they were all listed there.  I don't believe I did anything to analyze whether specifically each one had trades on those particular exchanges.  In other words, trades could have occurred on alternative exchanges, smaller exchanges, and have been reported through as trades for these securities.  I don't think there was any part of my analysis that guaranteed each of those series had trades on the CDOE or NASDAQ.

Q.    Do you know whether there were any options on any of the Uniti stock traded over-the-counter during the class period?

Page 136

CHAD COFFMAN

A.    I don't recall investigating that.  I was focused on options that were trading on the exchanges.

Q.    Is it possible that there were any Uniti options traded over-the-counter during the class period?

MS. WYMAN:  Objection to form.

A.    Could I have that question read back, please?

(The record was read as follows:

"Question: Is it possible that there were any Uniti options traded over-the-counter during the class period?")

A.    I don't recall the rules of whether all options trades have to take place on an exchange.  So I don't think I can exclude that possibility.  That's not something I investigated.

Q.    To the extent any Uniti options were traded over-the-counter during the class period, you're not offering an opinion regarding market efficiency as to any of those options, correct?

Page 137

CHAD COFFMAN

A.    I certainly have not explicitly included any data related to that in my analyses.  I am trying to think of an example of an over-the-counter option transaction.  I certainly have seen examples of private option contracts that sometimes don't have the usual standard features of an exchange option contract. Certainly those would not be included. To the extent there were trades over-the-counter of the exchange listed options, and to the extent the prices were consistent to what I was seeing on the exchanges, then I wouldn't see any reason to exclude those transactions as occurring in an inefficient market because there is clearly, in my view, available public pricing that is efficient.  But I am not offering an affirmative opinion that over-the-market transactions of Uniti options would necessarily be efficient.  I haven't analyzed that.

Q.    In your last answer you said

CHAD COFFMAN

you're not offering an affirmative opinion that over-the-market transactions of Uniti options would necessarily be efficient.

I think you meant you're not offering an affirmative opinion that over-the-counter traded options, of Uniti options would have traded in an efficient market; is that right?

A.    That's what I meant to say, yes.

Q.    Are you offering the opinion that the market for every single series of Uniti options traded over an exchange was efficient throughout the proposed class period?

A.    Yes.  I think that given the combination of the stock being efficient. The put-call parity being satisfied for all but a small number of trades across all of the option series, and the clear evidence of a cause-and-effect relationship between option prices and new information, and the fact that all

CHAD COFFMAN

the different series would have price relationships among themselves that would constrain the pricing of different option series, that's the conclusion I've reached and that's the opinion I am giving.  Yes.

Q.    You mentioned earlier, Mr. Coffman, that some of the series, some of the 611 call option series and 611 put option series did not trade at all during the class period, correct?

A.    That's correct.  And it's also my understanding that as a result, there wouldn't be any potential class member in any one of those option series, so it's not particular relevant to even ask the question.  So I am talking about the option series that traded during the class period.

Q.    So your opinion about efficiency is limited to the series of stock options that traded during the class period; is that right?

A.    That's my understanding of the

CHAD COFFMAN

ones that could even possibly be relevant to the case at hand; so yes.

Q. When you use the term "option series," what do you mean by series?

A. A particular type of option contract is called a series. So it's a particular contract for an option to purchase. So if we're talking about a call, it's an option to purchase Uniti stock at a particular price through a particular date of expiration, so that would define one series.

Q. And during the class period, each series traded as or was listed as a distinct security on the NASDAQ Options Exchange and the Chicago Board Options Exchange, correct?

A. Correct.

Q. And to your understanding, each option series is, in fact, a separate distinct security; is that right?

A. That's how I think of it, yeah.

Q. And each series has distinct characteristics, correct?

Page 141

CHAD COFFMAN

A.     Yeah.

Q.     Some option series, for example, are puts and others are calls, correct?

A.     Yes.

Q.     And different option series might have different strike prices, correct?

A.     Yes.

Q.     Different option series may have different expiration dates, correct?

A.     Yes.

Q.     Different option series may have different levels of liquidity, correct?

A.     That's not a feature of the contract like the other things we were just talking about.  But it's possible that different series could have different levels of liquidity in the market, yes.

Q.     And is it possible that the liquidity of a particular series may differ over time?

CHAD COFFMAN

A.    Yes.

Q.    And different option series may have different bid-ask spreads, correct?

A.    Yes.

Q.    And the bid-ask spreads of a particular series may differ over time as well, correct?

A.    Yes.

Q.    And each option series has its own distinct market price, correct?

A.    Yes.  The only reason I am hesitating is as a result of things called put-call parity and things like that, option prices are necessarily constrained to be consistent with other option prices depending on how they differ in terms of their, how far they are in or out of the money or how long is the expiration.

There are a bunch of different relationships that should hold amongst the option prices but each one has its own distinct price, yes.

Q.    You say there is a bunch of

CHAD COFFMAN

reasons why the relationship between option prices should hold as a theoretical matter. But for the actual market, each option series would have its own distinct market price that may or may not align with other prices in the manner you might expect based on theory; is that a fair statement?

MS. WYMAN: Objection to form.

A. I agree with the portion of your statement that each has its own market price. I think that is what I said in my prior answer as well.

I think whether or not the pricing relationships hold across securities, at least in certain respects I've already tested that. I tested whether put-call parity holds for Uniti options and found that it did in the vast, vast majority of cases.

Q. My question wasn't specific to Uniti.

A. Okay. I'm sorry. I understand.

CHAD COFFMAN

So each option series, regardless of whether it's Uniti or any other company, has its own market price, yes.

Whether relationships amongst prices holds is something that could be evaluated.

Q. Thank you. Would you agree that different series of options are not fungible then?

MS. WYMAN: Objection to form.

A. I agree with that, yes. By fungible, you mean you could just substitute one for the other and it would have the same value and the same features; clearly that's not the case, I agree with you.

Q. Would you agree that a change in the price of the underlying security may not impact the price of each option series equally?

MS. WYMAN: Objection to form.

A. That's certainly true. A change in the underlying would not affect

CHAD COFFMAN

each option series the same way nor would it be expected to, I agree.

Q.    Is it possible that the price of one option series changes in response to new information in the market while the price of another option series does not change?

MS. WYMAN:  Objection to form.

A.    Are we talking about with respect to the given piece of information, so contemporaneously at one moment in time there is a new piece of information is it possible that one series reacts to that and another does not?

Q.    Correct.

A.    Yes, that's certainly possible. For certain options that are, you know, for example, a call option that's way in the money, you would expect the call option price to react fairly similarly to the common stock.  Not exactly.  But much closer to what the common stock did.

For a call option that's way

Page 146

CHAD COFFMAN

out of the money, that might not be a big enough piece of information or a price movement to really impact the value of the option, you know, in an observable way.

So that's certainly possible, yes.

Q.    Is it possible that some option series could trade in an efficient market while others might not?

MS. WYMAN:  Objection to form.

A.    I suppose that can't be completely ruled out, yes.

Q.    Now, in order to assess the efficiency of the markets for Uniti's call options and put options, I think you mentioned earlier you looked at two different tests, correct?

A.    Yes.  But in combination with all of the other information in my report, too.  But two tests that were specific to the options, yes.

Q.    One was the put-call parity test and the other was an event study to

CHAD COFFMAN

examine the reaction of Uniti option prices to new public information, correct?

A.    Yes, that's correct.  And again, just to be clear, to expand upon my prior answers, for example, there was no need to explicitly analyze things like analyst coverage for each separate analyst series.  There is analyst coverage for the entire company that would be relevant to call the option series.

So that's why I just wanted to clarify, you know, there were two tests I performed that are specific to option series.  And the ones you described are the ones, yes.

Q.    Other than the put-call parity test and the news/no news test, you didn't conduct any other analyses to assess market efficiency for Uniti's options that were specific to Uniti's option series, correct?

A.    I think that's a fair

Page 148

CHAD COFFMAN

statement, yes.

Q.    And with respect to the news/no news test, is it fair to say that the event study was intended to be similar to the news/no news test that you ran for Uniti's common stock?

A.    Similar to the overall approach, yes.

Q.    And we discussed earlier about the market efficiency for Uniti's common stock.  You indicated that you reviewed 11 different factors, correct?

A.    Yes.

Q.    And you indicated that it would not be necessary to look at some of those factors specifically with respect to Uniti's options because they would apply equally, such as analyst coverage, correct?

A.    For certain factors, that's the case, yes.

Q.    But there are other factors that you looked at for Uniti's common stock that would apply specifically to

CHAD COFFMAN

Uniti's options that you did not look at, correct?

A.    I think that's a fair statement, yes.  I mean we would have to go factor by factor to talk about those and certain reasons you couldn't make an apples-to-apples comparison in certain cases.  But, yes, there are factors that I analyzed for the stock that I did not analyze for the options.

Q.    And, in fact, the only factor for the stock that you looked at for options was Cammer Factor 5, correct, which is the cause and effect relationship?

A.    Again, for certain of the factors there would be no need to look again at options somehow separately.  For others, that's correct, I limited, I did not do all of the same analyses for the options as for the common stock.

Q.    So for example, we talked earlier about Cammer Factor 1 that relates to trading volume; do you

CHAD COFFMAN

remember that?

A.    Yes.

Q.    Did you conduct any analysis to evaluate the trading volume for Uniti's option series?

A.    I didn't.  Again, the specific Cammer Factor relates to average weekly trading volume relative to the number of shares outstanding.  There are reasons that particular metric might or there are reasons that particular metric doesn't apply well to options.  The shares outstanding for options are actually created through trading, and the introduction of new contracts.  So it's not a -- there is not really a comparable metric that makes any sense for options. So that's one reason I don't look at that.

But, you're right, I did not perform a volume analysis of any kind, of any of the particular series, other than to note which ones had some level of trading.

CHAD COFFMAN

Q. And just to be clear, average weekly trading volume is one test of volume. But really it's the concept of volume at large that would be relevant to market efficiency and Cammer Factor 1 simply provides one measure of what volume would be, correct?

MS. WYMAN: Objection to form.

A. Correct. I mean I do, at the bottom of Exhibit 1, under the option category, summarize the total number of contracts that were traded over the class period.

And so if you look at that first number 1.6 -- I am going to round it -- 1.69 million put contracts, each contract is for 100 shares. So if you multiply that number by 100, you're really talking about 169 million shares, being subject to trading in the form of options.

In my view, that's a substantial amount. And so I did, at least, verify that there was a

Page 152

CHAD COFFMAN

substantial amount of option trading.

Beyond that, I agree with you, I didn't do any further analysis of volume beyond that.

Q. And you didn't do any analysis at all to look at trading volume for Uniti's options on a series-by-series basis correct?

A. Other than to verify which series actually had trading of some kind; that's correct. And other than looking at the aggregate amount of trading -- which is described in my options analysis of the last factor under, that I looked at for the common stock -- beyond that, I did not. There was clear evidence of substantial trading based on that alone.

Q. But that was on an aggregate basis, not on a series-by-series basis, correct?

A. Well, the number was calculated from series-by-series data. But, yes, the number itself represents an aggregate amount of trading across all series.

Page 153

CHAD COFFMAN

Q.    In your opinion is trading volume relevant when you're evaluating the market efficiency of stock options?

A.    Again, by default I am excluding options that didn't have any trading.  The volume -- I am not denying that volume could play a role in evaluating market efficiency.  As I said, I looked at it on an aggregate basis for the options.

Q.    You testified earlier that each option is a separate security -- each option series is a separate security, correct?

A.    Yes.

Q.    And you testified that the market efficiency -- there could be market efficiency for one series and not for another, correct?

MS. WYMAN:  Objection to form.

A.    That's theoretically possible, yes.

Q.    And so would trading volume at the individual series level be relevant

Page 154

CHAD COFFMAN

to a determination of market efficiency for a particular series of options?

A.    I can't say that it would play no role.  But given the analyses that I performed, I didn't believe that was necessary.

Q.    For the call option series that had some trading volume during the class period, would it be relevant to your opinion about market efficiency if half of those option series traded on fewer than 25 percent of the trading days, on which the series were available for trading during the class period?

MS. WYMAN:  Objection to form.

A.    Could I have that read back, please?

The record was read as follows:

("Question: For the call option series that had some trading volume during the class period, would it be relevant to your opinion about market efficiency if half of those option series traded on fewer than 25 percent

Page 155

CHAD COFFMAN

of the trading days, on which the series were available for trading during the class period?")

A.    That's not entirely unexpected, and I don't find that particularly relevant, no.

Q.    Why not?

A.    Because again, these are derivative securities that have values that are clearly tied to specific factors.  And subject to certain constraints placed upon them by the presence of other securities, and given the presence of all these different series with different expiration dates and different strike prices and different times to maturity, to the extent there was an arbitrage opportunity, one could use others of those securities or transactions in the underlying security to perform that arbitrage.

So I believe there are relevant economic constraints to what inefficiency there could be in those prices, and I

CHAD COFFMAN

didn't think that analyzing volume on a security-by-security basis was necessary to reach the opinion I am giving.

Q.    We talked earlier about Krogman factor 2 that looks at the bid-ask spread of a security; do you remember that?

A.    Yes.

Q.    You didn't conduct any analysis to evaluate the bid-ask spread for Uniti's options series; correct?

A.    That's correct.

Q.    In your opinion, is bid-ask spreads relevant when you're evaluating the market efficiency of stock options?

A.    Again, I am not saying it's illogical to look at.  But given the constraints on pricing and the put-call parity test and the cause and effect test that I performed.  I didn't believe that looking at bid-ask spread was necessary to get to the opinion that I'm giving.  And I'll leave my answer at that.

Q.    You stated in your report that the wider the bid-ask spread the more

CHAD COFFMAN

costly it is to arbitrage away small inefficiencies because the costs of the trade could be greater than the perceived inefficiencies; do you remember that?

MS. WYMAN:  Objection to form.

A.    Yes.

Q.    Isn't that also true for options?

A.    It could be, yes.

Q.    What would you consider to be a wide bid-ask spread in the options market?

MS. WYMAN:  Objection to form.

A.    I don't know that I could give you a specific number that represents a wide bid-ask spread.  I think it's also important, if you were going to be looking at that issue, to look at effective spreads which is how much the transaction prices actually differ from either the theoretical values or midpoints of the bid-ask spread.

So I don't think you could look at just the quoted bid-ask spread of an

CHAD COFFMAN

option and draw a lot of conclusion about whether the bid-ask spread is too wide to accommodate arbitrage trades.

Q.    In any event that's not something at all that you analyzed with respect to Uniti stock options, correct?

A.    That's correct.

Q.    We didn't talk about this earlier, but Cammer Factor 3 looks at the number of market makers for securities, correct?

A.    Yes.

Q.    And in paragraph 39 of your report, you state that it's believed that the larger the number of market makers in a given security, the more information is available about it, and the quicker its dissemination in the price.  Do you agree with that statement?

A.    Yes.

Q.    Did you do anything to try to determine the number of market makers for Uniti's option series?

A.    No, I am not -- I did not.

CHAD COFFMAN

Again, and just to be clear, you know, the Cammer court made clear that the counting of market makers was appropriate for over-the-counter stock.

I describe in my report how for exchange-traded securities that metric is not particularly useful, but gave it anyway for the common stock. Given that the options are traded on an exchange, I don't see that metric as particularly useful. But, no, I did not analyze it.

Q. Is it possible to test for autocorrelation in options prices?

A. I imagine there are probably ways one could do it, although it's much more complicated, because of the factor of time to maturity, so just the march of time could cause autocorrelation in option prices because you're moving toward a particular expiration date. So there are other factors one would need to, it's not as simple for options. Theoretically, I suppose one could probably do it.

Page 160

CHAD COFFMAN

Q.    It's not something you did for Uniti's options, correct?

A.    That's correct.

Q.    Let's talk about your put-call parity test that you ran in connection with Uniti's options.  What is a put-call parity?

A.    A put-call parity is a relationship among prices and the price of the underlying stock and prices of the options that must hold for there to be no arbitrage opportunities.  And it relates to pairs of pairing together a call and a put with the same exercise price and the same time to expiration.  There are certain relationships, economic relationships that could be shown should hold amongst, between those two securities such that there is not an arbitrage opportunity.  And the technical details of that are described at paragraph 86 of my report.

Q.    If I could summarize.  Let me know -- I don't want to put words in your

CHAD COFFMAN

mouth -- but let me know if this is a fair summary.

Is it fair to say that if you find put-call parity, that means that there is a theoretical no arbitrage relationship between a put, a call and the underlying stock where the put and the call have the same expiration date and the same strike price?

MS. WYMAN:  Objection to form.

A.    I think that's right.  I think that's a fair statement, yes.

Q.    And conversely, if put-call parity were violated, that would indicate potential arbitrage opportunities existed, correct?

A.    Yes.

Q.    And if there were persistent arbitrage opportunities, that would be inconsistent with a finding of market efficiency, correct?

MS. WYMAN:  Objection to form.

A.    When you say persistent, I think you want to be careful what you

Page 162

CHAD COFFMAN

mean by persistent. But if there was, you know, widespread violations of put-call parity that would suggest -- that are suggestive of widespread presence of arbitrage, you know, over time, and over a bunch of different securities, then that would suggest that the prices might not be efficient. That's correct.

Q. Is it your opinion that put-call parity is necessary for option market efficiency?

A. Again, I think a lack of persistent widespread violations of put-call parity is important for market efficiency. I don't know how I can say it any differently than that.

In order to conclude the market is inefficient or to say that there is insufficient evidence of market efficiency, you know, requires sort of a case-specific, fact-specific analysis.

In this particular case, there is so few violations of put-call parity,

Page 163

CHAD COFFMAN

I never got to the stage of saying, you know, what would be enough to be, to raise a red flag or something or how would I conclude differently, because that just didn't occur in this case.

So I don't know that I can say with sort of black and white, lack of -- or put-call parity must be present for there to be an efficient market. But I evaluate it on a case-by-case basis, and here there is such few instances of it that it's clear that put-call parity is by a vast margin is the better way to describe the operation of Uniti's options markets than the alternative.

Q.    Is a finding of put-call parity standing alone sufficient to find option market efficiency?

MS. WYMAN:  Objection to form.

A.    Again, I don't know what the Courts might find sufficient.  In terms of my opinion, I think that goes a long way towards showing market efficiency of the option markets.  But, you know, there

Page 164

CHAD COFFMAN

is a reason why I also ran a cause and effect test. I wanted to see that evidence as well.

Q. As an economist, could you opine that a company's stock options traded in a semi-strong efficient market based solely on a finding of put-call parity?

MS. WYMAN: Objection to form.

A. I don't want to speak for all economists. This financial economist would want to see some measure of cause and effect evidence as well.

Q. Does the put-call parity test tell you how quickly and fully a given option series incorporates new public information into its price?

A. I don't think it gives you definitive evidence of that. I think clearly, because you're using contemporaneous prices across multiple securities, and doing it on a daily basis, embedded in the test itself is an assumption that prices are adjusting on a

Page 165

CHAD COFFMAN

daily basis.  But I don't -- I haven't actually considered whether it actually provides its own separate independent evidence of rapid price movements.

Certainly consistent with rapid price movements, but I wouldn't say it actually provides that evidence.  It falls within the boundaries of being consistent with it, but I don't think it provides its own evidence.

Q.    Would you agree that put-call -- the put-call parity test is not itself a test of how quickly and fully a given option series incorporates new public information into its price?

A.    I would say there is a very indirect component to that test in there, which is that because you're looking at stock prices -- I'm sorry, at securities prices for two different option securities on the same day, and making sure on a daily basis put-call parity holds, it provides some indirect evidence of a rapid adjustment of market prices.

Page 166

CHAD COFFMAN

But the test itself is not designed to test specifically for rapid prices, movement.  So I think that's a fairly indirect test of the rapidity of option price movement.  But there is some element of rapidity built into that test.

Q.    You mentioned earlier paragraph 86 of your report.  I don't know if you have that up, Mr. Coffman.  Could you take a look at that?

A.    Yes.

Q.    And there is a formula in paragraph 86; do you see that?

A.    Yes.

Q.    Is that the formula you used when conducting your test of put-call parity?

A.    It is, yes.

Q.    And I just want to make sure I understand it, Mr. Coffman.  Can you just take a look at Exhibit 14 as well?

And I believe Exhibit 14 summarizes the results of your put-call parity test; is that right?

Page 167

CHAD COFFMAN

A.      Yes.

Q.      And there is a line there that says "Constraints" that has two different formulas there; do you see that?

A.      Yes.

Q.      And are those formulas the ones you used in conducting your test of put-call parity and if so, how does that differ from the formula in paragraph 86?

A.      Those are the constraints that are used to test put-call parity.  It's really -- the only difference -- this is just an inequality from paragraph 86 broken into two pieces.  But it also reflects that the constraint being tested, you know, the formulas in paragraph 86 treat that as being one call price and one put price.

The real arbitrage constraints is not to violate a particular call bid or ask prices, depending on which of those inequalities you're looking at.  So the only difference here is that this, these constraints reflect that formula

Page 168

CHAD COFFMAN

broken into two pieces.  And the appropriate ask for bid price being used for the comparison being reflected here.

Q.    Is it fair to stay that the formulas here are a more precise version of the formula you used to conduct your put-call parity test?

A.    I would say it just provides additional detail.  I mean it's really reflecting the same formula, but, yes, when you break the constraint into two different pieces and think about what the real arbitrage condition should be, it suggests that you should be using a bid or ask price, not just a single price for the call and put option.  So it's a more detailed version of that formula, yes.

Q.    Is there any academic literature that supports using the bid or ask price?

MS. WYMAN:  Objection to form.

A.    Well, yeah, I believe the logic of the test itself is reflective of which you should use there.

Page 169

CHAD COFFMAN

Q.     Is it fair to say that if put-call parity is satisfied, the difference in market price between a put and a call having the same strike price and expiration date should fall somewhere between the lower and upper bounds, calculated by these two equations?

MS. WYMAN:  Objection to form.

A.     Can I have that read back, please?

The record was read as follows:

("Question: Is it fair to say that if put-call parity is satisfied, the difference in market price between a put and a call having the same strike price and expiration date should fall somewhere between the lower and upper bounds, calculated by these two equations?")

A.     As long as one takes into account the bid and ask differences between the calls and the puts as well, yes, it should, it should, it should satisfy both the constraints on Exhibit

CHAD COFFMAN

14.

Q.    Paragraph 87 of your report states that you tested that proposition for 54,169 pairs of put-call options; is that right?

A.    54,169, yes.

Q.    And based and our prior discussion, in calculating the upper and lower bounds, you used the bid and ask quotes for the put and call prices; is that right?

A.    Yes.

Q.    And bid-ask spreads are a measure of transaction costs, correct?

A.    They are a measure of potential transaction costs, yes.  Often trades will occur within the bid-ask spread and so that could often be overstatement of the transaction costs, but it represents a potential transaction cost, yes.

Q.    So is it fair to stay that by using bid-ask spread quotes in your formula, your analysis took into account transaction costs?

CHAD COFFMAN

A.    It took into account the potential transaction cost, yes.

Q.    So is it fair to say that effectively your test of put-call parity evaluated whether profitable arbitrage opportunities existed after accounting for transaction costs?

A.    Yes.

Q.    And you found that of the Uniti put-call pairs you tested put-call parity existed over 99 percent of the time, correct?

A.    Correct.

Q.    But based on the data you observed in more than 99 percent of cases, there was no profitable arbitrage opportunity after accounting for transaction costs, correct?

A.    Correct.

Q.    And you conclude in paragraph 87 that this provides evidence that the market prices of Uniti options consistently reacted contemporaneously with changes in the market price of Uniti

CHAD COFFMAN

common stock so as to prevent arbitrage opportunities; is that right?

A.    Yes, that the prices of the different instruments were moving sufficiently together as to prevent arbitrage opportunities, yes.

Q.    And when you say the prices here in paragraph 87, you're using the term "market prices," correct?

A.    Yes.  These are prices, bid and ask prices are market prices that are quoted in the market, yes.

Q.    Would the size of the bid-ask spread for Uniti's options have any impact on the results of your put-call parity test?

MS. WYMAN:  Objection to form.

A.    When you say would it impact or have any impact, the bid prices and ask prices are what they are.  And I am asking whether or not there is clear evidence of any arbitrage opportunities, and the answer is no.

Now you're saying had the

Page 173

CHAD COFFMAN

bid-ask spread been different, would I have gotten a different result.  I don't think that's -- that would be pure speculation, I don't know.

Q.    Let me ask you a different question.  All else being equal, would you agree that the wider the range between the upper and lower bounds and your put-call parity equation, the easier it is for a combination of put and call options to satisfy put-call parity?

MS. WYMAN:  Objection to form.

A.    I think as a matter of arithmetic, holding everything else equal, yes, that's true.

Q.    And all else being equal, the wider the bid-ask spread, the wider the range between the upper and lower bounds in the equation, correct?

A.    I think that's fair, yes.

Q.    If Uniti stock options had relatively high bid-ask spreads reflecting high transaction costs, is it possible that a finding of put-call

CHAD COFFMAN

parity might simply reflect that it was too costly for arbitragers to trade and correct mispricing, even though option prices for Uniti's stock options do not incorporate new information quickly or at all?

MS. WYMAN:   Objection to the form.

A.   I would not reach that conclusion based just upon that information, no, for a variety of reasons.

Q.   What are those reasons?

A.   Well, number one, it's a potential transaction cost, as I was talking about before.  The effective spread can actually be much less, because you can often transact at a price within the bid-ask spread, even if it's relatively wide.

Second, there is nothing to suggest that a lower bid-ask spread, all else equal, would make a violation of put-call parity more likely.  Sure, it

CHAD COFFMAN

would reduce the ranges of the prices that would satisfy it, but the whole point is this isn't some random process where just by changing the range of what would satisfy put-call parity, that that somehow makes it less likely -- more likely you would see a violation. These are -- you know, when you have a well-functioning market, you wouldn't expect to see violations of put-call parity regardless of any of the bid-ask spread.

I just don't think that's a good way to look at the question, that somehow, that somehow by narrowing the bid-ask spread, you're creating the more likelihood of violations. That's just not the way, I don't think that's a proper way to think about it.

Q.    And you didn't do any work to evaluate the size of the bid-ask spreads for Uniti's call options in connection with your put-call parity test, correct?

A.    Well, as you suggested, it's to

CHAD COFFMAN

a certain extent taken into account in there, but I didn't do anything separate to analyze the bid-ask spread, no.

Q.    In conducting your test, you used bid and ask data from high volatility; is that right?

A.    Yes.

Q.    And just from reviewing the data, it looks like that if both the bid price and the ask price in that data were zero dollars that you dropped those observations from your analysis; is that correct?

A.    I treated those as not valid bid or ask prices, correct, nobody is going to buy or something -- nobody is going to sell something for zero or buy something for zero.

Q.    So you treated those as instances where there was no reported bid or ask price, effectively missing data; is that right?

A.    Yes.

Q.    What about instances where the

CHAD COFFMAN

bid price was zero, but the ask price was a positive number?

A.   Give me a second.

Q.   Just for the record, Mr. Coffman, what are you looking at?

A.   I was just going to pull up, I was just looking at Exhibit 14 to see if it provided additional detail.

(Witness reviews document.)

A.   Now, I am looking back just at the report to see if there is detail on that.  I am just having a hard time remembering off the top of my head exactly how those situations were handled.  So that is something that I would need to review my backup material to not be speculating about that.

Q.   You just don't recall whether you included in your put-call parity analysis, observations where the bid price was zero but the ask price was a positive number; is that right?

A.   That's something I need to go back and review rather than try to

Page 178

CHAD COFFMAN

speculate and answer.  It's been a while since I looked at the details of that calculation, so I simply don't recall.

Q.    Sitting here today, would it be appropriate to include those observations in your analysis?

A.    You know, I am sure that's something I thought about carefully at the time and came to the appropriate conclusion.

If you would like me to sit here and think about it for a while I can try to come up with an answer with that. It would be much easier for me to come up with it -- let me just think about it for a minute.

Q.    If you don't know sitting here, Mr. Coffman, that's okay.

A.    That's a technical enough question that I would want to go back and think about very carefully before speculating an answer on it.

Q.    Let me ask you a different question, which is if you included that,

CHAD COFFMAN

those observations in the analysis, would that mean that you were treating the zero dollar bid price as an actual bid price as opposed to a missing value?

A.    If it was being used as one of the constraints in the calculation, then yes.

Q.    And if the bid price in your data is zero, does that mean that the, would that mean that market participants would be bidding zero dollars to acquire the option?

A.    A bid of zero is, obviously, never going to be accepted by someone. There is nothing saying you can't do it I think.

Q.    Is it likely in your view that market participants would be making a bid of zero dollars for the option -- for an option?

MS. WYMAN:  Objection to form.

A.    That's unlikely to be an actual executable bid.

Q.    As discussed earlier, in

Page 180

CHAD COFFMAN

addition to a put-call parity test, you also conducted an event study to evaluate whether there was a cause and effect relationship between the market price of Uniti's options and the release of new information in the market; is that right?

A.    Well, when you say ran an event study, certainly there are events that would be components to it.  There was a -- again, as I talked about numerous times already today, there was a broader statistical test that was being compared between news events and non-news events and relying on that event study concepts, but it's not just an event study.

Q.    A fair clarification, Mr. Coffman.  I appreciated that.

So in addition to the put-call parity test, you conducted an a news/no news test to evaluate whether there was a cause and effect relationship between the market price of Uniti's options and the release of new information in the market, is that right?

Page 181

CHAD COFFMAN

A.    Yes.

Q.    Underlying that news/no news test was an event study, at least in part, correct?

A.    Yes, there was -- yeah, it's proper to think of that as an event study test, yes.

Q.    And in paragraph 89 of your report, you state that "The news/no news test for Uniti's options provides strong statistical evidence that Uniti Option Prices react to new news"; do you see that?

A.    Yes.

Q.    And Uniti option prices in that sentence is capitalized, but that term does not appear to be defined in your report, as far as I can tell.  What do you mean by Uniti option prices?

A.    The market prices of Uniti options as reflected in the high-volatility data.

Q.    In your event study, you quantified an abnormal price return for

Page 182

CHAD COFFMAN

each option by subtracting the expected return from the actual observed return; is that right?

A.    Yes.

Q.    And you calculated the expected return using the Black-Scholes Model; is that right?

A.    I incorporated the Black-Scholes Model into that to calculate the expected return.  And it reflects the, just to be clear, the change in the Black-Scholes Model that's being implemented to do that is the expected change in the stock price from the common stock regression.

So the common stock regression I ran, if on a given day the expected return of the stock was, let's say, 2 percent, then I recompute using the Black-Scholes formula how much the option price would be expected to change based just on that 2 percent change in the underlying stock price that was expected. That's how I get to an expected return

CHAD COFFMAN

for the option.

Q.    The expected return for the option was calculated using the Black-Scholes Model, correct?

MS. WYMAN:  Objection.

A.    Yes, in the specific way I described.

Q.    And you also calculated the actual observed return using the Black-Scholes Model as well, correct?

A.    No, the actual expected return is the actual observed change in the market prices according to high volatility.

So I computed -- so if the actual return from the market price the day before was 5 percent and the expected return from the Black-Scholes Model was 2 percent, I would have calculated an abnormal return of 3 percent.  The actual return doesn't come from a Black-Scholes Model.

MR. BURNOVSKI:  Can we take another quick break now?

Page 184

CHAD COFFMAN

MS. WYMAN:  Sure.

THE VIDEOGRAPHER:  We are now off the record.  The time on the video monitor is 3:22.

(Off the record.)

THE VIDEOGRAPHER:  We are now on the record.  The time on the video monitor is 3:32.

BY MR. BURNOVSKI:

Q.    Welcome back, Mr. Coffman. During the break, did you have any conversations with plaintiffs' counsel regarding the substance of your testimony?

A.    No.

Q.    Just before the break, Mr. Coffman, you indicated that in connection with your event study, you calculated the actual observed return that we were discussing using IVolitility data; is that right?

A.    Yes.

Q.    And did you use the midpoint price or something else?

CHAD COFFMAN

A.   I used the midpoint price from each day to calculate the return.

Q.   Would it have been appropriate to have used Black-Scholes Model prices in calculating the actual observed return?

A.   Give me a minute to think about that.  No, I think you -- for the purposes of performing the underlying event study, it's important to use an observed market return.  Not a theoretical price.

When you're looking at the expected return, you're trying to calculate already based on a model what one would expect.  So you're already departing from relying on observed prices.  So in that case, using the theoretical formula makes sense, but when looking at actual prices in order to get the abnormal return?  No, I think you have to use the actual market prices.

Q.   Are there any limitations to using the Black-Scholes Model to predict

CHAD COFFMAN

real world options prices?

MS. WYMAN:  Objection to form.

A.    Yes, but I'm using -- keep in mind I am using it for a very limited purpose.  I am not using the formula at a moment in time to come up with a hypothetical value assuming that that model can predict the price at that moment given all of the inputs.  I am performing a comparison from one day to the next, changing only the underlying stock price.  And because that formula is using an implied volatility already, it's correcting, to a certain extent, for differences that could be out there due to using a theoretical model versus a trading price.

And so I am using it for the very limited prospect of saying here is a Black-Scholes formula at one moment in time and here is a Black-Scholes formula at another moment in time, and what's the difference between driven by a change in the underlying stock price.  So it's a

Page 187

CHAD COFFMAN

very limited use of the Black-Scholes formula. And given that the implied volatility is being used as part of that formula, a lot of the concerns of what would make a use of a theoretical price problematic isn't really an element of the comparison that I am doing.

Q.    Would you agree that the Black-Scholes Model was developed for European options that do not pay a dividend?

MS. WYMAN:  Objection to form.

A.    That was its original construction, yes.

Q.    And Uniti options are American options that do pay a dividend, correct?

A.    That's correct, yes.

Q.    Did you make any adjustments to the Black-Scholes Model in your analysis to account for that?

A.    I did not. And again, because I am using it for the limited purpose I am using it for. And embedded in the assumption is a nonchanging dividends for

Page 188

CHAD COFFMAN

the one-day period I am looking at, I am abstracting away from the dividend question. The European versus American call, that is not something I am explicitly adjusting for.

But again, all I am trying to do is get a measure of how the value of the option changes based on a change in the underlying. Everything else held constant except the one day closer to expiration. In that circumstance, I don't believe the differences between American and European options would really drive a meaningful difference. At least, I can't imagine it would.

Q. If you were trying to calculate an actual price for Uniti's options, do you believe the Black-Scholes Model would do a good job?

A. It might. Again, I think there are adjustments that can be made for the factors you're citing. That is not something I've tested, but again, I'm using the Black-Scholes formula for a

CHAD COFFMAN

very limited component of what I am doing, which is assessing the expected change in the price given a specific change in the underlying, holding everything else constant except for the one-day change in the timed expiration.

Q.    You mentioned implied volatility, is that data that you were getting from IVolitility as well?

A.    Yes.

Q.    And do you know if IVolitility uses Black-Scholes to calculate implied volatility for Uniti?

A.    I would have to go back to their documentation.  I don't recall.  My sense is yes or my recollection is yes, but I just, I would have to go back and look at their documentation to be sure.

Q.    Would it be relevant if they used a different formula?

A.    I would have to think about that.  But ultimately I don't think so, given the limited nature of what I am trying to use the formula for.

CHAD COFFMAN

Again, I am not trying to predict the overall level of option prices.  I am just looking at a one day to the next change based on a change in the underlying price.

Q.    Suppose an option series had a statistically significant abnormal return on one of your news days, had zero trading volume on that day, do you interpret that as evidence of market efficiency?

MS. WYMAN:  Objection to form.

A.    Yes, because that suggests that the market bid-ask prices moved such that the market was valuing the option at a statistically significantly different value.

Q.    And what if there was no change in the bid-ask spread?

MS. WYMAN:  Objection to form.

A.    Well, I didn't say -- I said that the bid and ask prices were changing, not that the spread was changing.  So I am confused by your

CHAD COFFMAN

introduction of the spread as a relevant measure to this.  So that's why I am confused by your question.

Q.    It was a mistake.  What if there is no change in the bid and ask prices.

A.    It's not clear to me then how that would result in a statistically significant change in the option price. So unless there was some big negative expected movement or big positive expected movement, then it would be relevant information to consider as well. So I don't think that anything you're suggesting is, suggests an issue with the calculation.

Q.    You would need a change in the bid and ask prices in order to find a statistically significant abnormal return based on the analysis as you intended to run it; is that right?

A.    Again, you have to take into account the expected return.  But if, for example, the expected return was close to

Page 192

CHAD COFFMAN

zero, then in order to get a statistically significant option price movement the bid and/or the ask would have to move in a substantial way.

Q.   Now, Mr. Coffman, you talked earlier about differences between the methodology you used in this case versus prior cases.  And the fact that you at least conducted the analyses in this case on a series-by-series level; is that right?  Or conducted the calculations on a series-by-series level?

A.   Correct.

Q.   Is it fair to say that you analyzed the results of the news/no news test at an aggregate level rather than on a series-by-series level?

A.   Well, I certainly analyzed -- well, I think I would say that I did it, I did it both in the sense that if you look at slide -- I'm sorry, Exhibit 15, there I am summarizing for each earnings announcement date the number of different series that are significant at different

Page 193

CHAD COFFMAN

significance levels.  And what fraction of them are significant at different levels.  So the underlying analysis, the event study itself, and the determination of whether there is a price change that's statistically significant, is all being done at the series level.

That information, that information is then aggregated when performing the statistical tests on Exhibit 16.  But each individual series price movement is being analyzed separately to come to the -- as what the underlying observation is.  And then I am collecting together many different observations to do the cause and effect test that is reflected in Exhibit 16.

Q.    If you look at Exhibit 15, is it fair to say that you find a statistically -- a statistical significance for only a small fraction of the total number of option series --

MS. WYMAN:  Objection to form.

Q.    -- on each of those earnings

Page 194

CHAD COFFMAN

dates?

MS. WYMAN:  Objection to form.

A.    No, I think it varies from earnings announcement to earnings announcement.  And it's highly correlated with whether or not I observed a statistically significant movement in the stock price, which is exactly what you would expect if there was market efficiency.

So, for example, on the first event date, which the stock price moved in a statistically significant fashion, it's not at all surprising that I am able to find that a substantial -- that the vast majority of option price movements were also statistically significant.

So for the calls, I found 94.4 percent of the movements were statistically significant.  And for the puts, I found that 100 percent of the puts exhibited a statistically significant movement.

Now, go to event 4, where the

CHAD COFFMAN

stock price didn't really move very much, not even close to being statistically significant.  It's not at all surprising that I find that the options didn't move in a significant way, either.

So I don't think you can look at this -- the point of this exhibit isn't that there is overall a fairly small percentage that are statistically significant.  It's that the days in which we do see significance is highly correlated with when the stock price moved in a significant way.

So if you look at event 6 or event 7 or event 9, days where the stock moved significantly, a far greater percentage of the options moved significantly as well.

And then separately on Exhibit 16 and 17, I looked at the calls and puts and aggregate this data and show that overall, even setting aside that on many days the common stock didn't move significantly, so you wouldn't really

Page 196

CHAD COFFMAN

expect the options to move significantly. But even setting that aside and just looking at it all as one data sample, there is a statistically significant difference between the earnings announcement dates and the no news dates, on the same three metrics that we talked about earlier for the calls.

And then for the puts, at least for two of the three -- I'm sorry, it is significant for all three measures for both the calls and the puts.

Q.    So in Exhibit 16 for the call options, you analyzed whether in the aggregate across all of the call option series, there was a greater prevalence of statistically significant price movements on days there were earnings events compared to no news days; is that right?

A.    Yes.

Q.    And you did the same for the put options in Exhibit 17; is that right?

A.    That's correct, yes.

Q.    You did not analyze cause and

CHAD COFFMAN

effect on individual series of put or call options, correct?

MS. WYMAN:  Objection to form.

A.     Again, the underlying data was collected at the series level, but I didn't run this comparison that's on Exhibit 16 or 17 for any one individual series.  No, in my view that would not be the relevant evidence to consider.

Q.     So for each individual option series, you did not examine one way or the other whether prices for that series were more likely to move on days in which there were earnings-related announcements than they were to move on days without significant Uniti-related news, correct?

MS. WYMAN:  Objection to form.

A.     I did not run the equivalent of Exhibit 16 or 17 for each individual option series, no.  In my view, that would be unnecessarily ignoring lots of data that was relevant to the question at hand.

Q.     Would it be relevant to your

CHAD COFFMAN

opinion of market efficiency if on a given day when Uniti's stock price increased in a statistically significant manner, only a small percentage of the option series had a statistically significant price return?

MS. WYMAN:  Objection to form.

A.    Can I have that read back, please?

The record was read as follows:

("Question: Would it be relevant to your opinion of market efficiency if on a given day when Uniti's stock price increased in a statistically significant manner, only a small percentage of the option series had a statistically significant price return?")

A.    Not necessarily.  There may be reasons why that's occurring that have absolutely nothing to do with market efficiency.  For example, a particular option series or a whole bunch of option series may have heightened volatility

CHAD COFFMAN

during a particular period of time where it might just be harder to isolate a statistically significant stock price or option price movement.  So I wouldn't draw any specific conclusion from that.  There could be an easy explanation for it.

Q.    Is that something that would be relevant to investigate?

A.    I didn't see the need to, given the strength of the results I had, I didn't see the need to investigate whether that occurred or not.

Q.    That's not something you investigated, correct?

A.    That's correct.

Q.    Using your methodology, are you able to determine whether the majority of option series reacted to new news?

MS. WYMAN:  Objection to form.

A.    I guess I am a little confused by your question.  Are you saying on a particular day did a majority move in a significant way or for a particular

CHAD COFFMAN

option did it move significantly more than a majority of the time?  Like I am just a little confused about exactly how to interpret your question.

Q.    Well, is it possible that your aggregated results on Exhibits 16 and 17 are driven by a small percentage of the option series?

A.    Given some of the high percentages on Exhibit 15, on certain of the days where there was statistically significant movements in the stock price, I think that rules out that it was really being driven by a very small number of the series.

Q.    But were it driven by a small number of the series, would that be relevant to your conclusion?

          MS. WYMAN:   Objection to form.

A.    Again, given the results on Exhibit 15, I don't see how that's even plausible with, to conclude with my data. So I just haven't confronted that question.  I don't think that's a fair

CHAD COFFMAN

read of my findings.  So I haven't thought about whether that would be relevant or not.

Q.    You don't know one way or the other whether that would be relevant?

A.    Well, I satisfied myself that my results weren't being driven by a very small number of the series for which there were returns available.  So I didn't see that as a potential problem.

Q.    If results were driven by a small number of series, would that be relevant to your conclusion?

MS. WYMAN:  Objection to form.

A.    Again, I would have to understand better what was meant by a small number of series and how that was being determined.  And again, you know, looking at event 1, there is 17 different series alone out of 18 calls that drove that.  Event 6 there were 19 separate calls out of the 24 relevant call series at that date.  And there is other similar examples.

Page 202

CHAD COFFMAN

So I -- you're giving me a hypothetical that's totally inconsistent with the data that I am seeing.  So I haven't had an opportunity to consider what relevance that may or may not have. It wasn't necessary to investigate given the data I had.

Q.    If you look at Exhibit 15, number one, earnings announcement number one, you find a total number of series where a return is 18 and you find that 17 of those returns are statistically significant, correct?

A.    Yes.

Q.    Out of how many total option series is that 18, though?

A.    Well, a lot of the option series do not even exist at that point. This is looking over a four-plus year period.  So in terms of the total number of options in existence at any moment in time I'm not sure how many there are at that point in time.  But to the extent there are options that weren't traded or

CHAD COFFMAN

didn't have prices, those are being excluded. But I think to say 18 is a small number relative to the total number of series, it implies that all of those series were present and they weren't. Many of these options are only traded over short periods of time and go past the, you know, allow the options are created, the closer you get to the expiration date, or as the prices move around a lot. So comparing that 18 to the total number of series would be completely economically meaningless and statistically meaningless.

Q. Does that make it important to analyze this on a series-by-series basis?

A. No. I mean, it is an analysis done at the series-by-series basis. And it reflects the 18 calls and the 17 puts that had available returns on that day.

Q. Could you have analyzed your news/no news test, as reflected on Exhibit 16 and 17, at the individual series level?

Page 204

CHAD COFFMAN

A.    I'm sorry, was the question could I or should I?

Q.    Could you have.

A.    I mean as a matter of arithmetic, yes, you could do the equivalent of Exhibit 16 for a given option series.  You could make that calculation.  I don't think it would be particularly informative because of -- but theoretically, you could do it, yes.

Q.    And you did not do that analysis, correct?

A.    I did not.

Q.    Let's turn to your other principal opinion in your report that damages in this action can be calculated using a methodology that is common to each class member.

Is it fair to say that the common methodology you proposed to use to calculate damages in this case is the out-of-pocket method?

A.    Yes.

Q.    What are out-of-pocket damages?

CHAD COFFMAN

A.    Well, in the context of a class action securities matter as this, my understanding of out-of-pocket damages is based on looking at the artificial inflation at the time of purchase minus the artificial inflation at the time of sale, where that inflation represents the difference at each point in time between what the actual trading price was and what the trading price would have been had a, had the full undisclosed truth been revealed at each point in time.

Q.    Is it fair to say that a necessary component of any damages calculation under the out-of-pocket method is being able to determine artificial inflation for each day during the class period?

A.    Yes, since the methodology replies upon an inflation per share number as an input, it implies that when it ultimately comes time to perform that calculation after discovery and a detailed loss causation analysis, that

Page 206

CHAD COFFMAN

one is able to specify what the artificial inflation is on each day during the class period, yes.

Q.    And to determine the amount of artificial inflation in the share price on any particular date, you would need to determine what the price of the stock would have been if the information that was allegedly concealed from the market had been disclosed as of that date, correct?

A.    That's what one seeks to calculate, yes, as part of a loss causation analysis, and to compute the inflation, yes.

Q.    Again, I am not asking you to opine on what part of the case it is, whether it's part of loss causation or not.

I am just asking, in order to determine the amount of artificial inflation in the share price on any particular date, you'll need to determine what the price of the stock would have

CHAD COFFMAN

been if the information that was allegedly concealed from the market were disclosed as of that date; is that right?

MS. WYMAN:   Objection to form.

A.    Yes.   That's what would be necessary as an input to the out-of-pocket methodology, yes.

Q.    And that's sometimes referred to as a but-for price; is that right?

A.    A but-for price or true value price.  Yes, I've seen it referred a few different ways.  But the but-for price. And again, just to be clear, it's the way you described it.  I heard others describe it in a different way.  It's not the but-for price had there never been a misstatement or fraud.  It's the but-for price had the relevant truth been disclosed as of each point during the class period.

Q.    I think that's what I said in my question, correct?

A.    Yes, I am agreeing with you, that that's the right way to think about

Page 208

CHAD COFFMAN

it, yes. I heard it many other ways, but I am agreeing with your characterization, yes.

Q. Look at all the agreement we have, Mr. Coffman. It's wonderful.

A. That's something we agree about.

Q. Your report does not propose any methodology by which to calculate artificial inflation in the price of Uniti securities in this case, correct?

MS. WYMAN: Objection to form.

A. No, it talks about certain ways that are often used, but it does not specify the specific method by which I or anyone else would necessarily do it in this particular case. But it describes certain types of methodologies that are often used.

Q. You have not identified any particular methodology, technique or procedure that you believe would be appropriate to use in order to calculate artificial inflation in this case,

Page 209

CHAD COFFMAN

correct?

MS. WYMAN:  Objection to form.

A.    I think it would be hard to imagine an approach that does not rely at least in part on an event study approach which I described.  But I have not identified specifically what precise event study or on which dates or how it would be constructed, none of that is something I would be specifying.  It would be hard for me to imagine it wouldn't involve at least an event study on the dates in which allegedly withheld information in one way or the other was revealed to the market or a materialization of risks that were misleading or not fully disclosed revealed to the market.  It's hard for me to believe this wouldn't be an input of some kind, but I have not done that analysis nor determined what all the different methodologies that would be necessary to compute that.

Q.    And the entirety of your

Page 210

CHAD COFFMAN

damages opinion is included in Section 9 of your report, correct?

MS. WYMAN:  Objection to form.

A.      Well, it's certainly a summary and a summary of the bases.  I mean, if questioned about certain elements of it, I mean, I am sure there are spots that go beyond the words that are in the report. But overall in terms of the scope of my opinion, yes, I agree.

Q.      The entirely of your damages opinion as reflected in your report is included within Section 9, correct?

A.      Yes, that's a fair characterization.

Q.      And that consists of six paragraphs, correct?

A.      It's really just the first two paragraphs.  The last four paragraphs deal more with the types of analyses that would potentially be performed during a loss causation phase to try to quantify the artificial inflation.

The essence of the damages

Page 211

CHAD COFFMAN

opinion I am giving and the reasons for it are really subsumed just in the first two paragraphs of that section.

Q.    Is it fair to say that the six paragraphs in this section are copied nearly verbatim from other expert reports you've submitted in support of class certification motions in other security class actions?

A.    Absolutely.  And that's by design and precisely the point, which is once you're dealing with a case where it's clear that plaintiffs are seeking recovery based on the out-of-pocket method with -- or based on, I'm sorry, based on the economic rationale of an artificial inflation in the stock price, and they have an economic -- economically coherent theory as to why the stock price was inflated and how that artificial inflation got dissipated, then there is a general standard approach that is well accepted.  And there is the same way to describe it applies in virtually every

CHAD COFFMAN

case.  So by design, it's, yes, it's essentially copied and pasted.

Q.    Just to be clear, there is nothing in Section 9 of this report that is unique to this case, correct?

MS. WYMAN:  Objection to form.

A.    No, I don't think that's a fair statement at all.  I think in order to give the opinion that's in this section, I looked at, specifically, what plaintiffs were alleging.  I specifically discussed with plaintiffs' counsel what they were alleging and what the nature of the claims were.  Gained an understanding of whether the claims had an economic coherence to them.  And how -- and again, I didn't test the truth of the complaint or test the truth of whether there were dates on which the artificial inflation was dissipated.

But did they tell a coherent economic story of how the stock price is inflated and do I understand that the change in artificial inflation in the

Page 213

CHAD COFFMAN

price is the basis upon which they were seeking damages; the answer to those questions were yes. That's what we talked about earlier. I spent several hours, you know, thinking about the case and that's how I reached the opinion in this particular section.

Once that was decided, the words aren't any different, I agree, from case to case. But I certainly performed a case-specific analysis in order to get to this opinion.

Q. Let me just be more specific. For example, in paragraphs 97 and 98, you discussed that in determining per share inflation you would need to consider whether it's necessary to disaggregate confounding information, and how per share inflation may have evolved during the course of the class period. And then you go on to describe potential techniques or methodologies to address those issues, correct?

A. Correct.

CHAD COFFMAN

Q.    But the techniques and methodologies that you describe are not specific to the facts of this case, correct?

MS. WYMAN:  Objection to form.

A.    Well, they are specific to the types of claims that are being made, in general, in terms of the stock price being inflated and how.  And they are general in the way that, in the many, many examples of cases I or other experts I've observed have analyzed lost causation in these type of cases.  These are general issues that are confronted. You're right, though, I did not alter this list or consider which of the elements of this list may or may not be relevant for this particular case.

But certain of the statements I am making here are ubiquitous across virtually all securities litigation, in terms of, you know, do you have to consider confounding information?  Yes.

Do you have to consider if

CHAD COFFMAN

there is confounding information, how to value it?  Yes.

Do you at least have to consider how inflation might have evolved over the class period, regardless of what the claims are?  Yes.

So certainly I think a lot of these conclusions are just as apt to this case as to every other.  But if the question is, did I change the language or adopt this language because of certain specific facts in this case that are different than other cases, no.  It's describing a more generalized approach that certainly applies in this case, but it's not tailored to identify particular elements of what might or might not be used in this case versus others.

Q.    There are questions that are going to need to be answered in this case that are common to most any securities class action, correct?

MS. WYMAN:  Objection to form.

A.    I am sure that's the case, yes.

Page 216

CHAD COFFMAN

Q.    But you're not offering any opinion that any of the techniques or methodologies mentioned in this section would be appropriate to use in this case, correct?

A.    Again, it's hard for me to imagine that using an event study approach to analyze the dates on which there is allegedly information revealed that provides information that was either withheld or represents a materialization of a risk that was misstated.  It's hard for me to imagine that that's not going to have some relevance in a case like this -- or in this particular case, I'm sorry.

But, you know, for example, when I talk about using, if a disaggregation is necessary, and the use of valuation multiple methods and provide certain examples of those, I am not suggesting necessarily that that particular method is going to be necessary or appropriate in this case.

CHAD COFFMAN

You know, loss causation analyses are inherently case-specific, fact-specific. So I am not saying that any one of these particular disaggregation methods would even be necessary or that any particular one would be appropriate. That is not something I have been asked to analyze.

Q.    Fair to say that which of the techniques and methodologies are appropriate differs from case to case?

A.    Yes.

Q.    The techniques --

A.    Well, again, again, let's be clear what we're talking about before I just give a blanket answer.

We're saying specific approaches to analyzing loss causation and disaggregation analyses in order to try to isolate the stock price impact that reflects the dissipation of artificial inflation is inherently case-specific, fact-specific, context-specific analysis. And so, it's not clear which method may or may not be

Page 218

CHAD COFFMAN

relevant or appropriate in this particular case.

Q.    Is it fair to say that the techniques and methodologies to determine price inflation that can be used in one case may not be able to be used in another case?

MS. WYMAN:  Objection to form.

A.    That's fair.  That's fair, I think.  I think there are a lot of commonality.  As I mentioned, the use of an event study just in a general way is used in virtually every case to provide relevant information on how to quantify the inflation.

But in terms of all the different things you would have to consider or all the potential methodologies that might be relevant or necessary, I agree, those can change from case to case, in terms of quantifying the inflation.  The use of the out-of-pocket methodology is ubiquitous.  But the specific methodologies for quantifying

CHAD COFFMAN

inflation, I agree, can differ from case to case.

Q.    So the specific approach necessary to determine inflation is inherently case-specific; is that fair?

A.    Again, I think there can be a lot of commonality across cases. Certainly, of similar methodologies being used in similar circumstances, and virtually always the use of an event study. But which specific approaches and methodologies may be necessary, correct, requires a detailed case-specific analysis. And I have not done that.

Q.    So, for example, you say in your report that an often-used method to determine inflation over time is constant dollar inflation, but then in some cases it may be more reasonable to assume constant percentage inflation or to assume that inflation varied on a daily basis; is that right?

A.    Yes, that's correct.

Q.    And do you have any opinion as

Page 220

CHAD COFFMAN

to whether constant dollar inflation would be appropriate to use in this case?

A.    I have not evaluated that, no.

Q.    You haven't evaluated whether constant percentage inflation or some other method would be appropriate in this case, correct?

A.    That's correct.

Q.    Under what circumstances would constant dollar inflation be appropriate?

MS. WYMAN:  Objection to form.

A.    I don't know that I can lay out all the examples of all the different circumstances in which it would be appropriate.  But to the extent you believe that the value of the undisclosed information, that its nature and magnitude remained relatively the same over time, that there wasn't some major shift that would change the import or value of that information, then constant dollar might make perfect sense.

And I think, you know, to be clear, you know, my understanding of when

Page 221

CHAD COFFMAN

you're dealing with damages and coming up with inflation per share throughout a class period, the standard is reasonability.

So, you know, as long as it's reasonable to conclude that the market value of the withheld information stayed relatively constant or similar, then there would be justification for using constant dollar inflation.

Q.    Do you have any view as to whether that would be appropriate in this case?

MS. WYMAN:  Objection to form.

A.    I have not analyzed that question.  I have no view on it.

Q.    Going back to paragraph 94 of your report, you state that your assignment from counsel for lead plaintiffs in connection with your damages opinion was whether per share damages could be measured using a common methodology that is consistent with the lead plaintiffs' theory of liability,

CHAD COFFMAN

correct?

A.    Yes.

Q.    What does it mean for a damages methodology to be consistent with the lead plaintiffs' theory of liability?

A.    Well, my understanding is lead plaintiffs' theory of liability is that the alleged misstatements and/or omissions in this case caused Uniti's stock price to be artificially inflated. And when there is an allegation of that nature, then that suggests the out-of-pocket methodology will give the proper measure of damages, as long as one is measuring the inflation as the difference between the stock price and the price it would have traded at had a full disclosure been made.

So that's my understanding of what precisely plaintiffs' theory of liability is.  That there was a divergence between the market price and what the price should have prevailed, had there been a full disclosure, and that's

Page 223

CHAD COFFMAN

what they are seeking to cover as damages, is the difference between the artificial inflation at the -- if an investor purchased during the class period at an inflated price, and held that to the point that the inflation dissipated in part or in whole, that investors are entitled to damages based on that.

Q.    I think you said earlier that it was important to determine if plaintiffs have an economically coherent theory regarding how defendants' alleged misstatements or omissions purportedly distorted the company's stock price and how that distortion was corrected; do you agree with that statement?

A.    I agree that there needs to be some base -- in my view, at least, I am not willing to give this opinion until I'm satisfied that plaintiffs have a, at least a theory that makes economic sense. That there is some withheld information that would be value relevant, and that

Page 224

CHAD COFFMAN

ultimately, there was a method by which the market learned more of the relevant truth.  And that that could, again, not the fact of the matter that it did, but it at least could conceivably cause an inflated stock price and then ultimately for that inflation to come out.

And in reviewing plaintiffs' allegations, I do think they have at least an economically coherent economic story to tell.

Q.    Is it fair to say that in order for the out-of-pocket method to apply, you need to have information that was withheld from the market and that was later revealed to the market, either in whole or in part?

A.    Well, I think that's part of what's necessary to actually get to positive damages.  I think the out-of-pocket methodology works even if there were a finding of no material misstatements or no relevant revealing disclosure, because then it would boil

Page 225

CHAD COFFMAN

down to the inflation being zero when investor purchased and no inflation being dissipated.  So the out-of-pocket method actually works even without that.

But what I am saying is for there to be any hope of positive damages, there has to be an allegation of something the market wasn't told, either a misrepresentation or an omission.  And there needs to be a mechanism by which the price ultimately gets, there is a convergence between the actual price and the but-for price, because certain information is revealed that removes the artificial inflation.

Q.    And in your opinion there needs to be an economically coherent relationship between the story of how the stock became distorted in the first place and how the resulting inflation dissipated; is that right?

MS. WYMAN:  Objection to form.

A.    Yes.  And again, just to be clear, I am not saying that at this stage

Page 226

CHAD COFFMAN

that analysis takes into account every possible argument for why there might or might not be inflation.

I am just saying does it seem economically plausible that if plaintiffs' allegations are correct, that there was a misstatement and/or omission in the nature they described. And then there were events that effectively reveal either the materialization of a risk or some corrective information itself that causes the market to dissipate that artificial inflation. Then that's all I am really asking at this point. I am not testing it in any particular way, other than to say does this make some economic sense.

Q.    So embedded in your last answer, to your understanding, the information could ultimately be revealed, either through a corrective disclosure or through a materialization of the risk; is that right?

A.    Well, I was speaking very, very

CHAD COFFMAN

generally about claims generally, not even focused on this particular case. But sometimes I don't know that those two things are any different.

I hear people talk about materialization of a risk in lots of different ways and that theory in a lot of different things and I think it means a lot of different things to a lot different people.

When I was talking about -- I am just saying I understand plaintiffs' allegation here is that there was some materialization of an undisclosed or improperly disclosed risk which is part of their allegation here.

Q.    And in your mind, is there any difference between a corrective disclosure and a materialization of the risk?

A.    Not one that I think is relevant to the opinion I am giving now, no.  Again, I heard those phrases used in a number of different ways.

CHAD COFFMAN

The way I approach loss causation is to focus on is there a revelation of the relevant truth that was allegedly concealed, and whether you want to call that a materialization of a risk or a corrective disclosure or something else, it doesn't really matter, as long as it meets my understanding of loss causation is that it has to be something that reveals a portion of the relevant truth.  And that can be really be either of those things.

Q.    But in your mind, is there any difference between a corrective disclosure and a materialization of the risk, whether or not relevant to your opinion?

MS. WYMAN:  Objection to form.

A.    I would have to understand what the nature and context of the hypothetical is.

Again, in my view, from a loss causation perspective, it's really asking is there a revelation of the relevant

Page 229

CHAD COFFMAN

truth that's been concealed.  Whether you label it a materialization of a risk or a corrective disclosure isn't really particular important in my view from how I think about it as an economist.

Q.    And to your understanding, some or all of plaintiffs' claims in this case is based on the materialization of the risk theory; is that right?

A.    That's the way it's described in their complaint, yes.

Q.    Are all of their claims based on materialization of the risk theory?

A.    That's not an evaluation I made.  I don't know.

Q.    Would the calculation of inflation be different if information is revealed to be a corrective disclosure versus a materialization of the risk?

A.    I don't think about it in terms of those categorizations.

I think the way I think about it is you have to make an assessment of what portion of the stock price your

Page 230

CHAD COFFMAN

decline -- I am generalizing only to stock price inflation cases and ignoring deflation cases right now in my answers. But to the extent there is a stock price decline on a date that's alleged to have loss causation, whether you call it a corrective disclosure or a materialization of the risk, the relevant economic question is to what extent can that stock price decline or some portion of that stock price decline be inferred to represent inflation earlier in time.

And so in making that assessment, you have to determine to what extent would the full information that was revealed at that time have been something that could have been disclosed earlier versus only some portion of that or probability of that, that would have been disclosed earlier, that's a relevant thing to consider in the loss causation analysis.

Q.    So in a materialization of the risk case, would you agree that in order

CHAD COFFMAN

to measure inflation, you would have to determine what the but-for disclosure of the concealed true risk would have been?

MS. WYMAN:  Objection to form.

A.    To what specificity it would have to be quantified, I'm not sure.  But generally speaking when doing a loss causation analysis, you need to have a reasonable understanding of what it is that, at least the nature of the information that should have been disclosed.  Maybe it's not a word for word or a specific number or anything like that, but you have to have, to be able to articulate what is it you're evaluating the alternative disclosure should have been at least in substance and define that.

Q.    So in order to measure inflation, you would need to understand in substance what the alternative disclosure should have been?

MS. WYMAN:  Objection to form.

A.    And again, I'm not suggesting

CHAD COFFMAN

that you would need to know the precise wording or exactly what would have been said, but you need to have -- in order to value the missing information, you have to know what that missing information is. And so you have to have some articulation of what the alternative but-for disclosure would have been.

Q.    And in a materialization of the risk case, the but-for disclosure would not necessarily be the ultimate event through which the risk materialized, correct?

MS. WYMAN:  Objection to form.

A.    I would say in many cases that I've seen as described as a materialization of an undisclosed risk, that's right.

Now, there are certain cases that essentially the information that could have been disclosed was, and the price reaction that would have occurred is still reasonably proxied by what ultimately occurred.  But that's a

Page 233

CHAD COFFMAN

case-by-case evaluation that would need to be done.

Q.    So in order to determine inflation, you would have to understand the nature of the information that allegedly wasn't disclosed and you would need, is it fair to say you would also need to evaluate how the disclosure of that information would have changed the market's perception of the risk in the absence of that disclosure?

MS. WYMAN:  Objection to form.

A.    I think in general what you're saying is right.  You would need to understand how the market would have perceived the risk -- how the market perceived the risk.  And obviously whatever perceived risk existed is already reflected in the market price if it's an efficient market.

And then you're trying to assess how would the incremental disclosure of further risk have impacted the stock price.  That's ideally what

CHAD COFFMAN

you're trying to calculate, yes.

Q.    Let's take an example, Mr. Coffman.  Consider a company involved in a litigation and if the company loses the litigation, let's assume that the financial impact would be $100 per share, okay?

A.    Okay.

Q.    On day one the company disclosed to the market only partial information about the lawsuit, and based on that information the market believed there was a 10 percent chance of a negative outcome, okay?

A.    Okay.

Q.    So economically I would presume the market would have priced into the value of the stock a $10 per share liability based on a 10 percent chance of a $100 per share negative outcome; do you agree with that?

MS. WYMAN:  Objection to form. Brian, these questions are so far outside of the opinions that he's

Page 235

CHAD COFFMAN

given in this case.  I have been super patient with you.  But what you're trying to do is pretty obvious to me.

He hasn't done a loss causation analysis.  He can't answer these questions in the abstract.  The hypothetical you just gave is completely incomplete.  And I see no, no reason to continue on with this line of questioning.  I've been very, very patient and I'm not going to be patient much longer.  So that hypothetical is totally incomplete.  I don't know how he could possibly answer the question.  And I urge you to reign this in because I'm about ready to stop the depo if you're going to continue.

MR. BURNOVSKI:  That's sort of ridiculous.  We have the time.  I'm trying to be efficient with the deposition.  I would appreciate you stopping with the speaking objections. If you have an objection to form, you

Page 236

CHAD COFFMAN

can make it and that's perfectly appropriate.

I'm going to continue with the deposition the way I want to take it and I would appreciate if you stop with the speaking objections.

MS. WYMAN:  This is the first time I have made anything other than an objection to form and what you are doing is completely inappropriate. You know it and so do I.

MR. BURNOVSKI:  Your objection is noted for the record.

BY MR. BURNOVSKI:

Q.    So Mr. Coffman, going back to my hypothetical, presumably the market would have priced into the value of the stock $10 per share liability based on a 10 percent chance of a $100 per share negative outcome, correct?

MS. WYMAN:  Objection to form.

A.    I mean, this is a very simplistic hypothetical and I'm assuming the only relevant things are the things

CHAD COFFMAN

you're talking about, and assuming everything else about this company away and how it might interact with what you're describing.  But if we're talking about a simple lawsuit where everybody agrees the liability is $100, everybody agrees that the market currently believes there is a 10 percent chance they lose, and everybody agrees that if they are found liable, they absolutely have to pay the $100.

So that the implied -- and we're ignoring discounting and we are ignoring all sorts of other economic issues that are clearly relevant to assessing how the market would interpret this, but sort of in a very, very simplistic way, if there is a 10 percent risk of $100 loss and we are just going to ignore time, value, money and all sorts of other issues and appeals and other payment issues and that, but, setting aside all of those complications, if the market believes there is a 10

CHAD COFFMAN

percent chance of the company losing $100, than that $10 expected loss, you would expect to be priced into the stock price, yes.

Q.   Now also assume, Mr. Coffman, that the company had in its possession, but failed to disclose additional information about the lawsuit and that if that information had been disclosed, the market would have concluded that the risk of a negative outcome was 30 percent instead of 10 percent; with me?

A.   I understand your hypothetical, yes.

Q.   And so under that assumption, the quote unquote true risk of the litigation was $30 a share based on a 30 percent chance of a $100 per share negative outcome, correct?

MS. WYMAN:  Objection to form.

A.   I mean, I see in your hypothetical how you're getting to that result.

I think what's -- what I'm

CHAD COFFMAN

bothered by is you would have to take into account all the things the company was saying about this and how they were characterizing the lawsuit, and how the market was interpreting it and what the, you know, how, if there is a difference between a 30 percent chance and a 10 percent chance, would they be undertaking different legal strategies or would there be other things that you would be expecting the company doing.

So treating it in a vacuum like you're treating it never bears any real relation to reality. But from a purely sort of mathematical simplistic, if the market should have believed there was a 30 percent expected loss, $30 expected loss, and instead they believed it was a $10 expected loss, then there would be a $20 difference in the market's assessment of the value of the company.

But that also assumes that the only impact of that $20 is the $20 and not that it puts the company's ability to

CHAD COFFMAN

continue as a going concern at risk, that it doesn't put the company's overall risk level in jeopardy.  That it doesn't trigger other events separate and apart from that.  So it's a very simplistic way of thinking about it.  But I certainly see under your simple example how that would imply a difference of $20.

Q.    So you would agree in my hypothetical the inflation on day one would be $20 per share, which is the difference between the $10 per share risk that was actually priced into the shares by the market and the $30 per share risk that I told you to assume would have been priced into the shares if the company had fully disclosed the risk, correct?

MS. WYMAN:  Objection to form.

A.    Well, again, that makes all of the assumptions that were present in my last answer, that all of that sort of thing doesn't matter and that how the company was characterizing it qualitatively doesn't matter.  And that

CHAD COFFMAN

the strategy didn't matter.  And that the -- it didn't cause any further questions about going concern or riskiness of the firm.

So if you strip away all of the real life implications of a substantial verdict and what it might mean and how they could do business going forward, et cetera, so then you're just talking about the pure math of expected value, then I would agree with you.  But real life is never that simple.

But I agree conceptually with you that if all that mattered was the expected value of that lawsuit and that was the only thing that mattered, then, then the $20 inflation would make sense.

Q.     Is it fair to say that in order to determine damages in my hypothetical case, you would need to understand the market's original understanding of risk based on the information that was disclosed and how the but-for disclosure would have impacted that understanding of

Page 242

CHAD COFFMAN

the risk?

MS. WYMAN:  Objection to the form.

A.    I think that's fair.  You would certainly need to have a general understanding of how the risk profile of the company would be different if the full truth were told.

Q.    And your damages model does not propose any methodology to do that in connection with any of the allegedly undisclosed risks in this case, correct?

MS. WYMAN:  Objection to form.

A.    My methodology specifies precisely how once you have the inflation per share, what results from that calculates how damages would be calculated.  It does not seek to -- it does not describe precisely how those evaluations or details would be addressed in this particular case when constructing the inflation per share as part of the loss causation analysis.

Q.    Now, going back to my

Page 243

CHAD COFFMAN

hypothetical, assume that the risk of a negative outcome in the litigation ultimately materialized on day 100 and the company loses the case, okay?

A.    Okay.

Q.    At that point the risk of a negative litigation outcome is 100 percent, correct?

MS. WYMAN:  Objection to form.

A.    Again, assuming away all appeals and things, and payment issues and things of that nature, yes.  The negative litigation outcome has occurred at that point, yes.

Q.    That negative litigation outcome is not something the company could have predicted or disclosed on day one in my hypothetical, correct?

MS. WYMAN:  Objection to form.

A.    Well, my understanding is that they couldn't have disclosed it with certainty.  They could have, my understanding under your hypothetical, disclosed more and disclosed a heightened

Page 244

CHAD COFFMAN

risk and maybe other things about how it might impact the company and how that was affecting their legal strategy.

But I -- they could not have disclosed a verdict that had not yet, that I agree with.

Q.    Assume the market was pricing in the disclosed information that suggested a 10 percent risk of a negative outcome, on day 100 the stock would be expected -- all else being equal, would be expected to decline by $90 a share, reflecting the risk increasing from 10 percent to 100 percent times $100 a share; do you agree?

MS. WYMAN:  Objection to form.

A.    Again, under your very simplistic hypothetical, that's the case. It might actually react more if some of the things that I'm talking about come into play in terms of the firm now being in a riskier state.  Maybe having issues as to being able to continue as a going concern.  But assuming all of those

CHAD COFFMAN

things away, and under your simplistic assumption, you would expect the stock price to go down $90.

Q.   Would you agree that the $90 per share drop on day 100 in my hypothetical would not be reflective of the inflation in the shares as of day one?

MS. WYMAN:  Objection to form.

A.   Well, the full amount might not have been, but certainly a portion of it would be.

Q.   I'm sorry, my question is: Would you agree that the full $90 per share drop on day 100 would not be reflective of the inflation in the shares on day one?

MS. WYMAN:  Objection to form.

A.   I think I just agreed with that, that under your simple hypothetical where the market, had they had full information, only assessed a probability of loss of 30 percent, then the full $90 would not necessarily reflect artificial

CHAD COFFMAN

inflation, if that's the only relevant piece of information and under your very simple hypothetical.

But I make reference back to my answers over the last number of questions that describe why the real world is never that simple in terms of how to analyze this sort of risk.

Q.    In my hypothetical, in order to employ the out-of-pocket measure of damages, in order to actually figure out damages, you would need to, you would need a methodology to determine how much of a price drop on day 100 constituted inflation on day one, correct?

MS. WYMAN:  Objection to form.

A.    You would need an assessment of how much that decline, what portion of that decline reflects the dissipation of inflation versus the revealing of just new information that couldn't have been disclosed earlier, I agree with that.

Q.    What if information was allegedly -- moving off of my

CHAD COFFMAN

hypothetical, Mr. Coffman.  What if information was allegedly concealed from the market, but there is no allegation that the information was ever revealed to the market during the class period. Under those circumstances, would it be possible to calculate damages using the out-of-pocket method?

MS. WYMAN:  Objection to form.

A.    I don't see how that would ever get in the way of using the out-of-pocket methodology.  Especially since the inflation in the way that it's normally constructed is limited to observed stock price declines that relate to the revelation of information that reveals information about the alleged misstatements and omissions.

So what I'm talking about there is my understanding is you can never recover more than the decline in price related to the revelation of the relevant truth.

My understanding of the

Page 248

CHAD COFFMAN

hypothetical is there was some piece of misleading information that never gets corrected or at least not during the class period or at the post, immediately post class period disclosure, then there wouldn't be a relevant loss caused by the revelation of that specific piece of information.  So it wouldn't be part of the damages calculation anyway.

Q.    We have no way to calculate damages, correct?

MS. WYMAN:  Objection to form.

A.    No, I don't think I'm saying that at all.  I think I'm saying based on my understanding of the techniques that are required to calculate the artificial inflation in the first place, you would never -- that to the extent what you're saying happened, there just wouldn't be a portion of the inflation that's constructed based on that piece of information.  You're saying it never became disclosed or at least the relevant economic equivalent was never disclosed.

CHAD COFFMAN

So it would never be part of a date in which there is a stock price decline related to the revelation of that information, and therefore it's never entering into the inflation in the first place.

Q.    There just wouldn't be a portion of the inflation that is constructed based on that piece of information; I don't understand what you mean, Mr. Coffman.

A.    Well, I'm trying to work within your hypothetical.

So your hypothetical is -- and here is sort of a simplistic way to think about it -- is plaintiffs allege A, B and C are withheld from the market.  B and C get disclosed and there is a stock price decline, and there is damages and artificial inflation that's quantified using a loss causation analysis based on the disclosure of B and C.  A, there never gets disclosed, gets disclosed much later or just ceases to be economically

Page 250

CHAD COFFMAN

relevant at some point.

To the extent there is either no materialization of a risk or corrective disclosure related to A, it's never going to enter the inflation that's coming out of the loss causation analysis.  So to the extent it never got disclosed, and there is no relevant loss that's ever occurred because of A, it would just naturally be excluded from any damages calculation.  It doesn't -- it doesn't mean the out-of-pocket method can't be used, it's just not going to get incorporated.

If I somehow missed the nature of your hypothetical, then please correct me.

Q.   Well, there would be no way to calculate damages with respect to A, correct?

MS. WYMAN:  Objection to form.

A.   I think, just as a natural consequence of the way that loss causation is analyzed, A would not be

CHAD COFFMAN

part of the damages.

Now that's assuming that everyone agree that somehow A was never disclosed at time that B and C were, that there is never any stock price decline that's related to A. Then there wouldn't be any damages assessed for A because my understanding of the securities law is that you have to able to point to a loss that relates to A to collect damages for A.

MR. BURNOVSKI: Quick break?

MS. WYMAN: Sure.

THE VIDEOGRAPHER: Now off the record. The time on the video monitor is 4:48.

(Off the record.)

THE VIDEOGRAPHER: We are now on the record. The time on the video monitor is 4:57.

BY MR. BURNOVSKI:

Q. Welcome back, Mr. Coffman. During the break, did you discuss the substance of your testimony with

Page 252

CHAD COFFMAN

plaintiffs' counsel?

A.   No.

Q.   Mr. Coffman, in opining that damages in this action are capable of being measured on a class-wide basis consistent with plaintiffs' theory of liability, it was necessary for you to understand what plaintiffs' theory of liability in this case was or is, correct?

A.   At a very general level, yes, that's the case.

Q.   And based on your earlier testimony, is it fair to say that you attempted to gain that understanding by speaking with plaintiffs' counsel and reviewing a copy of the complaint?

A.   As well as the motion to dismiss order.

Q.   And to your understanding, has plaintiffs' theory of liability in this case changed since they filed their amended complaint?

A.   Not as far as I believe in

Page 253

CHAD COFFMAN

terms of the overall gravamen of the claim, no.  Maybe there are certain specifics that, you know, that they would emphasize more or less, but in terms of the general nature of the claim, I don't believe so, not that I'm aware of.

Q.    Are you aware of anything that they would exercise more or less?

A.    No.

Q.    To your understanding, there has been no change in plaintiffs' theory of liability since they filed their amended complaint; is that fair?

A.    Not that I'm aware of, that's fair.

Q.    And in trying to understand plaintiffs' theory of liability it would be necessary to understand what they allege to be false or misleading about defendants' historical disclosures, correct?

A.    At a very high level, yes.

Q.    And it would be necessary to understand how those misstatements or

CHAD COFFMAN

omissions were corrected or revealed to the market?

A.    Again, at a very high level, part of their complaint describes the certain events that in their view revealed some of the information or revealed certain -- or representative materialization of risks that had not fully disclosed that should have been disclosed.

Q.    What is your understanding of plaintiffs' theory of liability in this case?

A.    That the defendants in this case made certain misstatements and/or omissions that underrepresented the legal and financial risk of the sale-leaseback transaction that it had entered into and the legal and financial risk that that carried with it.

Q.    Anything else?

A.    Give me just a moment.

Q.    What are you looking at, Mr. Coffman, for the record?

Page 255

CHAD COFFMAN

A.    I just want to refer to the section of my report where I describe plaintiffs' claims in a very summary fashion and make sure there is not an element of it that I'm neglecting.  Just a moment.

Q.    You're referring to paragraph 13 of your report?

A.    I was just getting there. Well, 12 and 13.  12 describes, again, my understanding of their overall claim of the impact and how class members were damaged, and then 13 provides a little more specificity.  And again, this is meant to be just a very high-level description of my understanding of the claims.  So give me just a moment to reread paragraph 13.

(Witness reviews document.)

A.    I don't think I had explicitly included in my answer what's about three quarters of the way through that paragraph, which is "omitted the true risk facing the company should the

Page 256

CHAD COFFMAN

spinoff transaction or master lease be challenged or should Windstream declare bankruptcy."  I didn't specifically mention a potential Windstream bankruptcy or its effects before.  Other than that, I think it was a fair description.

Q.    Let me back up, Mr. Coffman.

Paragraph 13, does that accurately summarize your understanding of plaintiffs' claims?

A.    Yes.

Q.    Who drafted this paragraph?

A.    I don't recall if I or my staff wrote an initial version.  But it was based off of looking at the complaint and the discussions I had with plaintiffs' counsel.  And like I said in my earlier testimony, at some point a draft was provided to counsel and I don't recall if there were particular suggestions or edits to this section.

This was meant to be a reflection of their overall theory of the case and I believe is consistent with my

Page 257

CHAD COFFMAN

current understanding of their theory of the case.

Q.   Let's look -- let's start with -- I want to break down what you say here in a little bit more detail.

If you look at the second sentence of the paragraph, it says that "Lead plaintiffs' complaint alleges that defendants knew and actively concealed the material risk that the spinoff was a prohibited transaction by Windstream's indenture and that Wind -- and that Uniti was at greater financial risk in the event Windstream filed for bankruptcy."

Do you see that?

A.   Yes.

Q.   Is it your understanding that one of plaintiffs' theories of liabilities in this case is that defendants failed to disclose the risk that the spinoff was a prohibited sale-leaseback transaction under the terms of Windstream's debt indentures?

A.   My understanding is that their

CHAD COFFMAN

allegation is that there was more about that risk that should have been disclosed.  I don't know what -- I guess I didn't parse between whether they say there was absolutely no disclosure of any risk along that front or whether it was just an underrepresentation of that risk.

My general understanding is that they are saying there was certainly additional material -- additional material information about that risk or that would be necessary to provide a fair characterization of that risk with help from investors.

Q.    And that risk being that the spinoff was a prohibited sale-leaseback transaction under the terms of Windstream's debt indenture; is that correct?

MS. WYMAN:  Objection to form.

A.    My understanding is that that's the essence of, or at least one of the risks or a big part of the risk here being discussed is that the spinoff was a

CHAD COFFMAN

prohibited transaction or that there was a much greater risk of that than the market had been led to believe, yes.

Q.   In that same sentence, I want to focus on the second half of that sentence which says that defendants also concealed "that Uniti was at greater financial risk in the event Windstream filed for bankruptcy"; do you see that?

A.   Yes.

Q.   Is that referring to something separate and apart from the prohibited sale-leaseback theory?

A.   At least my understanding was the reason that is being complicated or contemplated that Windstream was at heightened risk for bankruptcy was because of the nature of the sale-leaseback transaction, not some other independent reason that they might go bankrupt.

Q.   Are you aware that plaintiffs also claimed that defendants failed to disclose the true risk that the master

Page 260

CHAD COFFMAN

lease between Uniti and Windstream could successfully be recharacterized as a financing arrangement rather than a true lease?

A.     Could I have that read back, please.

(The record was read as follows:

"Question:  Are you aware that plaintiffs also claimed that defendants failed to disclose the true risk that the master lease between Uniti and Windstream could successfully be recharacterized as a financing arrangement rather than a true lease?")

MS. WYMAN:  I'm going to object to form.

A.     I guess I've been focused on it as, that this entire structure that had been set up to accomplish the spinoff was prohibited under the indenture.  I haven't been focused on the details of whether it was one set of documents or another.  That's just a detail I was not

Page 261

CHAD COFFMAN

focused on.

MR. BURNOVSKI:  Let's do this, why don't we mark as Exhibit 2 a copy of plaintiffs' amended complaint.

(Exhibit 2, Plaintiffs' Amended Complaint, was so marked for identification, as of this date.)

Q.    Do you have that, Mr. Coffman?

A.    I do.

Q.    And plaintiffs' amended complaint was among the documents that you reviewed and considered in reaching your opinions, correct?

A.    Correct, yes.

Q.    Did you review the entire complaint?

A.    At one point I did, yes, in preparation for this deposition.  I skimmed portions of it, but I have not reread the whole thing in a very long time.

Q.    I will represent to you that Exhibit 2 is the version of the complaint that was produced among the documents

Page 262

CHAD COFFMAN

provided to us by plaintiffs' counsel from among the documents on which you -- that you considered in connection with your, forming your opinions.

A.    Okay.

Q.    Does this look like the version of the complaint you would have considered or reviewed in forming your opinions?

A.    The highlights that are in here do not look like something I would have reviewed or contemplated.  So I don't know where those came from.  I don't know if members of my staff added that.  But I don't remember that being part of what I initially reviewed.

Q.    Okay.  You have never -- I will represent to you that the highlighting was on the document when it came to us from plaintiffs' counsel.  Are you saying that you don't remember adding any of that highlighting?

A.    I did not personally add any of that highlighting.  Perhaps members of my

Page 263

CHAD COFFMAN

staff did, but I did not, no.  And I don't believe it came that way from counsel, either.

Q.    Would it be common for members of your staff to highlight particular portions of a complaint that you're reviewing?

A.    They might do it for themselves.  Usually I would look at an unhighlighted version for myself.  I don't rely on staff highlighting particular documents for me when I'm reviewing them.  That is not part of my normal procedure.

Q.    If you look at paragraph 16 of the complaint.

A.    Okay.

Q.    Beginning with the second sentence, it says that "Throughout the class period defendants repeatedly concealed that the spinoff violated the indenture by hiding from the market and investors (i) the material risk that the spinoff was a prohibited sale-leaseback

Page 264

CHAD COFFMAN

transaction that violated the indenture and (ii) the true extent of the risks that the master lease was not a true lease, but rather a carefully disguised financing arrangement."

Do you see that?

A.    Yeah, and I think the next part of it talks about it violating the indenture, the same indenture that I understand that is being referred to in one.  Yes, I see that.

Q.    Is it your understanding that romanette (i) and (ii) in that sentence are two different theories of liability that the plaintiffs are asserting?

A.    I never thought about it as two different theories of liability.  I thought about it as one theory where there were material risks as a result of the way the spinoff was structured.  I wasn't being specific to the sale-leaseback transaction versus the master lease being a true lease.  It was just that this transaction was structured

Page 265

CHAD COFFMAN

in such a way that it put them at greater legal and financial risk. That's the way, as I was thinking about it, I was conceiving of it.

To the extent there is specific different theories related to both of those, that was not the focus of my study.

Q. To the extent plaintiffs are asserting two separate theories in that regard, that's not something that you are aware of or considered; is that fair?

A. It's fair to say that I don't see how either of them, to the extent you consider them together or separate, changes in any way the applicability of the out-of-pocket methodology and it certainly has nothing to do with market efficiency. So that distinction had no relevance to my, the opinions I was giving.

Q. As you read this paragraph, Mr. Coffman, is it fair to say that the alleged failure to disclose the true risk

Page 266

CHAD COFFMAN

of recharacterization is distinct from the alleged failure to disclose the risk that the spinoff was a prohibited sale-leaseback transaction under the indenture?

MS. WYMAN:  Objection to form.

A.    I'm sorry, you lost me there a little bit.  Could I have it reread or rephrased?  Either way is fine with me. Reread is fine.

(The record was read as follows:

"Question:  As you read this paragraph, Mr. Coffman, is it fair to say that the alleged failure to disclose the true risk of recharacterization is distinct from the alleged failure to disclose the risk that the spinoff was a prohibited sale-leaseback transaction under the indenture?")

A.    Well, I mean it's listed under two sub-bullets, but I'm not a lawyer so whether that makes it distinct as a legal matter is not something I'm prepared to

CHAD COFFMAN

comment on or give an opinion about.

Q.    And that's not something that you have any understanding of; is that right?

A.    Well, I think I just described in one of my prior answers why it didn't have any relevance to me for the opinions I was giving, which is whether it does or it doesn't, it doesn't change anything about the applicability of the class-wide methodology I describe or whether the market for Uniti securities was efficient.  So it has no bearing whatsoever on my opinions.

Q.    I appreciate, Mr. Coffman, that that's your view, but that wasn't my question.

My question was, you don't have any understanding as to whether i and ii are two separate theories of liability that the plaintiffs are asserting?

MS. WYMAN:  Objection to form.

A.    I've always thought about it as one theory of liability with multiple

Page 268

CHAD COFFMAN

parts and multiple facts.  I don't think of it as -- I never considered it as two separate theories of liability.  I think that's the best way I can answer that question.

Q.    Let me ask it this way.  We talked earlier about the but-for disclosure, right, the concept of what plaintiffs allege should have been disclosed, correct?

A.    And I think we were talking about that how someone undertaking a loss causation analysis should have a clear understanding of that, yes.

Q.    But you're the one who has mentioned loss causation today, not me.

I'm just saying earlier today -- again, I don't care about your legal opinions, Mr. Coffman.  I'm just asking -- I would ask you to just confine your answers to my questions.  And earlier today we talked about the concept of a but-for disclosure, which I think we described as being conceptually what

CHAD COFFMAN

plaintiffs allege should have been disclosed?

MS. WYMAN: Objection to form.

A. Yeah. And I'm sorry, I don't -- I'm not making any legal conclusions. I was just making sure that the context of -- you're characterizing my testimony now and what I said. And I just want to be sure that any one reading the answer to this question understands that you are asking me about but-for disclosures in the context of how -- what type of information someone calculating the artificial inflation at different points in time would need to consider, not about whether the out-of-pocket methodology is applicable or whether the market for Uniti securities is efficient. So when you were characterizing my testimony, I want my testimony to be clear that that is not even relevant to anything I'm testifying about. But, yes, you asked me in that context about needing to know something about what

Page 270

CHAD COFFMAN

would be disclosed.

So I agree with you that ultimately someone analyzing to what extent the stock price was inflated would need to try to understand the scope and nature of what plaintiffs are alleging that defendants should have disclosed.  I agree with that portion -- if that's the extent of your question, I agree with it.  But it's only in that context and at that point; not now.

Q.    Mr. Coffman, my question is much simpler than that.  But for -- a but-for disclosure is the concept of what plaintiffs allege should have been disclosed, correct?

MS. WYMAN:  Objection to form.

A.    I agree with that, yes.

Q.    Okay.  And do you have any understanding as to whether in connection with romanette (i), the failure to disclose the material risk that the spinoff was a prohibited sale-leaseback transaction that violated the indenture,

CHAD COFFMAN

whether the but-for disclosure in connection with that risk is the same as the but-for disclosure in connection with the failure or the alleged failure to disclose the true extent of the risk that the master lease was not a true lease, but rather a carefully disguised financing arrangement?

MS. WYMAN:  Objection to form.

A.    And the answer is I don't know. That's not something I considered nor was it necessary to consider to reach the opinions I'm giving.

Q.    I didn't ask you if it was necessary to reach the opinions you are giving, Mr. Coffman.  This deposition will be a lot faster if you just answer my questions.

MS. WYMAN:  He is answering your questions.  You're going to have to stop.

MR. BURNOVSKI:  I'm not done with my question.  If you want to object, you can object.

Page 272

CHAD COFFMAN

MS. WYMAN:  You can ask it one more time, but that's it.  That's it.  That's it, Brian.  You've asked this question four times and he's answered it exactly the same way four times, notwithstanding what happened before we took this break and the little transverse into the loss causation land that you took us.  So you can ask the question one more time.  He can answer it again, but that is it.

MR. BURNOVSKI:  Again, Deb, stop with the speaking objections.  Object to form if you want.

MS. WYMAN:  Stop asking him the same question over and over, stop asking him questions that fall outside --

MR. BURNOVSKI:  Deb, I'm going to ask the questions that I want to ask.

MS. WYMAN:  Stop.

MR. BURNOVSKI:  Enough.

MS. WYMAN:  Stop.

CHAD COFFMAN

Q.    Mr. Coffman, you don't have any understanding of whether the but-for disclosure in connection with (i) would be the same as the but-for disclosure in connection with (ii)?

MS. WYMAN:  Objection to form.

A.    That is not something I carefully considered, no.

Q.    And you don't have any understanding, correct?

MS. WYMAN:  Objection to form.

A.    In terms of whether it's appropriate to parse it out in that particular way or to think of it being one general relevant truth or defining it as one relevant truth that needed to be disclosed, or whether this represents one theory or two theories, no, I don't have a view on that.

Q.    You don't have any understanding as to what information exactly was allegedly concealed that would have revealed the true risk of recharacterization?

CHAD COFFMAN

MS. WYMAN:  Objection to form.

A.    That is not part of what I was asked to evaluate and no, I don't.

Q.    And you don't have any understanding of what information was allegedly concealed that would have revealed the material risk that the spinoff was a prohibited sale-leaseback transaction and violated the indenture?

MS. WYMAN:  Objection to form.

A.    No, I think, I mean I generally described what my understanding is.

Plaintiffs are alleging that defendants made statements and/or omissions that failed to properly disclose those risks.  That's my understanding.

Q.    But you don't know what information it is that defendants allegedly concealed, correct?

MS. WYMAN:  Objection to form.

A.    Well, I have not studied the details of precisely what they should have disclosed.  The complaint itself

Page 275

CHAD COFFMAN

goes through lots of purported facts of things that weren't disclosed. But for purposes of my analysis it wasn't necessary to gain a detailed understanding of precisely what a but-for disclosure would have been.

Q. And is it fair to say that you don't even have a general understanding of what the but-for disclosure would have been?

MS. WYMAN: Objection to form.

A. Well, I mean, in my experience as a damages expert, when I'm performing a loss causation analysis at the time where it's relevant for me to define that in some meaningful way, or in some detailed way, is usually with the benefit of assumptions from counsel after having performed significant discovery, what they ultimately at trial will be able to prove from the things that defendants knew and should have disclosed to the market.

So pre, um, class

CHAD COFFMAN

certification, what I am -- and it certainly had absolutely no relevance to my market efficiency opinions whatsoever.

And for my damages opinion all I was considering was whether there is an economically coherent story as to why the stock price was potentially inflated by misrepresentations and/or omissions. I didn't need to undertake a detailed analysis of what that means.

I have a general understanding of what was being alleged that I already described; that there were facts and circumstances known to defendants which made the risk of the facing financial and legal risk as a result of things that were undisclosed to the market about the nature of the spinoff transactions, was withheld from the market.

Q. And you don't need to know anything about the nature of what defendants concealed in order to determine if there is an economically coherent theory between the alleged

Page 277

CHAD COFFMAN

misrepresentation and the alleged revelation?

MS. WYMAN:  Objection to form.

A.    No, I read the complaint and understand some of the general nature of the types of information that plaintiffs were relying on at the time of the complaint.

You know, my understanding is through discovery that may, you know, the facts of who knew what when and what should have been disclosed may evolve. So I wasn't presupposing some very specific detail but for disclosure.  It just wasn't necessary.

Q.    Let's take a look at paragraph 28 of the complaint.  The beginning of that paragraph it refers to Windstream attempting to recharacterization the master lease as a financing in an adversary proceeding; do you see that?

A.    I see that.

Q.    Are you aware that Windstream brought a claim against Uniti in an

Page 278

CHAD COFFMAN

adversary proceeding that was part of its bankruptcy to attempt to recharacterize the master lease?

A.    Not beyond what's described here in the complaint, no.

Q.    Do you know whether Windstream was successful in recharacterizing the master lease?

A.    No.

Q.    And as we talked about earlier, one of plaintiffs' claims is that defendants failed to disclose the true risk of Windstream being able to successfully recharacterize the master lease; is that right?

MS. WYMAN:   Objection to form.

A.    I believe that's the words we read is an element of their claim is the risk that the master lease was not a true lease.

Q.    But you don't know what information would have revealed the true risk, correct?

MS. WYMAN:   Objection to form.

CHAD COFFMAN

A.    That's not something I've been asked to study nor was it relevant to the opinions that I'm giving.

Q.    Later in this paragraph it talks about the fact that, or it alleges that the -- that "Windstream's filings in the adversary proceeding demonstrated that Windstream, Uniti and their key executives knew that the entire transaction was predicated on false information, specifically grossly inflated projections of the useful life of the copper wire assets that formed almost 80 percent of the assets transferred in the spinoff."

Do you see that?

A.    I see that sentence.

Q.    Is that something that you had focused on previously?

A.    I mean, I had read it.  It was not a -- again, whether that specific fact is true or not is not really pertinent to any opinion I'm giving.  But I've seen that sentence before, yes.

Page 280

CHAD COFFMAN

Q.    Do you know whether plaintiffs' claim is that what defendants failed to disclose in connection with describing the risk of recharacterization relates to the projections of the useful life of the copper wire assets that were transferred to Uniti in the spinoff?

MS. WYMAN:  Objection to form.

A.    Can I have that read back, please.

(The record was read as follows:

"Question:  Do you know whether plaintiffs' claim is that what defendants failed to disclose in connection with describing the risk of recharacterization relates to the projections of the useful life of the copper wire assets that were transferred to Uniti in the spinoff?")

A.    I haven't determined whether those things relate to each other or not.

Q.    Let's go back to paragraph 13 of your report, Mr. Coffman, which is Exhibit 1.

Page 281

CHAD COFFMAN

A.    Okay.

Q.    And after footnote 12, the next sentence of that paragraph, after the sentence we were just talking about earlier, says, "Lead plaintiffs further allege that defendants misled investors and omitted the true risks facing the company should the spinoff transaction, or master lease, be challenged or should Windstream declare bankruptcy."

Do you see that?

A.    Yes.

Q.    And is your understanding with respect to that allegation by lead plaintiffs any different than the risks we had talked about earlier?

MS. WYMAN:  Objection to form.

A.    Which risks that we talked about earlier are you referring to?

Q.    I mean, the risks that we talked about earlier in paragraph 16 of the complaint.

A.    I don't think it falls outside of the risks that are described in

CHAD COFFMAN

paragraph 16 of the complaint, no.

Q.    So I guess my question is, maybe a better question is:  Is that sentence that I just read describing something different than the prior sentence?

A.    I don't think of it as referring to a different theory, no.  I just see it as restating the theory or part of the theory.

And I just want to put some context on this, paragraph 13 is meant to be a very broad, overarching summary of what's in the complaint.  The complaint obviously speaks for itself.  The way the court characterized the complaint speaks for itself.  I was merely trying to have a very brief, very overarching, 10,000 foot summary of the claims here.  And obviously those other documents are much more on point than my own for characterizing what the complaint and the claims in the case are.

Q.    Is it fair to say that the

Page 283

CHAD COFFMAN

theory or theories that we were talking about in connection with paragraph 16 of the complaint are omission theories?

MS. WYMAN:  Objection to form.

A.    I generally understand that part of what the plaintiffs are stating is that the company omitted information, if that's the question, yes.

Q.    And in addition to alleging that defendants omitted information, are you aware that plaintiffs also allege that defendants made affirmative misstatements beginning in March of 2019 regarding Uniti's ability to navigate the Windstream bankruptcy proceedings without having to raise external capital; does that sound familiar to you?

A.    Yes.

Q.    And plaintiffs allege that defendants' statements about Uniti's ability to navigate the Windstream bankruptcy proceedings without having to raise external capital were false or misleading, correct?

Page 284

CHAD COFFMAN

MS. WYMAN:  Objection to form.

A.    That's my general understanding of what they are alleging, yes.

Q.    And is it fair to say that that theory of liability, that misstatement theory, is independent of the omission theories relating to the sale-leaseback and lease recharacterization?

MS. WYMAN:  Objection to form.

A.    I haven't made any determination on that.  I don't want to speculate about that.

Q.    Do you know how many individual misstatements plaintiffs allege in this action?

A.    I don't remember a specific count, no.

Q.    So in the complaint, in paragraph 139 --

A.    Give me just a moment.

Q.    If you look at Exhibit 2.

A.    You said paragraph 132?

Q.    139.

A.    139, sorry.  Okay.

Page 285

CHAD COFFMAN

Q.    Do you see that paragraph follows a section header, section six, that says "The defendants' false and misleading statements and omissions during the class period"?

A.    I do, yes.

Q.    And paragraph 139 begins: "Lead plaintiffs allege that the statements highlighted in bold and italics included in this section were materially false and misleading"; do you see that?

A.    Yes.

Q.    And I will represent to you that based on that standard, by my count, there are more than 40 alleged misstatements in the complaint.

Do you have any reason to disagree with that?

A.    No.

Q.    Based on your experience, is that a large number of alleged misstatements based on other securities class actions in which you served as an

Page 286

CHAD COFFMAN

expert?

A.    No.  I mean, everyone's different.  I have seen as few as one up to dozens, maybe even 100.  So that's not shocking in any way.

Q.    To your understanding, are plaintiffs alleging that inflation relating to each of the alleged misstatements was introduced into the stock price at the same time?

MS. WYMAN:  Objection to form.

A.    That's not generally how I read their complaint.  Again, I don't know precisely how plaintiffs might think inflation gets introduced in their own minds based on their theory.  It's not something I even discussed with them.

I have a general understanding that they are saying the risks of the structure of the spinoff were understated and that, therefore, from the very beginning of the class period, there was artificial inflation in the price.  Whether they believe further statements

Page 287

CHAD COFFMAN

after that introduced additional inflation or just served to conceal the already existing inflation, I think that's more consistent with my understanding of their claim.

But honestly, I don't know what they have in their mind as to whether there is additional inflation introduced at different points in time. That is something that would require detailed analysis before knowing whether that's the case or not.

Q. Would you agree that the alleged misstatements or omissions relating to the risk of an indenture violation or the risk of recharacterization preceded Uniti's existence as an independent public company?

MS. WYMAN: Objection to form.

A. I suppose that's possible. It's not something I really thought about or -- I don't know. That's not something I thought about.

Page 288

CHAD COFFMAN

Q.    Would that be relevant in any way to damages?

A.    Not that I can think of as I sit here, no.  Whether an investor who purchased on the first day of a class period, the degree to which that they paid an inflated price wouldn't depend on whether there were or weren't misrepresentations predating the class period.

Q.    What if there were investors who didn't purchase their stock but just received it in the spinoff?

A.    That is not something I specifically considered, whether it would be relevant or not.

Q.    So you don't have an opinion or an understanding as to whether any subsequent alleged misstatements after Uniti spun off from Windstream either maintained any preexisting inflation of the stock or incrementally increased the inflation; is that right?

MS. WYMAN:  Objection to form.

Page 289

CHAD COFFMAN

A.    That's not an issue that I studied, no.

Q.    We've talked a little bit about plaintiffs' alleged omissions and misstatements, but we haven't talked about the corrective disclosures.

Do you know how many corrective disclosure dates plaintiffs allege in the action?

MS. WYMAN:  Objection to form.

A.    I recall several.  I would have to go through and look up each one to be certain.  But I believe it was four. Four or five.  I don't recall -- I don't recall the exact specific number.  I can recall a few of them.  But I don't necessarily recall all of them off the top of my head.  I can look at the complaint if you would like me to.

Q.    Well, let's look at paragraph 246 of the complaint.  That paragraph says, "The truth and concealed risks materialized through a series of disclosures as detailed below."

Page 290

CHAD COFFMAN

A.    Yes, sorry, give me just one second.

Yes, I see that.

Q.    And following that paragraph are four different subsections labeled A through D, which describe four separate alleged partial disclosures; is that right?

A.    Yes, that rings a bell now.  It appears to be four that are alleged.

Q.    And just briefly, before we get to that, just take a quick look at paragraph 244 of the complaint.  And there is a highlighted sentence that says, "As a result of these partial disclosures of the fraud, the price of Uniti's stock fell from $24.69 per share at the close of trading on August 2, 2017 (the day before the truth began to enter the market) to $9.38 per share at the close of trading on June 25, 2019-a 62 percent decline."

Do you see that?

A.    I do.

Page 291

CHAD COFFMAN

Q.    And is it fair to say that that is describing the full time period in which the purported truth was revealed to the market for purposes of this action?

MS. WYMAN:  Object to form.

A.    It seems to be describing the time from August 2nd, 2017 to June 25th, 2019.

Q.    And the sentence after that, it's not highlighted, but refers to a decline in the price of Uniti's bonds; do you see that?

A.    Yes.

Q.    Do you know if Uniti's debt securities is part of the proposed plaintiffs' class?

A.    My understanding is they are not, based on my understanding of what I was asked to look at.  But I don't know that for a fact, I guess.

Q.    Were you ever asked to analyze Uniti's debt securities in connection with your work on this case at any time?

A.    Members of my staff may have

CHAD COFFMAN

been asked to analyze certain things. But I don't recall looking at Uniti's bond securities before, no.

Q.    Do you know whether members of your staff were asked to look at Uniti's bond securities?

A.    I don't know.  I know there were things that certain members of my staff were asked to do.  I wasn't monitoring exactly everything they were being asked to do.

Q.    Do you know whether anyone at Global Economics Group ever attempted to determine whether any of Uniti's debt securities traded in an efficient market?

A.    I don't -- I'm not aware of anyone on my staff being asked to make that determination, no.

Q.    So I just want to -- let's go back to paragraph 246 which is the prelude to describing the four partial disclosures in Sections A through D in this section of the complaint, okay?

A.    Okay.

CHAD COFFMAN

Q.    If you look at paragraph 247, the first alleged partial disclosure is August 3rd, 2017, when Windstream announced the dividend cut; do you see that?

A.    Yes.

Q.    To your understanding, what previously concealed fact or risk was disclosed by virtue of Windstream's dividend cut on August 3rd, 2017?

MS. WYMAN:  Objection to form.

A.    I mean, my general understanding of what's being alleged here, based on reading this, is that the reduction of the dividend represents a materialization of the risk that Windstream, that somehow the structure that had been put in place was inappropriate and this reflected Windstream's lessened ability to pay Uniti.

I have not, you know, I have not undertaken a detailed analysis of all the reasons this day may or may not be a

Page 294

CHAD COFFMAN

materialization of a risk or a corrective.  But my understanding is that plaintiffs are alleging that this is information that caused Uniti's stock price to decline and it reflected, at least they point to at least one analyst that ties it to questions about whether the sale-leaseback structure was appropriate.

Q.    To your understanding, did the dividend cut reveal the risk that the spinoff and master lease violated Windstream's debt covenants?

MS. WYMAN:  Objection to form.

A.    I have not formed an opinion on that or done an analysis to evaluate that.

Q.    As of August 3rd, 2017, do you know if Uniti even claimed that there was a default under Windstream's indentures?

A.    I don't know what Aurelius has claimed up to that point.  I recognize that plaintiffs point to an 8-K that gets filed after this that discloses

Page 295

CHAD COFFMAN

Aurelius's notice of default.  But what communications with Aurelius has been had up to this point, I have no idea.  I have not analyzed that.

Q.    So you don't know one way or the other whether the dividend cut revealed the risk of the spinoff and master lease violating Windstream's debt indentures, correct?

MS. WYMAN:  Objection to form.

A.    That's not something I have been asked to evaluate, no.

Q.    Do you have any understanding as to whether the dividend cut revealed the risk that the master lease was not a true lease or that the master lease could be recharacterized?

MS. WYMAN:  Objection to form.

A.    I have not undertaken any analysis of that, no.

Q.    Do you know why Windstream cut its dividends?

A.    I have not analyzed that, no.

Q.    Would that be relevant to

Page 296

CHAD COFFMAN

whether plaintiffs had an economically coherent theory of liability?

A.    No, I wasn't as focused on this particular disclosure as necessarily supporting my view that there was an economically coherent theory of liability.

Q.    Would that be relevant to whether plaintiffs had an economically coherent theory of liability?

MS. WYMAN:  Objection to form.

A.    No, it may be relevant, possibly.  I haven't determined one way or the other.  It may be relevant whether this particular event is properly considered a materialization of a risk or a corrective disclosure.  But as to whether overall there an economically coherent theory here, no, it doesn't make any difference here.  It was not dependent on that.

Q.    Part of determining of whether plaintiff has an economically coherent theory of liability is understanding the

CHAD COFFMAN

nature of the alleged concealed information and how that information was revealed to the market or the fact that it was revealed in some form or fashion to the market, correct?

MS. WYMAN:  Objection to the form.

A.    I think there has to be some general understanding and belief that that's an economically coherent story. I'm telling you this particular disclosure wasn't really my focus.

My focus was on some of the other disclosures, and whether, whether event A is ultimately deemed a corrective disclosure or not, doesn't change whether or not there is an economically coherent theory of liability in my view.  It might impact which days are relevant for damages or what the ultimate quantum of artificial inflation is, but I don't think plaintiffs -- the theory of plaintiffs' liability is dependent upon event A being a materialization of the

CHAD COFFMAN

risk or a corrective disclosure.

Q.    Would you agree that even if Uniti disclosed the risks that plaintiffs' claim should have been disclosed prior to August 3rd, 2017, Uniti's stock price still would have declined in response to an announcement that Windstream was cutting its dividends?

MS. WYMAN:  Objection to form.

A.    That's possible.  But I have no idea if that's the case or not.  That's not something I evaluated.

Q.    A cut in Windstream's dividend would signal financial weakness on the part of Windstream, correct?

MS. WYMAN:  Objection to form.

A.    Not necessarily.  It depends, again, on why they are cutting the dividends.  Some companies cut their dividends in order to have more cash to invest in certain assets or certain market opportunities.

So just by observing a dividend

Page 299

CHAD COFFMAN

cut doesn't necessarily signal financial weakness, not at all.  That alone, without context, is not enough to conclude that, no.

Q.    It's possible the market could view a dividend cut as a signal of financial weakness on the part of Windstream, correct?

MS. WYMAN:  Objection to form.

A.    I'm not ruling that out. That's certainly possible.

I'm saying just the very fact of it though doesn't necessarily allow you to conclude financial weakness.  You have to look at it in context and see how the market was interpreting it and why the company was doing it.

Q.    If the market did interpret it as a signal of financial weakness, that would be a bad signal for Uniti, correct?

MS. WYMAN:  Objection to form.

A.    I would want to study that much more carefully before reaching a definitive opinion on that.

CHAD COFFMAN

But generally I understand, just through my reading of the analyst reports, et cetera, that given Windstream's position as an important customer of Uniti's, that Windstream's financial weakness or ability to pay being called into question would have not been a good thing for Uniti.  It would have had downside risk potential for it.

Q.    Bad news that signals that Windstream might have difficulty paying on the master lease would be bad for Uniti and would tend to depress Uniti's stock price, correct?

MS. WYMAN:  Objection to form.

A.    Again, I think you have to look at the full context of any particular announcement you're asking about.  But as a general matter, based on my understanding of the business of the companies, if there was something that raised the risk of Uniti getting paid by Windstream, I agree, that would not be a good thing for Uniti.  It would

CHAD COFFMAN

potentially negatively affect them.

Q.    And that would be true regardless of whether the bad news had anything to do with the allegations in this case, correct?

MS. WYMAN:  Objection to form.

A.    I was answering the question without regard to whether it had anything to do with an alleged fraud or not.

Q.    Bad news about Windstream that signaled inability to pay the rent under the master lease could potentially depress Uniti's stock price regardless of whether that signal had anything to do with the allegations in this case, correct?

MS. WYMAN:  Objection to form.

A.    I certainly agree with the first part of what you said, which is that it would potentially have an adverse impact on Uniti's value and price.

Whether there is a relevant way in which it could be bad news or reflect something independent of the allegation

CHAD COFFMAN

in this case, and whether that is even plausible, is not something I've come close to evaluating.  So I don't know whether, whether that's possible or not.

Q.    Is that something that you would need to consider in assessing damages in this case?

A.    Well, I think the causal link between -- if one were doing a loss causation analysis and trying to compute the artificial inflation, the causal link between an adverse disclosure by Windstream and a -- and assuming that meant an adverse change in the price of Uniti's stock, the causal link between that and the misrepresentations and/or omissions to the extent there was any, is something you would want to consider, yes, or the lack thereof.  Either way.

Q.    In paragraph 247 of the complaint, do you see there is a phrase highlighted, "Uniti stock fell more than 8 percent on August 3rd, 2017"; do you see that?

Page 303

CHAD COFFMAN

A.    Yes.

Q.    The sentence then goes on to refer to an additional 4 percent drop on August 4th; do you see that?

A.    I see that.

Q.    If the dividend cut was announced before the market opened on August 3rd, the market would have had a full day on August 3rd to incorporate the information, agreed?

A.    Yes.  If what you just represented to me is true, that's the case, yes.

Q.    Do you expect that information to be fully reflected in Uniti's stock price within that full trading day?

MS. WYMAN:  Objection to form.

A.    Possibly.  There might be evidence that the decline on the next day is related to that information as well.

As I described I believe earlier in my testimony, there are times that there is evidence that it takes the market more than one full day to fully

Page 304

CHAD COFFMAN

react to new information.  That is not something I evaluated in this particular context or case.  And I wouldn't conclude, based just solely on what you're showing me here, that the decline on August 4th would be irrelevant.  I just don't know.  I haven't studied it.

Q.   If you look at the next paragraph, "plaintiffs alleged on August 8th, defendants attempted to reassure the market that the lease payment from Windstream was not in jeopardy, but that Uniti's stock continued to fall more than 12 percent between August 8th and August 11th"; do you see that?

A.   I see that.

Q.   Plaintiffs don't allege that the August 8th disclosure was a corrective disclosure of any kind, agreed?

MS. WYMAN:  Objection to form.

A.   I haven't seen anything to suggest that.

Q.   Assuming the disclosure on

CHAD COFFMAN

August 8th was not a corrective disclosure, in your opinion, would it be consistent with the conclusion that Uniti's stock traded in an efficient market defined that Uniti stock continued to fall between August 8th and August 11th, in response to a disclosure on August 3rd that Windstream was cutting its dividends?

MS. WYMAN:  Objection to form.

A.    I would find it difficult to believe that without some additional information or additional context or some additional reason to consider that a continued reaction -- from August 3rd to August 11th, I would want to study what all of the interim disclosures were.  I would certainly not jump to a conclusion that a disclosure on August 3rd could still be considering to impact the market price on August 8th to August 11th, especially given an efficient market.

In my view, there would need to be some additional evidence or reason to

Page 306

CHAD COFFMAN

see a stock price decline there if it was going to somehow be related back to that August 3rd disclosure.  That would not be normally consistent with how I would approach a loss causation analysis, to say a decline starting six days after the original announcement is related back to that announcement without some additional new piece of information to go along with it.

But this is not something that I specifically studied as to what might be the cause of the decline between the 8th and the 11th and whether there is a way to tie it to plaintiffs' allegations is just not something I studied.

Q.    If you look at paragraph 249, there is a reference to market rumors that began to enter the market during August of 2017 that the spinoff violated Windstream's debt covenants; do you see that?

A.    I see that.

Q.    To your understanding, are the

Page 307

CHAD COFFMAN

undated rumors alleged in this paragraph alleged to be partial corrective disclosures of any kind?

MS. WYMAN:  Objection to form.

A.    Well, it's in a section called Partial Disclosure August 2017.  So I don't see it as necessarily falling outside of what plaintiffs might believe they can prove as part of loss causation. But -- so I don't think I can definitively say one way or the other.

Q.    Is it possible to show there was a corrective disclosure without knowing when the rumors exactly entered the market or what rumors they were, or what information was included in those quote unquote rumors?

MS. WYMAN:  Objection to form.

A.    Well, I think potentially with a detailed loss causation analysis, maybe you could depending on what information is out there.

I certainly don't think this paragraph of the complaint provides

CHAD COFFMAN

sufficient information for me right now to say precisely what that is or what the cause might be.

But ultimately a detailed loss causation analysis, I would try to identify that and see what the claims could be tied to that. It's certainly not outside the realm of possibility.

Q.    Is there enough information in this paragraph to do that analysis?

MS. WYMAN:    Object to form.

A.    Not without going to -- no. If I was asked to do a loss causation analysis about that, I would go out and try to find what rumors are being talked about and where they appeared, and the timing of them and the timing of stock price declines that occurred after, and what the potential reasons were and whether there was any confounding information. I think you would need to do a very detailed loss causation analysis.

I'm just saying I don't think

CHAD COFFMAN

there is anything in this document that closes off the possibility that that's, that that's out there.

Q.    If you turn to paragraph 251, Mr. Coffman, that paragraph describes an additional partial disclosure on September 25th, 2017, when Windstream filed an 8-K disclosing that it received a purported notice of default from Aurelius; do you see that?

A.    I see that.

Q.    To your understanding, was this a partial materialization of the risk that the spinoff and master lease violated Windstream's debt covenant?

MS. WYMAN:  Objection to form.

A.    That's my understanding of what plaintiffs' allegation is, yes, that this provided additional information in the market about the risks that have been alleged misrepresented or omitted.

Q.    If the but-for disclosure was the risk that the spinoff and master lease constituted a default under

Page 310

CHAD COFFMAN

Windstream's debt covenant, wouldn't this be a full and complete materialization of that risk?

MS. WYMAN:  Objection to form.

A.    No.  I mean my understanding is that this is an allegation that there was a default and that the company continued to deny that there was any kind of default, so I don't see how one could ever conclude that this represented an absolute full corrective disclosure under plaintiffs' theory of the case.

Q.    This disclosure made clear that there was a risk of a default, correct?

MS. WYMAN:  Objection to form.

A.    I think it clearly raised the market's understanding of the risks faced.  But whether -- but whether the risks were even more heightened than what the market understood at this point in light of defendants' stringent denials, I think clearly raises a question about whether the market needed to know more and better understand the risks even

Page 311

CHAD COFFMAN

beyond this.

So again, I'm not making any kind of factual determination.  I'm just saying just the fact of receiving a -- even in the 8-K itself they quote unquote call it a purported notice of default, not that there is a notice of default or that there was a default.  So did it raise the market's understanding of the risk?  Yes.

Did it provide them everything that plaintiffs are alleged the market should have known given the stringent denials?  I think that would be inconsistent with plaintiffs' theory to conclude that.

Q.    To your understanding, was the September 25th notice of default a partial materialization of the risk that the master lease could be recharacterized or was not a true lease?

MS. WYMAN:  Objection to form.

A.    That's not something I carefully analyzed.

CHAD COFFMAN

Q.    Take a look at paragraph 265 of the complaint.  It describes an additional partial disclosure on February 15th, 2019 when Judge Furman, who presided over the Windstream/Aurelius trial, ruled in Aurelius's favor finding that the spinoff and master lease violated the sale-leaseback covenant in Windstream's indentures; is that right?

A.    Yes.

Q.    To your understanding, was this a further materialization of the risk that the spinoff and master lease violated Windstream's debt covenants?

MS. WYMAN:  Objection to form.

A.    That's my understanding that that is what plaintiff is alleging, yes. I haven't made any specific determination myself.  But that's my understanding of the basis, part of the basis of their claim.

Q.    Do you have any understanding of whether that decision revealed any new information to the market that defendants

CHAD COFFMAN

allegedly failed to disclose previously?

MS. WYMAN:  Objection to form.

A.    Well, I haven't done my own assessment, but my general understanding is that plaintiffs are alleging that prior to this date there remained undisclosed risks that the company had under -- had misled the market into believing the risks of this outcome were much less than they appreciated.  And that this therefore represents a materialization of that risk.

So that's my understanding of what they are alleging, yes.

Q.    Have you assessed whether the market was surprised by Judge Furman's decision?

MS. WYMAN:  Objection to the form.

A.    Well, I noted that there was a significant stock price decline.  I noted that there was analyst coverage that described it as important new negative developments.

Page 314

CHAD COFFMAN

So I think it was new -- when you say surprised, was it new value-relevant information that came to the market on this day?  Absolutely, yes.

Q.    Would you agree that prior to the actual decision, Uniti could not have disclosed that decision, in other words, Uniti couldn't have predicted the future, correct?

MS. WYMAN:  Objection to form.

A.    My understanding is that they could not have disclosed the decision before the decision occurred, nor is that the basis of plaintiffs' complaint, as far as I understand.

Q.    What's your understanding of plaintiffs' complaint?  Do you have any understanding of what the but-for disclosure that Uniti was allegedly obligated to make in respect to the undisclosed result of the litigation?

MS. WYMAN:  Objection to form.

A.    As I described before, my understanding is plaintiffs are alleging

Page 315

CHAD COFFMAN

that defendants failed to disclose the degree of risk that -- both financial and legal risk -- that Uniti faced as a result of the nature of the spinoff transaction and how it violated the indenture.

Q. But you don't know what it is that defendants failed to disclose that would have revealed the degree of risk, correct?

MS. WYMAN: Objection to form.

A. Not with any specificity of specific facts.

I mean plaintiffs allege a number of different facts about how the deal was structured and how they knew the deal was structured in a particular way, how there was a lack of arm's-length nature of the transaction.

So there were a number of different elements of the transaction that I understand exacerbated the risks according to them and that there should have been fuller disclosure.

Page 316

CHAD COFFMAN

But again, I'm not here to say what the precise but-for disclosure was. Determining that was not necessary to reach the opinions I've given in this case and it was not the subject of anything I was asked to do.

Q.    To your understanding, was the February 2019 decision by Judge Furman a partial materialization of the risk that the master lease could be recharacterized or was not a true lease?

MS. WYMAN:  Objection to form.

A.    I have not studied that particular question.  I don't know.

Q.    To your understanding, was there any new factual information concerning whether the spinoff and master lease constituted a violation of Windstream's debt covenants that was revealed in the Court's opinion that hadn't been previously disclosed to the market?

MS. WYMAN:  Objection to form.

A.    Could I have that read back,

Page 317

CHAD COFFMAN

please.

(The record was read as follows:

"Question:  To your understanding, was there any new factual information concerning whether the spinoff and master lease constituted a violation of Windstream's debt covenants that was revealed in the Court's opinion that hadn't been previously disclosed to the market?")

A.    The decision itself is obviously new public information, and after the weighing of all the evidence the judge ruled that in the Court's view it was, in fact, a violation of the indenture.  So that is clearly new relevant information.

Q.    Right.  But that's a legal conclusion that did not exist prior to the Court's opinion, correct?

MS. WYMAN:  Objection.

Q.    And that you could not have previously disclosed, correct?

Page 318

CHAD COFFMAN

MS. WYMAN:  Objection to form.

A.    They could not have disclosed the decision itself of the court, I agree with that.

Q.    So was there any new factual information in the Court's decision to your knowledge, factual information, that hadn't been previously disclosed?

MS. WYMAN:  Objection to form.

A.    Beyond the presence of the decision itself, that's not something I analyzed.

Q.    Would that be relevant to the calculation of damages in this case, whether the Court's opinion contained any new factual information?

A.    I hadn't made a determination about that one way or the other.

Q.    You don't know whether that would be relevant or not, whether the opinion contained new factual information?

MS. WYMAN:  Objection to form.

A.    I just haven't studied that

CHAD COFFMAN

question, no.

Q.    I'm not asking you for the conclusion of whether or not it contains new factual information.  I'm just asking you if you agree whether it would be relevant to the calculation of damages?

MS. WYMAN:  Objection to form.

A.    I don't know.  I would have to understand what factual information there was or if there was any, and whether that had any relevance or not requires a deep understanding of the facts and circumstances and an analysis of what precisely plaintiffs' claims are and what should have been disclosed earlier.  I just have not performed that analysis.

Q.    Between the time of the notice of default in September of 2017 and the Court's decision in February 2019 finding a violation, would the risk of a covenant breach have changed at all?

MS. WYMAN:  Objection to form.

A.    Well, if you're asking if the spinoff itself was a breach and whether

CHAD COFFMAN

the actual risk, whether somehow the risk changed, I think the answer to that is no, because the spinoff is the spinoff, and whether it was or wasn't a breach wasn't changing over time.

That's a different question, though, than was there additional information that came to light to defendants or the market over time that changed the perceived risks of that and how that might have an interplay with the level of artificial inflation. That I don't know. And is not at all clear to me and it's not clear whether there could or couldn't be any change in the information set that theoretically could have or should have been available to investors.

But was the -- the short answer is no. Whether it was a breach or not is likely not changing over time. But perhaps the information sets that sudden have been disclosed theoretically were. I just don't know. That's not something

Page 321

CHAD COFFMAN

I'm privy to.

Q.    Are you aware that Windstream solicited consents from its other bondholders to waive any alleged defaults by Aurelius?

A.    Could I have that read back, please?

(The record was read as follows:

"Question:  Are you aware that Windstream solicited consents from its other bondholders to waive any alleged defaults by Aurelius?")

A.    If I knew that, I had forgotten it.

Q.    Isn't that something -- sorry, I didn't mean to interrupt.

A.    As I sit here today, that's not something I had focused on.

Q.    Is that something that might impact the level of risk in the market's perceived level of risk?

MS. WYMAN:  Objection to form.

A.    Maybe.  I don't know.  That's not something I analyzed.

Page 322

CHAD COFFMAN

Q.    If Windstream had successfully waived any default, it would not have gone bankrupt, correct?

MS. WYMAN:  Objection to form.

A.    I guess I'm a little confused by your question.  If Windstream had obtained waivers from its lenders for any default or -- I'm a little confused by how you phrased that.  Like what would Windstream be waiving?

Q.    Fair point.  If Windstream had successfully obtained contents from its other bondholders to waive the alleged default that Aurelius claimed, Windstream would not have gone bankrupt, correct?

MS. WYMAN:  Objection to form.

A.    I don't know if Aurelius still was able to get a claim of default and everybody didn't.  I don't know if that would be enough for bankruptcy or not.  I would be speculating.

Q.    Is it fair to say that the level of risk in connection with the claims in a leaseback violation could

Page 323

CHAD COFFMAN

have changed over time during the class period?

MS. WYMAN:  Objection to form.

A.    I don't know whether that's the case or not.  If Aurelius succeeding by themselves was sufficient to push them into bankruptcy, then was the risk really fluctuating based on what other waivers they were able to get or not get?  I would be speculating, I just don't know.

Q.    Sorry, my question is:  If Windstream had successfully obtained consent from its other bondholders to waive the alleged default that was claimed by Aurelius in connection with the same series of bonds, would that have altered the risk that Windstream faced?

MS. WYMAN:  Objection to form.

A.    Well, are you saying that Aurelius was waiving this as well?

Q.    No.  I'm saying that the other bondholders in the same series of bonds were asked to waive the default, a majority or a super majority of the bond

Page 324

CHAD COFFMAN

holders in that series.

A.    I would be speculating to say how that would or wouldn't change the legal and financial risks without studying that question.  I just don't know.

Q.    You just have no idea how the bond indentures work; is that fair?

MS. WYMAN:  Objection to form.

A.    I mean, I don't, I don't know all the terms of these bond indentures.

I certainly have seen lots of bond indentures and have general understandings of how bond indentures work.  But how precisely this one operated with respect to this issue, I don't know, and whether Aurelius by itself was enough to trip a bankruptcy, and therefore it's totally irrelevant whether they could get waivers from other people or not, and was totally binary on the outcome of the trial, I would be speculating to say whether that mattered or not.  Or whether the overall risk was

Page 325

CHAD COFFMAN

fluctuating over the class period.  I just don't know.  I would have to study it.

Q.    If the overall risk did vary during the class period, is that something that would be relevant to determining alleged stock price inflation over time?

MS. WYMAN:  Objection to form.

A.    Possibly.  Again, that would be something that would have to be analyzed carefully.  I just don't know as I sit here if it would make any difference or not.  It's possible.  It's something I would have to consider.

Q.    If you look at paragraph 259 of the complaint.  "Plaintiffs go on to allege that credit rating agencies reacted negatively to Judge Furman's opinion and that S&P and Fitch downgraded the credit ratings of Uniti as the market digested the revelations about the spinoff."

Do you see that?

Page 326

CHAD COFFMAN

A.    Yes.

Q.    Do you understand the credit rating downgrade to be a separate corrective disclosure or a separate materialization of the risk from the judicial opinion on February 15th, 2019?

MS. WYMAN:  Objection to form.

A.    I haven't formed an opinion one way or the other on that.

Q.    Do you know if there was any new factual information relevant to plaintiffs' claim that was revealed via the credit agency downgrade that hadn't been previously disclosed to the market?

MS. WYMAN:  Objection to form.

A.    That's not something I analyzed.

Q.    If you look at paragraph 262 of the complaint, the final partial disclosure listed in the complaint is a June 24th, 2019 announcement by Uniti that it was launching a $300 million exchangeable note offering; do you see that?

Page 327

CHAD COFFMAN

A.     I see that.

Q.     To your understanding, did this disclosure allegedly correct defendants' purported misstatements about being able to navigate Windstream's bankruptcy without raising external capital?

MS. WYMAN:  Objection to form.

A.     That's my general understanding of plaintiffs' claim that this event revealed the relevant truth that was concealed or misrepresented by those statements, yes.

Q.     Did the debt offering reveal any relevant truth that was concealed with respect to the risk of a leaseback violation under Windstream's debt covenants?

MS. WYMAN:  Objection to form.

A.     I don't -- give me just a second.

Q.     By this time the court had already found that there was a covenant violation, so there was nothing further to reveal; is that fair?

CHAD COFFMAN

MS. WYMAN:  Objection to form. Let him answer your first question, first, Brian.

A.    I don't read this as necessarily excluding the possibility that the need for this note offering is also a materialization of the risk of the financial risk that they faced as a result of the structure of the spinoff transaction.  So I couldn't rule that out as I sit here.  So that's not an opinion I'm offering.  But it's -- I don't know that it can be ruled out just by looking at this.

Q.    To your understanding, did the debt offering correct or reveal any new information to the markets regarding the risk that the master lease was not a true lease or could successfully be recharacterized by Windstream?

MS. WYMAN:  Objection to form.

A.    I haven't specifically analyzed that question.

THE WITNESS:  When you're at a

Page 329

CHAD COFFMAN

natural breaking point, can we take a short break?

MR. BURNOVSKI: Sure. One more question and then we can take a break.

Q. Does your opinion regarding damages supply any methodology to apportion any company-specific price declines on any of the corrective disclosure dates we just discussed among plaintiffs' separate theories of liability and the more than 40 alleged misstatements in the case?

MS. WYMAN: Objection to form.

A. No, there is nothing in my report that attempts to apportion any loss causation or damages amongst different misstatements, or to the extent there even is different theories in this case, how to do that.

My understanding is the out-of-pocket methodology I described is appropriate for -- as long as the outcome of a loss causation analysis is a measurement to -- of the artificial

CHAD COFFMAN

inflation in the price, that it is the appropriate method for computing damages, and the, and applicable class-wide and the standard approach.

Whether that constitutes multiple theories or how it relates back to individual misstatements would be the subject of a detailed loss causation analysis.  My report doesn't go into precisely how that, any of those considerations would be taken into account.  But it certainly could be handled under the out-of-pocket methodology I describe.

MR. BURNOVSKI:  Going off the record for a quick break.

THE VIDEOGRAPHER:  We are now off the record.  The time on the video monitor is 6:27.

(Off the record.)

THE VIDEOGRAPHER:  We are now on the record.  The time on the video monitor is 6:36.

BY MR. BURNOVSKI:

CHAD COFFMAN

Q.    Welcome back, Mr. Coffman. During the break, did you discuss the substance of your testimony with plaintiffs' counsel?

A.    No.

Q.    Would the damages methodology that you describe in Section 9 of your report differ in any way for Uniti's options as compared to Uniti's common stock?

A.    The overall approach for call purchasers, the answer is no, because again my understanding is they are entitled to out-of-pocket damages that are the difference between the inflation and the security price at the time of purchase versus the inflation in the security price at the time of sale.

And the formula for calculating damages isn't any different.  The analysis of loss causation might have some differences just because each security would have different price movements, et cetera.  So the

Page 332

CHAD COFFMAN

quantification of inflation is certainly different. But the overall approach and application of the out-of-pocket methodology is the same.

For the sellers of put options, it's economically the same in the sense that you are really looking at the distortion in the price from the time of entry into the contract to the distortion of the price at the end. But because the puts would be artificial deflated rather than inflated, you would have to deal with artificial deflation. But other than that, overall out-of-pocket approach is the same.

Q.    Would you plan to use an event study to calculate inflation with respect to Uniti's stock options?

A.    There would -- I don't know is the short answer. But I likely, yes.

Certainly in other cases where I dealt with options there have been analyses showing whether or not there was statistically significant price movements

Page 333

CHAD COFFMAN

in the option series at the time of alleged corrective disclosures or materializations of risks.  And then that evidence was used as part of the method for computing the artificial inflation per share and whether and to what extent there was loss causation evidence for option holders.

So I would anticipate there to be some level or some type of event study related to the options for where there would be damaged investors.  But since I haven't done the analysis yet, I haven't thought through all the different techniques that might be relevant or useful there.

Q.    If you decided to use an event study, what would be your implication if you found statistically significant abnormal returns following an alleged corrective disclosure for some option series but not for others?

MS. WYMAN:  Objection to form.

A.    Well, if there was

Page 334

CHAD COFFMAN

consistent -- the answer is it depends.

If we're talking about a situation where there is 30 option series trading on a particular, on or around a particular corrective disclosure and 29 of the 30 show significant price movements, one of them falls just short, does that somehow suggest that there wasn't a movement in that 30th one that should be considered?  Of course not.  I may have just fallen short for a variety of reasons or there could have been heightened volatility in that particular stock, so the threshold may be a little higher.

But overall the economic evidence supports that the price of the stock and the price of virtually every option moved based on the event study, would you then expand that to include the 30th option based on the strength of the evidence?  You probably would.  Does that mean you automatically exclude that price reaction for that 30th option?  No, it

Page 335

CHAD COFFMAN

doesn't.

Now, if very few of the options showed statistically significant movements, that is also something that would have to get considered as well. I don't want to presuppose how that would be done or even whether it made sense to aggregate in some way across the options and say, given the totality of the evidence on the price movements of the options, it makes sense to infer that these were not random movements. These were due to information. And therefore conclude for the entire basket that there was sufficient evidence. I haven't thought about what all the different approaches that might be relevant or could be defended in terms of doing that.

So I think it's just speculative and premature to try to answer that question in a vacuum.

Q. We talked earlier about the fact that the expected volatility of Uniti's common stock is a factor that

Page 336

CHAD COFFMAN

would be relevant to the price of Uniti's options; do you recall that?

A.    Yes.

Q.    In determining a but-for price for the Uniti option series, would you agree that would you need to determine but-for volatility, meaning how the volatility of Uniti's common stock would have changed in the absence of the alleged misrepresentations and omissions?

MS. WYMAN:  Objection to form.

A.    That is something one would want to consider.  Exactly how that is dealt with, I'm not sure and would have to think about it as part of a loss causation analysis.  It's possible.

Q.    Do you know how you would plan to estimate but-for volatility?

MS. WYMAN:  Objection to form.

A.    No.  That is something I would have to think carefully about.

Q.    Is there more than one approach that you could consider in determining

Page 337

CHAD COFFMAN

but-for volatility?

A.    There might be.  Possibly, yes. I don't know.  I would have to study the question in the context of trying to answer that to think about what alternative approaches there might be.

Q.    Is it possible that different approaches could yield different estimates of but-for volatility?

MS. WYMAN:  Objection to form.

A.    I imagine that's possible, yes.

Q.    Would the determination of but-for volatility have an impact on the amount of alleged inflation in the prices of the Uniti options?

MS. WYMAN:  Objection to form.

A.    It might, yeah.  Whether such an adjustment is necessary and how one would do it, and to the extent it would impact inflation are clearly important loss causation questions.  I just don't know the answer to them.

MR. BURNOVSKI:  I have no further questions, Mr. Coffman.

Page 338

CHAD COFFMAN

MS. WYMAN:  I have a couple of follow-up questions.

EXAMINATION BY MS. WYMAN:

Q.    Mr. Coffman, have you done a loss causation analysis for either Uniti's common stock or any of the option series that you studied?

A.    No.

Q.    Have you done a damages analysis where you quantified damages for either the Uniti common stock or any of the option series that you studied?

A.    Beyond concluding that the out-of-pocket method is appropriate, no.

Q.    Was it necessary for you to do a loss causation analysis or a damages analysis to determine whether or not there was a method by which a class-wide calculation of damages could be made for Uniti common stock or options?

MR. BURNOVSKI:  Objection to form.

Page 339

CHAD COFFMAN

A.    No.

MS. WYMAN:  I have no further questions, thank you.

MR. BURNOVSKI:  No further questions from me.

THE VIDEOGRAPHER:  We are now off the record.  The time on the video monitor is 6:46.

(Time noted:  6:46 p.m.)

**Page 340**

**ACKNOWLEDGMENT OF DEPONENT**

I have read the foregoing transcript of my deposition and except for any corrections or changes noted on the errata sheet, I hereby subscribe to the transcript as an accurate record of the statements made by me.

_____

CHAD COFFMAN

SUBSCRIBED AND SWORN before

and to me this ____ day of _____,

20___.

_____

NOTARY PUBLIC

My Commission Expires:

CERTIFICATION

I, DAWN MATERA, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 7th day of December, 2021.

_____
DAWN MATERA

**Page 342**

I N D E X

Witness                                              Page

CHAD COFFMAN                                              5

E X H I B I T S

No.                                                  Page

Exhibit 1 Expert report                              21

Exhibit 2 Plaintiffs' Amended                        261

         Complaint

~oOo~

**Page 343**

** ERRATA SHEET **

CASE: UNITI GROUP INC. SECURITIES LITIGATION

DEPOSITION DATE:

DEPONENT: CHAD COFFMAN

PAGE LINE(S)    CHANGE                    REASON

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____|_____|_____|_____

_____

CHAD COFFMAN

SUBSCRIBED AND SWORN TO BEFORE ME

THIS _____ DAY OF _____, 20____.

_____        _____

(NOTARY PUBLIC)            MY COMMISSION EXPIRES:

**[& - 3s]**

**&**

**&** 2:4,12 4:15,21 14:23

**0**

**00756** 1:4 3:21

**1**

**1** 3:15 21:14,16 64:24 65:15,19 71:14 78:3 107:19 149:24 151:6,11 201:20 280:25 342:8
**1,486** 34:9
**1.6** 151:16
**1.69** 151:17
**10** 28:6,7 30:18,19 31:9,25 234:14,19 234:20 236:19,20 237:9,19,25 238:3 238:13 239:8,20 240:13 244:10,14
**10,000** 282:19
**10.01** 111:10
**10.50** 111:21
**100** 10:11 14:14 47:20 151:18,19 194:22 234:7,21 236:20 237:7,12 237:20 238:3,19 243:4,9 244:11,15 244:15 245:6,16 246:15 286:5
**100,000** 47:9
**1000** 5:19
**10017** 2:14
**11** 64:16,20 65:5,6 65:14 66:7 68:20 113:24 148:13
**11th** 304:16 305:8 305:17,22 306:15

**12** 255:11,11 281:3 304:15
**12:16** 70:7
**12:26** 70:11
**12:32** 75:22
**12:38** 76:2
**12th** 90:23
**13** 107:16,20 255:9 255:11,14,19 256:9 280:23 282:13
**132** 284:23
**139** 284:20,24,25 285:8
**14** 166:22,23 170:2 177:8
**140** 5:18
**15** 192:22 193:19 200:11,22 202:9
**15th** 312:5 326:7
**16** 85:4,13 86:12 86:21 99:25 100:4 100:8 193:12,18 195:21 196:14 197:8,20 200:7 203:24 204:7 263:16 281:22 282:2 283:3
**169** 151:20
**17** 195:21 196:23 197:8,20 200:7 201:20 202:12 203:20,24
**18** 50:21 57:23 201:21 202:12,17 203:3,12,20
**18th** 90:23
**19** 201:22
**1900** 2:6
**19th** 107:25

**1:27** 117:24,25

**2**

**2** 36:13 41:10 78:7 109:25 111:10 156:6 182:20,23 183:20 261:4,6,24 284:22 290:19 342:9
**20** 47:16 239:21,24 239:24 240:9,12 241:18 340:17 343:23
**200** 10:12
**2000's** 43:9,10
**2008** 43:5
**2016** 90:22
**2017** 290:19 291:8 293:4,11 294:19 298:6 302:24 306:21 307:7 309:8 319:19
**2018** 90:23,23 107:25
**2019** 90:24,24,25 107:25 108:2,3 283:14 290:22 291:9 312:5 316:9 319:20 326:7,22
**2021** 1:9 3:4 341:19
**20th** 107:25
**21** 342:8
**212** 2:15
**21st** 90:24
**22** 67:14
**22nd** 90:24 108:2
**23** 86:23
**24** 201:23
**24.69** 290:18
**244** 290:14

**246** 289:22 292:21
**247** 293:2 302:21
**249** 306:18
**24th** 326:22
**25** 154:13,25 290:22
**251** 309:5
**259** 325:17
**25th** 90:25 291:8 309:8 311:19
**26** 71:18
**261** 342:9
**262** 326:19
**265** 312:2
**26th** 108:2
**27** 71:21 73:13 76:6
**28** 277:18
**29** 334:6
**2:03** 118:3,9
**2nd** 291:8

**3**

**3** 41:6 72:18 158:10 183:21
**30** 238:12,18,18 239:8,18,18 240:15 245:24 334:4,7
**30,000** 47:8
**300** 326:23
**30th** 334:10,22,25
**37-1/2** 86:22 87:16
**39** 158:14
**3:22** 184:5
**3:32** 184:9
**3rd** 293:4,11 294:19 298:6 302:24 303:9,10 305:9,16,20 306:4
**3s** 28:7 30:19 31:19,21

**[4 - actively]**

| 4 | 6:46 339:9,10 | a | 179:15 211:24 |
|---|---|---|---|

**4**

**4** 72:15 194:25 303:4
**40** 47:17 285:17 329:12
**414** 85:7,16 86:14 86:23 101:4
**44** 22:5
**450** 2:14
**450-4000** 2:15
**47** 81:10
**4:19** 1:4 3:21
**4:48** 251:17
**4:57** 251:21
**4th** 303:5 304:7

**5**

**5** 24:21 69:10 81:5 88:18 91:11 93:18 94:8,14 106:4 111:16,24 119:11 149:14 183:18 342:4
**5.56** 86:24 87:17
**51** 11:15,16
**54,169** 170:5,7
**5777** 341:21

**6**

**6** 1:9 25:3 44:14 44:15,25 91:11,14 93:19 94:9,14 119:11 195:15 201:22
**60603** 5:20
**611** 134:23,23 139:10,11
**62** 290:22
**655** 2:6
**6:27** 330:20
**6:36** 330:24

**6:46** 339:9,10
**6th** 3:4

**7**

**7** 44:15 45:7 195:16
**71** 112:14
**75** 9:6 11:21 14:13
**7th** 90:22 341:18

**8**

**8** 25:15 28:6 30:19 294:24 302:24 309:9 311:6
**80** 279:15
**82** 130:12 131:2
**83** 134:25
**84** 129:8,17
**86** 160:23 166:9,14 167:10,14,18
**87** 170:3 171:22 172:9
**89** 181:9
**8th** 304:11,15,19 305:2,7,22 306:15

**9**

**9** 195:16 210:2,14 212:5 331:8
**9.38** 290:21
**9.50** 111:20
**9.99** 111:9
**90** 9:8 244:13 245:4,5,15,24
**92101** 2:6
**94** 221:18
**94.4** 194:19
**97** 213:15
**98** 213:15
**99** 87:18 171:12,16

**a**

**a.m.** 1:10 3:4
**abbvie** 122:24
**ability** 102:13 103:7 111:25 239:25 283:15,22 293:21 300:7
**able** 7:23 97:7 194:15 199:19 205:17 206:2 218:7 231:16 244:24 251:10 275:21 278:14 322:19 323:10 327:5
**abnormal** 86:20 119:8,9,13 120:7 120:24 122:3 181:25 183:21 185:22 190:8 191:20 333:21
**abnormally** 115:8 116:16
**absence** 89:17 90:11 97:8 233:12 336:10
**absolute** 69:12 81:20,22 114:10 310:12
**absolutely** 67:7 92:25 93:11 198:22 211:11 237:11 258:6 276:3 314:5
**abstract** 235:7
**abstracting** 188:3
**academic** 28:24 168:19
**acceptance** 113:4
**accepted** 67:15 82:2 83:7 97:14

179:15 211:24
**access** 6:14,20,22 30:25 52:20 54:8 54:15
**accessed** 53:20 56:19,20
**accommodate** 158:4
**accomplish** 260:21
**account** 100:24 103:12 169:22 170:24 171:2 176:2 187:21 191:24 226:2 239:3 330:13
**accounting** 171:7 171:18
**accurate** 35:11 38:9,19 44:16,18 96:25 120:3 340:8
**accurately** 44:22 256:10
**acknowledgment** 340:2
**acquire** 179:12
**action** 4:8 10:8 11:24 12:14 13:7 13:11,22 18:19 19:3,12 45:8 204:17 205:3 215:23 252:5 284:16 289:10 291:5 341:14
**actions** 11:3 12:3 211:10 285:25
**active** 16:20,25 17:7 73:10 77:2,3 80:24
**actively** 77:9 257:10

**activity** 69:4,5,6
  76:20 77:23
**actual** 20:6 22:16
  34:22 40:12 69:4
  87:14 117:9
  123:19 132:19
  133:5,12 143:4
  179:4,23 182:3
  183:10,12,13,17
  183:21 184:20
  185:6,21,23
  188:18 205:10
  225:13 314:7
  320:2
**add** 80:7 262:24
**added** 38:17,21
  262:15
**adding** 262:22
**addition** 180:2,19
  283:10
**additional** 24:25
  46:5 60:9 65:8,9
  69:22 91:4 106:10
  128:10,23 168:10
  177:9 238:8
  258:11,11 287:2,9
  303:4 305:13,14
  305:15,25 306:9
  309:7,20 312:4
  320:8
**address** 5:11,14,15
  5:17 6:2 46:12
  94:19 213:23
**addressed** 93:21
  93:22,24 242:21
**addressing** 49:18
**adjust** 51:3 119:13
**adjusting** 164:25
  188:6
**adjustment**
  165:25 337:19

**adjustments**
  187:19 188:22
**administer** 4:7
**administrative**
  19:7
**adopt** 215:12
**adversary** 277:22
  278:2 279:8
**adverse** 301:21
  302:13,15
**affect** 101:19
  103:10 144:25
  301:2
**affiliations** 4:13
**affirmative** 137:21
  138:2,7 283:13
**afternoon** 118:2
**agencies** 325:19
**agency** 326:14
**aggregate** 125:8
  126:3 152:13,19
  152:24 153:10
  192:17 195:22
  196:16 335:9
**aggregated** 193:10
  200:7
**aggregating**
  126:12
**aggregation**
  125:19
**ago** 14:3
**agree** 3:14 6:18
  7:7 12:24 53:10
  60:10 66:19 81:17
  127:13 129:2
  130:6 131:13
  134:13 143:11
  144:9,13,18,19
  145:3 152:3
  158:19 165:12
  173:8 187:9 208:7

  210:11 213:10
  218:21 219:2
  223:18,19 230:25
  234:22 240:10
  241:12,14 244:7
  244:16 245:5,15
  246:23 251:4
  270:3,9,10,19
  287:14 298:3
  300:24 301:19
  314:6 318:4 319:6
  336:7
**agreed** 12:25
  13:15 46:25
  245:20 303:11
  304:21
**agreeing** 41:19
  207:24 208:3
**agreement** 30:15
  208:5
**agrees** 237:7,8,10
**align** 143:7
**allegation** 90:18
  222:12 225:8
  227:14,17 247:4
  258:2 281:15
  301:25 309:19
  310:7
**allegations** 24:19
  48:11 99:6 224:10
  226:7 301:5,16
  306:16
**allege** 249:17
  253:20 268:10
  269:2 270:16
  281:7 283:12,20
  284:15 285:9
  289:9 304:18
  315:15 325:19
**alleged** 89:2 90:2
  98:20 99:2 222:9

  223:14 230:6
  247:18 265:25
  266:3,15,18 271:5
  276:13,25 277:2
  285:17,23 286:9
  287:15 288:20
  289:5 290:8,11
  293:3,14 297:2
  301:10 304:10
  307:2,3 309:22
  311:13 321:5,12
  322:14 323:15
  325:8 329:12
  333:3,21 336:11
  337:15
**allegedly** 206:10
  207:3 209:14
  216:10 228:5
  233:7 242:12
  246:25 247:3
  273:23 274:7,21
  313:2 314:20
  327:4
**alleges** 257:9
  279:6
**alleging** 90:6
  212:12,14 270:7
  274:14 283:10
  284:4 286:8 294:4
  312:18 313:6,15
  314:25
**allow** 67:16 203:9
  299:14
**allows** 37:9 125:16
  126:8
**alluding** 20:12
**alpha** 37:2,5,9
**alter** 214:16
**altered** 323:18
**alternative** 135:16
  163:16 231:17,22

**[alternative - applicable]** Page 4

232:8 337:7
**ambiguity** 111:13
**amended** 252:24
253:14 261:5,6,11
342:9
**american** 41:11
70:23 187:16
188:4,14
**amount** 8:13
49:25 62:21,22
75:11 80:11 84:14
98:10 130:18
151:24 152:2,13
152:25 206:5,22
245:11 337:15
**analyses** 23:14
28:5 41:25 43:19
44:3,21 103:15
137:4 147:21
149:21 154:5
192:10 210:21
217:2,19 332:24
**analysis** 25:24
28:11,18 29:10,25
31:4,16,18,24
34:20 37:10,16
42:9,22 48:14
52:9 59:22 62:16
69:17 77:20 84:17
85:3 87:21 91:6
97:6,12 100:15
103:22 106:5
107:15 118:24
120:13 122:25
123:7 124:8,10
125:9,18 126:2,5
128:8,10 135:19
150:4,22 152:4,6
152:14 156:9
162:23 170:24
176:13 177:21

178:7 179:2
187:20 191:21
193:4 203:18
204:13 205:25
206:15 209:22
213:12 217:24
219:15 226:2
230:23 231:9
235:6 242:24
249:22 250:8
268:14 275:4,15
276:11 287:12
293:24 294:17
295:21 302:11
306:6 307:21
308:6,11,15,24
319:14,17 329:24
330:10 331:22
333:14 336:18
338:6,11,19,20
**analyst** 27:5 28:18
28:20 35:22 36:3
36:5,9,11,14,18
52:18 53:13,21,24
54:8 57:18 62:16
62:21 77:15,17
85:10 95:17
101:14,15,22
147:9,10,10
148:19 294:7
300:3 313:23
**analysts** 55:17
56:4 57:5 63:17
76:18 77:19 95:7
95:11 102:12
**analyze** 46:8 66:6
76:16 135:13
147:8 149:11
159:12 176:4
196:25 203:17
216:9 217:8 246:8

291:22 292:2
**analyzed** 123:21
125:3 137:24
149:10 158:6
192:16,19 193:13
196:15 203:22
214:13 221:16
250:25 295:5,24
311:25 318:13
321:25 325:12
326:18 328:23
**analyzing** 66:9
156:2 217:18
270:4
**announce** 58:13
**announced** 87:8
293:5 303:8
**announcement**
58:12 63:23 83:5
85:14 87:12 92:17
93:3,6 192:24
194:5,6 196:7
202:10 298:8
300:19 306:8,9
326:22
**announcements**
52:10 83:8 85:6
86:13 89:2,7,20
98:23 100:8 105:8
197:15
**annual** 8:20 78:8
**answer** 7:19 15:15
16:4 47:5 48:22
55:24 105:4
118:20 119:3
131:17 137:25
143:14 156:23
172:24 178:2,14
178:23 213:3
217:16 226:20
235:6,16 240:22

255:22 268:5
269:11 271:11,18
272:12 320:3,20
328:3 331:13
332:21 334:2
335:22 337:6,23
**answered** 215:21
272:5
**answering** 18:21
23:19 271:20
301:8
**answers** 147:7
230:4 246:6 267:7
268:22
**ante** 94:4 97:23
120:11,14
**anticipate** 333:10
**anticipated** 108:15
130:19
**antitrust** 41:18
**anyway** 159:9
248:10
**apart** 240:5
259:13
**appeals** 237:22
243:12
**appear** 39:22
181:18
**appearances** 4:12
**appeared** 308:17
**appears** 22:4
290:11
**appendices** 22:2
**appendix** 26:10,23
27:14 37:18 41:10
**apples** 149:8,8
**applicability**
265:17 267:11
**applicable** 269:18
330:4

**[application - attempted]**

**application** 25:8 332:4

**applications** 7:5

**applied** 26:6 59:24 94:5,15,24

**applies** 25:25 59:18 211:25 215:16

**apply** 66:13 148:18,25 150:13 224:14

**apportion** 329:8 329:16

**appreciate** 67:12 123:24 235:23 236:6 267:16

**appreciated** 55:21 180:18 313:11

**approach** 88:16 89:21 124:18,21 148:9 209:5,6 211:23 215:15 216:9 219:4 228:2 306:6 330:5 331:12 332:3,15 336:24

**approaches** 217:18 219:12 335:18 337:7,9

**appropriate** 94:18 103:19 159:4 168:3 178:6,10 185:4 208:24 216:5,25 217:7,11 218:2 220:3,7,11 220:16 221:13 236:3 273:14 294:10 329:23 330:3 338:16

**approved** 22:21

**approximately** 17:13 20:25 47:7 47:10

**apt** 215:9

**arbitrage** 112:9 116:20 117:2 155:19,22 157:2 158:4 160:13,21 161:6,16,20 162:6 167:20 168:14 171:6,17 172:2,7 172:23

**arbitraged** 110:16 110:24

**arbitragers** 174:3

**area** 10:23 64:5 113:7

**areas** 88:12

**argue** 63:5 75:2 79:25 80:17

**argument** 226:3

**arithmetic** 173:15 204:6

**arkansas** 1:3 3:20

**arm's** 315:19

**arrangement** 260:4,15 264:6 271:9

**article** 27:5 28:24 37:8,8

**articles** 28:22 33:16,21,23 34:3,6 34:9,12,15,23 37:2 37:6,13 52:11 53:13 55:17 56:5 57:6,17 101:12

**articulate** 231:16

**articulation** 232:7

**artificial** 205:5,7 205:18 206:3,6,22 208:11,25 210:24

211:18,21 212:20 212:25 217:22 223:4 225:16 226:14 245:25 248:17 249:21 269:15 286:24 297:22 302:12 320:13 329:25 332:12,14 333:6

**artificially** 222:11

**aside** 13:23 195:23 196:3 237:24

**asked** 19:15 20:6 24:6 28:6,19 36:5 43:19 45:23 46:4 46:8,11,19,25 66:11 217:8 269:24 272:4 274:4 279:3 291:20,22 292:2,6 292:10,12,18 295:13 308:14 316:7 323:24

**asking** 5:10 104:25 123:11 172:22 206:17,21 226:15 228:24 268:21 269:12 272:16,18 300:19 319:3,5,24

**aspects** 23:21

**asserted** 128:18

**asserting** 264:16 265:11 267:22

**assess** 128:12 146:15 147:22 233:23

**assessed** 245:23 251:8 313:16

**assessing** 78:16 80:13 189:3

237:17 302:7

**assessment** 229:24 230:15 239:21 246:18 313:5

**asset** 134:15

**assets** 279:14,15 280:7,19 298:23

**assignment** 70:21 221:20

**assignments** 9:13 70:22

**assist** 25:21 26:12 26:14

**assistance** 24:2 26:9

**assisted** 22:23,25 25:11

**assisting** 24:12

**assume** 7:19 128:2 219:20,22 234:6 238:6 240:16 243:2 244:8

**assumes** 132:4,8 239:23

**assuming** 57:11 186:8 236:24 237:2 243:11 244:25 251:3 302:14 304:25

**assumption** 128:7 164:25 187:25 238:16 245:3

**assumptions** 126:11,14,17 131:21 240:21 275:19

**attempt** 95:9 278:3

**attempted** 124:7 252:16 292:14 304:11

**[attempting - believe]** Page 6

attempting 277:20
attempts 329:16
attending 4:11
attention 50:6
  57:5 106:22 107:3
attorney 20:5
attorneys 2:5,12
audio 3:5,11,12
august 290:19
  291:8 293:4,11
  294:19 298:6
  302:24 303:5,9,10
  304:7,10,15,15,19
  305:2,7,7,9,16,17
  305:20,22,22
  306:4,21 307:7
aurelius 29:23
  30:4,11 294:22
  295:3 309:11
  312:6 321:6,13
  322:15,18 323:6
  323:16,21 324:18
aurelius's 295:2
  312:7
authority 28:2
authorized 4:6
autocorrelation
  69:15 106:6,9,21
  107:10,12,15
  118:23 119:7,22
  120:2,5,13,17
  121:2 159:14,19
automatically
  334:24
available 28:21
  50:24 51:3 52:3,7
  52:23 53:8,12,19
  54:10 55:6,11
  56:2,9,11,12 57:3
  57:12,13,24 58:4
  60:21 73:23 78:15

137:19 154:14
155:3 158:18
201:10 203:21
320:18
avenue 2:14
average 64:6
  72:15 78:5,9
  79:16 83:18 150:8
  151:2
avoids 126:6
aware 6:6,10
  253:7,8,15 259:23
  260:9 265:13
  277:24 283:12
  292:17 321:3,10

**b**

b 37:18 41:10
  249:17,18,23
  251:5 342:6
back 11:18 27:24
  35:10 36:22 39:3
  47:22 49:23 50:5
  57:22 70:13 71:11
  92:25 108:10,22
  109:3,4,12,23
  118:12 121:12
  133:3,7 136:10
  154:17 169:10
  177:11,25 178:21
  184:11 189:15,18
  198:9 221:18
  236:16 242:25
  246:5 251:23
  256:8 260:6
  280:10,23 292:21
  306:3,8 316:25
  321:7 330:7 331:2
background 3:8
  24:23 27:21
backup 177:17

backwards 82:24
bad 56:22 299:21
  300:11,13 301:4
  301:11,24
balance 126:7
bank 58:10,14
bankrupt 259:22
  322:4,16
bankruptcy 256:4
  256:5 257:15
  259:10,18 278:3
  281:11 283:16,23
  322:21 323:8
  324:19 327:6
base 223:20
based 33:17 40:16
  63:15 78:5 95:23
  96:19 111:14
  121:10 125:10
  126:25 143:8
  152:18 164:8
  170:8 171:15
  174:11 182:22
  185:16 188:9
  190:5 191:21
  205:5 211:15,16
  211:17 223:9
  229:9,13 234:12
  234:20 236:19
  238:18 241:23
  248:15,22 249:10
  249:22 252:14
  256:16 285:16,22
  285:24 286:17
  291:19 293:15
  300:20 304:5
  323:9 334:20,22
bases 210:6
basis 19:16 45:9
  60:12 72:16,18
  114:12 117:17

129:23 152:9,20
152:20 153:10
156:3 163:11
164:24 165:2,23
203:17,19 213:2
219:23 252:6
312:21,21 314:15
basket 335:15
bearing 267:14
bears 239:14
began 290:20
  306:20
beginning 263:19
  277:18 283:14
  286:23
begins 285:8
behalf 4:16,21
  14:16
belief 54:5 297:10
believe 18:13,20
  19:5,9 20:23 21:8
  21:19 22:6 25:5
  36:19,23 38:16
  39:23 41:9,18
  43:3 47:14 54:5
  64:18 65:6 92:20
  92:24 93:9 94:15
  94:20 104:2
  111:15 113:8
  125:25 126:25
  130:24 135:11,12
  154:6 155:23
  156:20 166:23
  168:23 188:13,19
  208:23 209:20
  220:17 252:25
  253:7 256:25
  259:4 263:3
  278:18 286:25
  289:14 303:22
  305:13 307:9

[believed - calculated]

**believed** 158:15 234:13 239:17,19
**believes** 237:8,25
**believing** 313:10
**bell** 290:10
**benefit** 275:18
**best** 7:18 10:10 15:8 43:8 120:15 268:5
**better** 125:12,14 125:23 126:8 163:14 201:17 282:4 310:25
**beyond** 10:13 20:7 40:22 45:22 46:6 53:15 61:22 62:2 63:2 65:10 130:25 152:3,5,16 210:9 278:5 311:2 318:11 338:15
**bias** 120:25
**biasing** 105:16
**bid** 69:17 109:25 110:4,5,8,14,22 111:8,11,12,20,22 112:3,5,7,14,24 113:13,18,25 114:3,11,13,13,20 114:22,25 115:5,9 115:25 116:4,13 116:16,20,25 117:8,10,13,14 142:4,6 156:6,10 156:13,21,25 157:12,17,23,25 158:3 167:21 168:3,15,20 169:22 170:10,14 170:18,23 172:11 172:14,20 173:2 173:18,23 174:20

174:23 175:12,17 175:22 176:4,6,10 176:16,21 177:2 177:21 179:4,4,9 179:14,19,24 190:15,20,23 191:6,19 192:4
**bidding** 179:12
**big** 79:13 91:18 146:2 191:11,12 258:24
**billed** 47:3
**billing** 47:13,22 49:24
**billion** 58:10,14
**binary** 324:22
**bit** 48:21 53:16 58:8 114:2 257:6 266:9 289:4
**black** 41:2 132:8 163:8 182:7,10,13 182:21 183:5,11 183:19,22 185:5 185:25 186:21,22 187:2,10,20 188:19,25 189:13
**blanket** 217:16
**blood** 341:14
**board** 135:9 140:17
**boil** 224:25
**bold** 285:10
**bond** 292:4,7 323:25 324:9,12 324:14,15
**bondholders** 321:5,12 322:14 323:14,23
**bonds** 291:12 323:17,23

**bothered** 239:2
**bottom** 151:11
**boundaries** 165:9
**bounds** 169:7,19 170:10 173:9,19
**breach** 319:22,25 320:5,21
**breached** 30:14
**break** 66:24 70:4 70:14 72:5 117:20 118:13 168:12 183:25 184:12,17 251:13,24 257:5 272:8 329:3,5 330:17 331:3
**breaking** 67:6 329:2
**brian** 2:15 4:14 5:9 75:16 234:24 272:4 328:4
**brian.burnovski** 2:16
**brief** 282:19
**briefly** 41:14 290:12
**bright** 67:15 111:4
**broad** 126:11 282:14
**broader** 180:12
**broadly** 67:15
**broadway** 2:6
**broken** 167:15 168:2
**brokerage** 54:2
**brought** 277:25
**browser** 7:4
**bryant** 23:3
**bsm** 1:4 3:21
**built** 45:17 166:7
**bullet** 27:3 33:14 33:18 34:2 40:24

41:2,6,8
**bullets** 266:23
**bunch** 7:14 142:21 142:25 162:7 198:24
**burnovski** 2:15 4:14,15 5:7,9 67:4 67:8 70:3,12 76:3 117:19 118:11 129:22 183:24 184:10 235:20 236:13,15 251:13 251:22 261:3 271:23 272:13,20 272:24 329:4 330:16,25 337:24 338:24 339:5
**burnovski's** 16:5
**business** 5:14,16 5:17 31:12 34:4 241:9 300:21
**buy** 176:17,18
**buying** 21:12

c

**c** 2:2 5:3,3 118:4,4 249:18,18,23 251:5
**calculate** 182:11 185:3,16 188:17 189:13 204:22 206:14 208:10,24 234:2 247:8 248:11,17 250:20 332:18
**calculated** 9:3 10:18,25 40:9,13 45:8 70:24 152:22 169:8,19 182:6 183:4,9,20 184:20 204:17 242:19

**[calculates - cause]** Page 8

calculates 242:18
calculating 42:12
  42:14 170:9 185:6
  269:14 331:20
calculation 178:4
  179:7 191:17
  204:9 205:16,24
  229:17 248:10
  250:12 318:15
  319:7 338:22
calculations 23:19
  24:3 192:12
california 2:6
call 25:16 35:2,3
  35:12 45:2 85:13
  95:23 96:20 122:9
  124:6,11 125:2
  126:21 127:3
  134:7,9,23 138:20
  139:10 140:10
  142:14 143:19
  145:20,21,25
  146:17,24 147:12
  147:19 154:8,20
  156:18 160:5,7,9
  160:14 161:5,7,9
  161:14 162:4,12
  162:16,25 163:9
  163:13,17 164:8
  164:15 165:12,13
  165:23 166:17,24
  167:9,12,18,21
  168:8,17 169:3,5
  169:14,16 170:5
  170:11 171:5,11
  171:11 172:16
  173:10,11,12,25
  174:25 175:6,11
  175:23,24 177:20
  180:2,19 188:5
  196:14,16 197:3

201:23 228:6
230:7 311:7
331:12
called 37:23 38:3
  89:3 140:7 142:14
  300:8 307:6
calling 105:13
calls 141:4 169:23
  194:19 195:21
  196:9,13 201:21
  201:23 203:20
cammer 25:4
  31:20 36:13 65:8
  67:18 68:5,7,11,15
  69:10 71:14 78:3
  81:5 106:3 149:14
  149:24 150:8
  151:6 158:10
  159:3
capable 252:5
capital 283:17,24
  327:7
capitalized 181:17
care 268:19
careful 42:10 58:8
  161:25
carefully 79:4
  108:10 178:9,22
  264:5 271:8 273:9
  299:24 311:25
  325:13 336:23
carried 254:21
case 3:20 8:16
  9:14 10:6 13:25
  14:15 15:6,24
  16:13,17 17:3
  21:25 24:9,10
  25:2 26:7 27:17
  27:23,23 29:5
  37:17 38:24 39:2
  39:17 40:18,19

41:16,25 42:3,5,9
45:16 46:4,6,17,20
46:21 48:8 49:2,5
49:12,13 55:9
62:9 72:2 115:11
122:12,14,20
123:14,19,20
124:5,14 125:10
125:13 140:3
144:17 148:22
162:23,24 163:6
163:11,11 185:19
192:8,10 204:22
206:18 208:12,18
208:25 211:13
212:2,6 213:6,11
213:11,12 214:4
214:19 215:10,13
215:16,19,21,25
216:5,15,16,25
217:3,11,11,23
218:3,7,8,14,22,22
219:2,3,6,14 220:3
220:8 221:14
222:10 227:3
229:8 230:25
232:11 233:2,2
235:2 241:21
242:13,22 243:5
244:19 252:10,13
252:23 254:14,16
256:25 257:3,20
282:24 287:13
291:24 298:13
301:6,16 302:2,8
303:14 304:4
310:13 316:6
318:15 323:6
329:13,20 343:2
cases 8:15 9:17
  10:15 11:5 12:6

12:20,21,23 15:20
15:22 16:3,9,19
37:15 38:5,8,10,20
39:7,13,15 40:10
40:25 43:12,18,25
63:13 123:3,5,13
123:22,23,25
124:15 125:11,20
143:21 149:9
171:17 192:9
214:12,14 215:14
219:8,19 230:3,4
232:16,20 332:22
cash 298:22
categorizations
  229:22
category 64:21
  151:12
causal 81:12 82:3
  302:9,12,16
causation 205:25
  206:15,19 210:23
  214:14 217:2,18
  228:3,10,24 230:7
  230:22 231:9
  235:5 242:24
  249:22 250:7,25
  268:14,17 272:9
  275:15 302:11
  306:6 307:10,21
  308:6,14,23
  329:17,24 330:9
  331:22 333:8
  336:18 337:22
  338:6,19
cause 31:17 61:16
  69:9,25 82:9,11,14
  82:25 84:10 87:3
  99:22 103:24
  104:9,11 105:21
  106:4 124:8,9,13

125:6,17 127:4
138:23 149:15
156:19 159:19
164:2,13 180:4,22
193:17 196:25
224:6 241:3
306:14 308:4
**caused** 96:10
222:10 248:7
294:5
**causes** 226:13
**causing** 96:14
**caution** 16:3 19:22
**cdoe** 135:21
**ceases** 249:25
**cell** 3:9 6:16
**cent** 111:10
**cents** 111:16,24
**certain** 12:18
15:17 23:6,16,17
25:17 27:22 28:2
28:21 34:2 41:20
52:4 68:12 69:18
77:14,16,25 78:21
79:12 96:24 97:17
101:18 118:22
131:21 132:12
143:17 145:19
148:21 149:7,8,17
155:12 160:17
176:2 186:15
200:11 208:14,19
210:7 214:20
215:12 216:22
225:14 232:20
253:3 254:6,8,16
289:14 292:2,9
298:23,23
**certainly** 10:11
11:21 13:13 15:15
18:20 23:25 24:5

25:11 27:6 30:25
31:5,10 34:19
36:15 38:14 39:4
44:18 47:15,17,19
53:2 57:16,18
62:24 63:12 64:12
68:13 73:4 74:15
74:23 75:13 79:3
80:21 93:2,5
97:14,14 101:21
102:7,11,22
104:10 107:8
113:20 116:24
117:6,14 124:6
127:2 137:2,6,10
144:24 145:18
146:7 165:6 180:9
192:19 210:5
213:11 215:8,16
219:9 240:7 242:6
245:12 258:10
265:19 276:3
299:12 301:19
305:19 307:24
308:8 324:13
330:13 332:2,22
**certainty** 243:23
**certification** 45:16
46:7,21 211:9
276:2 341:2
**certify** 341:6,12
**cetera** 53:20 54:7
54:15 72:22 76:18
79:6 132:13
241:10 300:4
331:25
**chad** 1:13 3:1,16
4:1 5:1,13 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1

18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1

141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1

264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:13 342:4 343:3,21

**challenged** 256:3 281:10

**challenging** 30:13

**chance** 234:14,20 236:20 237:9 238:2,19 239:8,9

**change** 22:13 24:9 99:22 144:19,25 145:8 182:13,15 182:22,23 183:13 186:24 188:9 189:4,5,7 190:5,5 190:19 191:6,10 191:18 193:6

212:25 215:11 218:21 220:21 253:12 267:10 297:17 302:15 320:16 324:4 343:4

**changed** 233:10 252:23 319:22 320:3,11 323:2 336:10

**changes** 87:6 125:4 145:5 171:25 188:9 265:17 340:6

**changing** 175:5 186:12 190:24,25 320:6,22

**characteristics** 140:25

**characterization** 98:6 208:3 210:16 258:14

**characterized** 282:17

**characterizing** 239:5 240:24 269:8,20 282:23

**charge** 8:13

**charts** 91:25

**check** 35:10 36:22 39:4 64:19 93:12

**checking** 23:18

**chicago** 5:19 43:4 43:7 135:8 140:17

**choose** 27:9 88:6

**circumstance** 188:12

**circumstances** 39:20 55:8 62:8 69:19 79:23 102:17 116:11

219:10 220:10,15 247:7 276:15 319:14

**cite** 27:25 28:25 29:6,8

**cited** 36:19,24

**citing** 188:23

**claim** 48:25 253:3 253:6 255:12 277:25 278:19 280:3,14 287:6 298:5 312:22 322:19 326:13 327:10

**claimed** 259:24 260:10 294:20,23 322:15 323:16

**claiming** 30:11

**claims** 48:9 212:15 212:16 214:8 215:7 227:2 229:8 229:13 255:4,18 256:11 278:12 282:20,24 308:7 319:15 322:25

**clarification** 180:17

**clarify** 7:18 119:5 147:15

**class** 4:22 10:8 11:3,24 12:2,14 13:7,11,22 14:17 30:23 45:4,9,15 46:6,21 50:13 64:8 80:19 85:5,8 95:10 100:7 106:7 122:10 126:23 134:22 135:7,24 136:7,14,23 138:17 139:12,15 139:20,24 140:14

151:13 154:9,15 154:22 155:4 204:19 205:2,19 206:4 207:21 211:8,10 213:21 215:6,23 221:4 223:5 247:6 248:5 248:6 252:6 255:13 263:21 267:11 275:25 285:6,25 286:23 288:6,10 291:17 323:2 325:2,6 330:4 338:21

**classify** 67:17

**clause** 130:2

**clear** 7:16 9:11 21:4 33:6 62:13 65:18 72:11 73:9 82:10 83:25 84:6 84:9 85:15 86:2 90:13 91:20 92:9 92:12 95:3 97:9 97:21 98:17 99:13 101:6,18 106:18 119:17,22,24 122:5 133:11 138:22 147:6 151:2 152:17 159:2,3 163:13 172:22 182:12 191:8 207:14 211:14 212:4 217:15,25 220:25 225:25 268:14 269:22 310:14 320:14,15

**clearly** 9:3 12:24 32:23 52:14 54:4 76:21 83:4 86:2 96:6,14 111:16

**[clearly - collected]**                                                    Page 11

120:22 127:8
137:18 144:17
155:11 164:21
237:16 310:17,23
317:18 337:21

**clerical** 108:14,25
  109:11,14

**clients** 8:14 15:5
  54:2

**close** 14:2 191:25
  195:3 290:19,22
  302:4

**closer** 69:13
  145:24 188:11
  203:10

**closes** 309:3

**closest** 70:2

**coefficient** 121:2
  121:22

**coefficients** 91:12

**coffman** 1:13 3:1
  3:17 4:1 5:1,8,13
  6:1 7:1,12 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1,25
  16:1,8 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1,12 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1,23 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1,23 57:1
  58:1 59:1 60:1
  61:1 62:1 63:1

64:1 65:1 66:1
67:1,13 68:1 69:1
70:1,13,18 71:1
72:1 73:1 74:1
75:1 76:1,4 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1,24 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1,16 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
118:12 119:1
120:1 121:1 122:1
123:1,11 124:1
125:1 126:1,19
127:1 128:1 129:1
130:1,6 131:1
132:1 133:1 134:1
134:21 135:1
136:1 137:1 138:1
139:1,9 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1,10,21
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1

176:1 177:1,6
178:1,19 179:1
180:1,18 181:1
182:1 183:1 184:1
184:11,18 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1,6 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
208:6 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
234:4 235:1 236:1
236:16 237:1
238:1,6 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1,2
248:1 249:1,12
250:1 251:1,23
252:1,4 253:1
254:1,25 255:1
256:1,8 257:1
258:1 259:1 260:1
261:1,9 262:1
263:1 264:1 265:1
265:24 266:1,14
267:1,16 268:1,20
269:1 270:1,13
271:1,17 272:1
273:1,2 274:1

275:1 276:1 277:1
278:1 279:1 280:1
280:24 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1
297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1,6 310:1
311:1 312:1 313:1
314:1 315:1 316:1
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
331:2 332:1 333:1
334:1 335:1 336:1
337:1,25 338:1,5
339:1 340:13
342:4 343:3,21

**coherence** 212:17

**coherent** 211:20
  212:22 223:13
  224:11 225:18
  276:7,25 296:3,7
  296:11,20,24
  297:11,18

**colleague** 47:24
  49:17

**colleagues** 4:17,23

**collect** 28:6 29:4
  30:18 76:16
  251:11

**collected** 28:10,12
  28:16,16,22 29:9
  36:3 37:3 197:6

**[collecting - conclude]** Page 12

**collecting** 193:16
**collection** 23:13
  76:10
**combination**
  22:18 138:19
  146:20 173:11
**combined** 65:20
**come** 52:21 79:10
  131:9 178:14,15
  183:22 186:7
  193:14 224:8
  244:21 302:3
**comes** 17:3 114:16
  205:23
**comfortable** 49:3
**coming** 221:2
  250:7
**comment** 267:2
**comments** 26:17
**commission**
  340:22 343:25
**common** 25:9,17
  45:2,9 49:21 50:8
  50:13 64:15 66:5
  71:13 78:4,19,24
  79:7,14 80:24,25
  82:8,16 87:6
  89:12 107:4
  113:10,25 114:16
  116:15 120:2
  124:22 127:7
  128:3 129:3
  145:23,24 148:7
  148:11,24 149:22
  152:16 159:9
  172:2 182:16,17
  195:24 204:18,21
  215:22 221:23
  263:5 331:10
  335:25 336:9
  338:7,12,23

**commonality**
  218:12 219:8
**commonly** 65:7
**communicate** 7:8
**communication**
  32:20 33:2
**communications**
  295:3
**community** 54:23
  54:25 56:16
**companies** 298:21
  300:22
**company** 24:18
  36:15 52:11 58:9
  62:14,18 63:20
  81:7,13 82:17
  85:22,24 86:4,9
  90:14,19 91:21
  95:18 144:4
  147:11 234:4,5,10
  237:3 238:2,7
  239:3,12,22
  240:17,24 242:8
  243:5,17 244:3
  255:25 281:9
  283:8 287:20
  299:18 310:8
  313:8 329:8
**company's** 31:12
  127:14 164:6
  223:16 239:25
  240:3
**comparable**
  150:17
**compare** 83:10
  86:8 93:3
**compared** 31:13
  85:3 116:17
  180:13 196:20
  331:10

**compares** 130:17
**comparing** 85:20
  124:18 203:12
**comparison** 83:14
  113:24 149:8
  168:4 186:11
  187:8 197:7
**compensated** 8:10
**compensation**
  8:18
**compete** 41:19
**complaint** 18:14
  20:21 27:17 29:15
  29:23 30:4,7
  212:18 229:12
  252:18,24 253:14
  254:5 256:16
  257:9 261:5,7,12
  261:17,24 262:8
  263:7,17 274:25
  277:5,9,18 278:6
  281:23 282:2,15
  282:15,17,23
  283:4 284:19
  285:18 286:14
  289:20,22 290:14
  292:24 302:22
  307:25 312:3
  314:15,18 325:18
  326:20,21 342:9
**complete** 27:7
  38:14,18 133:10
  310:3
**completely** 111:7
  146:14 203:14
  235:9 236:11
**complex** 62:13
**complicated**
  117:12 159:17
  259:16

**complications**
  237:24
**component** 93:17
  165:18 189:2
  205:15
**components**
  180:10
**compute** 206:15
  209:24 302:11
**computed** 183:16
**computer** 3:10
  6:13,20,21 7:3
**computing** 330:3
  333:6
**conceal** 287:3
**concealed** 206:10
  207:3 228:5 229:2
  231:4 247:3
  257:10 259:8
  263:22 273:23
  274:7,21 276:23
  289:23 293:9
  297:2 327:12,15
**conceivably** 224:6
**conceiving** 265:5
**concept** 151:4
  268:9,23 270:15
**concepts** 180:15
**conceptually**
  241:14 268:25
**concern** 116:9
  240:2 241:4
  244:25
**concerning** 87:5
  316:18 317:6
**concerns** 187:5
**concierge** 2:24
**conclude** 78:2
  87:2 115:25
  162:19 163:5
  171:21 200:23

221:7 299:5,15
304:5 310:11
311:17 335:15
**concluded** 128:2
238:11
**concluding** 338:15
**conclusion** 118:25
121:7 129:7 139:5
158:2 174:11
178:11 199:6
200:19 201:14
305:4,19 317:21
319:4
**conclusions** 215:9
269:7
**concurrent** 105:7
**condition** 102:19
168:14
**conduct** 124:7
125:17 128:10
147:21 150:4
156:9 168:7
**conducted** 106:5
180:3,20 192:10
192:12
**conducting** 6:8
123:6 166:17
167:8 176:5
**conference** 35:2
**confidence** 87:19
**confine** 268:21
**confounding**
213:19 214:24
215:2 308:21
**confronted** 200:24
214:15
**confused** 190:25
191:4 199:22
200:4 322:6,9
**connection** 14:8
19:11 20:10 27:10

29:19 34:17 70:20
81:12 82:3,21
85:4 108:19
120:12 160:6
175:23 184:19
221:21 242:12
262:4 270:21
271:3,4 273:4,6
280:4,16 283:3
291:23 322:24
323:16
**consent** 323:14
**consents** 321:4,11
**consequence**
250:24
**consider** 26:20
32:5 67:20 68:3
79:4 109:15
157:11 191:14
197:10 202:5
213:17 214:17,24
214:25 215:5
218:19 230:22
234:4 265:16
269:16 271:13
302:7,19 305:15
325:16 336:15,25
**considerations**
127:19 330:12
**considered** 8:16
26:10,25 27:8
34:19,25 36:15
52:18 53:24 54:9
57:2 66:16 131:6
165:3 261:13
262:4,9 265:13
268:3 271:12
273:9 288:16
296:17 334:11
335:6

**considering** 32:18
48:7 100:21
114:19 127:21
276:6 305:21
**consist** 14:20
**consistent** 27:23
72:20 106:19
110:25 112:20
113:17 121:15
122:2 124:21
127:3 137:14
142:16 165:6,10
221:24 222:5
252:7 256:25
287:5 305:4 306:5
334:2
**consistently** 66:9
171:24
**consists** 210:17
**constant** 188:11
189:6 219:18,21
220:2,6,11,22
221:9,11
**constituted** 246:15
309:25 316:19
317:8
**constitutes** 52:2
59:14 112:23
330:6
**constituting** 86:13
86:16
**constrain** 80:9
139:4
**constrained** 79:17
115:23 116:5
142:16
**constraint** 167:16
168:12
**constraints** 155:13
155:24 156:18
167:4,11,20,25

169:25 179:7
**constructed**
124:25 209:10
247:15 248:22
249:10
**constructing**
242:22
**construction**
187:15
**consult** 42:6
**consultant** 8:3
9:18 12:17 13:16
41:11
**consulting** 8:22
9:12,25 10:23
12:7 19:16 39:14
41:24 44:9 70:21
**contact** 17:12,18
**contacted** 17:9,24
**contain** 32:15 33:7
33:8
**contained** 318:16
318:22
**contains** 83:5
319:4
**contemplated**
259:17 262:13
**contemporaneous**
164:22
**contemporaneou...**
145:12 171:24
**content** 34:23
**contents** 322:13
**context** 9:21 58:7
58:18,23 59:7,11
59:14,22 60:9
88:12 89:24 97:13
101:24 114:7
205:2 217:24
228:21 269:8,13
269:24 270:11

**[context - court]**

282:13 299:4,16
300:18 304:4
305:14 337:5
**contexts** 116:14
**continue** 3:13 62:2
102:14 235:10,19
236:4 240:2
244:24
**continued** 62:15
118:10 304:14
305:6,16 310:8
**continuity** 69:7
73:15 74:8 79:5
**continuous** 79:9
**continuously**
73:23
**contract** 137:9
140:7,8 141:18
151:18 332:10
**contracts** 137:7
150:16 151:13,17
**contrary** 49:14
97:11
**contributing**
104:5 120:25
**control** 83:11 84:7
104:8,14
**controlling** 103:17
**convergence**
225:13
**conversation** 18:4
18:7
**conversations**
118:14 184:13
**converse** 114:24
**conversely** 161:14
**conveyed** 101:13
**convincing** 81:14
81:19,23
**copied** 211:6
212:3

**copper** 279:14
280:7,19
**copy** 18:14 21:14
21:24 29:14,22
37:19 252:18
261:4
**cornerstone** 2:22
4:19
**correct** 9:15 14:17
14:21 21:24 22:13
27:2 39:11,12,19
46:18 50:14 64:17
68:5,6 78:12
82:19 85:25 86:25
87:7 95:7 106:12
109:17 112:21
121:11 126:23,24
128:6 129:5
133:20 134:15,17
136:25 139:12,13
140:18,19,25
141:5,9,12,16
142:4,8,11 145:17
146:19 147:4,5,24
148:13,20 149:3
149:14,20 151:8
151:10 152:9,12
152:21 153:15,20
156:11,12 158:7,8
158:12 160:3,4
161:17,22 162:10
170:15 171:13,14
171:19,20 172:10
173:20 174:4
175:24 176:14,16
181:5 183:5,11
187:17,18 192:14
196:24 197:3,17
199:16,17 202:14
204:13 206:12
207:23 208:12

209:2 210:3,14,18
212:6 213:24,25
214:5 215:23
216:6 219:13,24
220:8,9 222:2
226:7 232:14
236:21 238:20
240:18 242:13
243:9,19 246:16
248:12 250:17,21
252:11 253:22
258:20 261:14,15
268:11 270:17
273:11 274:21
278:24 283:25
295:10 297:6
298:17 299:9,21
300:15 301:6,17
310:15 314:10
315:11 317:22,25
322:4,16 327:4
328:17
**corrected** 223:17
248:4 254:2
**correcting** 186:15
**corrections** 340:6
**corrective** 89:2
90:3 92:17 93:7
226:12,22 227:19
228:7,15 229:4,19
230:8 250:5 289:7
289:8 294:3
296:18 297:16
298:2 304:20
305:2 307:3,14
310:12 326:5
329:9 333:3,22
334:6
**correlated** 102:5,8
134:12 194:6
195:13

**correlation** 103:13
119:16
**cost** 42:17 61:5
110:23 111:16
112:8 170:21
171:3 174:16
**costless** 76:15
**costly** 157:2 174:3
**costs** 111:25 157:3
170:15,17,20,25
171:8,19 173:24
**counsel** 4:10 7:9
14:16,19 16:13
26:12 27:16 28:19
35:23 36:2 49:3
70:15 118:15
184:13 212:13
221:20 252:2,17
256:18,20 262:2
262:21 263:4
275:19 331:5
**count** 65:2 284:18
285:16
**counter** 135:24
136:6,14,22 137:5
137:12 138:8
159:5
**counting** 11:7
159:4
**couple** 12:21
19:14 29:11 36:17
44:10 49:11 67:5
93:25 122:19
338:2
**course** 213:21
334:11
**court** 1:2 3:19 4:3
27:14,18 29:13,18
55:5 56:25 159:3
282:17 318:4
327:22

**[court's - days]**

**court's** 27:17 316:21 317:10,16 317:22 318:7,16 319:20

**courts** 66:17 163:22

**covenant** 30:14 309:16 310:2 312:9 319:21 327:23

**covenants** 294:14 306:22 312:15 316:20 317:9 327:18

**cover** 31:2,3 32:3 32:4 35:20,21 223:2

**coverage** 36:14 62:21,22 77:16,18 147:9,11 148:19 313:23

**create** 77:6

**created** 150:15 203:10

**creates** 77:3,7

**creating** 99:19 175:17

**credit** 325:19,22 326:3,14

**criteria** 33:24 94:4 94:7 96:4,5,19 97:24 120:11

**criticisms** 125:22

**current** 50:25 110:10 130:16 257:2

**currently** 15:19 16:9 237:8

**customer** 300:6

**cut** 293:5,11 294:12 295:7,15

295:22 298:15,21 299:2,7 303:7

**cutting** 298:9,20 305:9

**cv** 1:4 3:21 26:11 37:19

**d**

**d** 5:3 118:4 290:7 292:23 342:2

**d&o** 10:21

**daily** 88:9,15 164:23 165:2,23 219:22

**damaged** 255:14 333:13

**damages** 25:22 44:9 45:7 48:2,4 48:20 204:17,22 204:25 205:4,15 210:2,12,25 213:3 221:2,22,23 222:4 222:15 223:3,9 224:21 225:7 241:20 242:10,18 246:12,13 247:8 248:10,12 249:20 250:12,20 251:2,8 251:11 252:5 275:14 276:5 288:3 297:21 302:8 318:15 319:7 329:7,17 330:3 331:7,15,21 338:10,11,19,22

**daniel** 2:16 4:17

**daniel.magy** 2:17

**data** 23:13 28:9,9 28:12 42:13 48:14 95:20 96:19 98:2 98:7 120:25 121:4 121:6,21 137:3

152:23 171:15 176:6,10,11,22 179:10 181:23 184:22 189:9 195:22 196:4 197:5,23 200:23 202:4,8

**date** 21:18 38:15 38:17 47:4 140:12 159:21 161:9 169:6,17 192:24 194:13 201:24 203:11 206:7,11 206:24 207:4 230:6 249:2 261:8 313:7 343:2

**dates** 84:7 85:13 85:14 88:25 89:3 89:4,6,19 90:3,4,5 90:21 91:4 92:15 92:18,22,23 93:4,6 93:8,14 94:5 95:5 95:6,20,24 105:18 105:19 107:21,24 108:8,17 109:2,8,9 118:23 119:10,14 119:15 120:5,12 120:23 141:12 155:16 194:2 196:7,7 209:9,14 212:20 216:9 289:9 329:10

**davis** 2:12 4:15

**davispolk.com** 2:16,17,18,19

**dawn** 1:14 4:4 5:4 341:4,23

**day** 60:25 61:17 63:9,16,22 64:12 73:21,21 82:25 84:15 87:25 88:2

88:6 90:20 96:2 96:21,22 101:7 104:19 105:10,14 105:16 119:19,20 120:19,20 121:17 121:18,18 122:2,3 165:22 182:18 183:18 185:3 186:11 188:2,11 189:7 190:4,10 198:3,14 199:24 203:21 205:18 206:3 234:10 240:11 243:4,18 244:11 245:6,8,16 245:18 246:15,16 288:6 290:20 293:25 303:10,17 303:20,25 314:5 340:16 341:18 343:23

**days** 32:22 34:21 34:24 60:25 61:15 61:23,23 62:5,19 62:25 63:14,25 64:9,13 73:21 74:3,16,16 78:15 79:2,12 83:3,10,12 83:16 84:6,19 85:5,7,16,21,23 86:10,12,14,22,23 87:12,12 90:12 94:11 95:10,14 98:20 99:2,17,25 100:4,11,16,21 101:4 124:19,20 154:13 155:2 190:9 195:11,16 195:24 196:19,20 197:14,16 200:12 297:20 306:7

**[deal - describes]**                                                    Page 16

**deal** 210:21
  315:17,18 332:13
**dealing** 211:13
  221:2
**dealt** 332:23
  336:16
**dearborn** 5:18
**deb** 67:12 272:13
  272:20
**debra** 2:7 4:20
**debraw** 2:7
**debt** 257:24
  258:19 291:15,23
  292:15 294:14
  295:9 306:22
  309:16 310:2
  312:15 316:20
  317:9 327:14,17
  328:17
**december** 1:9 3:4
  90:23 341:19
**decide** 66:6
**decided** 94:17
  213:9 333:18
**deciding** 93:14
**decision** 29:15
  67:19 312:24
  313:18 314:7,8,13
  314:14 316:9
  317:13 318:4,7,12
  319:20
**decisions** 27:19
**declare** 256:3
  281:11
**decline** 230:2,6,11
  230:12 244:13
  246:19,20 247:22
  249:3,20 251:6
  290:23 291:12
  294:6 303:20
  304:6 306:2,7,14

313:22
**declined** 298:8
**declines** 247:16
  308:19 329:9
**deemed** 106:10
  297:16
**deep** 319:12
**deeper** 55:23
  84:20
**deeply** 115:14
**default** 153:5
  294:21 295:2
  309:10,25 310:8
  310:10,15 311:7,8
  311:9,19 319:19
  322:3,9,15,19
  323:15,24
**defaults** 321:5,13
**defendant** 11:23
  12:4,13 13:7,10,21
  14:5
**defendants** 2:12
  4:16 10:20 12:18
  12:25 13:15
  223:14 253:21
  254:15 257:10,21
  259:7,24 260:11
  263:21 270:8
  274:15,20 275:22
  276:15,23 278:13
  280:3,15 281:7
  283:11,13,21
  285:4 304:11
  310:22 312:25
  315:2,9 320:10
  327:4
**defended** 335:19
**defense** 64:4
**define** 56:13 59:25
  140:13 231:19
  275:16

**defined** 181:18
  305:6
**defining** 273:16
**definitely** 107:11
**definition** 51:9,16
  54:19 88:3
**definitive** 69:12
  115:7 164:20
  299:25
**definitively**
  307:12
**deflated** 332:12
**deflation** 230:4
  332:14
**degree** 57:19
  288:7 315:3,10
**demand** 73:25
  77:5,8,20,23
**demonstrated**
  279:8
**demonstrative**
  81:21,22
**denials** 310:22
  311:15
**deny** 310:9
**denying** 153:7
**departing** 185:18
**depend** 56:3 103:3
  288:8
**dependent** 81:3
  129:10,18,20
  130:8 296:22
  297:24
**depending** 27:12
  69:20 142:17
  167:22 307:22
**depends** 134:17
  298:19 334:2
**depo** 235:18
**deponent** 340:2
  343:3

**deposition** 1:12
  3:11,16,22 6:14,19
  6:22,25 38:23
  235:23 236:5
  261:19 271:17
  340:5 343:2
**depositions** 6:9
**depress** 300:14
  301:14
**depth** 73:16,24
  74:6,10 79:6
**derivative** 78:20
  79:15,22 80:3,6,12
  80:16,22 81:2
  115:22 117:5
  127:7,23 155:10
**derives** 80:23
**describe** 19:18
  33:17 41:14
  120:16 159:6
  163:15 207:16
  211:25 213:22
  214:3 242:20
  246:7 255:3
  267:12 290:7
  330:15 331:8
**described** 33:24
  33:25 85:18 120:9
  132:20 147:17
  152:14 160:22
  183:8 207:15
  209:7 226:9
  229:11 232:17
  267:6 268:25
  274:13 276:14
  278:5 281:25
  303:22 313:24
  314:24 329:22
**describes** 44:22
  208:18 254:5
  255:11 309:6

312:3
**describing** 25:18
34:2 63:18 112:21
215:15 237:5
280:4,16 282:5
291:3,7 292:22
**description** 54:18
65:13 255:17
256:7
**design** 211:12
212:2
**designed** 166:2
**detail** 42:11 84:21
168:10 177:9,12
257:6 260:25
277:15
**detailed** 37:15,16
42:13,22 54:24
168:18 205:25
219:14 275:5,18
276:10 287:11
289:25 293:24
307:21 308:5,23
330:9
**details** 42:21
160:22 178:3
242:21 260:23
274:24
**determination**
154:2 193:5
284:12 292:19
311:4 312:19
318:18 337:13
**determinative**
74:14
**determine** 26:19
64:14 84:13 87:21
94:5 104:18
158:23 199:19
205:17 206:5,8,22
206:24 218:5

219:5,18 223:12
230:15 231:3
233:4 241:20
246:14 276:24
292:15 336:7
338:20
**determined** 95:25
96:21 97:25
125:10 201:19
209:22 280:21
296:14
**determining** 66:17
213:16 296:23
316:4 325:8 336:5
336:25
**developed** 187:10
**developments**
313:25
**deviation** 91:13
**device** 6:21 7:3,5
**devices** 6:13
**diego** 2:6
**differ** 37:8 133:12
141:25 142:7,18
157:21 167:10
219:2 331:9
**differed** 124:11
**difference** 55:10
83:22 87:16
105:17 110:6,12
167:13,24 169:4
169:15 186:24
188:15 196:6
205:9 222:17
223:3 227:19
228:15 239:7,21
240:9,13 296:21
325:14 331:16
**differences** 169:22
186:16 188:13
192:7 331:23

**different** 10:22
14:21 16:7 24:22
26:3 33:5 42:18
43:20 44:2,6,21
63:13 71:8 72:17
73:7,8 88:13,14
108:6,11,18
124:14,16,22,24
126:14 134:18
139:2,4 141:7,8,11
141:12,14,15,20
141:21 142:3,4,21
144:10 146:19
148:13 155:15,16
155:17,17 162:7
165:21 167:4
168:13 172:5
173:2,3,6 178:24
189:21 190:17
192:24,25 193:3
193:16 201:20
207:13,16 209:23
213:10 215:14
218:18 220:14
227:5,8,9,10,11,25
229:18 239:10
242:8 264:15,18
265:7 269:15
281:16 282:6,9
286:4 287:10
290:6 315:16,22
320:7 329:18,19
331:21,24 332:3
333:15 335:17
337:8,9
**differentiate** 56:8
**differently** 162:18
163:5
**differs** 27:12
217:11

**difficult** 110:15
305:12
**difficulties** 76:5
**difficulty** 300:12
**digested** 61:20
325:23
**dimensions** 131:25
**direct** 69:12 70:2
**direction** 22:19
28:13 112:12
**directly** 21:12
23:9 82:12 127:6
129:20
**disaggregate**
213:18
**disaggregation**
216:20 217:5,19
**disagree** 285:20
**disclose** 12:10
99:7 238:8 257:21
259:25 260:11
265:25 266:3,16
266:18 270:23
271:6 274:17
278:13 280:4,15
313:2 315:2,9
**disclosed** 16:2
60:7 90:8 206:11
207:4,20 209:18
227:16 230:18,21
231:13 232:22
233:7 234:11
238:10 240:18
241:24 243:18,22
243:25,25 244:6,9
246:23 248:24,25
249:19,24,24
250:9 251:5
254:10,11 258:4
268:11 269:3
270:2,8,17 273:18

**[disclosed - drafting]**

274:25 275:3,23 277:13 293:10 298:4,6 314:8,13 316:22 317:11,25 318:3,9 319:16 320:24 326:15

**discloses** 294:25

**disclosing** 309:9

**disclosure** 89:3 90:3 92:17 93:8 99:15 222:19,25 224:25 226:22 227:20 228:7,16 229:4,19 230:8 231:3,17,23 232:9 232:11 233:9,12 233:24 241:24 248:6 249:23 250:5 258:6 268:9 268:24 270:15 271:2,4 273:4,5 275:7,10 277:15 289:9 293:3 296:5 296:18 297:13,17 298:2 302:13 304:19,20,25 305:3,8,20 306:4 307:7,14 309:7,23 310:12,14 312:4 314:20 315:25 316:3 326:5,21 327:4 329:10 333:22 334:6

**disclosures** 253:21 269:13 289:7,25 290:8,17 292:23 297:15 305:18 307:4 333:3

**discontinuities** 93:20 94:10,12 95:22 96:14 98:12

**discontinuity** 94:17 95:4 98:18

**discounting** 237:14

**discovery** 205:24 275:20 277:11

**discrete** 91:16 98:12

**discuss** 50:11 251:24 331:3

**discussed** 99:24 100:3 119:11 126:18 148:10 179:25 212:13 213:16 258:25 286:18 329:10

**discussing** 48:25 51:13 184:21

**discussion** 24:20 25:3,5 27:20 31:24 170:9

**discussions** 256:17

**disguised** 264:5 271:8

**dismiss** 27:18 29:16 252:20

**dispositive** 127:16

**disputing** 56:10

**disrupt** 96:7

**disseminated** 51:23 52:7,16,24 53:11,22,25 54:12 54:21 55:3 56:15 57:21

**dissemination** 54:4 158:19

**dissipate** 226:13

**dissipated** 211:22 212:21 223:8 225:4,22

**dissipation** 217:21 246:20

**distinct** 48:3 140:16,22,24 142:11,24 143:6 266:2,17,24

**distinction** 56:21 265:20

**distinguishing** 131:17

**distorted** 223:16 225:20

**distortion** 223:17 332:9,10

**distribute** 76:17

**distributed** 132:9

**distribution** 76:10

**district** 1:2,3 3:19 3:20

**divergence** 99:19 222:23

**dividend** 187:12 187:17 188:3 293:5,11,16 294:12 295:7,15 298:15,25 299:7 303:7

**dividends** 130:19 187:25 295:23 298:10,21,22 305:10

**docket** 55:6 57:2

**document** 21:23 27:13 56:24 123:9 177:10 255:20 262:20 309:2

**documentation** 189:16,19

**documents** 26:10 27:8,10,15 29:13 29:19 32:3 53:15

55:5,16 56:3,25 260:24 261:12,25 262:3 263:13 282:21

**doing** 9:20 17:16 84:12 88:10 94:10 98:16 123:3 125:5 126:15 164:23 187:8 189:3 231:8 236:11 239:12 299:18 302:10 335:19

**dollar** 111:22 114:11 179:4 219:19 220:2,11 220:23 221:11

**dollars** 58:10,14 176:12 179:12,20

**double** 23:18 35:10 64:19 78:9 93:12

**dowd** 2:4 4:21 14:24

**downgrade** 326:4 326:14

**downgraded** 95:7 95:11,18 325:21

**downloaded** 33:16

**downside** 300:10

**dozen** 12:21 13:3 43:17

**dozens** 44:2 286:5

**draft** 23:15 24:7 24:16 26:15,16 256:19

**drafted** 22:15 25:6 256:13

**drafting** 23:11 24:12,25 26:5,13 26:21

**drafts** 25:12
**draw** 129:7 158:2 199:6
**drawing** 56:21
**drive** 188:15
**driven** 91:20 121:20 186:24 200:8,15,17 201:8 201:12
**driving** 92:14
**drop** 245:6,16 246:15 303:4
**dropped** 176:12
**drove** 201:21
**dual** 41:22
**due** 186:16 335:14
**duly** 5:4 118:5 341:8

**e**

**e** 2:2,2 342:2,6
**earlier** 37:20 70:20 72:4 99:24 100:3 109:10 126:18 133:15 139:8 146:18 148:10 149:24 153:12 156:5 158:10 166:8 179:25 192:7 196:9 213:5 223:11 230:13,19 230:21 246:23 252:14 256:18 268:8,18,23 278:11 281:6,17 281:20,22 303:23 319:16 335:23
**early** 18:3 43:9,9
**earn** 8:14 51:5 60:15

**earned** 8:21
**earnings** 35:2 52:10 58:12 85:6 85:14 86:13 87:8 87:11 88:25 89:7 89:19 92:16 93:3 93:6 98:23 100:5 100:8,16 105:7 192:23 193:25 194:5,5 196:6,19 197:15 202:10
**easier** 173:10 178:15
**easily** 39:5
**eastern** 1:3 3:20
**easy** 199:7
**economic** 76:19 77:23 102:13 155:24 160:17 211:17,19 212:16 212:23 223:23 224:11 226:17 230:10 237:15 248:25 334:17
**economically** 68:2 203:14 211:19 223:13 224:11 225:18 226:6 234:17 249:25 276:7,24 296:2,7 296:10,19,24 297:11,18 332:7
**economics** 5:18 8:4,8,11 131:20 292:14
**economist** 127:22 128:14,25 129:6 164:5,12 229:6
**economists** 52:6 53:10 66:16 113:5 113:6 128:21

131:13 164:12
**edits** 256:22
**effect** 31:17 61:17 69:9,25 82:10,11 82:14 83:2 84:10 87:3 103:24 104:9 104:11 105:21 106:4 124:8,9,13 125:6,17 127:4 138:23 149:15 156:19 164:3,14 180:4,22 193:17 197:2
**effective** 113:2 157:20 174:17
**effectively** 85:19 95:19 171:5 176:22 226:10
**effects** 256:6
**efficiencies** 112:4
**efficiency** 18:23 25:9,16 28:11,17 29:3 31:18 43:13 44:4 48:3 49:19 49:20,22 50:8,19 50:23 51:10,14,15 51:17,19 54:9 56:14,24 57:4 65:2 66:5,10,12 67:20 71:13,24 73:17 74:12,16 75:5,7 77:12 78:4 78:17 79:25 80:5 80:13 81:15 82:7 82:12 111:2,4 113:23 116:22 117:17 122:8,15 123:21 124:2,4 126:22 128:12 136:24 139:22 146:16 147:22

148:11 151:6 153:4,9,18,19 154:2,11,24 156:15 161:22 162:13,17,22 163:19,24 190:12 194:11 198:2,13 198:23 265:20 276:4
**efficient** 45:3 50:14,17 51:21 60:4,13 61:24 62:3 63:8 64:11 64:15 66:18 67:17 73:2 74:21 75:3 75:13,15 80:18 106:12 112:16 113:12 114:23 115:3 127:8,15,17 128:4,5,19,20 129:3,5 137:20,23 138:5,9,16,19 146:10 162:9 163:10 164:7 233:21 235:22 267:14 269:19 292:16 305:5,23
**efficiently** 114:9 127:11,24
**effort** 95:17
**either** 9:25 12:7 15:4,20 18:2 29:8 59:5 157:22 195:6 216:11 224:17 225:9 226:11,22 228:12 250:3 263:4 265:15 266:10 288:21 302:20 338:6,12
**elaborate** 19:22

**[electronic - evolve]** Page 20

electronic 6:12 7:3
element 166:7
187:7 255:6
278:19
elements 24:21
133:3 210:7
214:18 215:18
315:22
eliminating 34:6
else's 75:19
embedded 164:24
187:24 226:19
emphasize 253:5
empirical 55:18
67:16
employ 246:11
employed 8:7
employment 43:7
encapsulates
56:15
energy 38:24
engaged 10:19,21
13:14 41:23
engagement 19:2
19:5 41:15 42:25
43:11
engagements 39:8
40:6,20 43:15
enormous 75:11
ensuring 88:4
enter 250:6 290:20
306:20
entered 6:7 109:2
254:19 307:15
entering 249:6
entire 147:11
260:20 261:16
279:10 335:15
entirely 35:11
155:5 210:12

entirety 209:25
entitled 223:9
331:15
entry 332:10
equal 74:11 134:2
173:7,16,17
174:24 244:12
equally 144:22
148:19
equation 173:10
173:20
equations 169:8
169:20
equity 8:17
equivalent 197:19
204:7 248:25
errata 340:7 343:1
error 91:12,14
108:14,25 109:11
109:14
escaping 123:4
especially 79:6
97:5 115:21 116:3
247:13 305:23
esq 2:7,8,9,15,16
2:17,18
essence 210:25
258:23
essentially 30:12
37:13 79:8 83:11
124:12 125:2,17
132:6 212:3
232:21
establish 75:9 81:4
82:3
establishing 81:11
estimate 10:10
40:14 47:25 49:19
336:20
estimates 337:10

estimation 89:10
89:20 90:10 91:9
91:19,22 92:4,10
96:15 107:22
et 53:20 54:7,15
72:22 76:18 79:6
132:13 241:10
300:4 331:25
european 187:11
188:4,14
evaluate 57:9,19
58:21 82:10
103:23 110:20
132:21,23 150:5
156:10 163:11
175:22 180:3,21
233:9 274:4
294:17 295:13
evaluated 26:18
144:8 171:6 220:4
220:5 298:14
304:3
evaluating 18:23
58:19 67:20 98:9
153:3,9 156:14
231:17 302:4
evaluation 68:17
97:20 107:13
229:15 233:2
evaluations
242:21
event 82:4,7,13,22
84:12 88:9,10,13
88:15,15 91:18
92:2,11,12 96:8
106:2 108:8 119:8
146:25 148:5
158:5 180:3,8,15
180:16 181:4,7,24
184:19 185:11
193:5 194:13,25

195:15,16,16
201:20,22 209:6,9
209:13 216:8
218:13 219:11
232:12 257:15
259:9 296:16
297:16,25 327:10
332:17 333:11,18
334:20
events 81:13 84:11
86:8 91:8 92:6,8
96:13 105:22
180:9,14,14
196:19 226:10
240:5 254:6
everybody 237:6,7
237:10 322:20
everyone's 286:3
evidence 53:5,17
55:13,19 57:4
61:13 62:10 63:24
69:4 72:20 73:9
73:22 74:12 81:14
81:23 82:11 83:25
84:9 85:15 87:3
92:9,13 98:18
103:23 113:16,20
115:13 117:15
119:25 127:4,9
128:24 138:23
152:17 162:21
164:4,14,20 165:5
165:8,11,24
171:22 172:23
181:12 190:11
197:10 303:20,24
305:25 317:15
333:5,8 334:18,23
335:11,16
evolve 277:13

**[evolved - explain]** Page 21

**evolved** 213:20 215:5
**ex** 94:4 97:23 120:11,14
**exacerbated** 315:23
**exact** 9:4 10:9 12:19 42:21 47:12 120:8 289:16
**exactly** 18:24 20:15 62:13 145:23 177:15 194:9 200:4 232:3 272:6 273:23 292:11 307:15 336:15
**examination** 5:7 118:10 338:4
**examine** 147:2 197:12
**examined** 5:5 68:9 118:5
**example** 29:23 58:9 62:11 77:15 91:10 111:6 132:3 133:4,16 137:5 141:4 145:20 147:7 149:23 191:25 194:12 198:23 213:15 216:18 219:16 234:3 240:8
**examples** 13:13 52:22 53:2 62:23 101:8,21 137:7 201:25 214:12 216:22 220:14
**exceeded** 78:6
**excess** 51:6 60:15
**exchange** 21:9 41:12,20 70:23

78:10 107:10 113:15,19 114:8 115:10 135:9,10 136:18 137:9,12 138:15 140:17,18 159:7,10
**exchangeable** 326:24
**exchanges** 41:17 41:23 42:15,24 79:8,11 113:9,11 114:5 135:14,16 135:17 136:4 137:15
**exclude** 89:6,9 90:2 91:3 93:15 94:6 95:10,14,24 96:20 98:19,25 104:12 119:15 131:11 136:19 137:16 334:24
**excluded** 39:18 88:24 90:4,22 92:16,23 95:6 107:21 121:3 203:3 250:11
**excluding** 89:10 96:12 153:6 328:6
**exclusion** 108:8 118:22 119:10
**executable** 179:24
**executives** 279:10
**exercise** 130:17 160:15 253:9
**exhibit** 6:15,23 7:2 21:14,16,20 64:24 65:15,19 88:18 91:10,11,14,15 93:18,19 94:13 97:3 107:16,20 108:19 109:10

119:11,11 120:3 151:11 166:22,23 169:25 177:8 192:22 193:12,18 193:19 195:8,20 196:14,23 197:8 197:20 200:11,22 202:9 203:24 204:7 261:4,6,24 280:25 284:22 342:8,9
**exhibited** 107:10 194:23
**exhibits** 22:2 23:15 24:2 94:8 95:2 200:7
**exist** 202:19 317:21
**existed** 161:17 171:7,12 233:19
**existence** 202:22 287:19
**existing** 287:4
**expand** 147:6 334:21
**expect** 51:22 56:17 59:11 60:18 61:25 63:7 86:5 89:16 99:11 102:3,18 134:19 143:8 145:21 175:11 185:17 194:10 196:2 238:4 245:3 303:15
**expectation** 103:9
**expected** 58:13 59:2 60:5 85:21 99:22 116:9 130:20 132:4 133:16,22 145:3 182:2,6,11,15,18

182:22,24,25 183:3,12,18 185:15 189:3 191:12,13,24,25 238:3 239:18,18 239:20 241:11,16 244:12,13 335:24
**expecting** 239:12
**expensive** 110:14
**experience** 11:8 37:24 41:9 62:11 63:16 95:24 101:5 121:10 275:13 285:22
**expert** 1:13 9:14 9:22,25 10:2,6,7 11:23 12:7,22 13:14 15:4 18:18 19:11 20:6,7,10,18 21:3,15,16,24 38:11 39:8,9,14,16 39:21 40:6,16 41:10 42:6,7 43:14 45:20 46:3 211:7 275:14 286:2 342:8
**expertise** 41:24
**experts** 12:18 214:12
**expiration** 130:18 140:12 141:12 142:20 155:16 159:21 160:16 161:9 169:6,17 188:12 189:7 203:11
**expires** 340:22 343:25
**explain** 43:22 82:20

explained  105:6
explaining  132:19
explanation
  115:17 199:7
explicitly  137:2
  147:8 188:6
  255:21
expressed  132:5
extended  74:24
extent  46:2,6
  55:14 76:25 77:17
  77:21,25 78:21,23
  91:19 92:9 97:16
  97:17,21 98:22
  100:17,20 101:17
  101:20 104:4
  105:5,6,11 121:19
  136:21 137:11,13
  155:18 176:2
  186:15 202:24
  220:16 230:5,10
  230:16 248:19
  250:3,8 264:3
  265:6,10,15 270:5
  270:10 271:6
  302:18 329:18
  333:7 337:20
external  283:17,24
  327:7
eyeballed  95:20
eyeballing  96:18

        f

f  5:3,3 118:4,4
faced  310:19
  315:4 323:18
  328:9
facing  255:25
  276:16 281:8
fact  58:17,18
  59:21 72:5 78:5
  80:22 127:5,14,23

138:25 140:21
149:12 162:23
192:9 217:3,23
224:5 279:6,23
291:21 293:9
297:4 299:13
311:5 317:17
335:24
factiva  33:16
factor  31:20 36:13
  65:5 69:7,8,18
  71:14 73:4 74:13
  75:6 77:14,16,18
  78:3 79:24 81:5
  102:15 106:3,10
  106:14 107:5,8
  109:24 149:6,6,12
  149:14,24 150:8
  151:6 152:15
  156:6 158:10
  159:17 335:25
factors  25:4,9
  64:16 65:2,6,8,9
  65:10,14,19 66:7,8
  66:13,15 68:2,5,7
  68:8,11,13,14,19
  68:23 69:19,21,21
  69:23,25 71:12
  72:6,8 77:15,24
  89:12,15 106:15
  115:14 130:8,12
  130:15,23 131:3
  131:12 132:20
  133:18 134:18
  148:13,17,21,23
  149:9,18 155:12
  159:22 188:23
facts  23:20 214:4
  215:13 268:2
  275:2 276:14
  277:12 315:14,16

319:13
factual  311:4
  316:17 317:6
  318:6,8,17,22
  319:5,10 326:12
failed  238:8
  257:21 259:24
  260:11 274:16
  278:13 280:3,15
  313:2 315:2,9
failure  99:7,9
  265:25 266:3,15
  266:18 270:22
  271:5,5
fair  8:5 11:2,8
  14:6 50:18 51:9
  54:17 60:2 65:11
  74:18 85:3,12
  86:25 98:5 116:19
  143:9 147:25
  148:4 149:4 161:3
  161:4,13 168:5
  169:2,13 170:22
  171:4 173:21
  180:17 192:15
  193:20 200:25
  204:20 205:14
  210:15 211:5
  212:8 217:9 218:4
  218:10,10 219:6
  224:13 233:8
  241:19 242:5
  252:15 253:14,16
  256:7 258:13
  265:13,14,24
  266:14 275:8
  282:25 284:5
  291:2 322:12,23
  324:9 327:25
fairly  11:11,20
  88:8 145:22 166:4

195:9
fall  169:6,18
  272:18 304:14
  305:7
fallen  334:12
falling  307:8
falls  88:3 165:9
  281:24 334:8
false  253:20
  279:11 283:24
  285:4,12
familiar  30:3,5
  283:18
far  6:17 78:6
  109:19 116:10,11
  142:18 181:19
  195:17 234:24
  252:25 314:16
fashion  51:5
  194:14 255:5
  297:5
faster  271:18
fat  132:14
favor  312:7
feature  141:17
features  137:9
  144:17
february  90:24,24
  90:25 107:25
  108:2,2 312:4
  316:9 319:20
  326:7
fell  290:18 302:23
fewer  80:3 154:12
  154:25
fewest  94:11
fields  8:4
figure  246:12
filed  3:18 16:20
  17:22 20:21 30:10
  38:15 252:23

**[filed - formal]**

253:13 257:15 259:10 294:25 309:9

**filing** 17:16 32:14 33:7 38:25

**filings** 28:3 30:17 30:23 31:15 32:6 32:10 52:10 53:13 85:10 279:7

**final** 98:14 326:20

**financial** 52:5,12 53:9 66:16 102:16 102:19 113:4,6 131:13,19 164:12 234:7 254:18,20 257:14 259:9 265:3 276:16 298:16 299:2,8,15 299:20 300:7 315:3 324:5 328:9

**financially** 4:9

**financing** 260:4,15 264:6 271:9 277:21

**find** 73:2 83:7,21 155:6 161:5 163:18,22 191:19 193:20 194:16 195:5 202:11,12 305:12 308:16

**finder** 8:16

**finding** 78:3 105:17 111:2 161:21 163:17 164:8 173:25 224:23 312:7 319:20

**findings** 201:2

**fine** 5:16 266:10 266:11

**finish** 67:4

**firm** 3:25 8:17,19 47:3 64:4 76:17 83:4,13 84:6,8 85:15 92:13 241:5 244:22

**firms** 14:21 15:5 15:20 54:3

**first** 5:4 17:9,11 17:23 33:14 44:24 84:14 104:21 122:12 151:16 194:12 210:19 211:3 225:20 236:8 248:18 249:6 288:6 293:3 301:20 328:3,4

**fitch** 325:21

**five** 8:25 11:19 13:5,9 65:8 289:15

**flag** 79:13 163:4

**float** 65:3,20

**fluctuating** 323:9 325:2

**focus** 228:3 259:6 265:8 297:13,14

**focused** 32:22 55:14 98:24 136:3 227:3 260:19,23 261:2 279:20 296:4 321:19

**follow** 70:19 338:3

**following** 290:5 333:21

**follows** 5:6 118:6 136:11 154:19 169:12 198:11 260:8 266:12 280:12 285:3 317:3 321:9

**foot** 282:20

**footnote** 88:23 107:19 281:3

**foregoing** 340:4

**foreign** 53:3

**forgotten** 321:14

**form** 11:6,12 12:15 14:11 15:10 15:13,23 19:13,20 20:6 32:12 38:13 46:14,23 50:19,22 51:10,15,21 60:3 62:6 63:11 66:11 66:20 74:22 78:18 80:14 92:19 96:3 96:23 102:6,21 103:2,16 104:20 116:23 129:16 132:25 133:25 134:16 136:8 143:10 144:12,23 145:9 146:12 151:9,21 153:21 154:16 157:6,14 161:11,23 163:20 164:10 168:22 169:9 172:18 173:13 174:9 179:22 186:3 187:13 190:13,21 193:24 194:3 197:4,18 198:8 199:21 200:20 201:15 207:5 208:13 209:3 210:4 212:7 214:6 215:24 218:9 220:12 221:15 225:23 228:19 231:5,24 232:15 233:13 234:23

235:25 236:10,22 238:21 240:19 242:4,14 243:10 243:20 244:17 245:10,19 246:17 247:10 248:13 250:22 258:21 260:18 266:7 267:23 269:4 270:18 271:10 272:15 273:7,12 274:2,11,22 275:12 277:4 278:17,25 280:9 281:18 283:5 284:2,10 286:12 287:21 288:25 289:11 291:6 293:12 294:15 295:11,19 296:12 297:5,8 298:11,18 299:10,22 300:16 301:7,18 303:18 304:22 305:11 307:5,19 308:12 309:17 310:5,16 311:23 312:16 313:3,20 314:11 314:23 315:12 316:13,24 318:2 318:10,24 319:8 319:23 321:23 322:5,17 323:4,19 324:10 325:10 326:8,16 327:8,19 328:2,22 329:14 333:24 336:13,21 337:11,17 338:25

**formal** 48:14 54:19

Page 24

**formally** 18:18 46:24

**formed** 46:13 279:14 294:16 326:9

**forming** 19:25 29:20 30:23 31:8 32:6 66:4 262:5,9

**formula** 132:8 133:6 166:13,16 167:10,25 168:7 168:11,18 170:24 182:21 185:20 186:6,13,21,22 187:3,5 188:25 189:21,25 331:20

**formulas** 71:7 131:5,22 167:5,7 167:17 168:6

**forth** 341:8

**forward** 241:9

**found** 86:19 143:20 171:10 194:19,22 237:11 327:23 333:20

**four** 63:2,3 106:15 107:21 108:17 119:23 120:4,11 120:22 202:20 210:20 272:5,6 289:14,15 290:6,7 290:11 292:22

**fox** 18:3

**fraction** 71:22 193:2,22

**fraud** 67:21 90:17 207:18 290:17 301:10

**free** 61:6

**frequency** 75:12

**front** 258:7

**full** 62:4 63:9 205:12 222:19,25 230:16 242:9 245:11,15,22,24 291:3 300:18 303:10,17,25 310:3,12

**fuller** 315:25

**fully** 7:23 55:21 61:11,14,20 63:14 64:9 164:16 165:14 209:18 240:18 254:10 303:16,25

**functioning** 175:10

**fund** 21:10,11

**fungible** 144:11,14

**furman** 312:5 316:9

**furman's** 313:17 325:20

**further** 45:24 52:8 106:23 118:6 152:4 233:24 241:3 281:6 286:25 312:13 327:24 337:25 339:3,5 341:12

**future** 314:9

**g**

**gain** 252:16 275:5

**gained** 212:15

**gather** 107:2

**geller** 2:4 4:21 14:23 15:16 16:10 16:11

**general** 25:5 54:5 97:2 102:11 108:8 211:23 214:9,11

214:15 218:13 233:14 242:6 252:12 253:6 258:9 273:16 275:9 276:12 277:6 284:3 286:19 293:13 297:10 300:20 313:5 324:14 327:9

**generalized** 215:15

**generalizing** 230:2

**generally** 30:5 42:11 44:5 51:12 51:20 52:6,19 53:11,23 54:20 58:5,25 60:2,10 61:22 63:9 68:22 69:3 73:14 83:7 86:7 113:4,6 131:4,11 227:2,2 231:8 274:12 283:6 286:13 300:2

**generated** 91:23 120:8

**generic** 56:8

**getting** 121:23 189:10 238:23 255:10 300:23

**give** 9:19 34:10 36:8 40:14 41:3,4 48:13 93:4 111:6 123:8 128:22 157:15 177:4 185:8 212:10 217:16 222:14 223:21 254:23 255:18 267:2 284:21 290:2

327:20

**given** 18:21 46:3 59:4,6 79:6 80:22 84:19 104:19 110:2 120:19 131:9,10 138:18 145:11 154:5 155:14 156:17 158:17 159:9 164:16 165:14 182:18 186:10 187:3 189:4,24 198:3,14 199:11 200:10,21 202:7 204:7 235:2 300:4 305:23 311:14 316:5 335:10 341:10

**gives** 59:7,14 164:19

**giving** 38:23 44:23 45:20 51:16 55:23 128:23 133:16 139:7 156:4,22 202:2 211:2 227:23 265:22 267:9 271:14,17 279:4,24

**glasses** 66:24 67:11

**global** 5:17 8:7,11 292:14

**go** 3:14 27:14,24 35:10 36:22 39:3 47:22 49:23 50:5 71:25 81:25 84:20 92:25 108:10,22 109:3,4,12,18,22 114:19 149:6 177:24 178:21 189:15,18 194:25

203:8 210:8 213:22 245:4 259:22 280:23 289:13 292:20 306:10 308:15 325:18 330:10
**goal** 94:10 97:6,12
**goes** 74:3 121:12 163:23 275:2 303:3
**going** 3:3 11:18 12:8 57:14,22 66:25 71:11 80:20 109:18 129:15 151:16 157:18 176:17,18 177:7 179:15 215:21 216:14,24 221:18 235:12,18 236:4 236:16 237:20 240:2 241:4,9 242:25 244:24 250:6,14 260:17 271:21 272:20 306:3 308:13 330:16
**good** 3:2 5:8 110:18 117:21 175:15 188:20 300:9,25
**gotten** 26:17 173:3
**governed** 80:8
**gravamen** 253:2
**greater** 84:2,4,5 87:18 157:4 195:17 196:17 257:14 259:3,8 265:2
**grossly** 279:12
**ground** 7:14

**group** 1:6 2:12 3:18 5:18 8:8,11 33:11,15 83:11,12 85:7 292:14 343:2
**groups** 83:17,19 83:21,23
**guaranteed** 135:20
**guess** 43:8 64:21 199:22 258:4 260:19 282:3 291:21 322:6
**guillermo** 23:3
**gunderman** 2:13

**h**

**h** 5:3 118:4 342:6
**half** 40:15,15 43:7 78:14,25 154:11 154:24 259:6
**hand** 111:19 140:3 197:24 341:18
**handful** 13:18 122:19
**handled** 19:6 177:16 330:14
**happen** 61:4
**happened** 101:7 248:20 272:7
**happening** 62:10
**hard** 48:21 63:4 73:2 74:25 80:17 177:13 209:4,12 209:19 216:7,13
**harder** 199:3
**head** 39:6 93:8 177:14 289:19
**header** 285:3
**heading** 38:3
**headlines** 33:15
**health** 102:16

**hear** 104:25 227:6
**heard** 207:15 208:2 227:24
**heart** 69:14
**heavier** 68:14 72:7
**heavily** 68:19,21 106:17
**hedstrom** 23:2
**heightened** 62:19 62:20,21,22 63:21 198:25 243:25 259:18 310:20 334:14
**held** 1:13 3:22 188:10 223:6
**help** 24:6 111:6 258:14
**helped** 23:24 24:12
**helpful** 84:23
**helps** 82:23
**hereunto** 341:18
**hesitate** 59:22
**hesitating** 142:13
**hid** 112:7
**hiding** 263:23
**high** 69:6 73:14 115:9 173:23,24 176:6 181:23 183:14 200:10 253:23 254:4 255:16
**higher** 69:11 115:25 116:4 125:8 134:3,4 334:16
**highlight** 263:6
**highlighted** 285:10 290:15 291:11 302:23

**highlighting** 262:19,23,25 263:12
**highlights** 262:11
**highly** 73:16 194:6 195:12
**hinder** 116:20
**hired** 9:17
**historical** 253:21
**hold** 131:23 132:11 142:22 143:3,16 160:12 160:19
**holder** 134:9,9
**holders** 110:10 324:2 333:9
**holding** 65:4 134:2 173:15 189:5
**holds** 143:19 144:7 165:24
**home** 5:14
**honestly** 287:7
**hope** 225:7
**hours** 47:10,20,23 48:2,5,17,18,19,24 49:11,16,20 213:6
**hypothesis** 60:13
**hypothetical** 186:8 202:3 228:22 235:8,14 236:17,24 238:14 238:23 240:11 241:20 243:2,19 243:24 244:19 245:7,21 246:4,10 247:2 248:2 249:14,15 250:17
**hypothetically** 78:13

**i**

**idea** 54:20 96:25
  295:4 298:13
  324:8
**ideally** 233:25
**identification**
  21:17 261:8
**identified** 34:3
  67:19 83:13 85:8
  85:9 99:25 100:4
  100:4 120:16
  130:25 208:21
  209:8
**identify** 86:15
  89:14 90:10 93:19
  95:13 97:7 103:22
  215:17 308:7
**identifying** 32:22
  34:24 92:4,8
**ignore** 237:21
**ignoring** 197:22
  230:3 237:14,15
**ii** 264:3,14 267:20
  273:6
**illinois** 3:24 5:19
**illogical** 156:17
**imagine** 109:5
  159:15 188:16
  209:5,12 216:8,14
  337:12
**immediately** 248:5
**impact** 91:18
  99:18 102:19
  104:23 130:24
  131:7 133:23
  144:21 146:4
  172:16,19,20
  217:20 234:7
  239:24 244:3
  255:13 297:20
  301:22 305:21

321:21 337:14,21
**impacted** 60:5
  92:10 99:17 103:6
  119:23 233:24
  241:25
**impacting** 91:8
  97:10 104:6 105:8
  121:22
**impacts** 98:15
**impede** 116:21
  117:2,2,17
**implemented**
  182:14
**implication** 44:8
  333:19
**implications** 57:13
  241:7
**implied** 133:7
  186:14 187:3
  189:8,13 237:13
**implies** 50:23 51:2
  203:5 205:22
**imply** 74:5 81:2
  240:9
**import** 220:21
**importance** 69:22
**important** 67:19
  67:24 68:8 69:7,8
  69:16,18 71:23
  72:13 73:4 90:7
  90:18 91:9 101:10
  101:11 102:15
  125:25 128:10,15
  130:3 157:18
  162:16 185:11
  203:16 223:12
  229:5 300:5
  313:24 337:21
**impossible** 51:5
**impression** 40:17

**improperly** 109:3
  227:16
**inability** 301:12
**inappropriate**
  236:11 293:20
**incentive** 112:8
**incentivized**
  111:18 112:11
**incidence** 84:2
**include** 26:23 39:8
  52:9 90:12 130:11
  130:16 178:6
  334:21
**included** 65:7
  100:5 137:3,10
  177:20 178:25
  210:2,14 255:22
  285:11 307:17
**including** 7:9 9:16
  35:3 89:19
**income** 8:21
**incomplete** 130:5
  235:9,14
**inconsistent**
  161:21 202:3
  311:16
**incorporate** 174:6
  303:10
**incorporated**
  51:24 182:9
  250:15
**incorporates**
  164:17 165:15
**increase** 105:15
**increased** 198:4
  198:15 288:23
**increasing** 244:14
**incremental** 92:16
  93:5,10 233:23
**incrementally**
  288:23

**indenture** 257:13
  258:19 260:22
  263:23 264:2,10
  264:10 266:6,21
  270:25 274:10
  287:16 315:7
  317:18
**indentures** 257:24
  294:21 295:10
  312:10 324:9,12
  324:14,15
**independent** 45:20
  165:4 259:21
  284:7 287:19
  301:25
**index** 125:2,3,5
  126:13
**indicate** 74:9 76:7
  76:8 114:12
  161:15
**indicated** 70:23
  148:12,15 184:18
**indicates** 88:24
  107:20
**indication** 90:13
**indicative** 73:14
  73:16
**indicator** 71:24
**indicators** 72:13
  75:5
**indirect** 165:18,24
  166:5
**individual** 91:8,17
  92:6 125:7 153:25
  193:12 197:2,8,11
  197:20 203:24
  284:14 330:8
**individuals** 37:14
**inefficiencies**
  110:16,21,24
  157:3,5

**inefficiency** 112:6 112:9 155:24
**inefficient** 67:18 106:25 137:17 162:20
**inefficiently** 115:6
**inequalities** 167:23
**inequality** 167:14
**infer** 335:12
**inferred** 230:12
**inflated** 211:21 212:24 214:10 222:11 223:6 224:7 270:5 276:8 279:13 288:8 332:13
**inflation** 205:6,7,8 205:18,21 206:3,6 206:16,23 208:11 208:25 210:24 211:18,22 212:20 212:25 213:17,20 215:5 217:22 218:6,16,23 219:2 219:5,18,19,21,22 220:2,6,11 221:3 221:11 222:16 223:4,7 224:8 225:2,3,16,21 226:4,14 229:18 230:3,13 231:2,21 233:5 240:11 241:18 242:16,23 245:8,17 246:2,16 246:21 247:14 248:18,21 249:6,9 249:21 250:6 269:15 286:8,16 286:24 287:3,4,9 288:22,24 297:22

302:12 320:13 325:8 330:2 331:16,18 332:2 332:18 333:6 337:15,21
**influence** 97:4 104:25 105:13 109:6,7 133:19
**influencers** 131:14
**inform** 27:20 31:16
**information** 18:10 24:24 27:4 29:9 49:15 50:24 51:4 51:7,23 52:3,5,8 52:14,19 53:8 54:10,12,16,20,23 55:3,15 56:2 57:24,25 58:4,15 58:22 59:3,4,6,15 59:20 60:7,19,22 61:4,8,12,14 62:12 62:17 63:4,10,15 63:18 64:7 76:11 76:17,21 77:4,7,8 77:20,24 81:8 82:16,17 83:6 85:17 87:5 90:7 90:19 92:14 100:22 101:10,11 101:14,16,19 102:2 103:4 138:25 145:6,12 145:14 146:3,21 147:3 158:17 164:18 165:16 174:6,12 180:7,24 191:14 193:9,10 206:9 207:2 209:15 213:19 214:24 215:2

216:10,11 218:15 220:18,22 221:8 223:24 224:15 225:15 226:12,21 229:18 230:16 231:12 232:5,6,21 233:6,10 234:12 234:13 238:9,10 241:23 244:9 245:23 246:3,22 246:24 247:3,5,17 247:18 248:3,9,23 249:5,11 254:7 258:12 269:14 273:22 274:6,20 277:7 278:23 279:12 283:8,11 294:5 297:3,3 303:11,15,21 304:2 305:14 306:10 307:17,22 308:2,10,22 309:20 312:25 314:4 316:17 317:6,14,19 318:7 318:8,17,23 319:5 319:10 320:9,17 320:23 326:12 328:18 335:14
**informative** 204:10
**informed** 54:6,14
**infrequent** 74:19 75:8,10
**inherently** 217:3 217:22 219:6
**initial** 23:15 24:7 24:16 25:12 26:5 26:15,21 48:24 49:10 256:15

**initially** 262:17
**input** 3:5 205:22 207:7 209:20
**inputs** 186:10
**insert** 129:15
**inside** 112:7 117:16
**instance** 86:5
**instances** 13:23 63:7 163:12 176:21,25
**instantaneous** 61:9
**instantaneously** 61:5
**institution** 54:7
**institutional** 65:4 65:21
**instrument** 115:24
**instruments** 116:8 172:5
**insufficient** 162:21
**insurers** 10:21
**intend** 45:14,23 46:16
**intended** 148:5 191:21
**intending** 46:14
**intensive** 59:21,21
**intent** 108:6
**interact** 237:4
**interacting** 23:5
**interest** 8:17 89:19 96:17 130:21
**interested** 4:9 341:15
**interfere** 3:11
**interfering** 105:3 105:23
**interim** 305:18

**interplay** 320:12

**interpret** 61:7
190:11 200:5
237:17 299:19

**interpreting** 10:3
239:6 299:17

**interrupt** 66:23
75:17 321:17

**introduced** 286:10
286:16 287:2,9

**introduces** 126:5

**introduction** 24:5
63:3 150:16 191:2

**invest** 298:23

**investigate** 109:4
109:23 199:10,13
202:7

**investigated**
106:23 136:20
199:16

**investigating**
136:2

**investment** 54:22
54:25 56:16

**investor** 35:2
223:5 225:3 288:5

**investors** 54:6,14
61:7 76:23 101:12
103:6,10 223:9
258:15 263:24
281:7 288:12
320:19 333:13

**involve** 209:13

**involved** 18:6
23:12 44:5 234:4

**involves** 97:18

**irrelevant** 80:21
100:18 304:7
324:20

**isolate** 199:3
217:20

**issuance** 20:17

**issue** 40:2 157:19
191:16 289:2
324:17

**issued** 28:7 85:6
90:20

**issues** 113:7 126:6
213:24 214:15
237:16,22,23
243:12 244:23

**italics** 285:11

**iterations** 94:2,14

**iterative** 91:24
93:14,16 98:3

**iteratively** 92:8

**ivolitility** 184:21
189:10,12

**j**

**jane** 2:17 4:17

**jane.ramage** 2:18

**january** 90:22

**jeopardy** 240:4
304:13

**job** 188:20

**jog** 123:17

**jogged** 123:13

**joseph** 2:9 4:24

**jtull** 2:9

**judge** 312:5
313:17 316:9
317:16 325:20

**judgment** 94:22
94:24 95:23 96:20
97:18 121:9

**judicial** 326:7

**july** 90:23 107:25

**jump** 91:16
305:19

**june** 290:22 291:8
326:22

**justification**
221:10

**k**

**k** 294:24 309:9
311:6

**keefer** 23:2

**keep** 51:13 186:4

**kelly** 23:3

**kenneth** 2:13

**kent** 2:23 3:25

**key** 279:9

**kind** 30:15 40:2
150:22 152:11
209:21 304:20
307:4 310:9 311:4

**knew** 257:10
275:23 277:12
279:10 315:17
321:14

**know** 7:12,17 9:4
10:9 12:19,20
14:13 15:17 16:16
16:21 17:14 18:9
33:4 36:2 47:5,21
48:22,24 49:24
50:4 52:15 53:9
54:21 55:15 56:25
62:7,23 68:10,25
69:20 72:14,15,16
72:19,23,25 75:11
93:22 98:21
108:11,16 111:14
114:19 121:3
122:17 127:18
128:18 135:22
145:19 146:5
147:15 157:15
159:2 160:25
161:2 162:3,6,17
162:22 163:3,7,21
163:25 166:9

167:17 173:5
175:9 178:8,18
189:12 201:5,19
203:9 213:6
214:23 216:18
217:2 220:13,24
220:25 221:6
227:4 229:16
232:2,6 235:15
236:12 239:7
253:4 258:4
262:14,14 269:25
271:11 274:19
276:21 277:10,11
278:7,22 280:2,13
284:14 286:14
287:7,24 289:8
291:15,20 292:5,8
292:8,13 293:23
294:20,22 295:6
295:22 302:4
304:8 310:24
315:8 316:15
318:20 319:9
320:14,25 321:24
322:18,20 323:5
323:11 324:7,11
324:18 325:3,13
326:11 328:13
332:20 336:19
337:4,23

**knowing** 287:12
307:15

**knowledge** 38:7
61:7 318:8

**known** 276:15
311:14

**krogman** 65:9
109:24 156:5

**ks** 28:6,6 30:18,19
31:9

**kubik** 23:4
**kyle** 2:22 4:18

**l**

**labaton** 14:24 15:14 16:10,16 17:4
**label** 229:3
**labeled** 290:6
**lack** 99:14,14 162:14 163:8 302:20 315:19
**land** 272:10
**language** 25:17,18 26:2 215:11,12
**languages** 53:4
**large** 11:11 91:15 92:5 95:13,21 96:5,10,11 116:16 116:25 132:15 151:5 285:23
**larger** 116:13 120:23 158:16
**launching** 326:23
**law** 14:21 27:19 251:9
**lawsuit** 234:12 237:6 238:9 239:5 241:16
**lawyer** 266:23
**lay** 220:13
**layer** 52:13
**layman's** 82:21
**lead** 14:16,19 221:20,25 222:6,7 257:9 281:6,15 285:9
**leading** 17:17
**learned** 224:3
**lease** 102:14 103:8 256:2 260:2,5,12 260:16 264:4,5,24

264:24 271:7,7 277:21 278:4,9,16 278:20,21 281:10 284:9 294:13 295:9,16,17,17 300:13 301:13 304:12 309:15,25 311:21,22 312:8 312:14 316:11,12 316:19 317:7 328:19,20
**leaseback** 30:11 254:18 257:23 258:17 259:14,20 263:25 264:23 266:5,20 270:24 274:9 284:8 294:9 312:9 322:25 327:16
**leave** 97:9 156:23
**led** 44:3 259:4
**left** 66:24 95:2
**legal** 4:2,4 127:19 128:16 239:10 244:4 254:17,20 265:3 266:24 268:20 269:6 276:17 315:4 317:20 324:5
**lenders** 322:8
**lending** 30:14
**length** 315:19
**lessened** 293:21
**letter** 19:3,5
**level** 87:19 94:17 94:23 96:24 97:18 114:10,19 115:19 125:8,18 126:3,3 126:10,13 150:24 153:25 190:3 192:11,13,17,18

193:8 197:6 203:25 240:4 252:12 253:23 254:4 255:16 320:13 321:21,22 322:24 333:11
**levels** 69:6 73:7,8 141:15,21 193:2,4
**lexington** 2:14
**liabilities** 257:20
**liability** 221:25 222:6,8,22 234:20 236:19 237:7 252:8,10,22 253:13,18 254:13 264:15,18 267:21 267:25 268:4 284:6 296:3,8,11 296:25 297:19,24 329:12
**liable** 237:11
**life** 241:7,13 279:13 280:6,18
**light** 97:5 310:22 320:9
**likelihood** 105:15 175:18
**likes** 53:12
**limit** 68:4
**limitations** 185:24
**limited** 35:4 139:22 149:20 186:5,20 187:2,23 189:2,24 247:15
**line** 67:15 111:4 167:3 235:11 343:4
**link** 302:9,12,16
**linkage** 101:25
**liquid** 72:21 73:10 73:23 116:12

**liquidity** 73:15 74:6 141:15,21,24
**list** 26:24 27:4 33:11 36:17 38:8 38:9,21 39:7,19,22 39:24 40:3,4,7,19 65:3 71:25 108:5 108:11,12 109:2,8 109:9 123:12 214:17,18
**listed** 35:5,8 41:21 65:4 79:7 93:9 106:15 108:18 134:24 135:11 137:12 140:15 266:22 326:21
**listing** 41:22,22
**lists** 65:19
**literature** 64:2 88:11 89:22 131:20 132:10 168:20
**litigation** 1:7 3:18 8:22 9:11,20,20,25 14:9 88:12 214:22 234:5,6 238:18 243:3,8,14,16 314:22 343:2
**little** 48:21 53:16 58:8 106:16 199:22 200:4 255:14 257:6 266:9 272:8 289:4 322:6,9 334:15
**liu** 2:8 4:23
**living** 8:2
**llp** 2:4,12
**local** 52:17
**located** 3:24 5:24
**log** 132:9

logic 77:17 168:23
logical 109:20
long 20:18 21:2
42:19 60:8 73:9
92:12 98:6 142:19
163:23 169:21
221:6 222:15
228:8 261:21
329:23
longer 61:21
235:13
look 22:5 29:22
37:18 40:23 44:14
50:5 55:22 57:9
69:21 73:5 88:18
93:18 94:9,25
100:9 101:2 107:6
107:12,19 108:23
109:13 112:25
115:14 116:18
117:7 120:18,21
123:16 148:16
149:2,18 150:19
151:15 152:7
156:17 157:19,24
166:11,22 175:15
189:19 192:22
193:19 195:7,15
202:9 208:5 257:4
257:7 262:7,12
263:10,16 277:17
284:22 289:13,19
289:21 290:13
291:20 292:6
293:2 299:16
300:17 304:9
306:18 312:2
325:17 326:19
looked 31:10
35:15 64:16 72:9
84:25 95:20

146:18 148:24
149:13 152:15
153:10 178:3
195:21 212:11
looking 31:20
42:13,16 44:5
49:14 57:16 61:17
64:23,24 65:16
72:12,14 79:14,15
83:2 91:10,24,25
94:13 96:11,13
98:14,16 101:6
114:6,7 115:7
116:6 117:13
123:12 125:6
126:9 152:12
156:21 157:19
165:19 167:23
177:6,8,11 185:14
185:21 188:2
190:4 196:4
201:20 202:20
205:5 254:24
256:16 292:3
328:14 332:8
lookout 49:5 91:7
looks 51:17 71:15
109:25 156:6
158:10 176:10
lose 237:9
loses 234:5 243:5
losing 238:2
loss 205:25 206:14
206:19 210:23
217:2,18 228:2,9
228:23 230:7,22
231:8 235:5
237:20 238:3
239:18,19,20
242:24 245:24
248:7 249:22

250:7,9,24 251:10
268:13,17 272:9
275:15 302:10
306:6 307:10,21
308:5,14,23
329:17,24 330:9
331:22 333:8
336:17 337:22
338:6,19
lost 214:13 266:8
lot 17:20 19:6
42:20,22 45:17
48:14 55:13 72:16
73:20 74:10
125:21 132:10
158:2 187:5
202:18 203:12
215:8 218:11
219:8 227:8,10,10
271:18
lots 197:22 227:7
275:2 324:13
low 74:4 114:17
lower 74:15 114:2
135:5 169:7,19
170:10 173:9,19
174:23
lunch 117:25

**m**

m 2:15 5:3 118:4
magnitude 220:19
magy 2:16 4:17
maintained
288:22
major 52:12 79:7
79:10,11 107:9
113:9,11,19 114:4
220:20
majority 9:4 11:5
11:9,11,20 14:7
143:21 194:17

199:19,24 200:3
323:25,25
makers 158:11,16
158:23 159:4
making 26:6 28:2
48:10,11 68:16
126:10 165:22
179:19 214:21
230:14 269:6,7
311:3
management
31:23
manipulation 38:5
38:10 40:25
manner 143:7
198:5,16
march 159:18
283:14
margin 163:14
mark 2:13 21:14
23:2 261:4
marked 21:17
261:7
market 18:23
28:11,17 29:2
31:18 38:4,10
40:25 43:13 44:4
49:18 50:7,12,16
50:19,25 51:10,19
51:20,24 52:20,25
54:8 55:21 56:14
56:24 57:3 58:3
59:2 60:4,13,14,18
60:20 61:3,11,24
62:3 64:10,11,14
66:5,9,12,17 67:17
67:21 71:8,13,24
72:22,24,25 73:11
73:15,17,23,24,24
74:6,10,12,15,21
75:7,12,15 76:9

77:2,3,12 78:16
79:6,9,25 80:13,18
80:25 81:14,15
82:7 89:11 106:12
111:2,4 112:16
113:12,22 114:18
114:24 115:2,3
116:17 122:8,15
123:21 124:2,4
127:15,17 128:4,5
128:20 129:4
133:12 136:24
137:17,21 138:3
138:10,14 141:22
142:11 143:5,6,13
144:4 145:6
146:10 147:22
148:11 151:6
153:4,9,18,19
154:2,11,23
156:15 157:13
158:11,16,23
159:4 161:21
162:13,16,19,21
163:10,19,24
164:7 165:25
169:4,15 171:23
171:25 172:10,12
172:13 175:10
179:11,19 180:5,7
180:23,24 181:21
183:14,17 185:12
185:23 190:11,15
190:16 194:10
198:2,13,22
206:10 207:3
209:16,19 221:7
222:23 224:3,16
224:17 225:9
226:13 233:16,17
233:20,21 234:11

234:13,18 236:17
237:8,17,25
238:11 239:6,17
240:15 244:8
245:22 247:4,6
249:18 254:3
259:4 263:23
265:19 267:13
269:19 275:24
276:4,18,20
290:21 291:5
292:16 297:4,6
298:24 299:6,17
299:19 303:8,9,25
304:12 305:6,21
305:23 306:19,20
307:16 309:21
310:21,24 311:13
312:25 313:9,17
314:5 316:23
317:12 320:10
325:22 326:15
**market's** 233:11
239:21 241:22
310:18 311:10
321:21
**markets** 44:25
116:10 126:21
128:12,19 146:16
163:16,25 328:18
**marriage** 341:14
**mary** 23:4
**massive** 121:5
**master** 256:2
259:25 260:12
264:4,24 271:7
277:21 278:4,9,15
278:20 281:10
294:13 295:9,16
295:17 300:13
301:13 309:15,24

311:21 312:8,14
316:11,18 317:7
328:19
**match** 109:9
**matera** 1:14 4:4
5:4 341:4,23
**material** 28:15
29:4,5 85:22,23
86:3,9 90:7 95:25
96:22 177:17
224:23 257:11
258:11,12 263:24
264:20 270:23
274:8
**materialization**
209:17 216:12
226:11,23 227:7
227:15,20 228:6
228:16 229:3,9,14
229:20 230:9,24
232:10,18 250:4
254:9 293:17
294:2 296:17
297:25 309:14
310:3 311:20
312:13 313:13
316:10 326:6
328:8
**materializations**
333:4
**materialized**
232:13 243:4
289:24
**materially** 103:6
285:12
**materials** 26:24
28:25 31:6 33:11
**math** 241:11
**mathematical**
239:16

**matt** 23:2
**matter** 3:17 17:5
17:10,20,25 18:11
20:22 44:17 47:4
78:21,22 94:21
102:13 121:9
122:24 132:2,18
134:6 143:4
173:14 204:5
205:3 224:5 228:8
240:23,25 241:2
266:25 300:20
341:16
**mattered** 241:15
241:17 324:24
**matters** 13:2
**maturity** 155:18
159:18
**mean** 11:14 14:12
33:20 34:4 35:14
53:25 57:24 60:22
60:25 66:22 67:24
68:20 71:4 73:3
73:19 74:8 75:10
76:14 81:20 86:4
94:25 103:20
106:24 114:3
115:6 123:20
140:5 144:14
149:5 151:10
162:2 168:10
179:3,10,11
181:20 203:18
204:5 210:6,8
222:4 236:23
238:22 241:8
249:12 250:13
266:22 274:12
275:13 279:21
281:21 286:3
293:13 310:6

315:15 321:17 324:11 334:24

**meaning** 54:18 55:11 73:20 76:15 336:8

**meaningful** 109:6 188:15 275:17

**meaningless** 203:14,15

**means** 127:24 129:4 161:5 227:9 276:11

**meant** 56:23 138:6 138:11 201:17 255:16 256:23 282:13 302:15

**measure** 110:12 110:19 151:7 164:13 170:15,16 188:8 191:3 222:15 231:2,20 246:11

**measured** 87:25 96:7 221:23 252:6

**measurement** 88:7 97:10 100:23 121:19 329:25

**measurements** 98:13

**measures** 42:17 104:17 110:5,19 133:4 196:12

**measuring** 88:2 222:16

**mechanism** 116:21 117:3 225:11

**media** 3:15

**median** 114:3

**mediator** 12:23

**meets** 228:9

**member** 139:15 204:19

**members** 22:22 23:7 80:19 255:13 262:15,25 263:5 291:25 292:5,9

**memory** 123:13 123:17

**mental** 40:17

**mention** 101:24 256:5

**mentioned** 37:20 127:12 131:2 139:8 146:18 166:8 189:8 216:4 218:12 268:17

**mere** 127:14

**merely** 282:18

**met** 33:23

**method** 124:9,12 125:20 204:23 205:17 208:16 211:16 216:24 217:25 219:17 220:7 224:2,14 225:4 247:9 250:13 330:3 333:5 338:16,21

**methodological** 124:20

**methodologies** 208:19 209:23 213:23 214:3 216:4 217:10 218:5,20,25 219:9 219:13

**methodology** 45:10 94:4 124:3 124:18 192:8 199:18 204:18,21

205:20 207:8 208:10,22 218:24 221:24 222:5,14 224:22 242:11,15 246:14 247:13 265:18 267:12 269:18 329:7,22 330:15 331:7 332:5

**methods** 124:23 216:21 217:5

**metric** 150:11,12 150:18 159:7,11

**metrics** 42:16 67:19,25 83:15,24 84:24 85:4 196:8

**microphone** 3:6

**mid** 43:10

**midpoint** 184:24 185:2

**midpoints** 157:23

**milliken** 2:22 4:18

**million** 151:17,20 326:23

**mind** 8:24 16:17 17:3 51:13 66:23 69:2,24 108:5 114:15 115:12 186:5 227:18 228:14 287:8

**minds** 103:6 286:17

**mine** 26:11

**minimum** 107:5

**minus** 205:6

**minute** 41:4 66:24 178:17 185:8

**miscounting** 64:20

**misleading** 209:18 248:3 253:20 283:25 285:5,12

**misled** 281:7 313:9

**mispriced** 111:16 111:23

**mispricing** 174:4

**misrepresentation** 225:10 277:2

**misrepresentatio...** 276:9 288:10 302:17 336:11

**misrepresented** 309:22 327:12

**missed** 250:16

**missing** 176:22 179:5 232:5,6

**misstated** 216:13

**misstatement** 98:20 99:2 207:18 226:8 284:6

**misstatements** 98:22 222:9 223:15 224:24 247:19 253:25 254:16 283:14 284:15 285:18,24 286:10 287:15 288:20 289:6 327:5 329:13,18 330:8

**mistake** 109:15 191:5

**mix** 100:22

**mobile** 6:21

**model** 88:25 98:11 182:7,10,13 183:5 183:11,19,23 185:5,16,25 186:9 186:17 187:10,20 188:19 242:10

**models** 133:9

**moment** 34:10 129:13 145:13 186:7,10,21,23 202:22 254:23 255:7,18 284:21

**moments** 131:10

**money** 58:17 142:19 145:21 146:2 237:21

**monitor** 70:7,11 75:22,25 117:24 118:8 184:5,9 251:16,21 330:20 330:24 339:9

**monitoring** 292:11

**months** 17:15,21 58:11

**morning** 3:2 5:8

**motion** 27:18 29:15 45:16 252:19

**motions** 211:9

**mouth** 161:2

**move** 59:12 83:9 99:11,16 112:11 134:14,20 192:5 195:2,5,24 196:2 197:14,16 199:24 200:2 203:11

**moved** 41:3 42:16 190:15 194:13 195:14,17,18 334:20

**movement** 61:19 83:18 84:15,19 85:2,20 86:7,21 96:5,6,10 105:16 119:19,20 121:16 121:17 146:4 166:4,6 191:12,13 192:4 193:13

194:8,24 199:5 334:10

**movements** 44:7 81:13 84:3,4 95:21 96:12 103:18,25 104:15 105:23 165:5,7 194:17,20 196:18 200:13 331:25 332:25 334:8 335:5,11,13

**moves** 46:6

**moving** 159:20 172:5 246:25

**multiple** 41:23 42:23 62:19 87:14 164:22 216:21 267:25 268:2 330:7

**multiply** 151:19

**munk** 2:24

**mute** 3:5

**mutual** 21:11

**n**

**n** 2:2 5:3 118:4 342:2

**name** 3:24 5:9,11 123:20

**names** 12:11 123:3

**narrow** 112:14,23 114:13,22

**narrowing** 175:16

**nasdaq** 78:10 135:9,21 140:16

**natural** 67:6 250:23 329:2

**naturally** 250:11

**nature** 31:11 41:15 42:2,8 48:10 80:6 103:4 189:24 212:14

220:18 222:13 226:9 228:21 231:11 233:6 243:13 250:16 253:6 259:19 270:7 276:19,22 277:6 297:2 315:5 315:20

**navigate** 283:15 283:22 327:6

**nearly** 211:7

**necessarily** 9:18 9:21 27:24 32:19 32:25 33:7 52:23 52:24 55:9 56:18 79:24 80:4 98:25 99:12,22 106:24 106:25 115:24 119:15 127:24 129:4 131:11 137:23 138:4 142:15 198:20 208:17 216:23 232:12 245:25 289:18 296:5 298:19 299:2,14 307:8 328:6

**necessary** 25:14 29:24 31:4 32:2 34:13,16,22 35:21 126:11 148:16 154:7 156:3,21 162:12 202:7 205:15 207:7 209:24 213:18 216:20,25 217:6 218:21 219:5,13 224:20 252:8 253:19,24 258:13 271:13,16 275:5 277:16 316:4

337:19 338:18

**need** 25:24 57:15 67:11 75:11 93:24 106:23 119:14 147:8 149:18 159:22 177:17,24 191:18 199:11,13 206:7,24 213:17 215:21 224:15 231:9,21 232:2,4 233:2,8,9,15 241:21 242:6 246:13,14,18 269:16 270:6 276:10,21 302:7 305:24 308:22 328:7 336:7

**needed** 93:20 273:17 310:24

**needing** 269:25

**needs** 223:19 225:11,17

**negative** 191:11 234:15,21 236:21 238:12,20 243:3,8 243:14,16 244:10 313:24

**negatively** 301:2 325:20

**neglecting** 255:6

**nera** 64:6

**neutral** 12:22 13:14,24

**neutrals** 10:20

**never** 9:2 12:9 39:16 40:10 80:17 115:19 163:2 179:15 207:17 239:14 241:13 246:7 247:21 248:3,19,23,25

**[never - objection]**

249:2,5,24 250:6,8 251:4,6 262:18 264:17 268:3

**new** 1:16 2:14,14 25:6 29:4 51:3 57:23,25 58:15,20 59:7,8,10,14,15,20 59:25 60:9,21 61:3,12 62:12,17 63:4,10 78:9 81:7 81:12 82:16,16 83:5 86:9 87:4 90:7,19 103:5 138:25 145:6,13 147:3 150:16 164:17 165:15 174:6 180:6,24 181:13 199:20 246:22 304:2 306:10 312:24 313:24 314:2,3 316:17 317:5,14 317:18 318:6,17 318:22 319:5 326:12 328:17 341:5

**news** 28:14 31:16 31:16 32:15,23 33:9,11,15 34:9,17 34:17,21,24 36:10 36:10 52:12,17 53:3,12 55:17 56:5 57:6,17 60:14,16 61:20 62:15,16,22 83:4 83:13 84:6,8 85:10,16,22,24 86:4,9,12,12,14,15 86:16,22,23 87:12 87:22 89:17 90:11 90:14 91:21 95:25

96:22 97:8 99:25 100:5,6,10,15,18 100:25 101:3,9,12 101:23 102:18 103:5,25 104:5,5 104:16,19,22 105:2,6,10,12,14 105:16,18,18,22 124:19,19 147:20 147:20 148:3,4,6,6 180:14,14,20,21 181:3,3,10,10,13 190:9 192:16,16 196:7,20 197:17 199:20 203:23,23 300:11 301:4,11 301:24

**nielson** 17:5

**nikolaus** 2:18

**nikolaus.williams** 2:19

**noise** 3:8

**non** 135:4 180:14

**nonchanging** 187:25

**normal** 89:11 263:15

**normally** 64:4 109:8 132:9 247:14 306:5

**notary** 1:15 5:4 340:20 341:4 343:25

**note** 78:20 150:24 326:24 328:7

**noted** 134:22 236:14 313:21,22 339:10 340:6

**notice** 295:2 309:10 311:7,8,19 319:18

**notwithstanding** 128:15 272:7

**number** 3:21 9:2 10:9,22 12:17,19 12:20 13:4,17 15:11 16:22 26:2 40:10,20 43:25 44:11 47:12,23 49:16 60:25 61:15 61:23 63:12,21 64:13 94:11 121:21 122:18 126:13 130:8 132:6 134:18 135:5 138:21 150:9 151:12,16 151:19 152:22,24 157:16 158:11,16 158:23 174:15 177:3,23 192:24 193:23 200:15,18 201:9,13,18 202:10,10,11,21 203:4,4,13 205:22 227:25 231:14 246:6 285:23 289:16 315:16,21

**numbers** 111:7

**numerous** 24:22 62:24 180:11

**o**

**o** 5:3 118:4

**oath** 4:7 5:22

**object** 260:17 271:25,25 272:14 291:6 308:12

**objecting** 15:24

**objection** 11:6,12 12:15 14:11 15:10 15:13,23 19:13,20 32:12 38:13 46:23

62:6 63:11 66:20 74:22 78:18 80:14 92:19 96:3,23 102:6,21,25 103:16 104:20 116:23 129:16,23 132:25 133:25 134:16 136:8 143:10 144:12,23 145:9 146:12 151:9 153:21 154:16 157:6,14 161:11,23 163:20 164:10 168:22 169:9 172:18 173:13 174:8 179:22 183:6 186:3 187:13 190:13,21 193:24 194:3 197:4,18 198:8 199:21 200:20 201:15 207:5 208:13 209:3 210:4 212:7 214:6 215:24 218:9 220:12 221:15 225:23 228:19 231:5,24 232:15 233:13 234:23 235:25 236:10,13,22 238:21 240:19 242:3,14 243:10 243:20 244:17 245:10,19 246:17 247:10 248:13 250:22 258:21 266:7 267:23 269:4 270:18 271:10 273:7,12 274:2,11,22

**[objection - opinions]** Page 35

275:12 277:4
278:17,25 280:9
281:18 283:5
284:2,10 286:12
287:21 288:25
289:11 293:12
294:15 295:11,19
296:12 297:7
298:11,18 299:10
299:22 300:16
301:7,18 303:18
304:22 305:11
307:5,19 309:17
310:5,16 311:23
312:16 313:3,19
314:11,23 315:12
316:13,24 317:23
318:2,10,24 319:8
319:23 321:23
322:5,17 323:4,19
324:10 325:10
326:8,16 327:8,19
328:2,22 329:14
333:24 336:13,21
337:11,17 338:24
**objections** 235:24
236:7 272:14
**objective** 94:3,7
94:15 120:10,15
**objectively** 83:3
**obligated** 314:21
**observable** 146:5
**observation**
193:15
**observations**
176:13 177:21
178:6 179:2
193:17
**observe** 62:18
**observed** 83:20
99:20 171:16

182:3 183:10,13
184:20 185:6,12
185:18 194:7
214:13 247:15
**observing** 298:25
**obtained** 322:8,13
323:13
**obtaining** 119:9
**obvious** 61:8 94:9
94:13 95:3 106:19
235:4
**obviously** 26:11
44:20 47:13 119:6
120:6 179:14
233:18 282:16,21
317:14
**occasions** 62:25
123:2
**occur** 107:3 163:6
170:18
**occurred** 18:25
25:2 43:3,5
101:22 135:15
199:14 232:23,25
243:14 250:10
308:19 314:14
**occurring** 72:21
105:7 115:15,16
137:17 198:21
**occurs** 83:10
117:9
**offer** 42:4 45:15
45:24 46:17
**offered** 110:7,9
122:14 123:25
**offering** 110:10
136:23 137:20
138:2,7,13 216:2
326:24 327:14
328:7,13,17

**office** 5:25 66:25
**okay** 7:12,20,21
9:24 20:9 50:9,10
71:11 88:20
122:10,11 123:10
143:24 178:19
234:8,9,15,16
243:5,6 262:6,18
263:18 270:20
281:2 284:25
292:24,25
**old** 60:16
**omission** 99:8,9
225:10 226:8
283:4 284:7
**omissions** 222:10
223:15 247:19
254:2,17 274:16
276:9 285:5
287:15 289:5
302:18 336:12
**omitted** 255:24
281:8 283:8,11
309:22
**once** 25:23 39:25
53:15 61:22 63:2
93:21 98:2 119:12
119:24 121:2
122:4 211:13
213:9 242:16
**ones** 16:23 23:4
31:21 35:12
130:25 132:21
140:2 147:17,18
150:24 167:7
**ooo** 2:25 342:11
**open** 7:5
**opened** 21:21
303:8
**operated** 324:17

**operation** 163:15
**operative** 18:14
**opine** 164:6
206:18
**opining** 252:4
**opinion** 9:22,23
32:6 36:12,16
42:3,4 43:13
44:24 45:6 46:2
48:2,3,4,13,16,20
49:4,8,10 50:12,17
66:4,12 122:7,14
122:14,22 123:25
126:21 128:23
136:24 137:21
138:3,7,13 139:6
139:21 153:2
154:11,23 156:4
156:13,22 162:11
163:23 198:2,13
204:16 210:2,11
210:13 211:2
212:10 213:7,13
216:3 219:25
221:22 223:21
225:17 227:23
228:18 267:2
276:5 279:24
288:18 294:16
299:25 305:3
316:21 317:10,22
318:16,22 325:21
326:7,9 328:12
329:6
**opinions** 19:25
20:7 24:14 29:20
30:24 31:8 32:11
44:4,17,19,21,23
45:13,14,18,20,22
45:25,25 46:5,10
46:12,13,16,17

50:7 126:20
234:25 261:14
262:5,10 265:21
267:8,15 268:20
271:14,16 276:4
279:4 316:5
**opportunities**
160:13 161:16,20
171:7 172:3,7,23
298:24
**opportunity**
155:19 160:21
171:18 202:5
**opposed** 179:5
**option** 71:6 125:7
125:18 126:2,10
126:12 128:18
129:9,18,19 130:7
130:18,19,25
131:4,8,14,22
132:22,24 133:6
133:19,24 134:5,7
134:7,11,13,19,23
134:24 137:5,7,9
138:22,24 139:4
139:10,11,16,19
140:4,6,8,10,21
141:3,7,11,14
142:3,10,15,17,23
143:3,5 144:2,21
145:2,5,7,20,22,25
146:5,9 147:2,12
147:16,24 150:6
151:11 152:2
153:13,14 154:8
154:12,20,24
158:2,24 159:20
162:12 163:18,25
164:17 165:15,21
166:5 168:17
174:4 179:13,20

179:21 181:12,16
181:20 182:2,21
183:2,4 188:9
190:3,7,16 191:10
192:3 193:23
194:17 196:16
197:11,21 198:6
198:17,24,24
199:5,20 200:2,9
202:16,18 204:8
333:2,9,22 334:4
334:20,22,25
336:6 338:7,13
**options** 25:16,18
41:17,20,22 42:15
42:18,23 43:14,16
43:21 44:6 45:3,3
49:22 70:25 116:3
117:5 122:9,9,16
122:25 123:21
124:2 126:22,22
127:10,16 128:4
128:11,13 129:4
133:3 135:6,9,10
135:23 136:3,6,13
136:17,21,25
137:13,22 138:4,8
138:9,15 139:23
140:16,17 143:20
144:10 145:19
146:17,17,23
147:23 148:18
149:2,11,14,19,22
150:13,14,18
151:22 152:8,14
153:4,6,11 154:3
156:11,15 157:9
157:12 158:7
159:10,14,23
160:3,7,12 163:15
164:6 170:5

171:23 172:15
173:12,22 174:5
175:23 180:6,23
181:11,22 186:2
187:11,16,17
188:14,18 195:5
195:18 196:2,15
196:23 197:3
202:22,25 203:7,9
331:10 332:6,19
332:23 333:12
335:3,9,12 336:3
337:16 338:23
**order** 27:17
128:11 146:15
162:19 185:21
191:19 192:2
206:21 208:24
212:9 213:12
217:19 224:13
230:25 231:20
232:4 233:4
241:19 246:10,12
252:20 276:23
298:22
**original** 187:14
241:22 306:8
**outcome** 4:9 98:15
234:15,21 236:21
238:12,20 243:3,8
243:14,17 244:11
313:10 324:23
329:23 341:15
**outlier** 89:4 90:21
91:4,18 92:15,22
94:5 97:21 107:21
107:24 118:23
119:14 120:4,12
120:23
**outliers** 95:13 97:3
97:9,13,17,24

119:24 121:5,9
122:5
**outside** 19:16,24
45:25 234:25
272:19 281:24
307:9 308:9
**outstanding** 71:23
78:7 150:10,14
**overall** 44:19,23
48:8 59:17 124:17
124:20 125:22
148:8 190:3 195:9
195:23 210:10
240:3 253:2
255:12 256:24
296:19 324:25
325:5 331:12
332:3,15 334:17
**overarching** 55:24
282:14,19
**overlap** 92:21
**overseas** 53:4
**overstatement**
170:19
**overview** 24:18
**overwhelming**
14:7,12
**owned** 21:6,11
**ownership** 65:21

**p**

**p** 2:2,2
**p.m.** 117:25 118:3
339:10
**page** 22:5,17 24:4
37:22 41:6,10
342:3,7 343:4
**paging** 21:21
**paid** 288:8 300:23
**pairing** 160:14
**pairs** 160:14 170:5
171:11

**[paragraph - perception]**

**paragraph** 44:13
44:15,25 45:7
50:21 57:23 67:9
67:14 71:18,21
73:13 76:6 81:10
112:13 129:8,17
130:12 131:2
134:25 158:14
160:23 166:8,14
167:10,14,18
170:3 171:21
172:9 181:9
221:18 255:8,19
255:24 256:9,13
257:8 263:16
265:23 266:14
277:17,19 279:5
280:23 281:4,22
282:2,13 283:3
284:20,23 285:2,8
289:21,22 290:5
290:14 292:21
293:2 302:21
304:10 306:18
307:2,25 308:11
309:5,6 312:2
325:17 326:19
**paragraphs** 44:16
210:18,20,20
211:4,6 213:15
**parameters** 98:17
**pareteum** 38:25
**parity** 124:7,11
127:3 138:20
142:14 143:19
146:24 147:19
156:19 160:6,8,9
161:5,15 162:4,12
162:16,25 163:9
163:13,17 164:9
164:15 165:13,23

166:18,25 167:9
167:12 168:8
169:3,14 171:5,11
172:17 173:10,12
174:2,25 175:6,12
175:24 177:20
180:2,20
**parse** 258:5
273:14
**part** 31:17 32:7
57:12 70:24 84:16
84:21 87:20 88:5
97:14 99:3 100:6
100:13,21 104:9
104:10 107:12
135:3,19 181:5
187:4 206:14,18
206:19 209:6
223:8 224:18,19
227:16 242:23
248:9 249:2 251:2
254:5 258:24
262:16 263:14
264:8 274:3 278:2
282:11 283:7
291:16 296:23
298:17 299:8
301:20 307:10
312:21 333:5
336:17
**partial** 234:11
290:8,16 292:22
293:3 307:3,7
309:7,14 311:20
312:4 316:10
326:20
**partially** 97:20
**participants**
179:11,19
**participation**
13:16

**particular** 29:5
35:4 36:24 37:17
58:23 66:7,18
67:17 75:3 80:16
89:18 94:16 96:13
99:8,16 113:21
122:4 123:6
135:14 139:17
140:6,8,11,12
141:24 142:7
150:11,12,23
154:3 159:21
162:24 167:21
198:23 199:2,24
199:25 206:7,24
208:18,22 213:8
214:19 215:17
216:16,24 217:5,6
218:3 226:16
227:3 229:5
242:22 256:21
263:6,13 273:15
296:5,16 297:12
300:18 304:3
315:18 316:15
334:5,6,14
**particularly** 155:6
159:8,11 204:10
**parties** 3:14 6:6
10:22 341:13
**partners** 43:4,8
**parts** 268:2
**party** 3:6 4:8
**pasted** 212:3
**patient** 235:3,12
235:13
**pay** 102:14 103:7
187:11,17 237:11
293:21 300:7
301:12

**paying** 57:5
300:12
**payment** 237:23
243:12 304:12
**payments** 8:12
102:14
**pendency** 6:19
**people** 18:5 23:8
24:11 37:9 56:20
76:16 77:9 112:11
227:6,11 324:22
**perceived** 157:4
233:17,18,19
320:11 321:22
**percent** 9:6,8
11:15,16,21 14:13
14:14 72:15,18
78:7 86:22,24
87:16,17,18
154:13,25 171:12
171:16 182:20,23
183:18,20,21
194:20,22 234:14
234:20 236:20
237:9,19 238:2,12
238:13,19 239:8,9
239:18 243:9
244:10,15,15
245:24 279:15
290:23 302:24
303:4 304:15
**percentage** 8:20
9:5,17 10:25
111:12 114:11
195:10,18 198:5
198:17 200:8
219:21 220:6
**percentages**
200:11
**perception** 233:11

**perfect** 51:17 220:23
**perfectly** 51:19 236:2
**perform** 10:23 19:12 29:25 43:19 82:6 113:23 150:22 155:22 205:23
**performance** 31:14
**performed** 25:23 44:2 64:3 82:13 83:14 106:3 147:16 154:6 156:20 210:22 213:11 275:20 319:17
**performing** 8:21 23:14 28:4,10,17 29:10 30:2 31:5 41:25 91:5 92:3 97:5 105:4,25 119:21 125:9 185:10 186:11 193:11 275:14
**period** 8:24 28:8 30:20,23 45:4 50:13 61:21 74:24 78:11 85:5,8 88:7 88:8 95:10 100:7 106:7 122:10 126:23 134:22 135:7,25 136:7,15 136:23 138:17 139:12,20,24 140:14 151:14 154:10,15,22 155:4 188:2 199:2 202:21 205:19 206:4 207:21

213:21 215:6 221:4 223:6 247:6 248:5,6 263:21 285:6 286:23 288:7,11 291:3 323:3 325:2,6
**periods** 64:8 132:12 203:8
**persistent** 161:19 161:24 162:2,15
**personally** 35:16 128:22 262:24
**perspective** 228:24
**pertinent** 279:24
**phase** 210:23
**phone** 6:16
**phones** 3:9
**phrase** 302:22
**phrased** 322:10
**phrases** 227:24
**pick** 3:7 101:25
**picked** 104:17
**picking** 105:9
**piece** 103:5 145:11 145:13 146:3 246:3 248:2,8,22 249:10 306:10
**pieces** 167:15 168:2,13
**place** 3:9,13 14:4 20:13,16 43:2 136:18 225:20 248:18 249:7 293:19
**placebo** 83:11
**placed** 155:13
**plaintiff** 10:16 14:16,17 20:21 29:14 296:24 312:18

**plaintiff's** 14:9
**plaintiffs** 2:5 7:9 10:20 11:4 14:20 26:12 45:15 46:20 48:8 49:2 70:15 90:6 99:6 118:14 128:18 184:13 211:14 212:12,13 221:21,25 222:6,8 222:21 223:13,22 224:9 226:7 227:13 229:8 249:17 252:2,7,9 252:17,22 253:12 253:18 254:13 255:4 256:11,17 257:9,19 259:23 260:10 261:5,6,11 262:2,21 264:16 265:10 267:22 268:10 269:2 270:7,16 274:14 277:7 278:12 280:2,14 281:6,16 283:7,12,20 284:15 285:9 286:8,15 289:5,9 291:17 294:4,24 296:2,10 297:23 297:24 298:5 304:10,18 306:16 307:9 309:19 310:13 311:13,16 313:6 314:15,18 314:25 315:15 319:15 325:18 326:13 327:10 329:11 331:5 342:9
**plan** 332:17 336:19

**platforms** 42:19
**plausible** 32:13 200:23 226:6 302:3
**play** 23:10 31:7 36:12 131:9 153:8 154:4 244:22
**please** 3:4,8 5:2,11 7:17 136:10 154:18 169:11 198:10 250:17 260:7 280:11 317:2 321:8
**plot** 93:18 120:19 120:22
**plus** 202:20
**pocket** 204:23,25 205:4,16 207:8 211:15 218:23 222:14 224:14,22 225:4 246:11 247:9,12 250:13 265:18 269:17 329:22 330:14 331:15 332:4,15 338:16
**point** 24:13 26:16 30:10 34:2 39:25 67:6 91:16 127:22 128:21,25 175:4 195:8 202:19,24 205:9,13 207:20 211:12 223:7 226:15 243:7,15 250:2 251:10 256:19 261:18 270:12 282:22 294:7,23,24 295:4 310:21 322:12 329:2

**points** 27:3,22 28:2 121:21 269:16 287:10
**polk** 2:12 4:15
**portion** 8:14 31:17 32:17 36:16 40:5 129:25 130:4 143:11 228:11 229:25 230:11,19 245:12 246:19 248:21 249:9 270:9
**portions** 25:19 31:6,23 35:19 49:18 261:20 263:7
**position** 300:5
**positive** 93:11 177:3,23 191:12 224:21 225:7
**positively** 134:11
**possession** 238:7
**possibility** 105:20 136:19 308:9 309:3 328:6
**possible** 10:13 16:12 94:12 95:14 95:15 116:24 117:6 136:5,12 141:19,23 145:4 145:14,18 146:7,9 153:22 159:13 173:25 200:6 226:3 247:8 287:22 298:12 299:6,12 302:5 307:13 325:15 336:18 337:8,12
**possibly** 9:9 140:2 235:15 296:14 303:19 325:11

337:3
**post** 248:5,6
**posted** 56:9
**posting** 37:14
**potential** 32:15 77:7 80:19 139:15 161:16 170:16,21 171:3 174:16 201:11 213:22 218:19 256:5 300:10 308:20
**potentially** 12:8 74:9 93:21 99:17 99:18 210:22 276:8 301:2,13,21 307:20
**potentials** 110:21
**powerful** 87:2
**practice** 19:4 28:4 30:18
**pre** 43:5 275:25
**preceded** 287:18
**precedent** 127:20
**precedential** 128:16
**precise** 13:4,17 15:11 122:17 168:6 209:8 232:2 316:3
**precisely** 14:4 75:10 211:12 222:21 242:16,20 274:24 275:6 286:15 308:3 319:15 324:16 330:11
**predating** 288:10
**predicated** 279:11
**predict** 185:25 186:9 190:3

**predicted** 243:18 314:9
**preexisting** 288:22
**preliminary** 67:10
**prelude** 292:22
**premature** 335:21
**premium** 134:10
**preparation** 19:17 261:19
**prepare** 23:24 24:6
**prepared** 24:16 39:25 122:13 266:25
**preparing** 9:19 22:23 23:11,14,15 23:21 24:2 25:12 25:21 26:15,25 27:11
**presence** 73:3 77:19 112:15 114:23 155:14,15 162:6 318:11
**present** 2:21 4:10 4:18 163:9 203:6 240:21
**presently** 45:14 46:16
**presided** 312:6
**press** 52:11 53:14 85:11
**presumably** 236:17
**presume** 234:17
**presumed** 114:9
**presuppose** 335:7
**presupposing** 277:14
**pretty** 14:2 26:7 59:20 235:4

**prevailed** 222:24
**prevalence** 196:17
**prevent** 172:2,6
**previous** 124:10 124:14
**previously** 15:3 58:6,17 59:10 60:6 118:5 279:20 293:9 313:2 316:22 317:11,25 318:9 326:15
**price** 44:7 50:25 51:24 53:2 60:4 61:25 62:4 71:9 81:6,14 82:15 83:9,18 84:3,4,15 84:18,25 85:2 86:6,20 87:6,11,21 88:2,5 90:15 95:21 96:5,6,10,12 99:12,16,20,20,23 100:19 102:20 103:18 104:2,7,15 105:23 110:11 111:8,9,20,20,21 112:11 121:16,17 125:2,3 126:9 129:10,19,20 130:7,9,16,17,24 131:16,18,18 133:5,19,24 134:11,19 139:2 140:11 142:11,24 143:6,13 144:4,20 144:21 145:4,7,22 146:3 158:19 160:10,15 161:10 164:18 165:5,7,16 166:6 167:19,19 168:3,16,16,21 169:4,5,15,17

**[price - provide]**

171:25 174:19
176:11,11,22
177:2,2,22,22
179:4,4,9 180:5,23
181:25 182:15,22
182:24 183:17
184:25 185:2,13
186:9,13,18,25
187:6 188:18
189:4 190:6
191:10 192:3
193:6,13 194:9,13
194:17 195:2,13
196:18 198:3,7,15
198:18 199:4,5
200:13 205:10,11
206:6,8,23,25
207:10,11,12,13
207:17,19 208:11
211:18,20 212:23
213:2 214:9
217:20 218:6
222:11,17,18,23
222:24 223:6,16
224:7 225:12,13
225:14 229:25
230:3,5,11,12
232:23 233:20,25
238:5 245:4
246:15 247:16,22
249:3,19 251:6
270:5 276:8
286:11,24 288:8
290:17 291:12
294:6 298:7
300:15 301:14,22
302:15 303:17
305:22 306:2
308:19 313:22
325:8 329:8 330:2
331:17,19,24

332:9,11,25 334:7
334:18,19,24
335:11 336:2,5
**priced** 234:18
236:18 238:4
240:14,17
**prices** 42:14,16
51:2 56:17 59:12
60:21 63:7 64:10
70:25 71:5,6
102:4 103:14
110:6,8,8 131:14
132:19 133:2,12
133:13 134:14
137:13 138:24
141:8 142:15,17
142:23 143:3,7
144:7 147:3
155:17,25 157:21
159:14,20 160:10
160:11 162:9
164:22,25 165:20
165:21,25 166:3
167:22 170:11
171:23 172:4,8,10
172:11,12,12,20
172:21 174:5
175:2 176:16
181:13,16,20,21
183:14 185:5,19
185:21,23 186:2
190:4,15,23 191:7
191:19 197:13
203:2,11 337:15
**pricing** 71:6 81:2
116:7 129:9,18
131:4,22 133:6,9
137:19 139:4
143:16 156:18
244:8

**primarily** 79:19
**primary** 31:21
131:14
**principal** 204:16
**principles** 80:8
**prior** 10:5 15:5
17:15 72:5 108:12
108:19 119:19
120:20 122:20
125:11,20 143:14
147:7 170:8 192:9
267:7 282:6 298:6
313:7 314:6
317:21
**private** 137:7
**privy** 321:2
**probability**
230:20 245:23
**probably** 11:9
12:21 13:18 17:6
24:10 25:6 40:18
40:21 47:8,16
48:16,23 49:11
70:2 93:25 109:11
159:15,25 334:23
**problem** 75:19
132:14 201:11
**problematic** 187:7
**procedure** 97:4
120:8 208:23
263:15
**proceeding** 277:22
278:2 279:8
**proceedings**
283:16,23
**process** 32:8 33:25
34:5 61:3,13
62:24 91:24 92:7
93:14,17 95:12
98:3 99:3 175:4

**processing** 61:5
**processor** 22:17
**produced** 261:25
**product** 20:5
**professional** 37:23
41:9
**profile** 242:7
**profit** 111:25
**profitable** 171:6
171:17
**profits** 8:19 60:15
**prohibited** 257:12
257:22 258:17
259:2,13 260:22
263:25 266:4,19
270:24 274:9
**projections** 279:13
280:6,18
**proper** 175:20
181:7 222:15
**properly** 274:16
296:16
**proportion** 40:12
83:15
**propose** 208:9
242:11
**proposed** 4:22
64:8 138:16
204:21 291:16
**proposition** 97:2
170:4
**propriety** 49:8
**prospect** 186:20
**protocols** 6:8
**prove** 275:22
307:10
**proven** 128:20
**provide** 27:7,21
28:19 39:10 41:24
44:16 46:5 74:11
75:6 99:13,18

113:15,20 115:17 216:21 218:14 258:13 311:12

**provided** 18:11,13 27:16 29:14 36:4 38:12 43:12 70:20 119:24 122:21 177:9 256:20 262:2 309:20

**provides** 58:2 75:7 81:23 84:9 127:9 151:7 165:4,8,11 165:24 168:9 171:22 181:11 216:11 255:14 307:25

**providing** 24:23 37:14 40:11 60:9

**proxied** 232:24

**public** 1:15 5:5 12:6 16:23 51:23 52:14,19 54:11 55:3,5,11 56:10,19 56:25 86:9 90:7,8 90:19 137:19 147:3 164:17 165:15 287:19 317:14 340:20 341:4 343:25

**publicly** 50:23 51:3,22 52:2,7,23 53:8,11,19 54:10 55:6 56:2,9,11,12 57:2,12,23 60:21 87:4

**publish** 37:9

**pull** 177:7

**punitive** 14:17

**purchase** 110:7 140:9,10 205:6 288:13 331:18

**purchased** 223:5 225:3 288:6

**purchasers** 331:13

**pure** 173:4 241:11

**purely** 239:15

**purported** 36:7 275:2 291:4 309:10 311:7 327:5

**purportedly** 223:15

**purpose** 55:7 89:13,13 90:9 103:21 186:6 187:23

**purposes** 25:6 34:24 50:17 54:9 56:23 57:3 61:16 67:21 128:8 185:10 275:4 291:5

**push** 323:7

**put** 25:16 45:3 63:17 122:9 124:6 124:11 125:2 126:22 127:3 134:7,10,24 138:20 139:11 142:14 143:19 146:17,24 147:19 151:17 156:18 160:5,7,9,15,25 161:5,7,8,14 162:4 162:12,16,25 163:9,13,17 164:8 164:15 165:12,13 165:23 166:17,24 167:9,12,19 168:8 168:17 169:3,4,14 169:16 170:5,11 171:5,11,11

172:16 173:10,11 173:12,25 174:25 175:6,11,24 177:20 180:2,19 196:23 197:2 240:3 265:2 282:12 293:19 332:6

**puts** 141:4 169:23 194:22,23 195:21 196:10,13 203:20 239:25 332:12

**putting** 13:23 22:16 23:17 26:9

## q

**qs** 28:7 30:19 31:25

**qualification** 24:8

**qualitatively** 240:25

**quality** 37:11

**quantification** 332:2

**quantified** 181:25 231:7 249:21 338:11

**quantify** 84:14 135:3 210:23 218:15

**quantifying** 218:22,25

**quantum** 297:21

**quarterly** 58:12

**quarters** 255:23

**question** 7:18,19 10:4 11:19 16:5,8 45:18 47:6 49:7 53:17 55:18,25 56:22 57:10 67:9 70:19 72:19 84:22 104:13,22 108:15

114:21 118:20 129:16 136:9,12 139:18 143:22 154:20 169:13 173:7 175:15 178:21,25 188:4 191:4 197:23 198:12 199:23 200:5,25 204:2 207:23 215:11 221:17 230:10 235:16 245:14 260:9 266:13 267:18,19 268:6 269:11 270:10,13 271:24 272:5,11 272:17 280:13 282:3,4 283:9 300:8 301:8 310:23 316:15 317:4 319:2 320:7 321:10 322:7 323:12 324:6 328:3,24 329:5 335:22 337:5

**questioned** 210:7

**questioning** 108:5 235:11

**questions** 5:10 7:16 18:22 23:19 28:5 46:9,11 67:5 74:7 115:12 125:22 213:4 215:20 234:24 235:7 241:4 246:6 268:22 271:19,21 272:18,21 294:8 337:22,25 338:3 339:4,6

**quick** 183:25 251:13 290:13

**[quick - recharacterized]**                                                                    Page 42

330:17
**quicker** 158:18
**quickly** 164:16
  165:14 174:6
**quite** 52:15 114:2
**quote** 134:10
  238:17 307:18
  311:6
**quoted** 129:25
  130:5 157:25
  172:13
**quotes** 170:11,23

**r**

**r** 2:2
**raise** 49:7 74:7
  104:21 115:11
  163:4 283:17,24
  311:10
**raised** 300:23
  310:17
**raises** 310:23
**raising** 118:21
  327:7
**ramage** 2:17 4:18
**ran** 148:6 160:6
  164:2 180:8
  182:18
**random** 175:4
  335:13
**range** 121:4 173:8
  173:19 175:5
**ranges** 132:12
  175:2
**ranking** 69:2
**rapid** 61:18 87:22
  88:4,4 165:5,6,25
  166:3
**rapidity** 166:5,7
**rapidly** 51:4,24
  52:20,25 60:14,22
  60:23,24

**rare** 80:2
**rates** 130:21
**rating** 325:19
  326:4
**ratings** 325:22
**rationale** 211:17
**reach** 118:19
  156:4 174:10
  271:13,16 316:5
**reached** 139:6
  213:7
**reaches** 46:22
**reaching** 261:13
  299:24
**react** 59:3 60:18
  62:2 145:22
  181:13 244:20
  304:2
**reacted** 171:24
  199:20 325:20
**reacting** 63:5
**reaction** 62:4
  87:11 147:2
  232:23 305:16
  334:25
**reacts** 60:14 81:7
  145:15
**read** 30:7 32:3
  136:9,11 154:17
  154:19 169:10,12
  198:9,11 201:2
  260:6,8 265:23
  266:12,13 277:5
  278:19 279:21
  280:10,12 282:5
  286:13 316:25
  317:3 321:7,9
  328:5 340:4
**reading** 35:20
  269:10 293:15
  300:3

**ready** 235:18
**real** 61:2 167:20
  168:14 186:2
  239:14 241:7,12
  246:7
**realistically** 96:9
**reality** 133:10
  239:15
**realization** 51:18
**really** 18:15 23:20
  24:9,11,13,23,25
  31:3 32:16 45:21
  48:4,6 49:24
  55:20 63:4 68:15
  73:11 91:23 95:13
  98:24 104:23
  114:18 115:23
  121:12,20,24
  125:7 146:4
  150:17 151:4,20
  167:13 168:10
  187:7 188:15
  195:2,25 200:14
  210:19 211:3
  226:15 228:8,12
  228:24 229:4
  279:23 287:23
  297:13 323:8
  332:8
**realm** 308:9
**realtime** 75:17
**reason** 7:22 60:17
  66:2 99:15 108:23
  109:20 115:16
  137:16 142:12
  150:19 164:2
  235:10 259:16,21
  285:19 305:15,25
  343:4
**reasonability**
  221:5

**reasonable** 121:4
  219:20 221:7
  231:10
**reasonably** 232:24
**reasons** 65:24,25
  71:25 127:20
  128:17,17 143:2
  149:7 150:10,12
  174:13,14 198:21
  211:2 293:25
  308:20 334:13
**reassure** 304:11
**recall** 12:3,12 13:6
  13:24,25 16:24
  17:11,13,16,19,23
  18:3,10,20 20:19
  20:25 21:12 23:4
  30:6 35:18,20
  38:20,23,25 39:5
  43:15 108:24
  109:21 122:24
  123:2,20 136:2,16
  177:19 178:4
  189:16 256:14,20
  289:12,15,16,17
  289:18 292:3
  336:3
**receive** 8:12,18
**received** 54:2
  288:14 309:9
**receiving** 311:5
**recess** 117:25
**recharacterization**
  266:2,17 273:25
  277:20 280:5,17
  284:9 287:18
**recharacterize**
  278:3,15
**recharacterized**
  260:3,14 295:18
  311:21 316:11

328:21
**recharacterizing**
  278:8
**recognition**
  101:18 102:11
**recognize** 21:23
  52:6 294:23
**recognized** 89:22
  131:4
**recognizes** 131:20
**recollection** 13:9
  15:9 19:8 20:15
  21:5 189:17
**recommendations**
  63:19
**recompute** 182:20
**record** 3:3,14 4:13
  5:12 7:8,10 9:10
  65:18 70:6,8,10
  75:21,23,25
  117:23 118:8
  136:11 154:19
  169:12 177:5
  184:4,6,8 198:11
  236:14 251:16,18
  251:20 254:25
  260:8 266:12
  280:12 317:3
  321:9 330:17,19
  330:21,23 339:8
  340:8 341:10
**recorded** 3:16
**recording** 3:12
**records** 47:13,22
  49:24
**recover** 247:22
**recovery** 211:15
**red** 79:13 163:4
**redistributed**
  60:19

**reduce** 95:15
  175:2
**reduction** 293:16
**redundant** 89:25
**refer** 54:11 57:23
  86:11 91:14 255:2
  303:4
**reference** 29:13
  33:15 35:13 36:14
  36:25 131:16
  246:5 306:19
**referenced** 56:4
**referred** 65:7
  132:14 207:9,12
  264:11
**referring** 50:18
  56:12 255:8
  259:12 281:20
  282:9
**refers** 277:19
  291:11
**reflect** 38:8 45:13
  47:14 56:17 61:11
  63:14 99:6,7
  110:22 167:25
  174:2 245:25
  301:24
**reflected** 7:10 40:7
  50:24 52:25 53:6
  64:10 77:13
  100:19 101:15
  168:4 181:22
  193:18 203:23
  210:13 233:20
  293:20 294:6
  303:16
**reflecting** 61:14
  120:4 168:11
  173:24 244:14
**reflection** 256:24

**reflections** 133:10
**reflective** 168:24
  245:7,17
**reflects** 29:5 77:19
  125:14 131:23
  167:16 182:12
  203:20 217:21
  246:20
**regard** 265:12
  301:9
**regarding** 6:7
  32:16 50:7 74:6
  77:8 118:15 122:8
  122:15 124:2
  136:24 184:14
  223:14 283:15
  328:18 329:6
**regardless** 80:9
  144:3 175:12
  215:6 301:4,14
**regression** 88:25
  89:14 96:8 106:5
  182:16,17
**regressions** 98:8
**regular** 69:5
  117:16
**regularly** 29:8
  66:15 74:2 116:3
**rehashing** 60:16
**reign** 235:17
**reinforce** 77:24
**relate** 77:11 79:5
  89:15 90:15 112:4
  247:16 280:22
**related** 4:7 31:20
  32:23 76:20 77:21
  85:9 90:16 101:13
  137:3 197:15,17
  247:23 249:4
  250:5 251:7 265:7
  303:21 306:3,8

333:12 341:13
**relates** 81:6
  149:25 150:8
  160:13 251:11
  280:5,17 330:7
**relating** 284:8
  286:9 287:16
**relation** 239:15
**relationship** 82:15
  83:2 84:10 87:4
  89:11 96:7 103:24
  105:21 106:4
  119:18 121:16,20
  122:6 127:5,12
  138:24 143:2
  149:16 160:10
  161:7 180:5,22
  225:19
**relationships**
  90:11 96:16 97:8
  97:11 98:9 116:7
  139:3 142:22
  143:16 144:6
  160:17,18
**relative** 113:13
  114:8,17 115:9
  150:9 203:4
**relatively** 69:5,17
  173:23 174:21
  220:19 221:9
**release** 180:6,24
**released** 85:16,18
  87:5 100:10,16
  101:3,10 104:6
**releases** 52:11
  53:14 85:11
**relevance** 32:21
  33:3 36:11 49:8
  59:8,15 202:6
  216:15 265:21
  267:8 276:3

319:12
**relevant**   28:8
30:19 31:19 32:10
32:15 33:8 58:18
58:22 68:2 77:14
77:18 78:16 80:12
83:6 100:14,20
104:12 106:10
119:12 139:17
140:2 147:12
151:5 153:3,25
154:10,23 155:7
155:23 156:14
189:20 191:2,14
197:10,23,25
198:12 199:10
200:19 201:4,6,14
201:23 207:19
214:19 218:2,15
218:20 223:25
224:3,24 227:23
228:4,11,17,25
230:9,21 236:25
237:16 246:2
247:23 248:7,24
250:2,9 269:22
273:16,17 275:16
279:3 288:2,17
295:25 296:9,13
296:15 297:20
301:23 314:4
317:19 318:14,21
319:7 325:7
326:12 327:11,15
333:16 335:18
336:2
**reliance**   24:20
**relied**   82:2 101:25
**rely**   29:2 209:5
263:12

**relying**   79:18
125:19 180:15
185:18 277:8
**remain**   16:25
**remainder**   121:6
**remained**   220:19
313:7
**remember**   13:20
14:4 18:8,15,24
20:16 23:8 42:20
71:2 93:7 122:21
123:6,16,22 150:2
156:7 157:5
262:16,22 284:17
**remembering**
177:14
**remote**   1:12 6:8
**remotely**   4:11
**removal**   97:13,17
**remove**   91:22
94:11,18 95:17
**removed**   119:24
120:5 122:5
**removes**   225:15
**removing**   89:18
92:11 97:22,24
120:11
**rent**   301:12
**repeatedly**   263:21
**repetition**   58:16
59:9
**rephrased**   266:10
**replacement**   59:6
**replies**   205:21
**report**   17:16,21
18:22 19:11,17
20:2,3,8,11,18
21:3,15,16,25 22:3
22:6,9,12,15,20,21
22:23 23:11,16,18
23:22,23 24:4,5,9

24:14 25:7 26:8
26:13,22,24,25
27:5,11,22 29:6
35:14 36:6,20
37:19 38:12,15,18
38:25 39:10 40:2
44:14 47:11,25
49:18 50:22 51:11
64:25 66:14 67:2
67:14 71:19,21
78:2 81:11 86:2
88:19 107:16
109:16 112:14
127:25 129:9
130:13 134:21
146:22 156:24
158:15 159:6
160:23 166:9
170:3 177:12
181:10,19 204:16
208:9 210:3,9,13
212:5 219:17
221:19 255:3,9
280:24 329:16
330:10 331:9
342:8
**reported**   53:3
55:16 56:4 57:6
57:17 135:17
176:21
**reporter**   1:15 4:3
5:2
**reporting**   62:15
**reports**   16:21
24:22 26:3 28:18
28:20 29:3 35:22
36:3,9,12,18 52:18
53:13,21,24 54:8
57:18 58:9 62:16
63:17 85:10
101:14,15,23

211:7 300:4
**represent**   230:13
261:23 262:19
285:15
**representative**
254:8
**represented**
303:13 310:11
**represents**   29:9
59:19 152:24
157:16 170:20
205:8 216:12
273:18 293:16
313:12
**republication**   60:6
**request**   29:18
**require**   126:16
287:11
**required**   248:17
**requires**   162:22
219:14 319:12
**reread**   255:19
261:21 266:9,11
**research**   2:22 4:19
**respect**   15:14,16
49:21,22 71:12
121:8 145:11
148:3,17 158:7
250:20 281:15
314:21 324:17
327:16 332:18
**respects**   143:17
**respond**   60:21
63:9
**response**   84:25
87:22 88:5 145:5
298:8 305:8
**responses**   88:2
126:9
**rest**   68:16 120:24

**restating** 282:10
**result** 128:19
  139:14 142:13
  173:3 191:9
  238:24 264:20
  276:17 290:16
  314:22 315:5
  328:10
**resulted** 121:3
**resulting** 225:21
**results** 91:25 94:8
  96:15 98:14
  107:14 109:7
  124:19 166:24
  172:16 192:16
  199:12 200:7,21
  201:8,12 242:17
**retained** 9:13 10:5
  10:7,16 11:4,22
  12:3,13,22 13:6,10
  13:21,24 14:5,15
  15:4 18:18 19:21
  39:9,14,15,21 42:6
**retention** 12:24,25
  15:25
**return** 87:25
  181:25 182:3,3,7
  182:11,19,25
  183:3,10,12,17,19
  183:21,22 184:20
  185:3,7,12,15,22
  190:8 191:20,24
  191:25 198:7,19
  202:12
**returned** 34:7
**returns** 51:6 87:24
  119:8,9,13 120:7
  120:19,20,24
  122:4 132:7,9
  201:10 202:13
  203:21 333:21

**reveal** 226:10
  294:12 327:14,25
  328:17
**revealed** 64:7
  205:13 209:16,19
  216:10 224:17
  225:15 226:21
  229:19 230:17
  247:5 254:2,7,8
  273:24 274:8
  278:23 291:4
  295:8,15 297:4,5
  312:24 315:10
  316:21 317:10
  326:13 327:11
**revealing** 224:24
  246:21
**reveals** 228:11
  247:17
**revelation** 228:4
  228:25 247:17,23
  248:8 249:4 277:3
**revelations** 325:23
**revenues** 8:15
**review** 26:6 27:10
  27:24 29:19 30:22
  31:2 34:12,14,22
  35:16 46:4 177:17
  177:25 261:16
**reviewed** 22:9,21
  24:17 31:6,22
  54:24 71:12
  148:12 261:13
  262:9,13,17
**reviewing** 35:18
  48:25 176:9 224:9
  252:18 263:8,14
**reviews** 123:9
  177:10 255:20
**rgrdlaw.com** 2:7,8
  2:9

**ridiculous** 235:21
**right** 6:17 16:15
  29:16 30:20 35:24
  37:3,20 45:4,11,24
  46:9 64:18 65:10
  65:16,22 68:21
  71:16 72:9 78:11
  81:8 82:4,8,18
  85:24 86:17,24
  90:25 93:15 96:2
  96:22 98:4,20
  100:6 106:7,17
  107:7,17 108:3
  110:2 111:23
  112:12 121:10
  123:4,15,18
  130:13,21 133:13
  134:25 138:10
  139:24 140:22
  150:21 161:12
  166:25 170:6,12
  172:3 176:7,23
  177:23 180:7,25
  182:4,8 184:22
  191:22 192:12
  196:20,23 207:4
  207:10,25 214:16
  219:23 225:22
  226:24 229:10
  230:4 232:19
  233:15 267:5
  268:9 278:16
  288:24 290:9
  308:2 312:10
  317:20
**rings** 290:10
**risk** 89:25 99:9
  216:13 226:11,23
  227:7,16,21 228:6
  228:17 229:3,10
  229:14,20 230:9

  230:25 231:4
  232:11,13,18
  233:11,17,18,19
  233:24 237:20
  238:11,17 240:2,3
  240:13,15,18
  241:22 242:2,7
  243:2,7 244:2,10
  244:14 246:9
  250:4 254:18,20
  255:25 257:11,14
  257:21 258:3,7,8
  258:12,14,16,24
  259:3,9,18,25
  260:12 263:24
  265:3,25 266:3,16
  266:19 270:23
  271:3,6 273:24
  274:8 276:16,17
  278:14,20,24
  280:5,16 287:16
  287:17 293:9,17
  294:2,12 295:8,16
  296:17 298:2
  300:10,23 309:14
  309:24 310:4,15
  311:11,20 312:13
  313:13 315:3,4,10
  316:10 319:21
  320:2,2 321:21,22
  322:24 323:8,18
  324:25 325:5
  326:6 327:16
  328:8,9,19
**riskier** 244:23
**riskiness** 241:5
**risks** 99:8 209:17
  242:13 254:9
  258:24 264:3,20
  274:17 281:8,16
  281:19,21,25

**[risks - see]**                                                                 Page 46

286:20 289:23 298:4 309:21 310:18,20,25 313:8,10 315:23 320:11 324:5 333:4

**robbins** 2:4 4:21 14:23 15:16 16:10 16:11

**rodriguez** 23:3

**role** 12:5 23:10 31:7 44:10,11 153:8 154:5

**romanette** 264:14 270:22

**room** 4:11 6:3,16

**root** 91:12

**roughly** 40:5,15 50:3

**round** 151:16

**row** 65:22

**rudman** 2:4 4:21 14:23

**rule** 328:11

**ruled** 146:14 312:7 317:16 328:14

**rules** 7:15 79:8 136:16 200:14

**ruling** 299:11

**rumors** 306:19 307:2,15,16,18 308:16

**run** 108:7 191:22 197:7,19

**running** 98:2,7,8 120:17

**s**

**s** 2:2 28:7 30:19 31:19,21 342:6 343:4

**s&p** 325:21

**sale** 30:11 205:8 254:18 257:23 258:17 259:14,20 263:25 264:23 266:5,20 270:24 274:9 284:8 294:9 312:9 331:19

**sample** 83:3 86:14 86:16,22,24 99:25 100:6 101:2 196:4

**san** 2:6

**satisfied** 138:20 169:3,14 201:7 223:22

**satisfy** 169:25 173:12 175:3,6

**saw** 101:21

**saying** 41:7 53:7 56:6 57:7 58:25 89:9 94:22 156:16 163:2 172:25 179:16 186:20 199:23 217:4,17 225:6,25 226:5 227:13 233:15 239:4 248:14,15 248:20,23 258:10 262:21 268:18 286:20 299:13 308:25 311:5 323:20,22

**says** 167:4 257:8 259:7 263:20 281:6 285:4 289:23 290:16

**scatter** 120:18,22

**scholes** 132:8 182:7,10,13,21 183:5,11,19,22 185:5,25 186:21

186:22 187:2,10 187:20 188:19,25 189:13

**scientific** 84:9 87:3

**scope** 210:10 270:6

**search** 33:17,23 34:7,8

**sec** 28:3 30:16 32:6,14 33:7 52:10 53:13 85:10

**sec's** 32:9

**second** 37:22 41:3 41:5 43:6 45:6 93:4 123:8 174:22 177:4 257:7 259:6 263:19 290:3 327:21

**section** 24:7,8,14 24:21 25:2,3,15,22 25:23,25 28:15,24 29:7 30:16 33:10 37:23 38:3 210:2 210:14 211:4,6 212:5,10 213:8 216:4 255:3 256:22 285:3,3,11 292:24 307:6 331:8

**sections** 23:16,17 23:23 25:14 29:12 292:23

**securities** 1:7 3:18 10:8 11:3,23 12:2 12:14 13:7,11,22 14:8 21:7,13 27:19 38:4,9 40:24 43:18 44:7 45:10 50:25 66:11 76:24 79:20,22

80:3 101:20 110:9 113:8 115:21,22 116:2 117:5 127:6 135:18 143:17 155:10,14,20 158:11 159:7 160:20 162:8 164:23 165:20,22 205:3 208:12 214:22 215:22 251:9 267:13 269:19 285:24 291:16,23 292:4,7 292:16 343:2

**security** 28:9 51:2 62:20 66:18 71:16 74:3,10,19,23 75:3 76:11,20 77:2,4,9 77:10,21 78:14,20 78:24 79:16,20 80:12,16,23 81:3,7 106:11 110:2,7,11 114:12,25 129:21 134:4 140:16,22 144:20 153:13,14 155:21 156:3,3,7 158:17 211:9 331:17,19,24

**see** 33:12,18 35:5 37:24 38:5 41:12 49:5,7 51:7,8 61:25 63:18,24 65:3 67:22 72:2 73:17 75:4,12 76:12 79:21 80:2 81:15 87:10 89:4 89:5,16 91:11 103:17 105:20 107:22,23 108:23 112:18 115:13,18 116:13 117:8

**[see - sides]**                                                           Page 47

118:19 123:13,17
129:10 137:15
159:11 164:3,13
166:14 167:5
175:8,11 177:8,12
181:13 195:12
199:11,13 200:22
201:11 235:9
238:22 240:8
247:11 257:16
259:10 264:7,12
265:15 277:22,23
279:17,18 281:12
282:10 285:2,13
290:4,24 291:13
293:5 299:16
302:22,25 303:5,6
304:16,17 306:2
306:22,24 307:8
308:7 309:11,12
310:10 325:25
326:24 327:2
**seeing** 63:16 74:17
115:18 117:11
137:14 202:4
**seek** 98:25 242:19
**seeking** 28:21 37:2
37:5,8 211:14
213:3 223:2
**seeks** 206:13
**seen** 53:2,4 55:8
55:12 62:23 63:12
63:21 88:17 137:6
207:12 232:17
279:25 286:4
304:23 324:13
**segment** 118:22
**select** 33:16,20
34:5
**sell** 110:10 176:18

**sellers** 332:6
**semi** 50:19,22
51:10,14,15,21
60:3,13 61:24
164:7
**sense** 32:19,25
34:20 56:11
102:12 104:14
118:18 150:18
185:20 189:17
192:21 220:23
223:23 226:18
241:18 332:7
335:8,12
**sensitive** 3:7
**sentence** 56:13
129:25 135:3
181:17 257:8
259:5,7 263:20
264:14 279:18,25
281:4,5 282:5,7
290:15 291:10
303:3
**separate** 64:16,22
85:7 106:2,5
140:21 147:9
153:13,14 165:4
176:3 201:22
240:5 259:13
265:11,16 267:21
268:4 290:7 326:4
326:5 329:11
**separately** 149:19
193:14 195:20
**september** 309:8
311:19 319:19
**series** 125:7,18
126:2,10,12
134:23,24 135:6,8
135:20 138:14,22
139:2,5,9,10,11,16

139:19,22 140:5,5
140:7,13,15,21,24
141:3,7,11,14,20
141:24 142:3,7,10
143:5 144:2,10,22
145:2,5,7,15
146:10 147:10,13
147:17,24 150:6
150:23 152:8,8,11
152:20,20,23,23
152:25 153:14,19
153:25 154:3,8,12
154:14,21,25
155:3,16 156:11
158:24 164:17
165:15 190:7
192:11,11,13,13
192:18,18,25
193:8,12,23
196:17 197:2,6,9
197:12,13,21
198:6,17,24,25
199:20 200:9,16
200:18 201:9,13
201:18,21,23
202:11,17,19
203:5,6,13,17,17
203:19,19,25
204:8 289:24
323:17,23 324:2
333:2,23 334:4
336:6 338:8,13
**served** 285:25
287:3
**server** 56:19
**services** 8:22 9:12
10:23
**session** 118:2
**set** 58:4 260:21,24
320:17 341:8,18

**sets** 92:22 320:23
**setting** 195:23
196:3 237:24
**severity** 103:4
**share** 6:15,23 7:2
21:20 42:11
205:21 206:6,23
213:16,20 221:3
221:22 234:7,19
234:21 236:19,20
238:18,19 240:12
240:13,15 242:17
242:23 244:13,16
245:6,16 290:18
290:21 333:7
**shared** 26:16
**shares** 71:23 78:7
150:10,13 151:18
151:20 240:14,17
245:8,17
**sheet** 340:7 343:1
**shift** 220:21
**shocking** 286:6
**short** 203:8 320:20
329:3 332:21
334:8,12
**shortcut** 125:5
**shorthand** 1:14
**show** 87:15 195:22
307:13 334:7
**showed** 335:4
**showing** 126:25
163:24 304:6
332:24
**shown** 108:4
160:18
**shows** 53:18
113:24
**side** 14:10
**sides** 12:23

**sign** 19:2
**signal** 298:16
  299:2,7,20,21
  301:15
**signaled** 301:12
**signals** 300:11
**signature** 22:7
  341:21
**significance** 35:7
  122:2 193:2,22
  195:12
**significant** 83:16
  83:22 84:3,18
  86:20 87:10,18
  105:15 106:20
  125:4 190:8
  191:10,20 192:3
  192:25 193:3,7
  194:8,14,18,21,24
  195:4,6,11,14
  196:5,12,18
  197:17 198:4,7,16
  198:18 199:4,25
  200:13 202:14
  275:20 313:22
  332:25 333:20
  334:7 335:4
**significantly** 11:16
  190:17 195:17,19
  195:25 196:2
  200:2
**similar** 9:14 148:5
  148:8 201:24
  219:9,10 221:9
**similarly** 145:22
**simple** 159:23
  237:6 240:8
  241:13 245:21
  246:4,8
**simpler** 270:14

**simplistic** 236:24
  237:19 239:16
  240:6 244:19
  245:2 249:16
**simply** 120:18
  128:2 129:2 151:7
  174:2 178:4
**single** 27:5 35:20
  41:21 65:21 101:7
  138:14 168:16
**sit** 17:8 45:24 46:9
  46:13 47:6 108:21
  109:21 123:15,18
  178:12 288:5
  321:18 325:13
  328:12
**sitting** 56:18 93:2
  178:5,18
**situation** 334:4
**situations** 59:18
  177:15
**six** 86:21 87:9 89:3
  90:21 91:3 108:6
  108:12,17,18
  210:17 211:5
  285:3 306:7
**size** 83:18 84:4,25
  172:14 175:22
**skimmed** 261:20
**slide** 108:12
  113:24 192:22
**slightly** 61:21 73:6
**small** 23:6 60:25
  61:15,23 64:13
  110:16,21,23,23
  111:11,17 112:3
  112:10 113:13
  121:21 138:21
  157:2 193:22
  195:10 198:5,16
  200:8,15,17 201:9

  201:13,18 203:4
**smaller** 112:5
  113:17 135:16
**software** 6:15,23
**solely** 164:8 304:5
**solicited** 321:4,11
**solutions** 4:2,5
**somewhat** 69:10
  72:7 116:8 124:13
  124:24
**sophistication**
  37:12
**sorry** 41:8 51:14
  52:17 56:22 71:19
  75:16 76:4 77:5
  80:7 91:13 100:2
  101:9 103:22
  143:24 165:20
  192:22 196:11
  204:2 211:16
  216:17 245:14
  266:8 269:5
  284:25 290:2
  321:16 323:12
**sort** 51:16 52:16
  56:2 59:7 67:10
  125:5 132:13
  162:22 163:8
  235:20 237:18
  239:16 240:22
  246:9 249:16
**sorts** 53:14 55:15
  56:3 237:15,22
**sound** 283:18
**sounds** 117:21
**source** 32:17
**sources** 27:20
  52:12
**south** 5:18
**space** 64:3 65:24

**speak** 58:5 164:11
**speaking** 3:6
  42:12 51:20 53:23
  60:2 68:22 69:3
  131:12 226:25
  231:8 235:24
  236:7 252:17
  272:14
**speaks** 282:16,17
**specific** 8:23 10:24
  11:13 12:10 13:8
  16:22 19:8 20:14
  25:20 36:7,18
  58:21 59:22 69:2
  81:7,13 82:17
  83:4,13 84:6,8
  85:15,22,24 86:4,6
  86:9,15 87:13,14
  90:14 91:7,21
  92:13 100:10,15
  101:3 103:25
  104:19 123:14,23
  124:23 128:11
  131:8 143:22
  146:23 147:16,23
  150:7 155:11
  157:16 162:23,23
  183:7 189:4 199:6
  208:16 213:12,14
  214:4,7 215:13
  217:3,3,17,23,23
  217:24 218:25
  219:4,6,12,14
  231:14 248:8
  264:22 265:6
  277:15 279:22
  284:17 289:16
  312:19 315:14
  329:8
**specifically** 35:13
  44:3 100:12

135:13 148:17,25
166:3 209:8
212:11,12 256:4
279:12 288:16
306:13 328:23
**specificity**  231:6
255:15 315:13
**specifics**  253:4
**specified**  25:14
**specifies**  242:15
**specify**  206:2
208:16
**specifying**  209:11
**speculate**  57:15
178:2 284:13
**speculating**  10:14
40:22 177:18
178:23 322:22
323:11 324:3,24
**speculation**  173:5
**speculative**  335:21
**spend**  47:11
**spending**  17:19
**spent**  47:20,24
48:2,20 49:13,17
49:20 50:2 213:5
**spikes**  132:15
**spinoff**  30:13
256:2 257:11,22
258:17,25 260:21
263:22,25 264:21
266:4,19 270:24
274:9 276:19
279:16 280:8,20
281:9 286:21
288:14 294:13
295:8 306:21
309:15,24 312:8
312:14 315:5
316:18 317:7
319:25 320:4,4

325:24 328:10
**spots**  210:8
**spread**  69:17
109:25 110:4,5,14
110:22 111:11,12
111:22 112:5,7,15
112:24 113:13,18
114:2,3,11,13,14
114:20,22,25
115:5,9 117:8,13
117:15,16 156:6
156:10,21,25
157:12,17,23,25
158:3 170:18,23
172:15 173:2,18
174:18,20,23
175:13,17 176:4
190:20,24 191:2
**spreads**  112:4
116:2,4,13,20,25
117:10 142:4,6
156:14 157:20
170:14 173:23
175:22
**springs**  16:17
**spun**  288:21
**squared**  91:12
**staff**  8:14 19:7,15
22:18,22,25 23:7
24:16 25:10,21
28:13,16 29:10
31:3 32:4 34:11
48:7 118:19 119:4
256:14 262:15
263:2,6,12 291:25
292:6,10,18
**stage**  12:9 46:21
46:22 163:2
225:25
**stale**  59:3 60:6

**stand**  117:22
**standard**  19:4
28:4 30:17 54:13
59:13,17,24,24
61:18 88:8,16
89:21 91:13 137:8
211:23 221:4
285:16 330:5
**standing**  163:18
**start**  16:7 82:24
257:4
**starting**  306:7
**state**  1:15 4:12
5:11 71:19,22
81:11 99:9 158:15
181:10 221:19
244:23 341:5
**stated**  18:22 58:6
59:10 99:10
156:24
**statement**  81:18
143:9,12 148:2
149:5 158:20
161:13 212:9
223:18
**statements**  99:13
99:14 214:20
274:15 283:21
285:5,10 286:25
327:13 340:9
**states**  1:2 3:19
53:6 170:4
**stating**  283:7
**statistical**  42:22
87:13,15 97:4
126:14 180:13
181:12 193:11,21
**statistically**  83:16
83:22 84:2,18
86:6,20 87:10,17
106:20 190:8,17

191:9,20 192:3
193:7,21 194:8,14
194:18,21,23
195:3,10 196:5,18
198:4,6,15,18
199:4 200:12
202:13 203:15
332:25 333:20
335:4
**statistics**  8:4
**stay**  168:5 170:22
**stayed**  221:8
**stays**  27:22 40:4
**stephen**  2:23
**steven**  3:25
**stipulation**  6:7,11
**stock**  25:10,17
37:17 41:11 43:13
45:2 49:21 50:8
50:13 59:12 60:4
61:25 63:5,8
64:15 66:6 70:23
71:14 78:4,10,20
78:24 79:14 80:24
80:25 82:16 83:9
84:4,18 85:20
86:6,21 87:6,10,23
89:12 90:15 99:12
99:16,23 100:19
102:4,20 103:14
104:2,7,15 105:8
105:23 106:25
107:4,9 111:8,9,14
111:15,23 113:13
113:22,25 114:16
116:15 120:2
122:16 124:22
127:7,13,14 128:3
128:20 129:3,10
129:19 130:9,16
130:21 133:17,23

**[stock - suggests]** Page 50

135:23 138:19 139:23 140:11 145:23,24 148:7 148:12,25 149:10 149:13,22 152:16 153:4 156:15 158:7 159:5,9 160:11 161:8 164:6 165:20 172:2 173:22 174:5 182:15,16 182:17,19,24 186:13,25 194:9 194:13 195:2,13 195:16,24 198:3 198:14 199:4 200:13 206:8,25 211:18,20 212:23 214:9 217:20 222:11,17 223:16 224:7 225:20 229:25 230:3,5,11 230:12 233:25 234:19 236:19 238:4 244:11 245:3 247:15 249:3,19 251:6 270:5 276:8 286:11 288:13,23 290:18 294:5 298:7 300:15 301:14 302:16,23 303:16 304:14 305:5,6 306:2 308:18 313:22 325:8 331:11 332:19 334:15,19 335:25 336:9 338:7,12,23 **stocks** 37:10 79:7 79:11 113:10,14

113:18 114:4,8 115:10 **stop** 235:18 236:6 271:22 272:13,16 272:17,23,25 **stopping** 235:24 **stories** 52:17 **story** 212:23 224:12 225:19 276:7 297:11 **strategies** 239:10 **strategy** 241:2 244:4 **stream** 101:9 **street** 5:19 **strength** 199:12 334:22 **strike** 71:19 100:2 119:2 141:8 155:17 161:10 169:5,17 **stringent** 310:22 311:14 **strip** 241:6 **strong** 50:19,22 51:10,14,15,21 60:3,13 61:24 164:7 181:11 **stronger** 115:13 **structure** 260:20 286:21 293:18 294:9 328:10 **structured** 264:21 264:25 315:17,18 **studied** 274:23 289:3 304:8 306:13,17 316:14 318:25 338:8,14 **studies** 88:9,10 92:2

**study** 82:4,7,8,13 82:22 84:12 94:8 96:8 100:13 106:2 108:9,10 119:8 146:25 148:5 180:3,9,15,16 181:4,7,24 184:19 185:11 193:5 209:6,9,13 216:8 218:13 219:12 265:9 279:3 299:23 305:17 325:3 332:18 333:11,19 334:20 337:4 **studying** 324:6 **sub** 44:21 266:23 **subject** 125:21 151:21 155:12 316:6 330:9 **subjective** 97:19 97:20 **subjectiveness** 95:16 **submit** 39:10 **submitted** 21:25 22:10 38:11 211:8 **subscribe** 340:7 **subscribed** 340:15 343:22 **subsections** 25:13 290:6 **subsequent** 288:20 **substance** 70:15 118:15,17 184:14 231:18,22 251:25 331:4 **substantial** 11:20 17:17 40:9 49:25 73:8,10 76:8 121:23 151:24

152:2,18 192:5 194:16 241:7 **substantially** 92:11 **substantive** 65:25 66:2 **substitute** 144:15 **subsumed** 211:3 **subtracting** 182:2 **succeeding** 323:6 **successful** 278:8 **successfully** 260:3 260:14 278:15 322:2,13 323:13 328:20 **sucharow** 14:25 **sudden** 320:23 **sued** 41:17 **sufficient** 96:6 127:9 131:6 163:18,22 308:2 323:7 335:16 **sufficiently** 172:6 **suggest** 55:20 73:6 74:15 75:14 79:9 115:2 162:4,8 174:23 304:24 334:9 **suggested** 95:22 98:11 175:25 244:10 **suggesting** 91:17 191:16 216:23 231:25 **suggestions** 26:17 256:21 **suggestive** 162:5 **suggests** 64:6 73:22 132:11 168:15 190:14 191:16 222:13

suit  30:10
suite  2:6 5:19
summarize  27:4
  151:12 160:24
  256:10
summarized  44:24
  45:7 65:15 107:16
summarizes  26:8
  166:24
summarizing
  192:23
summary  8:6
  24:14 27:7 44:16
  44:19 64:25 65:11
  85:12 86:25
  126:20 161:3
  210:5,6 255:4
  282:14,20
super  235:2
  323:25
supplied  35:23
supply  329:7
support  27:21
  28:10 45:15,21
  75:7 211:8
supporting  113:16
  296:6
supports  78:3
  112:15 114:23
  168:20 334:18
suppose  32:13
  78:13 146:13
  159:24 190:7
  287:22
sure  5:13 9:9 13:2
  16:6,11 17:5
  25:24 26:6,15
  35:11 36:23 39:2
  41:16 48:11 80:15
  82:23 92:25
  117:18 165:23

166:20 174:25
178:8 184:2
189:19 202:23
210:8 215:25
231:7 251:14
255:5 269:7,10
329:4 336:16
surprise  102:7
surprised  313:17
  314:3
surprising  103:8
  194:15 195:4
swamp  111:25
swear  5:2
sworn  5:4 118:5
  340:15 341:8
  343:22
systematic  119:25

**t**

t  342:6
tablet  6:20
tail  132:14
tailored  215:17
take  3:13 20:12
  40:23 42:25 61:2
  61:10,14 62:4
  63:16,24 64:8
  66:23 69:20,22
  70:4 116:18
  117:19 129:14
  133:2,5 136:17
  166:11,22 183:24
  191:23 234:3
  236:5 239:2
  277:17 290:13
  312:2 329:2,5
taken  24:13 63:13
  127:8 176:2
  330:12
takes  53:5 169:21
  226:2 303:24

talk  29:11 70:14
  71:14 109:24
  149:6 158:9 160:5
  216:19 227:6
talked  149:23
  156:5 180:11
  192:6 196:8 213:5
  268:8,23 278:11
  281:17,19,22
  289:4,6 308:16
  335:23
talking  27:13
  73:11 76:7 78:19
  108:13,20 115:20
  126:19 133:15
  134:8 139:18
  140:9 141:19
  145:10 151:20
  174:17 217:15
  227:12 237:2,5
  241:10 244:21
  247:20 268:12
  281:5 283:2 334:3
talks  208:14 264:9
  279:6
task  18:21 86:12
  117:12
tasks  23:6
team  47:18,19
technical  76:5
  160:21 178:20
technically  16:20
  52:22 65:5
technique  82:2
  208:22
techniques  213:23
  214:2 216:3
  217:10,13 218:5
  248:16 333:16
tell  164:16 181:19
  212:22 224:12

telling  297:12
ten  13:12,18,22
  14:3,7 15:12
  47:15 64:20 65:3
  65:19
tend  79:16 300:14
tended  106:16
term  9:11 51:11
  56:8 140:4 172:10
  181:17
terms  18:23 36:9
  40:11 48:14,25
  57:11 58:3 68:16
  82:21 94:24
  124:17 127:18
  134:8 142:18
  163:22 202:21
  210:10 214:9,23
  218:17,22 229:21
  244:22 246:8
  253:2,5 257:24
  258:18 273:13
  324:12 335:19
test  34:17 36:11
  61:18 69:9,13,13
  69:16,16 70:2
  81:21 82:7,9,12,14
  82:25 84:17 87:14
  88:5 94:15 98:15
  105:3,24 106:3,6
  109:7 111:4 119:7
  119:16,22,23
  120:6,15,18
  121:13,14,24
  146:25 147:20,20
  148:4,6 151:3
  156:19,19 159:13
  160:6 164:3,15,24
  165:13,14,18
  166:2,3,5,7,17,25
  167:8,12 168:8,24

**[test - third]** Page 52

171:5 172:17 175:24 176:5 180:2,13,20,21 181:4,8,11 192:17 193:18 203:23 212:18,19

**tested** 104:2 143:18,18 167:17 170:4 171:11 188:24

**testified** 5:5 118:6 153:12,17

**testify** 7:23

**testifying** 10:2 39:16 42:5 44:11 269:23

**testimonial** 9:19

**testimony** 9:23 12:8 38:3,8,12 39:11 40:2,11 46:3 70:16,19 118:16,18 119:6 184:15 251:25 252:15 256:19 269:9,21,21 303:23 331:4 341:7,10

**testing** 61:16 84:12 119:17 124:4 226:16

**tests** 67:16 81:22 87:15 111:5 146:19,22 147:15 193:11

**text** 35:13 36:20

**textbook** 51:16

**thank** 76:4 84:23 144:9 339:4

**theoretical** 42:14 60:17 70:25 71:4 116:6 131:7,16,18

132:23 133:6,9,11 143:4 157:22 161:6 185:13,20 186:17 187:6

**theoretically** 55:11 153:22 159:24 204:11 320:17,24

**theories** 257:19 264:15,18 265:7 265:11 267:21 268:4 273:19 283:2,4 284:8 329:11,19 330:7

**theory** 48:8 49:2 67:22 69:14 143:8 211:20 221:25 222:6,8,21 223:14 223:23 227:8 229:10,14 252:7,9 252:22 253:12,18 254:13 256:24 257:2 259:14 264:19 267:25 273:19 276:25 282:9,10,11 283:2 284:6,7 286:17 296:3,7,11,20,25 297:19,23 310:13 311:16

**thereof** 302:20

**thing** 24:18 28:14 57:19 80:7 88:14 104:7 230:22 240:23 241:17 261:21 300:9,25

**things** 19:15,19 23:6 27:15 29:7 31:25 38:16 52:9 52:16,22 53:9,12 54:3 57:8 61:4

79:22 91:6 117:11 131:9 141:18 142:13,14 147:8 218:18 227:5,9,10 228:13 236:25,25 239:3,11 243:12 243:13 244:2,21 245:2 275:3,22 276:17 280:22 292:2,9

**think** 8:5 11:7,17 12:5,10 16:4 17:7 24:24 26:4,7 27:12 31:22 33:22 34:18 37:7 43:24 45:17 48:20,22 49:9 51:12,18 52:4,13,21 53:7,8 53:15,23 54:17 55:10,17 57:11 58:2,7,19 59:16,17 59:18 61:2 64:19 64:22 65:11 67:11 68:15 69:3,8,10,15 69:16,23,23,24 74:25 75:9 79:21 80:20,21 81:23 82:23 96:25 97:2 97:12 98:5 102:10 103:3 109:10 113:2,3,7 116:2 117:7 123:19 125:12,23 126:4,6 127:22 131:5,19 131:23 134:25 135:19 136:18 137:4 138:6,18 140:23 143:13,15 146:17 147:25 149:4 156:2 157:17,24 161:12

161:12,25 162:14 163:23 164:19,20 165:10 166:4 168:13 173:4,14 173:21 175:14,19 175:20 178:13,16 178:22 179:17 181:7 185:8,9,22 188:21 189:22,23 191:15 192:20 194:4 195:7 200:14,25 203:3 204:9 207:22,25 209:4 212:8,9 215:8 218:11,11 219:7 220:24 223:11 224:10,19 224:21 227:9,22 229:6,21,23,23 233:14 238:25 242:5 245:20 248:14,15 249:16 250:23 255:21 256:7 264:8 267:6 268:2,4,12,24 273:15 274:12 281:24 282:8 286:15 287:4 288:4 297:9,23 300:17 302:9 307:11,20,24 308:22,25 310:17 310:23 311:15 314:2 320:3 335:20 336:17,23 337:6

**thinking** 16:14 49:12 125:11 213:6 240:7 265:4

**third** 40:24,25 41:6,8 83:19

**[thomas - treating]** Page 53

**thomas** 2:24
**thought** 39:24
  95:22 178:9 201:3
  264:17,19 267:24
  287:23,25 333:15
  335:17
**thoughts** 37:15
**three** 48:24 58:11
  61:23 62:5 63:2,2
  65:8,9 83:15,23
  84:24 196:8,11,12
  255:22
**threshold** 114:20
  334:15
**tie** 306:16
**tied** 155:11 308:8
**ties** 294:8
**time** 7:14 8:13,23
  11:18 17:20 18:7
  18:12,15,17 42:20
  47:17 48:6,17,19
  49:11,13,25 53:5
  59:21 61:3,11,21
  70:6,10 74:25
  75:21,25 88:11
  95:17 101:8
  110:13 117:23
  118:8 122:21
  129:14 130:18
  132:12 141:25
  142:7 145:13
  159:18,19 160:16
  162:7 171:12
  177:13 178:10
  184:4,8 186:7,22
  186:23 199:2
  200:3 202:23,24
  203:8 205:6,7,9,13
  205:23 219:18
  220:20 230:13,17
  235:21 236:9

237:21 251:5,16
  251:20 261:22
  269:16 272:3,11
  275:15 277:8
  286:11 287:10
  291:3,8,24 319:18
  320:6,10,22 323:2
  325:9 327:22
  330:19,23 331:17
  331:19 332:9
  333:2 339:8,10
**timed** 189:7
**times** 7:13 10:6,12
  12:12 13:3,5 15:8
  15:18 44:2,10,11
  63:21 87:9 122:13
  131:10 155:18
  180:12 244:15
  272:5,6 303:23
**timing** 308:18,18
**ting** 2:8 4:23
**titled** 30:16 33:10
**tliu** 2:8
**today** 5:10,22,24
  7:16,24 11:8 17:2
  38:22 178:5
  180:12 268:17,19
  268:23 321:18
**told** 225:9 240:16
  242:9
**top** 39:6 93:8
  177:14 289:19
**total** 40:6,20 47:23
  49:16 134:23
  151:12 193:23
  202:11,16,21
  203:4,13
**totality** 335:10
**totally** 202:3
  235:14 324:20,22

**touch** 43:15
**trade** 42:18 74:20
  78:14,15,25 79:12
  79:17 110:15,23
  111:17,18 112:8,9
  113:9,10,11,14
  114:4,9 115:10
  116:3 127:17
  139:11 146:10
  157:4 174:3
**traded** 21:10
  76:23 80:17 99:21
  114:8 116:16
  127:10 128:3,5
  135:7,8,24 136:6
  136:13,22 138:8,9
  138:15 139:19,23
  140:15 151:13
  154:12,25 159:7
  159:10 164:7
  202:25 203:7
  222:18 292:16
  305:5
**traders** 54:7,14,25
**trades** 63:8 72:15
  72:17 73:25 74:17
  80:3 106:11 115:6
  127:15,24 135:14
  135:15,18,21
  136:17 137:11
  138:21 158:4
  170:17
**trading** 42:23
  43:20 44:6 51:6
  69:4,5,6 71:15
  72:24 73:10 74:4
  74:5,19,24 75:14
  77:9 78:6 79:11
  80:10,11 84:5
  85:2 107:9 111:15
  111:24 113:19

116:10 117:9,15
  132:19 133:2,5
  135:4 136:4
  149:25 150:5,9,15
  150:25 151:3,21
  152:2,7,11,13,18
  152:25 153:2,7,24
  154:9,13,15,21
  155:2,3 186:18
  190:10 205:10,11
  290:19,22 303:17
  334:5
**transact** 174:19
**transaction** 30:12
  137:6 157:21
  170:15,17,20,21
  170:25 171:3,8,19
  173:24 174:16
  254:19 256:2
  257:12,23 258:18
  259:2,20 264:2,23
  264:25 266:5,20
  270:25 274:10
  279:11 281:9
  315:6,20,22
  328:11
**transactions** 72:20
  137:16,22 138:3
  155:21 276:19
**transcript** 340:5,8
  341:9
**transcripts** 35:3,4
  35:8,17
**transfer** 38:24
**transferred**
  279:16 280:7,20
**transverse** 272:9
**treat** 167:18
**treated** 176:15,20
**treating** 105:10
  179:3 239:13,14

**treatment** 85:13
**trial** 275:21 312:7
  324:23
**trigger** 240:5
**trip** 324:19
**true** 9:7 21:24
  111:13 114:24
  117:4 132:11
  144:24 157:8
  173:16 207:11
  231:4 238:17
  255:24 259:25
  260:4,11,16 264:3
  264:4,24 265:25
  266:16 271:6,7
  273:24 278:13,20
  278:23 279:23
  281:8 295:17
  301:3 303:13
  311:22 316:12
  328:19 341:10
**truth** 205:12
  207:19 212:18,19
  224:4 228:4,12
  229:2 242:9
  247:24 273:16,17
  289:23 290:20
  291:4 327:11,15
**truthfully** 7:24
**try** 57:14 59:23
  158:22 177:25
  178:14 210:23
  217:20 270:6
  308:6,16 335:21
**trying** 20:16 63:6
  86:8 104:12
  121:12,14,24
  125:8 137:4
  185:15 188:7,17
  189:25 190:2
  233:22 234:2

235:4,22 249:13
253:17 282:18
302:11 337:5
**tull** 2:9 4:24
**turn** 3:8 44:13
  50:6 51:2 53:16
  81:5 122:7 204:15
  309:5
**turnover** 78:8
**twice** 40:21
**two** 14:21 18:4
  35:4,8,15 36:24
  44:15,22,23 45:25
  46:15 48:24 61:23
  62:4,25 63:14,25
  64:9,22 83:17,19
  83:20,23 92:22
  110:13 146:18,22
  147:15 160:19
  165:21 167:4,15
  168:2,12 169:8,20
  196:11 210:19
  211:4 227:4
  264:15,17 265:11
  266:23 267:21
  268:3 273:19
**type** 27:13 48:9
  54:23 56:24 83:4
  83:8 101:23 102:2
  124:8,10 140:6
  214:14 269:14
  333:11
**types** 43:20 52:5
  85:17 115:21
  208:19 210:21
  214:8 277:7
**typically** 35:9,12
  36:21 132:21

**u**

**ubiquitous** 214:21
  218:24
**ultimate** 92:2
  98:15 232:12
  297:21
**ultimately** 12:9
  22:20 34:8 189:23
  205:23 224:2,7
  225:12 226:21
  232:25 243:4
  270:4 275:21
  297:16 308:5
**um** 275:25
**unbiased** 51:4
**undated** 307:2
**underlying** 24:3
  60:17 78:24 79:19
  89:13 90:9 97:6
  115:23 116:6
  120:7 127:13
  129:21 130:9,20
  133:17,23 134:4
  134:15 144:20,25
  155:21 160:11
  161:8 181:3
  182:24 185:10
  186:12,25 188:10
  189:5 190:6 193:4
  193:15 197:5
**underneath** 44:20
**underrepresentat...**
  258:8
**underrepresented**
  254:17
**understand** 5:21
  46:7 98:7 109:19
  143:25 166:21
  201:17 212:24
  227:13 228:20
  231:21 233:5,16

238:14 241:21
249:11 252:9
253:17,19,25
264:11 270:6
277:6 283:6 300:2
310:25 314:16
315:23 319:10
326:3
**understanding**
  14:18,20,22 20:3
  30:9 31:11,13
  99:5 130:4 139:14
  139:25 140:20
  205:4 212:15
  220:25 222:7,20
  226:20 228:9
  229:7 231:10
  241:22,25 242:7
  243:21,24 247:21
  247:25 248:16
  251:9 252:16,21
  253:11 254:12
  255:12,17 256:10
  257:2,18,25 258:9
  258:22 259:15
  264:13 267:4,20
  268:15 270:21
  273:3,11,22 274:6
  274:13,18 275:6,9
  276:12 277:10
  281:14 284:3
  286:7,19 287:6
  288:19 291:18,19
  293:8,14 294:3,11
  295:14 296:25
  297:10 300:21
  306:25 309:13,18
  310:6,18 311:10
  311:18 312:12,17
  312:20,23 313:5
  313:14 314:12,17

314:19,25 316:8 316:16 317:5 319:13 327:3,9 328:16 329:21 331:14
**understandings** 324:15
**understands** 269:11
**understated** 286:21
**understood** 7:20 48:12 57:14 310:21
**undertake** 276:10
**undertaken** 89:23 293:24 295:20
**undertaking** 239:9 268:13
**undisclosed** 205:12 220:17 227:15 232:18 242:13 276:18 313:8 314:22
**undue** 97:3
**unexpected** 62:12 84:15 155:5
**unhighlighted** 263:11
**unique** 34:9 62:8 212:6
**unit** 3:15
**united** 1:2 3:19 53:6
**uniti** 1:6 2:12 3:17 21:6,13 25:9,17,20 30:13 32:16,21,23 33:3,9,10,15 37:17 45:2,10 49:22 84:6,8 85:6,9 86:15,21 87:5,22

95:6,11 100:5,18 101:11,13,15,20 101:22,24 102:15 103:25 104:6,19 104:23 105:2,8,13 105:22 107:3 113:25 114:16 120:2 135:23 136:6,13,21 137:22 138:4,8,15 140:10 143:19,23 144:3 147:2 158:7 171:10,23,25 173:22 181:12,16 181:20,21 187:16 189:14 197:17 208:12 257:13 259:8 260:2,13 267:13 269:19 277:25 279:9 280:8,20 288:21 293:22 294:20 298:4 299:21 300:9,14,23,25 302:23 305:6 314:7,9,20 315:4 325:22 326:22 336:6 337:16 338:12,23 343:2
**uniti's** 34:4 45:2 49:21 50:8,12 64:15 66:5 71:13 78:4,5 82:8,15 85:20 89:12 102:3 102:15,20 103:11 103:13 122:9 126:21 128:3,4,11 128:13 146:16 147:22,23 148:7 148:11,18,24 149:2 150:5 152:8

156:11 158:24 160:3,7 163:15 172:15 174:5 175:23 180:6,23 181:11 188:18 198:3,14 222:10 283:15,21 287:18 290:18 291:12,15 291:23 292:3,6,15 294:5 298:7 300:6 300:14 301:14,22 302:16 303:16 304:14 305:5 331:9,10 332:19 335:25 336:2,9 338:7
**universal** 54:4 113:5
**unnecessarily** 197:22
**unquote** 134:11 238:17 307:18 311:6
**unrelated** 34:3
**unusual** 113:21 116:12
**update** 58:3
**updated** 59:5
**upper** 169:7,19 170:9 173:9,19
**upset** 80:4
**urge** 235:16
**use** 9:11 51:11 54:13 60:24 66:8 88:9,16,17 89:21 110:20 124:3 140:4 155:20 168:25 184:24 185:11,23 187:2,6 189:25 204:21 208:24 216:5,20

218:12,23 219:11 220:3 332:17 333:18
**useful** 159:8,12 279:13 280:6,18 333:17
**uses** 189:13
**usual** 137:8
**usually** 62:9 96:10 131:6 263:10 275:18
**uttered** 58:24

**v**

**vacuum** 239:13 335:22
**valid** 176:15
**valuable** 76:22,22
**valuation** 8:5 38:4 38:10 40:24 59:19 61:6 63:20 65:14 68:4 216:21
**value** 33:8 58:22 59:8,15 62:14 79:19 80:9,23 81:4 83:6 102:16 103:11 111:14 115:22 129:19 131:7 132:22,24 134:4 144:16 146:4 179:5 186:8 188:8 190:18 207:11 215:3 220:17,22 221:8 223:25 232:5 234:19 236:18 237:21 239:22 241:11,16 301:22 314:3
**values** 79:18 114:17 116:5 155:10 157:22

**[valuing - way]**

**valuing** 79:20
190:16
**variables** 91:15
92:3 96:16 131:25
132:18
**varied** 11:17
219:22
**varies** 194:4
**variety** 37:11
174:12 334:12
**various** 33:11
42:17 43:19 44:6
**vary** 325:5
**vast** 11:4 143:21
143:21 163:14
194:17
**velocity** 78:8
**verbatim** 211:7
**verdict** 241:8
244:6
**verify** 151:25
152:10
**verifying** 23:20
**veritext** 3:25 4:4
**version** 168:6,18
256:15 261:24
262:7 263:11
**versus** 49:21 68:16
86:23 120:19
124:19 186:17
188:4 192:8
215:19 229:20
230:19 246:21
264:23 331:18
**video** 3:12,16 70:6
70:10 75:21,25
117:24 118:8
184:4,8 251:16,20
330:19,23 339:8
**videoconference**
3:23

**videographer** 2:23
3:2 4:3,25 70:5,9
75:20,24 117:22
118:7 184:3,7
251:15,19 330:18
330:22 339:7
**videotaped** 1:12
**view** 6:20 25:25
39:25 45:19 55:4
61:10 62:17 67:18
68:13 84:8 102:24
110:18 126:7
127:22 128:9,21
129:2 130:3
137:18 151:23
179:18 197:9,21
221:12,17 223:20
228:23 229:5
254:6 267:17
273:20 296:6
297:19 299:7
305:24 317:16
**viewed** 103:10
**views** 37:10,16
63:19
**violate** 167:21
**violated** 161:15
263:22 264:2
270:25 274:10
294:13 306:21
309:16 312:9,15
315:6
**violating** 264:9
295:9
**violation** 174:24
175:8 287:17
316:19 317:8,17
319:21 322:25
327:17,24
**violations** 41:19
127:3 162:3,15,25

175:11,18
**virtually** 23:21
29:2 66:10 127:2
211:25 214:22
218:14 219:11
334:19
**virtue** 293:10
**volatility** 62:20
63:22 89:16 98:10
130:20 132:4,5,16
133:7,17,23 134:3
134:12 176:7
181:23 183:15
186:14 187:4
189:9,14 198:25
334:14 335:24
336:8,9,20 337:2
337:10,14
**volume** 62:19
63:22 69:8 71:15
71:22 72:5,12
73:7,8,14,21 74:5
74:20 75:5 76:8
76:19 77:22 78:6
81:3 83:20 84:5
85:2,21 135:4
149:25 150:5,9,22
151:3,4,5,8 152:5
152:7 153:3,7,8,24
154:9,21 156:2
190:10

**w**

**waive** 321:5,12
322:14 323:15,24
**waived** 322:3
**waivers** 322:8
323:9 324:21
**waiving** 322:11
323:21
**wallace** 2:13

**want** 5:14 24:4
55:22 56:7 73:6
75:4,13 79:3
90:12 91:22 97:3
104:8 107:6
108:22 109:12,17
109:19,22 115:12
116:18 123:16
131:10 160:25
161:25 164:11,13
166:20 178:21
228:5 236:5 255:2
257:5 259:5
269:10,21 271:24
272:15,21 282:12
284:12 292:20
299:23 302:19
305:17 335:7
336:15
**wanted** 26:20
128:22,23 147:14
164:3
**wardwell** 2:12
4:15
**waste** 7:14
**way** 32:10 54:24
78:22 80:4 91:9
92:5 103:14
104:23 105:3,24
113:2 120:15
121:23,24 124:16
125:5,12,14,23
126:8,15 145:2,20
145:25 146:6
163:14,24 175:15
175:19,20 183:7
192:5 195:6,14
197:12 199:25
201:5 207:14,16
207:25 209:15
211:24 214:11

**[way - wyman]**

218:13 226:16
228:2 229:11,23
236:5 237:19
240:6 247:12,14
248:11 249:16
250:19,24 255:23
263:3 264:21
265:2,4,17 266:10
268:5,7 272:6
273:15 275:17,18
282:16 286:6
288:3 295:6
296:14 301:23
302:20 306:16
307:12 315:18
318:19 326:10
331:9 335:9
341:15
**ways** 133:8 159:16
207:13 208:2,14
227:8,25
**we've** 289:4
**weakness** 298:16
299:3,8,15,20
300:7
**website** 56:10
**weekly** 72:16,18
78:6 150:8 151:3
**weigh** 68:13,19,21
69:24
**weighing** 317:15
**weight** 72:7
106:16
**weighted** 69:10
**welcome** 70:13
118:12 184:11
251:23 331:2
**went** 34:20 48:15
74:16
**west** 2:6

**whatsoever**
105:24 267:15
276:4
**whereof** 341:17
**whispering** 3:7
**white** 163:8
**wide** 37:11 45:9
114:13,25 115:5
117:14 157:12,17
158:3 174:21
252:6 267:11
330:4 338:21
**widely** 51:22 52:6
52:16,24 53:10,21
53:24 54:12 55:2
56:15 57:11,13,14
57:20
**wider** 110:13
116:19 156:25
173:8,18,18
**widespread** 54:22
162:3,5,15
**william** 5:13
**williams** 2:18
**willing** 48:12
127:10 223:21
**wind** 257:13
**window** 7:2,2
61:17 88:15 89:20
**windows** 7:4
88:13,15
**windstream** 32:5
32:14,20 33:2,6
100:10,15 101:3,9
101:19 104:4,16
104:22 105:2,6,12
105:22 256:3,5
257:15 259:9,17
260:2,13 277:19
277:24 278:7,14
279:9 281:11

283:16,22 288:21
293:4,18 295:22
298:9,17 299:9
300:12,24 301:11
302:14 304:13
305:9 309:8 312:6
321:3,11 322:2,7
322:11,12,15
323:13,18 328:21
**windstream's** 32:9
102:4,13,18 103:7
103:14,18 104:14
257:12,24 258:19
279:7 293:10,21
294:14,21 295:9
298:15 300:5,6
306:22 309:16
310:2 312:10,15
316:20 317:9
327:6,17
**wire** 279:14 280:7
280:19
**withheld** 209:14
216:12 221:8
223:24 224:16
249:18 276:20
**witness** 1:13 2:5
3:23 4:22 5:2 9:14
15:4 16:6 18:18
123:9 177:10
255:20 328:25
341:7,11,17 342:3
**wonder** 75:18
**wonderful** 208:6
**word** 22:17,19
231:13,14
**wording** 232:3
**words** 22:16 58:16
135:15 160:25
210:9 213:10
278:18 314:8

**work** 8:3,13 9:19
9:20 14:8 17:17
19:10,12 20:2,5,9
20:11,12 21:2
46:20 48:15 49:4
64:4 70:24 82:24
113:6,22 125:11
175:21 249:13
291:24 324:9,16
**worked** 12:17
43:16 70:22
**working** 9:21,24
15:19 16:9,18,25
17:4,10,24 22:19
23:8 47:11,24
75:18
**works** 224:22
225:5
**world** 61:2 186:2
246:7
**write** 50:22
**written** 9:22
101:14
**wrong** 77:6
**wrote** 256:15
**wyman** 2:7 4:20
4:20 11:6,12
12:15 14:11 15:10
15:13,23 18:2
19:13,20 32:12
38:13 46:23 62:6
63:11 66:20,22
67:7 74:22 75:16
78:18 80:14 92:19
96:3,23 102:6,21
102:25 103:16
104:20 116:23
117:21 129:15,24
132:25 133:25
134:16 136:8
143:10 144:12,23

**[wyman - zoom]**                                            Page 58

| | | z |
|---|---|---|
| 145:9 146:12 | 296:12 297:7 | **zero**   135:4 176:12 |
| 151:9 153:21 | 298:11,18 299:10 | 176:18,19 177:2 |
| 154:16 157:6,14 | 299:22 300:16 | 177:22 179:3,10 |
| 161:11,23 163:20 | 301:7,18 303:18 | 179:12,14,20 |
| 164:10 168:22 | 304:22 305:11 | 190:9 192:2 225:2 |
| 169:9 172:18 | 307:5,19 308:12 | **zoom**   1:14 |
| 173:13 174:8 | 309:17 310:5,16 | |
| 179:22 183:6 | 311:23 312:16 | |
| 184:2 186:3 | 313:3,19 314:11 | |
| 187:13 190:13,21 | 314:23 315:12 | |
| 193:24 194:3 | 316:13,24 317:23 | |
| 197:4,18 198:8 | 318:2,10,24 319:8 | |
| 199:21 200:20 | 319:23 321:23 | |
| 201:15 207:5 | 322:5,17 323:4,19 | |
| 208:13 209:3 | 324:10 325:10 | |
| 210:4 212:7 214:6 | 326:8,16 327:8,19 | |
| 215:24 218:9 | 328:2,22 329:14 | |
| 220:12 221:15 | 333:24 336:13,21 | |
| 225:23 228:19 | 337:11,17 338:2,4 | |
| 231:5,24 232:15 | 339:3 | |
| 233:13 234:23 | | |
| 236:8,22 238:21 | **x** | |
| 240:19 242:3,14 | **x**   1:5,8 342:2,6 | |
| 243:10,20 244:17 | **y** | |
| 245:10,19 246:17 | **yeah**   72:10 93:25 | |
| 247:10 248:13 | 129:17 133:2 | |
| 250:22 251:14 | 140:23 141:2 | |
| 258:21 260:17 | 168:23 181:6 | |
| 266:7 267:23 | 264:8 269:5 | |
| 269:4 270:18 | 337:18 | |
| 271:10,20 272:2 | **year**   202:20 | |
| 272:16,23,25 | **years**   8:25 10:17 | |
| 273:7,12 274:2,11 | 10:19 11:19 12:16 | |
| 274:22 275:12 | 13:3,6,9,12,22 | |
| 277:4 278:17,25 | 14:3,7 | |
| 280:9 281:18 | **yield**   337:9 | |
| 283:5 284:2,10 | **yielded**   34:9 | |
| 286:12 287:21 | **york**   1:16 2:14,14 | |
| 288:25 289:11 | 78:10 341:5 | |
| 291:6 293:12 | | |
| 294:15 295:11,19 | | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.