# EXHIBIT R

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 8-K

**CURRENT REPORT**

**Pursuant to Section 13 or 15(d)**

**of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): **June 24, 2019**

# Uniti Group Inc.

(Exact name of registrant as specified in its charter)

| **Maryland** | **001-36708** | **46-5230630** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**10802 Executive Center Drive**
**Benton Building Suite 300**
**Little Rock, Arkansas**　　　　　　　　　　　　**72211**
(Address of principal executive offices)　　　　　　(Zip Code)

Registrant's telephone number, including area code: **(501) 850-0820**

**Not Applicable**

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock | UNIT | The NASDAQ Global Select Market |

**Item 1.01 Entry Into a Material Definitive Agreement**

On June 24, 2019, Uniti Group Inc. (the "Company") entered into an amendment (the "Amendment") to its credit agreement dated as of April 24, 2015, as amended and supplemented through the date hereof (the "Credit Agreement"), by and among Uniti Group LP, Uniti Group Finance Inc., CSL Capital, LLC, the guarantors party thereto, Bank of America, N.A., as administrative agent, and the other lenders party thereto, including affiliates of the initial purchasers involved in the offering of Exchangeable Senior Notes described below. The Credit Agreement includes a $750 million revolving credit facility (the "Revolving Credit Facility"), the commitments for which are scheduled to mature on April 24, 2020, and a $2.14 billion term loan that matures on October 24, 2022. Borrowings under the Revolving Credit Facility total $749.0 million as of March 31, 2019. Pursuant to the Amendment, we will extend the maturity date of $575.9 million of commitments under the Revolving Credit Facility to April 24, 2022 (the "Extended Revolving Credit Facility") and pay down approximately $101.6 million of outstanding revolving loans and terminate the related commitments. The remaining commitments of approximately $72.4 million will continue to mature on April 25, 2020. The Amendment will increase the applicable margin for base rate loans under the Extended Revolving Credit Facility to a range of 2.75% to 3.25% and for Eurodollar rate loans under the Extended Revolving Credit Facility to a range of 3.75% to 4.25%, calculated in a customary manner and determined based on our consolidated secured leverage ratio. The Amendment has become effective, but the operative provisions thereof will not become effective unless and until, on or prior to September 15, 2019, we have cash sufficient to repay approximately $101.6 million under the Extended Revolving Credit Facility and repay such amount immediately following the effectiveness of such operative provisions. The Company intends to use a portion of the net proceeds from the offering of the Exchangeable Senior Notes described below to make the approximately $101.6 million repayment in connection with the effectiveness of the operative provisions of the Amendment.

The foregoing description of the Amendment is qualified in its entirety by reference to the Amendment, a copy of which is filed as Exhibit 10.1 hereto and is incorporated herein by reference.

**Item 8.01 Other Events**

*Exchangeable Notes Offering*

On June 24, 2019, the Company issued a press release announcing the offering of $300 million aggregate principal amount of exchangeable senior notes due 2024 (the "Exchangeable Senior Notes") by its subsidiary, Uniti Fiber Holdings Inc. (the "Issuer"), which will be guaranteed by the Company and each of the Company's subsidiaries (other than the Issuer) that is an issuer, obligor or guarantor under its existing senior notes. The offering of the Exchangeable Senior Notes is subject to market and other conditions. The Exchangeable Senior Notes will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), or any state securities laws, and may not be offered or sold in the United States absent registration or an applicable exemption from registration under the Securities Act or any applicable state securities laws. The Exchangeable Senior Notes will be offered only to persons reasonably believed to be qualified institutional buyers under Rule 144A under the Securities Act. A copy of the press release is attached hereto as Exhibit 99.1 and is incorporated herein by reference.

**Item 9.01 Financial Statements and Exhibits**

(d) Exhibits

| Exhibit Number | Description |
| --- | --- |
| 10.1 | Amendment No. 5 to the Credit Agreement, dated as of June 24, 2019, among Uniti Group LP, Uniti Group Finance Inc. and CSL Capital, LLC, as borrowers, the guarantors party thereto, the lenders party thereto, and Bank of America, N.A., as administrative agent and collateral agent. |
| 99.1 | Press release dated June 24, 2019 |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: June 24, 2019

UNITI GROUP INC.

