UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| In re UNITI GROUP INC. SECURITIES LITIGATION | ) ) ) ) | Master File No. 4:19-cv-00756-BSM <br><br> <u>CLASS ACTION</u> |
| This Document Relates To: <br><br> ALL ACTIONS. | ) ) ) ) ) | PLAINTIFFS' REPLY IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION |

# REDACTED

4854-4279-3743.v1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ........................................................................................................1

II.     THE CLASS SHOULD BE CERTIFIED..............................................................4

        A.      Plaintiffs Are Adequate Class Representatives............................................4

        B.      Defendants Have Not Met Their Burden of Proving Lack of Price Impact ..........11

                1.      Plaintiffs Plead One Unified Theory of Loss Causation.............................11

                2.      To Rebut the *Basic* Presumption of Reliance, Defendants Must Prove a Complete Lack of "Price Impact"..................................................12

                3.      Defendants Concede Price Impact Exists on Two of Plaintiffs' Partial Disclosures and Fail to Produce Any Evidence of No Price Impact for the Two Remaining Partial Disclosures...................................13

                4.      Defendants' Arguments Concerning Price Impact Are Actually Poorly Disguised and Premature Loss Causation Arguments ...................15

                        a.      Defendants' Arguments Concerning What They Call the "True Lease Theory" Do Not Rebut the *Basic* Presumption .........17

                        b.      Defendants' Arguments Concerning What They Call the "Sales-Leaseback Theory" Fail to Rebut the *Basic* Presumption ..................................................................................18

                        c.      Defendants Have Failed to Rebut the *Basic* Presumption as It Relates to What They Call the "Navigating the Bankruptcy Theory".......................................................................21

                5.      Defendants' Other Attacks on the Class Period Fail ...............................22

                6.      The *Affiliated Ute* Presumption of Reliance Applies to This Omissions Case.................................................................................23

        C.      Plaintiffs' Proposed Damages Methodology Satisfies Rule 23(b)(3)'s Predominance Requirement...........................................................................26

                1.      Plaintiffs' Proposed Methodology for Calculating Section 10(b) Damages Is Widely Accepted and Satisfies *Comcast*..............................26

                        a.      Mr. Coffman's Out-of-Pocket Damages Model Is Widely Accepted .................................................................................26

                        b.      Mr. Coffman's Out-of-Pocket Damages Model Satisfies *Comcast*.........................................................................................28

**Page**

       c.    Mr. Coffman's Methodology Can Measure Damages from Plaintiffs' Materialization of the Risk Theory of Loss Causation.......................................................................................33

D.    The Proposed Class of Uniti Options Investors Also Should Be Certified ...........37

    1.    Plaintiffs Have Standing to Pursue Claims on Behalf of Certain Options Investors During the Class Period................................................37

    2.    Plaintiffs Have Established that Uniti Options Traded in an Efficient Market ...........................................................................................42

III.    CONCLUSION.................................................................................................................46

4854-4279-3743.v1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abu Dhabi Com. Bank v. Morgan Stanley & Co.*,
  651 F. Supp. 2d 155 (S.D.N.Y. 2009) .................................................................................40

*Affiliated Ute Citizens v. United States*,
  406 U.S. 128 (1972) ..........................................................................................23, 24, 25

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
  2007 WL 276150 (D.N.J. Jan. 25, 2007) ...........................................................................20

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
  554 F.3d 342 (3d Cir. 2009) .............................................................................................20

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ................................................................................................ *passim*

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  955 F.3d 254 (2d Cir. 2020), *vacated on other grounds*,
  __U.S.__, 141 S. Ct. 1951 (2021) ...............................................................................13, 14

*Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  879 F.3d 474 (2d Cir. 2018) ..............................................................................................23

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................................ *passim*

*Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
  2016 WL 4098741 (D. Minn. July 28, 2016) ...................................................27, 28, 29, 34

*Brown v. Daikin Am., Inc.*,
  2021 WL 1758898 (S.D.N.Y. May 4, 2021) .......................................................................37

*Burges v. Bancorpsouth, Inc.*,
  2017 WL 2772122 (M.D. Tenn. June 26, 2017) ...............................................................6, 7

*Butler v. Sears, Roebuck & Co.*,
  727 F.3d 796 (7th Cir. 2013) .............................................................................................28

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) .........................................................................42, 44, 45

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
  270 F.R.D. 247 (D.S.C. 2010) .............................................................................................8

4854-4279-3743.v1

**Page**

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent
Biosolutions, Inc., HQ,*
322 F. Supp. 3d 676 (D. Md. 2018) ......................................................................11

*City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.,*
2018 WL 4931543 (N.D. Cal. Oct. 11, 2018)...................................................7, 32

*City of Pontiac Gen. Emps.' Ret. Sys. v. Wal-Mart Stores, Inc.,*
2016 WL 5400373 (W.D. Ark. Sept. 20, 2016).....................................................4

*City of Sterling Heights Gen. Emps.' Ret. System v. Prudential Fin., Inc.,*
2015 WL 5097883 (D.N.J. Aug. 31, 2015) ...........................................................13

*City of Sunrise Gen. Emps. Ret. Plan v. FleetCor Techs., Inc.,*
2019 WL 3449671 (N.D. Ga. July 17, 2019)...........................................................7

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013)............................................................................... *passim*

*Ctr. City Periodontists, P.C. v. Dentsply Int'l, Inc.,*
321 F.R.D. 193 (E.D. Pa. 2017)............................................................................32

*Deutschman v. Beneficial Corp.,*
132 F.R.D. 359 (D. Del. 1990) .............................................................................40

*Deutschman v. Beneficial Corp.,*
841 F.2d 502 (3d Cir. 1988)..................................................................................42

*Di Donato v. Insys Therapeutics, Inc.,*
333 F.R.D. 427 (D. Ariz. 2019) ............................................................................13

*Dougherty v. Esperion Therapeutics, Inc.,*
2020 WL 6793326 (E.D. Mich. Nov. 19, 2020) ..............................................32, 34

*Edwards v. McDermott Int'l, Inc.,*
2021 WL 5121853 (S.D. Tex. Nov. 4, 2021) .......................................................10

*Erica P. John Fund, Inc. v. Halliburton Co.,*
563 U.S. 804 (2011)........................................................................1, 13, 16, 29

*Första AP-Fonde v. St. Jude Med., Inc.,*
312 F.R.D. 511 (D. Minn. 2015).....................................................................42, 45

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.,*
301 F.R.D. 116 (S.D.N.Y. 2014) ....................................................................29, 30

- iv -

**Page**

*Fry v. UAL Corp.*,
   84 F.3d 936 (7th Cir. 1996) (Posner, J.) ...............................................................41

*Gabriele v. ConAgra Foods, Inc.*,
   2015 WL 3904386 (W.D. Ark. June 25, 2015) .....................................................38

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
   __U.S.__, 141 S. Ct. 1951 (2021)..............................................................2, 11, 15

*Grae v. Corr. Corp. of Am.*,
   330 F.R.D. 481 (M.D. Tenn. 2019) .....................................................................37

*Guyton v. Tyson Foods, Inc.*,
   767 F.3d 754 (8th Cir. 2014) ...............................................................................28

*Hall v. Medicis Pharm. Corp.*,
   2009 WL 648626 (D. Ariz. Mar. 11, 2009)..........................................................40

*Hand v. Beach Ent. KC, LLC*,
   456 F. Supp. 3d 1099 (W.D. Mo. 2020) .................................................................9

*Harris v. Union Elec. Co.*,
   787 F.2d 355 (8th Cir. 1986) ...............................................................................25

*Hatamian v. Advanced Micro Devices, Inc.*,
   2016 WL 1042502 (N.D. Cal. Mar. 16, 2016)...........................................16, 29, 33

*Howard v. Liquidity Servs. Inc.*,
   322 F.R.D. 103 (D.D.C. 2017)..............................................................................26

*IBEW Loc. 98 Pension Fund v. Best Buy Co.*,
   818 F.3d 775 (8th Cir. 2016) .................................................................2, 11, 13, 17

*In re Allstate Corp. Sec. Litig.*,
   2020 WL 7490280 (N.D. Ill. Dec. 21, 2020).........................................................19

*In re Allstate Corp. Sec. Litig.*,
   966 F.3d 595 (7th Cir. 2020) ...............................................................................13

*In re Am. Italian Pasta Co. Sec. Litig.*,
   2007 WL 927745 (W.D. Mo. Mar. 26, 2007).....................................................20, 41

*In re Arakis Energy Corp. Sec. Litig.*,
   1999 WL 1021819 (E.D.N.Y. Apr. 27, 1999) ......................................................41

4854-4279-3743.v1

**Page**

*In re Bank of Am. Corp. Sec. Derivative & ERISA Litig.*,
2011 WL 3211472 (S.D.N.Y. July 29, 2011) ........................................................................41

*In re BP p.l.c. Sec. Litig.*,
2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ........................................................................30

*In re BP p.l.c. Sec. Litig.*,
2014 WL 2112823 (S.D. Tex. May 20, 2014), *aff'd sub nom.*
*Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015) ............................................................36

*In re Celgene Corp. Sec. Litig.*,
2020 WL 8870665 (D.N.J. Nov. 29, 2020) ..........................................................................19

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
337 F.R.D. 193 (D. Minn. 2020).......................................................................14, 19, 26, 29

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ........................................................................8

*In re Cigna Corp. Sec. Litig.*,
459 F. Supp. 2d 338 (E.D. Pa. 2006) ...................................................................................23

*In re DDi Corp. Sec. Litig.*,
2005 WL 3090882 (C.D. Cal. 2005)......................................................................................40

*In re Enron Corp.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) .............................................................................44, 45

*In re Enron Corp. Sec. Litig.*,
206 F.R.D. 427 (S.D. Tex. 2002)......................................................................................40, 44

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
2021 WL 5826285 (S.D.N.Y. Dec. 8, 2021) .....................................................................15, 16

*In re Green Tree Fin. Options Litig.*,
2002 WL 1752209 (D. Minn. July 29, 2002) .......................................................................41

*In re IndyMac Mortgage-Backed Sec. Litig.*,
718 F. Supp. 2d 495 (S.D.N.Y. 2010)..............................................................................40, 41

*In re Intuitive Surgical Sec. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016).....................................................................9, 17

*In re Juniper Networks, Inc. Sec. Litig.*,
264 F.R.D. 584 (N.D. Cal. 2009).........................................................................................40

4854-4279-3743.v1

**Page**

*In re Merck & Co., Inc. Sec. Derivative & ERISA Litig.*,
2013 WL 396117 (D.N.J. Jan. 30, 2013) ................................................................42

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) ............................................................................18

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
2013 WL 4778157 (S.D.N.Y. Sept. 6, 2013).............................................................7

*In re NationsMart Corp. Sec. Litig.*,
130 F.3d 309 (8th Cir. 1997) ..................................................................................25

*In re NII Holdings, Inc. Sec. Litig.*,
311 F.R.D. 401 (E.D. Va. 2015) ............................................................................29

*In re Nw. Corp. Sec. Litig.*,
299 F. Supp. 2d 997 (D.S.D. 2003) ........................................................................10

*In re Pfizer Inc. Sec. Litig.*,
282 F.R.D. 38 (S.D.N.Y. 2012) ..............................................................................10

*In re Sanofi-Aventis Sec. Litig.*,
293 F.R.D. 449 (S.D.N.Y. 2013) ............................................................................25

*In re Schering-Plough Corp./ENHANCE Sec. Litig.*,
2012 WL 4482032 (D.N.J. Sept. 25, 2012) ...............................................22, 23, 39

*In re Scotts EZ Seed Litig.*,
304 F.R.D. 397 (S.D.N.Y. 2015) ............................................................................28

*In re Sepracor Inc.*,
233 F.R.D 52 (D. Mass. 2005)................................................................................40

*In re Signet Jewelers Ltd. Sec. Litig.*,
2019 WL 3001084 (S.D.N.Y. July 10, 2019) .......................................16, 29, 32, 33

*In re Silver Wheaton Corp. Sec. Litig.*,
2017 WL 2039171 (C.D. Cal. May 11, 2017) ...........................................................9

*In re Smith Barney Transfer Agent Litig.*,
290 F.R.D. 42 (S.D.N.Y. 2013) .......................................................................24, 25

*In re St. Jude Med., Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011)......................................................................16

4854-4279-3743.v1

**Page**

*In re Stellent, Inc. Sec. Litig.*,
  326 F. Supp. 2d 970 (D. Minn. 2004) ...............................................................20, 21

*In re Tel-Save Sec. Litig.*,
  2000 WL 1005087 (E.D. Pa. July 19, 2000) ...........................................................39

*In re Teva Sec. Litig.*,
  2021 WL 872156 (D. Conn. Mar. 9, 2021) .............................................................37

*In re Willis Towers Watson PLC Proxy Litig.*,
  2020 WL 5361582 (E.D. Va. Sept. 4, 2020) ...........................................................30

*In re Winstar Commc'ns Sec. Litig.*,
  290 F.R.D. 437 (S.D.N.Y. 2013) .............................................................................39

*In re Zillow Grp., Inc. Sec. Litig.*,
  2020 WL 6318692 (W.D. Wash. Oct. 28, 2020) ........................................................8

*Iron Workers Loc. No. 25 Pension Fund v. Credit-Based Asset Servicing &*
  *Securitization, LLC*,
  616 F. Supp. 2d 461 (S.D.N.Y. 2009)........................................................................7

*Jackson v. First Fed. Savs.*,
  709 F. Supp. 863 (E.D. Ark. 1988)....................................................................25, 43

*Johnson v. Aljian*,
  257 F.R.D. 587 (C.D. Cal. 2009) ...............................................................................6

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
  2017 WL 4297450 (D.S.C. Sept. 28, 2017)..............................................................26

*Laventhall v. Gen. Dynamics Corp.*,
  704 F.2d 407 (8th Cir. 1983) .............................................................................25, 41

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) ....................................................................................28

*Little Rock Fam. Plan. Servs. v. Rutledge*,
  984 F.3d 682 (8th Cir. 2021) ................................................................................3, 18

*Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*,
  244 F.3d 1152 (9th Cir. 2001) ....................................................................................6

