# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

| | |
|---|---|
| In re UNITI GROUP INC. SECURITIES LITIGATION | Case No. 4:19-cv-00756-BSM |

## <u>EXPERT REBUTTAL REPORT OF CHAD COFFMAN, CFA</u>

**February 22, 2022**

# Table of Contents

**Page**

I.      INTRODUCTION.................................................................................................. 3

II.     SUMMARY OF OPINIONS ................................................................................. 4

III.    DR. JAMES DOES NOT DISPUTE MARKET EFFICIENCY FOR UNITI
        COMMON STOCK ............................................................................................... 7

IV.     PROPERLY VIEWED, DR. JAMES' REPORT AFFIRMATIVELY SUPPORTS A
        FINDING OF PRICE IMPACT IN THIS MATTER ........................................... 9

        A.  SEPTEMBER 25, 2017 AND JUNE 24, 2019 CORRECTIVE DISCLOSURES ..... 11

        B.  AUGUST 3, 2017 CORRECTIVE DISCLOSURE...................................... 13

        C.  FEBRUARY 15, 2019 CORRECTIVE DISCLOSURE ........................................... 15

V.      DR. JAMES ACKNOWLEDGES THE OUT-OF-POCKET DAMAGES
        METHODOLOGY IS APPLICABLE CLASS-WIDE IN THIS MATTER AND HIS
        DAMAGES-RELATED ARGUMENTS RELATE TO LOSS CAUSATION
        QUESTIONS THAT THE OUT-OF-POCKET METHOD CAN EASILY
        ACCOMMODATE ............................................................................................. 20

        A.  APPROACH USED TO MEASURE ARTIFICIAL INFLATION ........................... 24

        B.  MATERIALIZATION OF RISK ............................................................... 27

        C.  SEPARATING CONFOUNDING FROM CORRECTIVE INFORMATION IS
            COMMON TO ALL SECURITIES FRAUD LITIGATION ............................... 33

VI.     THERE IS NO NEED TO DISAGGREGATE AMONGST DR. JAMES'
        INVENTED MULTIPLE THEORIES OF LIABILITY, AND IF THERE EVER
        WAS, IT WOULD REQUIRE A DETAILED LOSS CAUSATION ANALYSIS.... 34

VII.    DR. JAMES' CRITICISMS OF MY EFFICIENCY ANALYSIS OF UNITI
        OPTIONS ARE MISPLACED AND DO NOT DISTURB MY OPINION THAT
        THERE IS ECONOMIC EVIDENCE TO SUPPORT THAT UNITI OPTIONS
        TRADED EFFICIENTLY ................................................................................. 35

## I.    INTRODUCTION

1.    On October 25, 2021, I submitted an expert report in this matter (my "Initial Report") in which I opined that the markets for Uniti Common Stock and Uniti Call and Put Options (together, "Uniti Securities")[1] were efficient during the Class Period[2] and that damages in this action can be calculated on a class-wide basis using a common methodology for Uniti Securities.[3]

2.    Following the submission of my Initial Report, counsel for Lead Plaintiffs provided me with a copy of the December 23, 2021 Expert Report of Christopher M. James, Ph.D. (the "James Report") in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification filed December 23, 2021, and the sworn deposition transcript of Dr. James taken on February 4, 2022 ("James Deposition").  On January 24, 2022, I submitted a declaration to which I attached a corrected report (the "Coffman Report" or my "Report"), which made a correction and replaces my Initial Report in entirety.  Counsel for Lead Plaintiffs asked me to review and respond to contentions in the James Report that (1) two of the alleged corrective disclosures had no price impact under Dr. James' characterization of Plaintiffs' claims and two of the alleged corrective disclosures only had price impact under a subset of Dr. James' characterization of Plaintiffs' claims;[4] (2) I have not presented a methodology that can reliably measure damages consistent with Plaintiffs' theories of liability;[5] and (3) that I have failed to provide reliable

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meanings given to them in the Coffman Report.  Throughout this report the term "efficiency" refers to "semi-strong market efficiency" as defined in the Coffman Report (¶¶ 14-19).

[2] The putative Class Period is from April 24, 2015 through June 24, 2019, inclusive.

[3] Coffman Report ¶¶ 6-7.

[4] James Report ¶ 24 and Section VI.

[5] James Report ¶ 25 and Section VII.

evidence that Uniti Options traded in an efficient market throughout the Class Period.[6]  My

responses to the James Report are set forth in this document (my "Rebuttal Report").

3.    In formulating my opinions set forth in this Rebuttal Report, I relied upon the

Coffman Report and my knowledge, experience, and formal training in economics, finance, and

statistics, as well as the allegations and facts set forth in this lawsuit.  In performing the analyses

set forth in this Rebuttal Report, I also considered: (1) the James Report; (2) data, analyses, and

back-up materials provided by Dr. James to counsel for Lead Plaintiffs that Dr. James claims to

have considered in connection with his analyses; and (3) other relevant materials and

information.  All of the materials that I relied upon and considered in reaching my opinions in

this Rebuttal Report are identified in the attached **Appendix A,** as well as in Appendix A to my

Report.

4.    My qualifications and rate of compensation for work in this matter were identified

in my prior Report and I do not repeat them here.  I have attached an updated version of

my *curriculum vitae* as **Appendix B**.

5.    I reserve the right to amend this Rebuttal Report, including to reflect new

information that becomes available to me in light of the discovery process or future rulings from

the Court.

## II.    SUMMARY OF OPINIONS

6.    Dr. James does not dispute my analysis or opinion that the market for Uniti

Common Stock was efficient during the Class Period.

7.    Properly viewed, the James Report affirmatively supports a finding of price impact

in this matter.  In particular, Dr. James affirmatively opines that the alleged corrective

---

[6] James Report ¶ 26 and Section VIII.

disclosures on September 25, 2017 and June 24, 2019 contain new information that allegedly corrects prior misstatements and that there was a statistically significant stock price decline at the time of those disclosures.[7,8] Dr. James' assertion that each of these corrective disclosures relate only to subsets of the alleged misstatements based upon his own invented taxonomy of breaking Plaintiffs' claims into three mutually exclusive theories[9] (that Plaintiffs dispute) does nothing to change the simple economic conclusion that his analysis, far from precluding price impact, demonstrates price impact.

8.    Likewise, on the other two alleged corrective disclosures, while Dr. James asserts that there is no corrective information released on either August 3, 2017 or February 15, 2019 (a loss causation contention Plaintiffs dispute), his own analysis demonstrates there was new information released to the market concerning the viability of the Sale-Leaseback structure and/or the potential impacts of the failure of the Sale-Leaseback structure and that there was a statistically significant stock price decline at the time of both events.[10,11] Far from precluding price impact, his analysis provides economic evidence in support of price impact.

9.    Dr. James acknowledges that the Out-Of-Pocket damages methodology described in the Coffman Report (¶¶ 94-99) is standard and applicable in this matter.[12] Instead of calling into

---

[7] James Report Section VI.B and Section VI.D, James Deposition 88:10-89:8 and 135:13-136:3.

[8] My own event study also finds statistically significant stock price declines on these days and affirmatively supports price impact.

[9] James Deposition 48:23-52:5.

[10] Dr. James clearly finds that there is a statistically significant price reaction on both of these events (See Exhibit 1, in which my replication of Dr. James' event study finds a highly statistically significant abnormal decline on Uniti stock on both August 3, 2017 and February 19, 2019). However, he also attempts to argue that there is not a significant price reaction on August 3, 2017 if one controls for Windstream's returns. I describe herein why controlling for Windstream returns is fundamentally flawed as it inappropriately obscures the very causal linkage that Plaintiffs allege. If anything, his finding reinforces Plaintiffs' claim.

[11] My own event study also finds statistically significant stock price declines on these days and affirmatively supports price impact.

[12] James Deposition 142:25-143:5; there is no dispute of the applicability of the Out-Of-Pocket methodology in the James Report.

question the Out-Of-Pocket damages methodology outlined in my Report, the James Report merely raises a number of speculative questions as to how a loss causation analysis will ultimately address: (1) if the price reaction is unreflective of the removal of inflation due to a lack of causal economic linkage between the alleged corrective disclosure dates and the alleged misrepresentations,[13] (2) the market's reflection of already disclosed risks and how it may have changed or evolved over time,[14] and (3) confounding information.[15]  These more detailed issues regarding loss causation (*i.e.*, "disaggregating" the effect of potential confounding information, how inflation evolved over the *class* period, and the connectedness of the corrective events to the misstatements) are present in virtually every securities class action matter and are regularly the subject of expert and merits discovery based upon a full factual record.  In other words, Dr. James is conflating specific methodologies for evaluating loss causation (*i.e.*, properly determining the quantum of artificial inflation over the Class Period), with the standard and well-accepted Out-Of-Pocket damages framework that can easily be applied to Plaintiffs' claims class-wide regardless of the degree of artificial inflation that Plaintiffs can ultimately prove.

10.    Dr. James' critiques of my analysis of Uniti Options do not disturb my opinion that there is economic evidence supporting that Uniti Options traded efficiently.  Dr. James does not dispute my findings with respect to put-call parity, which demonstrates Uniti Option prices moved with the underlying stock price to avoid arbitrage conditions.  Dr. James' observations about my cause-and-effect analysis do not suggest market inefficiency or disturb my overall finding of a cause-and-effect relationship between new news and changes in Uniti Option prices.

---

[13] James Report ¶¶ 100-103.

[14] James Report ¶¶ 104-115.

[15] James Report ¶¶ 116-120.

6

Finally, Dr. James' criticism of my evaluation of option series on an aggregate level is misplaced.

### III.    DR. JAMES DOES NOT DISPUTE MARKET EFFICIENCY FOR UNITI COMMON STOCK

11.    Dr. James does not dispute that my empirical analysis of eleven well-established factors supports a finding of market efficiency during the Class Period for Uniti Common Stock. Indeed, in numerous places throughout the James Report, Dr. James explicitly provides analyses and opinions "assuming the market for Uniti's stock was efficient from April 24, 2015 through June 24, 2019…"[16]  Furthermore, Dr. James states that he was only asked to review and evaluate my market efficiency analyses and opinions as they relate to Uniti Options, not Uniti Common Stock.[17]

12.    My Report demonstrates that: (1) the weekly trading volume of Uniti Common Stock easily surpasses the *Cammer* threshold level of average weekly trading volume (an average weekly volume of 9.74 million shares, which represents 5.76% turnover per week during the Class Period) (*Cammer* Factor 1);[18] (2) a large number of securities analysts followed Uniti (at least 346 reports from 11 different equity analysts during the Class Period), and there was also substantial press coverage and other sources of publicly available information regarding the

---

[16] James Report ¶ 7. *See also,* James Report ¶ 24: ("assuming the market for Uniti's stock was efficient during the proposed Class Period."); James Report ¶ 59: ("assuming that Uniti's stock traded in an efficient market during the proposed Class Period"); James Report ¶ 61: ("Assuming Uniti's stock traded in an efficient market,"); James Report ¶ 69: ("assuming Uniti's stock traded in an efficient market."); James Report ¶ 81: ("assuming Uniti's stock traded in an efficient market."); James Report ¶ 90: ("assuming Uniti's stock traded in an efficient market"); and James Report Appendix D ¶ 16: ("assuming Uniti's stock traded in an efficient market").

[17] *See,* James Report ¶ 8: ("Specifically, I have been asked to review and evaluate: (1) whether Mr. Coffman has put forth a methodology capable of reliably measuring class-wide damages in a manner consistent with Plaintiffs' theories of liability, and (2) Mr. Coffman's analysis and conclusion that Uniti's options traded in an efficient market during the proposed Class Period.").

[18] Not only does this easily exceed the *Cammer* thresholds, but it also compares favorably against other exchange-traded securities (Coffman Report ¶¶ 27-28).

Company (*Cammer* Factor 2);[19] (3) Uniti traded on the NASDAQ at all times during the Class Period, and thus satisfies the "market maker" factor (*Cammer* Factor 3);[20] (4) Uniti was apparently eligible to file a Form S-3 during the Class Period because Uniti had been subject to SEC filing requirements for more than a year, had filed all documents in a timely manner over the preceding twelve months (except for a delayed 10-K filing during the brief period from March 4, 2019 to March 18, 2019), and did not fail to meet its debt obligations, to my knowledge (*Cammer* Factor 4);[21] and (5) there was a strong cause-and-effect relationship between new Company-specific information and the market price of Uniti Common Stock during the Class Period (*Cammer* Factor 5).[22] The analysis in my Report also demonstrated that (6) Uniti's market capitalization was sufficiently large during the Class Period, a factor associated with larger institutional ownership, greater analyst coverage, and is therefore correlated with a finding of market efficiency (*Krogman* Factor 1),[23] and (7) that Uniti had one of the lowest bid-ask spreads when compared to a random sample of 100 other common stocks on the NYSE and NASDAQ. This metric indicates that Uniti Common Stock traded in a well-developed market and that the costs to transact in Uniti Common Stock were relatively low, also indicating an efficient market (*Krogman* Factor 2).[24] In addition, (8) Uniti had a large percentage of shares held by non-insiders, and thus the public float is supportive of market efficiency (*Krogman* Factor 3);[25] (9) Uniti was traded by sophisticated traders, with virtually the entirety of its public

---

[19] Coffman Report ¶¶ 32-37.

[20] Coffman Report ¶¶ 38-42.

[21] Coffman Report ¶¶ 43-45.

[22] Coffman Report ¶¶ 46-67.

[23] Coffman Report ¶¶ 68-70.

[24] Coffman Report ¶¶ 71-72.

[25] Coffman Report ¶ 73.

float being held by institutions during the Class Period (Additional Factor 1);[26] (10) there was no evidence of consistent autocorrelation for Uniti Common Stock throughout the Analysis Period, of which the Class Period is a subset (Additional Factor 2);[27] and (11) there was considerable options trading during the Class Period, which is associated with the underlying stock trading in an efficient market (Additional Factor 3).[28]

13.    Taken together, these metrics provide overwhelming and undisputed evidence that support a conclusion that Uniti Common Stock traded in an efficient market throughout the entire Class Period.  Dr. James does not offer a single criticism of any part of my analysis or conclusions regarding the market efficiency of Uniti Common Stock.

## IV.    PROPERLY VIEWED, DR. JAMES' REPORT AFFIRMATIVELY SUPPORTS A FINDING OF PRICE IMPACT IN THIS MATTER

14.    To assess price impact, Dr. James analyzes the four alleged corrective disclosures:

> In this section, I will discuss the stock price movements following the four sets of alleged corrective disclosures, as well as the information released on those dates, and assess whether there was any "price impact" attributed to the alleged misrepresentations under each of Plaintiffs' theories of liability.  By "price impact," I mean whether the alleged misrepresentations impacted Uniti's stock price in connection with the alleged corrective disclosures.[29]

15.    Dr. James defines the three categories of Plaintiffs' theory as: (1) "Sale-Leaseback Theory" (*i.e.*, "the material risk that the Spin-Off was a prohibited sale-leaseback transaction that violated the indenture"); (2) the "True Lease Theory" (*i.e.*, "the true extent of the risk that the Master Lease was not a true lease, but rather a carefully disguised financing arrangement"); and (3) "Navigating the Bankruptcy Theory" (*i.e.*, "Uniti's ability to 'navigate the Windstream

---

[26] Coffman Report ¶ 74.

[27] Coffman Report ¶¶ 75-78.

[28] Coffman Report ¶ 79.

[29] James Report ¶ 36.

bankruptcy proceedings without having to raise external capital'").[30] Dr. James conceded in his deposition that this taxonomy of three separate theories of liability are his own invention and not identified in the Complaint.[31] I understand Plaintiffs' allegations to be that there was an overarching fraud whereby Defendants understood and knew the economic substance of the Spin-Off violated the indenture (even if they hoped form would trump substance), that Defendants took affirmative steps to conceal or downplay such an understanding and made affirmative statements that downplayed the risk to the market that the Spin-Off structure could be challenged and downplayed the risks to Uniti if Windstream was found in default of the indenture. Plaintiffs do not separate their overall theory of liability into mutually exclusive categories as imagined by Dr. James.[32]

16. Dr. James concludes that: (1) none of the alleged misstatements and/or omissions had a price impact on Uniti Common Stock on August 3, 2017 and February 15, 2019;[33] and (2) the alleged misstatements and/or omissions related to two of the three "theories of liability" Dr. James invented for his analysis did not have a price impact on Uniti Common Stock on September 25, 2017 and June 24, 2019.[34] By implication, Dr. James acknowledges that there is price impact on September 25, 2017 and June 24, 2019 from at least certain alleged misstatements and/or omissions, a conclusion his deposition testimony confirmed.[35] The former conclusion is based, not upon a lack of price movement, but entirely upon Dr. James' own flawed and disputed loss causation opinion that there is no corrective information on August 3,

---

[30] James Report ¶¶ 18 and 20.

