# EXHIBIT E

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

Master File No. 4:19-cv-00756-BSM

- - - - - - - - - - - - - - - - - - - -x

In re UNITI GROUP INC. SECURITIES  :

LITIGATION                         :

                                   :

- - - - - - - - - - - - - - - - - - - -x

This Document Relates To:          :

                                   :

                                   :

    ALL ACTIONS                    :

- - - - - - - - - - - - - - - - - - - -x

                    February 4, 2022

                    11:06 a.m.

        VIDEOTAPED VIRTUAL REMOTE DEPOSITION
UPON ORAL EXAMINATION OF CHRISTOPHER JAMES,
Ph.D., held at the above-mentioned time and
place, before Randi Friedman, a Registered
Professional Reporter, within and for the State
of New York.

C. James, Ph.D.

APPEARANCES:

ROBBINS GELLER RUDMAN & DOWD, LLP
Attorneys for Plaintiffs

655 West Broadway, Suite 1900
San Diego, California 92101
BY:   DEBRA J. WYMAN, ESQ.
      JOSEPH TULL, ESQ.

DAVIS POLK & WARDWELL, LLP
Attorneys for Defendants
450 Lexington Avenue
New York, New York 10017

BY:   BRIAN M. BURNOVSKI, ESQ.
      NIKOLAUS WILLIAMS, ESQ.
                * * *

ALSO PRESENT:

Adam Venturini - Videographer
Kelly Bryant

Page 3

C. James, Ph.D.

STIPULATIONS

IT IS HEREBY STIPULATED, by and between the attorneys for the respective parties hereto, that:

All rights provided by the C.P.L.R., and Part 221 of the Uniform Rules for the Conduct of Depositions, including the right to object to any question, except as to the form, or to move to strike any testimony at this examination is reserved; and in addition, the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or a waiver to make such motion at, and is reserved to, the time of this action.

This deposition may be sworn to by the witness being examined before a Notary Public other than the Notary Public before whom this examination was begun, but the failure to do so or to return the original of this deposition to counsel, shall not be deemed a waiver or the rights provided by Rule 3116, C.P.L.R., and shall be controlled thereby.

The filing of the original of this deposition is waived.

Page 4

C. James, Ph.D.

MR. VIDEOGRAPHER:  Good morning. We are going on the record at 11:06 a.m. on February 4th, 2022.

Please note that the microphones are sensitive and may pick up whispering, private conversations and cellular interference.  Please turn off all cellphones or place them away from the microphones as they can interfere with deposition audio.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Dr. Christopher James in the matter of United Group, Inc. Securities Litigation, which is filed in the United States District Court of the Eastern District of Arkansas.

My name is Adam Venturini from the firm Veritext and I'm the videographer.  The court reporter today is Randi Friedman, also from the firm Veritext.  I'm not authorized to administer an oath, I'm not related to

Page 5

C. James, Ph.D.

any party in this action, nor am I financially interested in the outcome.

Counsel and all present remotely will now state their appearances and affiliations for the record.  If there are any objections to the proceeding, please state them at the time of their appearance, beginning with the noticing attorney.

MS. WYMAN:  Good morning.  This is Debra Wyman and Joseph Tull from Robbins Geller Rudman & Dowd on behalf of the plaintiffs.

And just for point of clarification, I think the videographer identified this as United Group Securities Litigation.  It's actually the Uniti Group Securities Litigation.

MR. VIDEOGRAPHER:  My apologies.

MS. WYMAN:  That's okay.

Also with us is Kelly Bryant from Global Consulting.

MR. BURNOVSKI:  Brian Burnovski from Davis Polk & Wardwell on behalf of defendants and the witness, and with me is

Page 6

C. James, Ph.D.

my colleague, Nik Williams.

MR. VIDEOGRAPHER:  All right.
Will the court reporter please swear in the
witness.

* * *

CHRISTOPHER M. JAMES, Ph.D., the
witness herein, having been duly affirmed,
was examined and testified as follows:

* * *

EXAMINATION

BY MS. WYMAN:

Q     Good morning again, Dr. James.

A     Good morning.  How are you?

Q     I'm fine, thank you.  It's good to see
you again.  You and I have met on several
occasions; is that right?

A     That's correct.

Q     And as I know, you have had your
deposition taken on numerous occasions, so I
think we can dispense with the rules of the
deposition.  Is that fair?

A     I think so, yes.

Q     And, Dr. James, where are you today
physically located?

Page 7

C. James, Ph.D.

A     I am about 20 miles south of St. Augustine, Florida.

Q     Okay.  And are you alone in the room where this deposition is being taken?

A     I have a brown labrador with me, but other than that, I'm alone.

Q     A comfort animal for purposes of the deposition.

A     We'll see if he behaves, but...

Q     Have you, Dr. James, enabled the do-not-disturb setting on a cellphone or other applications like instant messaging or email or anything like that?

A     I turned off my cellphone, but let me just check to make sure it is.  It's off.

Q     Okay.  Terrific.  Will you agree not to communicate with anybody while we're on the record, except for as reflected on the record?

A     Sure.

Q     Okay.  Thank you.

Did you do anything to prepare for your deposition today?

A     I did.  I read over my report and I had a meeting with the attorneys from Davis Polk

Page 8

C. James, Ph.D.

yesterday, and a short meeting about a week ago.

Q    Okay.  And how long was the meeting that you had with the Davis Polk attorneys yesterday?

A    I think five or six hours is my recollection.

Q    And was it just yourself and lawyers from Davis Polk that participated in that meeting?

A    No.  A Kyle Milliken and a Yan Cao from Cornerstone Research were also on the call.

Q    And then you mentioned, I think, that you guys had one other meeting last week sometime; is that right?

A    Last Friday, yes.

Q    Last Friday.  Okay.  Was it the same folks that participated in that meeting last Friday?

A    Yes, although I think the meeting yesterday, there were -- there was an attorney, and I apologize, I forgot her name, from Davis Polk, I believe, that was on the call yesterday that wasn't on the call a week ago Friday.

Q    Okay.  And how long did you guys meet

Page 9

C. James, Ph.D.

for last week on Friday?

A    About two hours.

Q    Okay.  And I understand from your counsel that you have available to you a copy, a hard copy of your December 23rd report to use today?

A    Yes, I do.

Q    Okay.  And it's a clean copy; right?  It doesn't have any highlights or notes or adaptations; correct?

A    That is correct.

Q    I'm still going to mark one for our official record, but I just thought it would be easier for us to flip through the paper copy rather than dealing with scrolling on the electronic copy.

A    So do you want me to preserve this one and mark it or --

Q    No.  You don't need to.  You can use it.

A    Okay.

Q    Like I said, I accept your affirmation that it's not marked up in any way shape or form.

A    That's correct.

Page 10

C. James, Ph.D.

Q    Okay.  Do you have any other documents or notes or visual aids around you today that are in front of you or on the computer screen?

A    No.  Well, I have a clean copy of Mr. Coffman's report along with my report, but that's all I have in front of me.

Q    Okay.  And Mr. Coffman -- are you talking about Mr. Coffman's original report or the declaration that was filed this past January?

A    It's the declaration filed in January, yes.

Q    Okay.  Okay.  Great.  And other than the exhibits that we introduced through the Exhibit Share and the two hard copy documents that you just described to me, you'll agree not to look at any documents or visual aids while we're on the record today; correct?

A    That's correct.

Q    Okay.  Thank you.

All right.  So let's start by marking your report as Exhibit 1.

MS. WYMAN:  And just for our record, Exhibit 1 will be the expert report of Christopher M. James, Ph.D. dated

C. James, Ph.D.

December 23rd, 2021.

(Exhibit 1 was marked.)

Q       For everyone else, we'll wait to get it up on Exhibit Share and then we'll start with the questions.  It should be ready to go --

A       I have it.

Q       Okay.  Dr. James, is Exhibit 1 a copy of the report that you tendered in this action?

A       Yes, it is.

Q       And if you flip to Page 58, does your signature appear on that page?

A       So you want me to go to the one -- Exhibit Share right now?

Q       You can use your paper copy.  That's why I wanted you to have it.

A       Yeah.  Yes, that's my signature.

Q       Okay.  Terrific.  And are the summary of the opinions that you have offered in this case outlined on pages 7 through 9 of Exhibit 1?

A       That is correct.

Q       Now, Dr. James, did you draft this report yourself?

A       I did.  I drafted -- let me explain how the drafting procedure occurred.  I drafted

Page 12

C. James, Ph.D.

the first draft.  I asked Cornerstone to fill in certain references that I had identified, and so they were part of the drafting process in the sense that they followed my direction and inserted certain materials and the like, but this is my work product, and this is the product of my drafting.

Q    Okay.  And you skipped ahead of me, but your report does indicate that you were assisted by Cornerstone Research in this matter, and that was personnel from Cornerstone Research worked at your direction?

A    Yes.

Q    That's true.  All right.

So what apart from filling in data and other things in your draft report did Cornerstone Research do to assist you in forming your opinions?

A    They would do things such as, you know, I asked them to do a PACER search on certain court documents, search websites for various regulatory proceedings, identify documents that Judge Furman referred to in his -- in his decision, and conduct Factiva searches

C. James, Ph.D.

concerning news announcements and other information that may be coming to the market on various dates during the class period and at various times that are identified by the various documents, for example, that Judge Furman is referring to.

So data gathering, data search. Identify and listing for me news announcements, various analyst reports and so on. So very much like I would use a research assistant. Assembling data and presenting it to me in a way that I could use it for the research I was conducting in the context of this report.

Q    And how many people at Cornerstone helped you out?

A    My main -- there were three main contacts. I think there were a couple of analysts that worked under those managers or associates, but I didn't have direct contact with them.

Q    And who are the three main contacts that you worked with from Cornerstone on this case?

A    Brendan -- Travis Brendan, Yan Cao,

C. James, Ph.D. and Kyle Milliken.

Q     And what in particular did Travis Brendan do to assist you?

A     He -- his role was primarily in the area of the options analysis, examining and analyzing the code that was used.  He provided me with the I volatility data on which I constructed some summary statistics.  I believe he, at my direction, compiled those summary statistics in terms of the exhibits and the like.

Q     Okay.  And what about Yan Cao, am I saying that --

A     Yeah.  She is the sort of the -- I would say my primary contact and was the person at Cornerstone that was directing the team.  So I would think of her as my main contact person.

Q     Okay.  And did Ms. Cao assist you in any of the substantive work that was done?

A     We discussed certain aspects of my report, and she would answer questions that I posed to her.  We discussed, you know, for example, I have conducted an event study.  I asked her to look at the extent to which the event study results at various disclosure dates

Page 15

C. James, Ph.D.

based on my event study model were similar to those that are part of Mr. Coffman's file, for example.  That type of thing.

Q     Okay.  And I think the last person you mentioned was Kyle Milliken?

A     Yes.  Kyle was -- and I worked on really digging down into the documents that Judge Furman relied upon in his opinion, that he cited to in his opinion, and helped me trace back those documents to various sources.

Q     I see.  And do you have an understanding of what Mr. Brendan's background is?

MR. BURNOVSKI:  Just for the record, I believe his name is Brendan Travers.

THE WITNESS:  Travers, I'm sorry.

MR. BURNOVSKI:  First name is Brendan, last name is Travers.

THE WITNESS:  I misspoke, Brian.

MR. BURNOVSKI:  No worries.  I wanted to correct it for the record.

BY MS. WYMAN:

Q     Sorry.  What is Travers' background,

Page 16

C. James, Ph.D.

if you know?

A   He has a graduate degree in finance, and I'm not sure -- I don't recall if he has a Ph.D. or a master's degree, but --

Q   And what about Ms. Cao?

A   She has a Ph.D. in finance and she's a CFA.

Q   I see.  And finally, Mr. Milliken?

A   I believe he has a graduate degree as well in -- a master's.  He may have a Ph.D. as well.

Q   Okay.  And are those three folks people that you worked with in the past on other engagements?

A   Kyle, yes.  I haven't worked with Yan or Brendan in the past.

Q   Okay.

A   Yeah.

Q   I'm sorry, what did you say?

A   Nothing.

Q   Okay.  And in -- going to your report, in a paragraph of your report which is on Page 1, and Appendix A, which appears to be your CV --

A   Uh-huh.

Page 17

C. James, Ph.D.

Q      -- you're currently a professor of finance and economics at the University of Florida?

A      That's correct.

Q      Are you currently teaching any courses?

A      I am.

Q      Which courses are you teaching?

A      I'm currently teaching a course in what's on the catalog as financial decision-making.

Q      And is that an undergrad or graduate level course?

A      Graduate level course.

Q      And generally what is the course material covering?

A      It's an advanced course in corporate finance.  We divide our corporate finance courses roughly into the assets side and the liability side.  Financial decision-making focuses on the liability side.  How firms go about raising funds, debt structure, the extent to which various securities are sensitive to new information, risk management issues, liquidity

Page 18

C. James, Ph.D.
management issues.

Q      Is this the only course that you're teaching currently?

A      Pardon me?

Q      Is this the only course that you are currently teaching?

A      Yes.  I may be on the catalog for "PHC" courses.  But that's ongoing as part of a metric program.  But those are not courses in which I'm in the classroom.

Q      I see.  And can you give me an estimate of what percentage of your professional time is spent on your teaching duties?

A      Well, I have a research professorship, so I have a reduced teaching load in terms of in class.  So I would say less than 20 percent is devoted to teaching.  And I think the last time I looked at my activities report, I think it was 20 percent teaching, 75 percent research-related activities and 5 percent service.

Q      And 5 percent service refers to what?

A      Serving on review committees, evaluating faculty, that type of thing.

Q      All right.  So when you say 75 percent

Page 19

C. James, Ph.D.

of your time is devoted to research activities, are you talking about just your professorship duties within the University of Florida or are you talking about all of your professional time?

A    I think I'm talking about how my university time is divided.  So I'm a full-time faculty member, so of my faculty time, 75 percent would be research and 20 percent is in the classroom teaching.

The reason I hesitate is my research is conducted with graduate students, and so how one determines what's research activity or mentoring is -- it's difficult to disentangle.

Q    Sure.  I can appreciate that.

And then also in your report, in Paragraph 4 on Page 1, you indicate that you currently serve on the board of directors of two private companies?

A    That's correct.

Q    Which companies do you sit on the board?

A    A company called ID2, and a company called Ponce Inlet Ventures.

Q    What was that last company?

C. James, Ph.D.

A    Ponce Inlet Ventures.

Q    What is Ponce Inlet Ventures' business?

A    It's a commercial developing company, so it has commercial land and is in the process of developing a couple of the parcels of the land that it owns.

Q    And how long have you been on the Ponce Inlet Ventures board?

A    I think it was formed either early or -- early last year or the year before.

Q    I know COVID sort of made everything sort of mesh into one; right?

A    It is.  It's designed to develop and it's been difficult to -- because of supply chain issues -- to get the resources needed to develop certain other properties.

Q    How much time do you spend on your directorship duties for Ponce Inlet Ventures?

A    Since it's a small partnership, I don't spend much time.  I would say, you know, the managing partner, I think he and I, we talk once or twice a week.

Q    And then the other company you

Page 21

C. James, Ph.D.

mentioned was ID2?

A    Yes.

Q    What kind of business is ID2 involved in?

A    Similar to Ponce Inlet.  So it owns commercial properties, apartment buildings, commercial retail properties.

Q    And how long have you been involved with ID2?

A    Oh, more than -- more than ten years.

Q    Okay.  And how much time do you spend attending to ID2 business affairs?

A    It varies, but, again, I would say several times a week I talk to the operating partner and discuss various matters.  If we're in the midst of an acquisition of a property or the sale of a property, it would require more time.

Q    I see.  Okay.

And then you report in the same paragraph, Paragraph 4 indicates you're also a senior advisor to Cornerstone Research?

A    Yes.

Q    And can you briefly describe what Cornerstone Research business is?

Page 22

C. James, Ph.D.

A     It is a financial and economic consulting firm that engages in both expert-related litigation support, as well as non-litigation-related consulting activities.

Q     And how long have you been involved with Cornerstone Research?

A     Oh, gosh, I think the first time I used them for support was probably -- seems like yesterday, but maybe 30 years ago.

Q     Wow.  Okay.

And what services do you provide to Cornerstone Research as a senior advisor?

A     That really varies over time.  Prior to COVID, I would participate in seminars on current topics and that type of thing, but during the COVID era I haven't really done much in the way of that, or any real activity associated with my senior advisor activities, simply because the seminars and educational programs have been not going on because of COVID.

Q     Okay.  And are you compensated for your senior advisor role at Cornerstone?

A     No.  I used to have a retainer with Cornerstone, but I don't anymore.

Page 23

C. James, Ph.D.

Q    Okay.  And why did that change?

A    I think several years ago I made a decision to devote less time to consulting activity, and as a result, we sort of agreed that given my reduction in involvement, I think this is 19 -- beginning of 2019, thereabouts, I would -- I would not work with them on a retention basis.

Q    So do they -- are you compensated for any work that you do on seminars or as a senior advisor to them, as you do that particular work?

A    I haven't done any yet, so I don't know what the work arrangements in the non-retention era we'll agree to.  It just hasn't come up yet.

Q    I see.  So you haven't done any senior advisor-type duties for Cornerstone since the early part of 2019, I think you said?

A    Well, when was COVID?  Early part of 2020, so end of '19 I think is the dividing line.

Q    Okay.  Do you have an ownership interest in Cornerstone Research?

A    I do not.

Q    Is Cornerstone billing defendants for

Page 24

C. James, Ph.D.

the time that you devote to the activities in this matter?

A    No.  I bill them directly.

Q    Okay.  And do you -- how many hours have you billed the defendants for your work to date?

A    I don't -- I don't recall specifically, but it's well in excess of 100 hours.

Q    And I think your report in Paragraph 10 indicates that your hourly rate is $1,000 an hour?

A    Yes.

Q    And is that the rate that you billed the defendants for your work here?

A    Yes.

Q    Do you know how many -- do you know whether or not Cornerstone is also billing the defendants for the time that they've spent assisting you in generating your opinions in this case?

A    I presume so, but I don't know what -- I'm not involved in their billing, so I don't know, for example, how many hours they've billed

Page 25

C. James, Ph.D.

or that type of thing.

Q     Does Cornerstone pay you a percentage of the billables that they collect from parties that you provide expert witness testimony and consulting for?

A     They do.  They pay me as other consulting firms that I've used do, based on what is referred to as an attribution.

Q     And what's the attribution you are to receive from Cornerstone in this case?

A     It depends on their billing.  I would have to go back and look.  My recollection is it's a percentage of the billings for which -- that have been collected, and I believe it excludes the billings of officers, and it may exclude the billing of principals within Cornerstone.

Q     And are any of the folks that you worked with in generating your report principals or officers of Cornerstone?

A     Yes.  Yan is an officer in Cornerstone.

Q     Okay.  But I think Mr. Brendan --

A     The other two are, I believe, senior

Page 26

C. James, Ph.D.

managers.

Q    I see, okay.  And do you get a report from Cornerstone periodically, showing you what the attribution amount is that you have earned as a result of their assistance of you in this matter?

A    No.  They pay me periodically, but they don't -- I haven't asked for -- I presume if I asked for it, I could get it -- a breakdown of how the attribution is distributed over various cases, but I don't know as I sit here.

Q    And so how much have you been paid by Cornerstone for the attribution in this case?

A    I don't think -- I don't believe I've been paid anything.

Q    Okay.  But you expect that that will happen as the billings get generated and paid through the defendants; right?

A    It would be my expectation, yes.

Q    Is that how it works in other engagements that you have where Cornerstone has assisted you?

A    Yes.

Q    All right.  We are going to go back to

Page 27

C. James, Ph.D.

your report, which is Exhibit 1, and we're going to turn to Appendix C, please.

A      Okay.

Q      Appendix C is called List of Documents Considered; right?

A      Yes.

Q      And Appendix C lists the materials that you considered in reaching the opinions that you offer in your report?

A      Yes.

Q      And --

A      With one exception, that in the analyst reports, if you look on Page 2, the full set of analyst reports that I considered are in the backup material.  And the list, I believe -- my recollection is the list of analyst reports are the ones that I cite to in my report.

Q      You anticipated my next question.  So to the extent that you cited materials in the report or those materials are contained in your backup data, that's the universe of what you considered in forming your opinions in this case; right?

A      Well, with the exception that

Page 28

C. James, Ph.D.

obviously I relied upon my experience and education and training and past research to inform myself of various opinions, but with respect to documents, what I'll refer to as case specific, the backup material and the Appendix C is intended to provide a complete list of those.

Q    Okay.  Fair enough.

Are you aware of any materials that you considered materials -- case-specific materials that you considered that aren't either listed on Appendix C or cited in your report or contained in your backup materials?

A    Nothing comes to mind as I sit here. Not in the context of writing my report. Obviously, I presume you'll ask me questions about the declaration of Mr. Coffman and the -- his amending his prior report, but I obviously didn't have that at the time that I wrote my expert report.

Q    Fair enough.  And again, you anticipated what I was going to be asking you in the future, so we'll get to that.

Now for the materials that are listed on Exhibit C, did you personally read every

C. James, Ph.D.

document that is shown here?

A    I reviewed every document.

Let me just be clear.  Let's give an example.  John Hull's Options, Futures and Other Derivatives is a textbook that I have used in the past.  I didn't read it in its entirety in preparing my report.  So it has chapters on futures and straddles -- option strategies that are not something that was relevant for this report.  Similarly with respect to documents like Stephen Ross' Corporate Finance text and the like.

Q    Fair enough.

Did you read all of the press articles or news pieces that are contained -- either listed here or contained in the backup materials?

A    I reviewed all of these.  Can I say that I read every word of every -- no.  Let me give you an example.

Analyst reports tend to be several pages long, and in those analyst reports there will be the body of the report, which I looked at for those reports that I'm citing to and considered.  But there's a lot of other stuff in

Page 30

C. James, Ph.D.

the report in terms of maybe a report that's covering the REIT sector.  I didn't look at and read the verbiage with respect to other REITs.  I didn't read the analyst's statement or conflict and that type of thing, so I can't say that I read every analyst report in its entirety.

Q      So when you -- I'm sorry, I didn't mean to interrupt you.

A      No.  I'm sorry.

Q      There's several pages of disclosures that are at the end of the analyst report.  Is that what you're referring to?

A      Yeah.  To the extent that the analyst report contains a discussion of material that wasn't -- I didn't view relevant, I didn't read it in any detail.  Similar with respect to the news articles.

So to the extent that there's -- I looked at headlines and the first paragraph or so.  Some articles I read their entirety.  It really depended to the extent of which to a review I believed they were relevant for purposes of my analysis.

Q      And the legal documents that you list

Page 31

C. James, Ph.D.

in Appendix C, did you read those documents?

A      The legal documents in terms of?

Q      I believe it's on Page 3.

A      I think I read the relevant sections, so for example -- let me give you an example. The consolidated class action complaint, no offense, I read most of it, but there were certain parts of it that had to do with legal citations and the like that weren't really germane to my analysis.

Q      Understood.

In preparing your report and forming your opinions, did you talk to anyone apart from counsel, or the folks at Cornerstone that you mentioned before, about your opinions or potential opinions?

A      Yes.  I spoke with a colleague of mine who trades options.  I trade options, and I wanted -- I had a brief discussion with him on whether it was -- whether you could put market orders on for option contracts that had no volume and had a posted quote, but the trading volume in the trades such that the bid or ask was a quote, not a bid or ask associated with the transaction.

Page 32

C. James, Ph.D.

Q    And who was that person that you consulted -- or that you spoke with?

A    Nimal.  Nimalendran.

Q    Can you repeat that?

A    He goes by Nimal because his first name is rather long.  Nimalendran is his last name.  He's a chair professor at the University of Florida.

Q    Did your discussion with -- I'm going to call him Nimal because I don't want to butcher his last name.

A    Actually, when he goes into Chick-fil-A he calls himself Alex because Nimal just doesn't work.

Q    Understood.  Did your discussion with Nimal inform your opinions in this case?

A    Not really.  I guess it was consistent with what I had observed.  I just wanted to know whether the platform that I used was different, providing me information that was maybe different than what other platforms had had.

Q    Okay.  Turning back to Exhibit C, how did you determine which materials you needed to consider to form the opinions that you've

Page 33

C. James, Ph.D.

outlined in your report?

A     Well, we can start with the academic articles.  You know, there were various issues that I address in the case, and the -- for example, articles about the speed of adjustment in various securities markets, you know, articles concerning inner firms' linkage and the wealth effects across the supply chain, basically articles to support my opinion that I think it's well founded that -- sort of basic economics that, for example, if a firm has, in the case of the supply chain, a concentrated set of customers or a concentrated set of suppliers, that the concentration may result in a relationship between the -- a particular company's stock return and the returns on its suppliers or its customers' securities.

Q     And how did you determine which analyst reports to pull or gather to consider in forming your opinions here?

A     Well, I started with the analyst reports that were provided to me by -- in the context of Mr. Coffman's report.  I received from counsel certain analyst reports that I believe

Page 34

C. James, Ph.D.

were part of the company's files.  And then I looked for analyst reports in Capital IQ and Refinitiv to try to get a complete -- as much as I could -- picture of what analysts were saying. Now, certain analyst reports aren't available through Capital IQ and Refinitiv, and to the extent that they weren't in the company files or with Chad Coffman -- it's the universe that I had available to me.

Q     And are Capital IQ and Refinitiv paid subscription services that provide analyst information to subscribers?

A     Yes.

Q     Are those two sources of information that you've used before to gather analyst information in the context of doing consulting and testimony work such as this?

A     Yes.  I've also used Capital IQ in my academic research and Refinitiv in my academic research, although I didn't use the subscriptions that I have from the university in obtaining analyst reports from those sources.

Q     Were the gathering up of the analyst reports that we've been talking about something

Page 35

C. James, Ph.D.

that you asked the folks at Cornerstone Research to help you with?

A    Yes.

Q    Okay.  And there's -- on Page 3 of Appendix C there's a header that says Data.

A    Yes.

Q    And I see that it has Capital IQ and Refinitiv.  It has CRSP, Factiva and SEC EDGAR; right?

A    Yes.

Q    What is CRSP?

A    It's the CRSP file for securities returns.

Q    And what is that?  Is that also a subscription service that provides data about securities returns?

A    It's the Center for Research on Securities Prices.  It's a center at the University of Chicago.  I access it through WRDS. It requires a paid subscription.

Q    What did you use the CRSP service for in this case?

A    So for securities prices.  So when running a market model and looking at the

Page 36

C. James, Ph.D.

relationship between, say, Uniti stock and Windstream stock return, those returns and price information I obtained from CRSP.

Q    Okay.

A    In addition, CRSP has a market index and is the source for information on the various -- the REIT index I don't believe I got through CRSP.  But the CRSP valuated -- for lack of a better term, I'll abbreviate, total market return is something that I got through CRSP.

Q    Okay.  And Factiva, is that another platform that you used to gather for information for your use here?

A    Yes.  So it's a search engine that you can use to search the financial class.

Q    I see.

Did you use that or did you have Cornerstone assist you in using that to identify public press or other news items of import to you?

A    I looked at their search routines and their queries.  I didn't run the searches myself, although I've used Factiva in the past to run searches.

Page 37

C. James, Ph.D.

Q     That was something that Cornerstone assisted you to do; is that right?

A     That's right.

Q     And the last thing, the SEC EDGAR, it's my understanding that that's used to gather SEC filings made by public companies.  Is that what you used it for here?

A     Yes.

Q     And is that something also that Cornerstone helped you gather?

A     Yes.  You know, it's so easy to use and free, I accessed it at various points in time as well as documents that were downloaded by Cornerstone that I reviewed.  So for example, 10-Qs and K's and things like that.

Q     Okay.  And apart from the data sources that are listed here on Exhibit C, are those the only data sources that you or Cornerstone accessed on your behalf to gather information for your consideration in this case?

A     We -- I used PACER to obtain certain court documents.

Q     I think you mentioned that before.

A     Okay.  I'm sorry.

Page 38

C. James, Ph.D.

Q    Which court documents -- which court cases did you use PACER to gather documents concerning?

A    I would have to -- I think -- my recollection is in trying to identify certain documents that were part of the documents that Judge Furman referred to, some of those documents were obtained through PACER.

Q    I see.  So you're talking about the action where Aurelius sued Windstream for a purported default of its debt covenants; is that right?

A    Yes.  It's the proceedings in which Aurelius and U.S. Bank as the trustee sought an opinion by the court as to whether a default on the subordinated debt of Windstream had occurred arising from a variety of factors, one of which is the spinoff transaction.

Q    Okay.  Let's turn to Page 2 of your report, and look at Paragraph 7, please.

A    Paragraph, I'm sorry, 7?

Q    Seven, yes.

A    Yeah.

Q    Does Paragraph 7 and 8 on Page 2 of

Page 39

C. James, Ph.D.

your report generally describe the assignments
that you were given in this case?

A    Yes.

Q    Okay.  And in Paragraph 7 you say, "I
have been retained by counsel for Uniti Group,
Inc." -- and I'm going to skip the
parentheticals -- "to evaluate whether the
allegedly misrepresented or omitted information
under plaintiffs' various theories of liability
had a price impact on Uniti's stock in connection
with the alleged corrective disclosures
identified by plaintiffs on August 3rd, 2017,
September 25th, 2017, February 15th, 2019 and
June 24th, 2019.  Specifically I have been asked
to assess whether the alleged misrepresentations,
as purportedly revealed by those alleged
corrective disclosures, impacted Uniti's stock
price assuming the market for Uniti stock was
efficient from April 24, 2015 through June 24th,
2019 as plaintiffs claim."

Is that one of the assignments that
you were given in this case?

A    Yes.

Q    Okay.  And then in Paragraph 8 you

Page 40

C. James, Ph.D.

say, "I have also been asked by counsel to review and respond to the expert report submitted by Chad Coffman dated October 25th, 2021. Specifically I have been asked to review and evaluate (1), whether Mr. Coffman has put forth a methodology capable of reliably measuring classwide damages in a manner consistent with plaintiffs' theories of liability, and (2), Mr. Coffman's analysis and conclusion that Uniti's options traded in an efficient market during the proposed class period."

Is that also an assignment that you were given in this case?

A     Yes.

Q     Have you been tasked with any other assignments that are not outlined in your report?

A     Well, we talked about it just a moment ago, that Mr. Coffman has filed a declaration amended report.  I'm looking at it.  And, you know, I've asked -- been asked to review that and whether that report changes any of my opinions.

Q     Okay.  We'll talk about that later.

So that's the only other assignment that you've been given, to review Mr. Coffman's

Page 41

C. James, Ph.D.

declaration that was filed in January of 2022?

A     Yes, that's right.

Q     Okay.  And just while we're here, as part of that additional work, did you gather any other materials that aren't in your Appendix C or listed in your report or in your backup materials to help you review the declaration from January 2022 that Mr. Coffman provided?

