UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| In re UNITI GROUP INC. SECURITIES LITIGATION | ) ) ) | Master File No. 4:19-cv-00756-BSM |
| | ) | CLASS ACTION |
| This Document Relates To:<br><br>ALL ACTIONS. | ) ) ) ) ) ) ) ) ) ) ) ) | JOINT DECLARATION OF CHRISTINE M. FOX AND DEBRA J. WYMAN IN SUPPORT OF: (I) FINAL APPROVAL OF SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION, AND (II) AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AWARDS TO PLAINTIFFS PURSUANT TO 15 U.S.C. §78u-4(a)(4) |

CHRISTINE M. FOX and DEBRA J. WYMAN, each declare as follows, pursuant to 28 U.S.C. §1746:

1.      We, Christine M. Fox, a member of the New York Bar admitted to practice before this Court *pro hac vice* and a member of the law firm of Labaton Sucharow LLP ("Labaton Sucharow"), and Debra J. Wyman, a member of the California Bar admitted to practice before this Court *pro hac vice* and a member of the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), are the Court-appointed Co-Lead Counsel for Lead Plaintiffs Steamfitters Local 449 Pension Plan ("Local 449"), Wayne County Employees' Retirement System ("Wayne County ERS"), and David McMurray, on behalf of himself and as sole beneficiary of the David McMurray R/O IRA ("McMurray" or "Mr. McMurray") (collectively, "Plaintiffs"), and Zhengxu He, Trustee for the He & Fang 2005 Revocable Living Trust, on behalf of themselves and all other members of the Settlement Class in the above-captioned action (the "Action"), submit this Declaration in support of Plaintiffs' Motion for Final Approval of Settlement and Approval of Plan of Allocation and Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses.[1]  We each have personal knowledge of the matters set forth herein based on our active participation in all material aspects of the prosecution and settlement of this Action.  If called upon, we could and would competently testify that the following facts are true and correct.

2.      The motions have the full support of Plaintiffs.  *See* Declaration of Joseph M. Little on behalf of Local 449 ("Local 449 Decl."), dated September 27, 2022, attached hereto

---

[1]     All capitalized terms used herein that are not otherwise defined shall have the meanings provided in the Stipulation and Agreement of Settlement, dated June 17, 2022 (ECF 124) (the "Stipulation").

- 1 -

as Exhibit 1, Declaration of Gerard Grysko on behalf of Wayne County ERS ("Wayne County ERS Decl."), dated September 29, 2022, attached hereto as Exhibit 2, and the Declaration of David McMurray ("McMurray Decl."), dated September 28, 2022, attached hereto as Exhibit 3.[2]

## I.    PRELIMINARY STATEMENT

3.    The proposed Settlement now before the Court provides for the full resolution of all claims in the Action, and related claims, in exchange for a cash payment of $38.875 million.  As detailed herein, Plaintiffs and Co-Lead Counsel respectfully submit that the Settlement represents a very favorable result for the Settlement Class considering the significant risks of continuing to litigate the Action.

4.    Having litigated through completion of fact discovery, Plaintiffs and Co-Lead Counsel are well-informed of the strengths and weaknesses of the claims and defenses to the claims.  In choosing to settle, Plaintiffs and Co-Lead Counsel took into consideration the substantial risks associated with advancing the claims alleged in the Action, as well as the duration and complexity of the legal proceedings that remained ahead.  As discussed in detail below, had the Settlement not been reached, there were considerable barriers to a greater recovery, or any recovery at all.

5.    In the Consolidated Amended Class Action Complaint (the "Amended Complaint" or "AC"), Plaintiffs allege that Defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") during the period from April 24,

---

[2]    Citations to "Exhibit" or "Ex.___" herein refer to exhibits to this Declaration.  For clarity, citations to exhibits that have internal exhibits will be referenced as "Exs. __-__." The first numerical reference is to the designation of the entire exhibit attached hereto and the second alphabetical reference is to the exhibit designation within the exhibit itself.

2015 to June 24, 2019, inclusive (the "Class Period"), by making materially false and misleading statements and/or failing to disclose adverse information regarding the Company's business and operations.  Specifically, Plaintiffs allege that Defendants made material misrepresentations and omissions about the April 24, 2015 Spin-Off transaction, in which Windstream Services (a non-party to this Action): (i) created Windstream Holdings;[3] (ii) which in turn created and spun-off newly formed public company Defendant Uniti Group Inc. f/k/a Communications Sales & Leasing, Inc. ("Uniti" or the "Company"), a Real Estate Investment Trust ("REIT"); (iii) to which Windstream sold its aging telecommunications assets; and (iv) which then leased back those telecommunication assets to Windstream Services' subsidiaries in exchange for cash, stock, and billions in debt (the "Master Lease"). Plaintiffs allege that this complicated and complex transaction was a wholly improper and impermissible way for Defendants to avoid certain restrictive covenants that Windstream had entered into in connection with prior unsecured notes that Windstream had issued (referred to herein as the "Indenture").  Plaintiffs allege that Uniti and Individual Defendants Kenneth A. Gunderman ("Gunderman") and Mark Wallace ("Wallace") made materially false and misleading misstatements or omissions in connection with the Spin-Off and Master Lease transactions.

6.      Plaintiffs allege that, as a result of Defendants' material misrepresentations and omissions, certain publicly traded securities of Uniti traded at artificially inflated prices

---

[3]      Windstream Holdings (the publicly traded parent of Windstream Services LLC ("Windstream Services" and together with Windstream Holdings, "Windstream")), and Windstream Services were not named as defendants in this Action because on February 25, 2019, both filed for bankruptcy protection pursuant to Chapter 11 of the U.S. Bankruptcy Code, which triggered an automatic stay preventing lawsuits against Windstream.  AC, ¶¶ 46-47.

during the Class Period, and that, when the true facts regarding the Spin-Off, the Master Lease, and the state of the Company's business operations were revealed, the price of the Company's securities dropped, causing damage to members of the class.

7.    As discussed below, this Court denied Defendants' motion to dismiss the Amended Complaint in its entirety, but proceeding to summary judgment and trial in this matter was not without risk.

8.    For instance, Defendants would have continued to vehemently argue at summary judgment and trial that the alleged false and misleading statements and omissions were inactionable.  Defendants also would have argued that Plaintiffs would not be able to demonstrate a strong inference of scienter or loss causation in connection with the alleged corrective disclosures (under a materialization of the risk theory).  Additionally, issues relating to the calculation of the class's damages would have come down to an inherently unpredictable and hotly disputed "battle of the experts," and at the time of Settlement, Defendants were actively pursuing a statute of limitations defense which they raised in their motion to dismiss and in opposition to Plaintiffs' motion for class certification.  As such, the risks of continued litigation were substantial.

9.    Further, even if Plaintiffs succeeded at summary judgment, the outcome of a jury trial, especially in a highly complex case such as this, was far from certain.  Indeed, the facts of this case were not "user-friendly" for a jury and would have required substantial explanation of multiple complicated and complex topics, including explanation of the various restrictive covenants in the Indenture, spin-off and sale-leaseback transactions, the

benefits of REITs, the underlying Master Lease transaction itself, and the allegedly false and misleading nature of Defendants' statements in relation to the Spin-Off and Master Lease.

10.    At trial, Plaintiffs would bear the burden of proof with respect to all of the elements of each of their securities fraud claims, and thus also bear the risk. Even had Plaintiffs prevailed at trial, there is still no assurance that the recovery would have been any greater than the proposed Settlement Amount. Any potential greater recovery would have also been at least partially offset by the expenses incurred by Plaintiffs' Counsel through the point of trial, and during the subsequent appeal process. Further still, even a positive outcome at trial would not guarantee a positive result for the class. Indeed, there are numerous instances of plaintiffs' verdicts in securities fraud cases being reversed by the trial court or on appeal.

11.    Despite these challenges and risks, the Settlement is well above industry trends. The $38.875 million Settlement Amount is significantly above the median settlement amount of $9.9 million for securities class actions between 2016 and 2020, is higher than the median recovery in 2021 of $8.3 million, and is well above the $14.7 million median recovery for securities class actions prosecuted and settled within the Eighth Circuit from 2012 to 2021. *See* Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements – 2021 Review and Analysis*, at 1 and 19 (Cornerstone Research 2022), attached as Ex. 11 hereto. It is also above the average securities settlement in 2021 of $20.5 million. *Id.* at 1.

12.    It is respectively submitted that the Settlement is an excellent outcome for the Settlement Class, particularly considering the current posture of the litigation and the

significant litigation risks ahead. Indeed, this case – which was litigated efficiently and aggressively from the initial complaint to the agreement to settle – spanned over two and a half years and is based on the Parties' thorough understanding of the relative strengths and weaknesses of their respective positions. At the time of settlement, fact discovery, including fact depositions, was virtually complete but for one non-party deposition, and Plaintiffs' experts were drafting their reports. It also is a superb result considering the significant risks inherent in complex securities class actions generally, and this case's specific risks, particularly with regard to proving the elements of falsity, scienter, and loss causation, as discussed *infra*.

13.    In addition to seeking approval of the Settlement, Plaintiffs seek approval of the proposed Plan of Allocation governing the calculation of claims and the distribution of the Settlement proceeds. As discussed below, the proposed Plan of Allocation was developed with the assistance of Plaintiffs' damages expert, and provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment on a *pro rata* basis based on their losses attributable to the alleged fraud.

14.    Co-Lead Counsel are also seeking an award of attorneys' fees and payment of expenses, on behalf of all Plaintiffs' Counsel,[4] of 30% of the Settlement Fund, and submit that such a request is fair both to the Settlement Class and counsel, and warrants the Court's approval. This fee request is on par with fee percentages frequently awarded in this type of action and, under the facts of this case, is justified considering the benefits that Co-Lead

---

[4]    Plaintiffs' Counsel are Co-Lead Counsel and Patton Tidwell Culbertson, LLP, Schall Law Firm, Thornton Law Firm LLP, and Glancy Prongay & Murray LLP.

Counsel conferred on the Settlement Class, the risks they undertook, the quality of the representation, the nature and extent of the legal services, and the fact that Plaintiffs' Counsel pursued the case at their own financial risk.

15. Co-Lead Counsel also seek litigation expenses in the amount of $1,305,093.51, plus reimbursement to Plaintiffs Local 449, Wayne County ERS, and David McMurray pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4(a)(4) ("PSLRA"), for their efforts on behalf of the class in the aggregate amount of $19,034.44. The expense amounts are less than the maximum amount of expenses of $1.6 million provided for in the Notice.