By: /s/ Daniel L. Heard

| | |
|---|---|
| Name: | Daniel L. Heard |
| Title: | Executive Vice President — General Counsel and Secretary |

**Exhibit 10.1**

**AMENDMENT NO. 5**

This Amendment No. 5 (this "<u>Agreement</u>" or "<u>Amendment No. 5</u>"), dated as of June 24, 2019, to the Credit Agreement, dated as of April 24, 2015 (as amended by Amendment No. 1 thereto dated October 21, 2016, as further amended by Amendment No. 2 dated February 9, 2017, as further amended by Amendment No. 3 dated April 27, 2017, as further amended or otherwise modified by Amendment No. 4 and Limited Waiver dated March 18, 2019 and after giving effect to the Borrower Assumption Agreement and Joinder, dated as of May 9, 2017, the "<u>Credit Agreement</u>"; capitalized terms used in this Amendment No. 5 and not otherwise defined herein shall have the respective meanings given thereto in the Credit Agreement, as amended hereby), is made by and among Uniti Group Inc. (f/k/a Communications Sales & Leasing, Inc.), a Maryland corporation ("<u>Holdings</u>" or the "<u>Parent Guarantor</u>"), Uniti Group LP, a Delaware limited partnership (the "<u>Assumed Borrower</u>"), Uniti Group Finance Inc., a Delaware corporation ("<u>FinCo</u>"), CSL CAPITAL, LLC ("<u>CSL Capital</u>" and, collectively with the Assumed Borrower and Finco, the "<u>Borrowers</u>"), the Lenders party hereto and Bank of America, N.A., as Administrative Agent and Collateral Agent (the "<u>Administrative Agent</u>").

**W I T N E S S E T H:**

**WHEREAS**, pursuant to Section 2.16 of the Credit Agreement, the Borrowers and Revolving Credit Lenders are permitted to extend the maturity date of such Lender's Revolving Credit Commitments and to otherwise modify the terms of such Lender's Revolving Credit Commitments in accordance with Section 2.16;

**WHEREAS**, (i) each Revolving Credit Lender who executes this Amendment as an Extended Revolving Credit Lender (as defined below) has agreed to extend the maturity of all of such Revolving Credit Lender's Revolving Credit Commitments in accordance with the terms and subject to the terms and conditions set forth herein, (ii) each other Revolving Credit Lender will be deemed a Non-Extended Revolving Credit Lender (as defined below) and (iii) the Extended Revolving Credit Commitments and any Extended Revolving Credit Loans, on the one hand, and the Non-Extended Revolving Credit Commitments and any Non-Extended Revolving Credit Loans, on the other hand, will constitute separate tranches and Classes under the Credit Agreement;

**NOW, THEREFORE**, in consideration of the premises and further valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. <u>Amendments to the Credit Agreement</u>. Subject to the occurrence of the Amendment No. 5 Operative Date (as defined below):

(a) The Credit Agreement is, effective as of the Amendment No. 5 Operative Date, hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the underlined text (indicated textually in the same manner as the following example: <u>underlined text</u>) as set forth in the pages of the Credit Agreement attached as <u>Exhibit A</u> hereto.

(b) <u>Schedule 1.01(A)</u> to the Credit Agreement is, effective as of the Amendment No. 5 Operative Date (after giving effect to the Commitment Reduction (as defined below)), hereby replaced in its entirety with the table attached as <u>Schedule 1</u> hereto.

(c) <u>Exhibit C-2</u> to the Credit Agreement, effective as of the Amendment No. 5 Operative Date, hereby amended to delete the stricken text (indicated textually in the same

manner as the following example: ~~stricken text~~) and to add the underlined text (indicated textually in the same manner as the following example: underlined text) as set forth in the pages of Exhibit C-2 attached as Exhibit B hereto.

(d) Exhibit C-4 to the Credit Agreement is, effective as of the Amendment No. 5 Operative Date, shall be in the form of Exhibit C hereto.