*Loritz v. Exide Techs.*,
  2015 WL 6790247 (C.D. Cal. July 21, 2015)...........................................................32

4854-4279-3743.v1

**Page**

*Ludlow v. BP, P.L.C.*,
  800 F.3d 674 (5th Cir. 2015) ................................................................35, 36

*Lumen v. Anderson*,
  280 F.R.D. 451 (W.D. Mo. 2012).................................................................42

*Luna v. Marvell Tech. Grp., Ltd.*,
  2017 WL 4865559 (N.D. Cal. Oct. 27, 2017)..............................................34

*Marcus v. J.C. Penney Co.*,
  2016 WL 8604331 (E.D. Tex. Aug. 29, 2016) .............................................44

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
  2009 WL 10669638 (C.D. Cal. Sept. 8, 2009) ...............................................7

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
  332 F.R.D. 370 (N.D. Ga. 2019).................................................................14

*Mulderrig v. Amyris, Inc.*,
  2021 WL 5832786 (N.D. Cal. Dec. 8, 2021) ..........................................35, 36

*N.J. Carpenters Health Fund v. DLJ Mortg. Cap., Inc.*,
  2011 WL 3874821 (S.D.N.Y. Aug. 16, 2011), *amended in part*,
  2014 WL 1013835 (S.D.N.Y. Mar. 17, 2014) .................................................8

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
  2016 WL 7409840 (S.D.N.Y. Nov. 4, 2016).................................................30

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d. Cir. 2012)........................................................................38

*Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ............................................31

*Planned Parenthood Ark. & E. Okla. v. Selig*,
  313 F.R.D. 81 (E.D. Ark. 2016)......................................................................6

*Plumbers & Pipefitters Nat'l Pension Fund v. Burns*,
  292 F.R.D. 515 (N.D. Ohio 2013) ..................................................................7

*Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*,
  2020 WL 5757695 (D. Minn. Sept. 28, 2020)............................................ *passim*

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
  2021 WL 229310 (N.D. Cal. Jan. 21, 2021).................................................26

- ix -

**Page**

*Powers v. Credit Mgmt. Servs., Inc.*,
   313 F.R.D. 103 (D. Neb. 2016)............................................................................28

*Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
   2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ....................................................7, 30

*Roofer's Pension Fund v. Papa*,
   333 F.R.D. 66 (D.N.J. 2019)...............................................................................23

*Rougier v. Applied Optoelectronics, Inc.*,
   2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ...............................................37, 42

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
   335 F.R.D. 276 (N.D. Cal. 2020).........................................................................32

*Sicav v. James Jun Wang*,
   2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) .........................................................31

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
   552 U.S. 148 (2008).............................................................................................25

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016), *aff'd sub nom.*
   *Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017)......................................16

*Sudunagunta v. NantKwest, Inc.*,
   2018 WL 3917865 (C.D. Cal. Aug. 13, 2018).........................................................8

*Sullivan v. Barclays PLC*,
   2017 WL 685570 (S.D.N.Y. Feb. 21, 2017)..........................................................40

*TransUnion LLC v. Ramirez*,
   __U.S.__, 141 S. Ct. 2190 (2021)........................................................................37

*Vervaecke v. Chiles, Heider & Co.*,
   578 F.2d 713 (8th Cir. 1978) ...............................................................................25

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
   2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) .........................................................11

*Washtenaw Cnty. Emps' Ret. Sys. v. Walgreen Co.*,
   2018 WL 1535156 (N.D. Ill. Mar. 29, 2018).......................................................26

*Webster v. Reprod. Health Servs.*,
   492 U.S. 490 (1989)..........................................................................................3, 18

4854-4279-3743.v1

**Page**

*Weiner v. Tivity Health, Inc.*,
    334 F.R.D. 123 (M.D. Tenn. 2020) ......................................................................26

*Willis v. Big Lots, Inc.*,
    242 F. Supp. 3d 634 (S.D. Ohio 2017) ..................................................................7

**STATUTES, RULES AND REGULATIONS**

Legislative History
    Private Securities Litigation Reform Act of 1995
    Pub. L. No. 104-67, 109 Stat. 737 (1995) ("PSLRA") .............................................4

Federal Rules of Civil Procedure
    Rule 10b-5......................................................................................................41
    Rule 23 ............................................................................... *passim*
    Rule 23(a)........................................................................... *passim*
    Rule 23(a)(4).......................................................................4, 6
    Rule 23(b)(3)....................................................................... *passim*
    Rule 56.............................................................................................19

4854-4279-3743.v1

Lead Plaintiffs Steamfitters Local 449 Pension Plan ("Local 449"), Wayne County Employees' Retirement System ("WCERS"), and David McMurray, on behalf of himself and as sole beneficiary of the David McMurray R/O IRA ("McMurray," together, "Plaintiffs"), respectfully submit this reply memorandum of law in further support of their Motion for Class Certification, requesting that the Court: (i) certify this case as a class action; (ii) appoint Plaintiffs as Class Representatives; and (iii) appoint Labaton Sucharow LLP and Robbins Geller Rudman & Dowd LLP as Class Counsel.[1]

## I.   INTRODUCTION

Defendants have offered no legitimate argument, authority or evidence that compels the Court to deny Plaintiffs' Motion for Class Certification.  Instead, Defendants urge this Court to undertake premature, and prohibited, fact finding by endeavoring to ascertain what caused the price of Uniti Common Stock to fall during the Class Period, *i.e.*, resolve loss causation issues and determine that the information Plaintiffs allege was concealed was actually known to the market, *i.e.*, sustain Defendants' truth-on-the-market defense.  Opp. at 14-32.  The Supreme Court has, however, held that neither of these fact-intensive issues can be resolved at class certification.  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 474 (2013); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807, 812-13 (2011) ("*Halliburton I*").

Indeed, Defendants' Opposition is also notable for a few reasons.  First, Defendants do not contest that Uniti Common Stock traded in an efficient market, effectively conceding that the fraud-

---

[1]   Plaintiffs' Motion for Class Certification and Memorandum of Law in Support Thereof (ECF Nos. 90-91) and Defendants' Opposition to Plaintiffs' Motion for Class Certification (ECF No. 105) are herein referred to as "Motion" or "Mot." and "Opposition" or "Opp.," respectively.  The Expert Report of Chad Coffman, CFA (Corrected) (ECF No. 111-1) is herein referred to as the "Coffman Report."  The Expert Rebuttal Report of Chad Coffman, CFA is herein referred to as the "Coffman Rebuttal" and is attached as Ex. A to the Declaration of Debra J. Wyman in Support of Plaintiff's Reply in Further Support of Motion for Class Certification ("Wyman Decl.") filed concurrently herewith.  "Defendants" refers to Uniti Group Inc. f/k/a Communications Sales & Leasing, Inc. ("Uniti"), Kenneth A. Gunderman, and Mark A. Wallace.

4854-4279-3743.v1

- 2 -

on-the-market reliance presumption outlined by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) applies here. Opp. at 22-32; Expert Report of Christopher M. James, Ph.D. ("James Report") (ECF No. 105-9), ¶¶7, 24. Second, while Defendants attempt to rebut the *Basic* presumption by arguing that their alleged false and misleading statements and omissions did not impact the price of Uniti's Common Stock, they concede that their alleged false and misleading misstatements and omissions did impact the price of Uniti Common Stock on two of the four alleged disclosure dates – September 25, 2017 and June 24, 2019. Opp. at 29-32; James Report, ¶¶22, 24, 51-55, 91-99. Third, Defendants fail to advance any argument that they have rebutted the *Basic* presumption as it relates to a third corrective disclosure date – August 3, 2017 – thus waiving those arguments. *IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 780 (8th Cir. 2016) (holding that defendants have the burden to rebut the *Basic* presumption "with evidence showing an absence of price impact"). Finally, Defendants do not contest that Plaintiffs have shown that this case meets the numerosity, commonality, and typicality requirements of Federal Rule of Civil Procedure ("Rule") 23(a), and the superiority requirements of Rule 23(b)(3). Thus, leaving the Court only to determine if: (1) Plaintiffs/proposed class representatives are adequate in satisfaction of Rule 23(a); and (2) common questions predominate in satisfaction of Rule 23(b)(3). The answer to both of these questions is yes.

In an attempt to rebut the *Basic* presumption by proving, by a preponderance of the evidence, that their alleged concealment of material information did not impact the price of Uniti's securities, *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, __U.S.__, 141 S. Ct. 1951, 1959 (2021) ("*Goldman II*"), Defendants invent three "theories of liability" they assert Plaintiffs are using in pursuit of their claims: (i) the "Sale-Leaseback Theory"; (ii) the "True Lease Theory"; and (iii) the "Navigating the Bankruptcy Theory." Opp. at 9-12. However, this slicing and dicing of Plaintiffs'

- 2 -

claims is found nowhere in the Complaint.[2]  Instead, the Complaint articulates one theory of liability: Defendants engaged in a fraudulent scheme and made material misstatements and omissions throughout the Class Period that artificially inflated the price of Uniti's securities causing class members to suffer damages when those same risks materialized and the inflation was removed from the price of the securities.  ¶¶241-243.  But Defendants cannot rewrite Plaintiffs' allegations to suit their arguments and aid their obligation to satisfy their formidable burden to rebut the *Basic* presumption.  *See Little Rock Fam. Plan. Servs. v. Rutledge*, 984 F.3d 682, 691 (8th Cir. 2021) (noting that "'Plaintiffs are masters of their complaints'") (citing *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 512 (1989)).

In response to the Plaintiffs' expert, Chad Coffman, Defendants proffer a report from Dr. Christopher James to show that the alleged concealed information had no impact on the price on Uniti's securities.  Dr. James' report and Defendants' arguments, however, are not enough to meet the "daunting" burden to prove, by a preponderance of the evidence, that their alleged concealment had no impact on the price of Uniti's securities.  *See* §§II.B.-C.  Thus, having shown that the class is entitled to *Basic*'s fraud-on-the-market presumption of reliance – something Defendants do not contest – and Defendants having failed to rebut *Basic*'s presumption by a preponderance of the evidence, Plaintiffs have satisfied Rule 23(b)(3)'s predominance requirement.

Nor are Defendants' arguments challenging the adequacy of the three Plaintiffs/proposed class representatives meritorious.  Opp. at 37-42.  Each of the Plaintiffs/proposed class representatives are knowledgeable about the case and its allegations and have stayed informed of the litigation status through regular contact with counsel.  That is all that is needed of them to satisfy Rule 23(a)'s adequacy requirement.  *See, e.g.*, *Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, 2020

---

[2]    "Complaint" refers to the Consolidated Amended Class Action Complaint (ECF No. 62).  All "¶_" or "¶¶_" references are to the Complaint unless otherwise noted.  Unless otherwise noted, all citations and footnotes are omitted and emphasis is added.

- 3 -

4854-4279-3743.v1

WL 5757695, at *7 (D. Minn. Sept. 28, 2020).  Defendants' contentions to the contrary boil down to the absurd notion that in this complex case Plaintiffs/proposed class representatives – all non-lawyers – are not entitled to rely on counsel's expertise.  This position, however, is in direct conflict with the balance of authority.  *See* §II.A.

Having shown that each element of Rules 23(a) and 23(b)(3) is met, Plaintiffs' Motion should be granted.

## II.    THE CLASS SHOULD BE CERTIFIED

### A.    Plaintiffs Are Adequate Class Representatives

Courts in this Circuit, and others, regularly find Rule 23(a)(4)'s requirement that plaintiffs "fairly and adequately protect the interest of the class" satisfied when proposed class representatives: (1) have no conflicts; and (2) prosecute the action vigorously.  *See City of Pontiac Gen. Emps.' Ret. Sys. v. Wal-Mart Stores, Inc.*, 2016 WL 5400373, at *6 (W.D. Ark. Sept. 20, 2016).  As detailed in Plaintiffs' Motion, Plaintiffs easily satisfy these requirements here.  Mot. at 15-17; Fed. R. Civ. P. 23(a)(4).

As an initial matter, Local 449 and WCERS are the type of "'large, institutional lead plaintiff[s] envisioned by Congress when the PSLRA was enacted.'" *Patterson*, 2020 WL 5757695, at *7.  In addition, each of the Plaintiffs/proposed class representatives has demonstrated a willingness and ability to take an active role in the litigation to protect the interests of proposed class members.  Mot. at 16.