[31] James Deposition 48:23-52:5.

[32] I also note that Dr. James never addresses Plaintiffs' "scheme liability" claims at all (the word "scheme" never appears in the James Report) and offers no opinion about price impact specifically related to those claims.

[33] James Report Section VI.A and Section VI.C.

[34] James Report Section VI.B and Section VI.D, James Deposition 88:10-89:8 and 135:13-136:3.

[35] James Deposition 91:16-91:22 and 135:13-136:19.

10

2017 or February 15, 2019. Indeed, Dr. James' analysis, as well as my own, affirmatively demonstrates statistically significant price declines on all four of the alleged corrective disclosures.

### A. SEPTEMBER 25, 2017 AND JUNE 24, 2019 CORRECTIVE DISCLOSURES

17. There is no dispute that the market price of Uniti Common Stock declined significantly in the wake of both the September 25, 2017[36] and June 24, 2019 alleged corrective disclosures. This is confirmed by Dr. James' own event study, my replication of his event study, as well as my own independent event study that was described in my Report. **Exhibit 1** shows the results of each of our event studies on the alleged corrective disclosure dates, and while there are some slight calculation differences based upon using different estimation windows and control indices, the clear conclusion from each is that Uniti Common Stock declined by a statistically significant amount with well over 99% confidence on both September 25, 2017 and June 24, 2019.

18. Furthermore, while Dr. James dissects Plaintiffs' allegations into three mutually exclusive theories of liability, and attempts to describe how the disclosures on these days do not relate to certain of his own defined subsets of Plaintiffs' claims, he explicitly acknowledges price impact with regard to certain misstatements and/or omissions.

19. For example, there is no dispute that the market first learned of Aurelius's Notice of Default on September 25, 2017.[37] Dr. James makes no attempt to suggest that this information is

---

[36] The information was disclosed in an 8-K filing after market close on September 25, 2017 and the relevant price reaction therefore begins on the next trading day of September 26, 2017. Plaintiffs allege the stock price continued to reflect this new information when the stock price continued to decline on September 27, 2017 as well. It is not necessary to, and I do not, address here whether there is economic evidence that the stock price decline on September 27 reflects further price impact that should be considered as part of a loss causation or damages analysis.

[37] James Report ¶ 51; Uniti SEC Form 8-K filed Sep 25, 2017.

not causally related to the alleged misstatements under what he calls the "Sale-Leaseback"

theory.  Indeed, Dr. James states:

> The Aurelius notice of default claiming a breach of the Sale and Leaseback covenant of the indenture appears to relate to Plaintiffs' Sale-Leaseback Theory, i.e., the allegedly misrepresented and concealed risk that 'the Spin-Off was a prohibited sale-leaseback transaction that violated the indenture.'[38]

20.    While Dr. James then offers pure conjecture that this event "could" be related to

previously disclosed risks,[39] he stops far short of opining that the clear public disclosure of an

alleged breach is causally disconnected from Plaintiffs' alleged misstatements that there was an

undisclosed breach.  The causal connection is clear and logical: Plaintiffs allege that Defendants

downplayed and concealed the risk that the transaction was prohibited, and this relevant truth

was partially revealed when Aurelius sued claiming it was prohibited.  Combined with the

observed price decline, this provides clear economic evidence of price impact of the alleged

misstatements.

21.    Likewise, on June 24, 2019, the market first learned of Uniti's need to raise

additional capital in the wake of the sale-leaseback structure being ruled a violation of

Windstream's Indenture.[40]  Dr. James similarly makes no effort to suggest that this information

is not causally related to the alleged misstatements under what he calls the "Navigating the

Bankruptcy" theory.  Dr. James states:

> Plaintiffs assert that the $300 million note offering 'implicitly acknowledg[ed] that Uniti's business was impacted by Windstream's bankruptcy and, as a result, Uniti could not maintain its business operations without accessing the capital markets, contrary to the Company's and Defendants Kenny Gunderman's and

---

[38] James Report ¶ 52 citing Complaint ¶ 16.

[39] James Report ¶ 52.

[40] Uniti SEC Form 8-K filed June 24, 2019.

Wallace's repeated representations.'[41] Thus, Plaintiffs appear to claim that this alleged corrective disclosure relates to Plaintiffs' Navigating the Bankruptcy Theory, i.e., the alleged misrepresentations regarding Uniti's ability 'to navigate the Windstream bankruptcy proceedings without having to raise external capital.'[42]

22. Dr. James does not dispute the causal connection or that there was a statistically significant price impact when disclosed. Instead, he describes how, in his view, this disclosure is unrelated to certain misstatements and/or omissions outside of what he deems the "Navigating the Bankruptcy Theory." Therefore, properly viewed, Dr. James has not demonstrated a lack of price impact, but quite the opposite. There is a clear causal connection between the alleged false statement that Uniti would not need to access the capital markets and the later announcement that they were accessing the capital markets. Dr. James' avoidance of any attempt to explain a lack of economic connection between the June 24, 2019 event and his "Navigating the Bankruptcy" theory confirms that the alleged misstatements did indeed have a price impact on Uniti's stock on June 25, 2019, as is supported by the statistically significant price decline on that day.

## B. AUGUST 3, 2017 CORRECTIVE DISCLOSURE

23. There is no dispute that August 3, 2017 is when the market learned of Windstream's elimination of its dividend.[43] There is also no dispute that the price of Uniti Common Stock declined in a statistically significant manner as a result.[44] **Exhibit 1** shows that under both his event study as well as my own, there is a statistically significant stock price decline with well

---

[41] James Report ¶ 92 citing Complaint ¶ 262.

[42] James Report ¶ 92 citing Complaint ¶ 29.

[43] "Windstream Board of Directors Revises Capital Allocation Strategy," *NASDAQ GlobeNewswire*, August 3, 2017; James Report ¶ 39.

[44] James Report Exhibit A.1. (Dr. James finds an abnormal return on Uniti stock of -8.18% on August 3, 2017, an abnormal decline with a p-value of 0.00 and therefore at well over the 99% level of statistical significance.)

over 99% confidence. Dr. James argues that the alleged misstatements and/or omissions had no price impact on Uniti Common Stock:

> There is no economic connection between the announcement of Windstream's dividend cut and the alleged misrepresentations under any of Plaintiffs' theories of liability. Rather, the price decline following the announcement reflects Uniti's previously disclosed exposure to Windstream's financial performance.[45]

24. However, Dr. James' opinion is entirely based on an assumption that Windstream's cutting of its dividend has nothing to do with the risk that the Spin-Off transaction was improper. To the extent Plaintiffs can adduce evidence Windstream decided to discontinue its dividend to conserve cash as a result of potential claims of default, or that continued payment of dividends might be considered improper in the face of expected claims of default, then the news and subsequent stock price decline is clearly causally related to Plaintiffs' claims. There is nothing in the James Report that breaks this possible causal connection. In fact, an email sent to Uniti employees on August 4, 2017, Defendant Gunderman explained:

> … [Uniti's] largest customer, Windstream, surprised Wall Street by completely eliminating their dividend. As a result, their stock traded down by over 30% and our stock traded down over 8%. ***Typically a dividend cut is viewed as a sign of weakness in a business, and we believe our stock traded down largely based on investor's [sic.] fear that Windstream will not be able to continue paying our lease payment.***[46]

It is clear from this email that Defendants themselves attributed Uniti's stock price decline to Windstream's elimination of its dividend.

25. Separately, Dr. James performs a regression analysis that shows Uniti's stock price decline is no longer statistically significant if one also controls for the decline in Windstream's

---

[45] James Report ¶ 24.

[46] Uniti_Class_008822277 [emphasis added].

stock price upon the announcement of the elimination of the dividend.[47]  Far from being evidence of a lack of price impact, this analysis affirms the causal linkage between Windstream's announcement and the decline in Uniti's stock price.  In other words, his analysis shows that the market understood Uniti's reliance on Windstream's ability to pay its obligations to Uniti and that the Windstream announcement accounts for the decline in Uniti's stock price.  This conclusion is entirely consistent with how analysts interpreted the stock price decline.[48]  As a result, Dr. James' additional regression analysis affirms precisely the causal linkage that Plaintiffs assert and further supports price impact.

### C.  FEBRUARY 15, 2019 CORRECTIVE DISCLOSURE

26.    Similarly, there is no dispute that the price of Uniti Common Stock declined significantly following the February 15, 2019 opinion that the Spin-Off was an improper sale-leaseback transaction that put Windstream in default of its Indenture.  **Exhibit 1** shows that Dr. James' own event study, my replication of his event study, as well as my own independent event study described in my Report, all demonstrate that there was a statistically significant decline in Uniti's stock price with well over 99% confidence.

27.    Dr. James asserts that both the trial and the facts cited by Judge Furman in his February 15, 2019 opinion were publicly available prior the disclosure of the judge's decision, and so it follows that in an efficient market, the market price of Uniti Common Stock would have

---

[47] James Report ¶ 47 and Exhibit 1.

[48] *See, for example,* "Good 2Q17 Results; WIN Div Cut Creates Compelling Opportunity," *Cowen*, August 4, 2017 ("We understand the close relationship with Windstream, but we believe the UNIT stock pullback was unjustified, creating an attractive entry point"); *and* "Defensive, diversifying and discounted; Buy on pullback," *Deutsche Bank*, August 4, 2017 ("We certainly acknowledge the bear case around Windstream driving 70% of revenues, though we remain comfortable with rent coverage, and UNIT's risk-adjusted return profile"). Analysts had differing opinions on the impact of Windstream's dividend cut on Uniti, but they all acknowledged the close relationship between the companies.

15

accounted for that information prior to February 15, 2019.[49]  However, there is no dispute that February 15, 2019 is the first time the market learned of Judge Furman's ruling.[50]

28.   Dr. James nevertheless opines that there is no evidence of price impact on this day:

> Based on my review of the relevant information mix, all the factual findings that are cited by Judge Furman in support of his legal conclusion that the spinoff and Master Lease constituted a prohibited sale-leaseback transaction had been revealed to the market at least six months before the decision was issued.  Assuming Uniti's stock traded in an efficient market during the proposed Class Period, such factual information was already incorporated into Uniti's stock price and therefore could not have impacted Uniti's stock price on February 19, 2019 or on any later date. Rather, the market was reacting to Judge Furman's unexpected legal opinion as well as the resulting rating agency actions, which could not have been disclosed at the beginning of the proposed Class Period (and I understand that Plaintiffs are not alleging that Defendants should have disclosed predictions about such events).[51]

29.   While clearly true that Defendants could not have disclosed Judge Furman's opinion before it occurred, Dr. James' conclusion is based upon loss causation assumptions that are inconsistent with Plaintiffs' allegations.  Plaintiffs allege Defendants understood from the very beginning that the economic substance of the transactions was totally consistent with how the judge ultimately ruled (even though they hoped it would be seen differently) – took affirmative steps to try to structure the deal to obscure that reality – and made affirmative statements to the market that downplayed the risk.  In particular, on November 7, 2017, Defendant Gunderman made detailed representations, such as:

> But – so we realize the Windstream question is a big question. There's a lot of fear and confusion out there right now driving our securities, largely attributable to the – kind of the alleged default notice. *We find it extremely frustrating, especially on behalf of our shareholders that there's so much turmoil going on, and especially*

---

[49] James Report ¶¶ 60-61.

[50] Aurelius Litigation, ECF No. 245.

[51] James Report ¶ 24.

*when we think the claim itself is just manufactured. We've been following it very, very closely. . . . We've done a deeper dive on our lease and our different scenarios than we ever have before and continue to be highly confident in the leased, lease payment, the protections that we have in all scenarios. So none of that has changed. . . . And we do think that the trends and the tide are moving in Windstream's favor in terms of the things that they're dealing with*. . . .[52]

30.   Even after the trial, and the evidence that Dr. James claims was all publicly available, Plaintiffs allege that Defendants continued to mislead the market by downplaying the possibility that the judge's opinion could reflect what Plaintiffs allege was true all along:

> But I think it also – it is also the lawsuit relative to us.  And because it would be – with the litigation overhang there and then there's always some risk, I'll admit, small, as to what the impact of an unfavorable position could be.  Now that said, we fully expect – I believe Windstream fully expects as well, but I think they're speaking at the conference and I think they'll affirm it. We fully expect to have a favorable decision.  And sooner is better from that standpoint, and I think they fully expect to have a favorable outcome on the court ruling as well.[53]

> I expect that the litigation will be favorably settled here for Windstream, and we'll get a ruling from the judge pretty soon.[54]

31.   Therefore, Plaintiffs allege that the ultimate verdict reflects the materialization of the risk that Defendants had consistently downplayed throughout the Class Period prior to the verdict being announced, regardless of what information was already in the market.  Dr. James ignores the potential for such statements to influence the market price and change the perceptions of investors of the likelihood of an adverse decision from Judge Furman.[55]

---

[52] Complaint ¶ 186 citing Mr. Gunderman's statements at the Wells Fargo Media & Telecom Conference, November 7, 2017.

[53] Complaint ¶ 195 citing Mr. Wallace's statements at the Bank of America Merrill Lynch 2018 Media, Communications & Entertainment Conference, September 6, 2018.

[54] Complaint ¶ 197 citing Mr. Wallace's statement at the Deutsche Bank Leveraged Finance Conference, October 3, 2018. *See also,* Complaint ¶ 198 for similar statements by Mr. Gunderman during the November 1, 2018 conference call.

[55] James Deposition 30:11-18.

17

32. Indeed, this is the precise logic that was affirmed by the court in its Order on the Motion to Dismiss in response to Defendants' arguments that this event is unrelated to Plaintiffs' claims:

> Plaintiffs correctly respond that they have sufficiently pleaded loss causation and that they do not only rely on a "corrective disclosure" theory. Resp. Mot. Dismiss at 51. Plaintiffs point out that they have explicitly pleaded a "materialization of the risk" theory of loss causation. Id. at 52. Under this theory, plaintiffs plead that the "loss was foreseeable and caused by the materialization of the concealed risk." Id. (citing Schaaf v. Residential Funding Corp., 517 F.3d 544, 550 (8th Cir. 2008)). This is true because plaintiffs allege known risks that defendants concealed, and "when those risks materialized," plaintiffs suffered a loss. Am. Compl. ¶¶ 241–266.[56]

33. In summary, Dr. James' price impact opinion does not address whether there was a measurable price response to what Plaintiffs allege is a materialization of the risk that had been downplayed by the alleged misstatements and/or omissions. There was. His opinion instead rests upon a wholesale rejection of Plaintiffs' allegations and loss causation theory that Judge Furman's opinion was a materialization of the risk, while he (1) failed to consider the extent to which Defendants' alleged misstatements and/or omissions may have impacted the market's perception of the risk; and (2) ignores that the court's opinion is confirmation of what Plaintiffs alleged was always true but downplayed by Defendants – that the Spin-Off was an impermissible sale-leaseback transaction and that Windstream was in default of its Indenture putting Uniti's financial health in peril.

34. Dr. James' opinion also relies completely on an acceptance of the notion that the facts upon which Judge Furman decided the case were publicly available and therefore there was

---

[56] Decision and Order Denying Defendants' Motion to Dismiss filed March 31, 2021, In re *Uniti Group Inc. Securities Litigation*, No. 4:19-cv-00756-BSM, pp. 8-9.