A     His report and the backup materials to his report.

Q     Okay.  Fair enough.

And in this case were you asked to make any assumptions in the assignments that you've been given?

A     I wasn't asked to make an assumption. I employed certain assumptions consistent with certain arguments that the plaintiffs were making.

Q     And what assumptions did you employ in your analysis here?

A     Well, I employed -- for purposes of evaluating price impact, I assumed that the market for Uniti's common stock was efficient -- so in particular, that it was semi-strong form

Page 42

C. James, Ph.D.

efficient -- and utilized the implications of that in my analysis of price impact.

Q      Any other assumptions that you employed?

A      Not that I can think of as I sit here.

Q      Okay.

A      Obviously, my understanding of what plaintiffs allege, and what plaintiffs allege was omitted or misrepresented comes from a review of the various filings by plaintiffs in this case. It was a consolidated class action, their opposition to defendants' motion for summary judgment, the class certification, and so on.

So those understandings might be construed to be a set of assumptions, but I'm utilizing those to have an understanding, gain an understanding of what plaintiffs allege was omitted or misrepresented, yeah.

Q      Have you assumed for purposes of your analysis that those allegations are true?

A      I think that -- I've assumed, yes, that -- the question that I've assumed is I've accepted the assumption that they allege omissions and misrepresentations as it pertains

C. James, Ph.D.

to certain things, such as the risks attendant to the sale and leaseback agreement, the lease attendant to the master lease agreement, the allegations regarding misstatements that the plaintiffs allege were made with respect to navigating bankruptcy.

Q    So am I correct in understanding that you are not offering an opinion that the market for Uniti's stock was not efficient during the class period; right?

A    No, I haven't been asked to do that. I was asked to -- well, I wasn't asked. I assumed for purposes of my analysis. I adopted the assumption that plaintiffs had asked the court to accept, which is that the Uniti stock was trading in an efficient market.

Q    You haven't offered any analysis of the factors to determine market efficiencies in a securities class action case; right?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  No, I don't think that's correct.  Certainly what I discussed where I haven't utilized the assumption of market efficiency.

Page 44

C. James, Ph.D.

So for example, in evaluating whether Mr. Coffman has demonstrated market efficiency as it pertains to the options, I've looked at various factors that have been identified by Mr. Coffman and various court rulings, factors conducive to or facilitating market efficiency, as well as looking at what he claims is his test of a cause and effect relationship between movements and the value of the options, either actual prices or model prices, and information being disclosed to the market on various dates.

BY MS. WYMAN:

Q    That's right, Dr. James, that's a fair distinction.  I should have made myself clear, that you haven't offered any analysis of the factors that are usually analyzed for purposes of market efficiency in a securities class action as relates to Uniti's stock?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  I'm sorry?

MR. BURNOVSKI:  You can answer the question, Dr. James.  I just interposed an

Page 45

C. James, Ph.D.

objection to the form.

THE WITNESS:  Well, I -- I mean, I looked at those factors, but I accepted as an operating assumption market efficiency. I'm not opining as to the efficiency of Uniti's common stock.

BY MS. WYMAN:

Q    And you haven't offered any opinions criticizing Mr. Coffman's event study methodology as he used it to evaluate the price movements in Uniti's common stock; is that right?

A    Could I have the question back again? I'm sorry.

Q    Sure.  Let me repeat it.

You haven't offered any opinions criticizing Mr. Coffman's event study methodology that he used to evaluate the price movement in Uniti's common stock; correct?

A    The event study methodology itself in terms of this market model and his employment of that market model, no.

Q    Okay.  And so you weren't disputing Mr. Coffman's calculation of statistically significant price reactions as it relates to

Page 46

C. James, Ph.D.

Uniti's common stock; correct?

A     I employed a different model for my event study.  And as I say in my report, whether I employ that model or Coffman's model at various -- what I'll refer to as alleged corrective disclosure dates, the conclusion would be -- my conclusions regarding marketing impact would be the same regardless of whether I adopted his model or utilized the model I employed.  I would say with one exception, which is with respect to the August 3rd dividend cut by Windstream, I think that based on the academic literature, insights can be obtained as to the extent to which the Uniti stock was -- reacted in an abnormal fashion relative to its historical relationship with Windstream, the market and industry factors.

Q     All right.  Then are you disputing that Uniti's stock price reacted in a statistically significant manner on the corrective disclosure base that Mr. Coffman's event study looked at?

A     Well, with the exception of what I just mentioned, no.  In other words, I have -- as

Page 47

C. James, Ph.D.

I indicated in my report, I think that it's appropriate to examine the historical relationship between Uniti and Windstream. But for purposes of the price impact analysis, whether I adopt my event study market model and event study results, or whether I utilize Mr. Coffman's, my conclusions would be unaltered. In other words, I would reach the same conclusion.

Q    Okay. Now, say for any opinions that you may have as a result of your review of Mr. Coffman's January 2022 declaration, are all the opinions you intend to offer in this case described in Exhibit 1, your report?

A    Yes, I think a summary of the opinions I've reached in this case, at this stage of the case, you know, I can't think of any other opinions that I have at this point.

Q    Okay.

MR. BURNOVSKI:  Sorry. Just for the record, your question was if they're described in Exhibit 1 of the report? Do you mean --

MS. WYMAN:  I said Exhibit 1, the

Page 48

C. James, Ph.D.
report.

MR. BURNOVSKI:  Sorry.

THE WITNESS:  Ms. Wyman, could we take like a three-minute break?

MS. WYMAN:  We can take a five-minute break.

THE WITNESS:  Okay.  Thank you.

MR. VIDEOGRAPHER:  All right.  Off the record 12:07 p.m.

(Whereupon there was a brief recess.)

MR. VIDEOGRAPHER:  Back on the record 12:18 p.m. Eastern Standard Time.

BY MS. WYMAN:

Q     Welcome back, Dr. James.  You realize you're still under oath; correct?

A     Yes.

Q     Okay.  Let's turn back to your report, which is Exhibit 1 to the depo, and let's turn to Pages 5 and 6 and look at Paragraphs 18 to 20.

A     Okay.

Q     In Paragraph 18 you say, "Plaintiffs allege in the complaint that defendants concealed from the market '1, the material risk that the

C. James, Ph.D.

spinoff was a prohibited sale-leaseback

transaction that violated the indenture.'"  And

in parentheses you define that as "sale-leaseback

theory."  Is that right?

A     Yes.

Q     And then in that same paragraph you go

on to say, "And '2, the true extent of the risk

that the master lease was not a true lease but

rather a carefully disguised financing

arrangement,'" and you define that as "true lease

theory"; correct?

A     That's correct.

Q     Neither of those terms appear in the

complaint, though, do they?

A     No.  Those are -- I am using them as

organizing tools to identify the various theories

regarding aspects of risks that were

misrepresented or alleged to be misrepresented.

Q     So those are designations that you

created for purposes of your report; right?

A     Well, I would say that you're correct

that the sale-leaseback theory, you won't find

that quoted or term in the plaintiffs', say,

consolidated complaint, but the material risk

Page 50

C. James, Ph.D.
that the spinoff was a prohibited sale and
leaseback transaction that violated the indenture
is language in the complaint.  And it is that
language I'm identifying as the sale and
leaseback theory.

Q     Like I said, the sale-leaseback theory
is a designation that you've created; right?

A     Right.  Corresponding to the material
risk that plaintiffs have alleged was associated
with the spinoff transaction.

Q     And the same is true for the
designation of the true lease theory, that's
something that you contrived for your report;
correct?

A     I don't think I would characterize it
as contrived.  I think that I'm identifying as an
organizing tool a theory of liability that
plaintiffs have identified in their report as it
pertains to the risks that the master lease was
not a true lease, but rather carefully disguised
financing arrangement.

Q     If you turn, please, to Page 6 of your
report and look at Paragraph 20, in there you
say, "Plaintiffs also allege that between

C. James, Ph.D.

March 18th and June 20th, 2019, defendants made false and misleading statements regarding Uniti's ability to" -- "ability 'to navigate the Windstream bankruptcy proceedings without having to raise capital,' i.e., they falsely represented that Uniti could withstand the financial impact of Windstream's bankruptcy without raising additional capital."  And then in parens you say, "navigating the bankruptcy theory"; right?

A    That's correct.

Q    And navigating the bankruptcy theory is not a term that's defined in the complaint; right?

A    That is correct, although the allegation, separate and apart from allegations regarding the prohibited sale and leaseback transaction and the master lease as disguised financing, that's separate and apart from those, obviously, because it temporally doesn't correspond to allegations as it pertains to, say, the sale and leaseback in the spinoff transaction.

Q    That's a designation, again, that you have created for the report; right?

Page 52

C. James, Ph.D.

A     Well, I think it's -- I would say it's an organizing tool that describes it succinctly, the theory of liability described in the plaintiffs' filings.

Q     Are you familiar with the materialization of the risk loss causation theory?

MR. BURNOVSKI:  Object.

THE WITNESS:  I have a general understanding.  Perhaps it would be helpful if you had a specific theory in mind or allegation in mind.

BY MS. WYMAN:

Q     I'm sorry.  I was going to ask you what your understanding of that theory generally was.

A     Well, as I understand, sort of -- as generally an omissions claim, that there was an omission or misrepresentation of a risk, and the allegation is that that mischaracterization of the risk materialized -- plaintiffs allege materialized, and I would describe that as a material of risk -- materialization of risk complaint or allegation.

Page 53

C. James, Ph.D.

Q     And is it your understanding that the plaintiffs in this case have alleged a materialization of the risk loss causation theory as you described it?

A     I mean, I would need you to describe that in some more detail.  I think that I would agree that plaintiffs are -- with the exception of the March 18th and June 20th alleged misstatements, are -- their complaint suggested it's an omissions case, not a misstatements case.

Q     And your report also notes that there are four dates on which plaintiffs allege risks materialized and the truth was revealed to the market.  If you look at the report, Page 6 in Paragraph 22, do you see those four dates?

A     Yes.

Q     Those dates are August 3rd, 2017, September 25th, 2017, February 15th, 2019 and June 24th, 2019; right?

A     Yes.

Q     Okay.  Are those the only corrective disclosure dates that you are aware of that you studied in arriving at the opinions that you've provided?

Page 54

C. James, Ph.D.

A    They're the only corrective disclosure dates during the class period that plaintiffs allege are corrective disclosure dates.  I don't recall seeing any others in the complaint.

Q    Okay.

A    Now as -- so that's my -- my recollection is that these are the four dates that plaintiffs allege.

Q    Okay.  Would you please turn to Page 11 of your report.  The very bottom of the page, Paragraph 34.

A    Yes.

Q    And in Paragraph 34 do you discuss what you call limitations to an event study analysis?

A    Yes.

Q    And on Page 11, there's a sentence that starts -- it's the second sentence in Paragraph 34.  It says, "An event study measures the price impact of all new information revealed during the studies of that window.  It cannot apportion the price impact of an individual piece of information where multiple pieces of information are disclosed simultaneously."

Page 55

C. James, Ph.D.

Do you see that?

A      Yes.

Q      Is that a limitation that you meant to describe in Paragraph 34?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  I think, you know, in -- as part of the limitation that I'm describing, because I go on to say, "Put differently, even if an event study regression analysis results in a statistically significant residual price decline on a given alleged corrective disclosure date, that in and of itself does not allow one to discern whether the decline can be attributable to a company-specific information that's corrective of the alleged misrepresentation versus other non-fraud-related company-specific information, (i.e. confounding information)."

BY MS. WYMAN:

Q      So in other words, you're saying that an event study can't identify a fraud-related versus a non-fraud-related informational impact?

C. James, Ph.D.

A    Well, the event study is a tool that is used to determine the extent to which there's a significant price movement on a particular day. But the tool, without doing further research as I've done in my report, doesn't allow one to discern whether the decline can be attributable to corrective of an alleged misrepresentation versus other non-fraud-related company-specific information without more analysis.

So, for example, if on a particular day plaintiffs were to allege there's a significant price movement, but -- and point to disclosures that are made on that day, if the plaintiffs are relying on market efficiency, and there's evidence that the information on a particular day the claim alleges moving the stock price was in the mix of information from an earlier date, then one would conclude that attributing the price decline to previously disclosed information would be inconsistent with the assumption of market efficiency.

Q    So in other words, an event study doesn't identify necessarily the cause of the price movement that it has calculated; correct?

Page 57

C. James, Ph.D.

Additional analysis needs to be done to identify the cause of that movement; right?

A       That is correct.

Q       Okay.  Turning back to Paragraph 34, starting off from where you left off reading, you say, "If the information released on the alleged corrective disclosure date is economically unrelated to the alleged misrepresentations, i.e., there is a mismatch, then one cannot attribute the price movement to the alleged misrepresentations."

Did I read that correctly?

A       Yes.

Q       Is the term "mismatch" an economic or finance term of art?

A       I think that it refers to -- yes, I think it is a term of art, in the sense that one of the -- one of the things that one -- investigations or analysis that one does when employing an event study is to infer whether there's price impact with respect to a particular piece of information, is determined whether the information that's disclosed on that day, say in the litigation context, is related to the alleged

C. James, Ph.D.

omissions or misrepresentations, or is
information regarding something else.

Q    So in other words, in order to
determine whether there is a mismatch, as you
say, you need to employ additional analysis to
determine the cause of the stock price that you
see; right?

A    Yes, I think that's right.

Q    Okay.  Now if you'd please turn to
Paragraph 36 of your report.  It's on Page 12.

A    Yep.

Q    Paragraph 36 says in this section,
which is Section 6 of your report, "I will
discuss the stock price movements following the
four sets of alleged corrective disclosures, as
well as the information released on those dates,
and assess whether there's any 'price impact'
attributed to the alleged misrepresentations
under each of plaintiffs' theories of liability."

Did I read that right?

A    Yes.

Q    Okay.  And that's what you did in this
case as part of that first assignment that we
looked at a little earlier today; is that

Page 59

C. James, Ph.D.

correct?

A      That is correct.

Q      And in that same Paragraph 36 you go on to say, "By 'price impact' I mean whether the alleged misrepresentations impacted Uniti's stock price in connection with the alleged corrective disclosures."  Is that right?

A      That's correct.

Q      Is that the definition of price impact that you employed throughout your report whenever you referred to price impact?

A      Yes.

Q      And what's the basis or source for your definition of price impact as you've stated in Paragraph 36?

A      Well, I mean, from an economic perspective, what we're asking is, if plaintiffs alleged certain information was disclosed to the market on a particular day, and that that information is what is impacting the stock price, leading to, for example, on a corrective disclosure date, a statistically significant negative price reaction.  To investigate whether that information is having an impact, as opposed

Page 60

C. James, Ph.D.

to some other set of factors or -- one could do, as I've done in my report, a variety of analyses, one of which would be to, for example, ask the question, well, is there evidence that the information that was being -- that plaintiffs allege is impacting the stock price on a particular day was available to market participants, and in an efficient market therefore would be reflected in the stock price, prior to the date that plaintiffs allege there was a price impact. And if one finds that, then assuming the market is efficient, which plaintiffs have, it would be economically incorrect to say that the disclosure on that date, for example, is having an impact on the price from an economic perspective.

Q     So in other words, your price impact analysis looks to define the potential causes for the movements that the event study has identified; right?

A     Yes. You know, if -- I've employed event studies in my academic work, looking at, for example, the impact of -- potential impact of, say, regulatory changes, and one of the

Page 61

C. James, Ph.D.

things that one needs to do in conducting such an analysis is to determine whether in fact the information that is being revealed on a date to be identified is new to the market. If it isn't new to the market, if you're assuming market efficiency, then you can't attribute that price decline to old information. It must be arising from something other than information that has previously been available to market participants.

Q   If you would please turn to Paragraph 38 of your report. It's on Page 13.

A   Yes.

Q   In Paragraph 38, do you describe the methodology that you have used to perform your price impact analysis in this case?

A   In paragraph -- I'm sorry -- 38?

Q   Paragraph 38, I think I said.

A   Yeah. I was looking at the paragraph above it.

Q   Yes. So Paragraph 38. There you say, "To assess price impact, I evaluate whether the purported revelation of the 'truth' regarding the alleged misrepresentations changed Uniti's stock price in a statistically significant manner on a

Page 62

C.  James, Ph.D.

given day."

Is that what you did?

A    Yes.  Well --

Q    Then you go on to say --

A    Okay.  I was going to say that there's more to what I did than what you just said.

Q    Right.  That was the topic sentence.

A    Yes.

Q    The paragraph goes on to say, "This involves assessing, 1, whether there was a statistically significant stock price decline following the alleged corrective disclosures based on a properly conducted event study model."

Let's stop there.

Did you use Mr. Coffman's event study model to assess that first piece that we just described here?

A    As you see, there's a Footnote 46.  It says, "My event study model is described in detail in Appendix D."  So the event study model that I'm using, the market model, is the one I'm describing in Exhibit D.

Now as I say, I think later in the report, were I to employ the market model that

C. James, Ph.D.

Mr. Coffman employed, my conclusions about price impact would be the same.  In other words, my conclusions regarding price impact are not dependent upon my utilization of the model described in Appendix D versus utilizing the model described in Mr. Coffman's report.

Q    Do you dispute that Uniti's stock price reacted in a statistically significantly manner on the corrective disclosure dates that plaintiffs have identified and Mr. Coffman has identified in his report?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  I think that with respect to three of the disclosure dates, that's correct.  I think that when one looks at the August dividend cut date and examine whether the price reaction of Uniti's stock on that day is consistent with its historical relationship between industry market and Windstream, its major customer, the answer to that question is it is consistent with its historical relationship, and that employing that historical relationship with allow one to conclude

Page 64

C. James, Ph.D.

there's no statistically significant price reaction.

BY MS. WYMAN:

Q    Let me make sure I am understanding what you're saying.  So you are saying that with the exception of -- I think it's the August 3rd, 2017 corrective disclosure, you are not disputing that there were statistically significant price movements in Uniti's stock on the other three disclosure dates that Mr. Coffman identified and plaintiffs have identified; is that right?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  Yeah, with the exception that I don't agree with the underlying proposition that they're disclosure dates as it pertains to the alleged omissions and misrepresentations. That's part of my price impact analysis.  If you had qualified that with "alleged corrective disclosure dates," I would agree with you.

BY MS. WYMAN:

Q    Okay.  Thank you.

So then turning back to Paragraph 38,

Page 65

C. James, Ph.D.

the second part of the analysis that you outlined is, if there were -- just backing up a little bit -- if there were statistically significant price -- stock price declines following the alleged corrective disclosures based on a properly conducted event study model, then you look to see whether the stock price decline on each alleged corrective disclosure date can be attributed to the purported revelation of the alleged misrepresentations; is that correct?

A       Yes.

Q       And that's the second piece of the price impact analysis that you undertook here; right?

A       Yes.

Q       Then you go on to say, "Even if there was a statistically significant price decline on a given date, the price decline could be attributed to other factors that are economically unrelated to the alleged fraud rather than the revelation of the alleged misrepresentations"; right?

A       Yes.

Q       And that's what you undertook to

Page 66

C. James, Ph.D.

analyze in this case; correct?

A    Yes, that is correct, whether there's other factors that would be unrelated to the alleged fraud, and to look at what plaintiffs alleged was disclosed on a particular day and whether what they're claiming was disclosed is related to the alleged omitted or misrepresented risks under the various theories or aspects of risk disclosures that we spoke about earlier.

Q    So your analysis is really looking to determine the cause of the decline that was noted; is that correct?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  I think that it is asking a question as to whether the decline can be attributable to the disclosure of alleged omissions and misrepresentations as pled by plaintiffs.

BY MS. WYMAN:

Q    And then Paragraph 38 goes on to say, "Additionally, the stock price decline would not be attributable to the alleged misrepresentations if the purported 'truth' regarding the alleged misrepresentations had already been fully

Page 67

C. James, Ph.D.

disclosed and thus would not impact the stock price in an efficient market"; right?

A     That's correct.

Q     So one of the things you did here was your analysis also sought to determine whether the, quote, truth was already disclosed to the market prior to when plaintiffs say that it was disclosed; correct?

A     Yes.  As it pertains to what plaintiffs allege -- the alleged misrepresentation or omission of the risks were, yes.

Q     Okay.  Now if I could have you flip back to Page 7 and look at Paragraph 24 of your report.

A     Okay.

Q     In Paragraph 24 of your report -- actually, let me back up.  On Page 7 of your report there's a header that says Roman Numeral IV, Summary of Opinions; you see that?

A     Yes.

Q     And that section seems to go through Page 9 of your report; is that right?

A     That is correct.

Page 68

C. James, Ph.D.

Q     And in that section, does it contain a summary of the opinions -- apart from any new ones concerning the January 2022 declaration Mr. Coffman has tendered, this contains a summary of all the opinions you're offering in this case?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  Yes, I think it provides a summary of the areas in which I'm opining to what conclusions I've reached in those areas.  It's not meant to be self-contained, obviously.

BY MS. WYMAN:

Q     Certainly.  So if you look at Paragraph 24, please, in it you say -- third line in -- "I find that (1) with respect to two of plaintiffs' alleged corrective disclosures, the alleged misrepresentations had no price impact under any of plaintiffs' three theories of liability, and (2) with respect to the remaining two alleged corrective disclosures, the alleged misrepresentations had no price impact under two of plaintiffs' three theories of liability";  correct?

A     That's correct.

Page 69

C. James, Ph.D.

Q    And then you make reference in that same paragraph that a more fulsome discussion of your opinions concerning the price impact are contained in Section 7 of your report; is that right?

A    Yes.

Q    And in Section 7 of your report goes from Pages 3 through 37, if I have that right.

I'm sorry.  It's Section 6.  I misspoke.

A    Yes.  I think you said Page 3.  I think it's Page 12.

Q    Yes.  I was looking ahead on my outline.  I apologize.

A    No worries.

Q    Your more specific discussion of your price impact opinions show up in Section 6, Pages 12 to 37 of your report; is that correct, Dr. James?

A    Yes.

Q    And in that section you offer opinions concerning your price impact analysis for each of the corrective disclosure dates that plaintiffs have identified; is that right?

Page 70

C. James, Ph.D.

A    Alleged corrective disclosure dates, yes.

Q    All right.  If you turn back to Paragraph 24, just the summary of your opinions on Page 7, do you see that there is a subpart A to Paragraph 24 that relates to the August 3rd, 2017 alleged corrective disclosure date?

A    Yes.

Q    And does that paragraph summarize your price impact opinion as it relates to that disclosure date?

A    Yes.

Q    And is it true that your analysis caused you to conclude that there is no price impact under any of the theories of liability you have defined related to plaintiffs' allegations?

A    Yes.

Q    And is this the corrective disclosure -- or the alleged corrective disclosure date in which you dispute that there was a statistically significant price reaction in Uniti's stock?

A    Well, just to be clear, I'm not disputing that there was a statistical price

Page 71

C. James, Ph.D.

reaction under a set of assumptions in which you exclude the historical relationship between Uniti and Windstream.  In controlling for that historical relationship, then I would say there's not evidence that there's a significant price reaction.

Q    Okay.  And your analysis, you conclude that there was no price reaction under any of the theories of liability that you've defined; right?

A    That's correct.  There's no price impact.

Q    Price impact, pardon me.

So you basically just disagree with plaintiffs' allegations that the reaction was caused by materialization of risks that they allege that the defendants concealed; right?

MR. BURNOVSKI:  Objection.

THE WITNESS:  I mean, they fail to describe what was -- what was disclosed on that date that relates to any of their theories of liability, and the fact that, for example, the Uniti stock performed as one would expect based on the historical relationship, that, I think, suggests that

Page 72

C. James, Ph.D.

there was -- for example, indicates no new information regarding how Uniti and Windstream financial performance would be related.

BY MS. WYMAN:

Q      Would you please --

A      Under what was disclosed to the market, and which investors were aware.

Q      Would you please turn to Paragraph 39 of your report.  It shows up on Page 14.

A      Sure.

Q      Are you there?

A      Yes.

Q      Okay.  And at the top of Page 14, do you see a header that says, "The alleged misrepresentations did not have a price impact on Uniti's stock in connection with the alleged corrective disclosure on August 3rd, 2017"?

A      Yes.

Q      And if you look at your report between Paragraphs 39 and 50, are those the paragraphs that you devote to discussing your analysis and conclusions concerning the price impact analysis that you did with regard to August 3rd, 2017?

Page 73

C. James, Ph.D.

A    Yes.

Q    If you look, please, on Page 14 at Paragraph 40, you say, "Based on my analysis of the stock price movement and the information released on that date," that being August 3rd, 2017, "there is no economic connection between the information revealed by the dividend elimination and the alleged misrepresentations under plaintiffs' theories of liability.  As such, the alleged misrepresentations had no price impact in connection with that alleged corrective disclosure."  Is that right?

A    Correct.

Q    In other words, you find a mismatch between the disclosures and the alleged misrepresentations and omissions; is that right?

A    That's correct.

Q    What economic test did you use to determine that there was a mismatch here?

A    Well, I mean, the standard tools that I use in my analysis of stock returns.  First ask the question, are market participants -- is there evidence that market participants understand that there's a linkage between Windstream's financial

C. James, Ph.D.

performance and Uniti, given the fact that Windstream at various points in time is by far the largest customer that Uniti has, representing, you know, from the high 80s to the high 60s percent of Uniti's revenue.

Second, the plaintiffs do not identify any disclosure on the statements that pertains to the -- what I have referred to as the risks associated with this spinoff transaction or alleged omissions or misrepresentations regarding the risks associated with the master lease not being a true lease.  Nor did they cite to any relationship between the two.  They simply say, well, there was a dividend cut at Windstream and that is associated with the decline in Uniti's price.  Well, that's what one would expect under the publicly disclosed information regarding Uniti's dependence of Windstream for its revenues.

Q    Are there any peer review economic or finance studies out on the proper test to use to determine a, quote, mismatch?

A    Well, I would say, for example, that what I'm looking at here is consistent with

Page 75

C. James, Ph.D.

studies that I cite to as to linkages between companies who are dependent on one another to varying degrees based on customer concentration or supply side -- supply chain dependencies.

Q    Are there any studies, any peer-reviewed economic or finance studies that outline the proper test to use to determine whether there's a mismatch between alleged corrective disclosures and alleged misrepresentations or omissions that you utilize here?

A    Yes.  I think when you see published peer-reviewed articles such as mine that are examining whether, for example, a regulatory change or an announcement of a financing transaction or the disclosure of litigation risks are related to securities price movements, one of the tools that one uses is to say, well, is that new information that's available to the market, or is that information that in, say, a price change that one would expect based on previously disclosed information.  Okay.

So the question is really when conducting, as an academic, an event study is

Page 76

C. James, Ph.D.

first do you have a properly specified model to measure price changes.  And second, have you identified information that is new and value relevant to the market on the date in which you are investigating whether there's an impact on a company's stock price.

Q    And so are you describing valuation tools that an economist can use to determine the cause and effect relationship of information available to the public and the market price reaction?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  I think that it would depend on what you mean by cause and effect relationship.  If I'm saying, for example, that the announcement by a regulatory federal agency concerning restrictions on a company's operations had a significant impact on the company's stock price, I think that one of the things one would do is to say is the regulatory pronouncement new information or was it embedded -- disclosed to the market at some earlier date.  And to the extent that the

Page 77

C. James, Ph.D.

analysis is pertaining to trying to assess an impact of a risk that was disclosed but is alleged to not adequately have been disclosed, then you would need to rely on not just on sort of looking at the price reaction on the date on which the risk is realized with certainty, but also looking at evidence as to what market participants were assessing the risks at an earlier day.

BY MS. WYMAN:

Q    So what I'm really trying to understand is what you -- what principles guided your analysis of the other information outside the event study model and statistical regression that it output -- that informed your conclusions about the causes of the price impact that the model identified?

A    I would just modify your wording a little bit.  It's not the price impact that the model identified, but the price reaction or the price movement that the model identifies.

Let me take an example on Judge Furman's decision.  As I outlined in my report in great detail, I don't disagree with the fact that

Page 78

C. James, Ph.D.

his opinion had an impact on the price.  The question is, is the basis for his opinion in which plaintiffs allege was information that was not adequately disclosed to the marketplace, was that information available to market participants before the opinion?  If it is, then if you assume the market is efficient, then I conclude, and I think it's appropriate to conclude, that it's his opinion that is impacting the stock price on his opinion date and not the information on which the opinion is based.  Particularly in the context of when you have an opinion rendered by a judge that is rendered six months after the end of the trial, which is available -- that the proceedings to which was, you know, available to the public and attended by analysts and so on.

Q   So essentially what you're saying is that in doing the analysis that you just described, to determine whether there is a match or a mismatch between the alleged corrective disclosure and the alleged misrepresentation or omission, that you analyze other information potentially that's available to the market and decide whether or not that was actually the cause

Page 79

C. James, Ph.D.

of the stock price movement or if it was something else; is that right?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  I think that ultimately what you're trying to do is to identify what factors are impacting the stock price on a particular day.  And if plaintiffs allege a certain set of factors are impacting the stock price on a particular day and, for example, in the context of Judge Furman's ruling, one can establish that, well, the facts on which his decision was based were revealed to the market prior to his decision, then it's not the facts on which his decision is based, as a matter of economics and logic that is moving the price on that day, but rather his opinion itself, which I don't disagree that his opinion had an impact on the stock price.?

BY MS. WYMAN:

Q    Turn to Page 17 of your report and let's look at Paragraph 48.

A    Seventeen?

Page 80

C. James, Ph.D.

Q    Paragraph 48.  It's toward the bottom of Page 17.

A    Okay.

Q    In that paragraph you say, "No securities analyst reports published in the week following the August 3rd, 2017 disclosure discussed the risk that the spinoff transaction represented a prohibited sale-leaseback or the risk that the master lease was not a true lease."

Is that right?

A    Yes, that's correct.

Q    Is that another reason for your conclusion that there was a mismatch between the alleged corrective disclosure and the alleged misrepresentations and omissions as plaintiffs have alleged?

A    Yes, as well as -- as I continue on in Paragraph 19, "Nor did any analyst tie a reason for the Windstream dividend cut to either the risks that the spinoff was prohibited sale and leaseback, or the risk the master lease was not a true lease.  And obviously, to the extent that this dividend cut precedes the alleged misstatements regarding Uniti's ability to

Page 81

C. James, Ph.D.

navigate Windstream's future bankruptcy was certainly -- there's no linkage between the price reaction to the dividend cut and that category of risks that we've discussed.

Q    So in your opinion there has to be specific mention by "Alice" of the risks concerning the structure of the Uniti spinoff as a prohibited sale-leaseback or a mention of the risks that the master lease was not a true lease before you could conclude that there was a match between the alleged corrective disclosures and the alleged misrepresentations and omissions?

A    Not in and of itself.