## II.   RELEVANT PROCEDURAL HISTORY

### A.   The Initial Complaint and Appointment of Lead Plaintiffs and Co-Lead Counsel

16. On October 25, 2019, an initial complaint was filed in the U.S. District Court for the Eastern District of Arkansas on behalf of all investors who purchased or otherwise acquired Uniti securities, alleging violations of the Exchange Act against Defendants Uniti; the Company's Chief Executive Officer ("CEO") and President Kenneth A. Gunderman ("Gunderman"); and the Company's Chief Financial Officer ("CFO"), Treasurer and Executive Vice President Mark Wallace ("Wallace"). *See Safadi v. Uniti Group Inc., et al.*, No. 4:19-cv-00756-BSM (the "*Sadafi* Action"). The *Sadafi* Action alleged a class period from April 20, 2015 to February 15, 2019, inclusive.

17. On December 6, 2019, a separate complaint was filed in the U.S. District Court for the Eastern District of Arkansas on behalf of all investors who purchased or otherwise acquired Uniti securities, alleging violations of the Exchange Act against Defendants Uniti,

Gunderman, and Wallace. *See Queder v. Uniti Group Inc., et al.*, No. 4:19-cv-00873-BSM (the "*Queder* Action"). The *Queder* Action alleged a class period from April 20, 2015 to February 15, 2019, inclusive.[5]

18.    Both Actions were governed by the provisions of the PSLRA, which provides for consolidation of all related actions and the appointment of a lead plaintiff and lead counsel, after a 60-day notice period expires following the publication of notice of the filing of an initial securities class action. *See* 15 U.S.C. §78u-4(a)(3).

19.    On December 30, 2019, Local 449, Wayne County ERS, and McMurray (together, the "Uniti Investor Group"), jointly filed a motion for consolidation, appointment as lead plaintiff, and approval of selection of Labaton Sucharow LLP as lead counsel. ECFs 28-30.

20.    On December 30, 2019, Zhengxu He, Trustee for the He & Fang 2005 Revocable Living Trust ("Mr. He") filed a motion for consolidation, appointment as lead plaintiff, and approval of selection of Robbins Geller Rudman & Dowd LLP as lead counsel. ECFs 32-34.

21.    On March 12, 2020, the Court consolidated both the *Sadafi* Action and the *Queder* Action into *In re Uniti Group Inc. Securities Litigation*, Master File No. 4:19-cv-00756-BSM. *See* ECF 44 (the "Consolidation Order"). On April 14, 2020, after the Uniti Investor Group and Mr. He moved the Court for an Order clarifying the Court's

---

[5]    Another, separate, complaint was filed on December 23, 2019, in the U.S. District Court for the Eastern District of Arkansas on behalf of all purchasers of Uniti common stock between April 20, 2015 and June 24, 2019, inclusive. *See Avery v. Uniti Group Inc., et al.*, No. 4:19-cv-00927-LPR (the "*Avery* Action"). However, plaintiff in the *Avery* Action filed a notice of voluntary dismissal on March 9, 2020, and the Court dismissed the case without prejudice on March 10, 2020. *See Avery* Action, ECFs 10-12.

Consolidation Order (*see* ECF 50), the Court appointed both the Uniti Investor Group and Mr. He as Lead Plaintiffs and appointed Labaton Sucharow LLP and Robbins Geller Rudman & Dowd LLP as Co-Lead Counsel.  ECF 60.[6]

## B.    The Amended Complaint

22.    After their appointment on April 14, 2020, Lead Plaintiffs Local 449, Wayne County ERS, Mr. McMurray, and Mr. He, through Co-Lead Counsel, continued their investigation into the claims for the purpose of drafting a comprehensive amended consolidated complaint.  During this process, Co-Lead Counsel engaged in a thorough factual investigation that included, among other things, the review and analysis of: (i) press releases, news articles, and other public statements issued by or concerning Uniti, Windstream (as defined herein *supra* n.3), and the Individual Defendants; (ii) research reports issued by financial analysts concerning Uniti's and Windstream's business; (iii) Uniti's and Windstream's filings with the SEC; (iv) news articles, media reports and other publications concerning Uniti and Windstream, and concerning the telecommunications industry; (v) trial transcripts and trial exhibits from a related litigation pending in federal court in the Southern District of New York; (vi) pleadings from the Adversary Proceeding;[7] and (vii) other publicly available information and data concerning Uniti, Windstream, their securities, and the markets therefor.  In furtherance of the

---

[6]    While the Court appointed Mr. He as a Lead Plaintiff, and although Mr. He did not participate in discovery and did not seek to be appointed a class representative, he remains a Lead Plaintiff to this day and supports the settlement.

[7]    The "Adversary Proceeding" refers to the proceeding filed against Uniti in connection with Windstream's bankruptcy action.  *See Windstream Holdings, Inc., et al. v. Uniti Grp., Inc., et al.*, No. 7:19-AP-08279 (Bankr. S.D.N.Y. filed July 25, 2019).

allegations against Defendants, Co-Lead Counsel consulted with an expert in damages and loss causation.

23.     Co-Lead Counsel identified and contacted approximately 64 former Uniti employees and other persons with potentially relevant knowledge, and had formal interviews with 24 of them.  Co-Lead Counsel also identified and contacted approximately 18 former Windstream employees and other persons with potentially relevant knowledge, and had formal interviews with 6 of them.

24.     Co-Lead Counsel's preparation of the Amended Complaint required significant investigation, meetings, and analysis given the complexities of the case.  For example, the misstatements and omissions at issue here turned on the validity of the April 24, 2015 REIT Spin-Off, through which Uniti was formed and the Master Lease entered into with Windstream Services .  *See* AC, ¶¶53-59.

25.     According to the Amended Complaint, this Master Lease transaction was in violation of certain restrictive covenants that Windstream had previously entered into in connection with certain unsecured notes that Windstream issued (*i.e.*, the Indenture) – specifically, that Windstream Services, or its operating subsidiaries, were prohibited from selling any of Windstream's network and telecommunications assets to an entity and then leasing them back.  Additionally, Windstream also had to be sure that the lease it ultimately entered into with Uniti (the Master Lease) appeared to be a "true lease" and not a "financing," because if the "lease" entered into was really a financing in disguise, Windstream also risked violating certain other restrictive covenants in the Indenture. Importantly, if the purported lease breached the restrictive covenants of the Indenture,

noteholders representing 25 percent or more of the aggregate principal amount of the unsecured notes could seek to accelerate payments on the unsecured notes from Windstream, a figure in the ***hundreds of millions of dollars*** that could potentially trigger a Windstream bankruptcy. *See* AC, ¶¶8-9.

26.  Plaintiffs alleged that throughout the Class Period, Defendants repeatedly concealed that the Spin-Off violated the Indenture by hiding from the market and investors: (i) the material risk that the Spin-Off was a prohibited sale-leaseback transaction that violated the Indenture, and (ii) the true extent of the risk that the Master Lease was not a true lease, but rather a carefully disguised financing arrangement that: (a) violated various provisions of the Indenture (including debt and asset sale restrictions); (b) jeopardized Uniti's existence as a REIT; and (c) put Uniti and its investors at materially greater financial risk in the event Windstream filed for bankruptcy. AC, ¶16.

27.  In connection with preparation of the Amended Complaint, Co-Lead Counsel reviewed trial transcripts and exhibits from a related litigation pending in federal court in the Southern District of New York before the Honorable Jesse Furman.

28.  Co-Lead Counsel also reviewed numerous research reports issued by financial analysts concerning the Company's business and operations, as well as transcripts of conference calls hosted by Defendants during which analysts asked relevant questions concerning the Company's operations.

29.  In consultation with Plaintiffs' damages expert, Co-Lead Counsel reviewed statistically significant stock price movements for an extended period both before and after the class period alleged in the initial complaints.  Based on this review and the ongoing

analysis of developments in the Action, Co-Lead Counsel identified allegedly statistically significant stock price declines and related disclosures, which were included in the Amended Complaint as allegedly corrective disclosures, including the revelation of some previously concealed adverse information, in: (i) August 2017, (ii) on September 25, 2017, (iii) on February 15, 2019, and (iv) on June 24, 2019. *See* AC, ¶¶247-266.

30.     Accordingly, as result of this thorough investigation and analysis of Defendants' actions, on May 11, 2020, Plaintiffs and Mr. He filed the operative Amended Complaint, ECF 62.  The Amended Complaint alleges claims against Defendants Uniti, Gunderman, and Wallace – and pled a Class Period from April 24, 2015 to June 24, 2019, inclusive.

### C.     Defendants' Motion to Dismiss

31.     On July 10, 2020, Defendants filed their motion to dismiss the Amended Complaint. *See* ECF 64 ("MTD").  Defendants argued that the Amended Complaint should be dismissed for several reasons.  First, Defendants argued that Plaintiffs had failed to identify any actionable misstatement or omission or to plead with particularity the reasons why any of Defendants' public statements were misleading, because Defendants had no duty to disclose "speculative" litigation risks.  *See* MTD at 2.  According to Defendants, such risks are "classic 'soft information' that is not actionable unless it is 'virtually . . . certain' to occur."  *Id.*

32.     Second, Defendants argued that Plaintiffs did not meet their burden under the PSLRA to plead facts that give rise to a strong inference that Defendants acted with scienter in allegedly failing to disclose such risks.  *Id.*

33. Third, Defendants argued that Plaintiffs failed to adequately plead loss causation.

34. Additionally, Defendants argued that the statute of limitations barred certain claims because Defendants argued those claims were brought more than two years after a reasonably diligent investor would have discovered them.

**D.     Plaintiffs' Opposition Brief**

35. Plaintiffs and Mr. He filed their opposition to Defendants' motion to dismiss the Amended Complaint on September 8, 2020.  *See* ECF 66.

36. Among other things, Plaintiffs countered Defendants' framework of the issues, by arguing that by choosing to speak about the propriety of the Spin-Off and Master Lease, the Defendants were obligated to speak the full truth – *i.e.*, that the Spin-Off was, in fact, designed to misleadingly to appear as though it complied with the provisions of the Indenture, and that the Master Lease was not a "true lease," but merely a disguised financing arrangement that also violated the Indenture and provided no protection to Uniti's lease payment should Windstream file for bankruptcy.  *Id.* at 21-23.

37. Further, Plaintiffs argued that contrary to Defendants' assertions, the Amended Complaint did not plead non-actionable "soft" statements, but rather, alleged that Defendants failed to disclose hard facts: *i.e.*, that the structure of the Spin-Off and Master Lease transaction violated Windstream's Indenture from inception.  Plaintiffs alleged that the hard facts about the nature of the Spin-Off and Master Lease that Defendants failed to disclose included: (i) that the transaction creating Uniti violated the Indenture; (ii) the Master Lease also violated the Indenture and offered no protection to Uniti should its legitimacy as a "true lease" be challenged; and (iii) that Defendants drafted and received internal documents, and

attended meetings, revealing their awareness of the issues Plaintiffs allege were not disclosed. *Id.* at 27.