2. Reduction in Revolving Credit Commitments. Immediately following the occurrence of the Amendment No. 5 Operative Date, the Extended Revolving Credit Commitments shall automatically as of such date be reduced by $101,633,333.25 to $575,922,221.75, with such reduction to be applicable to each Extended Revolving Credit Lender's Extended Revolving Credit Commitment pro rata in accordance with each such Extended Revolving Credit Lender's Applicable Percentage (the "Commitment Reduction") and the Borrower shall have prepaid Extended Revolving Credit Loans so the Outstanding Amount of all Extended Revolving Credit Loans and all L/C Obligations shall not exceed the Extended Revolving Credit Commitments after giving effect to the Commitment Reduction (the "Specified Repayment").

3. Extension of Certain of the Revolving Credit Commitments.

(a) On the Amendment No. 5 Operative Date, each Existing Revolving Credit Lender that has executed and delivered a counterpart to this Amendment as an "Extended Revolving Credit Lender" (each, an "Extended Revolving Credit Lender") shall have its Revolving Credit Commitments outstanding immediately prior to the Amendment No. 5 Operative Date ("Existing Revolving Credit Commitments") automatically reclassified as an Extended Revolving Credit Commitment and all of its Revolving Credit Loans outstanding immediately prior to the Amendment No. 5 Operative Date ("Existing Revolving Credit Loans") automatically reclassified as Extended Revolving Credit Loans, respectively, for all purposes under the Credit Agreement, and such Extended Revolving Credit Commitments and Extended Revolving Credit Loans shall be outstanding under the Credit Agreement on the terms and conditions set forth therein.

(b) On the Amendment No. 5 Operative Date, all of the Existing Revolving Credit Commitments of any Existing Revolving Credit Lender that is not an Extended Revolving Credit Lender (each, a "Non-Extended Revolving Credit Lender") shall be reclassified as and constitute Non-Extended Revolving Credit Commitments, and all of the Existing Revolving Credit Loans of any Non-Extended Revolving Credit Lender shall be reclassified and constitute Non-Extended Revolving Credit Loans, under the Credit Agreement and shall continue to be in effect and outstanding under the Credit Agreement on the terms and conditions set forth therein.

4. Conditions Precedent to Effectiveness of this Agreement.

(a) This Amendment No. 5 shall become effective on the date when the following conditions are met (the "Agreement Effective Date"):

(i) the Administrative Agent shall have received a counterpart signature page of this Amendment No. 5 duly executed by each of the Parent Guarantor, the Borrowers, the Guarantors, the Administrative Agent and the Extending Revolving Credit Lenders;

(ii) the Administrative Agent shall have received the favorable legal opinion of (i) Davis Polk & Wardwell LLP, counsel to the Loan Parties and (ii) Kutak Rock LLP, counsel to the Loan Parties;

-2-

(iii) the Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of each Loan Party, the authorization of execution, delivery and performance of this Amendment No. 5, the performance of the Credit Agreement and each other applicable Loan Document, in each case as amended, extended or otherwise modified hereby, and any other legal matters relating to the Loan Documents, all in form and substance reasonably satisfactory to the Administrative Agent and its counsel; and

(iv) the Administrative Agent shall have received a certificate, dated as of the Agreement Effective Date, signed by a Responsible Officer certifying that (i) each of the Master Lease and the Recognition Agreement (and in each case any amendments thereto) are in full force and effect as of such date and attaching executed copies of the Master Lease and the Recognition Agreement (and in each case any amendments thereto), (ii) the representations and warranties of each Loan Party contained in Article 5 of the Credit Agreement and in each other Loan Document (including, for the avoidance of doubt, this Amendment No. 5) are true and correct in all material respects as of Agreement Effective Date (except to the extent that such representations and warranties specifically refer to an earlier date, in which case they were true and correct as of such earlier date); *provided* that, to the extent that such representations and warranties are qualified by materiality, material adverse effect or similar language, they are true and correct in all respects and (iii) as of the Agreement Effective Date, no Default or Event of Default exists or will result from the effectiveness of this Amendment No. 5.