Each of the Plaintiffs/proposed class representatives also have demonstrated their adequacy by retaining counsel with considerable experience in securities class actions.  *Id.* at 16-17.  Further, during their depositions, each of the Plaintiffs/proposed class representatives testified that they are willing to serve as class representatives (*see, e.g.*, Wyman Decl., Ex. B (Deposition Transcript of Local 449) at 312:5-10; Wyman Decl., Ex. C (Deposition Transcript of WCERS) at 29:9-15; Wyman

- 4 -

Decl., Ex. D (Deposition Transcript of McMurray) at 18:12-16) and that they understand the duties and obligations of a class representative (*see, e.g.,* Wyman Decl., Exs. B at 39:9-21, C at 29:21-30:2, D at 24:5-12).   In addition, each of the Plaintiffs/proposed class representatives also have demonstrated that they are knowledgeable about the case and confirmed their active participation in this lawsuit:

| Plaintiffs' Testimony Regarding Knowledge of Case | | | |
|---|---|---|---|
| **Topic of Testimony** | **Deposition Citations (David McMurray)** | **Deposition Citations (Local 449 – Joseph Little)** | **Deposition Citations (WCERS – Gerard Grysko)** |
| Knowledge of Defendants | 89:25-90:7; 121:10-122:14, 123:16-124:18: 126:4-7 | 67:14-20; 70:21-71:3; 92:8-19; 207:4-9 | 96:7-11; 96:12-97:14 |
| Knowledge of Allegations | 75:15-77:21; 87:25-88:7; 94:7-95:19; 126:15-22; 127:16-21: 128:7-17; 140:4-13; 145:16-23; 149:17-150:15; 221:12-14; 249:4-11 | 34:20-35:9; 70:2-13; 73:20-74:17; 79:12-21; 83:17-84:22; 90:8-20; 91:21; 155:2-13; 174:20-24; 178:13-179:12; 188:5-18; 194:19-25; 198:21-25; 199:12-16 | 26:12-21; 67:9-11; 70:11-16; 71:22; 97:15-100:17; 101:7-102:10; 106:20-107:16; 110:6-23; 111:3-9; 112:20-114:2; 116:7-19; 117:7-12; 215:11-25; 243:15-17 |
| Knowledge of Class Period | 94:15-18; 145:24-146:7; 259:2-11 | 54:25-55:12 | 27:7; 121:24-122:11; 122:22-123:5 |
| Knowledge of Class | 15:9-19:4; 25:5-11 114:17-23; 254:14-255:20 | 35:10-37:3; 38:2-6; 50:22-51:21; 54:7-24; 59:15-60:2; 131:19-22; 166:22-167:9 | 26:22-28:16; 39:21-40:5; 42:6-10; 63:10-20; 123:14-123:19; 126:4-9 |
| Review Relevant Materials and Participation in Action | 78:6-7; 81:18-24; 82:12-19; 84:19-85:10; 88:4-7; 89:19-90:7; 99:8-23; 100:11-101:19; 107:5-11; 161:10-14; 212:15-213:8; 249:4-11; 276:4-9 | 18:9-17; 37:16-38:14; 50:13-21; 63:12-64:9; 65:4-7; 91:19-92:2; 96:12-97:5; 101:22-25; 110:8-13; 115:21-116:17; 119:8-10; 123:2-5; 129:7-14; 140:23-141:15; 159:5-22; 162:4-8; 164:22-165:4; 167:14-168:4; 169:20-23; 234:2-4; 309:6-312:25 | 28:17-29:15; 29:22-30:2; 43:13-19; 45:18-25; 48:4-49:6; 51:3-15; 57:19-22; 58:9-12; 61:13-21; 72:1-19; 74:7-75:10; 77:16-23; 88:5-15; 174:5-7; 214:18-25; 216:6-9 |

Courts are clear that this is sufficient to demonstrate Plaintiffs' adequacy. *See Patterson*, 2020 WL 5757695, at \*7 (plaintiffs demonstrated "adequate knowledge of and participation in the case" because they "certified that they reviewed the [c]omplaint," were "knowledgeable" during their depositions, and "testified that they understood their decision-making role as" class representatives); *Burges v. Bancorpsouth, Inc.*, 2017 WL 2772122, at \*6 (M.D. Tenn. June 26, 2017) (plaintiff's "understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery are sufficient to meet the adequacy requirement of Rule 23(a)(4)").[3]

Defendants cherry-pick quotes from Plaintiffs' depositions to argue that Plaintiffs are not adequate class representatives contending they are mere "figureheads" who have "played no meaningful role" in the litigation. Opp. at 37-42. But these attacks on Plaintiffs' "knowledge of and willingness or ability to supervise the litigation . . . are, at best, hyperbolic and, at worst, consist of taking deposition testimony out of context and presenting it in a manner that borders on misleading." *Johnson v. Aljian*, 257 F.R.D. 587, 596 (C.D. Cal. 2009). For instance, Defendants suggest that Plaintiffs did not independently approach counsel about this case and that instead "this litigation was generated entirely by counsel." Opp. at 38. But "[h]ow the [Plaintiffs] came to be involved in this litigation is immaterial to their adequacy to serve as class representatives." *Planned Parenthood Ark. & E. Okla. v. Selig*, 313 F.R.D. 81, 89-90 (E.D. Ark. 2016) (rejecting defendant's contention that the plaintiffs were "'recruited'" for the litigation). Plaintiffs are entitled to rely "on their counsel to bring the potential case to their attention and to craft the pleadings," given that "Plaintiffs have

---

[3]   *See also Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) (Rule 23(a)(4) "does not require more" than that a class representative "understands his duties and is currently willing and able to perform them").

demonstrated adequate knowledge of and participation in this case." *Patterson*, 2020 WL 5757695, at *7.[4]

Likewise, that WCERS and Local 449 had portfolio monitoring agreements in place with counsel has no bearing on the adequacy determination – as courts regularly find that "sophisticated institutional investors' use of experienced counsel to monitor their portfolios and suggest initiation of lawsuits does not make them inadequate class representatives." *Patterson*, 2020 WL 5757695, at *8 (collecting cases); *Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 650 (S.D. Ohio 2017) (fact that plaintiffs learned of case through monitoring agreement did not render plaintiffs inadequate to serve as class representatives).[5]   In fact, the portfolio monitoring agreements here "actually illustrate [Plaintiffs'] involvement in and awareness of the financial issues involved in the litigation." *Burges*, 2017 WL 2772122, at *5 (collecting cases for notion that portfolio monitoring agreements are no bar to adequacy).[6]

---

[4]   *See City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *4 (N.D. Cal. Oct. 11, 2018) (finding no support for the notion that "the fact that class counsel approached [plaintiff] has any bearing on its adequacy as a class representative"); *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2020 WL 919249, at *6 (N.D. Ill. Feb. 26, 2020) (court "will not deny certification because of MSPERS's relationship with counsel" and MSPERS's "practice of working closely with outside counsel to identify potential securities frauds"); *City of Sunrise Gen. Emps.' Ret. Plan v. FleetCor Techs., Inc.*, 2019 WL 3449671, at *6 (N.D. Ga. July 17, 2019) (plaintiff was adequate class representative where plaintiff's counsel presented potential lawsuit to plaintiff).

[5]   *See also Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 292 F.R.D. 515, 523 (N.D. Ohio 2013) ("Courts have routinely rejected attacks on the propriety of portfolio monitoring agreements."); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2013 WL 4778157, at *2 (S.D.N.Y. Sept. 6, 2013) ("'[C]ourts routinely appoint institutional investors with monitoring agreements as lead plaintiffs and class representatives.'").

[6]   Defendants cite *Iron Workers Loc. No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461, 464 (S.D.N.Y. 2009) – but, as other courts have pointed out, the agreement at issue in *Iron Workers* "obligated [the fund] to use the monitoring counsel if the fund sought to instigate a class action," *Middlesex Ret. Sys. v. Quest Software, Inc.*, 2009 WL 10669638, at *8 (C.D. Cal. Sept. 8, 2009), which is not the case here.  Nothing in the monitoring agreement required WCERS or Local 449 to use Labaton if it decided to pursue securities litigation. *See* Wyman Decl., Ex. C at 82:23-83:6 (

Defendants also complain that Plaintiffs have not taken meaningful steps to "substantive[ly] direct[]" the litigation, have relied on counsel to direct the "case strategy," and have not provided substantive edits to legal documents or "carefully review[ed]" every legal filing in the litigation. Opp. at 3, 37-42. However, this ignores the actual testimony that demonstrates that each of the Plaintiffs has participated in the action as required, stayed apprised of key developments in the litigation through their counsel, and reviewed copies of important filings – such as the Complaint. *See supra*. **This is all that is required for a finding of adequacy as none of the three Plaintiffs is a lawyer and should not be required to act as such**.

Indeed, Defendants cite no case law in support of their attacks because courts are consistent that in complex securities class actions such as this one, Plaintiffs are *expected* to rely on their counsel to manage and direct the litigation – and are acting as adequate class representatives in doing so. *See, e.g.*, *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *8 (S.D.N.Y. Oct. 18, 2019) ("In complex securities litigation, '[Lead P]laintiffs are not expected to possess expert knowledge of the details of the case and *must* be expected to rely on expert counsel.'"), *report and recommendation adopted in part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020).[7]

_____

██████████████████████████████████████████████

█████████████████████████████████████). 

[7]   *See also Sudunagunta v. NantKwest, Inc.*, 2018 WL 3917865, at *8 (C.D. Cal. Aug. 13, 2018) (a plaintiff "relying on his counsel to make decisions does not undermine his adequacy as a class representative"); *In re Zillow Grp., Inc. Sec. Litig.*, 2020 WL 6318692, at *6 (W.D. Wash. Oct. 28, 2020) (rejecting similar "figureheads" argument and noting that "Defendants cite no authority for their claim that the failure to review all the legal briefing in the case is grounds for finding a named plaintiff inadequate"); *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 253 (D.S.C. 2010) (finding plaintiff adequate despite plaintiff's lack of participation in drafting complaint because plaintiff reviewed complaint and conferred with counsel); *N.J. Carpenters Health Fund v. DLJ Mortg. Cap., Inc.*, 2011 WL 3874821, at *4 (S.D.N.Y. Aug. 16, 2011) ("'[I]n complex actions . . . a great deal of reliance on expert counsel is to be expected.'"), *amended in part*, 2014 WL 1013835 (S.D.N.Y. Mar. 17, 2014).

Defendants also suggest that Plaintiffs lack a sufficient understanding of the Complaint's allegations, rendering them inadequate. Opp. at 40 & n.25. But each of the Plaintiffs has demonstrated a fundamental understanding of this case and the allegations – and courts are clear that a class representative need not have a deep or technical understanding of the allegations and legal issues. *See Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099, 1143 (W.D. Mo. 2020) ("'[T]he requirement that a named Plaintiff have an understanding of the litigation only requir[es] one to be aware of the basic facts underlying the lawsuit.'").[8]

Defendants further attempt to manufacture an issue where none exists when they point out that Local 449 and WCERS have had just one joint conference call about this case and that Mr. McMurray was not part of that communication. Notably, Defendants cite no case law for the notion that a group of class representatives ***must*** all have communicated jointly (and not through counsel) for them to be deemed adequate. Here, Plaintiffs have established procedures for overseeing this litigation and communicating amongst themselves when (and if) necessary, which is precisely what Plaintiffs have represented here. *See, e.g.*, ECF No. 30-4, ¶10 (Local 449). Indeed, that there has been only one joint call amongst Local 449 and WCERS (without McMurray) to date does not mean that there are no procedures in place for them to communicate when necessary (which there are) or that they have not been communicating through counsel – which Defendants do not accuse of them failing to do.[9]

---

[8]    *See also In re Silver Wheaton Corp. Sec. Litig.*, 2017 WL 2039171, at *8 (C.D. Cal. May 11, 2017) ("A representative plaintiff's lack of detailed, comprehensive knowledge about the legal technicalities of the claims asserted in class litigation therefore provides no basis on which to deny a motion for class certification."); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *7 (N.D. Cal. Dec. 22, 2016) ("'The threshold of knowledge required to qualify a class representative is low; a party must be familiar with the basic elements of [his] claim [ ] and will be deemed inadequate only if [he] is "startlingly unfamiliar" with the case.'").

[9]    Defendants cite two decades-old cases in which courts expressed concern about the ability of groups of plaintiffs to oversee counsel. Opp. at 41 n.26. But there is no dispute that groups of lead plaintiffs are routinely appointed to oversee securities class actions, particularly when they can

- 9 -

In addition, Defendants suggest that Plaintiffs have "exercised no control" over counsel because they "deferred" to Labaton's decision to litigate this case with additional co-counsel, Robbins Geller.  Opp. at 41-42.  As discussed, however, this ignores that Plaintiffs have been engaged in the oversight of the litigation since its inception, including by participating in the litigation and allowing counsel to direct legal strategy.

Finally, Defendants appear to argue that it is improper for Plaintiffs to move with two law firms as Co-Class counsel under Rule 23.  However, this ignores that Robbins Geller was appointed as Co-Lead Counsel by this Court at the Lead Plaintiff stage and has been operating as Co-Lead Counsel since the beginning of this case.  *See* ECF Nos. 44, 60.  Plaintiffs' decision to now move with both Labaton and Robbins Geller as Class Counsel under Rule 23 is an appropriate exercise of their discretion, as both firms have extensive experience litigating securities class actions.  Mot. at 16-17; ECF Nos. 92-2-93-3 (firm resumés); *see Edwards v. McDermott Int'l, Inc.*, 2021 WL 5121853, at *5 (S.D. Tex. Nov. 4, 2021) ("Lead counsel is obligated to work for the class's benefit. That can include, in certain limited circumstances, enlisting other law firms to assist them in the prosecution of claims.").[10]  Moreover, contrary to Defendants' insinuation, Plaintiffs all have been *aware* that Robbins Geller has been operating as Co-Lead Counsel.  *See In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 50-51 (S.D.N.Y. 2012) ("Defendants' argument that the Individual Plaintiffs are

demonstrate that they have procedures in place to supervise the litigation, which is the case here. *See, e.g.*, *In re Nw. Corp. Sec. Litig.*, 299 F. Supp. 2d 997, 1006 (D.S.D. 2003) (appointing lead plaintiff group where "they have a process in place for conducting the litigation; they have a mechanism in place to call emergency meetings if necessary; and, they have established a procedure to resolve disagreements").

[10]   Defendants also assert, without support, that Robbins Geller's participation in this matter "will serve only to drive up costs to the detriment of the class."  Opp. at 42.  But this Court appointed Robbins Geller as Lead Counsel at the Lead Plaintiff stage (ECF Nos. 44, 60), and this Court will also be tasked with approving any fee award to counsel, at which point the Court will decide if the requested fees and cost reimbursements are appropriate.  In short, this baseless and accusatory concern does not even have bearing at this stage.  *See Edwards*, 2021 WL 5121853, at *5 n.3 (rejecting Defendants' same argument).

inadequate because they have communicated only with Kessler Topaz, rather than with Lead Counsel, is unavailing, as the Individual Plaintiffs are well aware that Lead Counsel and Kessler Topaz are working together to litigate this case.").

### B.    Defendants Have Not Met Their Burden of Proving Lack of Price Impact

Defendants concede that the market for Uniti Common Stock is efficient.  Opp. at 14-32; James Report, ¶¶7, 24.[11]  In doing so, they also concede that Plaintiffs are entitled to the fraud-on-the-market reliance presumption outlined in *Basic*.  *Basic*, 485 U.S. at 246 (the touchstone of invoking the *Basic* presumption of reliance is establishing that the stock traded in an efficient market).  Having shown that Uniti securities traded in efficient markets, the burden shifts to Defendants to rebut the presumption by proving a complete lack of price impact.  *Best Buy*, 818 F.3d at 781.  Defendants can rebut the *Basic* presumption by proving by a "preponderance of the evidence" that the alleged fraud had *zero* price impact on the subject securities.  *Goldman II*, 141 S. Ct. at 1959.  A "defendant's burden of proving a lack of price impact is 'daunting,'" *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *14 (E.D. Pa. Aug. 4, 2016), because it requires showing "that the alleged misstatements caused *no price impact* whatsoever." *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 686-87 (D. Md. 2018).  In an effort to rebut the *Basic* presumption, Defendants slice and dice Plaintiffs' allegations into three "theories of liability" that appear nowhere in the Complaint.  Opp. at 9-12.  These efforts, however, fail.