18

no room for the price to be artificially inflated by Defendants' statements.[57]  Dr. James also

points out that certain analysts and articles covered the trial.  None of these materials, from an

economic standpoint, preclude the market from still being influenced by Defendants' public

statements.  The idea that investors have a duty to, expectation to, or in fact did (1) ignore

Defendants' own statements about the trial, the Spin-Off transaction and the protections the

Master Lease allegedly afforded Uniti in the event of Windstream's default or bankruptcy, and

(2) perform their own detailed legal and economic analysis based on the underlying documents

Dr. James contends were available from public sources, and (3) that the consensus market value

would reflect that assessment rather than rely to any degree on Defendants' own statements, is

purely speculative and unproven by Dr. James.  Market efficiency does not imply in any way that

the market will ignore issuer statements.  To the contrary, it is recognized as one of the most

important sources of information for investors, because insiders often have access to far more

information, context, and insights than investors.[58]

35.    Moreover, Dr. James' citation to a Raymond James analyst note and

contemporaneous news coverage of the trial does not suggest in any way that the market was

fully informed of the underlying facts Dr. James contends were available, or that investors were

---

[57] Dr. James also argues that information does not need to be widely disseminated to be reflected in the stock's price (James Report ¶ 29).  He cites to literature that does not make that explicit point, but rather, shows evidence of market price reactions to specific types of information that Dr. James characterizes as not widely disseminated. However, none of these articles document the extent to which the information they identify was widely disseminated.  Moreover, one of the articles assesses that certain information impacts the market price for up to three days, consistent with my earlier expressed views and contrary to Dr. James' claims that all price reactions would be expected to occur in one day or less.  In my decades of experience studying how the market reacts to certain types of information, I have found that whether the market price reacts to information that is technically publicly available but not necessarily widely disseminated can depend on a host of factors that are unique to the specific information for the particular company.  For example, a Court agreed with my conclusion that the market would not have incorporated information that another expert claimed was publicly available in brochures, flyers, blog posts, online forum posts, tweets, meetings from local city councils, employee information packets, etc., even though all these could technically have been considered public to some degree (Memorandum Opinion filed January 29, 2020, in *Eric Weiner, Individually and on Behalf of All Others Similarly Situated, vs. Tivity Health, Inc., et al.,* Case No. 3:17-cv-01469).

[58] *See* SEC Regulatory Pronouncements, accessible at https://www.sec.gov/divisions/enforce/friregulatory.shtml.

not influenced by Defendants' statements downplaying any risks to Uniti from the pending litigation. For example, the Raymond James analysts are not attorneys and were clearly not relying on detailed legal analysis to inform the market about the permissibility of the Spin-Off, or the risks to Uniti should Windstream be found in default of its Indenture. Their analysis focused on reading the degree to which the judge was questioning both sides and their impression of the quality of the presentations.[59] Likewise, the contemporaneous news coverage did not purport to provide legal analysis, let alone the "deep dive" into the transaction that Defendants purportedly did to justify their alleged misstatements. In sum, these public materials do not in any way imply that Defendants' misstatements did not impact the market price of Uniti or that the artificial inflation was dissipated on February 15, 2019.

## V.    DR. JAMES ACKNOWLEDGES THE OUT-OF-POCKET DAMAGES METHODOLOGY IS APPLICABLE CLASS-WIDE IN THIS MATTER AND HIS DAMAGES-RELATED ARGUMENTS RELATE TO LOSS CAUSATION QUESTIONS THAT THE OUT-OF-POCKET METHOD CAN EASILY ACCOMMODATE

36.    I concluded in my Report that damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole.[60] Specifically, I described:

> There is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act. This method, typically referred to as the "out-of-pocket" method, equates damages to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day

---

[59] "Windstream Trial Wraps Up; Remain Positive on Outcome," *Raymond James*, July 31, 2018. Raymond James displays the bios of the analysts who authored this report on their website (accessible at https://www.raymondjames.com/corporations-and-institutions/global-equities-and-investment-banking/equity-research/equity-research-team). Frank G. Louthan IV received his MBA from Vanderbilt University's Owen School and a B.A. degree in economics and business from the Virginia Military Institute, while Alexander Sklar graduated from Emory University's Goizueta Business School with concentrations in accounting and finance, and is a certified public accountant and a CFA charter-holder.

[60] Coffman Report ¶ 99.

20

lookback" provision, a formulaic limit on damages that also can be applied class-wide). The out-of-pocket method has been applied in virtually every Section 10(b) matter I have observed or participated in as a consulting, testifying, or neutral expert.

Once the inflation per share has been quantified on each day during the Class Period, the computation of damages for each class member is formulaic based upon information collected in the claims process (i.e., the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Therefore, there is a well-accepted method to compute damages on a class-wide basis in Section 10(b) matters such as this.[61]

37.    Importantly, Dr. James does not dispute the validity of the Out-Of-Pocket method in calculating damages in securities cases.[62] He also does not opine that the Out-Of-Pocket method would be inappropriate in this matter, nor does he offer any alternative damages approach. Instead, Dr. James argues that I have "not proposed a methodology for measuring damages that is consistent with Plaintiffs' theories of liability."[63] Specifically, Dr. James criticizes the damages methodology described in my Report for three primary reasons:

1)  Mr. Coffman's proposed approach relies primarily on using the price reactions on the alleged corrective disclosure dates as a measure of price inflation. However, as discussed above, on certain such dates, the price reaction is entirely unreflective of the removal of price inflation due to a lack of economic linkage (i.e., mismatch) between the information released and the alleged misrepresentations.[64]

2)  Mr. Coffman does not provide a reliable methodology to measure inflation attributable to an allegedly concealed risk.[65]

3)  Mr. Coffman does not explain how his damages approach would disentangle the impact of any of the distinct theories of liability advanced by Plaintiffs, apportion inflation among the various

---

[61] Coffman Report ¶¶ 94-95.

[62] James Deposition 142:25-143:5.

[63] James Report ¶ 101.

[64] James Report ¶ 25.

[65] James Report ¶ 25.

> alleged misrepresentations in this case, or account for non-fraud related company-specific (or "confounding") information, which is especially problematic given the complexity of the information mix and Plaintiffs' allegations.[66]

38.    None of Dr. James' objections relate to whether the generally accepted Out-Of-Pocket damages methodology can be applied uniformly and formulaically in this matter using common proof on a class-wide basis.  Instead, all three of his primary arguments are premised on how artificial inflation would ultimately be quantified.  In other words, while Dr. James does not dispute that I provided a well-accepted *formula* for calculating damages (*i.e.*, artificial inflation per share at the time of purchase less the artificial inflation per share at the time of sale), he takes issue with that I have not already explained how I (or another damages expert) would calculate the *specific inputs* to that formula (*i.e.*, artificial inflation per share for each day in the Class Period).  Dr. James' claims are misplaced.

39.    First and foremost, the Out-Of-Pocket damages method that I described in my Report is widely accepted at the class certification stage without the specification of case-specific inputs.[67]  Dr. James has not cited any prior cases in which a court ruled that the Out-Of-Pocket method was not a sufficient "methodology" at the class certification stage, and in fact conceded that it was an accepted methodology.[68]

40.    Second, as I stated in my Report, specifying an approach to determine artificial inflation per share throughout the Class Period is dependent on a detailed loss causation

---

[66] James Report ¶ 25.

[67] **Appendix C** contains a list of numerous examples of securities litigation matters that have led to successful class certification within the last 10 years where I presented the standard Out-Of-Pocket damages methodology without the specification of artificial inflation.

[68] James Deposition 142:25-143:5.

analysis,[69] which I understand is not required at this stage of the litigation. Indeed, Dr. James himself concedes that this is the case:

> The relevant question for assessing price inflation or damages is therefore determining how but-for disclosures altering the market's perception of the risk could have changed Uniti's stock price. ***To be clear, I am not faulting Mr. Coffman for failing to perform such an analysis, nor am I suggesting that Mr. Coffman needs to perform a loss causation or damages analysis at this stage***.[70]

41.    The questions raised by Dr. James are present in virtually every securities class action matter, can substantially depend on information obtained during discovery, and are determined based upon proof that is common to all class members. For example, in many cases there is a dispute about (1) the degree to which the disclosures are connected to the alleged misrepresentations and/or omissions, (2) whether and the degree to which disclosures might reflect the materialization of known risks, and (3) whether the newly released information that is alleged to be corrective is confounded by other information unrelated to the fraud, and if so, how to reasonably estimate the value of that potentially confounding information.[71] In addition, in many cases there is typically a battle of the experts at the merits stage regarding whether a constant dollar methodology is appropriate and how artificial inflation per share evolved during the class period.[72] Answering these questions, and the three raised by Dr. James, requires a detailed loss causation analysis, which I understand is not required at this stage of the litigation, and, as a result, I have not been asked to perform.

---

[69] Coffman Report ¶ 96. *See also,* Coffman Report ¶ 98: ("The determination of how artificial inflation evolved over the Class Period is a case-specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above.")

[70] James Report ¶¶ 109-110 [emphasis added].

[71] **Appendix C**.

[72] **Appendix C**.

42. Finally, quantifying the inputs to the damage formula is a question separate and apart from whether there is a common method for computing damages for the Class.[73] As I described in my Report, whatever approach is ultimately used to determine the quantification and evolution of artificial inflation per share throughout the Class Period, it would be class-wide in nature and does not depend on the identity or circumstance of any specific investor.[74] Furthermore, the calculated artificial inflation per share for each day during the Class Period could then be used as inputs in the Out-Of-Pocket damages formula I described in my Report. I am not aware of any evidence, and Dr. James has not presented any, to demonstrate that there are unique circumstances in this matter that would preclude the quantification of artificial inflation per share for each day during the Class Period (*i.e.*, the inputs to the Out-Of-Pocket damages formula) from being calculated for the Class as a whole.

43. As a result of the foregoing, Dr. James' claims are baseless, and I indeed provided a clear and well-accepted damages methodology in my Report, consistent with prior cases in which classes have been certified where I presented this same methodology.[75] Even still, as I will describe below, the Out-Of-Pocket method I presented in my Report is flexible enough to accommodate all three of the supposed concerns raised by Dr. James.

## A. APPROACH USED TO MEASURE ARTIFICIAL INFLATION

44. In my Report, I stated that "the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations (*i.e.*, a

---

[73] Coffman Report ¶ 96.

[74] Coffman Report ¶ 98.

[75] **Appendix C**.

24

'corrective disclosure')."[76]  Dr. James does not dispute this.  However, as it relates to Uniti specifically, he claims that I fail to consider:

> …the price reaction on certain such alleged corrective disclosure dates is entirely unreflective of the removal of price inflation due to a lack of economic linkage (i.e., mismatch) between the information released and the alleged misrepresentations.[77]

45.  Dr. James is simply wrong.  I discussed at length above in Section IV how Dr. James' arguments related to price impact are flawed and there is strong evidence supporting price impact in this matter.  As a result, this "mismatch" that Dr. James claims for certain (but importantly, not all) of the alleged corrective disclosure dates does not exist.  Therefore, I am not aware of any evidence demonstrating that it would be inappropriate to measure artificial inflation by starting with an event study that measures the price reactions to the alleged corrective disclosures.  Certainly, adjustments might be necessary to reflect that the entire abnormal return might not be reflective of dissipation of artificial inflation, but that would be evaluated as part of a detailed loss causation analysis.

46.  Regardless, Dr. James' point is related to the specific approach used to measure artificial inflation, not to whether or not there is a class-wide methodology to measure damages – something Dr. James does not dispute.  I clearly described above and in my Report how the determination of artificial inflation per share for each day in the Class Period is a case-specific, fact-specific loss causation exercise, which I have not been asked to conduct at this time.[78]  Indeed, Dr. James explicitly acknowledges that calculating damages is dealt with at the merits

---

[76] Coffman Report ¶ 97.

[77] James Report ¶ 103.

[78] Coffman Report footnote 104 and ¶ 98.

25

stage: "[t]o be clear, I am not … suggesting that Mr. Coffman needs to perform a loss causation or damages analysis at this stage."[79]

47.    If asked to perform a loss causation analysis during the merits phase of this matter, I will evaluate, based on discovery, the most appropriate way to quantify artificial inflation per share in Uniti Common Stock throughout the Class Period.  Even if Dr. James were correct and an event study is inappropriate to use in this matter (which he has not demonstrated), I explicitly described in my Report how the quantification of artificial inflation per share can rely on a variety of other different valuation techniques.[80]  Without knowledge of what information will be learned in discovery, it is impossible to determine whether some of the techniques listed in my Report will play *any* role in quantifying the value of artificial inflation in this matter.  Therefore, Dr. James' concern that I have not outlined which specific method I would use, or that an event study may not be suitable, is irrelevant at the class certification stage.

48.    Regardless of which approach, or combination of approaches, is ultimately used as the loss causation input (*i.e.*, artificial inflation) to the Out-Of-Pocket damages model, the formula to calculate class-wide damages will be mechanical, the proof will be common to the Class, and the results will apply class-wide.  To put this into perspective, suppose investor Z purchased a share of Uniti Common Stock on August 1, 2017 and sold it on August 31, 2017.[81] At the merits stage, an event study analysis may determine that the most reasonable estimate of artificial inflation present in Uniti Common Stock is $7.00 and $4.00 on August 1, 2017 and August 31, respectively.  In this instance, damages for investor Z would be $3.00 ($7.00 artificial

---

[79] James Report ¶ 110.

[80] Coffman Report ¶ 97.

[81] This example assumes that there was at least one partial corrective disclosure between August 1, 2016 and December 1, 2016.

inflation at time of purchase less $4.00 at time of sale). Alternatively, a different valuation technique at the merits stage may indicate that the most reasonable estimate of artificial inflation present in Uniti Common Stock is instead $6.00 and $4.00 on August 1, 2017 and August 31, 2017, respectively. In this hypothetical scenario, investor Z's share would be damaged by $2.00 ($6.00 artificial inflation at time of purchase less $4.00 at time of sale). In both instances, the Out-Of-Pocket method can be applied to calculate damages for investor Z and all Class members, regardless of the specific technique used to determine the inputs into the damages formula (*i.e.*, artificial inflation per share for each day during the Class Period).

49. Even if Dr. James was somehow able to establish that there are no valuation techniques available to measure artificial inflation on a certain date or dates (an opinion that he does not express and is not supported by the record existing to date), the Out-Of-Pocket model could easily handle that outcome on a class-wide basis by assigning 0% artificial inflation on the necessary dates during the Class Period.

50. As a result, Dr. James' concerns related to the specific approach used to measure artificial inflation are premature, irrelevant, and can be easily incorporated into the Out-Of-Pocket damages methodology I described in my Report.

## B. MATERIALIZATION OF RISK

51. Dr. James further argues that I have not provided a damages methodology to measure inflation attributable to a concealed risk. Specifically, he claims:

> In addition, Plaintiffs claim that Uniti's stock price dropped due to the "materialization of risks" allegedly concealed by the alleged misrepresentations. However, Mr. Coffman does not provide a reliable methodology to measure inflation attributable to an allegedly concealed risk.[82]

---

[82] James Report ¶ 25.

> Mr. Coffman has not articulated how he would assess what the market's perception of the disclosed risk could have been based on the information that had already been disclosed, or what the market's perception of the "true risk" would have been in response to a but-for disclosure. Nor has he explained an approach to assess how these assessments may vary over time, i.e., how the market's perception of risk may have changed—for example, as a result of the developments in the Aurelius litigation—or how additional disclosures may have affected the market's perception of the true risk.[83]

52.    In making this argument, Dr. James is making a mountain out of a molehill. Dr. James' discussion of the supposed issues I would encounter measuring artificial inflation because of Plaintiffs' materialization of risk theory boils down to two basic loss causation issues: (1) accounting for the impact of information unrelated to the fraud ("confounding information") and (2) accounting for time-varying artificial inflation over the Class Period. Again, he is prematurely raising questions that are not relevant at this stage of the litigation and regardless, the standard Out-Of-Pocket damages model described in my Report is flexible enough to easily incorporate the materialization of risk (and thus Dr. James' concerns). Plaintiffs' materialization of risk theory does not preclude me from quantifying artificial inflation throughout the Class Period for Uniti Common Stock and measuring damages on a class-wide basis at the merits stage. I will address both confounding information and time-varying artificial inflation below in turn.

53.    I will illustrate the concept of confounding information based on the example of a materialization of risk that Dr. James provides in his report. He describes a hypothetical company involved in litigation that discloses to the market that it has a 10% chance of a negative litigation outcome, but the company concealed from the market that the true likelihood of a

---

[83] James Report ¶ 25.

28

negative outcome was really 30%. Dr. James' example concludes with the company ultimately disclosing that the 30% risk materialized, and the litigation outcome was negative.[84]

54. Dr. James utilizes this illustration to say that using the full decline in value on the date that the company announced the negative litigation outcome "would vastly overstate damages"[85] because it would be capturing the materialization of the full 30% in risk, even though the market was already aware of 10% of that risk. He also claims, without citing to any authority, that "the stock price decline on the alleged corrective disclosure dates, when Plaintiffs assert this risk materialized with certainty, cannot be used to reliably measure inflation."[86] Dr. James is simply wrong and his hypothetical exercise fails.

55. Dr. James fails to acknowledge not only that the Out-Of-Pocket method is easily adaptable to this scenario, but also that an event study could still be used to measure the full price decline on the date that the company announced the negative litigation outcome. Specifically, a portion of the decline could be disaggregated to account for the contemporaneous release of confounding information. This analysis would directly address Dr. James' concern that damages would somehow be overstated because the analysis isolates the economic impact of only the fraud-related information.