MR. BURNOVSKI:  Objection to form. You can answer.

THE WITNESS:  Not in and of itself.  Certainly that evidence is supporting the conclusion.  But as identified in the section we're referring to, there's other evidence in support of that conclusion.

So for example, analysts from the beginning of the spinoff had noted Uniti's dependence on Windstream as a source of

Page 82

C. James, Ph.D.

revenue, and that when Uniti's valuation was related to the financial performance of Windstream through the fact that Windstream was the largest customer that Uniti had, consisting of, as I said, 60 -- depending on the time period, 60 to 80 percent of Uniti's revenues.

BY MS. WYMAN:

Q      In your view then, in order for there to be a match, does a corrective disclosure need to mention the specific alleged misrepresentation or omission?

A      No, I don't think there needs to be a mirror image, but I certainly think that there needs to be a linkage in some way, and as I indicate with respect to the dividend, plaintiffs don't identify that linkage.  And I don't see in the financial press a linkage being made.  And I see in the financial press prior to the dividend announcement an analysts and various press articles indicating, as Uniti in its own financial filing said, its dependency on Windstream as a source of revenue given the publicly disclosed structure of the spinoff

Page 83

C. James, Ph.D.

transaction and Uniti's reliance on the payments by Windstream.

Q     How do you measure whether there's an appropriate level of linkage, as you've said, to conclude that there is a match between the alleged corrective disclosure and the alleged misrepresentation?

A     Well, you know, for example, a dividend, there's nothing in the complaint or in the various motions filed by the plaintiffs that identify any linkage as it pertains to, as I described or characterized, the true lease theory or the sale and leaseback agreement.  As certainly a matter of logic, there can't be a relationship between the price movement and an allegation regarding misstatements or mischaracterizations of exposure to a bankruptcy filing that occurs in the future.

Q     Why is there not a linkage between the relationship between a price movement and an allegation regarding misstatements or mischaracterizations of exposure to a bankruptcy filing that occurs in the future?  Why is that not possible as a, quote, matter of logic as you

Page 84

C. James, Ph.D.

just said?

A    Because the misstatements that plaintiffs identify in March through June of 2019 have to do with statements regarding Uniti's belief that it could manage -- it could continue its business without -- the allegation is without raising external capital during the pendency of Windstream's bankruptcy.  Now those obviously are statements as they pertain to facts that didn't exist -- or conditions that didn't exist at the time of the dividend cut.

Q    I'm not entirely sure you answered my prior question.  I'm going to ask it again.

A    Sure.

Q    How do you measure whether there's an appropriate level of linkage, as you've said, to conclude that there's a, quote, match between an alleged corrective disclosure and alleged misrepresentation?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  I think I answered it.  I'll try to do it again.

So one thing you do is you look at what plaintiffs allege the linkage is, and

**Page 85**

C. James, Ph.D.

with respect to the dividend payment, there's silence as to what the linkage is. Which is one of the reasons why, for example, I looked at the historical relationship between Windstream and Uniti's stock, to say, you know, is there -- is the price change on the dividend date consistent with how Uniti has moved with Windstream's stock, indicating a linkage as one would expect between Uniti and its major customer, number one.

Number two, not observing any linkage identified by plaintiffs other than to say that -- well, they don't identify what was disclosed as to omitted or misrepresented risks in terms of the spinoff transaction or the allegations regarding the master lease agreement being allegedly, financing or not, a true lease, and there's nothing in market commentary that would suggest that, well, this puts us on notice or we're changing our forecast or ratings based upon what we now understand is a heightened risk associated with the master

Page 86

C. James, Ph.D.

lease agreement might not be true financing, but -- maybe not a true lease, but maybe construed as a financing arrangement.

And with respect to the Furman decision, I think we talked about that, but, you know, look at what he based his decision on and then ask the question, is the factual basis for his decision information of his in the marketplace.  And if plaintiffs argue, as they do in their opposition to the motion to dismiss, that Mr. Coffman has conceded that this is not -- plaintiffs are not alleging that Uniti should have predicted Judge Furman's opinion, then what's moving the price is his opinion based upon information that was previously available to market participants.

MS. WYMAN:  Brian, I'm ready to move on to the next disclosure, but I know it's late and lunchtime for you all.  I don't know if now would be a good time to take a little break so you guys can recharge and then we can resume after that.  That's totally fine with me if that's what you'd

Page 87

C. James, Ph.D.

like to do.

MR. BURNOVSKI:  That would be great, Deb, if you don't mind and if it's okay with Dr. James.

THE WITNESS:  Sure.  Let me know how long you guys want to take.  I can accommodate.

MR. BURNOVSKI:  Why don't we go off the record and we can discuss.

MS. WYMAN:  Let's go off the record.

MR. VIDEOGRAPHER:  Okay.  We are off the record, 1:12 p.m. Eastern Standard Time.

(Whereupon there was a lunch recess.)

Page 88

C. James, Ph.D.

AFTERNOON SESSION

MR. VIDEOGRAPHER:  Back on the record 1:49 p.m. Eastern Standard Time.

CONTINUED EXAMINATION

BY MS. WYMAN:

Q     Welcome back, Dr. James.  You understand you're still under oath; right?

A     Yes, I do.

Q     Let's turn back to your report on Page 7, Paragraph 24, please.  In subparagraph (b), do you describe your price impact conclusions as it relates to the September 25th, 2017 alleged corrective disclosure?

A     Yes.

Q     And there you indicate that you find that there's no price impact under two of the theories of liability you defined related to plaintiffs' allegations, the true lease and navigating the bankruptcy theories; right?

A     That's correct.

Q     But you don't conclude that there is no price impact under your so-called sale-leaseback theory; correct?

MR. BURNOVSKI:  Objection to form.

Page 89

C. James, Ph.D.

THE WITNESS:  I would say that, yes, I've concluded with respect to two of the theories of liability, no price impact, but the alleged -- if we're looking at the alleged corrective disclosure as an indication of whether misstatements impacted the stock price, the -- that is correct.

With respect to the spinoff transaction, or the sale and leaseback theory, at the time that the disclosure -- the default was declared, I looked for evidence as to the basis for Aurelius' notice of default.  And obviously one basis of that was they had accumulated a sufficient position in the indentures to be in a position to declare the default.

If I look at what is contained in the complaint that follows this notice of default, in October, and from that determine the reasons for Aurelius' belief that there was a default and a covenant violation associated with a spinoff transaction.  I observed that Aurelius' basis was for -- belief of default was based on information

C. James, Ph.D.

that was publicly available prior to Aurelius' indication and notice of default, and Aurelius was basing its notice of default on information that it had required in the public market.  And therefore, I think it was reasonable, but I was conservative in saying a finder of fact could conclude that there was no price impact with respect to the notice of default.  I was being conservative because I didn't know the basis of the notice of default to say that I couldn't conclude with a reasonable degree of certainty that there was no price impact.

BY MS. WYMAN:

Q     And again, you don't dispute Mr. Coffman's calculation that a statistically significant price reaction in response to the September 25th, 2017 information; right?

A     Yeah, so -- I think that when you're thinking about whether alleged omissions or misrepresentations impacted the stock price, we're really asking when those misstatements were made, did it impact the stock price.  We don't

Page 91

C. James, Ph.D.

have -- because this is an omissions case, we don't have that information, so we're looking at the alleged corrective disclosure, but as I talk about later in my report, for reasons that I just mentioned, that the price reaction on that date may reflect, for example, the decision -- or the market reaction to the position that Aurelius had obtained, and not necessarily roughly with the impact of the alleged misstatements or omissions concerning the risks were.

Q    My question was far simpler than that.

A    Okay.

Q    My question simply was --

A    I'm sorry.

Q    -- you don't dispute Mr. Coffman's calculation of a statistically significant price reaction in response to the September 25th alleged corrective disclosure, do you?

A    I think I don't dispute that there was a statistically significant price decline on that date.

Q    Okay.  Thank you.  You just disagree with plaintiffs' allegations as to the cause of the reaction that Mr. Coffman's event study

Page 92

C. James, Ph.D.

calculated; right?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  Well, I'm looking at whether there's any evidence that would suggest that -- that would inform us as to whether there's a price impact as it pertains to the plaintiffs' alleged omissions or misrepresentations concerning risk, and if you look at the complaint on which you assume that that is on -- the complaint is the basis of what the declaration of default was based, the conclusion is it's based upon the description of the transaction that was in the public domain in 2015, various statements regarding the transference of subsidiaries' exclusive use of the assets, the characterization of the rental payments and payments upstream to Windstream Holding.

BY MS. WYMAN:

Q    So that's a long way of saying that in your analysis, you've determined that there were different causes of the price impact than plaintiffs allege in their complaint; is that

Page 93

C. James, Ph.D.

right?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  No.  I think -- I thought I was being succinct.

BY MS. WYMAN:

Q    I'm asking you a yes or no question, I think.

A    Okay.

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  Could I have the question back again?  I'm sorry.

BY MS. WYMAN:

Q    I said so that's a long way of saying that in your analysis you've determined that there were different causes of the price impact than plaintiffs allege in their complaint; correct?

MR. BURNOVSKI:  Same objection.

THE WITNESS:  Not necessarily, no. If you like, I can expand on the answer.

BY MS. WYMAN:

Q    That's okay.  It may become clear as we talk in a little more detail, as we talk about this in your report.

Page 94

C. James, Ph.D.

If you would please turn to page 19, in about the middle of the page do you see a header that says B?

A     Yes.

Q     And that header says, "The alleged misrepresentations under plaintiffs' true lease theory and navigating the bankruptcy theory did not have a price impact on Uniti's stock in connection with the alleged corrective disclosure on September 25th, 2017."  Is that right?

A     That's correct.

Q     And then Paragraphs 51 through 55 of your report appear to me to relate to the topic sentence in that header; is that correct?

A     Yes.

Q     And those paragraphs that I just mentioned discuss in more detail your assessment and your conclusions concerning the September 25th, 2017 alleged corrective disclosure; is that right?

A     Yes.

Q     Okay.  Let's look at Paragraph 51. And in that paragraph, last sentence you say -- actually, strike that.  In that paragraph you

Page 95

C. James, Ph.D.

mention that plaintiffs allege that Uniti's common stock price dropped over two trading days following the September 25th disclosure, which occurred after the market closed; right?

A     Yes.

Q     Okay.  And the last sentence of Paragraph 51 reads, "They claim that Uniti's stock price dropped on the next two trading days due to this alleged corrective disclosure."  And then there's a Footnote 67 noted there; is that right?

A     Yes.

Q     In Footnote 67, you take issue with the allegation that a price reaction occurred over two days; correct?

A     Yes.

Q     Your contention in that footnote is that plaintiffs' allegation that the stock price moved on September 26th and September 27th is not consistent with Mr. Coffman's conclusion that Uniti's stock traded in an efficient market; is that right?

A     That's correct.

Q     Is it your opinion that stock -- that

Page 96

C. James, Ph.D.

price reactions in stocks that trade in efficient markets can never occur over the course of two days?

A     It depends on -- if you're asking the question of what's the expectation?  It would be reflected in the share price certainly within minutes or hours.  To argue that it takes the market two days to adjust, that, I think, is -- the consensus of financial economists would indicate that that is -- would have the opinion that would be inconsistent with market efficiency, a two-day response.  But as I made clear in my report, the opinions that I have regarding the lack of price impact are really not dependent upon whether I look at a one or two-day return.  So that's not the -- that shouldn't be construed as the basis for the opinions regarding the September 25th declaration of default.

Q     Understood.  I'm just trying to simply understand your assertion that, you know, the two-day return, as you just called it, is inconsistent with a finding of market efficiency in this particular instance.

So are you aware of any studies,

Page 97

C. James, Ph.D.

peer-reviewed studies, that determine that a two-day event window or two-day return is not indicative of an efficient market?

A    Well, you know, some studies have used, and I've employed it myself, a two-day event window when there's ambiguity as to when a particular piece of information was revealed to the market.  So in the early days, and even now, for some event studies where you're looking at corporate announcements and you don't have a timestamp, you might look at a two-day return. But I think that to argue that the market requires an excess of a trade -- requires several trading days to reflect information associated with a particular disclosure is, in my view, inconsistent with market efficiency.

Q    Are you aware of peer-reviewed studies that support the conclusion that in certain circumstances, an efficient market can take longer than a day, or minutes, as you said, to incorporate new value-relevant information?

A    The only study that I know, I wouldn't say it was peer-reviewed.  It was a study by Tabak and Dunbar, who propose a methodology of

Page 98

C. James, Ph.D.

looking at, you know, days until the significance is reduced to zero -- or until the returns are insignificant or they reverse in terms of their sign.  I wouldn't consider that to be an article that informs us of what the academic community and -- what would characterize evidence is consistent with market efficiency.

I think that Eugene Fama's observation that the expectation would be certainly within one trading day is, I think, the view that I think that virtually all financial economists, professional financial economists, would embrace.

Q    Let's look at Paragraph 52 of your report.  It starts on Page 19.  In this paragraph you say, "The Aurelius notice of default claiming a breach of the sale and leaseback covenant of the indenture appears to relate to plaintiffs' sale-leaseback theory, i.e., the allegedly misrepresented and concealed risk that 'the spinoff was a prohibited sale-leaseback transaction that violated the indenture.'"  Is that right?

A    Yes.

Q    And then you go on to say,

Page 99

C. James, Ph.D.

"Nonetheless, given the actions of new incremental factual information regarding the spinoff contained in the notice of default itself, the stock price movement could be a response to the fact that a third party was bringing a legal action related to the spinoff (a risk that Uniti had previously disclosed) rather than any new information that was revealed" -- that revealed 'the truth' about the spinoff transaction"; right?

A    Yes.

Q    So you don't opine conclusively that the September 25th, 2017 alleged corrective disclosure is a, quote, mismatch to the so-called sale and leaseback theory; right?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  Yes, for the reasons I gave you earlier.

You know, to be conservative, since at the date that the disclosure was made, Uniti -- I'm sorry, Aurelius wasn't -- as in the case of, say, Furman's decision -- outlining in great detail its reasoning for believing that there had been a breach of

Page 100

C. James, Ph.D.

the covenant with respect to a sale and leaseback. That comes later in October, when a complaint is filed, and then later on, when U.S. Bank files its statement of facts and law in support of its position. But you look at those documents and they're referring to, again, information that was in the public domain prior to the declaration of default.

BY MS. WYMAN:

Q    Let's look at Paragraph 53 of your report on Page 20. There you say, "In any event, from an economic perspective the Aurelius notice of default provided no new information, and indeed is economically unrelated to plaintiffs' other two theories of liability, i.e., the true lease theory and the navigating bankruptcy theory"; right?

A    Right.

Q    And then you go on to say -- at least one of the bases for your conclusion is that "The notice of default contains no discussion or information related to assessing whether the characterization of the master lease as a "true

C. James, Ph.D.

lease" could be challenged, such that information related to the useful life of copper" -- "such as the information related to the useful life of the copper wire assets."

A    That's right.

Q    Okay.  So again, in your opinion, the disclosure -- the notice of default needed to address this idea that the master lease could be challenged as a true lease and contain further information about whether or not the useful life of the copper wire assets was in question in order for there to be a, quote, match in your opinion; right?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  Well, I think if what one is trying to establish is whether the impact of an alleged misrepresentation regarding the useful life of the copper wire assets impacted the stock price, I would look to whether there's information revealed that relates to in some way the issue of the useful life.

The declaration of the default associated with a particular covenant, 419,

Page 102

C. James, Ph.D.

as to the sale and the leaseback agreement, I don't see any linkage.  Nor did anybody raise such linkages.  Nor do I see plaintiffs saying that there is a linkage between that alleged misstatement or misrepresentation regarding risks of -- associated with the master lease agreement, and the notice of default associated with a covenant with respect to the sale and leaseback provision in the indenture.

BY MS. WYMAN:

Q     How much discussion or information would have been necessary for you to determine that there was a match between the September 25th, 2017 alleged corrective disclosure and the risks associated with the so-called true lease theory of liability?

MR. BURNOVSKI:  Objection to form.  You can answer.

THE WITNESS:  You're asking me a hypothetical.  I mean, the absence of any information -- I don't need to go further and say, well, what would be the characterization of the disclosure that

C. James, Ph.D.

would lead you to conclude price impact given the facts and circumstances here. There's nothing provided other than the declaration of a default on a covenant that's unrelated to the allegations regarding the master lease and whether it's financing based upon an alleged misrepresentation regarding the useful life of the copper wire assets.

BY MS. WYMAN:

Q     So again I'll ask you, what level of discussion or information and materials that were available to you would have been necessary for you to determine that there was a match between the September 25th, 2017 alleged corrective disclosure and the so-called true lease theory of liability?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  Again, I think that -- you're asking me -- so there's the absence of any information.  Now you're asking me, well, what information hypothetically would be needed to determine whether there was some price impact.  And,

Page 104

C. James, Ph.D.

you know, I don't know how to address that hypothetical other than to say, well, there was, for example, analyst commentary that says, you know, the -- "We have heightened concerns regarding the estimates that were the foundation for the true lease opinion, the IRS ruling regarding the true lease for tax purposes."  If there were commentary that talked about, you know, reassessing the IRS lease treatment provisions, that would be something I would explore to determine whether it was a -- the default disclosure was something that I could reasonably conclude is reflective in some way of the price impact associated with the alleged misrepresentations.

BY MS. WYMAN:

Q     And the idea that you were just talking about concerning analyst commentary, that was something that you explained briefly in Paragraph 54 of your report; right?

A     Yes.

Q     And specifically you say in your report, "Consistent with the notion that the

C. James, Ph.D.

announcement of the Aurelius notice of default has no economic connection with the allegations in the plaintiffs' true lease theory, no security analyst reports published immediately following the September 25th, 2017 disclosure discussed the risk that the master lease's characterization as a 'true lease' could be challenged.  Nor have I seen in any analyst reports published during that period any discussion or information related to the copper wire asset useful life estimate."

So information in analyst reports that relate specifically to the alleged true lease theory would, in your estimation, be necessary for you to support a linkage; is that right?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  Well, it would have to go beyond simply the recognition that it had been in the marketplace since the time of the spinoff transaction, let's say, in the JPMorgan analyst report in 2015, that, you know, given financial distress, you know, there would be concerns regarding the ability of Windstream to perform and meet its obligations under the master lease

Page 106

C. James, Ph.D.

agreement.  And there were concerns that in the event of financial distress early on, that the terms of the lease agreement would be -- could be renegotiated given -- you know, in a way that's in the best interest of both Uniti and Windstream.

What plaintiffs are alleging is what Uniti purportedly failed to disclose was that the master lease agreement would not be characterized as a true lease, but maybe recharacterized as financing because of inflated estimates regarding -- alleged inflated estimates regarding the assets transferred in terms of their useful life, particularly the copper wire.

BY MS. WYMAN:

Q     I'm going to mark an exhibit, so you need to refresh your Exhibit Share folder.  I'm going to mark as Exhibit 2 the Consolidated Amended Class Action Complaint.  It should be up in your -- maybe not yet.

(Exhibit 2 was marked.)

A     One second.  I think it takes a minute.

Page 107

C. James, Ph.D.

Q      It should be up there.  There it is.

And the Exhibit 2, which is a Consolidated Amended Class Action Complaint that was filed on May 11, 2020, is a document that's contained on your Appendix C; correct?

A      Yes.

Q      Okay.  If you would please turn to Page 63 and look at Paragraph 171.

A      Sure.  Hold on.  Page 63?

Q      Sixty-three.  Paragraph 171.

A      Okay.

Q      You'll see in that paragraph that plaintiffs allege that defendant Kenny Gunderman gave a presentation on August 28th, 2017 to participants at a Cowen Communications Infrastructure Summit on behalf of Uniti; is that right?

A      Yes.

Q      And the transcript of that -- of his remarks doesn't appear in your backup materials or in your Exhibit C to your report, Dr. James, so that means that you did not consider that transcript; correct?

A      Well, I did refer to your complaint,

Page 108

C. James, Ph.D.

and so I was aware of the quote that you're referring to.  Whether I looked at the transcript from this conference call or not, I just don't recall as I sit here.

Q    Okay.  Well, we'll mark it as Exhibit 3.  Maybe that will jog your memory.

(Exhibit 3 was marked.)

A    All right.  Do I go back to --

Q    Yeah, you need to go back and refresh.  I understand it should be there and ready for you to open.

A    Okay.

Q    Okay.  So Exhibit 3, for our record, is Thomson Reuters Street Events edited transcript from Uniti Group, Inc. at Cowen Communications Infrastructure Summit, with an event date and time of August 8th, 2017, 10:40 p.m. GMT.

A    Okay.

Q    So if you look, please, on Page 3 of the transcript, you'll see a quote that's attributed to Mr. Gunderman, about the top half of the page.  And I'll represent to you that the quote that is in the complaint in Paragraph 171

C. James, Ph.D.

comes from the portion of the transcript that you're looking at right now in Exhibit 3.

A    So are you referring to -- I'm trying to -- so it's his response to Gregory Bradford Williams of Cowen?

Q    It appears to be from the transcript, yes.

A    It says, "I'm just curious why a fiber company wants to do a sale and leaseback.  I just -- when I think about -- think of you guys, you're a REIT, so you have a low cost to capital and maybe you can go after, like, more distressed companies and get yield differential there, and that would be the play.  But fiber companies I think of growing well capitalized.  They would probably go to market themselves.  Why would they want to sell assets to you guys?"

And he responds, "Yes, I think so.  I think it depends on what you're comparing it to in terms of cost of capital."

Q    I don't know if you and I are looking at the same thing.

A    Okay.  That's why I asked the question.

Page 110

C. James, Ph.D.

Q     No, I don't think you and I are looking at the same thing.  If you look at Page 3 of the transcript.

A     All right.

MR. BURNOVSKI:  Just so the record is clear, Dr. James, I think --

And Ms. Wyman, correct me if I'm wrong, the page number you're using is the page number at the bottom right of the page?

MS. WYMAN:  That's right.

THE WITNESS:  Okay.

MR. BURNOVSKI:  So it's PDF Page 2 and Page 3 of the transcript, I believe.

THE WITNESS:  All right.  I think -- yeah, that's the source of confusion to me.

MS. WYMAN:  Fair enough.  That's why it's so important we have Bates numbers. It just makes the whole thing so much more clear.

MR. BURNOVSKI:  Ms. Wyman, why don't you just read the first few words of the quote to make sure we're talking about the same thing, if that's okay with you.

Page 111

C. James, Ph.D.

BY MS. WYMAN:

Q     The block quote that I'm looking at that's attritted to Mr. Gunderman is at the top of the page and it says, "Yes.  So, yes, our stock showed weakness on Thursday and Friday, which is at a time when we really had a strong quarter where we met or beat expectations and raised guidance for the year, and we showed weakness, and which is frustrating in and of itself, but we understand the importance of Windstream to our story."

Do you see the quote?

A     So it starts, "Yes, so yes, our stock showed weakness"?

Q     Yes, it does.  So you and I are on the same page?

A     Yeah.

Q     Okay, good.  Hopefully in showing this to you is to determine whether this was not a document that you considered -- it's not a document that you looked at and studied in formulating your opinions in this case; correct?

A     I'd have to go to my backup material. I mean I was aware of the quote as you pointed

Page 112

C. James, Ph.D.

out from the complaint.  I've looked at a number of Thomson Reuters news announcements and conference calls, so I just don't recall specifically.

Q    Well, I checked your backup materials and this wasn't in it.  So does that mean that you didn't consider it?

MR. BURNOVSKI:  Objection to form. Deb, he's already testified that he considered the quote in the complaint, which is part of what you're showing him here.

THE WITNESS:  Right.

BY MS. WYMAN:

Q    Where is this quote discussed in your report, Dr. James?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  As I just mentioned, it's -- as you pointed out to me, it's in the complaint.

BY MS. WYMAN:

Q    Where is this quote and this statement specifically discussed by you in your report?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  But again, I don't

C. James, Ph.D.

know how to answer other than you pulled a quote out of the complaint, and to say it came from Thomson Reuters, and asking me whether the quote is something I considered. Well, I considered the complaint. I read the complaint and the quotes that plaintiffs cited to in the complaint.

BY MS. WYMAN:

Q     But you didn't go and pull the transcript to see the full context of what was quoted in the complaint as part of your analysis of price impact in this case; correct?

A     Well, let's be -- so this is not -- this is an announcement on a particular day, August 8th, and it's obviously subsequent to the dividend cut date. So to use it for purposes of ascertaining whether the dividend reduction at Windstream and the price reaction of Uniti is -- provides evidence of impact with respect to alleged misstatements regarding various theories of liability we've talked about, it comes subsequent to that, so it would not be something that I would use in support of that particular proposition.

C. James, Ph.D.

Similarly, if you're asking, well, what about the September 25th declaration of default, would you have looked at a transcript that is a month and a half earlier for purposes of concluding that the declaration of default by Aurelius and the price response to that reflects an impact on this statement as it pertains to the master lease agreement, again, I wouldn't, for the primary reason that it would be not what would be moving the stock on the disclosure date.

Q    So my question was simply, this document doesn't show up in your backup materials, it's not listed on your Appendix C, it's not cited in your report.  So it's not a document that you considered in formulating the opinions that you've offered in this case?

A    I can't answer it -- that question any differently than I have.  That I was aware of the quote.  Then the question is, would a document -- apart from knowledge of the quote, a document on August 8th regarding comments by Mr. Gunderman be informative of whether there -- the price response on an earlier date is evidence of price impact, or price reaction at a later date is

Page 115

C. James, Ph.D.

evidence of price impact.  It just doesn't seem relevant to me for that purpose.

Q     And --

A     Other than to establish that if plaintiffs is alleging that this is some information that is affecting investors' risk perceptions on dates other than the alleged corrective disclosure date, I'd have to consider that, but that's not what plaintiffs have contended is a disclosure date.

Q     Look back at the complaint, please, which is Exhibit 2.  And we were on Page 63.

A     All right.

Q     I think earlier today you testified that you reviewed the complaint but that you didn't read all portions of it.  Am I remembering that right?

A     Remember what I said.  I said I read the substance of the complaint, whether it had to do with legal standards and prior case precedent and that type of thing.  That's not something that I read every word of.

Q     Did you read this part of the complaint?

Page 116

C. James, Ph.D.

A    I did.

Q    Okay.  Will you please turn to Page 65 of the complaint and let's look at Paragraph 175.

A    Okay.

Q    In Paragraph 175 do you see a quote that's attributed to Defendant Wallace?

A    Yes.  September 13th, 2017?

Q    Right.  At the Goldman Sachs Communacopia Conference; right?

A    Yes.

Q    I also looked for the transcript of the Goldman Sachs 9/13/17 Communacopia and I did not find that in your backup materials, so that means you did not specifically pull and consider that document; correct?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  Yeah, I'd have to go back and look, but if it wasn't in my backup materials and it's not referenced, the document itself, the transcript, I would suspect is not something that I reviewed.

BY MS. WYMAN:

Q    So now you can close up the complaint, so that it's not marking up your screen, and

Page 117

C. James, Ph.D.

we're going to turn back to your report, please. We're going to go back to Page 7 in Paragraph 24. So let me know when you're there.

A     Okay.  I'm going to close this off and go back to my report.  Okay?

Q     Yes.

A     What page are we on?

Q     Page 7, and we're going to look at Paragraph 24.

Are you there?

A     Yes.

Q     Great.  In Paragraph 24(c), that paragraph summarizes your price impact opinions as it relates to the February 15th, 2019 alleged corrective disclosure; correct?

A     Yes.

Q     And just as a shorthand summary, you find and describe in that particular paragraph that there was no price impact under any of the theories of liability you have defined related to plaintiffs' allegations; right?

A     That is correct.

Q     And again, for -- you don't dispute Mr. Coffman's calculation of a statistically

C. James, Ph.D.

significant price reaction in response to the February 15th, 2019 information.  You just disagree with plaintiffs' allegations concerning what caused that price impact; correct?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  I'm not looking at -- well, first of all, as I -- I think I've testified, the event study analysis that I conducted and what Mr. Coffman conducted, other than the issues we discussed earlier regarding multiple days and controlling for potentially Windstream's stock returns, my analysis of a price impact or lack of price impact is really not dependent on whether I adopt my event study methodology or his.  As my report clearly indicates, if your question is, is the judge's opinion the factor that is leading to or associated with the negative price reaction on February 15th, 2019, the answer's yes.

The question is, can it be used for purposes of evaluating the price impact of alleged misrepresentations or omissions,

Page 119

C. James, Ph.D.

okay.  And there I believe it can't be, for the reasons that I discuss in my report.

BY MS. WYMAN:

Q    My question was a little bit different.  I appreciate the designation that you made.  My question simply was, you don't dispute that there was a statistically significant stock price reaction in response to the February 15th, 2019 alleged corrective disclosure?

A    I would say I don't think it's a response to an alleged corrective disclosure.  I think it's in response to something that plaintiffs had conceded Uniti couldn't have predicted or couldn't have said, which is the judge's opinion regarding the covenant violation.

Q    All right.  Let me be more artful in my question then, hopefully.

You don't dispute, do you, Dr. James, that Uniti's stock price reacted in a statistically significant way in response to information that the market received on February 15th, 2019?

A    No, I don't dispute that.  I would say that assuming market efficiency, it would not be

Page 120

C. James, Ph.D.

responding to information referenced in the judge's opinion that was available to market participants at an earlier date.

Q    I understand that that's your opinion. That wasn't my question, but I understand that that's your opinion.

So if you would please turn in your report to Page 21.  Do you see at the top of the page there is a header that says C?

A    Yes.

Q    And that header says, "The alleged misrepresentations did not have a price impact on Uniti's stock in connection with the alleged corrective disclosure on February 15th, 2019"; right?

A    Yes.

Q    And your report discusses in more detail the assessment that you've made and the conclusions and opinions you have concerning the February 15th, 2019 disclosure in Paragraphs 56 through 90, which ends up on Page 35; right?

A    That's correct.

Q    Okay.  And if you look at Paragraph 58 of your report, which is on Page 29, in there you

C. James, Ph.D.

say that in your opinion, the stock price declines that plaintiffs have allege occurred on February 19th, 21 and 22 are not evidence of price impact with regard to your so-called true lease and navigating the bankruptcy theories; right?

A    Yes.  Those are not price impact with respect to plaintiffs' true lease theory or navigating the bankruptcy theory, yes.

Q    And in Paragraph 58 you say that the basis for those conclusions -- for that conclusion are the same as outlined in Section -- excuse me -- 6B of your report, which relates to your analysis of the September 25th, 2017 disclosure; correct?

A    Correct.

Q    Look at Paragraph 59 of your report, which is again on Page 21.  In that paragraph you state that in your opinion, "The February 19th, 21 and 22 stock price drops plaintiffs allege are also not evidence of price impact with regard to your so-called sale-leaseback theory stating that the price movements on these dates are not attributable to the purported revelation of the

C. James, Ph.D.

truth of the alleged misrepresentations (i.e., information that would not allow the market to assess the true risk that the transaction was a sale-leaseback)"; right?