38.     Plaintiffs also argued that the balance of competing inferences supported a strong inference of scienter, because *inter alia*, (i) internal documents (including Board materials and emails pled in detail in the Amended Complaint) demonstrated that Defendants knew that the Spin-Off and Master Lease violated the restrictive covenants in the Indenture; (ii) Defendants were internally advised to offer vague and non-responsive answers to questions concerning the impact of the Indenture's restrictive covenants on the Spin-Off and Master Lease; (iii) Defendants received a "true lease" opinion prepared by the law firm Skadden Arps Slate Meagher & Flom and delivered to Uniti management, which expressly cautioned Defendants that, as structured, the Master Lease could be deemed a "sale-leaseback transaction;" (iv) the negotiations between Windstream and Uniti were not at "arm's-length" given the significant and substantial overlap between executive management at Windstream and Uniti (*e.g.*, John Fletcher, who was both General Counsel at Windstream and Uniti also served as Uniti's Executive Vice President); and (v) Defendants had motive and opportunity to commit fraud. *Id.* at 41-50.

39.     In addition, Plaintiffs argued that the Amended Complaint explicitly pled a materialization of the risk theory of loss causation, an approach specifically sanctioned by the Eighth Circuit, and therefore, they had adequately alleged loss causation. *See id.* at 52.

40.     On October 23, 2020, Defendants filed their Reply in response to Plaintiffs' opposition. *See* ECF 68.

### E.    The Court's Order on Defendants' Motion to Dismiss

41.    On March 31, 2021, the Court issued its Order denying Defendants' motion to dismiss in its entirety.  ECF 74 ( "MTD Order").

42.    In the MTD Order, the Court held that "Plaintiffs have sufficiently alleged material misrepresentations because they have pleaded that defendants failed to disclose the prohibited structure of the spin-off transaction and Master Lease." *Id.* at 4.  Specifically, the Court found that "[w]hile defendants did not have a duty to 'publicly opine' on the legality of their actions . . . they had the duty to disclose what their actions were." *Id.* at 6. Additionally, the Court also rejected Defendants' argument that the PSLRA's safe harbor was applicable, finding that "[b]ecause defendants' statement concerned the belief they held at the time the statement was made, the PSLRA safe harbor does not apply." *Id.*

43.    As to scienter, the Court found that Plaintiffs adequately alleged a strong inference of scienter when viewing all the allegations in totality, citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).  *See* MTD Order, at 7.

44.    The Court also found that Plaintiffs sufficiently pled loss causation because they had alleged that defendants could have foreseen their economic loss, and that Plaintiffs actually had suffered economic loss.  *See* MTD Order, at 8.

45.    Additionally, the Court upheld Plaintiffs' scheme liability claim (under Rule 10b-5(a) and (c)), finding the defendants committed a deceptive act with scienter, that the act was in connection with the purchase or sale of securities, and that the defendants' actions caused Plaintiffs' injuries.  MTD Order, at 9.

46.    The Court also upheld Plaintiffs' control-person liability claim under Section 20(a) of the Exchange Act.  MTD Order, at 10.

- 15 -

### F.    Defendants' Motion for Reconsideration

47.    On April 15, 2021, Defendants filed their Motion for Reconsideration of the Court's MTD Order, or in the alternative, Certification for Interlocutory Appeal.  ECFs 76-77 (the "Motion for Reconsideration").

48.    On April 29, 2021, Plaintiffs filed their Response in Opposition to Defendants' Motion for Reconsideration.  ECF 78.

49.    On December 22, 2021, the Court denied Defendants' Motion for Reconsideration (including the Certification for Interlocutory Appeal), finding that Defendants failed to satisfy the burden imposed by 28 U.S.C. §1292(b), and did not show "(1) a controlling question of law as to which there is (2) a substantial ground for difference of opinion and upon which (3) a decision will materially advance the ultimate outcome of the litigation." *See* ECF 104 at 1.

## III.    DISCOVERY

50.    As set forth in detail below, Plaintiffs: (i) prepared and served detailed discovery requests on Defendants, including requests for production of documents and interrogatories; (ii) met and conferred with Defendants' Counsel on countless occasions concerning the discovery served by both sides and the search terms and protocols to be used to collect documents and data responsive to those discovery requests; (iii) identified 11 non-parties with potentially relevant documents and served these non-parties with subpoenas and negotiated the production of information pursuant to many of those subpoenas; (iv) produced or received production of over 1,300,000 pages of documents from Defendants, Plaintiffs, and numerous non-parties (approximately 952,155 pages from Defendants, 1,022 pages from FOIA requests, 11,299 pages from Plaintiffs, and 338,056 pages from non-parties); (v) took,

defended, or otherwise participated in 13 remote depositions, including defending the depositions of corporate representatives of Plaintiffs Local 449 and Wayne County ERS, and Mr. McMurray's personal deposition, as well as defending the deposition of Plaintiffs' market efficiency expert, Chad Coffman; (vi) negotiated and resolved a myriad of discovery disputes; and (vii) engaged and consulted frequently with several experts—including Plaintiffs' (a) REIT expert, (b) accounting experts, and (c) damages and loss causation expert, each of whom were in the process of preparing expert reports when the Parties reached a Settlement.

51.     Prior to document production by the Parties, Co-Lead Counsel and Defendants' Counsel negotiated a comprehensive confidentiality agreement and ESI agreement.  The confidentiality agreement was submitted to and approved by the Court.  *See* ECF 84.

52.     During discovery, Co-Lead Counsel operated efficiently and flexibly, altering the size of the litigation team to fit the needs of the case and designating sub-teams to handle the many different aspects of discovery, such as Defendants' production, non-party productions, deposition preparation, as well as a specific team dedicated to documents supporting class certification issues.

53.     Throughout the discovery process, Co-Lead Counsel: (i) reviewed documents; (ii) assessed discovery issues; (iii) formulated litigation strategies; (iv) maintained the document review platform Relativity (managed and hosted by Robbins Geller); (v) drafted and reviewed correspondence and documents regarding discovery disputes; (vi) prepared for and defended client depositions; (vii) worked with Plaintiffs' experts; and (viii) prepared for and took fact depositions.  Co-Lead Counsel worked together to effectively and efficiently

manage the discovery process, maintaining the flexibility to aggressively litigate issues as they arose, while also keeping the active teams efficiently staffed.

**A.     Discovery Propounded on Defendants**

54.     Plaintiffs served their first set of document requests on Defendants on May 7, 2021.

55.     Plaintiffs served their first set of requests for admission on Defendants on September 21, 2021.   Plaintiffs served their second set of requests for admission on Defendants on February 23, 2022.

56.     Plaintiffs served their first set of interrogatories on Defendants on February 23, 2022.

57.     Plaintiffs served a Notice of 30(b)(6) Deposition on Uniti on September 15, 2021, which included 13 topics for examination.  The Parties met and conferred several times on the scope of the corporate depositions.

58.     Over the span of several months, the Parties engaged in numerous meet-and-confer conferences (typically, via video conference) and exchanged multiple meet and confer letters and emails, as to the scope and manner of the requested document productions, interrogatories, and corporate depositions, including issues pertaining to search terms and custodians for electronically stored information ("ESI"), production of documents in related actions – including production of documents from the Adversary Proceeding – and other disputes related to the requests.  Through this comprehensive effort, the Parties were able to reach an understanding as to the scope of discovery on most issues, and reached many compromises without having to seek the Court's intervention.

59.     A team of experienced attorneys reviewed and analyzed the document productions.  These attorneys have all worked on multiple securities cases and specialize in securities and/or corporate governance litigation, and are experienced in utilizing the latest technology with respect to electronic document review.  Weekly video-conference document review sessions were held with the litigation teams from Plaintiffs' Counsel to discuss the results of the ongoing review and additional searches to be conducted by the review teams.

60.     As the production of documents by Defendants and third-parties ramped up, so too did the size of Plaintiffs' review teams – in an effort to maximize effectiveness.  These attorneys focused on reviewing Defendants' and third-parties' document productions for the purpose of preparing for class certification, fact depositions, expert reports and depositions, trial preparation, as well as, eventually, preparing for mediation.  Document review and coding was primarily completed by a five-member review team provided by Labaton Sucharow, a two-member review team provided by Robbins Geller, and a two-member review team provided by Glancy Prongay & Murray LLP.

61.     In addition, the discovery review teams reviewed Defendants' privilege logs which collectively contained more than 5,500 entries.  Defendants also produced categorical privilege logs from the underlying Adversary Proceeding.  At the time of Settlement, Plaintiffs were preparing to challenge certain entries in the privilege log.  Plaintiffs were also preparing letters to Defendants' Counsel regarding certain deficiencies in Defendants' document production.

**B.     Depositions**

62.     At the time of settlement, Plaintiffs had taken remote depositions of the following eight current or former Uniti and Windstream executives:

(a)     Bill DiTullio (Uniti) – March 4, 2022;

(b)     Anthony Thomas (Windstream) – March 9, 2022;

(c)     Robert Gunderman (Windstream) – March 10, 2022;

(d)     Jeffrey Small (Windstream) – March 14, 2022;

(e)     John P. Fletcher (Uniti /Windstream) – March 16, 2022;

(f)     John Eichler (Windstream) – March 17, 2022;

(g)     Kenny Gunderman (Uniti /Windstream) – March 22, 2022; and

(h)     Francis X. Frantz (Uniti) – March 23, 2022.

63.     Plaintiffs also took the deposition of:

(a)     Christopher James (Defendants' market efficiency expert) – February 4, 2022.

64.     Defendants, in turn, had taken the depositions of the following four individuals, at the time of settlement:

(a)     Chad Coffman, CFA, President of Global Economics Group, LLC (Plaintiffs' market efficiency expert) – December 6, 2021;

(b)     David McMurray (named Plaintiff) – December 7, 2021;

(c)     Joseph Little (representative for Local 449) – December 8, 2021; and

(d)     Gerard Grysko (representative for Wayne County ERS) – December 10, 2021.

65.     At the time of settlement, Plaintiffs were preparing to take the deposition of Jason Chao (Ernst & Young).

66.    Collectively, the depositions provided substantial evidence and insight into events during the Class Period reflecting upon the alleged falsity of Defendants' alleged misstatements and omissions, and Defendants' scienter.  However, they also provided a preview of the difficulties of proving Plaintiffs' complex and intricate case through adverse witnesses aligned with the Defendants.