5. Conditions Precedent to Effectiveness of the Commitment Reduction and Amendments. The amendments set forth in Section 1 and the extension set forth in Section 3 hereof shall become effective on the date when the following conditions are met (the "Amendment No. 5 Operative Date"):

(i) the Agreement Effective Date shall have occurred;;

(ii) the Borrowers shall have paid to the Administrative Agent, for the account of each Lender that has delivered a counterpart to this Amendment No. 5 as an Extended Revolving Credit Lender by 4:00 p.m. (New York City time) on June 18, 2019, a consent fee equal to 0.20% of the aggregate principal amount of the Extended Revolving Credit Commitments held by such Extended Revolving Credit Lender after giving effect to the Commitment Reduction;

(iii) either (x) the Parent Guarantor or any direct or indirect Subsidiary thereof shall have issued senior secured or unsecured debt or Equity Interests (or any debt convertible or exchangeable into Equity Interests), (y) the Borrowers will have cash on hand or (z) any combination of (x) and (y), in an amount sufficient for the Borrowers to make the Specified Prepayment; and

(iv) the Borrowers shall have paid all fees and amounts due and payable pursuant to this Amendment No. 5, including, to the extent invoiced, reimbursement or payment of documented and reasonable out-of-pocket expenses in connection with this Amendment No. 5 and related matters (including the reasonable and documented fees and expenses of Cahill Gordon & Reindel LLP, counsel to the Administrative Agent and the Amendment No. 5 Arranger (as defined below)), any other out-of-pocket expenses of the Administrative Agent required to be paid or reimbursed pursuant to the Credit Agreement and any fees and expenses payable to the Administrative Agent or its affiliates and the Amendment No. 5 Arranger as separately agreed.

-3-

It is understood and agreed that if the Amendment No. 5 Operative Date does not occur on or prior to September 15, 2019, the amendments, extensions and other modifications set forth in Sections 1, 2 and 3 hereof shall not become operative.

6. <u>Representations and Warranties</u>. Each Loan Party represents and warrants to the Administrative Agent and the Lenders as of the Agreement Effective Date:

(i) the representations and warranties of each Loan Party contained in Article 5 of the Credit Agreement and in each other Loan Document (including, for the avoidance of doubt, this Amendment No. 5) are true and correct in all material respects as of the date hereof (except to the extent that such representations and warranties specifically refer to an earlier date, in which case they were true and correct as of such earlier date); *provided* that, to the extent that such representations and warranties are qualified by materiality, material adverse effect or similar language, they are true and correct in all respects;

(ii) no Default or Event of Default exists or will result from this Amendment No. 5; and

(iii) this Amendment No. 5 has been duly authorized, executed and delivered by each Loan Party and each of this Amendment No. 5 and the Credit Agreement, as amended, extended or otherwise modified hereby, constitutes a legal, valid and binding obligation of each such Loan Party, enforceable against each such Loan Party in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity.

7. <u>Costs and Expenses</u>. The Borrowers agree to pay all reasonable and documented out-of-pocket costs and expenses of the Administrative Agent (including the reasonable and documented fees and expenses of Cahill Gordon & Reindel LLP, counsel to the Administrative Agent and the Amendment No. 5 Arranger) in connection with the preparation, execution, delivery and administration of this Amendment No. 5, the other instruments and documents to be delivered hereunder and related matters with respect to the Loan Documents and transactions contemplated hereby.

8. <u>GOVERNING LAW</u>. THIS AMENDMENT NO. 5 SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK.

9. <u>Counterparts</u>. This Amendment No. 5 may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

10. <u>WAIVER OF RIGHT OF TRIAL BY JURY</u>. SECTION 10.16 OF THE CREDIT AGREEMENT IS INCORPORATED HEREIN BY REFERENCE, *MUTATIS MUTANDIS*.

11. <u>Effect of Amendment No. 5</u>. Except as expressly set forth herein, (i) this Amendment No. 5 (including, without limitation, the occurrence of the Amendment No. 5 Operative Date) shall not by implication or otherwise limit, impair, constitute a waiver of (including, without limitation, any Default or Event of Default) or otherwise affect the rights and remedies of the Lenders, the Administrative Agent or any other Agent, in each case under the Credit Agreement or any other Loan Document, and (ii) shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other provision of either such agreement or any other Loan Document. Each and every term, condition, obligation, covenant and agreement contained in the Credit Agreement or any other Loan Document, is hereby ratified and re-affirmed in all respects and shall continue in full force and effect as amended, extended or otherwise modified hereby. This

-4-

Amendment No. 5 shall constitute a Loan Document and a Loan Extension Agreement for all purposes and from and after the Agreement Effective Date, all references to the Credit Agreement in any Loan Document and all references in the Credit Agreement to "this Agreement", "hereunder", "hereof" or words of like import referring to the Credit Agreement, shall, unless expressly provided otherwise, refer to the Credit Agreement as amended, extended or otherwise modified hereby.