### 1.    Plaintiffs Plead One Unified Theory of Loss Causation

Despite Defendants' efforts to transform Plaintiffs' claims into something they are not, Plaintiffs have always alleged a single theory of liability:

---

[11]   Defendants contest that Plaintiffs have shown that Uniti Options traded in an efficient market. Opp. at 34-37.  As discussed in §II.D below, Defendants are wrong.

4854-4279-3743.v1

During the Class Period, as detailed herein, Uniti and the Individual Defendants engaged in a course of conduct that artificially inflated, or artificially maintained, the price of Uniti's securities . . . .

The material misstatements and omissions regarding the Master Lease's violation of Windstream's Indenture concealed risks related to the true nature of the Spin-Off as violative of Windstream's Indenture . . . .

When the truth about the Spin-Off and the hidden risks materialized and became known to the market, the price of Uniti's securities declined precipitously as the prior artificial inflation was removed from the price of the stock. As a result of their purchases and acquisitions of Uniti's securities at artificially inflated prices during the Class Period, Lead Plaintiffs and other members of the Class suffered a substantial economic loss (*i.e.*, damages under the federal securities laws). The price decline in Uniti's securities was a foreseeable and direct result of the nature and extent of Defendants' materially false and misleading statements, and omissions.

¶¶241-243.[12]    Notably, the Court sustained Plaintiffs' single theory of liability in denying Defendants' motion to dismiss. ECF No. 74 ("MTD Order") at 4 ("Plaintiffs have sufficiently alleged material misrepresentations because they have pleaded that defendants failed to disclose the prohibited structure of the spin-off transaction and Master Lease.").

### 2.    To Rebut the *Basic* Presumption of Reliance, Defendants Must Prove a Complete Lack of "Price Impact"

The *Basic* fraud-on-the-market presumption "facilitates class certification by recognizing a rebuttable presumption of classwide reliance on public, material misrepresentations when shares are traded in an efficient market." *Amgen*, 568 U.S. at 463.[13]    To rebut the presumption, Defendants

---

[12]    Mr. Coffman affirmed Plaintiffs' single "theory of liability" at his deposition, stating that his "understanding is lead plaintiffs' theory of liability is that the alleged misstatements and/or omissions in this case caused Uniti's stock price to be artificially inflated," Deposition Transcript of Chad Coffman (Dec. 6, 2021) ("Coffman Tr.") (ECF No. 105-16) at 222:7-11, and that the "defendants in this case made certain misstatements and/or omissions that underrepresented the legal and financial risk of the sale-leaseback transaction that it had entered into and the legal and financial risk that that carried with it." *Id.* at 254:15-21. As a matter of fact, when questioned about whether there are "different theories of liability," Mr. Coffman stated that he "never thought about it as two different theories of liability," but instead "thought about it as one theory where there were material risks as a result of the way the spinoff was structured." *Id.* at 264:17-265:5.

[13]    The Supreme Court has expressly cautioned courts not to extend price impact analyses into merits-based reliance inquiries such as truth-on-the-market, materiality and loss causation.

- 12 -

must offer admissible evidence that "the market in fact ***did not*** respond to the alleged misrepresentations."  *See Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 443-44 (D. Ariz. 2019) (citing *Best Buy*, 818 F.3d at 782 in articulating burden).  Thus, while Defendants can attempt to rebut the *Basic* presumption by showing a lack of price impact at the "front-end" (when the misstatements are made) ***and*** "back end" (when the truth is revealed), their evidence must conclusively establish "that the market ***would not have reacted*** had [Defendants] told the truth." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 271-72 (2d Cir. 2020), *vacated on other grounds*, __U.S.__, 141 S. Ct. 1951 (2021) ("*Goldman I*").  "[M]erely . . . introduc[ing] evidence raising a triable issue of fact as to whether there was a price impact" is insufficient rebuttal. *City of Sterling Heights Gen. Emps.' Ret. System v. Prudential Fin., Inc.*, 2015 WL 5097883, at *12 (D.N.J. Aug. 31, 2015).  And "'pointing to other potential causes for a stock price change following a corrective disclosure,'" ***which is precisely what Defendants here do***, is "'not enough to rebut the *Basic* presumption.'"  *Patterson*, 2020 WL 5757695, at *13.

### 3. Defendants Concede Price Impact Exists on Two of Plaintiffs' Partial Disclosures and Fail to Produce Any Evidence of No Price Impact for the Two Remaining Partial Disclosures

Although it is not Plaintiffs' burden to do so, they have affirmatively and conclusively demonstrated price impact.  For Plaintiffs' four partial disclosures – August 3, 2017, September 25, 2017, February 15, 2019, and June 24, 2019 – Mr. Coffman found that each partial disclosure was immediately followed by a statistically significant stock price decline and that the disclosures had a price impact on Uniti's stock price.  Coffman Rebuttal, ¶¶16-17, 22-23, 26.  Critically, Dr. James acknowledges that the September 25, 2017 and June 24, 2019 partial disclosures contain new

---

*Halliburton I*, 563 U.S. at 812; *Amgen*, 568 U.S. at 474.  "[T]he district court must . . . make findings [on price impact] needed to decide class certification while resisting the temptation to draw even obvious inferences on topics that are forbidden at this stage: materiality and loss causation." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 611 (7th Cir. 2020).

4854-4279-3743.v1

information that allegedly corrected prior misstatements and that there was a statistically significant stock price decline at the time of those disclosures – in other words conceding price impact on those two dates. James Report, ¶¶51-55, 91-99; Deposition Transcript of Christopher James (Feb. 4, 2021) ("James Tr.") attached as Ex. E to the Wyman Decl. at 48:23-52:5, 88:16-89:8; Coffman Rebuttal, ¶¶17-22.

As for the August 3, 2017 and February 15, 2019 partial disclosures, Dr. James concedes that there was new information released to the market concerning the viability of the Sale-Leaseback structure and/or the potential impacts of the failure of the Spin-Off and that there was a statistically significant stock price decline at the time of both events, he just disagrees with Plaintiffs' allegations that the price reactions were related to the previously concealed information. James Report, ¶¶39-50, 64-69; Coffman Rebuttal, ¶¶23-35; James Tr. at 64:5-16, 70:19-71:7, 119:19-24. However, Dr. James' disagreement as to the *cause* of the price reactions he does not dispute occurred does not prove a lack of price impact required to rebut *Basic*'s presumption. *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 395 (N.D. Ga. 2019) ("[statistically significant price decline] dooms Defendants' attempt to rebut the presumption of reliance because the inquiry is whether Defendants have proven a complete lack of price impact during the Class Period, not whether the stock price decline following individual corrective disclosures was caused by the alleged misrepresentations, which is a loss causation analysis not appropriate at this stage").

In short, Defendants have not carried their burden of demonstrating by a preponderance of the evidence that the alleged fraud had *zero price impact*. *Goldman I*, 955 F.3d at 270 n.18 (defendants must prove that "other events explain the entire price drop"). And because they concede that there was price impact because of the September 2017 and June 2019 partial disclosures, they have failed to prove that the alleged fraud did not impact the price of Uniti's securities and therefore have not rebutted the *Basic* presumption. *In re CenturyLink Sales Pracs. & Sec. Litig.*, 337 F.R.D.

- 14 -

193, 210-11 (D. Minn. 2020) ("statistically significant price drops following two of the three disclosure dates . . . is sufficient to prevent Defendants from 'sever[ing] the link' between the alleged misrepresentations and any impact on CenturyLink's stock price").

### 4. Defendants' Arguments Concerning Price Impact Are Actually Poorly Disguised and Premature Loss Causation Arguments

Having conceded that Uniti Common Stock traded in an efficient market and that the *Basic* presumption of reliance is applicable, Defendants attempt to rebut the presumption of reliance by asserting a hodgepodge of arguments that essentially argue a lack of loss causation. Opp. at 22-32.

As an initial matter, Defendants distort the Supreme Court's holding in *Goldman II*. There the Supreme Court set out to answer whether the Second Circuit erred "by holding that the ***generic nature*** of [the] alleged misrepresentations [was] irrelevant to the price impact inquiry." *Goldman II*, 141 S. Ct. at 1958. The Court noted that the "inference – that the back-end price drop equals front-end inflation – starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.* at 1961. The Court explained that this "mismatch . . . may occur when the earlier misrepresentation is ***generic*** . . . and the later corrective disclosure is ***specific***" because "[u]nder those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation." *Id.*

On remand, Judge Crotty confirmed the Supreme Court's "clear" guidance as to any "mismatch" theory to rebut the *Basic* presumption. *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2021 WL 5826285, at *14 (S.D.N.Y. Dec. 8, 2021). In doing so, the court held that the defendants "greatly overstate[d] the Court's obligation to do away with any inflation-maintenance claims that rely on corrective disclosures whose degree of genericness does not precisely 'match' the alleged misstatements' degree of genericness." *Id.* The court reasoned that "[n]othing in the Supreme Court's language purport[ed] to set forth such a ***restrictive rule***," but rather, "[p]hrases such as

- 15 -

'*starts* to break down,' '*less* likely,' and '*less* reason,' . . . suggest[ed] a ***sliding scale*** intended to orient this [c]ourt's review of a particular evidentiary issue, rather than a forceful tipping of the scale in [d]efendants' favor." *Id.* To that end, the Supreme Court "meant what it said, and said what it meant, which [was] that the inference of price impact becomes weaker – and at some point must fail – as misstatement and corrective disclosure diverge in genericness." *Id.*[14]

Moreover, "[t]he fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory." *Halliburton I*, 563 U.S. at 813. Indeed, "Defendants' attack [on] the 'fit' between an alleged corrective disclosure and a prior alleged fraudulent statement . . . is nothing more than an attack on loss causation." *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016). *See also Strougo v. Barclays PLC*, 312 F.R.D. 307, 326 n.127 (S.D.N.Y. 2016) ("[W]hile defendants presume that disclosure of the NYAG lawsuit is not related to the alleged fraud as a matter of law . . . it is a merits-based inquiry relating to loss causation that is not ripe for resolution on class certification."), *aff'd sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017). Defendants here make the same merits-based arguments which are irrelevant to, and inappropriately resolved, at class certification.

---

[14]   A mirror image, or confession of fraud is not required for the information to be corrective. *See In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 910 (D. Minn. 2011) (where the "court did 'not read *Dura* to imply that a plaintiff cannot satisfy loss causation without identifying a corresponding, mirror-image prior representation for every disclosure that precedes a share price decline'"); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *14 (S.D.N.Y. July 10, 2019) ("'[t]here is no requirement that the corrective disclosure take a particular form or be of a particular quality,' such that it be a 'mirror image tantamount to a confession of fraud'").

- 16 -

4854-4279-3743.v1

     **a.**      **Defendants' Arguments Concerning What They Call the "True Lease Theory" Do Not Rebut the *Basic* Presumption**

Defendants' manufactured "mismatch" argument, contending that the June 24, 2019 disclosure has "no economic relationship" with Defendants' alleged misstatements and omissions "regarding the useful life of the copper assets, which underlie the True Lease Theory" is easily rejected. Opp. at 25-31. ***Critically, Defendants concede that there was price impact in response to the June 24, 2019 partial corrective disclosure***. James Tr. at 135:13-136:19. Therefore, their discussion of whether or not there is a "mismatch" between their so-called "True Lease Theory" and the June 24, 2019 partial disclosure is a red-herring and does nothing to further their burden to prove a total lack of price impact. Opp. at 25-27. Defendants' admission that there is price impact in response to the June 24, 2019 information ends the inquiry into whether Defendants have rebutted the *Basic* presumption.[15]

From there, Defendants erroneously claim that July 25, 2019, the date that Windstream filed an adversary proceeding against Uniti as part of its bankruptcy, cannot be a disclosure date because it occurred "after" the Class Period. Opp. at 25-26. This argument is completely disingenuous. Plaintiffs plead ***four*** partial disclosure dates: (1) August 3, 2017; (2) September 25, 2017; (3) February 15, 2019; and (4) June 24, 2019. ¶¶247-266. The Complaint refers to July 25, 2019 only as a ***post-class period revelation***, ***not*** a partial disclosure date, that supports Plaintiffs' allegations that Defendants knew, or recklessly disregarded that the Master Lease was a financing in which

---

[15]   Because Defendants admit that there is price impact in response to the June 24, 2019 partial corrective disclosure, their two cited cases are wholly inapplicable. Opp. at 27-28. *See Best Buy*, 818 F.3d at 782-83 (where the plaintiffs' expert "'conclude[d] that there is ***no*** link between the price of [Best Buy's] stock and any of the alleged misrepresentations because these misrepresentations just reflected the "status quo"'"); *Intuitive Surgical*, 2016 WL 7425926, at \*16 (where both experts did not find a statistically significant price impact on the disclosure date and the court noted that "financial statements are not corrective of misrepresentations related to safety, and the court dismissed all other categories of affirmative misstatements Plaintiffs' previously ple[d]").

4854-4279-3743.v1

Windstream really owned the network assets and were aware that the Master Lease could be "recharacterized" as a financing arrangement and that such arrangement also violated the Indenture. ¶¶122-138.  Defendants' attempt to rewrite the allegations in the Complaint to more conveniently fit their arguments as they desperately try to satisfy their daunting burden to rebut the *Basic* presumption is demonstrably and fatally deficient.[16]  *See Rutledge*, 984 F.3d at 691 (noting that "'Plaintiffs are masters of their complaints'") (citing *Webster*, 492 U.S. at 512).