56. Indeed, using Dr. James' hypothetical, suppose an event study analysis determines there was a $9.00 decline in the share price (after controlling for market factors) on the day on which the company announced the negative litigation outcome. This would imply that a negative litigation outcome is worth $10.00 per share. In this hypothetical, the stock price dropped by 90% of the $10.00 (*i.e.*, $9.00) because 10% of the risk of the litigation outcome had

---

[84] James Report ¶ 107.

[85] James Report ¶ 108.

[86] James Report ¶ 106.

already been disclosed and was therefore already priced into the stock. In this instance, it would be improper to attribute the full $9.00 per share decline to the fraud (*i.e.*, the company's failure to disclose the additional 20% risk of the negative litigation outcome) because the vast majority of this price decline is due ultimately to bad luck that there was a negative litigation outcome, which the company did not know, and is thus confounding information.

57.    Therefore, because the company concealed a 20% known risk, then a $2.00 price decline on the disclosure date (20% of the $10.00 implied value of the litigation outcome) would be due to the fraud, and the remaining $7.00 per share decline would be considered unrelated to the fraud (*i.e.*, due to confounding information). This is entirely consistent with Dr. James' view that only the 20% undisclosed risk should be reflected in any artificial inflation prior to the materialization of the risk.[87] Dr. James' only reason in stating that I cannot measure inflation using an event study is based on the notion that I cannot attribute the full $9.00 price decline to the fraud. However, as I have demonstrated in this example, I can start from an event study and determine the portion of the decline attributable only to the concealed risk. Damages in this instance would not be overstated because the impact of any confounding information would be removed before using the artificial inflation per share estimate as an input in the Out-Of-Pocket formula.

58.    In any event, even if Dr. James were to determine that disaggregation is impossible in this case (an opinion that he does not express and which is not supported by the record existing to date), the Out-Of-Pocket formula could easily handle that outcome on a class-wide basis by assigning 0% artificial inflation to the alleged newly disclosed corrective information.

---

[87] James Report ¶ 108.

59. Likewise, in determining the appropriate assumption for the quantification of artificial inflation, the relevant inputs depend on the facts and evidence that existed and were concealed and what could and should have been disclosed at different points in time. This is the essence of what the parties investigate during discovery and what the finder of fact is asked to ultimately determine. The role of a damages expert is to assist the finder of fact in determining artificial inflation/damages based upon those findings. It is premature to specify these details before conducting a loss causation analysis that considers information learned in merits discovery. Who knew what, when they knew it, and what could and should have been disclosed are at the heart of what the finder of fact is asked to ultimately resolve based upon evidence presented by the parties after the completion of discovery. It is premature at the class certification stage to: (1) speculate that the evidence will show something different from what Plaintiffs allege, or (2) attempt to specify how these details would hypothetically impact Plaintiffs' quantification of artificial inflation without actually knowing what the evidence will show.

60. In any event, even if it turns out through merits discovery that true economic artificial inflation was not constant over the Class Period (for instance if, as Dr. James speculates, "the market's perception of risk may have changed"), the Out-Of-Pocket method outlined in my Report can account for such a circumstance and mechanically calculate damages on a class-wide basis. Indeed, the damages methodology described in my Report has accounted for artificial inflation that develops throughout a class period in other matters.[88]

---

[88] *See, for example, Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA) Litig.*, No. 09 MDL 2058 (PKC) (S.D.N.Y.); *Erica P. John Fund, Inc. v. Halliburton Co.*, No. 3:02-CV-1152-M (N.D. Tex.); *Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521-SB (D. Ore.).

61. For example, assume an event study analysis determines that there was a $10.00 decline in the share price attributable to the fraud on a day on which corrective information was released. Under a constant dollar back-casting methodology, such a finding would imply that $10.00 per share of artificial inflation existed on each day of the class period prior to this corrective disclosure. Now assume that the evidence obtained in discovery suggests that only half of the corrective information, or $5.00 per share, could have been disclosed for the first month of the Class Period. In that case, purchasers during the first month of the class period who held through the corrective disclosure would have purchased shares with $5.00 of artificial inflation (50% of $10.00) whereas shares purchased after the first month contained the full $10.00 of artificial inflation per share.

62. The same formula set out in my Report (artificial inflation at the time of purchase minus artificial inflation at the time of sale, which Dr. James does not dispute) still results in the appropriate assessment of damages. This example shows that the artificial inflation need not be constant over time for the Out-Of-Pocket damages methodology to be applied class-wide. Further, this example demonstrates that even under Plaintiffs' theory of a materialization of risk, the Out-Of-Pocket damages model can incorporate the changing economic impact of information at different points during the Class Period. No matter how the finder of fact weighs the evidence, whether it determines that artificial inflation was constant over the Class Period, or 90% or 50% of the full amount of artificial inflation was present in Uniti Common Stock at certain points in the Class Period, the result can easily be applied to any daily artificial inflation table that would accompany a loss causation report after merits discovery is complete. In other words, regardless of what the fact finder decides, the methodology for calculating damages will remain the same and apply equally to each Class member. Furthermore, if the finder of fact determines that the economic impact of a hypothetical disclosure was $0 as of a certain date, the

32

Out-Of-Pocket formula appropriately handles this outcome on a class-wide basis by assigning 0% artificial inflation to the relevant time period.

63.    That is, I would need to consider whether it is appropriate to assume that the economic impact of the information released on the alleged corrective disclosures would have been the same had the relevant truth concealed by the alleged fraud been disclosed at earlier points in the Class Period.

## C.  SEPARATING CONFOUNDING FROM CORRECTIVE INFORMATION IS COMMON TO ALL SECURITIES FRAUD LITIGATION

64.    Dr. James does not challenge my opinion that any estimate of artificial inflation in this matter would appropriately involve an event study specifically designed to assess the degree of price movement at the time of the alleged corrective disclosures.[89]  Instead, Dr. James notes that such an analysis would need to also address any potential confounding information, which he claims exists on the alleged corrective disclosure date and would require further analysis than an event study alone to determine artificial inflation.[90]  This is a loss causation issue ubiquitous in securities litigation which can be addressed on a class-wide basis.  As Dr. James himself

---

[89] Dr. James incorrectly asserts that the ultimate event window used in a loss causation analysis is dictated by the methodology I employ to analyze market efficiency. In particular, he states that the two-day stock price decline window is inappropriate given an efficient market, since "in an efficient market, stock prices react to information fully and quickly. Plaintiffs fail to explain how their attempt to include the stock price decline on September 27, 2017 as attributed to the announcement on September 25, 2017 is consistent with Mr. Coffman's conclusion on market efficiency." (James Report footnote 67). He repeats this assertion is his deposition (James Deposition 95:7-98:13). The precise determination of the appropriate event window to consider (*i.e.*, single day, two day or some other event window) in a loss causation analysis will be dependent upon further analysis of the facts. Additionally, it is not unusual for the market to take more than a day to fully impound corrective information. The use of two-day event windows is observed widely in the literature. *See, for example*, Tabak, David, et. al., "Determination of the Appropriate Event Window Length in Individual Stock Event Studies," *NERA Economic Consulting*, November 4, 2003 and A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (March 1997): pp. 13-39 ("It is customary to define the event window to be larger than the specific period of interest. This permits examination of periods surrounding the event.  In practice, the period of interest is often expanded to multiple days, including at least the day of the announcement and the day after the announcement.").

[90] James Report ¶ 34.

acknowledges, such a loss causation analysis, which is highly fact dependent, is not required at this stage.[91]

## VI.   THERE IS NO NEED TO DISAGGREGATE AMONGST DR. JAMES' INVENTED MULTIPLE THEORIES OF LIABILITY, AND IF THERE EVER WAS, IT WOULD REQUIRE A DETAILED LOSS CAUSATION ANALYSIS

65.   Dr. James states that I am required to explain how to separate the price impact attributable to each of his theories of liability.[92]  It is my understanding and experience that this is incorrect, and, in fact, pure speculation.  Plaintiffs do not allege separate theories in the way Dr. James describes them, but rather allege an overall fraud theory stemming from Defendants' failure to inform the market of the risks in the structure of the Spin-Off.  Even in the hypothetical scenario that Plaintiffs did allege the distinct theories of liability that Dr. James adopted, I see no reason to articulate a way to disentangle such theories as long as each is actionable in the case.  I am not aware of any economic authority suggesting that such a disaggregation of components of Plaintiffs' claims is necessary.  In the event that it did become necessary, the separation of these theories would be the result of a detailed loss causation analysis that would (a) be performed on a class-wide basis; and (b) include inputs that would still flow into the same Out-Of-Pocket methodology previously described.  My understanding is that loss causation (including disaggregation) need not be proven at class certification as a matter of law.[93]

---

[91] James Report ¶ 110 ("To be clear, I am not faulting Mr. Coffman for failing to perform such an analysis, nor am I suggesting that Mr. Coffman needs to perform a loss causation or damages analysis at this stage.")

[92] James Report ¶¶ 116-117.

[93] *Erica P. John Fund, Inc. v. Halliburton Co.,* 131 S. Ct. 2179, 2183 (2011).  (Holding that securities fraud plaintiffs need not prove loss causation in order to obtain class certification).

## VII.  DR. JAMES' CRITICISMS OF MY EFFICIENCY ANALYSIS OF UNITI OPTIONS ARE MISPLACED AND DO NOT DISTURB MY OPINION THAT THERE IS ECONOMIC EVIDENCE TO SUPPORT THAT UNITI OPTIONS TRADED EFFICIENTLY

66.    Dr. James asserts that I have not provided sufficient evidence to conclude that Uniti Options traded efficiently during the Class Period.[94]  First, he states that I do not perform the same analysis for Uniti Options that I did for Uniti Common Stock (*i.e.*, application of the *Cammer* and *Krogman* Factors) and that some Uniti Options have low volume and high bid-ask spreads that "could indicate potential impediments to market efficiency."[95]  Second, he states that my put-call parity test does not, by itself, establish market efficiency for Uniti Options.[96]  Finally, he states that I analyzed "cause and effect" as if Uniti Options were a single security, even though each is a unique security.[97]  I address each of these criticisms in turn.[98]

67.    To provide some context for my analysis and responses, I understand that there have been many securities class action matters where reliance on the misstatements and/or omissions was presumed for options, given that option values, and thus their market prices, are derivative of the market price for common stock, and would therefore be translated into the prices of options.[99]  Nevertheless, in certain matters, including this one, I have been asked to provide economic evidence to further substantiate that presumption.  The put-call parity test

---

[94] James Report ¶ 26.

[95] James Report ¶ 26(a) and ¶¶ 137-145.

[96] James Report ¶ 26(b).

[97] James Report ¶ 26(b).

[98] Dr. James also states that my "cause and effect" test is flawed because I did not use "actual prices." (James Report ¶ 26(b) and ¶¶ 146-153.)  This inadvertent error was addressed by my submission of a Declaration (attached as **Appendix D**) and in my Report, and is not addressed further herein.

[99] John Hull, *Options, Futures and Other Derivatives*, 7th Edition, Prentice Hall, 2009, p. 1.  *See also, Priceline.com Inc. Securities Litigation,* No. 3:00CV01884(DJS); *Scientific-Atlanta, Inc. Securities Litigation,* No. 1:01-CV-1950-RWS; and *Fannie Mae Securities Litigation,* No. 04-1639 (RJL).

assesses, daily, for each individual option pair, whether the observed option prices fall within the bounds that prevent arbitrage given the level of the common stock price.[100]  This test explicitly considers whether the option prices are consistent with any changes in the underlying Uniti Common Stock price and thus provide an indirect test of the premise that option prices can be presumed to incorporate anything impacting the common stock price.  Likewise, the cause-and-effect test seeks to show that, at a broad level, there is evidence of Uniti option prices moving when there is new news related to Uniti.[101]  Both these tests support the presumption that option prices, as a derivative of the common stock price, can be presumed to reflect information that impacts the common stock.

68.   As I stated in my Report, even for common stock, there are no bright-line tests for efficiency and no one test can definitively prove market efficiency.[102]  Furthermore, I am not aware of any case or other legal authority that suggests efficiency must be separately demonstrated on a series-by-series basis where, as here, there are hundreds of separate option series traded during the Class Period.[103]  That said, Dr. James' claim that I treat different series as "fungible" or "effectively as a single security" is simply inaccurate.[104]  In each of the analyses I perform, I directly take into account the differences across options on a series-by-series basis. Each and every put-call parity test is done by matching corresponding put and call options with the same expiration date and strike price.  Likewise, my cause-and-effect test performs analyses

---

[100] Coffman Report ¶¶ 85-88.

[101] Coffman Report ¶¶ 89-93.

[102] Coffman Report ¶ 22.

[103] I have been involved in previous cases in which I have submitted a full options analysis which was accepted by the court in certifying a class.  *See, for example,* Memorandum Order filed September 30, 2019, *Adam S. Levy v. Thomas Gutierrez, et al.*, No. 14-cv-443-JL; Memorandum and Order filed June 29, 2017, In re *Conn's, Inc. Securities Litigation*, No. 4:14-cv-548; Order filed September 25, 2012, In re *Schering-Plough Corporation/Enhance Securities Litigation*, Case No. 2:08-cv-00397-DMC-JAD.

[104] James Report Section VIII.B, ¶ 26(b).

at the individual series level and controlling for series-specific factors and explicitly accounting for series-specific expected returns and price volatility.[105]  To arrive at my overall opinion of whether there is economic evidence of efficiency, I certainly aggregate the series-level analysis to one overall test and conclusion, but the notion that I ignored the series-level differences in Uniti Options and in any way treated them as "fungible" or "effectively as a single security" is wrong.

69.    With that context, I now respond more specifically to Dr. James' criticisms.  As the James Report notes, there are important differences between the structure of options securities and equity securities.  This necessarily implies that the same factors analyzed for common stock are not necessarily applicable to options.  Nevertheless, certain of the *Cammer* and *Krogman* factors already described in my Report related to Uniti Common Stock apply equally to Uniti Options.  In particular, the presence of analyst coverage of Uniti, the fact the options trade on exchanges, Uniti's S-3 eligibility, and the overall market capitalization of Uniti are all background factors supporting efficiency that apply to Uniti Options as they do to Uniti Common Stock.[106]

70.    The first *Cammer* Factor, average weekly trading volume as percentage of shares outstanding, is not directly applicable to options because the ability to trade options is not limited by the number of outstanding contracts.  Options contracts can be created and eliminated through the trading of options itself.[107]  Therefore, *Cammer* Factor 1 is not directly applicable.  Dr. James notes, and I do not dispute, that some option series trade frequently while others trade

---

[105] Coffman Report ¶¶ 89-93.

[106] Coffman Report ¶¶ 32-37, 38-42, 43-45, 68-70.

[107] John Hull, *Options, Futures and Other Derivatives*, 7th Edition, Prentice Hall, 2009, pp. 6-8.  *See also,* Stephen A. Ross, *Options and Efficiency*, 90 Q. J. Econ.75 (1976).

infrequently.  However, on balance, there is a substantial amount of trading of Uniti Options. Over the Class Period, there were 3,069,053 contracts traded, which translates to positions on 306,905,300 shares of Uniti Common Stock (or 175.18% of the Common Stock shares outstanding over the Class Period).

71.    Likewise, Dr. James points out that quoted bid-ask spreads on options are far larger than that for Uniti Common Stock and varies substantially across option series.  I do not dispute such a finding, and I am not suggesting that small spreads on Uniti option series are a separate factor supporting efficiency.  I note, however, that the quoted bid-ask spread reflects a conservative measure (*i.e.*, an overstated measure) of the cost to trade.  In particular, the literature supports that measuring effective spreads (*i.e.*, how actual intraday transaction prices compare against the midpoint of the intraday bid-ask spread) are a more reliable measure of the cost to trade and often are substantially lower than quoted bid-ask spreads.[108]  The presence of relatively wide bid-ask spreads, by itself is not evidence of market inefficiency and does not undermine the affirmative evidence supporting efficiency.

72.    In sum, Dr. James' criticism that I did not refer to the exact same factors for evaluating market efficiency of Uniti Options as I did for Uniti Common Stock is hollow.  I describe how some of the factors already apply equally, others are not directly adaptable to Uniti Options, and my additional tests that are tailored specifically to option trading provide economic evidence that supports a finding Uniti Options traded efficiently.  I also note Dr. James does not affirmatively opine that any of the evidence he offers supports the conclusion of market *inefficiency*.

---

[108] Mitchell A. Peterson and David Fialkowski, "Posted Versus Effective Spreads: Good Prices or Bad Quotes?" *Journal of Financial Economics*, 35(3) pp. 269-292; Raman Kumar, Atulya Sarin & Kuldeep Shastri, *The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis*, 53 J. Fin. 717 (1998).