A    I think you misspoke.

Q    Did I misread it?

A    You said "would not."  I think it would allow.  I may have misheard you.

Q    Okay.  Well, let me just for the record make sure that we have it down correctly.

So in Paragraph 59 you say that one of the bases for your conclusion that "The price drops February 19th, 21 and 22 of 2019 are also not evidence of price impact with regard to your so-called sale-leaseback theory was because the price movements on these dates were not attributable to the purported revelation of the truth of the alleged misrepresentations (i.e., information that would allow the market to assess the true risk that the transaction was a sale-leaseback)."

Is that one of the bases?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  Yes.

Page 123

C. James, Ph.D.

BY MS. WYMAN:

Q      And that is because you also conclude, and as you state in this Paragraph 59, that instead the price movements were attributable to Judge Furman reaching a legal opinion based on facts that were already publicly available that had negative financial implications for Windstream and, in turn, Uniti; right?

A      Yes.

Q      Now looking at Paragraph 60, which goes on Page 21 over to 22, you conclude, as described in that paragraph, that in your opinion, "Any risk under your so-called failed leaseback theory had been fully disclosed to the market" through a couple of different things. One being the September 25th, 2017 disclosure of the Aurelius notice of default; right?

A      No.

          MR. BURNOVSKI:  Objection to form.

BY MS. WYMAN:

Q      No?

A      No.  I didn't use the term "any risk." What plaintiffs are alleging is that the February 15th disclosure of Furman's opinion, it

Page 124

C. James, Ph.D.

did reveal to the market information that the market didn't have already concerning the factual basis for his opinion.  Not the opinion himself.  As plaintiffs concede, your expert concedes, Uniti couldn't have predicted the judge's opinion, and obviously couldn't have stated a federal judge's opinion.

As I understand it, the structure of the transaction, the sale and leaseback, and various other aspects of the sale and leaseback agreement were alleged to have been misrepresented.  So I looked to what the judge is referring to in support of his opinion of a covenant violation.  And I asked the question of is that information available to market participants at an earlier date.  The answer is yes.

For example, the Aurelius complaint, the U.S. Bank trustees' statement of fact and law in support of its position, those are documents that provide us with the information of the factual basis on which the judge rendered his opinion.  We can look to see if those documents are associated with a significant price reaction

Page 125

C. James, Ph.D.

to address the question of, well, maybe something in those documents revealed to the market risks that plaintiffs allege was inadequately disclosed or misstated.  But I don't see a price reaction on those days that would be consistent with new information as to the risks associated with the sale and leaseback transaction -- spinoff transaction, sorry.

Q     So what I'm trying to get at is the various components of your conclusion that there was no price impact under the so-called sale-leaseback theory, the components of that conclusion.  And according to your report, it looks like one of those components was the September 25th, 2017 Aurelius notice of default being revealed.  The second one that I see in here that you just mentioned was the September -- sorry, the October 12th, 2017 complaint filed by Aurelius against Windstream; correct?

A     Yes.

Q     And then a third component that I see in here, that I think you just mentioned as well, was the June 15th, 2018 proposed findings of fact and conclusions of law filed by U.S. Bank, the

Page 126

C. James, Ph.D.

trustee for Windstream's notes; right?

A     Yes.

Q     And then I think the last component that I was able to understand from Paragraph 60 was through the public disclosure of "all of the factual information" cited in Judge Furman's February 15th, 2019 opinion, "well before February 2019."

So those are the four bases that your report outlines that support your opinion that the risks associated with the so-called sale-leaseback theory had been fully disclosed to the market prior to the time plaintiffs said that they were?

A     That's correct.

Q     Okay.  And in doing this analysis, you didn't consider statements that plaintiffs alleged defendants made at various industry conferences between November 2017 and October 28, 2018; did you?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  So the statements that are contained in the complaint, I did consider those, and the reasons as I've

Page 127

C. James, Ph.D.

discussed earlier today.  To the extent that plaintiffs would point to those statements as being -- that those were misstatements, and the relevant truth regarding those statements was disclosed as part of the judge's decision, I would say I don't see that linkage, number one, for several reasons.  One of which, it's not -- those documents, as I recall, are not documents that the judge, who carefully outlined the basis for his opinion and the factual basis, cites to in support of his opinion that there was a -- a violation of a covenant is part of the spinoff transaction.

BY MS. WYMAN:

Q    Let's pull up Exhibit 2 again, please, which is the complaint.  Once you get that open, I'd like you to turn to Page 71 and let's look at Paragraph 186.

A    Okay.

Q    Are you on page -- Paragraph 186?

A    Uh-huh.

Q    Okay.  And that paragraph, it quotes statements that were purportedly made by

Page 128

C. James, Ph.D.

Defendants Gunderman and Wallace at a November 2017 Wells Fargo Media and Telecom Conference; right?

A     Yes.

Q     And I looked for the transcript of the Wells Fargo Media and Telecom Conference from that day in your backup materials and I didn't find it there, so that means you did not look at that and pull that document; correct?

A     Again, I'd have to go back and look, but to the extent it was my intent to provide you with the backup to the documents that I considered, so if it's not in there, then I either overlooked it in compiling that or it's not something that I looked at beyond the references to it in the complaint.

Q     Okay.  And same on Exhibit 2, which is the complaint.  I would like you to turn to Page 73, and let's look at Paragraph 188.

A     Okay.

Q     And in that paragraph plaintiffs allege that on November 29th, 2017, the Defendant Wallace gave a presentation to participants of a Bank of America Merrill Lynch Leveraged Finance

C. James, Ph.D.

Conference for Uniti; right?  Is that right, sir?

A      Yes.

Yes, I'm sorry.  I answered.

Q      Oh, I didn't hear you if I did.  My apologies.

A      No worries.

Q      Again, I looked for this transcript in your backup materials and I did not see it, so that means it's not something you specifically pulled and considered; correct?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  Again, I would say I considered what -- this quote, I remember reading it in forming my opinions.  Again, if -- the conference is on November 29th, 2017.  If I didn't include the transcript in the backup materials or don't reference it, then in all likelihood it's not -- the transcript is not something I considered, but I did consider the quote.

BY MS. WYMAN:

Q      Where in your report do you discuss the quote, specifically from Paragraph 188 and Paragraph 186 and 187 that you just looked at?

Page 130

C. James, Ph.D.

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  You've asked me a couple of times did I read the complaint in its entirety, and I said that I read the substance of the complaint, this part of it in particular, and considered it in forming my opinion.  I didn't reference it specifically because I don't see the relevance of it, but for purposes of, for example, assessing -- examining whether the judge's opinion with respect to a covenant violation is informative of price impact regarding alleged omissions or misrepresentations concerning the various risks that we've talked about today.

BY MS. WYMAN:

Q     And then staying with the complaint, on Page 74, Paragraph 189, do you see that there's a quote that has been attributed to Defendant Wallace that he purportedly made at the December 4th, 2017 UBS Global Media and Communication Conference on behalf of Uniti; right?

A     Yes.

Page 131

C. James, Ph.D.

Q      And once again, I looked for the transcript of this particular conference in your backup materials and I didn't find it there, meaning that you didn't pull it specifically and consider the transcript as part of your work here?

A      That's correct.  I was aware of this because I reviewed what plaintiffs allege to be the various misstatements and omissions.  And this is one of the alleged misstatements as it pertains to their confidence regarding a favorable outcome of the litigation.

Q      All right.  I think on Page 75 you'll find Paragraph 194.

A      Uh-huh.

Q      And in Paragraph 194 there is a quote attributed, again, to Defendant Wallace that he purportedly made at the May 16th, 2018 JPMorgan Global Technology, Media and Communication Conference.

A      Yes.

Q      You see that?

A      Yep.

Q      Again, that's a transcript I looked

Page 132

C. James, Ph.D.

for in your backup materials that I didn't find, so you didn't pull that transcript and consider it in its entirety in doing your work here; right?

A    Same answer as I gave before.  I certainly considered the statement and the gravamen of what plaintiffs are contending, which is Windstream -- sorry, Uniti had conveyed to the market its expectation about a favorable outcome.

Q    And --

A    In the Windstream litigation.

Q    I'm sorry, I thought you were done.  I didn't mean to interrupt.

A    No.  No, I paused and you interjected, so you didn't interrupt.

Q    I know it's hard with this -- especially with virtual, it's difficult to -- anyway, so I apologize for that.

Let's stay on -- in the complaint on Page 75.  You'll see Paragraph 195.  And the next page you'll see Paragraph 196 referred to quotes made by Defendant Wallace again, at a September 6th, 2018 Bank of America Merrill Lynch 2018 Media Communications and Entertainment

Page 133

C. James, Ph.D.

Conference; right?

A     Uh-huh.

Q     And as with the others, I did not find the transcript of this conference in your backup materials, and so I'm assuming, based on the past answers you've given, that that is not something that you pulled and considered in doing your work?

A     For the reasons that I've given with respect to the others -- the other transcripts that you've identified, one is to awareness and consideration of these statements based on my review of the complaint, and second, the issue of the extent to which they're relevant for purposes of assessing whether the opinion by Judge Furman is informative of price impact of alleged omissions or misrepresentations.

Q     I have one more to do and then we can take our break.  If you would stay on Page 76, you'll see Paragraph 197; right?  And in Paragraph 197 you see another quote attributed to Defendant Wallace that was made purportedly on October 3rd, 2018 at a Deutsche Bank Leveraged Finance Conference; correct?

Page 134

C. James, Ph.D.

A     Yes.

Q     That transcript wasn't in your backup materials and it wasn't something you specifically pulled and reviewed and considered in forming your opinions here; right?

A     Here again, when Wallace says, "I expect that the litigation will be favorably settled here for Windstream, and we'll get a ruling from the judge pretty soon," I didn't see that -- I was aware of that, but didn't see the relevance for purposes of the analysis regarding price impact on the various alleged corrective disclosure.

MS. WYMAN:  Okay.  We've been going a little more than an hour.  Let's take like a five, ten-minute break, and we are on definitely the closing-in-on-the-end part.  Maybe we just need another hour or so before we're done.  So let's take our break.

THE WITNESS:  Thank you.

MR. VIDEOGRAPHER:  Great.  Off the record, 2:55 p.m.

(Whereupon there was a brief recess.)

Page 135

C. James, Ph.D.

MR. VIDEOGRAPHER:  Back on the record, 3:06 p.m. Eastern Standard Time.

BY MS. WYMAN:

Q     Welcome back, Dr. James.  You are still under oath; correct?

A     That is correct.

Q     Okay.  Turning back to your report, which is Exhibit 1 to your deposition, can you please turn to Page 8.  At the top of the page should be subparagraph (d) to Paragraph 24; okay?

A     Yes.

Q     And in that subparagraph (d), that summarizes your price impact opinion as it relates to the June 24th, 2019 alleged corrective disclosure; right?

A     That's correct.

Q     And in your summary you indicate that you found that there was no price impact under two theories of liability defined related to plaintiffs' allegations, the so-called true lease and sale-leaseback theories; correct?

A     That's correct.

Q     But you don't conclude that there's no price impact under your so-called navigating the

Page 136

C. James, Ph.D.

bankruptcy theory; correct?

A     That is correct.

MR. BURNOVSKI:  Objection to form.
Sorry.

BY MS. WYMAN:

Q     And just as -- you also don't dispute
Mr. Coffman's calculation of a statistically
significant price reaction in response to
information the market received on June 24th,
2019; right?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  As I indicate, I
think the responses to those questions are
the same responses.  The responses I would
give to those questions are the same as I've
given with respect to the other corrective
disclosures in my analysis that we talked
about earlier today.

BY MS. WYMAN:

Q     And in your report on Page 35, do you
see a header under D?

A     Yes.

Q     And that reads, "The alleged
misrepresentations under plaintiffs' failed

C. James, Ph.D.

leaseback theory and true lease theory did not have a price impact on Uniti's stock in connection with the alleged corrective disclosure on June 24th, 2019"; right?

A     Yes.

Q     And your report discusses in more detail the bases and your opinions and conclusions on that subject between Paragraphs 91 and 99; right?

A     Yes.

Q     Okay.  If you look, please, on Page 35 at Paragraph 93 --

A     Okay.

Q     -- and in that paragraph you say that it is your opinion that "The June 24th, 2019 alleged corrective disclosure is a mismatch with your so-called failed leaseback theory given Judge Furman's February 15th opinion"; right?

MR. BURNOVSKI:  Objection.

You can answer.

THE WITNESS:  Well, his opinion that preceded the announcement of the note issuance.  So the note issuance has to do with the desire by Uniti to, for example,

Page 138

C. James, Ph.D.

term out its revolver and doesn't reveal to the market any information as it pertains to whether the sale and leaseback under the spinoff was a violation of the covenant. There's no connection there that I can see. And certainly plaintiffs don't point to any.

BY MS. WYMAN:

Q    Right.  Dr. James, I was just trying to understand the contours of the basis for your opinion as it's stated in Paragraph 93.  You say, "As explained above, by the time of the note's offering, Judge Furman's decision regarding the violation of the sale-leaseback covenant had already been disclosed."

A    That's correct.

Q    So that's the basis of your conclusion that there's a mismatch with the sale-leaseback theory and the June 24th, 2019 disclosure?

A    In part.  It also has to do with what is being disclosed to the market on June 24th, 2019.

Q    Sure.

A    As it pertains to a financing that the company is undertaking.

Page 139

C. James, Ph.D.

Q    Now --

A    Go ahead.

Q    I was just going to direct you to your report on Paragraphs 95 through 97, which are on Page 35 and 36.  These paragraphs address your opinion that "The June 24th, 2019 disclosure is also a mismatch with your so-called true lease theory"; right?

A    Yes.

Q    Okay.  And if you look, please, at Paragraph 96, which is on Page 36 of your report, one of the bases for your conclusion is that there was, quote, "no information released on that day regarding the risk that the master lease could be recharacterized as a long-term financing rather than a 'true lease' based on the allegedly inflated useful life of the copper wire assets (which is the specific factual information that I understand that plaintiffs allege was concealed)."

        Have I stated the basis for -- one of the bases for one of your opinions correctly?

A    Yes.  You've read that portion of it -- that sentence of my report accurately, yes.

Page 140

C. James, Ph.D.

Q     So you find that there was a quote-unquote mismatch between the June 24th, 2019 disclosure and the alleged misrepresentations, at least as it relates to the true lease theory, because there was no information specifically about the master lease being able to potentially be recharacterized as a long-term financing or any information about allegedly inflated useful life of the copper wire assets that were part of the spinoff transaction; right?

MR. BURNOVSKI:  Objection.

THE WITNESS:  That's correct.

BY MS. WYMAN:

Q     How much information or discussion on those two subjects would it have been -- would have satisfied you that there was a connection or a match between the disclosure and those particular liability theories?

MR. BURNOVSKI:  Objection.

THE WITNESS:  I would have to look at the nature of the discussions, but when there is a complete absence of any discussion in the financial press and

Page 141

C. James, Ph.D.

plaintiffs don't point to any information conveyed -- that was allegedly conveyed concerning the potential risk of a recharacterization based upon the useful life of the assets transferred, I don't need to go further to examine whether -- you know, at what level one would expect to see -- what the nature of a particular disclosure would be to find a linkage between that disclosure and alleged misstatement earlier in the class period.

BY MS. WYMAN:

Q      If you look, please, at Paragraph 97, which is also on Page 36 of your report, does it state another basis for your conclusion that there was a mismatch between the June 24th, 2019 disclosure and the so-called true lease theory, because security analyst reports issued following the note offering don't contain any discussion of the useful life of the copper wire assets?

A      Yes.

Q      Now turning your attention to Page 37 of your report, in the middle of the page do you see a header that is Roman Numeral VII?

Page 142

C. James, Ph.D.

A        Yes.

Q        And that Roman numeral says, "Mr. Coffman failed to put forth a classified damages methodology that can reliably measure damages in a manner that is consistent with plaintiffs' theory of liability"; right?

A        That's correct.

Q        So this is another of your opinions that you've offered in this case; is that right?

A        That is correct.

Q        And the paragraph supporting your opinion that Mr. Coffman has not proposed a reliable measure of damages are contained in the Section 7 of your report, which goes from Paragraphs 100 through 120?

A        Yes.  Page 44.

Q        Sure.  So paragraphs 100 to 120 on Page 37 to 44 of your report contain the details about your analysis and conclusion concerning your opinion that there is no reliable damages methodology proposed by Mr. Coffman; right?

A        Yes, as it relates to plaintiffs' theory of damages.

Q        Sure.  Now you don't dispute, do you,

Page 143

C. James, Ph.D.

that a generally accepted methodology to calculate damages in a securities fraud class action is the out-of-pocket method; right?

A       No, I don't dispute that.

Q       And that method involves calculating damages by subtracting the inflation in the security on the sale date from the inflation on the security on a purchase date; right?

A       Yes.  Inflation of purchase plus inflation of sale.

Q       And this kind of calculation is commonly used on a classified basis to calculate damages in security fraud class actions; right?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  Yes.  Although the method by which one assesses inflation and -- at the alleged purchase date and at the sales date is what I -- I'm not objecting to a characterization that the calculation should be based on an out-of-pocket measure.  What I'm saying is he hasn't identified a methodology on which to rely on for purposes of measuring inflation at various points in time.

Page 144

C. James, Ph.D.

BY MS. WYMAN:

Q      So you're talking about whether or not there was a methodology stated to determine the inputs for the calculation of damages using the out-of-pocket method; right?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  Yes.  So he explains what -- here's what I mean by that affirmative answer:  Is that he describes some of the tools that might be used, but doesn't describe methodologies that he recognizes would need to be employed in a case such as this, where it's -- the allegations pertain to omissions or misstatements regarding risks and how to address out-of-pocket measures in the context of a case such as this.

BY MS. WYMAN:

Q      And isn't it true that the determination of what tools specifically would need to be used to identify the inflation at sale and the inflation at purchase are found when you do a full loss causation analysis; right?

MR. BURNOVSKI:  Objection, form.

C. James, Ph.D.

THE WITNESS: No, I disagree. I certainly think -- and I'm not criticizing for not engaging in a loss causation, but as I describe in my report, measuring damages in this case creates certain challenges. So for example, it's the -- the plaintiffs allege this is an omission and a misstatement of various risks. And the alleged corrective disclosures are, for example in Furman's -- in the context of Furman's decision, plaintiffs would allege, and I don't agree with them, but they allege that is the revelation of the risk with certainty. And if plaintiffs allege that -- admit, as they do, that they couldn't -- that Uniti couldn't have predicted, or shouldn't have, it couldn't have predicted Judge Furman's decision, then the question becomes how does one take an input that he's proposed, which is a price decline, and what methodology do you use to take that input to address inflation at various points during the class period, and the loss caused by an omission or misrepresentation. What method

Page 146

C. James, Ph.D.

are you going to use?  Now he's described a methodology to deal with a materialization of risk theory in other cases, but it's completely absent here.

BY MS. WYMAN:

Q     Is it your position that you can't use the out-of-pocket methods to calculate damages when a materialization of the risk theory is being used by the plaintiff?

A     No, but I don't think that you can use solely the decline on the corrective disclosure date to inform you of inflation arising from an alleged misstatement of risks at an earlier date if the disclosure that you're observing the price decline on is the revelation of the risk with certainty.

Q     And --

A     I think he's conceded that in other cases, that to address the issue, as you say, associated with out-of-pocket measure, what methodology are you going to use to assess what market participants assess the risks were relative to what their assessment would have been had the alleged misstatements or omissions not

C. James, Ph.D.

been made.

Q    And the assessment and the quantification of the inflation inputs for the out-of-pocket method is something that would be common to every class member; right?

MR. BURNOVSKI:  Objection to form.

THE WITNESS:  Well, without knowing what those inputs are -- again, it's not a question of, you know, whether -- it's not a question of whether he's failed to address a quantum of damages.  I'm not criticizing him for that.  What I'm saying is there are -- what methodology are you going to employ to -- I'm not saying he should have done it in terms of the estimations now, but how are you going to address the question of how misstatements resulted in inflation and how are you going to address the question of how risks were perceived by the market and how those risk perceptions would have changed had plaintiffs -- had defendants not made the alleged omissions or misrepresentations.

Page 148

C. James, Ph.D.

BY MS. WYMAN:

Q     And is it possible, sir, that that methodology -- several methodologies could apply to that assessment, that you won't know which one in particular or which several in particular would be useful until you've done an analysis of the causation factors?

A     No.  I think -- again, Mr. Coffman has done this with other cases, which has similar -- are similar in the sense that it's an allegation of a materialization of a risk and an omissions case, where you propose a method for evaluating the impact of alleged misstatements or omissions on investors' perceptions of the risk.

Q     All right.  Turning back to your report, we are going to look at Page 8, Paragraph 26.  Are you there?

A     Yes.

Q     Okay.  In Paragraph 26 on Page 8, you say in Section 8, "I explained that Mr. Coffman fails to provide reliable evidence that Uniti's options traded in an efficient market throughout the proposed class period"; right?

A     Yes.

C. James, Ph.D.

Q    And Section 8 of your report shows up between Pages 44 and 58; correct?

A    Yes.

Q    And Paragraphs 121 through 155 detail your conclusions and analysis concerning the failure of Mr. Coffman to provide reliable evidence that the Uniti options traded in an efficient market; correct?

A    That's correct.

Q    And we talked earlier about a declaration that Mr. Coffman has tendered in January of 2022, and I'm going to mark that as Exhibit 4.  I think you said you had a hard copy in front of you; is that right?

A    Yes.

(Exhibit 4 was marked.)

Q    So we'll put it up on the Exhibit Share for everybody else, but if you want to pull out your hard copy of the declaration of Chad Coffman, CFA, regarding calculation of returns for Uniti options, I would appreciate it.

A    Got it.

Q    It should be up in the Exhibit Share for everybody else.

Page 150

C. James, Ph.D.

A    Do you want me to go to the Exhibit Share or can I just use --

Q    You can use your hard copy.  I just wanted everyone else to know it was available for them.

So I think you testified earlier, Dr. James, that you had had an opportunity to look at Mr. Coffman's declaration that we just marked as Exhibit 4, along with the exhibits, and I think backup materials for it?

A    Yes.

Q    Okay.  And in Mr. Coffman's declaration, in Paragraph 5 he points out that he's correcting an error in his prior report; right?

A    Yes.

Q    And the error here describes -- that he's correcting is -- was the use of theoretical rather than actual prices in his cause and effect test for Uniti options that was contained in the computer backup data that was provided with his original report; correct?

A    That's correct.

Q    And he indicates here that the backup

C. James, Ph.D.

materials were provided in error with some miscommunication with the staff; right?

A      That's my understanding, yeah.

Q      Okay.  And then in Paragraph 6 of his report -- or his declaration, pardon me -- from January, he also says he's addressing an issue that came up during his deposition; right?

A      The zero bid price?

Q      Yes.  Specifically that he couldn't recall whether or not -- how he treated option pricing data when the bid price was listed as zero.

A      Right.

Q      And he's made some corrections for that and clarifications of his position and testimony on that in this declaration; right?

A      Yes.  He excludes those observations.

Q      Right.  And then I think it is in Paragraph 8, he provides a couple of new tables that shows the new computations using -- without using the zero price bid data in his cause and effect test; is that correct?

A      Yes.  He provides updated calculations of percentage with significant days, absent that

Page 152

C. James, Ph.D.

normal price return and the average volume, yes.

Q    His new calculations still show statistically significant cause and effect relationships; right?

A    No, I don't believe they do.

Q    Why is that?

A    Well, he hasn't addressed -- a couple of things.  He hasn't addressed a couple of questions and concerns that I had, and criticisms.

First is, he's still looking at it on an aggregate basis.  So if one were to look at it on an individual securities basis, so looking at it option by option, what he would observe, depending on whether he includes or excludes zero volume observations, the 80 to 90 percent of the options failed his test.  The failure rate of a test at 80 to 90 percent would, I think, be -- I think of it as evidence that's totally convincing that the options, when you're thinking of them as a whole, are not meeting the criteria that he views to test market efficiency.  Ninety percent failure rates are what I would consider to be strong evidence of -- against an argument that

Page 153

C. James, Ph.D.

the options in aggregate are considered to be trading on an efficient market.

Q     Okay.  I just want to make sure that I'm clearly understanding how, if at all, this new -- this declaration from Mr. Coffman has changed your conclusions concerning the options opinions.  And it sounds like, at least with regard to the aggregate, that your opinions haven't changed in the face of this new data.

A     Yeah.  I think the data suggests, because obviously he's got fewer option series dates to consider because he's taken out the zero bid dates.  The prior one, it failed the tests 80 percent of the time, and now it is around 80, a little over 80 percent.  If you include zero volume days, the test fails 90 percent of the time.

Q     Earlier I think you said that "Mr. Coffman hasn't addressed a couple of questions and concerns that I had, and criticisms."  So is one of the criticisms that you had is that looking at the aggregate, it still showed as a whole that he hasn't proved that Uniti's options traded in an efficient

Page 154

C. James, Ph.D.

market?

A    Yes.  So he recognizes that each individual option -- each option has characteristics that are -- that distinguish it from other of the options on a particular day. For example, different strike price, different expiration dates.  And as a result of those differences, there may be differences, say, in the trading of the options, where end of money options tends to trade more frequently than deep out of the money options.  And they have different price sensitivity.  So he's failed to consider the options on an individual basis.  He aggregates them.  But if he aggregates and then the question is, well, in the aggregate, what's the failure rate for your test?  The answer is 80 to 90 percent, which is, in my opinion, strong evidence against the proposition that he's shown market efficiency or demonstrated market efficiency with respect to the options.

Now that's putting aside other criticisms that I had.  So, for example, he says he's not using model prices, but he still uses model prices, so he doesn't use them to

C. James, Ph.D.

calculate, quote, the actual price, but he does use models to calculate what he would refer to as the but-for price.  So he's running it through a Black-Scholes model where the input into the Black-Scholes model is his predicted stock return and stock price, but it's still actual the model, not model to model as he had before.  It's certainly not, you know, looking at how actual prices would have changed in the event of -- in but-for world without a corrective disclosure.

Q     Did you undertake any event study analysis to test the market efficiency of Uniti's options either in the aggregate or per series?

A     Well, I do have in my exhibit -- let me look at my report.  It's an exhibit in my report, which I have an update based upon his updated analysis and backup materials.  But if you look at Exhibit 6 of my report, you'll see that the percentage of series for which Coffman calculates a statistically significant return of the 95 percent level, which was associated with trading volume of greater than zero on any of the 16 earnings dates in Coffman's exhibit, that number now would be -- instead of 12 percent, I

Page 156

C. James, Ph.D.

think it's around 10 percent for the calls, and I can't remember what the put is.  So the number goes down.  But the conclusion that here it's failing the test 88 percent of the time as opposed to 90 percent of the time.

Q    Did you perform your own event study and Black-Scholes analysis to determine whether or not there was the cause and effect relationship between information in option price movements?

MR. BURNOVSKI:  Objection.

THE WITNESS:  No.  I utilized his test.  I don't necessarily agree with the test, but in opining, he's failed to demonstrate market efficiency.  I've accepted his test, although I indicate there are problems with it.  I've pointed out that based on his own test, 90 percent of the options failed the test.  That, to me, is pretty convincing evidence that he hadn't demonstrated market efficiency.

BY MS. WYMAN:

Q    Are you offering an affirmative opinion that the options market for Uniti's

Page 157

C. James, Ph.D.

options was not efficient during the class period either on the aggregate or series by series?

A     I think he -- he certainly hasn't demonstrated it, and that's the opinion that I have.

Q     Okay.

A     I will also add that when one looks at certain factors that -- that he had -- identifies as factors that are conducive to market efficiency, such as trading volume, that for the vast majority of the options at issue here, there just is sparse trading activity, which is what I would expect given my prior experience with options and the diversity of option terms that you observe for Uniti, for example.

Q     Okay.  I would like if -- I would like to ask you for your updated Exhibit 6 to your report.  If you could send that over, that would be truly appreciated.

A     Okay.

MS. WYMAN:  Why don't we go off the record for a few minutes.  Let me check my notes and we may be done.

THE WITNESS:  Okay.  Thank you.

Page 158

C. James, Ph.D.

MR. VIDEOGRAPHER:  We are off the record, 3:38 p.m.

(Whereupon there was a brief recess.)

MR. VIDEOGRAPHER:  Back on the record, 3:45 p.m. Eastern Standard Time.

MS. WYMAN:  Dr. James, I wanted to thank you very much for your time today. Subject to any follow-up I may have to do, I have no more questions for you.

THE WITNESS:  All right.  Thank you.  Have a great weekend.

MR. BURNOVSKI:  No questions from defendants.

MS. WYMAN:  Looks like we're done. Thank you.  Have a great weekend.

(CONTINUED ONTO THE NEXT PAGE FOR JURAT.)

C. James, Ph.D.

MR. VIDEOGRAPHER:  Let me just take us off the record.

Off the record, 3:45 p.m. Eastern Standard Time.

* * *

--------------------------------

CHRISTOPHER M. JAMES, Ph.D.

SUBSCRIBED AND SWORN TO

BEFORE ME THIS _____ DAY

OF _____, 2022.

------------------------

NOTARY PUBLIC

MY COMMISSION EXPIRES_____

Page 160

C. James, Ph.D.

INDEX TO TESTIMONY

EXAMINATION OF

| | | PAGE |
|---|---|---|
| CHRISTOPHER M. JAMES, Ph.D. | | |
| BY:  Ms. Wyman | | 6 |

* * *

E X H I B I T S

| Number | Description | Page |
|---|---|---|
| Exhibit 1 | Expert Report of Dr. James | 11 |
| Exhibit 2 | Consolidated Amended Class Action Complaint | 106 |
| Exhibit 3 | Thomson Reuters Street Events Edited Transcript:  8-8-17 | 108 |
| Exhibit 4 | Declaration of Chad Coffman | 149 |

(Exhibits are on Egnyte.)

* * *

REQUESTS

1) Page 157, Line 20

C. James, Ph.D.

C E R T I F I C A T I O N

I, Randi Friedman, Registered Professional Reporter and Notary Public of the State of New York, do hereby certify:

THAT, the witness whose testimony is herein before set forth, was duly sworn by me, and THAT, the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related either by blood or marriage to any of the parties to this action; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this day, February 8, 2022.


*Randi C. Friedman*

Randi Friedman, RPR

*   *   *   *   *   *   *   *   *

Page 162

C. James, Ph.D.

ERRATA SHEET

VERITEXT/NEW YORK REPORTING, LLC

CASE NAME:  In re UNITI GROUP INC. SECURITIES
                LITIGATION

DATE OF DEPOSITION:  FEBRUARY 4, 2021

WITNESS NAME:  CHRISTOPHER M. JAMES, Ph.D.