### C.    Discovery Propounded on Plaintiffs

67.    Defendants also aggressively sought discovery from Plaintiffs.  Defendants served their first set of requests for production of documents by Plaintiffs on August 16, 2021. At the time the Settlement was reached, Plaintiffs had produced documents as follows:

(a)    Local 449:  Produced 4,894 pages of documents;

(b)    Wayne County ERS:  Produced 5,811 pages of documents; and

(c)    David McMurray:  Produced 594 pages of documents.

68.    Defendants also sought documents pursuant to subpoena from certain third-party investment managers of Local 449 and Wayne County ERS.

69.    The Parties were actively discussing the sufficiency of Plaintiffs' productions at the time the Settlement was reached.  Indeed, as discussed herein, Defendants moved to compel the production of certain additional information and documents from Plaintiffs.

70.    On September 8, 2021, Defendants served their first set of interrogatories directed to Plaintiffs.

71.    On February 23, 2022, as fact discovery was coming to a close, Defendants served their first set of requests for admissions and second set of interrogatories directed to Plaintiffs, which included 11 contention interrogatories and 99 requests for admissions.

72.    As a result of the breadth of Defendants' document requests, the Parties engaged in extended and substantial meet-and-confer conferences to negotiate the scope of production concerning the interrogatories, requests for admission, and document production.

73.    With respect to class certification, Defendants deposed Chad Coffman, CFA, Founder & President of Global Economics Group, LLC and Plaintiffs' market efficiency expert, on December 6, 2021, via videoconference.    The deposition concerned Mr. Coffman's expertise on market efficiency as it related to Plaintiffs' motion for class certification and his additional expertise as Plaintiffs' expert in damages, which were to be calculated under the "out-of-pocket" method such that damages are equal to the artificial inflation in the share price at the time of the purchase minus the artificial inflation at the time of purchase (subject to the PSLRA "90-day lookback" period).  *See* ECF 92-1 at 41.

74.    While the depositions of Plaintiffs' representatives and expert provided strong support for Plaintiffs' claims and support for class certification, they also provided a preview of the difficulties of proving Plaintiffs' case, particularly with respect to loss causation and damages.

**D.    Non-Party Discovery**

75.    In addition to the documents collected from Defendants, Co-Lead Counsel identified over 11 non-parties with potentially relevant information and served subpoenas on third-parties for the production of documents, including various state government agencies which produced documents pursuant to Plaintiffs' FOIA requests.

76.    The Parties engaged in various meet and confer sessions and negotiations with third-parties regarding their production of documents.  A total of 46,144 documents and approximately 338,000 pages were produced by 11 third-parties.  These third-parties

included entities such as Windstream, US Bank, FINRA, and Aurelius Capital.  Plaintiffs also successfully received documents from various state government agencies in Georgia, Kentucky, and North Carolina.  Review of the produced documents was conducted using targeted search terms, date limiters, and the use of metadata analytics to efficiently identify relevant documents.

### E.    Discovery Disputes

77.    As described above, discovery in this matter was both intense and voluminous. The Parties held multiple meet-and-confer sessions throughout discovery, and were able to resolve many of the discovery disputes that arose throughout the litigation without the Court's intervention.

78.    On November 12, 2021, following numerous meet and confers and Plaintiffs' Responses and Objections to Defendants' discovery requests, Defendants filed a motion to compel production of certain additional discovery (*see* ECFs 95-96) from Plaintiffs, including the following:

(a)    "transcripts of all testimony offered by You or Your representative in a securities lawsuit and accompanying exhibits."  (Defts' RFP No. 39);

(b)    all documents "relating to (a) any civil or criminal charges, sanctions, complaints, proceedings, fines, disciplinary actions, decisions, or judgments filed, issued, or entered" against Plaintiffs or (b) any investigations of [Plaintiffs] by any governmental agency, stock exchange, self-regulatory organization, or securities industry association." (Defts' RFP No. 40); and

- 23 -

(c)     Defendants' Interrogatory No. 11, which asked Plaintiffs to identify, for each allegedly false or misleading statement in the Amended Complaint, "the date on which you or your counsel first discovered that the statement was false or misleading."

79.     On September 15, 2021, Plaintiffs served their Responses and Objections, objecting to the production of documents requested by RFPs No. 39 and 40 above.

80.     On October 8, 2021, Plaintiffs served their Responses and Objections, objecting to, among other Requests, Interrogatory No. 11, on the basis that such information is protected under the attorney-client privilege and work product doctrine.

81.     Following numerous meet and confers, Defendants filed their motion to compel on November 12, 2021.  *See* ECF 96.

82.     On November 24, 2021, Plaintiffs filed their Response in Opposition to Defendants' motion to compel, arguing, *inter alia*, that (i) Plaintiffs had already provided Defendants with the information about when they each learned and first discovered that the certain challenged statements were false and misleading, and as such, the motion improperly sought information about when Plaintiffs' counsel learned such information, which is protected by the work-product doctrine; (ii) Plaintiffs' investments in other securities had no bearing on these class certification issues, especially considering that – because Plaintiffs do not even need to establish actual reliance on any specific representation Uniti made to investors or on market prices generally – their testimony on these issues in other cases is irrelevant here; and (iii) Defendants seeking information dating back ten years relating to any prior civil or criminal proceedings or investigations brought against Plaintiffs was extremely overly broad in scope.  *See* ECF 97.

83.     On February 7, 2022, the Court denied Defendants' motion to compel as to RFP No. 39, but granted Defendants' motion to compel response to Interrogatory No. 11.  As to RFP No. 40, the Court granted in part Defendants' motion to compel.  *See* ECF 114.

**F.      Expert Discovery**

84.     In preparation for expert discovery, Plaintiffs engaged experts in the fields of: (i) accounting and valuation, (ii) Federal Income Tax and Real Estate Investment Trusts, (iii) and market efficiency, loss causation, and damages.

(a)      Plaintiffs' experts in the field of accounting provided advice to Co-Lead Counsel throughout fact discovery and were preparing an expert report in connection with the Master Lease transaction.  More specifically, the accounting experts were analyzing whether: (i) the Spin-Off and Master Lease were negotiated at arm's length; (ii) the Spin-Off was set up to fail from the outset; (iii) the Spin-Off and Master Lease were detrimental to Uniti (as opposed to Windstream) from the outset; and (iv) inconsistent accounting valuations were used in connection with the Spin-Off and Master Lease transactions.  The accounting experts also analyzed whether the Master Lease was more akin to a structured debt financing than a "true lease," under an accounting-specific analysis; and the accounting implications of: (i) the Indenture Breach, (ii) the Aurelius Litigation, (iii) Windstream's Bankruptcy, and (iv) the Adversarial Proceedings;

(b)      Plaintiffs' expert in the field of Federal Income Tax and Real Estate Investment Trusts provided advice to Co-Lead Counsel throughout fact discovery and was preparing a report on the validity of the Master Lease.  More specifically, the expert was analyzing whether the Master Lease could be considered a "true lease" under a real-estate and tax specific analysis, and whether the purportedly transferred assets under the transaction

would qualify for REIT treatment and/or preferential tax treatment from the outset, and as a result of the Aurelius Litigation and Adversary Proceeding; and

(c) Plaintiffs also retained an expert in the field of market efficiency, loss causation and damages. In connection with class certification, the expert provided a report on the market efficiency of Uniti's common stock and options during the Class Period. The expert provided advice to Co-Lead Counsel throughout fact discovery and had prepared a merits report on loss causation and damages when the case settled. The expert also provided substantial assistance in analyzing different damages scenarios in connection with the mediation and assisted in the preparation of the Plan of Allocation for the Settlement proceeds.

85. Throughout fact discovery, Plaintiffs held weekly video-conference meetings with their experts.

86. At the time the Parties agreed to settle the Action, Plaintiffs' experts were preparing (or had already substantially prepared) expert reports for use at summary judgment and trial.

### G.   Plaintiffs' Motion for Class Certification

87. On October 25, 2021, Plaintiffs moved for certification of the class, appointment of McMurray, Local 449, and Wayne County ERS as class representatives pursuant to Rules 23(a) and 23(b)(3), and appointment of Labaton Sucharow and Robbins Geller as Class Counsel. ECFs 90-92. In connection with this motion, Plaintiffs filed an expert report on market efficiency by Mr. Coffman, CFA (ECF 92-1). Mr. Coffman conducted a detailed event study concerning: (i) the average weekly trading volume of Uniti's stock, (ii) the number of securities analysts following and reporting on Uniti, (iii) the

extent to which market makers traded in Uniti's stock, (iv) Uniti's eligibility to file an SEC Registration Form S-3, and (v) the demonstration of a cause-and-effect relationship between unexpected, material disclosures and changes in Uniti's stock's price. These factors are widely known as the *Cammer* factors.

88. Mr. Coffman also conducted an analysis of (i) Uniti's market capitalization (calculated as the number of shares multiplied by the prevailing price), (ii) the bid-ask spread for Uniti's stock, (iii) the public float (the amount of shares not held by insiders), (iv) the number of institutional owners of Uniti stock, (v) autocorrelation (*i.e.*, if previous price movements of a security have the ability to predict future price movements), and (vi) and the volume of options trading in Uniti common stock. These factors are widely known as the *Krogman* factors.

89. As a result of all the above, Mr. Coffman concluded that the market for Uniti's common stock was efficient throughout the Class Period.

90. Additionally, Mr. Coffman also concluded that the market for Uniti's options (both call options and put options) was also efficient throughout the Class Period. Mr. Coffman's Opening Report and Rebuttal Report (including his Declaration Regarding Calculation of Returns for Uniti Options, *see* ECF 111) provide independent evidence for the market efficiency of the defined Uniti options based upon the: (i) "put-call parity" test, which is "a standard method for evaluating efficient trading in options markets," and (ii) the

cause-and-effect test, which established an affirmative finding of the Fifth *Cammer* factor.[8]
*See* ECF 92-1 at ¶¶85-88; 91-93.

91.    Defendants deposed Mr. Coffman on December 6, 2021 concerning his expert report and opinion.  Co-Lead Counsel defended the deposition of Mr. Coffman.

92.    Defendants submitted an opposition to Plaintiffs' motion for class certification on December 23, 2021, with an accompanying expert report from Defendants' expert Dr. Christopher M. James.  *See* ECFs 105-106.