12. <u>Consent and Reaffirmation</u>. Each of the Loan Parties hereby consents to this Amendment No. 5 and, as of each of the Agreement Effective Date and the Amendment No. 5 Operative Date, confirms and reaffirms (i) that all obligations of such Loan Party under the Loan Documents to which such Loan Party is a party shall continue to apply to the Credit Agreement as amended, extended or otherwise modified hereby, (ii) its guaranty of the Obligations as amended, extended or otherwise modified hereby, (iii) its prior pledges and grants of security interests and Liens on the Collateral to secure the Obligations pursuant to the Collateral Documents and (iv) that such Guarantees, prior pledges and grants of security interests and liens on the Collateral to secure the Obligations, as applicable, are and shall continue to be in full force and effect as amended, extended or otherwise modified hereby and do, and shall continue to, inure to the benefit of the Collateral Agent, the Lenders and the other Secured Parties. This Agreement and the amendments, extensions and other modifications contemplated hereunder are not intended as, and shall not constitute, a novation of the Credit Agreement or any other Loan Document.

13. <u>Amendment No. 5 Lead Arranger</u>. BofA Securities, Inc. is acting as lead arranger (the "<u>Amendment No. 5 Arranger</u>") in connection with the Amendment No. 5 and shall be entitled to all rights, indemnities, privileges and immunities applicable to the "Arrangers" under the Loan Documents in connection herewith and that certain Engagement Letter, dated as of June 3, 2019, among BofA Securities, Inc. and the Borrowers.

[Signature pages follow]

-5-

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 5 to be duly executed as of the date first above written.

UNITI GROUP INC.

By:  /s/ Daniel Heard
      Name:  Daniel Heard
      Title:  Executive Vice President—
          General Counsel and Secretary

UNITI GROUP LP

By: Uniti Group Inc., its General Partner
By:  /s/ Daniel Heard
      Name:  Daniel Heard
      Title:  Executive Vice President—
          General Counsel and Secretary

UNITI GROUP FINANCE INC.

By:  /s/ Daniel Heard
      Name:  Daniel Heard
      Title:  Executive Vice President—
          General Counsel and Secretary

UNITI FIBER HOLDINGS INC.

By:  /s/ Daniel Heard
      Name:  Daniel Heard
      Title:  Executive Vice President—
          General Counsel and Secretary

CSL CAPITAL, LLC

By:  /s/ Daniel Heard
      Name:  Daniel Heard
      Title:  Executive Vice President—
          General Counsel and Secretary

CONTACT NETWORK, LLC
CSL NATIONAL GP, LLC

[Signature Page to Amendment No. 5]

CSL ALABAMA SYSTEM, LLC
CSL ARKANSAS SYSTEM, LLC
CSL FLORIDA SYSTEM, LLC
CSL IOWA SYSTEM, LLC
CSL MISSISSIPPI SYSTEM, LLC
CSL MISSOURI SYSTEM, LLC
CSL NEW MEXICO SYSTEM, LLC
CSL OHIO SYSTEM, LLC
CSL OKLAHOMA SYSTEM, LLC
CSL REALTY, LLC
CSL TEXAS SYSTEM, LLC
CSL NORTH CAROLINA REALTY GP, LLC
CSL TENNESSEE REALTY PARTNER, LLC
CSL TENNESSEE REALTY, LLC
HUNT TELECOMMUNICATIONS, LLC
INFORMATION TRANSPORT SOLUTIONS, INC.
NEXUS SYSTEMS, INC.
PEG BANDWIDTH DC, LLC
PEG BANDWIDTH DE, LLC
PEG BANDWIDTH IA, LLC
PEG BANDWIDTH LA, LLC
PEG BANDWIDTH MA, LLC
PEG BANDWIDTH MS, LLC
PEG BANDWIDTH TX, LLC
PEG BANDWIDTH VA, LLC
UNITI DARK FIBER LLC
UNITI FIBER LLC
UNITI LEASING LLC
UNITI LEASING X LLC
UNITI LEASING XI LLC
UNITI TOWERS LLC
UNITI TOWERS NMS HOLDINGS LLC