> **b.** **Defendants' Arguments Concerning What They Call the "Sales-Leaseback Theory" Fail to Rebut the *Basic* Presumption**

Defendants attempt to rebut the *Basic* presumption of reliance with evidence purportedly showing that the information about the material risk that the Spin-Off was a prohibited sale-leaseback transaction had been "fully disclosed" by September 25, 2017.  Opp. at 29-31.  ***Critically, Defendants admit that there is price impact in response to the September 25, 2017 disclosure – ending the inquiry into whether they have rebutted the* Basic *presumption*.  And their contention that they have proved a lack of price impact related to the February 15, 2019 disclosure of Judge Furman's decision in the Aurelius Litigation because all the facts in his decision were purportedly already known to the market, is erroneous.  *Id.*

Indeed, Defendants' argument is nothing but a thinly disguised "truth-on-the-market" defense, which cannot be properly considered or resolved at the class certification stage.  *Amgen*,

---

[16]  Defendants' reliance on *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480 (S.D.N.Y. 2011) is misplaced.  There the defendants' expert conducted an event study that "concluded that: 'during the entire purported Class Period, there is no day on which Plaintiffs allege Moody's made a misstatement that is associated with a statistically significant and positive abnormal return'" and the plaintiffs' expert in rebuttal "[did] not contest" the defendants' expert's findings "with regards to the impact of the alleged misrepresentations on the price of the stock."  *Id.* at 492.  Here both experts agree that there were statistically significant price movements in response to the corrective information Plaintiffs allege revealed the true extent of the concealed risks.  Defendants' expert just disagrees that the cause of the movements, on only two of the corrective disclosure dates, was due to Defendants' fraud.

4854-4279-3743.v1

568 U.S. at 475. As the Supreme Court held in *Amgen* and *Basic*, proof that "'news of the [truth] credibly entered the market and dissipated the effects of [prior] misstatements' . . . *'is a matter for trial' (and presumably also for a summary-judgment motion* under Federal Rule of Civil Procedure 56).'" *Amgen*, 568 U.S. at 482. Indeed, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 465-66.

Moreover, the Supreme Court has rejected defendants' attempts to label truth-on-the market as price impact. *Id.* at 480-81. Since *Amgen*, courts have repeatedly rejected efforts to defeat certification with truth-on-the-market defenses labeled "price impact." *See, e.g.*, *In re Allstate Corp. Sec. Litig.*, 2020 WL 7490280, at *7 (N.D. Ill. Dec. 21, 2020) ("[I]t appears to the court that [defendants' expert] report and defendants' briefing presents a truth-on-the-market defense, 'which *Amgen* held may not be decided on class certification.' . . . Defendants' briefing largely focuses on the fact that the identified statements could not have been corrective because the market already knew the truth. . . . And an argument that 'news of the [truth] credibly entered the market and dissipated the effects of the misstatement . . . is a matter for trial.'"); *In re Celgene Corp. Sec. Litig.*, 2020 WL 8870665, at *12 (D.N.J. Nov. 29, 2020) (defendants' argument that corrective disclosure was based on previously-published studies, and that the market had already reacted to such news, was insufficient to rebut *Basic* presumption); *CenturyLink*, 337 F.R.D. at 211 (arguments about whether particular statements were actually disclosures and that the market was aware of cramming allegations should be adjudicated at summary judgment or trial).

Even if it were appropriate to consider a truth-on-the-market defense at this stage of the proceedings, Defendants have failed to shoulder their "heavy burden" to show that the information Plaintiffs claim was concealed was "'transmitted to the public with a degree of intensity and

- 19 -

4854-4279-3743.v1

credibility sufficient to effectively counter-balance any misleading impression,'" a "notoriously heavy burden to carry short of trial." *In re Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 985-86 (D. Minn. 2004). Fatal to Defendants' truth-on-the-market argument is that it entirely ignores Plaintiffs' allegations of Defendants' persistent denials over a 15-month period that the Aurelius Litigation was meritless and "manufactured," that the Master Lease was "well-crafted," a "priority payment for Windstream," and that the Master Lease provided "protections" to Uniti should Windstream suffer financially. ¶¶183-196. Remarkably, Dr. James admitted at his deposition that he did not consider the transcripts of analyst conferences between November 2017 and October 2018, where Defendants went on the defensive to refute the possibility of Uniti being subjected to any risk associated with the Aurelius Litigation, in coming to the conclusions in his expert report concerning price impact. James Tr. at 127:17-134:14.

And it goes without saying that Defendants' argument that their subsequent statements that Windstream would win the Aurelius Litigation are "irrelevant" is nonsense and legally incorrect. Opp. at 30. Indeed, Defendants' cited authority supports ***Plaintiffs' position*** holding that "[j]ust as we require investors to act upon public information indicating fraud, so, too, do we allow them to rely upon corporate statements discounting the possibility of malfeasance." *See Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 350 (3d Cir. 2009); *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 2007 WL 276150, at *4 n.7 (D.N.J. Jan. 25, 2007) (finding that "defensive comments by the defendants did not affect the curative disclosure because the disclosure came in a 'barrage of news reports sufficient to outweigh defendants' assurances as a matter of law"). Defendants' remaining case is similarly unavailing in light of Defendants' repeated denials throughout the Class Period. *See In re Am. Italian Pasta Co. Sec. Litig.*, 2007 WL 927745, at *4 (W.D. Mo. Mar. 26, 2007) (finding the first partial disclosure completely curative where there was an announcement from the Company, the "'commencement of an SEC inquiry into accounting

- 20 -

improprieties,'" a "'delay in issuing financial results,'" and a "'delay in filing its third quarter 10-Q'").

In sum, even if the September 25, 2017 notice of default and the Aurelius Litigation proceedings disclosed facts relied upon in Judge Furman's February 15, 2019 opinion (which Defendants have not proved occurred), Defendants' strident denials that Uniti was at any risk still stand in the way of their truth-on-the-market defense. Put simply, Defendants' repeated and continued misrepresentations and omissions obfuscated the true extent of the risks facing Uniti and dooms their truth-on-the-market defense. *See Stellent*, 326 F. Supp. 2d at 985-86.

<strong>c.</strong>      <strong>Defendants Have Failed to Rebut the <em>Basic</em> Presumption as It Relates to What They Call the "Navigating the Bankruptcy Theory"</strong>

Defendants make no attempt to rebut the *Basic* presumption as it relates to their so-called "Navigating the Bankruptcy Theory." Instead, they argue that any certified class must be substantially narrowed because, according to Defendants, no statements prior to March 18, 2019 relate to this "theory of liability." Opp. at 31-32. But in parsing Plaintiffs' allegations, Defendants again misrepresent them.

The Class Period appropriately begins on April 24, 2015, the day that Windstream completed the Spin-Off of Uniti. Plaintiffs allege that beginning on April 24, 2015, and throughout the Class Period, Defendants misrepresented and concealed the true risk facing the Company should the Spin-Off transaction be challenged as invalid – *i.e.*, Uniti's largest customer could be responsible for immediate payment of hundreds of millions of Notes, meaning Windstream could be forced into bankruptcy and with it, potential financial ruin for Uniti. ¶¶55, 68-78, 90-91. In other words, the true risks facing Uniti were concealed from the first day of the Class Period pled in Plaintiffs' Complaint.

- 21 -

4854-4279-3743.v1

And throughout the Class Period Defendants repeatedly touted that the Master Lease provided "protections" to Uniti. On August 3, 2017 after Windstream announced it was eliminating its dividend, Defendants told their investors that the lease payment was "very, very safe and a very high priority payment from their [Windstream] prospective. ¶169.[17] A few days later, on August 8, 2017, Defendants told participants at the Cowen Communications Infrastructure Summit that with regard to the Master Lease, "[a]nd so we've obviously done an exhaustive amount of work on the protections associated with that lease payment in any sort of scenario, whether it's steady-state, distressed, bankruptcy, any scenario you want to work through, and feel confident that we're protected in all cases." ¶171. These false reassurances were reiterated on November 7, 2017 and September 6, 2018, with Defendants stating that "protections" in the Master Lease guarded against "all scenarios." ¶¶186, 196.

Defendants' attempt to shorten the length of the Class Period is nothing more than another invitation for the Court to engage in premature fact-finding and should be rejected. *In re Schering-Plough Corp./ENHANCE Sec. Litig.*, 2012 WL 4482032, at *9 (D.N.J. Sept. 25, 2012) ("[w]hether a disclosure actually cured any previous misrepresentations is a fact sensitive inquiry, and is more appropriately resolved after sufficient fact finding").

### 5.    Defendants' Other Attacks on the Class Period Fail

Unable to plausibly contest Plaintiffs' satisfaction of each of Rule 23(a) and (b)(3) factors, Defendants brazenly attempt to re-litigate the denial of their motion to dismiss by manufacturing a dispute about the contours of the time period applicable to Plaintiffs' allegations. To put it charitably, Defendants' assertions that there is: (i) no suitable start or end date for the Class Period as the so-called "Sale-Leaseback Theory" could not extend later than September 25, 2017; and (ii) any

---

[17]    Defendants fail to include any argument in their Opposition outlining how they have rebutted the *Basic* presumption as it relates to the August 3, 2017 partial disclosure, waiving any such argument. *See* Opp. at 14-32.

class period related to Defendants' self-labeled "Navigating the Bankruptcy Theory" could start no earlier than March 18, 2019, are unavailing and incorrect. Opp. at 28-32.

The Supreme Court has held that in securities class actions, "Rule 23 grants courts ***no license to engage in free-ranging merits inquiries*** at the certification stage." *Amgen*, 568 U.S. at 466. It follows then that at the "class certification stage, ***courts must not inquire*** into the merits to determine the adequacy of a class period." *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 88-89 (D.N.J. 2019). This is because the beginning or end date of the Class Period is plainly a Class-wide issue touching on, at least, the merits of the materiality, falsity, scienter and loss causation elements of Plaintiffs' claim.

Moreover, Courts routinely reject a defendant's attempt to shorten class periods as "premature" at class certification, because "[w]hether a disclosure actually cured any previous misrepresentations is a fact sensitive inquiry, and is more appropriately resolved after sufficient fact finding." *Schering-Plough*, 2012 WL 4482032, at *9; *see also Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 481 n.6 (2d Cir. 2018) (plaintiffs "need not prove the materiality of defendants' misstatements at the class certification stage"). Indeed, the determination of "partially corrective events" is always "***best assigned to the factfinder at trial***," and not even ripe for Defendants to raise at summary judgment, much less class certification. *In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 356-57 (E.D. Pa. 2006).

### 6. The *Affiliated Ute* Presumption of Reliance Applies to This Omissions Case

Defendants' scheme and fraudulent course of conduct is precisely the type of fraud for which *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) was intended, and the case law cited by Defendants does not support their assertions to the contrary. Opp. at 23. In *Affiliated Ute*, the Supreme Court reaffirmed that the federal securities laws are to be "construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'" 406 U.S. at 151. Reliance is

- 23 -

presumed under *Affiliated Ute* when "'[r]equiring a plaintiff to show a speculative set of facts, *i.e.*, how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff.'" *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013).  This is just such a case.

Contrary to Defendants' arguments, this case is primarily based on Defendants' omissions that the Spin-Off transaction that they had conceived constituted a sale-leaseback transaction between Uniti and the Windstream Operating Subsidiaries in direct violation of the Indenture, reflecting an inherent flaw in Uniti's business model and concealing the extent of the risk that Windstream could be driven into bankruptcy, risking sending Uniti into financial ruin.  ¶¶141-150, 157-159, 163, 165, 169, 171, 173-175, 179-180, 183-189, 194-198.  Plaintiffs also allege that Defendants failed to inform investors of the true extent of the risk that the Master Lease could be successfully recharacterized as a financing arrangement that also violated the Indenture, jeopardizing Uniti's main source of revenue, again potentially sending Uniti into financial collapse.  ¶¶141-150, 159, 163, 169, 171, 173-175, 179-180, 183, 185-186, 188, 190-191, 196, 205, 209, 212-225.  Defendants' scheme was thus far more weighted in what they did ***not*** say than in what they did say in their statements to investors and the public.

Notably, in deciding Defendants' motion to dismiss, this Court's analysis makes clear that this case deals directly with omissions (*i.e.*, misleadingly incomplete statements): "Plaintiffs have sufficiently alleged material misrepresentations because they have pleaded that defendants ***failed to disclose*** the prohibited structure of the spin-off transaction and Master Lease."  MTD Order at 4.  This Court also held that "[w]hile defendants did not have a duty to 'publicly opine' on the legality of their actions . . . they had the ***duty to disclose*** what their actions were."  *Id.* at 5-6.  Thus, Defendants' argument is irreconcilable with the Complaint and this Court's MTD Order.

- 24 -

Defendants' citation to *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713 (8th Cir. 1978) does not aid their argument as the opinion is silent as to the actual misrepresentations and omissions at issue. *Id.* at 717-18. As the Court in *Jackson v. First Fed. Savs.*, 709 F. Supp. 863, 869 (E.D. Ark. 1988) held, *Vervaecke*'s "discussion of the key points is terse to the point of obscurity." Further, this case is nothing like *Vervaecke* but is on point with *Jackson*, where the defendants' statements **omitted** material information and "did not say enough." *Id.* at 873. Moreover, as the Eighth Circuit held, eight years after *Vervaecke*, where a defendant's alleged disclosures were "inadequate" and gave inaccurate "impressions," the fraud involved primarily a failure to disclose. *Harris v. Union Elec. Co.*, 787 F.2d 355, 364-66 (8th Cir. 1986).

Defendants also cite to *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 321 (8th Cir. 1997), which mistakenly attributed to *Laventhall v. Gen. Dynamics Corp.*, 704 F.2d 407 (8th Cir. 1983), the following: "[T]he presumption of reliance in failure-to-disclose cases has been limited to situations where the parties deal directly with one another in face-to-face transactions." *NationsMart*, 130 F.3d at 321. But *Laventhall* said nothing about limiting *Affiliated Ute* to face-to-face transactions but rather merely provided the simple observation that the *Affiliated Ute* presumption does not arise absent a duty to disclose. *Laventhall*, 704 F.2d at 413 n.4. Further, it is undeniable that the *Affiliated Ute* presumption applies in situations that do not involve face-to-face transactions. *See, e.g.*, *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008) (stating that the *Affiliated Ute* presumption applies "if there is an omission of a material fact by one with a duty to disclose"); *In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 456 n.8 (S.D.N.Y. 2013) (*Affiliated Ute* presumption available to class members who purchased shares on public exchange because when company's representatives chose to speak, "they took on a 'duty to be both accurate and complete'"); *Smith Barney*, 290 F.R.D. at 47 (holding that *Affiliated Ute* presumption applied to purchasers of multiple different mutual funds).