73.    Dr. James' next criticism is that my put-call parity results, which show very few violations (44 out of 54,169 tests, or 0.08%), a fact which Dr. James does not dispute, is not affirmatively capable of proving market efficiency.  This criticism is misplaced for the simple reason that there is no single test that can prove or establish market efficiency definitively, which is why courts have turned to an evaluation of a number of different factors in the first place.  I acknowledged as much in my Report when talking about Uniti Common Stock, let alone Options, stating:

> While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient." In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory.  I also consider a number of other factors that courts have utilized beyond the *Cammer* factors. However, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics is determinative as to whether a particular market is efficient.[109]

74.    While the put-call parity test, like all the other factors, cannot definitively prove market efficiency of Uniti Options, it does provide clear evidence that the market price of Uniti Options moved sufficiently when the market price of Uniti Common Stock changed to prevent arbitrage opportunities in 99.92% of over 50,000 separate tests.  This provides economic evidence supporting the presumption that option prices will reflect what is impacting the price of the common stock.  As described above, each of these tests took into account the specific details of each option series, and the concurrent stock price.  Dr. James offers no criticism of how I performed the put-call parity tests, nor does he opine that the results I achieved are inaccurate. In my view, this is important economic evidence supporting market efficiency of Uniti Options.

---

[109] Coffman Report ¶ 22.

Dr. James' criticism that the test does not by itself unequivocally prove market efficiency is irrelevant.

75.    The other factor I analyzed to provide economic support for the conclusion that Uniti Options traded efficiently corresponds to *Cammer* Factor 5: cause-and-effect.  As I did for Uniti Common Stock, I performed an event study to determine whether there is statistical evidence of a greater likelihood of observing a statistically significant price movements in Uniti Option prices on earnings announcements (*i.e.*, "news days") versus days on which there was no news about Uniti,[110] and whether or not the news days had a greater size of price movements and volume.[111]

76.    Dr. James' first criticism is that I had originally used model-driven prices rather than "actual returns" when performing the cause-and-effect test.[112]  As described above, upon reviewing Dr. James' Report, I determined that there was an inadvertent error in an underlying computer program that resulted in this error.  On January 24, 2022, I filed a declaration (attached as **Appendix D**) describing how both my Initial Report and deposition testimony were clear that I had always intended to use actual returns rather than model-driven returns in the cause-and-effect test and that the corrections made did not alter the overall outcome of the test or my opinions.  At the same time, I submitted my Report that only made changes to reflect the changes made to this particular analysis.[113]

77.    I note that Dr. James **does not dispute** that, overall, my test demonstrates that there is a greater incidence of statistically significant price movements, greater magnitude of price

---

[110] As described in my Report, these are defined as days with no analyst reports, no SEC filings, no news from a Factiva search, and no Company press releases.

[111] Coffman Report Exhibits 16 and 17.

[112] James Report ¶¶ 146-150.

[113] Described in ¶ 2 above.

movements, and greater volume for Uniti Options on dates when Uniti announced quarterly earnings than when there was no Uniti news. This represents economic evidence that supports my opinion that Uniti Options traded efficiently.

78.    Rather than disputing the accuracy of this overall result, Dr. James objects to the fact that I aggregated results from across option series rather than perform this comparison on each option series individually. In particular, he notes that there are many series that did not experience statistically significant price movements on the earnings announcement days.[114] First, I want to reiterate that the underlying event study analysis that I performed *was* done at the individual series level and takes into account the unique attributes of each option. The aggregation I performed took place after such analysis, so I in no way treated the different series as "fungible"[115] or "uniform"[116] when evaluating the significance of their price movements.

79.    Second, statistical analysis often aggregates over non-uniform entities to reach overall conclusions. For example, in the pharmaceutical industry, drug studies evaluate whether there is evidence of an overall effect of a drug versus a placebo across different individuals that are obviously not identical. This is statistically and scientifically analogous to what I am testing: The treatment group (earnings dates) is shown to be statistically different than the placebo group (the no news days). Because individuals are different (like the option series here), the conclusion about whether the treatment is having an overall effect does not focus on the proportion of patients that do not respond to the treatment (what Dr. James is focused on), but rather on whether there is a statistically significant difference in outcomes for the treatment group than the control group.

---

[114] James Report ¶¶ 154-155.

[115] James Report Section VIII.B.

[116] James Report ¶ 130.

80.   Indeed, there are numerous reasons why, even if Uniti Options traded efficiently, that many series would not demonstrate statistically significant price movements.  These include:

- Depending on the duration of specific options contracts and when they began trading, many option series only existed for a small number of the observed earnings announcements, and over those particular announcements, Uniti Common Stock may not have reacted in a statistically significant manner.  Therefore, in an efficient market, one would not expect such an option series to react significantly on an earnings announcement while it traded.[117]

- As Dr. James discusses in his report, the price sensitivity of specific option series can depend greatly on whether and to what degree the option is "in the money" – e.g. the degree to which the current stock price is above the exercise price for a call option (and vice versa for a put option).[118]  For example, a deep out of the money option series would not be price sensitive to even fairly large changes in the stock price as long as it remains deep out of the money (and especially if it is close to expiration).

- As Dr. James discusses in his report, the price sensitivity of specific option series can depend greatly on the time to expiration.[119] For instance, an out of the money option that

---

[117] For example, there were 374 call series and 374 put series that did not trade over an earnings announcement where Uniti Common Stock reacted significantly. Among these, there are a number of option series that expired before the first statistically significant common stock abnormal return on August 13, 2015. Other series did not exist until after the last statistically significant common stock abnormal return on May 11, 2018. And there are yet other option series that are issued and expire in between such statistically significant earnings date.

[118] James Report ¶ 129. To understand why, consider a call option with strike price of $70 (*i.e.,* the option gives the owner the right to buy Uniti Common Stock for $70 per share) when the actual stock price is $50 per share. This option is deep "out of the money" because economically it would not make sense to exercise an option to purchase the stock for $70 when the Common Stock is valued at $50. At the time, this option would have very little value. If that option was set to expire in a matter of days, even a 10% increase in the stock to $55 per share would not have any meaningful impact on the value of a call option because the exercise price of $70 would still be well above the stock price. As a matter of economics, one would not expect the value of the option to change substantially even though the stock price moved by 10% because it is highly likely the option would expire worthless regardless of that large stock price movement.

[119] James Report ¶ 128.

42

is close to expiration is going to be less price sensitive than an out of the money option that has a longer time to expiration. It would not be unusual to see the close to expiration option not react substantially to significant changes in the stock price.[120]

- As noted by Dr. James, the bid-ask spread of options and the volatility of option prices can be much higher than that for common stock.[121] As a result of this greater volatility in pricing, the statistical power of the test for finding statistically significant price movements is generally lower.[122] In other words, these properties of options make it less likely to find a statistically significant reaction to news than if spreads and volatility were lower.

81.    As a result of these differing characteristics across option series as well as differences between options and equity (*e.g.*, duration of trading, moneyness, time to expiration, larger bid-ask spreads and volatility), it is not at all surprising, and entirely consistent with market efficiency, that many option series, on many earnings announcements, would not show a statistically significant abnormal return. To focus on that misses the point. The analyses I have performed scientifically demonstrate that Uniti Option prices are far more likely to have a

---

[120] To understand why, if a call option with an exercise price of $70 was set to expire the next day when the common stock price was $50, a 10% increase in the stock price the day prior to expiration would still mean that the stock would need to increase the next day by more than $15 per share (that is, by more than 27%) for the call option to be worth executing. The likelihood of that call option being executed is very small and would remain very small even with the large (10%) common stock share price increase. However, if the time to expiration was over a year in the future, then the probability of the stock price increasing above $70 before the time to expiration is much greater and the price movement from $50 to $55 makes that substantially more likely, and the market price of that option is much more likely to respond in a significant manner.

[121] James Report ¶ 129.

[122] When I refer to "lower statistical power" what I mean is that even if the option prices are moving based on new news, the statistical tests for options are less likely to be able to isolate that price movement because of the greater volatility and noise in option pricing data (including larger bid-ask spreads). I explicitly take the volatility into account by measuring the degree of unexplained price movements for each and every option series when performing the event study. Therefore, relative to common stock, when performing an event study analysis on options there is a much greater likelihood of Type II error – failing to detect a response even when it exists. In other words, the lack of statistical significance on a large number of option series is not evidence of market inefficiency, but rather largely reflects the relative bluntness of the measuring tool. The key fact is that despite the bluntness of the measuring tool, I find a statistically significant difference between option price movements on news days versus no news days.

43

statistically significant abnormal price movement on Uniti earnings announcements than when there is no news.

82.    Furthermore, Dr. James does not even address my showing that the average magnitude of option price changes on news days is higher than on no news days.[123]  Recall that in addition to the binary test of whether option price movements were statistically significant or not, I also tested whether the average *magnitude* of price movement for Uniti Options was greater on days when important firm-specific information was released to the market (earnings announcements) than on days where there was no news, and found that Uniti Option prices indeed did move by a statistically significantly higher magnitude on earnings announcements than no news days.[124]  I have shown, and Dr. James has not disputed, that Uniti Option prices move, on average, more on Uniti earnings announcement days than on no news days, and that the difference is statistically significant.

83.    Finally, the evidence presented in my Report is an even stronger indicator of market efficiency, as it shows that the rate of statistical significance, the magnitude of price movements, and the volume for Uniti Options are substantially higher on earnings days where there is evidence that Uniti Common Stock reacted in a statistically significant manner.  See **Exhibit 2** and **Exhibit 3**.  This analysis demonstrates that Uniti Option prices are far more likely to move when there is a large underlying stock price movement, exactly what would be expected if the market were efficient and option prices were responding derivatively to changes in Uniti Common Stock when there was important firm-specific news.

84.    In sum, Dr. James does not dispute the overall results of my cause and effect analyses, and his objections boil down to whether efficiency must be demonstrated completely

---

[123] Coffman Report Exhibits 16-17.

[124] Coffman Report Exhibits 16-17.

45

independently for each and every option series rather than based on an overall evaluation of whether there is evidence of efficiency across Uniti Options.  I am not aware of any authority that requires such an independent evaluation of each option series completely independent of the other – nor does Dr. James cite to any such authority, and therefore his criticisms are misplaced.


 Executed on February 22, 2022

Chad Coffman

45

## Exhibit 1
## Event Study Comparison for Uniti Common Stock on Key Event Dates

| # | Date | Day | Time | Market Date | Coffman Event Study Results [1] | | | James Event Study Results - Appendix D [2] | | | Event |
|---|------|-----|------|-------------|------------------|----------|--------------|------------------|----------|--------------|-------|
| | | | | | Abnormal Return | p-Value | Sig Level [3] | Abnormal Return | p-Value | Sig Level [3] | |
| 1 | 8/3/17 | Thu | 7:01 AM | 8/3/17 | -8.18% | 0.00 | *** | -8.18% | 0.00 | *** | Windstream announced the elimination of its dividend. (Complaint ¶¶ 168-170) |
| 2 | 9/25/17 | Mon | 4:09 PM | 9/26/17 | -9.61% | 0.00 | *** | -9.82% | 0.00 | *** | Windstream filed SEC Form 8-K disclosing that it had received a notice of default from Aurelius. (Complaint ¶¶ 177-178) |
| 3 | 2/15/19 | Fri | 5:58 PM | 2/19/19 | -37.74% | 0.00 | *** | -37.39% | 0.00 | *** | On February 15, 2019, U.S. District Court Judge Jesse M. Furman – the judge presiding over the Aurelius Litigation – entered his Findings of Fact and Conclusions of Law (which followed a bench trial held in July 2018), finding that the Spin-Off and execution of the Master Lease violated the Indenture. On February 19, 2019, the first trading day after Judge Furman's ruling, Uniti issued a statement about it and the impact the ruling had on the Company's business and the Master Lease. (Complaint ¶¶ 201-205) |
| 4 | 6/24/19 | Mon | 4:05 PM | 6/25/19 | -10.46% | 0.00 | *** | -12.25% | 0.00 | *** | Uniti issued a press release announcing a $300 million aggregate principle amount of exchangeable senior notes due 2024, with an option to purchase an additional $45 million aggregate principle amount of exchangeable senior notes during a 13-day period beginning on, and including, the first day on which the exchangeable notes are issued. (Complaint ¶¶ 227-228) |

Source: Complaint, S&P Capital IQ, and Uniti Group, Inc. SEC Filings.

Notes:

(1) The results are based on a fixed to rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index), and two industry indices, the MSCI US REIT Index and the S&P Composite 1500 Telecommunication Services. The MSCI US REIT Index (compared against Uniti in its 10-Ks during the Class Period) is a free float-adjusted market capitalization weighted index that is comprised of equity real estate investment trusts (REITs), while the S&P Composite 1500 Telecommunications Services comprises those companies included in the S&P Composite 1500 that are classified as members of the GICS Communication Services sector. Both indices are net of the S&P 500 Total Return Index. Earnings announcements, the alleged corrective disclosure dates and 6 outlier dates of 1/7/2016 (when Uniti acquired PEG Bandwidth LLC), 7/18/2018 (when Uniti and Windstream were downgraded by analysts), 12/12/2018 (when Uniti was downgraded by analysts), 2/21/2019 and 2/22/2019 (when Uniti was downgraded by analysts), and 2/25/2019 (when trading was halted twice for Uniti Common Stock) have been removed from estimation.

(2) The results are based on an event study created to replicate Dr. James' event study in Appendix D. He uses the CRSP NYSE/AMEX/Nasdaq/Arca value weighted Index as a market index, the MSCI US REIT Index as an industry index, and also includes the S&P Composite 1500 Telecommunication Services Index as an independent variable. He excludes earnings dates, misrepresentation dates, and corrective disclosure dates from his estimation. The values for 8/3/17 were taken from the report itself, whereas the values for the rest of the dates were based on the regression that was replicated. For this reason, the values may differ slightly from Dr. James' result as he does not present results that we can compare against.

(3) "***" Denotes statistical significance at the 99% confidence level or greater and "**" denotes statistical significance at the 95% confidence level or greater.

**Exhibit 2**

**Comparison of Statistical Significance and Abnormal Returns for Uniti Call Options**
**Uniti Earnings Announcement Dates with Statistically Significant Abnormal Returns**
**vs. Days with No News during the Class Period**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| $N^{(1)}$ | 156 | 10,937 |
| Significant Days at 95% Confidence Level | 48 | 733 |
| % Significant Days at 95% Confidence Level[2] | 30.77% | 6.70% |
| Average Absolute Abnormal Return[3] | 25.88% | 15.44% |
| Average Volume (Shares) | 4,619 | 3,218 |

Notes:

(1) Each observation represents a date for a specific call option series where a return can be calculated.

(2) 30.77% rate of statistical significance is statistically significantly different than 6.70% at the 99% confidence level using a Chi-Square test.

(3) 25.88% absolute return is statistically significantly different than 15.44% based on a t-test for difference of means at the 99% confidence level.

# Exhibit 3
## Comparison of Statistical Significance and Abnormal Returns for Uniti Put Options
## Uniti Earnings Announcement Dates with Statistically Significant Abnormal Returns vs. Days with No News during the Class Period

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| $N^{(1)}$ | 176 | 11,496 |
| Significant Days at 95% Confidence Level | 57 | 762 |
| % Significant Days at 95% Confidence Level[2] | 32.39% | 6.63% |
| Average Absolute Abnormal Return[3] | 36.62% | 16.77% |
| Average Volume (Shares)[4] | 8,459 | 2,692 |

Notes:

(1) Each observation represents a date for a specific put option series where a return can be calculated.

(2) 32.39% rate of statistical significance is statistically significantly different than 6.63% at the 99% confidence level using a Chi-Square test.

(3) 36.62% absolute return is statistically significantly different than 16.77% based on a t-test for difference of means at the 99% confidence level.

(4) The difference between 8,459 and 2,692 is statistically significant at the 99% confidence level.

# Appendix A
# Documents Considered

**Court Documents**

- Consolidated Amended Class Action Complaint, May 11, 2020, In re *Uniti Group Inc. Securities Litigation*, No. 4:19-cv-00756-BSM.
- Decision and Order Denying Defendants' Motion to Dismiss filed March 31, 2021, In re *Uniti Group Inc. Securities Litigation*, No. 4:19-cv-00756-BSM.