PAGE/LINE(S)/    CHANGE       /    REASON

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

___/_____/_____/_____

**[& - 38]**                                                                                                      Page 1

**&**

**&**   2:3,8 5:12,24

**0**

**00756**   1:3

**1**

**1**   4:15 10:22,24
  11:3,8,20 16:23
  19:17 27:2 40:6
  47:15,23,25 48:20
  48:25 62:11 68:16
  135:9 160:9,17
**1,000**   24:12
**10**   24:12 37:16
  156:2
**100**   24:9 142:16,18
**10017**   2:10
**106**   160:10
**108**   160:11
**10:40**   108:19
**11**   54:11,18 107:5
  160:9
**11:06**   1:10 4:3
**12**   58:11 69:13,19
  155:25
**120**   142:16,18
**121**   149:5
**12:07**   48:10
**12:18**   48:14
**12th**   125:19
**13**   61:12
**13th**   116:8
**14**   72:11,15 73:3
**149**   160:13
**155**   149:5
**157**   160:17
**15th**   39:14 53:19
  117:15 118:3,21
  119:9,23 120:15
  120:21 123:25
  125:24 126:8

137:19
**16**   155:24
**16th**   131:19
**17**   79:23 80:3
**171**   107:9,11
  108:25
**175**   116:4,6
**18**   48:21,23
**186**   127:20,22
  129:25
**187**   129:25
**188**   128:20 129:24
**189**   130:19
**18th**   51:2 53:9
**19**   23:7,21 80:19
  94:2 98:15
**1900**   2:4
**194**   131:15,17
**195**   132:21
**196**   132:22
**197**   133:21,22
**19th**   121:4,20
  122:14
**1:12**   87:14
**1:49**   88:4

**2**

**2**   27:14 38:20,25
  40:9 49:8 68:20
  106:20,23 107:3
  110:13 115:13
  127:17 128:18
  160:10
**20**   7:2 18:17,20
  19:9 48:21 50:24
  100:13 160:17
**2015**   39:20 92:16
  105:21
**2017**   39:13,14
  53:18,19 64:8
  70:8 72:19,25
  73:7 80:7 88:13

90:20 94:11,20
99:14 102:16
103:16 105:6
107:15 108:18
116:8 121:15
123:17 125:16,19
126:20 128:3,23
129:17 130:22
**2018**   125:24
  126:21 131:19
  132:24,25 133:24
**2019**   23:7,19 39:14
  39:15,21 51:2
  53:19,20 84:4
  117:15 118:3,21
  119:10,23 120:15
  120:21 122:14
  126:8,9 135:15
  136:11 137:5,16
  138:19,22 139:7
  140:4 141:17
**2020**   23:21 107:5
**2021**   11:2 40:4
  162:5
**2022**   1:10 4:4 41:2
  41:9 47:13 68:4
  149:13 159:21
  161:15
**20th**   51:2 53:9
**21**   120:9 121:4,19
  121:21 122:14
  123:12
**22**   53:16 121:4,21
  122:14 123:12
**221**   3:7
**23rd**   9:6 11:2
**24**   39:20 67:15,18
  68:15 70:5,7
  88:11 117:3,10,13
  135:11

**24th**   39:15,20
  53:20 135:15
  136:10 137:5,16
  138:19,21 139:7
  140:3 141:17
**25th**   39:14 40:4
  53:19 88:13 90:20
  91:18 94:11,20
  95:4 96:19 99:14
  102:16 103:16
  105:6 114:3
  121:15 123:17
  125:16
**26**   148:18,20
**26th**   95:20
**27th**   95:20
**28**   126:20
**28th**   107:15
**29**   120:25
**29th**   128:23
  129:16
**2:55**   134:23

**3**

**3**   31:4 35:5 69:9
  69:12 108:7,8,14
  108:21 109:3
  110:3,14 160:11
**30**   22:10
**3116**   3:22
**34**   54:12,14,20
  55:5 57:5
**35**   120:22 136:21
  137:12 139:6
**36**   58:11,13 59:4
  59:16 139:6,12
  141:15
**37**   69:9,19 141:23
  142:19
**38**   61:12,14,17,18
  61:21 64:25 66:21

**[3886 - affirmed]**                                          Page 2

**3886**  161:18
**39**  72:10,22
**3:06**  135:3
**3:38**  158:3
**3:45**  158:7 159:4
**3rd**  39:13 46:12
    53:18 64:7 70:7
    72:19,25 73:6
    80:7 133:24

**4**

**4**  1:10 19:17 21:21
    149:14,17 150:10
    160:13 162:5
**40**  73:4
**419**  101:25
**44**  142:17,19 149:3
**450**  2:10
**46**  62:19
**48**  79:24 80:2
**4:19**  1:3
**4th**  4:4 130:22

**5**

**5**  18:21,22 48:21
    150:14
**50**  72:22
**51**  94:13,23 95:8
**52**  98:14
**53**  100:12
**54**  104:22
**55**  94:13
**56**  120:21
**58**  11:11 120:24
    121:11 149:3
**59**  121:18 122:12
    123:4

**6**

**6**  48:21 50:23
    53:15 58:14 69:10
    69:18 151:5
    155:19 157:18

160:5
**60**  82:6,7 123:11
    126:5
**60s**  74:6
**63**  107:9,10 115:13
**65**  116:3
**655**  2:4
**67**  95:11,14
**6b**  121:14
**6th**  132:24

**7**

**7**  11:20 38:21,22
    38:25 39:5 67:15
    67:19 69:5,8 70:6
    88:11 117:3,9
    142:15
**71**  127:19
**73**  128:20
**74**  130:19
**75**  18:20,25 19:8
    131:14 132:21
**76**  133:20

**8**

**8**  38:25 39:25
    135:10 148:17,20
    148:21 149:2
    151:20 161:15
**8-8-17**  160:12
**80**  82:7 152:17,19
    153:15,15,16
    154:17
**80s**  74:5
**88**  156:5
**8th**  108:18 113:16
    114:22

**9**

**9**  11:20 67:24
**9/13/17**  116:13
**90**  120:22 152:17
    152:19 153:17

154:18 156:6,19
**91**  137:9
**92101**  2:5
**93**  137:13 138:11
**95**  139:5 155:22
**96**  139:12
**97**  139:5 141:14
**99**  137:10

**a**

**a.m.**  1:10 4:3
**abbreviate**  36:10
**ability**  51:4,4
    80:25 105:24
**able**  126:5 140:8
**abnormal**  46:16
**absence**  102:22
    103:22 140:24
**absent**  146:5
    151:25
**academic**  33:3
    34:20,20 46:13
    60:23 75:25 98:6
**accept**  9:23 43:16
**accepted**  42:24
    45:4 143:2 156:17
**access**  35:20
**accessed**  37:13,20
**accommodate**
    87:8
**accumulated**
    89:15
**accurately**  139:25
**acquisition**  21:17
**action**  3:15 5:2
    11:9 31:7 38:11
    42:12 43:20 44:20
    99:7 106:21 107:4
    143:4 160:10
    161:12
**actions**  1:8 99:2
    143:14

**activities**  18:19,21
    19:2 22:5,19 24:2
**activity**  19:13
    22:18 23:5 157:13
**actual**  44:12
    150:20 155:2,7,9
**adam**  2:21 4:21
**adaptations**  9:11
**add**  157:8
**addition**  3:11 36:6
**additional**  41:5
    51:9 57:2 58:6
**additionally**  66:22
**address**  33:5
    101:9 104:2 125:2
    139:6 144:17
    145:23 146:20
    147:12,18,20
**addressed**  152:8,9
    153:20
**addressing**  151:7
**adequately**  77:4
    78:5
**adjust**  96:9
**adjustment**  33:6
**administer**  4:25
**admit**  145:16
**adopt**  47:6 118:16
**adopted**  43:14
    46:9
**advanced**  17:18
**advisor**  21:22
    22:13,19,23 23:12
    23:18
**affairs**  21:13
**affiliations**  5:6
**affirmation**  9:23
**affirmative**  144:10
    156:24
**affirmed**  6:8

**afternoon** 88:2
**agency** 76:18
**aggregate** 152:13
  153:2,9,23 154:16
  155:14 157:3
**aggregates** 154:15
  154:15
**ago** 8:2,24 22:10
  23:3 40:19
**agree** 4:14 7:17
  10:16 23:15 53:8
  64:15,21 145:13
  156:14
**agreed** 23:5
**agreement** 43:3,4
  83:14 85:19 86:2
  102:2,8 106:2,4,10
  114:9 124:12
**ahead** 12:9 69:14
  139:3
**aids** 10:3,17
**alex** 32:14
**alice** 81:7
**allegation** 51:16
  52:13,21,25 83:17
  83:22 84:7 95:15
  95:19 148:11
**allegations** 42:21
  43:5 51:16,21
  70:17 71:15 85:18
  88:19 91:24 103:6
  105:3 117:22
  118:4 135:21
  144:15
**allege** 42:9,9,18,24
  43:6 48:24 50:25
  52:22 53:13 54:4
  54:9 56:12 60:7
  60:11 67:11 71:17
  78:4 79:9 84:25
  92:25 93:17 95:2

107:14 121:3,21
  125:4 128:23
  131:9 139:20
  145:8,12,13,15
**alleged** 39:12,16
  39:17 46:6 49:19
  50:10 53:3,9
  55:13,17 56:8
  57:7,9,11,25 58:16
  58:19 59:6,7,19
  61:24 62:13 64:18
  64:20 65:6,9,11,21
  65:22 66:5,6,8,18
  66:23,24 67:11
  68:17,18,21,21
  70:2,8,20 72:16,18
  73:9,11,12,16
  74:11 75:9,10
  77:4 78:21,22
  80:15,15,17,24
  81:12,13 82:12
  83:7,7 84:19,19
  88:13 89:5,6
  90:22 91:4,10,19
  92:8 94:6,10,20
  95:10 99:14
  101:18 102:6,16
  103:8,16 104:16
  105:13 106:13
  113:21 115:8
  117:15 118:25
  119:10,12 120:12
  120:14 122:2,19
  124:12 126:19
  130:14 131:11
  133:17 134:13
  135:15 136:24
  137:4,17 140:4
  141:11 143:18
  145:10 146:14,25
  147:24 148:14

**allegedly** 39:9
  85:19 98:19
  139:17 140:10
  141:3
**alleges** 56:17
**alleging** 86:14
  106:8 115:6
  123:24
**allow** 55:15 56:6
  63:25 122:3,9,20
**ambiguity** 97:7
**amended** 40:20
  106:21 107:4
  160:10
**amending** 28:18
**america** 128:25
  132:24
**amount** 26:5
**analyses** 60:3
**analysis** 14:6
  30:24 31:11 40:10
  41:21 42:3,21
  43:14,18 44:18
  47:5 54:16 55:11
  56:10 57:2,20
  58:6 60:19 61:3
  61:16 64:19 65:2
  65:14 66:11 67:6
  69:23 70:14 71:8
  72:23,24 73:4,22
  77:2,14 78:19
  92:23 93:15
  113:12 118:9,14
  121:15 126:17
  134:12 136:18
  142:20 144:24
  148:7 149:6
  155:13,18 156:8
**analyst** 13:10
  27:14,15,17 29:21
  29:22 30:7,12,14

33:20,22,25 34:3,6
  34:12,16,23,24
  80:6,19 104:4,20
  105:5,9,12,21
  141:19
**analyst's** 30:5
**analysts** 13:19
  34:5 78:17 81:23
  82:21
**analyze** 66:2 78:23
**analyzed** 44:19
**analyzing** 14:7
**animal** 7:8
**announcement**
  75:16 76:17 82:21
  105:2 113:15
  137:23
**announcements**
  13:2,9 97:11
  112:3
**answer** 14:21
  44:24 63:22 81:16
  93:21 102:20
  113:2 114:18
  124:17 132:6
  137:21 144:10
  154:17
**answer's** 118:22
**answered** 84:13
  84:22 129:4
**answers** 133:7
**anticipated** 27:19
  28:22
**anybody** 7:18
  102:3
**anymore** 22:25
**anyway** 132:19
**apart** 12:16 31:14
  37:17 51:16,19
  68:3 114:21

**[apartment - average]** Page 4

apartment 21:7
apologies 5:19
  129:6
apologize 8:22
  69:15 132:19
appear 11:12
  49:14 94:14
  107:21
appearance 5:8
appearances 2:2
  5:5
appears 16:24
  98:18 109:7
appendix 16:24
  27:3,5,8 28:6,12
  31:2 35:6 41:6
  62:21 63:6 107:6
  114:14
applications 7:13
apply 148:4
apportion 54:23
appreciate 19:15
  119:6 149:22
appreciated
  157:20
appropriate 47:3
  78:9 83:5 84:17
april 39:20
area 14:6
areas 68:9,11
argue 86:10 96:8
  97:13
argument 152:25
arguments 41:18
arising 38:18 61:8
  146:13
arkansas 1:2 4:20
arrangement
  49:11 50:22 86:4
arrangements
  23:14

arriving 53:24
art 57:16,18
artful 119:17
article 98:5
articles 29:15
  30:18,21 33:4,6,7
  33:10 75:14 82:22
ascertaining
  113:18
aside 154:22
asked 12:2,21
  14:24 26:9,10
  35:2 39:15 40:2,5
  40:21,21 41:13,16
  43:12,13,13,15
  109:24 124:15
  130:3
asking 28:22
  59:18 66:16 90:24
  93:7 96:5 102:21
  103:21,23 113:4
  114:2
aspects 14:20
  49:18 66:9 124:11
assembling 13:12
assertion 96:21
assess 39:16 58:18
  61:22 62:17 77:2
  122:4,20 146:22
  146:23
assesses 143:17
assessing 62:11
  77:10 100:24
  130:11 133:16
assessment 94:18
  120:19 146:24
  147:3 148:5
asset 105:11
assets 17:20 92:18
  101:5,12,20
  103:10 106:14

109:18 139:18
  140:11 141:6,21
assignment 40:13
  40:24 58:24
assignments 39:2
  39:22 40:17 41:14
assist 12:18 14:4
  14:18 36:19
assistance 26:6
assistant 13:11
assisted 12:11
  26:23 37:3
assisting 24:21
associated 22:18
  31:25 50:10 74:10
  74:12,16 85:25
  89:23 97:15
  101:25 102:8,9,17
  104:16 118:20
  124:25 125:7
  126:12 146:21
  155:22
associates 13:20
assume 78:7 92:11
assumed 41:23
  42:20,22,23 43:14
assuming 39:19
  60:13 61:6 119:25
  133:6
assumption 41:16
  42:24 43:15,24
  45:5 56:22
assumptions 41:14
  41:17,20 42:4,16
  71:2
attendant 43:2,4
attended 78:17
attending 21:13
attention 141:23
attorney 5:9 8:21

attorneys 2:3,9
  3:4 7:25 8:4
attributable 55:16
  56:7 66:17,23
  121:25 122:18
  123:5
attribute 57:11
  61:7
attributed 58:19
  65:10,20 108:23
  116:7 130:20
  131:18 133:22
attributing 56:20
attribution 25:9
  25:10 26:5,11,14
attritted 111:4
audio 4:11,12
august 39:13
  46:12 53:18 63:17
  64:7 70:7 72:19
  72:25 73:6 80:7
  107:15 108:18
  113:16 114:22
augustine 7:3
aurelius 38:11,15
  89:13,21,24 90:3,4
  91:8 98:16 99:22
  100:14 105:2
  114:7 123:18
  124:19 125:16,20
authorized 4:24
available 9:5 34:6
  34:10 60:8 61:10
  75:20 76:11 78:6
  78:15,16,24 86:17
  90:2 103:14 120:3
  123:7 124:16
  150:5
avenue 2:10
average 152:2

**aware** 28:9 53:23 72:9 96:25 97:18 108:2 111:25 114:19 131:8 134:11
**awareness** 133:12

**b**

**b** 88:11 94:4 160:7
**back** 15:10 25:13 26:25 32:23 45:13 48:13,16,19 57:5 64:25 67:15,19 70:4 88:3,7,10 93:12 108:9,10 115:12 116:19 117:2,3,6 128:11 135:2,5,8 148:16 158:6
**background** 15:13 15:25
**backing** 65:3
**backup** 27:16,22 28:6,13 29:17 41:7,10 107:21 111:24 112:6 114:13 116:14,19 128:8,13 129:9,18 131:4 132:2 133:5 134:3 150:11,22 150:25 155:18
**bank** 38:15 100:5 124:20 125:25 128:25 132:24 133:24
**bankruptcy** 43:7 51:5,8,10,12 81:2 83:18,23 84:9 88:20 94:8 100:18 121:6,10 136:2
**bar** 3:13

**base** 46:22
**based** 15:2 25:8 46:13 62:14 65:6 71:24 73:4 75:4 75:22 78:12 79:14 79:16 85:24 86:7 86:16 89:25 92:13 92:14 103:8 123:6 133:6,13 139:17 141:5 143:21 155:17 156:19
**bases** 100:22 122:13,23 126:10 137:8 139:13,23
**basic** 33:11
**basically** 33:9 71:14
**basing** 90:4
**basis** 23:9 59:14 78:3 86:9 89:13 89:14,24 90:12 92:12 96:18 121:12 124:4,23 127:12,12 138:10 138:17 139:22 141:16 143:13 152:13,14 154:14
**bates** 110:19
**beat** 111:8
**beginning** 5:9 23:7 81:24
**begun** 3:19
**behalf** 5:12,24 37:20 107:17 130:23
**behaves** 7:10
**belief** 84:6 89:21 89:25
**believe** 8:23 14:9 15:16 16:10 25:15 25:25 26:15 27:16

31:4 33:25 36:8 110:14 119:2 152:6
**believed** 30:23
**believing** 99:25
**best** 106:6
**better** 36:10
**beyond** 105:18 128:16
**bid** 31:24,25 151:9 151:12,22 153:14
**bill** 24:4
**billables** 25:4
**billed** 24:6,15,25
**billing** 23:25 24:19 24:24 25:12,17
**billings** 25:14,16 26:18
**bit** 65:4 77:20 119:5
**black** 155:5,6 156:8
**block** 111:3
**blood** 161:11
**board** 19:18,22 20:10
**body** 29:23
**bottom** 54:11 80:2 110:10
**bradford** 109:5
**breach** 98:17 99:25
**break** 48:5,7 86:23 133:20 134:17,20
**breakdown** 26:10
**brendan** 13:25,25 14:4 15:16,20 16:17 25:24
**brendan's** 15:13
**brian** 2:11 5:23 15:21 86:19

**brief** 31:20 48:11 134:24 158:4
**briefly** 21:24 104:21
**bringing** 99:7
**broadway** 2:4
**brown** 7:6
**bryant** 2:21 5:21
**bsm** 1:3
**buildings** 21:7
**burnovski** 2:11 5:23,23 15:15,19 15:22 43:21 44:22 44:24 47:21 48:3 52:9 55:6 63:13 64:13 66:14 68:7 71:18 76:13 79:4 81:15 84:21 87:3 87:9 88:25 92:3 93:3,10,19 99:17 101:15 102:19 103:19 105:16 110:6,13,22 112:9 112:17,24 116:17 118:6 122:24 123:20 126:22 129:12 130:2 136:4,12 137:20 140:13,21 143:15 144:7,25 147:7 156:12 158:14
**business** 20:4 21:4 21:13,25 84:7
**butcher** 32:11

**c**

**c** 2:1 3:1 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1

22:1 23:1 24:1
25:1 26:1 27:1,3,5
27:8 28:1,6,12,25
29:1 30:1 31:1,2
32:1,23 33:1 34:1
35:1,6 36:1 37:1
37:18 38:1 39:1
40:1 41:1,6 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1,6,22
108:1 109:1 110:1
111:1 112:1 113:1
114:1,14 115:1
116:1 117:1,13
118:1 119:1 120:1
120:10 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1

137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1,2,2 162:1
**c.p.l.r.** 3:6,22
**calculate** 143:3,13
146:8 155:2,3
**calculated** 56:25
92:2
**calculates** 155:21
**calculating** 143:6
**calculation** 45:24
90:18 91:17
117:25 136:8
143:12,21 144:5
149:21
**calculations**
151:24 152:3
**california** 2:5
**call** 8:12,23,24
32:11 54:15 108:4
**called** 19:23,24
27:5 88:23 96:22
99:15 102:18
103:17 121:5,23
122:16 123:14
125:12 126:12
135:21,25 137:18
139:8 141:18
**calls** 32:14 112:4
156:2
**cao** 8:11 13:25
14:12,18 16:6
**capable** 40:7
**capital** 34:3,7,11
34:19 35:8 51:6,9

84:8 109:12,21
**capitalized** 109:16
**carefully** 49:10
50:21 127:11
**case** 11:20 13:24
24:22 25:11 26:14
27:23 28:5,10
32:17 33:5,12
35:23 37:21 39:3
39:23 40:14 41:13
42:11 43:20 47:14
47:17,18 53:3,11
53:11 58:24 61:16
66:2 68:6 91:2
99:23 111:23
113:13 114:17
115:21 142:10
144:14,18 145:6
148:13 162:4
**cases** 26:12 38:3
146:4,20 148:10
**catalog** 17:11 18:8
**category** 81:4
**causation** 52:7
53:4 144:24 145:4
148:8
**cause** 44:10 56:24
57:3 58:7 66:12
76:10,15 78:25
91:24 150:20
151:22 152:4
156:9
**caused** 70:15
71:16 118:5
145:24
**causes** 60:19 77:17
92:24 93:16
**cellphone** 7:12,15
**cellphones** 4:9
**cellular** 4:7

**center** 35:18,19
**certain** 12:3,6,22
14:20 20:18 31:9
33:25 34:6 37:22
38:6 41:17,18
43:2 59:19 79:9
97:19 145:6 157:9
**certainly** 43:23
68:14 81:3,18
82:15 83:15 96:7
98:10 132:7 138:7
145:3 155:9 157:4
**certainty** 77:8
90:14 145:15
146:17
**certification** 42:14
**certify** 161:5,10
**cfa** 16:8 149:21
**chad** 34:9 40:4
149:20 160:13
**chain** 20:16 33:9
33:13 75:5
**chair** 32:8
**challenged** 101:2
101:10 105:8
**challenges** 145:6
**change** 23:2 75:16
75:22 85:8 162:6
**changed** 61:24
147:22 153:7,10
155:10
**changes** 40:22
60:25 76:3
**changing** 85:23
**chapters** 29:8
**characteristics**
154:5
**characterization**
92:19 100:25
102:25 105:7
143:20

**characterize** 50:16 98:7
**characterized** 83:13 106:11
**check** 7:16 157:23
**checked** 112:6
**chicago** 35:20
**chick** 32:14
**christopher** 1:20 4:16 6:7 10:25 159:19 160:4 162:5
**circumstances** 97:20 103:3
**citations** 31:10
**cite** 27:18 74:13 75:2
**cited** 15:9 27:20 28:12 113:8 114:15 126:7
**cites** 127:13
**citing** 29:24
**claim** 39:21 52:19 56:17 95:8
**claiming** 66:7 98:16
**claims** 44:9
**clarification** 5:15
**clarifications** 151:16
**class** 13:4 18:17 31:7 36:16 40:12 42:12,14 43:11,20 44:20 54:3 106:21 107:4 141:12 143:3,14 145:24 147:6 148:24 157:2 160:10
**classified** 142:4 143:13

**classroom** 18:11 19:10
**classwide** 40:8
**clean** 9:9 10:5
**clear** 29:4 44:17 70:24 93:23 96:14 110:7,21
**clearly** 118:17 153:5
**close** 116:24 117:5
**closed** 95:5
**closing** 134:18
**code** 14:7
**coffman** 10:8 28:17 34:9 40:4,6 40:19 41:9 44:3,6 63:2,11 64:11 68:5 86:12 118:10 142:4,13,22 148:9 148:21 149:7,12 149:21 153:6,20 155:20 160:13
**coffman's** 10:6,9 15:3 33:24 40:10 40:25 45:10,17,24 46:5,22 47:8,13 62:16 63:7 90:18 91:16,25 95:21 117:25 136:8 150:9,13 155:24
**colleague** 6:2 31:18
**collect** 25:4
**collected** 25:15
**come** 23:16
**comes** 28:14 42:10 100:3 109:2 113:22
**comfort** 7:8
**coming** 13:3

**commentary** 85:21 104:4,9,20
**comments** 114:22
**commercial** 20:5,6 21:7,8
**commission** 159:24
**committees** 18:23
**common** 41:24 45:7,12,19 46:2 95:3 147:6
**commonly** 143:13
**communacopia** 116:10,13
**communicate** 7:18
**communication** 130:23 131:20
**communications** 107:16 108:17 132:25
**community** 98:6
**companies** 19:19 19:21 37:7 75:3 109:14,15
**company** 19:23,23 19:25 20:5,25 34:8 55:16,19 56:9 109:10 138:25
**company's** 33:16 34:2 76:7,19,20
**comparing** 109:20
**compensated** 22:22 23:10
**compiled** 14:10
**compiling** 128:15
**complaint** 31:7 48:24 49:15,25 50:4 51:13 52:25 53:10 54:5 83:10 89:19 92:10,12,25

93:17 100:4 106:21 107:4,25 108:25 112:2,11 112:20 113:3,6,7,8 113:12 115:12,16 115:20,25 116:4 116:24 124:19 125:19 126:24 127:18 128:17,19 130:4,6,18 132:20 133:14 160:10
**complete** 28:7 34:4 140:24
**completely** 146:5
**component** 125:22 126:4
**components** 125:11,13,15
**computations** 151:21
**computer** 10:4 150:22
**concealed** 48:24 71:17 98:20 139:21
**concede** 124:5
**conceded** 86:12 119:14 146:19
**concedes** 124:5
**concentrated** 33:13,14
**concentration** 33:15 75:4
**concerning** 13:2 33:8 38:4 68:4 69:4,23 72:24 76:18 81:8 91:11 92:9 94:19 104:20 118:4 120:20 124:3 130:15 141:4 142:20

149:6 153:7
**concerns** 104:6
  105:23 106:2
  152:10 153:21
**conclude** 56:19
  63:25 70:15 71:8
  78:8,9 81:11 83:6
  84:18 88:22 90:9
  90:13 103:2
  104:15 123:3,12
  135:24
**concluded** 89:3
**concluding** 114:6
**conclusion** 40:10
  46:7 47:10 80:14
  81:19,22 92:14
  95:21 97:19
  100:22 121:13
  122:13 125:11,14
  138:17 139:13
  141:16 142:20
  156:4
**conclusions** 46:8
  47:8 63:2,4 68:10
  72:24 77:16 88:12
  94:19 120:20
  121:12 125:25
  137:9 149:6 153:7
**conclusively** 99:13
**conditions** 84:11
**conducive** 44:7
  157:10
**conduct** 3:7 12:25
**conducted** 14:23
  19:12 62:14 65:7
  118:10,11
**conducting** 13:14
  61:2 75:25
**conference** 108:4
  112:4 116:10
  128:3,7 129:2,16

130:23 131:3,21
  133:2,5,25
**conferences**
  126:20
**confidence** 131:12
**conflict** 30:5
**confounding**
  55:20
**confusion** 110:17
**connection** 39:11
  59:7 72:18 73:7
  73:12 94:10 105:3
  120:14 137:4
  138:6 140:18
**consensus** 96:10
**conservative** 90:8
  90:11 99:20
**consider** 32:25
  33:20 98:5 107:23
  112:8 115:9
  116:15 126:18,25
  129:21 131:6
  132:3 152:24
  153:13 154:14
**consideration**
  37:21 133:13
**considered** 27:6,9
  27:15,23 28:10,11
  29:25 111:21
  112:11 113:5,6
  114:16 128:14
  129:11,14,20
  130:7 132:7 133:8
  134:5 153:2
**consistent** 32:18
  40:8 41:17 63:19
  63:23 74:25 85:8
  95:21 98:8 104:25
  125:6 142:6
**consisting** 82:6

**consolidated** 31:7
  42:12 49:25
  106:20 107:4
  160:10
**constructed** 14:8
**construed** 42:16
  86:4 96:18
**consulted** 32:3
**consulting** 5:22
  22:3,5 23:4 25:6,8
  34:17
**contact** 13:20
  14:15,17
**contacts** 13:18,22
**contain** 68:2
  101:10 141:20
  142:19
**contained** 27:21
  28:13 29:16,17
  68:12 69:5 89:18
  99:4 107:6 126:24
  142:14 150:21
**contains** 30:15
  68:5 100:23
**contended** 115:11
**contending** 132:8
**contention** 95:18
**context** 13:14
  28:15 33:24 34:17
  57:25 78:12 79:12
  113:11 144:18
  145:11
**continue** 4:13
  80:18 84:6
**continued** 88:5
  158:25
**contours** 138:10
**contracts** 31:22
**contrived** 50:14
  50:17

**controlled** 3:23
**controlling** 71:4
  118:13
**conversations** 4:7
**conveyed** 132:9
  141:3,3
**convincing** 152:20
  156:21
**copper** 101:3,5,12
  101:19 103:10
  105:11 106:16
  139:18 140:10
  141:21
**copy** 9:5,6,9,15,17
  10:5,15 11:8,15
  149:14,20 150:4
**cornerstone** 8:12
  12:2,11,12,17
  13:15,23 14:16
  21:22,25 22:7,13
  22:23,25 23:18,23
  23:25 24:19 25:3
  25:11,18,21,23
  26:4,14,22 31:15
  35:2 36:19 37:2
  37:11,15,19
**corporate** 17:18
  17:19 29:12 97:11
**correct** 6:18 9:11
  9:12,25 10:18,19
  11:21 15:23 17:5
  19:20 43:8,23
  45:19 46:2 48:17
  49:12,13,22 50:15
  51:11,15 56:25
  57:4 59:2,3,9
  63:16 65:11 66:2
  66:3,13 67:4,9,25
  68:24,25 69:19
  71:11 73:14,18
  80:12 88:21,24

89:8 93:18 94:12
94:15 95:16,24
107:6,24 110:8
111:23 113:13
116:16 117:16,23
118:5 120:23
121:16,17 125:20
126:16 128:10
129:11 131:8
133:25 135:6,7,17
135:22,23 136:2,3
138:16 140:14
142:8,11 149:3,9
149:10 150:23,24
151:23
**correcting**  150:15
150:19
**corrections**  151:15
**corrective**  39:12
39:18 46:7,22
53:22 54:2,4
55:13,17 56:8
57:8 58:16 59:7
59:22 62:13 63:10
64:8,21 65:6,9
68:17,21 69:24
70:2,8,19,20 72:19
73:12 75:10 78:21
80:15 81:12 82:11
83:7 84:19 88:14
89:6 91:4,19
94:10,20 95:10
99:14 102:16
103:16 115:9
117:16 119:10,12
120:15 134:13
135:15 136:17
137:4,17 145:10
146:12 155:11
**correctly**  57:13
122:11 139:23