93.    Defendants argued that Plaintiffs failed to meet their burden of establishing predominance and adequacy, two requirements under Rule 23.  Specifically, as to their predominance arguments, Defendants asserted that (i) Plaintiffs failed to show that damages could be measured on a class-wide basis; and (ii) common issues of reliance do not predominate, because – as Defendants framed it – "(1) *no* class can be certified in connection with Plaintiffs' "True Lease Theory"; (2) any class related to the "Sale-Leaseback Theory" must be limited to the period from April 24, 2015 to September 25, 2017; and (3) any class related to the "Navigating the Bankruptcy Theory" must be limited to the period from March 18, 2019 to June 24, 2019." ECF 105 at 14.  Additionally, Defendants argued that Plaintiffs cannot certify a class on behalf of options traders because they lack standing to assert such claims and fail to show that the market for Uniti options was efficient, as necessary to invoke the fraud-on-the-market presumption of reliance.  *Id.*

---

[8]    The Fifth *Cammer* factor refers to "empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).

94.     As to adequacy, Defendants argued that the proposed class representatives, *i.e.*, Local 449, Wayne County ERS, and McMurray, are mere "figureheads" who had no meaningful role or oversight over the Action. *Id.* at 37.

95.     On February 22, 2022, Plaintiffs filed their reply brief in further support of their motion for class certification. ECFs 115-116. Accompanying the reply brief was Mr. Coffman's expert Rebuttal Report which, among other things, responded to the arguments made by Defendants' expert Dr. James. ECF 116-1. Plaintiffs argued that expert discovery demonstrated there was one unified theory of loss causation and damages, and Plaintiffs had sufficiently demonstrated market efficiency. *See* ECF 115. Further, Plaintiffs argued that their theory of damages was consistent with their theory of liability, that Defendants had not met their burden of proving lack of price impact sufficient to rebut the *Basic* presumption of reliance, that Plaintiffs' reliance on the out-of-pocket damages model was sufficient to satisfy the requirement of presenting a class-wide damages methodology, and that Plaintiffs' proposed class representatives were adequate. *Id.*

96.     Additionally, Plaintiffs argued that Defendants' assertions regarding price impact were actually poorly disguised and premature loss causation arguments, and that Defendants 1) conceded that price impact existed with respect to two of Plaintiffs' alleged partial disclosures (*i.e.*, September 25, 2017 and June 24, 2019); and 2) had failed to produce any evidence of ***no*** price impact for the two remaining alleged partial disclosures (*i.e.*, August 3, 2017 and February 15, 2019). *Id.*

97.     At the time the Settlement was reached, the Court had not yet ruled on Plaintiffs' motion for class certification. Because the Parties entered into the Stipulation and

notified the Court of the Agreement on June 17, 2022 (*see* ECF 124), and because the Court granted certification of the Settlement Class for Settlement purposes on July 20, 2022 (*see* ECF 128), the Court denied Plaintiffs' motion for class certification as moot on July 29, 2022. ECF 130.

## IV.    MEDIATION

98.    The proposed Settlement resulted from a thoughtful and demanding process. Early in the litigation, the Parties were cognizant that prolonged litigation would likely quickly result in both sides expending significant resources. Given that fact, the Parties considered both the advisability of a negotiated resolution of the litigation, and the means by which they could do so in a manner that protected their respective interests.

99.    On March 24, 2022 – and at the end of fact discovery – the Parties engaged in a confidential mediation session before Mr. David M. Murphy of Phillips ADR, who has three decades of experience representing plaintiffs and defendants before courts and arbitration panels across the country. Mr. Murphy is one of the nation's preeminent mediators and has significant experience mediating complex securities class actions such as this one. In advance of the mediation, the Parties provided to Mr. Murphy, and exchanged amongst themselves, detailed mediation material including mediation briefs and hundreds of accompanying exhibits. Co-Lead Counsel put extensive time and effort into preparing for the mediation and submitting the detailed mediation statements and related material. The Parties also responded to detailed written merits and damages related questions from Mr. Murphy, both in advance of and during the mediation session. Among other things, the submissions and Mediator's questions probed the strengths and weaknesses of Plaintiffs' claims, and the Parties' anticipated arguments at summary judgment and trial. The Parties

engaged in good faith negotiations throughout the day, and made much progress but did not ultimately reach a resolution at the mediation on March 24, 2022.

100. On March 25, 2022, Mr. Murphy made a mediator's proposal to resolve the case for $38.875 million – which both sides accepted that same day.

101. The Settlement was memorialized in a binding term sheet executed and finalized on April 26, 2022 (the "Term Sheet"), subject to the execution of a "customary long form" stipulation and agreement of settlement and related papers.

102. On June 17, 2022, the Parties executed the Stipulation and Plaintiffs filed their Unopposed Motion for Preliminary Approval of Settlement. ECFs 122-123.

103. On July 20, 2022, this Court granted Plaintiffs' Motion for Preliminary Approval of Settlement. ECF 128.

## V.   RISKS OF CONTINUED LITIGATION

104. Based on their experience and close knowledge of the facts of the case and law governing the claims, Co-Lead Counsel and Plaintiffs have determined that settlement at this juncture is in the best interests of the Settlement Class. As described herein, at the time the Settlement was reached, there were sizable risks facing Plaintiffs with respect to establishing falsity, scienter, and loss causation. In addition, there were unresolved risks related to class certification and substantial risks in taking this case to trial.

### A.   Risks Related to Falsity and Scienter

105. If the Action had not settled, Defendants would likely have moved for summary judgment on the issues of falsity and scienter and would have vigorously disputed both at trial.

106.    Uniti and the Individual Defendants (both executives at Uniti) have repeatedly made the argument that they believed at the time they made the alleged misstatements and omissions that they were acting legally and properly based on representations they received from well-respected legal counsel and financial advisors who worked on structuring the Spin-Off transaction and Master Lease.  Defendants' evidence that they believed that the statements they made were true and complete posed a risk to Plaintiffs' prevailing both on summary judgment, and at trial, because that evidence arguably undercut any inference that Defendants' statements were false or were made with scienter.

107.    Indeed, in their motion to dismiss, the Defendants argued (though unsuccessfully at the time) that what "Plaintiffs ask the Court [to do is] to conclude that (1) Windstream structured the spinoff and Master Lease in a manner that it knew violated, or likely violated, its debt indentures, leaving an eventual bankruptcy and likely 'financial ruin' . . . all but inevitable; and (2) Uniti not only went along with the supposed charade but, moreover, knew that in any Windstream bankruptcy, Windstream could and would seek to re-characterize the Master Lease as a financing, depriving Uniti of its valuable assets and leaving it at the back of the line in Windstream's allegedly inevitable bankruptcy as an unsecured creditor."  ECF 64 at 26.  According to Defendants, the "more compelling inference" is that "Uniti simply failed to anticipate that a court would conclude that the spinoff violated Windstream's indenture or that Windstream would declare bankruptcy and contend – in direct contravention to all of its prior statements – that the Master Lease was not a true lease."  *Id.*

108.    While Defendants were not successful in this argument at the motion to dismiss stage, they preserved the argument and would likely re-raise it at both summary judgment and trial.  Accordingly, a risk remained that after being presented with all the evidence, the Court would agree that no there was no genuine dispute as to any material fact and that Defendants were entitled to judgment as a matter of law, in this regard.

109.    Moreover, even if Plaintiffs were successful in defeating summary judgment, Defendants would reassert this argument at trial.  To that end, a major risk of continued litigation is that a jury would agree with Defendants that they should not be held liable for failing to anticipate future events – specifically, the outcome of the Aurelius Litigation to which Uniti was not a party, which was brought by a noteholder of Uniti's parent company[9] during the Class Period, and not decided until February 2019, close to the end of the Class Period – and that Uniti and the Individual Defendants were simply relying on the advice of counsel and financial advisors.  A jury could agree with Defendants that Plaintiffs could not prove that Uniti and the Individual Defendants acted with scienter, and that the alleged misstatements and omissions were not false or misleading, two elements of Plaintiffs' claim.

[9]    The Aurelius Litigation, and Judge Jesse Furman's decision in that litigation, is a critical event in this case.  According to the Indenture, any noteholder who owned 25% or more of the notes issued by Windstream could seek to accelerate payments on the notes if the restrictive covenants in the Indenture were breached.  On September 25, 2017, Windstream filed a Form 8-K disclosing that, on September 22, 2017, it had received a "purported notice of default" from a noteholder that claimed to hold greater than 25% of the aggregate principal amount of the Windstream notes.  This noteholder was later disclosed as Aurelius Capital Master, Ltd. ("Aurelius").  Over the next few months, litigation followed (*U.S. Bank N.A. v. Windstream Servs., LLC*, No. 17-cv-07857-JMF (S.D.N.Y.) (the "Aurelius Litigation")) – and on February 15, 2019, Judge Furman ruled against Windstream and found that the Spin-Off and signing of the Master Lease violated the Indenture, triggering the immediate acceleration of over $300 million of Windstream notes due and payable.  This significant and extraordinary liability led to Windstream's bankruptcy, and produced a significant collapse in the price of Uniti's stock.  *See* AC, at ¶¶16-25.

110.    In addition, and relatedly, proof of falsity and scienter here against Defendants are arguably undercut by certain internal documents that were already public at the time of the Amended Complaint, which – according to Defendants – purportedly aid Defendants' argument that both Windstream and Uniti executives did not believe that the Master Lease transaction violated the provisions of the Windstream Indenture.  Defendants, at both summary judgment and trial, would have accumulated the best internal documents they could find to bolster their defense that they believed their statements were true and complete, that they relied on counsel and financial advisors, and, therefore, lacked scienter.

111.    While Plaintiffs had a plan to counter and attack such arguments at both summary judgment and trial, such arguments require complex legal analysis (at summary judgment), and complex factual explanation (at trial), in order to demonstrate that Plaintiffs have met their burden of proof as to both falsity and scienter.  As such, the inherent complexity of this Action raised the risk-profile of continued litigation, especially as it relates to presenting this case before a jury, as discussed *infra* below.

## B.    Risks Related to a Jury Trial

112.    A major risk that Plaintiffs faced in this case was presenting this very factually intricate and complex case to a jury.

113.    To understand even the Master Lease transaction that is the subject of this securities fraud lawsuit would have required explanation of business organizations, debt securities, restrictive covenants, financial valuation, tax issues, REIT structures and benefits, and the extended background in which Defendants structured the transaction, including, but not limited to, the following facts: (i) Windstream Services issued certain unsecured notes on January 23, 2013, which were governed by the provisions and terms of the Indenture; (ii)

Section 4.19 of the Indenture prohibited any of the subsidiaries of Windstream Services from entering into a Sale and Leaseback transaction, and Section 4.09 of the Indenture prohibited certain financing transactions in which the network assets could be used to support additional loans to Windstream;[10] and (iii) in order to acquire more financing the Windstream urgently needed, it entered into the Master Lease transaction, whereby Defendants employed the following strategy to evade the restrictive covenants in the Indenture: (a) Windstream Services created a complicated corporate structure to accommodate the Spin-Off transaction, (b) Windstream Operating Subsidiaries would sell certain network assets to an internally controlled Uniti, which would be "spun-off" from Windstream as an independent public company, and (c) Windstream Holdings (which Defendants would argue is not technically a party to the Indenture and thus not governed by its provisions) would lease the assets back from Uniti at the time of the Spin-Off, in exchange for the needed cash and money in the form of rent payments from Uniti to Windstream. *See* AC, ¶¶68-76.