By:   /s/ Daniel Heard

Name:  Daniel Heard
Title:   Executive Vice President—
          General Counsel and Secretary

[Signature Page to Amendment No. 5]

CSL NATIONAL, LP, as a Guarantor
By:  CSL NATIONAL GP, LLC, as its general partner
By:  /s/ Daniel Heard
    Name:  Daniel Heard
    Title:  Executive Vice President—
        General Counsel and Secretary

CSL NORTH CAROLINA REALTY, LP, as a Guarantor
By:  CSL NORTH CAROLINA REALTY GP, LLC, as its
By:  general partner
    /s/ Daniel Heard
    Name:  Daniel Heard
    Title:  Executive Vice President—
        General Counsel and Secretary

CSL NORTH CAROLINA SYSTEMS, LP, as a Guarantor
By:  CSL NORTH CAROLINA REALTY GP, LLC, as its
By:  general partner
    /s/ Daniel Heard
    Name:  Daniel Heard
    Title:  Executive Vice President—
        General Counsel and Secretary

[Signature Page to Amendment No. 5]

UNITI HOLDINGS LP, as a Guarantor

By:   UNITI HOLDINGS GP LLC, as its general partner

By:   /s/ Daniel Heard

      Name:  Daniel Heard
      Title:   Executive Vice President—
               General Counsel and Secretary

UNITI LATAM LP, as a Guarantor

By:   UNITI LATAM GP LLC, as its general partner

By:   /s/ Daniel Heard

      Name:  Daniel Heard
      Title:   Executive Vice President—
               General Counsel and Secretary

UNITI QRS HOLDINGS LP, as a Guarantor

By:   UNITI QRS Holdings GP LLC, as its general partner

By:   /s/ Daniel Heard

      Name:  Daniel Heard
      Title:   Executive Vice President—
               General Counsel and Secretary

[Signature Page to Amendment No. 5]

BANK OF AMERICA, N.A., as Administrative Agent

By: /s/ Elizabeth Uribe

Name: Elizabeth Uribe

Title: Assistant Vice President

[Signature Page to Amendment No. 5]

Lender Signature Pages:
[On File with the Administrative Agent]

[Signature Page to Amendment No. 5]

**Exhibit 99.1**
**Press Release**
Release date: June 24, 2019



## Uniti Group Inc. Announces Launch of Exchangeable Notes Offering and Extension of Revolving Credit Facility

LITTLE ROCK, Ark. – Uniti Group Inc. (the "Company", "Uniti", or "we") (Nasdaq: UNIT) today announced the planned offering by Uniti Fiber Holdings Inc. (the "Issuer"), a subsidiary of the Company, of $300 million aggregate principal amount of exchangeable senior notes due 2024 (the "Exchangeable Notes"). The offering of the Exchangeable Notes is subject to market and other conditions.

The Issuer also intends to grant to the initial purchasers of the Exchangeable Notes an option to purchase up to an additional $45 million aggregate principal amount of the Exchangeable Notes during a 13-day period beginning on, and including, the first day on which the Exchangeable Notes are issued.

The Exchangeable Notes will be general senior unsecured obligations of the Issuer, guaranteed by the Company and each of the Company's subsidiaries (other than the Issuer) that is an issuer, obligor or guarantor under its existing senior notes.

The Exchangeable Notes will mature on June 15, 2024, unless earlier repurchased, redeemed or exchanged. Prior to March 15, 2024, the Exchangeable Notes will be exchangeable only upon satisfaction of certain conditions and during certain periods, and thereafter, the Exchangeable Notes will be exchangeable at any time until the close of business on the second scheduled trading day immediately preceding the maturity date. The Exchangeable Notes will be exchangeable on the terms set forth in the indenture into cash, shares of common stock of the Company (the "Common Stock"), or a combination thereof, at the Issuer's election.

The Issuer may redeem all or a portion of the Exchangeable Notes, at any time, at a cash redemption price equal to 100% of the principal amount of the Exchangeable Notes to be redeemed, plus accrued and unpaid interest to, but not including, the redemption date, if the Company's board of directors determines such redemption is necessary to preserve the Company's status as a real estate investment trust for U.S. federal income tax purposes. The Issuer may not otherwise redeem the Exchangeable Notes prior to June 20, 2022. On or after June 20, 2022 and prior to the 42nd scheduled trading day immediately preceding the maturity date, if the last reported sale price per share of Common Stock has been at least 130% of the exchange price for the Exchangeable Notes for certain specified periods, the Issuer may redeem all or a portion of the Exchangeable Notes at a cash redemption price equal to 100% of the principal amount of the Exchangeable Notes to be redeemed plus accrued and unpaid interest to, but not including, the redemption date.