- 25 -

C. **Plaintiffs' Proposed Damages Methodology Satisfies Rule 23(b)(3)'s Predominance Requirement**

Plaintiffs' expert, Mr. Coffman, has proffered a viable and universally accepted damages model that satisfies *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Indeed, Defendants' criticisms of Mr. Coffman's model are consistently rejected by courts and are improper at class certification.

1. **Plaintiffs' Proposed Methodology for Calculating Section 10(b) Damages Is Widely Accepted and Satisfies *Comcast***

a. **Mr. Coffman's Out-of-Pocket Damages Model Is Widely Accepted**

Neither Defendants nor their expert, Dr. James, dispute that Mr. Coffman's proposed out-of-pocket damages methodology is widely accepted by courts throughout the country as an appropriate method for measuring damages in §10(b) class actions. *See* Opp. at 15-19; James Tr. at 142:25-143:5. Nor could they, as courts routinely recognize that even post-*Comcast*, the use of the out-of-pocket method to measure damages is the "'standard measurement of damages in Section 10(b) securities cases.'" *CenturyLink*, 337 F.R.D. at 212; *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 137 (M.D. Tenn. 2020) (recognizing that the "[u]se of the out-of-pocket damages model in securities case[s] is hardly new or novel – *it 'is the standard measurement of damages in Section 10(b) securities cases' . . . [and] Comcast did not change this, or render the model improper*" (quoting *RH, Inc.*, 2018 WL 4931543, at *3, *7 n.2) (collecting cases)). Not surprisingly, Defendants also take great pains to ignore that post-*Comcast*, several courts have granted class certification based on Mr. Coffman's out-of-pocket damages model. *See, e.g.*, *Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 139 (D.D.C. 2017); *Washtenaw Cnty. Emps' Ret. Sys. v. Walgreen Co.*, 2018 WL 1535156, at *3 (N.D. Ill. Mar. 29, 2018); *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2021 WL 229310, at *7 (N.D. Cal. Jan. 21, 2021); *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2017 WL 4297450, at *6 (D.S.C. Sept. 28, 2017).

4854-4279-3743.v1

Furthermore, light years away from being "generic" and "boilerplate," as Defendants suggest, Opp. at 1, 15-19, Mr. Coffman's report specifically explains how the out-of-pocket damages model can be applied to this case:

- First, "[o]nce the inflation per share has been quantified on each day during the Class Period" (damages to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale), "the computation of damages for each class member is formulaic based upon information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions)." Coffman Report, ¶¶94-95; Coffman Rebuttal, ¶¶44-45.

- Second, to quantify artificial inflation, which Mr. Coffman states is a detailed loss causation analysis inappropriate under Rule 23, Mr. Coffman would start an "event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations." Coffman Report, ¶97; Coffman Rebuttal, ¶¶44-46.

- Third, the event study would "need to consider whether and to what extent any non-fraud related information (*i.e.*, 'confounding information') contributed to the observed price movement on the days on or following the alleged corrective disclosures." Coffman Report, ¶97; Coffman Rebuttal, ¶¶53-57, 64.

Mr. Coffman further explained that if discovery revealed specific issues complicating the quantification of artificial inflation in this case, standard valuation tools that can be performed on a class-wide basis will be used to resolve these potential issues and adjust inflation accordingly. Coffman Report, ¶¶97-98. Specifically, Mr. Coffman explained that when he is asked to conduct a loss causation analysis after the close of fact discovery, he would have the added benefit of fundamental valuation analyses such as discounted cash flow methods and use of academic studies. *Id.*, ¶97. In sum, Mr. Coffman explains not only what methodology would apply, but also how it would be applied to Plaintiffs' allegations and claims on a class-wide basis. *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 2016 WL 4098741, at \*11-\*12 (D. Minn. July 28, 2016) (granting class certification relying on Coffman's "'well-settled formula for assessing damages'" the out-of-pocket damages model).

Consistent with these rulings, Mr. Coffman's proposed out-of-pocket model is more than sufficient.

> **b.  Mr. Coffman's Out-of-Pocket Damages Model Satisfies** *Comcast*

*Comcast* held that in order to satisfy Rule 23's predominance requirement, plaintiffs need only present a model demonstrating that damages can be calculated on a class-wide basis consistent with their theory of liability.  569 U.S. at 34-35[18]; *see also Powers v. Credit Mgmt. Servs., Inc.*, 313 F.R.D. 103, 111 (D. Neb. 2016) (noting that all that *Comcast* requires is that plaintiffs "'be able to show that their damages stemmed from the defendant's actions that created the legal liability'") (citing *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)).  Here, Plaintiffs' expert has done just that.

Despite Mr. Coffman's clear explanation of his damages methodology, Defendants argue that Mr. Coffman has not explained how damages "actually" will be calculated.  Opp. at 1, 13, 16.  At bottom, Defendants criticize Mr. Coffman for failing to "actually" calculate damages and provide an estimation of class-wide damages.  But "*Comcast* does ***not require*** that the damage calculation be performed at the class certification stage."  *Beaver Cnty.*, 2016 WL 4098741, at *11 n.11 (citing *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 414 (S.D.N.Y. 2015)).  "[A]t the class-certification stage ***any*** method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be."  *Comcast*, 569 U.S. at 36.  At this stage, "Plaintiffs' burden . . .

---

[18]  In doing so, the Supreme Court did not alter the well-established principle that "individual damage calculations may vary among class members."  *Guyton v. Tyson Foods, Inc.*, 767 F.3d 754, 762 (8th Cir. 2014) (citing *Comcast*, 569 U.S. at 34-36); *see also Comcast*, 569 U.S. at 42-43 (noting that "it remains the 'black letter rule' that a class may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damages questions unique to class members") (Ginsburg, J., dissenting).  Indeed, "[i]t would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages."  *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013).

is simply to propose a methodology for calculating damages that corresponds to its theory of liability," which Plaintiffs have done. *Signet Jewelers*, 2019 WL 3001084, at *20.[19]  In short, while Plaintiffs have alleged a broad §10(b) scheme, including a number of different false and misleading misrepresentations and omissions, as Mr. Coffman has explained the method he would use to calculate damages on a class-wide basis accommodates Plaintiffs' theory of the case, more than satisfying *Comcast*.

Defendants gloss over this authority to argue that Mr. Coffman's damages model is incapable of calculating damages on a class-wide basis as it "fails to distinguish among Plaintiffs' specific and distinct theories of liability and harm." Opp. at 15.  This is an age-old loss causation argument that has been handily rejected, including by the Supreme Court.  *Halliburton I*, 563 U.S. at 807, 813 ("The question presented in this case is whether securities fraud plaintiffs must also prove causation in order to obtain class certification. We hold that they need not."); *CenturyLink*, 337 F.R.D. at 213 (finding contentions that it would be "difficult and complex to calculate damages because there are many dates with various alleged misrepresentations . . . [are a]ll criticisms [that] go to the accuracy of the damages model and loss causation, but do not prevent class certification because all of these alleged obstacles for accurate calculation of the damages are the same if there is one plaintiff or one million plaintiffs").

Defendants' cited cases are factually distinct and do not counsel for a different conclusion. Defendants rely heavily on *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D.

---

[19]   Indeed, Defendants' argument that Plaintiffs' proffered damage methodology is inadequate has been overwhelmingly rejected in securities cases.  *See, e.g.*, *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 413 (E.D. Va. 2015) (granting class certification and noting that "*Comcast* merely held that 'a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory'"); *Beaver Cnty.*, 2016 WL 4098741, at *11 (citing *Comcast* to reject as premature the defendants' argument that the plaintiffs did not "articulate[] any method for disentangling Tile Shop's allegedly corrective disclosures from other confounding information"); *Hatamian*, 2016 WL 1042502, at *8.

116 (S.D.N.Y. 2014). Opp. at 16-17. However, there, the expert mentioned three methods to value the securities at issue but "ha[d] not created . . . a model to date." *Fort Worth*, 301 F.R.D. at 141. Here, Mr. Coffman has done far more than simply mention models he could use to calculate damages. Instead, the record establishes that Mr. Coffman has considered Plaintiffs' allegations and has specified the precise valuation tools he could use at the loss causation and damages stage to calculate per share damages in this case. Coffman Report, ¶¶94-99; Coffman Rebuttal, ¶¶44-63.[20]

Defendants' reliance on *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ("*BP I*"), is similarly misplaced. In *BP I*, the district court noted that "[s]imply invoking the event study methodology . . . does not assuage the Court that the class-wide damages methodology proposed will track Plaintiffs' theories of liability," as required by *Comcast*. *Id.* at \*17. However, the district court's holding must be scrutinized in light of the factual circumstances of that case. Tellingly, the district court found that the plaintiff's proposed damages methodology did not take into account two differing theories of fraud liability they were pursuing: pre- and post- oil explosion. *Id.* at \*16-\*17. Based upon this, the district court required a "more complete explication of how Plaintiffs propose to use an event study to calculate class members' damages, and how that event study will incorporate . . . the various theories of liability." *Id.* at \*17. In stark contrast, Plaintiffs

---

[20] Recent district court opinions have rejected *Fort Worth* for the same reason – finding it to be an outlier as the court's ruling was grounded within the specific circumstances of that case. *See, e.g.*, *TreeHouse Foods*, 2020 WL 919249, at \*9 n.8 (upholding Coffman's damage analysis post-*Comcast* and noting that *Fort Worth* was inapposite as there the "plaintiff's expert determined that the market for the security was illiquid during much of the class period, and thus presented **unique individualized difficulties** concerning the congruence between liability and damages calculation"); *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 2016 WL 7409840, at \*10 (S.D.N.Y. Nov. 4, 2016) (granting class certification over the defendants' reliance on *Fort Worth* because "in *Fort Worth*, the court found the proposed damages calculation model inadequate because the defendants could not '**ascertain which particular method [the expert] would ultimately use to measure**' classwide damages out of the three cited in his report"); *In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at \*11 n.18 (E.D. Va. Sept. 4, 2020) (rejecting defendants' *Fort Worth* reference because there, the "proposed class-wide damages [were] rejected because the expert mentioned three methods, unsupported by evidence, and conclusorily stated that 'it [was] his opinion "that class-wide damages can be calculated in a formulaic manner"'").

here allege only a *single* theory of liability and Mr. Coffman's expert report details one specific and universally accepted method to calculate damages on a class-wide basis – the out-of-pocket method. Most importantly, Mr. Coffman explains how, after the close of discovery, inflation will be quantified, how confounding information will be considered and disaggregated, and what valuation techniques he will utilize to determine if artificial inflation evolved during the Class Period. Coffman Report, ¶¶94-99; Coffman Rebuttal, ¶¶44-50.[21]

Desperate to discredit Mr. Coffman's clear explanation of his methodology, Defendants resort to accusing Mr. Coffman of providing a damages opinion that is "materially identical to the opinion he has offered on behalf of plaintiffs in myriad other securities class actions." Opp. at 15-16. During his deposition, however, Mr. Coffman explained that he did utilize the same damages language in other reports, but that this was by "design":

> Absolutely. And that's by design and precisely the point, which is once you're dealing with a case where it's clear that plaintiffs are seeking recovery based on the out-of-pocket method . . . based on the economic rationale of an artificial inflation in the stock price, and they have an . . . economically coherent theory as to why the stock price was inflated and how that artificial inflation got dissipated, then there is a *general standard approach* that is well accepted. And there is the same way to describe it applies in virtually every case.

Coffman Tr. at 211:5-212:3. This is not to say, however, that Mr. Coffman did not consider the specific facts of this case in drafting his proposed methodology. On the contrary, Mr. Coffman testified that he "discussed with plaintiffs' counsel what they were alleging," gained an understanding of the "nature of the claims," and "[g]ained an understanding of whether the claims had an economic coherence to them." *Id.* at 212:8-21. Indeed, Mr. Coffman confirmed that he

---

[21]  Thus, Defendants' other cited cases are similarly factually distinguishable. *See Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at \*19 (N.D. Ohio Aug. 14, 2018) (where Feinstein "report[ed] various techniques he believe[d] he could use to calculate out-of-pocket damages based on inflation" and "state[d] there are *unspecified* 'valuation tools' available to measure damages"); *see also Sicav v. James Jun Wang*, 2015 WL 268855, at \*2, \*6 (S.D.N.Y. Jan. 21, 2015) (where the plaintiffs' "'insider sale' theory [was] an *unusual theory* of classwide injury").

"performed a case-specific analysis in order to get to [his] opinion." *Id.* at 213:9-13; Coffman Rebuttal, ¶15; *see Dougherty v. Esperion Therapeutics, Inc.*, 2020 WL 6793326, at *6 (E.D. Mich. Nov. 19, 2020) (finding "unpersuasive" defendants' argument that plaintiffs' out-of-pocket model failed to satisfy *Comcast* because it "use[d] 'copied-and-pasted' language," and concluding that the out-of-pocket method was the "'standard and well-settled formula for assessing damages for each class member seeking relief under Section 10(b)'").

Defendants also criticize Mr. Coffman's damages model as "incapable of meeting Plaintiffs' burden under *Comcast*, given the uniquely complex allegations underlying Plaintiffs' claim." Opp. at 17-18. But this assertion improperly wades into issues of loss causation and the accuracy of any damages figures calculated by the methodology, ***not*** whether the methodology aligns with Plaintiffs' theory of liability or will interject individual issues that will predominate over common questions.[22] The court decisions rejecting these exact same arguments at this stage are legion. *See, e.g.*, *RH Inc.*, 2018 WL 4931543, at *3 (rejecting the defendants' argument "that plaintiffs' proposed method does not contain anything that 'addresses any of the specific[s] of this litigation,'" because "this assertion seems to reflect the fact that securities fraud cases fit Rule 23 'like a glove,' rather than suggest that class treatment is appropriate"); *Signet Jewelers*, 2019 WL 3001084, at *20 ("[W]hile Plaintiff ultimately will need to disaggregate confounding factors to prove economic loss, it need not do so at this juncture to establish that common issues relating to damages predominate."); *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 288 (N.D. Cal. 2020) ("[c]alculating the actual inputs into

---

[22]   The remainder of Defendants' case law is easily distinguished as the experts did not identify a specific damages model. *See Loritz v. Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (where the plaintiffs "failed to set forth ***any model of damages*** . . . in their opening brief"); *Ctr. City Periodontists, P.C. v. Dentsply Int'l, Inc.*, 321 F.R.D. 193, 204 (E.D. Pa. 2017) (declining to certify a class in a breach of warranty case where the expert's "***undifferentiated methodology***" designed to measure damages in a consumer fraud case was inappropriate because the consumer fraud claims had been dismissed).

the out-of-pocket method . . . requires an analysis of loss causation . . . the out-of-pocket method does not involve any individualized issues").