**Related Reports and Depositions in this Matter**

- Expert Report of Chad Coffman, CFA, dated October 25, 2021, including all data and documents included in Appendix A of that report.
- Deposition of Chad Coffman, December 6, 2021.
- Declaration of Chad Coffman, CFA, Regarding Calculations of Returns For Uniti Options, dated January 24, 2022, including the Appendix.
- Expert Report of Christopher M. James, Ph.D., dated December 23, 2021, including all data, analyses, and back-up materials provided by Dr. James in connection with this report.
- Deposition of Christopher James, Ph.D., dated February 4, 2022.

**Court Decisions and Securities Law**

- *Cammer, et al., v. Bruce M. Bloom, et al.*, 711 F. Supp. 1264 (D.N.J. 1989).
- *Halliburton Co., et al., v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014).
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.
- Memorandum Opinion filed January 29, 2020, in *Eric Weiner, Individually and on Behalf of All Others Similarly Situated, vs. Tivity Health, Inc., et al.*, Case No. 3:17-cv-01469.
- *Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA) Litig.*, No. 09 MDL 2058 (PKC) (S.D.N.Y.).
- *Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521-SB (D. Ore.).
- *Priceline.com Inc. Securities Litigation,* No. 3:00CV01884(DJS).
- *Scientific-Atlanta, Inc. Securities Litigation,* No. 1:01-CV-1950-RWS.
- *Fannie Mae Securities Litigation,* No. 04-1639 (RJL).
- Memorandum Order filed September 30, 2019, *Adam S. Levy v. Thomas Gutierrez, et al.*, No. 14-cv-443-JL.
- Memorandum and Order filed June 29, 2017, In re *Conn's, Inc. Securities Litigation*, No. 4:14-cv-548.
- Order filed September 25, 2012, In re *Schering-Plough Corporation/Enhance Securities Litigation*, Case No. 2:08-cv-00397-DMC-JAD.

## SEC Filings

- Uniti Group Inc. SEC Form 10-K filings submitted throughout the Class Period.
- Uniti Group Inc. SEC Form 10-Q filings submitted throughout the Class Period.
- Uniti Group Inc. SEC Form 8-K filings submitted during the Class Period.
- Uniti Group Inc. SEC Forms S-3ASR filed on June 15, 2016 and March 12, 2020.

## Security Data

- Historical data for Uniti Group Inc. Common Stock, MSCI US REIT Total Returns Index, S&P Composite 1500 Telecommunications Services, and the S&P 500 Total Return Index were obtained from S&P Capital IQ. Historical data for Windstream Common Stock and CRSP NYSE/AMEX/Nasdaq/Arca Index were obtained from Dr. James' backup material.
- Uniti Group Inc. Common Stock options data was obtained from iVolatility.

## Uniti Group Inc. News

- "Windstream Board of Directors Revises Capital Allocation Strategy," *NASDAQ GlobeNewswire*, August 3, 2017.

## Uniti Group Inc. Analyst Reports

- "Good 2Q17 Results; WIN Div Cut Creates Compelling Opportunity," *Cowen*, August 4, 2017.
- "Defensive, diversifying and discounted; Buy on pullback," *Deutsche Bank*, August 4, 2017.
- "Windstream Trial Wraps Up; Remain Positive on Outcome," *Raymond James*, July 31, 2018.

## Academic Articles

- Hull, J., *Options, Futures and Other Derivatives*, 7th Edition, Prentice Hall, 2009.
- Kumar, Raman, Atulya Sarin, and Kuldeep Shastri, *The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis*, 53 J. Fin. 717 (1998).
- MacKinlay, A., *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE (1997).
- Peterson, Mitchell A. and David Fialkowski, "Posted Versus Effective Spreads: Good Prices or Bad Quotes?" *Journal of Financial Economics*, 35(3).
- Ross, Stephen A., *Options and Efficiency*, 90 Q. J. Econ.75 (1976).
- Tabak, David, et. al., "Determination of the Appropriate Event Window Length in Individual Stock Event Studies," *NERA Economic Consulting*, November 4, 2003.

**<u>Other</u>**

- Uniti_Class_008822277.
- Aurelius Litigation, ECF No. 245.
- https://www.sec.gov/divisions/enforce/friregulatory.shtml
- https://www.raymondjames.com/corporations-and-institutions/global-equities-and-investment-banking/equity-research/equity-research-team

# Appendix B

## CHAD W. COFFMAN, MPP, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:         (312) 470-6500
Mobile:       (815) 382-0092
Email:         ccoffman@globaleconomicsgroup.com


## EMPLOYMENT:

### Global Economics Group, LLC
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)


## EDUCATION:

**CFA**     Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**     Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing:  Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

## PROFESSIONAL EXPERIENCE:

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

  o  In Re: Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation.  Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
  o  In Re: Schering-Plough Corporation/ Enhance Securities Litigation. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
  o  In Re: REFCO Inc. Securities Litigation. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
  o  In Re: Computer Sciences Corporation Securities Litigation. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
  o  Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies.  One led to restatement of previously issued financial statements and both involved SEC investigations.

## Testimony:

- Testifying expert in the matter of Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836.  Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares. Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court for the Western District of Washington at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory. Filed expert report April 30, 2010. Filed expert rebuttal report August 4, 2010. Filed declaration re: Plan of Allocation September 25, 2011.

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed expert rebuttal report December 17, 2008. Deposition January 27, 2009. Filed expert rebuttal report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court for the Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009. Filed declaration re: Plan of Allocation September 9, 2009.

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>. Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court for the Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed expert rebuttal report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed expert rebuttal report July 8, 2010.  Deposition September 1, 2010. Filed supplemental expert rebuttal report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD, United States District Court for the Southern District of New York</u>.  Filed expert rebuttal report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed expert rebuttal report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Expert declaration in <u>Grady Scott Weston et. al v. RCS Capital Corporation, et. al, Civil Action No. 1:14-CV-10136-GBD, United States District Court for the Southern District of New York</u>. Filed declaration re: aggregate damages August 11, 2017.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>.  Filed expert report August 29, 2011. Filed expert rebuttal report September 26, 2011. Filed expert report March 16, 2012. Filed expert rebuttal report April 9, 2012. Filed expert rebuttal report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February 17, 2012. Deposition March 28, 2012. Filed expert rebuttal report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court for the Southern District of Florida</u>. Filed expert report July 20, 2012. Deposition September 14, 2012. Filed expert rebuttal report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed expert rebuttal report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee, Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013. Filed expert rebuttal report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in <u>In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division</u>. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed expert rebuttal report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed expert rebuttal report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in <u>In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York</u>. Filed expert report June 14, 2013. Filed expert rebuttal report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in <u>In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts</u>. Filed expert report October 28, 2013.

- Testifying expert in <u>In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York</u>. Filed expert report November 25, 2013. Filed expert rebuttal report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016. Filed expert rebuttal report March 27, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert rebuttal report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert rebuttal report May 13, 2016. Deposition June 10, 2016. Hearing testimony re: Plan of Allocation July 31, 2017.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed expert rebuttal report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015.  Filed expert rebuttal report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc. and Apple Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015. Filed expert report September 20, 2018. Deposition December 7, 2018. Filed expert rebuttal report February 22, 2019. Filed expert report June 7, 2019. Deposition September 6, 2019.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report September 1, 2015. Filed expert rebuttal report November 16, 2015. Filed expert report November 8, 2016. Filed expert report February 8, 2017. Deposition December 12, 2017.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed expert rebuttal report December 7, 2015. Filed expert report November 18, 2016. Filed expert rebuttal report January 17, 2017. Filed declaration March 6, 2017. Deposition March 7, 2017.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed expert rebuttal report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court for the Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016. Filed expert report July 1, 2016. Deposition July 26, 2016. Filed expert reply report August 15, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed expert rebuttal report February 2, 2016. Filed rebuttal reply expert report March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert reply report June 17, 2016. Deposition June 24, 2016.

- Testifying expert in <u>In Re Genworth Financial, Inc. Securities Litigation, Civ. A. No. 3:14-cv-00682-JAG, United States District Court for the Eastern District of Virginia, Richmond Division</u>. Filed declaration re: Plan of Allocation June 2, 2016.

- Testifying expert in <u>Zubair Patel, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. L-3 Communications Holdings, Inc., et al., Defendants, No. 1:14-cv-06038-VEC, United States District Court for the Southern District of New York.</u> Filed expert report June 30, 2016. Deposition July 20, 2016. Filed expert rebuttal report August 26, 2016.

- Testifying expert in <u>Leonard Howard, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Liquidity Services, Inc., et al., Defendants, No. 1:14-cv-01183-BAH, United States District Court for the District of Columbia.</u> Filed expert report September 2, 2016.

- Testifying expert in <u>James Quinn, Derivatively on Behalf of Nominal Defendant Apple REIT Ten, Inc., Plaintiff, v. Glade M. Knight, Justin Knight, Kent W. Colton, R. Garnett Hall, Jr., David J. Adams, Anthony F. Keating III, David Buckley, Kristian Gathright, David McKenney, Bryan Peery, and Apple Hospitality REIT, Inc., Defendants, and Apple REIT Ten, Inc., Nominal Defendant, No. 3:16-cv-610, United States District Court for the Eastern District of Virginia, Richmond Division.</u> Filed expert report October 14, 2016. Deposition October 20, 2016.

- Testifying expert in <u>Dr. Joseph F. Kasper, et al., Plaintiff, v. AAC Holdings, Inc., et al., Defendants, No. 3:15-cv-00923, United States District Court for the Middle District of Tennessee, Nashville Division.</u> Filed expert report October 18, 2016. Deposition November 29, 2016. Filed expert rebuttal report February 10, 2017. Filed expert report December 4, 2017.

- Testifying expert in <u>KBC Asset Management NV, et al., Plaintiff, v. 3D Systems Corporation, Abraham N. Reichental, Damon J. Gregoire, and Ted Hull, Defendants, No. 15-cv-02393-MGL, United States District Court for the District of South Carolina, Rock Hill Division.</u> Filed expert report October 31, 2016. Deposition January 5, 2017. Filed expert report April 21, 2017.

- Testifying expert in <u>Arkansas Teacher Retirement System, et al., Plaintiff, v. Virtus Investment Partners, Inc., Defendants, No. 15-cv-1249-WHP, United States District Court for the Southern District of New York.</u> Filed expert report November 7, 2016. Filed expert rebuttal report February 17, 2017. Deposition February 28, 2017. Filed expert report June 16, 2017. Filed expert rebuttal report July 26, 2017. Deposition August 9, 2017. Filed declaration re: prior reports December 4, 2017.

- Testifying expert in <u>Laborers Pension Trust Fund – Detroit, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. Conn's, Inc., et al., Defendants, No. 4:14-cv-00548 (KPE), United States District Court for the Southern District of Texas, Houston Division.</u> Filed expert report November 10, 2016. Deposition December 9, 2016. Filed expert rebuttal report March 27, 2017.

- Testifying expert in <u>Glen Hartsock, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., and Rajesh C. Shrotriya, Defendants, No. 16-cv-02279-RFB-GWF and Olutayo Ayeni, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., Rajesh C. Shrotriya, Kurt A. Gustafson, Joseph Turgeon, and Lee Allen, Defendants, No. 16-cv-02649-KJD-VCF, United States District Court for the District of Nevada.</u> Filed declaration re: damages December 8, 2016.

- Testifying expert in <u>In Re: ARIAD Pharmaceuticals, Inc. Securities Litigation, No. 1:13-cv-12544 (WGY), United States District Court District of Massachusetts</u>. Filed expert report March 6, 2017.

- Testifying expert in <u>Washtenaw County Employees' Retirement System, individually and on behalf of all others similarly situated, Plaintiff, v. Walgreen Co., Gregory D. Wasson, and Wade Miquelon, Defendants, No. 15-cv-3187, United States District Court for the Northern District of Illinois</u>. Filed expert report April 21, 2017. Deposition June 15, 2017. Filed expert rebuttal report September 15, 2017. Filed expert report November 11, 2020. Filed expert rebuttal report December 14, 2020. Deposition January 29, 2021.

- Testifying expert in <u>Lou Baker, individually and on behalf of all others similarly situated, Plaintiff, v. SeaWorld Entertainment, Inc., James Atchison, James M. Heaney, Marc Swanson, and The Blackstone Group L.P., Defendants, No. 3:14-cv-02129-MMA-KSC, United States District Court for the Southern District of California</u>. Filed expert report May 19, 2017. Deposition July 20, 2017. Filed expert rebuttal report September 14, 2017. Filed expert report January 22, 2019. Filed expert rebuttal report March 1, 2019. Deposition March 26, 2019.

- Testifying expert in <u>Benjamin Gross, individually and on behalf of all others similarly situated, Plaintiff, v. GFI Group, Inc., Colin Heffron, and Michael Gooch, Defendants, No. 3:14-cv-09438-WHP, United States District Court for the Southern District of New York</u>. Filed expert report May 30, 2017. Filed expert report August 7, 2017. Filed expert rebuttal report August 28, 2017. Deposition September 27, 2017.

- Testifying expert in <u>Murray Rubinstein, Jeffrey F. St. Clair, William McWade, Harjot Dev and Vikas Shah, individually and on behalf of all others similarly situated, Plaintiffs, v. Richard Gonzalez and Abbvie Inc., Defendants, No. 14-cv-9465, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report December 21, 2017. Deposition February 22, 2018. Filed supplemental expert report March 9, 2018. Filed expert reply report June 14, 2018. Filed expert sur-sur reply report August 28, 2018.

- Testifying expert in <u>In Re: SanDisk LLC Securities Litigation, No. 3:15-cv-01455-VC, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report January 19, 2018. Deposition January 31, 2018. Filed expert report August 30, 2018. Filed expert report October 23, 2018. Deposition November 15, 2018. Filed declaration re: Plan of Allocation and calculation of aggregate damages May 6, 2019.

- Testifying expert in <u>In Re: EZCORP, Inc. Securities Litigation, No. 1:15-cv-00608-SS, United States District Court for the Western District of Texas.</u> Filed expert report January 31, 2018. Deposition March 6, 2018.

- Testifying expert in <u>Kevin Murphy, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Precision Castparts Corp., Mark Donegan, and Shawn R. Hagel, Defendants, No. 3:16-cv-00521-SB, United States District Court for the District of Oregon, Portland Division</u>. Filed expert report March 2, 2018. Filed expert report March 22, 2019. Filed expert reply report June 19, 2019. Deposition July 19, 2019.

- Testifying expert in <u>In Re: Rent-A-Center, Inc. Securities Litigation, No. 4:16-cv-00978-ALM-CMC, United States District Court for the Eastern District of Texas, Sherman Division</u>. Filed expert report March 13, 2018. Filed rebuttal reply report July 12, 2018. Deposition August 21, 2018.

- Testifying expert in <u>Public Employees' Retirement Systems of Mississippi, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. TreeHouse Foods, Inc., Sam K. Reed, Dennis F. Riordan and Christopher D. Silva, Defendants, No. 1:16-cv-10632, United States District Court for the Northern District of Illinois</u>. Filed expert report July 13, 2018. Deposition September 21, 2018. Filed rebuttal reply report May 17, 2019.

- Testifying expert in <u>Gary Hefler, et al., Plaintiffs, v. Wells Fargo & Company, et al., Defendants, No. 1:16-cv-05479-JST, United States District Court for the Northern District of California</u>. Filed declaration re: Plan of Allocation July 27, 2018**.**

- Testifying expert in <u>In re Banco Bradesco S.A. Securities Litigation, No. 1:16-cv-04155-GHW, United States District Court for the Southern District of New York</u>. Filed expert report August 17, 2018. Filed supplemental expert report October 11, 2018. Deposition October 12, 2018. Filed expert report December 14, 2018. Filed expert report March 8, 2019. Filed declaration re: Plan of Allocation July 19, 2019.

- Testifying expert in <u>Richard Di Donato, et al., Plaintiffs, v. Insys Therapeutics Incorporated, et al. Defendants, No. CV-16-00302-PHX-NVW, United States District Court for the District of Arizona.</u> Filed expert report August 31, 2018. Deposition October 4, 2018. Filed expert report November 30, 2018. Filed expert report July 26, 2019. Filed expert report November 1, 2019.

- Consulting expert in <u>In Re: Wilmington Trust Securities Litigation, Master File No. 10-cv-00990-ER, United States District Court for the District of Delaware.</u> Filed declaration re: Plan of Allocation and calculation of aggregate damages September 17, 2018.

- Testifying expert in <u>Atul Singh Deora, Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. Nanthealth, Inc., Patrick Soon-Shiong, Paul A. Holt, Michael S. Sitrick, Kirck K. Calhoun, Mark Bennett, Edward Miller, Michael Blaszyk, Jefferies Llc, First Analysis Securities Corporation, Canaccord Genuity Inc., And Fbr Capital Markets & CO., Defendants., No. 2:17-CV-01825-BRO-MRW, United States District Court for the Central District of California Western Division.</u> Filed expert report September 20, 2018.