**correspond**  51:21
**corresponding**
50:9
**cost**  109:12,21
**counsel**  3:21 5:4
9:5 31:15 33:25
39:6 40:2
**couple**  13:18 20:7
123:16 130:4
151:20 152:8,9
153:20
**course**  17:10,14,15
17:16,18 18:3,6
96:3
**courses**  17:7,9,19
18:9,10
**court**  1:2 4:19,23
6:4 12:22 37:23
38:2,2,16 43:16
44:7
**covenant**  89:22
98:17 100:2
101:25 102:10
103:5 119:16
124:15 127:14
130:12 138:5,14
**covenants**  38:12
**covering**  17:17
30:3
**covid**  20:13 22:15
22:17,21 23:20
**cowen**  107:16
108:16 109:6
**created**  49:21 50:8
51:25
**creates**  145:6
**criteria**  152:22
**criticisms**  152:11
153:22,22 154:23
**criticizing**  45:10
45:17 145:3

147:13
**crsp**  35:9,12,13,22
36:4,6,9,9,11
**curious**  109:9
**current**  22:16
**currently**  17:2,6
17:10 18:4,7
19:18
**customer**  63:21
74:4 75:4 82:5
85:11
**customers**  33:13
33:18
**cut**  46:12 63:17
74:15 80:20,24
81:4 84:12 113:17
**cv**  1:3 16:24

**d**

**d**  62:21,23 63:6
135:11,13 136:22
**damages**  40:8
142:4,5,14,21,24
143:3,7,14 144:5
145:5 146:8
147:12
**data**  12:16 13:8,8
13:12 14:8 27:22
35:6,16 37:17,19
150:22 151:12,22
153:10,11
**date**  24:7 55:14
56:19 57:8 59:23
60:11,16 61:4
63:17 65:9,19
70:8,12,21 71:21
73:6 76:5,25 77:7
78:11 85:8 91:6
91:22 99:21
108:18 113:17
114:11,24,25
115:9,11 120:4

124:17 143:8,9,18
143:19 146:13,14
162:5
**dated**  10:25 40:4
**dates**  13:4 14:25
44:14 46:7 53:13
53:16,18,23 54:3,4
54:8 58:17 63:10
63:15 64:11,17,21
69:24 70:2 115:8
121:24 122:17
153:13,14 154:8
155:24
**davis**  2:8 5:24 7:25
8:4,9,22
**day**  56:4,12,14,17
57:24 59:20 60:8
62:2 63:19 66:6
77:10 79:8,11,18
96:13,16,22 97:3,3
97:6,12,21 98:11
113:15 128:8
139:15 154:6
159:21 161:15
**days**  95:3,9,16
96:4,9 97:9,15
98:2 118:12 125:6
151:25 153:17
**deal**  146:3
**dealing**  9:16
**deb**  87:4 112:10
**debra**  2:6 5:11
**debt**  17:23 38:12
38:17
**december**  9:6 11:2
130:22
**decide**  78:25
**decision**  12:25
17:12,21 23:4
77:24 79:14,15,16
86:6,7,9 91:7

**[decision - disclosure]**

99:23 127:7
138:13 145:12,19
**declaration** 10:10
10:11 28:17 40:19
41:2,8 47:13 68:4
92:13 96:19 100:9
101:24 103:5
114:3,6 149:12,20
150:9,14 151:6,17
153:6 160:13
**declare** 89:17
**declared** 89:12
**decline** 55:13,15
56:7,20 61:8
62:12 65:8,18,19
66:12,16,22 74:16
91:21 145:21
146:12,16
**declines** 65:5
121:3
**deemed** 3:21
**deep** 154:11
**default** 38:12,16
89:12,14,17,20,22
89:25 90:3,5,11,13
92:13 96:19 98:16
99:4 100:10,15,23
101:8,24 102:9
103:5 104:13
105:2 114:4,6
123:18 125:16
**defendant** 107:14
116:7 128:23
130:21 131:18
132:23 133:23
**defendants** 2:9
5:25 23:25 24:6
24:16,20 26:19
42:13 48:24 51:2
71:17 126:19
128:2 147:23

158:15
**define** 49:4,11
60:19
**defined** 51:13
70:17 71:10 88:18
117:21 135:20
**definitely** 134:18
**definition** 59:10
59:15
**degree** 16:3,5,10
90:14
**degrees** 75:4
**demonstrate**
156:16
**demonstrated**
44:3 154:20
156:22 157:5
**depend** 76:15
**depended** 30:22
**dependence** 74:19
81:25
**dependencies** 75:5
**dependency** 82:23
**dependent** 63:5
75:3 96:16 118:16
**depending** 82:6
152:16
**depends** 25:12
96:5 109:20
**depo** 48:20
**deposition** 1:19
3:16,20,25 4:11,16
6:20,22 7:5,9,23
135:9 151:8 162:5
**depositions** 3:8
**derivatives** 29:6
**describe** 21:24
39:2 52:23 53:6
55:5 61:14 71:20
88:12 117:19
144:12 145:5

**described** 10:16
47:15,23 52:4
53:5 62:18,20
63:6,7 78:20
83:13 123:13
146:2
**describes** 52:3
144:10 150:18
**describing** 55:9
62:23 76:8
**description** 92:15
160:8
**designation** 50:8
50:13 51:24 119:6
**designations** 49:20
**designed** 20:15
**desire** 137:25
**detail** 30:17 53:7
62:21 77:25 93:24
94:18 99:24
120:19 137:8
149:5
**details** 142:19
**determination**
144:21
**determine** 32:24
33:19 43:19 56:3
58:5,7 61:3 66:12
67:6 73:20 74:23
75:8 76:9 78:20
89:20 97:2 102:14
103:15,24 104:12
111:20 144:4
156:8
**determined** 57:23
92:23 93:15
**determines** 19:13
**deutsche** 133:24
**develop** 20:15,17
**developing** 20:5,7

**devote** 23:4 24:2
72:23
**devoted** 18:18
19:2
**diego** 2:5
**differences** 154:9
154:9
**different** 32:20,21
46:3 92:24 93:16
119:6 123:16
154:7,7,13
**differential** 109:14
**differently** 55:10
114:19
**difficult** 19:14
20:16 132:18
**digging** 15:8
**direct** 13:20 139:4
**directing** 14:16
**direction** 12:5,13
14:10
**directly** 24:4
**directors** 19:18
**directorship** 20:20
**disagree** 71:14
77:25 79:19 91:23
118:4 145:2
**discern** 55:15 56:7
**disclose** 106:9
**disclosed** 44:13
54:25 56:21 57:24
59:19 66:6,7 67:2
67:7,9 71:20 72:8
74:18 75:23 76:24
77:3,5 78:5 82:25
85:16 99:8 123:15
125:4 126:13
127:6 138:15,21
**disclosure** 14:25
46:7,22 53:23
54:2,4 55:14 57:8

**[disclosure - effect]** Page 11

59:23 60:15 63:10
63:15 64:8,11,17
64:21 65:9 66:17
69:24 70:2,8,12,20
70:21 72:19 73:13
74:8 75:17 78:22
80:7,15 82:11
83:7 84:19 86:20
88:14 89:6,11
91:4,19 94:10,21
95:4,10 97:16
99:15,21 101:8
102:17,25 103:17
104:13 105:6
114:11 115:9,11
117:16 119:10,12
120:15,21 121:16
123:17,25 126:6
134:14 135:16
137:4,17 138:19
139:7 140:4,19
141:10,11,18
146:12,15 155:11
**disclosures** 30:11
39:12,18 56:14
58:16 59:8 62:13
65:6 66:10 68:17
68:21 73:16 75:10
81:12 136:18
145:10
**discuss** 21:16
54:14 58:15 87:10
94:18 119:3
129:23
**discussed** 14:20,22
43:23 80:8 81:5
105:6 112:15,23
118:12 127:2
**discusses** 120:18
137:7

**discussing** 72:23
**discussion** 30:15
31:20 32:10,16
69:3,17 100:23
102:13 103:13
105:10 140:16,25
141:20
**discussions** 140:23
**disentangle** 19:14
**disguised** 49:10
50:21 51:18
**dismiss** 86:12
**dispense** 6:21
**dispute** 63:8 70:21
90:17 91:16,20
117:24 119:7,19
119:24 136:7
142:25 143:5
**disputing** 45:23
46:19 64:8 70:25
**distinction** 44:17
**distinguish** 154:5
**distress** 105:22
106:3
**distressed** 109:13
**distributed** 26:11
**district** 1:2,2 4:19
4:20
**disturb** 7:12
**diversity** 157:15
**divide** 17:19
**divided** 19:7
**dividend** 46:12
63:17 73:8 74:15
80:20,24 81:4
82:17,20 83:10
84:12 85:2,8
113:17,18
**dividing** 23:21
**document** 1:6 29:2
29:3 107:5 111:21

111:22 114:13,16
114:20,21 116:16
116:21 128:10
**documents** 10:2
10:15,17 12:22,24
13:6 15:8,11 27:5
28:5 29:11 30:25
31:2,3 37:14,23
38:2,3,7,7,8 100:7
124:21,24 125:3
127:10,10 128:13
**doing** 34:17 56:5
78:19 126:17
132:4 133:8
**domain** 92:16
100:9
**dowd** 2:3 5:12
**downloaded** 37:14
**dr** 4:16 6:13,24
7:11 11:8,22
44:16,25 48:16
69:20 87:5 88:7
107:22 110:7
112:16 119:19
135:5 138:9 150:8
158:8 160:9
**draft** 11:22 12:2
12:17
**drafted** 11:24,25
**drafting** 11:25
12:4,8
**dropped** 95:3,9
**drops** 121:21
122:14
**due** 95:10
**duly** 6:8 161:7
**dunbar** 97:25
**duties** 18:14 19:4
20:20 23:18

**e**

**e** 160:7 161:2
**earlier** 56:19
58:25 66:10 76:25
77:10 99:19 114:5
114:24 115:15
118:12 120:4
124:17 127:2
136:19 141:12
146:14 149:11
150:7 153:19
**early** 20:11,12
23:19,20 97:9
106:3
**earned** 26:5
**earnings** 155:24
**easier** 9:15
**eastern** 1:2 4:19
48:14 87:14 88:4
135:3 158:7 159:4
**easy** 37:12
**economic** 22:2
57:15 59:17 60:17
73:7,19 74:21
75:7 100:14 105:3
**economically** 57:8
60:14 65:20
100:16
**economics** 17:3
33:11 79:17
**economist** 76:9
**economists** 96:10
98:12,13
**edgar** 35:9 37:5
**edited** 108:15
160:12
**education** 28:3
**educational** 22:20
**effect** 44:10 76:10
76:16 150:20
151:23 152:4

156:9
**effects** 33:9
**efficiencies** 43:19
**efficiency** 43:25
  44:4,8,20 45:5,6
  56:15,22 61:7
  96:13,23 97:17
  98:8 119:25
  152:23 154:20,21
  155:13 156:16,22
  157:11
**efficient** 39:20
  40:11 41:24 42:2
  43:10,17 60:9,13
  67:3 78:8 95:22
  96:2 97:4,20
  148:23 149:9
  153:3,25 157:2
**egnyte** 160:14
**either** 20:11 28:11
  29:16 44:12 80:20
  128:15 155:14
  157:3 161:11
**electronic** 9:17
**elimination** 73:9
**email** 7:13
**embedded** 76:24
**embrace** 98:13
**employ** 41:20 46:5
  58:6 62:25 147:15
**employed** 41:17
  41:22 42:5 46:3
  46:10 59:11 60:22
  63:2 97:6 144:13
**employing** 57:21
  63:24
**employment** 45:21
**enabled** 7:11
**ends** 120:22
**engagements**
  16:15 26:22

**engages** 22:3
**engaging** 145:4
**engine** 36:15
**entertainment**
  132:25
**entirely** 84:13
**entirety** 29:7 30:7
  30:21 130:5 132:4
**era** 22:17 23:15
**errata** 162:2
**error** 150:15,18
  151:2
**especially** 132:18
**esq** 2:6,6,11,12
**essentially** 78:18
**establish** 79:13
  101:17 115:5
**estimate** 18:13
  105:11
**estimates** 104:6
  106:13,14
**estimation** 105:14
**estimations**
  147:17
**eugene** 98:9
**evaluate** 39:8 40:6
  45:11,18 61:22
**evaluating** 18:24
  41:23 44:2 118:24
  148:13
**event** 14:23,25
  15:2 45:10,17,20
  46:4,23 47:6,7
  54:15,20 55:10,24
  56:2,23 57:21
  60:20,23 62:14,16
  62:20,21 65:7
  75:25 77:15 91:25
  97:3,7,10 100:13
  106:3 108:18
  118:9,16 155:10

155:12 156:7
**events** 108:15
  160:11
**everybody** 149:19
  149:25
**evidence** 56:16
  60:5 71:6 73:24
  77:9 81:18,21
  89:13 92:5 98:7
  113:20 114:24
  115:2 121:4,22
  122:15 148:22
  149:8 152:20,25
  154:19 156:21
**examination** 1:20
  3:10,13,19 6:11
  88:5 160:3
**examine** 47:3
  63:17 141:7
**examined** 3:17 6:9
**examining** 14:6
  75:15 130:11
**example** 13:6
  14:23 15:4 24:25
  29:5,20 31:6,6
  33:6,12 37:15
  44:2 56:11 59:22
  60:4,16,24 71:23
  72:2 74:24 75:15
  76:17 77:23 79:11
  81:23 83:9 85:5
  91:7 104:4 124:19
  130:11 137:25
  145:7,11 154:7,23
  157:16
**exception** 27:13
  27:25 46:11,24
  53:8 64:7,15
**excess** 24:9 97:14
**exclude** 25:17 71:3

**excludes** 25:16
  151:18 152:16
**exclusive** 92:18
**excuse** 121:14
**exhibit** 10:15,22
  10:24 11:3,5,8,14
  11:20 27:2 28:25
  32:23 37:18 47:15
  47:23,25 48:20
  62:23 106:18,19
  106:20,23 107:3
  107:22 108:6,8,14
  109:3 115:13
  127:17 128:18
  135:9 149:14,17
  149:18,24 150:2
  150:10 155:15,16
  155:19,24 157:18
  160:9,10,11,13
**exhibits** 10:14
  14:11 150:10
  160:14
**exist** 84:11,11
**expand** 93:21
**expect** 26:17 71:24
  74:17 75:22 85:11
  134:8 141:8
  157:14
**expectation** 26:20
  96:6 98:10 132:10
**expectations**
  111:8
**experience** 28:2
  157:14
**expert** 10:24 22:4
  25:5 28:20 40:3
  124:5 160:9
**expiration** 154:8
**expires** 159:24
**explain** 11:24

explained 104:21
138:12 148:21
explains 144:8
explore 104:12
exposure 83:18,23
extent 14:24 17:23
27:20 30:14,19,22
34:8 46:15 49:8
56:3 76:25 80:23
127:2 128:12
133:15
external 84:8

**f**

f 161:2
face 153:10
facilitating 44:8
fact 61:3 71:22
74:2 77:25 82:4
90:8 99:6 124:20
125:24
factiva 12:25 35:9
36:12,24
factor 118:19
factors 38:18
43:19 44:5,7,19
45:4 46:18 60:2
65:20 66:4 79:7,9
148:8 157:9,10
facts 79:13,16
84:10 100:6 103:3
123:7
factual 86:8 99:3
124:3,23 126:7
127:12 139:19
faculty 18:24 19:8
19:8
fail 71:19
failed 106:9
123:14 136:25
137:18 142:4
147:11 152:18

153:14 154:13
156:15,20
failing 156:5
fails 148:22
153:17
failure 3:11,19
149:7 152:18,24
154:17
fair 6:22 28:8,21
29:14 41:12 44:16
110:18
false 51:3
falsely 51:6
fama's 98:9
familiar 52:6
far 74:3 91:12
fargo 128:3,7
fashion 46:16
favorable 131:13
132:10
favorably 134:8
february 1:10 4:4
39:14 53:19
117:15 118:3,21
119:9,23 120:15
120:21 121:4,20
122:14 123:25
126:8,9 137:19
161:15 162:5
federal 76:18
124:8
fewer 153:12
fiber 109:9,15
fil 32:14
file 1:3 15:3 35:13
filed 4:18 10:10,11
40:19 41:2 83:11
100:4 107:5
125:19,25
files 34:2,8 100:5

filing 3:24 82:23
83:19,24
filings 37:7 42:11
52:5
fill 12:2
filling 12:16
finally 16:9
finance 16:3,7
17:3,19,19 29:12
57:16 74:22 75:7
128:25 133:25
financial 17:11,21
22:2 36:16 51:7
72:4 73:25 82:3
82:19,20,23 96:10
98:12,13 105:22
106:3 123:8
140:25
financially 5:3
financing 49:10
50:22 51:19 75:16
85:20 86:2,4
103:8 106:12
138:24 139:16
140:9
find 49:23 68:16
73:15 88:16
116:14 117:19
128:9 131:4,15
132:2 133:4 140:2
141:10
finder 90:8
finding 96:23
findings 125:24
finds 60:12
fine 6:15 86:25
firm 4:22,24 22:3
33:12
firms 17:22 25:8
33:8

first 12:2 15:19
22:8 30:20 32:6
58:24 62:17 73:22
76:2 110:23 118:8
152:12
five 8:6 48:7
134:17
flip 9:15 11:11
67:14
florida 7:3 17:4
19:4 32:9
focuses 17:21
folder 106:19
folks 8:18 16:13
25:19 31:15 35:2
follow 158:10
followed 12:5
following 58:15
62:13 65:5 80:7
95:4 105:5 141:19
follows 6:9 89:19
footnote 62:19
95:11,14,18
forecast 85:23
forgot 8:22
form 3:9 9:24
32:25 41:25 43:21
44:22 45:2 55:6
63:13 64:13 66:14
68:7 76:13 79:4
81:15 84:21 88:25
92:3 93:3,10
99:17 101:15
102:19 103:19
105:16 112:9,17
112:24 116:17
118:6 122:24
123:20 126:22
129:12 130:2
136:4,12 143:15
144:7,25 147:7

**[formed - hourly]**                                             Page 14

**formed** 20:11
**forming** 12:18
  27:23 31:13 33:21
  129:15 130:7
  134:6
**formulating**
  111:23 114:16
**forth** 40:6 142:4
  161:7
**found** 135:19
  144:23
**foundation** 104:7
**founded** 33:11
**four** 53:13,16 54:8
  58:16 126:10
**fraud** 55:19,24,25
  56:9 65:21 66:5
  143:3,14
**free** 37:13
**frequently** 154:11
**friday** 8:16,17,19
  8:24 9:2 111:6
**friedman** 1:22
  4:23 161:3,19
**front** 10:4,7
  149:15
**frustrating** 111:10
**full** 19:7 27:14
  113:11 144:24
**fully** 66:25 123:15
  126:13
**fulsome** 69:3
**funds** 17:23
**furman** 12:24 13:6
  15:9 38:8 86:5
  123:6 133:16
**furman's** 77:24
  79:12 86:15 99:23
  123:25 126:7
  137:19 138:13
  145:11,12,19

**further** 56:5
  101:10 102:23
  141:7 161:10
**future** 28:23 81:2
  83:19,24
**futures** 29:5,9

**g**

**gain** 42:17
**gather** 33:20
  34:16 36:13 37:6
  37:11,20 38:3
  41:5
**gathering** 13:8
  34:24
**geller** 2:3 5:12
**general** 52:10
**generally** 17:16
  39:2 52:16,19
  143:2
**generated** 26:18
**generating** 24:21
  25:20
**germane** 31:11
**give** 18:12 29:4,20
  31:6 136:16
**given** 23:6 39:3,23
  40:14,25 41:15
  55:13 62:2 65:19
  74:2 82:24 99:2
  103:3 105:22
  106:5 133:7,10
  136:17 137:18
  157:14 161:9
**global** 5:22 130:22
  131:20
**gmt** 108:19
**go** 4:14 11:6,13
  17:22 25:13 26:25
  49:7 55:9 59:4
  62:5 65:17 67:23
  87:9,11 98:25

100:21 102:23
  105:18 108:9,10
  109:13,17 111:24
  113:10 116:18
  117:3,6 128:11
  139:3 141:7 150:2
  157:22
**goes** 32:6,13 62:10
  66:21 69:8 123:12
  142:15 156:4
**going** 4:3 9:13
  16:22 22:21 26:25
  27:2 28:22 32:10
  39:7 52:15 62:6
  84:14 106:18,20
  117:2,3,5,9 134:16
  139:4 146:2,22
  147:15,17,19
  148:17 149:13
**goldman** 116:9,13
**good** 4:2 5:10 6:13
  6:14,15 86:22
  111:19
**gosh** 22:8
**graduate** 16:3,10
  17:13,15 19:12
**gravamen** 132:8
**great** 10:13 77:25
  87:4 99:24 117:13
  134:22 158:13,17
**greater** 155:23
**gregory** 109:5
**group** 1:4 4:17
  5:16,17 39:6
  108:16 162:4
**growing** 109:16
**guess** 32:18
**guidance** 111:9
**guided** 77:13
**gunderman**
  107:14 108:23

111:4 114:22
  128:2
**guys** 8:14,25 86:23
  87:7 109:11,18

**h**

**h** 160:7
**half** 108:23 114:5
**hand** 161:15
**happen** 26:18
**hard** 9:6 10:15
  132:17 149:14,20
  150:4
**header** 35:6 67:20
  72:16 94:4,6,15
  120:10,12 136:22
  141:25
**headlines** 30:20
**hear** 129:5
**heightened** 85:25
  104:5
**held** 1:21
**help** 35:3 41:8
**helped** 13:16
  15:10 37:11
**helpful** 52:11
**hereto** 3:4
**hereunto** 161:14
**hesitate** 19:11
**high** 74:5,6
**highlights** 9:10
**historical** 46:16
  47:3 63:20,23,24
  71:3,5,24 85:5
**hold** 107:10
**holding** 92:20
**hopefully** 111:19
  119:18
**hour** 24:13 134:16
  134:19
**hourly** 24:12

**[hours - inputs]** Page 15

**hours** 8:6 9:3 24:5 24:10,25 96:8
**huh** 16:25 127:23 131:16 133:3
**hull's** 29:5
**hypothetical** 102:22 104:3
**hypothetically** 103:24

**i**

**i.e.** 51:6 55:20 57:10 98:19 100:17 122:2,19
**id2** 19:23 21:2,4 21:10,13
**idea** 101:9 104:19
**identified** 5:16 12:3 13:5 39:13 44:6 50:19 60:21 61:5 63:11,12 64:11,12 69:25 76:4 77:18,21 81:20 85:14 133:12 143:23
**identifies** 77:22 157:9
**identify** 12:23 13:9 36:19 38:6 49:17 55:24 56:24 57:2 74:7 79:7 82:18 83:12 84:4 85:15 144:22
**identifying** 50:5 50:17
**image** 82:15
**immediately** 105:5
**impact** 39:11 41:23 42:3 46:8 47:5 51:7 54:21 54:23 55:25 57:22 58:18 59:5,10,12

59:15,25 60:12,16 60:18,24,24 61:16 61:22 63:3,4 64:19 65:14 67:2 68:18,22 69:4,18 69:23 70:11,16 71:12,13 72:17,24 73:12 76:6,20 77:3,17,20 78:2 79:20 88:12,17,23 89:4 90:10,15,25 91:10 92:7,24 93:16 94:9 96:15 101:18 103:2,25 104:16 113:13,20 114:8,25 115:2 117:14,20 118:5 118:14,15,24 120:13 121:5,8,22 122:15 125:12 130:13 133:17 134:13 135:14,19 135:25 137:3 148:14
**impacted** 39:18 59:6 89:7 90:23 101:20
**impacting** 59:21 60:7 78:10 79:7 79:10
**implications** 42:2 123:8
**import** 36:20
**importance** 111:11
**important** 110:19
**inadequately** 125:4
**include** 129:17 153:16

**includes** 152:16
**including** 3:8
**inconsistent** 56:21 96:12,23 97:17
**incorporate** 97:22
**incorrect** 60:15
**incremental** 99:3
**indenture** 49:3 50:3 98:18,22 102:11
**indentures** 89:16
**index** 36:6,8 160:2
**indicate** 12:10 19:17 82:17 88:16 96:11 135:18 136:13 156:17
**indicated** 47:2
**indicates** 21:21 24:12 72:2 118:18 150:25
**indicating** 82:22 85:10
**indication** 89:7 90:3
**indicative** 97:4
**individual** 54:23 152:14 154:4,14
**industry** 46:18 63:20 126:19
**infer** 57:21
**inflated** 106:13,14 139:18 140:10
**inflation** 143:7,8 143:10,11,17,25 144:22,23 145:23 146:13 147:4,19
**inform** 28:4 32:17 92:6 146:13
**information** 13:3 17:25 32:21 34:13 34:15,17 36:4,7,13

37:20 39:9 44:13 54:21,24,25 55:17 55:20,21 56:10,16 56:18,21 57:7,23 57:24 58:3,17 59:19,21,25 60:6 61:4,8,9 72:3 73:5 73:8 74:18 75:20 75:21,23 76:4,10 76:23 77:14 78:4 78:6,11,23 86:9,17 89:25 90:5,20 91:3 97:8,15,22 99:3,9 100:8,15,24 101:2,4,11,21 102:13,23 103:13 103:22,23 105:10 105:12 115:7 118:3 119:22 120:2 122:3,20 124:2,16,22 125:7 126:7 136:10 138:3 139:14,19 140:7,9,16 141:2 156:10
**informational** 55:25
**informative** 114:23 130:13 133:17
**informed** 77:16
**informs** 98:6
**infrastructure** 107:17 108:17
**inlet** 19:24 20:2,3 20:10,20 21:6
**inner** 33:8
**input** 145:20,22 155:5
**inputs** 144:5 147:4 147:9

**[inserted - lack]**                                    Page 16

**inserted** 12:6
**insights** 46:14
**insignificant** 98:4
**instance** 96:24
**instant** 7:13
**intend** 47:14
**intended** 28:7
**intent** 128:12
**interest** 23:23
  106:6
**interested** 5:3
  161:13
**interfere** 4:10
**interference** 4:8
**interjected** 132:15
**interposed** 44:25
**interrupt** 30:9
  132:14,16
**introduced** 10:14
**investigate** 59:24
**investigating** 76:6
**investigations**
  57:20
**investors** 72:9
  115:7 148:15
**involved** 21:4,9
  22:6 24:24
**involvement** 23:6
**involves** 62:11
  143:6
**iq** 34:3,7,11,19
  35:8
**irs** 104:8,11
**issuance** 137:24
  137:24
**issue** 95:14 101:22
  133:14 146:20
  151:7 157:12
**issued** 141:19
**issues** 17:25 18:2
  20:17 33:4 118:11

**items** 36:20
**iv** 67:21

**j**

**j** 2:6
**james** 1:20 2:1 3:1
  4:1,17 5:1 6:1,7
  6:13,24 7:1,11 8:1
  9:1 10:1,25 11:1,8
  11:22 12:1 13:1
  14:1 15:1 16:1
  17:1 18:1 19:1
  20:1 21:1 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1 42:1 43:1
  44:1,16,25 45:1
  46:1 47:1 48:1,16
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1
  58:1 59:1 60:1
  61:1 62:1 63:1
  64:1 65:1 66:1
  67:1 68:1 69:1,20
  70:1 71:1 72:1
  73:1 74:1 75:1
  76:1 77:1 78:1
  79:1 80:1 81:1
  82:1 83:1 84:1
  85:1 86:1 87:1,5
  88:1,7 89:1 90:1
  91:1 92:1 93:1
  94:1 95:1 96:1
  97:1 98:1 99:1
  100:1 101:1 102:1
  103:1 104:1 105:1
  106:1 107:1,22

  108:1 109:1 110:1
  110:7 111:1 112:1
  112:16 113:1
  114:1 115:1 116:1
  117:1 118:1 119:1
  119:19 120:1
  121:1 122:1 123:1
  124:1 125:1 126:1
  127:1 128:1 129:1
  130:1 131:1 132:1
  133:1 134:1 135:1
  135:5 136:1 137:1
  138:1,9 139:1
  140:1 141:1 142:1
  143:1 144:1 145:1
  146:1 147:1 148:1
  149:1 150:1,8
  151:1 152:1 153:1
  154:1 155:1 156:1
  157:1 158:1,8
  159:1,19 160:1,4,9
  161:1 162:1,5
**january** 10:10,11
  41:2,9 47:13 68:4
  149:13 151:7
**jog** 108:7
**john** 29:5
**joseph** 2:6 5:11
**jpmorgan** 105:21
  131:19
**judge** 12:24 13:6
  15:8 38:8 77:23
  78:13 79:12 86:15
  123:6 124:13,23
  126:7 127:11
  133:16 134:10
  137:19 138:13
  145:19
**judge's** 118:19
  119:16 120:3
  124:6,8 127:7

  130:12
**judgment** 42:14
**june** 39:15,20 51:2
  53:9,20 84:4
  125:24 135:15
  136:10 137:5,16
  138:19,21 139:7
  140:3 141:17
**jurat** 158:25

**k**

**k's** 37:16
**kelly** 2:21 5:21
**kenny** 107:14
**kind** 21:4 143:12
**know** 6:19 12:21
  14:22 16:2 20:13
  20:22 23:14 24:18
  24:18,23,25 26:12
  32:19 33:4,7
  37:12 40:21 47:18
  55:7 60:22 74:5
  78:16 83:9 85:7
  86:7,20,22 87:6
  90:12 96:21 97:5
  97:23 98:2 99:20
  104:2,2,5,10
  105:22,23 106:6
  109:22 113:2
  117:4 132:17
  141:8 147:10
  148:5 150:5 155:9
**knowing** 147:9
**knowledge** 114:21
**kyle** 8:11 14:2
  15:6,7 16:16

**l**

**labrador** 7:6
**lack** 36:9 96:15
  118:15

**land** 20:6,7
**language** 50:4,5
**largest** 74:4 82:5
**late** 86:21
**law** 100:6 124:20
  125:25
**lawyers** 8:8
**lead** 103:2
**leading** 59:22
  118:19
**lease** 43:3,4 49:9,9
  49:11 50:13,20,21
  51:18 74:12,13
  80:10,10,22,23
  81:10,10 83:13
  85:19,20 86:2,3
  88:19 94:7 100:18
  100:25 101:2,9,10
  102:8,18 103:7,17
  104:7,8,11 105:4,8
  105:13,25 106:4
  106:10,11 114:9
  121:6,9 135:21
  137:2 139:8,15,17
  140:6,7 141:18
**lease's** 105:7
**leaseback** 43:3
  49:2,4,23 50:3,6,7
  51:17,22 80:9,22
  81:9 83:14 88:24
  89:10 98:17,19,21
  99:16 100:3 102:2
  102:11 109:10
  121:23 122:5,16
  122:22 123:15
  124:10,11 125:8
  125:13 126:13
  135:22 137:2,18
  138:4,14,18
**left** 57:6