114. Exemplifying the complexity of the Master Lease transaction and Spin-Off is the 300-page packet of information that attendees of a May 6-7, 2014 Windstream Board meeting were provided with, which included specific outlines of various valuation scenarios, as well as potential financial and economic impacts to Windstream and Uniti as a result of the transaction. *See* AC, ¶82.

115. As such, the preliminary task of explaining the relevant transaction itself posed a risk that members of the jury – who may or may not have financial or business

---

[10]     More specifically, Section 4.09 of the Indenture prohibited Windstream Services and its subsidiaries from incurring any additional debt unless, after giving effect to the additional debt, Windstream kept its "Consolidated Leverage Ratio" below a certain ratio.

organizational experience – would get lost or confused in trying to follow the facts of Plaintiffs' narrative, harming Plaintiffs' chances of success at trial as Plaintiffs bear the burden of proof.

116. Further, and importantly, this securities fraud case is not about the proprietary or impropriety of the Master Lease transaction itself, although this fact is extremely critical and indeed essential to the case. Rather, it is about Defendants' alleged misstatements and omissions in connection with the Master Lease transaction and Spin-Off both at the time of the transaction in April 2015 and during the Class Period.

117. As such, Plaintiffs would have needed to persuasively explain to a jury not only the backdrop of the Master Lease and Spin-Off, but then connect those facts to Defendants' alleged misstatements and omissions related to the restrictive covenants in the Indenture.

118. To prevail, Plaintiffs would need to prove: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . .; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." *See* ECF 66 at 17 (Plaintiffs' Opposition to Defendants' MTD) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (internal citations and quotations omitted)). Each of these elements presents an opportunity for Defendants to attack Plaintiffs' securities fraud case at trial.

119. Of course, even if Plaintiffs were successful in obtaining a jury verdict awarding damages on all or part of their claims, it was a foregone certainty that a jury verdict would have been just the beginning of a long and arduous post-trial and appellate process.

Given the novelty of the issues concerning falsity, scienter, and loss causation, an appellate process, with the possibility of reversal, presented a very real hurdle to obtaining a recovery for the class.

**C.      Risks Related to Class Certification, Loss Causation and Damages**

120.    Defendants challenged class certification on several grounds, and each posed at least some risk to Plaintiffs' ability to secure class certification. ECF 105. Defendants argued that Plaintiffs' showing of market efficiency, as to Uniti's options, suffered from numerous deficiencies. Plaintiffs did not view these arguments as especially significant, but nevertheless recognize that Defendants could have prevailed on certain of these arguments or in an appeal of a grant of class certification. Additionally, Defendants claimed that they successfully showed the prices of Uniti securities were not impacted by the alleged false or misleading statements, thus preventing Plaintiffs from proving Rule 23's predominance requirement.

121.    Defendants also argued that Plaintiffs' damages and economics expert, Mr. Coffman, did not provide an adequate damages model based upon Plaintiffs' "materialization of the risk" theory of loss causation. *See id.* at 19.

122.    Defendants also challenged Plaintiffs' adequacy to represent the class, and again, Plaintiffs viewed these arguments as posing minor, but not entirely irrelevant, risks.

123.    More significant however, was the threat of reduced damages or class size (either as a result of class certification or summary judgment) based upon Defendants' framing of the issues in their Opposition to Class Certification. *See* ECF 105. According to Defendants, Plaintiffs alleged "three distinct theories of liability," which they referred to as

- 37 -

(1) the Sale-Leaseback Theory, (2) the True Lease Theory, and (3) the Navigating the Bankruptcy Theory. Each "theory," according to Defendants, corresponded to a different time frame and warranted a different analysis of the *Basic* presumption of reliance. While Plaintiffs believe they persuasively countered this disjointing of the loss causation theory of liability in the Action, *see* ECF 115 at 12 (citing to Mr. Coffman's deposition testimony which affirmed Plaintiffs' single theory of liability), there nevertheless remained a significant risk that the Court at class certification would have adopted Defendants' framework and thus have reduced the length of the Class Period.

124. In addition, there remained a real risk that certain of the corrective disclosures (*i.e.*, August 3, 2017, September 25, 2017, February 15, 2019, and June 24, 2019) would not have survived class certification or summary judgment, thus potentially reducing damages. Indeed, throughout the case, Defendants maintained that even if Plaintiffs were to prove their case and certify a class, any realistic damages figure would be small, or worse, nonexistent. Defendants argued that the four disclosures identified herein either had no connection to the alleged misrepresentations or omissions or revealed no new factual information regarding the alleged omissions or hidden risks. Thus, Defendants argued, Plaintiffs would be unable to prove loss causation with respect to these disclosures and, would be unable to recover damages in connection with the alleged stock drops on the disclosure dates. Defendants also argued that almost all of the alleged four disclosures involved events that primarily impacted Windstream's financial condition (as opposed to Uniti's) and the fact that Uniti's stock price fell in response, was not the result of fraud. Again, while Plaintiffs believe that they had adequately and effectively advocated that Defendants did not meet their burden at class

certification in demonstrating a lack of price impact for each of the disclosure dates, there remained a risk that the Court would disagree as to some of the dates.

125. Finally, disaggregation of damages posed a risk at the class certification stage, which, if credited, would have materially decreased the damages available to the class.

126. Plaintiffs' loss causation and damages expert analyzed information released on each alleged disclosure date, the timing of the news or earnings release, analyst discussions about the new information, identification of potential confounding information, and the market reaction to the disclosures – while also performing a conservative event study to isolate the impact of new information on Uniti's stock price while controlling for industry and market influences. Using an Institutional and Proportional Two-Trader Model, and without netting pre-Class Period gains, Plaintiffs' loss causation and damages expert estimated total damages of at least $1.3 billion based on statistically significant abnormal stock-price declines on: (i) August 3, 2017, (ii) September 26, 2017, (iii) February 19, 2019, and (iv) June 25, 2019, all of which Plaintiffs alleged were attributable to Defendants' fraudulent conduct. Accordingly, the $38.875 million Settlement Amount represents approximately 3% of Plaintiffs' expert's estimation of likely recoverable damages, assuming none of Defendants' challenges were successful.

127. Given all the above risks, including the risks posed at class certification, summary judgment, and trial, Plaintiffs believe that settlement of the Action at this stage of the litigation, after nearly all of fact discovery has been completed and prior to a determination of class certification and summary judgment, is appropriate and in the best

interests of the Settlement Class in order to effectuate the greatest recovery for the Settlement Class.

## VI.    PLAINTIFFS' COMPLIANCE WITH PRELIMINARY APPROVAL ORDER AND REACTION OF THE SETTLEMENT CLASS TO DATE

128.    Pursuant to the Preliminary Approval Order, ECF 128, the Court appointed Kurtzman Carson Consultants LLC ("KCC") as Claims Administrator in the Action.  KCC was instructed to disseminate copies of the Notice of Pendency and Proposed Settlement of Class Action and Motion for Attorneys' Fees and Expenses ("Notice") and Proof of Claim and Release Form ("Claim Form") (collectively the "Notice Packet") by mail and to publish the Summary Notice of Pendency and Proposed Settlement of Class Action and Motion for Attorneys' Fees and Expenses ("Summary Notice").

129.    The Notice, attached as Exhibit A to the Declaration of Lance Cavallo Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; (C) Establishment of the Telephone Hotline; (D) Establishment of the Settlement Website; and (E) Report on Requests for Exclusion Received to Date, dated September 29, 2022 ("Mailing Decl." or "Mailing Declaration") (Exhibit 4 hereto), provides potential Settlement Class Members with information about the terms of the Settlement and contains, among other things: (i) a description of the Action and the Settlement; (ii) the terms of the proposed Plan of Allocation for calculating claims; (iii) an explanation of Settlement Class Members' right to participate in the Settlement; (iv) an explanation of Settlement Class Members' rights to object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or exclude themselves from the Settlement Class; and (v) the manner for submitting a Claim Form in order to be eligible for a payment from the net proceeds of

the Settlement.  The Notice also informs Settlement Class Members of Co-Lead Counsel's intention to apply for an award of attorneys' fees in an amount not to exceed 30% of the Settlement Fund and for payment of litigation expenses in an amount not to exceed $1.6 million.

130.   As detailed in the Mailing Declaration, KCC mailed Notice Packets to potential Settlement Class Members as well as banks, brokerage firms, and other third-party nominees whose clients may be Settlement Class Members.  Ex. 4 at ¶¶2-7.  In total, to date, KCC has mailed 356,402 Notice Packets to potential nominees and Settlement Class Members by first-class mail, postage prepaid.  *Id.* at ¶8.  To disseminate the Notice, KCC obtained the names and addresses of potential Settlement Class Members from the transfer agent of Uniti and banks, brokers, and other nominees whose clients may be Settlement Class Members.  *Id.* at ¶¶3-4.

131.   On August 17, 2022, KCC caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over the internet using *PR Newswire*.  *Id.* at ¶9 and Ex. B thereto.

132.   KCC also maintains and posts information regarding the Settlement on a dedicated website, www.UnitiGroupSecuritiesLitigation.com, to provide Settlement Class Members with information concerning the Settlement, as well as downloadable copies of the Notice Packet and the Stipulation.  *Id*. at ¶11.

133.   Pursuant to the terms of the Preliminary Approval Order, the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement Class is

October 14, 2022. To date, no objections have been received and only six requests for exclusion have been received. *Id*. at ¶13.

134. Should any objections or additional requests for exclusion be received, Plaintiffs will address them in their reply papers, which are due to be filed with the Court on October 28, 2022.

## VII.    THE PLAN OF ALLOCATION FOR DISTRIBUTION OF SETTLEMENT PAYMENTS

135. Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form, including all required information, postmarked or submitted online no later than December 1, 2022. As provided in the Notice, after deduction of Court-awarded attorneys' fees and expenses, Notice and Administration Expenses, and all applicable Taxes, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the plan of allocation approved by the Court (the "Plan of Allocation").