In addition, Uniti has entered into an amendment to its credit agreement to extend the maturity date of its revolving credit facility. Pursuant to the amendment, Uniti will extend the maturity date of $575.9 million of commitments under its revolving credit facility to April 24, 2022 and expects to pay down approximately $101.6 million of outstanding revolving loans and terminate the related commitments with a portion of the net proceeds of the offering of the Exchangeable Notes. The remaining commitments of approximately $72.4 million will

mature on April 25, 2020. The operative provisions of the amendment will become effective upon Uniti obtaining sufficient cash to fund the repayment on or prior to September 15, 2019. In addition, in the event that the commitments maturing on April 24, 2020 are not repaid in full or extended to April 24, 2022 on or before April 10, 2020, the maturity date of the revolving credit facility will spring to a maturity date of April 25, 2020.

The Issuer intends to use a portion of the net proceeds of the offering to repay the $101.6 million of outstanding borrowings under the revolving credit facility in connection with the amendment described above, pay the cost of the exchangeable note hedge transactions described below and for general corporate purposes, which may include funding acquisitions (including the previously announced acquisition of Bluebird Networks, LLC) and the repayment of additional borrowings under our revolving credit facility.

In connection with the pricing of the Exchangeable Notes, the Issuer intends to enter into privately negotiated exchangeable note hedge transactions with one or more of the initial purchasers and/or their respective affiliates (the "option counterparties"). The exchangeable note hedge transactions will cover, subject to customary anti-dilution adjustments substantially similar to those applicable to the Exchangeable Notes, the same number of shares of Common Stock that will initially underlie the Exchangeable Notes. The exchangeable note hedge transactions are expected generally to reduce potential dilution to the Common Stock and/or offset potential cash payments the Issuer is required to make in excess of the principal amount, in each case, upon any exchange of the Exchangeable Notes. Concurrently with the Issuer's entry into the exchangeable note hedge transactions, the Company intends to enter into warrant transactions with the option counterparties relating to the same number of shares of Common Stock, subject to customary anti-dilution adjustments. These warrant transactions could separately have a dilutive effect on the Common Stock to the extent that the market price per share exceeds the applicable strike price of the warrants on one or more of the applicable expiration dates unless, subject to the terms of the warrant transactions, the Company elects to cash settle the warrants. If the initial purchasers exercise their option to purchase additional Exchangeable Notes, we intend to repay additional outstanding debt under its revolving credit facility. In addition, the Issuer may enter into additional exchangeable note hedge transactions with the option counterparties and the Company may enter into additional warrant transactions with the option counterparties.

In connection with establishing their initial hedges of the exchangeable note hedge transactions and warrant transactions, the option counterparties and/or their respective affiliates have advised the Issuer and the Company that they expect to purchase Common Stock or securities of the Issuer in secondary market transactions and/or enter into various derivative transactions with respect to the Common Stock concurrently with or shortly after the pricing of the Exchangeable Notes, including with certain investors in the Exchangeable Notes. This activity could increase (or reduce the size of any decrease in) the market price of Common Stock or the Exchangeable Notes at that time. In addition, the option counterparties and/or their respective affiliates may modify their hedge positions by entering into or unwinding various derivatives with respect to the Common Stock and/or purchasing or selling shares of Common Stock or securities of the Issuer in secondary market transactions following the pricing of the Exchangeable Notes and prior to the maturity of the Exchangeable Notes (and are likely to do so following exchange of the Exchangeable Notes, during any observation period related to an exchange of the Exchangeable Notes or upon any repurchase of Exchangeable Notes by the Issuer (whether upon a fundamental change or otherwise)). The effect, if any, of these activities on the market price of the Common Stock or the Exchangeable Notes will depend in part on market conditions and cannot be ascertained at this time, but any of these activities could cause or prevent an increase or a decline in the market price of the Common Stock or the Exchangeable Notes, which could affect the ability of noteholders to exchange Exchangeable Notes and could also affect the amount of cash and/or the number and value of the shares of Common Stock noteholders receive upon exchange of the Exchangeable Notes.