> ### c.     Mr. Coffman's Methodology Can Measure Damages from Plaintiffs' Materialization of the Risk Theory of Loss Causation

In a last-ditch challenge to class certification, Defendants assert that Mr. Coffman's "model offers no methodology to calculate damages under" a materialization of the risk theory of loss causation. Opp. at 19-22. This remaining argument can be given short shrift. Not only are Defendants again making loss causation arguments in disguise, but they also blow past Mr. Coffman's explanation of how his model is sufficiently capable of measuring damages on a class-wide basis, which is all that *Comcast* requires.

First, whether Mr. Coffman has offered a damages method that can segregate "any resulting damages" from the "'value impact of the concealed or misrepresented risks,'" Opp. at 19, is a loss causation argument not proper for class certification. *See Signet Jewelers*, 2019 WL 3001084, at *20 ("[Defendants' expert's] contention that Plaintiff's methodology did not adequately isolate the impact of the materialization of known risks from the impact of allegedly concealed risks is simply a loss causation argument in disguise, because it tests the causal relationship between the alleged misstatements and the price decline. Such an argument 'goes beyond the Rule 23 inquiry.'"); *see also Hatamian*, 2016 WL 1042502, at *9 (holding that the defendants' argument that "Professor Coffman's methodology would not be able to 'disaggregate the price inflation' attributable to particular theories of liability" is nothing more than "an attack on loss causation"); *Patterson*, 2020 WL 5757695, at *14 ("Defendants' concerns that [plaintiff's expert] has not yet calculated an

- 33 -

inflation ribbon or adequately addressed disaggregation are loss causation disputes that are not appropriate for resolution at class certification.").[23]

Notwithstanding their impropriety at class certification, Defendants' arguments are wrong. Mr. Coffman's report was clear:

> For example, the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations . . . . Such an event study would also need to consider whether and to what extent any non-fraud related information (*i.e.* "confounding information") contributed to the observed price movement on the days on or following the alleged corrective disclosures. If there is such confounding information, disaggregating the price of corrective disclosures from confounding information may utilize commonplace valuation techniques and may depend on information learned through discovery.

Coffman Report, ¶97.

To the extent necessary, Mr. Coffman also testified that his eventual event study could determine the portion of the decline attributable only to a concealed risk under the materialization of the risk theory of loss causation, Coffman Tr. at 209:11-19, and Mr. Coffman's rebuttal report clarified that the materialization of the risk theory "does not preclude [him] from being able to quantify artificial inflation throughout the Class Period for Uniti common stock and measure damages on a class-wide basis at the merits stage." Coffman Rebuttal, ¶52.

Addressing Dr. James' example where there is a 30% risk of a negative outcome that would result in a stock price decline of $100 a share, Opp. at 20, Mr. Coffman explains that this example

---

[23]   *See also Beaver Cnty.*, 2016 WL 4098741, at *12 ("Concerns over disentangling loss specific to a corrective disclosure from other non-actionable announcements does not defeat predominance because Plaintiffs are not required to prove loss causation at this stage."); *Dougherty*, 2020 WL 6793326, at *7 (whether the expert's event study can disaggregate confounding factors "is really a merits inquiry into loss causation" that "is not required for class certification" and further recognizing that, even if confounding information "was partially responsible for the decline in [defendants'] stock price, the extent to which damages would need to be disaggregated is an issue common to all class members"); *Luna v. Marvell Tech. Grp., Ltd.*, 2017 WL 4865559, at *6 (N.D. Cal. Oct. 27, 2017) (holding that the plaintiff's expert need not show "how he will disaggregate price inflation attributable to confounding events" since that "is not . . . an attack on his damages model, but is rather an inquiry into loss causation").

fails to grasp not only that the out-of-pocket method is "easily adaptable to this scenario but also that an event study could still be used to measure the full price decline on the date the company announced the negative litigation outcome." Coffman Rebuttal, ¶55.  Specifically, Mr. Coffman clarifies that a "portion of the decline could be disaggregated to account for the contemporaneous release of confounding information." *Id.*

Finally, Defendants' claim that Plaintiffs' damages model cannot account for varying risks that "changed over time" is incorrect.  Opp. at 16, 21.  Mr. Coffman's model can readily be combined with other standard financial and economic approaches to estimate the changing economic impact of information at different points in time.  Coffman Rebuttal, ¶¶62-63. Mr. Coffman explains that "whether it determines that artificial inflation was constant over the Class Period, or 90% or 50% of the full amount of artificial inflation was present in Uniti Common Stock at certain points in the Class Period, the result can easily be applied to any daily artificial inflation table that would accompany a loss causation report after merits discovery is complete." *Id.*, ¶62.  Indeed, Mr. Coffman specifies that accounting for time-varying artificial inflation over the Class Period is "prematurely raising questions that are not relevant at this stage of the litigation." *Id.*, ¶52. Nevertheless, to determine the appropriate assumption for the "quantification of artificial inflation," the "relevant inputs depend on the facts and evidence that existed and were concealed" at different points in time and "[t]his is the essence of what the parties investigate during discovery and what the finder of fact is asked to ultimately determine." *Id.*, ¶59.  Accordingly, it is "premature to specify these details before conducting a loss causation analysis that considers information learned in merits discovery." *Id.*

While Defendants make much of the Northern District of California's decision in *Mulderrig v. Amyris, Inc.*, 2021 WL 5832786 (N.D. Cal. Dec. 8, 2021) this case does not justify denying Plaintiffs' Motion.  In *Mulderrig*, the defendants principally relied on *Ludlow v. BP, P.L.C.*, 800

- 35 -

F.3d 674 (5th Cir. 2015), to argue that a materialization of the risk theory of loss causation "requires an individualized assessment of whether a class member would have bought the stock **at all** . . . had the risk been disclosed." *Mulderrig*, 2021 WL 5832786, at *10 (citing *Ludlow*, 800 F.3d at 690). But in *Ludlow*, the Fifth Circuit expanded why the damages model and materialization of the risk theory put forward in that case was not entitled to the *Basic* presumption of reliance:

> But plaintiffs' **own model** asserts that they relied on something **other than price**: risk. By claiming that class members may have divested themselves of BP stock if they had known about the true risk of an accident in the Gulf – as distinguished from that risk's impact on BP's stock price – the plaintiffs are arguing that their investment decisions were based substantially upon factors other than price. The plaintiff's argument thus undercuts one of the rationales for the *Basic* presumption of reliance.

*Ludlow*, 800 F.3d at 691. It is undisputable that, here, Plaintiffs are proceeding under the out-of-pocket damages methodology, *i.e.*, damages calculated based on the artificial inflation of the price of Uniti securities during the Class Period versus the inflation caused by Defendants' fraud. Coffman Report, ¶¶94-99. Indeed, Mr. Coffman delineates that both the out-of-pocket method and event study can measure a full price decline and can disaggregate confounding information so that damages are not overstated. Coffman Rebuttal, ¶¶52-58. Further, in the event that true economic artificial inflation is not constant over the Class Period (for instance if, as Dr. James speculates "'the market's perception of risk may have changed'"), the out-of-pocket method can still account for such circumstances and will still result in the appropriate assessment of damages. *Id.*, ¶¶60-62. As a result, artificial inflation need not be constant over time for the out-of-pocket damages methodology to be applied class-wide. *Id.* Accordingly, unlike the plaintiffs in *Mulderring* and *Ludlow*, Plaintiffs are not seeking "consequential damages," *i.e.*, "all losses" as the plaintiffs were in *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *10-*12 (S.D. Tex. May 20, 2014), *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015), but proffer a damages model that relies on the market price of Uniti's securities.

- 36 -

4854-4279-3743.v1

Having explained the method Mr. Coffman would use to calculate damages on a class-wide basis, consistent with Plaintiffs' theory of the case, Plaintiffs have more than satisfied *Comcast*. Indeed, Defendants' view is inconsistent with the overwhelming majority of cases that found the out-of-pocket and event study methodologies appropriate to measure damages in materialization of the risk cases. *See, e.g.*, *In re Teva Sec. Litig.*, 2021 WL 872156, at *40 (D. Conn. Mar. 9, 2021) (upholding district court's grant of class certification where the plaintiff's expert explained that he "would conduct an event study to analyze 'the change in the market prices of each [defendant] security . . . on the dates of . . . the corrective disclosures and materializations of the risk alleged in this case'"); *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *18 (S.D. Tex. Nov. 13, 2019) (rejecting defendants' argument that the out-of-pocket method under a materialization of the risk theory would overcompensate investors and held that the damage methodology "will disaggregate losses not attributable to fraud"); *Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 496 (M.D. Tenn. 2019) (granting class certification under a materialization of the risk theory of loss causation).

### D. The Proposed Class of Uniti Options Investors Also Should Be Certified

#### 1. Plaintiffs Have Standing to Pursue Claims on Behalf of Certain Options Investors During the Class Period

To establish standing under Article III of the Constitution, a plaintiff must demonstrate: (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury was likely caused by the defendant; and (3) that the injury would likely be redressed by judicial relief. *TransUnion LLC v. Ramirez*, __U.S.__, 141 S. Ct. 2190, 2203 (2021). "Moreover, in the context of a class action lawsuit, plaintiffs must also establish 'class standing' – that is, standing to litigate the claims of the absent class." *Brown v. Daikin Am., Inc.*, 2021 WL 1758898, at *3 (S.D.N.Y. May 4, 2021).

As a threshold matter, there is no dispute that *each* of the Plaintiffs/proposed class representatives have individual Article III standing, because they suffered "concrete" economic harm from Defendants' misrepresentations and omissions in the form of losses in the value of the Uniti securities they purchased during the Class Period.  *See* ¶¶263-266; ECF Nos. 30-2, 103.  Defendants do not – and cannot – argue against this point.

Instead, Defendants appear to argue that the proposed class representatives lack *class* standing to pursue claims under the federal securities laws for Uniti Options investors because they did not transact in Uniti Options during the Class Period.  *See* Opp. at 32-34.[24]  Defendants largely rely on cases from district courts within the Second Circuit for this assertion, but completely ignore that the Second Circuit set out a two-pronged test in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d. Cir. 2012) to determine whether securities-plaintiffs have class standing – a test which courts in this Circuit have adopted.

> "[A] plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant, thus satisfying Article III standing requirements, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants."

*Gabriele v. ConAgra Foods, Inc.*, 2015 WL 3904386, at *9 (W.D. Ark. June 25, 2015) (quoting *NECA*, 693 F.3d at 162).

This test is met here.  First, as discussed, the Complaint alleges that Plaintiffs/proposed class representatives suffered actual Article III injury as a result of Defendants' alleged fraudulent conduct.  Second, the conduct alleged to have caused Plaintiffs' injury – *i.e.*, the false and misleading statements and omissions which Defendants made that artificially inflated the price of

---

[24]  Defendants mistakenly phrase this as "Article III standing" – but the case law is clear that the proper terminology is "class standing."  Article III standing refers to whether the named plaintiff has suffered concrete harm, class standing refers to whether the named plaintiff has standing to represent absent class members – which is what is at issue here.

4854-4279-3743.v1

Uniti securities – is the ***same*** conduct alleged to have caused injury to Uniti Options investors.  *See, e.g.*, *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 451 (S.D.N.Y. 2013) (applying the two-part test to determine Article III and class standing where Lead Plaintiffs traded in common stock and absent class members traded in bonds; finding that there "is no question that [Lead Plaintiffs] meet the first prong because they have plausibly alleged that they suffered some actual injury as a result of the Defendant's conduct" and further "[t]he injury suffered by Plaintiffs . . . also implicates the 'same set of concerns' as the injury suffered by purchasers of Winstar's bonds").  The court in *Winstar* found the second "same set of concerns" prong satisfied because: (i) "[t]he misstatement at issue here . . . related to a single company . . . and was ***not*** security-specific"; (ii) "the misstatement was . . . broadcast[ed] at the ***same time*** to all members of the public"; and (iii) both stockholders and bondholders had a "common concern for the company's ***financial health***."  *Id.* at 452.

Here, too, the fraudulent misrepresentations and omissions made by Defendants were not just targeted at purchasers of Uniti common stock but were made simultaneously to all members of the investing public – including those transacting in Uniti Options.  Further, Uniti Options investors share a common concern for Uniti's financial health as purchasers of Uniti common stock because the underlying value of the options contract is contingent upon Uniti's financial health.  *See In re Tel-Save Sec. Litig.*, 2000 WL 1005087, at *6 (E.D. Pa. July 19, 2000) ("Both option and stock holders have an interest in proving that stock prices were artificially inflated by defendants' material misrepresentations and omissions.").