- Testifying expert in <u>City of Sunrise General Employees' Retirement Plan, Plaintiff vs. FleetCor Technologies, Inc., et al., Defendants, No. 1:17-CV-02207-LMM, United States District Court for the Northern District of Georgia Atlanta Division</u>. Filed expert report January 4, 2019. Deposition March 20, 2019. Filed expert report May 6, 2019.

- Testifying expert in <u>Guevoura Fund LTD., On Behalf of Itself and All Others Similarly Situated, Plaintiffs, v. Robert F.X. Sillerman, D. Geoffrey Armstrong, John Miller, Michael John Meyer, and SFX Entertainment, Inc., Defendants, Case No. 1:15-cv-07192-CM, Case No. 1:18-cv-09784-CM,</u>

United States District Court for the Southern District of New York. Filed expert report January 18, 2019.

- Testifying expert in <u>Leon D. Milbeck On Behalf of Himself and All Others Similarly Situated, v. TrueCar, Inc, et al., Defendants, No. 2:18-cv-02612-SVW, United States District Court for the Central District of California</u>. Filed expert report March 8, 2019. Deposition April 8, 2019.

- Testifying expert in <u>Lewis Cosby, Kenneth R. Martin, as Beneficiary of the Kenneth Ray Martin Roth IRA, and Martin Weakly On Behalf of Themselves and All Others Similarly Situated, vs. KPMG, LLP, Case No. 3:16-cv-00121, United States District Court for the Eastern District of Tennessee, Knoxville Division</u>. Filed expert report March 15, 2019. Deposition April 12, 2019. Filed supplemental expert report April 19, 2019. Deposition April 25, 2019. Filed rebuttal reply report June 14, 2019.

- Testifying expert in <u>Shawn Sanawaz, Individually and On Behalf of All Other Similarly Situated, v. Intellipharmaceutics International Inc., Isa Odidi, and Domenic Della Penna, Defendants, No. 1:17-cv-05761-JPO, United States District Court for the Southern District of New York.</u> Filed expert report May 06, 2019.

- Testifying expert in <u>Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated, v. Esperion Therapeutics, Inc., et al., Defendants, No. 2:16-cv-10089-AJT-RSW, United States District Court for the Eastern Michigan of Michigan</u>. Filed expert report June 6, 2019. Deposition July 26, 2019. Filed rebuttal reply report October 7, 2019. Filed expert report May 15, 2020. Deposition July 31, 2020.

- Testifying expert in <u>West Virginia Investment Management Board, Stichting Blue Sky Global Equity Active Low Volatility Fund, and Stitching Blue Sky Active Large Cap Equity USA Fund vs. SCANA Corporation., et al., Civ. A. No. 3:17-cv-2616-MBS, United States District Court for the District of South Carolina.</u> Filed expert report June 28, 2019. Deposition August 16, 2019.

- Testifying expert in <u>Eric Weiner, Individually and on Behalf of All Others Similarly Situated, vs. Tivity Health, Inc., Donato Tramuto, Glenn Hargreaves and, Adam Holland, Defendants, Case No.: 3:17-cv-01469 United States District Court for the Middle District of Tennessee.</u> Filed expert report July 1, 2019. Deposition September 4, 2019. Filed rebuttal reply report December 20, 2019. Filed expert report July 30, 2020. Filed rebuttal reply report September 30, 2020. Deposition October 22, 2020.

- Testifying expert in <u>In Re Dr. Reddy's Laboratories Limited Securities Litigation, No. 3:17-cv-06436-PGS-DEA, United States District Court for the District of New Jersey.</u> Filed expert report July 19, 2019. Deposition September 10, 2019.

- Testifying expert in <u>Peace Officers' Annuity and Benefit Fund of Georgia, Individually and On Behalf of All Others Similarly Situated, and Jacksonville Police and Fire Pension Fund, Individually and On Behalf of All Others Similarly Situated vs. DaVita, Inc. et al., No. 1:17-cv-00304-WJM-NRN, United States District Court for the District of Colorado.</u> Filed expert report January 31, 2020. Deposition May 27, 2020.

- Testifying Expert in <u>In Re Avon Securities Litigation, No. 19 Civ. 01420- CM, United States District Court for the Southern District of New York.</u> Filed expert report February 13, 2020.

- Testifying Expert in <u>In Re Allergan Generic Drug Pricing Securities Litigation, Civil Action No. 2:16-9449 (KSH) (CLW), United States District Court for the District of New Jersey</u>. Filed expert report March 20, 2020. Deposition July 16, 2020. Filed expert reply report November 25, 2020.

- Expert declaration in <u>Martin Cohen, Individually and On Behalf of All Others Similarly Situated, v. Luckin Coffee Inc., Jenny Zhiya Qian, and Reinout Hendrik Schakel, Case no. 1:20-cv-01293-LJL, United States District Court for the Southern District of New York</u>. Filed declaration May 13, 2020.

- Testifying Expert in <u>In RE Navient Corporation Securities Litigation, No. 1:17-cv-08373-RBK-AMD, United States District Court of New Jersey.</u> Filed expert report May 15, 2020. Deposition July 23, 2020. Filed declaration August 21, 2020. Filed expert report April 16, 2021. Deposition June 3, 2021.

- Testifying Expert in <u>Yellowdog Partners, LP, Individually and on Behalf of All Others Similarly Situated, vs. CURO Group Holdings Corp., *et al*., Civil Action No. 2:18-cv-02662-JWL-KGG, United States District Court for the District of Kansas, Kansas City.</u> Filed expert report May 18, 2020.

- Testifying Expert in <u>Julian Keippel, Individually and On Behalf of All Others Similarly Situated, vs. Health Insurance Innovations, Inc., Gavin Southwell, and Michael D. Hershberger, No. 8:19-CV-00421-WFJ-CPT, United States District Court Middle District of Florida Tampa Division.</u> Filed expert report May 21, 2020. Deposition June 15, 2020.

- Testifying Expert in <u>In Re Perrigo Company plc Securities Litigation, No: 1:19-cv-00070-DLC, United States District Court for the Southern District of New York.</u> Filed expert report July 10, 2020. Deposition August 4, 2020. Filed expert report October 6, 2020. Filed expert rebuttal reply report December 4, 2020. Deposition March 4, 2021.

- Testifying Expert in <u>Plymouth County Retirement System, Individually and On Behalf of All Others Similarly Situated, vs. GTT Communications, Inc., Richard D. Calder, Jr., Chris Mckee, Michael Sicoli, And Gina Nomellini, Case No. 1:19-cv-00982-CMH-MSN, United States District Court for the Eastern District of Virginia Alexandria Division.</u> Filed expert report August 7, 2020. Filed expert report September 25, 2020.

- Testifying Expert in <u>Thomas W. Luczak, Individually and On Behalf of All Others Similarly Situated, vs. National Beverage Corp., Nick A. Caporella, and George R. Bracken, Case No. 0:18-cv-61631-KMM, United States District Court for the Southern District of Florida.</u> Filed expert report September 25, 2020. Deposition November 5, 2020.

**Chad Coffman**
**Page 13 of 18**

- Expert declaration in In re: PG&E Corporation – and – Pacific Gas and Electric Company Debtors, Case No. 19-30088 (DM), United States Bankruptcy Court for the Northern District of California, San Francisco Division. Filed declaration September 28, 2020.

- Testifying Expert in Oklahoma Police Pension Fund and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Teligent, Inc. and Jason Grenfell-Gardner, Defendants, Case No. 1:19-cv-03354-VM, United States District Court for the Southern District of New York. Filed expert report September 30, 2020. Deposition March 11, 2021.

- Testifying Expert in John Utesch, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Lannett Company, Inc., Arthur P. Bedrosian, and Martin P. Galvan, Defendants, Civil Action No. 2:16-cv-05932-WB, United States District Court for the Eastern District of Pennsylvania. Filed expert report October 1, 2020. Deposition December 10, 2020. Filed expert rebuttal report on May 13, 2021. Hearing testimony July 27, 2021.

- Testifying Expert in City of Warren Police and Fire Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. World Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios and Michelle D. Wilson, Defendants, Civil Action No. 1:20-cv-02031-JSR, United States District Court for the Southern District of New York. Filed expert report on October 6, 2020. Deposition October 14, 2020.

- Testifying Expert in Employees' Retirement System of the Puerto Rico Electric Power Authority, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh, Defendants, Case No. 2:19-cv-08237-SDW, United States District Court for the District of New Jersey. Filed expert report on December 7, 2020. Deposition December 22, 2020.

- Testifying Expert in The Police Retirement System of St. Louis, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Granite Construction Incorporated, James H. Roberts, Jigisha Desai, and Laurel J. Krzeminski, Defendants, Case No. 3:19-cv-04744-WHA, United States District Court for the Northern District of California. Filed expert report on November 25, 2020. Filed declaration re: Plan of Allocation May 25, 2021.

- Testifying Expert in Plumbers & Pipefitters National Pension Fund and Juan Francisco Nieves, as Trustee of the Gonzalez Coronado Trust, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Kevin Davis and Amir Rosenthal (Performance Sports Group Ltd.), Defendants, Case No.: 1:16-CV-3591-GHW, United States District Court for the Southern District of New York. Filed expert report on December 18, 2020. Deposition February 5, 2021. Filed expert rebuttal report on April 6, 2021. Filed declaration re: Plan of Allocation January 21, 2022.

- Testifying Expert in Mayuko Holwill, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. AbbVie Inc., Richard A. Gonzalez, and William J. Chase, Defendants, Case No. 1:18-cv-6790, United States District Court for the Northern District of Illinois. Filed expert report on February 1, 2021. Filed expert rebuttal report on September 20, 2021.

- Testifying Expert in <u>Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Newell Brands Inc., Michael B. Polk, John K. Stipancich, Scott H. Garber, Bradford R. Turner, Michael T. Cowhig, Thomas E. Clarke, Kevin C. Conroy, Scott S. Cowen, Domenico De Sole, Cynthia A. Montgomery, Christopher D. O'Leary, Jose Ignacio Perez-Lizaur, Steven J. Strobel, Michael A. Todman, and Raymond G. Viault, Defendants, Case No: HUD-L-3492-18, Superior Court of New Jersey Law Division (Hudson County).</u> Filed expert report on May 3, 2021. Filed expert rebuttal report on June 15, 2021. Deposition July 21, 2021. Filed expert supplemental reply report on February 4, 2022.

- Testifying Expert in <u>Carmignac Gestion, S.A., Mason Capital L.P., et al., Pentwater Equity Opportunities Master Fund LTD., et al., First Manhattan Co., Nationwide Mutual Funds, on behalf of its series Nationwide S&P 500 Index Fund, et. al., WCM Alternatives: Event-Driven Fund, et al., Hudson Bay Master Fund LTD., et al., Schwab Capital Trust on behalf of its series Schwab S&P 500 Index Fund, et al., Sculptor Master Fund, LTD. f/k/a OZ Master Fund, Ltd., et al., Aberdeen Canada Funds – Global Equity Fund, a series of Aberdeen Canada Funds, et al., Discovery Global Citizens Master Fund, LTD., et al., York Capital Management, L.P., et al., Burlington Loan Management DAC, Universities Superannuation Scheme LTD., Principal Funds, Inc., et al., Kuwait Investment Authority et al., Blackrock Global Allocation Fund Inc., et al., Plaintiffs, vs. Perrigo Company PLC, et al, Defendants, Civil Action No(s): 17-10467 (MCA) (LDW), 18-1119 (MCA) (LDW), 18-1121 (MCA) (LDW), 18-2291 (MCA) (LDW), 18-15382 (MCA) (LDW), 18-16204 (MCA) (LDW), 18-16206 (MCA) (LDW), 19-3973 (MCA) (LDW), 19-4900 (MCA) (LDW), 19-6560 (MCA) (LDW), 19-21502 (MCA) (LDW), 19-21732 (MCA) (LDW), 20-1484 (MCA) (LDW), 20-2262 (MCA) (LDW), 20-2410 (MCA) (LDW), 20-3431 (MCA) (LDW), 20-4748 (MCA) (LDW), United States District Court for the District of New Jersey.</u> Filed expert report on June 23, 2021. Filed expert report on September 29, 2021. Deposition October 26, 2021.

- Testifying Expert in <u>In Re Nielsen Holdings PLC Securities Litigation, Case No. 18-CV-07143-JMF, United States District Court Southern District of New York</u>. Filed expert report on July 14, 2021. Deposition September 30, 2021. Filed expert report December 17, 2021.

- Testifying Expert in <u>Allegheny County Employees Retirement System et al. v. Energy Transfer LP et al., Case No. 2:20-cv-00200-GAM, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report on September 17, 2021. Deposition November 18, 2021.

- Testifying Expert in <u>Julia Junge and Richard Junge et al. v. Geron Corporation et al., Case No. 3:20-cv-00547-WHA, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report on September 30, 2021. Deposition October 15, 2021. Filed expert rebuttal report on November 4, 2021.

- Testifying Expert in <u>In Re MINDBODY, Inc. Securities Litigation, Civil Action No. 1:19-cv-08331-VEC, United States District Court Southern District of New York</u>. Filed expert report on October 15, 2021.

- Testifying Expert in <u>Plymouth County Retirement System and Oklahoma Police Pension and Retirement System, Individually and On Behalf of All Others Similarly Situated, v. Evolent</u>

Health, Inc., Frank Williams, Nicholas McGrane, Seth Blackley, Christie Spencer, and Steven Wigginton, Case No. 1:19-cv-01031-RDA-TCB, United States District Court Eastern District of Virginia, Alexandria Division. Filed expert report on October 19, 2021.

- Testifying Expert in In re Uniti Group Inc. Securities Litigation, Case No. 4:19-cv-00756-BSM, United States District Court Eastern District of Arkansas, Central Division. Filed expert report on October 25, 2021. Deposition December 6, 2021. Filed declaration re: expert report on January 24, 2022.

- Testifying Expert in David Kanefsky, Individually and On Behalf of All Others Similarly Situated, v. Honeywell International Inc., Darius Adamczyk, and Thomas A. Szlosek, Civ. No. 2:18-15536-WJM, United States District Court for the District of New Jersey. Filed expert report on November 1, 2021.

- Testifying expert in In Re Pareteum Securities Litigation, No. 1:19-cv-09767-AKH-GWG, United States District Court for the Southern District of New York. Filed expert report December 1, 2021.

- Expert declaration in Arkansas Teacher Retirement System and John A. Prokop, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. OSI Systems, Inc., Deepak Chopra, Alan Edrick, and Ajay Mehra, Defendants, Case No. 17-cv-08841-VAP-SKx, United States District Court for the Central District of California, Western Division. Filed declaration re: Plan of Allocation and aggregate damages December 10, 2021.

- Testifying Expert in Boston Retirement System, Individually and On Behalf of All Others Similarly Situated v. Alexion Pharmaceuticals, Inc., Leonard Bell, David L. Hallal, Vikas Sinha, David Brennan, David J. Anderson, Ludwig Hantson, and Carsten Thiel, Defendants, Civ. No. 3:16-cv-2127(AWT), United States District Court for the District of Connecticut. Filed expert report December 15, 2021.

- Testifying Expert In Re Aphria, Inc. Securities Litigation, No. 1:18-cv-11376-GBD, United States District Court Southern District of New York. Filed expert report January 28, 2022.

- Testifying Expert in Discovery Global Citizens Master Fund, Ltd., et al., MSD Torchlight Partners, L.P., et al., Incline Global Master LP., et al., Valic Company I, et al., Okumus Opportunistic Value Fund, Ltd., The Boeing Company Employee Retirement Plans Master Trust, et al., Första Ap-Fonden, et al., GMO Trust, et al., Hound Partners Offshore Fund, LP, et al., Colonial First State Investments Limited As Responsible Entity For Commonwealth Global Shares Fund 1, et al., Bharat Ahuja, et al., Brahman Partners II, L.P., et al., The Prudential Insurance Company Of America, et al., 2012 Dynasty UC LLC, et al., Blackrock Global Allocation Fund, Inc., et al., Northwestern Mutual Life Insurance Co., et al., Bahaa Aly, et al., James M. Templeton, et al., GIC Private LTD., et al., USAA MUTUAL FUNDS TRUST On Behalf Of Its Series USAA Aggressive Growth Fund, et al., Maverick Select Fund, Ltd., et al., Plaintiffs, vs. Valeant Pharmaceuticals International, Inc. et al., Defendants, Civil Action No(s): 3:16-cv-07321-MAS-LHG, 3:16-cv-07324-MAS-LHG, 3:16-cv-07494, 3:16-cv-07496, 3:17-cv-06513-MAS-LHG, 3:17-cv-07636-MAS-LHG, 3:17-cv-12088-MAS-LHG, 3:18-cv-00089, 3:18-cv-08705-MAS-LHG, 3:18-cv-00383-MAS-LHG, 3:18-cv-00846-MAS-LHG, 3:18-00893, 3:18-cv-01223-MAS-LHG, 3:18-cv-

08595-MAS-LHG, 3:18-cv-00343-MAS-LHG, 3:18-cv-15286-MAS-LHG, 3:18-cv-17393, 3:20-cv-05478, 3:20-cv-07460-MAS-LHG, 3:20-cv-07462-MAS-LHG, 3:20-02190-MAS-LHG, United States District Court for the District of New Jersey. Filed expert report February 2, 2022.