**legal** 30:25 31:3,9
  99:7 115:21 123:6
**level** 17:14,15 83:5
  84:17 103:12
  141:8 155:22
**leveraged** 128:25
  133:24
**lexington** 2:10
**liability** 17:20,22
  39:10 40:9 50:18
  52:4 58:20 68:20
  68:23 70:16 71:10
  71:22 73:10 88:18
  89:4 100:17
  102:18 103:18
  113:22 117:21
  135:20 140:20
  142:7
**life** 101:3,4,11,19
  101:23 103:9
  105:11 106:15
  139:18 140:10
  141:6,21
**likelihood** 129:19
**limitation** 55:4,8
**limitations** 54:15
**line** 23:21 68:15
  160:17 162:6
**linkage** 33:8 73:25
  81:3 82:16,18,19
  83:5,12,20 84:17
  84:25 85:3,10,14
  102:3,5 105:15
  127:8 141:10
**linkages** 75:2
  102:4
**liquidity** 17:25
**list** 27:5,16,17
  28:7 30:25
**listed** 28:12,24
  29:17 37:18 41:7

  114:14 151:12
**listing** 13:9
**lists** 27:8
**literature** 46:14
**litigation** 1:5 4:18
  5:17,18 22:4,5
  57:25 75:17
  131:13 132:12
  134:8 162:4
**little** 58:25 65:3
  77:20 86:23 93:24
  119:5 134:16
  153:16
**llc** 162:2
**llp** 2:3,8
**load** 18:16
**located** 6:25
**logic** 79:17 83:15
  83:25
**long** 8:3,25 20:9
  21:9 22:6 29:22
  32:7 87:7 92:22
  93:14 139:16
  140:9
**longer** 97:21
**look** 10:17 14:24
  25:13 27:14 30:3
  38:21 48:21 50:24
  53:15 65:8 66:5
  67:15 68:14 72:21
  73:3 79:24 84:24
  86:7 89:18 92:10
  94:23 96:16 97:12
  98:14 100:7,12
  101:21 107:9
  108:21 110:3
  115:12 116:4,19
  117:9 120:24
  121:18 124:24
  127:19 128:9,11
  128:20 137:12

  139:11 140:22
  141:14 148:17
  150:9 152:13
  155:16,19
**looked** 18:19
  29:23 30:20 34:3
  36:22 44:5 45:4
  46:23 58:25 85:5
  89:12 108:3
  111:22 112:2
  114:4 116:12
  124:13 128:6,16
  129:8,25 131:2,25
**looking** 35:25
  40:20 44:9 60:23
  61:19 66:11 69:14
  74:25 77:6,8 89:5
  91:3 92:4 97:10
  98:2 109:3,22
  110:3 111:3 118:7
  123:11 152:12,14
  153:23 155:9
**looks** 60:19 63:16
  125:15 157:8
  158:16
**loss** 52:7 53:4
  144:24 145:4,24
**lot** 29:25
**low** 109:12
**lunch** 87:16
**lunchtime** 86:21
**lynch** 128:25
  132:24

**m**

**m** 2:11 6:7 10:25
  159:19 160:4
  162:5
**main** 13:17,17,22
  14:17
**major** 63:21 85:11

**[majority - minute]** Page 18

majority 157:12
making 17:12,21
  41:19
manage 84:6
management
  17:25 18:2
managers 13:19
  26:2
managing 20:23
manner 40:8
  46:21 61:25 63:10
  142:6
march 51:2 53:9
  84:4
mark 9:13,19
  106:18,20 108:6
  149:13
marked 9:24 11:3
  106:23 108:8
  149:17 150:10
market 13:3 31:21
  35:25 36:6,10
  39:19 40:11 41:24
  43:9,17,19,25 44:3
  44:8,13,20 45:5,21
  45:22 46:17 47:6
  48:25 53:15 56:15
  56:22 59:20 60:8
  60:9,13 61:5,6,6
  61:10 62:22,25
  63:21 67:3,8 72:9
  73:23,24 75:20
  76:5,11,24 77:9
  78:6,8,24 79:15
  85:21 86:18 90:6
  91:8 95:5,22 96:9
  96:12,23 97:4,9,13
  97:17,20 98:8
  109:17 119:22,25
  120:3 122:3,20
  123:16 124:2,3,16

125:3 126:14
132:10 136:10
138:3,21 146:23
147:21 148:23
149:9 152:23
153:3 154:2,20,20
155:13 156:16,22
156:25 157:10
marketing 46:8
marketplace 78:5
  86:10 105:19
markets 33:7 96:3
marking 10:21
  116:25
marriage 161:11
master 1:3 43:4
  49:9 50:20 51:18
  74:12 80:10,22
  81:10 85:19,25
  100:25 101:9
  102:8 103:7 105:7
  105:25 106:10
  114:9 139:15
  140:7
master's 16:5,11
match 78:20 81:11
  82:11 83:6 84:18
  101:13 102:15
  103:15 140:19
material 17:17
  27:16 28:6 30:15
  48:25 49:25 50:9
  52:24 111:24
materialization
  52:7,24 53:4
  71:16 146:3,9
  148:12
materialized
  52:22,23 53:14
materials 12:6
  27:8,20,21 28:9,10

28:11,13,24 29:17
32:24 41:6,7,10
103:13 107:21
112:6 114:14
116:14,20 128:8
129:9,18 131:4
132:2 133:6 134:4
150:11 151:2
155:18
matter 4:17 12:11
  24:3 26:7 79:17
  83:15,25 161:13
matters 21:16
mean 30:9 45:3
  47:24 53:6 59:5
  59:17 71:19 73:21
  76:15 102:22
  111:25 112:7
  132:14 144:9
meaning 131:5
means 107:23
  116:15 128:9
  129:10
meant 55:4 68:11
measure 76:3 83:4
  84:16 142:5,14
  143:22 146:21
measures 54:20
  144:17
measuring 40:7
  143:24 145:5
media 4:15 128:3
  128:7 130:22
  131:20 132:25
meet 8:25 105:24
meeting 7:25 8:2,3
  8:10,14,18,20
  152:22
member 19:8
  147:6

memory 108:7
mention 81:7,9
  82:12 95:2
mentioned 1:21
  8:13 15:6 21:2
  31:16 37:24 46:25
  91:6 94:18 112:18
  125:18,23
mentoring 19:14
merrill 128:25
  132:24
mesh 20:14
messaging 7:13
met 6:16 111:8
method 143:4,6,17
  144:6 145:25
  147:5 148:13
methodologies
  144:12 148:4
methodology 40:7
  45:10,17,20 61:15
  97:25 118:17
  142:5,22 143:2,23
  144:4 145:22
  146:3,22 147:14
  148:4
methods 146:8
metric 18:10
microphones 4:5
  4:10
middle 94:3
  141:24
midst 21:17
miles 7:2
milliken 8:11 14:2
  15:6 16:9
mind 28:14 52:12
  52:13 87:4
mine 31:18 75:14
minute 48:5,7
  106:25 134:17

minutes 96:8
  97:21 157:23
mirror 82:15
mischaracterizat...
  52:21
mischaracterizat...
  83:18,23
miscommunicati...
  151:3
misheard 122:9
misleading 51:3
mismatch 57:10
  57:15 58:5 73:15
  73:20 74:23 75:9
  78:21 80:14 99:15
  137:17 138:18
  139:8 140:3
  141:17
misread 122:7
misrepresentation
  52:20 55:18 56:8
  67:12 78:22 82:12
  83:8 84:20 101:18
  102:7 103:9
  145:25
misrepresentatio...
  39:16 42:25 57:9
  57:12 58:2,19
  59:6 61:24 64:18
  65:11,22 66:18,23
  66:25 68:18,22
  72:17 73:9,11,17
  74:11 75:11 80:16
  81:13 90:23 92:9
  94:7 104:17
  118:25 120:13
  122:2,19 130:15
  133:18 136:25
  140:5 147:24
misrepresented
  39:9 42:10,19

49:19,19 66:8
  85:17 98:20
  124:13
misspoke 15:21
  69:11 122:6
misstated 125:5
misstatement
  102:6 141:12
  145:9 146:14
misstatements
  43:5 53:10,11
  80:25 83:17,22
  84:3 89:7 90:24
  91:10 113:21
  127:4 131:10,11
  144:16 146:25
  147:18 148:14
mix 56:18
model 15:2 35:25
  44:12 45:21,22
  46:3,5,5,10,10
  47:6 62:14,17,20
  62:21,22,25 63:5,7
  65:7 76:2 77:15
  77:18,21,22
  154:24,25 155:5,6
  155:7,8,8
models 155:3
modify 77:19
moment 40:18
money 154:10,12
month 114:5
months 78:14
morning 4:2 5:10
  6:13,14
motion 3:14 42:13
  86:11
motions 83:11
move 3:9,12 86:20
moved 85:9 95:20

movement 45:18
  56:4,13,25 57:3,11
  73:5 77:22 79:2
  83:16,21 99:5
movements 44:11
  45:11 58:15 60:20
  64:10 75:18
  121:24 122:17
  123:5 156:11
moving 56:17
  79:18 86:15
  114:11
multiple 54:24
  118:12

**n**

n 161:2
name 4:21 8:22
  15:16,19,20 32:7,8
  32:12 162:4,5
nature 140:23
  141:9
navigate 51:4 81:2
navigating 43:7
  51:10,12 88:20
  94:8 100:18 121:6
  121:10 135:25
necessarily 56:24
  91:9 93:20 156:14
necessary 102:14
  103:14 105:14
need 9:20 53:6
  58:6 77:5 82:11
  102:23 106:19
  108:10 134:19
  141:6 144:13,22
needed 20:17
  32:24 101:8
  103:24
needs 57:2 61:2
  82:14,16

negative 59:24
  118:20 123:8
neither 49:14
never 96:3
new 1:24 2:10,10
  17:24 54:21 61:5
  61:6 68:3 72:2
  75:20 76:4,23
  97:22 99:2,9
  100:15 125:6
  151:20,21 152:3
  153:6,10 161:5
  162:2
news 13:2,9 29:16
  30:18 36:20 112:3
nik 6:2
nikolaus 2:12
nimal 32:4,6,11,14
  32:17
nimalendran 32:4
  32:7
ninety 152:23
non 22:5 23:15
  55:19,25 56:9
normal 152:2
notary 3:17,18
  159:23 161:4
note 4:5 137:23,24
  141:20
note's 138:12
noted 66:13 81:24
  95:11
notes 9:10 10:3
  53:12 126:2
  157:24
notice 85:22 89:14
  89:19 90:3,4,10,12
  98:16 99:4 100:14
  100:23 101:8
  102:9 105:2
  123:18 125:16

noticing 5:9
notion 104:25
november 126:20
  128:2,23 129:16
number 85:12,13
  110:9,10 112:2
  127:8 155:25
  156:3 160:8
numbers 110:19
numeral 67:20
  141:25 142:3
numerous 6:20

**o**

o 161:2
oath 4:25 48:17
  88:8 135:6
object 3:8,11 52:9
objecting 143:20
objection 43:21
  44:22 45:2 55:6
  63:13 64:13 66:14
  68:7 71:18 76:13
  79:4 81:15 84:21
  88:25 92:3 93:3
  93:10,19 99:17
  101:15 102:19
  103:19 105:16
  112:9,17,24
  116:17 118:6
  122:24 123:20
  126:22 129:12
  130:2 136:4,12
  137:20 140:13,21
  143:15 144:7,25
  147:7 156:12
objections 5:7
obligations 105:25
observation 98:9
observations
  151:18 152:17

observe 152:15
  157:16
observed 32:19
  89:24
observing 85:13
  146:15
obtain 37:22
obtained 36:4 38:9
  46:14 91:9
obtaining 34:22
obviously 28:2,16
  28:18 42:8 51:20
  68:12 80:23 84:9
  89:14 113:16
  124:7 153:12
occasions 6:17,20
occur 96:3
occurred 11:25
  38:17 95:5,15
  121:3
occurs 83:19,24
october 40:4 89:20
  100:3 125:19
  126:20 133:24
offense 31:8
offer 27:10 47:14
  69:22
offered 11:19
  43:18 44:18 45:9
  45:16 114:17
  142:10
offering 43:9 68:6
  138:13 141:20
  156:24
officer 25:22
officers 25:16,21
official 9:14
oh 21:11 22:8
  129:5
okay 5:20 7:4,17
  7:21 8:3,17,25 9:4

9:9,22 10:2,8,13
  10:13,20 11:8,18
  12:9 14:12,18
  15:5 16:13,18,22
  21:12,19 22:11,22
  23:2,22 24:5
  25:24 26:3,17
  27:4 28:8 32:23
  35:5 36:5,12
  37:17,25 38:20
  39:5,25 40:23
  41:4,12 42:7
  45:23 47:11,20
  48:8,19,22 53:22
  54:6,10 57:5
  58:10,23 62:6
  64:24 67:14,17
  71:8 72:15 75:23
  80:4 87:5,13
  91:13,23 93:9,23
  94:23 95:7 101:7
  107:8,12 108:6,13
  108:14,20 109:24
  110:12,25 111:19
  116:3,5 117:5,6
  119:2 120:24
  122:10 126:17
  127:21,24 128:18
  128:21 134:15
  135:8,11 137:12
  137:14 139:11
  148:20 150:13
  151:5 153:4 157:7
  157:17,21,25
old 61:8
omission 52:20
  67:12 78:23 82:13
  145:8,25
omissions 42:25
  52:19 53:11 58:2
  64:18 66:18 73:17

74:11 75:11 80:16
  81:13 90:22 91:2
  91:10 92:9 118:25
  130:14 131:10
  133:18 144:15
  146:25 147:24
  148:12,14
omitted 39:9
  42:10,19 66:8
  85:16
once 20:24 127:18
  131:2
ones 27:18 68:4
ongoing 18:9
open 108:12
  127:18
operating 21:15
  45:5
operations 76:19
opine 99:13
opining 45:6 68:10
  156:15
opinion 15:9,10
  33:10 38:16 43:9
  70:11 78:2,3,7,10
  78:11,12,13 79:19
  79:20 81:6 86:15
  86:16 95:25 96:11
  101:7,14 104:7
  118:19 119:16
  120:3,5,7 121:2,20
  123:6,14,25 124:4
  124:4,7,8,14,24
  126:8,11 127:12
  127:13 130:8,12
  133:16 135:14
  137:16,19,22
  138:11 139:7
  142:13,21 154:18
  156:25 157:5

**opinions** 11:19 12:19 24:21 27:9 27:23 28:4 31:14 31:16,17 32:17,25 33:21 40:22 45:9 45:16 47:11,14,16 47:19 53:24 67:21 68:3,6 69:4,18,22 70:5 96:14,18 111:23 114:17 117:14 120:20 129:15 134:6 137:8 139:23 142:9 153:8,9

**opportunity** 150:8

**opposed** 59:25 156:6

**opposition** 42:13 86:11

**option** 29:9 31:22 151:11 152:15,15 153:12 154:4,4 156:10 157:15

**options** 14:6 29:5 31:19,19 40:11 44:4,11 148:23 149:8,22 150:21 152:18,21 153:2,7 153:25 154:6,10 154:11,12,14,21 155:14 156:20,25 157:2,12,15

**oral** 1:20

**order** 58:4 82:10 101:13

**orders** 31:22

**organizing** 49:17 50:18 52:3

**original** 3:20,24 10:9 150:23

**outcome** 5:3 131:13 132:10 161:13

**outline** 69:15 75:8

**outlined** 11:20 33:2 40:17 65:2 77:24 121:13 127:11

**outlines** 126:11

**outlining** 99:24

**output** 77:16

**outside** 77:14

**overlooked** 128:15

**ownership** 23:22

**owns** 20:8 21:6

**p**

**p.m.** 48:10,14 87:14 88:4 108:19 134:23 135:3 158:3,7 159:4

**pacer** 12:21 37:22 38:3,9

**page** 11:11,12 16:23 19:17 27:14 31:4 35:5 38:20 38:25 50:23 53:15 54:10,11,18 58:11 61:12 67:15,19,24 69:12,13 70:6 72:11,15 73:3 79:23 80:3 88:10 94:2,3 98:15 100:13 107:9,10 108:21,24 110:3,9 110:10,10,13,14 111:5,17 115:13 116:3 117:3,8,9 120:9,10,22,25 121:19 123:12 127:19,22 128:19 130:19 131:14

132:21,22 133:20 135:10,10 136:21 137:12 139:6,12 141:15,23,24 142:17,19 148:17 148:20 158:25 160:4,8,17 162:6

**pages** 11:20 29:22 30:11 48:21 69:9 69:18 149:3

**paid** 26:13,16,18 34:11 35:21

**paper** 9:15 11:15

**paragraph** 16:23 19:17 21:21,21 24:11 30:20 38:21 38:22,25 39:5,25 48:23 49:7 50:24 53:16 54:12,14,20 55:5 57:5 58:11 58:13 59:4,16 61:11,14,17,18,19 61:21 62:10 64:25 66:21 67:15,18 68:15 69:3 70:5,7 70:10 72:10 73:4 79:24 80:2,5,19 88:11 94:23,24,25 95:8 98:14,15 100:12 104:22 107:9,11,13 108:25 116:4,6 117:3,10,13,14,19 120:24 121:11,18 121:19 122:12 123:4,11,13 126:5 127:20,22,24 128:20,22 129:24 129:25 130:19 131:15,17 132:21 132:22 133:21,22

135:11 137:13,15 138:11 139:12 141:14 142:12 148:17,20 150:14 151:5,20

**paragraphs** 48:21 72:22,22 94:13,17 120:21 137:9 139:5,6 142:16,18 149:5

**parcels** 20:7

**pardon** 18:5 71:13 151:6

**parens** 51:9

**parentheses** 49:4

**parentheticals** 39:8

**part** 3:7 12:4 15:3 18:9 23:19,20 34:2 38:7 41:5 55:8 58:24 64:19 65:2 112:12 113:12 115:24 127:6,15 130:6 131:6 134:19 138:20 140:11

**participants** 60:9 61:10 73:23,24 77:9 78:6 86:18 107:16 120:4 124:17 128:24 146:23

**participate** 22:15

**participated** 8:9 8:18

**particular** 14:3 23:12 33:16 41:25 56:4,11,17 57:22 59:20 60:8 66:6 79:8,11 96:24 97:8,16 101:25

113:15,24 117:19
130:7 131:3
140:20 141:9
148:6,6 154:6
**particularly** 78:12
106:16
**parties** 3:4 4:13
25:4 161:11
**partner** 20:23
21:16
**partnership** 20:21
**parts** 31:9
**party** 5:2 99:6
**paused** 132:15
**pay** 25:3,7 26:8
**payment** 85:2
**payments** 83:2
92:19,20
**pdf** 110:13
**peer** 74:21 75:7,14
97:2,18,24
**pendency** 84:8
**people** 13:15
16:14
**perceived** 147:21
**percent** 18:17,20
18:20,21,22,25
19:8,9 74:6 82:7
152:17,19,23
153:15,16,17
154:18 155:22,25
156:2,5,6,19
**percentage** 18:13
25:3,14 151:25
155:20
**perceptions** 115:8
147:22 148:15
**perform** 61:15
105:24 156:7
**performance** 72:4
74:2 82:3

**performed** 71:23
**period** 13:4 40:12
43:11 54:3 82:7
105:10 141:12
145:24 148:24
157:2
**periodically** 26:4
26:8
**person** 14:15,17
15:5 32:2
**personally** 28:25
**personnel** 12:12
**perspective** 59:18
60:17 100:14
**pertain** 84:10
144:15
**pertaining** 77:2
**pertains** 42:25
44:4 50:20 51:21
64:17 67:10 74:8
83:12 92:8 114:8
131:12 138:3,24
**ph.d.** 1:21 2:1 3:1
4:1 5:1 6:1,7 7:1
8:1 9:1 10:1,25
11:1 12:1 13:1
14:1 15:1 16:1,5,7
16:11 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1

58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
159:19 160:1,4
161:1 162:1,5
**phc** 18:9
**physically** 6:25
**pick** 4:6
**picture** 34:5

**piece** 54:23 57:23
62:17 65:13 97:8
**pieces** 29:16 54:24
**place** 1:22 4:9,13
**plaintiff** 146:10
**plaintiffs** 2:3 5:13
39:10,13,21 40:9
41:18 42:9,9,11,18
43:6,15 48:23
49:24 50:10,19,25
52:5,22 53:3,8,13
54:3,9 56:12,15
58:20 59:18 60:6
60:11,14 63:11
64:12 66:5,19
67:8,11 68:17,19
68:23 69:24 70:17
71:15 73:10 74:7
78:4 79:9 80:16
82:17 83:11 84:4
84:25 85:14 86:10
86:13 88:19 91:24
92:8,25 93:17
94:7 95:2,19
98:18 100:16
102:5 105:4 106:8
107:14 113:7
115:6,10 117:22
118:4 119:14
121:3,9,21 123:24
124:5 125:4
126:14,18 127:3
128:22 131:9
132:8 135:21
136:25 138:7
139:20 141:2
142:6,23 145:7,12
145:15 147:23
**platform** 32:20
36:13

**platforms** 32:22
**play** 109:15
**please** 4:5,8 5:7
   6:4 27:3 38:21
   50:23 54:10 58:10
   61:11 68:15 72:7
   72:10 73:3 88:11
   94:2 107:8 108:21
   115:12 116:3
   117:2 120:8
   127:17 135:10
   137:12 139:11
   141:14
**pled** 66:19
**plus** 143:10
**pocket** 143:4,22
   144:6,17 146:8,21
   147:5
**point** 5:14 47:19
   56:13 127:3 138:7
   141:2
**pointed** 111:25
   112:19 156:18
**points** 37:13 74:3
   143:25 145:23
   150:14
**polk** 2:8 5:24 7:25
   8:4,9,23
**ponce** 19:24 20:2,3
   20:10,20 21:6
**portion** 109:2
   139:24
**portions** 115:17
**posed** 14:22
**position** 89:16,17
   91:8 100:6 124:21
   146:7 151:16
**possible** 83:25
   148:3
**posted** 31:23

**potential** 31:17
   60:19,24 141:4
**potentially** 78:24
   118:13 140:8
**preceded** 137:23
**precedent** 115:21
**precedes** 80:24
**predicted** 86:14
   119:15 124:6
   145:17,18 155:6
**prepare** 7:22
**preparing** 29:8
   31:13
**present** 2:20 5:4
**presentation**
   107:15 128:24
**presenting** 13:12
**preserve** 9:18
**press** 29:15 36:20
   82:19,20,21
   140:25
**presume** 24:23
   26:9 28:16
**pretty** 134:10
   156:21
**previously** 56:20
   61:10 75:22 86:17
   99:8
**price** 36:3 39:11
   39:19 41:23 42:3
   45:11,18,25 46:20
   47:5 54:21,23
   55:12 56:4,13,18
   56:20,25 57:11,22
   58:7,15,18 59:5,7
   59:10,12,15,21,24
   60:7,10,12,17,18
   61:7,16,22,25
   62:12 63:2,4,9,18
   64:2,9,19 65:5,5,8
   65:14,18,19 66:22

67:3 68:18,22
   69:4,18,23 70:11
   70:15,22,25 71:6,9
   71:11,13 72:17,24
   73:5,11 74:17
   75:18,21 76:3,7,11
   76:21 77:6,17,20
   77:21,22 78:2,10
   79:2,8,10,18,21
   81:3 83:16,21
   85:8 86:16 88:12
   88:17,23 89:4,8
   90:9,15,19,23,25
   91:6,17,21 92:7,24
   93:16 94:9 95:3,9
   95:15,19 96:2,7,15
   99:5 101:20 103:2
   103:25 104:16
   113:13,19 114:7
   114:23,24,25
   115:2 117:14,20
   118:2,5,14,15,20
   118:24 119:9,20
   120:13 121:2,5,8
   121:21,22,24
   122:13,15,17
   123:5 124:25
   125:5,12 130:13
   133:17 134:13
   135:14,19,25
   136:9 137:3
   145:21 146:15
   151:9,12,22 152:2
   154:7,13 155:2,4,7
   156:10
**prices** 35:19,24
   44:12,12 150:20
   154:24,25 155:10
**pricing** 151:12
**primarily** 14:5

**primary** 14:15
   114:10
**principals** 25:17
   25:20
**principles** 77:13
**prior** 22:14 28:18
   60:11 67:8 79:15
   82:20 84:14 90:2
   100:9 115:21
   126:14 150:15
   153:14 157:14
**private** 4:7 19:19
**probably** 22:9
   109:17
**problems** 156:18
**procedure** 11:25
**proceeding** 5:7
**proceedings** 12:23
   38:14 51:5 78:15
**process** 12:4 20:6
**product** 12:7,7
**professional** 1:23
   18:13 19:5 98:13
   161:4
**professor** 17:2
   32:8
**professorship**
   18:15 19:3
**program** 18:10
**programs** 22:20
**prohibited** 49:2
   50:2 51:17 80:9
   80:21 81:9 98:21
**pronouncement**
   76:23
**proper** 74:22 75:8
**properly** 62:14
   65:7 76:2
**properties** 20:18
   21:7,8

**property** 21:17,18
**propose** 97:25
  148:13
**proposed** 40:12
  125:24 142:13,22
  145:21 148:24
**proposition** 64:16
  113:25 154:19
**proved** 153:24
**provide** 22:12
  25:5 28:7 34:12
  124:22 128:12
  148:22 149:7
**provided** 3:6,22
  14:7 33:23 41:9
  53:25 100:15
  103:4 150:22
  151:2
**provides** 35:16
  68:9 113:20
  151:20,24
**providing** 32:21
**provision** 102:11
**provisions** 104:11
**public** 3:17,18
  36:20 37:7 76:11
  78:16 90:6 92:16
  100:9 126:6
  159:23 161:4
**publicly** 74:18
  82:25 90:2 123:7
**published** 75:13
  80:6 105:5,9
**pull** 33:20 113:10
  116:15 127:17
  128:10 131:5
  132:3 149:19
**pulled** 113:2
  129:11 133:8
  134:5

**purchase** 143:9,10
  143:18 144:23
**purported** 38:12
  61:23 65:10 66:24
  121:25 122:18
**purportedly** 39:17
  106:9 127:25
  130:21 131:19
  133:23
**purpose** 115:3
**purposes** 7:8
  30:23 41:22 42:20
  43:14 44:19 47:5
  49:21 104:9
  113:17 114:5
  118:24 130:10
  133:15 134:12
  143:24
**put** 31:21 40:6
  55:9 142:4 149:18
  156:3
**puts** 85:22
**putting** 154:22

**q**

**qs** 37:16
**qualified** 64:20
**quantification**
  147:4
**quantum** 147:12
**quarter** 111:8
**queries** 36:23
**question** 3:9,12
  27:19 42:23 44:25
  45:13 47:22 60:5
  63:22 66:16 73:23
  75:24 78:3 84:14
  86:8 91:12,14
  93:7,12 96:6
  101:12 109:25
  114:12,18,20
  118:18,23 119:5,7

119:18 120:6
  124:15 125:2
  145:19 147:10,11
  147:18,20 154:16
**questions** 11:6
  14:21 28:16
  136:14,16 152:10
  153:21 158:11,14
**quote** 31:23,24
  67:7 74:23 83:25
  84:18 99:15
  101:13 108:2,22
  108:25 110:24
  111:3,13,25
  112:11,15,22
  113:3,5 114:20,21
  116:6 129:14,21
  129:24 130:20
  131:17 133:22
  139:14 140:3
  155:2
**quoted** 49:24
  113:12
**quotes** 113:7
  127:24 132:22

**r**

**r** 161:2
**raise** 51:6 102:4
**raised** 111:9
**raising** 17:22 51:8
  84:8
**randi** 1:22 4:23
  161:3,19
**rate** 24:12,15
  152:18 154:17
**rates** 152:24
**ratings** 85:23
**reach** 47:9
**reached** 47:17
  68:10

**reaching** 27:9
  123:6
**reacted** 46:15,20
  63:9 119:20
**reaction** 59:24
  63:18 64:3 70:22
  71:2,7,9,15 76:12
  77:7,21 81:4
  90:19 91:6,8,18,25
  95:15 113:19
  114:25 118:2,21
  119:9 124:25
  125:5 136:9
**reactions** 45:25
  96:2
**read** 7:24 28:25
  29:7,15,19 30:4,5
  30:7,16,21 31:2,5
  31:8 57:13 58:21
  110:23 113:6
  115:17,19,23,24
  130:4,5 139:24
**reading** 57:6
  129:15
**reads** 95:8 136:24
**ready** 11:6 86:19
  108:11
**real** 22:18
**realize** 48:16
**realized** 77:8
**really** 15:8 22:14
  22:17 30:22 31:10
  32:18 66:11 75:24
  77:12 90:24 96:15
  111:7 118:15
**reason** 19:11
  80:13,19 114:10
  162:6
**reasonable** 90:7
  90:14

**reasonably** 104:14
**reasoning** 99:24
**reasons** 85:4 89:21
   91:5 99:18 119:3
   126:25 127:9
   133:10
**reassessing** 104:10
**recall** 16:4 24:8
   54:5 108:5 112:4
   127:10 151:11
**receive** 25:11
**received** 33:24
   119:22 136:10
**recess** 48:12 87:17
   134:25 158:5
**recharacterization**
   141:5
**recharacterized**
   106:12 139:16
   140:8
**recharge** 86:23
**recognition**
   105:18
**recognizes** 144:13
   154:3
**recollection** 8:7
   25:13 27:17 38:6
   54:8
**record** 4:3,14 5:6
   7:19,19 9:14
   10:18,24 15:16,23
   47:22 48:10,14
   87:10,12,14 88:4
   108:14 110:6
   122:11 134:23
   135:3 157:23
   158:3,7 159:3,4
   161:8
**recorded** 4:16
**recording** 4:12

**reduced** 18:16
   98:3
**reduction** 23:6
   113:18
**refer** 28:5 46:6
   107:25 155:3
**reference** 69:2
   129:18 130:8
**referenced** 116:20
   120:2
**references** 12:3
   128:17
**referred** 12:24
   25:9 38:8 59:12
   74:9 132:22
**referring** 13:7
   30:13 81:20 100:8
   108:3 109:4
   124:14
**refers** 18:22 57:17
**refinitiv** 34:4,7,11
   34:20 35:9
**reflect** 91:7 97:15
**reflected** 7:19
   60:10 96:7
**reflective** 104:15
**reflects** 114:7
**refresh** 106:19
   108:10
**regard** 72:25
   121:5,22 122:15
   153:9
**regarding** 43:5
   46:8 49:18 51:3
   51:17 58:3 61:23
   63:4 66:24 72:3
   74:11,18 80:25
   83:17,22 84:5
   85:18 92:17 96:15
   96:18 99:3 101:19
   102:7 103:7,9