136. The proposed Plan of Allocation, which is set forth in full in the Notice (Ex. 4-A), was designed to achieve an equitable and rational distribution of the Net Settlement Fund. Co-Lead Counsel developed the Plan of Allocation in close consultation with Plaintiffs' damages expert and believe that the plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

137. The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on their "Recognized Claims," calculated according to the Plan's formulas, which are consistent with the Plaintiffs' theories

of liability and alleged damages under the Exchange Act. These formulas consider the amount of alleged artificial inflation in the prices of Uniti securities as estimated by Plaintiffs' expert.

138. Claimants will be eligible for a payment based on when they purchased, acquired, held, or sold their Uniti Securities. The Court-approved Claims Administrator, under Co-Lead Counsel's direction, will calculate claimants' Recognized Claims using the transactional information provided in their Claim Forms. Claims may be submitted to the Claims Administrator through the mail, online using the settlement website, or for large investors with hundreds or thousands of transactions, through email to KCC's electronic filing team. (Neither the Parties nor the Claims Administrator independently have claimants' transactional information.) Lead Plaintiffs' losses will be calculated in the same manner.

139. Once the Claims Administrator has processed all submitted claims and provided claimants with an opportunity to cure deficiencies or challenge rejection determinations, payments will be made to eligible Authorized Claimants using checks and, in some instances, wire transfers. After an initial distribution, if there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise) after a reasonable period of time from the date of initial distribution, Co-Lead Counsel will, if feasible and economical, re-distribute the balance among Authorized Claimants who have cashed their checks. Re-distributions will be repeated until the balance in the Net Settlement Fund is no longer economically feasible to distribute. Any balance that remains in the Net Settlement Fund after re-distribution(s), which is not economical to reallocate, after payment of any outstanding Notice and Administration Expenses or Taxes, will be donated to one or

more non-profit and non-sectarian organizations unaffiliated with Defendants' Counsel, Plaintiffs' Counsel, or the Parties. *Id.*

140. To date, there have been no objections to the Plan of Allocation.

141. In sum, the proposed Plan of Allocation, developed in consultation with Plaintiffs' damages expert, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants. Accordingly, Co-Lead Counsel respectfully submit that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

## VIII. CO-LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

### A. Relevant Factors Justify an Award of a 30% Fee

142. Consistent with the Notice to the Settlement Class, Co-Lead Counsel seek, on behalf of Plaintiffs' Counsel, a fee award of 30% of the Settlement Fund *i.e.*, $11,662,500, plus accrued interest. Any fee allocations among Plaintiffs' Counsel will in no way increase the fees that are deducted from the Settlement Fund, and no other attorneys will share the awarded attorneys' fees. Co-Lead Counsel also request payment of litigation expenses in connection with the prosecution of the Action from the Settlement Fund in the amount of $1,305,093.51, plus accrued interest.

143. Co-Lead Counsel submit that, for the reasons discussed below and in the accompanying Memorandum of Law in Support of Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4), such awards would be reasonable and appropriate under the circumstances before the Court.

- 44 -

### 1.    Plaintiffs Support the Fee and Expense Application

144.    Plaintiffs have evaluated and fully support the Fee and Expense Application. *See* Local 449 Decl., ¶¶11-13; Wayne County ERS Decl., ¶¶11-13; and McMurray Decl., ¶¶10-11 (Exs. 1-3 hereto).  In coming to this conclusion, Plaintiffs – who were involved throughout the prosecution of the Action and negotiation of the Settlement – considered the recovery obtained as well as Plaintiffs' Counsel's vigorous prosecution of the claims to obtain a favorable recovery.  *Id.*

### 2.    The Time and Labor of Plaintiffs' Counsel

145.    The investigation, prosecution, and settlement of the claims asserted in the Action required diligent efforts on the part of Plaintiffs' Counsel.  The many tasks undertaken by Plaintiffs' Counsel in this case are detailed above.

146.    Among other efforts, Plaintiffs' Counsel conducted a comprehensive investigation in connection with the preparation of the amended complaints, including reviewing trial testimony and exhibits in the Aurelius Litigation pending before the Honorable Jesse Furman in the United States District Court for the Southern District of New York; opposed Defendants' motion to dismiss; engaged in rigorous class, fact, and expert discovery efforts; fully briefed class certification; and undertook an extensive settlement process with experienced defense counsel and a preeminent mediator.  At all times throughout the pendency of the Action, Plaintiffs' Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the class, whether through settlement or trial.

147.    Attached hereto are counsel declarations, which are submitted in support of the request for an award of attorneys' fees and payment of litigation expenses.  *See* Declaration

of Debra J. Wyman on Behalf of Robbins Geller Rudman & Dowd LLP (Ex. 7); Declaration of Christine M. Fox on Behalf of Labaton Sucharow LLP (Ex. 8); Declaration of Ex Kano S. Sams II Filed on Behalf of Glancy Prongay & Murray LLP (Ex. 9); Declaration of Geoffrey Culbertson on Behalf of Patton Tidwell & Culbertson, LLP (Ex. 10).

148.    Included with these declarations are schedules that summarize the time of each firm, as well as each firm's litigation expenses by category (the "Fee and Expense Schedules").[11]  The attached declarations and the Fee and Expense Schedules report the amount of time spent by Plaintiffs' Counsel and professional support staff and the "lodestar" calculations, *i.e.*, their hours multiplied by their current hourly rates.  As explained in each declaration, they were prepared from daily time records regularly prepared and maintained by the respective firms.

149.    The hourly rates of Plaintiffs' Counsel here range from $400 to $1,350 for partners, $625 to $1,050 for of-counsel attorneys, and $175 to $550 for associates and staff attorneys.  *See* Exs. 7-A; 8-A; 9-A; 10- A.  It is respectfully submitted that the hourly rates for attorneys and professional support staff included in these schedules are reasonable and customary within the securities class action bar.  Ex. 5, attached hereto, are tables of hourly rates for defense firms doing comparably complex commercial litigation compiled by Labaton Sucharow from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2021.  The analysis shows that across all types of attorneys, Plaintiffs' Counsel's rates are consistent with, or lower than, the firms surveyed.

---

[11]    Attached hereto as Ex. 6 is a summary table of the lodestars and expenses of Plaintiffs' Counsel.

150.    Plaintiffs' Counsel have collectively expended 13,886.30 hours prosecuting the Action.  *See* Ex. 6.  The resulting collective "lodestar" is $7,746,162.00.  *Id*.  The requested fee of $11,662,500 (30% of the Settlement Fund) results in a slight "multiplier" of 1.5 on Plaintiffs' Counsel's lodestar.

### 3.    The Standing and Expertise of Co-Lead Counsel

151.    The expertise and experience of Co-Lead Counsel are described in Exs. 7-E & 8-F, annexed hereto.

152.    Since the passage of the PSLRA, Labaton Sucharow has been approved by numerous courts to serve as lead counsel in notable securities class actions throughout the United States, and has taken three of the approximately 21 post-PSLRA securities class actions to trial.  Here, Labaton Sucharow attorneys have devoted considerable time and effort to this case, thereby bringing to bear many years of collective experience.  For example, Labaton Sucharow served as lead counsel in:  *In re Am. Int'l Grp, Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1501 (N.D. Ala.) (representing the State of Michigan Retirement System, New Mexico State Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); *In re Countrywide Sec. Litig.*, No. 07-5295 (C.D. Cal.) (representing the New York State and New York City Pension Funds and reaching settlements of more than $600 million); *In re Schering-Plough Corp. /ENHANCE Sec. Litig.*, No. 08-397 (D.N.J.) (representing Massachusetts Pension Reserves Investment Management Board and reaching a settlement of $473 million).  *See* Ex. 8-F.

153.   Robbins Geller has successfully obtained some of the largest recoveries in history, including *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex.) ($7.2 billion recovery, which is the largest ever in a securities class action); *Jaffe v. Household Int'l, Inc.*, No. 02-C-05893 (N.D. Ill.) ($1.575 billion settlement, the largest ever following a securities fraud class action trial, the largest securities fraud settlement in the Seventh Circuit); *In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, No. 3:15-cv-07658 (D.N.J.) (approval of a $1.2 billion settlement); *In re Am. Realty Capital Props., Inc. Litig.*, No. 1:15-mc-00040 (S.D.N.Y.) ($1.025 billion settlement); and *In re UnitedHealth Group Inc. PSLRA Litig.*, No. 06-cv-1691 (D. Minn.) ($925 million settlement, the largest stock option backdating recovery). *See* Ex. 7-E

### 4.   Standing and Caliber of Opposing Counsel

154.   The quality of the work performed by Plaintiffs' Counsel in attaining the Settlement should also be evaluated in light of the quality of opposing counsel.  Here, Defendants were represented by one of the most preeminent defense firms in the country: Davis Polk & Wardwell LLP.  Defense counsel in this case are highly skilled and experienced securities attorneys with vast resources.  In the face of this knowledgeable and formidable defense, Plaintiffs' Counsel were nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle on terms that are favorable to the Settlement Class.

### 5.   The Contingency Risk Faced by Plaintiffs' Counsel

155.   From the outset, Co-Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that

responsibility Co-Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable costs that a case such as this requires.  With an average time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Plaintiffs' Counsel received no compensation during the course of the Action but incurred more than 13,885 hours of time for a total lodestar of $7,746,162.00 and incurred $1,305,093.51 in expenses in prosecuting the Action for the benefit of the Settlement Class.

156.   Co-Lead Counsel know from experience that the commencement of a class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels.  Co-Lead Counsel are aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.

157.   Federal circuit court cases include numerous opinions affirming dismissals with prejudice in securities cases.  The many appellate decisions affirming summary judgment dismissals show that even surviving a motion to dismiss is not a guarantee of recovery.  *See, e.g.*, *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Silicon Graphics Sec. Litig.*, 183

F.3d 970 (9th Cir. 1999); *Phillips v. Scientific-Atlanta, Inc.*, 489 F. App'x. 339 (11th Cir. 2012); *In re Smith & Wesson Holding Corp. Sec. Litig*, 669 F.3d 68 (1st Cir. 2012); *In re Digi Int'l Inc. Sec. Litig.*, 14 F. App'x. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001).

158. Successfully opposing a motion for summary judgment is also not a guarantee that plaintiffs will prevail at trial. While only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007) (tried by Labaton Sucharow), or substantially lost as to the main case, such as *In re Clarent Corp. Securities Litigation*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005).