The Exchangeable Notes will not be registered under the Securities Act of 1933, as amended (the "Securities

Act"), or any state securities laws, and may not be offered or sold in the United States absent registration or an applicable exemption from registration under the Securities Act or any applicable state securities laws. The Exchangeable Notes will be offered only to persons reasonably believed to be qualified institutional buyers under Rule 144A under the Securities Act. The Company has agreed to file registration statement covering resales of the shares of Common Stock issuable upon exchange of the Exchangeable Notes with the Securities and Exchange Commission (the "SEC").

This press release does not constitute an offer to sell, or a solicitation of an offer to buy, nor shall there be any sale of these securities in any state or jurisdiction in which such an offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state or jurisdiction.

**ABOUT UNITI**

Uniti, an internally managed real estate investment trust, is engaged in the acquisition and construction of mission critical communications infrastructure, and is a leading provider of wireless infrastructure solutions for the communications industry. As of March 31, 2019, Uniti owns 5.6 million fiber strand miles, approximately 500 wireless towers, and other communications real estate throughout the United States. Additional information about Uniti can be found on its website at www.uniti.com.

**FORWARD-LOOKING STATEMENTS**

Certain statements in this press release may constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, as amended from time to time. Those forward-looking statements include all statements that are not historical statements of fact including those regarding our proposed offering of the Exchangeable Notes.

Words such as "anticipate(s)," "expect(s)," "intend(s)," "estimate(s)," "foresee(s)," "plan(s)," "believe(s)," "may," "will," "would," "could," "should," "seek(s)" and similar expressions, or the negative of these terms, are intended to identify such forward-looking statements. These statements are based on management's current expectations and beliefs and are subject to a number of risks and uncertainties that could lead to actual results differing materially from those projected, forecasted or expected. Although we believe that the assumptions underlying the forward-looking statements are reasonable, we can give no assurance that our expectations will be attained. Factors which could materially alter our expectations include, but are not limited to, the future prospects of our largest customer, Windstream Holdings, which filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code; our ability to continue as a going concern if Windstream Holdings were to reject the master lease or be unable or unwilling to perform its obligations under the master lease; the ability and willingness of our customers to meet and/or perform their obligations under any contractual arrangements entered into with us, including master lease arrangements; the ability of our customers to comply with laws, rules and regulations in the operation of the assets we lease to them; the ability and willingness of our customers to renew their leases with us upon their expiration, and the ability to reposition our properties on the same or better terms in the event of nonrenewal or in the event we replace an existing tenant; the adverse impact of litigation affecting us or our customers; our ability to renew, extend or obtain contracts with significant customers (including customers of the businesses we acquire); the availability of and our ability to identify suitable acquisition opportunities and our ability to acquire and lease the respective properties on favorable terms; the risk that we fail to fully realize the potential benefits of acquisitions or have difficulty integrating acquired companies; our ability to generate sufficient cash flows to service our outstanding indebtedness; our ability to access debt and equity capital markets; the impact on our business or the business of our customers as a result of credit rating downgrades and fluctuating interest rates; our ability to retain our key management

personnel; our ability to qualify or maintain our status as a real estate investment trust ("REIT"); changes in the U.S. tax law and other state, federal or local laws, whether or not specific to REITs; covenants in our debt agreements that may limit our operational flexibility; other risks inherent in the communications industry and in the ownership of communications distribution systems, including potential liability relating to environmental matters and illiquidity of real estate investments; the risk that the agreements relating to our pending transactions may be modified or terminated prior to closing; the risks related to satisfying the conditions to our pending transactions; and additional factors described in our reports filed with the SEC.

Uniti expressly disclaims any obligation to release publicly any updates or revisions to any of the forward-looking statements set forth in this press release to reflect any change in its expectations or any change in events, conditions or circumstances on which any statement is based.

INVESTOR AND MEDIA CONTACTS:

Mark A. Wallace, 501-850-0866

Executive Vice President, Chief Financial Officer & Treasurer

mark.wallace@uniti.com

Bill DiTullio, 501-850-0872

Director, Finance and Investor Relations

bill.ditullio@uniti.com