Indeed, the options contract itself is a derivative instrument of the very same Uniti security that Plaintiffs/proposed class representatives did purchase during the Class Period – thus, because the harm suffered by both certain options traders and purchasers of common stock is the same, class standing is appropriate.  *See Schering-Plough*, 2012 WL 4482032, at *9-*10 ("The gravamen of Plaintiffs' allegation is the same whether Lead Plaintiffs purchased common stock, preferred stock,

4854-4279-3743.v1

or options; that is, Lead Plaintiffs need to prove, inter alia, that Defendants made material misstatements and/or omissions . . . . Accordingly, the Court finds that Lead Plaintiffs may represent options traders and preferred stock traders . . . .").[25]

Under this proper framework and analysis, it is easy to see why Defendants fail to distinguish the myriad of cases that support Plaintiffs' position. *See* Opp. at 33. The court in *In re Sepracor Inc.*, 233 F.R.D 52, 56 (D. Mass. 2005) quoted *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 445 (S.D. Tex. 2002) for its holding that "'[w]hen plaintiffs have alleged such a common course of conduct, courts consistently have found no bar to class certification even though members of a class may have purchased different types of securities or interests'" – which directly supports the second prong of the *NECA* test. *Sepracor*, 233 F.R.D. at 56. Likewise, the court in *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584 (N.D. Cal. 2009) cited to *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882 (C.D. Cal. 2005) for the proposition that "plaintiffs with a valid securities claim may represent the interests of purchasers of other types of securities in a class action where the alleged harm **stems from the same** allegedly improper conduct." *Juniper*, 264 F.R.D. at 594. And importantly, the court in *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 371 (D. Del. 1990) found that the "price of the option contract is directly responsive to the market price of the underlying security and to information affecting that price. Consequently, option traders, like purchasers of the underlying security, are susceptible to misrepresentations which distort the market price." *Id.* In short, class standing is appropriate.[26]

---

[25]  *See also Sullivan v. Barclays PLC*, 2017 WL 685570, at *8 (S.D.N.Y. Feb. 21, 2017) (finding that Lead Plaintiffs had standing to pursue claims on behalf of purchasers of a different derivative product because the harm both groups suffered "would have been caused by the identical misconduct of the identical parties"); *Hall v. Medicis Pharm. Corp.*, 2009 WL 648626, at *5 (D. Ariz. Mar. 11, 2009) ("Indeed, courts typically treat both stockholders and options holders as members of the same plaintiff class.") (collecting cases).

[26]  Defendants cite *In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 501 (S.D.N.Y. 2010), *Abu Dhabi Com. Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 175 (S.D.N.Y. 2009),

- 40 -

Finally, Defendants argue that the Eighth Circuit's decision in *Laventhall*, 704 F.2d at 412, as well as cases from the 1980s and 1990s that purportedly expanded that decision, prohibit options traders from pursuing §10(b) claims based on alleged fraudulent misstatements and omissions. Opp. at 33-34. But courts in this Circuit have more recently noted that *Laventhall* dealt "with the fundamentally separate and distinct issue of when corporate insiders have a duty to disclose for purposes of trading on material inside information" and that in "the context of Section 10(b) allegations premised on fraudulent misrepresentations, which are the claims at issue here, courts uniformly agree that option traders have standing." *In re Green Tree Fin. Options Litig.*, 2002 WL 1752209, at *5 (D. Minn. July 29, 2002) (collecting cases for notion that option traders have standing to pursue §10(b) claims).

The court in *Green Tree* noted that several Circuit courts distinguished *Laventhall* on grounds that it was an insider trading case, holding that the Eighth Circuit's decision in *Laventhall* is "not inconsistent" with a finding that "options plaintiffs do have standing to sue under Section 10(b)." *Id.*; *see Fry v. UAL Corp.*, 84 F.3d 936, 938-39 (7th Cir. 1996) (Posner, J.) (distinguishing *Laventhall* on grounds that it "was an insider-trading case" and holding "that option traders have standing to sue under Rule 10b-5"). To that end, courts routinely find that options investors have standing to pursue §10(b) claims (like those at issue here), even post-*Laventhall*. *See, e.g.*, *In re Arakis Energy Corp. Sec. Litig.*, 1999 WL 1021819, at *3 (E.D.N.Y. Apr. 27, 1999) (finding "that the members of the putative options class do have standing to sue under Section 10(b)");

and *In re Bank of Am. Corp. Sec. Derivative & ERISA Litig.*, 2011 WL 3211472, at *14 & n.11 (S.D.N.Y. July 29, 2011) to support their position, but these S.D.N.Y. cases were decided prior to the Second Circuit's controlling two-pronged test in *NECA*. Further, in *IndyMac* the court held that plaintiffs had standing only with respect to those offerings in which they purchased securities. 718 F. Supp. 2d at 501. But the offerings at issue concerned ***different*** alleged misstatements and different defendants, *id.*, and so, unlike here, the plaintiffs' injury did not involve the same core facts as the other class of investors. Defendants also cite *Am. Italian Pasta*, 2007 WL 927745, at *6, but the court there did not provide any analysis or rationale for its decision.

- 41 -

*Deutschman v. Beneficial Corp.*, 841 F.2d 502, 508 (3d Cir. 1988) (holding option purchaser has standing to seek damages under Section 10(b)).

### 2. Plaintiffs Have Established that Uniti Options Traded in an Efficient Market

Defendants also assert that Plaintiffs cannot certify a class on behalf of Uniti Options investors "for the separate reason that they have failed to meet their burden of showing that Uniti options traded in an efficient market during the Class Period." Opp. at 34. However, Defendants "***do not dispute***" that the "market for Uniti's common stock traded in an efficient market." *Id.* This admission is outcome determinative in Plaintiffs' favor and should end the Court's inquiry as to the matter. *See In re Merck & Co., Inc. Sec. Derivative & ERISA Litig.*, 2013 WL 396117, at \*12 (D.N.J. Jan. 30, 2013) (a finding of market efficiency for common stock is sufficient to prove options market efficiency); *Rougier*, 2019 WL 6111303, at \*14 (same) ("Courts in the Fifth Circuit routinely have held that a finding of market efficiency for common stock also applies to options, because the price for the option is derivative of the price of the stock.").

Further, Coffman's report and rebuttal report (including his Declaration Regarding Calculation of Returns for Uniti Options, *see* ECF No. 111) provide independent evidence for the market efficiency of the defined Uniti options based upon the: (1) "'put-call parity'" test, which is "a standard method for evaluating efficient trading in options markets," Coffman Report, ¶¶85-88; and (2) the cause-and-effect test, which established an affirmative finding of the Fifth *Cammer* factor.[27] *See* Coffman Report, ¶¶89-93; Coffman Rebuttal, ¶10. The results of Mr. Coffman's put-call parity

---

[27] The Fifth *Cammer* Factor refers to "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989). Notably, courts in this Circuit, and others, widely consider the Fifth *Cammer* factor to be the "most important" *Cammer* factor in determining market efficiency. *Lumen v. Anderson*, 280 F.R.D. 451, 460 (W.D. Mo. 2012); *Första AP-Fonde v. St. Jude Med., Inc.*, 312 F.R.D. 511, 520 (D. Minn. 2015) (court finding that the expert "acknowledges that the fifth *Cammer* factor 'is often considered the most direct and important of the *Cammer* factors'").

4854-4279-3743.v1

test (and his accompanying Exhibit 14) "provide[] evidence that the market prices of Uniti Options consistently reacted contemporaneously with changes in the market price of Uniti Common Stock," which "is strong evidence that Uniti Options traded efficiently." Coffman Report, ¶87. Likewise, the results of his cause-and-effect test "continue to provide affirmative statistical evidence of a cause-and-effect relationship between new news and changes in the market prices of Uniti Options," ECF No. 111, ¶8, demonstrating market efficiency for the Uniti options market. Indeed, Mr. Coffman concluded that both Exhibit 16 and Exhibit 17 of his report – which delineated statistically significant price changes on Uniti Call Option series at the 95% significance level, and "qualitatively similar results for Uniti Put Options," respectively – together provide "evidence of a cause-and-effect relationship between firm-specific news and changes in Uniti Option prices, and thus that *Uniti Options traded efficiently*." Coffman Report, ¶93. Notwithstanding, Defendants challenge this conclusion for the following reasons:

*First*, Defendants argue that Mr. Coffman's analysis improperly relied on theoretical option prices derived from the Black-Scholes pricing model – rather than actual observed market prices or bid-ask quotes (due to the "computer script" that Mr. Coffman relied on). Opp. at 35-36. However, this point is moot now given Mr. Coffman's declaration (ECF No. 111), which concluded that even with corrected actual prices (as opposed to theoretical) – the "text of the Report . . . my overall methodological approach, substantive findings, and ultimate opinions are completely unaltered." ECF No. 111, ¶9.

*Second*, Defendants argue that even with this correction, Mr. Coffman's "cause-and-effect test would still fail" because Mr. Coffman analyzed the aggregated results of his cause-and-effect test across all the options series, as opposed to analyzing each of the 372 call option series and 378 put option series separately. Opp. at 36. Without any supporting case law, Defendants nakedly assert that each "series" must be treated as its own security, and therefore the corresponding market

- 43 -

analysis must be done on the micro-level.  *Id.*  Yet, the applicable case law suggests the opposite.

*See Marcus v. J.C. Penney Co.*, 2016 WL 8604331, at *9 (E.D. Tex. Aug. 29, 2016) (the "market

analysis does not have to focus on the market for every security, separately"); *In re Enron Corp.*,

529 F. Supp. 2d 644, 747-48 (S.D. Tex. 2006) (accepting the grouping of securities that traded in

different markets to analyze whether debt securities traded in an efficient market).  Indeed, in *Enron*,

the court rejected defendants' expert "microscopic approach" to analyzing the securities at issue,

even though there were "variations in maturity, coupon, security seniority, issue sizes, etc.," because

the Court did "not agree that the only acceptable analysis is one focusing on the market for every

security, separately."  529 F. Supp. 2d at 748.

In any event, Defendants' mistaken assertion completely ignores the rest of Mr. Coffman's

testimony:

> Q: Are you offering the opinion that that market for *every single series* of Uniti options traded over an exchange was efficient throughout the proposed class period?
>
> A: *Yes*.  I think that given the combination of the stock being efficient.  The put-call parity being satisfied for all but a small number of trades across all of the option series, and the clear evidence of a cause-and-effect relationship between option prices and new information, and the fact that all the different series would have price relationships among themselves that would constrain the pricing of different options series, that's the conclusion I've reached and that's the opinion I am giving.  Yes.

Coffman Tr. at 138:13-139:7.  This evidence is sufficient to establish a finding of market efficiency

for the Uniti options at issue here, even if the Court chooses to analyze market efficiency on a series-

by-series basis.

***Third***, Defendants argue that Mr. Coffman ignored certain *Cammer* and *Krogman* factors

when attempting to show that the market for Uniti's options was efficient.  Opp. at 34 & n.21.

However, courts do not require a separate analysis of *Cammer/Krogman* for the particular options

market for there to be a finding of market efficiency – because the options contract is derivative of

- 44 -

the common stock.  *See, e.g.*, *Enron*, 529 F. Supp. 2d at 754 ("The Court finds that Dr. Nye's evidence applying the *Cammer*/*Unger*/*Bell* factors to the stock, is sufficient to trigger the fraud-on-the-market presumption for Plaintiffs' §10(b) claims based on the options.").  Here, Mr. Coffman thoroughly analyzed the eight *Cammer* and *Krogman* factors for the Uniti common stock (plus three additional factors he identified), *see* Coffman Report, ¶¶26-80, finding market efficiency.  This is all that is required.  Yet Mr. Coffman went above and beyond what is necessary to demonstrate market efficiency for options, and analyzed the "most important" *Cammer* factor and additionally conducted a separate put-call-parity test.

Even so, Defendants assert that because Mr. Coffman did not analyze: (i) trading volume; and (ii) bid-ask spread for the Uniti options market, his analysis is flawed, Opp. at 34-35, ignoring *why* he testified those factors not material to his analysis.  As to trading volume, Mr. Coffman testified that "[t]he shares outstanding for options are actually created through trading, and the introduction of new contracts.  So it's not a – there is not really a comparably metric that makes sense for options."  Coffman Tr. at 150:13-18.  And as to bid-ask spread, Mr. Coffman testified that "constraints on pricing" limit potential inefficiencies within the options market such that analysis of bid-ask spread analysis is unneeded, especially given the overwhelming evidence of efficiency due to the put-call-parity and cause-and-effect tests.  *Id.* at 156:13-22.

What Defendants thus attempt to do is to improperly utilize the *Cammer* factors as a "checklist," which courts routinely reject.  *Första*, 312 F.R.D at 520.  Instead,

> [t]he Eighth Circuit has not adopted any particular test for market efficiency but has guided courts toward determining whether its elements have been established through "facts showing that a large number of people could buy or sell the stock [option]; that trading information on the stock [option] was widely available; and that the market rapidly reflected new information in price."

*Id.* at 518.  Such facts have been established here.  Coffman Report, ¶¶81-93.

## III.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request an order certifying this action as a class action pursuant to Rules 23(a) and (b)(3), appointing Local 449, WCERS, and McMurray, on behalf of himself and as sole beneficiary of the David McMurray R/O IRA as Class Representatives, and Robbins Geller Rudman & Dowd LLP and Labaton Sucharow LLP as Class Counsel.

DATED:  February 22, 2022

DEBRA J. WYMAN
California Bar No. 190812
Attorney for Lead Plaintiff
ROBBINS GELLER RUDMAN
   & DOWD LLP
TING H. LIU
JOSEPH J. TULL
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:  debraw@rgrdlaw.com
        tliu@rgrdlaw.com
        jtull@rgrdlaw.com

LABATON SUCHAROW LLP
CAROL C. VILLEGAS
CHRISTINE M. FOX
CHARLES FARRELL
DAVID SALDAMANDO
140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)
E-mail:  cvillegas@labaton.com
        cfox@labaton.com
        cfarrell@labaton.com
        dsaldamando@labaton.com

Lead Counsel for Lead Plaintiffs

- 46 -

4854-4279-3743.v1

- 47 -

GEOFFREY P. CULBERTSON
Arkansas Bar No. 2014011
PATTON TIDWELL & CULBERTSON, LLP
2800 Texas Boulevard
Texarkana, TX 75503
Telephone: 903/792-7080
903/792-8233 (fax)
E-mail: gpc@texarkanalaw.com

Liaison Counsel for the Class

SCHALL LAW FIRM
BRIAN SCHALL
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: 424/303-1964
877/590-0483 (fax)
Email: brian@schallfirm.com

THORNTON LAW FIRM LLP
GUILLAUME BUELL
1 Lincoln Street, 25th Floor
Boston, MA 02111
Telephone: 617/720-1333
617/720-2445 (fax)
Email: gbuell@tenlaw.com

Additional Plaintiffs' Counsel