Experience in Labor Economics and Discrimination-Related Cases:

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.– Filed report re: lost wages and benefits.

- Testifying expert in Richard Akins v. NCR Corporation.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division. Filed expert report October 12, 2011. Deposition November 10, 2011.

- Testifying expert in Vincent Torbio, et al. against Feldor Billiards Inc. D/B/A Fatcat Billiards, et al., Index No. 153384/14, Supreme Court of the State of New Your, County of New York. Filed expert report May 29, 2018. Deposition July 24, 2018.


Selected Experience in Antitrust, General Damages, and Other Matters:

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

**TEACHING EXPERIENCE:**

KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**AWARDS:**

1994  Ford Fellowship Recipient for Summer Research.
1993  Arnold Prize for Best Research Proposal.
1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.

- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.

**Appendix C**
**Examples of Securities Cases in Which the Class was Certified in the Last 10 Years**

| # | Case Name | Case Number | US District/Division | Date of Class Certification Decision |
|---|-----------|-------------|----------------------|-------------------------------------|
| 1 | In Re NII Holdings, Inc. Securities Litigation | No. 1:14-cv-00227-LMB-JFA | Eastern District of Virginia, Alexandria Division | 11/17/15 |
| 2 | Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al. | No. 4:14-cv-00226-YGR | Northern District of California | 03/16/16 |
| 3 | Beaver County Employees' Retirement Fund, et al. v. Tile Shop Holdings Inc., et al. | No. 0:14-cv-00786-ADM-TNL | District of Minnesota | 07/28/16 |
| 4 | In Re Intuitive Surgical Securities Litigation | No. 5:13-cv-01920-EJD | Northern District of California | 12/22/16 |
| 5 | In Re Virtus Investment Partners, Inc. Securites Litigation | No. 15-cv-1249-WHP | Southern District of New York | 05/15/17 |
| 6 | Dr. Joseph F. Kasper, et al. v. AAC Holdings, Inc., et al. | No. 3:15-cv-00923 | Middle District of Tennessee, Nashville Division | 07/14/17 |
| 7 | Benjamin Gross, et al. v. GFI Group, Inc., et al. | No. 1:14-cv-09438-WHP | Southern District of New York | 08/23/17 |
| 8 | Leonard Howard, et al. v. Liquidity Services, Inc., et al. | No. 1:14-cv-01183-BAH | District of Columbia | 09/06/17 |
| 9 | KBC Asset Management NV v. 3D Systems Corporation, et al. | No. 0:15-cv-02393-MGL | District of South Carolina, Rock Hill Division | 09/28/17 |
| 10 | Lou Baker, et al. v. SeaWorld Entertainment, Inc., et al. | No. 3:14-cv-02129-MMA-AGS | Southern District of California | 11/29/17 |
| 11 | Washtenaw County Employees' Retirement System v. Walgreen Co., et al. | No. 15-cv-3187 | Northern District of Illinois | 03/29/18 |
| 12 | Kevin Murphy v. Precision Castparts Corp. | No. 3:16-cv-00521 | District of Oregon, Portland Division | 06/27/18 |
| 13 | In Re: SanDisk LLC Securities Litigation | No. 3:15-cv-01455-VC | Northern District of California, San Francisco Division | 09/04/18 |
| 14 | Guevoura Fund Ltd., et al. v. Sillerman, et al. | No. 1:15-cv-07192-CM No. 1:18-cv-09784-CM | Southern District of New York | 02/04/19 |
| 15 | In Re: EZCORP, Inc. Securities Litigation | No. 1:15-cv-00608-SS | Western District of Texas | 02/19/19 |
| 16 | Leon D. Milbeck v. TrueCar, Inc., et al. | No. 2:18-cv-02612-SVW-AGR | Central District of California | 05/09/19 |
| 17 | City of Sunrise General Employees' Retirement Plan v. FleetCor Technologies, Inc, et al. | No. 1:17-cv-02207-LMM | Northern District of Georgia, Atlanta Division | 07/17/19 |

# Appendix C
## Examples of Securities Cases in Which the Class was Certified in the Last 10 Years

| # | Case Name | Case Number | US District/Division | Date of Class Certification Decision |
|---|-----------|-------------|----------------------|--------------------------------------|
| 18 | Atul Singh Deora, et al. v. Nanthealth, Inc., et al. | No. 2:17-CV-01825-BRO-MRW | Central District of California, Western Division | 07/30/19 |
| 19 | Richard Di Donato v. Insys Therapeutics | No. CV-16-00302-PHX-NVW | District of Arizona | 09/20/19 |
| 20 | Adam S. Levy, et al. v. Thomas Gutierrez, et al. | No. 1:14-cv-00443-JL | District of New Hampshire | 09/30/19 |
| 21 | Eric Weiner v. Tivity Health, Inc. | No.: 3:17-cv-01469 | Middle District of Tennessee, Nashville Division | 01/29/20 |
| 22 | Public Employees' Retirement System of Mississippi v. Treehouse Foods, Inc. et al. | No. 1:16-cv-10632 | Northern District of Illinois | 02/26/20 |
| 23 | Lewis Cosby, et al. v. KPMG, LLP | No.: 3:16-CV-121-TAV-DCP | Eastern District of Tennessee, Knoxville Division | 06/29/20 |
| 24 | Julian Keippel v. Health Insurance Innovations, Inc., et al. | No. 8:19-CV-00421-WFJ-CPT | Middle District of Florida, Tampa Division | 08/28/20 |
| 25 | Plymouth County Retirement System v. GTT Communications, Inc., et al. | No. 1:19-cv-00982-CMH-MSN | Eastern District of Virginia, Alexandria Division | 09/10/20 |
| 26 | In Re Perrigo Company PLC Securities Litigation | No. 1:19-cv-00070-DLC | Southern District of New York | 09/24/20 |
| 27 | Kevin L. Dougherty v. Esperion Therapeutics, Inc., et al. | No. 2:16-cv-10089-AJT-RSW | Eastern District of Michigan | 11/19/20 |
| 28 | The Police Retirement System of St. Louis v. Granite Construction, Incorporated | No. 3:19-cv-04744-WHA | Northern District of California | 01/21/21 |
| 29 | In Re Navient Corporation Securities Litigation | No. 1:17-cv-08373-RBK-AMD | District of New Jersey | 03/11/21 |
| 30 | Utesch v. Lannett Company, Inc. et al. | No 2:16-cv-05932-WB | Eastern District of Pennsylvania | 08/12/21 |
| 31 | Holwill v. AbbVie Inc. et al. | No. 1:18-cv-6790 | Northern District of Illinois | 09/23/21 |
| 32 | In Re Pareteum Securities Litigation | No. 1:19-cv-09767-AKH-GWG | Southern District of New York | 01/21/22 |

**Appendix D**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

CENTRAL DIVISION

| | |
|---|---|
| In re UNITI GROUP INC. SECURITIES LITIGATION | Case No. 4:19-cv-00756-BSM<br><br>CLASS ACTION<br><br>**DECLARATION OF CHAD COFFMAN, CFA REGARDING CALCULATION OF RETURNS FOR UNITI OPTIONS**<br><br>Judge: Hon. Brian S. Miller |

I, Chad Coffman, declare as follows:

## I.    INTRODUCTION

1.    I submitted an initial report on October 25, 2021, wherein I concluded that the markets for Uniti Group, Inc. Common Stock and Options were efficient during the relevant Class Period, from April 24, 2015 through June 24, 2019, inclusive.  I also concluded that calculating damages in this matter is subject to a common methodology under Section 10(b) of the Securities Exchange Act of 1934.

**Appendix D**

2.      I was deposed on December 6, 2021 for this matter wherein I testified to these conclusions as well.[1]

3.      On December 23, 2021, I received an expert report from Dr. Christopher James in which he responded to the conclusions I made in the report I submitted on October 25, 2021.[2]

4.      While I am preparing to issue a rebuttal report in this matter to be submitted on February 22, 2022, and will respond to many of the points that Dr. James makes at that time, there is one issue raised by Dr. James that necessitates a correction to my report.  In this Declaration, I describe the nature and impact of that correction.

## III.    METHOD USED FOR CALCULATING RETURNS FOR UNITI OPTIONS

5.      In **Section VIII** of Dr. James' report, he points out that when testing cause and effect for Uniti options, there is a discrepancy between how I describe the analysis in my Report and the underlying computer code that implements the methodology.  In particular, I very clearly stated in my opening report that the abnormal returns for Uniti Options were calculated as the **actual return** minus the expected return.[3]  I also testified to this methodology in my deposition.[4]  Furthermore, in my deposition, when directly asked about

---

[1] Deposition of Chad Coffman, *In re UNITI GROUP INC. SECURITIES LITIGATION,* No. 4:19-cv-00756-BSM, December 6, 2021 ("Coffman Deposition").

[2] Expert Report of Christopher M. James, PH.D., *In re UNITI GROUP INC. SECURITIES LITIGATION*, No. 4:19-cv-00756-BSM, December 23, 2021 ("James Report").

[3] In **Section VIII** of my Report, ¶ 90, I clearly state: "I am able to quantify the abnormal price return for each option by subtracting the expected return from the actual observed return.  Once I have the abnormal return, I can then test whether the abnormal return is statistically significant."

[4] *See,* Coffman Deposition at 181: 24-25 and 182: 2-5, "Q. In your event study, you quantified an abnormal price return for each option by subtracting the expected return from the actual observed return; is that right?  A. Yes." *See also,* Coffman Deposition at 183: 9-23, "Q.  And you also calculated the actual observed return using the Black-Scholes Model as well, correct?  A. No, the actual ~~expected~~ return is the actual observed change in the market prices according to [iVolatility].  So I computed – so if the actual return from the market price the day before was 5 percent and the expected return from the Black-Scholes Model was 2 percent, I would have calculated an abnormal return of 3 percent.  The actual return doesn't come from a Black-Scholes model."

**Appendix D**

whether it would be appropriate to use theoretical prices to compute the actual return, I testified it would not.[5] My clear intent, both in my Report and deposition testimony, was to use actual returns as a key input to my cause and effect test for Uniti Options. That is also consistent with how I performed the analysis for Uniti Common Stock, which Dr. James does not challenge and I also note in my deposition testimony.[6] However, Dr. James correctly pointed out that the underlying backup computer code provided with my Report demonstrates that my cause and effect test for Uniti Options had not relied on the actual returns, but instead, incorrectly made use of theoretically calculated price returns instead of actual returns. That reflects an unintended error that requires correction.[7]

6.      Furthermore, I was asked at my deposition how I handled observations in the option pricing data where the bid price was listed as $0. At the time I did not recall exactly how those situations had been handled and I said I would need to review the issue to answer the question. Upon further reflection and consideration of this question, I have determined that I should have excluded such observations from the cause and effect analysis because they do not reflect the presence of an actionable bid price. Exclusion of such observations is also consistent with how the Chicago Board Options Exchange treats options pricing data

---

[5] *See,* Coffman Deposition at 185: 4-23, "Q. Would it have been appropriate to have used Black-Scholes Model prices in calculating the actual observed return? A. Give me a minute to think about that. No, I think you – for the purposes of performing the underlying event study, it's important to use an observed market return. Not a theoretical price. When you're looking at the expected return, you're trying to calculate already based on a model what one would expect. So you're already departing from relying on observed prices. So in that case, using the theoretical formula makes sense, but when looking at actual prices in order to get the abnormal return? No. I think you have to use the actual market prices."

[6] I noted this in my deposition as well when asked: "Q. And with respect to the news/no news test, is it fair to say that the event study was intended to be similar to the news/no news test that you ran for Uniti's common stock? A. Similar to the overall approach, yes." (Coffman Deposition at 148: 3-9)

[7] The error apparently resulted from a misunderstanding and/or miscommunication between me and my staff and resulted in a change in the code that I had not become aware of prior to filing the report.

**Appendix D**

when computing its VIX index product and with other literature that utilizes the same iVolatility data.[8]

7.    I have now reperformed the calculations underlying my cause and effect test for Uniti Options to make them consistent with the intended methodology and the methodology described in my Original Report as well as eliminating use of observations with $0.00 bid prices.

8.    These results continue to provide affirmative statistical evidence of a cause and effect relationship between new news and changes in the market prices of Uniti Options. In particular, the following tables reflect how the results and conclusions to be drawn are consistent with my Original Report:

---

[8] *See,* "Cboe VIX White Paper: Cboe Volatility Index," *Cboe Exchange, Inc.*, 2021. *See also,* "Addendum to Cboe VIX White Paper / Cboe Volatility Index," *Cboe Exchange, Inc.*, August 2, 2021.  Chang, Bo Young and Greg Orosi, "A Simple Method for Extracting the Probability of Default from American Put Option Prices," Staff Working Paper, Funds Management and Banking Department, *Bank of Canada*, April 20, 2020.  Gudmundsson, Hilmar and David Vyncke, "A Generalized Weighted Monte Carlo Calibration Method for Derivative Pricing," *Mathematics* 2021, 9, 739.

**Appendix D**

## Table A
## Comparison of Methodologies for UNIT Calls

| Statistic | Original | | Updated | |
|---|---|---|---|---|
| | **Earnings Announcements** | **Days with No News, Analyst Reports, or SEC Filings** | **Earnings Announcements** | **Days with No News, Analyst Reports, or SEC Filings** |
| % Significant Days at 95% Confidence Level[2] | 16.27% | 7.32% | 14.29% | 6.70% |
| Average Absolute Abnormal Return[3] | 19.86% | 10.15% | 21.31% | 15.44% |
| Average Volume (Shares) | 4,187 | 2,779 | 4,715 | 3,218 |

Notes:

(1) Each observation represents a date for a specific put option series where a return can be calculated.

(2) 16.27% rate of statistical significance is statistically significantly different than 7.32% at the 99% confidence level using a Chi-Square test. 14.29% rate of statistical significance is statistically significantly different than 6.70% at the 99% confidence level using a Chi-Square test.

(3) 19.86% absolute return is statistically significantly different than 10.15% based on a t-test for difference of means at the 99% confidence level. 21.31% absolute return is statistically significantly different than 15.44% based on a t-test for difference of means at the 95% confidence level.

**Appendix D**

### Table B
### Comparison of Methodologies for UNIT Puts

| Statistic | Original | | Updated | |
|---|---|---|---|---|
| | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
| % Significant Days at 95% Confidence Level[2] | 19.47% | 7.55% | 17.01% | 6.63% |
| Average Absolute Abnormal Return[3] | 15.27% | 7.81% | 22.29% | 16.77% |
| Average Volume (Shares)[4] | 5,671 | 2,620 | 5,918 | 2,692 |

Notes:

(1) Each observation represents a date for a specific put option series where a return can be calculated.

(2) 19.47% rate of statistical significance is statistically significantly different than 7.55% at the 99% confidence level using a Chi-Square test. 17.01% rate of statistical significance is statistically significantly different than 6.63% at the 99% confidence level using a Chi-Square test.

(3) 15.27% absolute return is statistically significantly different than 7.81% based on a t-test for difference of means at the 99% confidence level. 22.29% absolute return is statistically significantly different than 16.77% based on a t-test for difference of means at the 95% confidence level.

(4) The difference between 5,671 and 2,620 is statistically significant at the 99% confidence level. The difference between 5,918 and 2,692 is statistically significant at the 99% confidence level.

9.      Attached as an appendix is my Corrected Report.  The only changes to the Report are an updated version of Exhibits 15, 16, and 17, which reflect the corrections described above and citation to specific numbers from those exhibits in the text of the Report.  No other calculations outside the section relating to cause and effect for Uniti Options have been altered.  The text of the Report (with the exception of citing specific numbers from those exhibits), my overall methodological approach, substantive findings, and ultimate opinions are completely unaltered.

**Appendix D**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 24, 2022, in Chicago, Illinois.

_____
Chad Coffman