104:6,8 105:23
   106:13,14 113:21
   114:22 118:12
   119:16 127:5
   130:14 131:12
   134:12 138:13
   139:15 144:16
   149:21
**regardless** 46:9
**registered** 1:22
   161:3
**regression** 55:11
   77:15
**regulatory** 12:23
   60:25 75:15 76:18
   76:22
**reit** 30:3 36:8
   109:12
**reits** 30:4
**relate** 94:14 98:18
   105:13
**related** 4:25 18:20
   22:4,5 55:19,24,25
   56:9 57:25 66:8
   70:17 72:5 75:18
   82:3 88:18 99:7
   100:24 101:3,4
   105:10 117:21
   135:20 161:10
**relates** 1:6 44:21
   45:25 70:7,11
   71:21 88:13
   101:22 117:15
   121:14 135:15
   140:5 142:23
**relationship** 33:15
   36:2 44:10 46:17
   47:4 63:20,23,25
   71:3,5,25 74:14
   76:10,16 83:16,21
   85:6 156:10

**relationships**
   152:5
**relative** 46:16
   146:24
**released** 57:7
   58:17 73:6 139:14
**relevance** 130:10
   134:12
**relevant** 29:10
   30:16,23 31:5
   76:5 97:22 115:3
   127:5 133:15
**reliable** 142:14,21
   148:22 149:7
**reliably** 40:7
   142:5
**reliance** 83:2
**relied** 15:9 28:2
**rely** 77:5 143:24
**relying** 56:15
**remaining** 68:20
**remarks** 107:21
**remember** 115:19
   129:14 156:3
**remembering**
   115:17
**remote** 1:19
**remotely** 5:4
**rendered** 78:13,14
   124:23
**renegotiated**
   106:5
**rental** 92:19
**repeat** 32:5 45:15
**report** 7:24 9:6
   10:6,6,9,22,24
   11:9,23 12:10,17
   13:14 14:21 16:22
   16:23 18:19 19:16
   21:20 24:11 25:20
   26:3 27:2,10,18,21

28:12,15,18,20
29:8,11,23 30:2,2
30:7,12,15 31:13
33:2,24 38:21
39:2 40:3,17,20,22
41:7,10,11 46:4
47:2,15,23 48:2,19
49:21 50:14,19,24
51:25 53:12,15
54:11 56:6 58:11
58:14 59:11 60:3
61:12 62:25 63:7
63:12 67:16,18,20
67:24 69:5,8,19
72:11,21 77:24
79:23 88:10 91:5
93:25 94:14 96:14
98:15 100:13
104:22,25 105:21
107:22 112:16,23
114:15 117:2,6
118:17 119:3
120:9,18,25
121:14,18 125:14
126:11 129:23
135:8 136:21
137:7 139:5,12,25
141:15,24 142:15
142:19 145:5
148:17 149:2
150:15,23 151:6
155:16,17,19
157:19 160:9
**reporter** 1:23 4:23
6:4 161:4
**reporting** 162:2
**reports** 13:10
27:14,15,17 29:21
29:22,24 33:20,23
33:25 34:3,6,23,25
80:6 105:5,9,12

141:19
**represent** 108:24
**represented** 51:6
80:9
**representing** 74:5
**requests** 160:16
**require** 21:18
**required** 90:5
**requires** 35:21
97:14,14
**research** 8:12
12:11,12,18 13:11
13:13 18:15,20
19:2,9,11,13 21:22
21:25 22:7,13
23:23 28:3 34:20
34:21 35:2,18
56:5
**reserved** 3:11,15
**residual** 55:12
**resources** 20:17
**respect** 28:5 29:11
30:4,17 43:6
46:12 57:22 63:15
68:16,20 82:17
85:2 86:5 89:3,9
90:10 100:2
102:10 113:20
121:9 130:12
133:11 136:17
154:21
**respective** 3:4
**respond** 40:3
**responding** 120:2
**responds** 109:19
**response** 90:19
91:18 96:13 99:6
109:5 114:7,24
118:2 119:9,12,13
119:21 136:9

**responses** 136:14
136:15,15
**restrictions** 76:19
**result** 23:5 26:6
33:15 47:12 154:8
**resulted** 147:19
**results** 14:25 47:7
55:11
**resume** 86:24
**retail** 21:8
**retained** 39:6
**retainer** 22:24
**retention** 23:9,15
**return** 3:20 33:17
36:3,11 96:17,22
97:3,12 152:2
155:6,21
**returns** 33:17
35:14,17 36:3
73:22 98:3 118:14
149:21
**reuters** 108:15
112:3 113:4
160:11
**reveal** 124:2 138:2
**revealed** 39:17
53:14 54:21 61:4
73:8 79:14 97:8
99:9,10 101:21
125:3,17
**revelation** 61:23
65:10,22 121:25
122:18 145:14
146:16
**revenue** 74:6 82:2
82:24
**revenues** 74:20
82:8
**reverse** 98:4
**review** 18:23
30:23 40:2,5,21,25

41:8 42:10 47:12
74:21 133:14
**reviewed** 29:3,18
37:15 75:7,14
97:2,18,24 115:16
116:22 131:9
134:5
**revolver** 138:2
**right** 3:8 6:3,17
8:15 9:9 10:21
11:14 12:15 18:25
20:14 26:19,25
27:6,24 35:10
37:3,4 38:13 41:3
43:11,20 44:16
45:12 46:19 48:9
49:5,21 50:8,9
51:10,14,25 53:20
57:3 58:8,9,21
59:8 60:21 62:8
64:12 65:15,23
67:3,24 69:6,9,25
70:4 71:10,17
73:13,17 79:3
80:11 88:8,20
90:20 92:2 93:2
94:11,21 95:5,12
95:23 98:23 99:11
99:16 100:19,20
101:6,14 104:22
105:15 107:18
108:9 109:3 110:5
110:10,11,15
112:13 115:14,18
116:9,10 117:22
119:17 120:16,22
121:7 122:5 123:9
123:18 126:2
128:4 129:2,2
130:24 131:14
132:5 133:2,21

**[right - service]** Page 27

134:6 135:16
136:11 137:5,10
137:19 138:9
139:9 140:12
142:7,10,22 143:4
143:9,14 144:6,24
147:6 148:16,24
149:15 150:16
151:3,8,14,17,19
152:5 158:12
**rights** 3:6,22
**risk** 17:25 48:25
49:8,25 50:10
52:7,20,22,24,24
53:4 66:10 77:3,7
80:8,10,22 85:25
92:10 98:20 99:8
105:7 115:7 122:4
122:21 123:14,23
139:15 141:4
145:14 146:4,9,16
147:21 148:12,15
**risks** 43:2 49:18
50:20 53:13 66:9
67:12 71:16 74:9
74:12 75:17 77:10
80:21 81:5,7,10
85:17 91:11 102:7
102:17 125:3,7
126:12 130:16
144:16 145:9
146:14,23 147:20
**robbins** 2:3 5:11
**role** 14:5 22:23
**roman** 67:20
141:25 142:3
**room** 7:4
**ross** 29:12
**roughly** 17:20
91:9

**routines** 36:22
**rpr** 161:19
**rudman** 2:3 5:12
**rule** 3:22
**rules** 3:7 6:21
**ruling** 79:12 104:8
134:10
**rulings** 44:7
**run** 36:23,24
**running** 35:25
155:4

**s**

**s** 160:7 162:6
**sachs** 116:9,13
**sale** 21:18 43:3
49:2,4,23 50:2,5,7
51:17,22 80:9,21
81:9 83:14 88:24
89:10 98:17,19,21
99:16 100:2 102:2
102:10 109:10
121:23 122:5,16
122:22 124:10,11
125:8,13 126:13
135:22 138:4,14
138:18 143:8,11
144:22
**sales** 143:19
**san** 2:5
**satisfied** 140:18
**saying** 14:13 34:5
55:23 64:6,6
76:16 78:18 90:8
92:22 93:14 102:5
143:22 147:13,15
**says** 35:6 54:20
58:13 62:20 67:20
72:16 94:4,6
104:5 109:9 111:5
120:10,12 134:7
142:3 151:7

154:23
**scholes** 155:5,6
156:8
**screen** 10:4 116:25
**scrolling** 9:16
**search** 12:21,22
13:8 36:15,16,22
**searches** 12:25
36:23,25
**sec** 35:9 37:5,7
**second** 54:19 65:2
65:13 74:7 76:3
106:24 125:17
133:14
**section** 58:13,14
67:23 68:2 69:5,8
69:10,18,22 81:20
121:13 142:15
148:21 149:2
**sections** 31:5
**sector** 30:3
**securities** 1:4 4:18
5:16,18 17:24
33:7,18 35:13,17
35:19,24 43:20
44:20 75:18 80:6
143:3 152:14
162:4
**security** 105:4
141:19 143:8,9,14
**see** 6:15 7:10
15:12 16:9 18:12
21:19 23:17 26:3
35:8 36:17 38:10
53:16 55:2 58:8
62:19 65:8 67:21
70:6 72:16 75:13
82:18,20 94:3
102:3,4 107:13
108:22 111:13
113:11 116:6

120:9 124:24
125:5,17,22 127:7
129:9 130:9,19
131:23 132:21,22
133:21,22 134:10
134:11 136:22
138:6 141:9,25
155:19
**seeing** 54:5
**seen** 105:9
**self** 68:12
**sell** 109:18
**semi** 41:25
**seminars** 22:15,20
23:11
**send** 157:19
**senior** 21:22 22:13
22:19,23 23:11,17
25:25
**sense** 12:5 57:18
148:11
**sensitive** 4:6 17:24
**sensitivity** 154:13
**sentence** 54:18,19
62:8 94:15,24
95:7 139:25
**separate** 51:16,19
**september** 39:14
53:19 88:13 90:20
91:18 94:11,20
95:4,20,20 96:19
99:14 102:16
103:16 105:6
114:3 116:8
121:15 123:17
125:16,18 132:24
**series** 153:12
155:14,20 157:3,3
**serve** 19:18
**service** 18:21,22
35:16,22

services   22:12
  34:12
serving   18:23
session   88:2
set   27:15 33:13,14
  42:16 60:2 71:2
  79:9 161:7,14
sets   58:16
setting   7:12
settled   134:9
seven   38:23
seventeen   79:25
shape   9:24
share   10:15 11:5
  11:14 96:7 106:19
  149:19,24 150:3
sheet   162:2
short   8:2
shorthand   117:18
show   69:18 114:13
  152:3
showed   111:6,9,15
  153:24
showing   26:4
  111:19 112:12
shown   29:2 154:19
shows   72:11 149:2
  151:21
side   17:20,21,22
  75:5
sign   98:5
signature   11:12,17
  161:18
significance   98:2
significant   45:25
  46:21 55:12 56:4
  56:13 59:23 61:25
  62:12 64:2,9 65:4
  65:18 70:22 71:6
  76:20 90:19 91:17
  91:21 118:2 119:8

119:21 124:25
  136:9 151:25
  152:4 155:21
significantly   63:9
silence   85:3
similar   15:2 21:6
  30:17 148:10,11
similarly   29:11
  114:2
simpler   91:12
simply   22:19
  74:14 91:14 96:20
  105:18 114:12
  119:7
simultaneously
  54:25
sir   129:2 148:3
sit   19:21 26:12
  28:14 42:6 108:5
six   8:6 78:14
sixty   107:11
skip   39:7
skipped   12:9
small   20:21
solely   146:12
soon   134:10
sorry   15:18,25
  16:20 30:8,10
  37:25 38:22 44:23
  45:14 47:21 48:3
  52:15 61:17 69:10
  91:15 93:12 99:22
  125:9,19 129:4
  132:9,13 136:5
sort   14:14 20:13
  20:14 23:5 33:11
  52:18 77:6
sought   38:15 67:6
sounds   153:8
source   36:7 59:14
  81:25 82:24

110:16
sources   15:11
  34:15,23 37:17,19
south   7:2
sparse   157:13
specific   28:6,10
  52:12 55:16,19
  56:9 69:17 81:7
  82:12 139:19
specifically   24:9
  39:15 40:5 104:24
  105:13 112:5,23
  116:15 129:10,24
  130:9 131:5 134:5
  140:7 144:21
  151:10
specified   76:2
speed   33:6
spend   20:19,22
  21:12
spent   18:14 24:20
spinoff   38:19 49:2
  50:2,11 51:22
  74:10 80:8,21
  81:8,24 82:25
  85:17 89:9,23
  98:21 99:4,7,10
  105:20 125:8
  127:15 138:5
  140:11
spoke   31:18 32:3
  66:10
st   7:3
staff   151:3
stage   47:17
standard   48:14
  73:21 87:14 88:4
  135:3 158:7 159:5
standards   115:21
start   10:21 11:5
  33:3

started   33:22
starting   57:6
starts   54:19 98:15
  111:14
state   1:23 5:5,8
  121:20 123:4
  141:16 161:5
stated   59:15 124:7
  138:11 139:22
  144:4
statement   30:5
  100:5 112:22
  114:8 124:20
  132:7
statements   51:3
  74:8 84:5,10
  92:17 126:18,23
  127:3,6,25 133:13
states   1:2 4:19
stating   121:23
statistical   70:25
  77:15
statistically   45:24
  46:21 55:12 59:23
  61:25 62:12 63:9
  64:2,9 65:4,18
  70:22 90:18 91:17
  91:21 117:25
  119:8,21 136:8
  152:4 155:21
statistics   14:9,10
stay   132:20 133:20
staying   130:18
stephen   29:12
stipulated   3:3
stipulations   3:2
stock   33:16 36:2,3
  39:11,18,19 41:24
  43:10,16 44:21
  45:7,12,19 46:2,15
  46:20 56:17 58:7

58:15 59:6,21
60:7,10 61:24
62:12 63:8,18
64:10 65:5,8
66:22 67:2 70:23
71:23 72:18 73:5
73:22 76:7,20
78:10 79:2,8,10,20
85:7,10 89:8
90:23,25 94:9
95:3,9,19,22,25
99:5 101:20 111:6
111:14 114:11
118:14 119:8,20
120:14 121:2,21
137:3 155:6,7
**stocks** 96:2
**stop** 62:15
**story** 111:12
**straddles** 29:9
**strategies** 29:9
**street** 108:15
160:11
**strike** 3:10,12
94:25 154:7
**strong** 41:25 111:7
152:25 154:18
**structure** 17:23
81:8 82:25 124:9
**students** 19:12
**studied** 53:24
111:22
**studies** 54:22
60:23 74:22 75:2
75:6,7 96:25 97:2
97:5,10,18
**study** 14:23,25
15:2 45:10,17,20
46:4,23 47:6,7
54:15,20 55:10,24
56:2,23 57:21

60:20 62:14,16,20
62:21 65:7 75:25
77:15 91:25 97:23
97:24 118:9,16
155:12 156:7
**stuff** 29:25
**subject** 137:9
158:10
**subjects** 140:17
**submitted** 40:3
**subordinated**
38:17
**subparagraph**
88:11 135:11,13
**subpart** 70:6
**subscribed** 159:20
**subscribers** 34:13
**subscription** 34:12
35:16,21
**subscriptions**
34:21
**subsequent** 113:16
113:23
**subsidiaries** 92:18
**substance** 115:20
130:6
**substantive** 14:19
**subtracting** 143:7
**succinct** 93:5
**succinctly** 52:3
**sued** 38:11
**sufficient** 89:16
**suggest** 85:22 92:6
**suggested** 53:10
**suggests** 71:25
153:11
**suite** 2:4
**summarize** 70:10
**summarizes**
117:14 135:14

**summary** 11:18
14:9,10 42:13
47:16 67:21 68:3
68:5,9 70:5
117:18 135:18
**summit** 107:17
108:17
**suppliers** 33:14,17
**supply** 20:16 33:9
33:13 75:5,5
**support** 22:4,9
33:10 81:21 97:19
100:6 105:15
113:24 124:14,21
126:11 127:13
**supporting** 81:19
142:12
**sure** 7:16,20 16:4
19:15 45:15 64:5
72:12 84:13,15
87:6 107:10
110:24 122:11
138:23 142:18,25
153:4
**suspect** 116:22
**swear** 6:4
**sworn** 3:16 159:20
161:7

## t

**t** 160:7 161:2,2
**tabak** 97:25
**tables** 151:20
**take** 4:13 48:5,6
77:23 86:23 87:7
95:14 97:20
133:20 134:17,20
145:20,22 159:3
**taken** 6:20 7:5
153:13
**takes** 96:8 106:24

**talk** 20:23 21:15
31:14 40:23 91:4
93:24,24
**talked** 40:18 86:6
104:10 113:22
130:16 136:18
149:11
**talking** 10:9 19:3,5
19:6 34:25 38:10
104:20 110:24
144:3
**tasked** 40:16
**tax** 104:9
**teaching** 17:6,9,10
18:4,7,14,16,18,20
19:10
**team** 14:16
**technology** 131:20
**telecom** 128:3,7
**temporally** 51:20
**ten** 21:11 134:17
**tend** 29:21
**tendered** 11:9
68:5 149:12
**tends** 154:11
**term** 36:10 49:24
51:13 57:15,16,18
123:23 138:2
139:16 140:9
**terms** 14:11 18:16
30:2 31:3 45:21
49:14 85:17 98:4
106:4,15 109:21
147:16 157:15
**terrific** 7:17 11:18
**test** 44:9 73:19
74:22 75:8 150:21
151:23 152:18,19
152:23 153:17
154:17 155:13
156:5,14,15,17,19

**[test - transcript]**

156:20
**testified** 6:9
112:10 115:15
118:9 150:7
**testimony** 3:10,13
25:5 34:18 151:17
160:2 161:6,9
**tests** 153:14
**text** 29:12
**textbook** 29:6
**thank** 6:15 7:21
10:20 48:8 64:24
91:23 134:21
157:25 158:9,12
158:17
**theoretical** 150:19
**theories** 39:10
40:9 49:17 58:20
66:9 68:19,23
70:16 71:10,22
73:10 88:18,20
89:4 100:17
113:21 117:21
121:6 135:20,22
140:20
**theory** 49:5,12,23
50:6,7,13,18 51:10
51:12 52:4,8,12,16
53:4 83:13 88:24
89:11 94:8,8
98:19 99:16
100:18,19 102:18
103:17 105:4,14
121:9,10,23
122:16 123:15
125:13 126:13
136:2 137:2,2,18
138:19 139:9
140:6 141:18
142:7,24 146:4,9

**thereabouts** 23:7
**thing** 15:4 18:24
22:16 25:2 30:6
37:5 84:24 109:23
110:3,20,25
115:22
**things** 12:17,20
37:16 43:2 57:19
61:2 67:5 76:21
123:16 152:9
**think** 5:15 6:21,23
8:6,13,20 13:18
14:17 15:5 18:18
18:19 19:6 20:11
20:23 22:8 23:3,6
23:19,21 24:11
25:24 26:15 31:5
33:10 37:24 38:5
42:6,22 43:22
46:13 47:2,16,18
50:16,17 52:2
53:7 55:7 57:17
57:18 58:9 61:18
62:24 63:14,16
64:7 66:15 68:8
69:12,13 71:25
75:13 76:14,21
78:9 79:5 82:14
82:15 84:22 86:6
90:7,21 91:20
93:4,8 96:9 97:13
98:9,11,12 101:16
103:20 106:24
109:11,11,16,19
109:20 110:2,7,16
115:15 118:8
119:11,13 122:6,8
125:23 126:4
131:14 136:14
145:3 146:11,19
148:9 149:14

150:7,11 151:19
152:19,20 153:11
153:19 156:2
157:4
**thinking** 90:22
152:21
**third** 68:15 99:6
125:22
**thomson** 108:15
112:3 113:4
160:11
**thought** 9:14 93:5
132:13
**three** 13:17,22
16:13 48:5 63:15
64:10 68:19,23
107:11
**thursday** 111:6
**tie** 80:19
**time** 1:21 3:15 5:8
18:14,18 19:2,5,7
19:7,8 20:19,22
21:12,18 22:8,14
23:4 24:2,20
28:19 37:13 48:14
74:3 82:7 84:12
86:22 87:15 88:4
89:11 105:19
108:18 111:7
126:14 135:3
138:12 143:25
153:15,18 156:5,6
158:7,9 159:5
**times** 13:5 21:15
130:4
**timestamp** 97:12
**today** 4:23 6:24
7:23 9:7 10:3,18
58:25 115:15
127:2 130:16
136:19 158:9

**tool** 50:18 52:3
56:2,5
**tools** 49:17 73:21
75:19 76:9 144:11
144:21
**top** 72:15 108:23
111:4 120:9
135:10
**topic** 62:8 94:14
**topics** 22:16
**total** 36:10
**totally** 86:25
152:20
**trace** 15:10
**trade** 31:19 96:2
97:14 154:11
**traded** 40:11
95:22 148:23
149:8 153:25
**trades** 31:19,24
**trading** 31:23
43:17 95:3,9
97:15 98:11 153:3
154:10 155:23
157:11,13
**training** 28:3
**transaction** 31:25
38:19 49:3 50:3
50:11 51:18,23
74:10 75:17 80:8
83:2 85:18 89:10
89:23 92:15 98:22
99:11 105:20
122:4,21 124:10
125:8,9 127:15
140:11
**transcript** 107:20
107:24 108:3,16
108:22 109:2,7
110:4,14 113:11
114:4 116:12,21

**[transcript - utilized]**                                                          Page 31

128:6 129:8,17,20
131:3,6,25 132:3
133:5 134:3
160:12 161:8
**transcripts** 133:11
**transference**
92:17
**transferred**
106:15 141:6
**travers** 15:17,18
15:20,25
**travis** 13:25 14:3
**treated** 151:11
**treatment** 104:11
**trial** 78:15
**true** 12:15 42:21
49:8,9,11 50:12,13
50:21 70:14 74:13
80:10,23 81:10
83:13 85:20 86:2
86:3 88:19 94:7
100:17,25 101:10
102:18 103:17
104:7,8 105:4,8,13
106:11 121:5,9
122:4,21 135:21
137:2 139:8,17
140:6 141:18
144:20 161:8
**truly** 157:20
**trustee** 38:15
126:2
**trustees** 124:20
**truth** 53:14 61:23
66:24 67:7 99:10
122:2,19 127:5
**try** 34:4 84:23
**trying** 38:6 77:2
77:12 79:6 96:20
101:17 109:4
125:10 138:9

**tull** 2:6 5:11
**turn** 4:8 27:3
38:20 48:19,20
50:23 54:10 58:10
61:11 70:4 72:10
79:23 88:10 94:2
107:8 116:3 117:2
120:8 123:9
127:19 128:19
135:10
**turned** 7:15
**turning** 32:23 57:5
64:25 135:8
141:23 148:16
**twice** 20:24
**two** 9:3 10:15
19:18 25:25 34:15
68:16,21,22 74:14
85:13 88:17 89:3
95:3,9,16 96:3,9
96:13,16,22 97:3,3
97:6,12 100:17
135:20 140:17
**type** 15:4 18:24
22:16 23:18 25:2
30:6 115:22

**u**

**u.s.** 38:15 100:5
124:20 125:25
**ubs** 130:22
**uh** 16:25 127:23
131:16 133:3
**ultimately** 79:6
**unaltered** 47:8
**undergrad** 17:13
**underlying** 64:16
**understand** 9:4
52:18 73:24 77:13
85:24 88:8 96:21
108:11 111:11
120:5,6 124:9

126:5 138:10
139:20
**understanding**
15:13 37:6 42:8
42:17,18 43:8
52:11,16 53:2
64:5 151:4 153:5
**understandings**
42:15
**understood** 31:12
32:16 96:20
**undertake** 155:12
**undertaking**
138:25
**undertook** 65:14
65:25
**uniform** 3:7
**unit** 4:15
**united** 1:2 4:17,19
5:16
**uniti** 1:4 5:17 36:2
39:6,19 43:16
46:15 47:4 51:7
71:3,23 72:3 74:2
74:4 81:8 82:5,22
85:9,11 86:14
99:8,22 106:7,9
107:17 108:16
113:19 119:14
123:9 124:6 129:2
130:23 132:9
137:25 145:17
149:8,22 150:21
157:16 162:4
**uniti's** 39:11,18
40:10 41:24 43:10
44:21 45:7,12,19
46:2,20 51:3 59:6
61:24 63:8,18
64:10 70:23 72:18
74:6,16,19 80:25

81:24 82:2,7 83:2
84:5 85:6 94:9
95:2,8,22 119:20
120:14 137:3
148:22 153:25
155:13 156:25
**universe** 27:22
34:9
**university** 17:3
19:4,7 32:8 34:22
35:20
**unquote** 140:3
**unrelated** 57:9
65:21 66:4 100:16
103:6
**update** 155:17
**updated** 151:24
155:18 157:18
**upstream** 92:20
**use** 9:6,20 11:15
13:11,13 34:21
35:22 36:14,16,18
37:12 38:3 62:16
73:19,22 74:22
75:8 76:9 92:18
113:17,24 123:23
145:22 146:2,7,11
146:22 150:3,4,19
154:25 155:3
**useful** 101:3,4,11
101:19,23 103:9
105:11 106:15
139:18 140:10
141:5,21 148:7
**uses** 75:19 154:24
**usually** 44:19
**utilization** 63:5
**utilize** 47:7 75:11
**utilized** 42:2 43:24
46:10 156:13

**utilizing** 42:17 63:6

**v**

**valuated** 36:9
**valuation** 76:8 82:2
**value** 44:11 76:4 97:22
**varies** 21:14 22:14
**variety** 38:18 60:3
**various** 12:23 13:4 13:5,5,10 14:25 15:11 17:24 21:16 26:11 28:4 33:4,7 36:8 37:13 39:10 42:11 44:5,6,14 46:6 49:17 66:9 74:3 82:21 83:11 92:16 113:21 124:11 125:11 126:19 130:15 131:10 134:13 143:25 145:9,23
**varying** 75:4
**vast** 157:12
**ventures** 19:24 20:2,3,10,20
**venturini** 2:21 4:21
**verbiage** 30:4
**veritext** 4:22,24 162:2
**versus** 55:18,25 56:9 63:6
**video** 4:12,16
**videographer** 2:21 4:2,22 5:15,19 6:3 48:9,13 87:13 88:3 134:22 135:2 158:2,6 159:2

**videotaped** 1:19
**view** 30:16 82:10 97:16 98:11
**views** 152:23
**vii** 141:25
**violated** 49:3 50:3 98:22
**violation** 89:22 119:16 124:15 127:14 130:13 138:5,14
**virtual** 1:19 132:18
**virtually** 98:12
**visual** 10:3,17
**volatility** 14:8
**volume** 31:22,23 152:2,17 153:17 155:23 157:11

**w**

**wait** 11:4
**waived** 3:25
**waiver** 3:14,21
**wallace** 116:7 128:2,24 130:21 131:18 132:23 133:23 134:7
**want** 9:18 11:13 32:11 87:7 109:18 149:19 150:2 153:4
**wanted** 11:16 15:23 31:20 32:19 150:5 158:8
**wants** 109:10
**wardwell** 2:8 5:24
**way** 9:24 13:12 22:18 82:16 92:22 93:14 101:22 104:15 106:6 119:21 161:12

**we've** 34:25 81:5 113:22 130:16 134:15
**weakness** 111:6,10 111:15
**wealth** 33:8
**websites** 12:22
**week** 8:2,14,24 9:2 20:24 21:15 80:6
**weekend** 158:13 158:17
**welcome** 48:16 88:7 135:5
**wells** 128:3,7
**west** 2:4
**whereof** 161:14
**whispering** 4:6
**williams** 2:12 6:2 109:6
**window** 54:22 97:3,7
**windstream** 36:3 38:11,17 46:13,17 47:4 51:5 63:21 71:4 72:4 74:3,15 74:19 80:20 81:25 82:4,4,24 83:3 85:6 92:20 105:24 106:7 111:12 113:19 123:9 125:20 132:9,12 134:9
**windstream's** 51:8 73:25 81:2 84:9 85:9 118:13 126:2
**wire** 101:5,12,19 103:10 105:11 106:16 139:18 140:10 141:21
**withstand** 51:7

**witness** 3:17 5:25 6:5,8 15:18,21 25:5 43:22 44:23 45:3 48:4,8 52:10 55:7 63:14 64:14 66:15 68:8 71:19 76:14 79:5 81:17 84:22 87:6 89:2 92:4 93:4,11,20 99:18 101:16 102:21 103:20 105:17 110:12,15 112:13,18,25 116:18 118:7 122:25 126:23 129:13 130:3 134:21 136:13 137:22 140:14,22 143:16 144:8 145:2 147:8 156:13 157:25 158:12 161:6,9,14 162:5
**word** 29:19 115:23
**wording** 77:19
**words** 46:25 47:9 55:23 56:23 58:4 60:18 63:3 73:15 110:23
**work** 12:7 14:19 23:8,11,12,14 24:6 24:16 32:15 34:18 41:5 60:23 131:6 132:4 133:9
**worked** 12:13 13:19,23 15:7 16:14,16 25:20
**works** 26:21
**world** 155:11
**worries** 15:22 69:16 129:7

**[wow - zero]**                                                    Page 33

**wow**   22:11
**wrds**   35:20
**writing**   28:15
**wrong**   110:9
**wrote**   28:19
**wyman**   2:6 5:10
   5:11,20 6:12
   10:23 15:24 44:15
   45:8 47:25 48:4,6
   48:15 52:14 55:22
   64:4,23 66:20
   68:13 72:6 77:11
   79:22 82:9 86:19
   87:11 88:6 90:16
   92:21 93:6,13,22
   100:11 102:12
   103:11 104:18
   106:17 110:8,11
   110:18,22 111:2
   112:14,21 113:9
   116:23 119:4
   123:2,21 127:16
   129:22 130:17
   134:15 135:4
   136:6,20 138:8
   140:15 141:13
   144:2,19 146:6
   148:2 156:23
   157:22 158:8,16
   160:5

**x**

**x**   1:4,6,8 160:7

**y**

**yan**   8:11 13:25
   14:12 16:16 25:22
**yeah**   11:17 14:14
   16:19 30:14 38:24
   42:19 61:19 64:14
   90:21 108:10
   110:16 111:18

   116:18 151:4
   153:11
**year**   20:12,12
   111:9
**years**   21:11 22:10
   23:3
**yep**   58:12 131:24
**yesterday**   8:2,5,21
   8:23 22:10
**yield**   109:14
**york**   1:24 2:10,10
   161:5 162:2

**z**

**zero**   98:3 151:9,13
   151:22 152:16
   153:13,16 155:23

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.