159. Even plaintiffs who succeed at trial may find their verdict overturned by a post-trial motion for a directed verdict or on appeal. *See, e.g.*, *In re BankAtlantic Bancorp, Inc.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2010) (in case tried by Labaton Sucharow, after plaintiffs' jury verdict, court granted defendants' motion for judgment as a matter of law on loss causation grounds), *aff'd*, 688 F. 3d 713 (11th Cir. 2012) (trial court erred, but defendants entitled to judgment as matter of law on lack of loss causation); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury verdict for securities fraud); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Glickenhaus & Co., et al. v. Household Int'l, Inc., et al.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135

(2011)); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice).  And, the path to maintaining a favorable jury verdict can be arduous and time consuming.  *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, 2010 WL 5927988 (9th Cir. June 23, 2010) (trial court rejecting unanimous verdict for plaintiffs, which was later reinstated by the Ninth Circuit Court of Appeals) and judgment re-entered (*id*.) after denial by the Supreme Court of the United States of defendants' Petition for Writ of Certiorari (*Apollo Grp. Inc. v. Police Annuity and Benefit Fund*, 562 U.S. 1270 (2011)).

160.    As discussed in greater detail above, Plaintiffs' success was by no means assured.  Defendants strongly disputed whether Plaintiffs could establish falsity, scienter, and loss causation.  In addition, Defendants would no doubt have contended, as the case proceeded to summary judgment, that even if liability existed, the amount of damages was substantially lower than Plaintiffs alleged.  Were this Settlement not achieved, Plaintiffs and Plaintiffs' Counsel faced potentially years of costly and risky trial and appellate litigation against Defendants, with ultimate success far from certain and the significant prospect of no recovery.  Further, prolonged litigation would likely quickly result in the wasting of insurance coverage for the claims.

### B.    Request for Litigation Expenses

161.    Co-Lead Counsel seek payment from the Settlement Fund of litigation expenses, which were reasonably and necessarily incurred in connection with commencing and prosecuting the claims against Defendants.

162.    As set forth in the Fee and Expense Schedules and the Summary Table of Lodestar and Expenses, Plaintiffs' Counsel's litigation expenses in connection with the

prosecution of the Action total $1,305,093.51.  *See* Ex. 6 (Summary Table).  As attested to, these expenses are reflected on the books and records maintained by each firm.  These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of counsel's expenses.  The expenses are set forth in detail in Plaintiffs' Counsel's declarations, which identify the specific category of expense –*e.g.*, experts' fees, mediation fees, travel costs, online/computer research, and duplicating.

163.    From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved.  Thus, Plaintiffs' Counsel were motivated to take steps to manage expenses without jeopardizing the vigorous and efficient prosecution of the case. Co-Lead Counsel maintained control over the primary expenses in the Action by managing a joint litigation fund ("Joint Litigation Expense Fund" or "Litigation Fund").  Labaton Sucharow and Robbins Geller collectively contributed $987,000 to the Joint Litigation Expense Fund.  A description of the expenses incurred by the Litigation Fund by category is included in the individual firm declaration submitted on behalf of Labaton Sucharow.  *See* Ex. 8 at ¶6(g) and Ex. E.

164.    Plaintiffs' Counsel's expenses include fees and costs for, among other things: (i) experts and consultants in connection with various stages of the litigation; (ii) establishing and maintaining a database to house the documents produced in discovery; (iii) deposition-related expenses; (iv) online factual and legal research; (v) mediation; and (vi) document reproduction.  Courts have consistently found that these kinds of expenses are payable from a fund recovered by counsel for the benefit of a class.

165.    Much of Plaintiffs' Counsel's expenses were for the fees of Plaintiffs' experts ($1,072,693.71 or 82% of total expenses).  *See* Ex. 7 at ¶6(d) & Ex. 8 at ¶7(c).  As noted above, Co-Lead Counsel consulted with experts in the fields of:  (i) Federal Income Tax and Real Estate Investment Trusts, (ii) accounting and valuation, and (iii) market efficiency, loss causation and damages.  Plaintiffs' Counsel utilized these experts and consultants in connection with class certification, to assist with discovery and provide expert opinion, in preparation for mediation, and in connection with the development of the proposed Plan of Allocation.  These experts and consultants were essential to the prosecution of the Action.

166.    Another substantial component of Plaintiffs' Counsel's expenses (*i.e.*, $65,062.25, or approximately 5% of the total expenses) was the cost of court reporters, videographers, and transcripts in connection with the depositions counsel took or defended during the course of the Action.  *See* Ex. 7 at ¶6(c) & Ex. 8 at ¶7(b).

167.    The next largest expense (*i.e.*, $48,047.20, or approximately 3% of Plaintiffs' Counsel's total expenses) was for document hosting and management/litigation support.  Robbins Geller hosted the document production using a platform called Relativity, and maintained the approximately 1.3 million pages of documents produced by Defendants and third parties so they would be efficiently reviewed and shared by Plaintiffs' Counsel.  Hosting the documents internally was a significant cost saving measure.

168.    Lead Counsel also used two outside e-discovery vendors to gather and host the collections and production from Plaintiffs Local 449 and McMurray (using the Meta-E platform) and for Wayne County ERS (using the Driven platform).  Documents produced by non-party Windstream were hosted by e-discovery vendor Disco.  *See* Ex. 8 at ¶6(d).

169.     Because of the COVID-19 pandemic, travel expenses were significantly less than in a typical securities case involving events and potential witnesses across and outside the U.S.  However, notwithstanding the pandemic, some travel was required – including, but not limited to, travel:  (i) from New York to Detroit and Pittsburgh in connection with the in-person preparation with Plaintiffs for their depositions and for case update meetings; and (ii) for Plaintiffs' counsel and certain of the Plaintiffs to attend the mediation in New York on March 24, 2022.  Travel costs in connection with the Action and costs related to working meals, lodging, and transportation, total $25,481.44.

170.     Plaintiffs' Counsel also incurred a total of $20,000 in connection with the mediation sessions with David Murphy.  Ex. 8 at ¶7(a).

171.     Plaintiffs' Counsel's expenses also include the costs of computerized research services such as Lexis, Westlaw, and PACER in the amount of $25,819.55. It is standard practice for attorneys to use online services to assist them in researching legal and factual issues, and indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the class.

172.     The other expenses for which Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged in non-contingent cases.  These expenses include, among others, court fees, duplicating costs, long-distance and conference calling, and postage and delivery expenses.  All of the litigation expenses incurred by Plaintiffs' Counsel were reasonable and necessary for the successful litigation of the Action.

## C.    Reimbursement to Plaintiffs Pursuant to PSLRA

173.    The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class."  15 U.S.C. §78u-4(a)(4).  Accordingly, Plaintiffs Local 449, Wayne County ERS, and Mr. McMurray seek reimbursement of their reasonable costs incurred directly for their work representing the Settlement Class.

174.    Specifically, Plaintiff Local 449 seeks reimbursement of $3,010 based on 43 hours expended in connection with the Action.  *See* Local 449 Decl., Ex. 1 at ¶¶7-9.  Wayne County ERS seeks reimbursement of $6,024.44 based on 79.3 hours expended in connection with the Action.  *See* Wayne County ERS Decl., Ex. 2 at ¶¶7-9.  And Mr. McMurray seeks reimbursement of $10,000 based on 104 hours expended in connection with the Action.  *See* McMurray Decl., Ex. 3 at ¶¶7-8.

175.    As discussed in Plaintiffs' supporting declarations, each Plaintiff actively and effectively fulfilled their obligations as a representative of the class, complying with all of the many demands placed upon them during the litigation and settlement of the Action, and providing valuable assistance to Plaintiffs' Counsel.  Each (i) regularly communicated with Co-Lead Counsel regarding the posture and progress of the Action; (ii) reviewed and/or discussed significant pleadings, motions, and briefs filed in the Action; (iii) produced documents and written discovery responses to Defendants; (iv) prepared for and virtually participated in depositions; and (v) evaluated and approved the proposed Settlement.  Exs. 1-3.  With respect to the mediation, two Wayne County ERS representatives attended along with counsel for Local 449, Wayne County ERS, and Mr. McMurray.  These efforts required

representatives of Plaintiffs to dedicate time and resources to the Action that they would have otherwise devoted to their regular duties, and are precisely the types of activities courts have found to support reimbursement to class representatives, and fully support the request for reimbursement here.

**D.     The Reaction of the Settlement Class to the Fee and Expense Application**

176.    As mentioned above, consistent with the Preliminary Approval Order, a total of 356,402 Notices have been mailed to potential Settlement Class Members advising them that Co-Lead Counsel would seek an award of attorneys' fees not to exceed 30% of the Settlement Fund, and payment of expenses in an amount not greater than $1.6 million. *See* Ex. 4.

177.    Additionally, the Summary Notice was published in *The Wall Street Journal* and disseminated over *PR Newswire*. *Id.* at ¶9. The Notice and the Stipulation have also been available on the website maintained by the Claims Administrator. *Id.* at ¶11.[12]

178.    While the deadline set by the Court for Settlement Class Members to object to the requested fees and expenses has not yet passed, to date no objections have been received.

179.    The Settlement Class here has also been ably represented with respect to fees by Lead Plaintiffs Local 449, Wayne County ERS, and Mr. McMurray. Two out of the three Plaintiffs are experienced public pension funds that have considered the fee request and believe it to be fair and reasonable. *See* Exs. 1-2. Mr. McMurray also has considered the fee request and he believes it to be fair and reasonable. *See* Ex. 3.

---

[12]    Plaintiffs' motion for approval of the Settlement and Co-Lead Counsel's motion for an award of attorneys' fees and expenses will also be posted on the Settlement website.

180.    Co-Lead Counsel will respond to any objections received in their reply papers, which are due on October 28, 2022.

## IX.    MISCELLANEOUS EXHIBITS

181.    Attached hereto as Ex. 11 is a true and correct copy of Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements – 2021 Review and Analysis* (Cornerstone Research 2022).

## X.    CONCLUSION

182.    In view of the excellent recovery for the Settlement Class and the substantial risks of this litigation, as described above and in the accompanying memorandum of law, Plaintiffs and Co-Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of Allocation should likewise be approved as fair, reasonable, and adequate.  In view of the recovery in the face of substantial risks, the quality of work performed, the contingent nature of the fee, and the standing and experience of Co-Lead Counsel, as described above and in the accompanying memorandum of law, Co-Lead Counsel respectfully submit that a fee in the amount of 30% be awarded, that litigation expenses in the amount of $1,305,093.51 be awarded, and that Plaintiffs be awarded a total of $19,034.44, pursuant to the PSLRA.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in New York, New York this 30th day of September, 2022.

_____
CHRISTINE M. FOX

I declare under penalty of perjury that the foregoing is true and correct.  Executed in San Diego, California this 30th day of September, 2022.

_____
DEBRA J. WYMAN